# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HON. BENNIE G. THOMPSON, *in his personal capacity*, 2466 Rayburn House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |
| | Civil Action No. 1:21-CV-400-APM |
| HON. KAREN R. BASS, *in her personal capacity,* 2021 Rayburn House Office Building U.S. House Representatives Washington, DC 20515, | ) ) ) ) ) ) ) AMENDED COMPLAINT ) ) JURY TRIAL REQUESTED ) |
| HON. STEPHEN I. COHEN, *in his personal capacity*, 2104 Rayburn House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |
| HON. VERONICA ESCOBAR, *in her personal capacity,* 1505 Longworth House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |
| HON. PRAMILA JAYAPAL*, in her personal capacity,* 2346 Rayburn House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |
| HON. HENRY C. JOHNSON, JR., *in his personal capacity*, 2400 Rayburn House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |
| HON. MARCIA C. KAPTUR, *in her personal capacity,* 2186 Rayburn House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) |

HON. BARBARA J. LEE, *in her personal capacity,*
2470 Rayburn House Office Building
U.S. House of Representatives
Washington, DC 20515,                                    )
                                                          )
                                                          )
                                                          )
                                                          )
                                                          )
HON. JERROLD NADLER, *in his personal capacity,*
2132 Rayburn House Office Building
U.S. House of Representatives
Washington, DC 20515,                                    )
                                                          )
                                                          )
                                                          )
                                                          )
                                                          )
HON. MAXINE WATERS, *in her personal capacity,*
2221 Rayburn House Office Building
U.S. House of Representatives
Washington, DC 20515,                                    )
                                                          )
                                                          )
                                                          )
                                                          )
                                                          )
HON. BONNIE M. WATSON COLEMAN, *in her personal capacity*,
168 Cannon House Office Building
U.S. House of Representatives
Washington, DC 20515                                     )
                                                          )
                                                          )
                                                          )
                                                          )
                                                          )
Plaintiffs,                                               )
                                                          )
v.                                                        )
                                                          )
DONALD J. TRUMP, *solely in his personal capacity*
Mar-A-Lago
1100 S. Ocean Blvd.
Palm Beach, Florida 33480-5004,                          )
                                                          )
                                                          )
                                                          )
                                                          )
                                                          )
RUDOLPH W. GIULIANI,
Rudolph W Giuliani, PLLC
445 Park Ave FL 18
New York, NY 10022-2606,                                 )
                                                          )
                                                          )
                                                          )
                                                          )
OATH KEEPERS,
Attn: Stewart Rhodes
1030 E. Hwy 377
Ste 110-285
Granbury, TX 76048
4625 West Nevso Drive, Suite 2 & 3                       )
                                                          )
                                                          )
                                                          )
                                                          )
                                                          )

Las Vegas, NV, 89103, and                          )
                                                    )
PROUD BOYS INTERNATIONAL, L.L.C.,                   )
c/o Jason L. Van Dyke                               )
108 Durango Dr., Crossroads, TX, 76227,             )
                                                    )
WARBOYS LLC,                                        )
Attn: Enrique Tarrio                                )
5730 NW 2nd Street                                  )
Miami, Florida 33126,                               )
                                                    )
ENRIQUE TARRIO                                      )
5730 NW 2nd Street                                  )
Miami, Florida 33126                                )
                                                    )
Defendants.                                         )
_____              )

# TABLE OF CONTENTS

Page

JURISDICTION AND VENUE ................................................................. 3

THE PARTIES .......................................................................................... 4

STATEMENT OF FACTS ........................................................................ 10

I.  Defendant Trump Laid the Groundwork for the January 6 Attack by
    Praising Violent Supporters ........................................................ 10

II. Defendants Trump and Giuliani Mobilized Violent Supporters with a
    Misinformation Campaign ............................................................ 11

III. Defendant Trump Encouraged Violence Against Officials Who Refused to
     Lie About the Election Results ................................................... 14

IV. In December 2020 and January 2021, Defendants' Plans for the January 6
    Insurrection Took Shape .............................................................. 16

V.  By January 5, 2021, Defendants Were Poised for the Violent Insurrection ........ 21

VI. The Morning of January 6, 2021, Defendants Attempted to Execute a
    Multi-Faceted Campaign to Prevent Congress from Certifying the Election
    Results ........................................................................................... 21

VII. Defendants Proud Boys and Oath Keepers and Their Co-Conspirators
     Invaded the Capitol ..................................................................... 26

VIII. A Bipartisan Group of Officials Recognize Defendant Trump's
      Culpability for the January 6 Assault on the Capitol .............. 37

IX. Plaintiffs Were Injured by Defendants' Conduct ...................... 39

a. The Honorable Bennie Thompson ............................................. 39

b. The Honorable Karen Bass ......................................................... 41

c. The Honorable Stephen Cohen ................................................... 42

d. The Honorable Veronica Escobar ............................................... 43

e. The Honorable Pramila Jayapal ................................................... 46

f. The Honorable Henry C. "Hank" Johnson, Jr. .......................... 50

# TABLE OF CONTENTS

Page

g.    The Honorable Marcy Kaptur ............................................................... 52

h.    The Honorable Barbara Lee ................................................................. 54

i.    The Honorable Jerrold Nadler ............................................................. 56

j.    The Honorable Maxine Waters ............................................................ 57

k.    The Honorable Bonnie Watson Coleman ........................................... 58

CAUSE OF ACTION ......................................................................................... 60

PRAYER FOR RELIEF ..................................................................................... 62

1.      On and before January 6, 2021, the Defendants Donald J. Trump, Rudolph W.
Giuliani, Proud Boys, and Oath Keepers conspired to incite an assembled crowd to march upon
and enter the Capitol of the United States for the common purpose of disrupting, by the use of
force, intimidation, and threat, the approval by Congress of the count of votes cast by members
of the Electoral College as required by Article II, Section 1 and the Twelfth Amendment of the
United States Constitution.  In doing so, the Defendants each intended to prevent, and ultimately
delayed, members of Congress from convening and discharging their duty commanded by the
United States Constitution to approve the results of the Electoral College in order to elect the
next President and Vice President of the United States.

2.      Plaintiffs, the Honorable Bennie G. Thompson, the Honorable Karen Bass, the
Honorable Stephen Cohen, the Honorable Veronica Escobar, the Honorable Pramila Jayapal, the
Honorable Henry C. Johnson, Jr., the Honorable Marcy Kaptur, the Honorable Barbara Lee, the
Honorable Jerrold Nadler, the Honorable Maxine Waters, and the Honorable Bonnie Watson
Coleman, all Members of the United States House of Representatives, bring this action against
the Defendants for conspiring to prevent them and other members of Congress from discharging
these official duties, in violation of 42 U.S.C. § 1985(1).  Enacted as the "Ku Klux Klan Act" in
1871, Section 1985(1) was intended to protect against conspiracies that, by force, intimidation,
or threat, sought to prevent members of Congress from discharging their official duties.  The
statute was enacted in response to violence and intimidation in which the Ku Klux Klan and
other organizations were engaged during that time period.

3.      The Defendants conspired to prevent, by force, intimidation, and threats, the
Plaintiffs, as members of Congress, from discharging their official duties to approve the count of

votes cast by members of the Electoral College following the presidential election held in November 2020.

4.     In furtherance of this common goal of preventing the timely approval of the Electoral College vote count, the Defendants acted in concert to incite and then carry out a riot at the Capitol by promoting an assembly of persons to engage in tumultuous and violent conduct or the threat of it that created grave danger of harm to the Plaintiffs and to other members of Congress.

5.     This conduct jointly undertaken to threaten the Plaintiffs and other members of Congress in order to disrupt the Electoral College vote count was part of an ongoing course of action pursued by the Defendants for the purpose of contesting the announced results of the presidential election held in November 2020 and preventing the duly elected President and Vice President from attaining approval by Congress of their election necessary to their inauguration.

6.     The insurrection at the Capitol was a direct, intended, and foreseeable result of the Defendants' unlawful conspiracy.  It was instigated according to a common plan that the Defendants pursued since the election held in November 2020, culminating in an assembly denominated as the "Save America" rally held at the Ellipse in Washington, D.C. on January 6, 2021, during which Defendants Trump and Giuliani incited a crowd of thousands to descend upon the Capitol in order to prevent or delay through the use of force and intimidation the counting of Electoral College votes in the hope that Defendants could achieve a different outcome of the election.  As part of this unified plan to prevent the counting of Electoral College votes, Defendants Proud Boys and Oath Keepers, through their leadership, acted in concert to spearhead the assault on the Capitol while the angry mob that Defendants Trump and Giuliani incited descended on the Capitol.  The carefully orchestrated series of events that unfolded at the

Save America rally and the storming of the Capitol was no accident or coincidence.  It was the intended and foreseeable culmination of a carefully coordinated campaign to interfere with the legal process required to confirm the tally of votes cast in the Electoral College.

7.     While not all of the Defendants in this action were physically present at the Capitol during this attack on the Plaintiffs and other members of Congress, the events that occurred were the natural, foreseeable, and intended consequence of the Defendants' coordinated campaign to use force, intimidation and threats in an attempt to prevent Congress from discharging its legally required duty to preside over, and approve, the count of the Electoral College votes which ultimately confirmed that Defendant Trump's opponent was elected the next President of the United States.

8.     Accordingly, this action seeks the award of compensatory damages to redress the harm to the Plaintiffs caused by the Defendants' use of intimidation, harassment, and threats of violence to interfere with the discharge of their legally required duties as members of Congress and punitive damages to punish the Defendants for the reckless and malicious manner in which they acted and to enjoin and deter a recurrence of this unlawful conduct.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. § 1331 because the claim in this case arises under the laws of the United States.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

11.     Plaintiff Bennie G. Thompson is the duly elected Representative of the Second Congressional District of Mississippi.  On January 6, 2021, Rep. Thompson was present in the Capitol in order to discharge his legally required duty to observe and approve the count of votes cast by members of the Electoral College for the election of President and Vice-President of the United States.  As described in more detail below, Rep. Thompson was hindered, delayed, impeded, and almost completely prevented from carrying out these duties because of the Defendants' unlawful actions.  Rep. Thompson brings this suit in his personal capacity.

12.     Plaintiff Karen Bass is the duly elected Representative from California's Thirty-Seventh Congressional District.  On January 6, 2021, Rep. Bass was present in the Capitol in order to discharge her constitutional duty to observe and approve the votes cast by members of the Electoral College for the election of President and Vice President of the United States.  As described in more detail below, Rep. Bass was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Bass brings this suit in her personal capacity.

13.     Plaintiff Stephen Cohen is the duly elected Representative from Tennessee's Ninth Congressional District.  On January 6, 2021, Rep. Cohen was present in the Capitol in order to discharge his constitutional duty to observe and approve the votes cast by members of the Electoral College for the election of President and Vice President of the United States.  As described in more detail below, Rep. Cohen was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Cohen brings this suit in his personal capacity.

4

14.     Plaintiff Veronica Escobar is the duly elected Representative from Texas's Sixteenth Congressional District.  On January 6, 2021, Rep. Escobar was present in the Capitol in order to discharge her constitutional duty to observe and approve the votes cast by members of the Electoral College for the election of President and Vice President of the United States.  As described in more detail below, Rep. Escobar was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Escobar brings this suit in her personal capacity.

15.     Plaintiff Pramila Jayapal is the duly elected Representative from Washington's Seventh Congressional district.  On January 6, 2021, Rep. Jayapal was present in the Capitol in order to discharge her constitutional duty to observe and approve the votes cast by members of the Electoral College for the election of President and Vice President of the United States.  As described in more detail below, Rep. Jayapal was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Jayapal brings this suit in her personal capacity.

16.     Plaintiff Henry C. "Hank" Johnson, Jr. is the duly elected Representative from Georgia's Fourth Congressional District.  On January 6, 2021, Rep. Johnson was present in the Capitol in order to discharge his constitutional duty to observe and approve the votes cast by members of the Electoral College for the election of President and Vice President of the United States.  As described in more detail below, Rep. Johnson was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Johnson brings this suit in his personal capacity.

