**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HON. BENNIE G. THOMPSON, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:21-CV-00400-APM |
| ) | |
| DONALD J. TRUMP, *et al.* ) | |
| ) | JURY TRIAL REQUESTED |
| Defendants. ) | |
| ) | |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF FACTS ..................................................................................2

    A.    Trump Openly Encouraged His Supporters to Act with Violence ........................4

    B.    The Misinformation Campaign Waged by Trump and Giuliani Provided the Emotional and Counterfactual Impetus for the Crowd that Descended on the Capitol Seeking to Prevent Certification of the Election in Favor of Trump's Opponent ................................................................................................5

    C.    Storming the Capitol to Prevent the Certification of the Election Was Central to Defendants' Plan to Secure Trump's Reelection ..................................8

    D.    Led by the Proud Boys and Oath Keepers, the Incensed Crowd Dispatched by Trump and Giuliani Used Force, Intimidation and Threats to Disrupt the Congressional Ratification of the Presidential Election Results....................14

III.    STANDARD OF REVIEW ...............................................................................16

IV.    ARGUMENT ......................................................................................................18

    A.    Plaintiffs Have Standing to Sue Under Section 1985(1).....................................18

        1.    Plaintiffs Are Not Attempting to Vindicate an Institutional Interest of the House of Representatives.................................................19

        2.    On the Day of the Insurrection, Plaintiffs Were Discharging the Duties of an "Office, Trust, or Place of Confidence Under the United States".....................................................................................21

            a.    Members of Congress hold an "Office, Trust, or Place of Confidence Under the United States" .........................................21

                (1)    Members of Congress Hold an "Office . . . Under the United States"........................................................22

                (2)    Members of Congress hold a "Trust[] or Place of Confidence Under the United States"...............................25

            b.    Members of Congress Were Discharging Their Duties on the Day of the Insurrection .........................................................29

        3.    Regardless of Whether Plaintiffs Hold an "Office, Trust, or Place of Confidence Under the United States," or "Discharg[ed] any Duties" on January 6, 2021, They Are Entitled to Relief Under Section 1985(1) .....................................................................................30

    B.    Plaintiffs Have Sufficiently Alleged a Conspiracy by All Defendants.................32

        1.    Plaintiffs Have Adequately Alleged an Agreement Among Defendants to Participate in Unlawful Acts.............................................32

            a.    Defendant Trump.....................................................................34

            b.    Defendant Giuliani...................................................................42

            c.    Defendant Oath Keepers .........................................................45

## TABLE OF CONTENTS

Page

2.   Plaintiffs Have Adequately Alleged Overt Acts Causing Injury ..............48

C.   The First Amendment Does Not Protect Defendants' Violent Conspiracy .........49

1.   Defendants Participated in an Unlawful Conspiracy................................50

2.   Defendants Incited Violence....................................................................54

3.   Section 1985(1) Is Not Unconstitutionally Vague ..................................56

4.   Section 1985(1) Is Not Unconstitutionally Overbroad............................59

5.   Plaintiffs Are Not Required to Plead "Actual Malice" ...........................61

6.   Plaintiffs Are Not Seeking Unlawful Prior Restraints ............................63

D.   Trump is Not Immune from Suit ........................................................................64

1.   Trump Is Not Entitled to Absolute Immunity...........................................64

2.   This Case Presents No Political Question.................................................68

E.   The Impeachment Judgment Clause, *Res Judicata*, and Collateral Estoppel
Do Not Apply .....................................................................................................70

1.   The Impeachment Judgment Clause Does Not Apply ..............................70

2.   *Res Judicata* Does Not Apply..................................................................72

a.   There was No Prior Litigation ......................................................73

b.   The Claims Here Are Not the Same as in the Impeachment.........73

c.   The Parties in the Case Are Not the Same as Those in the
Impeachment ................................................................................74

d.   There Has Been No Final, Valid Judgment on the Merits ...........75

e.   The Senate is Not a Court ............................................................76

3.   Collateral Estoppel Does Not Apply .......................................................76

V.   CONCLUSION ...............................................................................................77

# TABLE OF AUTHORITIES

Page

**CASES**

*Act Now to Stop War & End Racism Coal. v. District of Columbia*,
    846 F.3d 391 (D.C. Cir. 2017) ........................................................................ 55, 58

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) .................................................................................... 17

*Anderson v. Bessemer City*,
    470 U.S. 564 (1985) ................................................................................................ 17

*Arpaio v. Zucker*,
    414 F. Supp. 3d 84 (D.D.C. 2019) .......................................................................... 62

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................... 2, 16, 18

*Associated Press v. United States*,
    326 U.S. 1 (1945) ................................................................................................... 56

*Auriemma v. Montgomery*,
    860 F.2d 273 (7th Cir. 1988) ................................................................................. 66

*Baron v. Carson*,
    410 F. Supp. 299 (N.D. Ill. 1976) .......................................................................... 24

*Barr v. Clinton*,
    370 F.3d 1196 (D.C. Cir. 2004) ........................................................................ 61, 63

*Behrens v. Pelletier*,
    516 U.S. 299 (1996) ............................................................................................... 65

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................... 2, 16, 17

*Black Lives Matter D.C. v. Trump*,
    Nos. 20-cv-1469 (DLF), 20-cv-1542 (DLF), 20-cv-2163 (DLF), 20-cv-1622
    (DLF), 2021 WL 2530722 (D.D.C. June 21, 2021) .............................................. 39

*Blumenthal v. Trump*,
    949 F.3d 14 (D.C. Cir. 2020) ................................................................................. 20

*Bostock v. Clayton Cnty.*,
    140 S. Ct. 1731 (2020) ........................................................................................... 22

# TABLE OF AUTHORITIES

Page

*Brady v. Livingood,*
   360 F. Supp. 2d 94 (D.D.C. 2004) ..................................................................... 18

*Brandenburg v. Ohio,*
   395 U.S. 444 (1969) ................................................................................... 54, 55

*Brown v. Hartlage,*
   456 U.S. 45 (1982) ..................................................................................... 50, 53

*Burns v. Reed,*
   500 U.S. 478 (1991) ........................................................................................ 64

*Bushrod v. District of Columbia,*
   No. 1:18-cv-02462, 2021 WL 673906 (D.C. Cir. Feb. 22, 2021) ......................... 76

*Butz v. Economou,*
   438 U.S. 478 (1978) ........................................................................................ 64

*In re Cal. Bail Bond Antitrust Litig.,*
   No. 19-CV-00717-JST, 2020 WL 3041316 (N.D. Cal. Apr. 13, 2020) ................. 35

*Canell v. Or. Dep't of Just.,*
   811 F. Supp. 546 (D. Or. 1993) ......................................................................... 64

*Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LLC,*
   569 F.3d 485 (D.C. Cir. 2009) ..................................................................... 72, 76

*Chaplinsky v. New Hampshire,*
   315 U.S. 568 ................................................................................................... 50

*Citizens for Resp. & Ethics in Wash. v. Trump,*
   276 F. Supp. 3d 174 (S.D.N.Y. 2017) ................................................................ 68

*Clinton v. Jones,*
   520 U.S. 681 (1997) ................................................................................... 66, 67

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
   370 U.S. 690 (1962) ................................................................................... 33, 42

*In re Credit Default Swaps Antitrust Litig.,*
   No. 13-md-02476, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ......................... 45

*De Jonge v. Oregon,*
   299 U.S. 353 (1937) ........................................................................................ 51

iv

# TABLE OF AUTHORITIES

Page

*In re Discipline of Clinton*,
   534 U.S. 806 (2001) ........................................................................................72

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ........................................................................................57

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009)............................................................42

*Fogle v. Sokol*,
   957 F.3d 148 (3d Cir. 2020) ............................................................................65

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ........................................................................18

*Forrester v. White*,
   484 U.S. 219 (1988) ..................................................................................64, 66

*Forrester v. White*,
   792 F.2d 647 (7th Cir. 1986) ..........................................................................64

*Fox v. Washington*,
   236 U.S. 273 ....................................................................................................50

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) ........................................................................................50

*Great Am. Fed. Sav. & Loan Ass'n v. Novotny*,
   442 U.S. 366 (1979) ..................................................................................30, 31

*Griffin v. Breckenridge*,
   403 U.S. 88 (1971) ..........................................................................................21

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ..................................................................*passim*

*Hall v. Clinton*,
   285 F.3d 74 (D.C. Cir. 2002) ....................................................................20, 30

*Hampton v. Hanrahan*,
   600 F.2d 600 (7th Cir. 1979), *modified on other grounds*, 446 U.S. 754 (1980) .............32, 66

*Harbury v. Hayden*,
   522 F.3d 413 (D.C. Cir. 2008) ........................................................................68

# TABLE OF AUTHORITIES

Page

*Hildebrandt v. Vilsack*,
  102 F. Supp. 3d 318 (D.D.C. 2015) ............................................................. 19, 21

*Hobson v. Wilson*,
  737 F.2d 1 (D.C. Cir. 1984) ................................................................... 32, 40

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013) ..................................................................................... 18

*Hourani v. Mirtchev*,
  796 F.3d 1 (D.C. Cir. 2015) ........................................................................ 69

*Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018) ........................................................... 41

*Jackson v. Loews Washington Cinemas, Inc.*,
  944 A.2d 1088 (D.C. 2008) ......................................................................... 46

*Jefferson v. Collins*,
  905 F. Supp. 2d 269 (D.D.C. 2012) ............................................................. 46

*Jin v. Ministry of State Sec.*,
  335 F. Supp. 2d 72 (D.D.C. 2004) ............................................................... 32

*Johnson v. United States*,
  576 U.S. 591 (2015) ..................................................................................... 57

*Jones v Clinton*,
  36 F. Supp. 2d 1118 (E.D. Ark. 1999) ............................................... 69, 71, 72

*Lamar v. United States*,
  240 U.S. 60 (1916) ................................................................................. 24, 28

*Lawrence v. Acree*,
  665 F.2d 1319 (D.C. Cir. 1981) ................................................................... 32

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*,
  507 U.S. 163 (1993) ..................................................................................... 18

*Levine v. Nat'l R.R. Passenger Corp.*,
  80 F. Supp. 3d 29 (D.D.C. 2015) ................................................................. 18

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ..................................................................................... 63

# TABLE OF AUTHORITIES

Page

*Makins v. District of Columbia*,
    861 A.2d 590 (D.C. 2004) ...............................................................................47

*McFarlane v. Esquire Mag.*,
    74 F.3d 1296 (D.C. Cir. 1996) .........................................................................62

*Modiri v. 1342 Rest. Grp., Inc.*,
    904 A.2d 391 (D.C. 2006) ...............................................................................76

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) ...........................................................................61

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) .........................................................................................17

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ............................................................................. 50, 51, 52

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    No. 20 Civ. 8668 (VM), 2021 WL 480818 (S.D.N.Y. Jan. 12, 2021), *appeal
    dismissed*, No. 21-232 (2d Cir. June 22, 2021)..................................................51

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................................. 61, 62

*Nixon v. United States*,
    506 U.S. ....................................................................................... 73, 75, 76

*Nnaka v. Fed. Republic of Nigeria*,
    238 F. Supp. 3d 17 (D.D.C. 2017), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019) .......69

*O'Brien v. Welty*,
    818 F.3d 920 (9th Cir. 2016) ...........................................................................60

*Paine v. City of Lompoc*,
    265 F.3d 975 (9th Cir. 2001) ...........................................................................67

*Parsi v. Daioleslam*,
    890 F. Supp. 2d 77 (D.D.C. 2012) ...................................................................61

*Peterson v. Jensen*,
    371 F.3d 1199 (10th Cir. 2004)........................................................................65

*Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*,
    413 U.S. 376 (1973) .........................................................................................63

# TABLE OF AUTHORITIES

<u>Page</u>

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011)...............................................................35

*Raines v. Byrd*,
   521 U.S. 811 (1997) ......................................................................................21

*Ridgell v. HP Enter. Servs., LLC*,
   209 F. Supp. 3d 1 (D.D.C. 2016) .................................................................69

*Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*,
   547 U.S. 47 (2006) ........................................................................................51

*Safir v. Klutznick*,
   526 F. Supp. 921 (D.D.C. 1981) ..................................................................30

*Salinas v. United States*,
   522 U.S. 52 (1997) ........................................................................................49

*Sandvig v. Sessions*,
   315 F. Supp. 3d 1 (D.D.C. 2018) .................................................................60

*Scales v. United States*,
   367 U.S. 203 (1961) .................................................................................50, 52

*Sculimbrene v. Reno*,
   158 F. Supp. 2d 8 (D.D.C. 2001) .................................................................61

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) .......................................................................41

*Search v. Uber Techs.*,
   128 F. Supp. 3d 222 (D.D.C. 2015) .............................................................47

*SEC v. Wall St. Publ'g Inst., Inc.*,
   851 F.2d 365 (D.C. Cir. 1988) .....................................................................64

*Sines v. Kessler*,
   324 F. Supp. 3d 765 (W.D. Va. 2018)......................................................*passim*

*Smalls v. United States*,
   471 F.3d 186 (D.C. Cir. 2006) .................................................................72, 73

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ......................................................................................62

# TABLE OF AUTHORITIES

Page

*Tah v. Glob. Witness Publ'g, Inc.*,
   991 F.3d 231 (D.C. Cir. 2021) .................................................................................. 61, 62

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ............................................................................................................ 74

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...................................................................................................... 17, 33

*Terminiello v. Chicago*,
   337 U.S. 1 (1949) ................................................................................................................ 56

*Texaco, Inc. v. Short*,
   454 U.S. 516 (1982) ............................................................................................................ 57

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ............................................................................. 35

*Tillman v. Burge*,
   813 F. Supp. 2d 946 (N.D. Ill. 2011) ................................................................................. 38

*Trump v. Vance*,
   140 S. Ct. 2412 (2020) ................................................................................................... 67, 77

*United States v. Abu Khatallah*,
   151 F. Supp. 3d 116 (D.D.C. 2015) .................................................................................... 59

*United States v. Bronstein*,
   849 F.3d 1101 (D.C. Cir. 2017) ..................................................................................... 57, 58

*United States v. Bryant*,
   245 F. 682 (N.D. Tex. 1917) ............................................................................................... 49

*United States v. Bundy*,
   No. 3:16-CR-00051-BR, 2016 WL 3156310 (D. Or. June 3, 2016) .............................. 58, 59

*United States v. Burr*,
   25 F. Cas. 30 (CC Va. 1807) ............................................................................................... 77

*United States v. Childress*,
   746 F. Supp. 1122 (D.D.C. 1990), *aff'd*, 58 F.3d 693 (D.C. Cir. 1995) .................. 36, 38, 40

*United States v. Class*,
   930 F.3d 460 (D.C. Cir. 2019) ............................................................................................ 58

# TABLE OF AUTHORITIES

Page

*United States v. Fulbright,*
    105 F.3d 443 (9th Cir. 1997) ........................................................................ 58, 61

*United States v. Payne,*
    No. 2:16-CR-00046-GMN-PAL, 2017 WL 8941311 (D. Nev. Jan. 3, 2017) ................ 58, 61

*United States v. Sineneng-Smith,*
    140 S. Ct. 1575 (2020) ................................................................................ 59

*United States v. Stevens,*
    559 U.S. 460 (2010) ................................................................................ 51, 60

*United States v. Thomas,*
    864 F.2d 188 (D.C. Cir. 1988) ........................................................................ 57

*United States v. Varani,*
    435 F.2d 758 (6th Cir. 1970) ........................................................................ 50

*United States v. Williams,*
    553 U.S. 285 (2008) ................................................................................ 54

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
    535 U.S. 635 (2002) ................................................................................ 21

*Vierria v. Cal. Highway Patrol,*
    644 F. Supp. 2d 1219 (E.D. Cal. 2009) .............................................................. 67

*Vila v. Inter–Am. Inv. Corp.,*
    570 F.3d 274 (D.C.Cir.2009) ...................................................... 17, 33, 34, 42

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) ................................................................................ 59

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ................................................................................ 57

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ................................................................................ 56

*Weimer v. Cnty. of Fayette,*
    972 F.3d 177 (3d Cir. 2020) ........................................................................ 64

*Windsor v. The Tennessean,*
    719 F.2d 155 (6th Cir. 1983) ........................................................................ 61

TABLE OF AUTHORITIES

Page

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) ..................................................................52

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012) .................................................................68

**STATUTES**

18 U.S.C. § 372...................................................................... 24, 51, 58, 59

42 U.S.C. § 1985..............................................................................*passim*

**OTHER AUTHORITIES**

167 Cong. Rec. S731-32.............................................................................76

Cong. Globe, 42nd Cong.,1st Sess. 334 (1871)................................. 23, 26, 27

2 Alexander M. Burrill, A Law Dictionary ....................................... 22, 26

24 Op. O.L.C. 110 (2000)...................................................................70, 71

77-68 Op. O.L.C. 274 (1977) .............................................. 24, 27, 28, 31

Benjamin Vaughan Abbott, Dictionary of Terms and Phrases Used in American
    or English Jurisprudence (1879) ...................................... 22, 26

Black's Law Dictionary (6th ed. 1990)....................................................73

*Cavalry*, Lexico, https://www.lexico.com/definition/cavalry (last visited July 1,
    2021).........................................................................................12

Dictionary, Adapted to the Constitution and Laws of the United States of
    America, and of the Several States of the American Union (5th ed. 1855) ............... 22, 26, 31

Fed. R. Civ. P. 8(a)(2) .................................................................. 16, 18

Fed. R. Civ. P. 37(b)(2) ..................................................................72

Fed. R. Civ. P. 9(b) .........................................................................18

Fed. R. Civ. P. 12(b)(6) .............................................................. 16, 65

*Litigation*, Merriam-Webster Dictionary, https://www.merriam-
    webster.com/dictionary/litigation.........................................................73

# TABLE OF AUTHORITIES

Page

President Trump's First Amendment Defense (Feb. 5, 2021),
    https://assets.documentcloud.org/documents/20473758/scholars-reject-trump-
    1a-defense.pdf ....................................................................................................55

Spencer S. Hsu, *Four more indicted in alleged Jan. 6 Oath Keepers conspiracy to
    obstruct election vote in Congress*, The Washington Post (May 30, 2021, 7:33
    PM) ....................................................................................................................48

U.S. Const. amend. I ...........................................................................................*passim*

U.S. Const. amend. XII ...............................................................................................29

U.S. Const. amend. XIV .............................................................................................23

U.S. Const. art. 1, § 3 .........................................................................................*passim*

U.S. Const. art. I, § 6, cl. 2 ........................................................................................24

## I.    INTRODUCTION

Across 62 pages, the Amended Complaint ("Complaint," ECF No. 11-1) meticulously

documents a conspiracy to prevent Congress from certifying the results of the 2020 election.

Ignoring the detailed allegations against them, Defendants Donald J. Trump ("Trump"), Rudolph

W. Giuliani ("Giuliani") and the Oath Keepers ("Oath Keepers") contend that the Complaint is

insufficient to plausibly allege their conduct violated 42 U.S.C. § 1985(1) (the "Ku Klux Klan

Act").[1]   None of their arguments shield them from accountability for the assault on Congress

they instigated and facilitated.

