*Hon. Bennie G. Thompson, et al. v. Donald J. Trump, et al.*
Civil Action No. 1:21-CV-00400-APM

# APPENDIX B
# LEGISLATIVE HISTORY

# Index of Legislative History

|  | Page |
|---|---|
| Cong. Globe, 42nd Cong., 1st Sess. 334 (Mar. 29, 1871) | 1 |
| Cong. Globe, 42nd Cong., 1st Sess. 361 (Mar. 31, 1871) | 2 |
| Cong. Globe, 42nd Cong., 1st Sess. 374 (Mar. 31, 1871) | 3 |
| Cong. Globe, 42nd Cong., 1st Sess. 412 (April 3, 1871) | 4 |
| Cong. Globe, 42nd Cong., 1st Sess. 420 (April 3, 1871) | 5 |
| Cong. Globe, 42nd Cong., 1st Sess. 431 (April 3, 1871) | 6 |
| Cong. Globe, 42nd Cong., 1st Sess. 439 (April 4, 1871) | 7 |
| Cong. Globe, 42nd Cong., 1st Sess. 441 (April 4, 1871) | 8 |
| Cong. Globe, 42nd Cong., 1st Sess. 479 (April 5, 1871) | 9 |
| Cong. Globe, 42nd Cong., 1st Sess. 484 (April 5, 1871) | 10 |
| Cong. Globe, 42nd Cong., 1st Sess. 486 (April 5, ;1871) | 11 |
| Cong. Globe, 42nd Cong., 1st Sess. 492 (April 5, 1871) | 12 |
| Cong. Globe, 42nd Cong., 1st Sess. 580 (April 11, 1871) | 13 |

impartial verdict before a Wisconsin jury. Is Congress to interfere?' My answer to that is this: that it is not possible to draw an absolute logical line between these two cases. The difference is a difference of degree. To authorize the interference of Congress there must be, not merely those imperfections and failures in the administration of law which are attendant upon all civil governments alike, but there must be a clear case of denial of government. We cannot interfere to deal with the incidental evils which attend upon republican government; but we should interfere where, we being the judges whether the case exists or not, on our oaths responsible to the great tribunal of the American people, wherever these evils have attained such a degree as amounts to the destruction, to the overthrow, to the denial to large classes of the people of the blessings of republican government altogether.

Another error, as it seems to me, Mr. Speaker, is to suppose that Congress in the exercise of this great power must either let the State alone altogether, or take entire possession of all its powers and instrumentalities of government, and displace the State government. But there is nothing in the Constitution that for a moment favors that idea. We have a right to limit our interference to the extent of the evil. If a particular class of persons are denied their civil rights permanently and as a rule in any State, we have a right to interfere simply to protect those rights, leaving the republican government, so far as it is enforced in regard to others, untouched where we can.

That is, to make a simple illustration, if we are to guaranty the payment of $1,000, and the principal debtor has paid $990 of that sum, in the execution of our guaranty, we have only to make up the other ten dollars. If we have guarantied the enjoyment of these civil rights, without which no republican government can exist, and in every particular, save one, they are secured and protected by the State government, our interference will be limited to the extent of securing that one, and that alone.

I desire, Mr. Speaker, in this connection to cite a few sentences from the opinion of a distinguished judge of the Supreme Court of the United States, Judge Bradley, in a recent judgment delivered in Louisiana. He says:

"A republican government is not merely a government of the people, but it is a free government."

He recognizes here the distinction which I have stated.

"Without being free it is republican only in name, and not republican in truth."

He says further:

"The Legislature has an undoubted right to make all police regulations which they may deem necessary (not inconsistent with constitutional restrictions) for the preservation of the public health, good order, morals, and intelligence: but they cannot, under the pretense of a police regulation, interfere with the fundamental privileges and immunities of American citizens. The question has its limits in both directions; and while we are to be specially careful not to do anything which may trench on the vast and almost limitless field of legislation, where the will of the people is supposed to be most freely and powerfully expressed, it is nevertheless our duty, with a firm and unflinching hand, to prevent the invasion of any clear and undoubted individual rights of the citizen which are secured to him by the Constitution."

Now, Mr. Speaker, I desire also to advert for a moment in this connection to the meaning of the term "privileges and immunities of the citizen," as used in the fourteenth amendment to the Constitution, and used also in the original text of the instrument. Congress is empowered by the fourteenth amendment to pass all "appropriate legislation" to secure the privileges and immunities of the citizen. Now, what is comprehended in this term, "privileges and immunities?" Most clearly it comprehends all the privileges and immunities declared to belong to the citizen by the Constitution itself. Most clearly, also, it seems to me, it comprehends those privileges and immunities which all republican writers of authority agree in declaring fundamental and essential to citizenship. I will here cite the weighty and pregnant words of Judge Washington, in the case of Corfield vs. Coryell, (4 Washington's Circuit Court Reports, 380:)

"The inquiry is, what are the privileges and immunities of citizens in the several States? We feel no hesitation in confining these expressions to those privileges and immunities which are in their nature fundamental; which belong, of right, to the citizens of all free governments; and which have at all times been enjoyed by the citizens of the several States which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are it would, perhaps, be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: protection by the Government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety: subject, nevertheless, to such restraints as the Government may justly prescribe for the general good of the whole. The right of a citizen of one State to pass through or reside in any other State, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of *habeas corpus*; to institute and maintain actions of any kind in the courts of the State; to take, hold, and dispose of property, either real or personal, and an exemption from higher taxes or impositions than are paid by other citizens of the State, may be mentioned as some of the particular privileges and immunities of citizens which are clearly embraced by the general description of privileges deemed to be fundamental; to which may be added the elective franchise, as regulated and established by the laws or constitution of the State in which it is to be exercised. These and many others which might be mentioned are, strictly speaking, privileges and immunities, and the enjoyment of them by the citizens of each State, in every other State, was manifestly calculated (to use the expression of the preamble of the corresponding provision in the old Articles of Confederation) 'the better to secure and perpetuate mutual friendship and intercourse among the people of the different States of the Union.'"

One further remark I desire to make on this point. It is sometimes suggested that the first section of the fourteenth amendment aims solely at unlawful acts by the State authorities. Its language is:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Now, sir, what does the Constitution mean when it authorizes Congress to interfere by "appropriate legislation" in the case of the denial by a State to any person within its jurisdiction of the protection of the laws? If it had been the purpose of the American people, in accepting this article, to provide merely for the case of an affirmative formal exercise of power by the State in derogation of civil rights, that last clause would have been unnecessary, because the preceding part had provided that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." But the provision goes on to say that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

Now, it is an effectual denial by a State of the equal protection of the laws when any class of officers charged under the laws with their administration permanently and as a rule refuse to extend that protection. If every sheriff in South Carolina refuses to serve a writ for a colored man and those sheriffs are kept in office year after year by the people of South Carolina, and no verdict against them for their failure of duty can be obtained before a South Carolina jury, the State of South Carolina, through the class of officers who are its representatives to afford the equal protection of the laws to that class of citizens, has denied that protection. If the jurors of South Carolina constantly and as a rule refuse to do justice between man and man where the rights of a particular class of its citizens are concerned, and that State affords by its legislation no remedy, that is as much a denial to that class of citizens of the equal protection of the laws as if the State itself put on its statute-book a statute enacting that no verdict should be rendered in the courts of that State in favor of this class of citizens.

As was suggested by my colleague from the Essex district, [Mr. Butler,] in conversation a short time ago in my hearing, the provision of the amendment is precisely a reaffirmance of the great clause of Magna Charta where the king declared that he "would sell, he would delay, and he would deny to no man law and justice." That denial on the part of the king might as well have been made by a refusal to listen to the prayer of the people asking justice as by a formal decree enacting that no such prayer should be presented to him. The State always acts through instrumentalities. Suppose the State should place on the towns the duty of raising troops, and that every town should refuse to raise its quota. If Congress was authorized to interpose in such a case, should we not consider our power complete although the State Legislature had not spoken in terms?

Now, Mr. Speaker, of the occasion for the exercise of these great powers, which, as I have said, are few, simple, and comprehensive—designedly made so, because the enumeration of details and methods would have weakened, not strengthened them—the national Congress is the sole, the undoubted, and the safest judge. Mr. Webster well said:

"Mr. President, all popular Governments rest on two principles, or two assumptions:
"First, that there is so far a common interest among those over whom the Government extends, as that it may provide for the defense, protection, and good government of the whole without injustice or oppression to parts; and
"Secondly, that the representatives of the people, and especially the people themselves"—

He is speaking of the whole people, as distinct from the people of any particular locality; he is arguing this very question in another form—

"the representatives of the people, and especially the people themselves, are secure against general corruption, and may be trusted, therefore, with the exercise of power.
"Whoever argues against these principles argues against the practicability of all free Governments. And whoever admits these, must admit, or cannot deny, that power is as safe in the hands of Congress as in those of other representative bodies. Congress is not irresponsible. Its members are agents of the people, elected by them, answerable to them, and liable to be displaced or superseded at their pleasure; and they possess as fair a claim to the confidence of the people, while they continue to deserve it, as any other political agents."

I ask, Mr. Speaker, can public liberty be more safely intrusted to the whole, or to a part? Is it not entitled to the protection of the supreme power, or should it be left to the care of an inferior power only? Can it not when imperiled use the strongest arm of national power for its protection? This question is not only answered by abstract reasoning, but it is answered also by history. During the seventy years of our national history not one single attempt to invade the liberties of this people by an unconstitutional enactment (with two possible exceptions to which I will allude in a moment) has ever come from the General Government, while from the individual States such attempts have been many.

It is said, it was said by the gentleman from Indiana [Mr. Kerr] yesterday, that the States may, in general, as a rule, be trusted with the preservation of their own liberties, and that it is more dangerous to permit the General Government to determine when it is necessary that it should interfere with the local concerns of the States, than to run the risk that the States may sometimes, without check, oppress particular individuals and classes. It seems to me that many intelligent and sensible persons look only at one side of this question. They accustom themselves to look at the supposed danger to civil liberty from the possible encroachments of the central power, and leave wholly out of view not only the probability, but the actual experience of the deprivation of large numbers of persons of their natural rights under the authority of the States when the protection of the nation is not extended to them. The question is not whether a majority of the people in a majority of the States are likely to be attached to and able to secure their own liberties. The question is not whether

is the order for business hereafter. I do not think it is now understood by the House.

The SPEAKER. Under the order made by unanimous consent the other day, the Chair cannot entertain anything except privileged questions. The pending proposition will remain before the House to the exclusion of all other business until disposed of.

Mr. BUTLER, of Massachusetts. I call for the regular order of business.

ENFORCEMENT OF FOURTEENTH AMENDMENT.

The SPEAKER. The regular order being called for, the morning hour now begins at nine minutes past twelve o'clock. The first business in order is the consideration of House bill No. 320, to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes, upon which the gentleman from Illinois is entitled to the floor for fifty-four minutes remaining of his hour.

Mr. FARNSWORTH and Mr. BINGHAM addressed the House, in speeches which will be published in the Appendix.

Mr. SWANN. Mr. Speaker, I feel gratified to be afforded this opportunity of addressing the House upon the important bill now under consideration. It was remarked by my honorable friend from New York [Mr. WOOD] that he had never approached a measure connected with the legislation of this country which impressed him with more solemnity than the bill now under consideration; and I confess, feeling as he does, that I owe it not only to myself, but to the constituency which I am here in part to represent, to present my views at large upon a measure which I consider more vital than any which has heretofore engaged the attention of this House.

My honorable friend from Kentucky [Mr. BECK] remarked in his eloquent speech of yesterday that he did not believe any member of this House could be returned to the place which he occupies on this floor who recorded his assent to the provisions of this bill. I hope he has properly estimated the public sentiment of the country as to the enormity of any such legislation as is here proposed. Certain it is, that if this bill passes you will never have an opportunity, in my opinion, of witnessing again a free expression of the popular voice in returning to this House those who may be called upon to represent us in the future. While, therefore, my honorable friend may be entirely justified in the remark which he has made, under a free expression of the popular will, he may find it very different in the view which I have suggested.

The able and exhaustive argument which has been made on the constitutional features of this bill by my friend from Indiana [Mr. KERR] will render it unnecessary for me to go over ground which has been already so well and carefully occupied by him. I am content to leave the bill, in this connection, in the main where he has left it, and to confine myself in the remarks which I propose to submit to the more popular view, in reference to its effect upon our existing form of government, which forces itself with startling interest upon the whole American people, without distinction of section or party. I am one of those who believe that this free system of ours is fast losing those fundamental characteristics which furnished to the people the only guarantee against centralization, without which it never could have received their sanction. The passage of this bill will complete the work which has been so steadily persevered in by the dominant party of this House and elsewhere. It strikes at the whole theory upon which the Federal Constitution was based; it ignores the existence of States as having any necessary connection with its complex machinery; it stifles the voice of the people in their local and domestic organizations, and clothes the President of the United States with a power greater than that of an emperor, and intended, as I believe, to perpetuate the rule of his party without limitation, unless interfered with by revolution and the indignation of an outraged people, which it is so well calculated to provoke.

Let us look for a moment, Mr. Speaker, at some of the extraordinary features of this measure. It is called "a bill to enforce the provisions of the fourteenth amendment of the Constitution of the United States, and for other purposes." The very preamble assumes a fact that does not exist, namely, that force and the interposition of the Federal arm are necessary to accomplish the object and intent of laws already upon your statute-book, giving the fullest protection to the citizen in his person and his property. This proposed legislation is neither defined nor specific, thus leaving the widest latitude to those who may be called on to execute it. It is a declaration of vague absurdities, of mere generalities, pregnant with danger in the hands of designing men, and having no practical bearing upon any evil which it is proposed to correct. It subverts the governments of sovereign States, always heretofore recognized as important integrals in our political system. It pronounces the severest penalties upon individual citizens, after having placed them at the mercy of partisan tribunals or prejudiced informers. It authorizes martial law, in times of profound peace, at the will and upon the motion of a single man, and without check or interference from any other source. It turns the whole current of State jurisprudence into the Federal courts, in order the more effectually to centralize the power which it is intended to exercise, showing at the same time the utter contempt in which all State authority is held.

