## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BENNIE G. THOMPSON, et al., | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) Civil Case No. 1:21-cv-00400 APM |
| v. | ) |
| | ) |
| DONALD J. TRUMP, et al., | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## REPLY IN SUPPORT OF PRESIDENT TRUMP'S
## MOTION TO DISMISS

Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
*Attorney for Donald J. Trump*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................I

TABLE OF AUTHORITIES............................................................................II

I.      The Constitution Forecloses Plaintiffs' Claims.................................. 1

    a.      President Trump is Absolutely Immune. .................................... 1
    b.      President Trump's political speech was protected by the First
    Amendment............................................................................... 7

II.     Plaintiffs Lack Standing. ................................................................ 15

    a.      Whether Plaintiffs claims are covered by the terms of the statute
    is a threshold matter properly considered in this Motion to
    Dismiss.................................................................................... 15
    b.      Plaintiffs are not covered by § 1985(1) because under controlling
    Supreme Court precedent, that statute only grants a cause of
    action based on injuries to federal officers. ............................... 16

III.    Plaintiffs Fail to State a Claim Upon Which Relief May be Granted.
    20

    a.      Plaintiffs Do Not Adequately Allege All Elements for a
    Conspiracy Claim as There are Not Enough Factually Supported
    Claims for the Court to Plausibly Find President Trump Had
    Knowledge or Intent. ............................................................... 21

CONCLUSION ......................................................................... 26

CERTIFICATE OF SERVICE ................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*,

   1 F.4th 180 (4th Cir. 2021)......................................................................... 6

*Bell Atlantic Corp. v. Twombly*,

   550 U.S. 544 (2007) .................................................................................. 21

*Brandenburg v. Ohio*,

   395 U.S. 444 (1969) .................................................................................... 8

*Canlis v. San Joaquin Sheriff's Posse Comitatus*,

   641 F.2d 711 (9th Cir. 1981). ................................................................... 18

*Diulus v. Churchill Valley Country Club*,

   601 F. Supp 677 (W.D. Pa. 1985) ............................................................ 19

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,

   561 U.S. 477 (2010) ............................................................................. 4, 19

*Griffin v. Breckenridge*,

   403 U.S. 88 (1971) ............................................................................. 16, 17

*Halberstam v. Welch*,

   705 F.2d 472 (D.C. Cir. 1983) ................................................................. 23

*Halperin v. Kissinger*,

   578 F. Supp. 231 (D.D.C. 1984 .................................................................. 4

*Hampton v. Hanrahan,*

    600 F.2d 600 (7th Cir. 1979) ................................................................................... 22

*Hobson v. Wilson,*

    737 F.2d 1 (D.C. Cir. 1984) ..................................................................................... 22

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*

    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................................. 21

*Jin v. Ministry of State Sec.,*

    335 F. Supp. 2d 72 (D.D.C. 2004) .......................................................................... 22

*Knight First Amend. Inst. at Colum. Univ. v. Trump,*

    928 F.3d 226 (2d Cir. 2019) ....................................................................................... 5

*Kush v. Rutledge,*

    460 U.S. 719 (1983) ................................................................................................. 18

*Lewis v. News-Press & Gazette Co.,*

    782 F. Supp. 1338 (W.D. Mo. 1992) ...................................................................... 20

*Lobosco v. Falsetti,*

    No. 09–01455, 2010 WL 4366209 (D.N.J. Oct. 28, 2010) ...................................... 18

*Lynch v. President of the U.S.,*

    2009 WL 2949776 (N.D. Tex. Sept. 14, 2009) ......................................................... 5

*Miller v. Indiana Hosp.,*

    562 F. Supp. 1259 (3d Cir. 1983) ........................................................................... 18

*Morse v. Frederick,*

    551 U.S. 393 (2007) ................................................................................................. 14

*Myers v. U.S.,*

　272 U.S. 52 (1926) ................................................................................. 3

*Nixon v. Fitzgerald,*

　457 U.S. 731 (1982) ............................................................................... 2

*Sines v. Kessler,*

　324 F. Supp. 3d 765 (W.D. Va. 2018) .................................................. 23

*Snyder v. Phelps,*

　562 U.S. 443 (2011) ............................................................................... 4

*Stern v. U.S. Gypsum, Inc.,*

　547 F.2d 1329 (7th Cir. 1977) ............................................................. 20

*Thomas v. Collins,*

　323 U.S. 516 (1945) ............................................................................. 14

*United States v. Childress,*

　746 F. Supp. 1122 (D.D.C. 1990) ................................................. 23, 24

*United States v. Mouat,*

　124 U.S. 303 (1888) ............................................................................. 19

*Windsor v. Tennessean,*

　719 F.2d 155 (6th Cir. 1983) .............................................................. 20

## Statutes

42 U.S.C. § 1985 ........................................................................... passim

## Other Authorities

Alton L. Lightsey, *Constitutional Law: The Independent Counsel and the Supreme Court's Separation of Powers Jurisprudence*, 40 UFLLR 563, 573 (1988) .............. 3

Andrew M. Wright, *The Take Care Clause, Justice Department Independence, and White House Control*, 121 WVLR 353, 385 (2018).................................................... 3

Annie Gowen, *Handful of protestors arrested during 'Occupy Congress'*, WA. POST (Jan. 17, 2012), https://www.washingtonpost.com/local/handful-of-protesters-arrested-during-occupy-congress/2012/01/17/gIQAjGgO6P_story.html ................ 11

