UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BARBARA J. LEE *et al.*, | Case No. 21-cv-00400 (APM) |
| Plaintiffs, | *Consolidated Cases:* |
| v. | *21-cv-00586 (APM)* |
| | *21-cv-00858 (APM)* |
| DONALD J. TRUMP *et al.*, | *21-cv-02265 (APM)* |
| | *22-cv-00010 (APM)* |
| Defendants. | *22-cv-00011 (APM)* |
| | *22-cv-00034 (APM)* |
| | *23-cv-00038 (APM)* |

**PRESIDENT DONALD J. TRUMP'S MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF HIS MOTION FOR SUMMARY
JUDGMENT ON ABSOLUTE PRESIDENTIAL IMMUNITY GROUNDS**

Jonathan M. Shaw
D.C. Bar No. 446249
Gerald A. Urbanek, Jr.
VA Bar No. 95043
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite 402
Alexandria, Virginia 22314
Telephone: (703) 574-1206
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com
gurbanek@dhillonlaw.com

Scott Gessler
GESSLER BLUE LAW
7350 E. Progress Place, Suite 100
Greenwood Village, Colorado 80111
Telephone: (720) 839-6637
sgessler@gesslerblue.com

Jesse R. Binnall VA022
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
jesse@binnall.com

*Attorneys for Defendant President Donald J. Trump*

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

ARGUMENT .......................................................................................................3

    A.   The substantive standards mandated by *Trump* and *Blassingame*
        provide a low threshold for establishing immunity........................................3

        1.   The summary judgment procedure applicable to this motion
            does not affect the very low threshold established by the
            applicable substantive law.......................................................................3

        2.   Under the "manifestly or palpably" standard, presidential
            immunity applies when the president makes a threshold
            showing that he engaged in official action. ...........................................4

    B.   President Trump's speech on January 6, 2021, meets the threshold for
        presidential immunity. ...................................................................................7

        1.   President Trump's Ellipse Speech fell within his core
            presidential functions as an exercise of his authority under the
            Recommendations Clause. ......................................................................7

        2.   Both core functions and the outer perimeter of presidential
            authority include speech on matters of public interest, including
            the fairness and integrity of federal elections.....................................14

        3.   The President discussed policy matters, sought to persuade
            Congress, and called for Vice President Pence to properly
            execute his duties. ..................................................................................18

        4.   Following its normal practice and procedures, White House staff
            vetted the speech as an official communication...................................20

        5.   White House officials helped plan the President's involvement in
            the event. ...............................................................................................22

        6.   Timing and location were designed to affect public policy and
            Congressional action. ............................................................................23

        7.   The Ellipse Speech urged the Vice President and Congress to
            discharge their duties in a manner President Trump believed to
            be consistent with the U.S. Constitution. ............................................24

8.    The speech was nationally televised. ...................................................25

9.    A court may not consider a President's allegedly improper motives or allegations of illegality. ...........................................26

C.    President Trump reached out to state and local officials in his capacity as President of the United States. ......................................................27

D.    President Trump's communications on his Twitter account also fell within the outer perimeter of presidential authority. ...................................28

1.    Lindke v. Freed provides the correct framework to determine whether a "tweet" constitutes official action. .....................................28

2.    President Trump possessed actual authority and in fact used it, thus making his tweets state – and official – action...........................32

E.    Courts may not inquire into allegations that President Trump failed to take action to stop the events of January 6. ...................................................37

CONCLUSION ..........................................................................................................37

# TABLE OF AUTHORITIES

**Cases**

*Barr v. Matteo,*
    360 U.S. 564 (1959) ..................................................................... 15

*Blassingame v. Trump,*
    87 F.4th 1 (D.C. Cir. 2023) ................................................. passim

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ....................................................................... 3

*Clinton v. Jones,*
    520 U.S. 681 (1997) ......................................................... 9, 18, 19

*Gregoire v. Biddle,*
    177 F.2d 579 (CA2 1949) ........................................................... 13

*Knight First Amend. Inst. at Columbia Univ. v. Trump,*
    928 F.3d 226 (2d Cir. 2019) ...................................................... 36

*Lindke v. Freed,*
    601 U.S. 187 (2024) ............................................................. passim

*Lugar v. Edmondson Oil Co., Inc.,*
    457 U.S. 922 (1982) ................................................................... 29

*Luther v. Borden,*
    48 US 1 (1849) ........................................................................... 37

*Martin v. Mott,*
    25 US 19 (1827) ......................................................................... 37

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ............................................................. passim

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ............................................................. 14, 32

*Trump v. Mazars USA, LLP,*
    591 U.S. 848 (2020) ............................................................. 10, 28

*Trump v. United States,*

603 U.S. 593 (2024) ........................................................................... passim

*United States v. Texas,*

599 U.S. 670 (2023) ................................................................................ 37

*Youngstown Sheet & Tube Co. v. Sawyer,*

343 U.S. 579 (1952) ............................................................................. 7, 8

**Statutes**

U.S. Const. art. II, § 1, cl. 3 .................................................................. 19

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................. 3

## Introduction

Eight complaints make multiple, overlapping allegations that President Trump violated various laws. But the allegations at the heart of each of complaint rest on official conduct, as to which President Trump is absolutely immune from civil liability. For analytical purposes, this conduct can be usefully considered as falling within four categories:

1. President Trump's speech at the Ellipse on January 6, 2021.[1]

2. Various "tweets" on the social media platform formerly known as Twitter leading up to the events of January 6, 2021.[2]

3. President Trump's outreach to, and discussions with, various state and local officials leading up to the events of January 6, 2021.[3]

_____

[1] *See, e.g., Blassingame, et al.:* ¶¶ 30, 36, 39, 60; *Kirkland:* ¶¶ 36, 43, 49, 69; *Moore:* ¶¶ 36, 43, 49, 64; *Tabron:* ¶¶ 36, 43, 50, 64; *Garza:* ¶¶ 69, 70, 71, 73, 74, 75, 76, 77, 78, 79, 81, 82, 110, 111, 114, 116, 117, 121, 123, 148, 149, 150, 151; *Swalwell:* ¶¶ 97, 121, 122, 123, 124, 125, 126, 128, 129, 152; *Lee, et al.:* ¶¶ 36, 53, 55, 56, 58, 59, 61, 62; and *Smith, et al.:* ¶¶ 111, 114, 115, 116, 117, 119, 120, 122, 131.

[2] *See, e.g., Blassingame, et al.:* ¶¶ 9, 10, 11, 13, 15, 16, 17, 18, 19, 21, 22, 23, 25, 27, 32, 38, 40, 45, 79, 125, 127; *Kirkland:* ¶¶ 10, 11, 12, 15, 19, 21, 22, 23, 24, 26, 27, 28, 30, 32, 38, 45, 48, 51, 56, 93, 126, 141, 155, 156; *Moore:* ¶¶ 10, 11, 12, 15, 19, 21, 22, 23, 24, 26, 28, 30, 32, 33, 38, 45, 48, 51, 56, 84, 123, 125, 141, 142; *Tabron:* ¶¶ 10,11, 12, 15, 19, 21, 22, 23, 24, 26, 27, 28, 30, 32, 33, 38, 46, 49, 52, 57, 108, 134, 136; *Garza:* ¶¶ 2, 3, 4, 9, 10, 11, 21, 24, 25, 26, 27, 28, 30, 51, 52, 53, 58, 62, 67, 68, 95, 103, 145, 146, 163, 164; *Swalwell:* ¶¶ 2, 3, 4, 13, 14, 15,25, 28, 29, 30, 31, 32, 33, 57, 58, 59, 86, 87, 90, 98, 99, 138, 147, 156, 157, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 181, 189, 196, 197, 211, 222, 227, 232, 256, 257; *Lee, et al.:* ¶¶ 31, 3, 4, 5, 6, 7, 12, 16, 17, 18, 19, 20, 21, 23, 24, 29, 30, 34, 35, 37, 40, 44, 50, 52; and *Smith, et al.:* ¶¶ 7, 50, 51, 52, 53, 54, 55, 57, 61, 62, 64, 67, 68, 69, 71, 84, 85, 87, 88, 89, 94, 95, 96, 107, 110, 112, 113, 145, 152, 153, 154.

