IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BARBARA J. LEE *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP *et al.*,<br><br>Defendants. | Case No. 21-cv-00400 (APM)<br><br>*Consolidated Cases:*<br>*21-cv-00586 (APM)*<br>*21-cv-00858 (APM)*<br>*21-cv-02265 (APM)*<br>*22-cv-00010 (APM)*<br>*22-cv-00011 (APM)*<br>*22-cv-00034 (APM)*<br>*23-cv-00038 (APM)* |

**PRESIDENT DONALD J. TRUMP'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule LCvR7(h), President Donald J. Trump hereby submits this Statement of Undisputed Material Facts as to which there is no genuine issue to be tried.

**I.    The Twitter Account**

1. At all times relevant to the material facts of this case, the @realDonaldTrump Twitter account had been designated "as a primary vehicle" for the official communications of President Donald J. Trump by the United States Court of Appeals for the Second Circuit. *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 953 F.3d 216, 217 (2d Cir. 2020). (Exhibit 1).[1]

2. "The public presentation of the Account and the webpage associated with it" bore "all the trappings of an official, state–run account." Knight First Amendment Inst. at Columbia Univ. v. Trump, 928 F.3d 226, 231 (2d Cir. 2019), cert. granted, judgment vacated for

---

[1] All references to exhibits in this document are to exhibits attached to the declaration of Gerald Urbanek.

mootness sub nom. <u>Biden v. Knight First Amendment Inst. At Columbia Univ.</u>, 141 S. Ct. 1220, 209 L. Ed. 2d 519 (2021), <u>abrogated by</u> <u>Lindke v. Freed</u>, 601 U.S. 187, 144 S. Ct. 756, 218 L. Ed. 2d 121 (2024). (Exhibit 2).

3. "The President and multiple members of his administration" had "described his use of the Account as official." *Id.* (Exhibit 2).

4. In June 2017, then–White House Press Secretary Sean Spicer stated at a press conference that President Trump's tweets should be considered "official statements by the President of the United States." *Id.* (Exhibit 2).

5. President Trump operated the Account with the assistance of Daniel Scavino, the White House Director of Social Media and Assistant to the President. *Id.* at 232. (Exhibit 2).

6. President Trump and his aides "have characterized tweets from the Account as official statements of the President." *Id.* (Exhibit 2).

7. The Account covered subjects as diverse as military actions, immigration policies, and senior staffing changes, among other major official announcements, and served as President Trump's most important channel of communication. *Knight v. Trump,* 953 F.3d 216, 225. (Exhibit 2a).

8. President Trump frequently used the Account "to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; [and] to challenge media organizations whose coverage of his Administration he believes to be unfair." *Knight v. Trump,* 928 F.3d 226, 231. (Exhibit 2a).

9. "In June 2017, the White House responded to a request for official White House records from the House Permanent Select Committee on Intelligence by referring the Committee to a statement made by the President on Twitter." *Id.* at 232. (Exhibit 2).

10. On November 13, 2017, in the matter of *James Madison Project, et al. v. Department of Justice, et al.*, (No. 1:17-cv-00144-APM) the U.S. Department of Justice cited tweets appearing on the Account as official statements of the President of the United States. (Exhibit 3, pgs. 3-4).

11. According to internal White House guidelines for the creation of daily "News Briefs," executive staff were instructed to monitor the @realDonaldTrump Twitter account for statements issued by President Trump. (Exhibit 4).

12. In accordance with these guidelines, the White House issued daily "News Briefs" with a "POTUS Tweets" section, dedicated entirely to tweets issued from the Account. (Exhibit 5).

13. On January 5, 2021, the White House issued a "News Alert" informing members of the White House Office and the Executive Office of the President that President Trump intended to speak at the Save America Rally on January 6, 2021, by citing directly to President Trump's statement issued via the Account. (Exhibit 6).

14. The U.S. Department of Defense monitored the Account for official statements from President Trump. (Exhibit 7, e.g. pg. 7).

