PRESIDENT DONALD J. TRUMP'S
MOTION FOR SUMMARY JUDGMENT
January 24, 2025

# EXHIBIT 40

*Lee, et al., v. Trump, et al.*
No. 1:21-cv-00400 (APM)

87 F.4th 1
United States Court of Appeals,
District of Columbia Circuit.

James BLASSINGAME and Sidney Hemby, Appellees

v.

Donald J. TRUMP, Appellant

No. 22-5069
|
Consolidated with 22-7030, 22-7031
|
Argued December 7, 2022
|
Decided December 1, 2023

**Synopsis**
**Background:** Members of House of Representatives in their personal capacities and Capitol Police officers brought actions against former United States President and others asserting claims for, among other things, violation of provision of civil rights conspiracy statute safeguarding federal officials and employees against conspiratorial acts directed at preventing them from performing their duties, arising out of January 6, 2021 attack on United States Capitol. Actions were consolidated. The United States District Court for the District of Columbia, Amit P. Mehta, J., 590 F.Supp.3d 46, denied in part former President's motion to dismiss, and he filed interlocutory appeal.

**Holdings:** The Court of Appeals, Srinivasan, Chief Judge, held that:

President's alleged speech was not official presidential action for which President was entitled to absolute official-act immunity, and

President was not exercising his duty under Take Care Clause when he made remarks in question.

Affirmed.

Katsas, Circuit Judge, concurred and filed opinion.

Rogers, Senior Circuit Judge, concurred in part and filed opinion.

**Procedural Posture(s):** Interlocutory Appeal; Motion to Dismiss for Failure to State a Claim.

**\*3** Appeals from the United States District Court for the District of Columbia (No. 1:21-cv-00858), (No. 1:21-cv-00586), (No. 1:21-cv-00400)

**Attorneys and Law Firms**

Jesse R. Binnall argued the cause for appellant. With him on the briefs were David A. Warrington, Jonathan M. Shaw, and Gary M. Lawkowski.

Joseph M. Sellers argued the cause for appellees. With him on the briefs were Brian Corman, Alison S. Deich, Philip Andonian, Patrick A. Malone, Heather J. Kelly, Anna Kathryn Barnes, Matthew Kaiser, Sarah R. Fink, Cameron Kistler, Erica Newland, Kristy Parker, Helen E. White, Genevieve C. Nadeau, and Benjamin L. Berwick.

Elizabeth B. Wydra and Brianne J. Gorod were on the brief for amici curiae Law Professors in support of appellees.

Joshua Matz, Raymond P. Tolentino, Carmen Iguina Gonzalez, and Alysha M. Naik were on the brief for amici curiae Former White House and Department of Justice Officials in support of appellees.

Joseph M. Meyer, Debo P. Adegbile, and Mark C. Fleming were on the brief for amici curiae Former Diplomats and Foreign Policy Officials in support of appellees.

Kathleen R. Hartnett and David S. Louk were on the brief for amicus curiae Jared Holt in support of appellees.

Before: Srinivasan, Chief Judge, Katsas, Circuit Judge, and Rogers, Senior Circuit Judge.

**Opinion**

Concurring opinion filed by Circuit Judge Katsas.

Opinion concurring in part filed by Senior Circuit Judge Rogers.

Srinivasan, Chief Judge:

**\*\*444** Since the Supreme Court's decision in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), Presidents have carried out their official responsibilities free from any exposure to civil damages

liability. *Nixon* established a President's absolute immunity from civil damages claims predicated on his official acts. The object of a President's official-act immunity is to assure that he can fearlessly and impartially discharge the singularly weighty duties of the office.

The President, though, does not spend every minute of every day exercising official responsibilities. And when he acts outside the functions of his office, he does not continue to enjoy immunity from damages liability just because he happens to be the President. Rather, as the Supreme Court made clear in *Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997), a President's official-act **\*4 \*\*445** immunity by nature does not extend to his unofficial actions. When he acts in an unofficial, private capacity, he is subject to civil suits like any private citizen.

This appeal calls for us to apply those key decisional precedents on presidential immunity to a decidedly unprecedented event involving the presidency: the riot at the Capitol on January 6, 2021, just as Congress convened to tabulate the Electoral College vote and declare the person elected President. The plaintiffs in the cases before us are Capitol Police officers and members of Congress who were at the Capitol that day. They seek civil damages for harms they allege they suffered arising from the riot. Although they sue various persons, the sole defendant named in all the cases consolidated before us is former President Donald J. Trump.

The plaintiffs contend that, during President Trump's final months in office, he conspired with political allies and supporters to obtain a second term despite his defeat in the 2020 election. He allegedly advanced that cause before January 6 by repeatedly making false claims that the election might be (and then had been) stolen, filing meritless lawsuits challenging the election results, and pressuring state and local officials to reverse the election outcomes in their jurisdictions. Those efforts allegedly culminated in the 75-minute speech President Trump delivered at the rally on January 6. According to the plaintiffs, President Trump's actions, including ultimately his speech on January 6, sparked the ensuing riot at the Capitol.

President Trump moved in the district court to dismiss the claims against him, including on grounds of a President's official-act immunity from damages liability. The district court largely rejected his claim of immunity, and President Trump now appeals. The sole issue before us is whether President Trump has demonstrated an entitlement to official-

act immunity for his actions leading up to and on January 6 as alleged in the complaints.

We answer no, at least at this stage of the proceedings. When a first-term President opts to seek a second term, his campaign to win re-election is not an official presidential act. The Office of the Presidency as an institution is agnostic about who will occupy it next. And campaigning to *gain* that office is not an official act *of* the office. So, when a sitting President running for a second term attends a private fundraiser for his re-election effort, hires (or fires) his campaign staff, cuts a political ad supporting his candidacy, or speaks at a campaign rally funded and organized by his re-election campaign committee, he is not carrying out the official duties of the presidency. He is acting as office-*seeker*, not office-*holder*—no less than are the persons running against him when they take precisely the same actions in their competing campaigns to attain precisely the same office.

President Trump himself recognized that he engaged in his campaign to win re-election—including his post-election efforts to alter the declared results in his favor—in his personal capacity as presidential candidate, not in his official capacity as sitting President. That is evident in his effort to intervene in the Supreme Court's consideration of a post-election lawsuit challenging the administration of the election in various battleground states. He expressly filed his motion in the Supreme Court "in his personal capacity as candidate for reelection to the office of President" rather than in his official capacity as sitting President. Trump Mot. to Intervene 3, *Texas v. Pennsylvania*, No. 22O155 (U.S. 2020). And he grounded his claimed right to intervene in the case in his "unique and substantial personal interests as a candidate for re-election to the Office **\*5 \*\*446** of President" rather than in any official interest in exercising the office's duties. *Id.* at 24.

In arguing that he is entitled to official-act immunity in the cases before us, President Trump does not dispute that he engaged in his alleged actions up to and on January 6 in his capacity as a candidate. But he thinks that does not matter. Rather, in his view, a President's speech on matters of public concern is invariably an official function, and he was engaged in that function when he spoke at the January 6 rally and in the leadup to that day. We cannot accept that rationale. While Presidents are often exercising official responsibilities when they speak on matters of public concern, that is not always the case. When a sitting President running for re-election speaks in a campaign ad or in accepting his political party's nomination at the party convention, he typically speaks on

matters of public concern. Yet he does so in an unofficial, private capacity as office-seeker, not an official capacity as office-holder. And actions taken in an *unofficial* capacity cannot qualify for *official*-act immunity.

While we thus reject President Trump's argument for official-act immunity at this stage, that result is necessarily tied to the need to assume the truth of the plaintiffs' factual allegations at this point in the proceedings. President Trump has not had a chance to counter those allegations with facts of his own. When these cases move forward in the district court, he must be afforded the opportunity to develop his own facts on the immunity question if he desires to show that he took the actions alleged in the complaints in his official capacity as President rather than in his unofficial capacity as a candidate. At the appropriate time, he can move for summary judgment on his claim of official-act immunity.

Because our decision is not necessarily even the final word on the issue of presidential immunity, we of course express no view on the ultimate merits of the claims against President Trump. Nor do we have any occasion to address his other defenses, including his claim that his alleged actions fall within the protections of the First Amendment because they did not amount to incitement of imminent lawless action: he did not seek appellate review at this time of the district court's denial of his First Amendment defense, but he could bring that issue before us in the future. We also do not opine on whether executive or other privileges might shield certain evidence from discovery or use as the litigation proceeds. Nor does our decision on a President's official-act immunity from damages liability in a civil suit treat with whether or when a President might be immune from criminal prosecution.

Instead, we hold only that, taking the allegations in the plaintiffs' complaints as true as we must at this point in the proceedings, President Trump has not demonstrated an entitlement to dismissal of the claims against him based on a President's official-act immunity. In the proceedings ahead in the district court, President Trump will have the opportunity to show that his alleged actions in the runup to and on January 6 were taken in his official capacity as President rather than in his unofficial capacity as presidential candidate.

## I.

### A.

Because this appeal comes to us on the denial in relevant part of motions to dismiss, we "assume the truth of the ... factual allegations" in the complaints. *Clinton*, 520 U.S. at 685, 117 S.Ct. 1636. We also draw from the complaints in all three **\*6 \*\*447** cases consolidated before us. And because the sole question we consider is whether President Trump has shown that he should have been granted a dismissal of the claims against him on grounds of presidential immunity, we focus on the allegations about his actions (rather than those of the other defendants) and, in particular, on the allegations pertaining to his entitlement to official-act immunity.

### 1.

President Trump served in office from January 20, 2017 until January 20, 2021. In 2020, he ran for re-election on the Republican ticket alongside then-Vice President Michael R. Pence. They faced the Democratic nominee, then-former Vice President Joseph R. Biden, Jr., and his running mate, then-Senator Kamala D. Harris.

According to the complaints, President Trump began sowing doubt about the integrity of the 2020 presidential election well before the election, often via the platform then called Twitter, and continued to do so through Election Day. He posted the numerous tweets recounted in the complaints (and related here) via his personal account, @realDonaldTrump, to his 89 million followers. Swalwell Compl. ¶ 15, J.A. 74; Thompson Compl. ¶ 38, J.A. 151. In June 2020, for example, President Trump tweeted: "MILLIONS OF MAIL-IN BALLOTS WILL BE PRINTED BY FOREIGN COUNTRIES, AND OTHERS. IT WILL BE THE SCANDAL OF OUR TIMES!" Swalwell Compl. ¶ 25, J.A. 76. That August, he stated that "the only way we're going to lose this election is if this election is rigged." Thompson Compl. ¶ 33, J.A. 150. And in October, he posted a tweet accusing Democrats of "trying to steal this Election." Swalwell Compl. ¶ 25, J.A. 76.

The plaintiffs allege that President Trump communicated the same message in the first presidential debate, in late September 2020, where he stated: "[t]his is going to be a fraud like you've never seen"; "[i]t's a rigged election"; "[t]hey"—Democrats—"cheat"; and they "found ballots in a wastepaper basket three days ago, and ... [t]hey all had the name Trump on them." Blassingame Compl. ¶¶ 13–15, J.A. 22–23. The plaintiffs also contend that, in the same debate, President Trump declined to conclusively reject the idea that the election results might warrant a potentially violent

response. When invited by a moderator to "urge his supporters to 'stay calm' following the election, and 'not to engage in any civil unrest,' " he responded: "If it's a fair election I am 100% on board. But if I see tens of thousands of ballots being manipulated, I can't go along with that." *Id.* ¶ 15, J.A. 23.

On Election Day, November 3, early returns showed President Trump leading in key states. But as states began processing more mail-in ballots, his lead started to dwindle. Swalwell Compl. ¶¶ 27–28, J.A. 76–77. Soon after midnight on November 4, as returns continued to come in, President Trump tweeted: "We are up BIG, but they are trying to STEAL the Election. We will never let them do it. Votes cannot be cast after the Polls are closed!" Blassingame Compl. ¶ 17, J.A. 24. The following day, President Trump reiterated his claims of a stolen election, tweeting: "STOP THE COUNT!" and "STOP THE FRAUD!" Swalwell Compl. ¶ 32, J.A. 78. He echoed that claim late that night, tweeting: "I easily WIN the Presidency of the United States with LEGAL VOTES CAST. The OBSERVERS were not allowed, in any way, shape, or form, to do their job and therefore, votes accepted during this period must be determined to be ILLEGAL VOTES. U.S. Supreme Court should decide!" *Id.* ¶ 33, J.A. 78.

**\*7  \*\*448**  2.

a.

On November 7, all major U.S. news outlets projected that then-former Vice President Biden and then-Senator Harris would win the election. Blassingame Compl. ¶ 20, J.A. 25. President Trump did not concede. Rather, over the ensuing weeks, he continued to assert that the election had been stolen. *Id.* ¶ 21, J.A. 25. For example, he tweeted that Democrats had "so blatantly cheat[ed] in their attempt to steal the election, which we won overwhelmingly." Swalwell Compl. ¶ 36, J.A. 80.

