PRESIDENT DONALD J. TRUMP'S
MOTION FOR SUMMARY JUDGMENT
January 24, 2025

# EXHIBIT 44

*Lee, et al., v. Trump, et al.*
No. 1:21-cv-00400 (APM)

Page 1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2
                  CASE NO.:  21-cv-00400-APM
 3

 4   BARBARA J. LEE, et al.,

 5        Plaintiffs,

 6    -vs-

 7   DONALD J. TRUMP, et al.,

 8        Defendants.
     _____/
 9

10      DEPOSITION OF:  STEPHEN MILLER

11      DATE:           Friday, November 22, 2024

12      TIME:           10:00 a.m. - 12:02 p.m.

13
        PLACE:          REMOTE PROCEEDING - FLORIDA
14                      Orlando, Florida 32803

15

16      STENOGRAPHICALLY
        REPORTED BY:    VANESSA OBAS, RPR

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1                    A P P E A R A N C E S:
 2
     ALISON DEICH, ESQUIRE
 3   OF:  COHEN MILSTEIN SELLERS & TOLL PLLC
          1100 New York Avenue NW
 4        5th Floor
          Washington, D.C. 20005
 5        adeich@cohenmilstein.com
          APPEARING ON BEHALF OF THE PLAINTIFF(s)
 6        (Appearing via ZOOM)
 7
     ROBERT N. DRISCOLL, ESQUIRE
 8   OF:  DICKINSON WRIGHT
          1825 Eye Street N.W.
 9        Suite 900
          Washington, D.C. 20006
10        rdriscoll@dickinsonwright.com
          APPEARING ON BEHALF OF THE DEFENDANT(s)
11        (Appearing via ZOOM)
12
     JONATHAN M. SHAW, ESQUIRE
13   OF:  DHILLON LAW GROUP INC.
          2121 Eisenhower Avenue
14        Suite 608
          Alexandria, Virginia 22314
15        jshaw@dhillonlaw.com
          APPEARING ON BEHALF OF PRESIDENT DONALD J. TRUMP
16        (Appearing via ZOOM)
17
     ALSO PRESENT:
18
19        BRIAN CORMAN, ESQUIRE
          ALISA TIWARI, ESQUIRE
20        WILLIAM (BILL) BLECHMAN, ESQUIRE
          DANIEL CSIGIRINSZKIJ, ESQUIRE
21        ETHAN JUDD, ESQUIRE
          KRISTY PARKER, ESQUIRE
22        MARC EPSTEIN, ESQUIRE
          MEGAN REIF, ESQUIRE
23        PATRICK TRAINOR, ESQUIRE
          MEREDITH WILSON, PARALEGAL
24        ADAM ASHER, ESQUIRE
          HUNTER KOLON, ESQUIRE
25        ALFRED D. CARRY, ESQUIRE
          GERALD URBANEK, ESQUIRE
```

1       JESSE BINNALL, ESQUIRE

        PATRICK TRAINOR, ESQUIRE

2       STEPHEN MILLER, ESQUIRE

        WILLIAM MILLER, VIDEOGRAPHER AND CONCIERGE

3

                              -   -   -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                           I N D E X

2
                                                    PAGE

3
      TESTIMONY OF STEPHEN MILLER

4
      DIRECT EXAMINATION BY MS. DEICH               7
5     CROSS-EXAMINATION BY MR. SHAW                 64
6     CERTIFICATE OF OATH OF WITNESS                74
      REPORTER'S DEPOSITION CERTIFICATE             75
7     ERRATA SHEET                                  77
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

```
1                    E X H I B I T S
2                                DESCRIPTION    PAGE
3    Plaintiffs' Exhibit Number 2     Affidavit of      25
                                        Stephen
4                                        Miller
     Plaintiffs' Exhibit Number 3      SMiller         54
5                                     002450-454
     Plaintiffs' Exhibit Number 4      SMiller         58
6                                     002601-602
     Plaintiffs' Exhibit Number 5    Investigation     61
7                                    of Political
                                     Activities By
8                                    Senior Trump
                                     Administration
9                                      Officials
                                      During the
10                                       2020
                                      Presidential
11                                      Election
12                               DESCRIPTION    PAGE
13   Defendants' Exhibit Number-1     NARAPROD         64
                                       040299
14   Defendants' Exhibit Number-2     NARAPROD         68
                                       098985
15
                       ------
16
                S T I P U L A T I O N S
17
18       It is hereby stipulated and agreed by and between
19   the counsel for the respective parties and the deponent
20   that the reading and signing of the deposition
21   transcript be reserved.
22                      ------
23
24
25
```

```
 1                    P R O C E E D I N G S

 2                      * * * * * * * * *

 3          THE VIDEOGRAPHER:  Good morning.  We're going

 4     on the record at 10:01 a.m. Eastern Time on

 5     November 22nd, 2024.

 6          Please note that this deposition is being

 7     conducted virtually.  Quality of recording depends

 8     on the quality of camera and Internet connection of

 9     participants.  What is seen from the witness and

10     heard on the screen is what will be recorded.

11          This is Media Unit 1 of the video-recorded

12     deposition of Stephen Miller in the matter of

13     Barbara Lee, et al. v. Donald J. Trump, et al.,

14     filed in the United States District Court for the

15     District of Columbia; Civil Action Number

16     21-cv-00400-APM.

17          My name is William Miller, representing

18     Veritext Legal Solutions, and I am the videographer.

19     The court reporter is Vanessa Obas from the firm

20     Veritext Legal Solutions.

21          At this time, counsel is noted on the

22     stenographic record.

23          Will the court reporter please swear in the

24     witness and we can begin.

25          THE COURT REPORTER:  Good morning, Mr. Miller.
```

```
                                            Page 7
 1       Please raise your right hand.

 2            Do you solemnly swear or affirm the testimony

 3       you will give will be the truth, the whole truth,

 4       and nothing but the truth?

 5            THE WITNESS:  Yes.

 6   THEREUPON

 7                      STEPHEN MILLER

 8   was called as a witness and, having first been duly

 9   sworn, testified as follows:

10            THE COURT REPORTER:  Thank you.

11            MS. DEICH:  Good morning.

12            THE VIDEOGRAPHER:  Just before your first

13       question, can you tilt the laptop.  Just pivot it a

14       little bit more towards you just to get you fully.

15            THE WITNESS:  Yeah, I can --

16            THE VIDEOGRAPHER:  Make it big, if possible.

17       Just spin it towards yourself just a little bit

18       more.

19            Excellent.  I appreciate it.

20            Sorry, Counsel.  Go ahead.

21            MS. DEICH:  No, no worries.

22                    DIRECT EXAMINATION

23   BY MS. DEICH:

24       Q.  Good morning, Mr. Miller.  My name is Ali

25   Deich, and I'm one of the lawyers for the plaintiffs.
```

1    I'll be asking questions today.

2            Can you hear me okay?

3       A.   I can.

4       Q.   Please let me know if at any time you have

5    trouble hearing me; okay?

6       A.   Likewise.

7       Q.   Please state your full name and spell it for

8    the record.

9       A.   Stephen Miller, S-T-E-P-H-E-N, M-I-L-L-E-R.

10      Q.   You've been deposed before; correct?

11           THE WITNESS:  Have I?

12           MR. DRISCOLL:  Yeah, but just answer for the

13      record.

14           THE WITNESS:  Yes.

15   BY MS. DEICH:

16      Q.   How many times?

17      A.   I was just thinking through the different terms

18   that you-all have for times that you interview people.

19   There's a lot of terminology there, but I think the

20   answer is yes.

21      Q.   Do you recall in which matter you were deposed?

22      A.   I believe that the -- the interview with the

23   Congressional Select Committee would be correctly termed

24   a deposition.

25      Q.   You understand that you're under oath just like

Page 9

1    you would be at trial; correct?

2         A.    Yes.

3         Q.    You understand that this deposition is being

4    videotaped; correct?

5         A.    Yes.

6         Q.    You understand that if this case goes to trial,

7    that videotape could be shown to a jury?

8         A.    Yes.

9         Q.    Who is in the room with you today, Mr. Miller?

10        A.    My attorney.

11        Q.    And who's that?

12        A.    Bob Driscoll.

13        Q.    Anyone else?

14        A.    No.

15        Q.    Is there any reason why your memory would be

16   impaired today?

17        A.    Impaired in the sense that you mean it?  No.  I

18   mean, in the sense that is it possible for a person to

19   forget a thing?  Certainly.  But no impairment.

20        Q.    Is there any reason why you can't fully and

21   accurately testify today?

22        A.    No.

23        Q.    Even though you've given a deposition, I'd like

24   to go over a few ground rules just to make life easier

25   on our court reporter and our videographer.

1           Our court reporter is here taking down

2    everything we're saying, so I'll ask that you answer my

3    questions audibly rather than shaking or nodding your

4    head.

5           Is that okay?

6    A.    Yes.

7    Q.    I'll also do my best to wait for you to finish

8    your answer before proceeding to my next question.  And

9    if you'll do your best to wait until I finish my

10   question to answer it, I'd appreciate it.

11          Does that sound all right?

12   A.    Yes.

13   Q.    Once I've asked the question, please let me

14   know if you don't understand my question, and I'll do my

15   best to clarify.  But if you don't ask me to clarify,

16   I'll assume you understand the question; okay?

17   A.    Okay.

18   Q.    After I ask a question, one of your attorneys

19   may object to my question or Mr. Trump's attorney may

20   object to my question.

21          Even if there's an objection, I'll ask that you

22   answer the question unless your attorney expressly

23   instructs you not to; okay?

24   A.    Yeah, I'll -- I will follow my attorney's

25   instructions.

Page 11

1        Q.   Please let me know if you need a break.  I'll
2   generally try to break every hour or so, but I'm happy
3   to take a break at more regular intervals if you need
4   that.
5             The only caveat is that if there is a question
6   pending, I may ask you to answer that question before we
7   go on break; okay?
8        A.   Yes.
9        Q.   Because this is a remote deposition, the
10  exhibits will be shown to you on a computer screen.
11  I'll ask that you please close all applications on the
12  computer you are using, except the Zoom link we are
13  using now and the Veritext Exhibit Share platform.
14       A.   Yes.
15       Q.   Are those the only applications that you have
16  open?
17            MR. DRISCOLL:  Give us a second here.
18            Okay.  We're good.
19  BY MS. DEICH:
20       Q.   So now is the Zoom link and the Veritext
21  Exhibit Share platform the only applications that you
22  have open?
23       A.   Yes.
24            MR. DRISCOLL:  Just for the record, there's
25       some firmware from my firm that pops up every once

Page 12

1           in a while, which is like just a regular thing,

2           but -- it doesn't interfere with our ability to see

3           the screen.  And I just close it when it pops up.

4      BY MS. DEICH:

5           Q.   Does it have any messaging capabilities?

6                MR. DRISCOLL:  No.  It's just a -- it's just a

7           portal we have to do for security reasons to use the

8           firm laptops.

9                MS. DEICH:  Got it.  Thank you.

10     BY MS. DEICH:

11          Q.   Mr. Miller, I'll ask that during today's

12     deposition you refrain from opening any other

13     applications or windows; okay?

14          A.   Yep.

15          Q.   Relatedly, to the extent you have a cell phone

16     with you, please put that away, and do not consult it

17     while we're on the record; okay?

18          A.   Yes.

19          Q.   Today, I'm going to be asking you some

20     questions covering the time period from November 3rd,

21     2020, to January 20th, 2021.  I will refer to that time

22     period as the relevant period; okay?

23          A.   Okay.

24          Q.   Unless I tell you otherwise, my questions

25     pertain to the relevant period; okay?

Page 13

1      A.    Okay.

2      Q.    Mr. Miller, earlier you testified that you are

3   represented by counsel in today's deposition; correct?

4      A.    Yes.

5      Q.    And you said that Mr. Driscoll was the attorney

6   representing you in today's deposition; correct?

7      A.    Yes.

8      Q.    To your knowledge, are any other attorneys

9   representing you?

10     A.    In this matter?  No.

11     Q.    Who is paying for your attorneys to represent

12  you in this litigation?

13          MR. DRISCOLL:  Objection.

14  BY MS. DEICH:

15     Q.    You can answer.

16     A.    I guess that's probably -- that's a question

17  for the attorney to answer because I'm not directly -- I

18  mean, I believe --

19          THE WITNESS:  Isn't --

20          MR. DRISCOLL:  Just to the extent you know.

21          THE WITNESS:  I think it's -- it's one of

22     the -- it's one of the entities that's -- that's

23     associated with the presidential act.  I don't

24     remember the -- as I sit here today, I don't

25     remember the exact name of the entity of it, but it

Page 14

```
 1       is right now -- I could speculate, but I haven't
 2       thought about it in a while.
 3  BY MS. DEICH:
 4       Q.   You're not personally paying for your lawyers
 5  to represent you in this deposition; correct?
 6       A.   No.
 7       Q.   What did you do to prepare for today's
 8  deposition?
 9       A.   Mainly just a conversation with my attorney
10  about the ground rules.
11       Q.   About how long did that conversation last?
12       A.   Probably all together, like 45 minutes.
13       Q.   And when you say your attorney, you mean
14  Mr. Driscoll; correct?
15       A.   Yes.  It wasn't solely limited to the ground
16  rules, but that was a large portion of it.
17       Q.   Okay.  I'm going to ask you, unless I say
18  otherwise, not to talk about the substance of your
19  communications with your counsel because those are
20  attorney-client privilege.
21       A.   That's kind of the way you phrased the question
22  was the problem, in fairness.
23       Q.   Did you meet with any other lawyers in
24  preparation for today's deposition?
25       A.   No.
```

Page 15

1      Q.   Did you have just the one meeting with

2   Mr. Driscoll to prepare for today's deposition?

3      A.   I'm just -- I'm a little bit confused

4   because -- can you tell me what I am and am not supposed

5   to say in answer to these questions? because I started

6   to answer and then you said, "Don't answer it."  I need

7   you to refine some of these questions a little bit for

8   me.

9      Q.   Of course.

10      You --

11      A.   Am I supposed to tell you -- I just need to

12   understand.

13      Am I supposed to tell you a log of all the

14   conversations I've had with my attorney?  I just -- that

15   seems odd to me.  Is that what you're asking for?  I

16   just don't get it.

17      Q.   Yes.  You can tell me about the existence and

18   the duration of the conversations, and I'm going to ask

19   you a couple more questions that will not tread on the

20   attorney-client privilege.  Though Mr. Driscoll can feel

21   free to correct me if he believes, but I will ask you

22   not to get into advice that your counsel provided you

23   during that meeting; okay?

24      A.   Are you asking me to go back to the first -- I

25   just don't under- -- I need you to scope the question

Page 16

```
 1    better.
 2            MR. DRISCOLL:  Are you talking about this
 3       deposition or in general related to this case?
 4    BY MS. DEICH:
 5       Q.   How about this?  I'm going to ask questions.
 6    If your lawyer believes that they are covered by the
 7    attorney-client privilege, he can object and say that.
 8    Otherwise --
 9       A.   I think your question was -- was too vague for
10    me to answer.
11       Q.   Okay.  Well, let's go back and try again.
12    We'll see if you can understand this one.
13            Did you speak --
14       A.   I -- I -- to be -- you don't have to be
15    sarcastic.  I understood your question.  It was poorly
16    framed.  Try again, please.
17       Q.   Did you meet with anybody other than
18    Mr. Driscoll to prepare for today's deposition?
19       A.   No.
20       Q.   Did you meet with Mr. Driscoll more than once
21    to prepare for today's deposition?
22       A.   No.
23       Q.   Did you meet with Mr. Driscoll by phone to
24    prepare for today's deposition?
25       A.   I had a phone call, yes.
```

1      Q.   Was it a video call or an audio call?

2      A.   It was an audio call.

3      Q.   Were any nonlawyers present on the call between

4  you and Mr. Driscoll?

5      A.   No.

6      Q.   Did you review any documents to prepare for

7  today's deposition?

8      A.   I looked at a couple documents.

9      Q.   Which documents were those?

10     A.   I refreshed my memory on the affidavit, and I

11  looked at, I believe, one exhibit.

12     Q.   What exhibit was that?

13     A.   Some text messages from what you refer to as

14  the relevant period.

15     Q.   Who were those text messages with?

16     A.   Mostly members of Congress.

17     Q.   How many text messages did you review?

18     A.   Maybe seven or eight.  "Review" is a strong

19  term.  I looked at them briefly.

20     Q.   What did those messages say?

21     A.   So, I mean, we can call them up.  I don't

22  remember them word for word.

23     Q.   If you have them with you, I'm going to ask

24  that your counsel produce them during a break for us.

25         MR. DRISCOLL:  For the record, they were

Page 18

1       produced to you as part of the production.

2            MS. DEICH:  Great.  Okay.

3            MR. DRISCOLL:  So if you want -- have questions

4       about them, I'll introduce that copy.

5            MS. DEICH:  Great.

6  BY MS. DEICH:

7       Q.   Apart from your declaration and the text

8  messages that you referenced, did you review any other

9  documents in preparation for today's deposition?

10      A.   I don't believe so, no.

11      Q.   Did you personally gather the documents that

12 you reviewed in preparation for this deposition?

13      A.   No.

14      Q.   Who gathered them for you?

15      A.   I don't think -- I don't know what you mean by

16 "gathered."  The -- I mean, my -- my affidavit is my

17 affidavit; right?  There's not really a lot of gathering

18 there.  And the -- several text messages I looked at,

19 again, I -- this is I believe a component of -- I mean,

20 I know it's a component of what was turned over to you.

21           So there wasn't anything curated from me, which

22 is, I think, what your question implies.

23      Q.   Yes.

24           So you individually decided which documents to

25 review?

1          A.    That's not what I said.   That's not what I

2     said.

3          Q.    Well, that's why I'm asking you that now.

4                Did you decide individually which documents to

5     review?

6          A.    Now you're phrasing it as a question.   You

7     didn't the first time.

8                So can you state the question clearly, please?

9          Q.    Sure.   Let me just repeat what I said.

10               Did you individually decide which documents you

11    were going to review in preparation for today's

12    deposition?

13         A.    No.

14         Q.    Who made the decision about which documents you

15    were going to review in preparation for today's

16    deposition?

17         A.    My attorney did.

18         Q.    Did you make any notes or documents in

19    preparation for today's deposition?

20         A.    No.

21         Q.    All right.   I'd like to switch gears a little

22    bit and ask you some background questions about e-mail

23    and cell phone communications.

24               Mr. Miller, who is your current employer?

25         A.    Well, it's a bit of a -- actually a complicated

Page 20

1    question because we're going through a presidential

2    transition right now.  So I have -- I have my -- my

3    501(c)(3), which is self-employed, and then we're also

4    in the process of entering into a new administration.  I

5    am on the -- so I'm both incoming staff and also

6    announced -- well, both incoming staff and then also

7    have a formal role in the transition.

8            I'm not certain where we are right now in the

9    process of -- of any salary for the transition

10   component.

11       Q.   During the relevant period, you worked for the

12   Trump administration; correct?

13       A.   Yes.

14       Q.   During the relevant period, did you have a cell

15   phone provided by the government for work purposes?

16       A.   Yes.

17       Q.   What was that cell phone number?

18       A.   I do not remember.

19       Q.   Do you know if your work cell phone number

20   changed at all during the relevant period?

21       A.   I believe it did at least once.  Maybe only

22   once, but I -- I'm pretty certain it did one time.

23       Q.   Do you remember when that change occurred,

24   roughly?

25       A.   I think in 2018.

Page 21

1       Q.   But after 2018, your work cell phone number

2   didn't change; correct?

3       A.   I don't believe so, no.

4       Q.   To your knowledge, did anyone other than you

5   use your work phone during the relevant period?

6       A.   No.

7       Q.   Did you send and receive text messages on your

8   work cell phone during the relevant period?

9       A.   Yes.

10      Q.   Did you send and receive e-mail messages on

11  your work cell phone during the relevant period?

12      A.   Yes.

13      Q.   You also had a personal cell phone during the

14  relevant period; correct?

15      A.   Yes.

16      Q.   What was that cell phone number?

17      A.   It's the -- the same number that I have today.

18      Q.   Can you please tell me what that number is.

19      A.   Yes.  For privacy reasons, though, that

20  number's not going to be distributed in any way; right?

21      Q.   Nope.

22      A.   And nobody listening to this is going to share

23  with anybody; right?

24      Q.   That's correct.

25      A.   Okay.  (310) 770-1175.

