# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BARBARA J. LEE *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP *et al.*, <br><br> Defendants. | Case No. 21-cv-00400 (APM) <br><br> *Consolidated Cases:* <br> *21-cv-00586 (APM)* <br> *21-cv-00858 (APM)* <br> *21-cv-02265 (APM)* <br> *22-cv-00010 (APM)* <br> *22-cv-00011 (APM)* <br> *22-cv-00034 (APM)* <br> *23-cv-00038 (APM)* |

## PRESIDENT DONALD J. TRUMP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION TO RECONSIDER DENIAL OF HIS MOTION TO DISMISS ON FIRST AMENDMENT GROUNDS

Jonathan M. Shaw
D.C. Bar No. 446249
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite 402
Alexandria, Virginia 22314
Telephone: (703) 574-1206
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com

Scott Gessler
GESSLER BLUE LAW
7350 E. Progress Place, Suite 100
Greenwood Village, Colorado 80111
Telephone: (720) 839-6637
sgessler@gesslerblue.com

Jesse R. Binnall VA022
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
jesse@binnall.com

*Attorneys for Defendant President Donald J. Trump*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................... i

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ............................................................................................ 5

PROCEDURAL BACKGROUND ..................................................................... 7

FACTUAL BACKGROUND ............................................................................. 9

ARGUMENT ................................................................................................. 11

   I.   Reconsideration is Appropriate Under FRCP 54(b) ...................... 11

   II.  The Court Should Reconsider its Incitement Order in Light of *Counterman* 13

       a. Legal standards for incitement after Counterman ................................... 16

       b. This Court failed to properly evaluate the words used to establish that the first *Brandenburg* element is met ............................................................ 21

       c. This Court impermissibly leaned on the "broader context" in evaluating the Brandenburg factors ........................................................... 27

       d. This Court's Order, if not revised, will open floodgates for incitement decisions against regular citizens ............................................................ 29

CONCLUSION ............................................................................................... 32

## TABLE OF AUTHORITIES

### Cases

*American Freedom Defense Initiative v. Metropolitan Transp. Authority,*

    70 F. Supp. 3d 572 (S.D.N.Y. 2015) ........................................................................ 20

*Bible Believers v. Wayne County,*

    805 F.3d 228 (6th Cir. 2015) (en banc) ................................................ 13, 14, 24, 26

*Blassingame v. Trump,*

    87 F.4th 1, 27 (D.C.C. 2023) ........................................................................... passim

*Brandenburg v. Ohio,*

    395 U.S. 444, 447 (1969) ................................................................................. passim

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.,*

    630 F.3d 217, 227 (D.C. Cir. 2001) ........................................................................ 10

*Cobell v. Jewell,*

    355 F. Supp. 2d 531, 540 (D.C.C. 2005) ................................................................. 11

*Cobell v. Jewell,*

    802 F.3d 12, 25 (D.C. Cir. 2015) ............................................................................ 10

*Cobell v. Norton,*

    224 F.R.D. 266, 272 (D.D.C. 2004) ........................................................................ 11

* *Counterman v. Colorado,*

    600 U.S. 66 (2023) ........................................................................................... passim

*Cox v. Louisiana,*

    379 U.S. 536, 578 (1965) (Black, J, concurring) ................................................... 14

*Federal Election Commission v. Wisconsin Right to Life, Inc.,*

    551 U.S. 449, 468-69 (2007) ........................................................................... 5, 25

*Gertz v. Robert Welch, Inc.,*

    418 U.S. 323, 340 (1974) .................................................................................. 15

*Greene v. Union Mut. Life Ins. Co. of Am.,*

    746 F.2d 19, 22-23 (1st Cir. 1985)..................................................................... 10

*Hess v. Indiana,*

    414 U.S. 105, 107-109 (1973) ..................................................................... passim

*Molock v. Whole Foods Mkt. Grp., Inc.,*

    317 F. Supp. 3d 1, 4 (D.C.C. 2018)..................................................................... 7

*NAACP v. Claiborne Hardware Co.,*

    458 U.S. 886, 927-929 (1982) ................................................................... passim

*New York Times Co. v. Sullivan,*

    376 U.S. 254, 280 (1964) .............................................................................. 17, 20

*Nixon v. Fitzgerald,*

    547 U.S. 731, 742-43 (1982) ............................................................................... 7

*Nwanguma v. Trump,*

    903 F.3d 604, 609 (6th Cir. 2018) ............................................................. passim

*Singh v. George Wash. Univ.,*

    383 F. Supp. 2d 99, 101 (D.C. Cir. 2005) .......................................................... 11

*Snyder v. Phelps,*

    562 U.S. 443, 453-54 (2011) ............................................................. 14, 24

*Speiser v. Randall,*

    357 U.S. 513, 526 (1958) ...................................................................... 15

*Thompson v. Trump,*

    590 F. Supp. 3d 46, 115 (D.D.C. 2022)........................................... passim

*Voisine v. United States,*

    579 U.S. 686, 691 (2016) ...................................................................... 21


**Statutes**

28 U.S.C. § 1292(b) ................................................................ 5, 6, 7, 10, 11


**Other Authorities**

Adam Liptak, *Chief Justice Samples Eminem in Online Threats Case*, THE NEW

    YORK TIMES (December 2, 2024) ............................................................ 28

Mem. Op. And Order, *Garza v. Trump,* Case No. 1:23-cv-00038-APM (D.D.C.

    January 2, 2024), ECF No. 55................................................................. 6

Tr. of Argument, *Blassingame v. Trump,* No. 22-5069 (D.C. Cir. Dec. 7, 2022) ...........

    ......................................................................................... 8, 11, 22, 27


**Rules**

Fed. R. Civ. P. 54(b) ............................................................................. 9

## INTRODUCTION

In 1969, *Brandenburg v. Ohio* held that before a Court may proscribe speech as incitement to violence, it must determine that *each* of the following factors is met: (1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intended the speech to result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech. *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969).

