### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DISTRICT OF COLUMBIA

| | |
|---|---|
| BARBARA J. LEE *et al.*, | |
| *Plaintiffs*, | Case No. 21-cv-00400 (APM) |
| v. | (lead case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants.* | |
| ERIC SWALWELL, | |
| *Plaintiff*, | Case No. 21-cv-00586 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants.* | |
| JAMES BLASSINGAME *et al.*, | |
| *Plaintiffs*, | Case No. 21-cv-00858 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP, | |
| *Defendant.* | |
| CONRAD SMITH *et al.*, | |
| *Plaintiffs*, | Case No. 21-cv-02265 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants.* | |

| | |
|---|---|
| MARCUS J. MOORE *et al.*, | |
| *Plaintiffs*, | Case No. 22-cv-00010 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP, | |
| *Defendant*. | |
| BOBBY TABRON *et al.*, | |
| *Plaintiffs*, | Case No. 22-cv-00011 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP, | |
| *Defendant*. | |
| BRIANA KIRKLAND, | |
| *Plaintiff*, | Case No. 22-cv-00034 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP, | |
| *Defendant*. | |
| SANDRA GARZA, | |
| *Plaintiff*, | Case No. 22-cv-00038 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants*. | |

## <u>REDACTED - PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................. 3

STANDARD OF REVIEW ..................................................................................... 7

ARGUMENT ......................................................................................................... 7

I.  Trump Bears the Burden of Establishing He Is Entitled to Presidential Immunity ................................................................................................. 7

    A.  Trump Fails to Address the Context-Specific Standard for Establishing He Is Entitled to Immunity .................................................. 8

    B.  Trump Mischaracterizes the Caselaw in an Impermissible Attempt to Lower the Immunity Standard .......................................................... 11

II.  Trump Failed to Meet His Burden of Establishing Presidential Immunity for the Conduct at Issue ........................................................................ 14

    A.  Trump's Unsupported Assertions of Election Fraud Before and After the 2020 Election Were Unofficial Conduct ................................. 14

        1.  The Context and Content of Trump's Tweets About Election Fraud Confirm the Tweets Were Sent in His Unofficial Capacity ........................................................................ 15

        2.  Trump's Argument That All of His Tweets Are Official Conduct Fails ................................................................................. 16

        3.  The Context and Content of Trump's Other Public Statements About Election Fraud Show Those Statements Were Unofficial Conduct ................................................................. 19

    B.  Trump's Attempts to Enlist State Actors and Employ Fraudulent Electors to Overturn the 2020 Election Were Unofficial Conduct .......... 20

        1.  Trump Fails to Address the Context of His Communications with State Officials and Organizing Fraudulent Electors ................................................................... 21

            a.  Efforts to Enlist State Officials ......................................... 22

            b.  Recruitment of False Electors ........................................... 23

        2.  Trump's Arguments Mischaracterize the Law and Are Irrelevant ................................................................................. 24

    C.  Trump's Lawsuits Challenging the 2020 Election Were Unofficial Conduct .............................................................................................. 25

    D.  Trump's Remarks at the Rally Were Unofficial Conduct ......................... 26

1.    Permitting for the Rally ..................................................... 27

2.    Funding for the Rally ...................................................... 28

3.    Promotion of the Rally...................................................... 30

4.    Organization and Execution of the Rally...................................... 32

5.    Speakers at the Rally....................................................... 34

6.    Trump's Rally Speech........................................................ 34

7.    Government Officials' Lack of Involvement in the Rally ............ 38

8.    Trump's Arguments Concerning the Rally Misconstrue the
      Law and the Facts ........................................................ 41

E.    Trump's Conduct During the Attack on the Capitol Was Unofficial ....... 44

CONCLUSION ...................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Blassingame v. Trump*,
    87 F.4th 1 (D.C. Cir. 2023) ................................................................................ *passim*

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................7, 19

*Clinton v. Jones*,
    520 U.S. 681 (1997) ............................................................................................7, 23

*Eastman v. Thompson*,
    636 F. Supp. 3d 1078 (C.D. Cal. 2022), *cert. denied*, 144 S. Ct. 248 (2023) ...........................3

*Lindke v. Freed*,
    601 U.S. 187 (2024) ............................................................................16, 17, 18, 19

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ...............................................................................................7

*Robinson v. Pezzat*,
    818 F.3d 1 (D.C. Cir. 2016) ..................................................................................7

*Thompson v. Trump*,
    590 F. Supp. 3d 46 (D.D.C. 2022) ...................................................................15, 35

*Trump v. Mazars USA, LLP*,
    592 U.S. 848 (2020) .............................................................................................23

*Trump v. United States*,
    603 U.S. 593 (2024) ..................................................................................... *passim*

## Rules

Fed. R. Civ. P. 56(a) .................................................................................................7

## INTRODUCTION

After losing the 2020 election, Defendant Donald J. Trump embarked on a scheme to retain the office of the presidency. His actions culminated in a speech to a crowd of thousands at a rally on January 6, 2021, which was organized, funded, promoted, and executed by his (failed) reelection campaign and private individuals and organizations affiliated with that campaign. His speech on January 6 caused the rallygoers to invade the Capitol, violently disrupt the peaceful transfer of power, and inflict grave harm to Plaintiffs in these consolidated cases. Plaintiffs brought these lawsuits to hold Trump and his co-conspirators accountable.

Trump now seeks to shield his conduct from liability by moving for summary judgment on the defense of presidential immunity. As this Court has recognized, the appropriate standard for resolving Trump's motion is set forth in *Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023). Dkt. 150 at 1–2. Under *Blassingame*, Trump "bears the burden of establishing that he is entitled to official-act immunity." 87 F.4th at 30. Trump can meet that burden only by offering the Court an "appropriately objective, context-specific assessment" to demonstrate that there is no genuine dispute of material fact as to whether his actions "can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Id.* But Trump fails to seriously address, let alone carry, that burden. To the contrary, the record overwhelmingly demonstrates that his actions must be understood as those of an office-seeker. For the reasons set forth below, Trump's motion should be denied.

*First*, unable to meet the standard set forth in *Blassingame*, Trump creates his own immunity standard out of whole cloth. This Court recognized that, under *Blassingame*, Trump bears the burden to establish his right to immunity. Dkt. 150 at 1–2. Nevertheless, Trump claims it is *Plaintiffs* who "must show that [his] actions . . . can *only* be understood as non-official action." Mot. at 3 (emphasis added). Trump's inversion of the standard for establishing presidential

immunity has no support in the case law and runs contrary to binding precedent set forth in *Blassingame* and reaffirmed in *Trump v. United States*, 603 U.S. 593 (2024).

*Second*, Trump fails to meet his burden of demonstrating that any of the conduct at issue in this case is official under *Blassingame*'s factbound, contextual standard. That conduct includes his unsupported assertions of outcome-determinative election fraud, his attempts to enlist state actors and employ fraudulent electors to overturn the 2020 election results, his unsuccessful private lawsuits challenging the 2020 election, and his remarks and actions at and after the Save America Rally on January 6. Rather than apply *Blassingame*'s context-specific standard to this conduct, Trump invokes the Take Care and Recommendations Clauses of the Constitution to argue he is entitled to immunity because of his identity as President at the time he engaged in the conduct. But *Blassingame* rejected this sort of test "grounded purely in the identity of [the President's] office," explaining that "[t]he same essential message or act may be either official or unofficial *depending on the circumstances* in which it is delivered or performed." 87 F.4th at 15, 21 (emphasis added). The stray facts on which Trump relies—like that a Hatch Act notice was applied to a draft of his Rally speech—whither when placed back into context. Take the Hatch Act notice. Trump fails to mention that the speech he actually gave was very dissimilar to the drafted remarks, and that the transcript of his actual speech was designated by the White House as a political speech and never posted on White House channels. *See infra* Section II.D.7. Looking at the factual record, an examination of the circumstances surrounding Trump's conduct makes clear that he was, at all relevant times, acting as an office-seeker and therefore could not have met his burden of establishing immunity even if he had attempted to do so.

In short, "when [a President] acts outside the functions of his office" by engaging in office-seeking behavior, "he does not continue to enjoy immunity from damages liability just because he

happens to be the President." *Blassingame*, 87 F.4th at 3. Trump has not and cannot meet his burden of establishing that he was acting in his official capacity, rather than as a private individual seeking to retain his office, when he engaged in the conduct at issue. Accordingly, the "[C]ourt not only may, but must deny immunity." *Id.* at 22.

## FACTUAL BACKGROUND

Plaintiffs' lawsuits allege that, following his loss in the 2020 presidential election, Trump continued his campaign to remain in office by conspiring with others to use force, intimidation, and threats to stop President Biden's election victory from being certified. The record reveals that Trump sought to remain in office in concert with his Campaign[1] and other private actors who shared his interest in his reelection—without the involvement of government employees.

Months before any votes were cast, Trump repeatedly claimed that he could lose the election only if it were "rigged" and "fraudulent." SUF ¶¶ 21–25. After he lost, Trump claimed that victory was "stolen" from him and that he had "won in a LANDSLIDE," *see id.* ¶¶ 26–42, 45–50, 243–44, even though multiple courts and his own Attorney General found no evidence of outcome-determinative fraud in the election, *see, e.g., id.* ¶¶ 102; 103–17; *Eastman v. Thompson*, 636 F. Supp. 3d 1078, 1092 (C.D. Cal. 2022), *cert. denied*, 144 S. Ct. 248 (2023).

Trump's election fraud claims were part of a broader, multi-faceted attempt to remain in office despite having lost the 2020 election. Specifically, Trump, his Campaign, and individuals affiliated with his Campaign: (1) designed and implemented a scheme to appoint false electors to cast electoral votes in his favor; (2) attempted to enlist state officials to block certification of the election results; and (3) orchestrated multiple private lawsuits challenging the election results in

---

[1] "Campaign" collectively refers to Donald J. Trump for President, Inc. ("DJTFP") and Make America Great Again PAC ("MAGA PAC"). DJTFP was Trump's campaign organization for the 2020 election that changed its name to MAGA PAC in early 2021. SUF ¶¶ 7–9.

key states he had lost (all of which failed).  *Id.* ¶¶ 56–97, 103–17.

By January 6, 2021, when a joint session of Congress was scheduled to certify the Electoral College's vote, SUF ¶¶ 51-55, Trump's opportunities to remain in office were nearing their end. The certification would officially establish Joseph R. Biden, Jr. as the next president.  That morning, before the vote was certified, Trump took the stage at the Ellipse in Washington, D.C. to appeal to the crowd at the "Save America Rally" (the "Rally").  *Id.* ¶ 118.  The Rally was planned, funded, promoted, organized, and executed by the Campaign, Campaign affiliates, and other private individuals dedicated to keeping Trump in office.  *Id.* ¶¶ 118–286; CSUF Tables C, D, E.

██████████████████████████████████████████████████████████████

████████████████████████. SUF ¶ 231.

The permit for the Rally describes the event as a "March for Trump."  SUF ¶ 185.  The permit was obtained by Women for America First ("WFAF"), a private political organization dedicated to "pushing the America First Agenda."  *Id.*  ¶¶ 123–30, 180–85, 210–20.  WFAF co-founders Kylie and Amy Kremer worked in concert with numerous Campaign affiliates, including Katrina Pierson, Justin Caporale, and Megan Powers, to ensure the event would accommodate Trump's needs.  *Id.* ¶¶ 123–30, 180–87, 263–70; CSUF Table D.  Ten of the twelve people named in the Rally permit worked or had worked for the Campaign.  *See* SUF ¶¶ 186–202; CSUF Table C.  By contrast, no government employees were identified in the permit.  SUF ¶¶ 198–99, 202.