17.     Plaintiff Marcy Kaptur is the duly elected Representative for Ohio's Ninth Congressional District.  Rep. Kaptur was present in the Capitol on January 6, 2021, prepared to

discharge her duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.  As described in more detail below, Rep. Kaptur was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Kaptur brings this suit in her personal capacity.

18.     Plaintiff Barbara Lee is the duly elected Representative for California's Thirteenth Congressional District.  Rep. Lee was present in the Capitol on January 6, 2021, prepared to discharge her duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.  As described in more detail below, Rep. Lee was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Lee brings this suit in her personal capacity.

19.     Plaintiff Jerrold Nadler is the duly elected Representative for New York's Tenth Congressional District.  Rep. Nadler was at the Capitol on January 6, 2021, prepared to discharge his constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.  As described in more detail below, Rep. Nadler was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Nadler brings this suit in his personal capacity.

20.     Plaintiff Maxine Waters is the duly election Representative from California's Forty-Third Congressional District.  Rep. Waters was present in the Capitol on January 6, 2021, prepared to discharge her duties of tallying ballots of the Electoral College and certifying the results of the 2020 presidential election.  As described in more detail below, Rep. Waters was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Waters brings this suit in her personal capacity.

21.     Plaintiff Bonnie Watson Coleman is the duly elected Representative from New Jersey's Twelfth Congressional District.  Rep. Watson Coleman was present in the Capitol on January 6, 2021, prepared to discharge her duties of tallying ballots of the Electoral College and certifying the results of the 2020 presidential election.  As described in more detail below, Rep. Watson Coleman was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Watson Coleman brings this suit in her personal capacity.

22.     Defendant Donald J. Trump was the President of the United States from January 20, 2017 until noon Eastern Standard Time on January 20, 2021.  Defendant Trump is a resident of the state of Florida.  As described in more detail below, Defendant Trump, acting solely in his personal capacity, conspired with others to prevent, by force, intimidation, and threats, the Plaintiffs and other members of Congress from discharging their duties to approve the results of the Electoral College vote and certify the results of the presidential election held in November 2020.  Defendant Trump's actions in furtherance of the conspiracy were far outside the scope of his official duties and were taken to advance his continued efforts to campaign and secure reelection to the presidency, notwithstanding actions taken by the states and members of the Electoral College that confirmed his defeat.  The tweets published by Defendant Trump, for example, which are reported below in this Amended Complaint, came from his personal (rather than official) Twitter account, and when he spoke to the assembled crowd on January 6, 2021, he continued to hold himself out as a viable candidate for the Presidency.  Indeed, Defendant Trump's campaign and the campaign's joint fundraising committees made direct payments of at least $3.5 million to organizers of the January 6 events.

7

23.     Defendant Rudolph William Giuliani has acted as a confidant of Defendant Trump.  The actions attributed to Defendant Giuliani were undertaken in his personal capacity and not as an officer of the United States.  He is a resident of New York.  As discussed in more detail below, Defendant Giuliani acted in concert with other Defendants with the intention and undertaking steps to prevent the Plaintiffs and other members of Congress from discharging their duties to approve the results of the Electoral College vote and certify the results of the presidential election held in November 2020.

24.     Defendant Proud Boys International, L.L.C. was a Texas Limited Liability Company with main offices located in Crossroads, Texas.  On February 10, 2021 (six days before the initial Complaint in this case was filed), this L.L.C. was terminated by its registered agent and director, Jason Lee Van Dyke.

25.     Defendant Warboys LLC is a Florida Limited Liability Company with main offices in Miami, Florida.  Warboys LLC was incorporated in Florida in July 2020, and the registered address for Warboys LLC is the same address as a former Proud Boys entity, Proud Boys, LLC, which was terminated in September 2019.  Warboys LLC's registered agent is Proud Boys Chairman Enrique Tarrio, and its managers are Joseph R. Biggs and Ethan M. Nordean, all three of whom were directly responsible for coordinating Proud Boys members in the leadup to and during the assault on the Capitol on January 6, 2021, as described in the allegations below. Warboys LLC operated in conjunction with Proud Boys International, L.L.C., and through its leadership, was involved in planning, promoting and carrying out the insurrection at the Capitol on January 6, 2021.

26.     Defendant Enrique Tarrio is a resident of Miami, Florida.  Since 2017, he has been a member of the Proud Boys, and since November 20, 2018, he has been the Chairman of

the Proud Boys – the highest role in, and the face of, the organization.  Defendant Tarrio is also

the registered agent of Defendant Warboys LLC and has been known to wear paraphernalia of

both Proud Boys and Warboys at rallies and other public gatherings of Proud Boys members.

Defendant Tarrio frequently responds to requests for comment to media organizations on behalf

of the Proud Boys, and he frequently leads Proud Boys rallies and gives direction to Proud Boys

members.  Defendant Tarrio was directly responsible for planning and promoting the January 6

insurrection at the Capitol and has served as an alter ego of the Proud Boys and Warboys, and

possibly other entities that have been used to fund and operate the Proud Boys organization.

27.     The Proud Boys organization (Proud Boys International, L.L.C., Warboys LLC,

and Enrique Tarrio, as an alter ego of those organizations, hereinafter collectively referred to as

the "Proud Boys") has multiple chapters in the United States and describes itself as a "pro-

Western fraternal organization for men who refuse to apologize for creating the modern world;

aka Western Chauvinists."  Proud Boys members have participated in multiple events that

supported and promoted views that were highly critical of positions advanced during the

presidential campaign of then-former Vice President Biden and views that were strongly

supportive of positions advanced during the presidential campaign of Defendant Trump.  It also

has repeatedly employed and supported the use of violence in its opposition to views with which

it differed, such as the views expressed by leaders of the Black Lives Matter movement.  Proud

Boys members can often be identified by the yellow and black colors they wear as well as by

logos and emblems that are identified with the Proud Boys organization.  As described in more

detail below, Proud Boys was involved in organizing and carrying out the insurrection at the

Capitol on January 6, 2021, in pursuit of a purpose shared by Defendants Trump and Giuliani, as

part of a jointly conceived and executed plan to prevent the counting of Electoral Votes confirming Defendant Trump's opponent as the next President.

28.     Defendant Oath Keepers is a militia organization incorporated as a non-profit corporation in Nevada, with its main office located in Las Vegas, Nevada, whose members are comprised of current and former military and law enforcement officers who express the view that the federal government is trying to strip American citizens of their rights.  The organization's name is derived from the oath that all military and police take to "defend the Constitution against all enemies, foreign and domestic."  The organization and its leadership have routinely stated that it is preparing for or engaged in a civil war.  As described in more detail below, Oath Keepers was directly involved in organizing and carrying out the insurrection at the Capitol on January 6, 2021 in pursuit of a purpose shared by Defendants Trump, Giuliani and Proud Boys.

## STATEMENT OF FACTS

**I.      Defendant Trump Laid the Groundwork for the January 6 Attack by Praising Violent Supporters**

29.     Even before the election, Defendant Trump repeatedly declined to agree that, regardless of the outcome, he would ensure a peaceful transition of power.  In doing so, he solicited the support of, and endorsed the belligerent and violent actions of, organizations such as the Proud Boys (which expressed support for his reelection).

30.     For example, during the September 29, 2020 presidential debate, Defendant Trump was asked: "[A]re you willing, tonight, to condemn white supremacists and militia groups and to say that they need to stand down and not add to the violence in a number of these cities?"  In response, Defendant Trump said: "Give me a name, give me a name, go ahead who would you like me to condemn?"  When then-former Vice President Biden answered, "Proud Boys,"  Defendant Trump condoned, rather than condemned, their violent conduct, speaking directly to

10

members of the group: "Proud Boys, stand back and stand by."  Understanding that Defendant

Trump was endorsing their violent conduct and enlisting them for future conflicts, Proud Boys

Chairman Tarrio responded by tweeting: "Standing by sir."

31.     During this time, Defendant Trump actively and enthusiastically supported armed

protesters who used threats and, at times, violence in the pursuit of their political and social

agendas.  For example, after state governments began implementing restrictions on access to

public facilities in response to the spread of the COVID-19, Defendant Trump referred to

supporters who threatened the use of violence in resisting these restrictions as the "Trump Army"

and the "first line of defense when it comes to fighting off the Liberal mob."

32.     In another illustration of Defendant Trump's endorsement of the threat of

violence, after a caravan of Trump supporters swarmed a Biden campaign bus on November 1,

2020, nearly causing a violent accident and leading to the cancellation of a Biden campaign

event, Defendant Trump praised the mob, saying, "These patriots did nothing wrong."

Defendant Trump later tweeted a video of the incident with the caption "I LOVE TEXAS."

## II.     Defendants Trump and Giuliani Mobilized Violent Supporters with a Misinformation Campaign

33.     Before a single vote was cast, Defendant Trump claimed that he would be the

winner of the presidential election and the only way he could lose was through fraud.  On

August 17, 2020, Defendant Trump said that "the only way we're going to lose this election is if

this election is rigged."  Soon thereafter, he insisted that "[t]he only way they can take this

election from us is if this is a rigged election."  He repeated this contention often in the ensuing

months.  In other words, no matter how the American people voted, Trump would claim he won,

and if the voters decided otherwise, he would claim fraud.

34.     As vote counts began to reveal that Defendant Trump lost the November 3, 2020 presidential election, Defendants Trump and Giuliani launched a misinformation campaign, trying to convince violent supporters—and the American public—that the announced vote tallies were the product of fraud and that Defendant Trump in fact won the election, notwithstanding that these assertions were repeatedly rejected by the courts and the states to which they were presented.

35.     On November 4, 2020, Defendant Trump declared that he had won the presidential election, notwithstanding that some votes cast had not yet been counted.

36.     After all the votes had been counted and former Vice President Joseph Biden was declared the victor, Defendants Trump and Giuliani and Defendant Trump's supporters embarked on a campaign to challenge as fraudulent the vote results in more than 60 lawsuits filed in various state and federal courts.

37.     Notwithstanding that the allegations of fraud were repeatedly rejected by the courts in which these suits were filed, Defendants Trump and Giuliani together maintained that Defendant Trump had actually prevailed in the election and continued to attack the integrity of the state election offices and officials and the election results in those states that reported Defendant Trump received fewer votes than former Vice President Biden.  Defendant Trump also attacked the integrity and capability of courts and judges that ruled against their meritless lawsuits.

38.     Defendant Trump communicated these inflammatory and demonstrably false views through various social media outlets, including Twitter, on which he had 89 million followers.  Similarly, at a press conference held in the parking lot of Four Seasons Total Landscaping in Pennsylvania held on November 7, 2020, Defendant Giuliani stated that there

had been widespread voter fraud in Philadelphia and Pittsburgh which he claimed accounted for

Defendant Trump's loss in that state.  Both cities have large African American populations.

39.     Defendant Giuliani claimed that Philadelphia had "a sad history of voter fraud."

He also called out by name deceased African Americans, whom he falsely claimed were still

allowed to vote.

40.     Defendants Trump and Giuliani engaged in this misinformation campaign in order

to convince Trump's supporters that they were victims of a massive electoral conspiracy that

threatened their democracy and the country's continued existence.

41.     In the weeks and months following the election, Defendant Giuliani, in concert

with Defendant Trump, issued statements from his personal Twitter account alleging that the

election was fraudulent, including unsupported claims that the election was part of a massive

conspiracy by "big city … crooks" in multiple states to "steal votes" from Defendant Trump's

supporters.  Defendant Giuliani also sent tweets during the same time period promoting the

January 6 rally.

42.     On November 19, 2020, Defendant Giuliani said, "The margin in Michigan was

146,121, and these ballots were all cast basically in Detroit, that Biden won 80-20.  So, you see a

change as a result in the election in Michigan if you take out Wayne County, so it's a very

significant case."  As a result, Defendant Giuliani advocated rejecting in their entirety the votes

cast by voters in Detroit, the population of which is 78 percent African American.  No evidence

of such fraud was ever produced or found by any court or state agency.

43.     In still another episode in this campaign to instill doubt in the integrity of the

electoral process, Defendant Giuliani, in coordination with Defendant Trump, asserted at a press

conference held on November 19, 2020 that Defendant Trump's loss in Wisconsin was attributed

to fraud in voting in Milwaukee and Madison, Wisconsin, both of which have large African American populations.