Each Defendant denies any role in the conspiracy, announced repeatedly on social and

mainstream media, to prevent Congress from approving the Electoral College results by force,

intimidation or threats, notwithstanding their communications with one another and the concrete

steps each Defendant took to orchestrate and advance their common plan.  Although their

remarks and conduct foreseeably led to a violent breach of the Capitol intended to interrupt

congressional approval of the presidential election results, each Defendant seeks refuge in the

First Amendment.  But the First Amendment does not protect the military-style incursion into the

Capitol led by the Oath Keepers; nor does it shield Trump and Giuliani's incendiary remarks,

which aroused and mobilized the assembled crowd with the purpose, and having the effect, of

violently disrupting official proceedings of Congress.  Nor does Trump have absolute immunity

from suit, normally accorded Presidents for actions taken within the scope of their official duties,

as his over-heated remarks goading the assembled crowd to obstruct Congress served no duties

---

[1] Defendants Proud Boys, War Boys and Enrique Tarrio have yet to respond to either the original Complaint or the Amended Complaint, notwithstanding that the time provided to respond has long elapsed.  *See* ECF Nos. 18 and 19 (Affidavits of Service; answers due May 22, 2021).

of the Presidency.  In any event, Trump's efforts to seize the Presidency from President-elect Biden qualify as private, albeit wholly misguided, campaign activity plainly outside the scope of Trump's official responsibilities.  And Defendants' contention that Congress did not intend to protect its members when it enacted the Ku Klux Klan Act overlooks abundant evidence to the contrary from contemporary interpretations of the statutory language and the Act's legislative history.

As none of Defendants' arguments diminish the plausible allegations that they each violated the Ku Klux Klan Act, their motions to dismiss should be denied in their entirety.

## II.    STATEMENT OF FACTS

Plaintiffs' Complaint paints a vivid and chilling portrait of Defendants' conspiracy to disrupt the certification of the 2020 election through force, intimidation, and threats in violation of the Ku Klux Klan Act.

Although most conspiracies involve clandestine meetings and cryptic messages, many aspects of Defendants' conspiracy to disrupt the Electoral College vote count on January 6, 2021 unfolded in plain view.  The Complaint therefore draws heavily on Defendants' own statements and recorded conduct.  Notwithstanding the very public record of their actions promoting and participating in a conspiracy to disrupt the congressional vote count, Defendants now seek to revise this indisputable historical account, ignoring vast swaths of incriminating events alleged in the Complaint and pulling individual statements out of context.  But the sufficiency of the Complaint must be assessed as a whole, and the well-pleaded allegations must be "accepted as true."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Taken together, the allegations in the Complaint are more than sufficient to plausibly show that each of the Defendants participated in a common plan intended to prevent Congress

from certifying the 2020 election results necessary to elect President Biden and Vice President

Harris.  Among other facts, the Complaint alleges:

- In September 2020, Trump spoke directly to Defendant Proud Boys ("Proud Boys") to enlist them in future unlawful conduct, telling them "stand back and stand by"; in response, a Proud Boys leader tweeted "standing by sir."  When Trump later called for a "wild" protest on January 6, a supporter posted "standing by no longer" on a website used to coordinate the violent assault on the Capitol.  ¶¶ 30, 55, 57.[2]

- Oath Keepers admitted that they joined Defendant Proud Boys on January 6, 2021 in an "orchestrated [] plan" to disrupt Congress's ratification of the presidential election results.  ¶ 63.  "Oath Keepers leaders recruited members in the weeks leading up to the Capitol insurrection and provided military training to its recruits and members" to carry out their plan.  ¶ 127.

- Trump openly supported and encouraged those who used violence against election officials and his political opponents.  ¶¶ 31-32, 47-54.  He was publicly warned "[t]here will be violence on January 6th because the President himself encourages it," ¶ 66, yet he did nothing to calm the crowds he called to D.C.  By the eve of the insurrection, it was such common knowledge that Trump supported violent actions on January 6 that the Washington Post reported: "[D.C. is] bracing for potentially violent protests, egged on by President Trump himself."  ¶ 72.

- An organizer of the January 6 "Save America" rally told reporters that the original plan was to keep protestors at the Ellipse until Congress had finished counting Electoral College Ballots; despite warnings that the rally goers would be violent, Trump and his campaign sent them to the Capitol during the count.  ¶ 69.

- At the "Save America" rally, Defendants Trump and Giuliani told the crowd that the election certification being conducted inside the Capitol that day was unlawful, that those conducting the certification were criminals and traitors, and that the crowd could use whatever means were necessary to stop the certification.  ¶¶ 81-88.  Trump then directed the assembled crowd to descend upon the Capitol.  ¶ 89.

- After rioters breached the Capitol, House Minority Leader Kevin McCarthy "pleaded with Trump to call off the rioters, emphasizing that they were all Trump supporters," but Trump simply responded, "'Well, Kevin, I guess these people are more upset about the election than you are.'"  ¶ 123.

---

[2] Citations to "¶ __" refer to paragraphs of the Amended Complaint ("Complaint," ECF No. 11-1).

- During the insurrection, Trump and Giuliani continued their attempts to stop the election certification by pressing members of Congress whose lives were at risk in the Capitol to "slow [] down" the election count.  ¶¶ 138-39.

These core facts, by themselves, would be sufficient to state a claim of conspiracy in violation of the Ku Klux Klan Act.  Yet the Complaint alleges far more.

### A.    Trump Openly Encouraged His Supporters to Act with Violence

During the September 29, 2020 presidential debate, Trump was asked to condemn white supremacist groups, and in particular the violent actions of the Proud Boys.  ¶ 30.  Rather than doing so, Trump used that opportunity to speak directly to the Proud Boys in a television broadcast carried on all major networks and cable news sources.  He told his co-conspirators to "stand back and stand by," thus not only endorsing and encouraging the Proud Boys' violent conduct, but also publicly telling them to await further instructions.  *Id.*

Trump's message was received and interpreted by his co-conspirators precisely as intended.  In a tweet stating, "Standing by [sic] sir," Enrique Tarrio, Chairman of Defendant Proud Boys and Warboys, acknowledged receipt of Trump's message and agreed, on behalf of himself and his organization, to await further instructions from co-conspirator Trump.  *Id.*

Long before the January 6, 2021 insurrection, Trump publicly acknowledged a keen awareness that many of his supporters had employed violence to promote his goal of securing re-election.  Trump openly referred to these violent supporters as the "Trump Army."  ¶ 31.  He demonized those who opposed him, while praising people willing to use violence against those he considered his enemies.  Trump stated that his violent supporters were the "first line of defense when it comes to fighting off the Liberal mob."  *Id.*  Thus, Trump made clear months before the insurrection that when he instructed supporters to "fight," he meant it literally.

For example, when his supporters swarmed a Biden campaign bus on November 1, 2020, nearly causing a violent accident and leading to the cancellation of a Biden campaign event,

Trump commended the horde, saying: "These patriots did nothing wrong." ¶ 32. Trump later tweeted a video of the incident with the caption "I LOVE TEXAS." *Id.* Foreshadowing his remarks on the day of the insurrection, Trump made clear to his followers and his co-conspirators that he would consider them patriots if they engaged in violence and intimidation in support of him and such violent actors would be recipients of his approval and even love.

Trump would again use the terms "patriots" and "love" when he expressed appreciation for those, including his co-conspirators, who took part in the insurrection. ¶¶ 82, 140 ("These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!").

### B. The Misinformation Campaign Waged by Trump and Giuliani Provided the Emotional and Counterfactual Impetus for the Crowd that Descended on the Capitol Seeking to Prevent Certification of the Election in Favor of Trump's Opponent

Foreshadowing the insurrection, Trump made it clear to his followers prior to the election that there could (*and would*) be violence if he lost the election. He repeatedly refused to agree that, regardless of the outcome, he would ensure a peaceful transition of power. ¶ 29.

Beginning on August 17, 2020, before a single vote had been cast, Trump announced that the only way he could lose the election was if it were rigged. ¶ 33. As vote counts in 2020 began to reveal that Trump was behind in the popular vote, Defendants Trump and Giuliani commenced their misinformation campaign by telling the American public that Trump had won the election and that vote tallies to the contrary were fraudulent. ¶ 34.

In fact, on November 4, 2020, within hours after the polls closed, and long before all votes could possibly have been counted, Trump publicly proclaimed that he had won the election. ¶ 35. By claiming victory before all votes had been counted, much less tallies of the

Electoral College ballots, Trump began his campaign of misinforming his followers of the election outcome.  As the votes were more fully counted and the Electoral College results seemed to disfavor Trump's reelection, he began ascribing reports of his loss to fraud and enlisting his supporters, including co-conspirators Proud Boys and Oath Keepers, to take whatever measures they believed necessary to ensure Trump was reelected.  ¶ 34.

Pressed to prove the existence of the fraud that Trump and Giuliani claimed had infected the 2020 presidential election, these Defendants enlisted lawyers around the country to bring more than 60 lawsuits in state and federal courts to challenge election results in various jurisdictions.  ¶ 36.  The suits targeted primarily locations with large proportions of registered Democrats, where they sought to set aside in their entirety the votes cast in urban areas with large numbers of African American voters.  ¶¶ 38-43.  Seeking to cast further doubt on the legitimacy of the election results from these areas, Giuliani told the national media at a press conference held on November 7, 2020 that votes had been cast on behalf of dead African Americans in Philadelphia and that the city had "a sad history of voter fraud," ¶ 39, and on another occasion publicly stated that there was a massive conspiracy by "big city . . . crooks" in multiple states to "steal votes" from Trump.  ¶ 41.  No court found evidence that fraud had affected the outcome of any election results.  ¶¶ 37, 42.

Notwithstanding this lack of evidence, Trump disparaged the ability and integrity of the judges who had dismissed his fraud claims.  ¶ 37.  In so doing, Trump cast doubt on the independence and legitimacy of the judiciary, heightening doubts among his followers whether the institutions of government could be relied upon to secure a fair and legal electoral process.  Trump then promoted the use of violence towards the government as a possible solution.

Increasingly, the remarks Trump and Giuliani delivered between the end of the presidential election and January 6, 2021 portrayed their followers as "us versus them," setting Trump's followers against the governments that accepted the election results.  ¶ 81 (Giuliani: "I'll be darned if they're going to take our free and fair vote"), ¶ 85 (Trump: "you'll never take back our country with weakness").  Ultimately, these statements constituted a call to arms, bringing to a boil the fervor with which Trump and Giuliani were amassing their followers to seize control of an electoral system they had portrayed as biased and fraudulent.

As they made these remarks, Trump and Giuliani received feedback from multiple sources notifying them that their campaign of fearmongering and inviting violence was working. Trump's supporters intimidated and threatened election workers in multiple states in an attempt to interfere with the vote count in those states, citing the calls to action from Trump and Giuliani as the basis for their conduct.  ¶ 44.  For example, when Trump's efforts to discredit the vote count in Georgia failed, he demonized the Georgia Secretary of State, as he did other election officials, as an "enemy of the people" for insisting that Georgia's election was untainted by fraud.  ¶ 47.  In response to these remarks, Trump's followers threatened violence, including the assassination of the Georgia Secretary of State.  *Id.*

On November 30, 2020, Joseph diGenova, a Trump Campaign attorney, publicly called for Christopher Krebs, a former federal election official who maintained the electoral process was fair, to be "taken out at dawn and shot."  ¶ 48.  Later, on December 6, 2020, armed protesters arrived at the home of the Michigan Secretary of State, threatening violence following the election results in that state.  ¶ 50.  And two days later, the Arizona GOP asked supporters if they were willing to die for Trump.  ¶ 51.  Notwithstanding these incendiary incidents undertaken in his name, Trump never publicly called upon followers to renounce violent tactics.

In a televised address on December 1, 2020, Georgia Republican election official Gabriel Sterling warned Trump about the foreseeable consequences of these remarks: "Mr. President, you have not condemned these actions. . . . This has to stop. . . . Stop inspiring people to commit potential acts of violence.  Someone is going to get shot, someone is going to get killed.  And it's not right."  ¶ 49.  Thus, little more than one month before the insurrection, Trump was expressly warned that his words and actions were "inspiring people to commit potential acts of violence." *Id*.  Trump was again warned on December 28, 2020 by former White House official Olivia Troye, who ominously predicted: "[T]here will be violence on January 6th because the President himself encourages it."  ¶ 66.  Ms. Troye continued: "This is what [Trump] does.  He tweets.  He incites it.  He gets his followers and supporters to behave in this manner, and these people think they they're being patriotic because they are supporting Donald Trump."  *Id.*

Instead of attempting to quell this rising storm of protests and threatened and actual violence, Trump ominously warned on December 10, 2020, that there would be violence if he were not ultimately reelected, tweeting: "People are upset, and they have a right to be. . . .  This is going to escalate dramatically.  This is a very dangerous moment in our history. . . ."  ¶ 52.

Having failed to stop ratification of the presidential election results by intimidating state and local election officials and failing to have any of their fraud allegations accepted by a court, Trump and Giuliani made clear to their followers that it would be necessary to resort to extralegal means to stop the final ratification of the 2020 presidential election results.

C.     **Storming the Capitol to Prevent the Certification of the Election Was Central to Defendants' Plan to Secure Trump's Reelection**

Having lost all legal challenges to the election results, Defendants Trump and Giuliani communicated to their followers that the only way to secure Trump's reelection was to preclude Congress from ratifying the Electoral College votes on January 6.

In order to galvanize their followers and allies for the incursion on the Capitol on January 6, Defendants engaged in or promoted a series of rallies, all with the stated goal of ensuring Trump's reelection following what they characterized as a fraudulent election.  On December 12, 2020, "Stop the Steal" rallies occurred across the country.  ¶ 54.  At the "Stop the Steal" rally in Washington, D.C., an Oath Keepers leader said that Trump "needs to know from you that you are with him, [and] that if he does not do it now while he is commander in chief, we're going to have to do it ourselves later, in a much more desperate, much more bloody war . . . Let's get it on now, while he is still the commander in chief."  *Id.*  Evidencing his support for this message from his co-conspirator, that same day, Trump reciprocated with the tweet: "WE HAVE JUST BEGUN TO FIGHT!!!"  *Id.*

Continuing his campaign to block ratification of the Electoral College votes, on December 19, 2020, Trump tweeted: "Statistically impossible to have lost the 2020 Election," and "Big protest in DC on January 6th.  Be there, will be wild!"  ¶ 55.  In this message, Trump perpetuated the false narrative that he began in August 2020—that it was impossible for him to lose unless the election was rigged—and furthered the conspiracy to prevent the certification of the election by calling his enraged supporters from around the country to converge on Washington, D.C. on the day of the Electoral College vote count.

Trump's followers instantly understood this message as a call to action.  Within five minutes of this tweet, a user on www.TheDonald.win—a heavily used pro-Trump online forum that became a key planning platform for the insurrection—posted a link to the tweet with the headline "TRUMP TWEET. DADDY SAYS BE IN DC ON JAN. 6TH."  ¶ 56.  The post was pinned to the homepage of www.TheDonald.win by moderators and garnered 4,683 comments and 20,663 users expressing approval of the message within five days.  *Id.*  Soon thereafter, a

follower referred to Trump's call to action in his December 19, 2020 tweet as "marching orders," while others posted messages confirming that they were ready for action, such as "THE COMMANDER IN CHIEF HAS ISSUED HIS ORDERS"; "[i]f you've been waiting for a signal, THAT'S IT" and "Roger that. Standing by no longer," a reference to the message given directly by Trump to the Defendant Proud Boys earlier in the year.  ¶ 57.

Trump's call to action also led to the circulation of detailed plans for the assembly in Washington, D.C. on or before January 6.  A widely distributed post on www.TheDonald.win titled "MAGA_CAVALRY D.C. Caravan MAIN FLYER" presented a color-coded graphic that identified "rally points" for convoys coming from different parts of the country to meet and descend upon Washington, D.C.  ¶ 60.  Some posts on www.TheDonald.win provided lists of items recommended for the "Save America" rally, including pepper spray, batons, tasers, bullet proof vests and knives.  ¶ 61.  Other posts discussed the rally as the "last stand" and repeatedly recognized the likely use of violence, such as the warning that people in the Capitol expect to "leave in one of two ways: dead or certifying Trump the rightful winner."  ¶¶ 61, 62.  One even called for "mass hangings and firing squads," ¶ 61, which ultimately was followed by the erection of gallows on the Capitol grounds, which displayed a noose and the call for hanging the President of the Senate.  ¶¶ 104, 121.

Some posts reflected the expectation that followers responding to Trump's call to action would receive special treatment, as they were being summoned by the chief law enforcement officer of the country.  Other posts suggested those arrested during the events at the Capitol would receive presidential pardons.  ¶ 62.  Those views followed from earlier statements by Trump that referred to those using any means possible to secure Trump's reelection as "patriots" who were doing "nothing wrong."  ¶ 32.

On December 19, 2020, the Oath Keepers publicly admitted to being part of the conspiracy at issue in this lawsuit.  An Oath Keepers leader posted a Facebook message, providing: "[T]his week I organized an alliance between Oath Keepers . . . and Proud Boys.  We have decided to work together and shut this shit down."  This leader sent another Facebook message on December 22, providing Trump "wants us to make it WILD [sic] that's what he's saying.  He called us all to the Capitol and wants us to make it wild!!! . . . Gentlemen we are heading to DC [sic] pack your shit!!"  ¶ 63.  This Oath Keepers leader then posted a Facebook message on December 25, 2020 discussing communications with Proud Boys leadership and how the Oath Keepers had "*orchestrated a plan with the Proud Boys*."  *Id.* (emphasis added).  These messages—smoking-gun evidence of a coordinated plan to stop official proceedings by force—furthered the conspiracy by providing instruction to the organizations' memberships that the plan was moving forward and that they should rendezvous in Washington, D.C. on January 6.

Similarly, four days later, on December 29, 2020, Defendant Enrique Tarrio, Chairman of the Proud Boys, posted a message on the social media site Parler instructing the organization's members to rendezvous in Washington, D.C. on January 6 and telling them how to dress so as not to be readily identifiable as members.  Specifically, he stated that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist. . . We will not be wearing our traditional Black and Yellow.  We will be incognito and we will be spread across downtown DC in smaller teams.  And who knows . . . we might dress in all BLACK for the occasion."  ¶ 64.  Law enforcement investigating the Capitol insurrection regarded this invitation to dress in "all BLACK" as reflecting a plan to wear gar indistinguishable from attire worn by the group known as "Antifa," whom the Proud Boys identified as an enemy of their movement.  *Id.*  According to phone records obtained by the FBI, the Trump White House was in communication with the

Case 1:21-cv-00400-APM   Document 29   Filed 07/01/21   Page 25 of 92

Proud Boys in the days leading up to the January 6, 2020 "Save America" rally that immediately preceded the insurrection.  ¶ 70.

In furtherance of the conspiracy, leaders of the Proud Boys obtained for its members equipment, including tactical vests, military-style communication equipment and bear mace, which could be used during the siege on the Capitol.  ¶ 65.  As they regarded themselves part of what Trump called the Trump Army, the Proud Boys set up a secure, encrypted communications channel called "Boots on the Ground" to coordinate the group's activities during the incursion on the Capitol.  *Id.*  Approximately 60 people used that channel on January 6.  *Id.*

Trump stayed abreast of the progress of the conspiracy through advisors who actively monitored the social media posts that publicly discussed details of the plan to storm the Capitol and disrupt ratification of the Electoral College vote tally by Congress.  ¶ 66.  These plans to disrupt the work of Congress were also discussed on media outlets that Trump personally and regularly viewed, including Fox News.  *Id.*  Law enforcement, including the FBI, issued explicit warnings to expect the protests to be violent.  *Id.*

Notwithstanding that many followers publicly expressed their intention to use violence to disrupt the Congressional ratification of the election results, Trump continued to encourage people to converge on Washington, D.C. and heaped praise on those who would be arriving.  On January 1, 2021, for example, Trump retweeted a tweet from an organizer of the "Save America" rally, announcing: "The calvary [*sic*] is coming, Mr. President!"[3]  In response, Trump welcomed them, stating: "A great honor!"  ¶ 67.