An honorable gentleman from Michigan, [Mr. STOUGHTON,] who opened this debate, said in his speech:

"The evidence taken before the Senate committee in relation to the outrages, lawlessness, and violence in North Carolina establishes the following propositions:
"1. That the Ku Klux organization exists throughout the State, has a political purpose, and is composed of the members of the Democratic or Conservative party.
"2. That this organization has sought to carry out its purposes by murders, whippings, intimidation, and violence against its opponents.
"3. That it not only binds its members to execute decrees of crime, but protects them against conviction and punishment, first by disguises and secrecy, and second by perjury, if necessary, upon the witness-stand and in the jury-box.
"4. That of all the offenders in this order, which has established a reign of terrorism and bloodshed throughout the State, not one has yet been convicted."

Without admitting the truth of any of these propositions, which I utterly deny, based upon no testimony of an authentic and reliable character, it only excites the more surprise that an evil so formidable in its proportions as these gentlemen would have us believe did not lead to the appointment of a joint committee of investigation, as was agreed upon, before a resort to the loose and inconsiderate action recommended by the President in his message to this House. That disorders have occurred in some of the southern States I am not here to deny. Emerging from the irritations of a war without a parallel in the angry passions which it excited, with the relations of labor suddenly changed, and a new element of power brought into existence for the first time, in some instances subordinating the white to the colored race, it would have been strange, indeed, if individual instances of disturbance and lawlessness did not occur. But that organized combinations to resist the law, in such proportions as to justify the presence of the Army and the Navy, have ever existed is too absurd to admit of argument. I will say here, in justice to the South, goaded almost to desperation by arbitrary and tyrannical exactions, and the wanton imposition of burdens degrading to the natural impulses of a once free people, no body of men could have borne themselves with more dignified submission to a hard but inevitable fate than the States of the South since the termination of the war.

There is not the shadow of a pretext for any such demand as the President has made upon this House. Why are not the State tribunals, mostly under Radical rule, competent to protect the citizen in his person and his property? Does General Grant want the Army and the Navy to arrest and punish men in detail, for murder, for mayhem, for robbery, for arson, and the other offenses named in this bill? How ridiculous would he appear, under its sweeping provisions, if he should deem it his duty to call to his aid the member from Massachusetts—a contingency by no means improbable in view of their new-born intimacy—and order him to take possession, with the Army and Navy at his back, of Alabama, or Georgia, or North Carolina, or of all the offending southern States, to surround and root out these mysterious bands of bloody Ku Kluxes of which he complains. He would no doubt accomplish wonders, as he has always done, by his surpassing valor and incredible military acumen.

But I doubt very much, Mr. Speaker, whether, with all his bitter feeling and pent-up wrath against the Southern States, and these diabolical Ku Kluxes, he would be any more successful than he was at Fort Fisher, in Virginia, or those other points in his military career which have been made classic by the luster of his name. The first thing he would have to do would he to find out the whereabouts of these strange and mysterious people. That is by no means ascertained. The law would give him all the authority of a magistrate, to arm him with the power of a search warrant. No man would know better how to search homes, especially in the southern States, than the member from Massachusetts. But suppose he did find them, surely their numbers could not be so formidable that the State tribunals could not deal with them.

His great Army and Navy would stand amazed, if he chanced to be successful, if he should be so fortunate as to make discoveries at all, (which I very much doubt,) at the appearance, it may be, of two or three half-starved rowdies and libertines, which he could find as well in his own State of Massachusetts without going South to search for them. The only difference would be that in the North they would bear the name of criminals, when in the South they are called Ku Kluxes. But is it reasonable to believe that General Grant would require the Army and the Navy to surround and capture them?

The first section of this law ignores the State tribunals as unworthy to be trusted, and confers jurisdiction upon the "district and circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provision of the act of the 9th of April, 1836."

The second section is a little more significant. It provides "that if two or more persons shall, within the limits of any State, band, conspire, or combine together to do anything in violation of the rights, privileges, or immunities of any person," &c., he shall be liable to a penalty of not exceeding $10,000, or imprisonment not exceeding ten years, or both, at the discretion of the court.

The third section provides that where such combinations of a formidable character exist the President shall employ the Army and the Navy. It goes on further to provide that it shall be lawful for the President of the United States, when in his judgment the public safety may require it, to suspend the privileges of the writ of *habeas corpus*, and to declare and enforce, subject to the Rules and Articles of War and other laws of the United States now in force applicable in case of rebellion, martial law, &c.

These are some of the leading features of this bill, without going into a more detailed

Case 1:21-cv-00400-APM   Document 29-2   Filed 07/01/21   Page 5 of 15

lowed by a second, and a third, and so on, until constitutional restraints are soon broken down. "Eternal vigilance is the price of liberty," a maxim as true as trite. On this subject, Junius, in his advice to the English people, expresses himself in language as forcible as it is beautiful, and it will apply to us with even greater force. He says:

"If an honest, and I may truly affirm, a laborious zeal for the public service, has given me any weight in your esteem, let me exhort and conjure you never to suffer an invasion of your political constitution, however minute the instance may appear, to pass without a determined, persevering resistance. One precedent creates another. They soon accumulate and constitute law. What yesterday was fact to-day is doctrine. Examples are supposed to justify the most dangerous measures; and when they do not suit exactly, the defect is supplied by analogy."

This was the advice of a great statesman to his countrymen, and it seems the English people appreciate its value, for at a much later period Macaulay says:

"We have been taught by long experience that we cannot without danger suffer any breach of the constitution to pass unnoticed."

A short experience ought to have been sufficient to have taught us the same thing. We have a written Constitution, prescribed by the sovereign power, the people, containing suitable limitations and restrictions on the known tendency of power to transcend its proper limits; but we do not profit by either the lessons of philosophy or the advice of patriot statesmen.

Our people seem to labor under the delusion that liberty is indestructible. If they will continue, they will soon find a sad end to their delusion. We have seen bad precedents followed by worse. We have seen innovations repeated, and each succeeding one magnified. This bill is the last and greatest of these innovations. We have seen act follow act, until all the original rights of the States have been absorbed and centered in Congress, and Congress now proposes to pass all the power thus absorbed into the hands of one man. Let this bill pass, and then farewell to the Republic.

Although the people have until the late elections been silent and passive, I pray God they may yet reclaim the lost ground; and the hope of every patriot now rests on them. I appeal to them to correct these abuses and to restore the Government to its original beauty.

Men who knowingly err will generally justify themselves on some pretext, and though they have to do so by appealing to some popular prejudices. Revenge is one of the base passions of human nature, and, no doubt, has great weight in shaping public sentiment at the North against the southern people. And there are those who would pander to this vicious passion by justifying the extreme measures of Congress as a proper punishment to the people of the South for their errors.

Such a motive may have influence with some, but it is an aggravation of the wrongs. Congress has no right to inflict punishment on individuals or on whole communities. How blind and misguided is that policy which undertakes to bring back a misguided people by oppressing and punishing them! Was ever a people brought to love or even respect a government which oppressed them? Man can never be brought to love those who oppress him. Religion may teach it, but in vain. And if there be any such thing as a free government which does not command the respect and approbation of the people, statesmen have failed to show us how it can be maintained. Punishment was not the object; it was a shallow pretense, used to deceive the people. The veriest rebel or secessionist at the South becomes at once a loyal citizen, purged of his offense, by joining the party and sustaining its extreme measures. Many of its most prominent men at the South, from Governors down, were the most zealous and active secessionists. They are rewarded and not punished. There is great joy over their conversion to the Republican party.

This proves that punishment was not the object. If the southern people are disloyal, as they are charged with being, oppression has made them so, and the Radical party is responsible therefor. At the close of the war they acknowledged their error, they had suffered grievously for it, and were anxious to be restored to their relations with the Government, and did all in their power to place themselves right. They were repulsed with scorn and consigned to punishment under military despotisms.

That old Roman was wise who said in the Roman Senate the way to attach a conquered people to their conquerors is to treat them with kindness. And it was said that Romulus was very wise, with respect to the people he subdued, by making those who were his enemies the same day citizens. The southern people are even yet treated as enemies, and such treatment is very sure to make them so. Kindness is the fountain from which attachment springs as well for Governments as for individuals.

A Roman emperor made a conspirator against his life his warm friend by forgiveness and kindness. Had the Republican party pursued this policy after the war closed it would have given renewed strength and renewed attachment to the Government. Besides, sir, the secessionists had some claims to forgiveness, especially from New England. It was a plant of northern origin, as early as 1796, under the nurture of the Hartford Courant, and upon the acquisition of Louisiana it received a new stimulus and bid fair to bring forth its fruits. Its spread was encouraged by public journals, public meetings, legislative bodies, and from the pulpits. It was fostered by such names as Plummer Pickering, Hillhouse, Hunt, Otis, Griswold, and others, and culminated in that Hartford convention which sent delegates to Washington as its advocates. Its prospects, however, were blighted by the general joy produced by General Jackson's brilliant defense of New Orleans.

To say nothing of the effect of this bill on the South, what of the northern people? By sustaining the Radical party they but forge the chains that ere long will encircle them in the toils of slavery. They have encouraged precedents which this day by this bill threaten to break up their State governments and place them under a one-man, military despotism, which will subject their lives, liberties, and property to military tribunals. And what of the western people, that great community of noble men whose minds should be as free as the air they breathe, will they too crouch before the tyrant's scepter, voluntarily surrender their rights, and willingly take upon themselves the yoke of slavery?

Will they quietly stand by and see a military satrap, with licentious soldiery, take possession of their States and State governments? Will they calmly see the standard of military supremacy erected on the ruins of civil power? The North, the West, and Middle States had better beware. They will but fill the chalice which ere long will be applied to their own lips. When it comes they will have but themselves to blame. In adhering to the Republican party, they have but fostered the monster which is now about to crush them.

I yield for twenty minutes to the gentleman from Pennsylvania, [Mr. STORM.]

Mr. STORM addressed the House in remarks which will appear in the Appendix.

Mr. ARCHER. I yield now to the gentleman from Missouri, [Mr. McCORMICK.]

Mr. McCORMICK, of Missouri, and Mr. MOORE addressed the House in speeches which will appear in the Appendix.

Mr. LOWE. Mr. Speaker, the questions presented for consideration upon the bill before the House are of the very first importance. We are confronted with the two inquiries whether the proposed legislation is needful and whether it is lawful. If these conditions concur, if the exigencies of the public welfare demand it, and if the bill may be constitutionally enacted into a law, then there can be no doubt of the duty of the House and of Congress to provide such redress as this bill proposes. That life and personal rights are insecure and systematically invaded in several of the States may be palliated, but cannot be successfully denied. The evidence is contained in the voluminous report of the Senate committee elicited from a crowd of witnesses; and it is also brought to us by the public press and by the mouths of those who speak of what they know and have seen.

While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice. Immunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress. If there is no remedy for this, if the rights of citizenship may be denied without redress, if the Constitution may not be enforced, if life and liberty may not be effectively protected, then, indeed, is our civil Government a failure, and instead of enjoying liberty regulated by law, its subjects may live only by the sufferance of lawless and exasperated conspirators. The cardinal doctrine of our institutions is that all citizens are equal before the law, and that the law shall equally secure to all, their natural and inalienable rights.

It is well to remember these fundamental doctrines. It is well to remember for what purpose Government is organized, that it may be so administered as to secure its appropriate ends. It is for the purpose of practically enforcing these cardinal principles that this bill is proposed. The President has advised the House that the condition of the country in certain districts is such that life and property are insecure and the carrying of the mails and the collection of the revenue dangerous, and that the power to arrest these evils is, in his judgment, beyond the control of State authority. If this condition does not anywhere exist, if there is nothing, in fact, for this bill to operate upon, if there are no outrages committed, if there are no organized bands of disguised conspirators, why such opposition to this measure? If there is nothing for the bill to apply to, nobody can be inconvenienced by its passage. If there are no Ku Klux organizations conspiring to banish and destroy, then nobody's rights, whether real or fancied, can be injured by a bill to put them down.

It is not impossible that in some instances exaggeration of the violations of law may have been made in reporting them to the public, but it must be a very stubborn incredulity which after perusing the report of the Senate committee, after hearing the credible narrations of eye-witnesses, would deny the substantial fact that in many districts in the South there is a demand for some further safeguards to life, liberty, and property, safeguards that may involve the element of sufficient power and force to carry into execution the guarantees of the Constitution in favor of personal security and personal rights.

It is claimed with great vehemence and pertinacity on the other side of the House that there is no constitutional authority in Congress to pass this law; that, even admitting the facts to be true as alleged, Congress is powerless to grant relief within the scope of the just powers of the Federal Government. If I were of that opinion, I should never give my vote for the bill, for there is no evil so great but that the obligations of the Constitution are paramount to any necessity for the removal of the evil.

But this is not the first time the Constitution

Mr. SHELLABARGER. I beg the gentleman's pardon; the Constitution uses no such words.

Mr. VAN TRUMP. Where does the gentleman find the power: in the legislative article or in the executive article?

Mr. SHELLABARGER. It is a question of interpretation between my colleague and myself. The Constitution does not say that Congress shall have the power; it does not say that the President shall have the power. It is a question of interpretation. The gentleman interprets the power to be in Congress. On the question as to which interpretation is right I refer the gentleman to the most learned treatise on the subject in the English language, from one of the ablest lawyers that America has ever produced; I mean Horace Binney.

Mr. VAN TRUMP. I understand that. I cannot yield for a speech.

Mr. SHELLABARGER. Very well, then; I will say that I take the other view.

Mr. VAN TRUMP. If this is not to come out of my time, of course I have no objection.

The SPEAKER. It must come out of the gentleman's time.

Mr. VAN TRUMP. I merely asked the gentleman where he found the power which he states.

Mr. SHELLABARGER. The bill proceeds upon the theory of the gentleman that the power is in Congress. The bill assumes that it is in Congress.

Mr. VAN TRUMP. Then I ask the gentleman, if that power can be thus delegated, why not the power to levy taxes, to make appropriations, to declare war, to raise and support armies, and to coin money, as well? It is a legal deduction from which there can be no escape that if Congress has the constitutional authority to delegate to the President any portion of their legislative functions, they have the same authority to remit to him the entire mass of their legislative power. And the converse of the proposition must be equally true, that if they have no authority to delegate their *whole* power, they are in like manner powerless to delegate any *portion* of it.