Cheyenne Haslett, *Dreamers protest on Capitol Hill on DACA deadline day*, ABC NEWS (Mar. 5, 2018), https://abcnews.go.com/Politics/dreamers-protest-capitol-hill-daca-deadline-day/story?id=53539262 .................................................................... 11

Gary Fineout, *Biden tells DeSantis to 'get out of the way' amid Covid surge*, (Aug. 3, 2021, 6:03 PM), https://www.politico.com/states/florida/story/2021/08/03/desantis-blames-media-for-hysteria-over-covid-surge-1389404.............................................. 7

Inciting Rhetoric From Democrats (August 16, 2021) https://www.youtube.com/watch?v=gcVlsq2x79g..................................................... 8

Kalhan Rosenblatt, *Protestors pound the doors of the Supreme Court following Kavanaugh confirmation*, NBC NEWS (Oct. 6, 2018), https://www.nbcnews.com/politics/supreme-court/protests-build-capitol-hill-ahead-brett-kavanaugh-vote-n917351 .............................................................................. 11

Miller Center, University of Virginia, *Andrew Johnson: Message Proposing Constitutional Amendments* https://millercenter.org/the-presidency/presidential-speeches/july-18-1868-message-proposing-constitutional-amendments ................. 6

Patricia Zengerle, *Congress rejects Obama veto, Saudi September 11 bill becomes law*, REUTERS (Sept. 28, 2016), https://www.reuters.com/article/us-usa-sept11-saudi/congress-rejects-obama-veto-saudi-september-11-bill-becomes-law-idUSKCN11Y2D1 .................................................................................................. 6

*Read the full transcript from the first presidential debate between Joe Biden and Donald Trump*, USA TODAY (Oct. 4, 2020, 7:44 PM) https://www.usatoday.com/story/news/politics/elections/2020/09/30/presidential-debate-read-full-transcript-first-debate/3587462001/ ........................................... 10

*Remarks by the President on the Supreme Court Decision on U.S. Versus Texas* (June 23, 2016, 11:53 AM), https://obamawhitehouse.archives.gov/the-press-office/2016/06/23/remarks-president-supreme-court-decision-us-versus-texas (commenting that the even split of justices was a consequence of partisan rel ...... 6

ROBERT BOLT, A MAN FOR ALL SEASONS (1966) ......................................................... 13

*Schumer Threatens the Court,* WSJ (Mar. 4, 2020, 7:34 PM), https://www.wsj.com/articles/schumer-threatens-the-court-11583368462 ............ 11

Staff of S. Comm. on Homeland Sec. & Gov't Affs., 117th Cong. Rep. on Examining The U.S. Capitol Attack: A Review of the Security, Planning, And Response Failures on January 6, (Jun. 7, 2021) ............................................................ 24, 25

Susan Cornwell, *U.S. lawmaker spends night outside Capitol to protest return of evictions*, REUTERS (July 31, 2021, 5:58 PM), https://www.reuters.com/world/us/us-lawmaker-spends-night-outside-capitol-protest-return-evictions-2021-07-31/ ..... 11

Yamiche Alcindor, *Attack Tests Movement Sanders Founded,* New York Times, (June 14, 2017), https://www.nytimes.com/2017/06/14/us/politics/bernie-sanders-supporters.html. ....................................................................................................... 12

## Regulations

11 C.F.R. § 100.29 ........................................................................................................ 6

## U.S. Constitution

U.S. Const. Art. II, § 2, cl. 2 ...................................................................................... 19

U.S. Const. Art. II, § 3 ................................................................................................ 3

President Trump was carrying out the discretionary functions of his office and his constitutional mandate to take care that the laws are faithfully executed. He was also wielding the power of the bully pulpit, vested solely in the President of the United States to lobby for congressional action. Despite the obvious fact that President Trump was speaking on a political matter, firmly within his prerogative to address the Nation and Congress on such matters, Plaintiffs argue President Trump is entitled to neither absolute immunity nor First Amendment protections. Plaintiffs argue their *own* statements are entitled to First Amendment protection, but not President Trump's. Such "liberty for me, but not for thee" hypocrisies are beyond the pale.

This Court should not be fooled by the political and personal animosity of Plaintiffs and their amici. The rule of law requires all people be treated equally in the eyes of the law. There can be no exception to these stalwart constitutional protections merely because Plaintiffs do not want to extend these protections to their political nemesis. The Plaintiffs' Amended Complaint should be dismissed with prejudice.

## I.     The Constitution Forecloses Plaintiffs' Claims.

### a.     President Trump is Absolutely Immune.

#### 1.     *The Court should reject Plaintiffs' invitation to make content-based value determinations on a Presidential address in making its "outer perimeter" determinations as to immunity.*

Plaintiffs and their amici wish to constrict the absolute immunity of the presidency by allowing courts to make content-based value determinations on presidential activities and the motives behind them. That focus on motive rather than

1

the nature of the presidential act at issue has been squarely rejected by the Supreme Court. *Nixon v. Fitzgerald,* 457 U.S. 731, 756 (1982) ("[A]n inquiry into the President's motives could not be avoided under the kind of "functional" theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive.")

Plaintiffs largely regurgitate many of the same arguments made by the *Nixon v. Fitzgerald* respondents, who claimed that President Nixon lacked a legitimate presidential purpose for dismissing a federal employee in violation of federal law. *Id.,* 457 U.S. at 756–57. But the Court rejected that argument, just as should this Court. Indeed, such a "construction would subject the President to trial on virtually every allegation that an action was unlawful or was taken for a forbidden purpose. Adoption of this construction thus would deprive absolute immunity of its intended effect." *Id.* at 757.