[3] *See, e.g., Blassingame, et al.:* ¶ 29; *Kirkland:* ¶ 35; *Moore:* ¶ 35; *Tabron:* ¶ 35; *Garza:* ¶¶ 31, 32, 33, 34, 35, 39, 40, 41, 44, 45, 46, 47, 48, 50; *Swalwell:* ¶¶ 35, 36, 37, 38, 39, 40, 41, 44, 45, 46, 49, 50, 51, 52, 53, 55, 56; *Lee, et al.:* ¶ 31; and *Smith, et*

4. President Trump's alleged failure to take action to halt the events that occurred at the U.S. Capitol on January 6, 2021.[4]

Accordingly, this *Motion for Summary Judgment* analyzes each category of allegations.

The controlling case law in this matter is relatively limited, and also straightforward. In *Blassingame v. Trump,* 87 F.4th 1 (D.C. Cir. 2023), the Court of Appeals articulated the general legal standards for determining whether President Trump's conduct in this case constituted the exercise of presidential authority, protected by presidential immunity. But the court stopped short of conducting that analysis in this case, awaiting instead this Court's analysis. Following *Blassingame*, the Supreme Court in *Trump v. United States,* 603 U.S. 593 (2024), applied presidential immunity standards in the context of criminal law. In so doing, it also provided standards—generally consistent with *Blassingame*—to evaluate when presidential action constitutes the exercise of presidential authority. To be sure, other cases also shed light on this matter, but *Blassingame* and *Trump* are the core authority governing this matter.

As shown below, *Blassingame* and *Trump* focused heavily on the necessity of broad presidential latitude, because the president serves as the United States' chief

---

*al.:* ¶¶ 70, 73, 74, 75, 76, 77, 78, 81.

[4] *See, e.g., Blassingame, et al.:* ¶¶ 94, 114, 115, 116, 118; *Kirkland:* ¶¶ 102, 104, 105, 106, 109; *Moore:* ¶¶ 36, 43, 49, 64; *Tabron:* ¶¶ 117, 119, 120, 121, 123; *Garza:* ¶¶ 6, 86, 98, 99, 106, 122, 147, 165; *Swalwell:* ¶¶ 133, 142, 143, 150, 190, 191, 198; *Lee, et al.:* ¶¶ 79, 110; and *Smith, et al.:* ¶¶ 9, 144, 147, 148, 149, 150, 177.

executive officer. To properly discharge his duties, the president must have "the maximum ability to deal fearlessly and impartially with the duties of his office." *Trump*, 603 U.S. at 611 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 752 (1982)). For that reason, "most communications are likely to fall comfortably within [a president's] official responsibilities." *Trump*, 603 U.S. at 593. The applicable legal standards reflect these broad values. To meet his burden under applicable law, President Trump faces a very low threshold—he need only show that his challenged actions *can* reasonably be understood as an exercise of presidential authority. Not that that is the only way to understand them, or even the best way, but just that they *can* reasonably be so understood. *See Nixon*, 457 U.S. at 756 (recognizing "absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility"). By contrast, to defeat presidential immunity, the Plaintiffs must show that President Trump's actions were "manifestly and palpably" non-official action, and that the actions can *only* be understood as non-official action.

## Argument

A.    **The substantive standards mandated by *Trump* and *Blassingame* provide a low threshold for establishing immunity.**

1.    **The summary judgment procedure applicable to this motion does not affect the very low threshold established by the applicable substantive law.**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

As shown below, the substantive rule of decision that the D.C. Circuit and the Supreme Court have established imposes only a very low bar that President Trump need clear to be entitled to a ruling in his favor on absolute presidential immunity. In his *Statement of Undisputed Material Facts*, President Trump has presented undisputed facts—such as the content of the Ellipse Speech and the actions taken by White House staff in vetting that speech—that show that the Ellipse Speech was considered to be an official act and that it was, objectively, an official act within the outer perimeter of President Trump's official responsibilities. These facts provide this Court with an adequate basis to rule that President Trump has come forth with sufficient facts to demonstrate that his actions leading up to, and on, January 6, 2021, *"can* reasonably be understood as the official acts of the officeholder" and therefore are protected by Presidential Immunity.

Moreover, the D.C. Circuit has also instructed that, if there is "no sufficiently clear answer in either direction, the President, in our view, should be afforded immunity." *Blassingame*, 87 F.4th at 21. Thus, President Trump is, in fact, entitled to summary judgment in his favor on absolute immunity grounds unless it is absolutely clear that his actions *cannot* be reasonably understood as official acts.

2.    **Under the "manifestly or palpably" standard, presidential immunity applies when the president makes a threshold showing that he engaged in official action.**

The *Blassingame* Court articulated the test—subsequently endorsed by the *Trump* Court—for determining whether presidential speech or action falls within the president's outer perimeter of authority, thus triggering presidential immunity. A president loses immunity only for those actions, reasonably understood, to be "manifestly or palpably" beyond his authority. *Trump*, 603 U.S. at 618 (holding that a president's actions fall within the "'outer perimeter' of his or her official responsibilities . . . so long as they are not manifestly or palpably beyond his authority." (quotation omitted); *see also Blassingame*, 87 F.4th at 13. In other words, President Trump's actions receive immunity, unless his actions were "manifestly or palpably" unofficial.

Accordingly, "the President's actions … involve official functions so long as [they] *can* reasonably be understood as the official actions of the office holder…." *Blassingame*, 87 F.4th at 21-22 (quotation omitted)(emphasis supplied). And in *Blassingame,* the court posited the contrast between official action and a re-election campaign activity, stating immunity did not apply "when a President's actions viewed objectively and in context may reasonably be understood *only* as re-election campaign activity. *Id.* (emphasis supplied). This standard explicitly applies to President Trump's Ellipse Speech. *Id.* at 23 ("President Trump's speech at the event would be treated as official action if it *could* reasonably be understood in that way.") (emphasis supplied). Emphasizing that the President need only make a threshold showing that his conduct *can* or *could* reasonably be considered official,

the Supreme Court held that he receives immunity if "there is support to characterize that conduct as official." *Trump*, 603 U.S. at 621.

*Blassingame* and *Trump* thus interchangeably articulate the standard as "manifestly or palpably," or "can be reasonably understood," or "may be reasonably understood *only* as non-official activity," or only requiring "support." These descriptions have one thing in common, however—a president need only make a threshold showing that his activities *can* be reasonably understood to fall within the outer perimeter of his authority. Therefore, to prevail, a president need not show that the only way, or the best way, or the most likely way, to understand his activities is as official action. Rather, he is entitled to immunity even if just one reasonable understanding among many possible understandings of his actions is that they were an exercise of presidential authority. Once the president clears that low bar, he is entitled to immunity. By contrast, Plaintiffs may only defeat immunity if they provide exceedingly unambiguous evidence, uncontradicted by President Trump, to show that the only reasonable way to understand his actions was as "manifestly and palpably" unofficial.