15. U.S. CENTCOM monitored the Account for official statements from President Trump. (Exhibit 8, pg. 2).

16. In accordance with the Presidential Records Act of 1978 ("PRA"), the National Archives is tasked with collecting and preserving Presidential records. 44 U.S.C. §§ 2201-2209.

17. The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have

an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. 44 U.S.C. § 2201.

18. The National Archives, the agency of government responsible for maintaining the government's records, has concluded that the President's tweets are official records. *Id. Knight v. Trump,* 928 F.3d 226, 232. (Exhibit 2).

19. As identified on the archived Trump White House website, which is preserved and maintained by the National Archives and is described as "historical material 'frozen in time,'" the @realDonaldTrump Twitter account is featured directly beneath the words "Donald J. Trump, 45th President of the United States."

    (https://trumpwhitehouse.archives.gov/people/donald-j-trump/)  (Exhibit 9).

20. On January 10, 2021, the National Archives announced its intention to "receive, preserve, and provide access to all official Trump Administration social media content, including deleted posts from @realDonaldTrump and @POTUS."

    (https://x.com/USNatArchives/status/1348330024420700160?mx=2) (Exhibit 10).

21. As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the Account which announced President Trump's intention to speak at the Save America Rally. (Exhibit 11).

22. As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the Account which criticized the Supreme Court's unwillingness to hear cases related to the 2020 election. (Exhibit 12).

23. As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the

4

Account which discussed the need for an immediate appointment of "a strong, fast, and fair Special Counsel" to investigate the 2020 election results. (Exhibit 13).

24. As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the Account which criticized the Justice Department and the Federal Bureau of Investigation for failing to adequately investigate the outcome of the 2020 election. (Exhibit 14).

25. As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the Account which criticized the methods by which various states conducted the 2020 election, accusing those methods of being illegal and unconstitutional. (Exhibit 15) (Exhibit 16).

26. As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the Account which referenced President Trump's phone call with state legislatures regarding the potential decertification of the 2020 election. (Exhibit 17).

27. Despite its efforts to obtain and preserve official statements issued via the Account, the National Archives was unable to obtain and preserve all relevant records due to the policies of Twitter, which suspended the @realDonaldTrump account, rendering it inaccessible for a time. (Exhibit 18).

## II.   The Rally

28. On December 16, 2020, the organization Women for America First ("WAF") announced its intention to host a rally in Washington D.C. on January 6, 2021 (the "Save America Rally"). (Tr. of Amy Kremer before the House Select Committee, pgs. 47:18 – 48:1) (Exhibit 19) (Exhibit 19a).

29. The purpose of the Save America Rally was to petition Congress regarding the results of the 2020 election, to motivate members of Congress to investigate the election results, and to see what evidence would ultimately be presented. (Tr. of Amy Kremer before the House Select Committee, pgs. 49:19 – 50:13; 59:24 – 60:11) (Exhibit 19).

30. Initially, it was the intention of WAF that the Save America Rally would be held at the Freedom Plaza and a permit was secured for that location. (Tr. of Amy Kremer before the House Select Committee, pgs. 61:12 – 62:2) (Exhibit 19).

31. At the time WAF first announced its intention to host the Save America Rally, WAF had not coordinated with any individuals in either the White House or from within the Trump family regarding the planning or organization of the Save America Rally. (Tr. of Amy Kremer before the House Select Committee, pgs. 50:22-51:1) (Exhibit 19).

32. Sometime around December 26, 2020, discussions began about moving the Save America Rally to the Ellipse in order to accommodate the potential appearance of President Trump. (Tr. of Amy Kremer before the House Select Committee, pgs. 58:11-16) (Exhibit 19) (Tr. of Katrina Pierson before the House Select Committee, pgs. 29:2-13) (Exhibit 20) (Exhibit 20a).

33. Shortly thereafter, WAF was able to obtain a permit for the Ellipse and the Save America Rally was moved from the Freedom Plaza. (Exhibit 21).

34. On January 1, 2021, as part of the effort to secure the "vista sight line" at the Ellipse, Deputy Chief of Staff Tony Ornato—signing in his official capacity as White House Deputy Chief of Staff—contacted Secretary of the Interior David L. Berhardt—in his official capacity as the Secretary of the Interior—requesting a special exception to allow the Save America Rally to be held at the center of the Ellipse. (Exhibit 22).