President Trump also attempted to alter the declared election results by various means. According to the plaintiffs, those efforts sought to further the sense among his supporters that the election had been stolen. Thompson Compl. ¶ 34, J.A. 151. For instance, President Trump and his allies filed 62 lawsuits in state and federal courts around the country that sought, on various theories, to overturn the results in key states. Swalwell Compl. ¶ 60, J.A. 85; Thompson Compl. ¶ 36, J.A. 151. **"**Virtually all [of] th[e] lawsuits were

rejected outright." Swalwell Compl. ¶ 61, J.A. 86; *see also* Blassingame Compl. ¶ 21, J.A. 25. In addition, President Trump tried to persuade state and local officials in Michigan, Pennsylvania, and Georgia to use their offices to change the declared results in their jurisdictions. Swalwell Compl. ¶¶ 37–55, J.A. 80–84; Thompson Compl. ¶¶ 46–52, J.A. 153–54.

b.

When members of the Electoral College met in their respective states on December 14, they collectively cast 306 electoral votes for then-President-elect Biden and 232 electoral votes for President Trump. According to the complaints, President Trump then began focusing his efforts on Congress, which was set to meet on January 6 to officially tabulate electoral votes and declare the next President pursuant to the Electoral Count Act, 3 U.S.C. §§ 1–22. Blassingame Compl. ¶ 30, J.A. 29; Thompson Compl. ¶ 55, J.A. 155.

On December 19, President Trump posted a tweet referencing a report "alleging election fraud 'more than sufficient' to swing victory to Trump." Swalwell Compl. ¶ 86, J.A. 92. President Trump stated that it was "[s]tatistically impossible" for him "to have lost the 2020 Election." *Id.* He added that there would be a "[b]ig protest in D.C. on January 6th," and he called on his supporters to attend: "Be there, will be wild!" *Id.* A week later, President Trump again promoted the planned protest via Twitter, this time asserting that the Department of Justice and the FBI had "done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming evidence. They should be ashamed. History will remember. Never give up. See everyone in D.C. on January 6th." *Id.* ¶ 56, J.A. 84.

Meanwhile, plans for the January 6 event, which became known as the "Save America" rally, took shape. According to the complaints, the rally's organizers—including the group Women for America First, at least one Trump campaign staff member, and a Trump campaign fundraiser—secured a permit to hold the event at the Ellipse, a large lawn just south of the White House. Blassingame Compl. ¶ 59, J.A. 38; Swalwell Compl. ¶¶ 97, 103, J.A. 98–99; Thompson Compl. ¶ 69, J.A. 159. The permit listed the Trump campaign's director of finance operations as the rally's "VIP Lead," and named Event Strategies Inc.—which received payments from President Trump's campaign roughly three weeks before January 6—as the event's **\*8  \*\*449** production vendor.

Blassingame Compl. ¶ 31, J.A. 29; Swalwell Compl. ¶ 97, J.A. 98; Thompson Compl. ¶ 68, J.A. 159.

More generally, the complaints allege that the Save America rally was privately funded and that the Trump campaign or persons associated with it were involved in organizing and funding it, although there is some variation among the complaints on the particulars. According to one complaint, the rally "was a private event, organized in part by [President] Trump's former campaign staff" and "arranged and funded by a small group including a top Trump campaign fundraiser and donor." Blassingame Compl. ¶ 59, J.A. 38 (internal quotation marks omitted). Another complaint alleges that the Trump campaign itself funded the rally. *See* Swalwell Compl. ¶ 97, J.A. 98. And the third complaint contends that "a top Trump campaign fundraiser oversaw the logistics, budgeting, funding and messaging" for the rally. Thompson Compl. ¶ 68, J.A. 159. One of the complaints also alleges that President Trump participated in planning the rally, including by weighing in on the speaker lineup and music selection. *Id.* ¶ 69, J.A. 159.

The complaints also describe President Trump's promotion of the rally via Twitter in the immediate leadup to the event. *See* Blassingame Compl. ¶¶ 36, 38, J.A. 32–34; Swalwell Compl. ¶¶ 57, 98–99, J.A. 84–85, 98. He reiterated his claims of election fraud on January 5, saying: "Washington is being inundated with people who don't want to see an election victory stolen by emboldened Radical Left Democrats." Swalwell Compl. ¶ 57, J.A. 85. He also repeatedly emphasized Vice President Pence's role in the counting of electoral votes. *See* U.S. Const. art. I, § 3, cl. 4; *id.* amend. XII; 3 U.S.C. §§ 11, 15–18. The night before the rally, for instance, President Trump tweeted: "Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike [Pence] can send it back!" Swalwell Compl. ¶ 98, J.A. 98.

c.

The Save America rally began at 7:00 AM on January 6 at the Ellipse. Blassingame Compl. ¶ 58, J.A. 37. For several hours, a slew of prominent supporters of President Trump gave speeches decrying election fraud and demanding corrective action. Swalwell Compl. ¶¶ 101–20, J.A. 99–102.

President Trump was the final speaker. He took the stage at around noon and spoke for roughly 75 minutes. *Id.* ¶ 121, J.A. 102. Although the complaints do not contain the full text of his speech, they quote liberally from it, and the district court "considered it in its entirety, analyzing it beyond the words quoted in the Complaints." *Thompson v. Trump*, 590 F. Supp. 3d 46, 83 (D.D.C. 2022); *e.g.*, Blassingame Compl. ¶¶ 60, 220, J.A. 38, 65; Swalwell Compl. ¶¶ 3, 121–28, 181, 211, J.A. 71, 102–03, 118–19, 124–25; Thompson Compl. ¶¶ 82–89, J.A. 162–65. The parties have thus treated the full speech as incorporated into the complaints, and we will do the same. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015). (A full transcript of President Trump's speech is available at *Read: Former President Donald Trump's January 6 Speech*, CNN (Feb. 8, 2021, 6:16 PM), https://www.cnn.com/2021/02/08/politics/trump-january-6-speech-transcript/index.html [https://perma.cc/MY5A-5UYH])

At the outset of his speech, President Trump proclaimed that "[a]ll of us here today do not want to see our election victory stolen by emboldened radical left Democrats, which is what they're doing, **\*9 \*\*450** and stolen by the fake news media. That's what they've done and what they're doing. We will never give up. We will never concede. It doesn't happen. You don't concede when there's theft involved." He then proceeded to allege election fraud in various battleground states and to call on Republicans in Congress and Vice President Pence to "do the right thing" and to send the election back to the states. He alleged that there had been "fraud on a scale never seen before," and detailed, at length, allegations of fraud in several battleground states won by then-President-elect Biden. He urged that "[w]e're going to have to fight much harder and Mike Pence is going to have to come through for us."

Throughout his remarks, President Trump enlisted his supporters in his self-described effort to "stop the steal." Near the outset of his speech, he stated that "[w]e have come to demand that Congress do the right thing and only count the electors who have been lawfully slated .... I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard." Later, he said that "[w]hen you catch somebody in a fraud, you're allowed to go by very different rules."

At one point near the end of his speech, President Trump briefly turned from alleging fraud and "challenging the certification of the election" to "calling on Congress and the

state legislatures to quickly pass sweeping election reforms." He said that "[w]e must stop the steal and then we must ensure that such outrageous election fraud never happens again," and, in the latter connection, he listed numerous policy proposals achievable "[w]ith your help." Many of the proposals concerned the conduct of elections: adopting "powerful requirements for voter ID"; requiring "proof of American citizenship in order to vote in American elections"; banning "ballot harvesting," "the use of unsecured drop boxes to commit rampant fraud," and "universal, unsolicited mail-in balloting"; and restoring "the vital civic tradition of in-person voting on Election Day."

At the close of his remarks, President Trump reiterated: "Something's wrong here. Something's really wrong. Can't have happened. And we fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore." He then ended his speech by saying: "So, we're going to, we're going to walk down Pennsylvania Avenue ... and we're going to the Capitol, and we're going to try and give—the Democrats are hopeless. They're never voting for anything .... But we're going to try to give our Republicans, the weak ones, because the strong ones don't need any of our help, we're going to try and give them the kind of pride and boldness that they need to take back our country. So, let's walk down Pennyvania Avenue. I want to thank you all. God bless you and God bless America."

d.

By 12:53 PM—as President Trump was still speaking at the Ellipse—a crowd had formed at the Capitol, and members of the crowd broke through the outer security barriers. Blassingame Compl. ¶¶ 65–66, J.A. 39–40; Swalwell Compl. ¶ 129, J.A. 104; Thompson Compl. ¶¶ 94–99, J.A. 166–67. They were soon joined by people who had made their way from the Ellipse to the Capitol after President Trump finished his speech. Thompson Compl. ¶¶ 100–01, J.A. 167. President Trump returned to the White House, where he watched television coverage of the events unfolding at the Capitol. Blassingame Compl. ¶¶ 79, 94, J.A. 42, 44–45; Thompson Compl. ¶ 106, J.A. 168.

Members of the crowd overcame Capitol Police officers, some of whom were injured **\*10** **\*\*451** while defending the Capitol from the rioters' advance. Among those injured was plaintiff Sidney Hemby, who was crushed against doors on the east side of the Capitol, struck with fists and various

objects, and sprayed with chemicals. Blassingame Compl. ¶¶ 83–89, 138–44, J.A. 43–44, 52. After rioters went inside the building, Capitol Police announced a full lockdown of the Capitol, and both houses of Congress stopped counting Electoral Votes and called recesses. *See id.* ¶ 92, J.A. 44; Swalwell Compl. ¶ 137, J.A. 106.

At 2:24 PM, shortly after his supporters breached the Capitol, President Trump tweeted: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!" Swalwell Compl. ¶ 138, J.A. 107. Fourteen minutes later, he added: "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful!" Blassingame Compl. ¶ 118, J.A. 48.

Inside the Capitol, some lawmakers, including some of the plaintiffs in these cases, became trapped inside the chambers as rioters advanced. Swalwell Compl. ¶¶ 9–11, 137, J.A. 72–73, 106; Thompson Compl. ¶¶ 182–83, J.A. 183. Capitol Police officers held off the rioters at gunpoint, deployed tear gas, and told the trapped lawmakers to put on gas masks. Swalwell Compl. ¶¶ 137, 233, J.A. 106, 129; Thompson Compl. ¶ 175, J.A. 181. One floor below, in the Capitol Crypt, a group of Capitol Police officers, including plaintiff James Blassingame, attempted to fend off another group of rioters. The rioters struck Officer Blassingame with fists and weapons and subjected him to racial epithets and threats. Blassingame Compl. ¶¶ 95–113, J.A. 45–47.

At 4:17 PM, President Trump posted on Twitter a recorded video statement in which he directed the rioters to go home. Swalwell Compl. ¶ 147, J.A. 108–09. He also repeated his claim that the election had been stolen and added: "I know your pain, I know you're hurt. ... We love you. You're very special." *Id.*, J.A. 109. And at 6:01 PM, after Capitol Police began clearing the building, President Trump tweeted: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!" *Id.* ¶ 150, J.A. 109–10.

The riot resulted in injuries to 140 police officers and claimed several lives. *Id.* ¶ 149, J.A. 109. Two weeks later, on January 20, then-President-elect Biden and then-Vice President-elect Harris took office.

eerp

## B.

### 1.

The three cases consolidated in this appeal involve complaints brought against President Trump and others in connection with the January 6 riot. The plaintiffs are Capitol Police officers and members of Congress who were at the Capitol that day. They seek recovery for physical injuries and emotional distress arising from the riot. Blassingame Compl. ¶¶ 150–228, J.A. 55–67; Swalwell Compl. ¶¶ 224–26, J.A. 127; Thompson Compl. ¶¶ 151–267, J.A. 178–200. As relief, they ask for damages (and other remedies), including from President Trump. Blassingame Compl., J.A. 67–68; Swalwell Compl., J.A. 132–33; Thompson Compl., J.A. 201.

**\*11  \*\*452**  The plaintiffs sue President Trump in his personal capacity. Blassingame Compl. ¶ 40, J.A. 34; Swalwell Compl., J.A. 70; Thompson Compl., J.A. 136. Each of the complaints alleges that "[a]ll his conduct inciting his followers" as described in the complaints "was conducted in his personal capacity as a candidate for elected office, not in any official capacity as President." Blassingame Compl. ¶ 40, J.A. 34; *see* Swalwell Compl. ¶¶ 15, 152, J.A. 74, 110; Thompson Compl. ¶¶ 22, 263, J.A. 146, 200. "For example," one complaint elaborates, President Trump "tweeted from his personal Twitter account (@realDonaldTrump) and not the official, White House, [T]witter account, and he spoke at the January 6 rally in his capacity as a losing candidate for the Presidency." Swalwell Compl. ¶ 15, J.A. 74; *see* Blassingame Compl. ¶ 18, J.A. 24; Thompson Compl. ¶ 22, J.A. 146.