```
                                                  Page 22
 1        Q.   To your knowledge, did anyone other than you

 2   use your personal cell phone during the relevant period?

 3        A.   No.

 4        Q.   Apart from your White House cell phone and the

 5   personal cell phone with the number ending in 1175, did

 6   you have any other cell phone during the relevant

 7   period?

 8        A.   No.

 9        Q.   Did you have a White House e-mail address that

10   you used in connection with your role in the Trump

11   administration?

12        A.   Yes.

13        Q.   What was that e-mail address?

14        A.   I believe it was stephen.miller@who.eop.gov.

15        Q.   Did you ever have a different White House

16   e-mail address while working for the Trump

17   administration?

18        A.   I don't believe so, no.

19        Q.   Is it your understanding that e-mails sent by

20   your White House e-mail address were preserved on the

21   White House computer system during the relevant period?

22        A.   Yes.

23        Q.   And, similarly, e-mails you received at your

24   White House e-mail address were preserved on the White

25   House computer system during the relevant period;
```

1    correct?

2        A.    Sorry.  Say that again?

3        Q.    To the best of your knowledge, were e-mails you

4    received at your White House e-mail address --

5        A.    Yes.

6        Q.    -- preserved on the White House --

7        A.    Yes.

8        Q.    Okay.  Thank you.

9              Sorry, I'm just looking at the transcript.  It

10   looks like we have a little bit of a messy transcript.

11             I'm just going to repeat the question so that I

12   get all the way to the end, and then you can provide

13   your same answer; okay?

14       A.    Uh-huh.

15       Q.    The e-mails you received at your White House

16   e-mail address were preserved on the White House

17   computer system during the relevant period; correct?

18       A.    Yes.

19       Q.    Were there any other e-mail addresses that you

20   operated and controlled during the relevant period?

21       A.    Were there any other e-mail addresses that I

22   operated and controlled during the relevant period?

23       Q.    Yes.

24       A.    Yes.  I had a -- a Gmail personal e-mail as

25   well.

Page 24

```
 1        Q.   And what was that e-mail address?
 2        A.   So there were -- I'm trying to remember during
 3   the relevant period.
 4             I think during -- I think during the relevant
 5   period it was e-mail dc20@gmail.com.
 6        Q.   Did you have any other e-mail addresses that
 7   you operated and controlled during the relevant period?
 8        A.   There might have been -- I don't believe so,
 9   no.  There might have been -- as I think we all have
10   e-mails that we created earlier in our lives, that at
11   some point we -- we stopped using and became dormant.
12             But as far as I can recall, I believe that I
13   was only using one personal account at that time.
14        Q.   During the relevant period, did you have a
15   Trump campaign e-mail address?
16        A.   I'm sure they would have created one for me --
17   or I'm pretty sure they would have created one for me.
18             It's a long time ago now, but I think so.
19        Q.   Do you recall using your campaign e-mail
20   address during the relevant period?
21        A.   If you show me e-mails that I had sent and
22   received on that, I wouldn't be surprised.  But I'm also
23   having trouble pulling firm memories.  But I would -- it
24   would make sense that I was given that e-mail address
25   and others were using it, that I would have used it,
```

Page 25

1    too.

2            All of that would have been -- would have been

3    preserved on that server, that I'm sure was long ago

4    turned over to a whole bunch of different people.

5            (Plaintiffs' Exhibit Number 2, Affidavit of

6        Stephen Miller, was marked for Identification.)

7    BY MS. DEICH:

8        Q.   All right.  I'd like to introduce Tab 2,

9    please.  And I'll mark that as Plaintiffs' Exhibit 2.

10           MS. DEICH:  Bill, when you get a moment, could

11       we please zoom in a little bit on the document.

12           Thank you very much.

13   BY MS. DEICH:

14       Q.   Mr. Miller, do you recognize this document?

15       A.   Yes.

16       Q.   What is it?

17           MR. DRISCOLL:  Where should these documents be

18       showing up?  I'm not seeing anything.

19           MS. DEICH:  Oh, it should be showing up on your

20       Zoom screen.  And then there should also be a

21       Veritext Exhibit Share platform if you would like to

22       download and view the entire document.

23           Why don't we go off the record?

24           MR. DRISCOLL:  I'm on the Exhibit Share

25       platform, but I'm not seeing any documents appear.

1           THE VIDEOGRAPHER:  Yeah, I'm still in the midst

2      of introducing it.  The first document takes a

3      little bit of extra time because I have to

4      completely make the sticker.

5           MR. DRISCOLL:  Okay.

6           THE VIDEOGRAPHER:  Give it about another 15

7      seconds and it should be in that folder.

8           MR. DRISCOLL:  And I'm also not seeing anything

9      on the screen.

10          THE VIDEOGRAPHER:  Is everybody else seeing the

11     share screen via Zoom?

12          MS. DEICH:  Yes.

13          MR. SHAW:  I am.

14          THE WITNESS:  I am.

15          THE VIDEOGRAPHER:  Yeah, okay.

16          So, sir, the person who's not seeing it on

17     Zoom, you should -- maybe your Zoom is just in the

18     background here.  You should be able to kind of look

19     through your tabs, and it should be there for you.

20     If you're not able to, I could stop the share and

21     reshare it, and hopefully that will kick it to the

22     forefront.

23          MR. DRISCOLL:  I am looking.  Let me see.

24          MS. DEICH:  Can we please go off the record for

25     a minute while we sort out the tech issues.

Page 27

```
 1              THE VIDEOGRAPHER:  Sure.  One moment.
 2              The time is now 10:26.  We're going off the
 3         video record.
 4              (Thereupon, a recess was taken, after which the
 5         proceedings continued as follows:)
 6              THE VIDEOGRAPHER:  The time is now 10:29.
 7         We're back on the video record.
 8    BY MS. DEICH:
 9         Q.   All right.  I'd like to introduce Tab 2 and
10    mark it as Plaintiffs' Exhibit 2, please.
11              Mr. Miller, do you recognize this document?
12         A.   Yes.
13         Q.   What is it?
14         A.   My affidavit.
15         Q.   And this was an affidavit that you provided in
16    connection with this litigation; correct?
17         A.   Yes.
18         Q.   If you turn to the last page of the document,
19    you'll see a signature.
20              That's your signature; correct?
21         A.   Yes.
22         Q.   In preparing this declaration, did you consult
23    any documents?
24         A.   I don't believe so.
25         Q.   I'd like to go over some of the text of this
```

Page 28

```
 1    declaration with you to make sure I understand it.
 2            First, I would like to look at Paragraph 5.
 3            Paragraph 5 states "Although I am not an
 4    attorney, during my time in the White House service, the
 5    White House Counsel's office periodically advised senior
 6    staff to remain mindful of the distinction between
 7    official and unofficial activities in the context of
 8    compliance with the Hatch Act."
 9            Is that correct?
10    A.    I'm sorry.  Is that statement correct?  Yes.
11    Q.    So you're not an attorney; correct?
12    A.    Yes, that is correct.
13    Q.    And you are not purporting to offer your own
14    legal opinion in this declaration; correct?
15    A.    I don't know that I would say it quite that
16    way.
17    Q.    What would be incorrect about the statement
18    that you are not purporting to offer your own legal
19    opinion in this declaration?
20    A.    It's a fairly global statement that I don't
21    think the declaration speaks to one way or the other, I
22    guess.
23            I just -- the declaration speaks for itself.
24    If you have a question about a specific line in the
25    declaration, I'm happy to answer it.  But I don't think
```

Page 29

```
 1     what you're saying to me now is aligned with the
 2     declaration.
 3          Q.   Let me phrase it a little bit differently.
 4               You're not purporting to serve as a legal
 5     expert in this case; correct?
 6          A.   Correct.
 7          Q.   In Paragraph 5, you're describing advice you
 8     received from attorneys in the White House Counsel's
 9     office; correct?
10          A.   Correct.
11          Q.   When you say "The White House Counsel's office
12     periodically advised senior staff about the Hatch Act,"
13     did that senior staff include you?
14          A.   Yes.
15          Q.   Who else is included in the senior staff you
16     reference in Paragraph 5?
17          A.   I wouldn't have a comprehensive list because I
18     wouldn't be present in all of those conversations.
19          Q.   Can you list some of the senior staff you're
20     referencing in Paragraph 5?
21          A.   Well, it would have included people like Derek
22     Lyons, the staff secretary, or presidential
23     speechwriters, like if it's Haley or Ross Worthington.
24     It would have included the heads of policy counsels,
25     things of that nature.
```

Page 30

1       Q.   About how often did the White House Counsel's

2   office advise you about compliance with the Hatch Act?

3       A.   I don't have a good answer to that question.

4       Q.   Can you give me a ballpark?

5       A.   Not one I can provide with great confidence,

6   no.

7       Q.   Did the White House Counsel's office ever

8   advise you about compliance with the Hatch Act via

9   e-mail?

10      A.   I don't have a -- I need you to clarify the

11  question a bit more.

12      Q.   I'm just trying to understand what you are

13  saying in Paragraph 5 when you said the "White House

14  Counsel's office periodically advised senior staff."

15      A.   Well, this is where your other question was

16  sort of problematic because -- it's not for me to say in

17  this proceeding what reason I've been summoned here.  I

18  understand it's a legal matter that -- I think that --

19  as a fact witness.

20           But the reason why your question was ill-formed

21  is because it's intertangled with the fact because at

22  the White House, the law intersects with the

23  Constitution, with our policy roles, with basic

24  fundamental questions about Article II.  So obviously I

25  have very strong views and, I would frankly argue,

Page 31

```
 1    superior views to many people who are experts about the
 2    Hatch Act, about the President's constitutional duties.
 3    And inevitably, those strong inform my views as to your
 4    answer to those questions and in my views about
 5    presidential power and prerogatives.  So it's all very
 6    much inter -- intermingled or intertwined.
 7             So it's not for me to say the reason why you're
 8    asking me questions, the reason why Jesse or Jonathan
 9    may ask me questions and how that fits into the
10    proceeding.  But I have strong views about these things.
11    I would argue I'm probably more informed than people who
12    are termed as experts.
13             I would say that the reason why that gets to
14    Paragraph 5 is because I had conversations on more than
15    one occasion with members of the White House Counsel's
16    office about the constitutionality of the Hatch Act and
17    the President's prerogatives.  And the idea is that the
18    Hatch Act was an unconstitutional constraint on
19    presidential authority and so on.  So this is all mixed
20    together.
21             MS. DEICH:  Okay.  I'm going to move to strike
22        everything since I last spoke because I actually
23        wasn't finished asking my question.
24             So let me try again.
25             THE WITNESS:  Well, just, I would like
```

Page 32

1        everything I said, though, to be on the record.

2              MR. DRISCOLL:  We'll talk about that later.

3        BY MS. DEICH:

4        Q.   Well, that's a choice for the judge.  I'm going

5        to move to strike it.

6              So let me finish my question.  Help me

7        understand what you meant when you said "The White House

8        Counsel's office periodically advised senior staff."

9              Did that advice come in the form of e-mails?

10       A.   I don't believe -- well, first of all, I can't

11       possibly answer that question categorically -- right? --

12       because, again, it's -- you're asking me what was said

13       to every member of the White House senior staff.

14             The -- it was common, as I remember it, for

15       certain products to have a note or comment about the

16       Hatch Act where it applied.  So that would be an example

17       of an advisory in the form of an e-mail; right?

18             But into some of these deeper conversations

19       that you're trying to strike from the record for some

20       reason, a lot of those were in person.  But I would also

21       note the reason why I also wanted to add that extra

22       context in is because I didn't get to provide an answer

23       to your earlier question, which I think is important.

24       Q.   Which earlier question was that?

25       A.   You were asking about why I was called here

Page 33

1    today.  And it's really -- I said it's not really for me

2    to say.  That's really for you to say or for Jonathan or

3    Jesse to say -- right? -- in other words.

4            Ironically, you're asking me to provide an

5    expert legal opinion on whether or not I'm a legal

6    expert.  It's a very weird question when you think about

7    it, the paradox there.  But my point is that I had

8    several conversations with White House Counsel's office

9    about the Hatch Act, presidential powers, presidential

10   prerogative that by definition covered my thinking on

11   all of these issues.  Because I recall on more than one

12   occasion I remember the White House Counsel's office

13   saying that the Hatch Act could not plausibly be applied

14   to the president or to his senior aides in the exercise

15   of his duties.

16           MS. DEICH:  All right.  I'm going to move to

17      strike everything from the portion starting

18      "Ironically, you're asking me to provide," and then

19      I will move on to my next question.

20           MR. DRISCOLL:  We are opposing your motion to

21      strike.

22           MS. DEICH:  Great.

23   BY MS. DEICH:

24      Q.   Just to make sure I understand your testimony,

25   Mr. Miller, you're saying that you were not a witness to

Page 34

```
 1    every conversation that White House counsel had with
 2    senior White House staff; is that correct?
 3         A.   Yes.
 4         Q.   So --
 5         A.   But, I mean, again, you're asking me what I --
 6    what I was really saying is how -- by definition,
 7    you're -- the question is -- again, it's a confusing
 8    question.
 9              Are you asking me is it possible, likely, or
10    probably certain that multiple conversations happened on
11    the subject in which I was not present over the course
12    of four years?  Is that the question you're asking?
13         Q.   I'm just trying to figure out which of the
14    conversations and advice referenced in Paragraph 5
15    you've personally seen or heard or whether Paragraph 5
16    is also referring to conversations that you are
17    summarizing but not a part of.
18         A.   What do you mean by "summarizing but not a part
19    of"?
20         Q.   Well, are you referring to any --
21         A.   How would I summarize something I wasn't a part
22    of?
23         Q.   So Paragraph 5 is limited to summarizing
24    conversations that you were a part of; correct?
25         A.   Paragraph 5 would encompass conversations I was
```

Page 35

1    a part of, conversations that I witnessed, conversations

2    that I recall, anything that I would have seen in

3    writing, any briefings I would have attended or

4    participated in, things I would have heard secondhand

5    and thirdhand, and probably additional buckets I can't

6    think of right now.

7         But I'm just making the point that it would be

8    preposterous to assume I was present at every

9    conversation about the Hatch Act over a period of four

10   years.

11        Q.   Let's look at the --

12        A.   Excuse me.  This is a well-known and

13   well-understood -- what I described in this sentence was

14   a well-known and well-understood thing.

15        But also as I mentioned, I don't know -- you

16   keep trying to strike me answering about this for some

17   reason, and I'm telling you that a large portion of --

18   or a significant portion of those conversations were

19   also conversations that I as well had personally in the

20   White House Counsel's office, which I have described to

21   you now on multiple occasions, and you keep striking,

22   which I don't understand.

23        Q.   Okay.  It will be a decision for the judge.

24        Let's look at the first sentence of the next

25   paragraph, which is Paragraph 6.

```
 1        A.   All right.  I just want to state that with

 2   abundant clarity that I've described to you now on

 3   multiple occasions the substance and nature of the

 4   conversations that I had in the White House Counsel's

 5   office about the Hatch Act, and as best I can recall, in

 6   every one of those instances, you have asked the

 7   substance and nature of those conversations to be

 8   stricken.

 9             MR. DRISCOLL:  Don't worry about it.

10   BY MS. DEICH:

11        Q.   Okay.  Mr. Miller, the way this works is that I

12   ask questions and you answer them, but you can't

13   volunteer statements.

14             So again --

15        A.   I did not volunteer a statement.  I answered

16   your question and I will continue to answer your

17   questions.  I did not volunteer a statement.

18             MS. DEICH:  I'd like to move to strike

19        everything from "I would like to state" all the way

20        through "substance of those conversations" to be

21        stricken as nonresponsive to any question.