In February 2022, this Court became one of the first to ever proscribe speech under *Brandenburg,* by holding that Plaintiffs had plausibly alleged that when President Donald J. Trump spoke at a rally on January 6, 2021 (the "Rally"), he incited the crowd to violence. *See Thompson v. Trump,* 590 F. Supp. 3d 46, 115 (D.D.C. 2022) (the "Order"). In doing so, the Court focused on what it concluded was President Trump's intent and what it called "the broader context" — in the sense of President Trump's supposed knowledge of the likely effect of his words on his audience — rather than on whether President Trump's words themselves call for violence or illegal activity (they indisputably do not). *Id.* Put differently, this Court used President Trump's supposed intent as a prism through which it examined and interpreted his words to conclude they implicitly incited violence or illegal activity.

In June 2023, the Supreme Court decided *Counterman v. Colorado,* 600 U.S. 66 (2023), which holds that **intent is a one-way ratchet,** the sole constitutionally permissible purpose of which is to protect a speaker, not penalize him. Under *Counterman,* intent can save facially unprotected speech from incitement liability,

but it cannot be used the other way around, to hold a speaker liable for facially protected speech. *See Counterman* 600 U.S. at 76–77 (explaining the intent requirement under *Brandenburg*, which is separate from the test for whether the speech incites violence). This is because <u>the inquiry must begin with the words used by the speaker</u> (*Brandenburg's* element one). Only if those words are facially unprotected under the first element of the *Brandenburg* test could a speaker *potentially* be penalized if there is *also* a showing of the requisite intent (element two) and imminence (element three). *Counterman,* 600 U.S. at 76. The constitutional floors provided by each element of *Brandenburg's* test prevent a situation whereby two speakers could be treated differently for identical speech, based solely on what a court perceives to be the speaker's intent. *See, e.g., Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 468-69 (2007) ("A test focused on the speaker's intent could lead to the bizarre result that identical ads aired at the same time could be protected speech for one speaker, while leading to criminal penalties for another"). As *Counterman* makes clear, to hold otherwise would impermissibly risk chilling protected speech. *Cf. Wisconsin Right to Life*, 551 U.S. at 469 ("To safeguard this liberty, the proper standard for an as-applied challenge to BCRA § 203 must be objective, focusing on the substance of the communication rather than amorphous considerations of intent and effect.").

Without the benefit of *Counterman's* guidance, this Court misapplied *Brandenburg's* first element — the words actually used by President Trump on January 6 — and instead relied on the remaining factors to fill in the gaps and to shape its analysis of that first element. *See Thompson,* 590 F. Supp. 3d at 112

6

(expressing uncertainty as to whether a three-part test even applies or is helpful in analyzing the First Amendment issue); *see id.* at 112-18. This was constitutionally impermissible, as *Counterman* establishes. Allowing this Court's incitement finding to stand would be inconsistent with *Counterman* and would open floodgates to incitement liability for future speakers of all types (not just politicians and presidents).

For the reasons discussed herein, President Trump urges this Court to grant his Motion for Reconsideration of the Denial of his Motion to Dismiss and revise its Order in line with the intervening law set forth in *Counterman v. Colorado.*

Furthermore, given the certainty that this Court's ruling on immunity— whichever way it goes—will be immediately appealed, President Trump respectfully submits that if the Court does not dismiss Plaintiffs' claims relating to the January 6 Speech on First Amendment grounds, it should certify the question for interlocutory appeal under 28 U.S.C. § 1292(b) so that this enormously significant issue can be considered by the appellate courts in tandem with the immunity issue.

## PROCEDURAL BACKGROUND

This proceeding consolidates complaints brought against President Trump, in his individual capacity, in connection with events prior to and on January 6, 2021, including President Trump's speech at a rally ("Rally") held on that date. President Trump moved to dismiss the claims against him on various grounds, including by arguing that he is entitled to official-act immunity and that plaintiffs seek to hold him liable for speech protected by the First Amendment. In an Order dated February 18,

2022, this Court largely rejected President Trump's claim of immunity and also rejected his First Amendment defense, holding that Plaintiffs had plausibly alleged that his speech at the Rally amounted to incitement of imminent lawless action under *Brandenburg v. Ohio,* 395 U.S. 444 (1969). *See* the Order.[1]

President Trump appealed the immunity ruling, which was an immediately appealable collateral order under *Nixon v. Fitzgerald,* 547 U.S. 731, 742-43 (1982). At that time, President Trump did not also seek discretionary review of the First Amendment question under 28 U.S.C. § 1292(b),[2] and thus the First Amendment issue was not before the D.C. Circuit. *See Blassingame v. Trump,* 87 F.4th 1, 27 (D.C.C. 2023). In an opinion dated December 1, 2023, the D.C. Circuit affirmed the district court's denial of President Trump's motion to dismiss on grounds of presidential immunity and left it to the district court "to conduct further proceedings on the issue" to enable an "ultimate resolution" of the immunity question. *Id.* at 30. The D.C. Circuit noted that it would address the merits of President Trump's First Amendment defense, should a party seek appellate review of that issue in the future. *See id.* at 27 (noting that the First Amendment issue "remains in the case and could come before us at a later stage" citing 28 U.S.C. § 1292(b)); *id.* at 5 (noting that President Trump "could bring [the First Amendment defense] before us in the

---

[1] The Court later adopted its First Amendment ruling wholesale when it ruled on a motion to dismiss in *Garza v. Trump.* Mem. Op. And Order, *Garza v. Trump,* Case No. 1:23-cv-00038-APM (D.D.C. January 2, 2024), ECF No. 55.

[2] Pursuant to 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory appeal when "(1) the order involves a controlling question of law; (2) a substantial ground for difference of opinion concerning the ruling exists; and (3) an immediate appeal would materially advance the litigation." *Molock v. Whole Foods Mkt. Grp., Inc.,* 317 F. Supp. 3d 1, 4 (D.C.C. 2018) (internal quotation marks omitted).

future"); *id.* at 11-12 (citing 28 U.S.C. § 1292(b) as a potential mechanism for appeal of this issue).

## FACTUAL BACKGROUND

A summary of the heart of plaintiffs' allegations against President Trump is found in the D.C. Circuit's Opinion:

> "The plaintiffs contend that, during President Trump's final months in office, he conspired with political allies and supporters to obtain a second term despite his defeat in the 2020 election. He allegedly advanced that cause before January 6 by repeatedly making false claims that the election might be (and then had been) stolen, filing meritless lawsuits challenging the election results, and pressuring state and local officials to reverse the election outcomes in their jurisdictions. Those efforts allegedly culminated in the 75-minute speech President Trump delivered at the rally ["Rally"] on January 6. According to the plaintiffs, President Trump's actions, including ultimately his speech on January 6, sparked the ensuing riot at the Capitol."