The Campaign and its affiliates also financially supported the Rally.  At a minimum, the Campaign directly compensated some organizers for their work in connection with the Rally, CSUF Table E; SUF ¶¶ 134–35, 139–44, 140, 152–57, 195–97, 204–09, and paid "for equipment rental in connection with a rally on or near January 6, 2021," SUF ¶ 204.  A Campaign finance advisor also personally obtained millions of dollars in donations from Campaign donors to support

the Rally, *id.* ¶¶ 211, 215, and then helped allocate the funds among private political groups in support of the event, *id.* ¶¶ 216–20. ████████████████████████████████. *Id.* ¶ 203.

The same is true with respect to Rally logistics: Campaign affiliates and other private actors handled the organization and execution of the Rally, not government employees. Caporale, Powers, and Caroline Wren—individuals who were or had been recently employed by the Campaign—coordinated logistics for the Rally using their Campaign email addresses, including event planning services, scheduling, production, access credentials, transportation, advertising, and medical plans. *Id.* ¶¶ 152–57, 161–76, 196, 204, 252, 257, 263, 265–66, 268, CSUF Table E. Together with Pierson and with input from Trump, Caporale and Powers helped select the final list of speakers—several of whom were associated with the Campaign and received payment from Campaign-affiliated funds. SUF ¶¶ 145–51, 180, 257, 263–86, 269. ████████████████

████████████████████████ *Id.* ¶¶ 271–86. Government employees were not meaningfully involved in organizing the event.

Nor was the Rally promoted on official government channels; instead, Trump promoted the Rally on his personal social media accounts, as did his Campaign and other private individuals. SUF ¶¶ 221–50. ████████████████████████████████████████

████████████████████████████████████ *Id.* ¶¶ 225–29, 241, 243–45. ████████████████████████████████ the Campaign's official YouTube Channel published a video on January 3 to encourage attendance at the Rally and asking followers to "JOIN THE MARCH" on "JANUARY 6." *Id.* ¶¶ 230, 237. The Campaign's official Twitter account, @TeamTrump, tweeted: "JANUARY 6 – WASHINGTON D.C." *Id.* ¶ 240. The Campaign even had employees focused on social media efforts for the Rally. *Id.* ¶¶ 140, 142–44, 205–09, 233–35. In contrast, neither the @POTUS or @WhiteHouse official

government Twitter accounts made a single post about the Rally on or before January 6. *Id.* ¶ 251.[2]

At the Rally, Trump spoke before a crowd of tens of thousands, moments before the election was to be certified, insisting again that the election in which he was a candidate was "stolen" and encouraging the crowd to "never concede." SUF ¶¶ 122, 335, 337. His remarks were entirely focused on his own candidacy, and no others. He also singled out specific states where he claimed election fraud occurred (all of which he had lost). *Id.* ¶ 337. He told the crowd that Vice President Mike Pence should block the certification process, *id.* ¶ 338. And he said that "if Mike Pence does the right thing, we win the election." *Id.* At the end of his speech, Trump summoned the crowd before him to "fight like hell" and "walk" to the U.S. Capitol to "take back our country." *Id.* ¶¶ 336–39. ████████████████████████████████

████████████████ *Id.* ¶¶ 303, 346.

████████████████████████████████████████████████

████████ SUF ¶ 347. ███████████████████████████████████████████

███████████████████████████████████████████. *Id.* ¶ 323–28. Less than a minute after news reports that "protestors . . . have made their way inside the Capitol," *id.* ¶ 348, ████████

████████████████████████████████████████████████████

████████ *id.* ¶ 349. Shortly thereafter, Secret Service escorted the Vice President to a secure location out of the Capitol as rioters chanted "hang Mike Pence." *Id.* ¶¶ 348–50. ████████████

████████████████████████████████████████████████

*Id.* ¶ 350. He also offered a clear message of support: "We love you, you're very special." *Id.*

---

[2] The White House maintains two "government Twitter accounts," @POTUS and @WhiteHouse, which are operated by White House staff and only controlled by the President "by virtue of his office." SUF ¶¶ 16, 18–19.

## STANDARD OF REVIEW

"At the summary-judgment stage—and throughout—President Trump bears the burden of establishing that he is entitled to official-act immunity." *Blassingame*, 87 F.4th at 30.  At summary judgment, courts construe the facts in the light most favorable to the non-moving party and then ask whether "a reasonable [factfinder could] return a verdict" in the non-movant's favor. *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016).  The "summary judgment standard requires [courts] to credit the plaintiff's version of events, even if 'directly contradictory' to other testimony." *Id.* at 8–9.  Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Dkt. 150 at 1–2.

## ARGUMENT

### I.    Trump Bears the Burden of Establishing He Is Entitled to Presidential Immunity

The Supreme Court has cautioned that presidential immunity should not be afforded to every act "of the individual who happens to be the President." *Clinton v. Jones*, 520 U.S. 681, 701 (1997).  Instead, immunity shields only "official acts" that fall within "the 'outer perimeter' of his official responsibility." *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982).  Ultimately, the President "does not spend every minute of every day exercising official responsibilities.  And when he acts outside the functions of his office, he does not continue to enjoy immunity from damages liability just because he happens to be the President." *Blassingame*, 87 F.4th at 3.

In determining whether immunity attaches, the "salient question" is "whether [the President] took the actions . . . in his official capacity or instead in his private capacity." *Id.* at 14.  This inquiry is "an objective one, 'grounded in' a context-specific assessment of 'the nature of the function performed.'" *Id.* at 20; *see also Trump*, 603 U.S. at 628 ("The necessary analysis [is] … fact specific[.]").  The burden of establishing immunity falls squarely on Trump. *See Blassingame,*

87 F.4th at 30. To meet this burden, he must show that under an "appropriately objective, context-specific assessment," "his alleged actions can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Id.*

Despite the Supreme Court's and D.C. Circuit's straightforward statement of the applicable immunity standard, Trump fails to engage in the requisite context-specific assessment to explain why he should be immune from civil liability, and because he cannot meet that standard, attempts to recast it and eviscerate his own burden of proof.

### A.   Trump Fails to Address the Context-Specific Standard for Establishing He Is Entitled to Immunity

Trump's statement of the law falls short of *Blassingame*'s directive to analyze immunity questions by focusing on the context in which conduct arises. As *Blassingame* makes clear, in some circumstances, determining whether an act is "official" or "unofficial" is straightforward, requiring minimal analysis of the factual context. For example, a President's selection of a secretary of state is an official act. *See Blassingame*, 87 F.4th at 15, 19. By contrast, it is equally obvious that a President acts unofficially when he is "engaged in reelection campaign activity," because "an incumbent President's interests in winning reelection have the same purely private character as those of his challengers." *Id.* at 17. After all, "[t]he Office of the Presidency as an institution is agnostic about who will occupy it next." *Id.* at 4. Thus, giving "a speech at a campaign rally fully funded by a President's campaign" or "at a political party's convention accepting the party's nomination as its candidate for President" are "straightforward" examples of unofficial actions. *Id.* at 18, 20–21.

But other actions by a sitting President may present "closer calls." *Id.* at 20. In those circumstances, "the crux of the inquiry" must be the "context" in which the President acts. *Id.* at 20, 22. Conduct is more likely to be immunized when "objective indicia" show that it is an

"official function" of the presidency—*i.e.*, "organized and promoted by official White House channels" and "funded with public resources." *Id.* at 21. Conversely, conduct is less likely to be immunized when "it is organized, promoted, and funded by campaign channels, personnel, and resources." *Id.* Opinions of both the courts and the Executive Branch provide guidance by identifying the specific context that should and should not be considered.

*Organizers and Facilitators of Activity*: Whether an activity "was organized in part by Trump's former campaign staff" "inform[s] the assessment . . . of President Trump's claim of official-act immunity." *Blassingame*, 87 F.4th at 23, 30. Conversely, when the "primary organizers" are government officials or federal government entities, the event or activity is more likely to be considered an official act. *Id.* at 22–23. The identity of support staff and vendors for an event is also relevant. At "political events, [services like lighting and sound equipment] are procured from private sources, with [the White House Communications Agency ("WHCA")] merely providing technical advice." WHCA Expenses Incurred on Political or Personal Travel by the President, 14 Op. O.L.C. 144, 145 (1990). By contrast, the WHCA typically "provides lighting and sound equipment" for "official presidential events." *Id.* at 145.

*Funding of Activity*: An activity "arranged and funded by a small group including a top Trump campaign fundraiser and donor" would likely be considered private conduct, while an event that was "publicly funded, including through National Park Service and Department of Defense resources," would more likely be official conduct. *Blassingame*, 87 F.4th at 23, 30.

*Promotion of Activity*: If an activity is "promoted . . . by campaign channels, personnel, and resources," it is more likely to be considered private conduct. *Blassingame*, 87 F.4th at 21. Conversely, when government actors are responsible for promoting an activity, it is more likely to be considered an official act. *Id.*; *see also id.* at 22–23 (White House's dedication of webpage to

a 2019 July Fourth event indicated that the Executive Branch viewed it as an official event).

*Treatment of Activity by Executive Branch*:  "If the President's (and executive branch's) own treatment of the matter exhibits that he views himself to be engaged in private activity as a candidate, there is no cognizable public interest in assuring he can carry out that quintessentially unofficial function with boldness."  *Id.* at 21.  By contrast, if the White House preserves a "speech as official presidential remarks on its official website," that may evidence official conduct.  *Id.* at 23.  But not all aspects of the Executive Branch's treatment of the activity are relevant, because they may be present whether the activity in question is official or unofficial.  For example, a President is likely to be "introduced and referred to as the president," and may speak "at a podium affixed with the presidential seal" even "when speaking in [his] private capacit[y]."  *Id.* at 19.

*Attendees at Activity*:  The attendance of key federal government officials, such as the Vice President and members of the President's cabinet, may indicate that an activity is official conduct. *Id.* at 23. ███████████████████████████, the mere presence of persons with official duties is not necessarily dispositive.  *See, e.g.*, SUF ¶¶ 287–90.  For example, "there are some persons whose official duties require them to be with the President, whether or not the President himself is on official business," including "the Secret Service agents responsible for his protection." Payment of Expenses, 6 Op. O.L.C. 214, 217 (1982); *see also* SUF ¶¶ 287–90.  The presence of such individuals does not provide insight into the "character of the event."  Payment of Expenses, 6 Op. O.L.C. at 218.

*Purpose of Activity*:  While the President's subjective intent should not be analyzed, *Blassingame*, 87 F.4th at 20; *Trump*, 603 U.S. at 618, the objective purpose of that activity is critical.  *Blassingame*, 87 F.4th at 21–22; *Trump*, 603 U.S. at 629.  For example, presidential speeches at reelection campaign rallies are unofficial conduct.  *Blassingame*, 87 F.4th at 19.

Similarly, as the OLC has explained, if the "'primary purpose' of the event involves [a] president's position as leader of his political party, [the] event should be considered 'political,'" as would be the case with "[a]ppearing at party functions, fundraising, and campaigning for specific candidates." Payment of Expenses, 6 Op. O.L.C. at 217 (internal citation omitted).