44.      In response to Defendant Trump and Giuliani's coordinated and repeated assertions that voting in states where Defendant Trump lost was tainted by fraud, some supporters of Defendant Trump, with his urging and support, harassed election workers in Arizona, Georgia, Michigan, Nevada, Pennsylvania, Wisconsin and other states and attempted to interfere with and/or stop the vote count in those states.

45.      Undeterred, Defendant Trump continually sought to cast doubt on the integrity of the electoral process in states where he lost and encouraging supporters to do the same, notwithstanding that state election officials found no evidence of fraud and even his own Attorney General acknowledged that the U.S. Department of Justice had uncovered no evidence of widespread voter fraud that could have changed the outcome of the 2020 election.

III.   **Defendant Trump Encouraged Violence Against Officials Who Refused to Lie About the Election Results**

46.      Although state officials rebutted the allegations of fraud and urged calmer exchanges over the election results, supporters of Defendant Trump, with his expressed support, continued to engage in personal, accusatory, and at times violent attacks.

47.      For example, Defendants Trump and Giuliani attempted to apply pressure on state officials in order to overturn the election of President Biden.  When this effort failed in Georgia, Defendant Trump publicly stated that the Georgia Secretary of State was an "enemy of the people" for insisting that Georgia's election was not tainted by fraud.  In response, to these November 26 remarks, Defendant Trump's followers threatened violence and assassination against the Georgia Secretary of State.

48.     On November 30, 2020, Joseph diGenova, one of the Trump campaign's attorneys, called into a television show and suggested that Christopher Krebs, a former federal election official who refused to say that the 2020 election was not secure, should be "taken out at dawn and shot."

49.     In a televised address on December 1, 2020, Georgia Republican election official Gabriel Sterling warned Defendant Trump about the foreseeable consequences of these remarks: "Mr. President, you have not condemned these actions. … This has to stop. … Stop inspiring people to commit potential acts of violence.  Someone is going to get shot, someone is going to get killed.  And it's not right."

50.     Defendant Trump did not heed this warning, and the threats continued unabated. On December 6, 2020, for example, armed protestors arrived at the home of Michigan Secretary of State Jocelyn Benson, threatening violence after the results of the election.

51.     On December 8, 2020, the official Twitter account of the Arizona GOP asked supporters if they were willing to die for Defendant Trump, accompanied by a clip from the movie "Rambo."

52.     Acknowledging the existence of these threats of violence, Trump endorsed rather than discouraged them.  For example, on December 10, 2020, Defendant Trump tweeted: "People are upset, and they have a right to be.  Georgia not only supported Trump in 2016, but now.  This is the only State in the Deep South that went for Biden?  Have they lost their minds? This is going to escalate dramatically.  This is a very dangerous moment in our history...."

53.     As states finished certifying the official election results, confirming that Defendant Trump had lost the presidential election, Defendants Trump and Giuliani—in a coordinated manner and using the same language—began characterizing the presidential election

as stolen and encouraged supporters to take desperate measures, including the use of force, intimidation, and threats, to change the outcome.

54.     On December 12, 2020, "Stop the Steal" rallies occurred across the country.  At the "Stop the Steal" rally in Washington, D.C., an Oath Keepers leader said that Defendant Trump, "needs to know from you that you are with him, [and] that if he does not do it now while he is commander in chief, we're going to have to do it ourselves later, in a much more desperate, much more bloody war … Let's get it on now, while he is still the commander in chief."  That same day, Defendant Trump tweeted in support of this rally, then tweeted, "WE HAVE JUST BEGUN TO FIGHT!!!"

## IV.   In December 2020 and January 2021, Defendants' Plans for the January 6 Insurrection Took Shape

55.     On December 19, 2020, Defendant Trump focused the violent efforts to change the results of the election on the congressional proceedings to certify the Electoral College vote count, tweeting: "Statistically impossible to have lost the 2020 Election" and "Big protest in DC on January 6th.  Be there, will be wild!"

56.     Within five minutes of this tweet, a user on www.TheDonald.win—a heavily used pro-Trump online forum that became a key planning platform for the insurrection—posted a link to the tweet with the headline "TRUMP TWEET. DADDY SAYS BE IN DC ON JAN. 6TH."  The post was pinned to the homepage of www.TheDonald.win by moderators and garnered 4,683 comments and 20,663 upvotes (whereby users signal an approval of a post) within five days.

57.     Many users on www.TheDonald.win construed Defendant Trump's December 19 tweet as "marching orders," and posted comments such as "THE COMMANDER IN CHIEF HAS ISSUED HIS ORDERS" and "If you've been waiting for a signal, THAT'S IT."  One user

16

on www.TheDonald.win posted "Roger that.  Standing by no longer," referring to the

September 29, 2020, Presidential Debate where Defendant Trump told the Proud Boys to "stand

back and stand by."

58.    Users on www.TheDonald.win also heard President Trump's statement that the

protests "will be wild" as an instruction, with one user explaining "'Will Be Wild' is a hidden

message for us to be prepared …. as in armed."  On December 27, 2020, the same user posted on

www.TheDonald.win "surround the enemy" together with a map of the US Capitol that had a red

perimeter drawn around it with the instruction "create perimeter"; the map also provided the

location of Capitol access tunnels.

59.    Comments on this post included discussions about how long the perimeter should

be, the number of people needed to defend it, what strategies they could use to overcome law

enforcement, and how they could use radios to communicate.

60.    Another widely circulated post on www.TheDonald.win titled

"MAGA_CAVALRY D.C. Caravan MAIN FLYER" presented a color-coded graphic with "rally

points" for groups coming to Washington, D.C.  It also suggested times when the groups should

leave their "rally points" so they could arrive in D.C. simultaneously.

61.    Some posts on www.TheDonald.win provided lists of items recommended for the

rally, including pepper spray, batons, tasers, bullet proof vests, and knives.  Other posts

discussed the rally as the "last stand" and repeated calls for violence, including "mass hangings

and firing squads."  In the words of one user, "[e]ither Trump wins or we water the tree of liberty

with blood."

62.    Posts similar to those on www.TheDonald.win appeared on other social media

websites popular with Trump supporters, including Parler, Gab, Twitter, and Facebook.  For

example, Trump supporters on Twitter and Facebook posted about "Operation Occupy the Capitol" and used hashtags such as #OccupyCapitols.  As one supporter posted on social media, "The objective is Congress," and people in the Capitol should "leave in one of two ways: dead or certifying Trump the rightful winner."  Some posts even suggested that Defendant Trump would pardon those arrested for participating in the violence.

63.     Defendants Proud Boys and Oath Keepers were directly involved in this violent planning.  An Oath Keepers leader has stated that the group coordinated with the Proud Boys about how members of the two organizations would work together during the insurrection on January 6.  This Oath Keepers leader posted a Facebook message on December 19, 2020 stating, "[T]his week I organized an alliance between Oath Keepers … and Proud Boys.  We have decided to work together and shut this shit down."  This leader sent another Facebook message on December 22 saying Defendant Trump "wants us to make it WILD that's what he's saying. He called us all to the Capitol and wants us to make it wild!!! … Gentlemen we are heading to DC pack your shit!!"  This Oath Keepers leader then posted a Facebook message on December 25, 2020 discussing communications with Proud Boys leadership and how the Oath Keepers had "*orchestrated a plan with the Proud Boys*" (emphasis added).

64.     On December 29, 2020, Enrique Tarrio, Chairman of the Proud Boys, posted a message on the social media site Parler about the demonstration planned for January 6, 2021. Among other things, Tarrio announced that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist… We will not be wearing our traditional Black and Yellow. We will be incognito and we will be spread across downtown DC in smaller teams.  And who knows … we might dress in all BLACK for the occasion."  Law enforcement investigating the Capitol insurrection has attributed the statement about dressing in "all BLACK" as a reference to

dressing like the group known as "Antifa," whom the Proud Boys have identified as an enemy of their movement and are often depicted in the media wearing all black attire to demonstrations.

65.    In the days leading up to the insurrection, Proud Boys leaders obtained equipment, including tactical vests, military-style communication equipment and bear mace, for their members, which could be used during the siege on the Capitol.  The Proud Boys set up a secure, encrypted communications channel called "Boots on the Ground" to coordinate the group's activities during the insurrection.  Approximately 60 people participated in that channel during the insurrection.

66.    Defendant Trump knew of the hundreds of social media posts from his supporters providing the details of how they would storm the Capitol and violently take over Congress on January 6, as Defendant Trump and his advisors actively monitored the websites where his followers made these posts.  These violent posts were also discussed by media outlets regularly viewed by Defendant Trump, including Fox News.  Law enforcement, including the FBI, issued explicit warnings of violence based on these social media posts.  And in widely publicized remarks on December 28, 2020, former White House official Olivia Troye expressed concern "that there will be violence on January 6th because the president himself encourages it."  Ms. Troye continued, "This is what [Trump] does.  He tweets.  He incites it.  He gets his followers and supporters to behave in this manner, and these people think they they're being patriotic because they are supporting Donald Trump."

67.    Despite these dire warnings, Defendant Trump expressed support for his followers' violent plans.  On January 1, 2021, for example, Defendant Trump retweeted a tweet from the chair of Women for America First, an organizer of the "Save America" rally, stating,

"The calvary [*sic*] is coming, Mr. President!"  In response to the tweet, Defendant Trump said, "A great honor!"

68.     With the help of his campaign and his associates, Defendant Trump also provided logistical support for the January 6 protests.  Defendant Trump's campaign and the campaign's joint fundraising committees made direct payments of at least $3.5 million to organizers of the January 6 events.  And a top Trump campaign fundraiser oversaw the logistics, budgeting, funding and messaging for the January 6 rally.

69.     After Defendant Trump decided he would speak at the Save America rally on January 6, he became more actively involved in decisions concerning the event, including the speaking lineup and even the music that would be played.  Defendant Trump and his campaign proposed that the rally include a march to the Capitol.  An organizer of the Save America rally later told reporters he was surprised to learn that the event would involve a march from the Ellipse to the Capitol.  Before the White House became involved, he said, the plan had been to stay at the Ellipse until the counting of the Electoral College votes was completed.

70.     The White House was also in contact with the Proud Boys.  An FBI review of phone records showed that, in the days leading up to the rally, a person associated with the Trump White House communicated with a member of the Proud Boys by phone.

71.     At the same time, Defendant Trump was in contact with long-time associate Roger Stone, who was in contact with both the Proud Boys and the Oath Keepers.  Mr. Stone posted on the social media website Parler that, at the end of December, he met with Defendant Trump to "ensure that Donald Trump continues as our president."  Proud Boys leader Enrique Tarrio confirmed that he called Roger Stone in early January.  Members of the Oath Keepers agreed to serve as Mr. Stone's security detail during the January 6 protests.

**V.**   **By January 5, 2021, Defendants Were Poised for the Violent Insurrection**

72.    By January 5, 2021, members of the Proud Boys and the Oath Keepers—among other pro-Trump demonstrators—had flocked to Washington, D.C.  As a January 5 *Washington Post* article observed, D.C. was "bracing for potentially violent protests, egged on by President Trump himself."

73.    That day, the leader of the "Stop the Steal" event led a crowd of Trump supporters assembled in Freedom Plaza in Washington, D.C., in a chant of: "Victory or death!"

74.    Proud Boys leader Joseph Biggs sent instructions to members using the secure "Boots on the Ground" channel, telling them to "avoid getting into any shit" on the eve of the event, because "[t]omorrow's the day."  Biggs then said "Just trying to get our numbers.  So we can plan accordingly for tonight and tomorrow's plan."  Later, he assured the group: "We have a plan."

**VI.**   **The Morning of January 6, 2021, Defendants Attempted to Execute a Multi-Faceted Campaign to Prevent Congress from Certifying the Election Results**

75.    On the morning of January 6, 2021, before the Congressional approval of the Electoral College vote count was scheduled to occur, Defendant Trump sent a message by Twitter to Vice President Pence, urging him to prevent the count of state-certified Electoral College ballots required by Article II, Section 1 and the Twelfth Amendment to the United States Constitution, in the hope that Defendant Trump could achieve a different outcome of the election.  Still acting in his personal capacity as a candidate, Defendant Trump stated, "All Mike Pence has to do is send [the election] back to the States, AND WE WIN."