_____

[3] The term "cavalry" is "[u]sed to refer to a source of help or rescue in an emergency, especially as a last resort."  *Cavalry*, Lexico, https://www.lexico.com/definition/cavalry (last visited July 1, 2021).

Trump's adoption of the term "Save America" furthered the conspiracy's narrative that the country was in peril. *Id.* Trump and Giuliani spent months working to convince Trump's supporters that the country was being stolen and needed to be saved. ¶¶ 33-43. The adoption of the term "cavalry" also furthered the conspiracy. ¶ 67.

Having publicly characterized the judicial branch as unable and unwilling to stop what Trump regarded as theft of the election, Trump sent the message that his followers, whom he called the Trump Army, were the last resort to rescue the country. ¶ 31. The fervor with which Trump transmitted this message grew after he learned that Vice President Pence had declined to stop certification of the Electoral College vote tally, which he lacked authority to do in any event. ¶ 77. In rallying the crowd to disrupt the ratification process themselves, Trump portrayed Pence as lacking the conviction to salvage his reelection. ¶ 75 ("All Mike Pence has to do is send [the election] back to the States, AND WE WIN."), ¶ 118 ("Mike Pence didn't have the courage to do what should have been done . . .").

Giuliani also was an active participant in the conspiracy to disrupt ratification of the vote tally by Congress by use of threats, violence and intimidation through his conduct at the "Save America" rally. At the rally, Giuliani disseminated the same misinformation that the election was being stolen from Trump and, therefore, that immediate and forceful action was necessary to protect against ratification of fraudulent election results. ¶ 81. Giuliani admonished the assembled crowd that it served as the final protection against implementing fraudulent election results and that their efforts might very well require the use of force, instructing them to "fight to the very end" and to engage in "trial by combat." *Id.*

Following Giuliani at the "Save America" rally, Trump also repeated the claims that the election was rigged and stolen, which no election official or court had ever credited. ¶ 82. In

furtherance of the conspiracy, Trump admonished the crowd that the election had been conducted illegally and that the only way to stop ratification of fraudulent election results was to block certification of the Electoral College vote count by any means necessary.  ¶¶ 82-88.  As Trump explained, if his followers did not stop the certification of the election, they "will have an illegitimate president," and "we can't let that happen."  ¶ 88.  He then explicitly gave the crowd permission to break the rules, assuring them that "when you catch somebody in a fraud, you're allowed to go by very different rules. . . ."  *Id.*

Then Trump directed the assembled crowd to descend on the Congress, which was actively engaged in counting the Electoral College votes.  ¶¶ 88-89.  In sending the crowd assembled at the Ellipse to descend on the Capitol, Trump directed the crowd to violate the express terms of the permit that allowed the group to gather lawfully, which stated: "This permit does not authorize a march from the Ellipse."  ¶ 90.

In the event there was any uncertainty about what Trump meant by his charge that the crowd "go by very different rules," his closing remarks made clear his endorsement of the use of force when reminding them that they would "never take back our country with weakness," and that they have to "show strength," and "fight like hell," or else they would not "have a country anymore."  ¶¶ 85, 88.

   D.   **Led by the Proud Boys and Oath Keepers, the Incensed Crowd Dispatched by Trump and Giuliani Used Force, Intimidation and Threats to Disrupt the Congressional Ratification of the Presidential Election Results**

Led by the Proud Boys, whose early arrival at the Capitol had been coordinated with Trump, the crowd that marched from the Ellipse in violation of their permit readily overwhelmed the Capitol Police and the barriers they had erected against unauthorized entry into the Capitol.  ¶¶ 99, 100-02, 104, 112.  This synchronized assault was conducted according to a pre-meditated and coordinated plan.  ¶ 103.

The final acts of the conspiracy developed as members and leaders of the Oath Keepers, acting in concert with the Defendant Proud Boys and through a carefully coordinated plan, actively participated in the violent assault on the Capitol.  ¶¶ 126-32.  Far from denying involvement in the insurrection, members of the Oath Keepers were video recorded relishing in their concerted actions to disrupt ratification of the presidential election vote tally.[4]  ¶¶ 129-32.

Notwithstanding that Trump was following media coverage of the incursion on the Capitol by force and use of violence, he made no statements and took no action to quell the riotous actions of his supporters.  Indeed, Trump encouraged the unlawful actions being conducted by his supporters in their attempt to disrupt the certification of the presidential election.  ¶¶ 106, 118.  His first public statement during the breach of the Capitol was to inform his supporters inside the Capitol that Pence had failed to stop ratification of the election results and, therefore, they were his last hope to "Save America."  ¶ 88.

While Trump continued to embolden the crowd to use force to disrupt Congress, Giuliani made telephone calls to selected members of Congress, acting as Trump's lawyer, in which he urged the members to slow the count of the Electoral College votes.  ¶ 138.  During these calls, which took place during the siege of the Capitol, Giuliani admitted that he and Trump had the shared goal of delaying certification that day, with the hopes of somehow preventing certification of the presidential election altogether.  ¶¶ 138-39.

---

[4] According to the Oath Keepers, "Representative Jerrold Nadler alleges that the Joint Session was in recess because 'an objection was made to the counting of the certified Electoral College ballots,'" and not because of the insurrection.  Oath Keepers Br. 9-10 (quoting ¶ 239). The Complaint, however, does not allege that the session was in recess *because* an objection was made; it simply notes that the session was in recess "*[s]hortly after* an objection was made." ¶ 239 (emphasis added).

Together, these facts and others on which they are based that are set forth in the well-pled Complaint allegations, which must be accepted as true at this juncture, more than suffice to plausibly allege that each Defendant conspired with one or more of the others to use force, intimidation or threats to interfere with the discharge of the duties in which Congress was engaged to ratify the results of the 2020 presidential election.[5]

## III.    STANDARD OF REVIEW

Rule 8 of the Federal Rules of Civil Procedure provides that a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

"Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556. Courts also "must accept a complaint's allegations as true."  *Id.*  Thus, even if a court doubts the truth of the allegations in the complaint, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).  "[A] well-pleaded complaint may proceed even if it strikes a

---

[5] None of the Defendants contests that the harm alleged by each of the Plaintiffs is sufficient to qualify as injury to "person or property" for which the Ku Klux Klan Act permits the recovery of damages.  42 U.S.C. § 1985(1) & (3).

savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely."  *Id.*

Because plausibility is a lower standard than probability, a given set of facts may well be subject to diverging interpretations, each of which is plausible.  *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ("two or more witnesses" may tell mutually inconsistent but "coherent and facially plausible stor[ies]"); *accord Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012).  The choice between plausible inferences or scenarios is one for the factfinder.  *See id.*; *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 766 & n.11 (1984) (the meaning of documents that are "subject to" divergent "reasonable . . . interpret[ations]" either as "referring to an agreement or understanding that distributors and retailers would maintain prices" or instead as referring to unilateral and independent actions, is "properly . . . left to the jury"); *id.* at 767 n.12 ("The choice between two reasonable interpretations of . . . testimony properly [i]s left for the jury.").

The Complaint must be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.  *See Vila v. Inter–Am. Inv. Corp.,* 570 F.3d 274, 285 (D.C.Cir.2009) (factual allegations should be "viewed in their totality").  *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 310 (2007) ("[C]ourts must consider the complaint in its entirety . . . . The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.").  Ultimately, evaluation of a complaint upon a motion to dismiss is "a context-

specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.[6]

## IV.   ARGUMENT

### A.   Plaintiffs Have Standing to Sue Under Section 1985(1)

Plaintiffs have standing to seek damages for the physical and emotional injuries they suffered as a result of Defendants' conspiracy.  To have standing, a litigant must show "[(1)] a concrete and particularized injury that [(2)] is fairly traceable to the challenged conduct, and [(3)] is likely to be redressed by a favorable decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013).  Here, Plaintiffs have described the physical and emotional injuries they suffered on January 6, 2021—ranging from an injured leg to fear of death—in painstaking detail.  ¶¶ 151-258.  Defendants do not dispute that such bodily and mental injuries confer Article III standing. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015) (recognizing that "physical injury" is the type of "concrete and particularized injury" that supports Article III standing); *Levine v. Nat'l R.R. Passenger Corp.*, 80 F. Supp. 3d 29, 40 (D.D.C. 2015) (plaintiffs can "establish an Article III injury in fact based on emotional harm if that alleged harm stems from the infringement of some legally protected or judicially cognizable interest that is either recognized at common law or specifically recognized as such by the Congress") (internal

---

[6] Defendants Trump and Giuliani argue that conspiracy claims brought under Section 1985(1) are subject to a heightened pleading standard that requires claims be pled with particularity, rather than the typical plausibility standard.  Trump Br. 29; Giuliani Br. 10, 15, 17-18.  This is incorrect.  The Supreme Court in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993), held that under Federal Rule of Civil Procedure 9(b), *only* claims involving fraud or mistake must be pled with particularity.  *See also Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004) (explaining rejection of heightened pleading standard for Section 1985 cases post-*Leatherman*).  Unsurprisingly, all the cases relied upon by Trump or Giuliani were either decided before *Leatherman*, are cases involving claims of fraud, or do not address the 12(b)(6) pleading standard at all.  As plaintiffs' conspiracy claim includes no element of fraud or mistake (or even any underlying facts involving fraud or mistake), it must be measured by the pleading standard in Rule 8(a)(2).

18

quotation marks omitted); *see also Sines v. Kessler*, 324 F. Supp. 3d 765, 774 (W.D. Va. 2018) (denying a motion to dismiss a Section 1985 claim where a plaintiff "suffered various emotional injuries").

Nor do Defendants contest that, if the Complaint has plausibly alleged a conspiracy among themselves and the individuals who invaded the Capitol, Plaintiffs' injuries can be fairly traceable to that conspiracy. As explained further below, the violence at the Capitol—which caused Plaintiffs' injuries—was the goal, and in any event the foreseeable consequence, of Defendants' coordinated effort to disrupt the Electoral College vote count through force, intimidation, or threat. *See Sines*, 324 F. Supp. 3d at 795 (in cases alleging a conspiracy under Section 1985, as with other conspiracy cases, "Plaintiffs may hold each Defendant liable for the reasonably foreseeable acts of their co-conspirators").

Finally, it is clear that Plaintiffs' injuries can be redressed by an award of compensatory damages. *See*, *e.g.*, *Hildebrandt v. Vilsack*, 102 F. Supp. 3d 318, 322 (D.D.C. 2015) (injuries can be redressed by a judgment in the plaintiff's favor and "an award of compensatory damages").

Nonetheless, Defendants argue that Plaintiffs lack standing because: (1) Plaintiffs are improperly seeking to vindicate an "institutional interest of the House of Representatives," Oath Keepers Br. 20; and (2) on the day of the insurrection, Plaintiffs were not discharging the duties of an "office, trust, or place of confidence under the United States." Trump Br. 16; Oath Keepers Br. 5. Both arguments lack merit.

   1. <u>Plaintiffs Are Not Attempting to Vindicate an Institutional Interest of the House of Representatives</u>

The Oath Keepers argue that Plaintiffs do not have standing to bring claims arising from an impaired ability to certify the results of the 2020 election because the ability to conduct certification proceedings is an institutional interest belonging to Congress as a whole, and

"individual members" of the Congress "lack standing to assert the institutional interests of a legislature." Oath Keepers Br. 24-26 (quoting *Blumenthal v. Trump*, 949 F.3d 14, 18–20 (D.C. Cir. 2020)). Plaintiffs, however, are *not* seeking damages for an impaired ability to certify the results of the election. Instead, they are seeking damages for injuries to their own bodies and minds, and they unquestionably have standing to recover for those personal injuries.

Section 1985 is, at its core, a personal injury statute. It begins by describing three types of unlawful conspiracies: (1) conspiracies "to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, . . ."; (2) conspiracies to obstruct justice or interfere with individuals involved in court proceedings; and (3) conspiracies to deprive "any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985. Then, the statute creates a cause of action for anyone who suffers personal injuries or property damages as a result of one of those conspiracies:

> in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is *injured in his person or property* . . . the party so injured or deprived may have an action for the recovery of damages . . . .

42 U.S.C. § 1985 (emphasis added); *see also Hall v. Clinton*, 285 F.3d 74, 78 (D.C. Cir. 2002).

Consistent with this statutory language, each Plaintiff has asserted that she or he was "injured in [her or] his person," as a result of Defendants' conspiracy. More specifically, all Plaintiffs have alleged either physical injuries or mental suffering from the deadly attack on the Capitol. Because freedom from bodily and psychological harm are "private rights" that belong

to Plaintiffs regardless of their status as members of Congress, they can bring suit in their individual capacity to vindicate those rights.  *Raines v. Byrd*, 521 U.S. 811, 821 (1997).

> 2.     On the Day of the Insurrection, Plaintiffs Were Discharging the Duties of an "Office, Trust, or Place of Confidence Under the United States"

Trump argues that members of Congress lack standing under Section 1985 because they do not hold an "office, trust, or place of confidence under the United States."  Trump Br. 16. Similarly, the Oath Keepers contend that members of Congress were not "discharging any duties" on the day of the insurrection.  Defendants are wrong on both fronts.[7]

> a.     *Members of Congress hold an "Office, Trust, or Place of Confidence Under the United States"*

Reconstruction-era civil rights statutes, including Section 1985, are given "a sweep as broad as [their] language."  *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971) (internal citation omitted).  The plain language of Section 1985(1) casts an extremely wide net, prohibiting all conspiracies to prevent "*any person* from accepting or holding *any office*, *trust, or place of confidence* under the United States, or from discharging *any duties* thereof."  42 U.S.C. § 1985(1) (emphasis added).  Both the ordinary meaning of these words and the historical context in which they were drafted support the view that members of Congress are "person[s] . . . holding any office, trust, or place of confidence under the United States."

---

[7] Defendants have "miscast [their] argument[s] as one of Article III standing." *Hildebrandt*, 102 F. Supp. 3d at 322.  Whether members of Congress hold an "office, trust, or place of confidence" under Section 1985, and whether they were performing any "duties" of their office within the meaning of the statute on January 6, 2021, are questions of statutory interpretation, rather than subject matter jurisdiction.  *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002).  In any event, the arguments are meritless.

(1)     Members of Congress Hold an "Office . . . Under the
United States"

First, members of Congress hold an "office . . . under the United States."  As with any

other statute, Section 1985(1) should be interpreted "in accord with the ordinary

public meaning of its terms at the time of its enactment."  *Bostock v. Clayton Cnty.*, 140 S. Ct.

1731, 1738 (2020).  Reconstruction-era dictionaries define an "office" as any "position or station

in which a person is employed to perform certain duties," including "[a] station or employment

conferred by election of the people."[8]  Because members of Congress occupy a station or

employment conferred by election of the people, they hold an "office."  Indeed, one leading legal

dictionary from 1855 expressly states that "officers" include "members of congress."[9]

While "the law's ordinary meaning at the time of enactment usually governs," courts may

also consult the legislative history at the time of a statute's enactment to determine "the

understandings of the law's drafters as . . . evidence" of how terms in the statute were "ordinarily

understood."  *Bostock*, 140 S. Ct. at 1750.  The legislative history of Section 1985(1) confirms

---

[8] 2 Alexander M. Burrill, A Law Dictionary and Glossary 257 (2d ed. 1867) (Appendix A ("App. A") at 2); *see also* John Bouvier, Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union 259 (5th ed. 1855) (App. A at 12) ("An office is a right to exercise a public function or employment, and to take the fees and emoluments belonging to it . . . *members of the legislature[] are of this number*") (emphasis added); J. J. S.; Hopper Wharton, Edward. Law Lexicon, or Dictionary of Jurisprudence: Explaining the Technical Words and Phrases Employed in the Several Departments of English Law 537 (2d ed. 1860) (App. A at 10) (an "office" is "that function by virtue whereof a person has some employment in the affairs of another, whether judicial, ministerial, *legislative*, municipal, ecclesiastical") (emphasis added); Archibald Brown, New Law Dictionary and Institute of the Whole Law. For the Use of Students, the Legal Profession, and the Public 259 (1874) (App. A at 6) ("An office is defined to be the right to exercise a public or private employment, and to take the fees and emoluments belonging thereto").

[9] John Bouvier, Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union 260 (5th ed. 1855) (App. A at 13); *cf.* Benjamin Vaughan Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence 203 (1879) (App. A at 8) ("A representative in the state legislature is a public officer.").

that members of Congress viewed themselves as "office" holders under Section 1985(1).  While the Senate was debating the statute that ultimately became Section 1985(1) and its criminal analogue, Senator Trumbull suggested that the statute would reach, for example, "the *Senator who sits before me* [Mr. Hamilton of Maryland] . . . while he is *here in the discharge of the duties of his office*."  Cong. Globe, 42nd Cong., 1st Sess. 580 (1871) (Appendix B ("App. B") at 13) (emphasis added; brackets in original); *see also* Cong. Globe, 42nd Cong., 1st Sess. 486 (1871) (App. B at 11) (Mr. Cook: "A citizen of the United States, in any State of the Union, has a right to *vote for any officer of the United States Government*.") (emphasis added); Cong. Globe, 42nd Cong., 1st Sess. 492 (1871) (App. B at 12) (Mr. Butler: "I never held any *office of profit or salary* until I held the office of brigadier general . . . . I never held any other except that of *Representative* of the people.") (emphasis added).  Additionally, one member of the House noted that "*officers are elected by the people* . . . ."  Cong. Globe, 42nd Cong., 1st Sess. 484 (1871) (App. B at 10) (emphasis added) (discussing "States with republican forms of government"). The legislative history also suggests that members of Congress were personally affected by the violence that prompted them to draft the Ku Klux Klan Act.  For instance, a House member testified, "I am reliably informed that not three days ago a member of this House was urged by an official, who is charged with the important duties in connection with the enforcement of the criminal law, not to vote for this bill, for the reason that he could not safely return to his home if he did."  Cong. Globe, 42nd Cong., 1st Sess. 484 (App. B at 10) (1871).

Finally, the legislative history of the Ku Klux Klan Act shows that Congress employed broad language to eradicate the threat posed by the Ku Klux Klan and similar groups: Earlier versions of statutes enforcing the protections of the Fourteenth Amendment had not been effective, and Congress was attempting to enact a more robust set of protections against

marauders.  Conspiracy to Impede or Injure an Officer of the United States, 18 U.S.C. § 372, 77-68 Op. O.L.C. 274, 276 (1977).  This historical context "supports a broad, rather than narrow, reading of the word 'office.'"  *Id.*  Thus, in interpreting the criminal analogue of Section 1985(1), the Department of Justice concluded that "the term 'officer' . . . includes both permanent and temporary, full- and part-time officers *and employees* of the United States."  *Id.* (emphasis added).  Under this appropriately broad construction, members of Congress qualify as officers.