The whole question is settled by the well-known maxim that a power created in the nature of a *trust* cannot be delegated by the agent in whom the trust was originally reposed. The people, in their primary capacity, are the original and exclusive source of all legislative power; as a matter of convenience it is delegated by them, through the instrumentality of constitutions, to their representatives, as *agents*, who hold it in trust for the benefit of the people. This great power is intrusted to them to be exercised in *their* discretion, in *their* judgment, and not in that of others not selected by the people for that purpose. In a constitutional Government like ours, when the people have once delegated their power, it cannot be *redelegated* back to them, even by their agents created by themselves. A familiar instance of this doctrine is to be found in those cases where a Legislature has passed an act to be submitted to the people for adoption or rejection at the ballot-box. There is scarcely a State in the Union whose supreme judicial tribunal has not decided these submissions unconstitutional and absolutely null and void. Said Chief Justice Marshall, in the case of Wyman vs. Southard:

"It will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly legislative."

But, Mr. Speaker, I maintain the proposition that not even Congress has the power to suspend the writ upon the facts presented by the President in his message. The Constitution declares that—

"The privilege of the writ of *habeas corpus* shall not be suspended, unless when, in cases of *rebellion* or invasion, the public safety may require it."

Now, this language was carefully considered and adopted by the framers of the Constitution. The term "rebellion" is here used in plain and palpable contradistinction to those of "insurrection" and "domestic violence," in other and separate parts of the Constitution, and for very different objects. That the Constitution contemplates the "rebellion" of a State or States, *as such*, and not a mere combination of persons as individuals in a state of "insurrection" against the authority of either the particular State itself or the United States, I think is quite manifest. This construction is in harmony with the whole theory of the Federal Constitution, in marking the line of distinction and separation between the jurisdiction of the Federal and State authority. If the public disorder sought to be overcome amounts to less than a "rebellion," in this assumed constitutional sense of the term, and therefore an "insurrection" only, as provided for in section four of the fourth article of the Constitution, the sovereign power of the State, in which the authority to suspend is also lodged, can apply the remedy by a suspension of its own writ, and thus accomplish every end which could be reached by a Federal exercise of the same power, as was done by the State of Massachusetts during the Shay insurrection.

The simple definition of the two terms will sustain this view of constitutional interpretation. All the leading philologists concur in the rendition of the meaning of the term "insurrection" as an uprising of *individuals* against the authority of Government, in relation to some particular law or grievance. As, for example, the insurrection in the western counties of Pennsylvania grew out of the popular objection to the excise law; and Shay's insurrection, in Massachusetts, from the public opposition to the collection of private debts by judgment and process in the courts, as well as a most bitter animosity to impost duties and poll-taxes. Rebellion is an armed resistance to the authority of Government, *with an intention to overthrow it*. Now, if these premises are sound, in relation to the true interpretation of these terms as used in the Constitution, it is in my opinion quite clear that even Congress itself could not constitutionally suspend the writ at this time, and in relation to the character of the disturbances which exist in the South, as alleged by those who demand its suspension.

The facts as claimed, either by the President himself or his most excited partisans, do not call for any higher exertion of power or any more stringent remedy than that which is provided for in the fourth section of the fourth article of the Constitution, to wit, upon due notice and requisition, either by a State Legislature, or, when such Legislature is not in session or cannot be convened in time for the emergency, then by the State Executive, the United States, (whether through Congress or the Executive is not defined by the Constitution,) shall protect such State against "*domestic violence,*" not by the suspension of the writ of *habeas corpus*, but by force of arms, either by the regular Army or by calling forth of the militia, as is provided for in the fifteenth clause of the eighth section of the first article of the Constitution. In no event, therefore, except in the specified cases of rebellion or invasion, can the writ of *habeas corpus* be suspended by the General Government, whether to do so belongs to Congress or the President. This is very clear to my mind because of the significant discrimination made by the Constitution between the classified wrongs of rebellion, insurrection, and domestic violence. But, sir, even if this interpretation were in doubt, that doubt, by the well-known canons of legal construction, would have to be resolved against an exertion of the power, for the reason that such suspension is in derogation of common right, as well as against the personal liberty of the citizen upon mere suspicion of guilt, and in order to uphold and protect both the common right and the individual liberty an equitable construction is to be put upon the terms used in the Constitution.

And now, Mr. Speaker, why is it that the Republican leaders are so blind as not to see, or so reckless as not to take heed, of the storm of public indignation which must surely follow these gross usurpations of executive power, whether committed by the President himself or accomplished by congressional instrumentality? Sir, I appeal to those gentlemen on this floor who were once Whigs but are now Republicans, whether it does not shock their Whig recollections to find themselves ranged as apologists and defenders of the unconstitutional extension of the executive power in this Government? Have they not taken a wide departure from their former principles, as announced from many a stump and declared through many a platform of that grand old constitutional party to which we once in common belonged and felt a common pride in its high-toned and national principles?

What, Mr. Speaker, was the great and leading principle in the creed of that party? Was it not the question of executive power in this Government and uncompromising opposition to all usurpation, whether civil or military? What was it but this question which made these Halls ring with the intellectual thunders of a Webster or the indignant and impassioned eloquence of a Clay? The gentleman from Massachusetts [Mr. DAWES] smiles. I say to him that I can smile with a better grace than he, for I stand now where I stood then.

Mr. DAWES. So do I.

Mr. VAN TRUMP. Then you have a very curious way of showing it. I beg the gentleman from Massachusetts to remember, now that he is a Republican, what he would have recognized as sound doctrine when he was a Whig, that "*power*, like water, is ever working in its own way," and that the most aggressive of all political power is the executive power of a nation, whether republican or monarchical.

[Here the hammer fell.]

Mr. BUCKLEY addressed the House. [His remarks will be found in the Appendix.]

Mr. ELLIS H. ROBERTS. Three facts combine to show the necessity for a bill substantially like that now under consideration. First, the violence and lawlessness, for which it is proposed to provide a remedy, occur in many widely separated districts; second, the character of the victims selected and the methods of outrage, indicate a common source and purpose, an organized conspiracy; and, third, the organization to which they are traced is political in its origin and aims, and is military in form.

That great soldier and good man, General Thomas, was one of the first to expose the existence and dangerous nature of the Ku Klux organization; and in his report for 1868, pointed out its effects in Tennessee. The minority of the Senate committee concede that these outrages have been committed in six or eight counties of North Carolina. The application of Governor Scott for help reveals the condition of South Carolina. Ex-Governor Stevenson, by a message, declared that dangerous lawlessness prevailed in Kentucky. Governor Alcorn on Saturday sent a message to the Legislature, bringing into prominence the arson and massacres in Mississippi. In Arkansas, the repressive measures of Governor Clayton have exposed while they have checked the crimes. In Alabama, the gubernatorial applications for national troops prove the necessity for relief. The exposures of the situation of Georgia, made by Governor Bullock, are startling and forcible. From Florida, the story is yet fresh in our ears of the murder of Yearty, a deputy marshal of the United States and a member of the Legislature of Florida.

These acts of violence are not directed against colored citizens only, although if they were that would be no palliation of their enormity; for the nation is under especial obliga-

But all this vast power is claimed under two articles of the Constitution of the United States; one the second section of article four, which provides that—

"The citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States."

This clause was rather a limitation upon than a grant of power to the Federal Government. It was founded in a jealousy between the larger and smaller States, lest the Federal Government, unrestrained, might make invidious or arbitrary discriminations between the citizens of the different States. It provided simply for a general citizenship, not intending to supersede the rights of the citizens under the different laws of the States, (3 Sto. Com., s. 1800.) But whatever deficiency of power there may be in that clause, it is insisted that it is supplied in the fourteenth amendment to the Constitution of the United States, which, like Aaron's rod, is intended to swallow up all the other powers. Section one provides that—

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Mark the language: "No State shall make or enforce any law," &c.; hence the prohibition is on the State. Now, I deny that Tennessee has made or enforced any law which abridges the immunities and privileges of the citizens of the United States. I deny that she has deprived any person of life, liberty, or property without due process of law. I deny that she denies the equal protection of the laws to any person within her jurisdiction.

If there were such denial the question is open to civil remedy, and the judicial power of this Government is the only power to decide the question. Whenever the Supreme Court of the United States shall decide any clause of the constitution or any law of Tennessee in conflict with the fourteenth amendment, I think I may safely pledge the State to bow to that high supremacy.

But really the fourteenth clause was only intended to bring the African up to the political level of the Caucasian race. Ours is the only Government upon earth which has attempted the political consolidation of these two races. England emancipated her slaves in the islands, in the distance, but stopped at emancipation. When she did so, she never dreamed that her freedmen would invade her soil and demand the elective franchise, clamor for seats in her Parliament and aspire to her woolsack.

But here we did not stop at emancipation, but opened the Constitution of the United States to let them in; opened all the State constitutions to let them in; reformed all our civil and criminal codes to accommodate them to their altered condition. After granting them these exalted privileges of constitutional and civil liberty, how bold, how arrogant, to claim that the power of a military despotism lay coiled, like a python, beneath the artful phraseology of the fourteenth amendment. But I deny the necessity of giving such enormous power to the President. He already has the power which Washington had to suppress the whisky rebellion in Pennsylvania. He has all the power of the law of July, 1861, with which President Lincoln encountered the rebellion of the eleven southern States. He has all the power of the enforcement act of 1870.

But after the proclamation of peace, after the insurgent government and armies were scattered to the four winds and quietly pursuing the arts of peace, after he is already bloated with military power, like the horse-leech, he still cries, "Give, give." He does not deign to tell Congress what new attribute of power is wanting. Shall Congress, with blind fatuity and exhaustive liberality, lay all the thunders at his feet? What does he want with armies? Let him march them to the South. They may leave the slime of their dragon folds on the country, but an armed rebellion, like the mirage of the desert, will never be found. All Governments are matters of trust. Why trust the President rather than the States and the people of the States? There is but one answer. The advocates of the bill are afraid of the people.

The bill is nothing but "a mere, sheer, ribald" confessional of infidelity respecting the capacity of the people for self-government. The people made the Government; it belongs to them; and why should it be wrested from them and given to a master? Has party frenzy driven the advocates of the bill to such a pitch of madness that they are willing to sink the liberties of the country to maintain the supremacy of their party? Let us beware. Cæsar hesitated at the Rubicon, but he took the fatal plunge when he saw that Rome could be swallowed up in Cæsar.

I have endeavored feebly to uncover and strike down the despotism of the bill. If it is pregnant with the direful reality claimed for it, then the distinguished draftsman will have the somber renown of indicting the epitaph of American liberty. If I can do nothing more, I will stand at my post and "ring the bell as the ship goes down."

But, to change the figure to a more hopeful one, if republican freedom is to appearance dead, let us still hope. We have the corpse with us, though the grave be dug. Give us a committee of pall-bearers, an equal number from North and South, and, with undying faith in the capacity of the people for self-government, let us sadly bear the corpse to the grave of Washington and let it down to touch his bones, that it may be revived, as the corpse of the man when let down on the bones of the prophet Elisha.

Let us inquire what has impelled us to this dire extremity. Is it the demon of sectionalism? Mr. Madison, our most sagacious prophet, in the Convention which formed the Consitution, foresaw the danger, and said:

"The great danger to our General Government is, the great southern and northern interests of the continent being opposed to each other. Look to the votes in Congress, and the most of them stand divided by the geography of the country, not according to the size of the State."—*Secret Proceedings of Federal Convention, p. 236.*

The history of our congressional legislation, in the main, furnishes a sad verification of the prediction. But I have not time for critical review; besides, the wounds are too sensitive for the probe. But grant me a word, not to harrow, but to heal. The South regarded the Government as sectionalized in the election of President Lincoln. The ship of State careened and drifted upon the dark cliff of African slavery. The shock precipitated many of us overboard, and how the craft was shattered we all know too well.

Although war generally executes its own judgments, (and how terribly they fell upon the South none but they do know;) yet Congress has continued to afflict us with rapid installments of vengeance. More than one hundred thousand of our southern sons lie sleeping on the battle-field; our maimed and wounded soldiers hobble on their crutches unpensioned by a friendly government; our land was ravaged, burned, and blackened with desolation, as if swept with a "whirlwind of fire;" famine breathed through her shriveled lips misery upon the children of poverty and want; our State authorities disfranchised the mass of our citizens, and, in some instances, drove from the ballot box the old pioneers who had driven out the savages, and had wrestled with the old oaks of the forest to subdue the country for the coming generations.

The Federal Government came and partitioned the country into military districts, dismantled some of the Legislatures, expelled the judiciary, dishabilitated the citizens, and dragged the rugged harrow of reconstruction through the bowels of our State constitutions. Some of the States were denied representation in the Electoral College for President, and some were held off in political quarantine and denied representation in Congress until they adopted the fourteenth amendment, old Virginia among the number. Yes, old Virginia, who, when ancient liberty was to be won, furnished a Henry to thunder in her forum, a Washington to roll the tide of war, successive Presidents to guide the helm, and brought as dowry to the Union the vast domain in the West out of which has grown up giant States like children around her feet. Surely western Representatives will not forget that they have a mother, and surely will not vote for her further humiliation.

Nearly every act of Congress has a sting for the southern man. When, willing to bury the memories of the past, he treads his way into the far West, upon the rough and perilous edge of Indian warfare, even there he finds the sectional presence of his Government, denying him the benefit of the homestead unless he can take the test-oath.

The old soldier in our second war of independence, who followed General Jackson, who, in the language of a great statesman of Tennessee—

"Silenced the roar of the British lion on the plains of New Orleans, and the American eagle took its loftiest flight and uttered its loudest note of exultant liberty"—

these old soldiers now come and hold out their hands, trembling with the palsy of age and want, and ask the pittance of a pension in remembrance of an ancient debt of gratitude, and they are refused unless they can pass the purgatorial ordeal.

We have not only felt the finger, but the pressure of the loin of the Government upon us. We have been war-ridden, tax-ridden, debt-ridden, poverty-ridden, League-ridden, Ku-Klux-ridden, militia-ridden, State-ridden, Congress-ridden; and now to be President-ridden, with the halter of the *habeas corpus*, and his military rowels dashed into our lacerated flanks, it would overleap all the bounds of mercy.

Let me assure the Republicans that they are greatly abused by the mendacious rumors of oppression which come pealing to them from the South. As the keeper of the lion rowels him up in his cage with his iron bar until he provokes a defiant growl, so some political miscreant may gall the rebel to utter a murmur, which enters a sort of Dionysius ear, reaching from Congress into the South, and as it travels it swells into appalling thunder as it opens into the Hall of Congress. And then you begin to cry out "Rebellion!" "Reconstruction!" and all your resentments flare up toward the South like the quills of the porcupine.