President Donald J. Trump ("President Trump") spoke on January 6 to address forthcoming congressional action. It is of no moment as to whether he was directly involved in that action or whether Plaintiffs, or even this Court, agreed with arguments made in that Presidential address. It is enough that the nature of the activity, a speech by the President, is the type of activity normal and customary to the presidency. Indeed, it was not at the outer perimeter of the President's duties— it was dead center.

### 2.   President Trump was exercising a specific constitutional duty to take care that the laws be faithfully executed.

A president need not point to a specific constitutional duty to show that the activities at issue are absolutely immune from suit. Nevertheless, Plaintiffs' pleadings show that President Trump was executing his duties under the Constitution to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3. President Trump had an ever-present duty to ensure that the election laws were followed, including the certification process. The Framers specifically sought to ensure that it was the President's duty to *execute* the laws faithfully. Initially, the Framers directed the President to "carry into execution" the laws; however, at the Convention, the Framers replaced that language with giving the President an affirmative duty to take care that those laws be faithfully executed. Andrew M. Wright, *The Take Care Clause, Justice Department Independence, and White House Control*, 121 WVLR 353, 385 (2018). As one scholar wrote, "enforcing election laws . . . struck at the core of the executive branch's duty to faithfully execute the law." Alton L. Lightsey, *Constitutional Law: The Independent Counsel and the Supreme Court's Separation of Powers Jurisprudence*, 40 UFLLR 563, 573 (1988). Therefore, President Trump's office included a duty to ensure compliance with election laws in this Country.

As the Supreme Court held, the take care clause "are sweeping words." *Myers v. U.S.*, 272 U.S. 52, 122 (1926). It is the President's duty to make sure the laws are faithfully executed. *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,

561 U.S. 477, 493 (2010). Accordingly, President Trump had a broad range of authority in ensuring that the laws are faithfully executed.

President Trump's efforts to question congressional action because of lapses in election integrity was a discretionary act, not subject to second-guesses from the judiciary. *See Halperin v. Kissinger*, 578 F. Supp. 231, 233 (D.D.C. 1984), *aff'd in part, remanded in part*, 807 F.2d 180 (D.C. Cir. 1986) ("Judicial inquiries, however, into possible motives for discretionary actions are 'highly intrusive[]' . . . and disruptive of effective government. If this were permitted, the doctrine of absolute immunity, which is based on the separation of powers, would lose its intended effect.").

President Trump was speaking on a public issue in a public place on national television. The rally on January 6 and all other statements made by President Trump regarding the legality of changes to election laws and the validity of election results constitute speech on matters of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"). What falls within this category for the President can be quite broad; in one instance, a district court held that the "[t]elevised publication of the President's views on various topical items is within the outer perimeter of his official duties." *Lynch v. President of the U.S.*, 2009

WL 2949776, at * 1 (N.D. Tex. Sept. 14, 2009) (finding that the President had immunity and dismissing Plaintiff's case).

### 3. *President Trump's speech was in his official capacity.*

President Trump's speech and social media posts complained of by Plaintiffs are all on matters of public concern and were all made in his official capacity. Indeed, courts have previously found that President Trump's speech on his Twitter account (@realDonaldTrump) is public speech in his official capacity. *See Knight First Amend. Inst. at Colum. Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019) (describing that because President Trump "repeatedly used [@realDonaldTrump] as an official vehicle for governance and made its interactive features accessible to the public without limitation," it "created a public forum."). Therefore, Plaintiffs' allegations which include President Trump's Twitter posts and publicly televised remarks, clearly include speech within the outer perimeter of the Presidential office.

Most notably, the speech came well after the election, not before. Thus, the speech at and leading up to the Ellipse rally—the basis of Plaintiffs' claims—is speech that President Trump made solely in his official capacity as the President of the United States. Indeed, the Federal Elections Commission has laid out a detailed definition of electioneering (or what Plaintiffs refer to as campaign speech). The FEC definition requires four things for a communication to be considered electioneering: (1) it must be a broadcast, cable, or satellite communication; (2) it must refer to a clearly identified candidate for federal office; (3) must be publicly distributed prior to an election; and (4) must be targeted to the relevant electorate. *See* 11 C.F.R.

§ 100.29. Accordingly, when President Trump made this speech, he was acting in his official capacity as the President of the United States and not engaged in electioneering. Further, as of November 5, 2020, "President Trump was no longer a candidate for public office" hence he was not engaged in electioneering. *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.,* 1 F.4th 180, 187-88 (4th Cir. 2021).

Plaintiffs argue there is no situation where the President may speak on something in his official capacity when there is no explicit constitutional duty involved. Aside from the obvious issue of the "take care" clause giving the executive broad authority to speak officially, Plaintiffs' argument is incredible. Presidents past, present, and future will speak, and should speak, on numerous issues where they do not have any textually identifiable constitutional duty. For instance, Presidents have pushed against a veto override,[1] commented on expectations for Supreme Court opinions,[2] supported Constitutional amendments,[3]   and spoken against State

---

[1] *See, e.g.,* Patricia Zengerle, *Congress rejects Obama veto, Saudi September 11 bill becomes law*, REUTERS (Sept. 28, 2016), https://www.reuters.com/article/us-usa-sept11-saudi/congress-rejects-obama-veto-saudi-september-11-bill-becomes-law-idUSKCN11Y2D1 (describing that President Obama called and wrote a letter to Senate Minority Leader Harry Reid to explain his opposition to the bill, and Reid was the only senator that sided against the veto override).