This substantive standard further limits a court's latitude. "[O]nce it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority *cannot be subject to further judicial examination.*" *Trump*, 603 U.S. 596 (emphasis supplied). Indeed, "when an appropriately objective, context-specific assessment yields no sufficiently clear answer in either direction, the President, in our view, should be afforded

6

immunity." *Blassingame*, 87 F.4th at 21. In short, both *Blassingame* and *Trump* severely limit a court's ability to pick among competing understandings of the facts.

**B.    President Trump's speech on January 6, 2021, meets the threshold for presidential immunity.**

> **1.    President Trump's Ellipse Speech fell within his core presidential functions as an exercise of his authority under the Recommendations Clause.**

As a threshold matter, before applying *Blassingame's* contextual analysis to determine the outer perimeter of presidential authority, *Trump* makes clear that the Court must first determine whether an act falls within a core presidential power, expressly granted by the Constitution. If it does, then immunity is automatic and there is neither reason nor room for any further analysis. "Determining whether an action is covered by immunity … begins with assessing the President's authority to take that action." *Trump,* 603 U.S. 596. A President is entitled to immunity when acting within his "conclusive and preclusive" constitutional authority. "[O]nce it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority *cannot be subject to further judicial examination*." *Trump*, 603 U.S. 608 (emphasis supplied). *See also id.* at 609 ("Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority.")

"No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump*, 603 U.S. 607 (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585 (1952)). In the latter case, the President's authority is "conclusive and preclusive," and when the

President exercises such authority he may act even in a manner "incompatible with the expressed or implied will of Congress." *Id.* (quoting *Youngstown* at 637, 638 (Jackson, J., concurring)). This is because "[t]he exclusive constitutional authority of the President 'disabl[es] the Congress from acting upon the subject.'" *Id.* (quoting *Youngstown* at 637–38). Similarly, "the courts have '*no power to control [the President's] discretion*' when he acts pursuant to the powers invested exclusively in him by the Constitution." *Id.* (citing *Marbury*, 1 Cranch, at 166) (emphasis supplied).

Thus, when exercising his expressly delegated constitutional powers, the President enjoys absolute immunity. *Id.* "[H]is discretion in exercising such authority *cannot be subject to further judicial examination.*" *Id.* (emphasis added). Neither an act of Congress nor an adjudication of a court may restrict the President when he is acting within the scope of his core constitutional powers. *Trump*, 603 U.S. 609. And former presidents are "entitled to absolute immunity from damages liability predicated on [their] official acts." *Nixon*, 457 U.S. at 749; *Blassingame*, 87 F.4th at 12. This immunity is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Nixon*, 457 U.S. at 749.

The central allegation in the complaints concerns President Trump's speech at the Ellipse on January 6, 2021 (the "Ellipse Speech" at the "Save America Rally") (Exhibit 42). The words President Trump used are not subject to dispute, and on its face that speech falls within President Trump's "conclusive and preclusive"

8

authority to provide recommendations to Congress and to advise Congress on matters of significant national concern. *See Trump,* 603 U.S 609 ("the President "also plays a role in lawmaking *by recommending to Congress the measures he thinks wise*") (emphasis supplied); U.S. Const. art. I, § 7, cl. 2; *id.* at art. II, § 3 (the President "shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient"). As discussed below, it also falls within President Trump's authority to address the public on matters of public and federal concern. *See Trump*, 603 U.S. at 618 ("[S]peaking to and on behalf of the American people … certainly can qualify as official even when not obviously connected to a particular constitutional or statutory provision."); *id.* at 629. Accordingly, it is immune from judicial examination in this action or otherwise.[5]

Article II, Section 3 of the United States Constitution provides, in pertinent part, that the President "shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures *as he*

---

[5] In *Blassingame*, the D.C. Circuit ruled that whether the President is acting in his official capacity is an objective inquiry "'grounded in' a context-specific assessment of 'the nature of the function performed.'" *Blassingame*, 87 F.4th at 20–21 (quoting *Clinton v. Jones*, 520 U.S. 681, 695 (1997)). As such, *Blassingame* arguably could be read as deemphasizing an analysis of "content." ("That is not to say that the content of a speech will invariably be entirely off-limits." *Id.* at 22. "But the crux of the inquiry . . . concerns the context in which the President speaks, not what precisely he says or whether it might advance his re-election prospects." *Id.*) Such deemphasis would be difficult to square with the Supreme Court's later analysis in *Trump*. To the extent *Blassingame* failed to anticipate this aspect of the *Trump* court's analysis*,* namely the full role that "content" plays in the "content, form, and context" analysis, *Blassingame* is no longer controlling authority.

9

*shall judge necessary and expedient* ….” (emphasis added) (“Recommendation Clause”). The Constitution imposes no limits or guidelines on the form, content, or timing of the President’s exercise of this enumerated function; to the contrary, it expressly permits him to do so “from time to time” and to recommend such Measures “as he shall judge necessary and expedient.” Put differently, the Constitution reposes remarkably broad discretion in the President to determine how and when he will exercise his expressly delegated authority under the Recommendations Clause. This is undeniably true in the context of addressing allegations of election misconduct. *See Trump*, 603 U.S 621 (“the Executive Branch has ‘*exclusive authority and absolute discretion*’ to decide which crimes to investigate and prosecute, including with respect to allegations of election crime.”) (citing *Nixon*, 418 U.S. at 693) (emphasis added). And in exercising his recommendation powers, the President must have the latitude to engage in the “hurly-burly, the give-and-take of the political process between the legislative and the executive.” *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (cleaned up).

In the Ellipse Speech, President Trump provided to Congress “Information of the State of the Union” by addressing concerns of widespread voter fraud and by providing to Congress evidence of election irregularities (SUMF ¶ 49), which he deemed necessary to their consideration of the 2020 election certification and recommended “Measures” that Congress should take in response. President Trump made clear his view that the events surrounding the 2020 presidential election implicated national security and posed a threat to the foundation of our democratic

system (SUMF ¶ 49), marking the election as a watershed moment in our nation's history. To be sure, the Ellipse Speech certainly addressed members of the general public—just as other nationally televised State of the Union speeches have done for decades, and it is immune conduct within the "outer perimeter" of official responsibilities on this ground as well, *see infra*—but the Speech's audience expressly included Senators and Members of Congress, who were the only persons positioned to take measures in response to the concerns raised (SUMF ¶¶ 50, 51).

Significantly, nothing in the Constitution mandates or limits how a President must carry out this Article II, Section 3 power. And although these powers have often, in recent times, taken the form of an annual address, the Constitution imposes no specific requirement as to how, when, or why a President shall fulfill this function. Rather, the only requirement placed upon a President is that he provides such information to Congress "from time to time" and that it should include such recommended Measures "as he shall judge necessary and expedient." Historically, presidents have fulfilled this function through a variety of means, including by letter. *See, e.g.,* J. Shagan, Colleen, *The President's State of the Union Address: Tradition, Function, and Policy Implications,* Congressional Research Service (Jan. 16, 2014) at pp. 1-2. Neither this Court nor anyone else may question the validity of the information provided or the style or manner in which President Trump provided it, as courts must not confuse the *cause* a power is invoked to promote with the "*issue* of a power's validity," being cognizant of the "enduring consequences upon the balanced power structure of our Republic." *Trump*, 603 U.S.

at 606.