35. In that correspondence, Mr. Ornato stated, "we are working with the organization that is

hosting the event on the 6th on the ellipse for POTUS to speak at. They are trying to get a center stage position so that POTUS is speaking with the White House directly behind him, not 30' off center, *which is the desire of the White House and the President as well*. We are looking for NPS to give the organization a waiver for the 'vista site line' so POTUS is center to the WH." (Exhibit 22) (*emphasis added*).

36. The Department of the Interior granted WAF the exception requested by the Deputy White House Chief of Staff and acknowledged that "a central theme of the event is to connect it to the White House and the Presidency." (Exhibit 23).

37. The Save America Rally was a privately funded event with most—if not all of the funding—being provided by a single donor, Julie Fancelli. (Exhibit 24).

38. The Save America Rally was not a campaign event, and the 2020 Trump campaign had no involvement in the planning, funding, or execution of the Rally. (Declaration of Justin Clark) (Exhibit 25).

39. Publicly available FEC records corroborate that none of the individuals who participated in the planning or execution of the Save America Rally were actively employed by the Trump campaign and the Trump campaign did not fund the Save America Rally. (Exhibit 26) (Exhibit 27).

40. Internal campaign emails also demonstrate that none of the individuals working on the Save America Rally were employed by the Trump campaign as of December 31, 2020. (Exhibit 28).

41. The Save America Rally was a privately funded event that was planned and executed with input directly from the White House. (Exhibit 29) (Exhibit 30).

42. Email records indicate that employees within the Executive Office of the President ("EOP") and the White House Office ("WHO") used their official EOP/WHO email

addresses when planning the Save America Rally, while those individuals from outside the White House used personal, rather than campaign, email addresses. (Exhibit 23, pg. 2) (Exhibit 24) (Exhibit 30) (Exhibit 30a) (Exhibit 31) (Exhibit 32) (Exhibit 33).

43. President Trump's attendance at the event was in his official capacity as President of the United States. Katrina Pierson testified that President Trump stated to her that he understood his attendance at the Save America Rally to be in an official capacity. (Tr. of Katrina Pierson before the House Select Committee, pgs. 113:12 – 115:16; 121:2 – 121:25) (Exhibit 20).

### III. The Speech

44. On January 6, 2021, President Trump attended the Save America Rally and delivered remarks between approximately 12 p.m. and 1:10 p.m., EST, just hours before the United States Congress was set to convene—in joint session—to fulfill its own constitutional duties relative to the certification of the 2020 election (the "Ellipse Speech"). The Ellipse Speech was delivered from a position centered on the White House and consistent with the plan approved by the National Park Service. (Exhibit 23) (Exhibit 37).

45. While delivering his remarks, President Trump stood behind a podium which featured the Seal of the President of the United States. (Exhibit 38).

46. The exact location of the Ellipse is within close proximity to the United States Capitol, approximately 2 miles away. (Exhibit 39).

47. As conceded by Plaintiffs, President Trump used the Ellipse Speech in an attempt to influence Congress's decision regarding the certification of the 2020 election results. *Blassingame v. Trump*, 87 F.4th 1, 25 (D.C. Cir. 2023) (Exhibit 40).

48. Article II, Sec. 3 of the United States Constitution provides, in relevant part, that the President "shall from time to time give to the Congress Information of the State of the

Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient…he shall take Care that the Laws be faithfully executed." (Exhibit 41).

49. Pursuant to his Article II, Sec. 3 authority, President Trump used the Ellipse Speech to provide Congress with information regarding the State of the Union in an effort to ensure that the laws were faithfully executed. Specifically, President Trump used the Ellipse Speech to inform Congress regarding significant irregularities relating to the 2020 presidential election, irregularities which, in his view, undermined the outcome of that election and posed a significant threat to the rule of law. Those irregularities included allegations of outright, systemic voter fraud and illegal and unconstitutional changes to state election laws; information which President Trump deemed necessary for Congress's upcoming deliberations as to the certification of the election. (Exhibit 42, pgs. 15, 16, 20, 21, 22, 23, 24, 25, 26, 27).