Each of the complaints asserts a claim against President Trump under 42 U.S.C. § 1985, which prohibits conspiring to prevent anyone from holding a federal office or from performing the duties of a federal office. Blassingame Compl. ¶¶ 213–24, J.A. 63–67; Swalwell Compl. ¶¶ 166–84, J.A. 114–19; Thompson Compl. ¶¶ 259–67, J.A. 199–200. The Section 1985 claims are generally based on the contention that President Trump engaged with others in a plan to prevent Congress from discharging its duty to count electoral votes and to prevent then-President-elect Biden and then-Vice-President-elect Harris from assuming office. Two of the complaints include various claims against President Trump under District of Columbia law. Blassingame Compl. ¶¶ 150–212, 225–28, J.A. 55–63, 67; Swalwell Compl. ¶¶ 192–261, J.A. 120–32. And one of the complaints contains a claim

against President Trump under 42 U.S.C. § 1986 for failing to stop the riot after it started. Swalwell Compl. ¶¶ 185–91, J.A. 119–20.

### 2.

President Trump moved to dismiss the claims against him on various grounds. Of principal relevance, he argued that he is entitled to official-act immunity under *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), as to all the claims against him.

The district court largely rejected President Trump's claim of immunity. It reasoned that President Trump's alleged acts—his tweets alleging fraud in the election, his efforts to persuade state and local officials to change election outcomes, his lawsuits challenging the election results, his participation in the planning of the January 6 rally, and his speech at that rally—were aimed at remaining in office for a second term, which, to the court, was not an official function of the presidency. *Thompson*, 590 F. Supp. 3d at 82–84. The court, however, granted President Trump immunity as to the claim under 42 U.S.C. § 1986 for failing to stop the riot. That claim, the court held, sought to hold President Trump liable for failing to exercise his official presidential powers and so fell within his official-act immunity. *Id.* at 84–85.

Beyond asserting official-act immunity, President Trump also sought dismissal of the claims against him on the ground that they seek to hold him liable for speech protected by the First Amendment. The district court rejected that argument. The court held that President Trump's speech at the January 6 rally lay beyond the protection of the First Amendment because it amounted to incitement of imminent lawless action. *Id.* at 115–18; *see Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). President Trump did not attempt to appeal the district court's denial of his First Amendment **\*12  \*\*453** defense at this stage, *see* 28 U.S.C. § 1292(b), so his potential entitlement to a dismissal on First Amendment grounds is not before us in this appeal.

The district court dismissed several of the claims brought under District of Columbia law as inadequately pleaded on the merits. *Thompson*, 590 F. Supp. 3d at 121–22, 124–25, 126. But it held that the plaintiffs had plausibly alleged that President Trump had violated Section 1985 and so allowed the Section 1985 claims against President Trump to proceed. *Id.* at 101–05. And the court reached the same conclusion as

463 U.S.App.D.C. 442

to some of the claims under District of Columbia law. *Id.* at 119–21, 122–24, 125. Those claims against President Trump thus remain live and await resolution.

## II.

President Trump appeals the district court's denial of his claim of official-act immunity. That is the sole issue before us. While the denial of a motion to dismiss ordinarily is not immediately appealable, an order denying a claim of official immunity is an immediately appealable collateral order. *See Nixon*, 457 U.S. at 742–43, 102 S.Ct. 2690. In considering President Trump's claim of immunity, we review the "district court's legal determinations de novo and assume the truth of the [plaintiffs'] material factual allegations." *Blumenthal v. Trump*, 949 F.3d 14, 18 (D.C. Cir. 2020); *see also Clinton*, 520 U.S. at 685, 117 S.Ct. 1636.

## A.

The Supreme Court's decisions in *Nixon v. Fitzgerald* and *Clinton v. Jones* establish the basic framework for our analysis. In *Nixon*, A. Ernest Fitzgerald sought civil damages from President Richard M. Nixon and other officials for allegedly eliminating his job at the Department of the Air Force in retaliation for unflattering congressional testimony he had provided about his superiors. 457 U.S. at 734, 739, 102 S.Ct. 2690. The Court concluded that President Nixon, "as a former President of the United States, [wa]s entitled to absolute immunity from damages liability predicated on his official acts." *Id.* at 749, 102 S.Ct. 2690. Such immunity, the Court said, is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.*

The presidential-immunity doctrine articulated in *Nixon* is capacious by design. In pre-*Nixon* official-immunity cases involving other officials, the Court had employed a "'functional' approach" under which, for most officials, "the scope of the [immunity] defense varied in proportion to the nature of [the officials'] official functions and the range of decisions that conceivably might be taken in 'good faith.'" *Id.* at 746, 102 S.Ct. 2690 (discussing *Scheuer v. Rhodes*, 416 U.S. 232, 247, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *see also id.* at 755, 102 S.Ct. 2690. But the President, the *Nixon* Court explained, "occupies a unique position in the constitutional scheme." *Id.* at 749, 102 S.Ct. 2690. As the

embodiment of the executive branch, he "must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Id.* at 752, 102 S.Ct. 2690. The principal rationale for official immunity—"providing an official 'the maximum ability to deal fearlessly and impartially with' the duties of his office"—thus applies to the President with pronounced force. *Id.* (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979)). For that reason, the Court found it "appropriate to recognize absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Id.* at 756, 102 S.Ct. 2690.

*13 **454 The decisions from which *Nixon* drew the outer-perimeter test make evident that a President's official responsibilities encompass more than just those acts falling within the office's express "constitutional and statutory authority." *Id.* at 757, 102 S.Ct. 2690. Official responsibilities also include "discretionary acts" within the "concept of duty" associated with the office. *Barr v. Matteo*, 360 U.S. 564, 575, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (plurality opinion). Put somewhat differently: an act lies within the outer perimeter of an official's duties if it is "the kind of act not manifestly or palpably beyond [the official's] authority, but rather having more or less connection with the general matters committed by law to his control or supervision." *Martin v. D.C. Metro. Police Dep't*, 812 F.2d 1425, 1429 (D.C. Cir. 1987), *overruled on other grounds by Crawford-El v. Britton*, 93 F.3d 813 (D.C. Cir. 1996) (en banc), *rev'd* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (quoting *Briggs v. Goodwin*, 569 F.2d 10, 16 (D.C. Cir. 1977)); *accord Spalding v. Vilas*, 161 U.S. 483, 498–99, 16 S.Ct. 631, 40 L.Ed. 780 (1896).

Applying the outer-perimeter test to President Nixon's alleged conduct, the *Nixon* Court had little trouble holding that President Nixon was entitled to official immunity. *See* 457 U.S. at 756–57, 102 S.Ct. 2690. President Nixon, the Court reasoned, had the "constitutional and statutory authority to prescribe the manner in which the Secretary will conduct the business of the Air Force," including by "prescrib[ing] reorganizations and reductions in force." *Id.* at 757, 102 S.Ct. 2690. The Court reached that conclusion notwithstanding Fitzgerald's contentions that his dismissal had been retaliatory and that "no federal official could, within the outer perimeter of his duties of office," dismiss Fitzgerald without satisfying the applicable for-cause removal standard "in prescribed statutory proceedings." *Id.* at 756, 102 S.Ct. 2690. Denying immunity on those grounds, the Court explained, would require a "highly intrusive" examination of "the President's

motives" and "subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose." *Id.* Doing so would therefore "deprive absolute immunity of its intended effect." *Id.*

The Court revisited a President's official-act immunity fifteen years later in *Clinton,* its most recent case on the subject. In that case, Paula Jones sought civil damages from President William J. Clinton. 520 U.S. at 684–85, 117 S.Ct. 1636. She alleged that President Clinton, while serving as Governor of Arkansas, had made unwelcome sexual advances towards her and then retaliated against and later defamed her for rejecting his advances. *Id.* at 685, 117 S.Ct. 1636. President Clinton moved to dismiss, arguing that as President, he was entitled to temporary immunity from the lawsuit until after his presidency. *Id.* at 686–87, 117 S.Ct. 1636. The Court disagreed, reasoning that President Clinton's alleged actions—with the potential exception of allegedly defamatory statements made after he became President, *see id.* at 686 & n.3, 117 S.Ct. 1636—were "unrelated to any of his official duties as President of the United States and, indeed, occurred before he was elected to that office," *id.* at 686, 117 S.Ct. 1636.

*Clinton* confirmed that the absolute presidential immunity recognized in *Nixon* is an "official immunity," that extends no further than the outer perimeter of a President's official responsibility. *Id.* at 693–94, 117 S.Ct. 1636 (quoting *Ferri,* 444 U.S. at 203, 100 S.Ct. 402). That is because the primary justification for affording the President official-act immunity from civil damages liability—"enabling [him] to perform [his] designated functions effectively without fear that a particular decision may **\*14  \*\*455** give rise to personal liability"—provides "no support for an immunity for *unofficial* conduct." *Id.* at 692–94, 117 S.Ct. 1636. To the contrary, an immunity for unofficial acts would be "grounded purely in the identity of [the President's] office," *id.* at 695, 117 S.Ct. 1636, contravening the settled understanding that immunity is based on "the nature of the function performed, not the identity of the actor who performed it," *id.* (quoting *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)). Because Jones's allegations involved President Clinton's "purely private acts" rather than "acts taken in his public character," he was not entitled to official immunity, even on a temporary basis. *Id.* at 696, 117 S.Ct. 1636 (internal quotation marks and citation omitted).

Together, *Nixon* and *Clinton* establish three governing principles. First, the President is entitled to official immunity

from civil damages liability based on actions within the "outer perimeter" of official presidential responsibility, including discretionary acts within the concept of duty associated with the presidency. Second, the President is subject to civil damages suits based on actions taken in an unofficial, private capacity to the same extent as any private citizen. And third, the President's actions do not fall beyond the outer perimeter of official responsibility merely because they are unlawful or taken for a forbidden purpose. Rather, the President's official immunity insulates all of his official actions from civil damages liability, regardless of their legality or his motives.

### B.

President Trump maintains that his actions as alleged in the complaints fall within the outer perimeter of official presidential responsibility, entitling him to official-act immunity as to all the claims against him. His primary argument is that his alleged actions leading up to and on January 6 were official presidential actions because they amounted to speech on matters of public concern. In the alternative, he submits that those actions were official because they came within his constitutional duty under the Take Care Clause. We are unpersuaded by either argument.

### 1.

We begin with President Trump's principal contention: that a President enjoys absolute immunity from civil damages liability whenever he speaks on matters of public concern. Without reaching the question whether all of President Trump's pertinent actions alleged in the complaints in fact involved speech on matters of public concern, we reject his submission that such speech invariably counts as official activity. To endorse that argument would be to establish "an immunity from suit for unofficial acts grounded purely in the identity of [the President's] office." *Clinton,* 520 U.S. at 695, 117 S.Ct. 1636. The salient question in the cases before us is whether President Trump took the actions alleged in the complaints in his official capacity or instead in his private capacity. The question whether those actions involved speech on matters of public concern bears no inherent connection to the essential distinction between official and unofficial acts.

### a.

The most basic premise of President Trump's argument—that speaking on matters of public concern is something Presidents regularly do in the exercise of official responsibilities—is incontestable. "The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, —— U.S. ——, 138 S. Ct. 2392, 2417–18, 201 L.Ed.2d 775 (2018). That power—famously labeled the presidential **\*15 \*\*456** "bully pulpit" by Theodore Roosevelt—is an everyday tool of the presidency. And many uses of the presidential bully pulpit fall comfortably "within the 'outer perimeter' of [the President's] official responsibility." *Nixon*, 457 U.S. at 756, 102 S.Ct. 2690.

True, there is no Bully Pulpit Clause in the Constitution. But as we have explained, the outer perimeter of official responsibility extends beyond a President's expressly enumerated powers to encompass "discretionary acts" within the "concept of duty" associated with the office. *Barr*, 360 U.S. at 575, 79 S.Ct. 1335 (plurality opinion). The President thus acts within the outer perimeter of his official functions when he announces his intention to issue an executive order, eulogizes the fallen leader of an ally, or offers the nation's condolences and support to a community reeling from a tragedy.

President Trump's argument, though, reaches considerably further: he insists that *all* of a President's speech on matters of public concern, as a categorical rule, is an exercise of official presidential responsibility. That is a sweeping proposition, and one that ultimately sweeps too far. The notion that speech must relate to a matter of public concern does not rule out much when the speaker is the President. "In view of the visibility of his office and the effect of his actions on countless people," *Nixon*, 457 U.S. at 753, 102 S.Ct. 2690, a great deal of what the President does or speaks about becomes a matter of public concern merely by virtue of the identity of his office, even if it would not amount to a matter of public concern if performed or said by someone else.