22             Mr. Driscoll, do you oppose?

23             MR. DRISCOLL:  Yes.

24             MS. DEICH:  Okay.

25             MR. BINNAL:  As does the campaign.
```

Page 37

1    BY MS. DEICH:

2        Q.    Let's look at the first sentence in the next

3    paragraph, which is Paragraph 6.

4            The beginning of the paragraph is "In this same

5    context, I further recall that senior staff were advised

6    that the distinction between the President's official

7    and unofficial activities, and by extension those of his

8    senior staff, was often unclear."

9            I'd like to focus on the first three words of

10   that sentence, which is "In this same context."

11           Does that mean in the context of compliance

12   with the Hatch Act?

13       A.    It means in the context of what I said earlier,

14   which ironically, I believe you asked to strike.   So

15   should I repeat that or --

16           MR. DRISCOLL:   Just leave -- can we take a

17       two-minute break?   Just a few minutes?

18           MS. DEICH:   Yeah.   We can take a two-minute

19       break.   That's fine.

20           THE VIDEOGRAPHER:   The time is 10:43.   We're

21       going off the video record.

22           (Thereupon, a recess was taken, after which the

23       proceedings continued as follows:)

24           THE VIDEOGRAPHER:   The time is now 10:44.   We

25       are back on the video record.

Page 38

```
 1   BY MS. DEICH:
 2       Q.   Okay.  Mr. Miller, I believe we were looking at
 3   Paragraph 6, which begins "In this same context."
 4            By using the phrase "In this same context,"
 5   were you referring to the context of compliance with the
 6   Hatch Act?
 7       A.   Let me read the preceding paragraph again,
 8   please.
 9       Q.   Uh-huh.
10       A.   Thanks.  You can freeze it there.
11            All right.  So the sentence is that -- the
12   sentence that precedes it is the sentence that we keep
13   fighting about, which is, ironically, in the affidavit.
14   But I won't keep harping on that.  I keep repeating the
15   sentence in the affidavit and you keep striking it, but
16   whatever.
17            So that's obviously part of the context.  So
18   the -- and the answer to the question is the context is
19   everything in Section 5, including the thing you keep
20   trying to strike.
21       Q.   Got it.
22            When you say in Paragraph 6 that "senior staff
23   were advised," who provided that advice?
24       A.   Can you make 6 bigger again, please?
25            Thank you.
```

Page 39

1          This would have been White House Counsel's

2     office.  It might have been broached by others that I'm

3     not remembering specifically.  But primarily White House

4     Counsel's office.

5          Q.   Do you remember who in the White House

6     Counsel's office provided that advice to you?

7          A.   Well, there was a lot of different attorneys

8     over the course of the four years.  I know conversations

9     were had on the subject with Pat Philbin and Pat

10    Cipollone.  But that -- but places us in the back half

11    of the administration, so the memories would get hazier

12    as we go earlier in time.

13          But -- but I'm sure that -- I'm sure that

14    conversations would have happened with the Donegan Team

15    as well.

16          Q.   Okay.  Let's jump to Paragraph 8.

17          The last sentence of Paragraph 8 states "This

18    reality was underscored by the fact that the White House

19    Counsel's office and other White House staff reviewed

20    all speeches regardless of whether they were official or

21    unofficial."

22          A.   Uh-huh.

23          Q.   I'd like to talk a little bit about the process

24    for that review.

25          How would the White House Counsel's office

Page 40

1    obtain drafts of presidential speeches for their review?

2         A.   So the speeches would be distributed by the

3    staff secretary to all components deemed relevant by the

4    staff secretary, which would invariably include White

5    House Counsel's office.

6         Q.   Were the draft speeches e-mailed to them for

7    their review?

8         A.   In the circumstance I'm describing, yes.

9    Doesn't mean that there would never be hard copy

10   distribution.  We can get real granular here if you want

11   to.  But, I mean, primarily we're talking about digital.

12        Q.   Right.  So primarily in your experience --

13        A.   Maybe a better way to put this would be

14   overwhelmingly, it would be digital.  But there would be

15   circumstances where there would be all kinds of reasons

16   to -- to also have a hard copy distribution or even just

17   an informal discussion of a hard copy draft of

18   something.

19        Q.   So just to make sure I understand what you were

20   saying when you said "Overwhelmingly, it would be

21   digital," does that mean that overwhelmingly, when the

22   White House Counsel's office obtained a draft speech for

23   their review, they would receive those drafts

24   electronically at their White House e-mail addresses?

25        A.   Yes.

Page 41

1      Q.    Okay.  Let's look at Paragraph 10.

2            It states "For me, the touchstone of good-faith

3      compliance with the distinction between official and

4      unofficial activities was ensuring that the President's

5      speeches were preserved on the White House computer

6      system."

7            The good-faith compliance that you're

8      referencing in this paragraph, is that good-faith

9      compliance with the Hatch Act?

10     A.    Again, I need to see the sentences that precede

11     it.

12     Q.    Sure.  Please take as much time as you would

13     like.

14     A.    Thanks.  That's good.  You can freeze it there,

15     I think.

16           Yes, I believe that that section refers to the

17     Hatch Act.

18     Q.    Did anyone in the White House Counsel's office

19     tell you that the touchstone of good-faith compliance

20     with the Hatch Act was ensuring that the president's

21     speeches were preserved on the White House computer

22     system?

23     A.    Not in that way, no.  It was generally

24     understood that the president is the head of state, he's

25     the head of the executive branch.  What he says is

Page 42

1    official government record and therefore is to be

2    preserved in the White House computer system.

3            Either this -- you know, that more than

4    anything else is sort of the very, very, like,

5    fundamental understanding at the bottom of all of it.

6        Q.   Did any attorney in the Office of Legal Counsel

7    tell you that the touchstone of good-faith compliance

8    with the Hatch Act was ensuring that the president's

9    speeches were preserved on the White House computer

10   system?

11       A.   I don't think it would have been expressed

12   exactly that way because, again -- and this is where it

13   gets awkward here -- is that I keep going to this point.

14   It's in the affidavit that it was the view expressed to

15   me on more than one occasion that I can recall by

16   members of the White House Counsel's office that the

17   Hatch Act as applied to the president and his senior

18   aides is unconstitutional.

19           So that's the -- that's the understanding that

20   undergirds all of this.  And I know you're going to say

21   strike it from the record again, but that's sort of

22   underneath all of this.

23           But the point of that paragraph is -- I wish

24   there was a shorter answer here.  But the point of that

25   paragraph is that understanding what I've been told

Page 43

1    about the Hatch Act, what I've also been told about

2    views about the unconstitutionality as applied in

3    certain circumstances, what I've been told about the

4    vagaries that divide different categories, what I've

5    been told about, just again, the very fundamental idea,

6    this is the president of the United States, when he --

7    when he speaks, these are official government records,

8    that you put all of that together and the obvious thing

9    to do is to preserve everything on the White House

10   computer system.

11          So there's a lot that goes into that bucket.

12   But it's -- but if you really unpack it, that's what you

13   end up with.

14   Q.    More generally in your time in the White House,

15   did any government attorney tell you that the touchstone

16   of good-faith compliance with the Hatch Act was ensuring

17   that the president's speeches were preserved in the

18   White House computer system?

19   A.    I'll refer you to my last answer because it

20   would be the same.

21   Q.    Okay.  I believe your last answer began, "No,

22   not in that way"; is that correct?

23   A.    Yes.  Everything, I think, that began with that

24   expression.

25          And I want to just underscore here, the first

Page 44

1    two words here are "for me," right?  So the -- this is

2    my way of expressing in -- in the way that I just sort

3    of laid out that, you know, all these preceding

4    paragraphs are these different data inpoints -- or

5    inputs about things I've been told, things I heard,

6    things I understood.

7          And Paragraph 10, it says "So for me."  It

8    doesn't mean I'm disqualifying -- I want to be clear

9    about this too.  I'm not disqualifying the possibility

10   that somebody said to me something that broadly

11   resembles that or very exactly resembles that.  But I'm

12   also not saying, oh, I have a very precise memory of a

13   sentence exactly like that that you said to me.

14         I'm not saying either of those two polls.  I'm

15   saying the thing in the middle, which is that in light

16   of this different information, this is how I looked at

17   it.

18   Q.   Okay.  I'd like to ask you a little bit about

19   the statement -- about speeches being preserved on the

20   White House computer system.

21         What does it mean to preserve a speech on the

22   White House computer system?

23   A.   Very simply, as I understand it, any e-mail,

24   text message, or any other written record that we

25   distribute on official government devices is preserved

Page 45

1    in perpetuity.

2        Q.    Got it.

3            So if I'm understanding you correctly, it would

4    be possible to preserve a speech on the White House

5    computer system by e-mailing a copy of the speech to a

6    White House employee at the employee's official White

7    House e-mail address; correct?

8        A.    Yes.   I think there are other ways as well,

9    too.   I can't get into them all, but that would be one

10   way.

11       Q.    All right.   I'd like to talk to you a little

12   bit more about your process of speech review.

13           Mr. Miller, your assistant during the relevant

14   period was Robert Gabriel; correct?

15       A.    I believe his title during this time period was

16   office director.   But for the purposes of -- of this

17   deposition, I think it would be -- I don't think I would

18   be bothered by the more colloquial "assistant."

19       Q.    I'm happy to use whichever title he prefers.

20           So during this time period, Mr. Gabriel was

21   your office director; correct?

22       A.    Yes.

23       Q.    Did you ever rely on Mr. Gabriel to help you

24   preserve the president's speeches on the White House

25   computer system?

Page 46

1        A.    Not -- not in the way the question implies in

2    the sense that, again, if anybody -- as soon as

3    somebody, I think -- I think as soon as somebody just

4    creates and saves the Word document -- even before you

5    send it, just creating it and saving it, I think,

6    preserves it in perpetuity, I think.

7            E-mailing it then creates an additional record.

8    So if -- but, for example, where he would have been the

9    one, you know, preserving the record, it would have been

10   if -- if the first instance in which it was e-mailed or

11   saved was from -- was from his computer.  But because of

12   how technology works, it wouldn't have been necessary

13   for me to say -- if the document existed in the White

14   House system, it would have been a redundancy to say to

15   him, "Oh, add it to the White House system," if it makes

16   sense.

17       Q.    Yes, it does.

18       A.    He had organizational systems as office

19   director where things would have been organized in a

20   clearer more coherent way than just random documents or

21   random places.

22            But nonetheless, even random documents in

23   random places, again as I understand it, are still

24   preserved digitally.

25       Q.    That's helpful.  Thank you.

1           Let's look at Paragraph 16 of the declaration.

2           It states "Because of the official character of

3     the January 6th, 2021, speech the electronic trail of

4     the final versions of the speech were routed through the

5     White House system and subjected to the protocols and

6     reviews of other official statements or speeches of

7     President Trump."

8           Do you see that?

9     A.    Yes.

10    Q.    All right.  I'd like to unpack that a little

11    bit.

12          The paragraph begins "Because of the official

13    character of the January 6th, 2021, speech."

14          Are you referring your own determination that

15    the January 6th, 2021, speech had an official character?

16    A.    I think that sentence is best understood as a

17    summary conclusion of everything that it precedes in the

18    affidavit.

19    Q.    And did you personally reach that summary

20    conclusion, or did someone else provide that statement

21    to you?

22    A.    Reframe -- or rephrase the question, please.

23    Q.    Sure.

24          So the sentence begins "Because of the official

25    character of the January 6th, 2021, speech," and I just

Page 48

 1    want to know if you were the one who decided to label
 2    the January 6th, 2021, speech official in character or
 3    if somebody else provided that characterization to you?
 4        A.    You mean in this -- in this affidavit, you
 5    mean?
 6        Q.    Yes.
 7        A.    That is my characterization in this affidavit.
 8        Q.    Did you make that determination for purposes of
 9    explaining compliance with the Hatch Act?
10        A.    I made that determination because it is a true
11    statement.
12        Q.    In the first sentence of Paragraph 16, what did
13    you mean by "electronic trail"?
14        A.    It just refers to all of the -- the back and
15    forth over the speech; in other words, edits, questions,
16    additions, and so on.
17        Q.    Can you please explain each step in the
18    electronic trail for the January 6th speech?
19        A.    No.  There's is no -- there is no match or
20    mystery to it.  I just made the changes and additions
21    that were made to the speech so you can track the -- the
22    augmentation of the draft are all -- as I understand it,
23    are all preserved in the White House system.
24        Q.    In Paragraph 16, you also referenced final
25    versions of the January 6th speech.

1          How many final versions are you referring to?

2          A.   Well, I mean, you have -- we're going to get

3     real semantic here.  So you have the final version as

4     submitted for staff review.  You have the final version

5     as submitted for presidential review.  You have the

6     final version as submitted to the TelePrompTer.  Well,

7     those would be the main ones.

8          Q.   You say that the final versions of this speech

9     were, quote, "routed through the White House system."

10         A.   Uh-huh.

11         Q.   Can you please tell me what that means.

12         A.   White House -- the White House system in this

13    case being the -- the technological infrastructure of

14    the White House in terms of its -- you know, our

15    official phones, laptops, desktops, e-mail, server.  All

16    of -- everything that collectively encompasses, the

17    quote, "White House system."

18         Q.   So just so I understand how that might work, if

19    one version of a speech is e-mailed to a White House

20    employee at that employee's White House e-mail address,

21    would that be one way that the speech could be routed

22    through the White House system?

23         A.   Yes.

24         Q.   In Paragraph 16, you say that the final

25    versions of the January 6th speech were subjected to the

Page 50

1    protocols and reviews of other official statements or

2    speeches of President Trump.

3          Do you see that?

4      A.   Uh-huh.  I do, yes.

5      Q.   Can you please list each protocol and review

6    you are referencing in that statement.

7      A.   Well, it includes a lot of what we already

8    discussed in terms of protocols.  The electronic

9    distribution, the staff sec- -- the staff secretary

10   process of distributing it to various White House

11   components, the delivery to the president, the editing

12   by the president or White House staff, and then the

13   review being whatever comments, suggestions, inputs,

14   etc., were -- were made by anybody on the distribution

15   stream.

16     Q.   For any of the protocols or reviews that you

17   just referenced, did you delegate that task to one or

18   more of your staff?

19     A.   I'm not sure that there -- all the protocols

20   and reviews were mine to delegate in the first instance.

21          As I mentioned, the -- there's a lot of --

22   there are numerous components that are involved in those

23   protocols and reviews.  You have to be much more

24   specific about what you're asking me if I delegated.

25     Q.   Got it.

Page 51

1       Did you delegate any task to Mr. Gabriel in

2   connection with the protocols and reviews you're

3   referencing in this paragraph?

4     A.   It -- the process carried out more or less as

5   it -- as it normally would have with respect to the

6   protocols and reviews.  There wasn't really any need for

7   me to, quote/unquote, delegate anything.

8       The -- you know, it was -- yeah, it was

9   relatively normal and straightforward.  The -- a draft

10  of the speech that had been produced at the staff level

11  was put into the White House system, distributed,

12  components provided, I believe.  Either some measure of

13  input or at least review.  And -- and then, again, as is

14  reflected in the electronic record.  And the President

15  had changes that he made to the speech as well, and --

16  and that was the -- that was the process.

17      So I don't -- I don't think that there was

18  really -- there wasn't really anything that really had

19  to be delegated in that sense as it went through a

20  relatively normal process.  And so that's not -- I'm not

21  saying that -- there's nothing -- there's just nothing

22  remarkable, I guess, would be the answer to your

23  question.

24      You know, Robert did what he does, and the

25  lawyers did what they do, the writers did what they do,

Page 52

1    and so on.

2          Q.   Got it.

3                So you believe that Mr. Gabriel, Mr. Haley, and

4    Mr. Worthington followed the same processes and

5    procedures that they always followed in the course of

6    their duties; is that correct?

7          A.   Yes.

8                MS. DEICH:  All right.  We've been going for

9          about an hour.  Why don't we take a quick break if

10         that's okay for folks?

11               MR. DRISCOLL:  Okay.

12               THE VIDEOGRAPHER:  The time is 11:08.  We're

13         going off the video record.  This ends Media Number

14         1.

15               (Thereupon, a recess was taken, after which the

16         proceedings continued as follows:)

17               THE VIDEOGRAPHER:  The time is now 11:24.  We

18         are back on the record.

19               This begins Media Number 2.

20    BY MS. DEICH:

21         Q.   Okay.  Mr. Miller, I'd like to talk to you a

22    little bit about the process for drafting the

23    declaration that we've marked as Exhibit 2.

24               Who wrote this declaration?

25         A.   The declaration are -- is my words.  The actual

Page 53