*Blassingame v. Trump,* 87 F.4th at 4. As discussed in the Opinion, the 75-minute speech that Plaintiffs contend incited the January 6 riot includes the following statements by President Trump:

- "[a]ll of us here today do not want to see our election victory stolen by emboldened radical left Democrats, which is what they're doing, and stolen by the fake news media";

- "We will never give up. We will never concede. It doesn't happen. You don't concede when there's theft involved"; allegations of "fraud on a scale never seen before";

- "we're going to have to fight much harder and Mike Pence is going to have to come through for us";

- "we have come to demand that Congress do the right thing and only count the electors who have been lawfully slated…I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard";

- "when you catch somebody in a fraud, you're allowed to go by very different rules";

- discussion about "calling on Congress and the state legislatures to quickly pass sweeping election reforms" and listing numerous policy proposals — such as adopting requirements for voter ID, requiring proof of citizen for voting, banning "ballot harvesting" and the use of unsecured drop boxes, universal, unsolicited mail-in balloting, and the return of in-person voting on Election Day — "with your help";

- "And we fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore"; and "we're going to walk down [to] Pennsylvania Avenue…and we're going to the Capitol, and we're going to try and give…our Republicans […] the kind of pride and boldness that they need to take back our country. So, let's walk down Pennsylvania Avenue."

*Blassingame v. Trump,* 87 F.4th at 6-9 (citing Plaintiffs' complaints).

In addition to President Trump's speech at the Rally, plaintiffs also contend that the President's *pre-Rally* conduct had a role in inciting violence on January 6, by creating "powder keg" conditions. *See, e.g.,* Tr. of Argument at 65:14-16, *Blassingame v. Trump,* No. 22-5069 (D.C. Cir. Dec. 7, 2022) (counsel for appellees states "[t]hey come to the Ellipse, and…he [President Trump] created a powder keg by virtue of the lead-up to that"); *id.* at 66:21 (counsel for appellees states "I think we have an enormous type of powder keg here"). Specifically, Plaintiffs point to speech President Trump published to the public at large, on Twitter and during the first presidential debate, in the months of June, August, October, September, November, and December 2020, and on the day before the Rally (*see Blassingame v. Trump,* 87 F.4th at 6-8), and to 62 lawsuits that President Trump "and his allies" filed after the November 2020 election (*id.* at 7).

Plaintiffs also contend that President Trump's *post-Rally* conduct is relevant to their incitement claim. The post-Rally conduct they cite includes a tweet President

10

Trump published at 2:24 p.m. on January 6, stating "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!" (*Blassingame v. Trump,* 87 F.4th at 10); a tweet President Trump published fourteen minutes later, stating "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful!" (*id.* at 10); and a video posted on Twitter at 4:17 p.m. on January 6, in which President Trump directed the rioters to go home (*id.* at 10).

## ARGUMENT

### I.    Reconsideration is Appropriate Under FRCP 54(b).

President Trump seeks reconsideration under Federal Rule of Civil Procedure 54(b) of this Court's Order denying his motion to dismiss on First Amendment grounds. Under Rule 54(b), an interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The rule "recognizes [the court's] inherent power to reconsider an interlocutory order 'as justice requires.'" *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.,* 630 F.3d 217, 227 (D.C. Cir. 2001) (citing *Greene v. Union Mut. Life Ins. Co. of Am.,* 746 F.2d 19, 22-23 (1st Cir. 1985)).

The standard under Rule 54(b) is generally "more flexible" than the Rule 59(e) standard for final orders (*Cobell v. Jewell,* 802 F.3d 12, 25 (D.C. Cir. 2015)), and a Rule 54(b) motion for reconsideration may be granted if there are "good reasons for

doing so." *Cobell v. Jewell,* 355 F. Supp. 2d 531, 540 (D.C.C. 2005). "Justice may require revision … 'where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court.'" *Singh v. George Wash. Univ.,* 383 F. Supp. 2d 99, 101 (D.C. Cir. 2005) (quoting *Cobell v. Norton,* 224 F.R.D. 266, 272 (D.D.C. 2004)).

The Rule 54(b) standard is met here because, after this Court decided *Thompson*, the Supreme Court decided *Counterman v. Colorado,* 600 U.S. 66 (2023). As discussed in Section II(A) below, *Counterman* carefully analyzes the role of intent in incitement cases and the constitutional floor required by each factor of the *Brandenburg* test before a finding of incitement under the First Amendment can permissibly be made. *Counterman* constitutes subsequent controlling authority that might be expected to alter this Court's conclusion, requiring reconsideration of the Order denying President Trump's motion on this point.

Reconsideration is not only necessary and appropriate under Rule 54(b), but it is also prudent considering the procedural posture of this case. While the First Amendment question was not presented on appeal of the Order, the D.C. Circuit repeatedly signaled that it would welcome the chance to address the issue, should a party seek appellate review pursuant to 28 U.S.C. § 1292(b). *See Blassingame v. Trump,* 87 F.4th at 27 (noting that the First Amendment issue "remains in the case and could come before us at a later stage" under 28 U.S.C. § 1292(b)); *see also id.* at 5 (noting that President Trump "could bring [the First Amendment defense] before us in the future"); *id.* at 11-12 (citing 28 U.S.C. § 1292(b) as a mechanism for later appeal of this issue); *see also* Tr. of Argument at 64:1-7, *Blassingame v. Trump,* No. 22-5069

(D.C. Cir. Dec. 7, 2022) (in colloquy with counsel for appellees, Judge Katsas expressed doubt regarding whether a president could lose immunity for speech in circumstances where a private party would have a *Brandenburg* defense, stating "to me that's where the rubber meets the road here" and "[i]f you look at, you just print out the speech, which I have done, and read the words on the page, it doesn't look like it would satisfy the [*Brandenburg*] standard, right?").