In addition, *Blassingame* provides that the content of a President's speech can be consulted "to confirm what an objective assessment of the context makes evident." 87 F.4th at 22. But context remains the crux of the inquiry, because "[t]he same essential message or act may be either official or unofficial *depending on the circumstances* in which it is delivered or performed." *Id.* at 21 (emphasis added). The State of the Union address, for example, is an official act, regardless of "whether priorities given primacy in the speech may echo ones emphasized on the campaign trail. Conversely, a speech at a campaign rally fully funded by a President's campaign committee might relate some of the same messages as the State of Union address, but is an unofficial event by nature." *Id.* Put simply, "circumstances"—and not just the content of the message or conduct—are key.

## B.    Trump Mischaracterizes the Caselaw in an Impermissible Attempt to Lower the Immunity Standard

Trump improperly seeks to lower his burden by advocating for a "very low threshold" for establishing immunity. Mot. at 3. In his view, he is "entitled to summary judgment . . . unless it is absolutely clear that his actions cannot be reasonably understood as official acts." *Id.* at 4. He asserts that "Plaintiffs may only defeat immunity if they provide exceedingly unambiguous evidence, uncontradicted by President Trump, to show that the only reasonable way to understand his actions was as 'manifestly and palpably' unofficial." *Id.* at 11 (emphases added).[3]

---

[3] Notably, the terms "exceedingly unambiguous," "uncontradicted," and "only reasonable way" appear nowhere in either *Trump* or *Blassingame*.

But that is not the law. It is *Trump's burden* to prove that he is entitled to immunity. *Blassingame*, 87 F. 4th at 30. In addition, while "there is not always a clear line between [the President's] personal and official affairs," "[t]he potential difficulty of meting out that distinction in some situations . . . cannot justify simply giving up on the enterprise altogether." *Id.* at 20. By carefully parsing the evidence, courts "can, in fact, tell the difference between official and unofficial conduct," even when different pieces of context point in different directions. *Id.* Thus, *Blassingame* had no difficulty concluding that a speech at a party convention would be an unofficial act even if, for example, the President delivered his remarks "at a podium affixed with the presidential seal." *Id.* at 19. The touchstone of the inquiry is reasonableness: "[W]hen a President's actions viewed objectively and in context may *reasonably* be understood only as re-election campaign activity," a court "must deny immunity." *Id.* at 21–22 (emphasis added).

Trump's attempt to lower this standard to subterranean levels relies on misrepresentations and mischaracterizations of binding case law. For example, Trump tries to recast *Blassingame*'s clear holding by suggesting *Blassingame*'s context-specific analysis is "difficult to square" with *U.S. v. Trump*. Mot. at 9 n.5. Not so; the decisions are on all fours with one another. While the Supreme Court recognized that a President's "public communications are *likely* to fall . . . within the outer perimeter of his official responsibilities," it nonetheless made clear that the ultimate classification would turn on an "objective" "factbound analysis" of the "content *and context* of" the communications. 603 U.S. at 629 (emphasis added). For example, the Court explained that "what else was said contemporaneous to the [at issue] communications, or who was involved in transmitting electronic communications and in organizing the rally, could be relevant to the classification of each communication." *Id.* at 630. That reasoning is entirely consistent with *Blassingame*. *Id.* at 618 (citing *Blassingame* with approval). As the D.C. Circuit explained, "[a]n

immunity for all presidential speech on matters of public concern—without regard to the context in which the President speaks—would be grounded purely in 'the identity of the actor who performed it' rather than 'the nature of the function performed.'" *Blassingame*, 87 F.4th at 16. "Such a result is 'unsupported by precedent.'" *Id.*; *see also Trump*, 603 U.S. at 615–6.

In another attempt to distort *Blassingame*'s focus on contextual analysis, Trump argues that "both *Blassingame* and *Trump* severely limit a court's ability to pick among competing understandings of the facts." Mot. at 7. In support of this position, Trump quotes the Supreme Court's statement that "once it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." *Id.* at 11 (quoting *Trump*, 603 U.S. 596). But that statement applies only when it has *already* been determined that a President was acting within the scope of his "exclusive constitutional authority." *Trump*, 603 U.S. at 597. It does not foreclose the Court from conducting the "necessarily factbound analysis," *id.* at 630, to determine if Trump has met his burden to establish that he was engaged in official conduct in the first place.

Trump also incorrectly argues that *Blassingame* and *Trump* "only requir[e]" him to identify "support" for his position that his conduct was official to receive immunity. Mot. at 6 (quoting *Trump*, 603 U.S. at 621). That quoted language is from the government's oral argument before the Supreme Court, not the Court's holding. *See Trump*, 603 U.S. at 621. Far from requiring Trump to merely identify "support" for his position, both the Supreme Court and D.C. Circuit clearly held that he bears the burden to show, under an "objective, context-specific assessment," that his actions "can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Blassingame*, 87 F.4th at 30; *see also Trump*, 603 U.S. at 630.

Finally, Trump repeatedly contends that Plaintiffs must show his actions were "manifestly

or palpably" non-official conduct, quoting *Blassingame*.  *See, e.g.*, Mot. at 5, 6, 17, 20, 26, 36.  *Blassingame*'s single use of this phrase was not announcing a new standard of proof but rather explaining that an act may be beyond the "outer perimeter" of an official's duties if it is "manifestly or palpably beyond [his] authority."  87 F.4th at 13.  The court was clear that (1) Trump bears the burden of establishing that his conduct fell within the "outer perimeter" of his official duties based on the relevant "context" and "circumstances," *id.* at 21–22, 30, and (2) that conduct in Trump's capacity as office-seeker is, by definition, "manifestly and palpably" unofficial.

## II.     Trump Failed to Meet His Burden of Establishing Presidential Immunity for the Conduct at Issue

When evaluated under the objective, context-specific standard required by *Blassingame*, Trump fails to meet his burden to show he is entitled to immunity for his conduct.  Viewed through that contextual lens, the unofficial nature of each category of conduct discussed below is mutually reinforcing.  In other words, the continuing course of unofficial conduct—all in service of Trump's personal office-seeking—predating January 6, 2021, is itself context that confirms the unofficial nature of Trump's conduct on that day.

### A.     Trump's Unsupported Assertions of Election Fraud Before and After the 2020 Election Were Unofficial Conduct

Trump fails to meet his burden of establishing that he engaged in official conduct when he made unsupported assertions about election fraud before, SUF ¶¶ 21–25 (prospectively alleging fraud before the election), and after the 2020 election, *id.* ¶¶ 26–42, 45–49, both (1) through his personal Twitter account, @realDonaldTrump, *id.* ¶¶ 27–40, 45, 47–49, 90, 225–29, 241, 243–45, 347, 349, 351, and (2) in speeches and interviews he gave, *id.* ¶¶ 41–42, 336–37, 350.  These assertions were important parts of Trump's office-seeking efforts that culminated in his actions on January 6.  The context and content of these statements, with which he does not engage, make clear that Trump acted in his capacity as candidate when making them.  His arguments to the

contrary ignore his own prior concessions, *id.* ¶¶ 12–17, and established law.

        *1.*      <u>*The Context and Content of Trump's Tweets About Election Fraud Confirm*</u>
<u>*the Tweets Were Sent in His Unofficial Capacity*</u>

      Trump fails to attempt the requisite "factbound analysis" of the "content and context of" his tweets about election fraud related to the 2020 election. *See supra* Section I.A.[4]  Rather, conducting the analysis set forth in *Blassingame* supports the conclusion that those tweets were posted in his unofficial capacity as an office-seeker.

      Because some tweets from @realDonaldTrump were official and some were purely private, campaign activity, *see, e.g.,* SUF ¶¶ 1, 20, the focus must be on the relevant tweets at issue.

██████████████████████████████████████████████████████

████████████████████. *E.g.*, *Id.* ¶ 20 ("█████████████████████████

████████████████████████████████████████████████████

██████████"); ¶ 22.  After the election, again with no evidence, Trump continued to attack its legitimacy, emphasize his own purported victory, and encourage his supporters to help "overturn" the result.  *E.g.*, *id.* ¶ 39 ("Republicans in Wisconsin" should go "to their State Legislators and overturn this ridiculous State Election.  We won in a LANDSLIDE!"); ¶¶ 104–06, 108.  He tweeted about the efforts of his Campaign's lawyers, including Rudy Giuliani, to keep him in office.  *Id.* ¶ 31.  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████).  *Id.* ¶ 47 .  When this Court previously analyzed similar tweets, it held that they "reflect an electoral purpose, not speech in furtherance of any official duty."  *Thompson*

---

[4] The relevant tweets posted from the @realDonaldTrump Twitter account, as set forth in paragraphs 21–23, 27–41, 45, 47–49, 90, 225–29, 241, 243–45, 347, 349, and 351 of the SUF, are hereinafter collectively referred to as the "relevant tweets."

*v. Trump*, 590 F. Supp. 3d 46, 83 (D.D.C. 2022).  There is no reason to disturb that conclusion.

The context in which Trump posted these tweets further confirms their office-seeking nature.  *Blassingame*, 87 F.4th at 22.  Critically, Trump posted the relevant tweets from his @realDonaldTrump account when he was attempting to remain in office, including through litigation echoing the claims in his tweets.  *Infra* Section II.C. ████████████████████

████████████████████████████████████████████

████████████████████████████████.  SUF ¶¶ 323–28; *see also id.* ¶¶ 16, 18–19, 251, 304, 309–310.  As *Blassingame* held, those facts make it "more likely" that the relevant tweets are unofficial statements.  87 F.4th at 21, 24.

In addition, Trump conceded before the Supreme Court and the Second Circuit that the account @realDonaldTrump "belongs to him in his personal capacity" and that he used it "well before" and after serving as President.  SUF ¶¶ 13–17.  He maintained this position in court filings from 2019 to April 2021—a period covering the relevant tweets in this action.  *Id.* at ¶ 12.  Trump's own contemporaneous treatment of the account demonstrates that he "view[ed] himself to be engaged in private activity" when he posted the relevant tweets.  *Blassingame*, 87 F.4th at 21.

### 2.    *Trump's Argument That All of His Tweets Are Official Conduct Fails*

Trump purports to apply the Supreme Court's framework in *Lindke v. Freed*, 601 U.S. 187 (2024), at times seemingly suggesting that *all* his tweets on @realDonaldTrump were official, an approach for which he cites no authority.  Mot. at 28–36.  In doing so, he disregards that *Lindke*, like *Blassingame*, requires a more detailed analysis of the relevant tweets.  *Lindke* held that a government actor's social media use is official only if the actor "(1) had actual authority to speak on behalf of the State *on a particular matter*, and (2) purported to exercise that authority *in the relevant posts*."  601 U.S. at 204 (emphases added).  This two-prong test once again requires a "fact-intensive" inquiry into the context and content of the tweets.  *Id.* at 197–202.

Trump argues the "first element of the *Lindke* test is easily met" because presidents "possess[] actual authority to speak on the government's behalf." Mot. at 32. But *Lindke* rejected that status-based approach, explaining "[defendant's] status as a state employee is not determinative," and that "[t]he distinction between private conduct and state action turns on substance, not labels." 601 U.S. at 197. Under *Lindke*, Trump "must show more than that [he] had some authority to communicate with [the public] on behalf of [the government]. The alleged [statements] must be connected to speech on a matter within [his] bailiwick." *Id.* at 199 (quotation marks omitted). Thus, Trump must show he had authority to speak on behalf of the government on the *particular matter* covered by the relevant tweets, which he makes no attempt to do. *Id.* at 204. Instead, he argues in broad strokes that the President "*may* use the soft power of his office . . . to urge action . . . on matters of public concern." Mot. at 32 (emphasis added). This kind of vague, ambiguous, and equivocal assertion is insufficient to establish official conduct. *See Lindke*, 601 U.S. at 198–99; *Blassingame*, 87 F.4th at 21.