76.    The Electoral Count Act of 1887 requires that Congress convene on January 6 at 1:00 PM of the year after each presidential election so that the ballots cast by members of the Electoral College can be counted as required by Article II, Section 1 and the Twelfth

Amendment.  The Twelfth Amendment expressly provides: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes *shall then be counted*; The person having the greatest Number of votes for President, *shall be the President*" (emphasis added).  It is beyond dispute that, on January 6, Joseph Biden had the greatest number of Electoral College votes for President.  The Vice President, acting as President of the Senate, is required to formally declare the victor in the election based on an accurate count of the electoral votes.

77.     Defendant Trump's demand of Vice President Pence as the President of the Senate, that he decline to count the Electoral College ballots and, instead of declaring the winner of the election, send the election back to the states, was in direct contravention of the legal requirements that the Constitution and the Electoral Count Act of 1887 imposed on the Vice President.

78.     By January 6, the counting of the Electoral College votes and the official declaration of Joseph Biden as the winner of the election could not be stopped by any lawful means.  Vice President Pence had written Defendant Trump a letter stating, in relevant part, "It is my considered judgment that my oath to support and defend the Constitution constrains me from claiming unilateral authority to determine which electoral votes should be counted and which should not."

79.     Having lost all legal avenues of challenging the election, Defendants Trump and Giuliani resorted to the only means they regarded as available to reelect Defendant Trump, which were to employ force, threats, and intimidation directed towards members of Congress to delay and prevent the final approval of the results of the Electoral College balloting.

22

80.     On the morning of January 6, 2021, before the "Save America" rally, Defendant Trump urged his followers to resist the final count of the Electoral College ballots, misinforming them in a tweet that "The States want to redo their votes.  They found out they voted on a FRAUD.  Legislatures never approved.  Let them do it.  BE STRONG!"  No state ever expressed the view, attributed to them by Defendant Trump, that they wanted to "redo their votes." Furthermore, in the history of this nation, there has never been any such "redo" nor has any court ever ruled that a hypothetical "redo" would be lawful.

81.     At the rally, Defendant Giuliani spoke immediately before Defendant Trump.  In remarks mirroring Defendant Trump's prior messages, Defendant Giuliani began by making a series of statements about the election contradicted by the state election officers, calling the votes lawfully cast in favor of President Biden "crooked ballots" and stating that he was "going to find criminality" and "proof this election was stolen."  Defendant Giuliani falsely told the crowd that it was "perfectly legal" for Vice President Pence to unilaterally block Congress from certifying the Electoral College votes, as Defendant Trump had previously demanded, and referred to a failure by Vice President Pence to block the certification as unlawful or treasonous.  Then, he incited the crowd to take violent action, stating, "If we're right, a lot of them will go to jail.  *So, let's have trial by combat.*  I'm willing to stake my reputation, the President is willing to stake his reputation, on the fact that we're going to find criminality there … I'll be darned if they're going to take our free and fair vote … *We're going to fight to the very end* to make sure that doesn't happen" (emphasis added).

82.     Then, Defendant Trump addressed the assembled crowd.  Defendant Trump began by condemning his political opposition and repeating the same unproven accusation, rejected by the state election officers, that the election was stolen from him: "They rigged an

election.  They rigged it like they've never rigged an election before …. Hundreds of thousands

of American patriots are committed to the honesty of our elections and the integrity of our

glorious Republic.  All of us here today do not want to see our election victory stolen by

emboldened radical left Democrats, which is what they're doing and stolen by the fake news

media.  That's what they've done and what they're doing.  We will never give up.  We will never

concede, it doesn't happen.  You don't concede when there's theft involved."  No state or court

had credited Defendant Trump's assertion that his opportunity to win the presidential election

was "stolen" from him.

83.     Defendant Trump then stated, "Our country has had enough.  We will not take it

anymore and that's what this is all about.  To use a favorite term that all of you people really

came up with, we will stop the steal."  As he had done repeatedly since the 2020 election,

Defendant Trump meant he would stop certification of Joseph Biden as President, as was

scheduled to take place later that day at the Capitol.

84.     Defendant Trump went on to instruct his followers in what he wanted them to do:

"We must stop the steal and then we must ensure that such outrageous election fraud never

happens again, can never be allowed to happen again, but we're going forward."

85.     Then, knowing that the crowd was armed and that the assembled masses had

threatened violence, Defendant Trump stoked their anger further and urged them to take action to

disrupt the process for counting and approving the Electoral College ballots: "Republicans are

constantly fighting like a boxer with his hands tied behind his back.  It's like a boxer, and we

want to be so nice.  We want to be so respectful of everybody, including bad people.  We're

going to have to fight much harder and Mike Pence is going to have to come through for us.  If

he doesn't, that will be a sad day for our country because you're sworn to uphold our

constitution.  Now it is up to Congress to confront this egregious assault on our democracy.
After this, we're going to walk down, and I'll be there with you.  We're going to walk down.
We're going to walk down any one you want, but I think right here.  *We're going walk down to
the Capitol*, and we're going to cheer on our brave Senators, and Congressmen and women.
We're probably not going to be cheering so much for some of them because *you'll never take
back our country with weakness.  You have to show strength, and you have to be strong*"
(emphasis added).

      86.     As shown above, in a direct effort to increase the number of his followers who
would journey to the Capitol, Defendant Trump falsely told them, "I'll be there with you."
Notwithstanding this statement, Defendant Trump never traveled to the Capitol on January 6,
2021 to join the rioters whom he dispatched.

      87.     Defendant Trump then told the crowd that it could not allow Biden to be deemed
the winner of the election: "Mike Pence has to agree to send [the electoral count] back [to the
states]. . . . If you don't do that, that means you will have a President of the United States for four
years . . .  who was voted on by a bunch of stupid people who lost all of these states.  You will
have an illegitimate president.  That is what you will have, *and we can't let that happen*"
(emphasis added).

      88.     Showing strength, the crowd began shouting and chanting, "Storm the Capitol,"
"Invade the Capitol Building," and "Take the Capitol right now."  Approving of those chants,
Defendant Trump pressed on: "The radical left knows exactly what they're doing.  They're
ruthless and it's time that somebody did something about it."  As the crowd shouted and bustled,
he gave them permission to break the rules, assuring them: "*when you catch somebody in a
fraud, you're allowed to go by very different rules*. . . . Something is wrong here, something is

really wrong, can't have happened and we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore" (emphasis added). The crowd answered in a chant: "Fight like Hell. Fight for Trump."

89. Defendant Trump directed his screaming supporters to descend upon the Capitol: "So we are going to … walk down Pennsylvania Avenue …, and we are going to the Capitol, and we are going to try and give … our Republicans, the weak ones because the strong ones don't need any of our help, we're … going to try and give them the kind of pride and boldness that they need to take back our country. So, let's walk down Pennsylvania Avenue."

90. The permit obtained for the Save America rally expressly provided: "This permit does not authorize a march from the Ellipse." Defendant Trump nevertheless instructed the angry crowd to march from the Ellipse to the Capitol for the purpose of "fight[ing] like hell," and therefore directed the crowd to take action outside the bounds of what the permit authorized.

## VII. Defendants Proud Boys and Oath Keepers and Their Co-Conspirators Invaded the Capitol

91. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification were allowed access inside the U.S. Capitol.

92. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public. Metal barriers were placed along pedestrian entrances approximately one hundred feet from the west side entrance to the Capitol.

93. On January 6, 2021, at approximately 1:00 PM, in accordance with the Constitution and federal law dictating the means by which Congress counts the states' Electoral Votes, including the date and time such counting shall occur, a joint session of the United Sates

Congress convened at the United States Capitol to certify the vote count of the 2020 presidential election.

94.     At approximately 12:50 PM on January 6, 2021, Defendant Proud Boys, rallied by leaders Joseph Biggs and Ethan Nordean, coalesced and marched towards the Capitol while Trump was speaking at the Save America rally.

95.     En route to the Capitol, members of Defendant Proud Boys were engaged in various chants and response calls, including "Fuck Antifa!" and "Whose streets?  Our streets!"

96.     While the Proud Boys were assembled near the Capitol, one Proud Boys member was video recorded shouting, "Let's take the fucking Capitol!"  In response, other Proud Boys members chastised the member for shouting this, with another Proud Boys member stating, "Let's not fucking yell that, alright," and another member stating, "Don't yell it, do it."

97.     At the direction of the Defendant Proud Boys rally organizers, many Proud Boys members abandoned their organization's colors of black and yellow in order to wear the black attire associated with Antifa.

98.     Proud Boys members, acting according to a carefully coordinated plan and at the direction of their leadership, broke up into small groups so that they could push past the Capitol barriers from multiple entry points without signaling to police that they were working together; these smaller groups communicated with each other through the use of military-style communication devices.

99.     At approximately 12:52 PM, Mr. Biggs dispatched the leader of the assault on the Capitol entrance.  Following him, more members of Defendant Proud Boys descended on the Capitol, breaking through the metal barriers erected a hundred feet from the Capitol Building and overcoming the Capitol Police officers stationed there to repel any incursion on the Capitol.

Defendant Proud Boys launched this assault while Trump was speaking at the ellipse, and as members broke through the barricades, they blasted Trump's speech on a bullhorn.

100.    Soon after Proud Boys had cleared the barricades, Defendant Trump finished his speech and dispatched the angry crowd to the Capitol.

101.    By the time the thousands of demonstrators who heard Trump's speech arrived at the Capitol, the Proud Boys had already begun compromising the protections erected by the Capitol Police near the base of the building.

102.    As a result, the crowd that arrived passed easily through the outer ring of barriers and was able to confront and ultimately overwhelm an inner array of Capitol Police and barricades established as the last line of defense outside the Capitol Building.

103.    Proud Boys members and leaders acted according to an intentional and premeditated plan to rely on non-Proud Boys rioters (whom the Proud Boys described as "normies" or "normiecons") to join forces with the Proud Boys in overtaking Capitol Police security forces.

104.    Proud Boys coordinated their assault with the rioters who, at the direction of Defendants Trump and Giuliani, created chaos and mayhem surrounding the Capitol such that security forces were spread thin and weakened, thus allowing both Proud Boys and non-Proud Boys insurrectionists to gain entry in the building.  The crowd that Defendants Trump and Giuliani incited to march upon and forcibly enter the Capitol erected gallows on the Capitol grounds and displayed a noose.

105.    At the time the rioters initially broke into the Capitol, members of the House of Representatives and the Senate were engaged in debating the tally of the votes cast by members of the Electoral College.

106.     Defendant Trump was watching live televised reports of the forcible entry into the Capitol and the violence committed by the crowd dispatched by Defendants Trump and Giuliani. Rather than take action to attempt to calm the riotous crowd or direct additional law enforcement to the site, Defendant Trump egged on members of the riotous crowd by tweeting at 1:49 PM a video of the "Save America" rally filmed shortly before, where he had rallied the crowd with his clarion call: "Our country has had enough.  We will not take it anymore and that's what this is all about . . . You'll never take back our country with weakness.  You have to show strength, and you have to be strong."

107.     Shortly after 2:00 PM, the riotous crowd breached the Capitol Building. Windows and barricades were broken as the mob stormed into the National Statuary Hall, the heart of the Capitol Building.

108.     Video recorded a member of Defendant Proud Boys as he broke through a Capitol window at approximately 2:11 PM, using the clear-plastic shield seized from an overcome Capitol Police officer.  Thereafter, members of the crowd, including some from the Defendant Proud Boys, entered the Capitol through the broken window and then opened a door, through which the riotous crowd streamed into the Capitol.

109.     The member of Defendant Proud Boys who broke through the window with a plastic shield then posted a self-congratulatory video of himself smoking a cigar in celebration of his unlawful entry, declaring: "Victory smoke in the Capitol, boys … I knew we could take this shit over if we tried hard enough."