Ignoring both the text of Section 1985 and its legislative history, Trump contends that members of Congress are not "officers" under Section 1985(1) because they do not satisfy the constitutional definition of an "officer."  *See* Trump Br. 16-17 (citing U.S. Const. art. I, § 6, cl. 2).  The Supreme Court, however, has held that members of Congress can be "officer[s]" under a statute, whether or not they are officers under the Constitution, because "words may be used in a statute in a different sense from that in which they are used in the Constitution."  *Lamar v. United States*, 240 U.S. 60, 64-65 (1916).  Thus, for example, a defendant who impersonated "a member of the House of Representatives" could be convicted under a statute forbidding impersonation of "an officer of the government of the United States," despite the fact that members of Congress are not officers under the Constitution.  *Id.*

None of the authorities cited by Trump supports his view that "office" holders under Section 1985(1) are limited to constitutional officers.  *Canlis v. San Joaquin Sheriff's Posse Comitatus*, cited in Trump Br. 16, merely held that Section 1985(1) does not extend to conspiracies to interfere with "*state* law enforcement officers."  641 F.2d 711, 718 (9th Cir. 1981) (emphasis added).  Rather, "[o]n its face, § 1985(1) relates solely to federal officers and federal office holders."  *Id.* (quoting *Baron v. Carson*, 410 F. Supp. 299, 301 (N.D. Ill. 1976)).  The court, however, had no occasion to consider which "federal officers and federal office

holders" fall within the scope of the statute.  If anything, the court's reference to "federal officers *and federal office holders*," separately, reflects an understanding that the statute covers federal employees who are not constitutional "officers."

In *United States v. Mouat*, cited in Trump Br. 16-17, the Court held that the defendant did not qualify as an "officer" of the Navy under the Constitution or the particular appropriations statute at issue.  124 U.S. 303, 307-08 (1888).  The Court emphasized, however, that "[u]ndoubtedly congress may have used the word 'officer' in some other connections in a more popular sense."  *Id.* at 308.  As explained above, there is clear evidence that Congress used the term office "in a more popular sense" in Section 1985(1).

Similarly, *Dalton v. United States*, cited in Trump Br. 17, held that a job with the United States Shipping Board Emergency Fleet Corporation was not an "office of the United States" within the meaning of a statute prohibiting dual compensation for particular federal office holders.  71 Ct. Cl. 421, 425 (1931).  The court's analysis, however, was heavily dependent on the history and context surrounding that particular statute.  As discussed above, *supra* 22-24, the history and context surrounding Section 1985(1) clearly demonstrate that members of Congress are covered under the statute.

Finally, in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, cited in Trump Br. 17, the Court simply explained the constitutional definition of an "officer."  561 U.S. 477, 498 (2010).  It did not interpret the term "office" under Section 1985(1).

> (2)     Members of Congress hold a "Trust[] or Place of Confidence Under the United States"

Even if members of Congress are not "office" holders, they certainly hold a "trust" or "place of confidence under the United States."  42 U.S.C. § 1985.  When Congress enacted Section 1985, the term "office" connoted both a "duty" to others and the more formal "ideas of

tenure, duration, fees, or emoluments, rights and powers."  2 Alexander M. Burrill, A Law

Dictionary and Glossary 257 (2d ed. 1867) (App. A at 2).  The term "trust," however, was not so

limited, and encompassed any "confidence reposed in one person for the benefit of another."  *Id.*

at 549 (App. A at 4).  Members of Congress undoubtedly act for the benefit of their constituents.

As House Member Van Trump explained in the debates over the Ku Klux Klan Act, members of

Congress hold "legislative power . . . in trust for the benefit of the people.  This great power is

intrusted [sic] to them to be exercised in *their* discretion, in *their* judgment . . . ."  Cong. Globe,

42nd Cong., 1st Sess. 412 (1871) (App. B at 4); *see also* Cong. Globe, 42nd Cong., 1st Sess. 439

(1871) (App. B at 7) (Mr. Cobb: "my trust as a Representative of a district"); Cong. Globe, 42nd

Cong., 1st Sess. 420 (1871) (App. B at 5) (Mr. Bright: "All Governments are matters of trust.");

Cong. Globe, 42nd Cong., 1st Sess. 479 (1871) (App. B at 9) (Mr. Leach: "a portion of them

*have trusted me with their public interests* for many years, and *returned me to office* again and

again by overwhelming majorities, and they expect me to plead their cause and demand their

rights") (emphasis added).

The term "place of confidence" is even broader.  It is not a legal term of art and does not

appear in legal dictionaries of the day.[10]  Rather, it is a catch-all term describing anyone who is

entrusted to act on behalf of the United States.  During one of the House debates on the Ku Klux

Klan Act, House Member Hoar explained that members of Congress occupy such a role:

---

[10] Not found in: 2 Alexander M. Burrill, A Law Dictionary and Glossary (2d ed. 1867);
John Bouvier, Law Dictionary, Adapted to the Constitution and Laws of the United States of
America, and of the Several States of the American Union (5th ed. 1855); J. J. S.; Hopper
Wharton, Edward. Law Lexicon, or Dictionary of Jurisprudence: Explaining the Technical
Words and Phrases Employed in the Several Departments of English Law (2d ed. 1860);
Archibald Brown, New Law Dictionary and Institute of the Whole Law. For the Use of Students,
the Legal Profession, and the Public (1874); Benjamin Vaughan Abbott, Dictionary of Terms
and Phrases Used in American or English Jurisprudence (1879).

"members [of Congress] are agents of the people, elected by them, answerable to them, and liable to be displaced or superseded at their pleasure; and they possess *as fair a claim to the confidence of the people*, while they continue to deserve it as any other political agents."  Cong. Globe, 42nd Cong., 1st Sess. 334 (1871) (App. B at 1) (emphasis added); *see also* Cong. Globe, 42nd Cong., 1st Sess. 431 (1871) (App. B at 6) (Mr. McHenry: "nor would they again have *trusted you with their confidence*") (emphasis added).[11]

More generally, the legislative history of the Ku Klux Klan Act demonstrates that Congress was using expansive language to "protect[] the Federal presence as fully as possible." 77-68 Op. O.L.C. at 276.  For instance, in expressing concern about the scope of the Act, one member of the House of Representatives noted that the scope of the statute was "neither defined nor specific, thus leaving the widest latitude to those who may be called on to execute it."  Cong. Globe, 42nd Cong., 1st Sess. 361 (1871) (App. B at 2).  Defending the virtues of this broad language, another Member of the House explained that "[c]ombinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice. . . . If there is no remedy for this, . . . then, indeed, is our civil Government a failure . . . ."  *Id.* at 374 (App. B at 3).

Trump contends that members of Congress do not hold a "trust[] or place of confidence under the United States" because they do not hold an "office of Profit or Trust" under the Constitution.  Trump Br. 17.  This argument ignores plain differences between the text of the Constitution and of Section 1985(1), and again ignores that terms may be used in a statute with a

---

[11] *See also* Cong. Globe, 42nd Cong., 1st Sess. 441 (1871) (App. B at 8) (Mr. Price: "If they desire one thing more than another, it is to feel that they are again in the Union and protected by *the Government from its own officers*.  I trust that the House will not pass this bill, but will adopt such a policy as will make the southern people feel that they are again in the Union and *restored to the confidence* of the Government.") (emphasis added).

different meaning from their use in the Constitution. *Lamar*, 240 U.S. at 64–65. While the Constitution speaks of an "office of Profit or Trust," Section 1985 speaks simply of a "trust" and does not mention "profit" at all. And as explained above, the term "trust," by itself, has a very broad reach. Given the breadth of the Ku Klux Klan Act and the historical context in which the statute was enacted, the Office of Legal Counsel has concluded that the term "office, trust, or place of confidence," as used in the Ku Klux Klan Act, "must" have a "reading broader" than the constitutional phrase "office of Profit or Trust." 77-68 Op. O.L.C. at 275–76.

Defendants similarly argue that at common law, "[A]n office of trust or profit referred exclusively to those in the employ in the executive, judiciary, or the church." Trump Br. 17. Again, if Congress intended to protect only those holding a common-law "office of trust or profit," it could have used that very specific phrase. But Congress chose broader language to create a more powerful tool for quashing conspiracies against the federal government.

Finally, Trump argues that members of Congress do not hold a "place of confidence under the United States," despite the fact that they are elected by and work for the benefit of the people. Trump concedes that "place of confidence" is not a term of art. *Id.* 18. Rather than accepting the phrase as the broad, catch-all that it is, however, Trump insists that the term is limited to "those who carry out and apply the law." *Id.* The cases he cites, however, say no such thing; instead, they emphasize the need to construe Section 1985 broadly. *Lewis v. News-Press & Gazette Co.*, cited in Trump Br. 17, held that even *state* law judges hold an "office, trust, or place of confidence under the United States" because they hold at least some "federal authority and responsibility." 782 F. Supp. 1338 (W.D. Mo. 1992).[12] And *Stern v. U.S. Gypsum, Inc.*,

---

[12] *See also id.* at 1342 n.5 (emphasizing that "federal officials *of whatever form* invariably have standing to sue under § 1985(1) in order to remedy interference in the lawful discharge of their duties").

cited in Trump Br. 17, held that Section 1985(1) prohibited a conspiracy to interfere with an
Internal Revenue Service agent's performance of his duties, despite the fact that the agent was
not enforcing civil rights. 547 F.2d 1329 (7th Cir. 1977).  In so holding, the Court emphasized
that Section 1985(1) is "a statute cast in general language of broad applicability," that serves "the
federal interest in the carrying out of federal functions."  *Id.* at 1335, 1337.  Members of
Congress, who are entrusted to carry out essential federal functions, therefore qualify as
individuals holding "a place of confidence under the United States."

> b.  *Members of Congress Were Discharging Their Duties on the Day of the Insurrection*

The Oath Keepers argue that members of Congress are not entitled to relief because
Section 1985(1) prohibits conspiracies to prevent federal officials from "discharging any duties"
of their office, trust, or place of confidence, and members were not discharging any duties on the
day of the insurrection.  Oath Keepers Br. 8.  This argument directly conflicts with the language
of the Twelfth Amendment, which instructs: "The President of the Senate shall, *in the presence
of the Senate and House of Representatives*, open all the certificates and the votes shall then be
counted."  U.S. Const. amend. XII (emphasis added).  Members of the House of Representatives
therefore had a duty to be "presen[t]" when the votes were counted.  The Oath Keepers also
contend that, even if the House of Representatives, as a whole, has a duty to be present for the
tallying of Electoral College votes, "[n]o constitutional provision states that any *individual
Member* of the House has a duty to be present."  Oath Keepers Br. 8 (emphasis added).
Crucially, however, the House of Representatives cannot satisfy its duty to be present unless
individual members are present themselves.  Moreover, the idea that a federal official does not
have a duty to perform an action simply because another federal official is capable of performing
the same action would render Section 1985(1) toothless.  Under the Oath Keepers' construction

29

of the statute, for example, a U.S. Marshal would not have any "duties" because other members of the Marshals Service could perform her assigned tasks.  Nothing in the text of Section 1985 requires the Court to adopt such a limiting construction of what was supposed to be a robust enforcement statute.  *Cf. Safir v. Klutznick*, 526 F. Supp. 921, 939 (D.D.C. 1981) ("The way to rationalize the statute, if rationalizing it needs, is not to gut its application to the [individuals] it clearly governs.").

        3.     <u>Regardless of Whether Plaintiffs Hold an "Office, Trust, or Place of Confidence Under the United States," or "Discharg[ed] any Duties" on January 6, 2021, They Are Entitled to Relief Under Section 1985(1)</u>

Section 1985 does not simply create a cause of action for federal officials who are the targets of an unlawful conspiracy.  Instead, it creates a cause of action for *anyone* injured by a conspiracy to prevent federal officials from assuming office or discharging their duties, including bystanders.  As explained above, Section 1985 prohibits a wide range of conspiracies, including conspiracies to prevent "*any person* from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof."  In addition, it creates a cause of action for *anyone* "injured in his person" by such a conspiracy, 42 U.S.C. § 1985; *see also Hall*, 285 F.3d at 78, including individuals who are *not* the target or "object of the conspiracy."  *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 390–91 (1979).

As detailed in the Complaint, the immediate aim of Defendants' conspiracy was to prevent members of Congress from discharging their own duties to certify the results of the 2020 election.  ¶¶ 1-7.  However, the broader aim of the conspiracy was to prevent President Biden and Vice President Harris from "accepting or holding" their "office[s], trust[s], or place[s] of confidence under the United States."  42 U.S.C. § 1985(1); ¶ 5 ("[Defendants'] conduct jointly undertaken to threaten the Plaintiffs and other members of Congress in order to disrupt the

Electoral College vote count was part of an ongoing course of action pursued by the Defendants

for the purpose of contesting the announced results of the presidential election held in November

2020 and preventing the duly elected President and Vice President from attaining

approval by Congress of their election necessary to their inauguration.").  Trump acknowledges

this point.  *See* Trump Br. 15-16 ("Plaintiffs allege that the Defendants in this case interfered

with the performance of their official duties as members of Congress . . . . Plaintiffs further

allege that this was done as part of the larger scheme to prevent Joseph Biden and Kamala Harris

from being certified by Congress.").

Trump does not dispute that a conspiracy to prevent the duly elected President and Vice

President from holding their "office[s], trust[s], or place[s] of confidence" falls within the ambit

of Section 1985(1).  To the contrary, he suggests that conspiracies targeting individuals who

"carry out and apply the law"—such as the President and Vice President—are covered by the

statute.  *Id.* at 18.[13]  Because Plaintiffs were injured in their "person or property" by the

conspiracy to prevent the President and Vice President from taking office, they may recover

damages (despite the fact that they are not themselves the President or Vice President).  *See*

*Great Am. Fed. Sav. & Loan Ass'n*, 442 U.S. at 390–91.

Thus, regardless of whether Defendants' conspiracy is viewed as a concerted effort to

prevent members of Congress from discharging their own duties to certify the results of the

---

[13] This suggestion is consistent with both the plain language and the legislative history of Section 1985.  *See*, *e.g.*, John Bouvier, Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union 260 (1855) (App. A at 13) (explaining that an "officer" is anyone "lawfully invested with an office," including "the President of the United States of America"); 77-68 Op. O.L.C. at 275-76 (explaining that the legislative history of the Ku Klux Klan Act calls for a broad reading of the statute).

election or a plot to prevent President Biden or Vice President Harris from holding office,

Plaintiffs have standing to sue under Section 1985.

## B.    <u>Plaintiffs Have Sufficiently Alleged a Conspiracy by All Defendants</u>

Section 1985 claims are governed by "the law of civil conspiracy."  *Lawrence v. Acree*,

665 F.2d 1319, 1323-24 (D.C. Cir. 1981).  A civil conspiracy is simply "an agreement between

two or more people to participate in an unlawful act or a lawful act in an unlawful manner."

*Hobson v. Wilson*, 737 F.2d 1, 51 (D.C. Cir. 1984), *overruled in part on other grounds*

*by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993).  The

core elements of a civil conspiracy are: (1) "an agreement between two or more persons"; (2) "to

participate in an unlawful act, or a lawful act in an unlawful manner"; (3) an "overt act"

committed "pursuant to and in furtherance of the common scheme"; and (4) an "injury" caused

by the overt act.  *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).  Plaintiffs have

adequately alleged each of these elements.

### 1.    <u>Plaintiffs Have Adequately Alleged an Agreement Among Defendants to Participate in Unlawful Acts</u>

First, the Complaint adequately alleges an agreement among all Defendants to participate

in unlawful acts.  A conspiratorial agreement exists wherever two or more persons share a

commitment to a "general objective or common plan."  *Jin v. Ministry of State Sec.*, 335 F. Supp.

2d 72, 80–81 (D.D.C. 2004).  The parties to a conspiratorial agreement need not know "the exact

limits of the illegal plan or the identity of all participants therein."  *Hobson*, 737 F.2d at 51

(quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir. 1979), *modified on other*

*grounds*, 446 U.S. 754 (1980)).  Nor do they need to verbalize their agreement: a "tacit

understanding" will suffice.  *Halberstam*, 705 F.2d at 477; *Hobson*, 737 F.2d at 51.

There is no dispute that the individuals who stormed the Capitol on January 6 had a conspiratorial agreement to disrupt the Electoral College vote count through illegal means.  The Complaint describes a coordinated plot to invade the building in extreme detail: the insurrectionists shared maps, discussed the best weapons and tactical gear for their assault, and communicated over secure channels as they moved through the Capitol and overwhelmed law enforcement.  The only question is whether Plaintiffs have plausibly alleged that each of the Defendants shared the insurrectionists' plan to interrupt the Electoral College vote count through force, intimidation, or threats.

The answer is a clear and resounding yes.  As explained in more detail below, Trump called supporters to a "wild" protest on January 6, prompting an Oath Keepers leader to announce that he "orchestrated a plan with the Proud Boys."  ¶ 63.  On the day of the insurrection, the Proud Boys and the Oath Keepers entered the Capitol in tactical formations wearing military equipment.  ¶ 65, 126.  Trump sent an angry mob chanting "storm the Capitol" after them.  ¶ 88.  As rioters trespassed across the halls of government, kicking and dragging Capitol Police, Giuliani took advantage of the disruption by calling members of Congress, invoking Trump's name, and urging them to do everything they could to "delay" the Electoral College vote count further.  ¶¶ 136, 138.  A member of Congress called Trump and urged him to call off the rioters, but he dismissed the request.  ¶ 123.

In their respective motions to dismiss, Defendants try to draw attention away from this disturbing picture by zeroing in on specific allegations.  But allegations in a complaint, especially those regarding a conspiracy claim, must be read together.  *See Tellabs*, 551 U.S. at 310; *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Vila*, 570 F.3d at 285.  When viewed as a whole, the Complaint presents an undeniable and insurmountable

33

truth: each Defendant engaged in the conspiracy—often in full view of the nation and the world—to use force, intimidation, or threats to stop Congress from performing its duty to certify the election results.

a.     *Defendant Trump*

Plaintiffs have more than plausibly alleged that Trump shared his supporters' general plan to march to the Capitol and use force, intimidation, or threats to prevent Congress from certifying the results of the 2020 election.  The Complaint alleges that he directly enlisted the help of the Proud Boys, called supporters to assemble on January 6, endorsed the use of force by his supporters, arranged for them to march to the Capitol, told them to "fight like hell," assured them that they were "allowed to go by very different rules," and refused to send a tweet (or any other communication) to call off the rioters when they breached the Capitol.  ¶¶ 29-32, 55, 66-71, 80, 82-90, 106, 117-119, 123.

Before the election, Trump publicly instructed the Proud Boys and other "militia" groups to await his orders, telling them: "stand back and stand by."  ¶ 30.  In response, Proud Boys Chairman Tarrio tweeted "standing by sir."  *Id.*  On December 19, 2020, Trump mobilized these militia groups and other violent supporters, tweeting: "Big protest in DC on January 6th.  Be there, will be wild!"  ¶ 55.  This message was widely understood as "marching orders."  ¶ 57.  Supporters responded online: "THE COMMANDER IN CHIEF HAS ISSUED HIS ORDERS," "If you've been waiting for a signal, THAT'S IT," and "Roger that. Standing by no longer."  ¶¶ 56-57.  A conspiratorial agreement can be inferred from this sort of "invitation, followed by

responsive assurances and conduct." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008).[14]

For weeks, Trump publicly encouraged his supporters, including those traveling to D.C. on January 6, to use violence to try to change the outcome of the 2020 election (long after it became clear that Trump had lost).  ¶¶ 55-58, 66-67.  Trump was repeatedly warned that his statements and actions were being construed as invitations to violence and was asked to condemn violent actions taken in his name, but he refused to do so.  For example, in a televised address, Georgia Republican election official Gabriel Sterling pleaded: "Mr. President, you have not condemned these actions. . . . This has to stop. . . . Stop inspiring people to commit potential acts of violence.  Someone is going to get shot, someone is going to get killed.  And it's not right." ¶ 49.  Rather than condemning violence, however, Trump asked supporters to "be wild" on January 6.  ¶ 55.  Supporters planning the insurrection online "indicated that they believed President Trump's statement that the protests 'will be wild' were a key part of his orders, with one post stating "'Will Be Wild' is a hidden message for us to be prepared . . . . as in armed." ¶ 58.  The Oath Keepers leader who admitted to "orchestrat[ing] a plan with the Proud Boys" also took to social media to emphasize the importance of Trump's statement that he "wants us to make it wild!!!"  ¶ 63.