Let me appeal to you of the North to dignify your great triumph over your southern brethren with magnanimity and mercy. Cease to play with the thunders, change your line of policy, expunge your sectional legislation, and strike the fetters from your disfranchised brethren. Let us, North and South, bring our sectional prejudices and sacrifice them as burnt offerings on the common altar of our country. Let the compassion of Congress be stretched out like the wings of a mighty angel and shake the odors of forgiveness on the land. Let us try and imitate the sublime divinity of Him who, with the gall upon his lips, looked up to Heaven through his crown of thorns and invoked the benediction of forgiveness on his foes. Then our land will have rest; then will we have universal peace, brotherhood, and prosperity.

Mr. CRITCHER was granted unanimous consent to have printed in the Globe some remarks he had prepared on the pending bill. [See Appendix.]

Case 1:21-cv-00400-APM   Document 29-2   Filed 07/01/21   Page 8 of 15

tions can be extorted from the law by straining its meaning to the utmost tension, and the necessity for the exercise of that power to elect the Republican candidate for President should be manifested, as it is now daily manifesting itself, who can for a moment, in the light of the history of that party, doubt that it will be exercised?

The pretexts for this bill are the supposed southern outrages and the existence of terrible Ku Klux—parties of men banded together for the purpose of whipping, hanging, and driving from the country negroes and white Republicans—and the Democratic party is charged with all these things; and they go back for their facts two, three, four, and five years, and every murder, every assault and battery, every whipping—all the acts of violence committed in the entire South—is treasured up, the newspaper account of it is read, the enormity of it exaggerated, and all now heralded before the country to give the dominant party some pretense to do this great violence to the Constitution and this great wrong to the liberties of the people and the rights of the States.

Sir, I have great respect for the ability of the distinguished gentleman from Pennsylvania, [Mr. KELLEY,] and when he spoke I listened attentively to hear a constitutional argument to show that this bill did not conflict with the rights of the people and the States, and if it could have been demonstrated he would have done it; but his speech was an effort to prove that we were in a state of war, and he cited certain war measures of the Government, which were denounced as unconstitutional at the time, as an excuse for the extreme measure now under consideration; and proof of the existence of hostilities was established by evidence taken before the Senate committee that secret armed organizations existed in two counties in North Carolina in 1868 and 1869.

This, sir, is not such war as gave the pretext for the other measure alluded to by the gentleman, but a mere domestic neighborhood trouble that State authority and county officials can and will put down and control, without the intervention of the Army and Navy of the United States, without setting a precedent which invades our Constitution, that will one day turn upon us and involve us all perhaps in one common ruin. The hope expressed by the gentleman that this extreme measure will be short-lived may or may not be verified, but the injury to our institutions may come long after the law expires by its limitations; and I here quote the words of Junius, which ought to be forever remembered by patriots and statesmen of all parties:

"Never suffer an invasion of the political constitution, however minute the instance may appear, to pass without a determined, persevering resistance. One precedent creates another. They soon accumulate and constitute law. What yesterday was fact to-day is doctrine. Examples are supposed to justify the most dangerous measures, and where they do not suit exactly the defect is supplied by analogy. Be assured that the laws which protect us in our civil rights grow out of the Constitution, and they must fall or flourish with it."

The same gentleman to whom I alluded in his ingenious speech uses this language:

"Sir, a government that cannot protect the humblest man within its limits, that cannot snatch from oppression the feeblest woman or child, is not a government. It is wanting in the vital attribute of government. The power to protect its people inheres indestructibly in all Governments, and that frame of constitution or laws which does not provide for it fails to establish government."

How can a government protect a man who has been murdered? It can punish the murderer. It can protect the man who has been assaulted and beaten only by giving him a pecuniary consideration for the injury done him. Do our States fail in these remedies? What southern State has not a penal code to punish wicked men for their crimes and misdemeanors? In my State there is not an offense in the whole catalogue of crime that is not denounced by a severe penalty; so, I presume, in all the others. But suppose we have failed in this: does our delinquency give another legislative power the right to interfere in our municipal regulations? Can Congress supply our legislative deficiencies any more than the Legislature of Pennsylvania can do it? If it can, the express authority to do so must be found in the Constitution. But in all this debate that power has not been pointed out. The gentleman struck the key-note when he said, "we are in war." That indefinable "war power" from which we have suffered so many outrages upon our rights and institutions is the warrant of authority for this bill.

The great strides toward the centralization of power in the Federal Government which we have made under the auspices of the Republican party are alarming, and the Democratic party must and will contest, inch by inch, the aggression still sought to be made on the manifest rights and jurisdiction of the States. Power once acquired is never voluntarily yielded up. No potentate ever gave up a prerogative, no court ever surrendered a jurisdiction, no centralized power ever restored privileges exercised by it. If the people of the States desire prosperity and happiness and government suited to their climate, their avocations, their locality, and their interests, they must withhold from the Federal Government the power to interfere with their legislative and judicial rights.

A law which might be beneficial to the people of one State would perhaps overturn the well-regulated and well-understood and beneficent customs and laws of another.

The courts established by a general law might be organized under a system that would mete out impartial justice to one community and in another be a tyranny. The history of the world shows that all small States and principalities are prosperous when permitted to manage their own domestic affairs in their own way and to administer justice for themselves under their peculiar institutions and regulations; but when interfered with and controlled by the legislative and judicial systems of larger States, they became dispirited and degenerated and their prosperity fled from them.

Are we prepared for a judicial system that sends us our judges from other States and makes the Army the executive officer to carry the judgment into effect? Yet such a system is not beyond the scope of this bill, and gentlemen claim that the power is already granted under the fourteenth amendment, and they seek to exercise it.

Sir, if the people had understood, if the advocates of that amendment had claimed this power for it when it was submitted to the States for their ratification, it would have been rejected by every State in the Union.

What gentleman on the other side can rise in his place and say that, when he advocated the adoption of this amendment before his people, he claimed this power for the General Government under it? Did any of you then think so yourselves? Would you have dared stand up and asked the people of your State to yield up to Congress the right to send Federal courts to supersede your local tribunals? If you had, the fourteenth amendment would never have received the indorsement of your people, nor would they again have trusted you with their confidence.

Recent outrages are not so much complained of as those which occurred two or three years ago, and we have to go back to that time for the pretexts for the bill. Then every insurrectionary State had a Radical Governor and a Radical Legislature, with power to call on the President for assistance to put down the domestic violence if it existed to such an extent as to defy State authority, and it is fair to presume that they would not have hesitated or neglected to have sought that assistance if it were true, as claimed, that secret armed societies were organized for violence on men of their party in the interest of the Democratic party; and their failure to do so may be taken as evidence that such violence was not carried to any great extent. And we have high authority that more recently they were unknown, or of such insignificance as to fail to attract the attention of State and national officials. The President of the United States in his last annual message to Congress says: "A year of peace and general prosperity to this nation has passed since the last assembling of Congress."

The distinguished Speaker of this House, in his address to us on the 4th of March, used this language:

"The Forty-Second Congress assembles at a period of general content, happiness, and prosperity throughout the land. Under the wise administration of the national Government peace reigns in all our borders, and the only serious misunderstanding with a foreign Power is, we may hope, at this moment in process of honorable, cordial, and lasting adjustment. We are fortunate in meeting at such a time, in representing such constituencies, in legislating for such a country."

And the gentleman from New York [Mr. WOOD] has read to us extracts from the last annual messages of the Governors of nine of the southern States, who say that—

"Law and order, peace and security reign throughout our borders. Under the benign influence of our free institutions, and the faithful enforcement of the laws, old feuds are rapidly dying out, old animosities are being forgotten, and old prejudices eradicated."

Such is the exact language of one of them, and substantially the language of all; and in this connection I will read an extract from a speech made in the Senate Chamber a few days since by a Republican representing a southern State:

"Much has been said here and elsewhere as to the inclination of the southern people to enter into another rebellion, but I would assure Senators there is not one word of truth in such representations. The remembrance of their maimed sons, desolated hearthstones, and devastated fields precluded the possibility of their ever again entertaining the idea of a rebellion for a moment. I do not think the disturbances in the South originated from hostility to the General Government, but they were inspired by disaffection to the local governments."

And we have other evidence to show the peaceful intentions and avocations of the southern States. Since the war they have made over thirty-five hundred miles of railroad. Their agricultural productions for the year 1869 were worth $750,000,000, and that part of the crop that was exported brought back to the whole people of this country in gold, or its equivalent, $250,000,000; and the productions and exports for the year 1870 were largely in excess of these figures. The number of her farms and establishments of productive industry have each increased since the war nearly one hundred per cent. Let us not disturb this effort to return to prosperity and to regain the former wealth lost during the war by such legislation as will make a proud and chivalric people feel that they are forever to be under a despotism that strikes at their rights and liberties.

It may be that there are some disorders and domestic troubles, it may be that cases of individual violence and outrage are committed in the South; but they will be remedied sooner and perfect order established earlier if the people are left to manage their own domestic affairs in their own way and under their own laws. The only remedy Congress can offer is one that would be efficient, a remedy that would go to the heart of every true southern man and woman; that is, an act of general amnesty, removing the political disabilities imposed by the same amendment to the Constitution which you now propose to enforce. The true principle by which to govern a republic is found in the love of the people for that government and their confidence in its ability and disposition to protect them in their rights of life, liberty, and property, and its recognition of their perfect political equality. When these fail, and the citizen feels that he has not that protection and equality which his interest requires and his pride demands, his fidelity to and his affection for his government is lost.

The people of the South are devoted to republican institutions. No act of theirs but

pelled to make these assertions and back them up with proof; but a conviction of duty compels me to do so. My colleague has not and cannot have a closer attachment to North Carolina than I have, or a stronger incentive to speak the praises of that good State. I would be glad if I could maintain here, with truth, that peace and order reign supreme, as in days of old, within her borders; but such is not the fact, such is not the testimony before the committee to whose report my colleague refers, such is not the information I receive from my correspondents; and I should be unfaithful to my trust as a Representative of a district whose people are and have been undisturbed by these outrages, who have steadily pursued the avocations of peace and industry since the close of the war, and who desire that the same good order which prevails there should extend itself throughout the State, if I neglect to inform this House of the true condition of affairs in North Carolina.

But, Mr. Speaker, my colleague, in his manifest zeal to serve the party which sent him here, (and which, by the way, on his own statement, is now in a minority in North Carolina, for he says that "thousands of Republicans, both white and black, absented themselves from the polls" in the late election, and the majority of the Democracy was five thousand or less,) after declaring that these outrages no longer exist, proceeds to assert, in speaking of the Ku Klux Klans:

"This whole subject was thoroughly examined last summer by the judges of our supreme court. The testimony as to the purpose of the Ku Klux organization was subjected to a rigid scrutiny, but it completely failed to give it a political significance."

Mark the language:

"But it failed completely to give it a political significance."

In replying to this extraordinary statement I shall not refer to the Senate report, but direct the attention of the House to the proceedings held before the judges of the supreme court of North Carolina during last summer, when this "subject was thoroughly examined." And I refer, first, to the testimony of Dr. John A. Moore, of Alamance county, and its representative in the Legislature of the State, and, by his own evidence, a member of the "White Brotherhood," an *alias* for Ku Klux Klan, and a reluctant witness, still occupying a high seat in the Democratic chamber:

"*Chief Justice.* State the oath, if you please?
"*Witness.* Well, I just swore to secrecy: that was all.
"*Chief Justice.* Did they declare the purpose of it?
"*Witness.* Well, they told me it was to strengthen the Conservative party. That was my understanding of it."

"Conservative," Mr. Speaker, in North Carolina is another name for Democratic. I suppose my colleague will not demand proof for this:

"*Mr. Battle.* Did you know of the existence of an organization known as the Union League?
"*Witness.* Nothing but from hearsay.
"*Mr. Battle.* It is generally believed there is such an organization, composed of both white and colored, but mainly of colored?
"*Witness.* Yes, sir.
"*Mr. Battle.* It was understood that it was a political association?
"*Witness.* Yes, sir.
"*Mr. Battle.* And yours was also?
"*Witness.* Yes, sir. I went into it just the same as I went into the Know Nothing movement.
"*Mr. Battle.* If you will permit me to give you a little advice, you will never join another secret society.
"*Witness.* I don't think I ever shall, sir.
"*Mr. Battle.* What was the object of these Leagues?
"*Witness.* It was to carry elections.
"*Mr. Battle.* And what was the object of the other; the same?
"*Witness.* Yes, sir."

I shall not read further from the testimony before the court. I am satisfied my colleagues will not question the accuracy of the statement of Dr. Moore, who confesses himself a member of the organization and ought to know its purposes, but proceed to give extracts from the opinion of the judges. In the case of The State *vs.* Wiley and others, decision in chambers, at Raleigh, August 29, 1870, by Chief Justice Pearson and Justices Settle and Dick, the following language occurs:

"No motive is assigned for this murder except 'political animosity.' The circumstances show it was done on premeditation, with fatal skill, and by a number of conspirators, (either taking part in the killing, or else keeping watch and being on the lookout,) to whom the unsuspecting victim was led up for sacrifice."

Later, sir, in the case of Tarpley, Gray, and others, September 1, 1870, the chief justice, after saying "probable cause has been made out," proceeds, in referring to the evidence of Long, to add:

"It was the subject of remark between us that in our experience as lawyers and as judges we had never known a witness on the examination-in-chief to expose himself more fully to contradiction (unless he was telling the truth) by stating in detail as to place, time and the persons present, the whipping of Sellars, in which he was an actor, the whipping of Holt, and of Trollinger and Corliss, all of which he narrated as reported by members of the Klan; the burning of the school-house, in which he took part, the contemplated murder of Holt and of Shoffner and the actual murder of Outlaw and Puryear by the Ku Klux, or White Brotherhood; and by stating, in the general, from reports made to his camp, that the number of members in Alamance was between seven and eight hundred, in Guilford twelve hundred, in Orange, Chatham, Rockingham, and other counties, not informed as to the number, but the order extended over the State and amounted to forty thousand; was said to have originated with ex-President Johnson, and to extend over the whole South for the political purpose of preventing negro equality by whipping, hanging, and other acts necessary to effect that object; and by stating the oath not to reveal any secrets of the order; to obey the commands of the chief, to go to the rescue of a member, and to swear for him as a witness and acquit him as a juror. In short, this witness disclosed a condition of things showing, if true, that the civil authorities were unable to protect life or property, confirmed by the fact that in no one instance have the perpetrators of these crimes and 'known felonies' been brought to justice. It was a further subject of remark that this witness sustained himself under a most searching cross-examination, as well as any person we had ever seen in similar circumstances. This witness was not contradicted in a single particular, either in the detail or in the general."