[2] *Remarks by the President on the Supreme Court Decision on U.S. Versus Texas* (June 23, 2016, 11:53 AM), https://obamawhitehouse.archives.gov/the-press-office/2016/06/23/remarks-president-supreme-court-decision-us-versus-texas (commenting that the even split of justices was a consequence of partisan reluctance to confirm a ninth justice and the President's policies "can't go forward at this stage, until there is a ninth justice on the Court to break the tie.").

[3] Miller Center, University of Virginia, *Andrew Johnson: Message Proposing Constitutional Amendments,* https://millercenter.org/the-presidency/presidential-speeches/july-18-1868-message-proposing-constitutional-amendments.

actions.[4] A President need not sift through the text of Article II as a precondition of using his bully pulpit to support or oppose issues of public concern. Any assertion to the contrary is an ill-considered and impractical limitation on presidential speech.

Accordingly, when President Trump made this speech, he was acting in his official capacity as the President of the United States and is thus protected by absolute immunity.

### b. President Trump's political speech was protected by the First Amendment.

President Trump's speech must be considered in context, something Plaintiffs are more than willing to acknowledge when the situation involves the speech of one of their own. Pls.' Resp. In Opp'n at 53, n. 24 ("Pls.' Opp'n"). Plaintiffs argue – in a footnote – Plaintiff Waters' speech should be analyzed "[i]n context" as she tried to excuse her reckless comments. Her protestations, however, simply show the danger of the First Amendment exception that she and her co-Plaintiffs seek against President Trump. If political opponents can cherry-pick comments made in political speeches to justify tort liability based upon the actions of impassioned supporters, then the well of litigation will spring eternal and the chilling effects on political speech will be considerable.

---

[4] *See, e.g.,* Gary Fineout, *Biden tells DeSantis to 'get out of the way' amid Covid surge*, (Aug. 3, 2021, 6:03 PM), https://www.politico.com/states/florida/story/2021/08/03/desantis-blames-media-for-hysteria-over-covid-surge-1389404 (quoting President Biden, saying if the state governors are "not going to help, get out of the way of the people that are trying to do the right thing.").

Indeed, for years it has been Democratic politicians, including several of the Plaintiffs, that have encouraged, supported, and provoked left-wing extremists and rioters, including avowed Marxists. The proof is in the pudding:[5]



Plaintiffs' astounding hypocrisy also highlights their misunderstanding of the incitement doctrine. Liability for speech does not turn on whether violence was successfully incited; it depends upon whether the speech was directed to incite and created a likelihood of imminent lawless action. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). President Trump did nothing of the sort when commenting that supporters could peacefully and patriotically make their voices heard. Nothing that Plaintiffs have or could plead even approaches the *Brandenburg* test of imminence.

---

[5] See entire video at: https://www.youtube.com/watch?v=gcVlsq2x79g.

1.   *Plaintiffs' incredible allegations of a conspiracy cannot preclude First Amendment protections.*

Plaintiffs argue that President Trump is not entitled to First Amendment protections because of the supposed conspiracy theory explained in their Amended Complaint. Yet, the actions they allege against President Trump universally are comprised of political speech, often made to political supporters. Political speech is never made in a vacuum; to be effective it must be made while engaging with others. For the Court to find that President Trump's speech here was unprotected under a theory of conspiracy liability, would be to create an exception that would swallow-whole the uniquely American protections for political discourse found in the First Amendment.

2.   *Plaintiffs take President Trump's words out of context.*

Plaintiffs' claim President Trump spoke "directly" to the Proud Boys is an example of a misleading, and patently false, allegation. Pls.' Opp'n at 3. As Plaintiffs paint the story, President Trump answered a question during a *nationally televised* presidential debate, directing the Proud Boys to "stand back and stand by." *Id.* The full context of the question and answer shows a different story.

> Chris Wallace: [A]re you willing tonight to condemn white supremacists and militia groups and to say that they need to stand down . . . [?]
>
>  . . .
>
> President Trump: I'm willing to do anything. I want to see peace.
>
> Chris Wallace: Well, then do it, Sir.
>
> Vice President Biden: Say it. Do it. Say it.

President Trump: You want to call them . . . what do you want to call them? Give me a name, give me a name. Go ahead. Who would you like me to condemn?

Chris Wallace: White supremacist and right-wing militia.

Vice President Biden: The Proud Boys.

President Trump: Proud Boys, stand back and stand by. But I'll tell you what somebody's got to do something about Antifa . . . [6]

It was then-Vice President Biden who suggested President Trump address the Proud Boys, and the context for his off-the-cuff comment for whom they should stand by to deal with was not the federal government, but rather antifa vigilantes and rioters.

Plaintiffs even go so far as to suggest that a social media post from a supposed Proud Boy leader shows conspiracy simply by its public response to President Trump after the debate. The First Amendment is not so fragile as to be defeated by social media posts from debate viewers. Further, the different conspiracies that Plaintiffs allege all relate to the results of the November 2020 elections, which were unknown at the time that this Presidential debate took place.

---

[6] *Read the full transcript from the first presidential debate between Joe Biden and Donald Trump*, USA TODAY (Oct. 4, 2020, 7:44 PM) https://www.usatoday.com/story/news/politics/elections/2020/09/30/presidential-debate-read-full-transcript-first-debate/3587462001/.

Given the numerous protests over the years on Capitol Hill[7] and the necessity of protecting political speech – the very type of speech the First Amendment was designed to protect – a holding that individuals can be liable for violence by random listeners if their words could be interpreted as a threat would nearly shut down Washington.