In addition to providing Congress information that bore upon matters of national importance, President Trump directly called upon Congress to enact "Measures," including "sweeping election reform," such as an end to ballot harvesting, requirements for voter identification, and a ban on universal mail-in balloting, among others (Exhibit 42, pp. 15, 16, 20-27; SUMF ¶ 49). That the President recommended these Measures in the course of his Ellipse Speech further demonstrates that it was an exercise of his core Article II, Section 3 powers, which allow a President to make recommendations to Congress for their consideration as he shall judge necessary and expedient. And to the extent President Trump sought to influence Vice President Mike Pence in the performance of his own Article I, Section 3 duties as President of the Senate, any such act would undoubtedly implicate the Recommendation Clause as well (SUMF ¶ 52).

Notably, the Recommendation Clause does not limit the President to mere recommendations of legislation. Rather, he may make *any* recommendation he *shall judge necessary and expedient*. U.S. Const., art. II, § 3.  Indeed, whether addressing matters of policy, good governance, or even matters of personal virtue, the President is entitled to make such recommendations to Congress as he sees fit, whenever and wherever he deems appropriate. As evidenced by President George Washington's first inaugural address, the powers granted under Article II, Section 3 extend not only to specific policy recommendations but even to personal opinion and sentiment, including encouragement or chastisement. In that address, President Washington

12

stated:

> By the article establishing the executive department it is made the duty
> of the President "to recommend to your consideration such measures as
> he shall judge necessary and expedient." The circumstances under
> which I now meet you will acquit me from entering into that subject
> further than to refer to the great constitutional charter under which you
> are assembled, and which, in defining your powers, designates the
> objects to which your attention is to be given. It will be more consistent
> with those circumstances, and far more congenial with the feelings
> which actuate me, to substitute, *in place of a recommendation of
> particular measures*, the tribute that is due to the talents, the rectitude,
> and the patriotism which adorn the characters selected to devise and
> adopt them.

George Washington's First Inaugural Address; 4/30/1789; (SEN 1A-E1); Presidential

Messages, 1789–1875; Records of the U.S. Senate, Record Group 46; National

Archives Building, Washington, D.C. (emphasis added)

Among the other Measures that President Trump recommended in the

Ellipse Speech—which also thereby constitutes an exercise of his constitutional

duty to "take care that the laws be faithfully executed"—was his recommendation

regarding an avenue for Congress to reject the certification of the 2020 election

(thereby granting state legislatures more time to investigate) and his

recommendation of a package of legislative reforms directed to preventing the

repeat of similar problems in future elections (SUMF ¶¶ 50, 51). In addition to

concerns over specific violations of the law, President Trump's recommendations

would protect the right to vote, prevent voter disenfranchisement, and uphold due

process and equal protection, all of which fall squarely within a President's purview

under the Recommendations Clause (SUMF ¶¶ 50, 51). More generally, President

Trump made clear that his concerns directly implicated the preservation of our

American democracy, issues of national security, and safeguarding the Constitution (SUMF ¶¶ 49, 50).

The Supreme Court has repeatedly upheld the doctrine of Presidential immunity when the action in question implicates an official function of the presidency. Indeed:

> Even if the President were ultimately not found liable for certain official actions, the possibility of an extended proceeding alone may render him "unduly cautious in the discharge of his official duties." *Fitzgerald*, 457 U.S., at 752, n. 32, 102 S.Ct. 2690. Vulnerability "to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute." *Id.*, at 752–753 102 S.Ct. 2690 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (CA2 1949) (Hand, L., C. J.)). The Constitution does not tolerate such impediments to "the effective functioning of government." *Fitzgerald*, 457 U.S., at 751, 102 S.Ct. 2690.

*Trump*, 603 U.S. at 636. For these reasons, President Trump is entitled to absolute immunity as to the Ellipse Speech, because it was an exercise of his core Recommendations Clause authority under the Constitution. Any further inquiry by this Court or any other would breach the separation of powers and undermine the other purposes of absolute presidential immunity.

## 2. Both core functions and the outer perimeter of presidential authority include speech on matters of public interest, including the fairness and integrity of federal elections.

President Trump's Ellipse Speech is also independently immune, because speaking to the public and/or Members of Congress on matters of public concern is an act within the "outer perimeter" of his official responsibility. *Nixon*, 457 U.S. at 756 ("In view of the special nature of the President's constitutional office and functions, we think it appropriate to recognize absolute Presidential immunity from

damages liability for acts within the 'outer perimeter' of his official responsibility."). Even when "not obviously connected to a particular constitutional or statutory provision," a President's official actions—i.e., actions not clearly outside that outer perimeter— remain immune. *Trump*, 603 U.S. at 618. For example, when a President "speak[s] to and on behalf of the American people" in an official capacity, immunity always attaches, even if the President lacks an explicit role in the underlying subject. *Id.* (citing *Trump v. Hawaii*, 585 U.S. 667, 701 (2018)). Indeed, "[t]he presidential-immunity doctrine articulated in *Nixon* is capacious by design." *Blassingame*, 87 F.4th at 12.

As a practical matter, most of a President's public "communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump*, 603 U.S. at 629. And for good reason. As the D.C. Circuit recognized in *Blassingame*, the president must have "the maximum ability to deal fearlessly and impartially with the duties of his office." *Id.* (quoting *Nixon*, 457 U.S. at 752). *Blassingame* thus expressly rejected the plaintiffs' contention "that immunity can attach only to speech made in furtherance of a presidential power specifically enumerated in Article II of the Constitution." *Id.* at 31 (Katsas, J., concurring) ("Presidents routinely speak in an official capacity even when not directly exercising any enumerated power."). "Official responsibilities also include 'discretionary acts' within the 'concept of duty' associated with the office." *Id.* at 13 (quoting *Barr v. Matteo*, 360 U.S. 564, 575 (1959) (plurality opinion)).

"[D]ecades if not centuries of tradition establish that the President may use

15

the soft power of his office—the bully pulpit—to urge action by Congress, the judiciary, the states, or private parties on matters of public concern." *Id.* at 31 (Katsas, J., concurring). "The President possesses 'extraordinary power to speak to his fellow citizens and on their behalf.'" *Trump*, 603 U.S. at 629. (citing *Hawaii*, 585 U.S. at 701; *cf. Lindke v. Freed*, 601 U.S. 187, 191 (2024). "As the sole person charged by the Constitution with executing the laws of the United States, the President oversees—and thus will frequently speak publicly about—a vast array of activities that touch on nearly every aspect of American life." *Id.* "Indeed, a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically," and the President is even expected to comment on "those matters of public concern that may not directly implicate the activities of the Federal Government." *Id.* "For example, the political branches have no official role in deciding cases or controversies, U.S. Const. Art. III, yet Presidents often comment officially—in White House press conferences or even State of the Union addresses—about past or prospective Supreme Court decisions." *Blassingame*, 87 F.4th at 31.