50. Pursuant to his Article II, Sec. 3 authority, President Trump used the Ellipse Speech to make recommendations to Congress, which he deemed necessary and expedient, in an effort to ensure that the laws were faithfully executed. Those recommendations included legislative proposals meant to strengthen future federal elections as well as the specific recommendation that Congress reject the certification of the 2020 elector slates and send those slates back to the states for additional deliberation and investigation. (Exhibit 42, pgs. 16, 18, 27, 28).

51. Pursuant to his Article II, Sec. 3 authority, President Trump critiqued Congressional inaction and called upon the Republican members of Congress to fight for the country. (Exhibit 42, pgs. 5, 6, 7).

52. President Trump also used the Ellipse Speech to address Vice President Mike Pence regarding the performance of his constitutional duties. As determined by the Supreme

Court in *Trump v. United States*, such activity necessarily involves official conduct, for which President Trump is immune. 603 U.S. 593, 623, 144 S. Ct. 2312, 2336, 219 L. Ed. 2d 991 (2024) (Exhibit 42, pgs. 3, 4, 7, 17, and 21).

53. EOP/WHO employees understood that the Ellipse Speech conformed with President Trump's Article II, Sec. 3 authorities and acted in conformity with that understanding. Declaration of Stephen Miller. (Exhibit 43).

54. The White House Staff Secretary, whose office was tasked with differentiating official from unofficial speeches as part of its regular duties for purposes of ensuring Hatch Act compliance, understood the Ellipse Speech to be an official speech and treated it as such as is shown by the fact that the email from the White House Staff Secretary transmitting the Ellipse Speech to White House personnel for review did not bear a Hatch Act notice. Deposition of Stephen Miller at pgs. 64:1 – 72:11 (Exhibit 44) (Exhibit 44a) (Exhibit 44b); (Exhibit 45).

55. By contrast, just three days earlier, when the White House Staff Secretary distributed a draft Presidential Speech to be delivered at a political event in Georgia to a largely identical group of White House Staffers for review, the cover email contained a prominent Hatch Act notice in the following form:

> **NOTE: HATCH ACT RESTRICTIONS APPLY.** This speech will be delivered at a political event and thus Hatch Act restrictions apply. Accordingly, per instruction from the White House Counsel's Office, review for issues beyond accuracy (such as for political consistency or effective messaging) should not be performed by noncommissioned officers or using official equipment and office space. Commissioned officers should not use official equipment to review for issues beyond accuracy (such as for political consistency or effective messaging). If you have any questions pertaining to Hatch Act restrictions with respect to review of these remarks, please be sure to consult with your designated ethics officer.

(Exhibit 46).

56. Among the recipients of the Staff Secretary's email transmitting the Ellipse Speech for review was a member of the White House Counsel's Office, Patrick Philbin. There is no

evidence that Mr. Philbin objected to the lack of such a warning or contended that the Speech was subject to the Hatch Act.   (Exhibit 45) (Urbanek Declaration at ¶ 51).

57. After the conclusion of his remarks, President Trump posted a link to the speech to the Account. (Exhibit 47, https://x.com/realDonaldTrump/status/1346891760174329859).

January 24, 2025                                        Respectfully submitted,

/s/      *Jonathan M. Shaw*
Jonathan M. Shaw
D.C. Bar No. 446249
Gerald A. Urbanek, Jr.
VA Bar No. 95043
DHILLON LAW GROUP, INC.
2121 Eisenhower Ave, Suite 402
Alexandria, Virginia 22314
Telephone: (703) 574-1206
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com
gurbanek@dhillonlaw.com

Jesse R. Binnall, VA022
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA  22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
jesse@binnall.com

Scott Gessler*
GESSLER BLUE LAW
7350 E. Progress Place, Suite 100
Greenwood Village, Colorado 80111
Telephone: (720) 839-6637
sgessler@gesslerblue.com

*Attorneys for Defendant
President Donald J. Trump*

* pro hac vice forthcoming