To see how far a public-concern test reaches, consider initially an example involving conduct alone rather than speech—in particular, sexual misconduct. Such conduct, as President Trump concedes, is presumably of a "manifestly private nature," undertaken in a private, unofficial capacity. Trump Reply Br. 12; *see also Clinton*, 520 U.S. at 686, 117 S.Ct. 1636. Yet alleged sexual misconduct involving *the President* is also plainly "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83–84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam)). To immunize a President from civil damages liability for alleged sexual misconduct during his presidency just because the conduct is a matter of public concern, then, would be to "construct an immunity from suit for unofficial acts grounded purely in the identity of his office." *Clinton*, 520 U.S. at 695, 117 S.Ct. 1636.

President Trump's proposed public-concern test would unduly broaden official-act immunity in much the same way for presidential speech. The Supreme Court has "never suggested that the President ... has an immunity that extends beyond the scope of any action taken in an official capacity." *Id.* at 694, 117 S.Ct. 1636. President Trump's public-concern standard, though, would do just that. When the speaker is the President, speech undertaken in a plainly and purely unofficial capacity will often involve a matter of public concern. Yet President Trump's test would still grant immunity in that circumstance, even though there is "no support for an immunity for *unofficial* conduct" (or speech). *Id.*

As an example, consider a situation directly germane to the cases before us in which President Trump publicly volunteered that he was acting—and speaking—in an unofficial, private capacity. In the period after the 2020 election and before January 6, the Supreme Court considered **\*16 \*\*457** an effort by Texas to challenge the administration of the election in several battleground states in which then-President-elect Biden had been declared the winner. *Texas v. Pennsylvania*, No. 22O155 (U.S. 2020). President Trump moved to intervene in the case. In doing so, he specifically explained to the Supreme Court (and captioned his filing accordingly) that he sought to "intervene in this matter in his personal capacity as a candidate for re-election to the office of President of the United States." Motion of Donald J. Trump, President of the United States, to Intervene in his Personal Capacity as Candidate for Re-Election, Proposed Bill of Complaint in Intervention, and Brief in Support of Motion to Intervene 14, *Texas v. Pennsylvania*, No. 22O155 (U.S. Dec. 9, 2020) (Trump Mot. to Intervene). He relatedly elaborated that he wished "to intervene to protect his unique and substantial personal interests as a candidate for re-election to the Office of President." *Id.* at 24.

President Trump, then, affirmatively communicated to the Supreme Court (and the public) that he was acting and speaking in that matter in his "personal capacity" as a

candidate for reelection—indeed, he explained that his reason for wanting to participate in the case was a "substantial personal" one rather than an official one. That stands in sharp contrast with other cases in which he—like all Presidents—had filed briefs in the Supreme Court in his "official capacity as President of the United States." *See, e.g.*, Brief for the Petitioners at II, *Trump v. Hawaii*, 138 S. Ct. 2392 (No. 17-965). But while President Trump's effort to participate in *Texas v. Pennsylvania* was made in an expressly and self-consciously personal, unofficial capacity, the content of his speech in his submission undoubtedly involved a matter of significant public concern: his challenge to the election results in various pivotal states, whose "electors [would] determine the outcome of the election." Trump Mot. to Intervene 27.

As that example illustrates, an immunity for all presidential speech on matters of public concern—without regard to the context in which the President speaks—would be grounded purely in "the identity of the actor who performed it" rather than "the nature of the function performed." *Clinton*, 520 U.S. at 695, 117 S.Ct. 1636 (quoting *Forrester*, 484 U.S. at 229, 108 S.Ct. 538). Such a result is "unsupported by precedent." *Id.* And it is unsupported by the basic object of granting a President official-act immunity: assuring that the President is not "unduly cautious in the discharge of his *official* duties." *Id.* at 694, 117 S.Ct. 1636 (emphasis added) (quoting *Nixon*, 457 U.S. at 752 n.32, 102 S.Ct. 2690). That concern necessarily has no salience when the President acts —by his own admission—in an unofficial, private capacity.

b.

As President Trump's intervention motion in *Texas v. Pennsylvania* highlights, whether the President speaks (or engages in conduct) on a matter of public concern bears no necessary correlation with whether he speaks (or engages in conduct) in his official or personal capacity. And because it is the latter question that governs the availability of presidential immunity—as a matter both of precedent and of the essential nature of an immunity for (and only for) official acts—we must reject President Trump's proposed public-concern test as ill-suited to the inquiry.

President Trump's intervention motion is telling in a related respect as well, which pertains to identifying when a President acts in an official or private capacity in the specific circumstances of the cases before **\*17** **\*\*458** us. The motion expressly recognizes, as we hold today, that when

a sitting President acts as a "candidate for re-election," he does so in his "personal capacity," not in an official capacity. Trump Mot. to Intervene 14. Otherwise said, a sitting President, just like the candidates he runs against, is subject to civil damages liability for his actions constituting re-election campaign activity.

The principle that an incumbent President seeks reelection in his private capacity rather than in his official capacity finds its roots in the Framing. Madison explained that "[a] dependence on the people is no doubt the primary controul on the government." The Federalist No. 51, at 349 (James Madison) (Jacob E. Cooke ed., 1961). To that end, the Framers "render[ed] the President directly accountable to the people through regular elections." *Seila Law LLC v. CFPB*, —— U.S. ——, 140 S. Ct. 2183, 2203, 207 L.Ed.2d 494 (2020). And "every practicable obstacle" was imposed to prevent "cabal, intrigue and corruption" from giving an incumbent President a structural electoral advantage—including the exclusion from service in the Electoral College of "all those who from situation might be suspected of too great devotion to the president in office." The Federalist No. 68, *supra*, at 459 (Alexander Hamilton); *see also* U.S. Const. art. II, § 1, cl. 2.

The essence of those Framing-era principles, in the words of Chief Justice Marshall, is that "the president is elected from the mass of the people, and, on the expiration of the time for which he is elected, returns to the mass of the people again." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, Circuit Justice). That fundamental understanding holds regardless of whether the person elected to serve as the next President also happens to be the incumbent. A sitting President has no inherently greater claim to serving the next four-year term than does any other candidate. And if an incumbent President seeks and ultimately wins re-election, he does so in the same manner as anyone else vying for the office: he "is elected from the mass of the people." *Id.*

It follows that, when a sitting President acts in his capacity as a candidate for re-election, he acts as office-*seeker*, not office-*holder*. The presidency itself has no institutional interest in who will occupy the office next. Campaigning to *attain* that office thus is not an official function *of* the office. Rather, an incumbent President's interests in winning re-election have the same purely private character as those of his challengers—i.e., "substantial personal interests as a candidate" to attain (or retain) the office. Trump Mot. to Intervene 24. Accordingly, a President acts in a private,

unofficial capacity when engaged in re-election campaign activity.

The executive branch's own views and practice reinforce the point. In 1982, just a few months before the Supreme Court decided *Nixon*, the Department of Justice's Office of Legal Counsel (OLC) advised President Reagan that "funds appropriated for the official functioning of the offices of the President and the Vice President may be used for travel expenses only if the travel is reasonably related to an official purpose," and that "appropriated funds" thus "should not be used to pay for political events." Payment of Expenses Associated with Travel by the President and Vice President, 6 Op. O.L.C. 214, 215–16 (1982). Political events, OLC reasoned, generally have "no reasonable connection" to the "official purposes" served by appropriated funds. *Id.* at 216. "As a general rule," moreover, "Presidential and Vice Presidential travel should be considered 'political' if its primary purpose involves their positions as leaders of their political party"—as **\*18  \*\*459** would be the case with "[a]ppearing at party functions, fundraising, and campaigning for specific candidates," of course including for oneself. *Id.* at 217 (citation omitted).

The executive branch itself thus considers its own chief office-holder's campaign for re-election to lie well outside his official functions. A contrary conclusion would grant a sitting President immunity based "purely in the identity of his office," improperly treating his efforts to *gain* the office for a second term as an official act *of* the office. *Clinton*, 520 U.S. at 695, 117 S.Ct. 1636.

Compare, for instance, a former one-term President who runs to regain the presidency for a second, non-consecutive term with a current one-term President who runs to retain office for a second straight term. Whether a one-term President runs to regain the office or to retain it, the object is the same: to serve (again) as President in the next term. And with respect to their campaign-related activity to attain that objective, there is no basis for cloaking a sitting President running for the office with an immunity—and resulting advantage—that a former President running for the office would lack. Both act in their "personal capacity as a candidate for re-election to the office of President." Trump Mot. to Intervene 14. President Trump's proposed public-concern standard, though, would treat them differently: the sitting President would enjoy absolute immunity for all speech on a matter of public concern, even purely campaign speech given strictly in his

capacity as candidate, whereas the former President would get no immunity for precisely the same campaign speech.

Consider, for example, a speech at a political party's convention accepting the party's nomination as its candidate for President. Such a speech is inherently given in the nominee's private capacity as office-seeker. That is no less true when the party's nominee is the sitting President: a sitting President gives the acceptance speech at his party's convention only if he seeks and wins the party's nomination —or else some other person will give the same speech. In that situation, then, the President speaks in an unofficial, private capacity. Applying the executive branch's longtime understanding: if a sitting President running for re-election gives an acceptance speech at the party's convention, that presumably counts as "[a]ppearing at [a] party function[ ]" and is unofficial activity in the executive branch's own view. Payment of Expenses, 6 Op. O.L.C. at 217 (citation omitted). But because an acceptance speech at a party convention will also surely address matters of public concern, President Trump's proposed approach would nonetheless grant a sitting President immunity for it. A former President, though, would not get the same favorable treatment for the same speech, nor would any other candidate. President Trump's approach thus would attach official-act immunity to the "unofficial conduct of the individual who happens to be the President." *Clinton*, 520 U.S. at 701, 117 S.Ct. 1636.

Or take another example: a campaign ad fully funded by a candidate's campaign (her "authorized political committee" in the words of campaign-finance law). *See* 52 U.S.C. § 30120(a)(1), (d)(1)(B). In the ad, the candidate discusses her policy priorities—no doubt matters of public concern. And the ad concludes with the legally mandated disclosure, "Paid for and authorized by Jane Doe's campaign," followed by the familiar voiceover, "I am Jane Doe, and I approve this message." *Id.* Under President Trump's proposed public-concern test, if the candidate happens to be the sitting President (but not if she is a former President or any other candidate), her **\*19  \*\*460** speech in the ad would be official—even though it is plainly campaign speech in a campaign ad given in her private capacity as candidate. A sitting President then would be absolutely immune from defamation liability for something she may have said about her opponent in the campaign ad, whereas a former President would face liability for saying the very same thing in the very same ad.

The pro-incumbent imbalance would be especially stark if the former and current Presidents were to run against each other. In that situation, one candidate, the former President, would face civil damages liability for statements on matters of public concern in campaign ads or in an acceptance speech at a party convention. But the competing candidate, the sitting President, would be wholly insulated from damages liability for making the very same statements on the opposing side of the very same race. We see no basis for giving an incumbent President that kind of asymmetrical advantage when running against his predecessor.

That is not to say that, when an incumbent President engages in campaign speech as a candidate, there is no recognition of his current office. At the party convention, he presumably would be introduced and referred to as the President, as is natural. And relatedly, he may give the acceptance speech at a podium affixed with the presidential seal, as nominees of both major political parties have done when speaking in their private capacities as candidates for reelection. *See, e.g.*, Mark Knoller, *Presidential Seal Returns to Obama Campaign Events After Change of Heart*, CBS News (July 6, 2012, 5:31 PM), https://www.cbsnews.com/news/presidential-seal-returns-to-obama-campaign-events-after-change-of-heart [https://perma.cc/533X-EVHE]; *George W. Bush 2004 Acceptance Speech*, C-SPAN (Sept. 2, 2004), https://www.c-span.org/video/?182731-2/george-w-bush-2004-acceptance-speech [https://perma.cc/6Z26-TNBD].

But while the person giving the address is—and is recognized to be—the sitting President, he still delivers the address in his private, unofficial capacity as candidate for reelection. It is analogous to the President appearing in a public filing as the "President of the United States" but specifically "in his personal capacity as candidate for re-election." Trump Mot. to Intervene 1 (capitalization altered). And when the President speaks strictly in that capacity, there is no warrant for granting him official-act immunity.

In short, a President's speech on matters of public concern can be an official act, as in the case of the State of the Union address, or an unofficial act, as in the case of a speech at a reelection campaign rally. For purposes of presidential immunity, the key is whether the President is speaking (or engaging in conduct) in an official capacity as office-holder or instead in an unofficial capacity as officer-seeker. Whether the speech relates to matters of public concern is beside the point.