```
 1    drafting process was conducted by my attorney, although
 2    I engaged very directly in that process, as would make
 3    sense because they're my words.
 4        Q.   So am I understanding correctly that your
 5    attorney wrote the first draft, and then you edited it?
 6             THE WITNESS:  Can I have a sidebar, please?
 7    BY MS. DEICH:
 8        Q.   No.  If there's an objection your lawyer would
 9    like to assert, he can do that, but -- no.
10             MR. DRISCOLL:  If the witness wants to consult
11        with his attorney on the question of privilege, he's
12        entitled to do that.
13             THE WITNESS:  Yeah.
14             MR. DRISCOLL:  Do you have a question about
15        privilege?
16             THE WITNESS:  I have a question about
17        privilege, yes.
18             MS. DEICH:  Okay.  Then, yes.
19             MR. DRISCOLL:  I'll answer the question and
20        then we can get back on.  Thanks.
21             MS. DEICH:  Yep.
22             THE VIDEOGRAPHER:  The time is 11:25.  We're
23        going off the video record.
24             (Thereupon, a recess was taken, after which the
25        proceedings continued as follows:)
```

Page 54

1          THE VIDEOGRAPHER:  The time is now 11:26.  We

2      are back on the video record.

3  BY MS. DEICH:

4      Q.   Okay.  Mr. Miller, let me give you a fresh

5  question.

6          Did you write the first draft of the

7  declaration marked as Exhibit 2?

8      A.   I had a discussion with my attorney regarding

9  my thoughts, opinions, recollections, etc., that would

10  form the basis of the affidavit.  And then given my

11  schedule and time commitments, etc., he provided the

12  first draft based on that consultation and conversation,

13  at which point I then edited the draft and returned it.

14      Q.   Did former President Trump's attorneys provide

15  guidance about what this declaration should say?

16      A.   The only conversations I had about this

17  draft -- or the -- sorry, the affidavit was with my

18  attorney, Bob Driscoll.

19      Q.   Do you know from any other source whether

20  President Trump's attorneys provided guidance about what

21  this declaration should say?

22      A.   I can only speak to the contents I had with my

23  own attorney, which -- which is what I said.

24          (Plaintiffs' Exhibit Number 3,

25      SMiller 002450-454, was marked for Identification.)

Page 55

1    BY MS. DEICH:

2        Q.    All right.  Can you please turn to Tab 3, which

3    I'll mark as Plaintiffs' Exhibit 3.  The Bates range for

4    this document is SMiller 002450 through 454.

5        A.    Can you zoom way in on this?

6        Q.    Mr. Miller, this is an e-mail chain between

7    Mr. Robert M. Driscoll, Gerald Urbanek, and Michael A.

8    Columbo that also includes some e-mails with David

9    Warrington, Jonathan Shaw, and Gary Lawkowski; correct?

10       A.    It's not my e-mail, so I'll take your word for

11   who's on it.

12       Q.    Mr. Driscoll is the attorney representing you

13   in connection with this litigation; correct?

14       A.    Yes.

15       Q.    Do you know who Gerald Urbanek is?

16       A.    No.

17       Q.    I will represent to you that Mr. Urbanek is one

18   of former President Trump's attorneys in this

19   litigation.

20             Do you know who Michael Columbo is?

21       A.    No.

22       Q.    How about David Warrington?

23       A.    Yes.  Although, importantly -- well, I don't

24   know if it's important or not, but I've only really

25   gotten to know him recently in the context of the -- of

Page 56

1    the campaign and the presidential transition.

2            I can't be certain, but I don't think I would

3    have known who he was at this point in time.  In other

4    words, on the dates of these -- I don't think I knew him

5    on the dates of the e-mails that you're showing here.

6        Q.    Do you know who Jonathan Shaw is?

7        A.    I'm looking at him right now.

8        Q.    Can you tell me what his role in this case is,

9    please.

10       A.    I mean, I think Jonathan probably could answer

11   that; right?

12       Q.    Do you know what his role in the case is?

13       A.    I mean, as I sit here today, I'm pretty sure

14   he's on the other team -- the one you're on, because I'm

15   seeing him there and he's not the one asking the

16   questions.

17       Q.    Do you know who he represents?

18       A.    I see that he has the word "Dhillon" next to

19   his name, so I'm assuming he's part of the Dhillon Law

20   Group.

21       Q.    Do you know who he represents in this

22   litigation?

23       A.    If you had asked me like -- I don't know,

24   sometime earlier than today and you said -- you just

25   said to me out of the blue, "Hey, Jonathan Shaw, what's

Page 57

1    he up to?" I would have said, "I don't know."  But it's

2    pretty obvious, sitting here today, he's representing

3    President Trump.

4        Q.   Do you know who Gary Lawkowski is?  I apologize

5    if I'm butchering anyone's name.

6        A.   No.

7        Q.   Have you ever been on a Zoom call with

8    Mr. Urbanek, Mr. Columbo, Mr. Warrington, Mr. Shaw, or

9    Mr. Lawkowski other than this Zoom deposition today?

10       A.   I don't think so, no.  I mean -- well, most of

11    the names I don't even -- I don't recognize at all.  As

12    information, I've gotten to know Dave a little bit in

13    much more recent history.

14       Q.   Have you ever been on a phone call with

15    Mr. Columbo, Mr. Warrington, Mr. Shaw, or Mr. Lawkowski?

16       A.   Well, can we just segregate out one of those

17    names, which is Dave Warrington, who I've gotten to

18    know -- not well, but subsequently to, I believe, the

19    time frame of these e-mails and affidavit and

20    everything.

21         So I have had phone calls with Dave Warrington

22    but not ever about any of this.

23       Q.   So just to make sure I understand, you've never

24    had a call with Mr. Warrington regarding the substance

25    of the declaration that's been marked as Exhibit 2; is

Page 58

1    that correct?

2        A.    Yes.

3        Q.    And you don't remember ever having

4    conversations with any of the other gentlemen, who would

5    be Mr. Urbanek, Mr. Columbo, Mr. Shaw, and

6    Mr. Lawkowski; is that correct?

7        A.    Yes.

8        Q.    Okay.  I'm just looking through some documents,

9    Mr. Miller.  One minute.

10              (Plaintiffs' Exhibit Number 4,

11        SMiller 002601-602, was marked for Identification.)

12   BY MS. DEICH:

13       Q.    Okay.  I'd like to turn to Tab 8, please, which

14   we'll mark as the next exhibit.  The Bates range for

15   this document is SMiller 002601 through 602.

16              Mr. Miller, this is another e-mail thread

17   involving Mr. Driscoll and Mr. Urbanek; correct?

18       A.    I think we're on a -- there we are.  Okay.  It

19   just came up.

20              So what I'm reading now, I believe for the

21   first time, is an e-mail from Bob Driscoll to someone

22   named GUrbanek, and the subject is "Miller declaration."

23       Q.    Okay.  Let's look at the last e-mail on the

24   chain, which is at the top of the first page.  I think

25   it's blown up on the screen.

Page 59

1              Mr. Driscoll writes to Mr. Urbanek "I'll patch
2      in Alfred as he has the pen on the 'final' final."
3              Do you see that?
4      A.    Yes.
5      Q.    Alfred Carry is also one of your attorneys in
6      this case; correct?
7      A.    I haven't really spoken with Alfred personally
8      about this, but I understand he's an associate or a
9      partner with Bob Driscoll, and they worked together on
10     many matters.  But I presume, based on this e-mail, on
11     this matter as well.
12     Q.    And this says he held the pen on the "final"
13     final version of the declaration; correct?
14     A.    Yes.
15     Q.    All right.  You can go ahead and set that
16     document aside.
17             Mr. Miller, I'd like to talk to you a little
18     bit about your prior work experience that might be
19     relevant to this deposition.
20             You have never worked for the White House
21     Counsel's Office; correct?
22     A.    As an employee of -- no.  I've worked with them
23     on a lot of things, but never as a member of them.  I'm
24     not an attorney.
25     Q.    Do you know what the U.S. Office of Special

Page 60

1    Counsel is?

2         A.   I believe that is the office that enforces the

3    Hatch Act.

4         Q.   And you have never been an employee of the U.S.

5    Office of Special Counsel; correct?

6         A.   No.

7         Q.   You have never been an employee of the Office

8    of Legal Counsel; correct?

9         A.   No.

10        Q.   You have never been an employee in the

11   Department of Justice; correct?

12        A.   Correct.

13        Q.   You have never been an employee in the Office

14   of Personnel Management; correct?

15        A.   Yes, that is correct.

16        Q.   And you have never worked for the National

17   Archives; correct?

18        A.   That is also correct.

19        Q.   Have you ever read the Hatch Act in its

20   entirety?

21        A.   No.

22        Q.   To your knowledge, does the text of the Hatch

23   Act mention preservation of presidential speeches on the

24   White House computer system?

25        A.   I would have to review the text of the Hatch

Page 61

1    Act to answer that question.

2        Q.    To your knowledge, has any United States agency

3    promulgated regulations implementing the Hatch Act?

4        A.    I'd have to review the federal code to answer

5    that question.

6        Q.    Have you ever read the implementing regulations

7    for the Hatch Act?

8        A.    I don't believe so.

9        Q.    Has any United States agency ever determined

10   that you violated the Hatch Act?

11       A.    I recall getting some finding from the -- the

12   SCO at some point during the Trump administration.

13       Q.    What's the SCO?

14       A.    Special Counsel's Office -- or maybe it's the

15   Office of Special Counsel, OSC, maybe would be, I think,

16   the acronym.  Either one.  The office that you mentioned

17   earlier, I think that -- I think they issued a fine --

18   I -- the precise terminology that governs that finding,

19   I would have to review.

20       Q.    All right.  Well, we can help you out with

21   that.

22            MS. DEICH:  Could we please pull up Tab 9,

23        which I'll mark as the next exhibit.

24            THE WITNESS:  It's very thoughtful.  Thank you.

25            (Plaintiffs' Exhibit Number 5, Investigation of

Page 62

1        Political Activities By Senior Trump Administration

2        Officials During the 2020 Presidential Election, was

3        marked for Identification.)

4   BY MS. DEICH:

5        Q.    You're welcome.

6              Okay.   The title of this document is

7   "Investigation of Political Activities By Senior Trump

8   Administration Officials During the 2020 Presidential

9   Election"; correct?

10       A.    Yes.

11       Q.    And the seal on the cover says "Office of

12  Special Counsel"; correct?

13       A.    Yes.

14       Q.    Can you please turn to Page 17 of this

15  document.

16             THE VIDEOGRAPHER:   Is that a 17 as a PDF or on

17       the bottom of the page?

18             MS. DEICH:   I think on the bottom of the page,

19       please.   There's a Subsection 4A.

20             Yep.

21  BY MS. DEICH:

22       Q.    So if you look in the middle of the page,

23  you'll see that Subsection 4A is entitled "11 senior

24  Trump administration officials violated the Hatch Act

25  during official interviews or media appearances";

Page 63

1    correct?

2         A.    That is what it says.

3         Q.    And then the first subsection of that sentence

4    states "11 Trump administration officials" -- it lists

5    several people, including Stephen Miller -- "violated

6    the Hatch Act over the course of 18 different official

7    interviews or media appearances"; correct?

8         A.    That is indeed what it says.

9         Q.    Does that refresh your recollection that the

10   Office of Special Counsel determined that you violated

11   the Hatch Act?

12        A.    Yes.

13             MR. DRISCOLL:  Object to form.

14             THE WITNESS:  Oh, actually, go back.  Let the

15        objection happen again.

16             MR. DRISCOLL:  Objection to form.

17             THE WITNESS:  Okay.  Yes.

18             MS. DEICH:  All right.  Pending questions from

19        your attorneys or Mr. Trump's attorneys, those are

20        all the questions I have for you today.

21             Thank you for your time.

22             MR. DRISCOLL:  Thank you.

23             MR. SHAW:  I have a few questions.

24             Mr. Binnall, did you have any questions?

25             MR. BINNALL:  No, I don't have any questions.

Page 64

```
 1        Mr. Shaw, you can proceed.

 2            MR. SHAW:  Okay.  Give me a moment.

 3                    CROSS-EXAMINATION

 4   BY MR. SHAW:

 5        Q.   Mr. Miller, my name is Jonathan Shaw.  I'm with

 6   the Dhillon Law Group, and as you correctly surmised, I

 7   represent President Trump in this proceeding.

 8        A.   The powers of deduction are unparalleled.  I

 9   wasn't expecting a trivia quiz today, but I passed.  I

10   correctly identified you as not being a member of the

11   plaintiffs' team.

12        Q.   Yes.

13            I'll share the right one here.

14            Do you recall earlier today you discussed

15   distribution of speeches by the staff secretary?

16        A.   Yes.

17            (Defendants' Exhibit Number-1, NARAPROD 040299,

18        was marked for Identification.)

19            MR. SHAW:  I'm just introducing an exhibit.

20        One moment.

21            THE VIDEOGRAPHER:  And, Counsel, if you're

22        having any trouble with the exhibit, just let me

23        know.

24            MR. SHAW:  No, I got it.

25
```

Page 65

1    BY MR. SHAW:

2        Q.  I am introducing and I hope people are seeing

3    what has been marked as Exhibit D0001.

4            MS. DEICH:  I don't see that.  I apologize.

5            MR. SHAW:  Okay.

6            THE VIDEOGRAPHER:  I'm seeing it in the Exhibit

7        Share platform.

8            MR. SHAW:  Okay.  It may just -- if you're not

9        seeing it in the Exhibit Share platform, you may

10       just need to refresh your page.

11           MS. DEICH:  Got it.

12           MR. DRISCOLL:  Yeah, we can't see it either.

13       Let me see.

14           MS. DEICH:  Bill, would it be possible for you

15       to put it up on the screen?

16           THE VIDEOGRAPHER:  Yeah, absolutely.  If that's

17       okay with everybody, I can put it up.

18           MR. SHAW:  Yep.

19           THE VIDEOGRAPHER:  Give me one second to make

20       sure I got the right one.  All right.

21           MR. SHAW:  And, for the record, it is a

22       one-page document bearing the Exhibit Stamp D0001

23       and the Bates Number NARAPROD 040299.

24   BY MR. SHAW:

25       Q.  I'll represent to you, sir, that it was

Page 66

1    produced to us by the National Archives.  It is a

2    one-page e-mail from the staff secretary.  The date on

3    it is Wednesday, January 6th, 2021, at 12:59 a.m., UTC.

4            I will represent to you, sir, that the UTC

5    timestamp is a time code that corresponds to what we

6    used to call Greenwich Mean Time.  So to get it back to

7    Eastern Standard Time, it has to be adjusted back five

8    hours.  So that should actually be January 5th, 2021, at

9    approximately 7:59 p.m.

10        A.   Yes.

11        Q.   Do you understand that?

12        A.   Yes.

13        Q.   Based on your tenure in the White House, the

14   format of the document, the content of the document, the

15   folks who are receiving it, do you recognize that as a

16   document -- an e-mail from the staff secretary to

17   various folks in the White House transmitting a draft of

18   the remarks that President Trump was to deliver at the

19   Ellipse on January 6th?

20            MS. DEICH:  Object to form and foundation.

21            THE WITNESS:  Yes.

22   BY MR. SHAW:

23        Q.   Are you -- did you, during your time at the

24   White House, frequently see such documents?

25        A.   Yes.

Page 67

1      Q.   Are you familiar with their form and content?

2           MS. DEICH:  Object to form.

3           THE WITNESS:  Yes.

4   BY MR. SHAW:

5      Q.   And do you recognize that document as such --

6   as a typical example of such documents?

7           MS. DEICH:  Object to form.

8           THE WITNESS:  Yes.

9   BY MR. SHAW:

10     Q.   And do you recognize this particular document

11  as an e-mail circulating the draft of the speech that

12  President Trump was going to give to the -- at the

13  Ellipse on January 6th, 2021?

14          MS. DEICH:  Object to form.

15          THE WITNESS:  Yes.

16  BY MR. SHAW:

17     Q.   I think you mentioned that among those who

18  would receive -- typically receive such distributions

19  were folks from the White House Counsel's Office; is

20  that correct?

21     A.   Yes.

22     Q.   I see there Mr. Philbin.  Patrick Philbin, was

23  he a member of the White House Counsel's Office?

24     A.   Yes.

25     Q.   Generally, without going through everybody on

Page 68

1    the list, are all those folks on the list White House

2    staffers?  Those recipients?

3        A.   Yes.

4        Q.   All right.  Let's put that document to one side

5    for the moment.  And I'm going to introduce another

6    exhibit.

7            (Defendants' Exhibit Number-2, NARAPROD 098985,

8        was marked for Identification.)

9            THE VIDEOGRAPHER:  And it is populated in the

10       Exhibit Share for me.  Give me one moment and I can

11       get it up on the screens.

12           MR. SHAW:  Great.  Thank you.

13           MS. DEICH:  Thanks.

14   BY MR. SHAW:

15       Q.   Okay.  I'm showing you now what has been marked

16   as --

17           MS. DEICH:  One moment.  I'm so sorry.  I

18       just -- if you could please zoom in for a minute,

19       that would be very helpful.  Thank you.

20           Okay.  And I'm sorry to interrupt.  Go ahead.

21   BY MR. SHAW:

22       Q.   Okay.  Showing you now what has been marked as

23   D- -- Exhibit D0002 -- and, for the record, that is a

24   one-page e-mail bearing the Bates Number NARAPROD

25   098985.

Page 69

1          Do you see that?

2      A.   Yes.

3      Q.   And that is -- do you recognize that as an

4  e-mail from the staff secretary on Sunday, January 3rd,

5  2021, at 1:59 p.m. UTC to a bunch of folks at the White

6  House?

7      A.   Yes.

8      Q.   Okay.  And does that appear to be circulating a

9  different speech?

10     A.   Yes.

11          MS. DEICH:  Object to form and foundation.

12          Sorry, if you could please give me a minute,

13      Mr. Miller, to lodge my objection before you answer,

14      that would be great.  Thank you.

15          THE WITNESS:  Yes.

16  BY MR. SHAW:

17     Q.   And when you say that it appears to be a

18  document circulating a different speech, is that based

19  upon your experience from the White House and your

20  familiarity with such documents?

21          MS. DEICH:  Object to form.

22          THE WITNESS:  Yes, Jonathan.

23  BY MR. SHAW:

24     Q.   At the bottom of that page, there's a portion

25  of it that begins with the word "Note."

Page 70

```
 1              Do you see that?
 2      A.   Yes.
 3      Q.   And that -- that says "Note:  Hatch Act
 4   restrictions apply."
 5              Do you see that?
 6      A.   Yes.
 7      Q.   Was that sometimes attached by someone in the
 8   staff secretary's office to speeches that were being
 9   circulated?
10              MS. DEICH:  Object to form.
11              THE WITNESS:  Yes, Jonathan.  In fact, that is
12        the -- the note that I think I actually alluded to
13        earlier during today's deposition when I mentioned
14        e-mail notifications on the Hatch Act that might be
15        distributed or that were, in fact, often
16        distributed.  You're providing precisely such an
17        example right there.
18   BY MR. SHAW:
19      Q.   Okay.  And the first sentence of that note says
20   "This speech will be delivered at a political event and
21   thus Hatch Act restrictions apply"; is that correct?
22      A.   Yes.
23      Q.   Okay.  Looking at the previous exhibit, Exhibit
24   D0001.
25              MR. SHAW:  If you could put that up, please.
```

Page 71

1              Could you please put that one up?

2              MR. DRISCOLL:  We can see it.

3              THE WITNESS:  I see it now.

4              THE VIDEOGRAPHER:  It should be up on the

5         screen.

6              THE WITNESS:  I see it.

7    BY MR. SHAW:

8         Q.   Does that contain a Hatch Act restriction

9    notice?

10        A.   No, it does not.

11        Q.   Does the fact that that -- that Exhibit 1 -- D1

12   does not contain a Hatch Act restriction notice tell you

13   anything about how -- about whether the White House

14   staff viewed the speech on the Ellipse on January 6th as

15   an official or unofficial speech?

16             MS. DEICH:  Object to form.  Foundation.  And

17        outside the scope with cross.

18             You can answer.

19             THE WITNESS:  Yes.  Well, this is a subject

20        with which I'm intimately acquainted and familiar,

21        Jonathan.  And the answer to your question is

22        absolutely.  It conveys deep significance as to the

23        view of the relevant equities in the White House, as

24        to the official nature of the remarks.

25             And you would be correct to draw exactly the

Page 72

1      inference that you did in comparing the previous

2      set, which if I believe I read it correctly were the

3      Georgia rally remarks, which did indeed contain the

4      Hatch Act warning -- whereas, these remarks

5      circulated January 5th did not contain the Hatch Act

6      warning, shows, I think clearly, the view with --

7      within those -- within the minds of those tasked

8      with making that determination as to the official

9      nature of the remarks that were delivered ultimately

10     on January 6th.

11          MR. SHAW:  I have no further questions, sir.

12          Thank you very much.

13          THE WITNESS:  Thank you, Jonathan.

14          MS. DEICH:  All right.  Can I please go off the

15     record for a moment.

16          THE VIDEOGRAPHER:  Sure.

17          The time is 11:52.  We're going off the video

18     record.

19          (Thereupon, a recess was taken, after which the

20     proceedings continued as follows:)

21          THE VIDEOGRAPHER:  The time is now 12:02.  We

22     are back on the video record.

23          MS. DEICH:  Mr. Miller, plaintiffs have no

24     further questions for you at this time.

25          Thank you very much for your time.

Page 73

1           THE WITNESS:  Thank you.  I appreciate it.

2           MR. SHAW:  Mr. Miller, thank you for your time

3      today.

4           THE WITNESS:  Thank you, Jonathan.

5           MR. DRISCOLL:  Thanks, everybody.

6           THE VIDEOGRAPHER:  The time is now 12:02.  This

7      concludes today's testimony.

8           (Thereupon, the videotaped deposition was

9      concluded at 12:02 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 74

1                CERTIFICATE OF OATH OF WITNESS

2

3

   STATE OF FLORIDA          )
4                            )SS:
   COUNTY OF MIAMI-DADE      )

5

6       I, VANESSA OBAS, RPR, Notary Public in and for the

7    State of Florida at Large, certify that the witness,

8    STEPHEN MILLER, appeared before me via Zoom

9    videoconference on November 22, 2024 and was duly sworn

10   by me.

11      WITNESS my hand and official seal this

12   December 11, 2024.

13

14                    VANESSA OBAS, RPR
                      Notary Public, State of Florida
15                    at Large

16

17   Notary #HH428338
     My commission expires:  3/13/2027

18

19   Produced Identification
     Type of Identification Produced:  Driver's License

20

21

22

23

24

25

Page 75

1                 REPORTER'S DEPOSITION CERTIFICATE

2

3     I, VANESSA OBAS, RPR, certify that I was authorized to

4     and did stenographically report the deposition of

5     STEPHEN MILLER, the witness herein on November 22, 2024;

6     that a review of the transcript was requested; that the

7     foregoing pages numbered from 1 to 77 inclusive is a

8     true and complete record of my stenographic notes of the

9     deposition by said witness; and that this

10    computer-assisted transcript was prepared under my

11    supervision.

12

13    I further certify that I am not a relative, employee,

14    attorney or counsel of any of the parties, nor am I a

15    relative or employee of any of the parties' attorney or

16    counsel connected with the action.

17

18        DATED this December 11, 2024.

19

20

                      _____

21                    VANESSA OBAS, RPR

22

23

24

25

Page 76

1    Robert Driscoll, Esquire

2    rdriscoll@dickinsonwright.com

3                        December 11, 2024

4    RE:    Lee, Barbara Et Al v. Trump, Donald Et Al

5         11/22/2024, Stephen Miller (#7032245)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Page 77