Given the inevitability of an immediate appeal of this Court's decision on the absolute immunity question (whichever way it is decided), this Court should reconsider the First Amendment question at this time. Unless the Court dismisses the claims against President Trump relating to the Speech on First Amendment grounds, President Trump would expect to ask the Court to certify the issue for appeal under 28 U.S.C. § 1292(b)[3] so that the immunity and First Amendment issues can be considered by the D.C. Circuit in tandem.

## II.    The Court Should Reconsider its Incitement Order in Light of *Counterman.*

*Brandenburg v. Ohio* famously holds that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use

---

[3] The standard for this Court to exercise its discretion to certify an order for interlocutory appeal under 28 U.S.C. § 1292(b) would easily be met in this case, because any order on the First Amendment defense implicates the application of recent Supreme Court precedent and will necessarily involve a controlling question of law on which there is a substantial ground for difference of opinion. In addition, an immediate appeal would materially advance the litigation; indeed, if President Trump has a First Amendment defense to the claims insofar as they rest upon the Speech, it is difficult to see how Plaintiffs could possibly maintain a viable claim against him based on their remaining allegations. At a minimum, a case against President Trump without the Speech would be a very different case.

of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg,* 395 U.S. at 447; *see also NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927-929 (1982) ("*Claiborne*"). This Court's Order cites *Bible Believers v. Wayne County,* 805 F.3d 228 (6th Cir. 2015) (en banc) ("*Bible Believers*") for the following articulation of the three-part *Brandenburg* test:

> The *Brandenburg* test precludes speech from being sanctioned as incitement to riot unless (1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends the speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech.

*Thompson v. Trump,* 590 F. Supp. 3d at 112, (citing *Bible Believers,* 805 F.3d at 246); *see also Nwanguma v. Trump,* 903 F.3d 604, 609 (6th Cir. 2018) (citing same standard).

All three elements must be met: "the speaker's intent to encourage violence (second factor) and the tendency of his statement to result in violence (third factor) are not enough to forfeit First Amendment protection unless the words used specifically advocated the use of violence, whether explicitly or implicitly (first factor)." *Nwanguma,* 903 F.3d at 611. A court that "place[s] too much weight" on one or two factors and "slight[s]" the remaining factor(s), will be reversed. *Id.* (reversing Kentucky District Court for failure to meet all three factors); *see also Hess v. Indiana,* 414 U.S. 105, 107-109 (1973) (reversing judgment of the Indiana Supreme Court for failing to meet all three factors).

In an incitement case, words are evaluated in their context, which refers to "what was said, where it was said, and how it was said." *Snyder v. Phelps,* 562 U.S. 443, 453-54 (2011); *see also Nwanguma*, 903 F.3d at 611 (quoting *Snyder* for same proposition). As the *Nwanguma* court noted, Supreme Court precedent makes clear that **context cannot render facially protected speech unprotected**. 903 F.3d at 612 ("Despite the sensitive context and the pain inflicted by the picketers' speech on the family of the fallen Marine, the Court held the speech was protected by the First Amendment. Because the speech was protected, its setting, or context, could not render it unprotected." (citing *Snyder*, 562 U.S. at 454-55)); *see also Bible Believers,* 805 F.3d. at 246 ("[t]he hostile reaction of a crowd does not transform protected speech into incitement"). Similarly, *Counterman* holds that **intent cannot render facially protected speech unprotected.** *Counterman,* 600 U.S. at 76. Rather, each *Brandenburg* factor is its own constitutional floor protecting a speaker, and each must be evaluated on its own merits. Courts "weigh the circumstances in order to protect, not to destroy, freedom of speech." *Cox v. Louisiana*, 379 U.S. 536, 578 (1965) (Black, J, concurring); *Bible Believers*, 805 F.3d at 234 ("We interpret the First Amendment broadly so as to favor allowing more speech.").

In applying an incitement analysis, this Court made at least three errors. First, it placed too much weight on factors two and three (intent and effect) and failed to properly and separately address the first factor — whether the words used by the President on January 6 advocated the use of force or of law violation (they indisputably did not). Second, in assessing factors two and three, this Court examined a "broader context" that was impermissible under *Brandenberg.* Third, the Court's

conclusions regarding *mens rea* were insufficient to meet the standard articulated in *Counterman.* As such, reconsideration and revision of the Order is warranted.

      a.     **Legal standards for incitement after *Counterman*.**

Under the First Amendment, freedom to speak is the rule, and liability for speech is the exception. *See, e.g. Counterman,* 600 U.S. at 93 (Sotomayor, J., concurring) ("[r]emoving speech from normal First Amendment scrutiny is a major shift in the balance of expression and public interest that our Constitution generally strikes"). For this reason, "[f]rom 1791 to the present," the First Amendment has only "permitted restrictions upon the content of speech in a few limited areas," including incitement, defamation, obscenity, and "true threats." *Id.* at 73 (citations omitted).

In *Counterman,* the Supreme Court acknowledged the "profound harms" to individuals and society that come from these limited areas of speech, and the attendant desire to regulate this expression to protect against such harms. *Counterman,* 600 U.S. at 80. But *Counterman* also recognized a "competing value[]" — namely, the need to guard against "'self-censorship' of speech that could not be proscribed." *Id.* at 75 (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974)). As the Court explained, "[t]he speaker's fear of mistaking whether a statement is a threat; his fear of the legal system getting that judgment wrong; his fear, in any event, of incurring legal costs — all those may lead him to swallow words" that could not otherwise be proscribed, in an effort to "steer[] 'wide[] of the unlawful zone.'" *Counterman,* 600 U.S. at 75 (quoting *Speiser v. Randall,* 357 U.S. 513, 526 (1958)).

To strike a balance between these competing values, *Counterman* requires that before liability may be imposed on a speaker accused of defamation, true threats, or

incitement, there must be proof that a speaker has the requisite "subjective mental-state" — in addition to any other elements of the charge. *Counterman,* 600 U.S. at 75. *Counterman* held that "an important tool to prevent [self-censorship] — to stop people from steering 'wide[ ] of the unlawful zone' — is to condition liability on the State's showing of a culpable mental state." *Id.* (quoting *Speiser,* 357 U.S. at 526). Put differently, *Counterman* requires a "constitutional floor" or "one-way ratchet" that protects citizen speakers by ensuring that speech can only be punished if (1) a speaker acts with the requisite level of subjective mental state, *and* (2) the plaintiff can establish the remaining elements of the charge.