Trump argues the second *Lindke* element is met because he generally "purported to exercise his presidential authority when he spoke on social media" or spoke to fulfill legal responsibilities. Mot. at 33. Again, *Lindke* rejected this sweeping position. As the Supreme Court explained, "an official does not necessarily purport to exercise his authority simply by posting about a matter within it." 601 U.S. at 203. When Trump tweeted allegations of election fraud, he was not using "his speech in furtherance of his official responsibilities, he [was] speaking in his own voice." *Id.* at 201. Like *Blassingame*, then, the second *Lindke* prong requires a context-specific inquiry into the relevant tweets, and as with the first prong, Trump fails to satisfy that inquiry. *Id.* at 202. Trump attempts to reimagine his tweets as statements urging Congress to take actions on matters of public concern. Mot. at 33. On their face, the relevant tweets are not that—

they are open attempts to maintain himself in office.  *See supra* II.A.1.  And his brief invocation of the Take Care Clause and his previously-rejected "public concern" test for immunity cannot paper over his failure to engage in the requisite context.  *See infra* Sections II.B.2, II.D.8.[5]

Trump's attempts to point to "additional specific evidence" that purportedly "corroborat[es]" his claim that his use of his personal Twitter account was official fare no better. Mot. at 34–36.  He first argues his tweets about the Rally were official statements because the Rally was not a campaign event (Mot. at 34), but that assumes the conclusion of the analysis.  As discussed in detail below, *see infra* Section II.D, Trump's conduct at the Rally was unofficial because he acted as an office-seeker.

Trump also argues that, because the U.S. National Archives ("NARA") purportedly "obtained and preserved" other tweets not at issue here, the relevant tweets are official conduct. Mot. at 35–36.  Even if Trump had shown NARA preserved the relevant tweets (which he did not), there is no evidence that what NARA chooses to archive tracks with the immunity analysis.  If anything, Trump's argument makes clear that NARA's archiving efforts are irrelevant to that analysis.  Trump claims NARA "has concluded that the President's tweets are official records." Dkt. 144-2 ¶ 18.  But the designation of *all* Trump's tweets as presidential records sweeps in campaigning tweets that are plainly unofficial under *Blassingam*e.  *See, e.g.*, SUF ¶¶ 1, 20.

The remainder of Trump's arguments all concern his Twitter account more generally, such as how he "routinely" used that account "for official communications."  Mot. at 33–36.  But those arguments miss the mark, as Plaintiffs are not arguing *all* of Trump's tweets from that account are

---

[5] Trump discourages the Court from analyzing the second element of *Lindke* because it is "difficult."  Mot. at 31–32.  This abdication of Trump's burden cannot carry the day.  "The potential difficulty of meting out that distinction in some situations . . . cannot justify simply giving up on the enterprise altogether."  *Blassingame*, 87 F. 4th at 20.

unofficial.  In any event, Trump conceded in other lawsuits that he used the account for "personal" and "official" purposes, SUF ¶ 15, and that "[h]is use of the [@realDonaldTrump] account to make statements about official matters does not alter the fundamentally private, rather than governmental, nature of that authority," *id.* ¶ 13.  Thus, the fact that Trump sometimes tweeted about official actions fails to show that he was "purporting to exercise state authority in [the] specific posts" at issue here.  *Lindke*, 601 U.S. 203.  Even Trump's claim that he "operated the *account* with help from the White House Director of Social Media," Mot. at 35 (emphasis added), presents no evidence that any Executive Branch resources were devoted to preparing or releasing the relevant tweets specifically.

Accordingly, under both *Blassingame* and *Lindke*, Trump has failed to meet his burden to demonstrate that the relevant tweets were official.

### 3. The Context and Content of Trump's Other Public Statements About Election Fraud Show Those Statements Were Unofficial Conduct

Because Trump makes no attempt to argue that his other pre-January 6 public statements about election fraud were official acts, he concedes that they are not entitled to presidential immunity and has definitionally failed to meet his burden of "informing the [] court of the basis for [his] motion."  *Celotex Corp.*, 477 U.S. at 323; *see also Blassingame*, 87 F.4th at 30.  Even so, it is clear that they are not official.

Trump began making public statements questioning the legitimacy of the 2020 election long before it occurred.  SUF ¶¶ 21–25.  On August 17, 2020, at a Trump Campaign rally in Wisconsin, Trump said: "the only way we're going to lose this election is if this election is rigged." *Id.* ¶ 24.  A week later, during the Republican National Convention, he said that "[t]he only way they can take this election away from us is if this is a rigged election."  *Id.* ¶ 25.  *Blassingame* held these types of statements are those of a candidate for office and are unofficial conduct.  87 F.4th

at 18–21 (addressing these two speeches).

After losing the 2020 election, Trump continued to claim he had won the election.  *See* SUF ¶¶ 26–42.  Trump claimed in his election night speech that he lost because of a "fraud on the American public," adding:  "Frankly, we did win this election."  *Id.* ¶ 26.  Similarly, in a speech given at Dalton, Georgia, on January 4, 2021, to support two candidates in the U.S. Senate runoff election, Trump said:  "[T]hey are not taking this White House, we are going to fight like hell." *Id.* ¶ 41–42, 336.  These statements, delivered to his reelection supporters on election night and at a partisan rally, were plainly made to retain office.  *Blassingame*, 87 F.4th at 18–21; SUF ¶¶ 26, 41–42, 336.

As with Trump's relevant tweets, the content of these statements confirms that Trump acted in his personal capacity as an office-seeker when making them.  *Blassingame*, 87 F.4th at 22.  In these statements, Trump attacked the legitimacy of the presidential election and told voters why he purportedly should remain in office.  Such statements differ markedly from the types of statements the D.C. Circuit identified as potentially bearing on a President's official responsibilities.  For example, Trump was not "announc[ing] his intention to issue an executive order, eulogiz[ing] the fallen leader of an ally, or offer[ing] the nation's condolences."  *Id.* at 15. Instead, Trump's conduct promoted his own victory in the 2020 election, even in the face of overwhelming evidence that he lost.  *See, e.g.*, SUF ¶¶ 98–102, 105–06, 112–14, 117.

### B.    Trump's Attempts to Enlist State Actors and Employ Fraudulent Electors to Overturn the 2020 Election Were Unofficial Conduct

After losing the 2020 election, Trump attempted to overturn the results of his race at the state level by (1) pushing state officials to block certification of valid election results; and (2) implementing a scheme to appoint false electors.  SUF ¶¶ 51–102.  As with Trump's above-described statements, these efforts were integral to his efforts to secure reelection that culminated

in his actions on January 6.  Trump now argues this conduct was official.  But his arguments miss the mark in two respects.  *First*, he again fails to deal with the actual conduct at issue and its context.  Had Trump applied the contextual analysis required by *Blassingame*, he couldn't have claimed his conduct was "official."  *Second*, the few arguments he makes to contend these actions were official are either squarely foreclosed by *Blassingame* or irrelevant.

1.    *Trump Fails to Address the Context of His Communications with State Officials and Organizing Fraudulent Electors*

Trump fails to show he is entitled to immunity for his attempts to persuade state officials to change election results and attempts to organize fraudulent electors.  As an initial matter, Trump fails to describe the conduct at issue accurately, referring to it solely as "reach[ing] out to numerous state and local election officials and members of state legislatures over concerns of election irregularities that occurred within their respective jurisdictions."  Mot. at 32.  The only supporting evidence he cites is his tweet sharing a link to a news article titled "Trump Speaks to State Legislators on Call About Decertifying Election."  Dkt. 144-21.  But Trump did not merely "reach out . . . over concerns of election irregularities"—he requested that state officials take concrete steps to overturn the results of the 2020 presidential election in their states so he could remain in office.  SUF ¶¶ 51–102.

Specifically, after it became apparent that Trump lost the 2020 election, he attempted to recruit Republican officials in several swing states, including Pennsylvania, Michigan, and Georgia, to sway the outcome of the election in his favor.  Trump, his Campaign and personal attorneys, and his Campaign staff pursued this goal by (1) contacting state officials to assert baseless claims of fraud and persuade them to change the results of the 2020 election, and (2) recruiting individuals in those states to serve as "alternate" electors to cast fraudulent electoral votes in his favor, even though those individuals had not been chosen by the voters in their states

to serve as members of the Electoral College.  *See* SUF ¶¶ 51–102.

a.     *Efforts to Enlist State Officials*

In November 2020, Trump told Pennsylvania officials that the 2020 election "███████

██████████ SUF ¶¶ 75–80.  That same month, Trump called two local Michigan officials, after which they both attempted to "rescind" their votes in favor of certification.  *Id.* ¶¶ 81–83.  In December 2020, Trump called the Georgia Secretary of State and said he needed to "find 11,000 votes" in Trump's favor.  *Id.* ¶¶ 88–95.  As Justice Barrett explained, "[t]he President has no authority over state legislatures or their leadership."  *Trump*, 603 U.S. at 653 (Barrett, J., concurring).  There are many legitimate reasons for a President to contact state officials; urging officials to reverse the results of his own election is not among them.  *See id.*

The context in which this outreach occurred also demonstrates Trump acted as an office-seeker looking to retain office, not as a President engaged in an official duty.  Trump's Campaign Twitter account confirms the unofficial nature of these overtures, as it instructed readers to contact Michigan officials on January 3, 2021 to "[c]orrect false statements" and "[d]emand [a] vote on decertification."  SUF ¶ 86. ███████████████████████████

███████████████████ *Id.* ¶ 90.  In contrast, no evidence shows that Trump deployed Executive Branch officials or other federal government resources when he attended a state legislative hearing in Pennsylvania, *id.* ¶¶ 75–76, or when he called officials in Pennsylvania, Michigan, and Georgia, *id.* ¶¶ 77–97, as there is no legitimate role for a sitting president in certifying state election results, *see Trump*, 603 U.S. at 628 (noting this conduct "cannot be neatly categorized as falling within a particular Presidential function").  Trump's efforts to enlist state officials to change the results of the election must be viewed in the context of his other private, office-seeking conduct in which he was trying to overturn the results of the election through the recruitment of false electors and the filing of private lawsuits.  *See infra* Section II.B.1.b., II.C.

Considering all this context, which Trump does not address, he has failed to establish immunity for his communications with state officials seeking to alter the results of the election.[6]

        *b.*     *Recruitment of False Electors*

In November and December 2020, Trump and Campaign affiliates, including Campaign attorneys James Troupis and Kenneth Chesebro, executed a plan to recruit false electors to keep Trump in office. SUF ¶¶ 51–74. Together, they enlisted individuals in key battleground states to sign certificates declaring they were the "qualified and elected" members of the Electoral College and casting fraudulent votes for Trump, even though they were not elected and qualified Electoral College voters. *Id.* ¶¶ 57–74. Trump also met with Michigan legislators and told them to "have [a] backbone and do the right thing," which they understood to mean "overturn the election by naming electors for" Trump. *Id.* ¶¶ 84–86. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████ *Id.* ¶ 88.