110.     Other video live streamed to the social media site Parler captured Defendant Proud Boys leader Joseph Biggs, who had entered the Capitol, responding to an inquiry asking, "Hey Biggs, what do you gotta say" by smiling and pronouncing, "This is awesome!"

111.    Shortly after the Capitol was breached, the Senate was called into recess.

112.    Chaos and violence reigned as riotous members of the crowd inflamed by remarks from Defendants Trump and Giuliani streamed into the Capitol, overcoming most of the remaining Capitol Police and descending upon Capitol offices of members of Congress and their staff.  Rioters beat on the doors of the Chamber of the House of Representatives where Defendant Thompson and other members of the House were forced to shelter in place.

113.    Employing ear pieces and walkie-talkies in order to communicate with each other and coordinate their attack on the Capitol, members of Defendant Proud Boys inside the Capitol Building continued to lead and coordinate facets of the attack on the Capitol in order to interfere with the tally of Electoral College votes in which members of Congress were engaged.

114.    Yet another video depicted a member of Defendant Proud Boys inside the Capitol saying, "We just went ahead and stormed the Capitol.  It's about to get ugly."  He was surrounded by riotous supporters who chanted "Our house" and were accompanied by another member of Defendant Proud Boys who called for "Nancy," to summon the Speaker of the House of the United States House of Representatives, Nancy Pelosi.

115.    Thereafter, members of Defendant Proud Boys and members of the riotous crowd whose invasion of the Capitol was incited by Defendants Trump and Giuliani roamed the Capitol, entering and rifling through member offices, including the office of House Speaker Nancy Pelosi, leaving furniture and files in disarray and removing personal and official effects including laptops containing confidential information.  As they roamed the Capitol Building, members of Defendant Proud Boys and members of the riotous crowd chanted, "Fight for Trump."

116.   Members of Defendant Proud Boys as well as members of the riotous crowd also searched for members of Congress in the halls and rooms of the Capitol.  Several rioters carried plastic handcuffs that would have permitted them to detain members of Congress whom they encountered.

117.   Notwithstanding that Republican members of Congress trapped in the Capitol transmitted appeals to the White House to take immediate action to stop the insurrection, no action was forthcoming as Defendant Trump continued to watch the insurrection unfold in live televised reports.

118.   Soon after members of the riotous crowd dispatched by Defendants Trump and Giuliani forcibly entered the Capitol and began roaming its halls and offices, Defendant Trump, through his personal Twitter account, called upon them to disrupt the Electoral College ballot count, tweeting that "Mike Pence didn't have the courage to do what should have been done …"

119.   This tweet was repeated by rioters at the Capitol on megaphones, who understood Trump's tweet to be encouragement to further violence.

120.   When the Capitol was breached shortly after 2:00 PM, then-Vice President Pence was present at the Capitol in his capacity as President of the Senate, in order to preside over the tally of the Electoral College ballots.

121.   Having declined to suspend the Electoral College vote tally as Defendant Trump urged him to do, then-Vice President Pence himself became a target of the crowd's threats and intimidation, along with members of Congress, as rioters chanted "Hang Mike Pence."

122.   Once inside the Capitol, some members of the riotous crowd confirmed they were acting upon the direction and at the behest of Defendant Trump.  When the crowd confronted Capitol Police inside the Capitol, they warned the Capitol Police officers, "You're outnumbered.

There's a fucking million of us out there.  And we are listening to Trump – your boss."
Apparently believing that Defendant Trump's inciteful remarks authorized and directed them to
enter and overtake the Capitol, leaders of the riotous crowd also told Capitol Police, "We were
invited here by the President of the United States."  Rioters parading through the halls of the
Capitol carried flags and wore clothing and other paraphernalia bearing the name of their leader:
"Trump."

123.    After the rioters breached the Capitol, House Minority Leader Kevin McCarthy
pleaded with Defendant Trump to call off the rioters, emphasizing that the rioters were all Trump
supporters.  Dismissive of Leader McCarthy's warning, Defendant Trump told McCarthy, "Well,
Kevin, I guess these people are more upset about the election than you are."

124.    As House Republican Conference Chair the Honorable Elizabeth L. Cheney
stated in her vote in favor of the Article of Impeachment on January 12, 2021, Defendant Trump
"summoned this mob, assembled the mob, and lit the flame of this attack.  Everything that
followed was his doing.  None of this would have happened without the President."

125.    Then Senate Majority Leader Senator Mitch McConnell likewise observed in
remarks delivered on the Senate floor on January 19, 2021 the pivotal role of Defendant Trump
in inciting the attack on the Capitol, stating, "The mob was fed lies.  They were provoked by the
President and other powerful people and they tried to use fear and violence to stop a specific
proceeding of the first branch of the federal government which they did not like."

126.    Acting in concert with Defendant Proud Boys and the rest of the riotous mob
entering the Capitol, members of Defendant Oath Keepers wore paramilitary equipment,
helmets, reinforced vests and clothing with Oath Keepers paraphernalia, moving in a regimented
manner as members of the military are trained.  Pursuing a purpose shared by Defendants Trump

and Giuliani as well as Defendant Proud Boys, Defendant Oath Keepers played a leadership role

of the riotous crowd and provided military-style assistance sufficient to overcome the Capitol

Police resistance.

127.    Oath Keepers leaders recruited members in the weeks leading up to the Capitol

insurrection and provided military training to its recruits and members so that they would be

prepared for the violent actions the group would take that day.

128.    Members of Defendant Oath Keepers were equally clear that the purpose of their

unlawful presence at the Capitol was to interfere with the tally of Electoral College votes.  One

member of Defendant Oath Keepers, for example, posted a photograph of herself at the Capitol

on the social media site Parler, along with the statement: "Me before forcing entry into the

Capitol Building.  #stopthesteal #stormthecapitol #oathkeepers #ohiomilitia."  Another post late

in the day declared: "Yeah.  We stormed the Capitol today.  Teargassed, the whole, 9.  Pushed

our way into the Rotunda.  Made it into the Senate even.  The news is lying (even Fox) about the

Historical Events we created today."

129.    Like Defendant Proud Boys, members of Defendant Oath Keepers communicated

with portable devices that permitted them to coordinate their activities in the Capitol.  A message

later posted on Facebook for example revealed Defendant Oath Keepers was transmitting

intelligence about the location of members of Congress whom they were hunting.  It said: "All

members are in the tunnels under capital seal them in.  Turn on gas."  Another message

transmitted to Defendant Oath Keepers leader Thomas Caldwell during the attack reported:

"Tom, all legislators are down in the Tunnels 3 floors down," and "Go through back house

chamber doors facing N left down hallway down steps."  Still another message among members

of Defendant Oath Keepers revealed the organized manner in which they pursued their mission:

"We have a good group.  We have about 30-40 of us.  We are sticking together and sticking to the plan."

130.    Reflecting on their success in interfering with the tally of the Electoral College votes, Defendant Oath Keepers leader Thomas Caldwell posted a message on Facebook at nearly 8:00 PM on the same day with a video of himself inside the Capitol and the message: "Us storming the castle.  Please share.  Sharon was with me.  I am such an instigator!  She was ready for it man!  Didn't even mind the tear gas."

131.    Gloating over their perceived success, Caldwell then sent another message reporting: "Proud boys scuffled with cops and drove them inside to hide.  Breached the doors.  One guy made it all the way to the house floor, another to Pelosi's office.  A good time."

132.    Viewing their success in disrupting the Congress as a model for similar actions in the future, Caldwell sent another message stating: "We need to do this at the local level.  Let's storm the capitol in Ohio.  Tell me when!"

133.    Members of the riotous crowd prominently displayed a Confederate flag within the walls of the Capitol.  Widely viewed as a symbol of the subjugation of African Americans as slaves by the dominant white slave holders as well as a powerful reminder of the insurrection caused by the secession of the southern states before the Civil War, members of the riotous crowd carried the Confederate Flag as a banner reflecting much of the sentiment motivating many who invaded the Capitol.

134.    Outside the Capitol, rioters attacked Capitol Police officers, yelling "traitors" at those law enforcement officers who were trying to protect the Capitol and the members of the House of Representatives and Senate.

135.    Rioters sprayed law enforcement officers with bear mace, a concentrated pepper spray designed to deter bear attacks which is unsafe for use on humans.

136.    Capitol Police officers were dragged and kicked.

137.    At least one officer was beaten with the pole attached to an American flag.

138.    While the rioting crowd was forcibly entering the Capitol, roaming its halls and desecrating its offices, that same day Defendant Giuliani joined the other Defendants in seeking to delay and derail the tally of the Electoral College ballots by calling members of Congress, urging them to do everything they could to "slow it down" and "delay" the Electoral College vote count in Congress, in order to serve Defendant Trump's goal of returning the election to the states where a different outcome could be arranged.  In these phone call communications with selected members of Congress while the insurrection was ongoing on January 6, Defendant Giuliani urged: "And I know they're reconvening at eight tonight, but the only strategy we can follow is to object to numerous states and raise issues so that we get ourselves into tomorrow ideally until the end of tomorrow."

139.    In these phone calls with selected members of Congress, Defendant Giuliani introduced himself as the "President's lawyer," invoking the authority of, and conveying his agreement with the plans of, Defendant Trump.  Defendant Giuliani was Defendant Trump's personal attorney and counsel of record for Defendant Trump in multiple lawsuits following the November election, and has at all times represented Defendant Trump only in Defendant Trump's personal capacity.

140.    At 6:01 PM, Defendant Trump expressed the view that the insurrection attempted by the rioting crowd dispatched by Trump and Giuliani and the accompanying violence at the Capitol were justified and to be expected, tweeting: "These are the things and events that happen

35

when a sacred landslide election victory is so unceremoniously & viciously stripped away from

great patriots who have been badly & unfairly treated for so long.  Go home with love & in

peace.  Remember this day forever!"  Defendant Trump made these statements notwithstanding

that no state or court credited the claims of fraud that he and those acting on his behalf had

raised.

141.   The final announcement by Vice President Mike Pence of the count of the

Electoral College votes, which provided the imprimatur of Congress on the results of the

presidential election held in 2020, did not occur until 3:41 AM the next morning, January 7,

2021.

142.   Five people died during the course of the riot or from injuries sustained during the

riot.

143.   Fights between rioters and officers of the Capitol Police resulted in the

hospitalization of more than 50 officers.

144.   Faced with the threat of criminal prosecution, many of the rioting crowd members

justified their presence and their actions as occurring because Defendants Trump and/or Giuliani

instructed them to proceed in this unruly and disruptive manner, and that these individuals were

following orders from their then-President and his attorney.

145.   Rather than recognizing they had participated in a violent insurrection against the

government, some rioters were led to believe that they were authorized to overtake the Capitol to

prevent the fraudulent election of then-former Vice President Joseph Biden, given the factually

baseless statements made in the days and weeks before by Defendants Trump and Giuliani and

the directions to the assembled crowd at the Save America rally.

36

146.     Some of those who followed Defendant Trump's directions and stormed the

Capitol, including leaders of the Proud Boys, have since stated that they believed their actions

were lawful, as they were acting at the direction of Defendant Trump, whom they believed to be

the country's chief law enforcement officer.

147.     Many former members of Defendant Trump's administration, including former

White House Chief of Staff John Kelly, former White House Chief of Staff Mick Mulvaney,

former Secretary of Defense Jim Mattis, former Attorney General Bill Barr, former Ambassador

to the United Nations John Bolton, and former National Security Advisor H.R. McMaster, have

stated that Defendant Trump was directly responsible for the insurrection.