Eliminating any doubt about Trump's messaging, former White House official Olivia Troye warned in "widely publicized remarks" that "'there will be violence on January 6th

---

[14] *See also In re Cal. Bail Bond Antitrust Litig.*, No. 19-CV-00717-JST, 2020 WL 3041316, at *13 (N.D. Cal. Apr. 13, 2020) (inferring agreement in part based on "public statements by defendants that could be construed as 'invitations to agree'"); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011) (inferring agreement in part because "defendants made public statements about supply strategy which were intended as 'signals' to competitors that the conspiracy was proceeding").

because the president himself encourages it.'"  ¶ 66.  Yet Trump continued to express support for a militant gathering on January 6, even retweeting a message stating, "The calvary [*sic*] is coming, Mr. President!"  ¶ 67.  By the eve of the January 6 rally, it was such common knowledge that Trump was encouraging violence that the *Washington Post* observed: "[D.C. is] bracing for potentially violent protests, egged on by President Trump himself."  ¶ 72.  Such open "encourage[ment]" of unlawful behavior can give rise to an inference of a conspiracy.  *United States v. Childress*, 746 F. Supp. 1122, 1130 (D.D.C. 1990), *aff'd*, 58 F.3d 693 (D.C. Cir. 1995).

Trump trained his violent supporters on the Capitol and the members of Congress who were gathering to certify the election results.  ¶¶ 85, 89.  The organizers of the "Save America" rally—the central protest on January 6, 2021—originally planned to keep protestors at the Ellipse until Congress had finished counting the Electoral College votes.  Trump and his campaign, however, proposed that rally-goers march down to the Capitol, despite the fact that their permit explicitly stated that it did "not authorize a march from the Ellipse."  ¶ 90.  Violent Trump supporters, including the Oath Keepers leader who agreed to "work together" with the Proud Boys, expressed an understanding that Trump had specifically "called us all to the Capitol" on January 6.  ¶ 63.

On the morning of the insurrection, before the "Save America" rally, "Trump urged his followers to resist the final count of the Electoral College ballots, misinforming them in a tweet that 'The States want to redo their votes.'"  ¶ 80.  At the rally itself, Trump spoke to a fevered crowd "shouting and chanting, 'Storm the Capitol,' 'Invade the Capitol Building,' and 'Take the Capitol right now.'"  ¶ 88.  Condoning this plan, he urged the crowd to "fight like hell," adding, "we are going to the Capitol."  ¶¶ 88-89.  Knowing he was perceived as an authoritative source of information, Trump even told the crowd they had permission to break rules, explaining:

36

"when you catch somebody in a fraud, you're allowed to go by very different rules[.] . . ."  ¶ 88.

"While this could potentially being taken [*sic*] as very dark hyperbole in some instances, in the

light of the later events it plausibly alleges a plan for violence."  *Sines*, 324 F. Supp. 3d at 788.

Following Trump's instruction, protestors marched down to the Capitol.  ¶ 94.  With the

way cleared by the Proud Boys, the crowd poured into the building, telling Capitol Police

"You're outnumbered.  There's a fucking million of us out there.  *And we are listening to*

*Trump—your boss.*"  ¶ 122 (emphasis added).  Leaders of the riotous crowd also told Capitol

Police, "We were invited here by the President of the United States."  *Id.*  Rioters kicked,

dragged, and pepper sprayed the police who resisted them, erected gallows on the Capitol

grounds, and displayed a noose.  ¶¶ 104, 135-137.  Trump "watch[ed] the insurrection unfold in

live televised reports," and shortly after the rioters "began roaming [the Capitol's] halls and

offices," he inflamed them further, tweeting (from his personal account): "Mike Pence didn't

have the courage to do what should have been done . . . ."  ¶¶ 117-18.  This tweet was repeated

by rioters at the Capitol on megaphones.  ¶ 119.

House Minority Leader Kevin McCarthy "pleaded with [] Trump to call off the rioters,

emphasizing that they were all Trump supporters," but Trump simply responded, "'Well, Kevin,

I guess these people are more upset about the election than you are.'"  ¶ 123.

Members of Congress were forced to adjourn proceedings and shelter in secure locations

until the rioters were cleared from the building.  ¶ 111.  Capitalizing on this adjournment,

Giuliani called members of Congress, introduced himself as Trump's lawyer (i.e., an agent

acting on Trump's behalf), and urged them to prolong the delay in counting the Electoral College

votes.  Thus, acting through Giuliani, Trump capitalized on the disturbance caused by violent

rioters to further the conspirators' shared goal of impeding the certification of the Electoral

College vote count.  ¶¶ 138-139.  This evidence that Defendants Trump and Giuliani were acting at the same time and in furtherance of a shared objective while other co-conspirators stormed the Capitol building is precisely the type of "easy situation in which to draw an inference" of a conspiracy.  *Halberstam*, 705 F.2d at 481.

In the aftermath of the attack, Trump reassured violent supporters that they had his blessing, saying: "Go home with love and in peace.  Remember this day forever!"  ¶ 140.

This evidence, taken together, gives rise to a plausible inference that Trump agreed to a general plan to use force, intimidation, or threats to prevent members of Congress from carrying out their duty to certify the results of the 2020 election.  His repeated endorsements of violence, his integral role in planning the "Save America" rally (including *his* decision to have rallygoers march to the Capitol before Congress had finished counting the Electoral College votes), his instruction to "fight like hell," his inflammatory tweet after they entered the building, and his refusal to call off violent rioters reflect Trump's commitment to the overall scheme.  *Cf. Sines*, 324 F. Supp. 3d at 785-86 (finding it plausible that Richard Spencer participated in a conspiracy to violate civil rights because he was "prominently involved in the organization of the events" at a white supremacist rally, "incited physical assaults and violence," "actively promote[d] the rally through social media," and thanked the crowd after the event); *Tillman v. Burge*, 813 F. Supp. 2d 946, 989–90 (N.D. Ill. 2011) (holding that plaintiffs adequately alleged the mayor's participation in a conspiracy in light of the mayor's "public statements" and "the internal actions he took (or failed to take)" in his leadership role); *Childress*, 746 F. Supp. at 1130 (D.D.C. 1990) ("[I]f a defendant, with an understanding of the unlawful character of the conspiracy,

knowingly, *encourages*, advises or assists in furthering the purpose of the conspiracy, that

defendant is a knowing and voluntary participant" (emphasis added)).[15]

The widespread consensus that Trump was responsible for the attack on the Capitol

reinforces the plausibility of the inference that Trump shared the rioters' plan to use force,

intimidation, or threats to stop the certification of the election results.  "Many former members of

Trump's administration, including former White House Chief of Staff John Kelly, former White

House Chief of Staff Mick Mulvaney, former Secretary of Defense Jim Mattis, former Attorney

General Bill Barr, former Ambassador to the United Nations John Bolton, and former National

Security Advisor H. R. McMaster, have stated that Trump was directly responsible for the

insurrection."  ¶ 147.  Similarly, then-Senate Majority Leader McConnell stated: "There is no

question that President Trump is practically and morally responsible for provoking the events of

that day.  The people who stormed this building believed they were acting on the wishes and

instructions of their president."  ¶ 150.

---

[15] Recently, another Court in this District held that the plaintiffs had not sufficiently alleged that the defendants, including Defendant Trump, had engaged in a conspiracy to violate the plaintiffs' civil rights when Defendant Trump and others cleared protestors supporting the Black Lives Matters movement from Lafayette Square next to the White House on June 1, 2020. *Black Lives Matter D.C. v. Trump*, Nos. 20-cv-1469 (DLF), 20-cv-1542 (DLF), 20-cv-2163 (DLF), 20-cv-1622 (DLF), 2021 WL 2530722, at *23-27 (D.D.C. June 21, 2021).  The allegations in that case are readily distinguishable.  There, the plaintiffs "merely alleg[ed] that the defendant officials communicated, without alleging any details of those communications suggesting that an unlawful agreement" had been made. *Id*. at 25.  The court further held that the defendants' actions were consistent with legitimate activities as opposed to a conspiracy to violate the plaintiffs' civil rights, including enforcement of a curfew and the policing of demonstrators in close proximity to a sitting President. *Id*. at 26.  In the case at bar, Plaintiffs have alleged the contents of specific and direct communications between Defendant co-conspirators demonstrating their involvement in an unlawful conspiracy, and there is no legitimate alternative explanation for a violent insurrection on the Capitol or Defendants' actions leading up to that event.

Fighting the weight of this evidence, Trump picks out specific allegations against him, arguing that these allegations—by themselves—are insufficient to support a conspiracy. For example, Trump has downplayed the importance of his direct communication to the Proud Boys during a presidential debate, endorsing their violent conduct and enlisting them for future lawless action. ¶ 30.[16]  This instruction, however, was clearly meaningful to the Proud Boys, who tweeted that they were "standing by," awaiting Trump's instructions. *Id.*  Answering Trump's later call for a "wild" event on January 6, the Proud Boys took the lead in the insurrection, having broken through the initial Capitol barriers at precisely the right moment for Trump's mob to descend upon the Capitol building itself. ¶¶ 94, 98-103.  Such direct communications between co-defendants and separate actions in support of each other and in furtherance of a common objective are precisely the types of evidence demonstrating a conspiracy. *See Hobson*, 737 F.2d at 51-52; *Halberstam*, 705 F.2d at 481.

Trump also contends that he did not know of his supporters' online communications responding to his tweets and planning for the insurrection. Trump Br. 7.  Given the allegations in the Complaint, however, it is reasonable to infer that Trump knew of those communications. The Complaint specifically alleges that the planned violence was discussed in media outlets Trump followed, as well as by law enforcement. ¶ 66.  But more importantly, this overlooks the fact that he knew his supporters would be ready to use force on January 6 because Trump himself supported and encouraged the use of violence for months. ¶¶ 46-54.  The only reason

---

[16] Defendant Enrique Tarrio and the organizations he leads, Defendants Proud Boys and Warboys, have not responded to Plaintiffs' Complaint, despite having been properly served. ECF. Nos. 1-5.  Plaintiff will be moving for default judgment against these Defendants, but simply point out that the facts laid out in the Complaint are more than enough to sufficiently allege their involvement in the conspiracy.

the Trump Army was in D.C. on January 6 ready to use force against Trump's opponents was because Trump had summoned them.  ¶¶ 31-32, 46-55.

Trump also contends that his statements at the "Save America" rally do not show that he agreed to use threats, intimidation, or force to interrupt the Electoral College vote count. Straying outside the four corners of the Complaint, Trump points to one statement he made during the "Save America" rally that his supporters should march "peacefully and patriotically." Trump Br. 5, 28.  But this statement does not negate the dozens of other statements he made in the months leading up to and during the rally endorsing the use of force, and even characterizing the use of force as "patriot[ic]."  ¶¶ 32, 82, 140.

Trump also denies the significance of the phone call between Trump's White House and the Proud Boys and the communications between Trump and his confidant, Roger Stone (who was in direct communications with the Oath Keepers).  Trump Br. 27, 29.  While the phone call between Trump's White House and the Proud Boys in the days leading up to the insurrection is circumstantial evidence, it still bolsters the inference that Trump and the Proud Boys shared a common plan.  "Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire."  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015); *see also Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 321 (S.D.N.Y. 2018) ("[A]llegations of an opportunity to conspire may, when considered alongside allegations of parallel conduct and other plus factors, suffice to defeat a motion to dismiss.").  Similarly, Trump argues that Plaintiffs have not sufficiently alleged Trump's involvement in the conspiracy because they did not name the "time, place, or subject matter" of the conversations between Trump and Roger Stone, despite Mr. Stone's public comments that such a communication took

41

place at the end of December and that the subject matter of the conversation was how to ensure that Trump remained in office. Any further specificity is not required at the pleading stage. *See, e.g.*, *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1148 (N.D. Cal. 2009) (holding that dismissal is not warranted "on the ground that Plaintiffs fail to identify 'who attended these meetings, what was discussed at them, or how they purportedly related to the conspiracy other than providing an opportunity for the parties to talk to one another'" (citation omitted)). Again, Trump incorrectly assumes that this allegation should be addressed on its own and not in the context of all the communications Trump had with those involved in the insurrection. *Cont'l Ore Co.*, 370 U.S. at 699; *Vila*, 570 F.3d at 285.

Thus, while each of these instances of Trump's knowledge of and participation in the conspiracy might be sufficient to plausibly allege liability, taken as a whole, as they must, Plaintiffs have more than met their burden.

b. *Defendant Giuliani*

Many of the allegations demonstrating Trump's participation in the conspiracy, likewise implicate Giuliani, who worked alongside Trump for many months and during the insurrection. *See Halberstam*, 705 F.2d at 481 ("Mutually supportive activities by parties in contact with one another over a long period suggests" a conspiracy.). The insurrection could not have occurred if Trump and Giuliani had not engaged in a months-long misinformation campaign to convince Trump's supporters that the election had been illegally stolen. Reiterating those lies at the "Save America" rally, Giuliani told the crowd that they needed to save their country and called for "trial by combat." ¶ 81. Once the insurrection was underway, and the violent mob prompted an adjournment of congressional proceedings, Giuliani capitalized on the adjournment by calling members of Congress and urging them to continue delaying the certification of the election results. ¶ 138.

42

Like Trump, Giuliani ignores nearly all of the allegations demonstrating his involvement in the conspiracy, focusing on several facts in isolation.  First, Giuliani goes to great lengths to argue that the timing of the breach of the Capitol demonstrates that Trump, Giuliani, and the Proud Boys did not work in concert.  Giuliani Br. 4, 7-8.  Yet according to his own account, the Proud Boys breached the outer perimeter of the Capitol *two minutes* before Trump's mob arrived.  *Id.* 7.  Far from demonstrating a lack of coordination, the timing of this attack—an initial assault on the outer perimeter by the Proud Boys, followed by a flood of Trump supporters on the inner perimeter of the Capitol—is yet more clear evidence of a conspiracy.

Giuliani also contends that his statement to the Trump mob to engage in "trial by combat" was not to be taken as literal support of violence.  *Id.* 12.  Like Trump's instruction to "fight like hell," Giuliani's call for trial by combat "could potentially being [sic] taken as very dark hyperbole in some instances," but in light of surrounding events, namely that the mob to which Giuliani spoke engaged in combat immediately after the rally, "it plausibly alleges a plan for violence."  *Sines*, 324 F. Supp. at 788.

During his speech at the "Save America" rally, Giuliani demonized Trump's political opponents as criminals and traitors and encouraged Trump's supporters to take any action necessary to prevent a purportedly unlawful takeover of their government by Trump's opponents.  ¶ 81.  Speaking as the attorney to Trump and his Campaign, Giuliani laid out the steps that could be taken to overturn the election, but as he made clear to his audience, those steps could only be taken if Congress failed to certify the election that day.  *Id.*  And because Vice President Pence was not willing to violate the Constitution in order to keep Trump in power, it would be up to Trump's followers to ensure that the certification did not take place.  Giuliani's statements to have "trial by combat" and to "fight to the very end" were clearly

43

signifying that Trump's mob had to take matters into their own hands, including by using force

and threats, and even violence, and that doing so was legally justified.  ¶ 81.  This led directly

into Trump's speech, where Trump assured his supporters that they did not have to follow the

law because his opponents had not done so themselves.  ¶¶ 82, 88.  At the least, Giuliani's

speech supports Plaintiffs' plausible allegation that Giuliani was acting in furtherance of the

common objective of preventing certification of the election through the use of force.

Giuliani's reliance on *United States ex rel. PCA Integrity Associates, LLP v. NCO

Financial Systems, Inc.*, cited in Giuliani Br. 18, to argue that Plaintiffs have not sufficiently

alleged a conspiracy, is unavailing.  No. CV 15-750 (RC), 2020 WL 686009 (D.D.C. Feb. 11,

2020).  The conspiracy claim in that case was dismissed because there was no underlying tort,

and the plaintiffs had failed to allege any overt acts taken in furtherance of the conspiracy or

even allege what the conspiratorial objective was.  *Id*. at *30.[17]  Here, Plaintiffs have plausibly

alleged that Defendants all took part in the shared objective of preventing the certification of the

Presidential election by force, and as a result, certain co-conspirators stormed the Capitol in

furtherance of that objective (an obvious tort and violation of Section 1985).

Giuliani also claims that his condemnation of the insurrection the day after it took

place—an obvious attempt to deflect attention away from his involvement in the insurrection—

somehow absolves him.  Giuliani Br. 13.  But that condemnation does not negate his conduct

*prior to and during* the insurrection.[18]

---

[17] In addition, as explained above, *supra* n.6, Plaintiffs' claims under Section 1985(1) do
not have the "heightened pleading standard" that apply to False Claims Act conspiracy cases
such as *PCA Integrity Associates.*

[18] Giuliani argues that the allegations against him are implausible because the FBI has
conducted an extensive investigation into the attack on the Capitol, but there is "no evidence that
either Giuliani or President Trump has been investigated for, let alone charged with, any crime

c.      *Defendant Oath Keepers*

The Oath Keepers do not contest Plaintiffs' allegations that individuals holding

themselves out as members and leaders of the Oath Keepers participated in the conspiracy to use

threats, force, or intimidation to obstruct the certification of the election results.  Instead, the

Oath Keepers attempt to wash the organization's hands of the conspiracy altogether by arguing

that individual members and leaders may not have been representing the group when they

participated in the unlawful scheme.  Oath Keepers Br. 13-15.  This argument ignores clear

allegations regarding the Oath Keepers *as an organization*, overlooks the law on vicarious

liability, and inappropriately draws inferences in the Oath Keepers' favor.

The Complaint contains detailed allegations about the Oath Keepers as a whole.  For

example, the Complaint alleges that an Oath Keepers leader confessed to "organiz[ing] an

alliance between Oath Keepers . . . and Proud Boys"—*not* an alliance between individual

members of the two groups.  ¶ 63.  That same leader later stated that "the Oath Keepers had

'*orchestrated a plan with the Proud Boys*'"—not a plan among individuals.  *Id.*  Additionally,

the Complaint alleges that "Oath Keepers leaders recruited members in the weeks leading up to

the Capitol insurrection and provided military training to its recruits and members so that they

would be prepared for the violent actions the *group* would take that day."  ¶ 127 (emphasis

added).  Likewise, during the insurrection itself, a member of the Oath Keepers sent a message to

---

related to the Capitol Riot."  Giuliani Br. 14.  Setting aside the fact that the investigation is still
ongoing, and that the progress of the investigation falls outside the four corners of the
Complaint, a governmental decision not to investigate or prosecute Giuliani would not make him
immune from civil liability.  *See, e.g.*, *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-
02476, 2016 WL 2731524, at *2-3 (S.D.N.Y. Apr. 26, 2016) (after the Department of Justice
closed its investigation into an antitrust conspiracy without bringing charges, civil plaintiffs sued
the conspirators and recovered $1.865 billion).

fellow Oath Keepers: "*We have a good group*.  We have about 30-40 of us.  We are sticking together and sticking to the plan."  ¶ 129.