This decision is also signed by the same judges, Pearson, Settle, and Dick, who sat upon the investigation.

I have, in the beginning of these remarks, read from the oath requiring members of these klans to swear that they are not members of "the Red String Order, Union League, Heroes of America, Grand Army of the Republic, or any other organization whose aim and intention is to destroy the rights of the South," &c., and, further, that the candidate "will never assist in initiating, or allow to be initiated, if you can prevent it, any one belonging" to these several orders, "or any one holding Radical views or opinions." And now I give the opinions of the judges to whom my colleague refers, sustained by Democratic testimony that these klans were organized for party purposes. Sir, I felt amazed that my colleague should boldly announce such an untenable proposition. I can only commend him to a careful reading of the testimony before the Southern Outrage Committee of the Senate, and the testimony before the justices of the supreme court of North Carolina in August last, to both of which he refers in his speech, and neither of which, I very much fear, has he read with care and attention.

I shall now notice one other statement of my colleague, which carries with it its own reply. Asserting that the Ku Klux societies were organized as correctives to the outrages of the Loyal League, he assures you that the former have existence in only six or eight counties of the State. The League is known to exist in every county of the State. Where are the Ku Klux in the remaining counties? Why not organize in every county in which the League had existence? But I do not propose to follow these inquiries. The statement of my colleague is altogether "too thin."

Now, Mr. Speaker, the State government has failed in every instance to punish these Ku Klux crimes, and the liberty amendments are already a practical nullity where these klans operate. The Government of the United States must abandon its reconstruction policy, or it must now enforce it by appropriate legislation of sufficient stringency and power to overcome the thousands of banded conspirators who have raised a new rebellion against the execution of the laws and the rights of the citizen.

The colored men of the South, and those who have supported them in their rights as guarantied by the Constitution of the country, look to the national Government to enforce by "appropriate legislation" what is declared to be necessary for the future peace and security of the Republic. It is not wonderful that those who gained political preferment by means of these lawless organizations should resist any and every effort of the national Government to enforce its authority and its laws. It is to be expected that they will denounce those who advocate such enforcement. But common caution ought to admonish them that over-zeal and manifest violence of temper in the discussion of the question would betray an interest, partisan or otherwise, in the continuance of the operations of the Ku Klux conspiracy, which has been invoked in aid of their party. Why is it that no man can aim a blow at a Ku Klux without having it returned by the whole Democratic party? This of itself should admonish the Government that it is dangerous longer to delay a stringent and resolute dealing with a conspiracy as wide-spread and powerful as that which existed in the early part of the year 1861.

Having started with broad denials of established facts, shutting their eyes to published testimony that is undeniable and irrefutable, denouncing all who stand in their way, the opponents of the pending bill finally descend to constitutional scruples and quibbles upon words, and feign to forget the fundamental principles upon which the Government is founded, that of the protection of the lives and liberty of the American people. Sir, if the Constitution does not authorize this Government to protect the liberty and lives of its citizens it were well that the Constitution were amended or the Government changed in its character or powers. A Government that cannot afford safety and protection to citizens who give it love and allegiance is unworthy of their love or allegiance!

In conclusion, Mr. Speaker, we hear complaints of political disabilities imposed by national authority upon men recently engaged in rebellion. My colleague concludes his speech by an appeal to you to remove these disabilities and to extend universal amnesty to the people of the South. Sir, does my colleague forget that hundreds of thousands of the loyal people of the United States, who never engaged in rebellion, black men and white men, who had the misfortune to reside in the territory which recent destroyers of the Government claimed as peculiarly their own, are under far greater social and political disability, imposed by violence and lawlessness? And allow me to say that his allegation, that the continuance of disability has given rise to the Ku Klux, is a confession that the leading men of the Democratic party are the originators and contrivers of the movement.

This confession may be startling to the country; but we who see and know of the practical operations of these klans need not this to convince us that they had their origin, their motive-power, and their impunity from punishment, and all upon which they rely to protect them in their crimes, from the hands of the leaders of that party, which, in 1868, announced as its platform that the reconstruction acts of Congress should be overturned by the bayonet and the Army made to undo what the Army had done in suppressing the rebellion and keeping down those who had manifested a disposition to continue to disturb and

charged him, before W. B. Smith, United States commissioner, with the offense of resisting officers of the Government in the lawful discharge of their duties. The parties showed by their own testimony in the examination substantially the foregoing state of facts. Hon. J. D. Pope, United States district attorney, who was present and conducted the case for the Government, when he heard the testimony, with laudable indignation, moved the commissioner to discharge the accused; and he was immediately released. I have been informed that one of the deputy United States marshals was present when these acts were done. I also learn from the district attorney and Major Smyth, United States marshal, that there was no evidence whatever before the commissioner implicating him in the transaction. But to return. If persons will have the temerity to violate the criminal laws of the United States, the Constitution and the acts of Congress provide the mode of executing processes of United States courts; they have the power and will not be backward in enforcing it. Then, I say, let no man dare take the laws into his own hand; for where this has been permitted, as has been the case often of late in this and neighboring States, by bands of outlaws, anarchy and confusion reign.

"The Government of the United States is supreme within its sphere. With its gigantic powers, it is, as all know—and all know and feel who venerate it—benign and forgiving as mercy itself.

"It is the duty of this court, and it will always be my pleasure while I have the honor to preside here, to execute and enforce the laws, and at the same time to retain the respect and affection of the citizen to the nation."

Since this question has been before Congress, and since it has been proposed to enact additional reconstruction laws for the South, my people have become alarmed; and numbers of the best men in my district have written to me requesting that I would do all in my power to prevent any such bill as this from becoming a law. I have before me a letter, written by Judge C. D. Davis, a pupil, at one time, of the celebrated Judge Story, whose Commentaries on the Constitution are so often cited on this floor. Judge Davis has been a Republican, appointed to office by Governor Bullock—a native of Massachusetts, reared and educated in the North, who came down into our section long before the war. He is an upright man and an honest judge. Understanding that the passage of the bill of the gentleman from Massachusetts [Mr. BUTLER] was to be urged at this session, he stopped in the midst of his court, in the county of Jackson, to write me the following:

"I have just been informed that there is now pending before Congress a bill for the appointment of commissioners in each county here for the arrest and examination of persons, and binding them over for trial in the United States circuit court. Such a measure would eventuate in disaster alone, and only tend to irritate and wound more deeply the already deeply injured feelings of our people. I pray that we may be let alone."

I could read quite a number of other letters of similar tenor; but I am unwilling to trespass longer upon the attention of the House.

I ask gentlemen from the North and from the West to save the people of the South from further infliction of wrongs. They desire to be restored in good feeling and amity to their relations with the Government. They desire likewise to be protected by its laws. They wish to live in obedience to the Constitution of the United States. There is not a white citizen of my State who has not, perhaps, taken the amnesty oath. If they desire one thing more than another, it is to feel that they are again in the Union and protected by the Government from its own officers. I trust that the House will not pass this bill, but will adopt such a policy as will make the southern people feel that they are again in the Union and restored to the confidence of the Government.

Mr. GARFIELD, of Ohio, obtained the floor.

Mr. COOK and Mr. BURCHARD, by unanimous consent, obtained leave to have printed amendments which they propose to offer to the pending bill.

ELECTION IN CONNECTICUT.

Mr. KELLEY. Will the gentleman from Ohio [Mr. GARFIELD] yield to me a single moment that I may have a dispatch read?

Mr. GARFIELD, of Ohio. With pleasure.

Mr. KELLEY. It is in response to one read to this House by the gentleman from Ohio [Mr. MORGAN] the morning after the New Hampshire election.

Mr. HARRIS, of Virginia. Let it be read, of course.

Mr. ELDRIDGE. By all means.

The Clerk read as follows:

HARTFORD, CONNECTICUT, April 4, 1871.
Hon. WILLIAM D. KELLEY:
We have elected our Governor and three Congressmen; and the Democrat is, as you know, as sound a protectionist as you are.

[Laughter.]

Mr. ELDRIDGE. Now, I hope gentlemen on the other side will remember that they did not allow us to have our telegram read.

Mr. MORGAN. The States of New Hampshire and Connecticut have just elected seven members of Congress, four of whom are Democrats. We tender our congratulations to our friends on the other side upon that result. If the Democracy elect a majority of Congressmen from New England, what results will they not achieve in the other States of the Union?

PENSIONS TO SOLDIERS OF 1812.

Mr. HARRIS, of Virginia, by unanimous consent, introduced a bill (H. R. No. 323) to amend section one of the act granting pensions to the survivors of the war of 1812, approved February 14, 1871, by striking out so much of said section as excludes from the benefits of the law those who adhered to the enemies of the Government; which was read a first and second time, and referred to the Committee on Revolutionary Pensions and War of 1812.

GEORGE B. DICKSON.

Mr. BIGGS, by unanimous consent, introduced a bill (H. R. No. 324) for the relief of George B. Dickson, late assessor of internal revenue for the district of Delaware, for assessing the direct tax as levied upon the several States by act approved August 5, 1861; which was read a first and second time, and referred to the Committee of Claims.

SAMUEL V. B. STRIDER.

Mr. McGREW, by unanimous consent, introduced a bill (H. R. No. 325) for the relief of Samuel V. B. Strider; which was read a first and second time, and referred to the Committee of Claims.

JOHN SPANGLER.

Mr. McGREW also, by unanimous consent, introduced a bill (H. R. No. 326) for the relief of John Spangler; which was read a first and second time, and referred to the Committee of Claims.

Mr. GARRETT. I ask unanimous consent to introduce a bill and have it considered at this time.

The regular order of business was called for.

ENFORCEMENT OF FOURTEENTH AMENDMENT.

Mr. GARFIELD, of Ohio, addressed the House. [His speech will be published in the Appendix.]

THE DISEASE AND ITS CAUSES.

Mr. BUTLER, of Massachusetts. At the surrender of the rebel armies, in the spring of 1865, the officers and soldiers "were allowed to return to their homes" upon their paroles, "not to be disturbed by the United States authorities so long as they observe their paroles and the laws in force where they reside."

Violence and bloodshed thereupon ceased. The last great act of murder—the death of Lincoln—had so aroused the people in the North that men of the South believed that retribution would speedily follow crime. Everywhere the armies of both sections disbanded without turbulence, and the soldiers of both turned their attention to the arts of peace. The lately enfranchised negro, falsifying every prophecy to the contrary, became a willing and industrious laborer, and his rights were substantially respected by the most violent and the most criminal, so that Grant, the conqueror, passing through the South in that summer, holding the life, liberty, and property of the rebels in his hands, could well report to the President that peace had taken the place of war.

It is to be remarked that this very noticeable state of things followed immediately the conflict of arms, by which men's passions were all aroused, when the returning soldiers were out of employment, and when the scars and wounds of the freshly-ended contest were open and bleeding. What was the reason of this almost anomalous quiet? What the cause of this so sudden cessation of strife? Clearly because the rebellion in the South was overthrown by the armies of the Union; and in the presidential election just previous the votes of the people had as completely routed their Democratic allies in the North. Five States only were found to show any sympathy with secession and treason. Superadded to this was the fact that the then President of the United States was declaring from his high place that "treason was a crime to be punished, and traitors should take back seats." There was no belief in any quarter but that the Republican party, whose wise laws, determined energy, and progressive ideas had preserved the country, would rule it for the ensuing four years.

But a change came over the aspect of political affairs in the fall of 1865, when President Johnson, courting a nomination for the Presidency from the late rebels, issued pardons to traitors by the quire, and his declarations of amnesty, by his speeches and proclamations, by the ream, so that it became painfully evident that traitors were not to be punished, but were to take again the high seats of power of the nation they had betrayed.

Congress, reluctantly giving voice to the wishes of the people, that the asperities and wounds of war should be healed and forgotten, yielded step by step to what indeed it was almost powerless to prevent; and, by passing bills relieving the disabilities of traitors and acts of unguarded reconstruction, aided President Johnson in giving back political power to the men who had abused it.

The decisions of the courts practically annulled the confiscation acts, and men, red-handed from rebellion, were found besieging the Treasury of the United States for payment for losses alleged to have been suffered in the war; while the bereaved widow, the mourning mother, and the sonless father of the North were at their own bereaved hearth-stones, weeping the losses they had suffered, without indemnification or reward, save in the hope that the blood of their husbands and sons had preserved the Union of their fathers and cemented the foundation and given power to the Government to enforce tranquillity, peace, equal rights, and equal power to all men, especially to a race that had for generations been crushed down by the iron heel of slavery.

Now questions, not of the war, now began more and more to attract the public mind. Good and true men, who had stood shoulder to shoulder with ardent patriotism while the war raged, now differed on measures of finance, of the payment of the public debt, and the collection of the revenues, so that the parties seemed about to divide on these issues alone.

From such division of counsels hopes came to the Democracy; especially the defection of President Johnson, and his passing bodily over to their ranks, gave them roseate and radiant expectations in the then-coming presidential election.

Whosoever studies the history of the time will find that as Democratic hopes of rule grew apace, so did disorder, outrage, and murder with equal steps increase in the southern States.

Without pausing to give the evidences in detail of this fact, to which every student of recent history can turn, I pray to call the attention of the country and the House to the

against her people are the very surest means that could possibly be adopted to utterly defeat their object, and therefore to increase greatly the majority against them; and, if I did not value the Constitution of our common country and the liberties of the people as far above party, I should witness without regret this wreckless, wicked, and unconstitutional legislation.

Sir, I undertake to say that this bill puts on trial, so to speak, the Constitution of the United States; that in its monstrous provisions it, in effect, annihilates the States of this Union, and if passed and practically carried out it will overthrow the liberties of the people of all the States of this Republic. I do not say that the President of the United States, though the chosen head of his party, is the leader in this wicked, continued raid upon public liberty; for although the conquering chieftain in the late unfortunate internecine war, yet he exhibited to the admiration of the civilized world the grandest attributes of the true hero—generosity and kindness to conquered but brave and noble foes, when they grounded their arms and returned in good faith to their allegiance to their country.