For example, Senate Majority Leader Schumer directed statements at Supreme Court Justices Gorsuch and Kavanaugh, saying "[y]ou have released the whirlwind, and you will pay the price" and "[y]ou won't know what hit you if you go forward with these awful decisions."[8] While his words were undoubtedly

---

[7] *See* Kalhan Rosenblatt, *Protestors pound the doors of the Supreme Court following Kavanaugh confirmation*, NBC NEWS (Oct. 6, 2018), https://www.nbcnews.com/politics/supreme-court/protests-build-capitol-hill-ahead-brett-kavanaugh-vote-n917351 ("[P]rotestors pushed past a police line, storming up steps to pound on the doors of the U.S. Supreme Court on Saturday after the Senate confirmation of Brett Kavanaugh."); Cheyenne Haslett, *Dreamers protest on Capitol Hill on DACA deadline day*, ABC NEWS (Mar. 5, 2018), https://abcnews.go.com/Politics/dreamers-protest-capitol-hill-daca-deadline-day/story?id=53539262 (describing the DACA protests in which protestors arrived at the Capitol and Senate office buildings to demand Congress pass legislation to renew DACA protections and quoting a protestor who claimed her conduct was "fighting for the people whose DACA expires soon."); Susan Cornwell, *U.S. lawmaker spends night outside Capitol to protest return of evictions*, REUTERS (July 31, 2021, 5:58 PM), https://www.reuters.com/world/us/us-lawmaker-spends-night-outside-capitol-protest-return-evictions-2021-07-31/ (describing how "progressive lawmakers" sat outside the Capitol all night to emphasize demand to extend the moratorium on evictions); Annie Gowen, *Handful of protestors arrested during 'Occupy Congress'*, WA. POST (Jan. 17, 2012), https://www.washingtonpost.com/local/handful-of-protesters-arrested-during-occupy-congress/2012/01/17/gIQAjGgO6P_story.html (describing a particularly large protest by the "Occupy" movement that involved entering Congressional buildings to make demands).

[8] Video available: https://youtu.be/rs1f7JhCxoQ; *Schumer Threatens the Court,* WSJ (Mar. 4, 2020, 7:34 PM), https://www.wsj.com/articles/schumer-threatens-the-court-11583368462.

irresponsible, they were not actionable, and would not have been even if any actual harm befell the Justices from those who claimed they were inspired by Schumer's words. If every individual had to police her speech to ensure it could never be perceived as a threat in light of later events, nearly all political discussion would be off the table.

James Hodgkinson's June 2017 shooting of Rep. Steve Scalise, Capitol Police Officer Crystal Griner, and others is also illustrative. Hodgkinson was a supporter of Sen. Bernie Sanders. Shortly before the shooting, Sanders passionately addressed his supporters, saying that "today in the White House we have perhaps the worst and most dangerous President in the history of our country. And we also have, not to be forgotten, extreme right-wing leadership in the U.S. House and the U.S. Senate."[9]

---

[9] Video available: https://youtu.be/7-nR_5UBIPU; Yamiche Alcindor, *Attack Tests Movement Sanders Founded,* New York Times, (June 14, 2017), https://www.nytimes.com/2017/06/14/us/politics/bernie-sanders-supporters.html.



JUNE 10, 2017 / JUNE 14, 2017

Yet Rep. Steve Scalise, one of the victims of the shooting, did not attempt to cast aside the First Amendment to sue Sen. Sanders for his political rhetoric, almost certainly because Congressman Scalise understands that while he may have disagreed with Sen. Sanders' rhetoric, he was not willing to sacrifice the ancient protections of the First Amendment to hold the rival Senator accountable for that rhetoric. Perhaps Rep. Scalise even remembered Sir Thomas Moore's celebrated lines from *A Man for All Seasons*: "[t]his country is planted thick with laws, from coast to coast, Man's laws, not God's! And if you cut them down . . . do you really think you could stand upright in the winds that would blow then?"[10]

---

[10] ROBERT BOLT, A MAN FOR ALL SEASONS (1966).

### 3. *Plaintiffs mistakenly rely upon the effect upon the listeners to argue President Trump incited the violence at the Capitol.*

Plaintiffs' insistence that the way *others* interpret one's speech is somehow enough to establish a conspiracy or incitement goes against well-established First Amendment law. *See Thomas v. Collins*, 323 U.S. 516, 535 (1945) (rejecting liability based on how others interpret one's speech because that "would 'pu[t] the speaker . . . wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning"); *Morse v. Frederick*, 551 U.S. 393, 442 (2007) (Stevens, J., dissenting) (describing that liability based on others' understanding would blur "the distinction between advocacy and incitement."). In any event, quoting President Trump's language and leaving out key phrases that indicate a desire for peaceful protest does not amount to factual support for an allegation of conspiracy or incitement. Plaintiffs have cherry-picked their allegations from thousands of tweets, speeches, rallies, and public statements in order to create an out-of-context narrative. Taken in context, with the totality of only President Trump's actual language considered, Plaintiffs cannot plausibly state a claim.

Plaintiffs cannot, in fact, plausibly allege that President Trump expected, desired, or incited violence. The bulk of their allegations consist of general statements, interpreted by others to be calls to violence. This effect on others is not what is relevant under the First Amendment. Rather, it is President Trump's actual words. His words that included passionate flourish and calls for peaceful and patriotic

protest. Taken overall, and in context, Plaintiffs cannot plausibly allege that President Trump sought to incite violence.