Furthermore, the Supreme Court has made clear that the President's authority to speak on a wide range of topics is not limited by subject matter, and official action unambiguously includes "his public communications regarding the fairness and integrity of federal elections" even when "he is running for re-election." *Trump*, 603 U.S. at 627. "Similarly, the President may speak on and discuss such matters with state officials—even when no specific federal responsibility requires

his communication—to encourage them to act in a manner that promotes the President's view of the public good." *Id.* Indeed, "so long as they are 'not manifestly or palpably beyond [his] authority,'" immunity extends fully to those actions which fall within the outer perimeter of a President's official responsibilities. *Id.* at 618. Consequently, there is "absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Blassingame*, 87 F.4th at 12. (quoting *Nixon*, 457 U.S. at 756). This is because the president "occupies a unique position in the constitutional scheme," *Nixon*, 457 U.S. at 749, *Blassingame*, 87 F.4th at 12, and, as the embodiment of the executive branch, the President "must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Nixon*, 457 U.S. at 752; *Blassingame*, 87 F.4th at 12.

As the D.C. Circuit noted, "a President acts within the scope of his office when he urges Members of Congress to act in a particular way with respect to a given legislative matter—even a matter, such as a congressional investigation, in which the President has no constitutional role." *Blassingame*, 87 F.4th at 31–32 (Katsas, J., concurring) (quoting Brief for United States as Amicus Curiae at 11–12).

"The President possesses 'extraordinary power to speak to his fellow citizens and on their behalf,'" *Trump*, 603 U.S. at 629. And in January of 2021 there was no matter more pressing to the American public than the outcome of the 2020 presidential election. President Trump thus dedicated his Ellipse Speech to addressing these concerns, to speaking directly to Congress and to the American

public, and to using the power of the bully pulpit to speak on the public's behalf (*see* SUMF at 42). President Trump's attempt to influence Congress over such matters undoubtedly fell within the outer perimeter of his executive authority, as articulated in *Blassingame*.

In fact, during arguments before the D.C. Circuit, Plaintiffs *conceded* that the President Trump acted in his presidential capacity. "The plaintiffs assert that President Trump 'disrupted the constitutionally mandated separation of powers by invading a coordinate branch of government [i.e., Congress] as it carried out its own constitutional duties' to count the votes of the Electoral College. Pls' Br. 28. That kind of 'executive branch interference,' to the plaintiffs, *id.* at 33, works a 'blatant violation of the constitutional separation of powers that 'restrains each of the three branches of the Federal Government from encroaching on the domain of the other two,' *id.* at 29–30 (quoting *Clinton*, 520 U.S. at 691). In conceiving of President Trump's actions as an effort by one branch to interfere in another branch's sphere, however, the plaintiffs' argument presupposes that President Trump acted in an official capacity." *Blassingame*, 87 F.4th at 25.

And this concession is proper, when one analyzes the content, context, and form of President Trump's speech.

### 3. The President discussed policy matters, sought to persuade Congress, and called for Vice President Pence to properly execute his duties.

Standing alone, the content of a President's speech is enough to enable a court to determine that presidential action falls within the outer perimeter of his official duties. (*See* footnote 1, *supra*.) The content of the Ellipse Speech, as

previously addressed, demonstrates that it was an official act. The speech (1) provided information to Congress regarding the State of the Union, (2) recommended Measures to Congress regarding matters of election reform and election certification, and (3) in the aggregate, sought to ensure that the Nation's election laws were upheld. (SUMF ¶¶ 49-51). The Ellipse Speech made significant use of President Trump's outer perimeter powers by addressing the Nation on matters of public concern and by communicating with Vice President Mike Pence regarding his constitutional obligations. (SUMF ¶ 52).

Further, the Ellipse Speech repeatedly called upon Vice President Mike Pence to perform his constitutional and statutory duties by refusing to certify the election results, an act that also fell squarely within the ambit of the President's outer perimeter powers (SUMF ¶ 52). Indeed, "[w]henever the President and Vice President discuss their official responsibilities, they engage in official conduct" and "[p]residing over the January 6 certification proceeding at which Members of Congress count the electoral votes is a constitutional and statutory duty of the Vice President." *Trump*, 603 U.S. at 622 (citing U.S. Const. art. II, § 1, cl. 3; *Id.* amend. XII; 3 U.S.C. § 15). In the Supreme Court's view, "[t]he indictment's allegations that Trump attempted to pressure the Vice President to take particular acts in connection with his role at the certification proceeding thus involves official conduct, and Trump is at least presumptively immune from prosecution for such conduct." *Trump*, 603 U.S. at 623. President Trump is entitled to the same presumption here, in the civil context, as well.

On its face, there is no portion of the Ellipse Speech that could be considered *manifestly or palpably* outside the broad powers the President enjoys when performing an act within the outer perimeter of his executive authorities and, indeed, "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump*, 603 U.S. at 629; *see also Clinton*, 520 U.S. at 686 (finding potentially defamatory public comments on behalf of Clinton regarding pre-presidential private conduct "arguably may involve conduct within the outer perimeter of the President's official responsibilities. . ." and thus not "palpably" outside that perimeter). Thus, the speech, standing alone, demonstrates that President Trump is entitled to absolute civil immunity.

But this Court need not rely solely on the Ellipse Speech itself. As discussed below, other contextual factors also demonstrate that the Ellipse Speech must, at a minimum, reasonably be understood to have been an official act.

### 4. Following its normal practice and procedures, White House staff vetted the speech as an official communication.

Particularly telling is the treatment of the Speech itself by staff within the White House. "The executive branch's own views and practice" are accorded weight, *Blassingame*, 87 F.4th at 17, including whether the White House, under its normal practice and procedures, "treat[s] President Trump's speech as official presidential remarks." *Id.* at 23.

Here, the White House staff treated President Trump's speech as official action, based on its normal practice and procedure. (SUMF ¶¶ 53-56). Stephen

Miller, who headed the White House speechwriting office, explained that White House staff—including those responsible for determining, for Hatch Act purposes, whether speeches were official or political—treated the Ellipse Speech as an official, rather than an unofficial, speech. (SUMF ¶¶ 53, 54). For example, on the evening of January 5, 2021, a draft of the Ellipse Speech was circulated by the White House Staff Secretary to various personnel, including at least one member of the Office of White House Counsel, for review. (SUMF ¶ 54). The transmittal email did not contain a Hatch Act notice which, as Mr. Miller explained, the Staff Secretary would have included had the Ellipse Speech been considered an unofficial, political speech. (SUMF ¶ 54). By contrast, just three days earlier, when the White House Staff Secretary distributed a draft Presidential Speech to be delivered at a political event in Georgia to a largely identical group of White House Staffers for review, the cover email contained a prominent Hatch Act warning in the following form:

**NOTE: HATCH ACT RESTRICTIONS APPLY**. This speech will be delivered at a political event and thus Hatch Act restrictions apply. Accordingly, per instruction from the White House Counsel's Office, review for issues beyond accuracy (such as for political consistency or effective messaging) should not be performed by noncommissioned officers or using official equipment and office space. Commissioned officers should not use official equipment to review for issues beyond accuracy (such as for political consistency or effective messaging). If you have any questions pertaining to Hatch Act restrictions with respect to review of these remarks, please be sure to consult with your designated ethics officer.

(Exhibit 47, SUMF ¶ 55). Notably, Deputy White House Counsel Patrick Philbin was copied on the Staff Secretary's email conveying the draft of the Ellipse Speech. But there is no evidence that he or any other member of the White House Counsel's Office suggested that the Ellipse Speech should be treated as subject to the Hatch Act. (SUMF ¶¶ 54-56).