Because President Trump believes that speech on matters of public concern constitutes official presidential action as a categorical matter, he makes no effort in this appeal to resist the notion that he was acting in his capacity as a candidate when engaged in the activity alleged in the complaints. In his view, he is entitled to immunity regardless of whether "he was acting as a candidate." Trump Br. 18. Even if so, President Trump submits, his relevant actions "[i]n the run-up to January 6th and on the day itself" amounted to speech on a matter of public concern—i.e., the "integrity of the 2020 election"—and so fell "well within the scope of ordinary presidential action" entitled to immunity. *Id.* at 4.

**\*20  \*\*461** As President Trump would have it, then, he engaged in official presidential action for immunity purposes even when he, by his own description, acted and spoke "in his personal capacity as a candidate for re-election" rather than in his "official capacity as President." Trump Mot. to Intervene 14; *accord id.* at 1, 3, 6, 19; *compare* Brief for the Petitioners at II, *Trump v. Hawaii*, 138 S. Ct. 2392 (No. 17-965). After all, his arguments in that filing addressed at length the same matter of public concern he invokes in this appeal—the "integrity of the 2020 election." Trump Br. 4; *see* Trump Mot. to Intervene 4–5, 8–12, 15–17, 25–28, 37–38. But as the Supreme Court has explained, there is "no support for an immunity for *unofficial* conduct," *Clinton*, 520 U.S. at 694, 117 S.Ct. 1636, and hence no basis for granting immunity for conduct (or speech) the President himself contemporaneously recognizes he undertakes in his personal, unofficial capacity as a candidate.

c.

Under *Nixon* and *Clinton*, then, the task is to distinguish between official acts and private acts. In the context of the cases before us, that means determining whether President Trump acted as an office-holder or office-seeker when he engaged in the activity alleged in the complaints.

In that regard, we recognize that "there is not always a clear line between [the President's] personal and official affairs." *Trump v. Mazars USA, LLP*, ––– U.S. ––––, 140 S. Ct. 2019, 2034, 207 L.Ed.2d 951 (2020). In particular, "the line between President and candidate will not always be clear." Trump Br. 18 (quoting *Thompson*, 590 F. Supp. 3d at 80). But in some situations, there will be little doubt, and not just when the President himself allows that he acts "in his personal capacity

463 U.S.App.D.C. 442

as a candidate for re-election." Trump Mot. to Intervene 14. When a sitting President solicits donations at a fundraiser for his reelection campaign, fires a campaign pollster or hires a new one, or gives a speech at a party convention accepting the party's nomination, it is straightforward to conclude that he acts in an unofficial capacity as presidential candidate rather than an official capacity as incumbent President.

Even if other contexts doubtless present closer calls, there is ultimately no avoiding the essential understanding that a President's immunity from damages liability applies only to "acts within the 'outer perimeter' of his official responsibility," *Nixon*, 457 U.S. at 756, 102 S.Ct. 2690, and hence does not "extend[ ] beyond the scope of any action taken in an official capacity," *Clinton*, 520 U.S. at 694, 117 S.Ct. 1636. The potential difficulty of meting out that distinction in some situations, then, cannot justify simply giving up on the enterprise altogether. And President Trump himself allows that "courts can, in fact, tell the difference between official and unofficial conduct." Trump Reply Br. 14.

The inquiry, though, should be fashioned and carried out with appropriate sensitivity to the important interests at stake. In that connection, the Supreme Court has emphasized the need to avoid "highly intrusive" inquiries "into the President's motives." *Nixon*, 457 U.S. at 756, 102 S.Ct. 2690. An assessment of whether the President is engaged in official functions or unofficial reelection campaign activity, correspondingly, does not turn on whether the activity was subjectively undertaken in some measure to enhance the President's re-election prospects or profile. The inquiry instead is an objective one, "grounded in" a context-specific assessment of "the nature of the function performed." **\*21 \*\*462** *Clinton*, 520 U.S. at 695, 117 S.Ct. 1636 (internal quotation marks and citation omitted).

We emphasize context because, only by looking to context can the relevant nature of an action be understood. The same essential message or act may be either official or unofficial depending on the circumstances in which it is delivered or performed. The President's delivery of the State of the Union address to Congress (and the public), for instance, is an official act. *See* U.S. Const. art. II, § 3. That remains so regardless of whether he may draw themes and make points with an eye on maintaining his public standing in an election year, or whether priorities given primacy in the speech may echo ones emphasized on the campaign trail. Conversely, a speech at a campaign rally fully funded by a President's campaign committee might relate some of the same messages

as the State of Union address, but is an unofficial event by nature. Similarly, the President can remove the Secretary of State, and he can remove his campaign manager. The former is an official exercise of the executive power. *See Nixon*, 457 U.S. at 757, 102 S.Ct. 2690; *Seila Law*, 140 S. Ct. at 2197. But the latter is no such thing. Understanding the context, then, will often be essential to identifying the capacity in which a President acts.

That context may be substantially informed by the way in which the President and the executive branch themselves treat the activity in question. If it is clothed in the trappings of an official function based on objective indicia, it more likely constitutes an official act for immunity purposes than if it bears the hallmarks of re-election campaign activity. So, if an activity is organized and promoted by official White House channels and government officials and funded with public resources, it is more likely an official presidential undertaking than if it is organized, promoted, and funded by campaign channels, personnel, and resources. *Cf.* Payment of Expenses, 6 Op. O.L.C. at 215–17. Those considerations may not always point in the same direction, or even be known, but they can be illuminating when brought to light. The grant of immunity aims to free the President from an inclination that may otherwise exist to discharge his official functions in an unduly cautious manner. Yet if the President's (and executive branch's) own treatment of the matter exhibits that he views himself to be engaged in *private* activity as a candidate, there is no cognizable *public* interest in assuring he can carry out that quintessentially unofficial function with boldness.

When an appropriately objective, context-specific assessment yields no sufficiently clear answer in either direction, the President, in our view, should be afforded immunity. The "special nature of the President's constitutional office and functions" prompted the *Nixon* Court to extend immunity to the "outer perimeter of his official responsibility." 457 U.S. at 756, 102 S.Ct. 2690 (internal quotation marks omitted). And subsequent decisions have construed statutes not to constrain presidential action absent clear indication of Congress's intent to do so. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992); *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 465–67, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *cf.* Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges, 19 Op. O.L.C. 350, 351–57 (1995). The same considerations counsel in favor of construing the President's actions to involve official functions "so long as [they] can reasonably be understood" as such. *Hawaii*, 138 S. Ct. at 2420. Conversely, though,

when a President's actions viewed objectively and in context may reasonably be understood **\*22** **\*\*463** only as re-election campaign activity, a court not only may, but must deny immunity. By doing so, the court "acts, not in derogation of the separation of powers, but to maintain their proper balance." *Nixon*, 457 U.S. at 754, 102 S.Ct. 2690.

We have no occasion to apply that framework in this appeal because, as explained, President Trump makes no argument at this stage that his actions as alleged in the complaints were not re-election campaign activity. He will have every opportunity to make such an argument in the proceedings to come in the district court. *See* pp. 28–30, *infra*. But the inquiry we have outlined is consistent with his submission that the analysis should turn on "the function being performed and not the politics or policy being advanced or the words being used." Trump Reply Br. 11. And the inquiry does not consist of "[t]rying to identify speech that would benefit a president politically." *Id.* at 4.

That is not to say that the content of a speech will invariably be entirely off-limits. In certain circumstances, for instance, it could serve to confirm what an objective assessment of the context makes evident. Indeed, even "[d]eciding whether speech is of public or private concern" under President Trump's proposed approach would "require[ ] us to examine the content, form, and context of that speech." *Snyder*, 562 U.S. at 453, 131 S.Ct. 1207 (internal quotation marks and citation omitted). But the crux of the inquiry we have described concerns the context in which the President speaks, not what precisely he says or whether it might advance his re-election prospects.

By way of illustration, consider President Trump's speech at the "Salute to America" event on the National Mall on July 4, 2019. By the time of that address, President Trump had formally announced his candidacy for re-election. Maggie Haberman et al., *Trump, at Rally in Florida, Kicks Off His 2020 Re-election Bid*, N.Y. Times (June 18, 2019), https://www.nytimes.com/2019/06/18/us/politics/donald-trump-rally-orlando.html [https://perma.cc/A2GB-P96X]. And his address drew criticism in many quarters as amounting to a taxpayer-funded campaign rally in service of his reelection effort. *See, e.g.*, Juliet Eilperin et al., *Park Service Diverts $2.5 Million in Fees for Trump's Fourth of July Extravaganza*, Wash. Post (July 2, 2019, 9:39 PM), https://www.washingtonpost.com/politics/white-house-gives-tickets-to-trumps-july-fourth-extravaganza-to-gop-donors/2019/07/02/9109a566-9ce0-11e9-b27f-

ed2942f73d70_story.html [https:// perma.cc/48UL-HV9W]. But several objective considerations strongly suggest that the speech was—and was treated by the President and executive branch as—part of an official event, regardless of whether what was said or how it was conceived might have borne some subjective connection to enhancing President Trump's re-election prospects.

For instance, the Salute to America rally was publicly funded, including through National Park Service and Department of Defense resources. *See id.*; Kathryn Watson, *Pentagon Spent $1.2 Million for Trump's July 4 "Salute to America"*, CBS News (July 10, 2019, 8:09 AM), https://www.cbsnews.com/news/trumps-july-4-salute-to-america-cost-military-1-2-million-pentagon-says/ [https://perma.cc/87S6-ZWFT]. In addition, the government promoted the event, and its primary organizers were government officials from the White House and the Department of the Interior. *See* Eilperin et al., *supra*. The National Park Service, for example, "presented" the event and invited the public to attend. News Release, Nat'l Park Serv., **\*23** **\*\*464** National Park Service Presents 2019 Independence Day Celebration in the Nation's Capital (June 27, 2019), https://www.nps.gov/nama/learn/news/national-park-service-presents-2019-independence-day-celebration-in-the-nation-s-capital.htm [https://perma.cc/9B8B-S3P6].

Accordingly, the White House treated President Trump's speech as official presidential remarks on its official website and, while President Trump was in office, dedicated a web page to the annual Salute to America event. *See Remarks by President Trump at the 2019 Salute to America*, The White House (July 5, 2019), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-salute-america [https://perma.cc/YV6J-F82P]; *Salute to America*, The White House, https://trumpwhitehouse.archives.gov/salutetoamerica [https://perma.cc/GK67-JMLS] (last visited Nov. 18, 2023); *see also* Trump White House Archived, *Salute to America 2019 – Lincoln Memorial*, YouTube (July 5, 2019), https://www.youtube.com/watch?v=wgL0v9sJ0ZM [https://perma.cc/9335-JGJG]. The White House also promoted the event on its official Twitter account. *See, e.g.*, @WhiteHouse45, Twitter (July 3, 2019, 6:01 PM), https://twitter.com/WhiteHouse45/status/1146539367269359618 [https://perma.cc/3XJW-N7UZ]. And, finally, a number of government officials attended the event (as was noted in the President's remarks,

*see Remarks by President Trump at the 2019 Salute to America*, *supra*), some of whom could have violated federal law by attending it if it were a campaign event, *see* 5 U.S.C. § 7324.

We have no need here to definitively decide whether President Trump's remarks at the Salute to America event would qualify as official presidential action for purposes of presidential immunity. Additional considerations might affect the assessment in some fashion. As one example, if the White House's official Twitter feed regularly promoted quintessential campaign events, its promotion of the Salute to America rally may not itself shed material light on the event's official or unofficial character in the eyes of the executive branch. But under the inquiry we have outlined, President Trump's speech at the event would be treated as official action if it could reasonably be understood in that way. Whether his remarks addressed matters of public concern would not—and we believe should not—decide the issue.

2.

We turn next to President Trump's alternative argument that he is entitled to official-act immunity because he took the actions alleged in the complaints in an exercise of his Article II duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. President Trump's contention in that regard, however, does not demonstrate that he was acting in his official capacity so much as presume it. His argument presents no ground for affording him immunity that is independent of his ability to show that he engaged in the relevant actions in his official capacity as President rather than in his private capacity as presidential candidate.

The duty and authority to ensure the faithful execution of the laws, as with all of the executive power, is vested in the President solely in his official capacity. *See* U.S. Const. art. II, § 1, cl. 1. After all, the President assumes his Take Care Clause responsibilities and other executive duties only upon taking the constitutional oath of office, in which he must "solemnly swear (or affirm)" that he "will faithfully execute the *Office of President of the United States*." *Id.* art. II, § 1, cl. 8 (emphasis added). Nothing in Article II contemplates **\*24 \*\*465** the President's exercise of the powers of the presidency when acting in a private—i.e., non-presidential—capacity. Rather, President Trump's assertion that he exercised his authority under the Take Care Clause, at least without more, assumes the answer to the question whether he acted in an official

capacity as office-holder or in a private capacity as office-seeker. If he acted in the latter capacity, he cannot have been exercising the duties of the very office he was seeking to attain—any more than could his challengers when taking the same kinds of actions in seeking to attain the same office.