```
 1    Lee, Barbara Et Al v. Trump, Donald Et Al
 2    Stephen Miller (#7032245)
 3                 E R R A T A   S H E E T
 4    PAGE_____ LINE_____ CHANGE_____
 5    _____
 6    REASON_____
 7    PAGE_____ LINE_____ CHANGE_____
 8    _____
 9    REASON_____
10    PAGE_____ LINE_____ CHANGE_____
11    _____
12    REASON_____
13    PAGE_____ LINE_____ CHANGE_____
14    _____
15    REASON_____
16    PAGE_____ LINE_____ CHANGE_____
17    _____
18    REASON_____
19    PAGE_____ LINE_____ CHANGE_____
20    _____
21    REASON_____
22
23    _____    _____
24    Stephen Miller                              Date
25
```

Page 78

1    Lee, Barbara Et Al v. Trump, Donald Et Al

2    Stephen Miller (#7032245)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Stephen Miller, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Stephen Miller                          Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

**[& - 8]**                                                                    Page 1

| **&** |
| --- |
| **&**   2:3 |

| **0** |
| --- |
| **002450**   55:4 |
| **002450-454**   5:5 |
| 54:25 |
| **002601**   58:15 |
| **002601-602**   5:6 |
| 58:11 |
| **00400**   1:2 6:16 |
| **040299**   5:13 |
| 64:17 65:23 |
| **098985**   5:14 |
| 68:7,25 |

| **1** |
| --- |
| **1**   5:13 6:11 |
| 52:14 64:17 |
| 71:11 75:7 |
| **10**   41:1 44:7 |
| **10:00**   1:12 |
| **10:01**   6:4 |
| **10:26**   27:2 |
| **10:29**   27:6 |
| **10:43**   37:20 |
| **10:44**   37:24 |
| **11**   62:23 63:4 |
| 74:12 75:18 |
| 76:3 |
| **11/22/2024** |
| 76:5 |
| **1100**   2:3 |

| **1175**   22:5 |
| --- |
| **11:08**   52:12 |
| **11:24**   52:17 |
| **11:25**   53:22 |
| **11:26**   54:1 |
| **11:52**   72:17 |
| **12:02**   1:12 |
| 72:21 73:6,9 |
| **12:59**   66:3 |
| **15**   26:6 |
| **16**   47:1 48:12 |
| 48:24 49:24 |
| **17**   62:14,16 |
| **18**   63:6 |
| **1825**   2:8 |
| **1:59**   69:5 |

| **2** |
| --- |
| **2**   5:3,14 25:5,8 |
| 25:9 27:9,10 |
| 52:19,23 54:7 |
| 57:25 68:7 |
| **20**   78:15 |
| **20005**   2:4 |
| **20006**   2:9 |
| **2018**   20:25 |
| 21:1 |
| **2020**   5:10 |
| 12:21 62:2,8 |
| **2021**   12:21 |
| 47:3,13,15,25 |
| 48:2 66:3,8 |
| 67:13 69:5 |

| **2024**   1:11 6:5 |
| --- |
| 74:9,12 75:5 |
| 75:18 76:3 |
| **20th**   12:21 |
| **21**   1:2 6:16 |
| **2121**   2:13 |
| **22**   1:11 74:9 |
| 75:5 |
| **22314**   2:14 |
| **22726**   74:13 |
| 75:20 |
| **22nd**   6:5 |
| **25**   5:3 |

| **3** |
| --- |
| **3**   5:4 20:3 |
| 54:24 55:2,3 |
| **3/13/2027** |
| 74:17 |
| **30**   76:16 |
| **310**   21:25 |
| **32803**   1:14 |
| **3rd**   12:20 69:4 |

| **4** |
| --- |
| **4**   5:5 58:10 |
| **45**   14:12 |
| **454**   55:4 |
| **4a**   62:19,23 |

| **5** |
| --- |
| **5**   5:6 28:2,3 |
| 29:7,16,20 |
| 30:13 31:14 |
| 34:14,15,23,25 |

| 38:19 61:25 |
| --- |
| **501**   20:3 |
| **54**   5:4 |
| **58**   5:5 |
| **5th**   2:4 66:8 |
| 72:5 |

| **6** |
| --- |
| **6**   35:25 37:3 |
| 38:3,22,24 |
| **602**   58:15 |
| **608**   2:14 |
| **61**   5:6 |
| **64**   4:5 5:13 |
| **68**   5:14 |
| **6th**   47:3,13,15 |
| 47:25 48:2,18 |
| 48:25 49:25 |
| 66:3,19 67:13 |
| 71:14 72:10 |

| **7** |
| --- |
| **7**   4:4 |
| **7032245**   76:5 |
| 77:2 78:2 |
| **74**   4:6 |
| **75**   4:6 |
| **77**   4:7 75:7 |
| **770-1175**   21:25 |
| **7:59**   66:9 |

| **8** |
| --- |
| **8**   39:16,17 |
| 58:13 |

| 9 |
| --- |

**9**  61:22

**900**  2:9

| a |
| --- |

**a.m.**  1:12 6:4
  66:3
**ability**  12:2
**able**  26:18,20
**above**  76:6
  78:7
**absolutely**
  65:16 71:22
**abundant**  36:2
**account**  24:13
**accuracy**  76:9
**accurately**  9:21
**acknowledge...**
  78:3
**acknowledg...**
  76:12
**acquainted**
  71:20
**acronym**  61:16
**act**  13:23 28:8
  29:12 30:2,8
  31:2,16,18
  32:16 33:9,13
  35:9 36:5
  37:12 38:6
  41:9,17,20
  42:8,17 43:1
  43:16 48:9
  60:3,19,23

61:1,3,7,10
62:24 63:6,11
70:3,14,21
71:8,12 72:4,5
**action**  6:15
75:16
**activities**  5:7
28:7 37:7 41:4
62:1,7
**actual**  52:25
**actually**  19:25
31:22 63:14
66:8 70:12
**adam**  2:24
**add**  32:21
46:15
**additional**  35:5
46:7
**additions**  48:16
48:20 78:6
**address**  22:9,13
22:16,20,24
23:4,16 24:1
24:15,20,24
45:7 49:20
**addresses**
23:19,21 24:6
40:24
**adeich**  2:5
**adjusted**  66:7
**administration**
5:8 20:4,12
22:11,17 39:11
61:12 62:1,8

62:24 63:4
**advice**  15:22
29:7 32:9
34:14 38:23
39:6
**advise**  30:2,8
**advised**  28:5
29:12 30:14
32:8 37:5
38:23
**advisory**  32:17
**affidavit**  5:3
17:10 18:16,17
25:5 27:14,15
38:13,15 42:14
47:18 48:4,7
54:10,17 57:19
**affirm**  7:2
**agency**  61:2,9
**ago**  24:18 25:3
**agreed**  5:18
**ahead**  7:20
59:15 68:20
**aides**  33:14
42:18
**al**  1:4,7 6:13,13
76:4,4 77:1,1
78:1,1
**alexandria**
2:14
**alfred**  2:25
59:2,5,7
**ali**  7:24

**aligned**  29:1
**alisa**  2:19
**alison**  2:2
**allotted**  76:19
**alluded**  70:12
**announced**
  20:6
**answer**  8:12,20
  10:2,8,10,22
  11:6 13:15,17
  15:5,6,6 16:10
  23:13 28:25
  30:3 31:4
  32:11,22 36:12
  36:16 38:18
  42:24 43:19,21
  51:22 53:19
  56:10 61:1,4
  69:13 71:18,21
**answered**
  36:15
**answering**
  35:16
**anybody**  16:17
  21:23 46:2
  50:14
**anyone's**  57:5
**apart**  18:7 22:4
**apm**  1:2 6:16
**apologize**  57:4
  65:4
**appear**  25:25
  69:8

**appearances**
62:25 63:7
**appeared** 74:8
**appearing** 2:5
2:6,10,11,15,16
**appears** 69:17
**appended** 78:7
**applicable** 76:8
**applications**
11:11,15,21
12:13
**applied** 32:16
33:13 42:17
43:2
**apply** 70:4,21
**appreciate** 7:19
10:10 73:1
**approximately**
66:9
**archives** 60:17
66:1
**argue** 30:25
31:11
**article** 30:24
**asher** 2:24
**aside** 59:16
**asked** 10:13
36:6 37:14
56:23
**asking** 8:1
12:19 15:15,24
19:3 31:8,23
32:12,25 33:4
33:18 34:5,9

34:12 50:24
56:15
**assert** 53:9
**assistant** 45:13
45:18
**assisted** 75:10
**associate** 59:8
**associated**
13:23
**assume** 10:16
35:8
**assuming** 56:19
**attached** 70:7
76:11
**attended** 35:3
**attorney** 9:10
10:19,22 13:5
13:17 14:9,13
14:20 15:14,20
16:7 19:17
28:4,11 42:6
43:15 53:1,5
53:11 54:8,18
54:23 55:12
59:24 75:14,15
76:13
**attorney's**
10:24
**attorneys** 10:18
13:8,11 29:8
39:7 54:14,20
55:18 59:5
63:19,19

**audibly** 10:3
**audio** 17:1,2
**augmentation**
48:22
**authority** 31:19
**authorized**
75:3
**available** 76:6
**avenue** 2:3,13
**awkward** 42:13

**b**

**b** 5:1
**back** 15:24
16:11 27:7
37:25 39:10
48:14 52:18
53:20 54:2
63:14 66:6,7
72:22
**background**
19:22 26:18
**ballpark** 30:4
**barbara** 1:4
6:13 76:4 77:1
78:1
**based** 54:12
59:10 66:13
69:18
**basic** 30:23
**basis** 54:10
**bates** 55:3
58:14 65:23
68:24

**bearing** 65:22
68:24
**began** 43:21,23
**beginning** 37:4
**begins** 38:3
47:12,24 52:19
69:25
**behalf** 2:5,10
2:15
**believe** 8:22
13:18 17:11
18:10,19 20:21
21:3 22:14,18
24:8,12 27:24
32:10 37:14
38:2 41:16
43:21 45:15
51:12 52:3
57:18 58:20
60:2 61:8 72:2
**believes** 15:21
16:6
**best** 10:7,9,15
23:3 36:5
47:16
**better** 16:1
40:13
**big** 7:16
**bigger** 38:24
**bill** 2:20 25:10
65:14
**binnal** 36:25
**binnall** 3:1
63:24,25

**bit** 7:14,17 15:3
  15:7 19:22,25
  23:10 25:11
  26:3 29:3
  30:11 39:23
  44:18 45:12
  47:11 52:22
  57:12 59:18
**blechman** 2:20
**blown** 58:25
**blue** 56:25
**bob** 9:12 54:18
  58:21 59:9
**bothered** 45:18
**bottom** 42:5
  62:17,18 69:24
**branch** 41:25
**break** 11:1,2,3
  11:7 17:24
  37:17,19 52:9
**brian** 2:19
**briefings** 35:3
**briefly** 17:19
**broached** 39:2
**broadly** 44:10
**bucket** 43:11
**buckets** 35:5
**bunch** 25:4
  69:5
**butchering**
  57:5

**c**

**c** 2:1 6:1 20:3
**call** 16:25 17:1
  17:1,2,3,21
  57:7,14,24
  66:6
**called** 7:8 32:25
**calls** 57:21
**camera** 6:8
**campaign**
  24:15,19 36:25
  56:1
**capabilities**
  12:5
**carried** 51:4
**carry** 2:25 59:5
**case** 1:2 9:6
  16:3 29:5
  49:13 56:8,12
  59:6
**categorically**
  32:11
**categories** 43:4
**caveat** 11:5
**cell** 12:15 19:23
  20:14,17,19
  21:1,8,11,13,16
  22:2,4,5,6
**certain** 20:8,22
  32:15 34:10
  43:3 56:2
**certainly** 9:19

**certificate** 4:6,6
  74:1 75:1
**certify** 74:7
  75:3,13
**chain** 55:6
  58:24
**change** 20:23
  21:2 77:4,7,10
  77:13,16,19
**changed** 20:20
**changes** 48:20
  51:15 76:10
  78:6
**character** 47:2
  47:13,15,25
  48:2
**characterizati...**
  48:3,7
**choice** 32:4
**cipollone** 39:10
**circulated** 70:9
  72:5
**circulating**
  67:11 69:8,18
**circumstance**
  40:8
**circumstances**
  40:15 43:3
**civil** 6:15
**clarify** 10:15,15
  30:10
**clarity** 36:2
**clear** 44:8

**clearer** 46:20
**clearly** 19:8
  72:6
**client** 14:20
  15:20 16:7
**close** 11:11
  12:3
**code** 61:4 66:5
**cohen** 2:3
**cohenmilstei...**
  2:5
**coherent** 46:20
**collectively**
  49:16
**colloquial**
  45:18
**columbia** 1:1
  6:15
**columbo** 55:8
  55:20 57:8,15
  58:5
**come** 32:9
**comment** 32:15
**comments**
  50:13
**commission**
  74:17
**commitments**
  54:11
**committee** 8:23
**common** 32:14
**communicati...**
  14:19 19:23

**[comparing - counsel's]**                                    Page 5

| | | | |
|---|---|---|---|
| **comparing** 72:1 | **concludes** 73:7 | **contents** 54:22 | 27:16,20 28:9 |
| **complete** 75:8 78:8 | **conclusion** 47:17,20 | **context** 28:7 32:22 37:5,10 | 28:10,11,12,14 29:5,6,9,10 |
| **completed** 76:16 | **conducted** 6:7 53:1 | 37:11,13 38:3 38:4,5,17,18 | 34:2,24 43:22 45:7,14,21 |
| **completely** 26:4 | **confidence** 30:5 | 55:25 | 52:6 55:9,13 |
| **compliance** 28:8 30:2,8 | **confused** 15:3 | **continue** 36:16 | 58:1,6,17 59:6 |
| 37:11 38:5 | **confusing** 34:7 | **continued** 27:5 37:23 52:16 | 59:13,21 60:5 |
| 41:3,7,9,19 | **congress** 17:16 | 53:25 72:20 | 60:8,11,12,14 |
| 42:7 43:16 | **congressional** 8:23 | **controlled** 23:20,22 24:7 | 60:15,17,18 |
| 48:9 | **connected** 75:16 | **conversation** 14:9,11 34:1 | 62:9,12 63:1,7 67:20 70:21 |
| **complicated** 19:25 | **connection** 6:8 22:10 27:16 | 35:9 54:12 | 71:25 78:8 |
| **component** 18:19,20 20:10 | 51:2 55:13 | **conversations** 15:14,18 29:18 | **corrections** 78:6 |
| **components** 40:3 50:11,22 | **constitution** 30:23 | 31:14 32:18 | **correctly** 8:23 45:3 53:4 64:6 |
| 51:12 | **constitutional** 31:2 | 33:8 34:10,14 34:16,24,25 | 64:10 72:2 |
| **comprehensive** 29:17 | **constitutional...** 31:16 | 35:1,1,18,19 36:4,7,20 39:8 | **corresponds** 66:5 |
| **computer** 11:10,12 22:21 | **constraint** 31:18 | 39:14 54:16 58:4 | **counsel** 5:19 6:21 7:20 13:3 |
| 22:25 23:17 | **consult** 12:16 27:22 53:10 | **conveys** 71:22 | 14:19 15:22 |
| 41:5,21 42:2,9 | **consultation** 54:12 | **copies** 76:14 | 17:24 34:1 |
| 43:10,18 44:20 | **contain** 71:8,12 | **copy** 18:4 40:9 40:16,17 45:5 | 42:6 60:1,5,8 |
| 44:22 45:5,25 | 72:3,5 | **corman** 2:19 | 61:15 62:12 |
| 46:11 60:24 | **content** 66:14 | **correct** 8:10 | 63:10 64:21 |
| 75:10 | 67:1 | 9:1,4 13:3,6 | 75:14,16 76:14 |
| **concierge** 3:2 | | 14:5,14 15:21 | **counsel's** 28:5 |
| **concluded** 73:9 | | 20:12 21:2,14 | 29:8,11 30:1,7 |
| | | 21:24 23:1,17 | 30:14 31:15 |
| | | | 32:8 33:8,12 |
| | | | 35:20 36:4 |
| | | | 39:1,4,6,19,25 |

40:5,22 41:18
42:16 59:21
61:14 67:19,23
**counsels** 29:24
**county** 74:4
**couple** 15:19
17:8
**course** 15:9
34:11 39:8
52:5 63:6
**court** 1:1 6:14
6:19,23,25
7:10 9:25 10:1
**cover** 62:11
**covered** 16:6
33:10
**covering** 12:20
**created** 24:10
24:16,17
**creates** 46:4,7
**creating** 46:5
**cross** 4:5 64:3
71:17
**cs** 76:15
**csigirinszkij**
2:20
**curated** 18:21
**current** 19:24
**cv** 1:2 6:16

**d**

**d** 2:25 4:1 6:1
68:23

**d.c.** 2:4,9
**d0001** 65:3,22
70:24
**d0002** 68:23
**d1** 71:11
**dade** 74:4
**daniel** 2:20
**data** 44:4
**date** 1:11 66:2
77:24 78:12
**dated** 75:18
**dates** 56:4,5
**dave** 57:12,17
57:21
**david** 55:8,22
**day** 78:15
**days** 76:16
**dc20** 24:5
**december**
74:12 75:18
76:3
**decide** 19:4,10
**decided** 18:24
48:1
**decision** 19:14
35:23