What level of subjective mental state does the First Amendment require, for each type of speech restriction? *Counterman* explained the different options as follows:

> [t]he law of *mens rea* offers three basic choices. Purpose is the most culpable level in the standard mental-state hierarchy, and the hardest to prove. A person acts purposefully when he 'consciously desires' a result…Next down, though not often distinguished from purpose, is knowledge …. A person acts knowingly when 'he is aware that [a] result is practically certain to follow'…. A greater gap separates those two from recklessness. A person acts recklessly, in the most common formulation, when he 'consciously disregards a substantial and unjustifiable risk that the conduct will cause harm to another.' That standard involves insufficient concern with risk, rather than awareness of impending harm.

*Counterman,* 600 U.S. at 78-79 (internal citations omitted). *Counterman* then applied these "three basic choices" to the limited speech restrictions. For instance, the Court held that in a public figure's claim for defamation, liability will only be imposed if — in addition to proving all elements of the tort — the plaintiff *also* proves that the speaker acted with "knowledge that [the statement] was false or with reckless

disregard of whether it was false or not." *Id.* at 75-76 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 280 (1964)). This means that even if the speech at issue is facially *unprotected* — e.g. it is false, disparaging, unprivileged, and directly concerns the plaintiff — the First Amendment nonetheless precludes liability unless it is *also* proven that the speaker acted with knowledge or recklessness.

Regarding "true threats," the Court again applied a "recklessness" standard, reasoning that this approach "offers enough breathing space for protected speech, without sacrificing too many of the benefits of enforcing laws against true threats." *Counterman,* 600 U.S. at 81-82 (internal citations omitted). Once again, the result is that even if the speech at issue is facially *unprotected,* the First Amendment precludes liability unless it is *also* proven that the defendant acted recklessly. Applying this standard, the Supreme Court refused to impose "true threat" liability on Mr. Counterman — even though he repeatedly communicated with the plaintiff in a manner that would cause a reasonable person to suffer serious emotional distress and actually caused the plaintiff to suffer serious emotional distress — because Mr. Counterman's recklessness could not be proven. The Justices in *Counterman* were sensitive to the reality that this approach will inevitably result in harm to individuals (like the plaintiff in that case) who are damaged by threatening speech and noted that "[a]s with any balance, something is lost on both sides." *Id.* However, they concluded that "[t]he rule we adopt today [in true threat cases] is neither the most speech-protective nor the most sensitive to the dangers of true threats." *Id.*

Yet with respect to incitement cases, the Supreme Court imposed the most speech-protective *mens rea* requirement available: purpose or knowledge. *Id.* at 81

(Supreme Court declares that "our incitement decisions demand more" and "compel the use of a distinct standard"). The Court began by acknowledging the similarities between incitement and true threats: "[l]ike threats, incitement inheres in particular words used in particular contexts: Its harm can arise even when a clueless speaker fails to grasp his expression's nature and consequence." *Id.* at 76. "But still, the First Amendment precludes punishment [for incitement], whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder." *Id.* (quoting *Hess v. Indiana,* 414 U.S. 105, 109 (1973) (*per curiam*) ("*Hess*")); *see also Brandenburg,* 395 U.S. at 447; *Claiborne,* 458 U.S. at 927-929. As *Counterman* noted, "[where] incitement is at issue, we have spoken in terms of specific intent, presumably equivalent to purpose or knowledge." *Counterman,* 600 U.S. at 81 (citing *Hess,* 414 U.S. at 109).

Why impose the highest *mens rea* requirement on incitement, uniquely? *Counterman* explained that because "incitement to disorder is commonly a hair's-breadth away from political 'advocacy' — and particularly from strong protests against the government and prevailing social order," a "strong intent requirement" is necessary to "ensure that efforts to prosecute incitement would not bleed over, either directly or through a chilling effect, to dissenting political speech at the First Amendment's core." *Counterman,* 600 U.S. 81. *Counterman* contrasted incitement with true threat cases, which do not pose issues "so central to the theory of the First Amendment nor so vulnerable to government prosecutions," and in which the "potency of [a strong intent requirement] is not needed." *Id.*

Thus, *Counterman* made clear that among the limited recognized exceptions to free speech, incitement *uniquely* demands the most exacting level of protection from liability. Indeed, although the *Counterman* Justices were divided on the level of *mens rea* to assign to other categories of speech restrictions,[4] all nine Justices were unanimous in requiring the highest subjective mental state possible for incitement charges. *See Counterman,* 600 U.S. at 112 (Barrett, J., dissenting) (dissenting to the majority's "baseline ban on an objective standard" but noting "I will give the Court this much: Speakers must specifically intend to incite violence before they lose First Amendment protection") (citing *Brandenburg,* 395 U.S. at 447)).

*Counterman* also made clear that — while it is true that the *Brandenburg* line of cases discusses the importance of a speaker's intent — intent can permissibly serve only as an additional hurdle for an incitement finding, not a substitute for the required focus on the words themselves or as a lens through which to examine those words. The inquiry must begin with the words used by the speaker, and only if those words specifically advocate imminent violence can a speaker *potentially* be penalized, as before government may penalize expression there must *also* be a showing of the requisite intent. *Counterman*, 600 U.S. at 76. "Such a requirement comes at a cost: It will shield some otherwise proscribable (here, threatening) speech because the State cannot prove what the defendant thought. But the *added* element reduces the prospect of chilling fully protected expression." *Id.* at 75 (emphasis added); *see id.* at 78 ("An objective standard, turning *only* on how reasonable observers would construe

---

[4] *See Counterman,* 600 U.S. at 83 (Sotomayor dissent, joined by Gorsuch); *id.* at 105 (Thomas dissent); *id.* at 106-107 (Barrett dissent, joined by Thomas).

a statement in context,….would discourage the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'") (cleaned up) (quoting *Sullivan*, 376 U.S. at 270)).