That Trump's participation in the recruitment of fraudulent electors was unofficial is settled. As the Supreme Court recognized, Trump "appeared to concede" these acts "entail[ed] 'private' conduct." *Trump*, 603 U.S. at 626. And as Justice Barrett recognized, Trump's "attempt to organize alternative slates of electors" "is private [conduct] and therefore not entitled to protection." *Id.* at 653 n.2 (Barrett, J., concurring).

_____

[6] Trump argues it is "inconsequential whether any other government agency . . . participated in these efforts, as the President 'alone composes a branch of government.'" Mot. at 33. This conflates the separation of powers analysis in *Trump v. Mazars USA, LLP*, 592 U.S. 848 (2020) with the "fact specific" analysis required here. *Trump*, 603 U.S. at 628. Binding precedent makes clear that "who was involved" in the challenged conduct sheds light on the nature of that conduct. *Id.* at 630; *see also Blassingame*, 87 F.4th at 23. Further, this argument essentially asks the Court to grant immunity to any action a President takes simply because he *is* the President—an approach squarely rejected by the Supreme Court. *Clinton*, 520 U.S. at 695.

Perhaps for those reasons, Trump makes no effort to meet his burden of establishing that these attempts to recruit false electors were official. Nor could he. The surrounding context makes clear his actions were those of an office-seeker. Campaign actors—not Executive Branch officials—concocted the scheme and worked with Trump to execute it. SUF ¶¶ 56–71. For example, Chesebro, on behalf of the Campaign, prepared and circulated a memorandum to Campaign officials and others outlining how false electors could submit fraudulent electoral votes in Trump's favor. *Id.* ¶¶ 58–64. Another lawyer working for the Campaign, John Eastman, sought Republican National Committee representatives' help in identifying "alternate electors." *Id.* ¶¶ 67–68. And Executive Branch officials were not only uninvolved in executing the scheme; they also advised Trump the plan was "not legally sound," *id.* ¶ 72, and that his contesting the 2020 election results should have ended when the Electoral College certified their votes, *id.* ¶¶ 73–74. Thus, the conduct of Trump, his Campaign, and Executive Branch officials demonstrates that Trump was "engaged in *private* activity as a candidate." *Blassingame*, 87 F.4th at 21.

### 2.    *Trump's Arguments Mischaracterize the Law and Are Irrelevant*

Trump advances a handful of other arguments that are either irrelevant or mischaracterize the law. He claims, with no factual support, that his communications with state actors were official conduct because they were performed "in accordance with" the Take Care Clause of the Constitution. Mot. at 32. *Blassingame*, however, expressly rejected this argument, explaining Trump's argument "does not demonstrate that he was acting in his official capacity so much as presume it." 87 F.4th at 23; *cf. Trump*, 603 U.S. at 651 n.1 (Barrett, J., concurring) (not "all exercises of the Take Care power fall within the core executive power"). The Take Care Clause is not a "get out of jail free" card—rather, the official nature of an act must be demonstrated by analyzing the "context" surrounding it. *Blassingame*, 87 F.4th at 24. Here, a review of the context

illustrates that Trump was acting in his private capacity as office-seeker.[7]

Trump also argues that his attempts to enlist state officials to change the election in his favor were official because "records . . . referring to these conversations [] are considered official communications maintained by the National Archives."  Mot. at 32.  As discussed above, the archiving of documents by NARA does not determine that the *conduct described in the documents* was official.  *See supra* Section II.A.2.  In addition, the only evidence Trump cites is a single tweet he contends was "obtain[ed] and preserve[d]" by NARA.  Dkt. 144-2 ¶ 26.  In this tweet, Trump shared a link to a Breitbart article reporting on a phone call he had with state officials loosely related to the conduct at issue.  Dkt. 144-21.  Thus, under Trump's logic, any time that NARA archived a tweet from his personal Twitter account sharing a link to a news article, the subject of the article becomes an "official act."  Trump offers no legal support for this boundless proposition.

### C.   Trump's Lawsuits Challenging the 2020 Election Were Unofficial Conduct

After Trump lost the 2020 election, he personally brought five lawsuits in his private capacity alleging voter fraud, violations of state election laws, and constitutional claims.  SUF ¶¶ 103–04.  These lawsuits were yet another component of his efforts to retain office.  The Campaign joined three of those lawsuits as a plaintiff and brought at least five others in various federal courts.  *Id.* ¶¶ 104, 107.  The United States government was not a party to any of them, and the DOJ refused to pursue Trump's allegations of election fraud for lack of any credible evidence.  *Id.* ¶¶ 73, 102, 115–17.  In each case, Trump sought relief in his personal capacity as a candidate

---

[7] Nor could Trump credibly claim that he was acting to ensure the integrity of the 2020 election (Mot. at 27), because he continued to pursue his scheme even after state and federal officials uniformly disputed his allegations of election fraud and publicly backed the integrity of the 2020 election, *see* SUF ¶¶ 88–102.  In any event, Trump has previously conceded his actions to impact the administration of elections in battleground states through litigation was private in nature, and done to "protect his … interests as a candidate for re-election to the Office of President." *Blassingame*, 87 F.4th at 16.

for reelection.  *Id.* ¶¶ 103–04; *see also id.* ¶¶ 109–10.[8]  That is dispositive here.

As *Blassingame* recognized, this conduct was plainly unofficial.  The court observed that "Trump himself recognized that he engaged in his campaign to win reelection—including his post-election efforts to alter the declared results in his favor—in his personal capacity as presidential candidate, not in his official capacity as sitting President.  That is evident in his effort to intervene in the Supreme Court's consideration of a post-election lawsuit challenging the administration of the election in various battleground states."  *Blassingame*, 87 F.4th at 4.  This series of private lawsuits was yet another link in the chain of conduct seeking to perpetuate Trump's incumbency that culminated in his actions on January 6.  Trump does not and cannot argue that filing these lawsuits was official, and thus has failed to meet his burden.  *Id.* at 30.

### D.    Trump's Remarks at the Rally Were Unofficial Conduct

Trump's remarks at the Save America Rally were the culmination of his efforts to retain office through tweets and public statements asserting unfounded complaints of election fraud, attempts to enlist state actors and employ fraudulent electors to overturn the results of the election, and failed private litigations claiming election fraud.  These actions provide critical context by which to assess Trump's actions at the Rally, which represented his last-ditch effort to stay in office beyond his elected term.  Additionally, all the immediate context surrounding the Rally—from the Rally's objective purpose to its organization, funding, promotion, and execution—points in one clear direction: On January 6, 2021, Trump appeared in front of the Rally crowd acting as an office-seeker, not an office-holder.  This conclusion is further supported by the content of

---

[8] By January 2021, the five lawsuits brought by Trump and five federal lawsuits brought by the Campaign were dismissed, decided against the plaintiffs, or denied the plaintiffs' requested relief.  SUF ¶¶ 105–06, 108.  Four of the five cases Trump brought personally had been rejected or withdrawn by January 6, with Trump voluntarily dismissing the fifth case on January 7, 2021.  *Id.*

Trump's remarks at the Rally, which resembled his remarks at other political events and indisputably concerned his reelection efforts.[9]

### 1.    *Permitting for the Rally*

The permitting process makes plain that, from its inception, the Rally was an unofficial event created by private individuals—the majority of whom were current or former Campaign affiliates.  SUF ¶¶ 180–202; CSUF Table C; *see Blassingame*, 87 F.4th at 21, 30 (whether the Rally "was organized *in part* by Trump's former campaign staff" would "inform" the immunity "assessment") (emphasis added).

The permit for the Rally was obtained by WFAF, a private grassroots organization dedicated to supporting the America First Agenda.  SUF ¶¶ 123, 180–85, 311; CSUF Table D.  The founders of WFAF—Kylie Kremer and Amy Kremer, two of Trump's "longtime supporters"—were never employees or officials of the federal government.  SUF ¶¶ 123, 126, 128.

The Campaign's involvement in the Rally is evident from early in the permitting process.  On December 17, 2020, weeks before the permit was issued, Pierson, a senior advisor with the Campaign, SUF ¶ 145, texted Amy Kremer that "January 6th is D day."  SUF ¶ 180.  Kremer replied, "I know" and "we are putting together the plan now."  *Id.* ███████████████

█████████████████████████████████████████████████

███████████████  ███  ████████████████  *Id.* ¶ 38 (emphasis added).

The Kremers worked with Justin Caporale, another Campaign affiliate, to secure the permit

---

[9] Trump is incorrect that "during arguments before the D.C. Circuit, Plaintiffs *conceded* that the [*sic*] President Trump acted in his presidential capacity."  Mot. at 18.  Plaintiffs argued that the court would *create* a separation of powers issue if it held that Trump was acting in his official capacity.  Plaintiffs did not argue that one existed, and certainly did not concede that Trump was acting within his official capacity.  *Blassingame v. Trump*, Case No. 22-7031, Dkt. 1965949 at 28–33 (D.C. Cir. Sept. 23, 2022).

for (and ultimately organize) the Rally.  SUF ¶¶ 182, 186; CSUF Table D.  Caporale worked for the Campaign at least through November 30, 2020, and ███████████████████████████ ████████████████  SUF ¶¶ 171–72, 232–33, 235–37.  On or around December 26, 2020, Caporale advised WFAF that the Ellipse would be a better location than the planned Freedom Plaza.  *Id.* ¶ 182.  On December 29, 2020, the Kremers submitted a permit application to the National Parks Service ("NPS") ensuring that the Rally could be held at the Ellipse.  *Id.* ¶ 183.  NPS issued the permit for the Rally on January 5, 2021.  *Id.* ¶ 184.  It is clear from the permit's face that the Rally was intended to be a "March for Trump," not a government event.  *Id.* ¶ 185.  The permit also highlights that Rally speakers would include private individuals, including those associated with the Campaign—Roger Stone, Julio Gonzalez, Rudy Giuliani, and Diamond and Silk.  *Id.*

Finally, the permit lists the names and roles of those responsible for the Rally.  SUF ¶¶ 186–96, 198.  None of these individuals were government officials or employees; they were all private actors, and many were affiliated with the Campaign.  *Id.* ¶¶ 186–202; CSUF Table C.  In fact, ten of the twelve people named on the permit worked or had recently worked for the Campaign.  SUF ¶¶ 198–99; CSUF Table C.  Those individuals were collectively paid over $1.3 million by the Campaign between 2015 and January 6, 2021.  SUF ¶ 199.  And the Campaign continued to pay some after that, like Megan Powers, who received nearly $20,000 on February 2, 2021.  *Id.* ¶ 157.

## 2.   *Funding for the Rally*

*Blassingame* explains that if "an activity is . . . funded with public resources, it is more likely an official presidential undertaking than if it is . . . funded by campaign channels, personnel, and resources."  87 F.4th at 21.  It is undisputed that no public funds financed the Save America Rally, unlike the July 4, 2019 Salute to America event.  SUF ¶¶ 203, 309, 312–13; *Blassingame*, 87 F.4th at 22, 23.  Rather, the Rally was funded by the Campaign and private donations procured by individuals affiliated with the Campaign.  *See* SUF ¶¶ 203–20.

For example, Pierson was involved in discussions about funding the Rally. SUF ¶ 147. So was Sean Dollman, the Campaign's CFO, who told other Campaign staff that they continued to be "on payroll" with the Campaign after the 2020 election.[10] *Id.* ¶ 135. With Dollman's sign-off, Mike Hahn, a member of the Campaign's social media team, instructed organizers to invoice the Campaign for Rally-planning compensation, and to "copy Dollman" on those requests. *Id.* ¶¶ 139, 143. In the days leading up to the Rally, Dollman approved payments from the Campaign, including to Caporale. *Id.* ¶ 135. On or around January 6, 2021, the Campaign paid Event Strategies for equipment rentals in connection with the Rally, continuing its longstanding financial relationship with that contractor. *Id.* ¶¶ 169, 204.