## VIII.   A Bipartisan Group of Officials Recognize Defendant Trump's Culpability for the January 6 Assault on the Capitol

148.     On January 13, 2021, an Article of Impeachment was passed by a bipartisan

majority of the House of Representatives, citing Defendant Trump for inciting the violence

perpetrated at the Capitol.  The Article of Impeachment provides, in part:

> On January 6, 2021, pursuant to the 12th Amendment to the
> Constitution of the United States, the Vice President of the United
> States, the House of Representatives, and the Senate met at the
> United States Capitol for a Joint Session of Congress to count the
> votes of the Electoral College.  In the months preceding the Joint
> Session, President Trump repeatedly issued false statements
> asserting that the Presidential election results were the product of
> widespread fraud and should not be accepted by the American
> people or certified by State or Federal officials.  Shortly before the
> Joint Session commenced, President Trump, addressed a crowd at
> the Ellipse in Washington, D.C.  There, he reiterated false claims
> that "we won this election, and we won it by a landslide."  He also
> willfully made statements that, in context, encouraged — and
> foreseeably resulted in — lawless action at the Capitol, such as: "if
> you don't fight like hell you're not going to have a country
> anymore."  Thus incited by President Trump, members of the
> crowd he had addressed, in an attempt to, among other objectives,
> interfere with the Joint Session's solemn constitutional duty to
> certify the results of the 2020 Presidential election, unlawfully
> breached and vandalized the Capitol, injured and killed law

> enforcement personnel, menaced Members of Congress, the Vice
> President, and Congressional personnel, and engaged in other
> violent, deadly, destructive and seditious acts.

149.    At the conclusion of President Trump's impeachment trial, the Senate voted to acquit Defendant Trump, finding Defendant Trump not guilty of inciting the deadly riot at the Capitol by a vote of 57 to 43.

150.    Minutes after voting to acquit Defendant Trump, however, Senate Minority Leader Mitch McConnell gave a speech on the floor of the Senate.  Senator McConnell began by acknowledging Defendant Trump's culpability: "There is no question that President Trump is practically and morally responsible for provoking the events of that day.  The people who stormed this building believed they were acting on the wishes and instructions of their president.  And their having that belief was a foreseeable consequence of the growing crescendo of false statements, conspiracy theories, and reckless hyperbole which the defeated President kept shouting into the largest megaphone on planet Earth."  However, like the other Senators who voted to acquit Defendant Trump, Senator McConnell did not believe that the impeachment process was constitutional.  Senator McConnell went on to state that "President Trump is still liable for everything he did while he was in office, as an ordinary citizen, unless the statute of limitations has run, still liable for everything he did while in office, didn't get away with anything yet – yet.  We have a criminal justice system in this country.  We have civil litigation.  And former presidents are not immune from being held accountable by either one."

**IX.**     **Plaintiffs Were Injured by Defendants' Conduct**

    **a.**     **The Honorable Bennie Thompson**

151.     When the attack on the Capitol began, Plaintiff Thompson was seated in Gallery C of the House of Representatives, prepared to discharge his duties to supervise and eventually vote on approval of the count of the Electoral College ballots.

152.     Plaintiff Thompson was present when the proceeding began at 1:00 PM, as required by the Electoral Count Act of 1887.

153.     Between approximately 2:15 and 2:20 PM, soon after rioters had breached the Capitol Building, the House was called into recess.

154.     Plaintiff Thompson heard rioters pounding on the door of the House Chamber and saw security guards move furniture to blockade the door.  He then heard the rioters trying to break into the Chamber refer to Speaker Pelosi as a "bitch," saying they wanted to get their hands on her and refer to Vice President Pence as having betrayed President Trump.

155.     Plaintiff Thompson witnessed security personnel draw their firearms to protect Plaintiff Thompson and other members of Congress, who were there to perform their legally required duties, from the violent rioters who were attempting to disrupt, and ultimately did disrupt, this important function of Congress.

156.     Through the blocked doors, Plaintiff Thompson heard threats of physical violence against any member who attempted to proceed to approve the Electoral College ballot count.

157.     Plaintiff Thompson heard a gunshot, the source of which, at the time, was unknown to him, although he later learned that it had killed one of the rioters who had forced her way into the Capitol lobby.

158.    Capitol security instructed Plaintiff Thompson and the other lawmakers to lie on the floor, don gas masks that were stored under seats in the gallery, and to move to the other side of the gallery.  After an extended period of time had elapsed, during which Plaintiff Thompson and his colleagues were unable to move or leave the gallery because the rioters posed a continuing threat to their safety, Capitol security led Plaintiff Thompson and the other lawmakers through a tunnel out of the Capitol to the Longworth House Office Building ("Longworth"), where they were directed to shelter in a room with 200-300 other lawmakers, staff members, and family members.

159.    During this period, Plaintiff Thompson received telephone calls from his wife who reported what she saw on the televised reports of violence at the Capitol.  Plaintiff Thompson ultimately moved to a different room in Longworth, and at about 6:00 PM was moved to a secure location in the Capitol.

160.    Plaintiff Thompson personally witnessed rioters who had gotten far into the building and were lying face down on the floor and restrained after being arrested by security.

161.    All these events took place during a worldwide COVID-19 pandemic.  Plaintiff Thompson was 72 years old at the time and therefore within the age group for which the virus posed the greatest risk to his health.

162.    By being required to shelter in place, Plaintiff Thompson and other members of Congress were forced to occupy space that did not allow for the social distancing measures that minimized the risk of transmission of the virus.

163.    Shortly after the siege on the Capitol ended, at least two other members of Congress who shared the confined space with Plaintiff Thompson tested positive for COVID-19.

164.     Until the proceedings with the count of the Electoral College ballots resumed at approximately 8:00 PM, Plaintiff Thompson and other members were barred from leaving the Capitol Building because their safety remained at risk from rioting crowd members who were still present.

165.     During this entire time, Plaintiff Thompson reasonably feared for his physical safety.  While trapped in the building, during the siege by the rioters that Defendants unleashed on the Capitol, Plaintiff Thompson feared for his life and worried that he might never see his family again.

    **b.**    **The Honorable Karen Bass**

166.     Rep. Bass was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

167.      Shortly before the attack on the Capitol began, Rep. Bass left the Gallery to walk to her office in the Rayburn House Office Building ("Rayburn"), where she was to conduct a video conference call.  As she walked, she saw the crowd of Defendant Trump's supporters through the window.

168.     Upon walking into her office, Rep. Bass learned that the Capitol had been breached.  Had she walked slower, or been delayed even by a few minutes, she would have been subject to attack when the rioters breached the building.

169.     Rep. Bass was directed by the Capitol Police to shelter in place in her office.  Rep. Bass posted a video on social media while in her office.  Her concern for her safety grew when an officer directed her to take down the post, as the video revealed her location and could expose her to harm from the rioters.

170.     Fearing for her safety, Rep. Bass remained in her office until the insurrection was quelled and she confirmed it was safe to leave.

171.     At about 8:00 PM, Rep. Bass returned to the Capitol to discharge her duty to observe and ultimately approve the count of the Electoral College ballots and ratify the results of the 2020 presidential election.  She remained in the Capitol until the early morning of January 7 in order to perform those duties.

172.     The riot has shaken Rep. Bass's faith in the security of the Capitol.  For days after the riot, she was troubled by the realization that she could have been seriously harmed or killed by the rioters at the Capitol.

       c.     **The Honorable Stephen Cohen**

173.     When the attack on the Capitol began, Rep. Cohen was seated in the Gallery of the House of Representatives, prepared to discharge his constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.

174.     Rep. Cohen was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

175.     Shortly after the proceedings began, Rep. Cohen heard loud shouts and aggressive banging on the doors from outside the Gallery.  The officers within the room gave instructions to the members to retrieve, and be prepared to don, gas masks stored below their seats.  As he heard these threatening noises grow louder and more insistent, Rep. Cohen became increasingly fearful that his personal safety was in jeopardy.  Anticipating that he might not emerge from the House Gallery alive, he began to contemplate whether he would want to be buried with his family in Memphis or at the Congressional Cemetery.

176.     When the Capitol Police directed members sitting in the House Gallery to evacuate, they were directed to traverse the Gallery to arrive at the exit.  This evacuation required Rep. Cohen to walk the length of the Gallery, navigating narrow paths between closely positioned rows of seats and surmounting multiple aisle railings.  As Rep. Cohen had contracted polio as a child that left him with a limp, the need to exit the House Gallery rapidly impaired his balance, causing him to fear that he would fall.

177.     Following evacuation from the Gallery, Rep. Cohen walked out into a public hall where an officer called for an elevator.  Rep. Cohen took the elevator to the sub-basement.  From there, he went to his office in Rayburn.  Once inside his office, he locked the two doors, turned off the lights so no one would know he was there, and grabbed a baseball bat for protection.  He sat in his chair, with the bat in his hands or lying next to him for two to three hours.

178.     Following the incidents described above, Rep. Cohen developed difficulties falling and staying asleep that he had not previously suffered and difficulties with his digestion that he had not suffered before.  He became jumpy whenever he heard a loud or unfamiliar noise in his home.  He also had recurring fears that he was not as safe as he had previously believed, renewing his thoughts about the choice of places where he would be buried.

**d.     The Honorable Veronica Escobar**

179.     When the attack on the Capitol began, Rep. Escobar was seated in the front row of the Gallery of the House of Representatives, prepared to discharge her constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.

180.     Rep. Escobar was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

181.     Shortly after the proceedings began, Rep. Escobar learned that the Cannon House Office Building ("Cannon") was being evacuated and then saw the Speaker of the House escorted from the House floor.  While she had received no formal notice that rioters had entered the Capitol, inquiries about her safety from family member text messages and reports on social media left her feeling that the Capitol was under attack.  Nonetheless, she expected the law enforcement officers present would ably protect the Capitol and the members present within it.

182.     Rep. Escobar grew more fearful for her safety when she saw law enforcement officers escort the Speaker of the House and other leadership off the House floor.  Her fears increased when the doors of the House Chamber were shut and a Capitol Police officer instructed her and the other members present to retrieve the gas masks from under their chairs.  She grew more alarmed that her safety might be jeopardized when she began hearing shouts and banging from people outside the House Gallery.  Her heart began racing as she realized she might be trapped in the House Gallery, unable to protect herself from what sounded like an angry mob. Her fears were heightened even further when the Capitol Police informed her that tear gas had been released in Statuary Hall and she realized she did not know how to properly wear the gas mask provided her.

183.     Eventually Rep. Escobar was instructed to evacuate the House Gallery, which required her to walk to the other side of the Gallery.  She had to traverse narrow paths between the rows of seats and crouch under a number of railings that separate the sections of the Gallery. When she reached the other side of the Gallery, she saw that doors to the House Chamber had been barricaded with furniture and was startled by the sounds of shattering glass.  She feared rioters would reach another door to the House Chamber that she saw was neither barricaded nor guarded by the Capitol Police.

184.    During the time required for Rep. Escobar to cross the entire Gallery, she heard sharp noises and banging, prompting her on several occasions to take cover behind the wall in the front of the Gallery.  When Rep. Escobar and other members with her finally reached the other side of the Gallery, they were instructed to lie down on the floor of the Gallery.  She felt their safety was in great jeopardy when she saw police officers standing behind a door barricaded with furniture, with their firearms drawn towards the door.  The glass in the windows was broken and she could see faces of rioters on the other side of the officers.

185.    After hearing the rioters shouting outside the House Chamber and banging on the Chamber doors, punctuated by a loud gunshot, Rep. Escobar feared that an officer had been shot and that the mob had entered the Speaker's Lobby, located adjacent to the House Chamber, putting her life in imminent danger.  Hoping that a nearby Capitol Police officer who was guarding a door to the House Gallery would be her last line of defense, she pleaded with him not to admit anyone whose identity was not confirmed.

186.    When Rep. Escobar was finally evacuated from the Gallery, she saw several intruders who had been apprehended lying face down on the floor.  Eventually, she reached the sub-basement of the House Chamber and found her way to a large room in Longworth where she and other members were directed to remain.  As there was insufficient space in the hearing room for members to maintain the social distance prescribed by the CDC, and many members were unwilling to wear masks, she became worried that she was being exposed to a heightened risk of contracting COVID-19.  She waited in the anteroom with several other members.  At the direction of the Capitol Police, she sheltered in this room for several hours before she was able to return to her office, where she remained until she returned to the House Chamber when the proceedings resumed.  She remained in the House until about 3:00 AM.

187.     When Rep. Escobar had returned to the House after leaving Longworth, she saw the floor littered with broken glass and other debris, reminiscent of a crime scene.

188.     Rep. Escobar struggled to fall asleep that night and has had difficulty, as never before, sleeping in the weeks following January 6, 2021.  She suffered from violent nightmares and has since talked with mental health professionals as a direct result of these events.