The Oath Keepers organization is also vicariously liable for the actions of its agents, *i.e.*, the individual leaders and members of the Oath Keepers who planned, organized, and led the insurrection.  "The existence of an agency relationship is a question of fact" that ultimately turns on whether the "parties[] consent[ed] to establish a principal-agent relationship" and whether "the activities of the agent are subject to the principal's control."  *Jackson v. Loews Washington Cinemas, Inc.*, 944 A.2d 1088, 1097 (D.C. 2008) (citation omitted).  At this stage, Plaintiffs' allegations more than "plausibly support an inference that an agency relationship existed" between the Oath Keepers and those leaders and members who contributed to the insurrection. *Jefferson v. Collins*, 905 F. Supp. 2d 269 (D.D.C. 2012).  As stated in Plaintiffs' Complaint, leaders and members of the Oath Keepers planned and furthered the conspiracy, and both leaders and members of the Oath Keepers were present at the conspiracy's culmination during the January 6 insurrection—it requires no stretch whatsoever to infer that these members and leaders were under the control of the Oath Keepers organization.[19]  Moreover, the Complaint alleges carefully coordinated uniforms and movements among members of the Oath Keepers during the insurrection: "Acting in concert with Defendant Proud Boys and the rest of the riotous mob entering the Capitol, members of Oath Keepers wore paramilitary equipment, helmets, reinforced vests and clothing with Oath Keepers paraphernalia, moving in a regimented manner as members of the military are trained."  ¶ 126.  Oath Keepers members also exchanged messages about the members of Congress they were hunting, including: "All members are in the tunnels under

---

[19] Of course, whether those at the insurrection representing themselves to be Oath Keepers leaders and members were in fact leaders and members of Oath Keepers is the very definition of a factual question that cannot be resolved on a motion to dismiss.

capital [sic] seal them in. Turn on gas"; "Tom, all legislators are down in the Tunnels 3 floors down"; and "Go through back house chamber doors facing N left down hallway down steps." ¶ 129.  Such careful coordination raises an inference that the Oath Keepers were acting as a group taking directions.  *See Sines*, 324 F. Supp. 3d at 787-88 (plaintiffs plausibly alleged that an organizational defendant participated in a conspiracy to violate civil rights where, as here, the organization's members wore uniforms, communicated through a private channel, engaged in "coordinated marching and shield tactics," and admitted to violence after the event); *id.* at 790 (plaintiffs' "allegations of organized paramilitary fighting" supported an inference that another organizational defendant participated in the conspiracy).

        In any event, Oath Keepers is also vicariously liable for the actions of the Oath Keepers leaders and members who participated in the conspiracy with apparent authority from the Oath Keepers.  "[A]pparent authority does not depend upon any manifestation from the principal to her agent, but rather from the principal to the third party."  *See Makins v. District of Columbia*, 861 A.2d 590, 594 (D.C. 2004) (citing Restatement (2nd) of Agency Law).  Here, as alleged, there were ample "manifestation[s]" from the Oath Keepers, the principal, that caused Plaintiffs, the third party, to reasonably believe that the Oath Keepers organization "consent[ed] to have the act done on [its] behalf by th[ose] purporting to act for [it]."  Restatement (2nd) of Agency Law § 27; *see also Search v. Uber Techs.*, 128 F. Supp. 3d 222, 235 (D.D.C. 2015) (complaint sufficiently alleged apparent authority, and defendant's facts in opposition were "material *outside* the Complaint . . . and the Court thus cannot consider it in resolving the 12(b)(6) motion at hand").  Defendant Oath Keeper's leader, for example, publicly stated that there would be a

"much more desperate, much more bloody war" if Trump were allowed to lose, ¶ 54,[20] and another leader stated that they had "organized an alliance between Oath Keepers . . . and Proud Boys . . . to work together."  ¶ 63.  Statements like these—along with the involvement of Oath Keepers leaders and members at the January 6 insurrection, ¶ 126—support an inference that these alleged leaders and members of the Oath Keepers acted with the consent of the Oath Keepers organization.

2.    Plaintiffs Have Adequately Alleged Overt Acts Causing Injury

In addition, Plaintiffs have adequately alleged that one or more Defendants committed "overt act[s]" in furtherance of the conspiracy, *Halberstam*, 705 F.2d at 477, including: changing the plans for the "Save America" rally to ensure they included a march to the Capitol (Trump), ¶ 69; purchasing military equipment and practicing tactical formations for the assault on the Capitol (Proud Boys and Oath Keepers), ¶ 65; serving as an advance team to breach the Capitol barriers (Proud Boys), ¶ 99; sending an angry mob to the Capitol in the Proud Boys' wake (Trump and Giuliani), ¶ 100; violently storming into the Capitol building (Proud Boys and Oath Keepers), ¶¶ 101-104; and expressing encouragement and support for those who stormed the Capitol (Trump), ¶¶ 118, 140.  Plaintiffs have also alleged that these overt acts caused Plaintiffs' physical and emotional injuries, including physical injuries they sustained while taking shelter

---

[20] While the names of Oath Keepers members and leaders need not be stated in the Complaint, the media reported that this statement was made by Oath Keepers founder and president-for-life Stewart Rhodes.  *See* Spencer S. Hsu, *Four more indicted in alleged Jan. 6 Oath Keepers conspiracy to obstruct election vote in Congress*, The Washington Post (May 30, 2021, 7:33 PM), https://www.washingtonpost.com/local/legal-issues/oathkeepers-capitol-riot/2021/05/30/270b1e6a-bf43-11eb-b26e-53663e6be6ff_story.html.

and the emotional injury of a near-death experience.  ¶¶ 165, 199, 206-208, 227, 235, 237, 254-256, 265.  Thus, Plaintiffs have plausibly alleged all elements of a civil conspiracy.[21]

### C.    The First Amendment Does Not Protect Defendants' Violent Conspiracy

Defendants cannot take refuge in the First Amendment.  Trump Br. 18-24; Giuliani Br. 18-20; Oath Keepers Br. 27-31.  Contrary to the revisionist history presented in their briefs, Defendants were not simply delivering political messages; they were forming and executing a violent scheme to obstruct the orderly transition of power, posing a profound threat to our democracy.

Defendants' conduct is not protected by the First Amendment for at least two independent reasons.  First, each Defendant affirmatively joined and contributed to an unlawful conspiracy.  Second, Defendants incited violence with their words and actions.  Moreover, Section 1985(1) is neither unconstitutionally vague nor overbroad.  Nor are Plaintiffs required to plead that Defendants acted with actual malice.  Finally, Plaintiffs are not requesting an unconstitutional prior restraint on Defendants' rights to free speech and to petition.

---

[21] Because Plaintiffs have alleged that overt acts in furtherance of the conspiracy caused them injury, they are entitled to relief, even if the conspirators did not ultimately prevent the certification of the election results.  *See* 42 U.S.C. § 1985 (creating a cause of action for anyone injured by "any act in furtherance of the object of [the] conspiracy"); *United States v. Bryant*, 245 F. 682, 684 (N.D. Tex. 1917) ("If the prompt steps taken by the officers of the government, in causing the arrest and prosecution of the alleged conspirators, thwarted the conspiracy and prevented armed resistance and rebellion, such of the defendants who may be proved to have been parties to such conspiracy are none the less guilty, nor does the fact that the whole scheme was chimerical and utterly impossible of success, make it any the less a conspiracy denounced by the statutes of the United States."); *Salinas v. United States*, 522 U.S. 52, 65 (1997) ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.").  The Oath Keepers have cited no law to the contrary.  *See* Oath Keepers Br. 9.

1.      Defendants Participated in an Unlawful Conspiracy

Defendants claim that their actions involved some combination of speech, assembly, and petition and are therefore protected by the First Amendment.  These arguments ignore the longstanding authority holding that conspiratorial statements and agreements in furtherance of unlawful actions are not protected by the First Amendment.  Accepting the allegations in the Complaint as true, Plaintiffs' claims are perfectly consistent with the Constitution.

The First Amendment does not authorize "knowing association with [a] conspiracy." *Scales v. United States*, 367 U.S. 203, 229 (1961).  Nor does it confer a right to "imped[e] or obstruct[]" a government employee's "performance of duty by threats."  *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970).  As the Supreme Court held in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949):

> [I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.  *See e.g., Fox v. Washington*, 236 U.S. 273, 277; *Chaplinsky v. New Hampshire*, 315 U.S. 568.  Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against . . . agreements and conspiracies deemed injurious to society.

*See also Brown v. Hartlage*, 456 U.S. 45, 55 (1982) (noting the fact that an "agreement[] to engage in illegal conduct . . .  necessarily takes the form of words does not confer upon it, or upon the underlying conduct, the constitutional immunities that the First Amendment extends to speech")

In passing the Ku Klux Klan Act, Congress deemed as injurious to society those conspiracies that prevent—by force, intimidation, or threat—federal officials from discharging their duties.  The Supreme Court has long held that such conspiracies against "public peace and order" are not cloaked in First Amendment protection.  *See NAACP v. Claiborne Hardware Co.*,

50

458 U.S. 886, 908-09 (1982) (quoting *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937)). Thus, if a group of people "form[] or are engaged in a conspiracy against the public peace and order," they "may be prosecuted for their conspiracy or other violation of valid laws." *Id.*

Just as the First Amendment does not protect "speech integral to criminal conduct,"[22] *United States v. Stevens*, 559 U.S. 460, 468 (2010), it does not protect speech integral to a violation of a valid civil law. *See, e.g.*, *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 62 (2006) ("Congress, for example, can prohibit employers from discriminating in hiring on the basis of race [which] will require an employer to take down a sign reading 'White Applicants Only'"). Thus, speech used to form or implement a civil conspiracy is not immunized by the First Amendment.

Applying these principles, courts have held that "the First Amendment does not protect Defendants" from liability under Section 1985 for forming or furthering "a conspiracy to commit violence." *Sines*, 324 F. Supp. 3d at 802. Nor does it protect Defendants who conspire to interrupt civic functions through intimidation or true threats. *See Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 Civ. 8668 (VM), 2021 WL 480818, at *9–10 (S.D.N.Y. Jan. 12, 2021) (First Amendment did not bar plaintiffs' Section 1985(3) claim where plaintiffs alleged a conspiracy to intimidate and make true threats against voters), *appeal dismissed*, No. 21-232 (2d Cir. June 22, 2021). Thus, the First Amendment does not protect speech that formed or furthered

---

[22] This is particularly true where, as here, a civil statute prohibiting harmful conduct has a criminal analogue. Section 1985(1) has a criminal analogue, 18 U.S.C. § 372, which also proscribes conspiracies "to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof." If it is constitutionally permissible to impose criminal penalties on someone engaging in such a conspiracy, it is *a fortiori* permissible to impose civil penalties.

Defendants' conspiracy to interrupt congressional proceedings through force, intimidation, or threats.

Trump contends that he, like others, has a right to speak on matters of public concern and to petition the government.  Trump Br. 19-21.  Nonetheless, Trump's speech can still be taken as evidence of his participation in a conspiracy.  *See, e.g.*, *Scales*, 367 U.S. at 229; *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (First Amendment "does not prohibit the evidentiary use of speech to . . . prove" an element of the violation).  As explained above, Trump's statements *and actions* support a plausible inference that he went far beyond politically divisive speech and committed to a conspiratorial plan.  *See supra* 34-42.  Trump himself made the decision to have attendees at the "Save America" rally march to the Capitol *before* the Electoral College ballots had all been counted, despite the fact that the permit for the rally did not permit such a march, and despite clear warnings that "there will be violence on January 6th because the President himself encourages it."  ¶ 66.  After telling the crowd to "fight like hell" and directing them "down to the Capitol,"[23]  Trump "watch[ed] the insurrection unfold in live televised reports."  Shortly after the rioters "began roaming [the Capitol's] halls and offices," he inflamed them

---

[23] Trump cites to one comment he made during his rally speech about "peacefully and patriotically making your voices heard."  Trump Br. 28.  As an initial matter, that fragment of a much longer speech cannot be evaluated in a vacuum for the purposes of a motion to dismiss.  *See supra* 17-18.  More importantly, the weight to be given that fragment once it is before this Court should be reserved for the trier to fact to consider along with the other evidence of a conspiracy and the steps that were taken in furtherance of it.  In *NAACP v. Claiborne Hardware Co.*, 458 U.S. at 928, the Supreme Court noted that a speech by boycott leader Charles Evers included mostly peaceful language but also some "strong language."  The Court held, "If that [strong] language had been followed by acts of violence, a substantial question would be presented whether Evers could be held liable for the consequences of that unlawful conduct."  *Id.*  Here, by contrast, Trump's exhortations—including his statements that the crowd should "fight like hell" to prevent the vote count and that the crowd did not have to play by the rules when ordered to march on the Capitol—*were* followed by acts of violence, changing the First Amendment calculus and bolstering the other evidence that Trump incited violence.

further, tweeting (from his personal account): "Mike Pence didn't have the courage to do what should have been done . . ."  House Minority Leader Kevin McCarthy "pleaded with Trump to call off the rioters, emphasizing that they were all Trump supporters," but Trump simply responded, "'Well, Kevin, I guess these people are more upset about the election than you are.'"

Giuliani also displayed a clear commitment to the conspiracy.  *See supra* 42-45.  At the "Save America" rally, he reiterated the core plank of his misinformation campaign, insisting the election had been illegally stolen, and then urged "trial by combat."  Then, as an angry mob infiltrated the Capitol, he capitalized on the chaos they caused by calling members of Congress and urging them to delay the certification of the Electoral College vote count, in furtherance of the rioters' ultimate goal.  The fact that such clear conspiratorial conduct "[took] the form of words does not confer upon it . . . the constitutional immunities that the First Amendment extends to speech."  *Brown v. Hartlage*, 456 U.S. at 55.[24]

The Oath Keepers' First Amendment argument boils down to a contention that the crowd gathered at the Capitol had the right to peaceably assemble for the purpose of petitioning the United States government in connection with the election.  Oath Keepers Br. 29-30.  Of course, that is not what occurred that day.  Nor is it the basis of this lawsuit.  Had the Oath Keepers (and the other Defendants) been involved only in a peaceful protest outside the Capitol, there would

---

[24] Leaving the four corners of the Complaint to cast blame on Plaintiff Waters, Trump Br. 21, Trump mischaracterizes her statements related to convicted murderer Derek Chauvin.  In context, Plaintiff Waters' statements were clearly intended to shed light on injustices entrenched in the criminal justice system and encourage protesters to remain engaged in calling for systemic reform and positive change.  It was neither designed to, nor did it provoke the type of violence Trump successfully incited.  Trump's argument is irrelevant to this case and an attempt to politicize and diminish the legal claims brought by Plaintiffs.  Such mudslinging distracts from the crux of this case—that Trump caused real harm to Plaintiffs when he engaged in an unlawful conspiracy to prevent the approval of the Electoral College votes.

be no case here.  This case is about a conspiracy to prevent Plaintiffs from fulfilling their

constitutional duties to count Electoral College votes by means of force, intimidation, or threats,

which is not protected by the First Amendment.

2.   Defendants Incited Violence

Beyond the fact that Trump's and Giuliani's actions were an integral part of the

conspiracy in violation of the Ku Klux Klan Act, they also were unprotected by the First

Amendment because they were "directed to inciting or producing imminent lawless action and

[were] likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444, 447

(1969).[25]  Indeed, the vast numbers who marched to the Capitol after Trump and Giuliani spoke,

and the role they played in overpowering the police defending the Capitol, demonstrate that

Trump and Giuliani's speeches were not only "likely to incite" lawless action, but *actually*

*produced* that result.

Trump attempts throughout his brief to characterize his remarks at the "Save America"

rally as peaceful "political speech."  Trump Br. 1, 5, 6, 11, 12, 19, 21, 22, 28.  Considering those

remarks in their full context, however, they were far from peaceful.  By January 6, Trump's

misinformation campaign and his repeated endorsements of violence had reached a fevered

crescendo.  He gathered a restless crowd around him, told them to "fight like hell" or they would

not "have a country anymore," and assured them that they did not have to go by ordinary rules.

¶¶ 85, 88.  As 144 constitutional scholars recently recognized, such "words and conduct were

unprotected [because], in the words of the *Brandenburg* case, [they] were 'directed to inciting or

_____

[25] Regardless of whether Defendants' alleged statements and conduct satisfy the
*Brandenburg* test, they are not entitled to First Amendment protection because they furthered
Defendants' unlawful conspiracy.  *See United States v. Williams*, 553 U.S. 285, 298 (2008)
(suggesting that conspiracy and incitement are distinct offenses).

producing imminent lawless action and . . . likely to . . . produce such action.'"[26]  These scholars continued: "No reasonable scholar or jurist could conclude that President Trump had a First Amendment right to incite a violent attack on the seat of the legislative branch, or then to sit back and watch on television as Congress was terrorized and the Capitol sacked."  *Id.*

Giuliani's remarks similarly "prepar[ed] a group for violent action and steel[ed] it to such action."  *Brandenburg*, 395 U.S. at 448.  Giuliani repeated the lie that the election had been stolen and told the crowd that Vice President Pence's failure to block the certification of election results was unlawful and treasonous.  ¶ 81.  Then he called for action: "If we're right, a lot of them will go to jail.  So let's have trial by combat. . . . I'll be darned if they're going to take our free and fair vote . . . . We're going to fight to the very end to make sure that doesn't happen."  ¶ 81.  These words could and did incite an insurrection.

Giuliani claims that remarks at the Save America rally were not calls for "imminent and immediate" action but instead for action "at some indefinite point in the future."  Giuliani Br. 18-19.  This argument is inconsistent with the allegations that Trump and Giuliani urged the crowd to stop the certification of the election results, which was happening that very moment at the Capitol, saying "we can't let that happen" and "[w]e're going to fight to the very end to make sure that doesn't happen."  ¶¶ 81, 87.  Trump urged the crowd to "fight like hell" as they were shouting "Take the Capitol *right now*."  ¶ 88 (emphasis added).  Trump also directed the crowd to march to the Capitol immediately after his speech: "*Now* it is up to Congress . . . democracy.  *After this*, we're going to walk down . . . We're going walk down to the Capitol."  ¶ 85 (emphasis added).

---

[26] Constitutional Law Scholars on President Trump's First Amendment Defense (Feb. 5, 2021), https://assets.documentcloud.org/documents/20473758/scholars-reject-trump-1a-defense.pdf (citing *Brandenburg*, 395 U.S. at 447 (1969)).

Giuliani analogizes this case to *Terminiello v. Chicago,* 337 U.S. 1, 3-5 (1949), where the Supreme Court overturned a conviction because a jury instruction allowed the defendant to be convicted of a breach of the peace if his speech "stir[red] the public to anger, invite[d] dispute, [or] br[ought] about a condition of unrest."  Giuliani Br. 19-20.[27]  However, Plaintiffs do not simply allege that Trump and Giuliani stirred a crowd to anger: As explained above, they urged the crowd to take immediate action at the Capitol, and the crowd heeded their call.