But, sir, the Executive may have evil counselors; ay, sir, he has not only here at the seat of Government, but at the South and in my own State, men who, claiming more acquaintance with civil affairs than himself, are assiduously plying him and poisoning, perhaps, his mind, against the true friends of liberty and law and order. Be this as it may, I assert on this floor, to the people of North Carolina and to the country, that the issue is now being made up in these United States (and this bill but supplements and proves the truth of the assertion) between constitutional liberty and a military despotism; and the country must array itself on one side or the other. The great State of North Carolina, maligned, abused, and basely slandered as she has been, stands as of old for public rights, and firmly plants herself on the side of liberty and law, of right and justice.

Mr. Speaker, the unconstitutionality of this bill has been ably argued and conclusively shown by the distinguished gentleman from Indiana [Mr. KERR] and others. The force and conclusiveness of their arguments have not been weakened, in my judgment, by any speech from the other side of this House; and I call the attention of the country to these able speeches. Why, Mr. Speaker, this bill establishes, as every fair-minded man must see, executive irresponsibility in the fullest sense of the term. All the powers of the Government, if this bill pass unamended, will be absorbed in the hands of one man; and all history, with fatal uniformity, shows that the constant tendency of power is to steal from the many to the few, and where functions belonging to one department are either permitted to be exercised or are usurped by another coördinate department, that this in itself is a long and most dangerous stride toward despotism. And, sir, every member of this Congress knows, and the country will know, that the parallel and analogy is precisely found in this bill.

Sir, what right has Congress, and that, too, in time of profound peace, to delegate to the President, not merely to say when insurrection or war exists, but also to declare a State in insurrection and proclaim martial law—suspend at his will and pleasure the privilege of the great writ of *habeas corpus*? Sir, if the legal principle of *delegatus non delegare* holds good, as it does, where matters of even little importance are involved, how much more so in that most delicate question and great inalienable right, the liberty of the citizen? No, sir; the law learning of the country will declare against the constitutionality of it, and the plain sense of her free people will indignantly denounce it, and will, ere long, rebuke and repudiate alike the men and the devices by which they are now threatened with enslavement. Yes, sir, this bill proposes to delegate to the President the power to suspend the sacred writ of *habeas corpus*; thus surrendering this great and delicate power with which they are invested, and thereby transforming the President of the United States into a dictator, and entirely destroying the sovereignty of the States. This is a grant of power without authority of law, that the Father of his Country never would have allowed himself to have been invested with—a power he never should have been invested with.

Why, sir, according to my recollection, the writ of *habeas corpus* has been suspended in England but three times in one hundred and fifty years, and then by Parliament, and with limitation on the power conferred so as to protect the subject; has never been suspended in this nation but once since the formation of the Government, and in that instance by Congress, and not by the President in virtue of any authority supposed to be delegated to him by Congress. This was done by Congress in 1863, during the most fearful struggle of the late rebellion. And now, sir, Congress, in a time of profound peace, without law or constitutional authority, without a precedent in the history of the nation from its foundation, assumes the right to delegate this tremendous power to the President of the United States; fearful power to be placed by freemen in the hands of any man on earth! Sir, as an American citizen, as a North Carolinian, proud of my native State and loving her people—living as I do in the exercise and enjoyment of civil, political, and religious liberty, I solemnly declare here in my place, on the floor of the American Congress, that God never made any one man that I would trust with such a high prerogative, or into whose hands I would place such despotic power—never!

But, Mr. Speaker, I come now to some of the circumstances of the origin of this bill, and the arguments used in its favor, as it appears to be in a large degree aimed at North Carolina and at the noble people of my own district—a people dear to me, for a portion of them have trusted me with their public interests for many years, and returned me to office again and again by overwhelming majorities, and they expect me to plead their cause and demand their rights in the language of truth and soberness.

Sir, in North Carolina we have been cursed with an administration of the State government without a parallel for stupidity, recklessness, and corruption; which has sought and still seeks to perpetuate its ascendency by busy slanders of our people. Instead of defending the good name of the State, whose honor they have in trust, many of our office-holders there, and I am sorry to add some of our men in higher places, have leagued themselves with those who are willing to make political capital by manufacturing and publishing to the world the grossest and most unblushing falsehoods, to her discredit.

Our people are unfortunate to a degree that ought to excite sympathy and commiseration here, instead of indifference or hate, in that many of their public servants are their worst enemies, and are willing to thrive by the injury of their State. History has seldom presented such a spectacle. They have destroyed the credit of the State and well-nigh bankrupted the people, fixed a debt of nearly twenty million dollars upon her people, and an immense tax, too grievous to be borne, which the people can never pay; and all this immense debt with less than half a million expended for her benefit. They have placed upon the bench judges both stupid and corrupt. Now, sir, when will our countrymen of the North learn to contemn the stories of these shameless slanderers? When will the honest and intelligent people of the North be able to see, what is so manifest, that these wonderful tales of outrage and horror are almost entirely base falsehoods, manufactured by unscrupulous politicians for the purpose of "arousing the northern mind and bring the northern heart," all for party and personal aggrandizement?

Why, sir, after the most searching investigation on the part of the respondent, Governor Holden, in the recent impeachment trial at Raleigh, not a single case of what is coming to be technically denominated "outrage" was shown to have occurred in the counties of Alamance and Caswell, the counties and localities where such things are mainly charged to exist, not a single outrage for more than ten months past; but, on the contrary, all such disorders and crimes—and there were unfortunately a number in these counties—were distinctly proven to have wholly ceased there at least two months prior to the occupation of those counties by the Holden-Kirk troops. And let it be remembered those counties are but little more than forty miles from Raleigh, thus affording on that trial every facility of obtaining all the evidence touching on such outrages; and let it be also remembered that even the evidence as to the time of the commission of these alleged offenses, taken before the Senate of this body—one-sided testimony, taken with closed doors, and gotten up for the wicked occasion, for party capital—substantially corroborates that taken, so much fairer and fuller, at Raleigh.

It was further in proof, and not controverted, (I know the truth of what I say, for the testimony was printed and I have it,) that an organization known as the White Brotherhood had once existed in Alamance, (but no proof of any in Caswell,) and that upon the passage of an act of the Assembly making it a crime to go masked or disguised, a meeting of the chiefs of the White Brotherhood was held, and that organization was formally dissolved in April, 1870. It was further shown that every act committed by disguised men after that time was committed without any countenance of any secret society, and solely by improvised squads of both parties and both races, of the character of vigilance committees, and that even these had entirely ended there since April, 1870. And, sir, not a particle of evidence was produced there, or has been here, to raise even a suspicion that any man of note or prominence, either there or in any part of the State, ever, at any time, had given the slightest countenance or approval to these wicked acts and disorders.

It is unnecessary for me to say that I utterly condemn all such violations of the law, and that I deprecated and denounced them on every stump during my canvass with as much vehemence as did my able competitor; and yet, in the miserable partisanship, and one-sided testimony taken before the Senate committee my name is not mentioned as having denounced lawlessness and outrage, and as having urged the people everywhere to encourage by their voice, and aid by their influence the maintenance of the supremacy of the laws, as well as the cultivation of kind feeling for and generous conduct toward the colored race; and I undertake to say, right here, in this connection, that such is the feeling and conduct of the white toward the colored people of the State, notwithstanding the ineffable meanness of bad men, both natives and northern men, to inflame their passions and excite their feelings against their former owners and best friends.

Sir, they are daily discovering this, and are returning in thousands to their former homes and settling upon the lands they formerly cultivated. And in my district I have never known or heard of one instance of attempts by their employers to influence their votes—not one. They are a kind, docile, grateful, confiding people, and the man who would seek to deceive or mislead them, whether native or "carpet-bagger," is a bad man. And yet this has often been done by these bad, designing men, to the injury and prejudice of the colored man. Generally they vote Republican;

the South disgraceful to the nation and shocking to the civilization of the age.

It seems to me that a man must shut his eyes and close his ears and summon all his prejudices, or he must be convinced that lawlessness and disorder are holding high carnival in a large part of the domain of this nation. He must set at defiance all human testimony, and resolve that he will not believe even though the dead victims of this spirit of diabolism should rise in their bloody garments, and from their watery graves, and bear witness to the fearful fact.

But even let it be conceded that the telegraph is prolific of lies in this regard, let it be conceded that letter-writers exaggerate, let it be conceded that the newspapers are filled with untruths, still here upon this very floor, in our very midst, members of this body are the witnesses who can speak and who have spoken, and who do bear witness to the fact that the lives and property of citizens of the southern States are in peril every hour, and that the State authorities will not or cannot afford them protection, and that they can only be made safe against outlaws by the intervention of Federal authority.

Sir, I am reliably informed that not three days ago a member of this House was urged by an official, who is charged with the important duties in connection with the enforcement of the criminal law, not to vote for this bill, for the reason that he could not safely return to his home if he did. And, sir, what is the purpose of all this bloody work? I assert—and all well-authenticated evidence proves the truth of the assertion—that it is for the express purpose of controlling government in the States where these things are done, by preventing citizens from exercising their legitimate constitutional privileges. It is to overthrow by force and violence political opinion; it is to destroy by violence the freedom of the ballot-box, and therefore it is the most dangerous form of domestic violence and rebellion against the laws. My colleague said:

"The utmost extent of insubordination is confined to a very small number of persons, and they are in a few localities. They are merely common criminals, without politics or higher motives of action than the base aims of individual offenders."

I will let these gentlemen here upon this floor answer whether this "insubordination is confined to a very small number of persons" and a "few localities." "They are merely common criminals," says my colleague. Yes, in one sense they are common, unfortunately very remarkably so; but the character of their criminality is very uncommon everywhere in the wide world except in the localities lately darkened by rebellion.

If my colleague means that they are to be classed with the ordinary criminals of the country, as I suppose he does, I must beg to differ with him. Men who bind themselves together by oaths to do deeds of cold-blooded murder and perpetrate every other crime that has ever been denounced by the laws of God or man, who mask themselves and perpetrate deeds that would shame a savage, are no ordinary criminals. They are men schooled in crime. They are sprouts of that greatest of all crimes, treason. And when my colleague says that they are "without politics" I must differ with him again. What is the purpose of murdering poor and defenseless negroes? Is it for gain or "the base aims of individual offenders?" No. What is the purpose of driving officers from their places? Is it for gain or the "base aims of individual offenders?" No. It is to get rid of votes, to get possession of local and State governments.

My colleague almost admits this, for in the same connection he says:

"It is undoubtedly true that millions of people, good, loyal, and true, dislike some of the southern State governments as now organized. It is not in the power of intelligent and virtuous citizens to do less."

That is by way of apology for these outrages. They "dislike" the "State governments."

Therefore these outrages are committed. What for? I know of but one legitimate deduction from the language, and that is to get rid of either the State governments or those who hold offices under them. This looks as though they were not entirely "without politics." But why do they dislike the "State governments?" These are States with republican forms of government; the officers are elected by the people; what is the matter with these governments that these "intelligent and virtuous citizens" should "dislike" them? I think I can furnish a solution of the meaning of my colleague when he says that they "dislike the State governments as now organized."

Further on he says:

"Remove from them all disabilities, and thus invite them to assume again all the rights, capacities, and responsibilities of freemen; let them organize their local governments in the persons of their best citizens; do not force upon them bad, corrupt, and incompetent officers, nor attempt to govern then by strangers, nor give the legal, moral, or partisan support of Congress to the political plunderers and oppressors who have so long run riot among them. Then you may hope for speedy restoration of law, order, peace, real and enduring, in the South."

That tells the whole story. There must be lawlessness and disorder or there could be no restoration of "law, order, and peace."

But, sir, when is this delightful state of tranquillity to come? It is when these violators of law, these disturbers of the peace, have acquired control of the local governments. Then law, order, and peace are to prevail. But the inference is that until then the work of blood shall still go on. Does this look as though there was no politics in this business? No, sir; it is a confession that politics is at the bottom of it all. It means that this is a struggle for political power. It means that it is an effort to get control of government by violence; it means that those who cast ballots must become subservient to the will of those who "dislike the State governments as now organized;" and, failing to do so, this work must go on until death or intimidation shall end the exercise of the highest constitutional rights and privileges of unoffending American citizens.

But suppose it should turn out that these things are exaggerated? Having the constitutional power to do so, what possible harm can there be in placing upon the statute-book a law denouncing such acts as it is charged are being committed, and such organizations as are alleged to exist, as great and heinous crimes to be punished by appropriate penalties? If no scourgings, no burnings, no murders are perpetrated, who will be injured? If there are no such lawless conspirators there will be no one to be punished as such. If all is peace and order there will be no infliction of penalties. Why is it, then, and all Christendom will ask why it is, that there is such a persistent effort to prevent legislation to maintain the equal rights of every citizen before the law?

I remember that there was a time in the history of this nation when its very existence was in peril. I remember that here on the floor of this House, and also in the body that occupies the further end of the Capitol, no measure could be suggested to keep the peace and preserve the Government that did not meet with determined opposition and fierce and bitter denunciation. Can it be that the same spirit that then pervaded these Halls and stalked about through the land is rioting here now? If one half that is told us is true, and protection is not afforded these unoffending citizens by the General Government that owes them protection, the next thing will be a resort to the instincts of all animated nature, to a law that rises high above all human enactments, the law which prompts and justifies self-protection. That involves civil strife and anarchy and the destruction of all law, and the numberless evils that follow in its train.

If it should hereafter become manifest that we have been misinformed; that these troubles only existed in perverted imaginations, no harm will come from the legislation proposed. If they do exist, now is the time to smite them down, now is the time to strike, now is the time to make these disturbers of the peace, these violators of individual rights, feel the power of the Government, and to teach them that there is not of all the thirty-eight millions of the citizens of this nation one so humble that his rights under the Constitution and laws can be lawlessly smitten unnoticed to the ground.

Sir, we ought to learn a lesson from the past. In the State of Indiana, during the rebellion, there existed an organization of oathbound conspirators, working in the dark, drilling in the night for the purpose of seizing the government of that State and plunging it into open rebellion against the Constitution and laws of the nation. The day was fixed when they would "let slip the dogs of war." At the appointed time these conspirators were secretly gathering about the capital, prepared for their desperate work, and but for the vigilance and prompt action of the State and Federal authorities Indiana would have been scourged and blackened with civil strife.

And so it will be now in the South unless the Ku Klux organizations existing there are confronted with the majesty of the law. Let us provide for the punishment of these men for their lawlessness and conspiracies, and then we may confidently hope that "law, order, and peace will be restored to the South" and the nation.