### 4. *Plaintiffs are seeking a prior restraint.*

Plaintiffs and their amici, argue they are seeking to restrain unlawful conspiracies and political intimidation. Those are, however, already prohibited by law. What Plaintiffs are truly seeking is a mechanism to prevent speech before it happens. Regardless of Plaintiffs' attempt to argue they are seeking an adjudication of whether the speech should be allowed, requiring such an adjudication before speech is, in itself, an improper prior restraint on speech. Requiring President Trump to litigate his right to speak on issues of public concern would directly hamper his First Amendment right to free speech. It is, by definition, a prior restraint regardless of whether a court would rule on whether the speech would subsequently be allowed.

## II.   Plaintiffs Lack Standing.

Standing is a key determination that must be made before this Court has the authority to proceed to consideration on the merits. Whether the Plaintiffs have the right to sue in this instance is a threshold issue to determine this Court's authority to hear the merits of this case that must be determined on motion to dismiss.

### a.   Whether Plaintiffs claims are covered by the terms of the statute is a threshold matter properly considered in this Motion to Dismiss.

Plaintiffs are bound by the allegations of their Amended Complaint. The alleged facts in that complaint show that they lack standing to bring this action.

15

Indeed, whether the lack of standing is based on constitutional or statutory grounds, the end result is dismissal of the case.

The standing requirements for a 42 U.S.C. § 1985 claim require at a minimum two findings: (1) Plaintiffs were harmed, and (2) that harm was caused by either a conspiracy to prevent any person by force, intimidation, or threat from holding any office, trust, or place of confidence under the United States, or from executing the duties thereof; or a conspiracy to force, intimidate, or threaten an officer of the United States to leave any state, district, or place where his duties are required to be performed.

When discussing their statutory standing, Plaintiffs describe an elaborate conspiracy plan. Regardless of how the alleged conspiracy is framed, none of the formulations create a cause of action under the terms of § 1985 because Plaintiffs are not federal officers. Even if they were federal officers, Plaintiffs have not sufficiently alleged factual support for a conspiracy to prevent the certification of the election, let alone a conspiracy to use violence to achieve that alleged goal. *Id.*

**b.    Plaintiffs are not covered by § 1985(1) because under controlling Supreme Court precedent, that statute only grants a cause of action based on injuries to federal officers.**

Plaintiffs cite a single case and an 1850s dictionary in support of their argument that Congressional members are either federal officers or hold an office, trust, or place of confidence under the United States. *See* Pls.' Opp'n at 21 (citing *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971)). That case solely stands for the proposition that reconstruction statues should be accorded a broad sweep. They do

16

not cite any statute, act, regulation, policy statement, or even statement that indicates that members of Congress officers hold such a station.

Plaintiffs have broadly alleged that they are both the harmed party and such persons holding an office, trust, or place of confidence under the United States or officers. Plaintiffs have not, however, plausibly alleged that they are officers of the United States as required by 42 U.S.C. § 1985. In *Griffin*, the Supreme Court held that Reconstruction Era statutes such as § 1985 should be accorded a sweep as broad as their language. *Griffin, 403 U.S.* at 97.

While it is generally true that remedial statutes are construed broadly, Plaintiffs left out that the Court made this particular statement in the context of 42 U.S.C. § 1985(3) to address whether the prohibition of conspiracies to deny equal protection applied to the actions of private individuals or solely the state. *Id.* at 97–98. The Court ultimately held that § 1985(3) should be read broadly enough to encompass the actions of private individuals, not just actions from the state in their official capacity, and this intent is evidenced from the inclusion of legislative history indicating that the act was meant to cover conspiracies by private individuals. *Id.* at 98, 101. Because § 1985(1) and § 1985(3) confer standing in different ways (and involve pleading different elements), it is misleading to use *Griffin*, a case specifically only involving the construction of § 1985(3), to argue that Plaintiffs have standing under § 1985(1), which requires a particular type of threat against enumerated parties. Reading § 1985(3) to cover deprivations of equal protection by private individuals is not the same as reading § 1985(1) to include conspiracies against

17

members of Congress who are, under binding Supreme Court precedent, not considered federal officers.

The Supreme Court has laid out five specific conspiracies that § 1985 proscribes, which are those that interfere with

> (a) the performance of official duties by federal officers; (b) the administration of justice in federal courts; (c) the administration of justice in state courts; (d) the private enjoyment of 'equal protection of the laws' and 'equal privileges and immunities under the laws'; and (e) the right to support candidates in federal elections.

*Kush v. Rutledge*, 460 U.S. 719, 724 (1983). The Court further explained that as currently codified, § 1985(1) applied to (a), § 1985(2) applied to (b) and (c), and § 1985(3) applied to (d) and (e). *Id.* With this binding Supreme Court precedent, it is understandable that many courts, including the Third Circuit, merge the phrase "office, trust, or place of confidence under the United States" in § 1985(1) to mean that the person interfered with must be a federal officer. *Miller v. Indiana Hosp.*, 562 F. Supp. 1259, 1281 (3d Cir. 1983). The Third Circuit went as far as to say "subsection [§ 1985(1)] only protects federal officers." *Id.* The Ninth Circuit also held that § 1985(1) applies exclusively to federal officers. *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 717-18 (9th Cir. 1981).

Other district courts have also come to the same conclusion. The District of New Jersey found that to bring a claim under § 1985(1), a plaintiff must show that they are a federal officer. *Lobosco v. Falsetti*, No. 09–01455, 2010 WL 4366209, at * 3 (D.N.J. Oct. 28, 2010). In *Lobosco*, the court dismissed the plaintiff's claims under § 1985(1) as a matter of law because the plaintiff failed to plead sufficient facts to

show that he was a federal officer. *Id. See also Diulus v. Churchill Valley Country Club*, 601 F. Supp 677, 681 (W.D. Pa. 1985) (dismissing a § 1985(1) claim because the complaint did not indicate any action of a federal officer).