Thus, the White House personnel expressly charged with distinguishing between official and political speeches for purposes of enforcing the Hatch Act concluded at the time that the Ellipse Speech was an official, as opposed to a political, speech. This conclusion reasonably arose from (1) the content of the Speech, which aired the President's views on key election and electoral reform issues, (2) the President's recommendations to Congress of an array of measures to address his concerns, and (3) the location of the speech, a site carefully selected by the President and the White House staff, as the President addressed Congress and the nation directly in front of the White House. And White House staff, of course, made these determinations contemporaneously, for important legal reasons that had nothing to do with this inquiry.

### 5.    White House officials helped plan the President's involvement in the event.

"Knowing, for instance, … who was involved … in organizing the rally" is relevant to determining whether action is official or non-official. *Trump*, 603 U.S. at 630. Evidence shows that White House personnel acting within their official capacity were deeply involved in the planning, organization, and execution of President Trump's participation in the event. White House personnel were involved in the logistics and planning of President Trump's Ellipse Speech (SUMF ¶¶ 41, 42). After President Trump decided to speak at the event, the White House Deputy Chief of Staff obtained clearance from the Department of the Interior to have the President's Speech held at the center of Ellipse "so POTUS is center to the WH." (SUMF ¶¶ 34-36), Exhibit 22) ("we are working with the organization that is

22

hosting the event on the 6th on the ellipse for POTUS to speak at. They are trying to get a center stage position so that POTUS is speaking with the White House directly behind him, not 30' off center, *which is the desire of the White House and the President as well*. We are looking for NPS to give the organization a waiver for the 'vista site line' so POTUS is center to the WH.")(emphasis supplied). Thus, senior White House staff not only referred to President Trump in his official position as "POTUS," but it also selected the setting for the President's nationally televised policy speech in order to ensure that the backdrop would be an iconic view of the White House, while President Trump spoke from behind a podium that prominently featured the Seal of the President of the United States. (SUMF ¶ 45).

### 6. Timing and location were designed to affect public policy and Congressional action.

The context surrounding the Ellipse Speech shows that it was an official act, and the date, location, and timing of the Ellipse Speech confirms this. It is no coincidence that President Trump delivered his remarks on the same day that the Vice President and Congress assembled, in joint session, to carry out their Constitutional duties, (SUMF ¶ 44). Nor is it a coincidence that President Trump delivered his remarks before Congress was set to engage in debates over the certification of the election results. (SUMF ¶ 44). And President Trump, for his part, directly addressed both Congress and the Vice President regarding their duties from a carefully selected location at the White House approximately two miles away. (SUMF ¶ 46). And as explained above, official White House staff sought to ensure that President Trump delivered his remarks in front of the very seat of the

executive branch. To be sure, President Trump did not give the speech from the Oval Office, which would have been impossible given the large crowd. But use of the iconic backdrop of the White House and use of the Presidential Seal for the Ellipse Speech was itself a significant indicator of its official nature.

These facts make it evident that President Trump was engaging with Congress in his official role as President and not as a private candidate for office.

### 7. The Ellipse Speech urge the Vice President and Congress to discharge their duties in a manner President Trump believed to be consistent with the U.S. Constitution.

The Ellipse Speech was an event aimed at addressing the nation and, more specifically, Members of Congress. Evidence of this fact is the location of the rally, which was held at the Ellipse and in full view of the White House.

Women for America First organized the Save America Rally, (SUMF ¶ 28), which was funded entirely by private donors (SUMF ¶ 37) and not by the presidential campaign. The organizers did not work with the Trump campaign in conceiving or organizing the Save America Rally, they did not receive funds from the Trump campaign, and they did not employ or work with any person on the Trump campaign, all facts confirmed by Federal Election Commission Records. (SUMF ¶¶ 37-40).

In fact, the event organizer testified that the purpose was not to promote President Trump's re-election or to advance any private agenda, but rather to petition members of Congress to take action regarding the administration of the November 2020 election and to raise concerns regarding election fraud and election

integrity (SUMF ¶ 29).

Importantly, President Trump used this opportunity to further his agenda as President of the United States and lobby Congress. The Plaintiffs concede that President Trump used his Ellipse Speech as an attempt to influence Congress, (SUMF ¶ 47), and at the time he spoke, President Trump also viewed his attendance to be in his official capacity as President of the United States (SUMF ¶ 43). President Trump's participation is in line with the common, well-accepted practice of all presidents. For example, presidents have frequently used private events to further their official duties, including events such as the National Prayer Breakfast. And while the private funding of the Save America Rally alone may not determine the nature of President Trump's attendance, private funding is consistent with the goal of petitioning Congress, and it is consistent with President Trump using the platform to further his official agenda of urging Congress to take certain actions regarding the electoral vote. Similarly, a president who gives a nationally televised speech regarding the nation's economic policy at a privately funded event hosted by the Economic Club of Chicago engages in official conduct, even if the event is not publicly funded.

### 8.    The speech was nationally televised.

The Ellipse Speech delivered at the Save America Rally was a nationally televised address. This is markedly different than purely private conduct, such as writing a letter to a personal friend, or a private conversation. Rather, as noted above, the speech was aimed at both Members of Congress and the general public

and related to matters of public importance pending before Congress involving the safety and security of federal elections (which, of course, take place every two years). Such a speech is not palpably and manifestly unofficial.

### 9. A court may not consider a President's allegedly improper motives or allegations of illegality.

"A President's actions do not fall beyond the outer perimeter of official responsibility merely because they are unlawful or taken for a forbidden purpose. Rather, the President's official immunity insulates all of his official actions from civil damages liability, regardless of their legality or his motives." *Blassingame*, 87 F.4th at 14. More bluntly, "[i]n dividing official from unofficial conduct, courts may not inquire into the President's motives." *Trump*, 603 U.S. at 618, "[n]or may courts deem an action unofficial merely because it allegedly violates a generally applicable law *Trump*, 603 U.S. at 619.

Thus, the validity and/or merit of President Trump's concerns (as articulated in the speech) and what anyone believes was President Trump's subjective intent in advancing his concerns, bears no significance in determining whether his conduct was official. *See Blassingame* at 20–21 (quoting *Nixon*, 457 U.S. at 756). Nor is it determinative whether President Trump was a candidate seeking office at the time the Ellipse Speech was delivered, because such circumstances cannot overcome his ability to exercise his constitutional and statutory authorities. *Trump*, 603 U.S. at 627. As such, the analysis to be conducted by this Court must "be fashioned and carried out with appropriate sensitivity to the important interests at stake," eschewing "highly intrusive inquiries" into President Trump's motivations.

*Blassingame*, 87 F.4th at 20–21. Nor should the inquiry turn on whether "the politics or policy being advanced or the words being used" could benefit President Trump politically. *Id.* Indeed, "[t]he principal rationale for official immunity— 'providing an official 'the maximum ability to deal fearlessly and impartially with' the duties of his office'—thus applies to the President with pronounced force." *Id.* at 12 (quoting *Nixon*, 457 U.S. at 752). And this principle explicitly applies "whether the activity was subjectively undertaken in some measure to enhance the President's re-election prospects or profile." *Blassingame*, 87 F.4th at 20-21.