It is not that President Trump could not establish his entitlement to immunity by demonstrating that he acted pursuant to the Take Care Clause; it is that he has not done so. He asserts that he was attempting to ensure faithful execution of the laws—in particular, the Electoral Count Act—but he has not explained why his actions should count as official other than to say they fit within the ambit of his Take Care Clause duties. They might, or they might not, depending on the context in which he acted. The President could exhort Congress to do its duty under the Electoral Count Act in a campaign ad, or he could do the same in the State of the Union address. Even assuming (without deciding) that the latter would be an action taken in furtherance of the President's Take Care Clause duties, the former would not be—and indeed could not be, given that, as explained, the Take Care Clause presupposes official rather than private action. President Trump, though, has made no argument as to why his actions alleged here should be treated more like the State of the Union than the campaign ad. His invocation of the Take Care Clause thus ultimately does not add anything to his claim of immunity in the circumstances of the cases before us.

C.

Whereas President Trump propounds a theory of immunity that, in application, could confer immunity even if he acted in an unofficial capacity as presidential candidate, the plaintiffs' theory presents the opposite shortcoming: it could deny a President immunity even if he acted in his official capacity as sitting President. The government's proposed approach ultimately shares that same deficiency. We thus decline to adopt either the plaintiffs' or government's proposed rationales for rejecting President Trump's claim of immunity.

1.

The plaintiffs argue that a President's official responsibilities "do not include engaging in campaign activity." Plaintiffs' Br. 33. That reasoning, consistent with the approach we have outlined, focuses on whether the President acted in his official capacity as incumbent officeholder or instead engaged in

campaign activity in his private capacity as office-seeker. To that extent, we agree with the plaintiffs' understanding of the pertinent inquiry in the cases before us.

But the plaintiffs also go further. In their view, President Trump's actions were not official activity—and thus are not imbued with immunity—because they obstructed a constitutional process in which his office had no role, thereby infringing on the separation of powers. The plaintiffs maintain that the Constitution intentionally excludes the President from the formal process of counting electoral votes, assigning that function instead to Congress and the Vice President in his capacity as the President of the Senate. *See* U.S. Const. art. II, § 1, cl. 3–4; *id.* amend. XII. President Trump's alleged efforts to interfere in that process, the plaintiffs assert, thus necessarily **\*25 \*\*466** fell beyond the outer perimeter of his official presidential duties, and indeed undermined the democratic legitimacy of the presidency. As a result, the plaintiffs urge, President Trump's claim of immunity must be denied.

That argument, in our view, cannot carry the day. *Nixon's* outer-perimeter test, as we have explained, does not confine the President's official-act immunity to actions the Constitution expressly authorizes him to take. *See* pp. 12–13, 14–15, *supra*. We do not doubt, for instance, that the President can act in an official capacity when commenting on state legislation, on a judicial decision, or on Congress's internal procedures, even though those matters may lie beyond the President's own enumerated job duties. To be sure, if the President speaks about those subjects at a re-election campaign rally, he does so in an unofficial capacity. But that is because he acts in his private capacity as a presidential candidate, not because he engages with matters falling outside his enumerated executive responsibilities.

Here, insofar as the plaintiffs' argument rests on the notion that President Trump's alleged actions infringed the separation of powers, their reasoning tends on balance to support granting immunity more than it does withholding it. The plaintiffs assert that President Trump "disrupted the constitutionally mandated separation of powers by invading a coordinate branch of government [i.e., Congress] as it carried out its own constitutional duties" to count the votes of the Electoral College. Plaintiffs' Br. 28. That kind of "executive branch interference," to the plaintiffs, *id.* at 33, works a "blatant violation of the constitutional separation of powers that 'restrains each of the three branches of the Federal Government from encroaching on the domain of the other

two,' " *id.* at 29–30 (quoting *Clinton*, 520 U.S. at 691, 117 S.Ct. 1636).

In conceiving of President Trump's actions as an effort by one branch to interfere in another branch's sphere, however, the plaintiffs' argument presupposes that President Trump acted in an official capacity. He could effect an executive branch incursion on a coordinate branch only if he were acting in his capacity as the executive branch's chief officer—i.e., in his official capacity as President. Put in the alternative, he could *not* work an executive branch intrusion on another branch's domain if he were acting in an unofficial, private capacity: in that event, he would be acting as a private person lacking any authority over the executive branch, not as the branch's chief officer. In short, the President acts in an official capacity cloaked with the protections of immunity when he allegedly perpetrates an infringement of the separation of powers, but he lacks any such ability to violate the separation of powers when acting in the kind of private, unofficial capacity for which immunity is unavailable.

By way of illustration, consider "[p]erhaps the most dramatic example" of a President found to have exceeded the executive branch's authority in a manner encroaching on Congress's domain. *Clinton*, 520 U.S. at 703, 117 S.Ct. 1636 (discussing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)). *Youngstown Sheet & Tube Co. v. Sawyer* involved a challenge to President Truman's executive order directing the Secretary of Commerce to seize and operate the nation's steel mills at the height of the Korean War. 343 U.S. at 582, 72 S.Ct. 863. The Supreme Court rejected that assertion of presidential power, holding that "[t]he Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times." **\*26 \*\*467** *Id.* at 589, 72 S.Ct. 863; *cf. id.* at 635–37, 72 S.Ct. 863 (Jackson, J., concurring).

But while President Truman was found to have gone beyond the limits of his branch's authority into the province of a coordinate branch, he did so in an exercise of official responsibility, as to which immunity from civil damages liability would attach. Indeed, the Supreme Court, in the course of later denying immunity to President Clinton, described President Truman's challenged order in *Youngstown* as an example of "when the President takes official action." *Clinton*, 520 U.S. at 703, 117 S.Ct. 1636. So, whereas the Supreme Court would treat President Truman's act as official even though it encroached on a coordinate branch's domain, the plaintiffs' approach would treat it as unofficial—and,

it follows, unprotected by official-act immunity in a civil damages suit.

The plaintiffs might perceive *Youngstown* as different from this case on a theory that President Trump affirmatively obstructed Congress, something President Truman did not do. But the *Youngstown* framework treats all presidential action interfering with the "expressed or implied will of Congress" the same—i.e., as falling at the "lowest ebb" of a President's authority, but still fully eligible for treatment as official action for purposes of presidential immunity. *See Zivotofsky v. Kerry*, 576 U.S. 1, 10, 135 S.Ct. 2076, 192 L.Ed.2d 83 (2015) (quoting *Youngstown*, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring)). And we see no reliable, administrable criteria for predictably identifying when presidential action might amount to obstruction of a coordinate branch as opposed to something less. That is particularly so when, as here, the extent to which a President's challenged actions ultimately interfere with a coordinate branch depends on how third parties respond to the President. Insofar as those kinds of third-party reactions may be difficult to predict—as could well be the case in the charged contexts in which presidential immunity can be in issue—a President might hesitate to act with the conviction and dispatch that official-act immunity aims to secure. *See Nixon*, 457 U.S. at 752–53, 102 S.Ct. 2690.

Under the plaintiffs' theory, moreover, the availability of presidential official-act immunity would turn on the legality of the President's actions—specifically, on whether the actions flouted the separation of powers by intruding on a coordinate branch. But *Nixon* forecloses a legality-centered approach of that sort. Recall that the Supreme Court rejected the suggestion that, because President Nixon had unlawfully discharged Fitzgerald without adequate cause, he had necessarily acted beyond the outer perimeter of his official functions. *Nixon*, 457 U.S. at 756, 102 S.Ct. 2690. Withholding immunity on that basis, the Court explained, "would subject the President to trial on virtually every allegation that an action was unlawful," which in turn "would deprive absolute immunity of its intended effect." *Id.*

Those concerns apply to an alleged violation of the separation of powers no less than to any other alleged violation of law. In fact, the more uncertain the lawfulness of prospective official action, the more pronounced the need for (and effect of) granting official-act immunity. On that register, immunity for separation-of-powers violations rates quite high, for "the lines between the powers of the three branches are not always

neatly defined." *Clinton*, 520 U.S. at 701, 117 S.Ct. 1636. For that reason as well, we are unmoved by the plaintiffs' argument for a denial of immunity based on President Trump's ostensible infringement of the separation of powers.

2.

Like the plaintiffs, the government puts forward an argument for affirming the denial **\*27 \*\*468** of immunity to President Trump that does not adequately correlate with whether he took the actions alleged in the complaints in his official capacity as President or in his private capacity as presidential candidate. In fact, the central object of the government's proposed approach is to avoid the need to apply that distinction. *See* Gov't. Br. 16, 22. We appreciate the government's submission of its views in response to our invitation to share the executive branch's perspective on the proper resolution of this appeal, but we decline to adopt the government's suggested approach.

The government's proposed approach is highly fact-specific, turning on the particular grounds advanced (and not advanced) by President Trump on appeal. The government seizes on President Trump's argument that speech on matters of public concern, as a categorical matter, is an official presidential function. That argument, the government reasons, assumes that a President would be afforded immunity even if his speech amounts to incitement of imminent private violence. The government proposes that we reject President Trump's argument for immunity by exploiting that assumption, because, in the government's view, incitement of imminent private violence by definition lies outside a President's official functions. And the government suggests that we simply assume that President Trump's conduct fits within that category of ostensibly non-immune activity, the boundaries of which the government would define by reference to First Amendment standards marking unprotected incitement as set out in *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

As an initial matter, the government's suggested approach could lead to our denying immunity to President Trump based on an assumption that turns out to be false—indeed, an assumption that President Trump has already contested. The government asks us to assume for purposes of this appeal (but not actually decide) that President Trump's speech on January 6 and in the leadup to that day falls outside the First Amendment's protections because it amounts to incitement

463 U.S.App.D.C. 442

of imminent lawless action under *Brandenburg*. We could so assume only because that First Amendment question is not presently before us, since President Trump opted not to seek appellate review on the issue at this time. *See* 28 U.S.C. § 1292(b). If his First Amendment claim were before us, we would need to engage it on the merits rather than assume its rejection. The issue, though, remains in the case and could come before us at a later stage. So if we were to accept the government's suggested approach, we might resolve the question of President Trump's immunity based on an assumed answer to his First Amendment claim that perhaps could—depending on its ultimate resolution, the merits of which we do not now assess in any way—fail to stand up in the end.

As for the substantive merits of the government's proposed approach, it aligns the scope of a President's official-act immunity with the scope of protected speech under the First Amendment. There is no evident precedent for that kind of approach, and the fit seems an uneasy one. The considerations that inform whether a President is engaged in the discharge of official duties—the relevant question for purposes of presidential immunity—bear no necessary relation to the considerations that inform whether a President's speech would fall within the First Amendment's protections. The two inquiries serve distinct purposes, and in some sense appear to work at cross purposes. At a high level, the President is immune when he acts in his official capacity—i.e., as the government **\*28  \*\*469** rather than as a private person —whereas the First Amendment protects private persons against restraints imposed by the government. It is unclear why the existence of official-act immunity's protections for acting *as* the government should turn on the existence of First Amendment protections *against* the government.

In operation, the government's proposed approach would tend to confer presidential immunity when it is least needed while withholding it when it is most needed. As to the former, if the President's speech falls within the First Amendment's protections, the government's approach would preserve presidential immunity. But if the First Amendment protects the President's speech, that protection would foreclose the possibility of civil damages based on the speech regardless of presidential immunity. *See, e.g., Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55–56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). In that situation, then, the President would have little need for the protection that official-act immunity would afford.

Conversely, if the President's speech falls outside the First Amendment's protections because it amounts to incitement, the government's proposed approach would leave the President without official-act immunity even if it otherwise seems apparent that the speech was delivered in an official capacity—e.g., in the State of the Union address. And while the government specifically focuses on incitement, there are other types of unprotected speech, too, such as defamation. *See United States v. Stevens*, 559 U.S. 460, 468–69, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). We see no conceptual basis for confining a theory that would render immunity unavailable when the First Amendment is unavailable to one type of unprotected speech alone. So, the President would be denied immunity not just for incitement, but also for defamation (or other types of unprotected expression). And when the President engages in speech amounting to incitement or defamation, he not only removes himself from the First Amendment's protections, but he also subjects himself to the prospect of damages suits—the situation in which official-act immunity is salient. *E.g., Milkovich v. Lorain J. Co.*, 497 U.S. 1, 11, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (civil action for defamation); *cf. Falwell*, 485 U.S. at 56, 108 S.Ct. 876 (intentional infliction of emotional distress); *see also* Blassingame Compl. ¶¶ 180–89, J.A. 59–60 (inciting to riot); Swalwell Compl. ¶¶ 192–200, 208–20, J.A. 120–22, 123–26. (inciting to riot and inciting assault).