**declaration**
18:7 27:22
28:1,14,19,21
28:23,25 29:2
47:1 52:23,24
52:25 54:7,15
54:21 57:25
58:22 59:13

**declare** 78:4
**deduction** 64:8
**deemed** 40:3
78:6
**deep** 71:22
**deeper** 32:18
**defendant** 2:10
**defendants** 1:8
5:13,14 64:17
68:7
**definition**
33:10 34:6
**deich** 2:2 4:4
7:11,21,23,25
8:15 11:19
12:4,9,10
13:14 14:3
16:4 18:2,5,6
25:7,10,13,19
26:12,24 27:8
31:21 32:3
33:16,22,23
36:10,18,24
37:1,18 38:1
52:8,20 53:7
53:18,21 54:3
55:1 58:12
61:22 62:4,18
62:21 63:18
65:4,11,14
66:20 67:2,7
67:14 68:13,17
69:11,21 70:10
71:16 72:14,23

**delegate** 50:17
50:20 51:1,7
**delegated**
50:24 51:19
**deliver** 66:18
**delivered** 70:20
72:9
**delivery** 50:11
**department**
60:11
**depends** 6:7
**deponent** 5:19
76:13 78:3
**deposed** 8:10
8:21
**deposing** 76:13
**deposition** 1:10
4:6 5:20 6:6,12
8:24 9:3,23
11:9 12:12
13:3,6 14:5,8
14:24 15:2
16:3,18,21,24
17:7 18:9,12
19:12,16,19
45:17 57:9
59:19 70:13
73:8 75:1,4,9
**derek** 29:21
**described**
35:13,20 36:2
**describing** 29:7
40:8

**[description - earlier]**                                                    Page 7

**description**  5:2
  5:12
**desktops**  49:15
**determination**
  47:14 48:8,10
  72:8
**determined**
  61:9 63:10
**devices**  44:25
**dhillon**  2:13
  56:18,19 64:6
**dhillonlaw.c...**
  2:15
**dickinson**  2:8
**dickinsonwri...**
  2:10 76:2
**different**  8:17
  22:15 25:4
  39:7 43:4 44:4
  44:16 63:6
  69:9,18
**differently**  29:3
**digital**  40:11,14
  40:21
**digitally**  46:24
**direct**  4:4 7:22
**directly**  13:17
  53:2
**director**  45:16
  45:21 46:19
**discussed**  50:8
  64:14
**discussion**
  40:17 54:8

**disqualifying**
  44:8,9
**distinction**  28:6
  37:6 41:3
**distribute**
  44:25
**distributed**
  21:20 40:2
  51:11 70:15,16
**distributing**
  50:10
**distribution**
  40:10,16 50:9
  50:14 64:15
**distributions**
  67:18
**district**  1:1,1
  6:14,15
**divide**  43:4
**document**
  25:11,14,22
  26:2 27:11,18
  46:4,13 55:4
  58:15 59:16
  62:6,15 65:22
  66:14,14,16
  67:5,10 68:4
  69:18
**documents**
  17:6,8,9 18:9
  18:11,24 19:4
  19:10,14,18
  25:17,25 27:23
  46:20,22 58:8

  66:24 67:6
  69:20
**donald**  1:7 2:15
  6:13 76:4 77:1
  78:1
**donegan**  39:14
**dormant**  24:11
**download**
  25:22
**draft**  40:6,17
  40:22 48:22
  51:9 53:5 54:6
  54:12,13,17
  66:17 67:11
**drafting**  52:22
  53:1
**drafts**  40:1,23
**draw**  71:25
**driscoll**  2:7
  8:12 9:12
  11:17,24 12:6
  13:5,13,20
  14:14 15:2,20
  16:2,18,20,23
  17:4,25 18:3
  25:17,24 26:5
  26:8,23 32:2
  33:20 36:9,22
  36:23 37:16
  52:11 53:10,14
  53:19 54:18
  55:7,12 58:17
  58:21 59:1,9
  63:13,16,22

  65:12 71:2
  73:5 76:1
**driver's**  74:19
**duly**  7:8 74:9
**duration**  15:18
**duties**  31:2
  33:15 52:6

**e**

**e**  2:1,1 4:1 5:1
  6:1,1 8:9,9,9
  19:22 21:10
  22:9,13,16,19
  22:20,23,24
  23:3,4,15,16,19
  23:21,24 24:1
  24:5,6,10,15,19
  24:21,24 30:9
  32:9,17 40:6
  40:24 44:23
  45:5,7 46:7,10
  49:15,19,20
  55:6,8,10 56:5
  57:19 58:16,21
  58:23 59:10
  66:2,16 67:11
  68:24 69:4
  70:14 77:3,3,3
**earlier**  13:2
  24:10 32:23,24
  37:13 39:12
  56:24 61:17
  64:14 70:13

**[easier - feel]** Page 8

**easier** 9:24
**eastern** 6:4
  66:7
**edited** 53:5
  54:13
**editing** 50:11
**edits** 48:15
**eight** 17:18
**eisenhower**
  2:13
**either** 42:3
  44:14 51:12
  61:16 65:12
**election** 5:11
  62:2,9
**electronic** 47:3
  48:13,18 50:8
  51:14
**electronically**
  40:24
**ellipse** 66:19
  67:13 71:14
**employed** 20:3
**employee** 45:6
  49:20 59:22
  60:4,7,10,13
  75:13,15
**employee's**
  45:6 49:20
**employer** 19:24
**encompass**
  34:25
**encompasses**
  49:16

**ends** 52:13
**enforces** 60:2
**engaged** 53:2
**ensuring** 41:4
  41:20 42:8
  43:16
**entering** 20:4
**entire** 25:22
**entirety** 60:20
**entities** 13:22
**entitled** 53:12
  62:23
**entity** 13:25
**epstein** 2:22
**equities** 71:23
**errata** 4:7
  76:11,13,16
**esquire** 2:2,7
  2:12,19,19,20
  2:20,21,21,22
  2:22,23,24,24
  2:25,25 3:1,1,2
  76:1
**et** 1:4,7 6:13,13
  76:4,4 77:1,1
  78:1,1
**ethan** 2:21
**event** 70:20
**everybody**
  26:10 65:17
  67:25 73:5
**exact** 13:25
**exactly** 42:12
  44:11,13 71:25

**examination**
  4:4,5 7:22 64:3
**example** 32:16
  46:8 67:6
  70:17
**excellent** 7:19
**except** 11:12
**excuse** 35:12
**executive** 41:25
**exercise** 33:14
**exhibit** 5:3,4,5
  5:6,13,14
  11:13,21 17:11
  17:12 25:5,9
  25:21,24 27:10
  52:23 54:7,24
  55:3 57:25
  58:10,14 61:23
  61:25 64:17,19
  64:22 65:3,6,9
  65:22 68:6,7
  68:10,23 70:23
  70:23 71:11
**exhibits** 11:10
**existed** 46:13
**existence** 15:17
**expecting** 64:9
**experience**
  40:12 59:18
  69:19
**expert** 29:5
  33:5,6
**experts** 31:1,12

**expires** 74:17
**explain** 48:17
**explaining** 48:9
**expressed**
  42:11,14
**expressing** 44:2
**expression**
  43:24
**expressly** 10:22
**extension** 37:7
**extent** 12:15
  13:20
**extra** 26:3
  32:21
**eye** 2:8

**f**

**fact** 30:19,21
  39:18 70:11,15
  71:11
**fails** 76:18
**fairly** 28:20
**fairness** 14:22
**faith** 41:2,7,8
  41:19 42:7
  43:16
**familiar** 67:1
  71:20
**familiarity**
  69:20
**far** 24:12
**federal** 61:4
**feel** 15:20

**[fighting - good]**                                                Page 9

| | | | |
|---|---|---|---|
| **fighting**  38:13 | **folks**  52:10 | **freeze**  38:10 | **getting**  61:11 |
| **figure**  34:13 | 66:15,17 67:19 | 41:14 | **give**  7:3 11:17 |
| **filed**  6:14 | 68:1 69:5 | **frequently** | 26:6 30:4 54:4 |
| **final**  47:4 48:24 | **follow**  10:24 | 66:24 | 64:2 65:19 |
| 49:1,3,4,6,8,24 | **followed**  52:4,5 | **fresh**  54:4 | 67:12 68:10 |
| 59:2,2,12,13 | **follows**  7:9 | **friday**  1:11 | 69:12 |
| **finding**  61:11 | 27:5 37:23 | **full**  8:7 | **given**  9:23 |
| 61:18 | 52:16 53:25 | **fully**  7:14 9:20 | 24:24 54:10 |
| **fine**  37:19 | 72:20 | **fundamental** | 78:9 |
| 61:17 | **forefront**  26:22 | 30:24 42:5 | **global**  28:20 |
| **finish**  10:7,9 | **foregoing**  75:7 | 43:5 | **gmail**  23:24 |
| 32:6 | 78:5 | **further**  37:5 | **gmail.com.** |
| **finished**  31:23 | **forget**  9:19 | 72:11,24 75:13 | 24:5 |
| **firm**  6:19 11:25 | **form**  32:9,17 | | **go**  7:20 9:24 |
| 12:8 24:23 | 54:10 63:13,16 | **g** | 11:7 15:24 |
| **firmware**  11:25 | 66:20 67:1,2,7 | **g**  6:1 | 16:11 25:23 |
| **first**  7:8,12 | 67:14 69:11,21 | **gabriel**  45:14 | 26:24 27:25 |
| 15:24 19:7 | 70:10 71:16 | 45:20,23 51:1 | 39:12 59:15 |
| 26:2 28:2 | **formal**  20:7 | 52:3 | 63:14 68:20 |
| 32:10 35:24 | **format**  66:14 | **gary**  55:9 57:4 | 72:14 |
| 37:2,9 43:25 | **formed**  30:20 | **gather**  18:11 | **goes**  9:6 43:11 |
| 46:10 48:12 | **former**  54:14 | **gathered**  18:14 | **going**  6:3 12:19 |
| 50:20 53:5 | 55:18 | 18:16 | 14:17 15:18 |
| 54:6,12 58:21 | **forth**  48:15 | **gathering** | 16:5 17:23 |
| 58:24 63:3 | **foundation** | 18:17 | 19:11,15 20:1 |
| 70:19 | 66:20 69:11 | **gears**  19:21 | 21:20,22 23:11 |
| **fits**  31:9 | 71:16 | **general**  16:3 | 27:2 31:21 |
| **five**  66:7 | **four**  34:12 35:9 | **generally**  11:2 | 32:4 33:16 |
| **floor**  2:4 | 39:8 | 41:23 43:14 | 37:21 42:13,20 |
| **florida**  1:13,14 | **frame**  57:19 | 67:25 | 49:2 52:8,13 |
| 74:3,7,14 | **framed**  16:16 | **gentlemen**  58:4 | 53:23 67:12,25 |
| **focus**  37:9 | **frankly**  30:25 | **georgia**  72:3 | 68:5 72:17 |
| **folder**  26:7 | **free**  15:21 | **gerald**  2:25 | **good**  6:3,25 |
| | | 55:7,15 | 7:11,24 11:18 |

**[good - includes]** Page 10

30:3 41:2,7,8
41:14,19 42:7
43:16
**gotten** 55:25
57:12,17
**government**
20:15 42:1
43:7,15 44:25
**governs** 61:18
**granular** 40:10
**great** 18:2,5
30:5 33:22
68:12 69:14
**greenwich** 66:6
**ground** 9:24
14:10,15
**group** 2:13
56:20 64:6
**guess** 13:16
28:22 51:22
**guidance** 54:15
54:20
**gurbanek**
58:22

**h**

**h** 5:1 8:9 77:3
**haley** 29:23
52:3
**half** 39:10
**hand** 7:1 74:11
**happen** 63:15
**happened**
34:10 39:14

**happy** 11:2
28:25 45:19
**hard** 40:9,16
40:17
**harping** 38:14
**hatch** 28:8
29:12 30:2,8
31:2,16,18
32:16 33:9,13
35:9 36:5
37:12 38:6
41:9,17,20
42:8,17 43:1
43:16 48:9
60:3,19,22,25
61:3,7,10
62:24 63:6,11
70:3,14,21
71:8,12 72:4,5
**hazier** 39:11
**head** 10:4
41:24,25
**heads** 29:24
**hear** 8:2
**heard** 6:10
34:15 35:4
44:5
**hearing** 8:5
**held** 59:12
**help** 32:6 45:23
61:20
**helpful** 46:25
68:19

**hereto** 78:7
**hey** 56:25
**hh428338**
74:17
**history** 57:13
**hope** 65:2
**hopefully** 26:21
**hour** 11:2 52:9
**hours** 66:8
**house** 22:4,9,15
22:20,21,24,25
23:4,6,15,16
28:4,5 29:8,11
30:1,7,13,22
31:15 32:7,13
33:8,12 34:1,2
35:20 36:4
39:1,3,5,18,19
39:25 40:5,22
40:24 41:5,18
41:21 42:2,9
42:16 43:9,14
43:18 44:20,22
45:4,6,7,24
46:14,15 47:5
48:23 49:9,12
49:12,14,17,19
49:20,22 50:10
50:12 51:11
59:20 60:24
66:13,17,24
67:19,23 68:1
69:6,19 71:13
71:23

**huh** 23:14 38:9
39:22 49:10
50:4
**hunter** 2:24

**i**

**idea** 31:17 43:5
**identification**
25:6 54:25
58:11 62:3
64:18 68:8
74:19,19
**identified**
64:10
**ii** 30:24
**impaired** 9:16
9:17
**impairment**
9:19
**implementing**
61:3,6
**implies** 18:22
46:1
**important**
32:23 55:24
**importantly**
55:23
**include** 29:13
40:4
**included** 29:15
29:21,24
**includes** 50:7
55:8

**including** 38:19 63:5
**inclusive** 75:7
**incoming** 20:5 20:6
**incorrect** 28:17
**individually** 18:24 19:4,10
**inevitably** 31:3
**inference** 72:1
**inform** 31:3
**informal** 40:17
**information** 44:16 57:12
**informed** 31:11
**infrastructure** 49:13
**inpoints** 44:4
**input** 51:13
**inputs** 44:5 50:13
**instance** 46:10 50:20
**instances** 36:6
**instructions** 10:25
**instructs** 10:23
**inter** 31:6
**interfere** 12:2
**intermingled** 31:6
**internet** 6:8
**interrupt** 68:20

**intersects** 30:22
**intertangled** 30:21
**intertwined** 31:6
**intervals** 11:3
**interview** 8:18 8:22
**interviews** 62:25 63:7
**intimately** 71:20
**introduce** 18:4 25:8 27:9 68:5
**introducing** 26:2 64:19 65:2
**invariably** 40:4
**investigation** 5:6 61:25 62:7
**involved** 50:22
**involving** 58:17
**ironically** 33:4 33:18 37:14 38:13
**issued** 61:17
**issues** 26:25 33:11

**j**

**j** 1:4,7 2:15 6:13

**january** 12:21 47:3,13,15,25 48:2,18,25 49:25 66:3,8 66:19 67:13 69:4 71:14 72:5,10
**jesse** 3:1 31:8 33:3
**jonathan** 2:12 31:8 33:2 55:9 56:6,10,25 64:5 69:22 70:11 71:21 72:13 73:4
**jshaw** 2:15
**judd** 2:21
**judge** 32:4 35:23
**jump** 39:16
**jury** 9:7
**justice** 60:11

**k**

**keep** 35:16,21 38:12,14,14,15 38:19 42:13
**kick** 26:21
**kind** 14:21 26:18
**kinds** 40:15
**knew** 56:4
**know** 8:4 10:14 11:1 13:20

18:15,20 20:19 28:15 35:15 39:8 42:3,20 44:3 46:9 48:1 49:14 51:8,24 54:19 55:15,20 55:24,25 56:6 56:12,17,21,23 57:1,4,12,18 59:25 64:23
**knowledge** 13:8 21:4 22:1 23:3 60:22 61:2
**known** 35:12 35:14 56:3
**kolon** 2:24
**kristy** 2:21

**l**

**l** 5:16 8:9,9
**label** 48:1
**laid** 44:3
**laptop** 7:13
**laptops** 12:8 49:15
**large** 14:16 35:17 74:7,15
**law** 2:13 30:22 56:19 64:6
**lawkowski** 55:9 57:4,9,15 58:6
**lawyer** 16:6 53:8

**lawyers**  7:25
  14:4,23 51:25
**leave**  37:16
**lee**  1:4 6:13
  76:4 77:1 78:1
**legal**  6:18,20
  28:14,18 29:4
  30:18 33:5,5
  42:6 60:8
  76:23
**level**  51:10
**license**  74:19
**life**  9:24
**light**  44:15
**likely**  34:9
**likewise**  8:6
**limited**  14:15
  34:23
**line**  28:24 77:4
  77:7,10,13,16
  77:19
**link**  11:12,20
**list**  29:17,19
  50:5 68:1,1
**listening**  21:22
**lists**  63:4
**litigation**  13:12
  27:16 55:13,19
  56:22
**little**  7:14,17
  15:3,7 19:21
  23:10 25:11
  26:3 29:3
  39:23 44:18

  45:11 47:10
  52:22 57:12
  59:17
**lives**  24:10
**lodge**  69:13
**log**  15:13
**long**  14:11
  24:18 25:3
**look**  26:18 28:2
  35:11,24 37:2
  41:1 47:1
  58:23 62:22
**looked**  17:8,11
  17:19 18:18
  44:16
**looking**  23:9
  26:23 38:2
  56:7 58:8
  70:23
**looks**  23:10
**lot**  8:19 18:17
  32:20 39:7
  43:11 50:7,21
  59:23