The nearly insurmountable standard imposed by *Brandenburg* and clarified in *Counterman* explains why the Supreme Court has never held a speaker liable for incitement in the 56 years since *Brandenburg* was decided. *See, e.g. American Freedom Defense Initiative v. Metropolitan Transp. Authority,* 70 F. Supp. 3d 572 (S.D.N.Y. 2015) (order vacated for mootness) ("the Supreme Court has rarely applied the *Brandenburg* incitement standard, and never explicitly found speech to be on the proscribable side of the standard"). Because the standard is not met in this case, reconsideration of the Court's Order is warranted.

> **b.    This Court failed to properly evaluate the words used to establish that the first *Brandenburg* element is met.**

This Court's analysis of the language of President Trump's speech is flawed under *Counterman* because it improperly filters the words used through what it took to be President Trump's understanding of the crowd and its reaction in order to vest them with implicit meaning that the Court acknowledged they did not explicitly contain.[5] *See, e.g., Thompson v. Trump*, 590 F. Supp. 3d at 115 ("*The President would have known* about these events, as they were widely publicized. Against this backdrop, the President invited his followers to Washington, D.C., on January 6th. It is reasonable to infer that *the President would have known* that some supporters

_____

[5] This Court has rightly acknowledged that "[t]he President's words on January 6th did not explicitly encourage the imminent use of violence or lawless action." *Thompson v. Trump*, 590 F. Supp. at 115.

viewed his invitation as a call to action."); *id.* at 116 ("Thus, when the President stepped to the podium on January 6th, it is reasonable to infer that *he would have known* that some in the audience were prepared for violence. Yet, the President delivered a speech *he understood* would only aggravate an already volatile situation.") (emphases added)).

There are two problems with this. First, these inferences amount only to conclusions that President Trump was aware of a risk that some listeners might react violently and spoke anyway. *Counterman*, however, requires more. 600 U.S. at 76 ("[T]he First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder."); *id.* at 81 ("When incitement is at issue, we have spoken in terms of specific intent, presumably equivalent to purpose or knowledge."). And *Counterman* likewise makes clear that "purpose" or "knowledge" require more than disregarding a known risk— that is "recklessness" which does not suffice to establish incitement. *Id.* at 78-79 ("A person acts purposefully when he 'consciously desires' a result," "knowingly when "he is aware that [a] result is practically certain to follow," and "recklessly…when he 'consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another."') (quoting *Voisine v. United States*, 579 U.S. 686, 691 (2016)).

Second, in viewing the words of the Speech through the prism of President Trump's supposed understanding and intent, this Court erred, failing to properly analyze the language actually used by the President on January 6 in determining that he implicitly incited the crowd on that day. The Court summarizes: "[h]aving considered the President's January 6 Rally Speech in its entirety and in context, the

court concludes that the President's statements that, '[W]e fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore,' and '[W]e're going to try to and give [weak Republicans] the kind of pride and boldness that they need to take back our country,' immediately before exhorting rally-goers to 'walk down Pennsylvania Avenue,' are plausibly words of incitement not protected by the First Amendment." *Thompson v. Trump,* 590 F. Supp. 3d at 115. This was error under *Counterman.*

It ignores the reality that nothing in President Trump's speech even came close to the far more incendiary language that the Supreme Court has held to be protected as a matter of law and does so by making impermissible use—*contra Counterman*—of intent to infuse words with meaning that they do not objectively hold. *See Claiborne*, 458 U.S. at 902 ("We're gonna break your damn neck."); *Hess*, 414 U.S. 105, 107 ("We'll take the fucking street again."); *Brandenburg,* 395 U.S. at 446 ("if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken. We are marching on Congress July the Fourth, four hundred thousand strong"). In those cases, the Court did not ask whether the statements were coded language that may have had a special, secret meaning to a subset of listeners or to the speaker. What mattered was the objective meaning of the words under the circumstances. As Judge Katsas has noted in this case, "you just print out the [President's January 6] speech ... and read the words ... it doesn't look like it would satisfy the [*Brandenburg*] standard." Tr. of Argument at 64:5-7 (Katsas, J.), *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. Dec. 7, 2022). None of the statements attributed to President Trump on

January 6 advocated illegal conduct. *Id.* at 74:21-25 (Rogers, J.) ("[T]he President didn't say break in, didn't say assault members of Congress, assault Capitol Police, or anything like that."). This Court's construction of President Trump's January 6 speech "flatly contradicted" the words' plain meaning. *Nwanguma,* 903 F.3d at 610.

In *Nwanguma v. Trump,* protestors at a Trump for President campaign rally were perceived to be disruptive and were ushered out (along with pushes and shoves by audience members) after then-candidate Trump said "Get 'em out of here" and, shortly thereafter, "Don't hurt 'em." *Id.* at 606-608. The protestors claimed that President Trump's words amounted to incitement, and the Court addressed the following question: in order to forfeit constitutional protection, is it enough that the words "may *arguably* have had a tendency to encourage unlawful use of force," or must they "specifically advocate for listeners to take unlawful action"? *Id.* at 610. *Nwanguma* reached the latter conclusion: a court must "examin[e] the *words* used by the speaker…not how they may be heard by a listener." *Id.* at 612-613. As *Counterman* later made clear, that holding was correct.

This holding is broadly supported across incitement cases. In *Hess v. Indiana,* the Supreme Court "focused on the words, on the language, that comprised the subject speech, i.e., the first *Brandenburg* factor." *Nwanguma,* 903 F.3d at 611. The *Hess* Court determined that because "there was no evidence or rational inference from the import of the *language,* that [the speaker's] *words* were intended to produce, and likely to produce, imminent disorder, those *words* could not be punished by the State on the ground that they had a tendency to lead to violence." *Hess,* 414 U.S. at 109 (emphases added and internal citations omitted). In *Snyder*, while recognizing that

speech must be evaluated in context, "the court's examination [was] focused on the content, form, and context of the *speech*: 'what was *said,* where it was *said,* and how it was *said.*'" *Nwanguma,* 903 F.3d at 611 (quoting *Snyder*, 562 U.S. at 454-55) (emphasis in original). In *Bible Believers,* we again see a court examining the *words* used by the speaker and rejecting an incitement claim where those words did not specifically advocate violence. *Bible Believers,* 805 F.3d at 244 (examining the meaning of messages such as "Islam is a Religion of Blood and Murder," "Turn or Burn," and "Your prophet is a pedophile.").