It is also undisputed that the Campaign's financing of the Rally was supplemented by numerous private actors. Leading up to the Rally, Caroline Wren, a Campaign finance advisor, hired three individuals who worked in the Campaign's finance department to assist her. SUF ¶¶ 161, 164. Wren obtained a multi-million donation from Julie Fancelli, a private Campaign donor, which was budgeted to support the Rally. *Id.* ¶¶ 177–79, 211, 215, 216–20. The budget allotted $1 million to Turning Point Action, which used the funding to organize buses for Rally attendees, compensate speakers, and to otherwise coordinate the event. *Id.* ¶¶ 216, 219. The Tea Party Express received funds to advertise and "crowd build" for the Rally via radio and digital advertising. *Id.* ¶¶ 216, 220. The Rule of Law Defense Fund received money to make robocalls encouraging people to attend the Rally. *Id.* ¶¶ 216, 218. WFAF itself was allotted $300,000 of Fancelli's donation. *Id.* ¶ 216. Numerous other private individuals also contributed to the Rally. SUF ¶¶ 212–14. In sum, the Rally was financed like a campaign event—not a governmental one.

---

[10] Dollman was paid by the MAGA PAC through at least March 16, 2021. SUF ¶ 134.

3.      *Promotion of the Rally*

The government had no involvement in promoting the Rally, unlike the 2019 Salute to America rally. *Blassingame*, 87 F.4th at 22, 23; SUF ¶ 310. Rather, the Rally was "promoted" by "campaign channels, personnel, and resources," as well as other private actors and Trump himself, evidencing that it was an unofficial event. *Blassingame*, 87 F.4th at 21.

*First*, Campaign channels promoted the Rally, as did Campaign employees. SUF ¶¶ 230–37, 240–42, 246–50. ████████████████████████████

████████████████████████████████████████

████████████████████████████" *Id.* ¶ 231. Hannah Salem, a Campaign employee, was identified by the Campaign as "running press ops for jan 6," and the Campaign had its own "PR campaign" for the Rally. *Id.* ¶¶ 232–37. Consistent with the foregoing, the Campaign posted on its Twitter account: "JANUARY 6 – WASHINGTON D.C.," along with a link to a news clip about the Rally featuring Kylie Kremer. *Id.* ¶ 240. On January 2, 2021, YouTube channel @DonaldJTrumpforPresident posted a promotional video that promised the Rally "could be the biggest event in Washington D.C. history," and encouraged viewers to "join the march on January 6, 2021." *Id.* ¶ 230. On January 3, 2021, Jason Miller, a Senior Advisor to the Campaign, retweeted the Campaign's promotion of the Rally. *Id.* ¶ 242. The @TeamTrump account also posted several promotional tweets on January 6: (1) a picture of the Rally with the caption "This is what Democracy looks like"; (2) the message "we must SAVE AMERICA" and "Pass it on"; and (3) an image of Trump during his Rally speech, alongside a quote containing his accusations of election fraud. *Id.* ¶¶ 246–47, 249. The Campaign also posted on its Instagram an image of Trump speaking at the Rally, with the caption, attributed to @realDonaldTrump: "STOP THE STEAL" and "This is what Democracy looks like." *Id.* ¶¶ 248, 250.

*Second*, members of WFAF promoted the Rally on unofficial, private channels. SUF

¶¶ 210, 221–24.  Kylie Kremer sent a Fox News anchor an infographic and invitation for a "March for Trump" in Washington, D.C. on January 6, 2021.  *Id.* ¶ 221.  She also distributed an infographic about the Rally—tailored to be disseminated on Twitter—with the note: "ALL HANDS ON DECK – THE PRESIDENT HAS CALLED US TO ACTION… 'BE THERE, WILL BE WILD.'"  *Id.* ¶ 223.  Kremer also disseminated a WFAF-branded infographic for the "March for Trump bus tour," planned for December 27 through January 6, 2021.  *Id.* ¶ 224.  On December 21, 2020, Amy Kremer invited Lara and Eric Trump to the Rally, ████████████████████████████ ████████████████████.  *Id.* ¶¶ 222, 275, 277.  WFAF promoted the event on television, too.  On January 3, 2021, Kylie Kremer appeared on a news channel, where she was described as the "organizer" of the Rally.  *Id.* ¶ 239.  Her appearance included a banner that read: "JAN 6 MAGA MARCH TO BE HELD ON WHITE HOUSE ELLIPSE."  *Id.*

*Third*, Trump himself repeatedly promoted the Rally on his personal social media accounts.



████████████████████████████████████████████████████

████████████████████████████.  SUF ¶¶ 225–29, 241, 243–45; *see supra* Section II.A.  ██

████████████████████████████████████████████████████

████████████████████████████.  *Id.* ¶ 227.  He also repeatedly advertised his own attendance at the Rally.  *Id.* ¶ 238 ("I will be there.  Historic day!"); *id.* ¶ 225.  And on January 3, 2021, Trump retweeted a tweet from the Campaign that contained the news clip in which Kremer promoted the Rally.  *Id.* ¶ 241. ████████████████████████████████████████

*Id.* ¶ 236. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.  *Id.* ¶¶ 228–29.

Trump's personal tweets promoting the Rally further evidence that he appeared there in his

capacity as an office-seeker. ███████████████████████████████████████
SUF ¶ 227.  Ross Worthington, who wrote both official and political speeches for President
Trump, explained the significance of the term "rally," stating, "generally political speeches were
rallies."  *Id.* ¶¶ 314, 318.  ████████████████████  Trump's tweets promoting the Rally urged
supporters not to let the election be "stolen."  *Id.* ¶¶ 227, 243–44.  ████████████████

████████████████████████████████████████████████████████████████

████████████████████████  *Id.* ¶ 243.  █████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████  *Id.* ¶¶ 54, 118, 245.

The significance of these private efforts to promote the Save America Rally is especially
clear when juxtaposed with the silence from official government channels about the event.  For
example, neither the @WhiteHouse nor @POTUS accounts said anything about the Rally.  SUF
¶ 251.  ███████████████████████████████████████████████████████████

████████████████████████████████████.  *Id.* ¶¶ 323–28.

### 4.    *Organization and Execution of the Rally*

Many of the private groups and individuals responsible for permitting, funding, and
promoting the Rally were also intimately involved in its execution.  These actors—many of whom
were employed by or otherwise affiliated with the Campaign—orchestrated and oversaw the
Rally's logistics.  *See* SUF ¶¶ 252–62.  This context, too, makes clear the event was unofficial in
nature.  *See Blassingame*, 87 F.4th at 4, 21.

Caporale, Powers, Wren, and Guilfoyle—all of whom were either directly employed by or
affiliated with the Campaign, SUF ¶¶ 136–37, 152–57, 161–66, 171–72—coordinated logistics for

the Rally.[11]  A "Guidance Memo" for the Rally directed questions about the Rally to several Campaign affiliates, including Wren, and provided their contact information.  *Id.* ¶ 262.  Caporale contracted with Event Strategies to provide event planning services, including coordination of the Rally's schedule and production, and payment for the Rally's medical plan.  *Id.* ¶¶ 170, 255.  As explained below, Powers and Caporale helped decide who would speak at the event, *see infra* Section II.D.5, and Powers and Wren provided access credentials for speakers and attendees, SUF ¶¶ 154, 252, 257.  Wren coordinated Rally production, advertising, access, and held influence over which organizations would be involved.  *Id.* ¶¶ 162, 216–17, 252.  Wren's responsibilities extended to post-Rally logistics, too, as she personally facilitated payments to speakers in return for their participation.  *Id.* ¶¶ 216–17, 286.  Taylor Budowich, senior advisor to the Campaign, informed Caporale that another Campaign employee wanted to help with the Rally.  *Id.* ¶¶ 131, 201.  Consistent with the Campaign's heavy involvement, Budowich referred to the Rally as a "DJTFP rall[y]," i.e., a Donald J. Trump for President Campaign rally.  *Id.* ¶ 261.

WFAF was also deeply involved in organizing the Rally.  WFAF coordinated lodging for Rally speakers, paid for certain attendee expenses, provided marshals and volunteers for "crowd control" and "safety," and engaged Event Strategies as a "production vendor" for the Rally.  SUF ¶¶ 253, 255.  WFAF represented to others that the Rally was a private political event, *id.* ¶ 254, and others involved in the Rally understood that to be true, *id.* ¶¶ 149, 174.  For example, Caporale "underst[ood]" the Rally "was not an official event put on by the White House."  *Id.* ¶ 174; *see also id.* ¶ 149 (similar for Pierson).

---

[11] Lower-level Campaign affiliates also assisted with organizational efforts.  For example, two then-recent Campaign staffers, William Wilson and Ron Holden, coordinated the rental of golf carts and procurement of signage for the Rally, respectively.  SUF ¶¶ 192–93, 258–59.

5.     _Speakers at the Rally_

The selection of speakers for the Rally and the affiliations of the speakers themselves also "bear[] the hallmarks of reelection campaign activity." *Blassingame*, 87 F.4th at 21.

To start, Campaign employees, other private individuals, and Trump himself helped prepare the list of Rally speakers. On December 31, 2020, Campaign employee Powers emailed Kylie Kremer edits to the list of speakers for the Rally, stating the as-edited list was "good to now send to the Park Service." SUF ¶¶ 263, 265–66. Similarly, on January 2, 2021, WFAF's Cindy Chafian texted Pierson her "lineup" of speakers and asked to receive Pierson's list of speakers as well. *Id.* ¶ 264. On January 4, 2021, Pierson met with Trump to discuss the list and emailed Powers and Caporale the list afterwards. *Id.* ¶¶ 267–69. Trump made the final decisions about who was speaking at the Rally in conjunction with members of his Campaign staff—not with members of his presidential administration. *Id.* ¶¶ 263–70. And Pierson provided instructions on the order of speakers, how to allocate time among them, and the start time of the Rally. *Id.* ¶ 269.

█████████████████████████████████████████████████████████████████

██████████████ SUF ¶¶ 271–85. Instead, the other speakers were overwhelmingly individuals associated with the Campaign, such as Campaign employee Guilfoyle, Campaign attorneys Giuliani and Eastman, and Campaign affiliates Lara Trump, Eric Trump, and Donald Trump, Jr. *Id.* ¶¶ 43, 67, 131, 136–38, 271–81. Moreover, Donald Trump, Jr. and Guilfoyle were paid for their participation using private funds raised for the event. *Id.* ¶ 286. The undisputed fact that Trump and Campaign employees chose primarily private individuals associated with his Campaign to speak at the Rally is thus an "objective consideration[]" that "strongly" suggests the Rally was a private event. *Blassingame*, 87 F.4th at 22–23.

6.     _Trump's Rally Speech_

*Blassingame* explained that the content of a speech can "serve to confirm what an objective

assessment of the context makes evident."  *Id.* at 22.  That is precisely the case here:  Trump's Rally speech was singularly focused on his own effort to cling to office.  In fact, when this Court last examined "the words spoken by the President" in his January 6 speech, it held that it was not "in furtherance of any official duty."  *Thompson*, 590 F. Supp. 3d at 83.  Trump has failed to introduce any evidence that would alter this conclusion.