      **e.**      **The Honorable Pramila Jayapal**

189.     When the attack on the Capitol began, Rep. Jayapal was seated in the Gallery of the House of Representatives, prepared to discharge her constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.

190.     Rep. Jayapal was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

191.     Shortly after the proceedings began, she received an email notification from the Capitol Police reporting the evacuation of Cannon.

192.     Soon thereafter, Rep. Jayapal sent a text message stating, "Police have been breached.  Chaos is going to break out and violence too."  Believing that the Chamber of the House of Representatives was the most secure place she could be and having received no direction otherwise, Rep. Jayapal remained in the House Gallery, confident that the Capitol Police were able to protect her.

193.     At about this time, Rep. Jayapal saw on social media to which she had access that rioters breached the Capitol, and she began hearing shouts, screams and other loud noises outside the House Gallery.  Another Member of Congress showed her a photo of a rioter who was inside the Senate Chamber holding flex cuff restraints.

194.    A little while later, Rep. Jayapal saw the Speaker of the House, other House leadership, and the members on the House floor evacuate, causing her to begin questioning her safety in the House Gallery.

195.    Then Rep. Jayapal saw the Capitol Police barricading the doors of the House Chamber, heightening her concerns about her safety in the House Gallery.

196.    Soon thereafter, the Capitol Police instructed Rep. Jayapal and others in the House Gallery to retrieve from under their seats, and put on, gas masks which she had never been trained to use.

197.    Then the Capitol Police instructed Rep. Jayapal and other members seated in the House Gallery that they needed to move to the other end of the Gallery, though they were not told why.  To reach the other side of the Gallery, Rep. Jayapal was required to crouch down and walk under multiple railings to travel through the various sections of the Gallery.  As she was recovering from surgery for the replacement of her knee that required her to move slowly and use a cane, traversing the Gallery was very difficult and painful, especially when she had to crouch under the railings.

198.    Once she reached the other side of the Gallery, Rep. Jayapal and the members who were in the Gallery with her were instructed to get down on the floor.  This was extremely difficult for Rep. Jayapal because of her recent surgery.  Once Rep. Jayapal was on the floor, she looked down on the main floor of the Chamber and saw the doors to the main floor had been barricaded and law enforcement was positioned in a semi-circle around the doors with guns drawn.  She also heard rioters banging on the doors of the Gallery and saw Capitol Police officers using their bodies to hold those doors closed.  Her fear for her safety spiked when she heard a gunshot, believing it was a shot into the House Chamber.

47

199.    Rep. Jayapal's fear for her safety increased when she noticed it wasn't possible to barricade the doors to the House Gallery, as the furniture was bolted to the floor.  As her very limited mobility precluded her from moving quickly and, she feared, would render it impossible for her to rapidly escape any physical threats, she considered as a last resort using her cane and gas mask to defend herself from attacks by rioters in the event they entered the Gallery.  As she heard some members around her begin praying, Rep. Jayapal was struck by the realization that she might lose her life or suffer severe injury in the Gallery.

200.    Eventually, Capitol Police officers permitted Rep. Jayapal to exit the Gallery, which required her to pass by a group of rioters prone on the floor, whose conduct was so violent that the law enforcement officers had to secure them with drawn firearms.

201.    The exit from the Gallery required Rep. Jayapal to descend several tiers of stairs very slowly, leaning on another Member of Congress for support.  The pain in her knee was excruciating.

202.    Eventually, she descended to the sub-basement level.  As the congressional trains were not running that day, Rep. Jayapal limped through the tunnel to Longworth where she had initially been directed to shelter.  On her way to Longworth, she got on the escalators to Rayburn.  At that point, a Capitol Police officer instructed Rep. Jayapal and the small group of other members with her to instead go to a large room in Rayburn.

203.    Finally, Rep. Jayapal arrived at the room in Rayburn, exhausted and drained by the throbbing pain in her greatly swollen knee.

204.    The room to which Rep. Jayapal was directed was densely populated by many members of Congress, forcing the members in proximity to each other much closer than the CDC social distancing guidelines prescribed to minimize the risk of COVID-19 infection.  While Rep.

48

Jayapal continuously wore a mask prescribed by the CDC, she saw many members in the room who were not wearing protective masks, exposing her to a "super spreader event." Having been confined to this room to ensure her safety from the rioters who invaded the Capitol, Rep. Jayapal was compelled to remain there for nearly five hours, during which she was inevitably exposed to members with and without masks, none of whom were socially distant from the others.

205.    Rep. Jayapal was permitted to depart from Rayburn at about 8:00 PM, at which time she returned directly to the House Chamber; she remained there until approximately 3:30 AM on January 7, 2021, when the voting concluded that ratified the results of the Electoral College balloting.

206.    In the week prior to these events, Rep. Jayapal tested negative twice for the COVID-19 virus. Several days after she was confined to the room in Rayburn with members who refused to wear protective masks, she exhibited symptoms such as fever, chills, extreme exhaustion, and difficulty breathing. On Monday, January 11, Rep. Jayapal tested positive for COVID-19.

207.    As Rep. Jayapal's symptoms worsened and she experienced greater difficulty breathing, her pre-existing conditions of asthma and pre-diabetes qualified her for the Monoclonal Antibody Treatment for COVID-19. Notwithstanding this treatment, she continued to experience COVID-19 symptoms for at least seven days and did not fully recover for six weeks.

208.    The events described above caused Rep. Jayapal physical pain to her knee that endured well after she returned from discharging her duty to ratify the results of the Electoral College vote. Prior to January 6, Rep. Jayapal was informed by her physical therapist and surgeon that her recovery from the knee-replacement surgery was ahead of schedule. After

being required to bend her knee to maneuver under the railings in the House Gallery, crouch down on the floor, crawl on her knees, stand back up, and traverse multiple staircases and long walkways, Rep. Jayapal endured significant pain and experienced setbacks in her knee replacement surgery recovery.

209.     Following these events, Rep. Jayapal's physical therapist informed her that no individual recovering from knee replacement surgery would be able to easily get down on the floor only five weeks post-operation.  Her range of movement decreased following these events and her recovery was slowed.  Her recovery was also negatively impacted by her COVID-19 diagnosis, as she could not continue her physical therapy schedule regularly for several weeks.

210.     In addition to the pain and suffering caused Rep. Jayapal by the events alleged above, she also suffered grave fear for her personal safety while she was confined in the House Chamber.  In the days following the events of January 6, Rep. Jayapal spoke with mental health professionals in both group and individual settings about fears for her safety that she had never encountered before.  Her need for counseling was a direct result of the attack on the Capitol.

**f.     The Honorable Henry C. "Hank" Johnson, Jr.**

211.     When the attack on the Capitol began, Rep. Johnson was seated in the Gallery of the House of Representatives, prepared to discharge his duties to supervise and eventually vote on approval of the count of the Electoral College ballots.

212.     Rep. Johnson was present shortly after the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

213.     After the proceedings had been underway for a little while, Rep. Johnson heard noises that sounded like a commotion, bumping, and shuffling.  Such noises were not typical at the Capitol for such an event, causing him to begin worrying whether there was trouble nearby.

214.    Shortly thereafter, the Capitol Police instructed Rep. Johnson and other members to retrieve and put on gas masks that were stored under their seats in the Gallery.  Sometime later, he and other members were instructed to make their way to the Gallery exit, requiring him to navigate with difficulty narrow paths between the rows of seats and surmount railings between Gallery sections.  As he continued to hear banging on the House Chamber doors and increasingly virulent shouting, he feared the situation was serious and might end badly for him and other members nearby.

215.    His fear that he might be unable to evade the growing efforts to enter the House Chamber by loud and boisterous intruders were heightened even further when he heard a gunshot, prompting him to drop to the floor in a crouch as the Capitol Police instructed Rep. Johnson and other members to lie on the floor.

216.    After exiting the Gallery, he was surprised and troubled to see intruders who were secured by law enforcement officers, lying face down on the floor, where they were guarded by officers with drawn weapons.

217.    Eventually, Rep. Johnson was directed to shelter in Longworth, where he remained for several hours.  Immediately upon arriving at the Longworth room and throughout his time sheltering there, he was forced to stand with other members who, because of their number, could not be socially distant from each other, as the CDC prescribed to minimize transmission of the COVID-19 virus.  And many members declined to wear masks, as the CDC prescribed.  As Rep. Johnson was 66 years old at the time, he feared during the time he sheltered in Longworth that he would contract the virus and jeopardize his health after having fled conditions that jeopardized his safety.

218.    After he sheltered in Longworth for several hours, he returned to the Capitol where he completed his responsibility to oversee and approve the results of the Electoral College balloting.

g.    **The Honorable Marcy Kaptur**

219.    When the attack on the Capitol began, Rep. Kaptur was seated in the Gallery of the House of Representatives, prepared to discharge her constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.

220.    Rep. Kaptur was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

221.    Sometime after the proceedings were underway, Rep. Kaptur witnessed law enforcement officers escort the Vice President and the Speaker of the House off the House floor. Another Member of the House leadership attempted to preside over the debate, but the proceedings were totally interrupted by loud and unruly shouting and banging heard nearby. Rep. Kaptur also heard echoing sounds in the stairwell of the Capitol.  Then a Capitol Police officer ran into the House Chamber, announcing that the police were trying to gain control of some corridors that had been breached by rioters, prompting some concern that her safety and that of other members might be in jeopardy.  Thereafter, the House was called into recess and she and other members were instructed to remain seated.

222.    While she was seated in the Gallery, Rep. Kaptur grew increasingly worried about the safety of the members and staff as she heard loud noises and bangs in the hallways outside the House Chamber that sounded like logs being pounded against the doors.  She grew increasingly eager to exit the Gallery, as she feared that hostile intruders might enter the House Chamber and put her safety at risk.

52

223.    Rep. Kaptur's worries that threats to her safety were nearby were heightened when a Capitol Police officer announced that tear gas had been launched in the Rotunda and urged them to put on gas masks stored under their seats.  Rep. Kaptur had not been trained on how to remove the gas mask from its case and metallic shrink-wrapping or how to use the gas mask.  She faced a dilemma that worried her, as she feared wearing a gas mask would fog up her glasses, making it difficult to see clearly and ultimately to exit.

224.    Her concern for her safety grew as banging on the Gallery doors became louder and more frequent and she saw an officer pushing back on a heavy door.

225.    Rep. Kaptur, being one of about a dozen members feeling stranded in the Gallery for some time, was eventually instructed to exit the area by crossing to the opposite side of the Gallery.   Her exit was delayed and made more difficult by the need to pass through many sets of low-rise railings by either climbing over the railings or crouching under them.  Several members ahead of her struggled to crouch below these railings.  But when she reached the other end of the Gallery, Rep. Kaptur was directed by the Capitol Police to crouch down and hide behind the short balcony wall and wait quietly.  As the intruders continued to storm the hallways and bang on the Gallery doors, she was informed there was still no safe exit.  There was no means to assure who might be on the other side of the Gallery's exit.

226.    While Rep. Kaptur hid on the floor of the Gallery, her fear for her safety and that of her colleagues was confirmed when an officer directed a photographer to cease his efforts to photograph the surroundings, as the flash of the camera might reveal their location to the rioters immediately outside the House Chamber.  Rep. Kaptur remained on the Gallery floor for close to half an hour before she was finally allowed to exit.  Her last view of the House floor was of

several law enforcement officers standing with their firearms drawn towards the doors to the House Chamber.

227.    After she exited the Gallery, Rep. Kaptur traveled a long distance through hallways and stairwells down to the sub-basement, where she finally arrived at a very crowded room where other members and their staffs sheltered.  After leaving threats to her physical safety, Rep. Kaptur grew concerned for her health, as she was directed to shelter in a room in which members could not remain socially distant and many refused to wear masks, as the CDC prescribed as the means to minimize the risk of contracting COVID-19.  Rep. Kaptur was 74 years old at the time and therefore within the age group for which the virus posed the greatest risk to her health.

228.    Rep. Kaptur was required to remain in this room for several hours until she was informed that it was safe to return to her office.  She returned to her office and joined her staff at approximately 9:00 PM, at which point she left the Capitol complex and returned home.