Finally, Giuliani argues that his speech is protected because it did not present a "'clear and present danger' tantamount to the proverbial yelling 'fire' in a crowded theater."  Giuliani Br. 20 (citing *Terminiello,* 337 U.S. at 5).[28]  As explained above, however, Trump and Giuliani *did* present a clear and present danger of provoking a violent crowd.

### 3.     Section 1985(1) Is Not Unconstitutionally Vague

Trump asserts—without any supporting analysis—that, if his "tweets, statements, and speeches," can be considered overt acts in furtherance of a conspiracy, then the Ku Klux Klan Act is unconstitutionally vague.  Trump Br. 21.  Even a cursory review of vagueness law shows that it has no application here.

Facial vagueness challenges "are disfavored," as they "often rest on speculation" and "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)

---

[27] In addition, *Terminiello* did not involve an alleged conspiracy.

[28] Notably, the "clear and present danger" doctrine does not apply to conspiracy claims. *See Associated Press v. United States*, 326 U.S. 1, 7 (1945) ("[I]t would degrade the clear and present danger doctrine to fashion from it a shield" for those accused of violating conspiracy statutes).  Thus, regardless of whether Giuliani's speech satisfies this test, it is unprotected.

56

(citation omitted).  Courts assessing vagueness challenges consider whether: (1) the public "know[s] what is required of them so they may act accordingly," and (2) the statute provides enough "precision and guidance" that "those enforcing the law do not act in an arbitrary or discriminatory way."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Johnson v. United States*, 576 U.S. 591, 595 (2015).

First, Defendants had ample notice of the requirements of Section 1985(1).  As the D.C. Circuit recently explained, "[t]o provide 'fair notice', 'a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'"  *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)).  And when assessing vagueness challenges in the First Amendment context, the D.C. Circuit has noted that "language is unavoidably inexact . . . and that statutes cannot, in reason, define proscribed behavior exhaustively or with consummate precision."  *United States v. Thomas*, 864 F.2d 188, 194 (D.C. Cir. 1988); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.").  Courts evaluate vagueness using the traditional rules for statutory interpretation and favor interpretations that support a statute's constitutionality.  *Bronstein*, 849 F.3d at 1106.

The Ku Klux Klan Act prohibits conspiracies to "prevent, by force, intimidation, or threat, any person from . . . holding any office . . . or from discharging any duties thereof."  42 U.S.C. § 1985(1).  The statute rests on a simple, long-standing principle of our constitutional democracy: efforts to violently disrupt government officials and bodies will not be tolerated.  This is more than sufficient to "provide the kind of notice that will enable ordinary people to understand what conduct [the statute] prohibits," as any "ordinary" person would interpret the

statute to bar participation in a conspiracy to engage in an insurrection at the U.S. Capitol to disrupt the certification of a presidential election. *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 846 F.3d 391, 409 (D.C. Cir. 2017).

Additional aspects of Section 1985(1) also make clear that the statute is not unconstitutionally vague. The statute is free of "complicated phrasing or specialized vocabulary" associated with vagueness. *United States v. Class*, 930 F.3d 460, 467 (D.C. Cir. 2019). And the fact that Congress enacted the statute over a century ago weighs in favor of finding fair notice, *id.* at 467, as does the fact that it was enacted specifically to keep extremists from intimidating officeholders and preventing them from doing their job, the precise circumstances giving rise to this case. *See* ¶ 2.

Defendants speculate that Plaintiffs' interpretation of Section 1985(1) would encourage "subjective enforcement" of the law at some point in the future, according to the political whims of the enforcer. Trump Br. 21. However, this "slippery slope" argument is irrelevant because vagueness is a question of statutory construction, not prediction. *See Bronstein*, 849 F.3d at 1106. Even if relevant, the concerns about discriminatory and arbitrary enforcement are misplaced because Plaintiffs bring these claims under very specific and egregious facts: Defendants conspired to block the electoral vote count, which resulted in the bloodiest attack on the U.S. Capitol since the War of 1812.

Consistent with this view, multiple courts have held that Section 1985(1)'s criminal analogue (18 U.S.C. § 372), which contains identical language, is not unconstitutionally vague. *See United States v. Fulbright*, 105 F.3d 443, 452 (9th Cir. 1997), *overruled on other grounds*, *United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007); *United States v. Bundy*, No. 3:16-CR-00051-BR, 2016 WL 3156310, at *3 (D. Or. June 3, 2016); *United States v. Payne*, No. 2:16-

CR-00046-GMN-PAL, 2017 WL 8941311, at *7 (D. Nev. Jan. 3, 2017), *report and recommendation adopted*, 2017 WL 480392 (D. Nev. Feb. 2, 2017).  In *Bundy*, for example, the court held that:

> Read as a whole, the conduct that is proscribed by § 372 (i.e., agreeing to prevent a federal official from discharging his or her official duties by force, intimidation, or threat) is sufficiently well-defined to be understandable by individuals of common intelligence and provides a sufficiently clear standard for enforcement.

2016 WL 3156310, at *3.  This case law is particularly compelling because courts assessing civil statutes have more vagueness "tolerance" than those assessing criminal laws.  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982).

4.     Section 1985(1) Is Not Unconstitutionally Overbroad

Trump also claims, without explanation, that Section 1985(1) could be unconstitutionally overbroad.  Trump Br. 21.  "But recitation of the applicable legal standards and a conclusory declaration that a law is overbroad do not come close to carrying the burden for prevailing in an overbreadth challenge under the First Amendment."  *United States v. Abu Khatallah*, 151 F. Supp. 3d 116, 143 (D.D.C. 2015) (internal quotation marks and brackets omitted).  To the extent this overbreadth argument could even be entertained, it is without merit because overbreadth arguments are disfavored and, properly construed, Section 1985(1) does not limit a substantial amount of protected expression.

Just as facial vagueness challenges are disfavored, so too are challenges for overbreadth. The Supreme Court "has repeatedly warned that invalidation for . . . overbreadth is strong medicine that is not to be casually employed."  *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1581 (2020) (internal quotations omitted).  A statute can only be invalidated for overbreadth if it is substantially overbroad, such that the law's deterrence of constitutionally protected speech heavily outweighs the "harmful effects of invalidating a law that in some of its applications is

perfectly constitutional." *United States v. Stevens*, 559 U.S. 460, 484-85 (2010) (internal quotations omitted).  The overbreadth must be "*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."  *Id.*  When assessing potential overbreadth, this Court considers whether "a limiting construction has been or could be placed on the challenged statute" to save it.  *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 28 (D.D.C. 2018).

Properly read, Section 1985(1) proscribes only a narrow set of conduct—that which furthers a conspiracy to "prevent, by force, intimidation, or threat, any person from . . . holding any office . . . or from discharging any duties thereof."  42 U.S.C. § 1985(1).  Each of the terms used (e.g., "intimidation," "force," "threat," etc.) only reaches conduct that prevents an officeholder from discharging their duties, which provides a sufficient limiting principle.  *See, e.g.*, *O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016) (rejecting an overbreadth claim because "intimidation" was not an "obscure word" and was limited to intimidation that threatened or endangers someone in the community) (internal citations omitted).

Even if Section 1985(1) were overbroad in some way, that overbreadth would not be substantial.  When bringing a facial overbreadth challenge, a party has the burden of demonstrating that there is a "*realistic danger*" that the statute will "significantly compromise" the First Amendment rights of non-parties.  *Stevens*, 559 U.S. at 485.  Trump claims that the statute could "hold politicians vicariously liable for the actions of their supporters."  Trump Br. 21.  But this is precisely the kind of "fanciful hypothetical[]" that the Supreme Court has expressly disallowed in an overbreadth analysis.  *Stevens*, 559 U.S. at 485.  Properly construed, Section 1985(1) prohibits a narrow range of egregious conduct like Trump's, including conspiracies to use force against public officials and incitement of violence.

At least two courts have rejected overbreadth challenges to the criminal analogue of section 1985(1), recognizing that the statutory language is sufficiently narrow and serves the government's "legitimate interest in preventing the intimidation of public officials." *Fulbright*, 105 F.3d at 452; *see also Payne*, 2017 WL 8941311, at *9.

5.    Plaintiffs Are Not Required to Plead "Actual Malice"

Defendants Trump and Giuliani incorrectly contend that they can only be liable that Defendants acted with "actual malice." *See* Trump's Br. 26 (citing *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021)); Giuliani's Br. 9-10. The "actual malice" standard, however, only applies to claims sounding in defamation, where a public figure alleges that a defendant's false statements damaged her reputation. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964), "the Supreme Court held that, under the First Amendment, public officials claiming *defamation* must allege that the published information was both false and published with actual malice, i.e., with knowing or reckless disregard for its falsity." *Barr v. Clinton*, 370 F.3d 1196, 1202 (D.C. Cir. 2004) (emphasis added).

Courts later clarified that "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994). In *Barr*, for example, the D.C. Circuit required a plaintiff to show actual malice where he alleged a conspiracy to publish material harming his reputation because "ruling otherwise would allow public officials to recast *defamation claims* barred by *New York Times* as section 1985(1) conspiracies." 370 F.3d at 1203 (emphasis added); *see also Windsor v. The Tennessean*, 719 F.2d 155, 162 (6th Cir. 1983); *Sculimbrene v. Reno*, 158 F. Supp. 2d 8, 18 (D.D.C. 2001). Like *Barr*, the other cases Defendants cite in support of their "actual malice" arguments involve defamation or defamation-like causes of action. *See Tah*, 991 F.3d at 231 (defamation by implication); *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 90 (D.D.C.

61

2012) (common law defamation); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.D.C. 2019) (defamation, tortious interference with prospective business relations, and false light); *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1301 (D.C. Cir. 1996) (libel); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (same).

Here, Plaintiffs are not seeking redress for any defamatory conduct; rather, they are alleging injuries from actual and threatened violence (which fell within the scope of Defendants' conspiracy). For example, Plaintiff Thompson "heard threats of physical violence against any [Congress] member who attempted to proceed to approve the Electoral College ballot count [in fulfilment of their public service duties]," "heard a gunshot . . . [which] killed one of the rioters," and "feared for his life and worried that he might never see his family again." ¶¶ 156-57, 165. Plaintiff Bass, like all plaintiffs, "could have been seriously harmed or killed by the rioters." ¶ 172. Plaintiff Cohen developed anxiety and had difficulty sleeping and with his digestion. ¶ 178. Plaintiff Escobar has similarly suffered from severe insomnia and violent nightmares as a result of the threats on her life. ¶ 188. Plaintiff Jayapal contracted COVID-19 and experienced harm to her recently-replaced knee, including significant pain and setbacks in her recovery. ¶¶ 206-209. Plaintiff Watson Coleman also contracted COVID-19. ¶¶ 257-58.

These harms go well-beyond the simple defamation to which the *New York Times Co. v. Sullivan* standard applies. While the First Amendment "enshrines 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,'" *Tah*, 991 F.3d at 240 (quoting *New York Times Co.*, 376 U.S. at 270), Defendants' conspiratorial and dangerous actions are not conduct the First Amendment is meant to protect.

Finally, even if Plaintiffs were required to allege actual malice (which they are not), the Complaint provides sufficient facts to meet this requirement. A defendant acts with actual

malice when he has a knowing or reckless disregard for the falsity of his statements.  *Barr*, 370 F.3d at 1202.  As alleged in the Complaint, Trump and Giuliani both demonstrated an extreme disregard for the truth of their statements concerning the election results.  ¶ 33.  Together, they launched a misinformation campaign, knowing that the statements they made to the public had been consistently rejected by courts, and knowing that members of Congress had a duty to certify the election results.  ¶¶ 34, 76.  It is not clear how the actual malice standard would apply to Trump and Giuliani's *true* instructions and threats.  As explained above, however, it is clear that Trump and Giuliani's instructions and threats were deliberate acts in furtherance of a conspiracy that specifically targeted Congress.

      6.     <u>Plaintiffs Are Not Seeking Unlawful Prior Restraints</u>

Trump argues that Plaintiffs' request for injunctive relief is an "unconstitutional prior restraint against speech."  Trump Br. 23-25.  Plaintiffs are not, however, seeking to restrain speech; they are seeking to restrain unlawful conspiracies to prevent members of Congress from carrying out their official duties.

In addition, even if this case involved some form of protected speech (and it does not), an injunction would not raise the same concerns as most prior restraints on speech.  As the Supreme Court noted in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 390 (1973), "[t]he special vice of a prior restraint is that communication will be suppressed . . . *before* an adequate determination that it is unprotected by the First Amendment" (emphasis added).  Here, Plaintiffs only seek injunctive relief as one of the remedies following a liability determination and, even then, only if the Court concludes an injunction is an appropriate component of the relief.  As such, whether injunctive relief is awarded, and the scope of any such relief, will appropriately rest on the record developed in this litigation.  *See, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 n.3 (1994) ("Under general equity principles, an

injunction issues only if there is a showing that the defendant has violated, or imminently will

violate, some provision of statutory or common law."); *SEC v. Wall St. Publ'g Inst., Inc.*, 851

F.2d 365, 370 (D.C. Cir. 1988) ("Orders that are carefully focused, address a continuing course

of speech, and are imposed after an opportunity for full merits consideration are not properly

analyzed as prior restraints.").

        **D.**      **Trump is Not Immune from Suit**

             1.      <u>Trump Is Not Entitled to Absolute Immunity</u>

      A President's entitlement to absolute immunity is not limitless.  "[A]bsolute immunity is

at odds with fundamental notions of American justice which hold that all officers of the

government, from the highest to the lowest, are creatures of the law and are bound to obey it."

*Canell v. Or. Dep't of Just.*, 811 F. Supp. 546, 552 (D. Or. 1993) (citing *Butz v. Economou*, 438

U.S. 478, 506 (1978)).  Accordingly, the Supreme Court has held that absolute immunity is

"strong medicine, justified only when the danger of officials' being deflected from the effective

performance of their duties is very great."  *Forrester v. White*, 484 U.S. 219, 230 (1988) (internal

quotation marks and alterations omitted) (quoting *Forrester v. White*, 792 F.2d 647, 660 (7th Cir.

1986) (Posner, J., dissenting)).  Importantly, "the official seeking absolute immunity bears the

burden of showing that such immunity is justified for the function in question."  *Burns v. Reed*,

500 U.S. 478, 486 (1991).  Thus, "[t]o earn the protections of absolute immunity at the motion-

to-dismiss stage, a defendant must show that the conduct triggering absolute immunity clearly

appears on the face of the complaint."  *Weimer v. Cnty. of Fayette*, 972 F.3d 177, 187 (3d Cir.

2020) (internal quotation marks and alterations omitted) (quoting *Fogle v. Sokol*, 957 F.3d 148, 161 (3d Cir. 2020)).[29]

Taking the facts in the Complaint as true, Trump cannot establish a viable absolute immunity defense because he participated in Defendants' unlawful conspiracy solely in his personal capacity as a political candidate and private citizen—and not through his public, official capacity as President.  Additionally, Trump engaged in serious misconduct that obstructed a co-equal branch of government, removing his actions from the outer bounds of permissible presidential conduct.

First, Trump is not absolutely immune for the unlawful conduct giving rise to Plaintiffs' claims because Plaintiffs allege that he was "acting solely in his personal capacity" as a *candidate*—and not in his official capacity as President:

> The tweets published by Defendant Trump, for example, . . . came from his personal (rather than official) Twitter account, and when he spoke to the assembled crowd on January 6, 2021, he continued to hold himself out as a viable candidate for the Presidency.  Indeed, Defendant Trump's campaign and the campaign's joint fundraising committees made direct payments of at least $3.5 million to organizers of the January 6 events.

¶ 22.[30]  In *Nixon v. Fitzgerald*, the Supreme Court held that a former President "is entitled to absolute immunity from damages liability *predicated on his official acts*."  457 U.S. 731, 749

---

[29] *See also Fogle*, 957 F.3d at 160–61 ("asserting an immunity defense via a Rule 12(b)(6) motion subjects the defendant to a more challenging standard of review than would apply on summary judgment") (internal quotation marks and alterations omitted) (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)); *id.* ("in a motion to dismiss, 'it is the defendant's conduct as *alleged in the complaint* that is scrutinized'") (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)).

[30] *See also, e.g.*, ¶ 20 ("Trump, acting solely in his personal capacity, conspired with others to prevent, by force, intimidation and threats, the Plaintiffs and other Members of Congress from discharging their duties . . . . Trump's actions in furtherance of the conspiracy were far outside the scope of his official duties, and were taken to

(1982) (emphasis added).  The Court further clarified, "In defining the scope of an official's absolute privilege, . . . the sphere of protected action must be related closely to the immunity's justifying purpose.  Frequently our decisions have held that an official's absolute immunity should extend only to acts in performance of particular functions of his office."  *Id.* at 755; *see also Forrester*, 484 U.S. at 227 ("immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches"); *Clinton v. Jones*, 520 U.S. 681, 694 (1997) (noting that the Court's reasoning in *Fitzgerald* "provides no support for an immunity for *unofficial* conduct" and confirming that the Court has "never suggested that the President . . . has an immunity that extends beyond the scope of any action taken in an official capacity"); *Hampton v. Hanrahan*, 600 F.2d 600, 632–33 (7th Cir. 1979) (holding that "publicity campaigns" are not encompassed within the "boundaries of absolute immunity afforded [to] prosecutors"), *rev'd in part on other grounds*, 446 U.S. 754 (1980).  Trump's electioneering as a political candidate and participation in a Section 1985(1) conspiracy (to further his personal electoral ambitions) neither advanced an interest protected by absolute immunity nor related to the performance of official presidential duties.[31]  Trump's apparent "effort to construct an immunity from suit for unofficial acts grounded purely in the identity of his office is unsupported by precedent."  *Clinton v. Jones*, 520 U.S. at 695.

---

advance his continued efforts to campaign and secure reelection to the presidency . . . ."); *see also* ¶¶ 242–244.  In fact, Trump's own brief essentially concedes that his conduct constituted "campaign" speech.  Trump Br. 21.

[31] There is also no basis in the Constitution or federal law to conclude that campaigning for election to office or participating in an illicit conspiracy falls even within the "outer perimeter" of the official responsibilities of the President.  *See Fitzgerald*, 457 U.S. at 756.  Such conduct is plainly for personal gain and does not advance any legitimate government interest or provide any benefit to the public.  *See also Auriemma v. Montgomery*, 860 F.2d 273, 277 (7th Cir. 1988) (noting that "the overriding public policy justification . . . no longer exists to justify the costs imposed upon society by absolute immunity" when public officials act outside the scope of their official duties and the specific functions of their offices).

Furthermore, courts decline to extend absolute immunity to defendants facing allegations of serious misconduct, participation in unlawful conspiracies, or other illicit behavior because such inappropriate conduct is inherently and manifestly outside the scope of a public official's duties.  Just last year, the Supreme Court explained in *Trump v. Vance* that it has "twice denied absolute immunity claims by Presidents in cases involving allegations of serious misconduct." 140 S. Ct. 2412, 2427 (2020) (citing *Clinton v. Jones* and *United States v. Nixon*).  Likewise, in *Banneker Ventures, LLC v. Graham*, the D.C. Circuit held that a defendant was not entitled to absolute immunity because the plaintiff "alleged that [the defendant] sought to barter a vote in his capacity as member of the D.C. Council . . . and attempted to extort [the plaintiff]."  798 F.3d 1119, 1141 (D.C. Cir. 2015).