[During the delivery of the foregoing speech, the ten minutes having expired, Mr. PACKARD obtained the floor and yielded his time to enable Mr. WILSON, of Indiana, to conclude his remarks.]

Mr. HARRIS, of Virginia. Mr. Speaker, in the few minutes allotted to me, I do not intend to discuss the general merits of this bill. But there is one feature of it which strikes me as being sufficient to condemn it even in the estimation of its friends, as it must in the judgment of the country. This bill presents an aspect of jurisprudence which I have never seen in any legislation. In the various States of this Union, as in England, there are laws for the punishment of offenses, and also laws to punish attempts to commit offenses; but both in England and America the laws punish the *attempt* with less severity than the actual commission of the offense. But this bill presents the anomaly of inflicting for the *attempt* to commit an offense a higher degree of punishment than is allotted to the offense when committed. In other words, by this bill a conspiracy of two or more persons to commit an assault and battery is made a *felony*, punishable by ten years' imprisonment in the penitentiary and a fine of $10,000, while assault and battery committed by one man is a misdemeanor, and may be punished by a fine of one cent and costs.

I appeal to members of the legal profession to say whether in the history of the law they have ever witnessed such an anomaly as that. And I appeal to gentlemen from the North to say whether their own section of country will stand legislation like that? Are they willing to say that when two men combine together to commit assault and battery, but fail to carry out their intent, fail to hurt a hair of the head of anybody, they shall be convicted of felony, sent to the penitentiary for ten years, and subjected to a fine of $10,000? That is the effect of this bill. Not only that; but if two men conspire and combine for the purpose of committing an offense, yet do not commit it, and do any act toward its commission, the President of the United States, under the third section, is empowered to declare martial law and send troops to that portion of the country. When a man has conceived the design of committing an offense, and has done any act in furtherance of the design, this bill allows him no opportunity to repent of his intention. The offense is then complete with all its horrible consequences to the party and the country.

tion to deprive a citizen of a right secured to him by the Constitution of the United States.

Mr. ELDRIDGE. But when it is of that magnitude, does it not amount to an insurrection or rebellion?

Mr. COOK. It might or might not. Suppose the combination in the State is too strong for the State laws to restrain it; and suppose a hundred men not engaged in that combination at all should form a conspiracy, by force, intimidation, or threats to prevent the Governor from calling upon the national power to protect the right of the citizen, that would be an offense against the Constitution of the United States.

Mr. FARNSWORTH. How prevent the Governor from doing that?

Mr. COOK. By intimidation, by threats.

Mr. BINGHAM. By making him a prisoner.

Mr. POTTER. Then the Lieutenant Governor would take his place.

Mr. FARNSWORTH. Does this bill provide for the case of the Governor being so intimidated?

Mr. COOK. No, sir. I use the illustration only in reply to the gentleman from Wisconsin, to show that where individual rights, secured by the Constitution of the United States, are affected by combination, such combinations are offenses against the United States. Let me make an illustration which my colleague [Mr. FARNSWORTH] will appreciate. In our State, not many years ago, there was a law passed which provided that no property should be sold upon a judgment of a court, by virtue of an execution, unless that property should bring two thirds of its appraised value. Now, a citizen of the State of New York sued a citizen of our State, and got a judgment against him, to be discharged under our laws. He appealed to the supreme court of our State, and our supreme court sustained that law. I am narrating a history which my colleague well knows. Then the citizen of the State of New York, claiming that that law was a violation of a right secured to him by the Constitution of the United States, which provided that no State should impair the obligation of contracts, claimed an appeal to the Supreme Court of the United States.

Now, sir, if my colleague and myself, and a hundred others in my State, who desired to pay our debts in real estate at two thirds of the appraised value, which we might be able to get our neighbors to place upon it for that purpose, if we had conspired to prevent the clerk of the court from certifying the case to the Supreme Court of the United States, and thus deprived that plaintiff of a right under the Constitution of the United States, we should have been committing an offense against the United States which might be punished by national law.

I think if the Government of the United States may not protect a citizen in the exercise and enjoyment of a right secured to him by the Constitution of the United States, it cannot rightfully demand of that citizen any allegiance to that Government, in its constitutional sphere. The duty of allegiance and the right of protection cannot be separated.

Now, sir, there are other illustrations of this principle which I might cite. A citizen of the United States, in any State of the Union, has a right to vote for any officer of the United States Government. He has a right to have his cause tried within a United States Federal court where that court has jurisdiction of the case. Now, if there be any combination of men who shall combine and conspire together for the purpose of preventing a legal voter from giving his vote or a witness from testifying in a court of the United States in a proper case, or to compel a jury in a United States court to give a false verdict, or to punish him for giving a true verdict, or to punish a witness for testifying truthfully, that combination is an offense against the United States; for the simple reason, easily understood, that it seeks to deprive a citizen of the United States of a right guarantied to him by the Constitution of the United States. If you can touch in any point or particle any right of a citizen secured by the Constitution of the United States, you might, upon the same principle and by the same logic, overthrow the entire Constitution and destroy the whole Government. If we have not a right to legislate for the defense of every right secured by the Constitution we have no authority to legislate for the security of any right. That seems to be perfectly plain.

I must hurry on. I cannot amplify as I would like to do. But there is one other illustration which I would like to make. I, as a citizen of a State, have a right to support and advocate the election of any qualified person to any office under the United States Government. That is a right which is secured to me by the Constitution of the United States. Any combination of men who shall conspire to prevent me from advocating the election of any qualified person to any office under the Government of the United States, or to a seat in this House, is an offense against the Government of the United States, for such a combination or conspiracy strikes down a right secured to me by the Constitution as a citizen of the United States. The citizen, in the support or advocacy of any qualified person to an office under the national Government, is exercising a right secured to him clearly by the fundamental law of this nation. Hence, a combination to deprive the citizen of that right, or to punish him for its exercise, is an offense against the United States, and may be so declared and punished by national law.

Mr. ELDRIDGE. I would like the gentleman to state how he applies his doctrine to a case which arose a few years ago in the State of Wisconsin—the Booth case—in which the Supreme Court of the United States issued a *certiorari* to the supreme court of Wisconsin requiring the latter court to send up a record. The State court refused to do so. It was a case arising under the fugitive slave law; and the State put itself in direct opposition to the United States. The Supreme Court of the United States did not pretend to say that there was any power to punish those judges of the State court; it simply made an order that some other certificate should be sufficient, and upon that the Supreme Court acted. No prosecution was ever undertaken against those State judges. I ask the gentleman whether that is such a case as he thinks might be punished?

Mr. COOK. I ask the gentleman to state his own view, whether, in his opinion, it is a case which might be punished.

Mr. ELDRIDGE. That is a convenient way of evading my question; but I will say that in my opinion the case presented no offense under the Constitution of the United States.

Mr. COOK. I will answer the gentleman's question. If an attempt had been made to prevent a record being certified to the Supreme Court in a proper case by force, intimidation, or threat, it would have been an act which the national Government might prohibit by law, and if done in violation of a law might punish. We have the right to so frame the law that a man shall not be deprived of a hearing in the Supreme Court of the United States in a proper case by unlawful means.

Mr. ELDRIDGE. The Federal Government had no power in that case to require the action of the State officers; it had no control over them.

Mr. COOK. That is an entirely different question from the one whether the Government of the United States may punish a set of men who combine to prevent, by intimidation, force, or fraud, the exercise of the rights of a citizen. The gentleman must understand that.

Mr. ELDRIDGE. The State officers in the case I mention not only threatened not to do the act, but refused to do it and did not do it.

Mr. COOK. But they acted judicially; they did not propose to deprive a citizen of his right by violence. There was no force, intimidation, or threat.

Mr. ELDRIDGE. Oh, yes; and they were sustained by the whole Republican party.

Mr. COOK. No matter; I must go on with my argument, for I have but very little time. It does not matter whether a constitutional right is enacted into a law or not, so far as the existence of the right is concerned. And when you come to punish a combination, to deprive a citizen of such right, every lawyer knows that the combination to do any unlawful act may be declared a crime.

The combination may be to do an act not in itself a crime but simply unlawful, but a combination to do that unlawful act is a crime; or, so is a combination to do a lawful act by unlawful means. Every lawyer understands this principle. There are rights secured by the fourteenth article of amendments. What are those rights? The amendment provides that no State shall deny to any portion of its citizens the equal protection of the laws. That is the right which the Constitution secures to every citizen of the United States, to have the equal protection of the laws, the equal protection of the laws through the executive, and through the legislative and the judicial departments of every State government, and every combination of men by force and intimidation or threat to prevent the Governor of a State calling upon the Executive of the United States to secure the aid of the United States to protect the rights of all citizens alike, or to induce the Legislature of a State by unlawful means to deprive citizens of the equal protection of the laws, or to induce the courts to deny citizens the equal protection of the laws under the Constitution of the United States is the offense against the Constitution of the United States, and may be defined and punished by national law. And that, sir, is the distinct principle upon which this bill is founded.

[Here the hammer fell.]

Mr. BIRD addressed the House. [His speech will be published in the Appendix.]

Mr. TYNER. Seven days debate on the pending bill have been sufficient to indicate all of good and to foreshadow all of evil to be accomplished by its passage. The friends and the enemies of the measure ought now to be content to submit it to the ordeal of amendments and a vote. If others were willing to do likewise, I would not be found prolonging this discussion. But I have caught the common infection, and must, in the ten minutes allotted me, sum up as best I can the reasons that will influence my vote. The vote itself will doubtless be satisfactory to those who sent me here and the reasons I shall offer to fortify it may not increase their approval.

I will not commit the silly blunder of discussing in ten minutes the constitutional questions involved. My business is simply to refer to some of the facts on which legislation is now to be based.

The necessity of legislation to protect the life, liberty, property, and immunities of citizens of the States lately in rebellion ought not to astonish any one. It was to have been expected from the upheaving of the foundations on which society there rested. One third of an entire population, in the full enjoyment of all their rights as citizens, with all their privileges undisturbed, and with a representation in the national councils based, not only on their own numbers, but on a part of their property also, for reasons unsatisfactory to the balance of the world, rashly determined to submit their destiny to the arbitrament of the sword. They were defeated, as all armed enemies of a just Government deserve to be. Humiliated by defeat, inflamed by passion, bankrupted in property, and reduced from the

ligence, and propriety of life are as much prized as anywhere on earth, and I never held any office of profit or salary until I held the office of brigadier general, by which I was enabled to bring the rebel associates of the gentleman from Baltimore on their knees to me. [Laughter on the Democratic side.]

Mr. SWANN. Never, sir; never.

Mr. BUTLER, of Massachusetts. I never held any other except that of Representative of the people. I represent a district which knows me. I represent a community who know me my life long, and their continued confidence, may I say their ever-increasing confidence?—for which I humbly thank my God, for it is the only protection I need against slander and detraction—their ever-increasing confidence in me is the best answer to all calumnies. Why, sir, Washington was denounced by the enemies of the country as a speculator for founding this capital. Jackson was placarded in the streets of London as a tyrant and a beast because he stood for the liberties of the country. I am the only American beside him that has been so honored. I have been in the same way attacked by the same kind of men. [Laughter on the Democratic side.] Yes, sir, by precisely the same kind of men—English aristocrats who desired the destruction of the country, and sneaking southern rebels who were in league with them, [renewed laughter on the Democratic side;] men who, after having been Know-Nothings, after having advised the burning of churches, Catholic-Irish churches, now pander to the Catholic-Irish votes, to get here to represent the city of Baltimore. [Laughter and applause.]

[Here the hammer fell.]

SAN DOMINGO.

The SPEAKER, by unanimous consent, laid before the House the following message from the President of the United States:

*To the Senate and House of Representatives:*

I have the honor to submit herewith to the two Houses of Congress the report of the commissioners appointed in pursuance of joint resolution approved January 12, 1871.

It will be observed that this report more than sustains all that I have heretofore said in regard to the productiveness and healthfulness of the republic of San Domingo; of the unanimity of the people for annexation to the United States, and of their peaceable character.

It is due to the public, as it certainly is to myself, that I should here give all the circumstances which first led to the negotiation of a treaty for the annexation of the republic of San Domingo to the United States.

When I accepted the arduous and responsible position which I now hold I did not dream of instituting any steps for the acquisition of insular possessions. I believed, however, that our institutions were broad enough to extend over the entire continent as rapidly as other peoples might desire to bring themselves under our protection. I believed further that we should not permit any independent Government within the limits of North America to pass from a condition of independence to one of ownership or protection under a European Power.

Soon after my inauguration as President I was waited upon by an agent of President Baez, with a proposition to annex the republic of San Domingo to the United States. This gentleman represented the capacity of the island, the desire of the people, and their character and habits about as they have been described by the commissioners, whose report accompanies this message. He stated further that, being weak in numbers and poor in purse, they were not capable of developing their great resources, that the people had no incentive to industry on account of lack of protection for their accumulations; and that if not accepted by the United States with institutions which they loved above those of any other nation, they would be compelled to seek protection elsewhere. To these statements I made no reply, and gave no indication of what I thought of the proposition. In the course of time I was waited upon by a second gentleman from San Domingo, who made the same representations, and who was received in like manner.

In view of the facts which had been laid before me, and with an earnest desire to maintain the "Monroe doctrine," I believed that I would be derelict in my duty if I did not take measures to ascertain the exact wish of the Government and inhabitants of the republic of San Domingo in regard to annexation, and communicate the information to the people of the United States. Under the attending circumstances I felt that if I turned a deaf ear to this appeal I might, in the future, be justly charged with a flagrant neglect of the public interests and an utter disregard of the welfare of a downtrodden race, praying for the blessings of a free and strong Government and for protection in the enjoyment of the fruits of their own industry.

Those opponents of annexation who have heretofore professed to be preëminently the friends of the rights of man I believed would be my most violent assailants if I neglected so clear a duty. Accordingly, after having appointed a commissioner to visit the island, who declined on account of sickness, I selected a second gentleman, in whose capacity, judgment, and integrity I had, and have yet, the most unbounded confidence. He visited San Domingo, not to secure or hasten annexation, but, unprejudiced and unbiased, to learn all the facts about the Government, the people, and the resources of that republic. He went certainly as well prepared to make an unfavorable report as a favorable one, if the facts warranted it. His report fully corroborated the views of previous commissioners, and upon its receipt I felt that a sense of duty and a due regard for our great national interests required me to negotiate a treaty for the acquisition of the republic of San Domingo.