According to the foregoing precedent from the Supreme Court, circuit courts, and district courts, the phrase, "office, trust, or place of confidence under the United States" in § 1985(1) is all merged to mean federal officer. The scope of an officer of the United States is very clear. "Unless a person in the service of the government, therefore, holds his place by virtue of an appointment by the president, or of one of the courts of justice or heads of departments authorized by law to make such an appointment, he is not, strictly speaking, an officer of the United States." *United States v. Mouat*, 124 U.S. 303, 307 (1888). Additionally, the Supreme Court explained in 2010, "[t]he people do not vote for the 'Officers of the United States.' Art. II, § 2, cl. 2. They instead look to the President to guide the 'assistants or deputies . . . subject to his superintendence.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 497-98 (2010). Accordingly, members of Congress are not federal officers, nor do they hold an office, trust, or place of confidence under the United States for purposes of 42 U.S.C. § 1985(1).

Plaintiffs' claims do not fall within § 1985(1); it is also clear that their claims do not fall within either of the other two sections in § 1985, as § 1985(2) deals with the obstruction of the justice and § 1985(3) deals with depriving individuals of equal protection of the laws. Plaintiffs cite to an 1850s dictionary that says that members of Congress are "public officers," yet this definition does not say that they are federal

19

officers, as § 1985(1) requires. Additionally, Plaintiffs pull quotes from the 1871 legislative hearings. Notably, Plaintiffs disregard the Supreme Court's interpretation of § 1985(1), which comes to the opposite conclusion as Plaintiffs' pieced-together, faulty interpretation.

Plaintiffs cite three additional cases illustrating, in their opinion, why they have standing under § 1985(1). First, in *Lewis*, the Western District of Missouri held that a state court judge had standing under § 1985(1). *Lewis v. News-Press & Gazette Co.*, 782 F. Supp. 1338 (W.D. Mo. 1992). Second, in *Stern*, the Seventh Circuit held that an IRS agent had standing under § 1985(1). *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977). Third, in *Windsor*, the Sixth Circuit held that a United States Attorney had standing under § 1985(1). *Windsor v. Tennessean,* 719 F.2d 155 (6th Cir. 1983). Not surprisingly, Plaintiffs failed to cite a single case where a member of Congress had standing under § 1985(1). This is because members of Congress do not have standing under § 1985(1).

### III.    Plaintiffs Fail to State a Claim Upon Which Relief May be Granted.

As outlined above, Plaintiffs are not federal officers and therefore do not fall within the purview of 42 U.S.C. § 1985(1). Therefore, in addition to not having standing, Plaintiffs have failed to state a claim upon which relief may be granted as to that claim.

a.   **Plaintiffs Do Not Adequately Allege All Elements for a Conspiracy Claim as There are Not Enough Factually Supported Claims for the Court to Plausibly Find President Trump Had Knowledge or Intent.**

1.   *Plaintiffs' allegations of an agreement by President Trump lack any plausible factual support.*

Plaintiffs characterize President Trump's organizing of a "wild" protest at the Ellipse where he encouraged citizens to assemble and petition the government – two of the most central elements of our First Amendment protected freedoms – as conspiring to help the violent protestors at the Capitol by sending "an angry mob" to their location. Pls.' Opp'n at 12. They also allege President Trump "directly enlisted the help of the Proud Boys," yet at no point do they allege a factual basis for concluding there was direct communication between President Trump and the Proud Boys or others who may have orchestrated the violence on January 6. Plaintiffs describe that it is possible to infer conspiratorial agreement from an "invitation, followed by responsive assurances and conduct," but the case cited for that proposition is an out-of-district antitrust case involving price-fixing for which there is strict liability for achieving the end-goal regardless of how it was accomplished. Pls.' Opp'n at 34–35 (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1118 (N.D. Cal. 2008)). That is a starkly different situation from this case, involving political activities and speech. To adequately allege a conspiracy to engage in illegal action, it is insufficient to allege that the Defendant shares an end-goal with the individuals who engaged in violence, especially when the end-goal can be legally accomplished. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007) (explaining that even in the antitrust context where there is strict liability for the

21

illegal end-goal, a "conspiracy must include evidence tending to exclude the possibility of independent [legal] action").

Plaintiffs cite *Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 81-82 (D.D.C. 2004) to support their rule that an inference of agreement only requires they establish two or more persons "share a commitment to a 'general objective or common plan.'" Pls.' Opp'n at 32. But that case explained that when the plaintiff relies on indirect evidence, proof of "relationships between the actors and between the actions (e.g., the proximity in time and place of the acts, and the duration of the actors' joint activity) are relevant in inferring an agreement." *Jin*, 335 F. Supp. 2d at 82 (finding the pleadings sufficient because the plaintiff alleged the defendant had a personal reception with an alleged co-conspirator, which would have been documented). In the present case, Plaintiffs do not sufficiently allege there were relationships between the actors.

Plaintiffs cite *Hobson v. Wilson* to establish the parties need not be aware of the exact limits of the illegal plan, but conveniently end the quote before the relevant standard of proof is described, which requires Plaintiffs must show "there was 'a single plan, the *essential nature and general scope of which [were] known to each person* who is to be held responsible for its consequences.'" 737 F.2d 1, 51-52 (D.C. Cir. 1984) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979) (emphasis added). Plaintiffs also use a carefully selected a quote saying "dark hyperbole" can sustain an allegation of a plan for violence in light of later events. Pls.' Opp'n at 37. But the case cited as support for that assertion, *Sines v. Kessler*, 324 F.