C.    **President Trump reached out to state and local officials in his capacity as President of the United States.**

In the aftermath of the 2020 presidential election, President Trump reached out to numerous state and local election officials and members of state legislatures over concerns of election irregularities that occurred within their respective jurisdictions. To the extent records exist memorializing or referring to these conversations, they are considered official communications maintained by the National Archives. (SUMF ¶ 26). As to these communications, President Trump is entitled to absolute civil immunity, as these acts were performed not only within the outer perimeter of his official responsibilities, but in accordance with his conclusive and preclusive Article II, Section 3 authority to "take care that the laws be faithfully executed." Indeed, "the President may speak on and discuss such matters with state officials—even when no specific federal responsibility requires his communication—to encourage them to act in a manner that promotes the President's view of the public good." *Trump*, 603 U.S. at 627. Furthermore, it is

27

inconsequential whether any other government agency, including any law enforcement agency, such as the Department of Justice, participated in these efforts, as the President "alone composes a branch of government" and his powers are not derivative from any other component of the Executive branch. *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020). Nor are the President's broad powers to speak on matters of public concern diminished "simply because he is running for re-election." *Trump*, 603 U.S. at 627. Thus, President Trump is entitled to absolute civil immunity over any communication with state and local officials—and members of state legislatures—which addressed concerns over the 2020 presidential election.

**D.    President Trump's communications on his Twitter account also fell within the outer perimeter of presidential authority.**

**1.    Lindke v. Freed provides the correct framework to determine whether a "tweet" constitutes official action.**

President Trump enjoys absolute civil immunity for any tweet that implicates a conclusive and preclusive executive power as enumerated under Article II, Section 3. And for those tweets that fall within the outer perimeter of President Trump's executive authority—such as those consistent with the power of the bully pulpit—President Trump enjoys absolute civil immunity in accordance with *Nixon* and *Trump, supra*. The Supreme Court's decision in *Lindke v. Freed* provides the framework for determining whether a given tweet constitutes state action. There, a unanimous Court set forth the analysis to be used to determine when a government official's postings on a social media account must be treated as

state action for First Amendment purposes. Consistent with this analysis, the scope of official conduct in the presidential context includes, at minimum, all conduct that the Supreme Court considers state action in the First Amendment context. Therefore, if President Trump's activity on Twitter is state action under the *Lindke* analysis, *a fortiori*, it is within the "outer perimeter" of the President's official responsibility under *Nixon*.

At the outset of its analysis, the Court in *Lindke* recognized that it "has had little occasion to consider" when an officeholder "engaged in state action or functioned as a private citizen," noting "[t]he question is difficult" and especially so for an "official who routinely interacts with the public." *Lindke v. Freed*, 601 U.S. 187, 188, 196 (2024). "A close look is definitely necessary in the context of a public official using social media." *Id.* at 197. The Court acknowledged that many among the United States' tens of millions of public officials "use social media for personal communication, official communication, or both—and the line between the two is often blurred." *Id.* Accordingly, "[t]he Court has frequently emphasized that the state-action doctrine demands a fact-intensive inquiry." *Id.* With those concerns in mind, the *Lindke* court determined that "speech is official . . . if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." *Id.* at 191.

"The first prong of this test is grounded in the bedrock requirement that 'the conduct allegedly causing the deprivation of a federal right be *fairly attributable to the State.*'" *Id.* at 198 (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937

(1982) (emphasis added)). "An act is not attributable to a State unless it is traceable to the State's power or authority." *Id.* In contrast to the primacy of determining official conduct by its "trappings" according to the *Blassingame* court, the *Lindke* Court held that "[p]rivate action—no matter how 'official' it looks—lacks the necessary lineage" to be state action. *Id.* In fact, the *Lindke* court criticized "Lindke's focus on appearance," holding instead that "the presence of state authority must be real, not a mirage." *Id.* at 199.

What matters for this first prong is that the government entrusted the official with the responsibility of making the statements that were made. *Id.* That is, the official's speech was "on a matter within [the official's] bailiwick" or within the official's "portfolio," and there is "a tie between the official's authority and 'the gravamen of the plaintiff's complaint.'" *Id.* Though President Trump did not misuse his power, consistent with *Blassingame*, the *Lindke* Court also held that the "*misuse* of power, possessed by virtue of state law," is official conduct ("state action"). *Id.* at 199 (cleaned up) ("To misuse power, however, one must possess it in the first place.").

Where "an official has authority to speak for the State, he may have the authority to do so on social media even if the law does not make that explicit." *Id.* at 200. A "high-ranking official" with "broad responsibility" implicitly has "authority to make official announcements" on the subjects within their purview. *Id.* at 201 ("The inquiry is not whether making official announcements *could* fit within the job description; it is whether making official announcements is *actually*

part of the job that the State entrusted the official to do."). This same standard would apply to the President, who alone encompasses a branch of government, with pronounced force.

Under the second prong of the test, "[f]or social-media activity to constitute state action, an official must not only have state authority—he must also purport to use it." *Id.* at 201. "Generally, a public employee purports to speak on behalf of the State while speaking in his official capacity or when he uses his speech to fulfill his responsibilities pursuant to state law." *Id.* (cleaned up). "If the public employee does not use his speech in furtherance of his official responsibilities, he is speaking in his own voice." *Id.*

Where a social media account is "not designated either 'personal' or 'official,'" it may be "mixed use"—containing "some posts in his personal capacity and others in his [official] capacity[.]" *Id.* at 202. Categorizing such posts on "ambiguous" accounts "is a fact-specific undertaking in which the post's content and function are the most important considerations." *Id.* at 203. The *Lindke* court further noted that "many public officials possess a broad portfolio of governmental authority that includes routine interaction with the public, and it may not be easy to discern a boundary between their public and private lives." *Id.* "[W]hen there is doubt, additional factors might cast light—for example, *an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business.*" *Id.* (Emphasis added).

The *Lindke* Court's conclusion that an inquiry into whether a prolific official's

social media statements were state action or not is "difficult" and often involves "blurred" lines, which this Court must consider in light of *Blassingame*'s conclusion that a president "should be afforded immunity" absent "a sufficiently clear answer in either direction." *Blassingame*, 87 F.4th at 21. "[I]f it is unclear whether the presidential speech is official, the Court appropriately preserves the immunity." *Id.* at 33 (Katsas, J., concurring). Those "considerations counsel in favor of construing the President's actions to involve official functions 'so long as [they] can reasonably be understood' as such." *Id.* (quoting *Hawaii*, 585 U.S. at 670). In combination, these rubrics further warrant granting immunity.

### 2. President Trump possessed actual authority and in fact used it, thus making his tweets state – and official – action.

Applying the *Lindke* analysis to President Trump's Twitter statements identified within the Complaints makes it clear that the first element of the *Lindke* test is easily met. As President of the United States, President Trump "possessed actual authority to speak on the [government's] behalf." *Lindke*, 601 U.S. at 191. "Decades if not centuries of tradition establish that the President may use the soft power of his office—the bully pulpit—to urge action by Congress, the judiciary, the states, or private parties on matters of public concern." *Blassingame*, 87 F.4th at 31 (Katsas, J., concurring). "For example, the political branches have no official role in deciding cases or controversies, U.S. Const. Art. III, yet Presidents often comment officially—in White House press conferences or even State of the Union addresses—about past or prospective Supreme Court decisions." *Id.* "[A]s the government explains in this case, 'a President acts within the scope of his office

when he urges Members of Congress to act in a particular way with respect to a given legislative matter—even a matter, such as a congressional investigation, in which the President has no constitutional role'"—and "the President [in his official capacity] can and must engage with the public on matters of public concern" *Id.* at 31–32 (Katsas, J., concurring) (quoting Brief for United States as Amicus Curiae at 11–12).