The government would accept that result because it considers incitement (and presumably other categories of similarly unprotected speech) to be categorically unofficial. But it is possible that a President, in exhorting the public to action on a cause considered essential or in responding to a reporter's question at a White House press briefing about criticism directed at the President, might speak in a manner testing the potentially indistinct lines dividing protected from unprotected speech: "incitement to disorder," the Supreme Court recently observed, "is commonly a hair's-breadth away from political 'advocacy.' " *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106, 2118, 216 L.Ed.2d 775 (2023) (quoting *Brandenburg*, 395 U.S. at 447, 89 S.Ct. 1827); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *cf. Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996), *aff'd on other grounds*, 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (alleging defamation "by Mr. Clinton's presidential press secretary while Mr. Clinton was President").

**\*29  \*\*470** The government's suggested approach would deny official-act immunity if a President's borderline speech

463 U.S.App.D.C. 442

falls on the wrong side of that potentially elusive divide. But immunity cannot serve its intended purpose if it is withheld when a President would need it most—i.e., when a President might refrain from undertaking some course of official action because of uncertainty about whether it could give rise to damages liability. To that end, *Nixon*, as explained, rejected as unduly constraining the proposition that a President's official-act immunity is coextensive with the legality of his actions. *See* 457 U.S. at 756, 102 S.Ct. 2690. Yet that would be the upshot of an approach that would deny immunity if the President's speech falls beyond the First Amendment's protections.

All told, we see no sound basis for categorically excluding unprotected speech from the protections of presidential official-act immunity—and little affirmative reason for doing so. We therefore decline to accept the government's proposed approach.

### III.

While we affirm the district court's denial of President Trump's claim of official-act immunity at the current stage of the proceedings, that does not mean the proceedings now instantly move ahead to engage with the merits of the plaintiffs' claims. President Trump moved to dismiss the claims against him on grounds of official-act immunity based on the allegations in the complaints, and at the motion-to-dismiss stage, those allegations are assumed to be true. He thus has had no opportunity to dispute the plaintiffs' allegations bearing on the immunity question or to introduce his own facts pertaining to the issue. He must be afforded that opportunity before the proceedings can move ahead to the merits, including before any merits-related discovery.

Official immunity, including the President's official-act immunity, is "*immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). It is "an entitlement not to stand trial or face the other burdens of litigation." *Id.* And as we have made clear, "[d]iscovery is itself one of the burdens from which defendants are sheltered" by official immunity. *Martin*, 812 F.2d at 1430 (collecting cases). The importance of shielding officials from the burden of unwarranted discovery is among the reasons the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172

L.Ed.2d 565 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)). Those concerns are particularly pronounced when the official claiming immunity from suit is the President. *See generally Nixon*, 457 U.S. at 749–53, 102 S.Ct. 2690.

While President Trump therefore must be afforded an opportunity to resolve his immunity claim before merits discovery, discovery bearing on the immunity question itself might be in order if the circumstances warrant it. The Supreme Court has recognized that discovery "tailored specifically to the question of" immunity may be merited when there is a need to develop facts or resolve factual disputes to facilitate deciding a threshold question of immunity. *Anderson v. Creighton*, 483 U.S. 635, 646–47 n.6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). President Trump may of course move for summary judgment on his immunity claim, and the district court may rule on any such motion once the factual record on the issue is sufficiently developed. *Cf.* **\*30 \*\*471** *Kartseva v. Dep't of State*, 37 F.3d 1524, 1530 n.21 (D.C. Cir. 1994) ("[W]here the parties present a factual *dispute* about the challenged conduct, and the merits of the qualified immunity question turn on that dispute, 'discovery may be necessary before [a] motion for summary judgment on qualified immunity grounds can be resolved.' " (second alteration in original) (quoting *Anderson*, 483 U.S. at 646–47 n.6, 107 S.Ct. 3034)).

At the summary-judgment stage—and throughout—President Trump bears the burden of establishing that he is entitled to official-act immunity. As a general matter, "[t]he burden of justifying absolute immunity rests on the official asserting the claim." *Harlow v. Fitzgerald*, 457 U.S. 800, 812, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *accord Banneker*, 798 F.3d at 1140. There is no evident reason to apply any different approach in the context of presidential immunity. In *Nixon*, the Supreme Court characterized a President's official-act immunity as a "defense" that President Nixon had "claimed," 457 U.S. at 741, 102 S.Ct. 2690, and the Court nowhere suggested the need for any President-specific exception to the "general rule" that a defendant must "plead and prove ... a defense," *Taylor v. Sturgell*, 553 U.S. 880, 907, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008). Accordingly, in *Jones v. Clinton*, the court of appeals held that President Clinton bore the burden of establishing his entitlement to presidential immunity, 72 F.3d at 1361, a conclusion the Supreme Court did not address or revisit in its decision in the case.

Although President Trump must demonstrate his entitlement to immunity, that burden will be met if, based on an appropriately objective, context-specific assessment, his alleged actions can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker. *See* pp. 19–22, *supra*. In other words, is it reasonable to think he was exercising his official responsibilities as President, or was he instead engaging in reelection campaign activity as a presidential candidate? The complaints contain factual allegations potentially bearing on the issue—for instance, that the January 6 rally was "organized in part by Trump's former campaign staff" and "arranged and funded by a small group including a top Trump campaign fundraiser and donor," Blassingame Compl. ¶ 59, J.A. 38 (quotation marks and citation omitted), or "was organized and funded by Trump's campaign organization," Swalwell Compl. ¶ 97, J.A. 98. President Trump appears to deny those accounts as a factual matter, having asserted in the district court that "the January 6th rally is in no way related to the campaign; ... the campaign doesn't pay [ ] for it; the campaign is not involved with it at all." J.A. 327.

Those sorts of considerations and others would inform the assessment and ultimate resolution of President Trump's claim of official-act immunity in the proceedings to come in the district court, insofar as he continues to press that defense. As for the appeal presently before us, we affirm the district court's denial of President Trump's motion to dismiss on grounds of presidential immunity, and we leave it to that court to conduct further proceedings on the issue as desired and warranted.

\* \* \* \* \*

For the foregoing reasons, we affirm the district court's denial of President Trump's motion to dismiss the claims against him on grounds of presidential immunity.

*So ordered.*

Katsas, Circuit Judge, concurring:
This appeal presents the question whether President Trump is entitled to **\*31 \*\*472** immunity from damages claims based on his speech outside the White House on January 6, 2021. Under *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), the President is immune from damages claims based on his official acts. But under *Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997), the President is not immune from claims based on private,

unofficial acts. The immunity question thus turns on whether President Trump made the January 6 speech in an official or private capacity.

Today, we do not definitively resolve that question. Instead, we hold only that we cannot resolve it on a motion to dismiss. Our conclusion rests on two propositions persuasively established by Chief Judge Srinivasan's lead opinion. First, in certain limited contexts, courts may reliably conclude that a sitting President is speaking only in a private capacity as a candidate for re-election or as the leader of a political party. These include instances where the President speaks at a party convention, in a presidential debate, in a political advertisement, at a campaign rally, or at a party fundraiser. Second, the operative complaints plausibly allege that the January 6 speech involved this kind of purely private campaign speech. In particular, the complaints allege that the January 6 rally was organized by campaign staff and funded by private donors, and was neither facilitated by White House staff nor paid for with congressionally appropriated funds. Given those allegations, which remain to be tested on summary judgment or at trial, we cannot resolve the immunity question in President Trump's favor at this stage of the case.

Although we do not definitively resolve the immunity question, we do set forth the legal framework for assessing it. Given the immunity's importance, I offer a few thoughts elaborating on the Court's handiwork.

The parties present us with stark, categorical alternatives. President Trump's primary contention is that whenever a sitting President speaks on a matter of public concern, the speech is official enough for immunity to attach. The plaintiffs respond that immunity can attach only to speech made in furtherance of a presidential power specifically enumerated in Article II of the Constitution. The Court rightly rejects both positions.

As to the latter, Presidents routinely speak in an official capacity even when not directly exercising any enumerated power. Decades if not centuries of tradition establish that the President may use the soft power of his office—the bully pulpit—to urge action by Congress, the judiciary, the states, or private parties on matters of public concern. *Ante*, at 12–13, 14–15, 24–25. For example, the political branches have no official role in deciding cases or controversies, U.S. Const. Art. III, yet Presidents often comment officially—in White House press conferences or even State of the Union addresses—about past or prospective Supreme Court decisions. The

federal government has no official role in deciding whether guns should be permitted near schools. *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Yet a President could, in his official capacity, seek to cajole state officials one way or the other on that issue. Likewise, as the government explains in this case, "a President acts within the scope of his office when he urges Members of Congress to act in a particular way with respect to a given legislative matter—even a matter, such as a congressional investigation, in which the President has no constitutional role." Brief for United States as Amicus Curiae at 11, **\*32  \*\*473** *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. March 2, 2023); *see also id.* at 12 ("the President can and must engage with the public on matters of public concern").

As to the former, the President does not always act in an official capacity when he speaks on matters of public concern. To take a few trivial examples, the President acts unofficially when he speaks with a first cousin, an old college friend, a business associate, or the teachers of his school-age children —even if they happen to discuss matters of public concern. And as relevant here, the President acts unofficially when he speaks as a candidate. Immunity attaches to functions of presidential action, not to the individual occupying the Office of the President. *See Clinton v. Jones*, 520 U.S. at 694–95, 117 S.Ct. 1636.

How, then, to distinguish official from private presidential speech on matters of public concern? The Court stresses an "objective" inquiry into the "context" of the speech, "substantially informed" by whether it is "clothed in the trappings of an official function"—*i.e.*, whether it is "organized and promoted by official White House channels" and "funded with public resources." *Ante*, at 20–22. In some instances, this inquiry will yield clear answers: Campaign or other political events are unofficial; White House staff may not work on them, and congressionally appropriated funds may not support them. *See*, *e.g.*, Payment of Expenses Associated with Travel by the President and Vice President, 6 Op. O.L.C. 214 (1982). Accordingly, when the President speaks at campaign events—whether in political conventions, debates, advertisements, rallies, or fundraisers—he normally does so in a private capacity, as a candidate for re-election or as the leader of his party. On the other hand, many other kinds of presidential speech are obviously official—for instance, the State of the Union address, a formal address from the Oval Office, or a press conference from the White House Press Briefing Room.

As the Court makes clear, this inquiry in no way turns on the President's motive for the speech at issue. In particular, the inquiry does not turn on the extent to which a speech reflects the President's views of good politics as opposed to good policy. *Ante*, at 20–21. As a general matter, motive-based inquiries are "highly intrusive" and thus inappropriate for scoping out immunity, even in cases involving plausible allegations that the President has acted for some unconstitutional purpose. *See Nixon v. Fitzgerald*, 457 U.S. at 756, 102 S.Ct. 2690. Moreover, a motive-based inquiry would be even more unsound to separate official presidential action from the unofficial actions of a mere candidate for re-election. Presidents routinely take political considerations into account in their official acts, which is the intended goal of a Constitution establishing the presidency as an elected and thus democratically accountable office.

Nor should the immunity turn on how political the speech appears on its face. A State of the Union address does not become unofficial if it contains base partisan jabs in addition to august policy proposals. And a President's acceptance speech at a party nominating convention does not become official if it contains august policy proposals in addition to base partisan jabs. Because the President may deliver the "same essential message" at an official or unofficial event, the immunity cannot turn on what he says. *Ante*, at 21. Thus, while the content of a speech may "serve to confirm what an objective assessment of the context makes evident," *id.* at 22, it cannot substitute for that assessment. In other words, if a presidential speech is "clothed in the trappings of an official function," *id.* at 21, it almost certainly **\*33  \*\*474** warrants the protection of official immunity.

The Court's approach recognizes that presidential speech on matters of public concern will very often be official—and thus immunized. To begin with, the President is always on-duty: He "alone composes a branch of government." *Trump v. Mazars USA, LLP*, ––– U.S. ––––, 140 S. Ct. 2019, 2034, 207 L.Ed.2d 951 (2020). Vested with the entire "executive Power" of the United States, U.S. Const. Art. II, § 1, cl. 1, he must "take Care that the Laws be faithfully executed," *id.* § 3, cl. 1, and must supervise over four million subordinates in the process, *see Seila Law LLC v. CFPB*, ––– U.S. ––––, 140 S. Ct. 2183, 2191, 207 L.Ed.2d 494 (2020). Absent a disability established by formal executive action under the Twenty-Fifth Amendment, he must always remain "ready, at a moment's notice, to do whatever it takes to preserve, protect, and defend the Constitution and the American people." Amar & Katyal, *Executive Privileges and Immunities: The* Nixon *and* Clinton

*Cases*, 108 Harv. L. Rev. 701, 713 (1995). Unless speaking at some specific campaign or political event, he will thus likely be "clothed in the trappings" of his Office—whether in the West Wing, in the Executive Residence, on Air Force One, at Camp David, at his own private residence, visiting foreign dignitaries, or even on a working vacation. In these contexts, his speech on matters of public concern will likely be official. (I do not address here the distinct question whether the President in these settings may choose to speak on public matters in a purely private capacity. *Cf. Knight First Amend. Inst. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst.*, ––– U.S. ––––, 141 S. Ct. 1220, 209 L.Ed.2d 519 (2021).) And critically, if it is unclear whether the presidential speech is official, the Court appropriately preserves the immunity. *Ante*, at 21–22.