**lyons**  29:22

**m**

**m**  2:12 8:9 55:7
**made**  19:14
  48:10,20,21
  50:14 51:15
  78:5
**mail**  19:22
  21:10 22:9,13

  22:16,20,24
  23:4,16,19,21
  23:24 24:1,5,6
  24:15,19,24
  30:9 32:17
  40:24 44:23
  45:7 49:15,20
  55:6,10 58:16
  58:21,23 59:10
  66:2,16 67:11
  68:24 69:4
  70:14
**mailed**  40:6
  46:10 49:19
**mailing**  45:5
  46:7
**mails**  22:19,23
  23:3,15 24:10
  24:21 32:9
  55:8 56:5
  57:19
**main**  49:7
**make**  7:16 9:24
  19:18 24:24
  26:4 28:1
  33:24 38:24
  40:19 48:8
  53:2 57:23
  65:19
**makes**  46:15
**making**  35:7
  72:8
**management**
  60:14

**marc**  2:22
**mark**  25:9
  27:10 55:3
  58:14 61:23
**marked**  25:6
  52:23 54:7,25
  57:25 58:11
  62:3 64:18
  65:3 68:8,15
  68:22
**match**  48:19
**matter**  6:12
  8:21 13:10
  30:18 59:11
**matters**  59:10
**mean**  9:17,18
  13:18 14:13
  17:21 18:15,16
  18:19 34:5,18
  37:11 40:9,11
  40:21 44:8,21
  48:4,5,13 49:2
  56:10,13 57:10
  66:6
**means**  37:13
  49:11
**meant**  32:7
**measure**  51:12
**media**  6:11
  52:13,19 62:25
  63:7
**meet**  14:23
  16:17,20,23

| | | | |
|---|---|---|---|
| **meeting** 15:1 15:23 | **miller** 1:10 3:2 3:2 4:3 5:4 | **move** 31:21 32:5 33:16,19 | **new** 2:3 20:4 **nodding** 10:3 |
| **megan** 2:22 | 6:12,17,25 7:7 | 36:18 | **nonlawyers** 17:3 |
| **member** 32:13 59:23 64:10 | 7:24 8:9 9:9 12:11 13:2 | **multiple** 34:10 35:21 36:3 | **nonresponsive** 36:21 |
| 67:23 | 19:24 25:6,14 | **mystery** 48:20 | **nope** 21:21 |
| **members** 17:16 31:15 42:16 | 27:11 33:25 36:11 38:2 | **n** | **normal** 51:9,20 **normally** 51:5 |
| **memories** 24:23 39:11 | 45:13 52:21 54:4 55:6 58:9 | **n** 2:1,7 4:1 5:16 6:1 8:9 | **notary** 74:6,14 74:17 78:13,19 |
| **memory** 9:15 17:10 44:12 | 58:16,22 59:17 63:5 64:5 | **n.w.** 2:8 **name** 6:17 7:24 | **note** 6:6 32:15 32:21 69:25 |
| **mention** 60:23 | 69:13 72:23 73:2 74:8 75:5 | 8:7 13:25 56:19 57:5 | 70:3,12,19 76:10 |
| **mentioned** 35:15 50:21 | 76:5 77:2,24 78:2,4,12 | 64:5 | **noted** 6:21 78:7 **notes** 19:18 |
| 61:16 67:17 70:13 | **milstein** 2:3 **mindful** 28:6 | **named** 58:22 **names** 57:11,17 | 75:8 **notice** 71:9,12 |
| **meredith** 2:23 | **minds** 72:7 | **naraprod** 5:13 | **notifications** |
| **message** 44:24 | **mine** 50:20 | 5:14 64:17 | 70:14 |
| **messages** 17:13 17:15,17,20 | **minute** 26:25 37:17,18 58:9 | 65:23 68:7,24 **national** 60:16 | **november** 1:11 6:5 12:20 74:9 |
| 18:8,18 21:7 21:10 | 68:18 69:12 **minutes** 14:12 | 66:1 **nature** 29:25 | 75:5 **number** 5:3,4,5 |
| **messaging** 12:5 | 37:17 | 36:3,7 71:24 | 5:6,13,14 6:15 |
| **messy** 23:10 | **mixed** 31:19 | 72:9 | 20:17,19 21:1 |
| **miami** 74:4 | **moment** 25:10 | **necessary** | 21:16,17,18 |
| **michael** 55:7 55:20 | 27:1 64:2,20 68:5,10,17 | 46:12 78:6 **need** 11:1,3 | 22:5 25:5 52:13,19 54:24 |
| **midatlantic** 76:15 | 72:15 **morning** 6:3,25 | 15:6,11,25 30:10 41:10 | 58:10 61:25 64:17 65:23 |
| **middle** 44:15 62:22 | 7:11,24 **motion** 33:20 | 51:6 65:10 **never** 40:9 | 68:7,24 |
| **midst** 26:1 | | 57:23 59:20,23 60:4,7,10,13,16 | |

| | | | |
|---|---|---|---|
| **number's** 21:20 | **odd** 15:15 | 15:23 16:11 | **osc** 61:15 |
| **numbered** 75:7 | **offer** 28:13,18 | 18:2 21:25 | **outside** 71:17 |
| **numerous** 50:22 | **office** 28:5 29:9 | 23:8,13 26:5 | **overwhelmin...** |
| **nw** 2:3 | 29:11 30:2,7 | 26:15 31:21 | 40:14,20,21 |
| | 30:14 31:16 | 35:23 36:11,24 | **own** 28:13,18 |
| **o** | 32:8 33:8,12 | 38:2 39:16 | 47:14 54:23 |
| **o** 5:16 6:1 | 35:20 36:5 | 41:1 43:21 | **p** |
| **oath** 4:6 8:25 | 39:2,4,6,19,25 | 44:18 52:10,11 | **p** 2:1,1 5:16 6:1 |
| 74:1 | 40:5,22 41:18 | 52:21 53:18 | 8:9 |
| **obas** 1:16 6:19 | 42:6,16 45:16 | 54:4 58:8,13 | **p.m.** 1:12 66:9 |
| 74:6,14 75:3 | 45:21 46:18 | 58:18,23 62:6 | 69:5 73:9 |
| 75:21 | 59:21,25 60:2 | 63:17 64:2 | **page** 4:2 5:2,12 |
| **object** 10:19,20 | 60:5,7,13 | 65:5,8,17 | 27:18 58:24 |
| 16:7 63:13 | 61:14,15,16 | 68:15,20,22 | 62:14,17,18,22 |
| 66:20 67:2,7 | 62:11 63:10 | 69:8 70:19,23 | 65:10,22 66:2 |
| 67:14 69:11,21 | 67:19,23 70:8 | **once** 10:13 | 68:24 69:24 |
| 70:10 71:16 | **official** 28:7 | 11:25 16:20 | 77:4,7,10,13,16 |
| **objection** 10:21 | 37:6 39:20 | 20:21,22 | 77:19 |
| 13:13 53:8 | 41:3 42:1 43:7 | **ones** 49:7 | **pages** 75:7 |
| 63:15,16 69:13 | 44:25 45:6 | **open** 11:16,22 | **paradox** 33:7 |
| **obtain** 40:1 | 47:2,6,12,15,24 | **opening** 12:12 | **paragraph** |
| **obtained** 40:22 | 48:2 49:15 | **operated** 23:20 | 28:2,3 29:7,16 |
| **obvious** 43:8 | 50:1 62:25 | 23:22 24:7 | 29:20 30:13 |
| 57:2 | 63:6 71:15,24 | **opinion** 28:14 | 31:14 34:14,15 |
| **obviously** | 72:8 74:11 | 28:19 33:5 | 34:23,25 35:25 |
| 30:24 38:17 | **officials** 5:9 | **opinions** 54:9 | 35:25 37:3,3,4 |
| **occasion** 31:15 | 62:2,8,24 63:4 | **oppose** 36:22 | 38:3,7,22 |
| 33:12 42:15 | **oh** 25:19 44:12 | **opposing** 33:20 | 39:16,17 41:1 |
| **occasions** 35:21 | 46:15 63:14 | **organizational** | 41:8 42:23,25 |
| 36:3 | **okay** 8:2,5 10:5 | 46:18 | 44:7 47:1,12 |
| **occurred** 20:23 | 10:16,17,23 | **organized** | 48:12,24 49:24 |
| | 11:7,18 12:13 | 46:19 | 51:3 |
| | 12:17,22,23,25 | **orlando** 1:14 | |
| | 13:1 14:17 | | |

[paragraphs - precise]                                                    Page 15

**paragraphs**
  44:4
**paralegal** 2:23
**parker** 2:21
**part** 18:1 34:17
  34:18,21,24
  35:1 38:17
  56:19
**participants**
  6:9
**participated**
  35:4
**particular**
  67:10
**parties** 5:19
  75:14,15
**partner** 59:9
**passed** 64:9
**pat** 39:9,9
**patch** 59:1
**patrick** 2:23
  3:1 67:22
**paying** 13:11
  14:4
**pdf** 62:16
**pen** 59:2,12
**pending** 11:6
  63:18
**people** 8:18
  25:4 29:21
  31:1,11 63:5
  65:2
**period** 12:20,22
  12:22,25 17:14

20:11,14,20
21:5,8,11,14
22:2,7,21,25
23:17,20,22
24:3,5,7,14,20
35:9 45:14,15
45:20
**periodically**
  28:5 29:12
  30:14 32:8
**perpetuity** 45:1
  46:6
**person** 9:18
  26:16 32:20
**personal** 21:13
  22:2,5 23:24
  24:13
**personally** 14:4
  18:11 34:15
  35:19 47:19
  59:7
**personnel**
  60:14
**pertain** 12:25
**philbin** 39:9
  67:22,22
**phone** 12:15
  16:23,25 19:23
  20:15,17,19
  21:1,5,8,11,13
  21:16 22:2,4,5
  22:6 57:14,21
**phones** 49:15

**phrase** 29:3
  38:4
**phrased** 14:21
**phrasing** 19:6
**pivot** 7:13
**place** 1:13
**places** 39:10
  46:21,23
**plaintiff** 2:5
**plaintiffs** 1:5
  5:3,4,5,6 7:25
  25:5,9 27:10
  54:24 55:3
  58:10 61:25
  64:11 72:23
**platform** 11:13
  11:21 25:21,25
  65:7,9
**plausibly** 33:13
**please** 6:6,23
  7:1 8:4,7 10:13
  11:1,11 12:16
  16:16 19:8
  21:18 25:9,11
  26:24 27:10
  38:8,24 41:12
  47:22 48:17
  49:11 50:5
  53:6 55:2 56:9
  58:13 61:22
  62:14,19 68:18
  69:12 70:25
  71:1 72:14

**pllc** 2:3
**point** 24:11
  33:7 35:7
  42:13,23,24
  54:13 56:3
  61:12
**policy** 29:24
  30:23
**political** 5:7
  62:1,7 70:20
**polls** 44:14
**poorly** 16:15
**pops** 11:25
  12:3
**populated** 68:9
**portal** 12:7
**portion** 14:16
  33:17 35:17,18
  69:24
**possibility** 44:9
**possible** 7:16
  9:18 34:9 45:4
  65:14
**possibly** 32:11
**power** 31:5
**powers** 33:9
  64:8
**precede** 41:10
**precedes** 38:12
  47:17
**preceding** 38:7
  44:3
**precise** 44:12
  61:18

**precisely** 70:16
**prefers** 45:19
**preparation**
 14:24 18:9,12
 19:11,15,19
**prepare** 14:7
 15:2 16:18,21
 16:24 17:6
**prepared** 75:10
**preparing**
 27:22
**preposterous**
 35:8
**prerogative**
 33:10
**prerogatives**
 31:5,17
**present** 2:17
 17:3 29:18
 34:11 35:8
**preservation**
 60:23
**preserve** 43:9
 44:21 45:4,24
**preserved**
 22:20,24 23:6
 23:16 25:3
 41:5,21 42:2,9
 43:17 44:19,25
 46:24 48:23
**preserves** 46:6
**preserving**
 46:9

**president** 2:15
 33:14 41:24
 42:17 43:6
 47:7 50:2,11
 50:12 51:14
 54:14,20 55:18
 57:3 64:7
 66:18 67:12
**president's**
 31:2,17 37:6
 41:4,20 42:8
 43:17 45:24
**presidential**
 5:10 13:23
 20:1 29:22
 31:5,19 33:9,9
 40:1 49:5 56:1
 60:23 62:2,8
**presume** 59:10
**pretty** 20:22
 24:17 56:13
 57:2
**previous** 70:23
 72:1
**primarily** 39:3
 40:11,12
**prior** 59:18
**privacy** 21:19
**privilege** 14:20
 15:20 16:7
 53:11,15,17
**probably** 13:16
 14:12 31:11
 34:10 35:5

 56:10
**problem** 14:22
**problematic**
 30:16
**procedures**
 52:5
**proceed** 64:1
**proceeding**
 1:13 10:8
 30:17 31:10
 64:7
**proceedings**
 27:5 37:23
 52:16 53:25
 72:20
**process** 20:4,9
 39:23 45:12
 50:10 51:4,16
 51:20 52:22
 53:1,2
**processes** 52:4
**produce** 17:24
**produced** 18:1
 51:10 66:1
 74:19,19
**production**
 18:1
**products** 32:15
**promulgated**
 61:3
**protocol** 50:5
**protocols** 47:5
 50:1,8,16,19,23
 51:2,6

**provide** 23:12
 30:5 32:22
 33:4,18 47:20
 54:14
**provided** 15:22
 20:15 27:15
 38:23 39:6
 48:3 51:12
 54:11,20
**providing**
 70:16
**public** 74:6,14
 78:19
**pull** 61:22
**pulling** 24:23
**purporting**
 28:13,18 29:4
**purposes** 20:15
 45:16 48:8
**put** 12:16 40:13
 43:8 51:11
 65:15,17 68:4
 70:25 71:1

**q**

**quality** 6:7,8
**question** 7:13
 10:8,10,13,14
 10:16,18,19,20
 10:22 11:5,6
 13:16 14:21
 15:25 16:9,15
 18:22 19:6,8
 20:1 23:11

28:24 30:3,11
30:15,20 31:23
32:6,11,23,24
33:6,19 34:7,8
34:12 36:16,21
38:18 46:1
47:22 51:23
53:11,14,16,19
54:5 61:1,5
71:21
**questions**  8:1
10:3 12:20,24
15:5,7,19 16:5
18:3 19:22
30:24 31:4,8,9
36:12,17 48:15
56:16 63:18,20
63:23,24,25
72:11,24
**quick**  52:9
**quite**  28:15
**quiz**  64:9
**quote**  49:9,17
51:7

**r**

**r**  2:1 6:1 8:9
77:3,3
**raise**  7:1
**rally**  72:3
**random**  46:20
46:21,22,23
**range**  55:3
58:14

**rather**  10:3
**rdriscoll**  2:10
76:2
**reach**  47:19
**read**  38:7 60:19
61:6 72:2 76:9
78:5
**reading**  5:20
58:20
**real**  40:10 49:3
**reality**  39:18
**really**  18:17
33:1,1,2 34:6
43:12 51:6,18
51:18,18 55:24
59:7
**reason**  9:15,20
30:17,20 31:7
31:8,13 32:20
32:21 35:17
76:11 77:6,9
77:12,15,18,21
**reasons**  12:7
21:19 40:15
**recall**  8:21
24:12,19 33:11
35:2 36:5 37:5
42:15 61:11
64:14
**receipt**  76:17
**receive**  21:7,10
40:23 67:18,18
**received**  22:23
23:4,15 24:22

29:8
**receiving**  66:15
**recent**  57:13
**recently**  55:25
**recess**  27:4
37:22 52:15
53:24 72:19
**recipients**  68:2
**recognize**
25:14 27:11
57:11 66:15
67:5,10 69:3
**recollection**
63:9
**recollections**
54:9
**record**  6:4,22
8:8,13 11:24
12:17 17:25
25:23 26:24
27:3,7 32:1,19
37:21,25 42:1
42:21 44:24
46:7,9 51:14
52:13,18 53:23
54:2 65:21
68:23 72:15,18
72:22 75:8
**recorded**  6:10
6:11
**recording**  6:7
**records**  43:7
**redundancy**
46:14

**refer**  12:21
17:13 43:19
**reference**  29:16
**referenced**  18:8
34:14 48:24
50:17 76:6
**referencing**
29:20 41:8
50:6 51:3
**referring**  34:16
34:20 38:5
47:14 49:1
**refers**  41:16
48:14
**refine**  15:7
**reflected**  51:14
**refrain**  12:12
**reframe**  47:22
**refresh**  63:9
65:10
**refreshed**
17:10
**regarding**  54:8
57:24
**regardless**
39:20
**regular**  11:3
12:1
**regulations**
61:3,6
**reif**  2:22
**related**  16:3
**relatedly**  12:15

**relative** 75:13
  75:15
**relatively** 51:9
  51:20
**relevant** 12:22
  12:25 17:14
  20:11,14,20
  21:5,8,11,14
  22:2,6,21,25
  23:17,20,22
  24:3,4,7,14,20
  40:3 45:13
  59:19 71:23
**rely** 45:23
**remain** 28:6
**remarkable**
  51:22
**remarks** 66:18
  71:24 72:3,4,9
**remember**
  13:24,25 17:22
  20:18,23 24:2
  32:14 33:12
  39:5 58:3
**remembering**
  39:3
**remote** 1:13
  11:9
**repeat** 19:9
  23:11 37:15
**repeating**
  38:14
**rephrase** 47:22

**report** 75:4
**reported** 1:16
**reporter** 6:19
  6:23,25 7:10
  9:25 10:1
**reporter's** 4:6
  75:1
**represent**
  13:11 14:5
  55:17 64:7
  65:25 66:4
**represented**
  13:3
**representing**
  6:17 13:6,9
  55:12 57:2
**represents**
  56:17,21
**requested** 75:6
**required** 78:13
**resembles**
  44:11,11
**reserved** 5:21
**reshare** 26:21
**respect** 51:5
**respective** 5:19
**restriction** 71:8
  71:12
**restrictions**
  70:4,21
**return** 76:13,16
**returned** 54:13
**review** 17:6,17
  17:18 18:8,25