"The bottom line is that the analysis employed in *Brandenburg, Hess, Snyder,* and *Bible Believers* evidences an unmistakable and consistent focus on the actual words used by the speaker," not on "how they may be heard by a listener." *Nwanguma* at 613. *Counterman* demands such a primary focus on what the speaker actually said. And, where — as here — "[n]ot a single word encouraged violence or lawlessness, explicitly or implicitly," there cannot be incitement liability. *Id.* at 609. Nor did any of those cases indulge in or permit the kind of intent-based interpretation of a speaker's words that this Court engaged in here. To the contrary, *Counterman* makes clear that such analysis by psychoanalysis is impermissible. The intent requirement applied to incitement is meant to provide only *additional* speech protection, not to enable courts to strip it away from otherwise protected speech. *Id.* at 75 ("Such a requirement comes at a cost: It will shield some otherwise proscribable (here, threatening) speech because the State cannot prove what the defendant thought. But the added element reduces the prospect of chilling fully protected expression"); *id.* at 78 ("An objective standard turning *only* on how reasonable observers would construe

a statement in context…. would discourage the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'") (cleaned up); *cf. Wisconsin Right to Life,* 551 U.S. at 468-69 ("A test focused on the speaker's intent could lead to the bizarre result that identical ads aired at the same time could be protected speech for one speaker, while leading to criminal penalties for another.")

In addition, there are at least two contextual factors that mitigate against an incitement finding. First, President Trump's only explicit instructions to his audience called for protesting "peacefully and patriotically," to "support our Capitol Police and law enforcement," and to "[s]tay peaceful." *Blassingame v. Trump,* 87 F.4th at 9-10. It "can hardly be denied" that this type of context "undercuts the alleged violence-inciting sense of Trump's words." *Nwanguma,* 903 F.3d 604, 612  (considering President Trump's use of the words "Don't hurt 'em" as mitigating against an incitement finding).

Second, in the same breath as he allegedly incited violence, President Trump also advocated for numerous policy changes — including "sweeping election reforms," adopting requirements for voter ID, requiring proof of citizen for voting, banning "ballot harvesting" and the use of unsecured drop boxes, universal, unsolicited mail-in balloting, and the return of in-person voting on Election Day. *See Blassingame v. Trump,* 87 F.4th at 9. President Trump's January 6 speech, like the speech in *Hess* and *Claiborne,* is properly characterized as "strong protests against the government and prevailing social order" — a context that demands the highest deference to speech and protection from censorship. *Counterman,* 600 U.S. at 80-81 (noting that "[s]uch protests gave rise to all the cases in which the Court demanded a showing of intent,"

and "a strong intent requirement was, and remains, one way to guarantee history [of chilling political speech through punishing supposed incitement] was not repeated"). Fiery rhetoric in political speeches is a hallmark of the type of advocacy that *Counterman* so clearly protects. *See, e.g., Claiborne,* 458 U.S. at 928 ("[t]he emotionally charged rhetoric of [the plaintiff's] speeches did not transcend the bounds of protected speech set forth in *Brandenburg*"); *Bible Believers,* 805 F.3d at 246 (citing *Claiborne* for same proposition).

In short, the omission from President Trump's words of any calls for violence or lawlessness, his express calls for the crowd to remain peaceful, and his advocacy of policy changes at the January 6 Rally all require a finding, in context, that element one of *Brandenburg's* test is not met.

###### c.    This Court impermissibly leaned on the "broader context" in evaluating the Brandenburg factors.

In an incitement finding, speech "must meet all three factors to avoid First Amendment free speech protection." *Nwanguma* at 611. Each factor independently serves as a constitutional floor to liability, and thus a court errs when it overly relies on one or two factors to gloss over the third.

Thus, in *Hess v. Indiana,* the Supreme Court reversed an incitement finding because the Indiana Supreme Court "had placed primary reliance on evidence that the speaker's statement was *intended* to incite further lawless action and was *likely* to produce such action." *Nwanguma,* 903 F.3d at 611. "This was not enough" — rather, each factor must be analyzed and met on its own terms. *Id.* "*Hess* teaches that the speaker's intent to encourage violence (second factor) and the tendency of his

statement to result in violence (third factor) are not enough to forfeit First Amendment protection unless the words used specifically advocated the use of violence, whether explicitly or implicitly (first factor)." *Id.*

Following *Hess's* teachings, *Nwanguma* similarly reversed an incitement finding where the district court failed to address each *Brandenburg* factor on its own terms: "[f]inding little support for the first *Brandenburg* factor — *specific* advocacy of violence — the court ostensibly placed heavy reliance on the allegations addressed to the latter two *Brandenburg* factors. That is, the court relied on plaintiffs' allegations that Trump intended violence to occur and knew that his words were likely to result in violence." *Nwanguma,* 903 F.3d at 610-611. The Court noted that "[t]his very approach was rejected in *Hess v. Indiana*…[which] focused on the words, on the language, that comprised the subject speech, i.e., the first *Brandenburg* factor." *Id.* at 611.

Without the benefit of *Counterman,* this Court made the same mistake as the Indiana Supreme Court in *Hess* and the district court in *Nwanguma*: it leaned too heavily on the second *Brandenburg* factor (e.g., the intent the Court inferred President Trump may have had, given past events) and the third factor (e.g. the fact of subsequent violence by some of his listeners), to imbue the words he actually used on January 6 with implicit incitement. Without the guidance of *Counterman*, the Court accepted Plaintiffs' invitation to examine isolated examples of President Trump's *past* speech — in some cases, speech that pre-dated January 6 by over seven months — to conclude that he had created "powder keg" conditions by January 6. *See Thompson v. Trump,* 590 F. Supp. 3d at 115 (holding that "the 'import' of the

President's words must be viewed within the broader context" of events that happened "for months" prior to January 6, and that his words at the Rally "stoked an already inflamed crowd.") But as *Brandenburg* and its progeny have made clear, powder keg conditions cannot be used to create First Amendment liability. *See* Tr. of Argument at 65:24-66:6, *Blassingame v. Trump,* No. 22-5069 (D.C. Cir. Dec. 7, 2022) (discussing *Nwanguma* as "stand[ing] for the proposition that if the words themselves are not very inciting, and the primary danger comes from the powder keg, that's not enough to eliminate first amendment protection under *Brandenburg*.")