During the hour-plus speech, Trump repeatedly insisted that he won the 2020 election, but that his victory was stolen from him.  SUF ¶ 335; *see id.* ¶ 337 ("I've been in two elections; I won them both, and the second one I won much bigger than the first.");  *id.* ¶ 337 ("You will have an illegitimate president, that's what you'll have.  And we can't let that happen.");  *id.* ¶ 337 ("All of us here today do not want to see our election victory stolen by emboldened radical-left Democrats, which is what they're doing . . . .").  His explicit focus on staying in office demonstrates that the speech was unofficial.  *See Blassingame*, 87 F.4th at 17.

Trump also singled out specific states where he claimed election fraud occurred—Arizona, Georgia, Nevada, Michigan, Wisconsin, and Pennsylvania.  SUF ¶ 337.  He was undeniably speaking as an office-seeker when he referenced the states he believed he should have won and were critical to Biden's victory.  Moreover, Trump said then-Vice President Mike Pence should "do the right thing" by delaying the electoral vote certification process.  *Id.* ¶ 338.  ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮  *Id.* ¶ 47.  As has since been uncovered, this delay would have furthered Trump's plan to allow fraudulent electors to be substituted for legitimate ones, resulting in his reelection.  *Id.* ¶¶ 56–72.  Finally, he implored the crowd of tens of thousands assembled before him to "fight like hell," or else "you're not going to have a country anymore."  *Id.* ¶ 336.  He then

told his rallygoers to "walk" to the U.S. Capitol to "take back our country." *Id.* ¶ 339.

The unofficial nature of Trump's Rally speech is further demonstrated by its similarities to the speech he gave at an indisputably unofficial campaign event in Dalton, Georgia two days earlier.  SUF ¶ 336; *see* Mot. at 21 (describing Dalton rally as "a political event in Georgia").  Notably, some of the very statements Trump relies on here to demonstrate that he was speaking to Congress when delivering the Rally remarks are mirrored in Trump's admittedly unofficial Dalton speech.  SUF ¶ 336 (demonstrating both speeches contained purported claims of election fraud in states like Pennsylvania, Wisconsin, Arizona, Nevada, and Georgia); Dkt. 144-2 ¶ 49.

Each of these remarks considered separately, and even more so considered together, reveal that Trump was continuing his office-seeking scheme by disrupting the last stage in the ratification of the election results.  They confirm that Trump's conduct on January 6 was unofficial and, therefore, not entitled to immunity.  *Blassingame*, 87 F.4th at 22.

Trump's Motion fails to mention, let alone explain, many of these statements or the overwhelming content of his remarks at the Rally.  He asks the Court to focus instead on a few scattered references taken out of context.  Mot. at 9–20.   But that context makes clear the speech concerned his *own reelection*.  For example, Trump cites his statements to the crowd about certain measures like "an end to ballot harvesting, requirements for voter identification, and a ban on universal mail-in balloting."  Mot. at 12.  But he fails to mention these comments are only a small portion of his lengthy speech, and he mentioned them when speaking about *his own* election loss.  Mot. Ex. 42, pp. 15–16, 20–27.  Trump's approach misapplies *Blassingame*, which requires consideration of the broader context surrounding an act, not just the act itself—and surely not a small, cherry-picked portion of the conduct that paints a misleading picture.  87 F.4th at 21–23.  Here, Trump's speech, read as a whole, confirms what a contextual analysis reveals:  He was not

acting in his official capacity, but instead as an office-seeker.  *Id.* at 22.[12]

Trump's argument about his speech's visual optics is equally unpersuasive.  Mot. at 23–24.  *Blassingame* is clear that even when an incumbent President engages in campaign speech, his current office is often recognized, and such recognition does not turn the unofficial campaign speech into official conduct.  87 F.4th at 19.  Accordingly, the "use of the iconic backdrop of the White House and use of the Presidential Seal for the Ellipse Speech," Mot. at 24, cannot overcome the weight of the evidence showing the Rally and Trump's speech were unofficial—especially given that Trump's nomination acceptance speech at the 2020 Republican National Convention, an indisputably unofficial event, took place on the White House Lawn.  SUF ¶ 2.

Nor does an inference of official action arise from the fact that Trump spoke on the day the election results were to be certified.  Mot. at 23.  If anything, the timing of the Rally demonstrates the opposite: by disrupting the final ratification of the election results, Trump was not recommending that Congress pass forward-looking legislation, but instead attempting to retain the office he had already lost.  That the speech was nationally televised does not help Trump, either.  Mot. at 25–26.  All sorts of campaign speeches are televised, but that doesn't change the fact that the speeches are given "in an unofficial, private capacity."  *Blassingame*, 87 F.4th at 5, 19.

When viewed in their entirety, Trump's remarks at the Rally confirm what the context—before, during, and after the remarks—tells us:  He acted as an office-seeker while making them, and immunity cannot attach.  *See id.*

---

[12] Even if the Court were to find that Trump's speech included some isolated statements that could be official in nature, that would not be dispositive here.  *Blassingame* made clear that "if the President speaks about those subjects at a re-election campaign rally, he does so in an unofficial capacity."  87 F.4th at 25.  The context in which the speech was spoken confirms that it was at a rally to further Trump's reelection, not an official event.  *See supra* Section II.D.

7.    *Government Officials' Lack of Involvement in the Rally*

Trump also fails to establish that federal government officials viewed the Rally as an official activity.  *Blassingame*, 87 F.4th at 21.  The evidence shows the opposite is true.

Rather than address the mountain of contextual evidence tying his Campaign to the Rally, Trump instead contends—without any factual basis—that White House personnel "were deeply involved in the planning, organization, and execution of President Trump's participation in the event."  Mot. at 22.  The few pieces of evidence Trump cites do not support this argument.  For example, Trump makes much of the fact that the White House Deputy Chief of Staff contacted the Department of the Interior to have Trump's speech held at the center of the Ellipse as opposed to thirty feet to its side.  Mot. at 22.  But even for this inconsequential fact, Trump omits that the government official was merely passing along the request that initially came from the Rally's private organizers.  CSUF ¶ 34.  Similarly, Trump claims that government officials used their government email addresses in conjunction with the Rally, without noting that they were merely responding to emails sent by private Campaign-affiliated Rally planners.  *Id.* ¶ 42.

Trump also argues the involvement of White House speechwriters in the drafting of his speech for the Rally suggests he was acting in an official capacity.  Mot. at 20–22.  In fact, the speechwriters' actions further establish that the speech was unofficial.  The speechwriters who participated in drafting the speech served in dual roles, working for both the Campaign and the presidential administration.  SUF ¶¶ 302, 314.  The White House speechwriting team, which included Ross Worthington, Vincent Haley, and Stephen Miller, regularly drafted both official and campaign speeches.  *See id.*  Multiple members of the White House speechwriting office testified that, while the start of the drafting process was different for political and official speeches, the end of the process was the same.  More specifically, when the speechwriters began drafting a political speech (such as a campaign speech), they used personal devices and accounts.  *Id.* ¶¶ 300–02, 320–

22.  By contrast, when they drafted official speeches, they used White House computers and accounts.  *Id.*  In the end, however, both political and official speeches went through a "staff secretary process," in which the speeches were circulated to White House employees at their White House email addresses for final review and approval.  *Id.* ¶ 319.

Crucially, in drafting Trump's speech for the Rally, Worthington and Haley used personal devices, personal email accounts, and Google Docs.  SUF ¶¶ 300–02, 320–22. Worthington specifically noted that he and other speechwriters would generally "use Google Docs for political speeches and *not* for official speeches."  *Id.* ¶ 301 (emphasis added).

Trump also notes the Rally speech was circulated "by the White House Staff Secretary to various personnel, including at least one member of the Office of White House Counsel, for review."  Mot. at 21.  What Trump omits is that this staff secretary process was routinely used for political speeches.  As Worthington put it, the "staff secretary circulation" would "happen for any speech, whether it's political or official."  SUF ¶ 319.  Stephen Miller likewise represented that "the White House Counsel's Office and other White House staff reviewed all speeches regardless of whether they were 'official' or 'unofficial.'"  *Id.* ¶ 317.

Moreover, White House Counsel and other key White House personnel treated the draft speech as unofficial.  Upon receiving a draft, White House Counsel Pat Cipollone instructed Deputy White House Counsel Pat Philbin that it was not their role to review or sign off on the speech's factual accuracy, indicating their understanding that it was a political speech rather than an official one.  SUF ¶ 316.  Before the January 6 committee, Stephen Miller testified it was "blindingly obvious that the purpose of the speech was to build support for the election contest."  *Id.* ¶ 315.  And Hope Hicks, Trump's White House aide, testified White House staff "thought it was more a campaign event" than a presidential one.  *Id.* ¶¶ 329–34; *see also id.* ¶¶ 291–92.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████. *See supra* at 10 (citing SUF ¶¶ 287–90).  It is undisputed that no federal

agency funded the Rally as a government event, SUF ¶¶ 203, 312–13, or████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ *id.* ¶¶ 251, 305–308, 323–28.  This stands in sharp contrast to

the 2019 Salute to America event, which *Blassingame* held had elements that made it appear

official in nature, including the fact that it was "publicly funded," promoted by the White House's

official website and social media accounts, and its "primary organizers were government

officials."  87 F.4th at 22.  By contrast, the involvement of the Campaign and private individuals

affiliated with the Campaign in the Rally was overwhelming.  *See supra* Section II.D.

Despite these undisputed facts, Trump nonetheless contends that White House staff treated

his speech as official action because the White House Staff Secretary did not apply a Hatch Act

notice to a draft of the speech.  Mot. at 20–22.  This argument is based on the fact that three days

earlier, the Staff Secretary did apply a Hatch Act notice to an email disseminating draft remarks

for a political event in Georgia.  *Id.*  Trump's Hatch Act argument fails for at least three reasons.

*First*, it is undisputed that the speech Trump gave at the Rally bore very little, if any,

resemblance to the version of the speech that the White House speechwriting team circulated.

Worthington recalled Trump "ad-libb[ed]" his speech at the Rally.  SUF ¶ 340.  A redline

comparison of the speech Trump gave against the last version of the speech the speechwriting team

reviewed confirms this.  *Id.* ¶¶ 341–45.  Any disclaimers applied to transmissions of *drafts* of the

speech are thus irrelevant, because Trump did not give the pre-drafted speech at the Rally.

*Second*, ████████████████████████████████████████████████████████

███████████████████████████████ SUF ¶ 346.  As speechwriter Haley testified, any transcript bearing that designation was considered by the White House to be a "political speech."  *Id.* ¶ 303.  Thus, regardless of how the Staff Secretary designated a *draft* of Trump's Rally speech made days earlier, it is indisputable that the White House considered the speech Trump *actually gave* to be an unofficial one.



███████████████████████████████████████████

██████████████████████████████████. ████████████████

█████████████████████████████████████████████.

SUF ¶ 293. ███████████████████████████████████

████████████████████. *Id.* ¶¶ 294–99. ██████████████████

███████████████████████████████████████████

████████████████████████████████ *Id.* ¶¶ 298–99.

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

As a result, the limited nature of the government's alleged involvement in and stated understanding of the Rally provide no basis for a finding of presidential immunity.  To the contrary, viewed in their context, these facts show that Trump was acting in an unofficial capacity.