      **h.**    **The Honorable Barbara Lee**

229.    When the attack on the Capitol began, Rep. Lee was seated in the House of Representatives, prepared to discharge her constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.

230.    Rep. Lee was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

231.    Shortly after the proceedings began, Rep. Lee saw reports that Cannon was being evacuated.  When the Speaker of the House and other members of the House leadership were escorted from the Chamber, Rep. Lee concluded that, taken together, these two events reflected some kind of threat was nearby.

232.     Rep. Lee began to harbor concerns about her safety when Capitol Police officers locked the doors to the House Chamber and told the members who remained to shelter in place.

233.     Shortly thereafter, Rep. Lee's fear for her safety grew when saw news reports transmitted to her mobile telephone that violent intruders had breached the outer perimeter of the Capitol and had entered Statuary Hall.

234.     Her fears for her safety grew even higher when the Capitol Police officers warned that she may need to shelter on the House floor and heard someone say that bullets might be coming in.  The instruction that followed, that she prepare to put on a gas mask for which she was never trained to use, compounded her fears, as she expected that the intruders would be using tear gas or another chemical irritant.  As this chaos unfolded, Capitol Police told Rep. Lee and others on the House floor that they needed to evacuate.  Rep. Lee and others hurried off the House floor through the Speaker's Lobby and then escaped down three or four flights of stairs.

235.     After traveling through tunnels in the sub-basement, she arrived in Longworth and was brought to a room where a large number of other members of Congress and staffers sheltered in place.  After leaving threats to her physical safety, Rep. Lee realized the place where she was directed to shelter would pose a threat to her health, as there was insufficient room for the members in the room to social distance themselves, as the CDC prescribed, and many refused to wear masks, as the CDC directed in order to minimize transmission of the COVID-19 virus. Rep. Lee was 74 years old at the time and therefore within the age group for which the virus posed the greatest risk to her health.

236.     At about 8:00 PM, Rep. Lee was permitted to leave the room in Longworth in which she had sheltered for several hours.  She returned directly to the House Chamber where

she remained until approximately 3:30 AM on January 7, 2021 when the voting concluded that ratified the results of the Electoral College balloting.

237.    The events on January 6 described above left Rep. Lee feeling that she had narrowly escaped serious injury or death on that date, prompting her to finalize her plans for her estate.

       **i.**    **The Honorable Jerrold Nadler**

238.    Rep. Nadler was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

239.    Shortly after an objection was made to the counting of the certified Electoral College ballots from Arizona, Rep. Nadler went to his office in Rayburn to wait until the joint session of Congress was reconvened.  After arriving at his office, Rep. Nadler learned that the Capitol had been breached by boisterous and threatening intruders.

240.    Having seen that violent intruders had entered the Capitol and needing to remain nearby to participate in the votes needed to ratify the results of the 2020 presidential election, Rep. Nadler believed he needed to shelter in place in Rayburn.

241.    Believing that if the intruders could enter the Capitol, they could also enter Rayburn, he began searching for a place in which he could shelter in place safely.  After considering places in his personal office that might be safe, he concluded the plate bearing his name on his office door made his office a target of hostile intruders in the event they entered the building.  Therefore, Rep. Nadler sought refuge in the nearby offices of the House Judiciary Committee where his name did not appear on the exterior.

242.    Rep. Nadler sheltered in place in the Judiciary Committee office for hours awaiting confirmation that the riot had been quelled.  Throughout this time, Rep. Nadler

genuinely feared for his safety.  Anticipating that he might need to evacuate Rayburn on short

notice, he prepared a "go bag" with materials he might need in the immediate future.  Having

watched reports of the menacing and aggressive behavior of the rioters who entered the Capitol,

Rep. Nadler had serious concerns that his personal safety and even his life would be jeopardized

in the event the intruders came to Rayburn.

**j.**    **The Honorable Maxine Waters**

243.    Rep. Waters was present when the proceedings began at 1:00 PM, as required by

the Electoral Count Act of 1887.

244.     Shortly before the attack on the Capitol began, Rep. Waters left the Gallery to

walk to her office in Rayburn and wait for the joint session to reconvene.

245.    Upon arrival at her office, Rep. Waters learned from televised news reports that

rioters had breached the Capitol Plaza and had advanced to the Capitol Building.  She watched as

the rioters forcibly entered the Capitol and violently charged police officers, fearful that her own

safety was in jeopardy.

246.    Rep. Waters telephoned the Chief of the Capitol Police to discuss the dangerous

situation that was unfolding.  Having been informed on that telephone call of the scope and force

of the incursion into the Capitol, Rep. Waters immediately barricaded herself in her office.

247.    Although Rep. Waters was later advised by the Capitol Police that she could join

other Members who were sheltering in the Cannon Building, she declined the offer out of fear

for her safety.  Instead, she remained barricaded in her office.

248.    After several hours had elapsed, the Capitol Police informed her that the rioters

had been contained.  Thereafter, Rep. Waters returned to the Capitol to discharge her duty to

observe and ultimately approve the count of the Electoral College ballots and ratify the results of

57

the 2020 Presidential election. She remained in the Capitol until the early morning of January 7 in order to perform those duties.

249. Since the riot, Rep. Waters has had increased worries about her safety, and has felt compelled to increase the amount of security personnel with whom she travels to and from her home.

**k.** **The Honorable Bonnie Watson Coleman**

250. On January 6, Rep. Watson Colman arrived at the Capitol earlier than she had originally planned because she was evacuated from her apartment due to a bomb found near her building.

251. Rep. Watson Coleman was in the Capitol when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

252. Rep. Watson Colman, her husband, and one of her staffers arrived at the Capitol shortly before the time at which the rioters descended on the Capitol. Upon arriving, Rep. Watson Colman planned to go to the attending physician's office to attend to a minor medical need. As she walked toward that office, she could see and hear the rioters as they came down the hallway.

253. An officer instructed Rep. Watson Colman, her husband, and the staffer to get behind him. The officer escorted them to a small room near the physician's office. Inside the room, Rep. Watson Coleman, her husband, the staffer, and a nurse locked themselves behind two doors. Rep. Watson Coleman could hear chants of "USA," along with other shouts and menacing noises from the insurgents in the next hallway. While trapped in the room, Rep. Watson Coleman hoped that, if the rioters broke down the first door, the second thicker door would be strong enough to keep them out of the room.

254.    After several hours had transpired, during which she heard the menacing sounds of the violent and hostile intruders and feared that their entry would cause her physical harm, members of the Capitol Police banged on the door to reassure her that she could leave the place where she had sheltered.

255.    Thereafter, Rep. Watson Coleman and the others were taken through a tunnel to Longworth.  Rep. Watson Coleman, who suffers from chronic obstructive pulmonary disease, had to stop multiple times during the trek to catch her breath.

256.    Upon arriving in Longworth, Rep. Watson Coleman realized that while she may have left behind the threat of physical assault, she was going to be exposed to another health risk. The large number of members confined to the same room made it impossible for her to socially distance herself from others, as the CDC had recommended, and the multiple members who refused to wear masks posed a significant risk of COVID-19 transmission to her.  As Rep. Watson Coleman was 75 years old at the time and had a pre-existing pulmonary medical condition, she had a heightened risk of infection and of experiencing severe symptoms.  After being confined in this room for several hours, she arranged to move to the office of another Member of Congress where there were far fewer people.  She remained there until she was permitted to return to the Capitol.

257.    Prior to being trapped at the Capitol, Rep. Watson Coleman had consistently taken measures to limit potential exposure to the COVID-19 virus.  She had been tested for the virus as recently as January 3, 2021, and the results were negative.

258.    After learning from the attending physician that persons with her in Longworth were testing positive for COVID-19, on Monday, January 9, 2021, Rep. Watson Coleman submitted to a test that day.  Following the test, Rep. Watson Coleman learned that her results

were positive.  Her age and medical condition permitted her access to the Monoclonal Antibody

Treatment for COVID-19, which she began receiving the same day as she received the test

results.  Her physician informed her that, absent her partial vaccination and special antibody

treatment, her life would have been in jeopardy.  Notwithstanding the prompt medical treatment

she received, Rep. Watson Coleman still suffered from congestion, coughing, and fatigue.

## CAUSE OF ACTION

### Violation of the Ku Klux Klan Act

259.    Plaintiffs incorporate herein by reference the allegations contained in all

preceding paragraphs.

260.    Under the Ku Klux Klan Act, 42 U.S.C. § 1985(1), Defendants may not "conspire

to prevent, by force, intimidation, or threat, any person … holding any office, trust, or place of

confidence under the United States … from discharging any duties thereof; or to induce by like

means any officer of the United States to leave any … place[] where his duties as an officer are

required to be performed, or … to molest, interrupt, hinder, or impede him in the discharge of his

official duties."

261.    Defendants Trump, Giuliani, Proud Boys and Oath Keepers plotted, coordinated,

and executed a common plan to prevent Congress from discharging its official duties in

certifying the results of the presidential election.

262.    In furtherance of this conspiracy, Defendants Trump and Giuliani engaged in a

concerted campaign to misinform their supporters and the public, encouraging and promoting

force, intimidation and threats in furtherance of their common plan to promote the re-election of

Defendant Trump, even after the states had certified election results decisively showing he lost

the election, and to disrupt the legally required process before Congress to supervise the counting of the Electoral College ballots and certify the results of that count.

263.     As a result, Defendant Trump acted beyond the outer perimeter of his official duties and therefore is susceptible to suit in his personal capacity.

264.     The activities alleged above were undertaken by all Defendants as co-conspirators for the purpose of seeking to prevent each of the Plaintiffs named above and other members of Congress from certifying that former Vice President Biden won the presidential election.

265.     As a result of the acts set out in the above paragraphs committed in furtherance of this conspiracy, each of the Plaintiffs named above was hindered and impeded in the discharge of his or her official duties and suffered the deprivation of the right to be free from intimidation and threats in the discharge of his or her official duties, as explicitly protected under Ku Klux Klan Act.  During the time when the Capitol was under attack, each of the Plaintiffs named above suffered emotional harm.

266.     As a result, each of the Plaintiffs named above seeks an award of compensatory damages.

267.     As the unlawful actions taken by the Defendants were malicious and in reckless disregard of federally protected rights, each of the Plaintiffs named above seeks an award of punitive damages to punish the Defendants for engaging in a concerted and continuing course of unlawful conduct and to deter the Defendants and others from engaging in similar unlawful conduct in the future.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request an award of the following relief:

      A.      A declaratory judgment that the actions described herein constitute a violation of 42 U.S.C. § 1985(1);

      B.      Injunctive relief enjoining Defendants from engaging in future violations of 42 U.S.C. § 1985(1);

      C.      Compensatory damages to each Plaintiff named above in amounts to be determined at trial;

      D.      Punitive damages to each Plaintiff named above in amounts to be determined at trial;

      E.      An award of costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

      F.      Such other relief as the Court deems necessary and just.

Dated: April 7, 2021

Respectfully submitted,

| | |
|---|---|
| */s/ Janette Louard* | */s/ Joseph M. Sellers* |
| Janette Louard (*pro hac vice motion to be filed*) | Joseph M. Sellers, Bar No. 318410 |
| Anthony P. Ashton, Bar No. MD0096 | Brian Corman, Bar No. 1008635 |
| Anna Kathryn Barnes, Bar No. 1719493 (*motion for admission pending*) | Alison S. Deich, Bar No. 1572878 (*motion for admission pending*) |
| NAACP | COHEN MILSTEIN SELLERS & TOLL PLLC |
| Office of General Counsel | 1100 New York Avenue, N.W. Suite 500, East |
| 4805 Mount Hope Drive | Tower Washington, DC 20005 |
| Baltimore, MD 21215 | Telephone: (202) 408-4600 |
| Telephone: (410) 580-5777 | Facsimile: (202) 408-4699 |
| jlouard@naacpnet.org | jsellers@cohenmilstein.com |
| aashton@naacpnet.org | bcorman@cohenmilstein.com |
| abarnes@naacpnet.org | adeich@cohenmilstein.com |