Other courts have specifically held that officials are not entitled to absolute immunity when they participate in unlawful conspiracies.  *See Vierria v. Cal. Highway Patrol*, 644 F. Supp. 2d 1219, 1240 (E.D. Cal. 2009) (denying motion to dismiss on the basis of absolute immunity because "viewing the facts in the light most favorable to plaintiff, [defendant] ceased acting in his official capacity when he actively participated in the criminal conspiracy among defendants"); *see also Paine v. City of Lompoc*, 265 F.3d 975, 984 (9th Cir. 2001) ("theory that appellants are not protected by absolute immunity if they participated in the alleged out-of-court conspiracy is legally viable").

Because the factual allegations in the Complaint must be accepted as true, Trump's alleged participation in an unlawful conspiracy under Section 1985(1) divests him of absolute immunity.  Conspiratorial acts obstructing a co-equal branch of government and the peaceful transition of power plainly fall outside the scope of any presidential duties.

2.     This Case Presents No Political Question

Contrary to Trump's suggestion, "the political question doctrine" does not bar this suit.

Trump Br. 11-12.  The political question doctrine is a "narrow exception to th[e] rule" that a

court has "a responsibility to decide cases properly before it, even those it would gladly avoid."

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012) (internal quotation marks

omitted).  As the Supreme Court explained in *Baker v. Carr*, the political question doctrine may

apply where there is:

> [1] a textually demonstrable constitutional commitment of the issue
> [at hand] to a coordinate political department; [2] a lack of judicially
> discoverable and manageable standards for resolving it; [3] the
> impossibility of deciding without an initial policy determination of
> a kind clearly for nonjudicial discretion; [4] the impossibility of a
> court's undertaking independent resolution without expressing lack
> of the respect due coordinate branches of government; [5] an
> unusual need for unquestioning adherence to a political decision
> already made; or [6] the potentiality of embarrassment from
> multifarious pronouncements by various departments on one
> question.

369 U.S. at 217.  "The *Baker* factors are generally viewed as being listed in descending order of

importance," with courts placing "a disproportionate emphasis on the first two."  *Citizens for*

*Resp. & Ethics in Wash. v. Trump*, 276 F. Supp. 3d 174, 193 (S.D.N.Y. 2017); *see also Harbury*

*v. Hayden*, 522 F.3d 413, 418 (D.C. Cir. 2008) (explaining that "th[e] first two factors . . . are the

most important").

All of the *Baker* factors confirm that this dispute can and should be resolved by this

Court.  First, there is no "textually demonstrable constitutional commitment of the issue [at hand]

to a coordinate political department."  *Baker*, 369 U.S. at 217.  Drawing on common law

principles, Plaintiffs have alleged that Defendants formed a civil conspiracy that caused them

physical and emotional injuries.  "As the complaint frames them," the issues here turn on what

Trump did as a "private part[y]," and whether those actions are sufficient to support a plausible

inference of conspiracy.  *Hourani v. Mirtchev*, 796 F.3d 1, 8 (D.C. Cir. 2015).  "Nothing in the Constitution reserves to the Political Branches the determination of [Trump's] private civil liability" for conspiring with violent groups or causing Plaintiffs' personal injuries.  *Id.  See also Nnaka v. Fed. Republic of Nigeria*, 238 F. Supp. 3d 17, 31 (D.D.C. 2017) (rejecting the application of the political question doctrine in a case involving "common law contract, quasi-contract, and tort claims"), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019).

The fact that Trump's misconduct gave rise to an impeachment proceeding does not mean that questions regarding that misconduct are textually committed to a coordinate branch of government.  To the contrary, the Constitution expressly instructs that a party convicted in an impeachment proceeding can "nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law."  U.S. Const. art. 1, § 3; *cf. Jones v Clinton*, 36 F. Supp. 2d 1118, 1130 (E.D. Ark. 1999) (holding a sitting president liable for lying under oath "while he was in office" without discussing the political question doctrine).

Trump does not discuss the remaining *Baker* factors.  It is clear, however, that there is no "lack of judicially discoverable and manageable standards for resolving" this dispute.  *Baker*, 369 U.S. at 217.  The Court can resolve Plaintiffs' claims with ordinary principles of conspiracy liability.  *Cf. Ridgell v. HP Enter. Servs., LLC*, 209 F. Supp. 3d 1, 20 (D.D.C. 2016), *order vacated in nonrelevant-part on reconsideration sub nom. Delorenzo v. HP Enter. Servs., LLC*, No. 1:15-CV-0216-RMC, 2016 WL 6459550 (D.D.C. Oct. 31, 2016) ("analyz[ing] . . . negligence claims . . . is what courts applying D.C. law do on a daily basis and, thus, *it cannot be said that the legal standards governing these tort claims are not judicially manageable*") (emphasis added); *Hourani*, 796 F.3d at 8 (the "standards needed to resolve the [plaintiffs'] racketeering, extortion, and defamation claims are the workaday tools for decision-making that

courts routinely employ.").  The remaining four *Baker* factors do not apply because, as explained

above, Trump was not acting in his official capacity when he conspired to use force,

intimidation, or threats to obstruct the certification of the 2020 election results.  *See supra* 65-67.

**E.    The Impeachment Judgment Clause, *Res Judicata*, and Collateral Estoppel Do Not Apply**

Trump argues that because the Senate acquitted him at his impeachment trial, Plaintiffs'

claims are barred by the Impeachment Judgment Clause, *res judicata*, and collateral estoppel.

Trump Br. 12-14.  These arguments are contradicted by robust, settled authority.

1.    The Impeachment Judgment Clause Does Not Apply

Article I, Section 3, Clause 7 of the Constitution (the "Impeachment Judgment Clause")

states that a party convicted in an impeachment trial "shall nevertheless be liable and subject to

Indictment, Trial, Judgment and Punishment, according to Law."  Trump argues that, by

preserving liability for those convicted in impeachment trials, the Constitution implicitly

precludes liability for those who are acquitted.  This argument is unavailing.

There is no authority holding that an acquittal after an impeachment trial forecloses civil

liability under the Impeachment Judgment Clause.  The Impeachment Judgment Clause simply

states that an official can be convicted and removed from office, and then may be held criminally

or civilly liable in court.  It does not address acquittal at all.  In fact, the only source upon which

Trump relies rejected the very argument he is currently trying to make.  *See* Trump Br. 13 (citing

Whether a Former President May be Indicted and Tried for the Same Offense for Which He was

Impeached by the House and Acquitted by the Senate, 24 Opinions of the Office of Legal

Counsel 110, 113 (2000)).  There, the Office of Legal Counsel ("OLC") explained that an

impeachment acquittal does not foreclose a subsequent criminal indictment.  24 Op. OLC at 119-

27.  Based on the historical context and legislative history of the Impeachment Judgment Clause,

the OLC determined that the Clause's language allowing subsequent proceedings for parties "convicted" does not foreclose subsequent proceedings for those acquitted. *Id.* Indeed, those who participated in ratifying this Clause, as well as those who participated in the first federal impeachment trial, discussed the fact that acquittal would not bar subsequent prosecution for the same offenses. *Id.* at 124-25. The OLC continued by explaining the critical differences between the purposes of an impeachment and court litigation, the former meant to protect the nation as a whole and the latter to protect individual victims, and how the Clause's framers had in mind the separation of powers between Congress and the courts when discussing how subsequent litigation would be permissible. *Id.* at 128. And, perhaps most importantly, an impeachment trial does not determine guilt or liability, but instead whether the accused should face the unique punishment of removal from office, an outcome that inherently is based on a political, not a legal, process. *Id.* at 130, 132-33. The fact that Trump was acquitted on party lines highlights the point that "partisan loyalties or popular sentiment might influence the Senate's decision to convict or acquit," and therefore have no effect on subsequent legal proceedings before the judiciary. *Id.* at 133.

Consistent with this view, at least one court has imposed civil liability on a sitting President following an impeachment acquittal. At his impeachment trial, President Bill Clinton was acquitted of "obstruction of justice." In a subsequent civil lawsuit, however, the Court found that "the record demonstrates by clear and convincing evidence that the President responded to plaintiff's questions by giving false, misleading and evasive answers that were designed to obstruct the judicial process." *Jones v. Clinton*, 36 F. Supp. 2d at 1127. In short, the court found that Clinton had engaged in precisely the conduct of which he was accused *and acquitted* in the impeachment proceeding. The Impeachment Judgment Clause was no

71

impediment to the court making that finding or holding: "Sanctions must be imposed, not only to redress the President's misconduct, but to deter others who might themselves consider emulating the President of the United States by engaging in misconduct that undermines the integrity of the judicial system.  Accordingly, the Court adjudges the President to be in civil contempt of court pursuant to Fed. R. Civ. P. 37(b)(2)."  *Id.* at 1134.  The court also ordered Clinton, who was still President at time, to "pay plaintiff any reasonable expenses, including attorney's fees" caused by the misconduct for which he was cited.  *Id.*

Nor did Clinton's impeachment acquittal preclude courts from rendering findings and issuing sanctions related to his license to practice law.  In fact, the Supreme Court sanctioned Clinton for the conduct that resulted in his impeachment.  *See In re Discipline of Clinton*, 534 U.S. 806 (2001) ("Bill Clinton, of New York, New York, is suspended from the practice of law in this Court, and a rule will issue, returnable within 40 days, requiring him to show cause why he should not be disbarred from the practice of law in this Court.").  In short, the Supreme Court does not recognize the Impeachment Judgment Clause as having the preclusive effect that Trump contends.

### 2.    *Res Judicata* Does Not Apply

Under the doctrine of *res judicata*, or claim preclusion, "a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, resulting in (3) a final, valid judgment on the merits, (4) by a court of competent jurisdiction."  *Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 490 (D.C. Cir. 2009) (quoting *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006)).  Not one of these factors is present here.

a.       *There was No Prior Litigation*

Trump seems to argue that because there was a "trial" before the Senate, there has been "prior litigation."  Litigation, by definition, means a "[c]ontest in court of law for purpose of enforcing a right or seeking a remedy.  A judicial contest, a judicial controversy, a suit at law." Black's Law Dictionary, 934 (6th ed. 1990); *see also Litigation*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/litigation ("the act, process, or practice of settling a dispute in a court of law") (last visited Jun. 30, 2021).  No case cited by Trump treats an impeachment—a non-judicial proceeding—as litigation capable of having the effect of *res judicata* or collateral estoppel.  As explained in *Nixon v. United States*, "the use of the word 'try' in the first sentence of the Impeachment Trial Clause lacks sufficient precision to afford any judicially manageable standard of review. . . ."  506 U.S. 224, 230 (1993):

> The Framers labored over the question of where the impeachment power should lie.  Significantly, in at least two considered scenarios the power was placed with the Federal Judiciary.  See 1 Farrand 21-22 (Virginia Plan); *id.*, at 244 (New Jersey Plan).  Indeed, James Madison and the Committee of Detail proposed that the Supreme Court should have the power to determine impeachments.  *See* 2 *id.*, at 551 (Madison); *id.*, at 178-179, 186 (Committee of Detail). Despite these proposals, the Convention ultimately decided that the Senate would have "the sole Power to try all Impeachments." Art. I, § 3, cl. 6.

In short, there is no "prior litigation" that could bar Plaintiffs from pursing this action.

b.       *The Claims Here Are Not the Same as in the Impeachment*

In this case, Trump is being sued for conspiring with the other Defendants.  The word "conspiracy" appears nowhere in the Article of Impeachment, and there is no claim in the Article of Impeachment that he conspired with anyone.  ¶ 148.  In fact, Trump concedes that there was only one charge, "Incitement of Insurrection."  *See* Trump Br. 12.  Thus, for this reason too, his *res judicata* argument fails.

c.    *The Parties in the Case Are Not the Same as Those in the Impeachment*

A person is not precluded from bringing a suit if he was not made a party to the first lawsuit. *Taylor v. Sturgell*, 553 U.S. 880, 893 (2008).  As the Supreme Court has explained: "The application of claim and issue preclusion to nonparties thus runs up against the deep-rooted historic tradition that everyone should have his own day in court."  *Id.* at 882-83 (internal marks and citation omitted).

Without citing any authority, Trump argues that members of Congress, suing in their personal capacities for personal injuries, are precluded from seeking relief because the branch of government for which they work brought the Article of Impeachment.  Trump Br. 14.  The law, however, provides only six exceptions to the rule that non-parties to prior litigation are not bound by the outcome or the prior litigation: (1) if a non-party agreed to be bound by the prior suit; (2) if there is a substantive legal relationship between the non-party and the party, *e.g.* preceding and succeeding owners of property, bailee and bailor, assignee and assignor relationships (this exception generally involves "property laws"); (3) if there was adequate representation of the non-party in the previous suit, *e.g.*, class actions and suits by trustees, guardians, or other fiduciaries; (4) if the non-party assumed control over the prior suit because the non-party had the chance to present proofs and argument; (5) if the non-party is a designated representative, *i.e.*, proxy for the party in the prior lawsuit; and (6) if there is a special statutory scheme that "expressly foreclose[s] successive litigation by nonlitigants."  *Id.* at 893–95.

None of these exceptions apply here.  There is no agreement between Congress and Plaintiffs whereby Plaintiffs agreed to be bound by the outcome of the impeachment.  Plaintiffs are not successors in interest and there are no "property laws" at issue.  The impeachment was not a class action or in any way similar to one.  Plaintiffs, in their personal capacities, did not

74

have a chance to present arguments and evidence during the impeachment proceedings.
Plaintiffs are not acting as proxies for anyone else.  They are suing for injuries they sustained to
their persons.  And no statutory scheme expressly forecloses this litigation.

         d.    *There Has Been No Final, Valid Judgment on the Merits*

       Furthermore, there has been no judgment that can be recognized by courts.  As explained
by the Supreme Court: "[W]e must examine Art. I, § 3, cl. 6, to determine the scope of authority
conferred upon the Senate by the Framers regarding impeachment.  It provides: 'The Senate shall
have the sole Power to try all Impeachments.  When sitting for that Purpose, they shall be on
Oath or Affirmation.  When the President of the United States is tried, the Chief Justice shall
preside:  And no Person shall be convicted without the Concurrence of two thirds of the
Members present.'"  *Nixon v. United States*, 506 U.S. at 229.  The Court noted that on oath or
affirmation and a two-thirds vote to convict are the only "requirements to which the Senate
proceedings shall conform."  *Id.*  The Court declined even to determine what "try" meant under
the Impeachment Trial Clause, recognizing that doing so would intrude on the separation of
powers ingrained in the Constitution.  *Id.* at 237.  Determining whether the outcome of the
impeachment trial was a "judgment on the merits" (or even what the Senate considered the
"merits" of the dispute to be) necessarily would require an examination and evaluation of that
proceeding.  The Supreme Court made clear that the judiciary may not engage in such an
examination and evaluation: "Judicial involvement in impeachment proceedings, even if only for
purposes of judicial review, is counterintuitive because it would eviscerate the 'important
constitutional check' placed on the Judiciary by the Framers."  *Id.* at 235.

e.      *The Senate is Not a Court*

The final factor required for the application of the doctrine of *res judicata* is that the final valid judgment on the merits be issued by "a court of competent jurisdiction."  *Capitol Hill Grp.,* 569 F.3d at 490.  The Senate is not now, nor has it ever been, a court.

3.      Collateral Estoppel Does Not Apply

"In the District of Columbia, collateral estoppel renders an 'an issue of fact or law' conclusive in a subsequent case when '(1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum.'"  *Bushrod v. District of Columbia*, No. 1:18-cv-02462, 2021 WL 673906, at *5 (D.C. Cir. Feb. 22, 2021) (quoting *Modiri v. 1342 Rest. Grp., Inc.*, 904 A.2d 391, 394 (D.C. 2006)).

As with *res judicata*, none of the elements of collateral estoppel apply here.  The first two factors already have been addressed, *see supra* 73-75.  Given that there was no "litigation," as that term is understood by the court system, there was no "full and fair opportunity for litigation."  *Nixon v. United States*, 506 U.S. at 235.  Moreover, determining whether impeachment provided a "fair and full opportunity for litigation," would require an impermissible judicial review of the impeachment proceeding.  *Id.*  Finally, the only "requirements to which [impeachment] proceedings shall conform" are that: (1) the impeachment trial is on oath or affirmation; and (2) two thirds of the Senate are needed for conviction.  *Id.* at 229.  Other than those two requirements, nothing else "was *essential*" to the outcome.

Furthermore, Trump expressly argued during his impeachment trial that he should be acquitted because he was no longer in office.  167 Cong. Rec. S731-32.  As the Senate may have

acquitted over the question whether it is permissible to hold impeachment proceedings after a President leaves office—an issue not presented in this case—Trump's *res judicata* and collateral estoppel arguments fail.

Indeed, following the acquittal, then-Senate Majority leader Mitch McConnell explained that the Senate's acquittal vote did *not* reflect a determination that Trump was blameless or immune from liability:

> There is no question that President Trump is practically and morally responsible for provoking the events of that day. . . . President Trump is still liable for everything he did while he was in office, as an ordinary citizen . . . He didn't get away with anything yet—yet. We have a criminal justice system in this country.  We have civil litigation, and former Presidents are not immune from being accountable by either one."

¶ 150.

In sum, Trump is arguing that he cannot be held accountable in an ordinary court for actions he took as an ordinary citizen, despite the damage he caused or the strength of any claims against him.  Such arguments have no place in our judicial system.  "[A] king is born to power and can 'do no wrong.'  The President, by contrast, is 'of the people' and subject to the law." *See Trump v. Vance*, 140 S. Ct. 2412, 2422 (2020) (citing *United States v. Burr*, 25 F. Cas. 30, 33-34 (No. 14,692d) (CC Va. 1807)).

## V.    CONCLUSION

For the reasons set forth above, each of the Defendant's motions to dismiss should be denied in their entirety.

Dated: July 1, 2021

Respectfully submitted,

| | |
|---|---|
| */s/ Janette McCarthy-Wallace* | */s/ Joseph M. Sellers* |
| Janette McCarthy-Wallace (*pro hac vice* motion pending) | Joseph M. Sellers, Bar No. 318410 |
| Anthony P. Ashton, Bar No. MD25220 | Brian Corman, Bar No. 1008635 |
| Anna Kathryn Barnes, Bar No. 1719493 | Alison S. Deich, Bar No. 1572878 |
| NAACP | COHEN MILSTEIN SELLERS & TOLL PLLC |
| Office of General Counsel | 1100 New York Avenue, N.W. Fifth Floor |
| 4805 Mount Hope Drive | Washington, DC 20005 |
| Baltimore, MD 21215 | Telephone: (202) 408-4600 |
| Telephone: (410) 580-5777 | Facsimile: (202) 408-4699 |
| jlouard@naacpnet.org | jsellers@cohenmilstein.com |
| aashton@naacpnet.org | bcorman@cohenmilstein.com |
| | adeich@cohenmilstein.com |

Robert B. McDuff (admitted pro hac vice)
MISSISSIPPI CENTER FOR JUSTICE
767 North Congress Street
Jackson, MS 39202
601-259-8484
rbm@mcdufflaw.com

**CERTIFICATE OF SERVICE**

I certify that on July 1, 2021, a copy of the foregoing was filed with the Clerk using the

Court's CM/ECF system, which will send a copy to all counsel of record.

<u>Joseph M. Sellers</u>
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
jsellers@cohenmilstein.com