As soon as it became publicly known that such a treaty had been negotiated the attention of the country was occupied with allegations calculated to prejudice the merits of the case, and with aspersions upon those whose duty had connected them with it. Amid the public excitement thus created the treaty failed to receive the requisite two-thirds vote of the Senate, and was rejected; but whether the action of that body was based wholly upon the merits of the treaty, or might not have been, in some degree, influenced by such unfounded allegations, could not be known by the people, because the debates of the Senate in secret session are not published. Under these circumstances I deemed it due to the office which I hold, and due to the character of the agents who had been charged with the investigation, that such proceedings should be had as would enable the people to know the truth. A commission was therefore constituted, under authority of Congress, consisting of gentlemen selected with special reference to their high character and capacity for the laborious work intrusted to them, who were instructed to visit the spot and report upon the facts. Other eminent citizens were requested to accompany the commission, in order that the people might have the benefit of their views. Students of science and correspondents of the press, without regard to political opinions, were invited to join the expedition, and their numbers were limited only by the capacity of the vessel.

The mere rejection by the Senate of a treaty negotiated by the President only indicates a difference of opinion between two coördinate departments of the Government, without touching the character or wounding the pride of either. But when such rejection takes place simultaneously with charges openly made of corruption on the part of the President, or of those employed by him, the case is different. Indeed, in such case, the honor of the nation demands investigation. This has been accomplished by the report of the commissioners, herewith transmitted, and which fully vindicates the purity of the motives and action of those who represented the United States in the negotiations.

And now my task is finished, and with it ends all personal solicitude upon the subject. My duty being done, yours begins; and I gladly hand over the whole matter to the judgment of the American people and of their representatives in Congress assembled. The facts will now be spread before the country, and a decision rendered by that tribunal whose convictions so seldom err, and against whose will I have no policy to enforce. My opinion remains unchanged—indeed, it is confirmed by the report—that the interest of our country and of San Domingo alike invite the annexation of that republic.

In view of the difference of opinion upon this subject, I suggest that no action be taken at the present session beyond the printing and general dissemination of the report. Before the next session of Congress the people will have considered the subject, and formed an intelligent opinion concerning it; to which opinion, deliberately made up, it will be the duty of every department of the Government to give heed; and no one will more cheerfully conform to it than myself. It is not only the theory of our Constitution that the will of the people, constitutionally expressed, is the supreme law, but I have ever believed that "all men are wiser than any one man;" and if the people, upon a full presentation of the facts, shall decide that the annexation of the republic is not desirable, every department of the Government ought to acquiesce in that decision.

In again submitting to Congress a subject upon which public sentiment has been divided, and which has been made the occasion of acrimonious debates in Congress, as well as of unjust aspersions elsewhere, I may, I trust, be indulged in a single remark. No man could hope to perform duties so delicate and responsible as pertain to the presidential office without sometimes incurring the hostility of those who deem their opinions and wishes treated with insufficient consideration; and he who undertakes to conduct the affairs of a great Government as a faithful public servant, if sustained by the approval of his own conscience, may rely with confidence upon the candor and intelligence of a free people, whose best interest he has striven to subserve, and can bear with patience the censure of disappointed men.

U. S. GRANT.

EXECUTIVE MANSION, *April 5, 1871.*

Mr. DICKEY. I move that the message and accompanying documents be referred to the Committee on Foreign Affairs when appointed, and that they be ordered to be printed.

Mr. BROOKS, of New York. I hope the gentleman will tell us who these disappointed men are. They are not on our side.

Mr. DICKEY. I judge from the reading of that message the disappointed gentlemen are all on that side.

Mr. KELLEY. I wish to move that twenty-five thousand extra copies of the message and documents be printed.

Mr. BROOKS, of New York. I hope that will not be done.

The SPEAKER. Under the law it must go to the Committee on Printing.

Mr. DICKEY. I demand the previous question on my motion.

The previous question was seconded and the main question ordered; and under the operation thereof the motion was agreed to.

Mr. DICKEY moved to reconsider the vote by which the motion was agreed to; and also moved that the motion to reconsider be laid on the table.

The latter motion was agreed to.

Mr. KELLEY. I now ask unanimous consent to submit a resolution for the printing of twenty-five thousand extra copies.

Mr. COX. I object.

APPORTIONMENT OF REPRESENTATION.

Mr. MERCUR, by unanimous consent, introduced a bill (H. R. No. 828) for the apportionment of Representatives to Congress among the several States according to the ninth census; which was read a first and second time, referred to the Committee on the Judiciary when appointed, and ordered to be printed.

W. T. GREEN.

Mr. HARPER asked and obtained unanimous consent for the withdrawal from the files of the House of the papers in the case of W. P. Green.

LEAVE OF ABSENCE.

Mr. PRICE, by unanimous consent, obtained leave of absence for twenty days from and after to-morrow.

Mr. BLAIR, of Missouri, by unanimous consent, obtained indefinite leave of absence.

LEAVE TO PRINT.

Mr. NIBLACK obtained unanimous consent to have printed in the Globe some remarks he had prepared on the bill for the enforcement of the fourteenth amendment. [See Appendix.]

Mr. MERRIAM also obtained unanimous consent to have printed in the Globe remarks be had prepared on the same bill. [See Appendix.]

WALTER STAFFORD.

Mr. LEWIS asked and obtained unanimous consent to have withdrawn from the files of the House the papers in the case of Walter Stafford, heretofore referred to the Committee on Military Affairs of the Forty-First Congress.

J. T. CHUTKOWSKI.

On motion of Mr. COX, by unanimous consent, leave was given to withdraw from the files of the House the papers in the case of J. T. Chutkowski.

ALFRED L. CONCHON.

On motion of Mr. EDWARDS, by unanimous consent, leave was given to withdraw from the files of the House all papers relating to the claim of Alfred L. Conchon for a wagon taken from him in Arkansas by the military authorities of the United States.

J. H. GARGES AND JAMES CRUX.

On motion of Mr. POLAND, by unanimous consent, leave was given to withdraw from the files of the House the papers of John H. Garges and James Crux.

ENTRY OF FERRY-BOATS, ETC.

Mr. CONGER, by unanimous consent, introduced a bill (H. R. No. 829) relative to the

Illinois that never until the Federal Government got right did the people of that State rise high enough to give liberty and protect all men in their liberty. In the State of Illinois they had black laws almost as atrocious as they had in South Carolina.

Mr. TRUMBULL. We did have some objectionable laws in the early history of the State; there may have been mobs in Illinois as there have been in Boston; but, speaking generally, there was always freedom of discussion and of the press in my State.

I beg pardon of the Senate for having taken up so much time. I did not intend when I rose to occupy its attention twenty minutes, and now I would rather finish unless I am wearisome to the Senate. I wanted to call attention to this bill, and if I am not diverted by interruptions I shall be through in a very few moments.

I had stated that I did not suppose the Senator from Vermont was in favor—and I might say I was quite well satisfied he was not—of entering the States to pass a general criminal code for the States, or a general law for the redress of civil injuries in the courts in cases of contest between individuals, where the Constitution and laws of the United States were not directly encroached upon. Assuming that to be so, and that that is the opinion of every member of the Senate, I should like now to get the attention of Senators a moment, and especially of the lawyers of the body, to a single amendment in the seventeenth line of the second section. The Judiciary Committee propose to insert the words "or while engaged in the." I think that changes the whole character of that section. Let me show how.

As the bill originally stood as it came from the House, it provided for the punishment of a conspiracy to injure a person holding a United States office in his person or property on account of his lawful discharge of the duties of his office. That is legitimate. I can vote for a law that punishes a conspiracy to injure a United States officer on account of his lawful discharge of the duties of his office. But what is the amendment? Its effect is to punish a conspiracy to injure his property "while he is engaged in the lawful discharge of his duties." Is not that very different? To illustrate: the Senator who sits before me [Mr. HAMILTON of Maryland] has a very valuable farm over in Maryland, I assume; I suppose he has; if he has not he ought to have half a dozen. Suppose while he is here in the discharge of the duties of his office somebody trespasses upon his farm; suppose two or three persons get together and make a combination for the purpose of breaking into his barn and stealing his grain, if you please; that is made a United States offense, and they are to be punished in the United States courts with imprisonment for not less than six months nor more than six years.

Mr. EDMUNDS. May I ask my friend a question at this point?

Mr. TRUMBULL. Certainly.

Mr. EDMUNDS. This, he will see, applies to officers of the United States. Let me ask him if within the period of two years he has not united with this Senate, without a division of parties, in passing a bill which punished everybody for assaulting or beating any officer of the United States, marshal or collector, or anybody while engaged in performing the duties of his office, and even while going from and returning to his home when he had gone from his home for the purpose of performing those duties, or was returning?

I am not certain in my recollection about this last inquiry; but let me ask my friend if he and I did not vote for a bill two years ago which provided in broader terms than this as to some parts of it, but certainly as broad, for punishing everybody who undertook to assault the person or destroy the property of an officer while he was engaged in performing the duties of the office which his commission under the United States authorized him to perform?

Mr. TRUMBULL. I do not remember whether I voted for that law or not; but I will say to the Senator from Vermont that I am ready to vote and will vote now if it is necessary, if we have not got one already, for a law to punish anybody that obstructs an officer of the United States or makes an assault upon him while engaged in the discharge of his duties.

Mr. EDMUNDS. But you will not punish a conspiracy to do the same thing!

Mr. TRUMBULL. I will punish a conspiracy to assault an officer on account of his being engaged in the duties of his office, or when he is engaged in the duties of his office; but I will not punish a conspiracy to steal his apples out in Illinois when he is performing duties in Washington. I think the cases are very different. This is an injury to his property. My friend from Vermont sees as quickly as any one the distinction between these cases. It is one thing to resist an officer, and another to make an attack upon a man's property.

Mr. EDMUNDS. Is my friend sure that he did not vote for a bill which provided a punishment for attacking his property?

Mr. TRUMBULL. I am not. I do not recollect the provisions of all the bills we have passed. I said that I was willing to protect the officer in the discharge of his duties, but there is no such divinity hedging about a person, because he is an officer of the United States, that when he has a controversy with his neighbors as to the ownership of a tract of land that cause must be brought into the Federal courts, or that when they combine to trespass upon the disputed property, the act having nothing to do with his official duties, that it is to be made a penal offense against the United States.

Mr. President, if I have made myself understood, I have said all I desire to say in reference to this amendment. I wish now to call attention to another amendment in the same section, section two, on lines thirty-six, thirty-seven, thirty-eight, thirty-nine, and forty, which is obnoxious to the same objection that I have made to the other amendment. That amendment proposes to punish two or more persons who "conspire together for the purpose of in any manner impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws."

I do not deny the authority to punish a conspiracy for the purpose of denying to any citizen of the United States the due and equal protection of the laws. We have a right to punish such a conspiracy; but that is not this amendment. This amendment punishes a conspiracy to impede or obstruct the due course of justice in a State. That is the conspiracy that it punishes; not the conspiracy to deny the citizen the equal protection of the laws, but the conspiracy to defeat the due course of justice, with intent, it is true, to deny to any citizen the equal protection of the laws. That must be the intent; but the intent is not the thing that is punished. It is not the substantive part of the offense. If it is, then it is provided for in the four preceding lines. If this clause simply means to punish a conspiracy to deny the equal protection of the laws, that is provided for in the previous lines, commencing with line thirty-four.

Mr. EDMUNDS. Is not that the due course of justice of the State courts?

Mr. TRUMBULL. The language of the amendment is:

For the purpose of in any manner impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws.

A conspiracy to deny to citizens of the United States the due and equal protection of the laws, I submit to the Senator from Vermont, comes within lines thirty-four, thirty-five, and thirty-six, which provide for punishing a conspiracy "for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws." So that if that is all that the Senator means, it is already provided for. If he means more than that, and to punish a conspiracy against the State, then I am opposed to it.

Mr. EDMUNDS. Now will the Senator allow me to say a word if it does not interrupt him?

Mr. TRUMBULL. Certainly.

Mr. EDMUNDS. We are both of us in favor of the general principle of this bill, I have no doubt thoroughly, and we are both of us equally sincere in the desire to make it, as far as it goes, effectual, so that the violent people we design to repress will be taught to behave themselves. Now, I submit to my friend whether those three lines, thirty-four, thirty-five, and thirty-six, beginning in the disjunctive at the end of line thirty-three, do not, in express terms, provide for punishing a conspiracy formed "for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws." What laws? The laws of that State. Therefore the bill as it came from the House, of which I understand my friend to be in favor, expressly provides for punishing a conspiracy to obstruct the State authorities by a general name, (the Executive, the military, the judiciary, every department of the State,) in giving to everybody the equal protection of their own laws.

Now, if my friend will pardon me a little further, I wish to ask him this question: I ask if he does not know that the object of this amendment was, in the same spirit and with the same scope, instead of using those vague generalities, which it might be thought would be difficult in a court of justice to define and enforce, to take up, as another mode of expressing the same general idea, words that are known to previous statutes, that are known to the courts, technically defining an offense that is well known of obstructing the State authorities in the course of executing justice. That was all that we meant, and with the intent we have named, which really, it seems to me, narrows what is the point of the scope of the previous clause.

Mr. TRUMBULL. If this last clause is embraced within the other, as I have said, there is no occasion for it. If it is not embraced within the other then it means something more than the other, and is the punishment of a conspiracy against the execution of a State law, and that I do not think we can punish. If that provision were in the original bill, if it were susceptible of that construction, I think it would be objectionable.

Mr. EDMUNDS. What do you understand that to mean?

Mr. TRUMBULL. I should have to read the whole section back, and I do not care to go into that at this moment.

Section three, I think, is made objectionable by striking out the words in the third line "so far obstruct or hinder the execution of the laws thereof and of the United States as to." In order to make myself understood I will read that section as I now understand it with the amendment that has been made striking out the words I have just read and including the words in lines seven and eight, which are inserted in the bill, or a portion of those words. Of course I cannot be understood in the remarks I am making except by Senators who have the bill before them. The Senator from Vermont will see the point I make. I will read the section leaving out the surplusage:

That in all cases where domestic violence in any State shall obstruct the impartial course of justice, and the constituted authorities of such State shall from any cause fail in protection of the people in such rights, it shall be lawful for the President to employ the land and naval forces, &c.