22

Supp. 3d 765, 788 (W.D. Va. 2018), involved individuals wearing shirts expressing violent intentions (e.g., text saying "killer" over an image of decapitated bodies). Political speech hardly qualifies as *dark hyperbole* when compared against the example drawn from another out-of-district case. Indeed, Plaintiffs also quote *Halberstam v. Welch* to support their claim that the present case is an "easy situation" in which to draw an inference of conspiracy. Pls.' Opp'n at 38. The full sentence from that case, however, reads, "[t]he easiest situation in which to draw an inference of agreement is where the parties are on the scene together at the same time performing acts in support of one another. . . . The performance of different *acts* at different *times* in different *places* . . . requires a more extensive set of inferences to link the actors together." *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983).

2.   ***Plaintiffs' allegations do not plausibly allege President Trump had knowledge of the general scope of plans of those who engaged in violence at the Capitol.***

Individuals misinterpreting President Trump's language to assume participation in a conspiracy does not make him liable for their unrelated and unfortunate actions. When citing *United States v. Childress*, 746 F. Supp. 1122, 1130 (D.D.C. 1990), to support their contention that a Defendant can be liable for encouraging conspirators if he has an "understanding of the unlawful character of the conspiracy," Plaintiffs are quoting the lower court's jury instructions under debate in the opinion. Pls.' Opp'n at 38. Plaintiffs also leave out the rest of the sentence, which says the individual must also "knowingly, encourage[], advise[] or assist[] in furthering the purpose of the conspiracy," which in that context was a conspiracy to

distribute illegal narcotics—something with no possibility for a legal explanation. *Childress,* 746 F. Supp. at 1130. Even if understanding and encouragement were the standard for a § 1985(1) conspiracy, Plaintiffs have not adequately alleged President Trump understood the unlawful character of the alleged conspiracy at the time of the speech. Plaintiffs seek to use hindsight bias to show the language appears to be encouraging the alleged conspirators to suggest President Trump's subjective mindset at the time of the speech. This entire line of reasoning is logically flawed at best.

While an inference of a conspiracy can be drawn from knowledge of the actual plan, there is no factually based allegation that President Trump was aware of a real plan of violent action rather than just the typical militaristic, hyperbolic language of people posting on the internet about their political beliefs and activities. Pls.' Opp'n at 12. The findings in the Homeland Security and Government Affairs ("HSGA") staff report investigating the events of January 6 show that even the FBI and Department of Homeland Security did not find the websites and alleged threats referenced by Plaintiffs to be credible. *Id.;* HSGA Staff Report at 5.[11]

If offices dedicated to assessing threats to the homeland and keeping the President aware of those threats did not find the postings credible, Plaintiffs' allegation that President Trump and his aides were monitoring those postings are beyond incredible. Importantly, it would set an impossible burden on future

---

[11] Staff of S. Comm. on Homeland Sec. & Gov't Affs., 117th Cong. Rep. on Examining The U.S. Capitol Attack: A Review of the Security, Planning, And Response Failures on January 6, (Jun. 7, 2021).

defendants who face allegations of conspiracy if the court holds negative findings by an intelligence agency tasked with tracking the possibility of domestic terrorism threats is insufficient to refute knowledge of a conspiracy. Further, the Plaintiff has the burden to affirmatively allege knowledge, and the existence of the HSGA report shows this allegation is not credible. The HSGA report goes even further to show President Trump was concerned about the security of the January 6 meeting. HSGA Report at 77 (describing that President Trump made a point to ask the Acting Secretary of Defense, in a meeting on an unrelated issue, "whether they were prepared" and the President "concurred in the activation of DCNG to support law enforcement"). This interaction, contained in an official report written after President Trump left office, severely cuts against Plaintiffs' notions of conspiracy.

Finally, Plaintiffs alleged communications, except for one, are based entirely upon public speech aimed at millions of Americans, some during an election cycle, and the rest on political issues within the President's purview to comment on topical issues. The single other alleged communication comes from an unconfirmed leak from a governmental agency, alleging that someone within the White House complex had a phone call with someone from the Proud Boys. This is entirely insufficient to show that *President Trump* had communication with the Proud Boys or that the person that made the call was doing so on President Trump's behalf or even that there was an illegitimate purpose for the call. The White House has numerous calls in and out per day to a huge variety of individuals and organizations. For Plaintiffs to blindly

assume that because someone associated with the Proud Boys was on a call log indicates a conspiracy is incredible on its face.

Plaintiffs' entire argument falls into the logical fallacy of post hoc ergo propter hoc. Plaintiffs allege that because the rally was scheduled on the day of January 6 and that there was a violent protest at the Capitol on that day following that rally, it must have been caused by that rally. This is simply flawed logical reasoning as these events are unrelated.

## CONCLUSION

For the foregoing reasons, President Trump's motion to dismiss should be granted. This matter should be dismissed, with prejudice.

Dated: August 16, 2021                          Respectfully submitted,


                                                /s/ Jesse R. Binnall
                                                Jesse R. Binnall (VA022)
                                                BINNALL LAW GROUP, PLLC
                                                717 King Street, Suite 200
                                                Alexandria, VA 22314
                                                Tel: (703) 888-1943
                                                Fax: (703) 888-1930
                                                jesse@binnall.com
                                                *Attorney for Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that on August 16, 2021, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

Dated: August 16, 2021                                            /s/ Jesse R. Binnall
                                                                 Jesse R. Binnall