President Trump's tweets also satisfied the second element of the *Lindke* test because he generally "purported to exercise that authority when he spoke on social media," *Lindke*, 601 U.S. at 191, or "use[d] his speech to fulfill his responsibilities pursuant to state law," *id.* at 201, and did so specifically with regard to the relevant tweets at issue in this case. A president's responsibilities include taking care that the laws are faithfully executed. His responsibilities also include urging Congress and the states to take action on matters of public concern, which, as the Government agrees, was decidedly an act "within the scope of his office." As the Government also acknowledged, a President "must engage" with the public on matters of public concern and does so in his official capacity.

Few matters in late 2020 and early 2021 were of greater public concern than the handling of the November 2020 election. President Trump's communications on Twitter addressed these perceived irregularities and thus addressed a pressing matter of national concern. These communications included President Trump's belief that the U.S. Department of Justice, members of Congress, and certain state governments had failed to adequately investigate those irregularities. Whether, in

hindsight, this Court agrees with the concerns expressed by President Trump is ultimately irrelevant to the analysis presently before the Court. Presidents must have the latitude to judge circumstances and call for government action as they deem appropriate, and preserving the President's ability to do so implicates the separation of powers. Thus, questions of style, factual accuracy, or mere political disagreement play no part in the present analysis.

*Prima facie*, President Trump spoke in furtherance of his official responsibilities. He purported to exercise his official authority when he used Twitter to broadcast his concerns over the 2020 election, when he used his Twitter account to call Congress and the Vice President to action, and when he criticized the actions of state and federal authorities. As analyzed above, the Ellipse Rally was not a campaign event but rather an event directed at influencing members of Congress and addressing the American public, and President Trump delivered the Ellipse Speech in his official capacity. Accordingly, President Trump's tweets promoting the Rally—and his tweeted video of his Ellipse Rally speech—also constituted official conduct. President Trump's tweets directed at the protesters, urging them to be peaceful, to respect the law enforcement officers defending the Capitol, and to go home, were also clearly in his official capacity as the Nation's leader and constituted an attempt to diffuse the situation by persuading the crowd to desist and disperse without further violence.

There is additional specific evidence corroborating that President Trump's use of his Twitter account was official conduct. First, he labeled the account with

his official title, The 45th President of the United States (SUMF ¶ 19). Second, the President, his aides, and multiple members of his administration described the use of his account as "official." (SUMF ¶ 3, 6). Third, The White House Press Secretary publicly announced that communications on President's the Twitter account should be considered "official statement by the President of the United States" (SUMF ¶ 4), and President Trump operated the account with help from the White House Director of Social Media (SUMF ¶ 5).

Fourth, President Trump used his Twitter account routinely for official communications. He used the account to announce, describe, and defend his policies, agenda, and actions, (SUMF ¶ 8) and discussed diverse public policy subjects (SUMF ¶ 7). Officials throughout the U.S. Government treated communications on the Twitter account as official statements. In court, the U.S. Department of Justice cited tweets in official court filings as official statements (SUMF ¶ 10), executive staff monitored the account for presidential statements (SUMF ¶ 10), official news briefs referred to tweets on the account (SUMF ¶ 11), the U.S. Department of Defense monitored the account SUMF ¶ 14), as did U.S. CENTCOM (SUMF ¶ 15).

Fifth, the U.S. National Archives, the agency tasked with maintaining and preserving government records, treated the account as official (SUMF ¶ 19-20).

Sixth, the Archives has obtained and preserved the tweets announcing President Trump's participation in the Save Our America Rally and his actions surrounding the event have been obtained and preserved by the National Archives

(SUMF ¶¶ 21-26), although it was not able to save all of them, due to Twitter's decision to deactivate and remove President Trump's account (SUMF ¶ 27).

Seventh, a then-in-force (but since vacated on mootness grounds) Second Circuit decision held that "the President … acts in an official capacity when he tweets," demonstrating that President Trump's tweets at issue here were considered official conduct when issued. *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 236 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021), *and abrogated by Lindke*, 601 U.S. 187.

Eighth, the Trump Presidential Library specifically cites to the @realDonaldTrump Twitter account as the official Twitter account of the Trump presidency (see SUMF at 19).

For the foregoing reasons, President Trump's use of his Twitter account, as alleged in the Complaints, was official conduct for which President Trump is entitled to absolute civil immunity. This evidence shows that one cannot argue that President Trump's tweets were "manifestly and palpably" non-official action. And if the lines were blurred with respect to President Trump's tweets under the *Lindke* standard, or if there is not "a sufficiently clear answer in either direction," *Blassingame*, 87 F.4th at 21, under the *Blassingame* standard, or if "it is unclear whether the presidential speech is official," *id.* at 33 (Katsas, J., concurring), this Court must recognize that presidential immunity attaches to all communications in the Twitter account @realDonaldTrump.

**E.    Courts may not inquire into allegations that President Trump failed to take action to stop the events of January 6.**

President Trump understands this Court to have already concluded that no claim can be stated against him for any alleged failure to take action to stop the events of January 6. *See Thompson v. Trump*, 590 F. Supp. 3d 46, 84-85 (D.D.C. 2022) ("Absolute immunity would be gutted if a plaintiff could avoid it simply by alleging a failure to exercise presidential power."). But, to the extent, if at all, that any Plaintiff still asserts that President Trump can be liable for an alleged failure to use police, military, or other presidential power to stop those events, such claims are clearly barred. This Court was correct in *Thompson* that absolute immunity bars such claims. In addition, claims that the President has failed properly to execute the law are categorically non-justiciable. *United States v. Texas*, 599 U.S. 670, 678-681 (2023). Such concerns are to be policed by Congress and the electorate, not the courts. *Id.* at 685. That is especially true to the extent that any Plaintiff suggests President Trump should have made different decisions with respect to the use of the National Guard—a President's discretionary decision making regarding the use of military force is *emphatically* outside the province of judicial review. *Martin v. Mott*, 25 U.S. 19, 31-32 (1827); *Luther v. Borden*, 48 US 1, 44-45 (1849).

## CONCLUSION

For the foregoing reasons, Defendant Donald J. Trump respectfully requests the Court to grant his Summary Judgment Motion.

January 24, 2025                                        Respectfully submitted,

*/s/     Jonathan M. Shaw*
Jonathan M. Shaw
D.C. Bar No. 446249
Gerald A. Urbanek, Jr.
VA Bar No. 95043
DHILLON LAW GROUP, INC.
2121 Eisenhower Ave, Suite 402
Alexandria, Virginia 22314
Telephone: (703) 574-1206
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com
gurbanek@gmail.com


Jesse R. Binnall, VA022
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
jesse@binnall.com

Scott Gessler*
GESSLER BLUE LAW
7350 E. Progress Place, Suite 100
Greenwood Village, Colorado 80111
Telephone: (720) 839-6637
sgessler@gesslerblue.com


*Attorneys for Defendant
President Donald J. Trump*


* pro hac vice forthcoming

## CERTIFICATE OF SERVICE

I certify that on January 24, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/     *Jonathan M. Shaw*
Jonathan M. Shaw
D.C. Bar No. 446249

*Attorney for Defendant*
*President Donald J. Trump*

39