One final point: The President's official duties are so pervasive that he may occasionally render official speech even during a typical campaign event. Imagine, for instance, that the President uses such an event to remove his Secretary of State. That would surely be an official act, *ante*, at 21, which could not serve as the basis for a wrongful-termination lawsuit. Likewise, any accompanying explanation of the removal, given its close connection to the official act, would likely count as official speech. Thus, it likely could not serve as the basis for a defamation lawsuit. Or recall the iconic image of President Bush reading a book to schoolchildren on September 11, 2001, when an aide whispered to him that America was under attack. Had that event been a political rather than an official event, and had the President immediately responded with an off-the-cuff statement to rally or console the Nation, I have little doubt that the response would have been official. Despite the Court's emphasis on the formal "trappings" of an event, *id.*, its contextual approach does not foreclose consideration of the constitutional and practical imperative that the President must be able to engage in official business on a moment's notice, even when speaking at campaign events.

In sum, the Court's approach is well-tailored to identify campaign speech that can reasonably be viewed only as unofficial. It does not threaten to strip immunity from other kinds of presidential speech. It is flexible enough to accommodate rare cases where even speech made during a campaign event would be official. And it is cautious, in leaving open both the question whether the speech at issue is entitled to immunity and, if not, whether the First Amendment nonetheless protects it.

*Rogers*, Circuit Judge, concurring in part.

**\*34   \*\*475**  The issue before the court on interlocutory review is whether the district court erred when it partially denied President Trump's motion to dismiss pending civil claims on the basis of absolute immunity.

The Supreme Court has twice addressed the scope of absolute presidential immunity in the context of suits for civil damages. In *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), the Court held that President Nixon was absolutely immune from civil damages claims arising from his reorganization of the Department of the Air Force and the plaintiff's resultant job loss during Nixon's presidency. In *Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997), the Court held that absolute presidential immunity did *not* apply against suits for civil damages arising from a transaction or occurrence before the start of a President's tenure. Although the facts are distinct from the instant case, both decisions emphasize that the President has absolute immunity from civil damages suits that arise from his execution of official presidential duties. *See Nixon*, 457 U.S. at 749, 754, 102 S.Ct. 2690; *Clinton*, 520 U.S. at 693-95, 117 S.Ct. 1636.

I concur in the court's substantive legal analysis of the sole issue before the court. Op. Pts. I, II.A, II.B.1.a-b & B.2. Because the remainder of the opinion is premature and unenforceable dictum, I do not join it. Op. Pts. II.B.1.c, II.C, & III; *see* Concurring Op. of Judge Katsas.

**I.**

President Trump seeks reversal of the denial of his absolute immunity defense because his pre–January 6th speech on Twitter, his January 6th rally speech, and his failure to act promptly once the Capitol was breached fall into two discrete presidential "functions" and therefore were undertaken in his official capacity: (1) speaking on matters of public concern and (2) the constitutional duty to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3. On appeal, he does not dispute that at these times he was acting as a candidate for reelection. *See* Appellant's Br. at 8-10. Both contentions are unpersuasive.

A defendant who seeks to assert absolute immunity bears the burden of showing that it applies. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1140 (D.C. Cir. 2015). Although not

explicitly assigning the burden of proof, the Supreme Court has acknowledged that a President "asserts his immunity." *See Nixon*, 457 U.S. at 748, 102 S.Ct. 2690. This court thus applies *Banneker*, an in-circuit guide for absolute immunity determinations. *Cf.* Op. at 8.

### A.

President Trump principally contends that "the expansive immunity to which [he] is entitled," Appellant's Br. at 11, applies "whenever and wherever a President speaks on a matter of public concern," *id.* (quoting Dist. Ct. Op. at 33). Although the President's absolute immunity from suit extends to actions falling within the "outer perimeter" of official duty, *Nixon*, 457 U.S. at 757, 102 S.Ct. 2690, "the sphere of protected action must be related closely to the immunity's justifying purposes," *id.* at 755, 102 S.Ct. 2690; *see Clinton*, 520 U.S. at 694, 117 S.Ct. 1636. The main rationale for absolute immunity is that the President's duties distinguish the role of President from that of other executive officials. The immunity afforded is "a functionally mandated incident of the President's unique office" because the "diversion of [the President's] energies by concern with private lawsuits would raise unique risks to the **\*35  \*\*476** effective functioning of government." *Nixon*, 457 U.S. at 749, 751, 102 S.Ct. 2690. Given that rationale, absolute immunity applies to claims for civil damages against the President for official acts — not to criminal acts or acts taken in a personal capacity. *See id.* at 749, 754, 102 S.Ct. 2690; *Clinton*, 520 U.S. at 693-95, 117 S.Ct. 1636.

Speech on matters of public concern is unquestionably a function of the presidency. Yet the critical question is whether *all* speech on matters of public concern, regardless of substance, context, or consequence, must be considered an official duty, or at least on the outer perimeter thereof. As the court explains, Op. Pts. II.B.1.a-b, the fact that speech touches on a matter of public concern, and that the President is the speaker, does not automatically render that speech part of a "designated function[ ]," *Clinton*, 520 U.S. at 693, 117 S.Ct. 1636, or part of the "discharge of [the President's] official duties" — an essential aspect of the logic of attaching immunity, *Nixon*, 457 U.S. at 752 n.32, 102 S.Ct. 2690. The Supreme Court's admonition that the sphere of action protected by absolute immunity must be closely tied to the immunity's justifying purposes, *see Nixon*, 457 U.S. at 755, 102 S.Ct. 2690, forecloses President Trump's expansive interpretation of speech on matters of public concern. It

cannot be that anytime the President speaks in a way that touches on a matter of public concern, absolute immunity from suit attaches. Op. at 16. The content and context of that speech matters. *Id.* at 19. President Trump maintains that denying absolute immunity would be "terribly damaging" to the Executive Branch and would undercut the President's ability to freely discuss congressional and judicial action. Appellant's Br. at 22. But refusing to attach absolute immunity to speech that is clearly outside the bounds of official duty — *e.g.*, ordering armed protestors to a Supreme Court Justice's house, slandering a political opponent, or inciting violence — discourages only *that* speech, not all speech concerning the topics.

So understood, President Trump's January 6th speech on Twitter leading up to the rally and his speech at the rally implicated important matters of public concern, including the outcome of the 2020 presidential election and election integrity generally. Yet because not all speech on matters of public concern serves an official function, the district court correctly inquired into what purpose that speech was serving: was President Trump engaged in the performance of an official act, or was he carrying out some other function outside the scope of official duty? *See* Dist. Ct. Op. at 33. That determination, as the court emphasizes, requires a close look at the specific acts alleged to determine whether they were performed in the course of furthering an official presidential function. Op. Pt. II.B.1.b. The Supreme Court's reasoning supports a functional analysis, *see Clinton*, 520 U.S. at 692-93, 117 S.Ct. 1636, as does this court's treatment of absolute immunity in *Banneker*, 798 F.3d at 1140. In *Banneker*, the court focused on the "relationship between 'the act complained of' and the corresponding 'matters committed by law to [the official's] control or supervision.' " *Id.* at 1141 (quoting *Barr v. Matteo*, 360 U.S. 564, 573, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)). *See also* Dist. Ct. Op. at 36.

Although the line between President and candidate may not always be clear, President Trump's alleged words and actions were directed toward promoting his victory in the 2020 presidential election rather than carrying out a designated official duty to confirm the integrity of the electoral process, to ensure the faithful execution of the laws, or to fulfill other official purposes. **\*36  \*\*477** *See* Op. at 4–5; Dist. Ct. Op. at 38. In conducting a functional analysis based on the record, the district court could properly find that President Trump's criticism of state officials and promotion of the January 6th "Save America" rally were not, viewed in context, in furtherance of an official presidential function, but rather

were acts directed at securing his reelection. *See* Dist. Ct. Op. at 37-39. So too President Trump's filing of lawsuits contesting the election and his rally speech itself. *See* Op. at 4–5, 6–7, 7–8; Dist. Ct. Op. at 38-40. At no point before, during, or immediately after January 6th did President Trump identify a constitutional or statutory provision in accordance with which he was purporting to exercise an officially designated presidential duty. Under the circumstances, it is unnecessary to inquire into the President's motives in order to conclude that his actions did not constitute an official function of his office. *See Nixon*, 457 U.S. at 756-57, 102 S.Ct. 2690.

In some instances, a functional analysis approach to absolute immunity may involve difficult questions and require close judicial calls. Not so at this stage of the proceedings. *See* Op. at 5. To permit the application of absolute immunity under the alleged facts would stretch the outer perimeter of presidential duty to result in immunity to the officeholder, rather than to the execution of official duties. *See id.* at 16.

### B.

Alternatively President Trump contends that he is entitled to official-act immunity because he took the alleged actions in an exercise of his Article II duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3; Appellant's Br. at 27-31. The court explains why this contention must fail. Op. Pt. II.B.2.

The President's authority to exercise executive power in a specific manner "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Article II and the Take Care Clause do not grant the President boundless authority to supervise, control, or otherwise interfere with procedures entrusted by law to other branches of government. In the district court, President Trump failed to identify any constitutional, much less statutory, provision that authorized the official acts allegedly taken — whether his tweets, his rally speech, or his failure to act promptly when the Capitol was breached. *See* Dist. Ct. Op. at 29-30.

President Trump now points to the Electoral Count Act, 3 U.S.C. § 15, as the statute he was attempting to enforce. Appellant's Br. at 31. That statute prescribes no role to the President. The Founders allocated the electoral process to an intermediate body of electors on behalf of the people, rather than to the "one who was himself to be the final object of the public wishes." THE FEDERALIST NO. 68 (Alexander Hamilton). Following similar logic, the Electoral Count Act prescribes a certification process to be carried out by the Senate and the House of Representatives — *not* the President. The President lacks an identified duty to faithfully execute the laws for the certification of electoral votes.

President Trump has failed to identify any specific provision, other than the Take Care Clause generally, that would grant him the authority to execute or enforce Electoral College certification procedures. Scholarly interpretations of Article II point to the passive voice of the Take Care Clause — "take Care that the Laws be faithfully executed" — as implying that the President must have some degree of direction, power, control, or supervision over **\*37  \*\*478** the officials engaging in that execution. *See* Dist. Ct. Op. at 30 (citing Andrew Kent et al., *Faithful Execution and Article II*, 132 HARV. L. REV. 2111, 2126 (2019); Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 YALE L.J. 1836, 1875 (2015)). By design, then, the President has specific and limited control over the co-equal legislative branch (*e.g.*, the veto power).

### II.

Mine is a partial concurrence because the remaining parts of the court's opinion address issues unnecessary to dispose of the sole issue now on appeal. The court has no occasion to define a "framework" of analysis for the district court on remand and acknowledges that its framework does not apply now. *See* Op. Pt. II.B.1.c. The Supreme Court's framework in *Nixon* and *Clinton* suffices. *See* Op. Pt. II.A. Similarly, the court has no occasion to address additional contentions of the plaintiffs, Op. Pt. II.C.1, nor the contention by the United States in response to the request for its views, Op. Pt. II.C.2; Order (Dec. 20, 2022). Those contentions may become relevant during the district court's continued consideration of the parties' arguments but they are not yet before this court.

Notwithstanding the importance of the absolute immunity issue, the record suggests no reason for this court to direct the order of the district court's proceedings on remand. The district court has signaled appreciation of the sensitive institutional issue in addressing a presidential claim of absolute immunity, and there is nothing to suggest this will not continue. At this early stage of the proceedings, this limited interlocutory appeal offers scant insight into how the district

463 U.S.App.D.C. 442

court proceedings will and should proceed. Significantly, as well, this court has no reason to presume that the record in a subsequent appeal will be limited to that now before the court. And the district court is well able to consider arguments of the parties' counsel and rule in accord with precedent

on standards of review for motions for summary judgment, rendering Part III unnecessary. *See* Op. Pt. III.

**All Citations**

87 F.4th 1, 463 U.S.App.D.C. 442

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.