19:5,11,15
  39:24 40:1,7
  40:23 45:12
  49:4,5 50:5,13
  51:13 60:25
  61:4,19 75:6
  76:7
**reviewed** 18:12
  39:19
**reviews** 47:6
  50:1,16,20,23
  51:2,6
**right** 7:1 10:11
  14:1 18:17
  19:21 20:2,8
  21:20,23 25:8
  27:9 32:11,17
  33:3,16 35:6
  36:1 38:11
  40:12 44:1
  45:11 47:10
  52:8 55:2 56:7
  56:11 59:15
  61:20 63:18
  64:13 65:20,20
  68:4 70:17
  72:14
**robert** 2:7
  45:14 51:24
  55:7 76:1
**role** 20:7 22:10
  56:8,12
**roles** 30:23

**room** 9:9
**ross** 29:23
**roughly** 20:24
**routed** 47:4
  49:9,21
**rpr** 1:16 74:6
  74:14 75:3,21
**rules** 9:24
  14:10,16

**s**

**s** 2:1,5,10 5:1
  5:16,16 6:1 8:9
  77:3
**salary** 20:9
**sarcastic** 16:15
**saved** 46:11
**saves** 46:4
**saving** 46:5
**saying** 10:2
  29:1 30:13
  33:13,25 34:6
  40:20 44:12,14
  44:15 51:21
**says** 41:25 44:7
  59:12 62:11
  63:2,8 70:3,19
**schedule** 54:11
**sco** 61:12,13
**scope** 15:25
  71:17
**screen** 6:10
  11:10 12:3
  25:20 26:9,11

58:25 65:15
71:5
**screens** 68:11
**seal** 62:11
74:11
**sec** 50:9
**second** 11:17
65:19
**secondhand**
35:4
**seconds** 26:7
**secretary** 29:22
40:3,4 50:9
64:15 66:2,16
69:4
**secretary's**
70:8
**section** 38:19
41:16
**security** 12:7
**see** 12:2 16:12
26:23 27:19
41:10 47:8
50:3 56:18
59:3 62:23
65:4,12,13
66:24 67:22
69:1 70:1,5
71:2,3,6
**seeing** 25:18,25
26:8,10,16
56:15 65:2,6,9
**seems** 15:15

**seen** 6:9 34:15
35:2
**segregate** 57:16
**select** 8:23
**self** 20:3
**sellers** 2:3
**semantic** 49:3
**send** 21:7,10
46:5
**senior** 5:8 28:5
29:12,13,15,19
30:14 32:8,13
33:14 34:2
37:5,8 38:22
42:17 62:1,7
62:23
**sense** 9:17,18
24:24 46:2,16
51:19 53:3
**sent** 22:19
24:21 76:14
**sentence** 35:13
35:24 37:2,10
38:11,12,12,15
39:17 44:13
47:16,24 48:12
63:3 70:19
**sentences** 41:10
**serve** 29:4
**server** 25:3
49:15
**service** 28:4
**set** 59:15 72:2

**seven** 17:18
**several** 18:18
33:8 63:5
**shaking** 10:3
**share** 11:13,21
21:22 25:21,24
26:11,20 64:13
65:7,9 68:10
**shaw** 2:12 4:5
26:13 55:9
56:6,25 57:8
57:15 58:5
63:23 64:1,2,4
64:5,19,24
65:1,5,8,18,21
65:24 66:22
67:4,9,16
68:12,14,21
69:16,23 70:18
70:25 71:7
72:11 73:2
**sheet** 4:7 76:11
**shorter** 42:24
**show** 24:21
**showing** 25:18
25:19 56:5
68:15,22
**shown** 9:7
11:10
**shows** 72:6
**side** 68:4
**sidebar** 53:6
**sign** 76:12

**signature** 27:19
27:20 74:13
75:20
**signed** 76:19
**significance**
71:22
**significant**
35:18
**signing** 5:20
**similarly** 22:23
**simply** 44:23
**sir** 26:16 65:25
66:4 72:11
**sit** 13:24 56:13
**sitting** 57:2
**smiller** 5:4,5
54:25 55:4
58:11,15
**solely** 14:15
**solemnly** 7:2
**solutions** 6:18
6:20 76:23
**somebody**
44:10 46:3,3
48:3
**soon** 46:2,3
**sorry** 7:20 23:2
23:9 28:10
54:17 68:17,20
69:12
**sort** 26:25
30:16 42:4,21
44:2

| | | | |
|---|---|---|---|
| **sound**  10:11 | **spell**  8:7 | 41:2 43:6 47:2 | **strong**  17:18 |
| **source**  54:19 | **spin**  7:17 | 61:2,9 63:4 | 30:25 31:3,10 |
| **speak**  16:13 | **spoke**  31:22 | **stenographic** | **subject**  34:11 |
| 54:22 | **spoken**  59:7 | 6:22 75:8 | 39:9 58:22 |
| **speaks**  28:21 | **ss**  74:4 | **stenographic...** | 71:19 |
| 28:23 43:7 | **staff**  20:5,6 | 1:16 75:4 | **subjected**  47:5 |
| **special**  59:25 | 28:6 29:12,13 | **step**  48:17 | 49:25 |
| 60:5 61:14,15 | 29:15,19,22 | **stephen**  1:10 | **submitted**  49:4 |
| 62:12 63:10 | 30:14 32:8,13 | 3:2 4:3 5:3 | 49:5,6 |
| **specific**  28:24 | 34:2 37:5,8 | 6:12 7:7 8:9 | **subscribed** |
| 50:24 | 38:22 39:19 | 25:6 63:5 74:8 | 78:14 |
| **specifically** | 40:3,4 49:4 | 75:5 76:5 77:2 | **subsection** |
| 39:3 | 50:9,9,12,18 | 77:24 78:2,4 | 62:19,23 63:3 |
| **speculate**  14:1 | 51:10 64:15 | 78:12 | **subsequently** |
| **speech**  40:22 | 66:2,16 69:4 | **stephen.miller** | 57:18 |
| 44:21 45:4,5 | 70:8 71:14 | 22:14 | **substance** |
| 45:12 47:3,4 | **staffers**  68:2 | **sticker**  26:4 | 14:18 36:3,7 |
| 47:13,15,25 | **stamp**  65:22 | **stipulated**  5:18 | 36:20 57:24 |
| 48:2,15,18,21 | **standard**  66:7 | **stop**  26:20 | **suggestions** |
| 48:25 49:8,19 | **started**  15:5 | **stopped**  24:11 | 50:13 |
| 49:21,25 51:10 | **starting**  33:17 | **straightforward** | **suite**  2:9,14 |
| 51:15 67:11 | **state**  8:7 19:8 | 51:9 | **summarize** |
| 69:9,18 70:20 | 36:1,19 41:24 | **stream**  50:15 | 34:21 |
| 71:14,15 | 74:3,7,14 | **street**  2:8 | **summarizing** |
| **speeches**  39:20 | **statement** | **stricken**  36:8 | 34:17,18,23 |
| 40:1,2,6 41:5 | 28:10,17,20 | 36:21 | **summary**  47:17 |
| 41:21 42:9 | 36:15,17 44:19 | **strike**  31:21 | 47:19 |
| 43:17 44:19 | 47:20 48:11 | 32:5,19 33:17 | **summoned** |
| 45:24 47:6 | 50:6 | 33:21 35:16 | 30:17 |
| 50:2 60:23 | **statements** | 36:18 37:14 | **sunday**  69:4 |
| 64:15 70:8 | 36:13 47:6 | 38:20 42:21 | **superior**  31:1 |
| **speechwriters** | 50:1 | **striking**  35:21 | **supervision** |
| 29:23 | **states**  1:1 6:14 | 38:15 | 75:11 |
| | 28:3 39:17 | | |

[supposed - time]                                        Page 21

| | | | |
|---|---|---|---|
| **supposed**  15:4 | **tabs**  26:19 | **termed**  8:23 | **think**  8:19 |
| 15:11,13 | **take**  11:3 37:16 | 31:12 | 13:21 16:9 |
| **sure**  19:9 24:16 | 37:18 41:12 | **terminology** | 18:15,22 20:25 |
| 24:17 25:3 | 52:9 55:10 | 8:19 61:18 | 24:4,4,9,18 |
| 27:1 28:1 | **taken**  27:4 | **terms**  8:17 | 28:21,25 30:18 |
| 33:24 39:13,13 | 37:22 52:15 | 49:14 50:8 | 32:23 33:6 |
| 40:19 41:12 | 53:24 72:19 | **testified**  7:9 | 35:6 41:15 |
| 47:23 50:19 | **takes**  26:2 | 13:2 | 42:11 43:23 |
| 56:13 57:23 | **talk**  14:18 32:2 | **testify**  9:21 | 45:8,17,17 |
| 65:20 72:16 | 39:23 45:11 | **testimony**  4:3 | 46:3,3,5,6 |
| **surmised**  64:6 | 52:21 59:17 | 7:2 33:24 73:7 | 47:16 51:17 |
| **surprised** | **talking**  16:2 | 76:9,17 78:8 | 56:2,4,10 |
| 24:22 | 40:11 | **text**  17:13,15 | 57:10 58:18,24 |
| **swear**  6:23 7:2 | **task**  50:17 51:1 | 17:17 18:7,18 | 61:15,17,17 |
| **switch**  19:21 | **tasked**  72:7 | 21:7 27:25 | 62:18 67:17 |
| **sworn**  7:9 74:9 | **team**  39:14 | 44:24 60:22,25 | 70:12 72:6 |
| 78:14 | 56:14 64:11 | **thank**  7:10 12:9 | **thinking**  8:17 |
| **system**  22:21 | **tech**  26:25 | 23:8 25:12 | 33:10 |
| 22:25 23:17 | **technological** | 38:25 46:25 | **thirdhand**  35:5 |
| 41:6,22 42:2 | 49:13 | 61:24 63:21,22 | **thought**  14:2 |
| 42:10 43:10,18 | **technology** | 68:12,19 69:14 | **thoughtful** |
| 44:20,22 45:5 | 46:12 | 72:12,13,25 | 61:24 |
| 45:25 46:14,15 | **teleprompter** | 73:1,2,4 | **thoughts**  54:9 |
| 47:5 48:23 | 49:6 | **thanks**  38:10 | **thread**  58:16 |
| 49:9,12,17,22 | **tell**  12:24 15:4 | 41:14 53:20 | **three**  37:9 |
| 51:11 60:24 | 15:11,13,17 | 68:13 73:5 | **tilt**  7:13 |
| **systems**  46:18 | 21:18 41:19 | **thing**  9:19 12:1 | **time**  1:12 6:4 |
| **t** | 42:7 43:15 | 35:14 38:19 | 6:21 8:4 12:20 |
| | 49:11 56:8 | 43:8 44:15 | 12:21 19:7 |
| **t**  5:1,16,16 8:9 | 71:12 | **things**  29:25 | 20:22 24:13,18 |
| 77:3,3 | **telling**  35:17 | 31:10 35:4 | 26:3 27:2,6 |
| **tab**  25:8 27:9 | **tenure**  66:13 | 44:5,5,6 46:19 | 28:4 37:20,24 |
| 55:2 58:13 | **term**  17:19 | 59:23 | 39:12 41:12 |
| 61:22 | | | 43:14 45:15,20 |

**[time - unpack]**

52:12,17 53:22
54:1,11 56:3
57:19 58:21
63:21 66:5,6,7
66:23 72:17,21
72:24,25 73:2
73:6 76:18
**timeframe**  76:8
**times**  8:16,18
**timestamp**  66:5
**title**  45:15,19
62:6
**tiwari**  2:19
**today**  8:1 9:9
9:16,21 12:19
13:24 21:17
33:1 56:13,24
57:2,9 63:20
64:9,14 73:3
**today's**  12:11
13:3,6 14:7,24
15:2 16:18,21
16:24 17:7
18:9 19:11,15
19:19 70:13
73:7
**together**  14:12
31:20 43:8
59:9
**told**  42:25 43:1
43:3,5 44:5
**toll**  2:3
**top**  58:24

**touchstone**
41:2,19 42:7
43:15
**towards**  7:14
7:17
**track**  48:21
**trail**  47:3 48:13
48:18
**trainor**  2:23
3:1
**transcript**  5:21
23:9,10 75:6
75:10 76:6,19
78:5,8
**transition**  20:2
20:7,9 56:1
**transmitting**
66:17
**tread**  15:19
**trial**  9:1,6
**trivia**  64:9
**trouble**  8:5
24:23 64:22
**true**  48:10 75:8
78:8
**trump**  1:7 2:15
5:8 6:13 20:12
22:10,16 24:15
47:7 50:2 57:3
61:12 62:1,7
62:24 63:4
64:7 66:18
67:12 76:4
77:1 78:1

**trump's**  10:19
54:14,20 55:18
63:19
**truth**  7:3,3,4
**try**  11:2 16:11
16:16 31:24
**trying**  24:2
30:12 32:19
34:13 35:16
38:20
**turn**  27:18 55:2
58:13 62:14
**turned**  18:20
25:4
**two**  37:17,18
44:1,14
**type**  74:19
**typical**  67:6
**typically**  67:18

**u**

**u**  5:16
**u.s.**  59:25 60:4
**uh**  23:14 38:9
39:22 49:10
50:4
**ultimately**  72:9
**unclear**  37:8
**unconstitutio...**
31:18 42:18
**unconstitutio...**
43:2
**under**  8:25
15:25 75:10

**undergirds**
42:20
**underneath**
42:22
**underscore**
43:25
**underscored**
39:18
**understand**
8:25 9:3,6
10:14,16 15:12
16:12 28:1
30:12,18 32:7
33:24 35:22
40:19 44:23
46:23 48:22
49:18 57:23
59:8 66:11
**understanding**
22:19 42:5,19
42:25 45:3
53:4
**understood**
16:15 35:13,14
41:24 44:6
47:16
**unit**  6:11
**united**  1:1 6:14
43:6 61:2,9
**unofficial**  28:7
37:7 39:21
41:4 71:15
**unpack**  43:12
47:10

**unparalleled**
64:8
**unquote** 51:7
**urbanek** 2:25
55:7,15,17
57:8 58:5,17
59:1
**use** 12:7 21:5
22:2 45:19
**used** 22:10
24:25 66:6
76:19
**using** 11:12,13
24:11,13,19,25
38:4
**utc** 66:3,4 69:5

**v**

**v** 6:13 76:4
77:1 78:1
**vagaries** 43:4
**vague** 16:9
**vanessa** 1:16
6:19 74:6,14
75:3,21
**various** 50:10
66:17
**verify** 76:9
**veritext** 6:18,20
11:13,20 25:21
76:14,23
**veritext.com.**
76:15

**version** 49:3,4
49:6,19 59:13
**versions** 47:4
48:25 49:1,8
49:25
**video** 6:11 17:1
27:3,7 37:21
37:25 52:13
53:23 54:2
72:17,22
**videoconfere...**
74:9
**videographer**
3:2 6:3,18 7:12
7:16 9:25 26:1
26:6,10,15
27:1,6 37:20
37:24 52:12,17
53:22 54:1
62:16 64:21
65:6,16,19
68:9 71:4
72:16,21 73:6
**videotape** 9:7
**videotaped** 9:4
73:8
**view** 25:22
42:14 71:23
72:6
**viewed** 71:14
**views** 30:25
31:1,3,4,10
43:2

**violated** 61:10
62:24 63:5,10
**virginia** 2:14
**virtually** 6:7
**volunteer**
36:13,15,17
**vs** 1:6

**w**

**wait** 10:7,9
**want** 18:3 36:1
40:10 43:25
44:8 48:1
**wanted** 32:21
**wants** 53:10
**warning** 72:4,6
**warrington**
55:9,22 57:8
57:15,17,21,24
**washington** 2:4
2:9
**way** 14:21
21:20 23:12
28:16,21 36:11
36:19 40:13
41:23 42:12
43:22 44:2,2
45:10 46:1,20
49:21 55:5
**ways** 45:8
**we've** 52:8,23
**wednesday**
66:3

**weird** 33:6
**welcome** 62:5
**went** 51:19
**whichever**
45:19
**white** 22:4,9,15
22:20,21,24,24
23:4,6,15,16
28:4,5 29:8,11
30:1,7,13,22
31:15 32:7,13
33:8,12 34:1,2
35:20 36:4
39:1,3,5,18,19
39:25 40:4,22
40:24 41:5,18
41:21 42:2,9
42:16 43:9,14
43:18 44:20,22
45:4,6,6,24
46:13,15 47:5
48:23 49:9,12
49:12,14,17,19
49:20,22 50:10
50:12 51:11
59:20 60:24
66:13,17,24
67:19,23 68:1
69:5,19 71:13
71:23
**who.eop.gov.**
22:14
**william** 2:20
3:2 6:17

| | |
|---|---|
| **wilson** 2:23 | **works** 36:11 |
| **windows** 12:13 | 46:12 |
| **wish** 42:23 | **worries** 7:21 |
| **witness** 4:6 6:9 | **worry** 36:9 |
| 6:24 7:5,8,15 | **worthington** |
| 8:11,14 13:19 | 29:23 52:4 |
| 13:21 26:14 | **wright** 2:8 |
| 30:19 31:25 | **write** 54:6 |
| 33:25 53:6,10 | **writers** 51:25 |
| 53:13,16 61:24 | **writes** 59:1 |
| 63:14,17 66:21 | **writing** 35:3 |
| 67:3,8,15 | **written** 44:24 |
| 69:15,22 70:11 | **wrote** 52:24 |
| 71:3,6,19 | 53:5 |
| 72:13 73:1,4 | **x** |
| 74:1,7,11 75:5 | **x** 4:1 5:1 |
| 75:9 76:8,10 | **y** |
| 76:12,18 | **yeah** 7:15 8:12 |
| **witnessed** 35:1 | 10:24 26:1,15 |
| **word** 17:22,22 | 37:18 51:8 |
| 46:4 55:10 | 53:13 65:12,16 |
| 56:18 69:25 | **years** 34:12 |
| **words** 33:3 | 35:10 39:8 |
| 37:9 44:1 | **yep** 12:14 |
| 48:15 52:25 | 53:21 62:20 |
| 53:3 56:4 | 65:18 |
| **work** 20:15,19 | **york** 2:3 |
| 21:1,5,8,11 | **z** |
| 49:18 59:18 | **zoom** 2:6,11,16 |
| **worked** 20:11 | 11:12,20 25:11 |
| 59:9,20,22 | 25:20 26:11,17 |
| 60:16 | 26:17 55:5 |
| **working** 22:16 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.