This Court erred when it relied on the "broader context" to read into President Trump's words a meaning that simply was not there. This converts *Brandenburg* from an analysis of speech within the context it was made, to a holistic evaluation of a speaker's words going back days, weeks, and months — and ultimately, to his or her character writ large — to extrapolate a perceived intent and from that to imbue his words with a secret meaning that they do not have as a matter of standard English usage. This standard is impermissible under *Counterman*, and therefore reconsideration is warranted.

#### d.   This Court's Order, if not revised, will open floodgates for incitement decisions against regular citizens.

As mentioned, this Court's order assigned incitement liability for the very first time since that limited exception was recognized over 50 years ago. The Court dismissed concerns raised by President Trump in prior briefing regarding effects of the Order on potential and past political speech by other speakers, such as Democratic legislators, as "a game of what-aboutism" and concluded that future speakers would

continue to be held liable for political speech "only in the rarest of circumstances." *Thompson v. Trump,* 590 F. Supp. 3d at 117. Respectfully, not so.

First, it should be noted that unlike a finding on immunity, which protects official acts *as* the government, the First Amendment protects against restraints on citizens *by* the government. *See, e.g., Blassingame v. Trump,* 87 F.4th at 27-28 ("The two inquiries serve distinct purposes, and in some sense appear to work at cross purposes. At a high level, the President is immune when he acts in his official capacity — i.e., as the government rather than as a private person — whereas the First Amendment protects private persons against restraints imposed by the government"). Thus, any First Amendment precedent set by this Court will necessarily have ramifications for public citizen speech; it will not be confined to cases dealing with presidents, politicians, or even political speech.

Consider the following hypothetical: a rapper "rockets to the top of the charts for his aggressive, provocative lyrics that become wildly popular nationwide, particularly among angsty teenagers. He is ranked as one of the most controversial lyricists of all time. Many of his lyrics describe explicit violent acts, including gun violence, rape, and a description of the rapper drowning his wife.[6] While at times, the rapper's lyrics suggest that his work is not intended to encourage or endorse actual violence, other lyrics suggest the contrary. There is extensive news coverage of the impact that the rapper's music has on young people, commenting on how it incites

---

[6] *See, e.g.,* https://www.nytimes.com/2014/12/02/us/chief-justice-samples-eminem-in-online-threats-case.html (describing Chief Justice John G. Roberts Jr.'s citations to Eminem lyrics during oral argument in a colloquy discussing what threats may be prosecuted as crimes). Adam Liptak, *Chief Justice Samples Eminem in Online Threats Case*, THE NEW YORK TIMES (December 2, 2024).

them to act emotionally and sometimes violently. The rapper publicly acknowledges that he is aware that his music is causing some of his fans to commit violence. After several years of this phenomenon, the rapper takes the stage at an enormous concert venue packed with thousands of his fans, and after hours of playing his most aggressive songs and stoking his audience's passions, he yells "Fight the Man! Fight the Establishment! Don't let them tell you what to do! Fight like hell!" Inspired by the rapper's fiery rhetoric, several of his fans decide to mirror his expressed disdain for authority by storming the nearest establishments, stealing food from the venue's concession stands, violently attacking the vendors, and beating down security guards to access the backstage areas of the venue.

Historically, the rapper's speech at the concert would fall squarely within the protections of the First Amendment. But under the standard articulated in this Court's Order, there is a compelling argument to be made that the rapper's speech — "in context" (which could include lyrics he published weeks, months, or years prior to the concert) — constitutes incitement to violence: that his words contained "an implicit call for imminent violence or lawlessness," because "[h]e called for thousands to 'fight like hell'" and to disregard authority, when he knew that some fans "among the crowd were prone to violence" and that his rhetoric might cause them to act violently toward the business establishments at the venue and the individuals running them. *Thompson v. Trump,* 590 F. Supp. at 117. And in this hypothetical, the rapper's speech would not even be entitled to the "high bar protecting political speech." *Id.* ("*Brandenburg*'s imminence requirement is stringent, and so finding the

President's words here inciting will not lower the already high bar protecting political speech.")

*Counterman* is the first substantive treatment of incitement law by the Supreme Court in decades. This Court's Order was produced without benefit of its guidance, it cannot be squared with multiple aspects of *Counterman*, and it threatens the free speech rights of many American citizens. This Court should grant the Motion for Reconsideration and revise its First Amendment ruling. And, unless the Court rules that President Trump's January 6 Speech was constitutionally protected, President Trump expects to ask the Court to certify the issue for an interlocutory appeal so that it can be considered in tandem with the immunity appeal that will doubtless be taken however that decision comes out.

## CONCLUSION

For the foregoing reasons, Defendant Donald J. Trump respectfully requests the Court to grant his Motion to Reconsider the Denial of his Motion to Dismiss on First Amendment Grounds and revise its Order in line with the intervening authority of *Counterman v. Colorado* and the arguments raised above.


January 24, 2025                                    Respectfully submitted,


                                        */s/    Jonathan M. Shaw*
                                        Jonathan M. Shaw
                                        D.C. Bar No. 446249
                                        DHILLON LAW GROUP, INC.
                                        2121 Eisenhower Ave, Suite 402
                                        Alexandria, Virginia 22314
                                        Telephone: (703) 574-1206

Facsimile: (415) 520-6593
jshaw@dhillonlaw.com

Jesse R. Binnall, VA022
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
jesse@binnall.com

Scott Gessler*
GESSLER BLUE LAW
7350 E. Progress Place, Suite 100
Greenwood Village, Colorado 80111
Telephone: (720) 839-6637
sgessler@gesslerblue.com

*Attorneys for Defendant*
*President Donald J. Trump*

* pro hac vice forthcoming

## CERTIFICATE OF SERVICE

I certify that on January 24, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/      *Jonathan M. Shaw*
Jonathan M. Shaw
D.C. Bar No. 446249

*Attorney for Defendant*
*President Donald J. Trump*