      8.      <u>*Trump's Arguments Concerning the Rally Misconstrue the Law and the Facts*</u>

Against this overwhelming contextual evidence, Trump urges the Court to forgo the *Blassingame* contextual analysis altogether.  Mot. at 7–18.  He argues the Court should grant him immunity for the entire speech based on cherry-picked snippets that ignore the speech's overall content and the context in which it was given.  He argues these snippets fall into three buckets:

(1) speech on matters of public concern, Mot. at 14–18; (2) speech in accord with the Take Care Clause of the Constitution, Mot. at 27–28; and (3) speech in service of the Recommendations Clause of the Constitution, Mot. at 7–14.  Each argument fails.

Trump's arguments premised on speaking on matters of public concern and the Take Care Clause recycle those in his motion to dismiss, which were already rejected by this Court and *Blassingame*.  There, as here, Trump argued his speech at the Rally is "immune from judicial examination" because it "falls within [his] authority to address the public on matters of public and federal concern."  Mot. at 9, 14.  In response, *Blassingame* held:  "President Trump[] . . . insists that all of a President's speech on matters of public concern, as a categorical rule, is an exercise of official presidential responsibility.  That is a sweeping proposition, and one that ultimately sweeps too far."  87 F.4th at 15.[13]  And *Blassingame* rejected Trump's claim that he is entitled to immunity whenever he asserts that he acted under the Take Care Clause.  *Id.* at 23; *see supra* Section II.B.2.

Trump's Recommendations Clause argument likewise fails.  According to him, the Clause "grant[s] the president authority to provide recommendations to and advise Congress," Mot. at 8, and thus any presidential utterance which might be construed as offering Congress advice is an exercise of core Constitutional power subject to absolute immunity, *see id.* at 7–14.  Trump's interpretation of the Recommendations Clause is wrong for at least two reasons.

*First*, as discussed above, Trump's position flouts decades of binding precedent concerning the scope of presidential immunity, including most recently *Blassingame*.  At its core, Trump's argument is that if he says four magic words—"I recommend that Congress…."—anywhere in a

---

[13] Trump misleadingly claims *U.S. v. Trump* upset *Blassingame* by holding "immunity always attaches" "when a President 'speak[s] to and on behalf of the American people."  Mot. at 15 (quoting *Trump*, 603 U.S. at 618).  Not so.  *U.S. v. Trump* merely held that presidential speech to the American people "*can* qualify as official," 603 U.S. at 618, which comports with *Blassingame*'s context-specific standard.

speech about any subject, everything else in that speech is necessarily official and thus immune, even if he is talking about problems that Congress cannot address through legislation. *Id.* at 10, 12. In other words, if a President purports to speak to Congress, he may say *anything*—no matter the context in which he speaks. Under that logic, if, for example, Trump said members of Congress should assassinate his political rival, he would be engaging in official conduct—even if he gave this instruction during a presidential debate, in a campaign ad, or in an acceptance speech at a party convention. This is plainly incorrect under *Blassingame*, which made clear that the same words can be official or unofficial, depending on context. 87 F.4th at 21. And, as demonstrated above, the context of Trump's Rally remarks makes clear they are unofficial in nature. The same analysis that drove *Blassingame* to reject Trump's argument that speech on matters of public concern is categorically entitled to immunity forecloses his Recommendations Clause argument. *Id.* at 18.

*Second*, Trump's Recommendations Clause argument mischaracterizes his Rally speech. He excerpts a few lines ostensibly related to policy proposals to suggest that the speech as a whole was directed at Congress and more akin to a formal State of the Union speech than a campaign rally. *See* Mot. at 10–13, 18–19. But he conveniently ignores the rest of the speech, which is threaded throughout with statements about his own bid to win the presidency. *See supra* Section II.D.6. He also ignores that the speech was clearly directed to the thousands of supporters gathered before him when it was given, not at Congress. SUF ¶¶ 336–39; *see also, e.g.*, CSUF ¶ 29. Trump repeatedly referenced the attendees, spoke directly to them, and told them what to do. *See, e.g.*, CSUF ¶ 29. Indeed, he even counted himself among them in discussing how he could retain office. *Id.* There is no evidence that Congress, which was not present for the Rally and was instead convening in the Capitol, was aware of his words. Contrary to Trump's sanitized description, then, the context of the speech demonstrates that he addressed the crowd in furtherance of his office-

seeking plan and was not making "recommendations" to Congress in his official capacity.

### E. Trump's Conduct During the Attack on the Capitol Was Unofficial

As violent, armed rioters poured into the Capitol on January 6, 2021, Trump explicitly and implicitly encouraged the insurrection through public statements. Trump fails to make any argument that his conduct during the attack could reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker. *Blassingame*, 87 F.4th at 30. The undisputed facts show that Trump's conduct during the attack was unofficial in nature.[14]

Trump was not acting in an official capacity when he stoked the fire among his listeners by explicitly calling out then-Vice President Pence for not delaying the certification. According to the Select Committee to Investigate the January 6th Attack on the United States Capitol, at approximately 2:13 pm ET, the U.S. Capitol was breached. SUF ¶ 348. ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████      ███████████████

████    *Id.* ¶ 349.[15] Trump's statements about Pence were unofficial because, in context, they

---

[14] Plaintiffs do not argue that Trump's failure to act during the January 6 attack on the Capitol was unofficial conduct.

[15] Trump argues the Supreme Court found "[w]henever the President and Vice President discuss their official responsibilities, they engage in official conduct," that is "presumptively immune from prosecution." Mot. at 19 (quoting *Trump*, 603 U.S. at 621). But the Supreme Court addressed discussions between Trump and Pence, focusing on the Vice President's core role "as one of the President's closest advisers." 603 U.S. at 621, 622. The statements at issue here do not involve conversations between Trump and Pence, nor was there any opportunity for Pence to advise Trump. Rather, Trump's few references to Pence during and after the Rally were addressed to the public. In any event, to the extent the Court applies the "rebuttable presumption" standard to civil presidential immunity (thus far, it has only been discussed in the criminal context, *id.*), any presumption is rebutted here. In light of the fact that the President lacks any role in the election certification process, imposing civil liability on a President who, without basis, interferes with Congress's certification of an election poses no "dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 615.

were part of Trump's attempt to remain in office.  Trump publicly placed pressure on Pence to take a course of action that would have helped Trump secure his re-election.  *See id.* ¶¶ 56–64.

███████████████████████████████████████████████ SUF ¶ 350

████████████████████████████████████████████████████

██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ *Id.* (emphasis added)).

Later that evening, Trump tweeted:  "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long."  *Id.* ¶ 351.  Months later, on March 13, 2021, Trump admitted the Rally and ensuing attack on the Capitol were meant to overturn the outcome of the election:  "Had Mike Pence sent the votes back to the legislatures, they wouldn't have had a problem with Jan. 6, so in many ways you can blame him for Jan. 6.  Had he sent them back to Pennsylvania, Georgia, Arizona, the states, I believe, number one, you would have had a different outcome.  But I also believe you wouldn't have had 'Jan. 6' as we call it."  *Id.* ¶ 352.

Trump's statement after the Rally highlights the office-seeking nature of that event.  As the Supreme Court held:  "The President enjoys no immunity for his unofficial acts, and not everything the President does is official.  The President is not above the law."  *Trump*, 603 U.S. at 642.  Like any other candidate for office, Trump is not entitled to immunity for his efforts to continue his presidency through a violent insurrection.  *Blassingame*, 87 F.4th at 17.

## CONCLUSION

For the reasons discussed above, the Court should deny Trump's motion for summary judgment on the defense of presidential immunity.

Dated:  February 28, 2025                    Respectfully submitted,

/s/ Edward G. Caspar
Edward G. Caspar, D.C. Bar No. 1644168
Marc P. Epstein D.C. Bar No. 90003967
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, DC 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org
mepstein@lawyerscommittee.org

Faith E. Gay, *pro hac vice*
Joshua S. Margolin, *pro hac vice*
Elizabeth H. Snow, *pro hac vice*
Esther D. Ness, *pro hac vice*
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
jmargolin@selendygay.com
esnow@selendygay.com
eness@selendygay.com

William J. Blechman, *pro hac vice*
Elizabeth B. Honkonen, *pro hac vice*
SPERLING KENNY NACHWALTER
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: 305-373-1000
wblechman@sperlingkenny.com
ebh@sperlingkenny.com

*Attorneys for Plaintiffs Conrad Smith, et al.*

/s/ Joseph Sellers
Joseph M. Sellers, Bar No. 318410
Brian Corman, Bar No. 1008635
Alison S. Deich, Bar No. 1572878
Nina Jaffe-Geffner, Bar No. 90011459 (application
for admission forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC

1100 New York Avenue N.W.
Eighth Floor Washington, D.C. 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699
jsellers@cohenmilstein.com
bcorman@cohenmilstein.com
adeich@cohenmilstein.com
njaffegeffner@cohenmilstein.com

Janette McCarthy-Wallace, Bar No. OH066257
Anthony P. Ashton, Bar No. MD25220
NAACP
Office of General Counsel
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: 410-580-5777
jlouard@naacpnet.org
aashton@naacpnet.org

*Attorneys for Plaintiffs Barbara J. Lee, et al.*


*/s/ Matthew Kaiser*
Matthew Kaiser, D.C. Bar No. 486272
Noah Brozinsky, D.C. Bar No. 1655789
KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor
Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
bozinsky@kaiserlaw.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC
1100 H Street N.W. Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com
joe@calebandonian.com

*Attorneys for Plaintiff Eric Swalwell*

_/s/ Patrick Malone_ _____
Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556
(application for admission forthcoming)
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

Cameron Kistler, Bar No. 1008922
Kristy Parker, Bar No. 1542111
Erica Newland (Bar No. MD0141)
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Avenue N.W. #163
Washington, D.C. 20006
Telephone: 202-579-4582
cameron.kistler@protectdemocracy.org
kristy.parker@protectdemocracy.org
erica.newland@protectdemocracy.org

Genevieve C. Nadeau, Bar No. 979410
UNITED TO PROTECT DEMOCRACY
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: 202-579-4582
genevieve.nadeau@protectdemocracy.org

_Attorneys for Plaintiffs James Blassingame and Sidney Hemby_

_/s/ Mark Zaid_ _____
Mark S. Zaid, Esq., D.C. Bar No. 440532
Bradley P. Moss, Esq., D.C. Bar No. 975905
MARK S. ZAID, P.C.
1250 Connecticut Avenue N.W. Suite 700
Washington, D.C. 20036
Telephone: 202-498-0011
Facsimile: 202-330-5610
Mark@MarkZaid.com
Brad@MarkZaid.com

Matthew Kaiser, D.C. Bar No. 486272
Noah Brozinsky, D.C. Bar No. 1655789
Daniel Csigirinszkij, D.C. Bar No. 90017805
KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor
Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
nbrozinsky@kaiserlaw.com
dcsigirinszkij@kaiserlaw.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC
1100 H Street N.W. Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com
joe@calebandonian.com

*Attorneys for Plaintiff Sandra Garza*


*/s/ Patrick Malone*
Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

*Attorneys for Plaintiffs Marcus J. Moore et al.;*
*Bobby Tabron et al.; and Briana Kirkland*

**CERTIFICATE OF SERVICE**

I certify that on February 28, 2025, a copy of the foregoing was filed with the Clerk of Court using the Court's CM/ECF system, which will send a copy to all counsel of record.  Plaintiffs are serving pro se defendants with redacted copies of the Motion and Proposed Order via first class mail or other permitted means.

*/s/ Edward G. Caspar*
Edward G. Caspar
