# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

| | |
|---|---|
| BARBARA J. LEE *et al.*, | |
| *Plaintiffs,* | Case No. 21-cv-00400 (APM) |
| v. | (lead case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants.* | |
| ERIC SWALWELL, | |
| *Plaintiff,* | Case No. 21-cv-00586 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP *et. al.*, | |
| *Defendants.* | |
| JAMES BLASSINGAME *et al.*, | |
| *Plaintiffs,* | Case No. 21-cv-00858 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP, | |
| *Defendants.* | |
| CONRAD SMITH *et al.*, | |
| *Plaintiffs,* | Case No. 21-cv-02265 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP *et. al.*, | |
| *Defendants.* | |

MARCUS J. MOORE *et al.*,

               *Plaintiffs,*

      v.

DONALD J. TRUMP,

               *Defendant.*

Case No. 22-cv-00010 (APM)

(consolidated case)

---

BOBBY TABRON *et al.*,

               *Plaintiffs,*

      v.

DONALD J. TRUMP,

               *Defendant.*

Case No. 22-cv-00011 (APM)

(consolidated case)

---

BRIANA KIRKLAND,

               *Plaintiff,*

      v.

DONALD J. TRUMP,

               *Defendant.*

Case No. 22-cv-00034 (APM)

(consolidated case)

---

SANDRA GARZA,

               *Plaintiff,*

      v.

DONALD J. TRUMP *et. al.*,

               *Defendants.*

Case No. 22-cv-00038 (APM)

(consolidated case)

# REDACTED - PLAINTIFFS' COUNTERSTATEMENT TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS

Pursuant to Local Rule 7(h)(1) and Federal Rule of Civil Procedure 56, Plaintiffs in the above-titled consolidated cases respectfully submit their Counterstatement to Defendant Trump's Statement of Undisputed Facts ("CSUF"), Plaintiffs' Statement of Additional Undisputed Facts ("SUF") in Support of Their Opposition to Defendant Trump's Motion for Summary Judgment, and the evidence attached to the Declaration of Edward G. Caspar in support of their responses and SUF, which is capable of being presented in a form that would be admissible at trial, including by calling the underlying declarant to testify at trial.  Fed. R. Civ. P. 56(c); *Byrd v. D.C.*, 807 F. Supp. 2d 37, 66 (D.D.C. 2011) (explaining that "a non-movant is not required to produce evidence in a form that is admissible" so long as the proffered evidence is "capable of being converted into admissible evidence at trial" and considering non-movant's evidence where the underlying statement was based on the declarant's personal knowledge).  For the convenience of the Court and the parties, Plaintiffs' exhibits are numbered consecutive to those of Defendant Trump and begin at "Exhibit 50."

## PLAINTIFFS' COUNTERSTATEMENT TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

## I.      The Twitter Account

1.      At all times relevant to the material facts of this case, the @realDonaldTrump Twitter account had been designated "as a primary vehicle" for the official communications of President Donald J. Trump by the United States Court of Appeals for the Second Circuit. *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 953 F.3d 216, 217 (2d Cir. 2020). (Exhibit 1).

**Plaintiffs' Response:  Disputed and immaterial**.  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer v. McCormick & Schmick's Seafood Restaurants, Inc.*, 264 F. Supp. 3d 208, 239 (D.D.C. 2017) ("But the Court may not consider their testimony if it is both objected to and inadmissible.").  *First*, a judicial opinion (let alone a statement accompanying the denial of a hearing en banc) is not evidence that Defendant Trump could present in an admissible form at trial; "findings of fact by a judge are hearsay and not subject to any exception enumerated by the Federal Rules of Evidence."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171–72 (D.C. Cir. 2010) ("[J]udicial findings are probabilistic determinations based upon a limited set of data points . . . they are not indisputable facts."); *Grimes v. District of Columbia*, 308 F. Supp. 3d 93, 106 (D.D.C. 2018) (declining to consider the D.C. Circuit's characterization in a judicial opinion as evidence); Fed. R. Evid. 802.  *Second*, Defendant Trump mischaracterizes Judge Parker's statement, which in full states that the "case *arises from* the President's use of the @realDonaldTrump Twitter account [] as a primary vehicle for his official communications," rather than "designat[ing]" Defendant Trump's @realDonaldTrump account as his primary vehicle for official communications, or suggesting that all tweets from @realDonaldTrump are official communications (as Defendant Trump contends).  Ex. 1 at 217 (emphasis added).  *Third*, Judge Parker's statement addressed a specific period of time, i.e., 2017, and Defendant Trump has not offered any evidence showing that Judge Parker's statements continue to apply three years later.  Ex. 2 at 232–33; *see also* RJN App'x. A (hereinafter "RJN") at ¶ 21 (identifying the initiation of the *Knight*

lawsuit as occurring in July 2017).  *Fourth*, *Knight* did not analyze the communications of Defendant Trump for the purpose of establishing whether his statements or conduct using the @realDonaldTrump account entitled him to immunity.  *Fifth*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually in light of the relevant context.  *See Blassingame v. Trump*, 87 F.4th 1, 20 (D.C. Cir. 2023).  Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official.  *Id.*; *Lindke v. Freed*, 601 U.S. 187, 201–03 (2024); *see also* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).  *Finally*, in *Knight*, Defendant Trump and his administration stated in multiple signed public filings that the Twitter account @realDonaldTrump belongs to and is controlled by Defendant Trump in "his personal capacity."  *See* RJN at ¶ 25; *see also* Ex. 50 (Petition for Writ of Certiorari) at 13, *Donald J. Trump v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) (No. 20-197), 2020 WL 4905204 at *13 ("*Knight* Cert. Pet.") ("Although President Trump is currently a public official, the @realDonaldTrump account belongs to him in his personal capacity, not his official one. He created and began frequent use of that account in 2009, well before taking public office [and] . . . he will continue to have control over the @realDonaldTrump account after his term of office has completed."); RJN at ¶ 28; *see also* Ex. 51 (Reply Br. for Appellants at 5–7, *Knight First Amend. Inst. at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26, 2018) (Trump "created the account before he assumed the Presidency, and he will retain control over it after he leaves public office.")); RJN at ¶¶ 26–27; *see also* Ex. 50 (*Knight* Cert. Petition) at 5, 13 (contrasting "@realDonaldTrump account" "to the @WhiteHouse and @POTUS

accounts, over which he may exercise control only by virtue of his office"). Moreover, Defendant Trump stated in a signed public filing that following his inauguration in 2017, while he "has used the account to communicate with the public about official actions and policies of his administration," he has also "continued to use the account for [] personal purposes." Ex. 50 (*Knight* Cert. Pet.) at 4–5.

**Table A**:

| No. | Exhibit | The Tweet |
|-----|---------|-----------|
| 1 | • Ex. 52 at NARA_PROD_069147. | • ███████████████ |
| 2 | • Ex. 53 at NARA_PROD_095765. | • ███████████████ |
| 3 | • Ex. 54 at NARA_PROD_095498. | • ███████████████ |
| 4 | • Ex. 54 at NARA_PROD_095499. | • ███████████████ |
| 5 | • Ex. 54 at NARA_PROD_095500. | • ███████████████ |

| No. | Exhibit | The Tweet |
|-----|---------|-----------|
|  |  | ████████████████████████ ████████ |
| 6 | • Ex. 54 at NARA_PROD_095503. | • ████████████████ ████████████ ████████████████ ██████████ |
| 7 | • Ex. 54 at NARA_PROD_095504. | • ██████████████████ ██████████████ ████████████████ ████████████████ ████████████ ██████████████ ████████████ ████████ |
| 8 | • Ex. 54 at NARA_PROD_095509. | • ██████████████ ████████████████ ██████████ ██████████████ ████████████████ ████████████ ████████ |
| 9 | • Ex. 54 at NARA_PROD_095510. | • ██████████████ ██████████████ ██████████████ ████████████████ ██████████ ████████ |
| 10 | • Ex. 55 at NARA_PROD_095842. | • ████████████ ██████████████ ████████████ ████ |
| 11 | • Ex. 55 at NARA_PROD_095845. | • ██████████ ██████████ |

| No. | Exhibit | The Tweet |
|-----|---------|-----------|
| 12 | • Ex. 55 at NARA_PROD_095845. | • ████████████████████ ████████████████ |
| 13 | • Ex. 55 at NARA_PROD_095848. | • ██████████████████████ ██████████████████ ████████████████████ ████████████████████ ████████████████ ██████████████████ ████████ |
| 14 | • Ex. 55 at NARA_PROD_095849. | • ██████████████████████ ████████████ |
| 15 | • Ex. 55 at NARA_PROD_095849. | • █████████████████ ████████████████████ ██████████████ |
| 16 | • Ex. 55 at NARA_PROD_095851. | • ██████████████████████ █████████████████████ ████████████████████ ███████████████ |

2.  "The public presentation of the Account and the webpage associated with it" bore "all the trappings of an official, state–run account." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 231 (2d Cir. 2019), *cert. granted, judgment vacated for mootness sub nom. Biden v. Knight First Amendment Inst. At Columbia Univ.*, 141 S. Ct. 1220, 209 L. Ed. 2d 519 (2021), *abrogated by Lindke v. Freed*, 601 U.S. 187, 144 S. Ct. 756, 218 L. Ed. 2d 121 (2024). (Exhibit 2).

**Plaintiffs' Response:  Disputed and immaterial**.  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F. Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to

and inadmissible."). *First*, the Supreme Court vacated the decision upon which Defendant Trump relies. *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). *Second*, a judicial opinion is not evidence that Defendant Trump could present in an admissible form at trial; "findings of fact by a judge are hearsay and not subject to any exception enumerated by the Federal Rules of Evidence." *Rimkus*, 750 F. Supp. 2d at 171–72 ("[J]udicial findings are probabilistic determinations based upon a limited set of data points . . . they are not indisputable facts."); *Grimes*, 308 F. Supp. 3d at 106 (declining to consider the D.C. Circuit's characterization in a judicial opinion as evidence); Fed. R. Evid. 802. *Third*, the Second Circuit's statement addressed a specific period of time, i.e., 2017, and Defendant Trump has not offered any evidence showing the Second Circuit's statement continued to apply three years later. Ex. 2 at 232–33; RJN at ¶ 21 (identifying the initiation of the *Knight* lawsuit as occurring in July 2017). *Fourth*, *Knight* was not analyzing the communications of Defendant Trump for the purpose of establishing whether his statements or conduct using the @realDonaldTrump account entitled him to immunity. *Fifth*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually in light of the relevant context. *Blassingame*, 87 F.4th at 20. Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official. *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events). *Finally*, in *Knight*, Defendant Trump and his administration stated in multiple signed public filings that the Twitter account @realDonaldTrump belongs to and is controlled by Defendant Trump in "his personal capacity." *See* RJN at ¶ 25; *see also* Ex. 50 (*Knight* Cert. Pet.) at 13 ("Although

President Trump is currently a public official, the @realDonaldTrump account belongs to him in his personal capacity, not his official one. He created and began frequent use of that account in 2009, well before taking public office [and] . . . he will continue to have control over the @realDonaldTrump account after his term of office has completed."); RJN at ¶ 28; *see also* Ex. 51 (Reply Br. for Appellants at 5–7, *Knight First Amend. Inst. at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26, 2018) (Trump "created the account before he assumed the Presidency, and he will retain control over it after he leaves public office.")); RJN at ¶¶ 26–27; *see also* Ex. 50 (*Knight* Cert. Pet.) at 5, 13 (contrasting "@realDonaldTrump account" "to the @WhiteHouse and @POTUS accounts, over which he may exercise control only by virtue of his office").  Moreover, Defendant Trump stated in a signed public filing that following his inauguration in 2017, while he "has used the account to communicate with the public about official actions and policies of his administration," he has also "continued to use the account for [] personal purposes."  Ex. 50 (*Knight* Cert. Pet.) at 4–5.

3.      "The President and multiple members of his administration" had "described his use of the Account as official." *Id.* (Exhibit 2).

**Plaintiffs' Response: <u>Disputed and immaterial</u>**.  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F. Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to and inadmissible.").  *First*, the Supreme Court vacated the decision upon which Defendant Trump relies.  *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).  *Second*, a judicial opinion is not evidence that Defendant Trump could

8

present in an admissible form at trial; "findings of fact by a judge are hearsay and not

subject to any exception enumerated by the Federal Rules of Evidence." *Rimkus*, 750 F.

Supp. 2d at 171–72 ("[J]udicial findings are probabilistic determinations based upon a

limited set of data points . . . they are not indisputable facts."); *Grimes*, 308 F. Supp. 3d at

106 (declining to consider the D.C. Circuit's characterization in a judicial opinion as

evidence); Fed. R. Evid. 802.  *Third*, the Second Circuit's statement addressed a specific

period of time, i.e., 2017, and Defendant Trump has not offered any evidence showing

the Second Circuit's statement continued to apply three years later.  Ex. 2 at 232–33; RJN

at ¶ 21 (identifying the initiation of the *Knight* lawsuit as occurring in July 2017).

*Fourth*, *Knight* was not analyzing the communications of Defendant Trump for the

purpose of establishing whether his statements or conduct using the @realDonaldTrump

account entitled him to immunity.  *Finally*, in *Knight*, Defendant Trump and his

administration stated in multiple signed public filings that the Twitter account

@realDonaldTrump belongs to and is controlled by Defendant Trump in "his personal

capacity."  *See* RJN at ¶ 25; *see also* Ex. 50 (*Knight* Cert. Pet.) at 13 ("Although

President Trump is currently a public official, the @realDonaldTrump account belongs to

him in his personal capacity, not his official one. He created and began frequent use of

that account in 2009, well before taking public office [and] . . . he will continue to have

control over the @realDonaldTrump account after his term of office has completed.");

RJN at ¶ 28; *see also* Ex. 51 (Reply Br. for Appellants at 5–7, *Knight First Amend. Inst.

at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26, 2018) (Trump

"created the account before he assumed the Presidency, and he will retain control over it

after he leaves public office.")); RJN at ¶¶ 26–27; *see also* Ex. 50 (*Knight* Cert. Pet.) at 5,

13 (contrasting "@realDonaldTrump account" "to the @WhiteHouse and @POTUS accounts, over which he may exercise control only by virtue of his office"). Moreover, Defendant Trump stated in a signed public filing that following his inauguration in 2017, while he "has used the account to communicate with the public about official actions and policies of his administration," he has also "continued to use the account for [] personal purposes." Ex. 50 (*Knight* Cert. Pet.) at 4–5.

4.      In June 2017, then–White House Press Secretary Sean Spicer stated at a press conference that President Trump's tweets should be considered "official statements by the President of the United States." *Id.* (Exhibit 2).

**Plaintiffs' Response:  Disputed and immaterial**.  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F. Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to and inadmissible.").  *First*, the Supreme Court vacated the decision upon which Defendant Trump relies.  *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).  *Second*, a judicial opinion (let alone a statement accompanying the denial of a hearing en banc) is not evidence Defendant Trump could not establish that this evidence could be presented in an admissible form at trial; "findings of fact by a judge are hearsay and not subject to any exception enumerated by the Federal Rules of Evidence."  *Rimkus*, 750 F. Supp. 2d at 171–72 ("[J]udicial findings are probabilistic determinations based upon a limited set of data points . . . they are not indisputable facts.");  *Grimes*, 308 F. Supp. 3d at 106 (declining to consider the D.C. Circuit's characterization in a judicial opinion as evidence); Fed. R. Evid. 802.  *Third*, any legal

conclusions derived from Sean Spicer's *opinion* in June 2017 (three years before the conduct at issue) is irrelevant to the matter at hand, Fed. R. Evid. 401, and such conclusions are inadmissible to support factual assertions at summary judgment. *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996) ("[R]epeatedly blending factual assertions with legal argument . . . does not satisfy the purposes of [Rule 7(h)]."); *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 185 (D.D.C. 2023) (explaining the court will disregard legal arguments contained within statements of facts). *Fourth*, *Knight* was not analyzing the communications of Defendant Trump for the purpose of establishing whether his statements or conduct using the @realDonaldTrump account entitled him to immunity. *Fifth*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually in light of the relevant context. *Blassingame*, 87 F.4th at 20. Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official. *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events). *Finally*, in *Knight*, Defendant Trump and his administration stated in multiple signed public filings that the Twitter account @realDonaldTrump belongs to and is controlled by Defendant Trump in "his personal capacity." *See* RJN at ¶ 25; *see also* Ex. 50 (*Knight* Cert. Pet.) at 13 ("Although President Trump is currently a public official, the @realDonaldTrump account belongs to him in his personal capacity, not his official one. He created and began frequent use of that account in 2009, well before taking public office [and] . . . he will continue to have control over the @realDonaldTrump account after his term of office has completed."); RJN at ¶ 28; *see also* Ex. 51 (Reply Br. for

Appellants at 5–7, *Knight First Amend. Inst. at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26, 2018) (Trump "created the account before he assumed the Presidency, and he will retain control over it after he leaves public office.")); RJN at ¶¶ 26–27; *see also* Ex. 50 (*Knight* Cert. Pet.) at 5, 13 (contrasting "@realDonaldTrump account" "to the @WhiteHouse and @POTUS accounts, over which he may exercise control only by virtue of his office").

5.      President Trump operated the Account with the assistance of Daniel Scavino, the White House Director of Social Media and Assistant to the President. *Id.* at 232. (Exhibit 2).

**Plaintiffs' Response: <u>Disputed and immaterial</u>**.  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F. Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to and inadmissible.").  *First*, the Supreme Court vacated the decision upon which Defendant Trump relies.  *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).  *Second*, a judicial opinion is not evidence that Defendant Trump could present in an admissible form at trial; "findings of fact by a judge are hearsay and not subject to any exception enumerated by the Federal Rules of Evidence."  *Rimkus*, 750 F. Supp. 2d at 171–72 ("[J]udicial findings are probabilistic determinations based upon a limited set of data points . . . they are not indisputable facts."); *Grimes*, 308 F. Supp. 3d at 106 (declining to consider the D.C. Circuit's characterization in a judicial opinion as evidence); Fed. R. Evid. 802.  *Third*, the Second Circuit's statement addressed a specific period of time, i.e., 2017, and thus, even if the Second Circuit's decision were admissible evidence (it is not), Defendant Trump has not offered any evidence to support that *during*

*the relevant time period* Defendant Trump operated the @RealDonaldTrump account with the assistance of Daniel Scavino, or that Daniel Scavino was the White House Director of Social Media. Ex. 2 at 232–33; RJN at ¶ 21 (identifying the initiation of the *Knight* lawsuit as occurring in July 2017. ██████████████████████

███████████████████████████████████. Ex. 56, No. 1. *Fourth*, *Knight* did not analyze the communications of Defendant Trump for the purpose of establishing whether his statements or conduct using the @realDonaldTrump account entitled him to immunity. *Finally*, in *Knight*, Defendant Trump and his administration stated in multiple signed public filings that the Twitter account @realDonaldTrump belongs to and is controlled by Defendant Trump in "his personal capacity." *See* RJN at ¶ 25; *see also* Ex. 50 (*Knight* Cert. Pet.) at 13 ("Although President Trump is currently a public official, the @realDonaldTrump account belongs to him in his personal capacity, not his official one. He created and began frequent use of that account in 2009, well before taking public office [and] . . . he will continue to have control over the @realDonaldTrump account after his term of office has completed."); RJN at ¶ 28; *see also* Ex. 51 (Reply Br. for Appellants at 5–7, *Knight First Amend. Inst. at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26, 2018) (Trump "created the account before he assumed the Presidency, and he will retain control over it after he leaves public office.")); RJN at ¶¶ 26–27; *see also* Ex. 50 (*Knight* Cert. Pet.) at 5, 13 (contrasting "@realDonaldTrump account" "to the @WhiteHouse and @POTUS accounts, over which he may exercise control only by virtue of his office"). *Finally*, ambiguous as to the meaning of "operated the Account *with the assistance of*."

6.    President Trump and his aides "have characterized tweets from the Account as official statements of the President." *Id.* (Exhibit 2).

**Plaintiffs' Response: <u>Disputed and immaterial</u>**.  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F. Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to and inadmissible.").  *First*, the Supreme Court vacated the decision upon which Defendant Trump relies.  *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).  *Second*, a judicial opinion is not evidence that Defendant Trump could present in an admissible form at trial; "findings of fact by a judge are hearsay and not subject to any exception enumerated by the Federal Rules of Evidence."  *Rimkus*, 750 F. Supp. 2d at 171–72 ("[J]udicial findings are probabilistic determinations based upon a limited set of data points . . . they are not indisputable facts."); *Grimes*, 308 F. Supp. 3d at 106 (declining to consider the D.C. Circuit's characterization in a judicial opinion as evidence); Fed. R. Evid. 802.  *Third*, the Second Circuit's statement addressed a specific period of time, i.e., 2017, and Defendant Trump has not offered any evidence showing that the Second Circuit's statement continued to apply three years later.  Ex. 2 at 232–33; RJN at ¶ 21 (identifying the initiation of the *Knight* lawsuit as occurring in July 2017). *Fourth*, *Knight* did not analyze the communications of Defendant Trump for the purpose of establishing whether his statements or conduct using the @realDonaldTrump account entitled him to immunity.  *Fifth*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually in light of the relevant context. *Blassingame*, 87 F.4th at 20.  Whether Defendant Trump issued some tweets that may be

official does not suggest that all tweets issued by @realDonaldTrump are official.  *Id.*;

*Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from

@realDonaldTrump regarding campaign-related events).  *Finally*, in *Knight*, Defendant

Trump and his administration stated in multiple signed public filings that the Twitter

account @realDonaldTrump belongs to and is controlled by Defendant Trump in "his

personal capacity."  *See* RJN at ¶ 25; *see also* Ex. 50 (*Knight* Cert. Pet.) at 13 ("Although

President Trump is currently a public official, the @realDonaldTrump account belongs to

him in his personal capacity, not his official one. He created and began frequent use of

that account in 2009, well before taking public office [and] . . . he will continue to have

control over the @realDonaldTrump account after his term of office has completed.");

RJN at ¶ 28; *see also* Ex. 51 (Reply Br. for Appellants at 5–7, *Knight First Amend. Inst.*

*at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26, 2018) (Trump

"created the account before he assumed the Presidency, and he will retain control over it

after he leaves public office.")); RJN at ¶¶ 26–27; *see also* Ex. 50 (*Knight* Cert. Pet.) at 5,

13 (contrasting "@realDonaldTrump account" "to the @WhiteHouse and @POTUS

accounts, over which he may exercise control only by virtue of his office").

7.    The Account covered subjects as diverse as military actions, immigration policies,

and senior staffing changes, among other major official announcements, and served as President

Trump's most important channel of communication. *Knight v. Trump,* 953 F.3d 216, 225.

(Exhibit 2a).

**Plaintiffs' Response:  <u>Disputed and immaterial</u>**.  This assertion is not supported by

evidence that can be presented in a form that would be admissible at trial and therefore

should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F.

Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to and inadmissible."). *First*, a judicial opinion is not evidence that Defendant Trump could present in an admissible form at trial; "findings of fact by a judge are hearsay and not subject to any exception enumerated by the Federal Rules of Evidence." *Rimkus*, 750 F. Supp. 2d at 171–72 ("[J]udicial findings are probabilistic determinations based upon a limited set of data points . . . they are not indisputable facts."); *Grimes*, 308 F. Supp. 3d at 106 (declining to consider the D.C. Circuit's characterization in a judicial opinion as evidence); Fed. R. Evid. 802. *Second*, the Second Circuit's statement addressed a specific period of time, i.e., 2017, and Defendant Trump has not offered any evidence showing the Second Circuit's statement continued to apply three years later. Ex. 2 at 232–33; RJN at ¶ 21 (identifying the initiation of the *Knight* lawsuit as occurring in July 2017). *Third*, *Knight* was not analyzing the communications of Defendant Trump for the purpose of establishing whether his statements or conduct using the @realDonaldTrump account entitled him to immunity. *Fourth*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually in light of the relevant context. *Blassingame*, 87 F.4th at 20. Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official. *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events). In addition, the context of tweets about the topics discussed in the assertion must be analyzed to determine whether those tweets are official or unofficial. *Blassingame*, 87 F.4th at 20. *Finally*, in *Knight*, Defendant Trump and his administration stated in multiple signed public filings that the Twitter account @realDonaldTrump belongs to and is controlled by Defendant Trump in

16

"his personal capacity." *See* RJN at ¶ 25; *see also* Ex. 50 (*Knight* Cert. Pet.) at 13

("Although President Trump is currently a public official, the @realDonaldTrump

account belongs to him in his personal capacity, not his official one. He created and

began frequent use of that account in 2009, well before taking public office [and] . . . he

will continue to have control over the @realDonaldTrump account after his term of office

has completed."); RJN at ¶ 28; *see also* Ex. 51 (Reply Br. for Appellants at 5–7, *Knight*

*First Amend. Inst. at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26,

2018) (Trump "created the account before he assumed the Presidency, and he will retain

control over it after he leaves public office.")); RJN at ¶¶ 26–27; *see also* Ex. 50 (*Knight*

Cert. Pet.) at 5, 13 (contrasting "@realDonaldTrump account" "to the @WhiteHouse and

@POTUS accounts, over which he may exercise control only by virtue of his office").

8.      President Trump frequently used the Account "to announce, describe, and defend

his policies; to promote his Administration's legislative agenda; to announce official decisions;

to engage with foreign political leaders; to publicize state visits; [and] to challenge media

organizations whose coverage of his Administration he believes to be unfair." *Knight v. Trump*,

928 F.3d 226, 231. (Exhibit 2a).

**Plaintiffs' Response:  Disputed and immaterial**.  This assertion is not supported by

evidence that can be presented in a form that would be admissible at trial and therefore

should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F.

Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to

and inadmissible.").  *First*, a judicial opinion is not evidence that Defendant Trump could

present in an admissible form at trial; "findings of fact by a judge are hearsay and not

subject to any exception enumerated by the Federal Rules of Evidence."  *Rimkus*, 750 F.

Supp. 2d at 171–72 ("[J]udicial findings are probabilistic determinations based upon a limited set of data points . . . they are not indisputable facts."); *Grimes*, 308 F. Supp. 3d at 106 (declining to consider the D.C. Circuit's characterization in a judicial opinion as evidence); Fed. R. Evid. 802. Moreover, this portion of the Second Circuit's opinion quotes Defendant Trump's filing. Ex. 2 at 231 ("The President has stipulated that he, with the assistance of Defendant Daniel Scavino, uses the Account frequently 'to announce, describe, defend. . . .'" (quoting relevant Appendix at 56)). *Second*, the Second Circuit's statement addressed a specific period of time, i.e., 2017, and Defendant Trump has not offered any evidence showing the Second Circuit's statement continued to apply three years later. Ex. 2 at 232–33; RJN at ¶ 21 (identifying the initiation of the *Knight* lawsuit as occurring in July 2017). *Third*, *Knight* did not analyze the communications of Defendant Trump for the purpose of establishing whether his statements or conduct using the @realDonaldTrump account entitled him to immunity. *Fourth*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually in light of the relevant context. *Blassingame*, 87 F.4th at 20. Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official. *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events). In addition, the context of tweets about the topics discussed in the assertion must be analyzed to determine whether those tweets are official or unofficial. *Blassingame*, 87 F.4th at 20. *Finally*, in *Knight*, Defendant Trump and his administration stated in multiple signed public filings that the Twitter account @realDonaldTrump belongs to and is controlled by Defendant Trump in "his personal

capacity." *See* RJN at ¶ 25; *see also* Ex. 50 (*Knight* Cert. Pet.) at 13 ("Although

President Trump is currently a public official, the @realDonaldTrump account belongs to

him in his personal capacity, not his official one. He created and began frequent use of

that account in 2009, well before taking public office [and] . . . he will continue to have

control over the @realDonaldTrump account after his term of office has completed.");

RJN at ¶ 28; *see also* Ex. 51 (Reply Br. for Appellants at 5–7, *Knight First Amend. Inst.*

*at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26, 2018) (Trump

"created the account before he assumed the Presidency, and he will retain control over it

after he leaves public office.")); RJN at ¶¶ 26–27; *see also* Ex. 50 (*Knight* Cert. Pet.) at 5,

13 (contrasting "@realDonaldTrump account" "to the @WhiteHouse and @POTUS

accounts, over which he may exercise control only by virtue of his office").

9.      "In June 2017, the White House responded to a request for official White House

records from the House Permanent Select Committee on Intelligence by referring the Committee

to a statement made by the President on Twitter." *Id.* at 232. (Exhibit 2).

**Plaintiffs' Response:  <u>Disputed and immaterial</u>**.  This assertion is not supported by

evidence that can be presented in a form that would be admissible at trial and therefore

should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F.

Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to

and inadmissible.").  *First*, the Supreme Court vacated the decision upon which

Defendant Trump relies.  *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S.

Ct. 1220 (2021).  *Second*, a judicial opinion is not evidence that Defendant Trump could

present in an admissible form at trial; "findings of fact by a judge are hearsay and not

subject to any exception enumerated by the Federal Rules of Evidence."  *Rimkus*, 750 F.

Supp. 2d at 171–72 ("[J]udicial findings are probabilistic determinations based upon a limited set of data points . . . they are not indisputable facts."); *Grimes*, 308 F. Supp. 3d at 106 (declining to consider the D.C. Circuit's characterization in a judicial opinion as evidence); Fed. R. Evid. 802. *Third*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually, *Blassingame*, 87 F.4th at 20, and there is no indication that the tweet referenced in the judicial opinion is one of the challenged tweets in this case (nor could it have been, given the time period referenced in the assertion). Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official. *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events). *Fourth*, any legal conclusions derived from the White House's response to a request for "official White House records" is irrelevant to the matter at hand, Fed. R. Evid. 401, and such conclusions are inadmissible to support factual assertions at summary judgment, *Jackson*, 101 F.3d at 153 ("[R]epeatedly blending factual assertions with legal argument . . . does not satisfy the purposes of [Rule 7(h)]."); *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d at 185 (explaining the court will disregard legal arguments contained within statements of facts). *Finally*, the method by which the White House responded to a June 2017 Congressional request is irrelevant to conduct that occurred more than three years later during the relevant time period. Fed. R. Evid. 401.

10.    On November 13, 2017, in the matter of *James Madison Project, et al. v. Department of Justice, et al.*, (No. 1:17-cv-00144-APM) the U.S. Department of Justice cited

tweets appearing on the Account as official statements of the President of the United States. (Exhibit 3, pgs. 3-4).

> **Plaintiffs' Response:  <u>Undisputed</u>** that the Department of Justice stated in a brief that it was treating *two* tweets from 2017 by @realDonaldTrump that are unrelated to the conduct at issue in this case as official statements.  **<u>Disputed and immaterial</u>** to the extent that Defendant Trump suggests a pattern from these two tweets.  *First*, the DOJ stated in that same brief that:  "All of the tweets to which plaintiffs refer are from @realDonaldTrump, the *personal* Twitter account President Trump established in 2009. . . ."  Ex. 3 at 3 n.2 (emphasis added).  *Second*, the citation of two tweets by Defendant Trump in 2017 by the DOJ in an unrelated legal matter in 2017 is irrelevant to conduct that occurred more than three years later during the relevant time period.  Fed. R. Evid. 401.  Finally, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually in light of the relevant context. *Blassingame*, 87 F.4th at 20.  Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official.  *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

11.     According to internal White House guidelines for the creation of daily "News Briefs," executive staff were instructed to monitor the @realDonaldTrump Twitter account for statements issued by President Trump. (Exhibit 4).

> **Plaintiffs' Response:  <u>Disputed and immaterial.</u>**  *First*, Defendant Trump failed to direct the Court and Plaintiffs to any specific "parts of the record" in its large compilation in Exhibit 4 in support of this assertion as required by Local Rule 7(h), and the Court

should disregard it as a result. *See Richardson v. Petasis*, 160 F. Supp. 3d 88, 95 n.3
(D.D.C. 2015) (explaining that "Local Civil Rule 7(h) requires a party opposing a motion
for summary judgment to include in her statement of disputed facts 'references to the
parts of the record relied on' for support," which "embodies the thought that judges are
not like pigs, hunting for truffles buried in briefs or the record." (quoting D.D.C. Local
Civ. R. 7(h)(1); *Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009))).
*Second*, Exhibit 4 never mentions the "@realDonaldTrump" Twitter account and never
instructs staff "to monitor the @realDonaldTrump Twitter account"; it merely states that
"POTUS Tweets should include all tweets that have been sent since his last tweet was
flagged." Ex. 4 at 1. *Third*, Exhibit 4 does not suggest that executive staff should
monitor the @realDonaldTrump Twitter account for *official* statements issued by
President Trump. *Finally*, the assertion is immaterial as the nature of each tweet issued
by Defendant Trump must be analyzed individually in light of the relevant context.
*Blassingame*, 87 F.4th at 20. Whether Defendant Trump issued some tweets that may be
official does not suggest that all tweets issued by @realDonaldTrump are official. *Id.*;
*Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from
@realDonaldTrump regarding campaign-related events).

12.    In accordance with these guidelines, the White House issued daily "News Briefs"
with a "POTUS Tweets" section, dedicated entirely to tweets issued from the Account. (Exhibit
5).

   **Plaintiffs' Response:  <u>Disputed and immaterial</u>.** *First,* disputed to the extent that
   Defendant Trump relies on his prior factual assertion when characterizing "these
   guidelines." *See supra* Pls' Response to Def. Trump's Assertion 11. *Second*, disputed

that the "POTUS Tweets" section of the daily "News Briefs" was "dedicated entirely to tweets issued from" the @realDonaldTrump account, as Exhibit 5 makes no such assertions.  Ex. 5.  *Third*, Exhibit 5 is a sample of tweets and is silent about the scope of the content included or whether those tweets constitute official statements.  *Id.  Fourth*, further disputed to the extent that Defendant Trump suggests that the inclusion of such tweets renders a tweet official conduct, as the News Briefs contain a significant number of tweets from the @realDonaldTrump account that address either his 2020 election campaign or the campaigns of other candidates.  *See, e.g., supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).  Indeed, in one of the News Alerts mentioned in Table A (███████████████████████████ █████████████), Defendant Trump's administration characterized that rally as a political event.  Ex. 46 (Jan. 3, 2021 email distributing "draft POTUS remarks for [Jan. 4, 2021] event in GA. . . . This speech will be delivered at a political event"); *see also* Def.'s Mot. Summ. J. at 21.  *Finally*, the assertion is immaterial, as the issuance of a "News Alert" about Defendant Trump's attendance at events does not bear on the nature of such attendance.  Several other "News Alert" emails in the record include tweets from @realDonaldTrump flagging attendance at campaign-related events.  *See, e.g., supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

13.    On January 5, 2021, the White House issued a "News Alert" informing members of the White House Office and the Executive Office of the President that President Trump intended to speak at the Save America Rally on January 6, 2021, by citing directly to President Trump's statement issued via the Account. (Exhibit 6).

**Plaintiffs' Response:  Disputed and immaterial.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, Defendant Trump's evidence does not support that the White House issued a News Alert to inform members of the White House Office and the Executive Office of the President that President Trump intended to speak at the Save America Rally on January 6, 2021. Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  Exhibit 6 merely flags the tweet without further announcement, consistent with the procedure that all tweets from Defendant Trump should be flagged.  Ex. 6 at 1; *see also* Ex. 4.  Exhibit 6 supports only that, on January 5, 2021, an email account titled "News Alert" flagged a tweet from @realDonaldTrump stating "I will be speaking at the SAVE AMERICA RALLY tomorrow on the Ellipse at 11AM Eastern. Arrive early – doors open at 7AM Eastern. BIG CROWDS!"  Ex. 6 at NARA_PROD_042304.  *Second*, this assertion is immaterial, as the issuance of a "News Alert" about Defendant Trump's attendance at events does not bear on the nature of such attendance.  Several other "News Alerts" emails in the record include tweets from @realDonaldTrump flagging attendance at campaign-related events. *See, e.g.*, *supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

14.    The U.S. Department of Defense monitored the Account for official statements from President Trump. (Exhibit 7, e.g. pg. 7).

**Plaintiffs' Response:  Disputed.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, Defendant Trump's evidence

shows only that reports from the U.S. Department of Defense contain a "Tweets of Note"; the cited evidence provides no evidentiary support for the remaining assertions in this statement, i.e., that it was the Department's policy to "monitor" the @realDonaldTrump account "for official statements," that the "Tweets of Note" cite the @realDonaldTrump Twitter account, or that any of the "Tweets of Note" were "official statements." Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *see generally* Ex. 7. *Second*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually in light of the relevant context. *Blassingame*, 87 F.4th at 20. Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official. *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

15.    U.S. CENTCOM monitored the Account for official statements from President Trump. (Exhibit 8, pg. 2).

**Plaintiffs' Response: <u>Disputed</u>.** This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1). *First*, Defendant Trump's evidence shows only that reports from the U.S. CENTCOM contain "Notable Tweets"; the cited evidence provides no evidentiary support for the remaining assertions in this statement, i.e., that CENTCOM's policy was to "monitor" the @realDonaldTrump account "for official statements," or that any of the "Notable Tweets" were "official statements." Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *see generally* Ex. 8. *Second*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed

individually in light of the relevant context. *Blassingame*, 87 F.4th at 20. Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official. *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

16.    In accordance with the Presidential Records Act of 1978 ("PRA"), the National Archives is tasked with collecting and preserving Presidential records. 44 U.S.C. §§ 2201-2209.

**Plaintiffs' Response:  Undisputed** that the National Archives (NARA) is tasked with collecting and preserving Presidential records as defined by the statute. **Disputed** to the extent this assertion is a legal conclusion, which is inadmissible to support factual assertions at summary judgment. *Jackson*, 101 F.3d at 153 ("[R]epeatedly blending factual assertions with legal argument . . . does not satisfy the purposes of [Rule 7(h)]."); *In re Domestic Airline Travel*, 691 F. Supp. 3d at 185 (explaining the court will disregard legal arguments contained within statements of facts).

17.    The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. 44 U.S.C. § 2201.

**Plaintiffs' Response:  Undisputed** that the assertion accurately quotes from 44 U.S.C. § 2201. **Disputed** to the extent this assertion is a legal conclusion, which is inadmissible to support factual assertions at summary judgment. *Jackson*, 101 F.3d at 153

26

("[R]epeatedly blending factual assertions with legal argument . . . does not satisfy the purposes of [Rule 7(h)]."); *In re Domestic Airline Travel*, 691 F. Supp. 3d at 185 (explaining the court will disregard legal arguments contained within statements of facts).

18.     The National Archives, the agency of government responsible for maintaining the government's records, has concluded that the President's tweets are official records. *Id. Knight v. Trump,* 928 F.3d 226, 232. (Exhibit 2).

**Plaintiffs' Response:  <u>Disputed and immaterial.</u>**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F. Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to and inadmissible.").  *First*, the Supreme Court vacated the decision upon which Defendant Trump relies.  *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).  *Second*, a judicial opinion is not evidence that Defendant Trump could present in an admissible form at trial; "findings of fact by a judge are hearsay and not subject to any exception enumerated by the Federal Rules of Evidence."  *Rimkus*, 750 F. Supp. 2d at 171–72 ("[J]udicial findings are probabilistic determinations based upon a limited set of data points . . . they are not indisputable facts."); *Grimes*, 308 F. Supp. 3d at 106 (declining to consider the D.C. Circuit's characterization in a judicial opinion as evidence); Fed. R. Evid. 802.  *Third*, Defendant Trump's first citation ("*Id.*") suggests that he asserts that his tweets are official records under the Presidential Records Act, 44 U.S.C. § 2201.  Legal conclusions are inadmissible to support factual assertions at summary judgment.  *Jackson*, 101 F.3d at 153 ("[R]epeatedly blending factual assertions with legal argument . . . does not satisfy the purposes of [Rule 7(h)]."); *In re Domestic*

*Airline Travel*, 691 F. Supp. 3d at 185 (explaining the court will disregard legal arguments contained within statements of facts).  *Fourth*, any determination by NARA about whether a president's tweets are official records under the Presidential Records Act is immaterial, because the standard for identifying a Presidential Record under the Presidential Records Act differs from the standard for identifying official conduct for purposes of determining presidential immunity.  *Compare* 44 U.S.C. § 2201(2)(A), *with Blassingame*, 87 F.4th at 20 (laying out the context-specific approach to determine if presidential immunity applies).  *Fifth*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually.  *Blassingame*, 87 F.4th at 20.  Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official.  *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

19.    As identified on the archived Trump White House website, which is preserved and maintained by the National Archives and is described as "historical material 'frozen in time,'" the @realDonaldTrump Twitter account is featured directly beneath the words "Donald J. Trump, 45th President of the United States." (https://trumpwhitehouse.archives.gov/people/donald-j-trump/) (Exhibit 9).

> **Plaintiffs' Response:  Undisputed** that the assertion accurately reflects the contents of the archived Trump White House website.  **Disputed and immaterial** to the extent this assertion suggests all tweets from @realDonaldTrump are official in nature.  The nature of each tweet issued by Defendant Trump must be analyzed individually in light of the relevant context.  *Blassingame*, 87 F.4th at 20; *Lindke*, 601 U.S. at 201–03.

28

20.    On January 10, 2021, the National Archives announced its intention to "receive, preserve, and provide access to all official Trump Administration social media content, including deleted posts from @realDonaldTrump and @POTUS."

(https://x.com/USNatArchives/status/1348330024420700160?mx=2) (Exhibit 10).

**Plaintiffs' Response:  Undisputed** that the assertion above accurately reflects a tweet posted by NARA on January 10, 2021.  **Disputed and immaterial** to the extent Defendant Trump suggests this has any bearing on whether Defendant Trump's tweets constitute official actions for purposes of determining presidential immunity.  *First*, any determination by NARA about whether a president's tweets are official records under the Presidential Records Act is immaterial, because the standard for identifying a Presidential Record under the Presidential Records Act differs from the standard for identifying official conduct for purposes of determining presidential immunity.  *Compare* 44 U.S.C. § 2201(2)(A), *with Blassingame*, 87 F.4th at 20.  *Second*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually. *Blassingame*, 87 F.4th at 20.  Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official.  *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

21.    As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the Account which announced President Trump's intention to speak at the Save America Rally. (Exhibit 11).

29

**Plaintiffs' Response:  <u>Disputed and immaterial</u>.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, Defendant Trump's evidence shows only that NARA obtained and preserved a tweet appearing on the Twitter account @realDonaldTrump; the cited evidence provides no evidentiary support for the remaining assertions in this statement, *e.g.*, that preserving the tweet at issue was part of NARA's "efforts to receive and preserve all official Trump Administration social media content," or about the motivation, processes, and significance of NARA in preserving social-media content more generally.  Fed. R. Civ. P. 56(c)(1)(B); *see generally* Ex. 11.  *Second*, any determination by NARA about whether a president's tweets are official records under the Presidential Records Act is immaterial, because the standard for identifying a Presidential Record under the Presidential Records Act differs from the standard for identifying official conduct for purposes of determining presidential immunity.  *Compare* 44 U.S.C. § 2201(2)(A), *with Blassingame*, 87 F.4th at 20.  *Third*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually.  *Blassingame*, 87 F.4th at 20.  Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official.  *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

22.    As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the Account which criticized the Supreme Court's unwillingness to hear cases related to the 2020 election. (Exhibit 12).

**Plaintiffs' Response:  Disputed and immaterial.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First,* Defendant Trump's evidence shows only that NARA obtained and preserved a tweet appearing on the Twitter account @realDonaldTrump; the cited evidence provides no evidentiary support for the remaining assertions in this statement, *e.g.*, that preserving the tweet at issue was part of NARA's "efforts to receive and preserve all official Trump Administration social media content," or about the motivation, processes, and significance of NARA in preserving social-media content more generally.  *See* Fed. R. Civ. P. 56(c)(1)(B); Local Rule 7(h)(1); *see generally* Ex. 12.  *Second*, any determination by NARA about whether a president's tweets are official records under the Presidential Records Act is immaterial, because the standard for identifying a Presidential Record under the Presidential Records Act differs from the standard for identifying official conduct for purposes of determining presidential immunity.  *Compare* 44 U.S.C. § 2201(2)(A), *with Blassingame*, 87 F.4th at 20.  *Third*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually.  *Blassingame*, 87 F.4th at 20.  Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official.  *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

23.     As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the

Account which discussed the need for an immediate appointment of "a strong, fast, and fair Special Counsel" to investigate the 2020 election results. (Exhibit 13).

> **Plaintiffs' Response:  <u>Disputed and immaterial.</u>**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, Defendant Trump's evidence shows only that NARA obtained and preserved a tweet appearing on the Twitter account @realDonaldTrump; the cited evidence provides no evidentiary support for the remaining assertions in this statement, *e.g.*, that preserving the tweet at issue was part of NARA's "efforts to receive and preserve all official Trump Administration social media content," or about the motivation, processes, and significance of NARA in preserving social-media content more generally.  *See* Fed. R. Civ. P. 56(c)(1)(B); Local Rule 7(h)(1); *see generally* Ex. 13.  *Second*, any determination by NARA about whether a president's tweets are official records under the Presidential Records Act is immaterial, because the standard for identifying a Presidential Record under the Presidential Records Act differs from the standard for identifying official conduct for purposes of determining presidential immunity.  *Compare* 44 U.S.C. § 2201(2)(A), *with Blassingame*, 87 F.4th at 20.  *Third*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually.  *Blassingame*, 87 F.4th at 20.  Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official.  *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

24.      As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the Account which criticized the Justice Department and the Federal Bureau of Investigation for failing to adequately investigate the outcome of the 2020 election. (Exhibit 14).

**Plaintiffs' Response: <u>Disputed and immaterial.</u>** This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, Defendant Trump's evidence shows only that NARA obtained and preserved a tweet appearing on the Twitter account @realDonaldTrump; the cited evidence provides no evidentiary support for the remaining assertions in this statement, *e.g.*, that preserving the tweet at issue was part of NARA's "efforts to receive and preserve all official Trump Administration social media content," or about the motivation, processes, and significance of NARA in preserving social-media content more generally.  *See* Fed. R. Civ. P. 56(c)(1)(B); Local Rule 7(h)(1); *see generally* Ex. 14.  *Second*, any determination by NARA about whether a president's tweets are official records under the Presidential Records Act is immaterial, because the standard for identifying a Presidential Record under the Presidential Records Act differs from the standard for identifying official conduct for purposes of determining presidential immunity.  *Compare* 44 U.S.C. § 2201(2)(A), *with Blassingame*, 87 F.4th at 20.  *Third*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually.  *Blassingame*, 87 F.4th at 20.  Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official.  *Id.*;

*Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

25.    As part of its efforts to receive and preserve all official Trump Administration social media content, the National Archives obtained and preserved a tweet appearing on the Account which criticized the methods by which various states conducted the 2020 election, accusing those methods of being illegal and unconstitutional. (Exhibit 15) (Exhibit 16).

**Plaintiffs' Response: <u>Disputed and immaterial.</u>**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, Defendant Trump's evidence shows only that NARA obtained and preserved a tweet appearing on the Twitter account @realDonaldTrump; the cited evidence provides no evidentiary support for the remaining assertions in this statement, *e.g.*, that preserving the tweet at issue was part of NARA's "efforts to receive and preserve all official Trump Administration social media content," or about the motivation, processes, and significance of NARA in preserving social-media content more generally.  *See* Fed. R. Civ. P. 56(c)(1)(B); Local Rule 7(h)(1); *see generally* Exs. 15 & 16.  *Second*, any determination by NARA about whether a president's tweets are official records under the Presidential Records Act is immaterial, because the standard for identifying a Presidential Record under the Presidential Records Act differs from the standard for identifying official conduct for purposes of determining presidential immunity.  *Compare* 44 U.S.C. § 2201(2)(A), *with Blassingame*, 87 F.4th at 20.  *Third*, the assertion is immaterial as the nature of each tweet issued by Defendant Trump must be analyzed individually. *Blassingame*, 87 F.4th at 20.  Whether Defendant Trump issued some tweets that may be

34

official does not suggest that all tweets issued by @realDonaldTrump are official. *Id.*;
*Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from
@realDonaldTrump regarding campaign-related events).

26.    As part of its efforts to receive and preserve all official Trump Administration
social media content, the National Archives obtained and preserved a tweet appearing on the
Account which referenced President Trump's phone call with state legislatures regarding the
potential decertification of the 2020 election. (Exhibit 17).

**Plaintiffs' Response:  Disputed and immaterial.**  This assertion is not supported by
evidence that can be presented in a form that would be admissible at trial and therefore
should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*,
Defendant Trump's evidence shows only that NARA obtained and preserved a tweet
appearing on the Twitter account @realDonaldTrump; the cited evidence provides no
evidentiary support for the remaining assertions in this statement, *e.g.*, that preserving the
tweet at issue was part of NARA's "efforts to receive and preserve all official Trump
Administration social media content," or about the motivation, processes, and
significance of NARA in preserving social-media content more generally.  *See* Fed. R.
Civ. P. 56(c)(1)(B); Local Rule 7(h)(1); *see generally* Ex. 17.  *Second*, any determination
by NARA about whether a president's tweets are official records under the Presidential
Records Act is immaterial, because the standard for identifying a Presidential Record
under the Presidential Records Act differs from the standard for identifying official
conduct for purposes of determining presidential immunity.  *Compare* 44 U.S.C.
§ 2201(2)(A), *with Blassingame*, 87 F.4th at 20.  *Third*, the assertion is immaterial as the
nature of each tweet issued by Defendant Trump must be analyzed individually.

*Blassingame*, 87 F.4th at 20.  Whether Defendant Trump issued some tweets that may be official does not suggest that all tweets issued by @realDonaldTrump are official.  *Id.*; *Lindke*, 601 U.S. at 201–03; *see also supra* Table A (sampling tweets from @realDonaldTrump regarding campaign-related events).

27.     Despite its efforts to obtain and preserve official statements issued via the Account, the National Archives was unable to obtain and preserve all relevant records due to the policies of Twitter, which suspended the @realDonaldTrump account, rendering it inaccessible for a time. (Exhibit 18).

**Plaintiffs' Response:  Disputed and immaterial.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, Defendant Trump's cited evidence provides no evidentiary support for the assertions in this statement, e.g., the motivation, processes, and significance of NARA preserving social media content.  Fed. R. Civ. P. 56(c)(1)(B); Local Rule 7(h)(1).  *Second*, this assertion improperly relies on inadmissible hearsay.  Fed. R. Evid. 802; *White Coat Waste Project v. United States Dep't of Veterans Affs.*, 404 F. Supp. 3d 87, 105 (D.D.C. 2019) ("[I]t is well-settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.") (internal citation omitted); *Equal Emp. Opportunity Comm'n v. Howard Univ.*, 70 F. Supp. 3d 140, 148 (D.D.C. 2014) ("While a nonmovant is not required to produce evidence in a form that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence . . . .  Otherwise, the objective of summary judgment—to prevent unnecessary trials—would be undermined.") (internal citation omitted).  *Third*, Defendant Trump

ignores that the communication he cited emphasizes that NARA advised the Trump Administration to capture and preserve "all tweets . . . whether on *his personal* @realDonaldTrump account or on the official @POTUS account . . ."; that the communication details that the account @realDonaldTrump was enrolled late in the automatic preservation program and unenrolled early (while the account @POTUS, after being enrolled late, was preserved through the end of his administration); and that the communication characterized seven other Twitter accounts not owned or controlled by Defendant Trump as potentially containing "presidential record information." Ex. 18 at 3–4 (emphasis added). *Fourth*, this assertion is ambiguous as to the meaning of "all relevant records." *Finally*, any determination by NARA about whether a president's tweets are official records under the Presidential Records Act is immaterial, because the standard for identifying a Presidential Record under the Presidential Records Act differs from the standard for identifying official conduct for purposes of determining presidential immunity. *Compare* 44 U.S.C. § 2201(2)(A), *with Blassingame*, 87 F.4th at 20.

## II. The Rally

28.     On December 16, 2020, the organization Women for America First ("WAF") announced its intention to host a rally in Washington D.C. on January 6, 2021 (the "Save America Rally"). (Tr. of Amy Kremer before the House Select Committee, pgs. 47:18 – 48:1) (Exhibit 19) (Exhibit 19a).

> **Plaintiffs' Response:  Disputed.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F. Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to and inadmissible.").

*First*, Defendant Trump relies on hearsay that could not be presented in an admissible form at trial, which the Court should disregard. *See* Fed. R. Evid. 802; *White Coat Waste Project*, 404 F. Supp. 3d at 105; *Howard Univ.*, 70 F. Supp. 3d at 148. *Second*, Defendant Trump's evidence shows only that, on December 16, 2020, Kylie Kremer sent out a tweet regarding the Save America Rally; the cited evidence provides no evidentiary support for the assertions in this statement, i.e., that on December 16, Women for America First (WFAF) "announced its intention to host a rally in Washington D.C. on January 6, 2021." *See* Fed. R. Civ. P. 56(c)(1)(B); Local Rule 7(h)(1); Ex. 19 at 47:18–48:1. *Finally*, the assertion is ambiguous as to the meaning of "host."

29. The purpose of the Save America Rally was to petition Congress regarding the results of the 2020 election, to motivate members of Congress to investigate the election results, and to see what evidence would ultimately be presented. (Tr. of Amy Kremer before the House Select Committee, pgs. 49:19 – 50:13; 59:24 – 60:11) (Exhibit 19).

**Plaintiffs' Response: <u>Disputed</u>.** This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1). Defendant Trump's evidence does not support the assertion that the purpose of the "Save America Rally was to petition Congress regarding the results of the 2020 election, to motivate members of Congress to investigate the election results, and to see what evidence would ultimately be presented." Ex. 19 at 49:19–50:13; 59:24–60:11; Fed. R. Civ. P. 56(c)(1)(B); Local Rule 7(h)(1). The cited testimony provides Amy Kremer's opinion only. Ex. 19 at 49:16–18 ("Q . . . So, just from your perspective, what was the purpose of . . . doing another rally in D.C. on January 6th"). Moreover, nothing in the cited testimony supports that the Rally's

purpose was "motivate members of Congress to investigate the election results."  *See id.*;
Fed. R. Civ. P. 56(c)(1)(b); Local Rule 7(h)(1).  To the contrary, the record reveals that
this was not the purpose of the Rally.  Stephen Miller testified that "[i]t was blindingly
obvious that the purpose of the speech was to build support for [Defendant Trump's]
election contest."  Ex. 57 at 131:7–12.  Ross Worthington, Defendant Trump's head
speechwriter, was asked what he understood the intent of Defendant Trump's speech at
the Rally to be and testified that "I understood the speech to be his last . . . rally," that he
thought of the speech as a political event, and that  he used his personal devices to review
the speech, consistent with the White House speechwriting team's practice for reviewing
speeches given in connection with political events.  *See, e.g.*, Ex. 58 (Jan. 6 Comm. R.
Worthington Dep. Tr.) at 16:22–17:1, 115:12–21.  Additionally, Defendant Trump's
speech at the Rally was directed towards members of the audience.  *See, e.g.*, Ex. 42 at
NARA_PROD_097097 ("*All of us here* today do not want to see our election victory
stolen by emboldened radical-left Democrats, which is what they're doing. . . . *We* will
never give up, *we* will never concede."  (emphasis added)), *id.* ("And to use a favorite
term that *all of you people* really came up with: We will stop the steal. Today I will lay
out just some of the evidence proving that we won this election and we won it by a
landslide."  (emphasis added)), *id.* at NARA_PROD_097099 ("*Many of you have
traveled* from all across the nation *to be here*, and I want to thank *you* for the
extraordinary love. . . . For the extraordinary love for this amazing country, and this
amazing movement, thank you."  (emphasis added)), *id.* at NARA_PROD_097100
("*We're gathered together* in the heart of our nation's capital for one very, very basic and
simple reason: To save our democracy."  (emphasis added)), *id.* at

NARA_PROD_097101 ("But just remember this: *You're* stronger, *you're* smarter, *you've* got more going than anybody. And they try and demean everybody having to do with *us*. And *you're the real people*, *you're the people* that built this nation. *You're not the people* that tore down our nation.*"* (emphasis added)), *id.* at NARA_PROD_097102–103 ("[W]e're going to walk down to the Capitol. And we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them [] because you'll never take back our country with weakness. You have to show strength and you have to be strong." (emphasis added)), *id.* at NARA_PROD_097107 ("*We* will not be intimidated into accepting the hoaxes and the lies that *we've* been forced to believe." (emphasis added)). Furthermore, Defendant Trump made similar comments during his speech on January 6, 2021 and during a rally in Dalton, Georgia days before, which his administration characterized as a political event. Ex. 46 (Jan. 3, 2021 email distributing "draft POTUS remarks for [Jan. 4, 2021] event in GA" and noting that "This speech will be delivered at a political event"); Def.'s Mot. Summ. J. at 21; Def.'s Assertion 55; *see also infra* Table B (comparing remarks during the two speeches). *Finally*, the context surrounding the Rally further suggests that the purpose was not "to motivate members of Congress to investigate the election results, and to see what evidence would ultimately be presented," but rather to advance Defendant Trump's reelection efforts. SUF ¶¶ 26–117, 131–79, 185–209, 225–51, 256–59, 261–310, 336, 340.

**Table B: Comparison of Defendant Trump's Speech at the January 4, 2021 Dalton, GA rally and the January 6, 2021 Rally Speech:**

| Jan. 4, 2021, Dalton, GA. rally speech.  Ex. 59 | Jan. 6, 2021, Rally Speech.  Ex. 42 |
|---|---|
| • "[A]nd they're not taking this White House. We're going to **fight like hell**." Ex. 59 at 4:19–20.<br><br>• "If you don't fight to save your country with everything that you have, **you're not going to have a country left**." Ex. 59 at 19:23–24. | • "We **fight like hell**.  And if you don't fight like hell, **you're not going to have a country anymore**." Ex. 42 at NARA_PROD_097125. |
| • "[B]ut when you win in a landslide and they steal it and it's **rigged**, it's not acceptable." Ex. 59 at 4:25–5:1. | • "This year they **rigged** an election." Ex. 42 at NARA_PROD_097097. |
| • "How about the press?  Look at them back there. . . . But, you know, they've gone silent now.  They have a new thing.  **They used to fight me left, right -- I'd go, they'd go.  You know, you'd fight**, I'd win . . . Now they don't want to talk about it . . . **they went stone cold silent**. . . . Big tech, the fake news media, they go silent anymore.  They don't talk about it, and that is the beginning of **communism**." Ex. 59 at 5:10–25. | • "The American people do not believe the corrupt, fake news anymore.  They have ruined their reputation . . . But you know, it used to be . . . **they had their point of view, I had my point of view, but you'd have an argument.  Now what they do is they go silent.**  It's called suppression and that's what happens in a **communist country**." Ex. 42 at NARA_PROD_097107. |
| • "**I hope Mike Pence comes through for us**, I have to tell you.  I hope that our great vice president . . . comes through for us." Ex. 59 at 6:9–12. | • "**I hope Mike is going to do the right thing.**  I hope so." Ex. 42 at NARA_PROD_097098. |
| • "If [Democrats] Ossoff and Warnock are elected . . . they'll **throw open American borders** . . . ." Ex. 59 at 13:3–5. | • "Democrats enacted policies that . . . **threw open our borders** and put America last." Ex. 42 at NARA_PROD_097101. |
| • "[W]e built almost 500 miles of wall and **they want to rip down the wall**.  They want to rip down. . . . So, they're coming up now, the caravans.  **Remember the** | • "You know, the wall is built.  We're doing record numbers at the wall.  Now, **they want to take down the wall**.  Let's let everyone flow in.  Let's let |

| Jan. 4, 2021, Dalton, GA. rally speech.  Ex. 59 | Jan. 6, 2021, Rally Speech.  Ex. 42 |
|---|---|
| **caravans?  The caravans are starting to form.**  Here they come. . . . If they win this race, Democrats will implement nationwide catch and release."  Ex. 59 at 13:16–14:7. | everybody flow in.  We did a great job in the wall.  Remember, the wall, they said it could never be done.  One of the largest infrastructure projects we've ever had in this country, and it's had a tremendous impact, that we got rid of catch and release. . . . But now, **the caravans**, I think Biden's getting in, **the caravans are forming again**."  Ex. 42 at PLAINTIFFS_00070125. |
| • "**The most unhappy person right now, anywhere** in the United States, **is Hillary Clinton** because she's asking the Democrat party, why the hell didn't you do this for me? . . . True.  **Why didn't you do it for me?** . . . Why the hell didn't you?  You **notice how quiet she's been**?"  Ex. 59 at 37:15–24. | • "And the only unhappy person in the United States, **single most unhappy, is Hillary Clinton**.  Because she said: '**Why didn't you do this for me four years ago**?  Why didn't you do this for me four years ago?  Change the votes, 10,000 in Michigan.  You could have changed the whole thing.' But she's not too happy.  You know, **you don't see her anymore**.  What happened?  Where's Hillary? Where is she?"  Ex. 42 at NARA_PROD_097124. |
| • "I've had **two elections.  I won both of them.**  It's amazing.  And I actually did **much better on the second one**."  Ex. 59 at 2:10–12. | • "I've been in **two elections**; **I won them both,** and the second one, I won **much bigger than the first**."  Ex. 42 at NARA_PROD_097097. |
| • "**Almost 75 million people voted for me -- the most of any incumbent president in the history of our country.**  We won over 11 million -- close to **12 million, more votes than 2016**; one of the largest -- actually, the single **largest increase** in the history of our country."  Ex. 59 at 6:20–25. | • "**Almost 75 million people voted for our campaign, the most of any incumbent president by far in the history of our country, 12 million more people than four years ago.**"  Ex. 42 at NARA_PROD_097097. |
| • "The U.S. military, which we rebuilt -- we've totally **rebuilt the U.S. military**, much of it coming right out of Georgia."  Ex. 59 at 11:16–18. | • "We got rid of plenty of different things that everybody knows and the **rebuilding of our military** in three years.  People said it couldn't be done.  And it was all made in the USA, all made in the USA, best equipment in the |

| Jan. 4, 2021, Dalton, GA. rally speech. Ex. 59 | Jan. 6, 2021, Rally Speech. Ex. 42 |
|---|---|
|  | world." Ex. 42 at NARA_PROD_097114. |
| • "**We want voter ID**. Is that so much to ask?" Ex. 59 at 15:22–23. | • "**We want voter ID**. . . ." Ex. 42 at NARA_PROD_097110. |

30.     Initially, it was the intention of WAF that the Save America Rally would be held at the Freedom Plaza and a permit was secured for that location. (Tr. of Amy Kremer before the House Select Committee, pgs. 61:12 – 62:2) (Exhibit 19).

> **Plaintiffs' Response:  Disputed.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  Defendant Trump's evidence does not support his assertions about the intentions of WFAF or that it secured a permit for Freedom Plaza. Ex. 19 at 61:12–62:2; Fed. R. Civ. P. 56(c)(1)(B).  Amy Kremer testified that "[W]e were second in line. . . . [W]e did not have the permit [for Freedom Plaza] at that time.  But we have been told we were probably going to get it." Ex. 19 at 61:24–62:2.  Further disputed to the extent Defendant Trump contends that only WFAF was involved in the permitting processes for the Rally, given that multiple individuals associated with the Trump Campaign (but not the White House) were also involved in obtaining permits for the Rally, *see* Table C.

**Table C: Evidence of Individuals Affiliated with the Trump Campaign and their Involvement in Permitting for the Rally**

| Individual | Affiliation with the Trump Campaign | Involvement in Permitting for the Rally |
|---|---|---|
| **Caroline Wren** | • Ex. 56, No. 54 ( ██████████████████ ██████████████████ ██████████████████ <br><br> • Ex. 60 at 8:10–13 (C. Wren stating that "[I]n March of 2020 to November 2020, I went in-house with the Trump [C]ampaign."); <br><br> • Ex. 61 at 34:3–15 (K. Davis stating: "[w]hat I confirmed was that [C. Wren] was part of Trump Victory or Trump something fundraising."); <br><br> • Ex. 62 at 51:5–9 (D. Trump Jr. stating that C. Wren was a fundraiser for the Trump Campaign); <br><br> • Ex. 63 at rows 361–377 (showing $170,000 to C. Wren in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021); *see also* Ex. 64 (website capturing FEC search); <br><br> • Ex. 60 at 7:25–10:19 (C. Wren's description of work history does not include any work in government, only private fundraising); <br><br> • Ex. 65, No. 155 ██████████████ ██████████████ | • Ex. 21 at DOI_TOUHY_00296 5 (Rally permit listing C. Wren as "VIP ADVISOR"); |
| **Justin Caporale** | • Ex. 56, No. 49 ( ██████████████████ ██████████████████ <br><br> • Ex. 66 at row 6794 (J. Caporale receiving a "PAYROLL" disbursement from the Trump Campaign on Nov. 30, 2020); *see also* Ex. 67 (website capturing FEC search); <br><br> • Ex. 68 at SCAVINO_SMITH_000026–29 ██ ██████████████████ ██████████████████ | • Ex. 21 at DOI_TOUHY_00296 4 (Rally permit listing J. Caporale as "[o]n-[s]ite [c]ontact" and "PROJECT MANAGER"); <br><br> • Ex. 73 at 95:12– 96:17 (K. Kremer explaining that she, A. Kremer, and J. Caporale decided |

| Individual | Affiliation with the Trump Campaign | Involvement in Permitting for the Rally |
|---|---|---|
| | ███████████████████ *see also* Ex. 69 at SCAVINO_SMITH_00030–32 (████); <br><br> • Ex. 70 (Event Strategies, Inc. receiving a total of $2,560.685.55 in disbursements from the Trump Campaign between 2015 and March 1, 2021); *see also* Ex. 71 (website capturing FEC search); <br><br> • Ex. 72 at 12:20–13:10 (J. Caporale stating that at the time of the Rally he was "essentially acting on behalf of [ESI] to provide the services that ESI would provide"); Ex. 56, No. 48 (████████████████ ████████████████ ████████████); <br><br> • Ex. 65, No. 158 (████████████ ████████████ █████████) | "that the Ellipse was going to be the best place for us to file for the permit"); <br><br> • Ex. 74 at KKremer5155 (J. Caporale texting K. Kremer stating she can sign the contract with GW medical for the Rally and he will "pay it"); <br><br> • Ex. 72 at 22:17–24 (J. Caporale discussing planning for location of the Rally). |
| Kiran Menon | • Ex. 66 at rows 2631, 6750, 7585 (disbursements to K. Menon from the Trump Campaign for "PAYROLL" as of Nov. 13, 2020, Nov. 30, 2020, and Dec. 15, 2020); <br><br> • Ex. 66 at row 8749 (showing Jan. 7, 2021 "TRAVEL REIMBURSEMENT" from the Trump Campaign to K. Menon); <br><br> • Ex. 63 at rows 70–87 (showing $28,164.46 to K. Menon in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_00296 5 (Rally permit listing K. Menon as "OPERATIONS ASSOCIATE 2"); |
| Maggie Mulvaney | • Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she knew because they were in the Trump Campaign's finance department—to assist with the Rally); <br><br> • Ex. 63 at rows 88–126 (showing $140,394.48 to M. Mulvaney in total disbursements from the | • Ex. 21 at DOI_TOUHY_00296 5 (Rally permit listing M. Mulvaney as "VIP LEAD"). |

| Individual | Affiliation with the Trump Campaign | Involvement in Permitting for the Rally |
|---|---|---|
| | Trump Campaign from 2015 through Mar. 1, 2021). | |
| Megan Powers | • Ex. 75 (Dec. 31, 2020 email from M. Powers using her @donaldtrump.com email address);<br><br>• Ex. 76 (M. Powers's LinkedIn account stating she worked as Director of Operations for Donald J. Trump for President through Jan. 2021);<br><br>• Ex. 66 at row 9058 (campaign disbursing $19,566.67 to M. Powers on Feb. 2, 2021);<br><br>• Ex. 63 at rows 191–298 (showing $413,996.71 to M. Powers in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021);<br><br>• Ex. 65, No. 165 ███████████████████████████████████████ | • Ex. 21 at DOI_TOUHY_00296 4 (Rally permit listing M. Powers as "OPERATIONS MANAGER FOR SCHEDULING AND GUIDANCE"). |
| Ron Holden | • Ex. 66 at rows 1301, 2706 (disbursements to R. Holden from the Trump Campaign for $15,693 on Nov. 4, 2020 and $3,833.33 on Nov. 13, 2020);<br><br>• Ex. 63 at rows 42–68 (showing $100,832.18 to R. Holden in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_00296 5 (Rally permit listing R. Holden as "BACKSTAGE MANAGER"). |
| Tim Unes | • Ex. 77 (T. Unes using an @donaldtrump.com email address re planning an Oct. 13, 2020 Rally);<br><br>• Ex. 70 (Event Strategies, Inc. receiving a total of $2,560.685.55 in disbursements from the Trump Campaign between 2015 and Mar. 1, 2021); | • Ex. 21 at DOI_TOUHY_00296 5 (Rally permit listing T. Unes as "STAGE MANAGER"). |

| Individual | Affiliation with the Trump Campaign | Involvement in Permitting for the Rally |
|---|---|---|
| | • Ex. 66 at rows 645, 1321, 7626 (Event Strategies Inc. receiving disbursements from the Trump Campaign in Nov. and Dec. 2020). | |
| **William Wilson** | • Ex. 66 at rows 2036, 2191 (disbursements to W. Wilson from the Trump Campaign for $1,260 on Nov. 9, 2020 and $4,000 on Nov. 10, 2020); <br><br> • Ex. 63 at rows 358–360 (showing $6,040.00 to W. Wilson in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_00296 5 (Rally permit listing W. Wilson as "BACKSTAGE ASSISTANT"). |
| **Hannah Salem** | • Ex. 66 at row 1241 (campaign disbursement of $19,689.96 to "Salem Strategies LLC" on Nov. 4, 2020); <br><br> • Ex. 78 (showing $113,471.51 in total disbursement to Salem Strategies from the Trump Campaign from 2015 through Mar. 1, 2021); *see also* Ex. 79 (website capturing FEC search); <br><br> • Ex. 63 at rows 299–305 (showing $2,346.00 to H. Salem, individually, in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_00296 4 (Rally permit listing H. Salem's role as "OPERATIONS MANAGER FOR LOGISTICS AND COMMUNICATION S" and contact information as Hannah@salemstrate giesllc.com). |
| **James Oaks** | • Ex. 66 at row 2606 (disbursement to J. Oaks from the Trump Campaign on Nov. 13, 2020); <br><br> • Ex. 63 at rows 69, 127–190 (showing $144,332.05 to J. Oaks in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_00296 4 (listing J. Oaks as "OPERATIONS ASSOCIATE"). |

31.     At the time WAF first announced its intention to host the Save America Rally,
WAF had not coordinated with any individuals in either the White House or from within the
Trump family regarding the planning or organization of the Save America Rally. (Tr. of Amy
Kremer before the House Select Committee, pgs. 50:22-51:1) (Exhibit 19).

**Plaintiffs' Response:  Disputed.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, Defendant Trump's evidence does not support this factual assertion.  Fed. R. Civ. P. 56(c)(1)(B); Local Rule 7(h)(1). Amy Kremer testified only that she personally had not "coordinated with anybody at the White House or anybody in the Trump family" the "announcement on December 16th." Ex. 19 at 50:22–51:1 ("[Q:] I just have to ask the obvious question, had ***you*** coordinated with anybody at the White House or anybody in the Trump family with your ***announcement on December 16th*** that you were coming back to D.C."  "[A:] No." (emphasis added)).  The cited testimony refers only to Amy Kremer's coordination and is limited to her December 16 announcement; she did not testify to WFAF's coordination with the White House or Trump family, and she did not testify to her coordination with the White House or Trump family beyond her December 16 announcement.  *Second*, the record demonstrates that numerous individuals affiliated with the Trump Campaign coordinated, organized, or planned the Save America Rally with WFAF.  *See, e.g.*, Table D.  *Third*, further disputed to the extent Defendant Trump contends that only WFAF was involved in the planning processes for the Rally given that multiple individuals associated with the Trump Campaign (but not the White House) were also involved in obtaining permits for the Rally, *see supra* Table C.

**Table D: Evidence of Individuals Affiliated with the Trump Campaign Coordinated, Organized, or Planned for the Save America Rally with WFAF**

| Name | Affiliation with the Trump Campaign | Coordination with WFAF | Coordinating, Organizing, Planning the Rally |
|------|-------------------------------------|------------------------|---------------------------------------------|
| **Caroline Wren** | • Ex. 56, No. 54 ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████<br><br>• Ex. 60 at 8:10–13 (C. Wren stating that "[I]n March of 2020 to November 2020, I went in-house with the Trump [C]ampaign.");<br><br>• Ex. 61 at 34:3–15 (K. Davis stating: "[w]hat I confirmed was that she was part of Trump Victory or Trump something fundraising.");<br><br>• Ex. 62 at 51:5–9 (D. Trump Jr. stating that C. Wren was a fundraiser for the Trump Campaign);<br><br>• Ex. 63 at rows 361–377 (showing $170,000 to C. Wren in total disbursements from | • Ex. 21 at DOI_TOUHY_0 02965 (listing C. Wren as "VIP ADVISOR" on WFAF's Rally permit);<br><br>• Ex. 72 at 13:11–18:2 (J. Caporale stating that he was asked to plan the Rally by WFAF, Wren, and Budowich). | • Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she knew because they were in the Trump Campaign's finance department—to assist with the Rally);<br><br>• Ex. 21 at DOI_TOUHY_002965 (listing C. Wren as "VIP ADVISOR" on WFAF's Rally permit);<br><br>• Ex. 80 (██████ ██████████ ██████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████<br><br>• Ex. 81 at PLAINTIFFS_0000145 9–61 (text messages between C. Wren and T. Enlow discussing advertisement package proposals, seeking a contract for speakers, updated fliers or website links to advertise the |

| Name | Affiliation with the Trump Campaign | Coordination with WFAF | Coordinating, Organizing, Planning the Rally |
|------|-------------------------------------|------------------------|---------------------------------------------|
| | the Trump Campaign from 2015 through Mar. 1, 2021); <br><br> • Ex. 60 at 7:25–10:19 (C. Wren's description of work history does not include any work in government, only private fundraising); <br><br> • Ex. 65, No. 155 (███████████ ██████████ ██████████ ███████████ ██████████ █████████) | | Rally, and requesting VIP passes and access badges for speakers and the media for the Rally); <br><br> • Ex. 60 at 194:17–195:8 (C. Wren stating that she coordinated speaking fee payments for K. Guilfoyle and D. Trump Jr. for the Rally); <br><br> • Ex. 31 at NARA_PROD_042387 (Rally Guidance Memo stating "if you have any questions please contact" Caroline Wren, Maggie Mulvaney, Kyra Schaefer, or Cassidy Kofoed); <br><br> • Ex. 82 at 74:21–75:14 (K. Guilfoyle stating that C. Wren "brought [speaking fees] to [Guilfoyle's] attention"); <br><br> • Ex. 83 at PLAINTIFFS_0000138 8 (J. Caporale texting C. Wren on Dec. 29, 2020 regarding "schedule proposal" and "a call to action to march to [the] capitol and make noise"); <br><br> • Ex. 72 at 13:11–18:2 (J. Caporale stating that he was asked to plan the |

| Name | Affiliation with the Trump Campaign | Coordination with WFAF | Coordinating, Organizing, Planning the Rally |
|---|---|---|---|
| | | | Rally by WFAF, Wren, and Budowich). |
| **Justin Caporale** | • Ex. 56, No. 49 (██████ ████████ ████████ ████████ ████████); <br><br> • Ex. 66 at row 6794 (J. Caporale receiving a "PAYROLL" disbursement from the Trump Campaign on Nov. 30, 2020); <br><br> • Ex. 68 at SCAVINO_SMITH _000026–29 (██████ ████████ █████ ████████ ████████ ████████ ████████ ████████ *see also* Ex. 69 at SCAVINO_SMITH _00030–32 ████); <br><br> • Ex. 70 (Event Strategies, Inc. receiving a total of $2,560.685.55 in disbursements from the Trump Campaign between | • Ex. 84 ████ ████████ ████████ ████████ ████████ ████████ ████████ █████; <br><br> • Ex. 72 at 13:11– 18:2 (J. Caporale stating that he was asked to plan the Rally by WFAF, Wren, and Budowich); <br><br> • Ex. 73 at 95:12– 96:17 (K. Kremer explaining that she, A. Kremer, and J. Caporale decided "that the Ellipse was going to be the best place for us to file for the permit"). | • Ex. 21 at DOI_TOUHY_002934, 02964 (Rally permit listing J. Caporale as "[o]n-[s]ite [c]ontact" and "PROJECT MANAGER"); <br><br> • Ex. 72 at 22:17–24 (J. Caporale discussing planning for the location of the Rally); <br><br> • Ex. 73 at 95:21–17 (K. Kremer explaining that she, A. Kremer, and J. Caporale decided "that the Ellipse was going to be the best place for us to file for the permit"); <br><br> • Ex. 84 (██████ ████████ ████████ ████████ ████████ █████); <br><br> • Ex. 80 (████ ████████ ████ ████████ ████████ ████████ █████) |

| Name | Affiliation with the Trump Campaign | Coordination with WFAF | Coordinating, Organizing, Planning the Rally |
|------|-------------------------------------|------------------------|----------------------------------------------|
|  | 2015 and Mar. 1, 2021); | | ████████████ ████████ |
|  | • Ex. 72 at 12:20–13:10 (J. Caporale stating that at the time of the Rally he was "essentially acting on behalf of [ESI] to provide the services that ESI would provide"); | | • Ex. 72 at 19:17–20:5 (J. Caporale stating that he "receive[d] payments from Turning Point to cover the invoices and costs incurred for the January 6th event" in addition to payments from WFAF); |
|  | • Ex. 56, No. 48 (████████████ ████████████ ████████████ ██████) | | • Ex. 69 at SCAVINO_SMITH_00 00030–32 (████ ████████████ ████████████ ████████████ ████████████ ██████████████) |
|  | • Ex. 65, No. 158 (████████████ ████████████ ████████████ ██████) | | • Ex. 69 at SCAVINO_SMITH_00 00031 (████████ ████████████ ████████████ ████████████ ████████████ ████████) |
|  | | | • Ex. 68 at SCAVINO_SMITH_00 00026 (██████ ████████████ ████████████ ████████████ ████████████ ████████████) |

| Name | Affiliation with the Trump Campaign | Coordination with WFAF | Coordinating, Organizing, Planning the Rally |
|------|-------------------------------------|------------------------|---------------------------------------------|
| | | | ███████████<br>███████████<br>███████████<br>███████<br><br>• Ex. 85 at KPierson0042 (J. Caporale discussing "graphics proofs for the stage design and credentials" for the Rally);<br><br>• Ex. 74 at KKremer5155 (J. Caporale texting K. Kremer stating she can sign the contract with GW medical for the Rally and he will "pay it");<br><br>• Ex. 233 at KPierson0065 (email from K. Pierson to M. Powers and J. Caporale with "POTUS list" of speakers);<br><br>• Ex. 83 at PLAINTIFFS_0000138 8 (J. Caporale texting C. Wren on Dec. 29, 2020 regarding "schedule proposal" and "a call to action to march to [the] capitol and make noise"). |
| **Katrina Pierson** | • Ex. 86 at 8:3–18, 11:7–21 (K. Pierson identifying role on Trump Campaign); *see also* Ex. 20(a) | • Ex. 87 at KKremer 4457, 64 (K. Kremer Dec. 2020 and Jan. 2021 text chain with K. Kremer, K. | • Ex. 86 at 29:2–33:23 (K. Pierson testifying to initial involvement in planning for the Rally);<br><br>• Ex. 86 at 108:12–112:7 (K. Pierson testifying to |

| Name | Affiliation with the Trump Campaign | Coordination with WFAF | Coordinating, Organizing, Planning the Rally |
|---|---|---|---|
| | (adopting Ex. 86 as sworn testimony).<br><br>• Ex. 86 at 11:12–12:8 (K. Pierson testifying that she and other members of the Trump Campaign stayed on after the 2020 election);<br><br>• Ex. 86 at 8:6–12 (K. Pierson testifying she "did not" work for Trump's presidential administration);<br><br>• Ex. 65, No. 159 ████████ ████████ ████████ ████████ ████████ | Pierson, J. Hulsey, and A. Kremer in which Pierson discusses the "money flow," "allocating funds," and "branding rights" for the Rally). | her involvement in deciding who would speak at the Rally and in what order);<br><br>• Ex. 86 at 104:7–118:1 (K. Pierson testifying that "[on] January 4th at 3:30 pm," she discussed the speaker list with Defendant Trump);<br><br>• Ex. 233 at KPierson0065 (email from K. Pierson to M. Powers and J. Caporale with "POTUS list" of speakers);<br><br>• Ex. 87 at KKremer 4457, 64  (K. Kremer Dec. 2020 and Jan. 2021 text chain with K. Kremer, Katrina K.Pierson, Jennifer J. Hulsey, and Amy A. Kremer in which Pierson discusses the "money flow," "allocating funds," and "branding rights" for the Rally);<br><br>• Ex. 88 at KPierson0201–02 (Dec. 17, 2020 text from K. Pierson to A. Kremer stating: "January 6th is D day," to which Kremer replied, "I know," and said "[w]e are putting together the plan now"). |

| Name | Affiliation with the Trump Campaign | Coordination with WFAF | Coordinating, Organizing, Planning the Rally |
|---|---|---|---|
| **Kiran Menon** | • Ex. 66 at rows 2631, 6750, 7585 (disbursements to K. Menon from the Trump Campaign for "payroll" as of Nov. 13, 2020, Nov. 30, 2020, and Dec. 15, 2020);<br><br>• Ex. 66 at row 8749 (showing Jan. 7, 2021 "TRAVEL REIMBURSEMENT" from the Make American Great Again PAC to K. Menon);<br><br>• Ex. 63 at rows 70–87 (showing $28,164.46 to K. Menon in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 84 ( ████████ ██████████ █████████ █████████ ████████ █████████ █████████ ███████ | • Ex. 21 at DOI_TOUHY_002965 (Rally permit listing Kiran Menon as "OPERATIONS ASSOCIATE 2");<br><br>• Ex. 89 ( ████████ ██████████ █████████ ████<br><br>• Ex. 84 ( ██████ █████████ █████████ █████████ █████████ ███████ |
| **Megan Powers** | • Ex. 75 (Dec. 31, 2020 email from Megan Powers using her @donaldtrump.com email address);<br><br>• Ex. 76 (M. Powers's LinkedIn account stating she worked as Director of Operations for Donald J. Trump for | • Ex. 84 █████ ████████ ██████ █████████ ███████ █████ ██████ ██████<br><br>• Ex. 21 at DOI_TOUHY_0 | • Ex. 90 (M. Powers addressing role in credentialing for Rally);<br><br>• Ex. 21 at DOI_TOUHY_002964 (Rally permit listing M. Powers as "OPERATIONS MANAGER FOR SCHEDULING AND GUIDANCE");<br><br>• Ex. 89 ( ████████ ██████ |

| Name | Affiliation with the Trump Campaign | Coordination with WFAF | Coordinating, Organizing, Planning the Rally |
|---|---|---|---|
| | President, Inc. through Jan. 2021);<br><br>• Ex. 66 at row 9058 (Make America Great Again PAC $19,566.67 to M. Powers on Feb. 2, 2021);<br><br>• Ex. 63 at rows 191–298 (showing $413,996.71 to M. Powers in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021);<br><br>• Ex. 65, No. 165 (███████████ ███████████ ███████ ███████████ ███████ ███████ ███) | 02964 (listing M. Powers as "OPERATIONS MANAGER FOR SCHEDULING AND GUIDANCE" on the permit for the WFAF's permit for the Rally). | ███████████<br>███████████<br>███████████<br>██);<br><br>• Ex. 84 (███ ███████████ ███████ ███████ ███████ ██);<br><br>• Ex. 80 (███ ███████████ ███<br>███████████<br>███████████<br>███████████<br>███████████<br>███████);<br><br>• Ex. 91 (Email from K. Kremer to M. Powers with draft speakers list);<br><br>• Ex. 233 at KPierson0065 (email from K. Pierson to M. Powers and J. Caporale with "POTUS list" of speakers). |
| **Taylor Budowich** | • Ex. 56, No. 53 (███████████ ███████████ ███████████ ███████) | • Ex. 72 at 13:11–18:2 (J. Caporale stating that he was asked to plan the Rally by WFAF, | • Ex. 92 at 27:2–24 (T. Budowich stating that as of Dec. 26, 2020, T. Budowich was in contact with C. Wren); |

| Name | Affiliation with the Trump Campaign | Coordination with WFAF | Coordinating, Organizing, Planning the Rally |
|------|-------------------------------------|------------------------|-----------------------------------------------|
|  | ██████<br>██████<br><br>• Ex. 92 at 9:17–10:2 (T. Budowich stating he served as a campaign advisor);<br><br>• Ex. 86 at 31:11–16 (K. Pierson testifying that T. Budowich "worked on the campaign" not "the administration);<br><br>• Ex. 86 at 31:11–16 (K. Pierson testifying T. Budowich "worked on the campaign" not in "the administration"). | Wren, and Budowich). | • Ex. 92 at 39:5–25 (T. Budowich stating that he sought Tea Party Express's help with paid advertising to crowd build for the Rally);<br><br>• Ex. 92 at 63:5–9 (T. Budowich stating that Turning Point helped to organize buses to bring attendees to the Rally);<br><br>• Ex. 60 at 63:7–24 (C. Wren stating that as of Dec. 26, 2020, C. Wren was in contact with T. Budowich, and describing J. Fancelli giving $3 million);<br><br>• Ex. 93 (T. Budowich believed that H. Furman wanted to help with the Rally and was "still on campaign payroll so not looking for money"). |

32. Sometime around December 26, 2020, discussions began about moving the Save America Rally to the Ellipse in order to accommodate the potential appearance of President Trump. (Tr. of Amy Kremer before the House Select Committee, pgs. 58:11-16) (Exhibit 19) (Tr. of Katrina Pierson before the House Select Committee, pgs. 29:2-13) (Exhibit 20) (Exhibit 20a).

**Plaintiffs' Response: Disputed.** This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1). Defendant Trump's evidence does

not support the assertion that "discussions began about moving the Save America Rally to the Ellipse in order to accommodate the potential appearance of President Trump." Fed. R. Civ. P 56(c)(1)(B); Local Rule 7(h)(1).  The testimony merely shows that Amy Kremer testified that Justin Caporale reached out to her the day after Christmas about connecting "and possibly moving the event to the Ellipse," with no further details or information, including the purpose for moving the event.  *See* Ex. 19 at 58:9–16; Ex. 20 at 29:2–13; Ex. 20a.  Notably, Justin Caporale was associated with the Trump Campaign █████████████████████████████████████████████████████████.  Ex. 66 at row 6794 (FEC Data Report from Donald J. Trump For President, Inc.); Ex. 56, No. 49; Ex. 65, No. 158; Ex. 94 (Dec. 30, 2020 email from S. Dollman to J. Caporale approving an invoice for resubmission to the Trump Campaign for work completed "thru [sic] the 4th").

33.    Shortly thereafter, WAF was able to obtain a permit for the Ellipse and the Save America Rally was moved from the Freedom Plaza. (Exhibit 21).

**Plaintiffs' Response:  Undisputed** to the extent that Exhibit 21 shows that a permit was issued to WFAF on January 5, 2021 for the following "Location(s): Ellipse, Southeast and Southwest Quadrants."  **Disputed** to the extent Defendant Trump contends that only WFAF was involved in the permitting processes for the Rally.  The evidence shows that multiple individuals associated with the Trump Campaign (but not the White House) were involved in obtaining permits for the Rally.  *See supra* Table C.  In fact, the majority of private individuals named on the permit as having a role related to the Rally were associated with the Trump Campaign.  *See id.*

34.     On January 1, 2021, as part of the effort to secure the "vista sight line" at the Ellipse, Deputy Chief of Staff Tony Ornato—signing in his official capacity as White House Deputy Chief of Staff—contacted Secretary of the Interior David L. Berhardt—in his official capacity as the Secretary of the Interior—requesting a special exception to allow the Save America Rally to be held at the center of the Ellipse. (Exhibit 22).

> **Plaintiffs' Response:  Disputed.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, this assertion should be disregarded because it improperly relies on a legal conclusion about whether individuals were acting in their official capacity.  *Jackson*, 101 F.3d at 153 ("[R]epeatedly blending factual assertions with legal argument . . . does not satisfy the purposes of [Rule 7(h)].");  *In re Domestic Airline Travel*, 691 F. Supp. 3d at 185 (explaining the court will disregard legal arguments contained within statements of facts).  *Second*, Defendant Trump's evidence shows only that Tony Ornato sent an email from his government email address to pass along "a brief synopsis from the host [of the Rally]" sent to him by private, nongovernmental actors planning the Rally—and lacks any indication that he was doing so in his official capacity.  *See* Fed. R. P. 56(c)(1)(B); Ex. 22 at DOI_TOUHY_000015– 16.  The evidence also lacks any indication that Tony Ornato's actions were "part of the effort to secure the 'vista sight line' at the Ellipse."

35.     In that correspondence, Mr. Ornato stated, "we are working with the organization that is hosting the event on the 6th on the ellipse for POTUS to speak at. They are trying to get a center stage position so that POTUS is speaking with the White House directly behind him, not 30' off center, *which is the desire of the White House and the President as well*. We are looking

for NPS to give the organization a waiver for the 'vista site line' so POTUS is center to the WH."
(Exhibit 22) (*emphasis added*).

> **Plaintiffs' Response:  <u>Undisputed</u>** that Defendant Trump accurately quotes a portion of
> Exhibit 22, which proceeds the brief synopsis from the hosts.  Ex. 22 at
> DOI_TOUHY_000015–16.

36.    The Department of the Interior granted WAF the exception requested by the
Deputy White House Chief of Staff and acknowledged that "a central theme of the event is to
connect it to the White House and the Presidency."  (Exhibit 23).

> **Plaintiffs' Response: <u>Disputed</u>.**  This assertion is not supported by evidence that can be
> presented in a form that would be admissible at trial and therefore should be disregarded.
> *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F. Supp. 3d at 239 ("But
> the Court may not consider their testimony if it is both objected to and inadmissible.").
> *First*, this assertion relies on hearsay offered to establish the truth of the matter asserted
> that cannot be presented in an admissible form at trial.  Fed. R. Evid. 802; *White Coat*,
> 404 F. Supp. 3d at 105; *Howard Univ.*, 70 F. Supp. 3d at 148; Fed. R. Civ. P. 56(c)(2).
> *Second*, this assertion ignores that Justin Caporale, an individual associated with the
> Trump Campaign, and working for Event Strategies Inc., emailed John Stanwich from
> the Department of the Interior and requested the exception.  Ex. 56, No. 49 (███████
> ████████████████████████████████████████████████
> ██████████████); Ex. 66 at row 6794 (J. Caporale receiving a "PAYROLL" disbursement
> from the Trump Campaign on Nov. 30, 2020); Ex. 23 at DOI_TOUHY_004863–64.  In
> response, Stanwich emailed Caporale back and granted the exception.  Ex. 23 at
> DOI_TOUHY_004862–63.  *Third*, further disputed to the extent that Defendant Trump

suggests that "a central theme of the event [wa]s to connect it to the White House and the Presidency," as this statement by Stanwich is his own characterization from one email (and also, as noted above, inadmissible hearsay offered to prove the truth of the matter asserted). *Fourth*, further disputed to the extent Defendant Trump contends that only WFAF was involved in the permitting processes for the Rally. The evidence shows that multiple individuals associated with the Trump Campaign (but not the White House) were involved in obtaining permits for the Rally. *See* Ex. 23 (showing J. Caporale using his "eventstrategiesinc.com" email to seek a permit exception from the Department of the Interior); *see also supra* Table C. In fact, the majority of private individuals named on the permit as having a role related to the Rally were associated with the Trump Campaign. *See id.*

37.     The Save America Rally was a privately funded event with most—if not all of the funding—being provided by a single donor, Julie Fancelli. (Exhibit 24).

**Plaintiffs' Response: <u>Undisputed</u>** that ████████████████████████ ████████████████████████████████████, Ex. 56, No. 59, but **<u>disputed</u>** to the extent Defendant Trump implies that nearly all of the funding for the Save America Rally came from Julie Fancelli, as the cited evidence does not support that assertion. Fed. R. Civ. P. 56(c)(1)(B). Moreover, the record reveals that other private individuals contributed to the fundraising of the Rally, *see* Ex. 56, No. 59 (██████████████████ ████████████████████████████████); Ex. 95 at 77:8– 19, 100:19–101:13, 104:4–105:7 (D. Stockton stating "I believe, in grassroots contributions, I believe [WFAF] brought in between $700,000 and $800,000."); Ex. 96 at KKremer5452 (K. Kremer solicited help from M. Lindell in securing a $125,000

donation for the Rally);  Ex. 97 at PLAINTIFFS_00001895–96 (text message from K. Guilfoyle on Jan. 3, 2021 stating M. Lindell "donated $600k").  The record also demonstrates that the Trump Campaign made disbursements in connection with the Save America Rally.  *See, e.g.*, Answer of Make America Great Again PAC and Donald J. Trump for President, Inc. at ¶ 84, *Smith v. Trump,* No. 1:21-cv-02265-APM (D.D.C. Feb. 9, 2023), Dkt. 187 (admitting that "the Trump Campaign made payments to Event Strategies Inc for equipment rental in connection with a rally on or near January 6, 2021");  Ex. 98 (M. Hahn instructing Joseph Karwacki and Ryann McEnany in an email with the Subject "Jan. 6"  to invoice "the campaign, Donald J. Trump for President, Inc." for their compensation related to their involvement in the Rally and to "copy Dollman" on the email with the invoice); Ex. 99 (Dec. 29, 2020 email from A. Pardo to J. Miller, S. Dollman, and T. Murtaugh, with the Subject "Following up – Chelsea Parella" and stating "we will also be extending Courtney to help with rally . . . Sean- I have shared the invoice information").

38.     The Save America Rally was not a campaign event, and the 2020 Trump campaign had no involvement in the planning, funding, or execution of the Rally. (Declaration of Justin Clark) (Exhibit 25).

**Plaintiffs' Response:  Disputed and immaterial**.  *First*, the Declaration of Justin Clark is uncorroborated and self-serving and cannot support a grant of summary judgment.  *See Coleman v. Allstate Ins. Co.*, 80 F. Supp. 3d 5, 8 (D.D.C. 2015).  *Second*, ███████████

████████████████████████████████████████████

████████████████████████████████████████████

Ex. 100 at 122:13–123:10. ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████. *Id.* at 111:16–20, 113:19–22, 116:14–19, 117:7–13. ████████

███████████████████████████████████████

████████████████████. *Id.* at 122:5–7. ██████████████████████

████████████████████████████████. *Id.* at 120:19–121:4. *Third*, the record

demonstrates that over a dozen individuals associated with the Trump Campaign played a

role in planning, organizing, coordinating, or fundraising for the Rally. *See* Table E.

*Fourth*, the record reveals that Trump Campaign made payments to the Save America

Rally vendors, *see, e.g.*, Answer of Make America Great Again PAC and Donald J.

Trump for President, Inc. at ¶ 84, *Smith v. Trump,* No. 1:21-cv-02265-APM (D.D.C. Feb.

9, 2023), Dkt. 187 (admitting that "the Trump Campaign made payments to Event

Strategies Inc for equipment rental in connection with a rally on or near January 6,

2021"), and payments to Campaign officials in connection with the Rally, *see, e.g.*, Ex.

98 (M. Hahn instructing J. Karwacki and R. McEnany in an email with the Subject "Jan.

6" to invoice "the campaign, Donald J. Trump for President, Inc." for their compensation

related to their involvement in the Rally and to "copy Dollman" on the email with the

invoice); *see also* Ex. 99 (Dec. 29, 2020 email from A. Pardo to J. Miller, S. Dollman,

and T. Murtaugh, with the Subject "Following up – Chelsea Parella" and stating "we will

also be extending Courtney to help with rally . . . Sean- I have shared the invoice

information"). *Fifth*, to the extent this assertion is a legal conclusion that the Rally was

not a campaign event, it is inadmissible to support factual assertions for summary

judgment. *Jackson*, 101 F.3d at 153 ("[R]epeatedly blending factual assertions with legal

argument . . . does not satisfy the purposes of [Rule 7(h)]."); *In re Domestic Airline Travel*, 691 F. Supp. 3d at 185 (explaining the court will disregard legal arguments contained within statements of facts).

**Table E: Evidence of Individuals Affiliated with the Trump Campaign Coordinated, Organized, Planned, or Fundraised for the Save America Rally**

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|------|-------------------------------------|---------------------------------------------|------------------------------------------------|
| Hannah Salem | • Ex. 66 at row 1241 (campaign disbursement of $19,689.96 to "Salem Strategies LLC" on Nov. 4, 2020);<br><br>• Ex. 78 (showing $113,471.51 in total disbursement to Salem Strategies from the Trump Campaign from 2015 through Mar. 1, 2021);<br><br>• Ex. 63 at 299–305 (showing $2,346.00 to H. Salem, individually, in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_002964 (Rally permit listing H. Salem's role as "OPERATIONS MANAGER FOR LOGISTICS AND COMMUNICATION" and contact information as hannah@salemstrategiesllc.com);<br><br>• Ex. 88 at KPIERSON0364 ("H. Salem handling press credentials");<br><br>• Ex. 69 at SCAVINO_SMITH_0000031 (███████ ████████ ████████ ████████ ████████ ████████) | |
| James Oaks | • Ex. 66 at row 2606 (disbursement to J. Oaks from the Trump Campaign on Nov. 13, 2020); | • Ex. 21 at DOI_TOUHY_002964 (Rally permit listing J. Oaks' role as | |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|------|-------------------------------------|---------------------------------------------|------------------------------------------------|
|  | • Ex. 63 at rows 69, 127–190 (showing $144,332.05 to J. Oaks in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | "OPERATIONS ASSOCIATE"). |  |
| **Justin Caporale** | • Ex. 56, No. 49 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)<br><br>• Ex. 66 at row 6794 (J. Caporale receiving a "PAYROLL" disbursement from the Trump Campaign on Nov. 30, 2020);<br><br>• Ex. 68 at SCAVINO_SMITH_0 00026–29 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)<br><br>• Ex. 69 at SCAVINO_SMITH_0 0030–32 (▮▮▮▮▮▮▮ | • Ex. 21 at DOI_TOUHY_002934, 02964 (Rally permit listing J. Caporale as "[o]n-[s]ite [c]ontact" and "PROJECT MANAGER");<br><br>• Ex. 72 at 22:17–24 (J. Caporale discussing planning for location of the Rally);<br><br>• Ex. 73 at 95:12–96:17 (K. Kremer explaining that she, A. Kremer, and J. Caporale discussed "moving [the Rally] to the Ellipse" and that it was ultimately decided "that the Ellipse was going to be the best place for us to file for the permit");<br><br>• Ex. 84 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) | • Ex. 94 (approving an invoice for resubmission to the Trump Campaign for work completed "thru the 4th"). |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|---|---|---|---|
| | █████ ███████ ██████ █████ ██████ █████ <br><br> • Ex. 70 (Event Strategies, Inc. receiving a total of $2,560,685.55 in disbursements from the Trump Campaign between 2015 and Mar. 1, 2021); *see also* Ex. 72 at 12:20–13:10 (J. Caporale stating that at the time of the Rally he was "essentially acting on behalf of [ESI] to provide the services that ESI would provide"), <br><br> • Ex. 56, No. 48 (████ ████████ █████████ ████████ █████ <br><br> • Ex. 65, No. 158 (██████ █████████ | • Ex. 80 (█████ ██████ ██████ █████ ██████ ██████ █████ <br><br> • Ex. 72 at 19:17–20:5 (J. Caporale stating that he "receive[d] payments from Turning Point to cover the invoices and costs incurred for the January 6th event" in addition to payments from WFAF); <br><br> • Ex. 69 at SCAVINO_SMITH_0000 030–32 (████ ██████ ████ ██████ █████ ███████ █████ ██████ █████ <br><br> • Ex. 69 at SCAVINO_SMITH_0000 031 (██████ ██████ █████ | |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|------|-------------------------------------|---------------------------------------------|-----------------------------------------------|
| | ████████████████ ███████ ). | ████████████████ ████████████ <br><br> • Ex. 68 at SCAVINO_SMITH_0000 026 (████████ ████ ████████████████ ████████████████ ████████████████ ████████████████ ████████████ ██████████ ██████████ ████ <br><br> • Ex. 85 at KPierson0042 (J. Caporale discussing "graphics proofs for the stage design and credentials" for the Rally); <br><br> • Ex. 74 at KKremer5155 (J. Caporale texting K. Kremer stating she can sign the contract with GW medical for the Rally and he will "pay it"); <br><br> • Ex. 233 at KPierson0065 (email from K. Pierson to M. Powers and J. Caporale with "POTUS list" of speakers); <br><br> • Ex. 83 at PLAINTIFFS_00001388 (J. Caporale texting C. Wren on Dec. 29, 2020 | |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|------|-------------------------------------|----------------------------------------------|-----------------------------------------------|
| | | regarding "schedule proposal" and "a call to action to march to [the] capitol and make noise"). | |
| **Katrina Pierson** | • Ex. 86 at 8:3–18, 11:7–21 (K. Pierson identifying role on Trump Campaign); <br><br>• Ex. 86 at 11:12–12:8 (K. Pierson testifying that she and other members of the Trump Campaign stayed on after the 2020 election); <br><br>• Ex. 86 at 8:6–12 (K. Pierson testifying she "did not" work for Trump's presidential administration); <br><br>• Ex. 65, No. 159 (███████████ ████████████ ████████████ █████████████ ██████ ) | • Ex. 86 at 29:2–33:23 (K. Pierson testifying to initial involvement in planning for the Rally); <br><br>• Ex. 86 at 108:12–112:7 (K. Pierson testifying to her involvement in deciding who would speak at the Rally and in what order); <br><br>• Ex. 86 at 104:7–118:1 (K. Pierson testifying that "[on] January 4th at 3:30 pm," *id.* at 104:7–13, she discussed the speaker list with Defendant Trump, *id.* at 113:8–118:1); <br><br>• Ex. 233 at KPierson0065 (email from K. Pierson to M. Powers and J. Caporale with "POTUS list" of speakers); <br><br>• Ex. 87 at KKremer 4457, KKremer_4464 (K. Kremer Dec. 2020 and Jan. 2021 text chain with K. Kremer, K. Pierson, J. Hulsey, and A. Kremer in which Pierson discusses the "money flow," "allocating funds," and | • Ex. 87 at KKremer 4457, KKremer_446 4 (K. Kremer Dec. 2020 and Jan. 2021 text chain with K. Kremer, K. Pierson, J. Hulsey, and A. Kremer in which Pierson discusses the "money flow," "allocating funds," and "branding rights" for the Rally). |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|------|-------------------------------------|----------------------------------------------|------------------------------------------------|
| | | "branding rights" for the Rally);<br><br>• Ex. 88 at KPierson0201– 0202 (Dec. 17, 2020 text from K. Pierson to A. Kremer stating: "January 6th is D day," to which Kremer replied, "I know," and said "[w]e are putting together the plan now"). | |
| **Kyra Schaefer** | • Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she knew because they were in the Trump Campaign's finance department—to assist with the Rally). | • Ex. 31 (NARA_PROD_042387) at NARA_PROD_042387 (Rally Guidance Memo stating "if you have any questions please contact" C. Wren, M. Mulvaney, K. Schaefer, or C. Kofoed);<br><br>• Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she knew because they were in the Trump Campaign's finance department—to assist with the Rally). | • Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney— whom she knew because they were in the Trump Campaign's finance department— to assist with the Rally). |
| **Kim Guilfoyle** | • Ex. 82 at 11:5–12:9 (K. Guilfoyle stating "my first role was as senior advisor to the President working on the campaign …[a]nd then I became also, in addition to that role, | • Ex. 56, No. 55 (████████ ████████████████ ████████████████ ██████ );<br><br>• Ex. 60 at 193:21–195:22 (C. Wren stating that Turning Point Action paid | • Ex. 97 at PLAINTIFFS_ 00001895–96 (Text message from K. Guilfoyle on Jan. 3, 2021 stating M. Lindell |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|---|---|---|---|
| | the national finance chair"); <br><br> • Ex. 56, No. 57 (███████████ ███████████ ███████████ ███████████) | invoices for K. Guilfoyle to speak at the Rally); <br><br> • Ex. 60 at 194:11–195:8 (C. Wren stating that Turning Point Action paid speaking fees for K. Guilfoyle and D. Trump Jr.). | "donated $600k"). |
| **Kiran Menon** | • Ex. 66 at rows 2631, 6750, 7585 (disbursements to K. Menon from the Trump Campaign for "PAYROLL" as of Nov. 13, 2020, Nov. 30, 2020, and Dec. 15, 2020); <br><br> • Ex. 66 at row 8749 (showing Jan. 7, 2021 "TRAVEL REIMBURSEMENT" from the Trump Campaign to K. Menon); <br><br> • Ex. 63 at rows 70–87 (showing $28,164.46 to K. Menon in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_002965 (listing Kiran Menon as "OPERATIONS ASSOCIATE 2"); <br><br> • Ex. 89 (███████ ███████████ ███████████ ███████████ ███████████ ███████████ ██████████); <br><br> • Ex. 84 (█████████ ███████████ ███████████ ███████████ ███████████ ██████.) | |
| **Maggie Mulvaney** | • Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she | • Ex. 21 at DOI_TOUHY_002965 (Rally permit listing M. Mulvaney as "VIP LEAD"); | • Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|------|-------------------------------------|----------------------------------------------|-----------------------------------------------|
| | knew because they were in the Trump Campaign's finance department—to assist with the Rally);<br><br>• Ex. 63 at rows 88–126 (showing $140,394.48 to M. Mulvaney in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 80 (███████████ ███████████ ███████ ████████ ████████ █████████ █████████ ██████ ████)<br><br>• Ex. 31 at NARA_PROD_042387 (Rally Guidance Memo stating "if you have any questions please contact" C. Wren, M. Mulvaney, K. Schaefer, or C. Kofoed);<br><br>• Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she knew because they were in the Trump Campaign's finance department—to assist with the Rally). | Kofoed, K. Schaefer, and M. Mulvaney— whom she knew because they were in the Trump Campaign's finance department— to assist with the Rally). |
| Megan Powers | • Ex. 75 (Dec. 31, 2020 email from M. Powers using her @donaldtrump.com email address);<br><br>• Ex. 76 (M. Powers's LinkedIn profile stating she worked as Director of Operations for Donald J. Trump | • Ex. 90 (M. Powers addressing role in providing credentials for Rally);<br><br>• Ex. 21 at DOI_TOUHY_002964 (Rally permit listing M. Powers as "OPERATIONS MANAGER FOR | |

71

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|---|---|---|---|
| | for President through Jan. 2021);<br><br>• Ex. 66 at row 9058 (campaign disbursing $19,566.67 to M. Powers on Feb. 2, 2021);<br><br>• Ex. 63 at rows 191–298 (showing $413,996.71 to M. Powers in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021);<br><br>• Ex. 65, No. 165 (███████████ ███████████ ███████████ ███████████) | SCHEDULING AND GUIDANCE");<br><br>• Ex. 89 (███████ ███████████ ███████████ ███████████ ███████████ ████████);<br><br>• Ex. 84 █████ ███████████ ███████████ ██████████ ██████████ ██████);<br><br>• Ex. 80 ████████ ███████████ ███████████ ██████████ ███████████ ██████████ ██████████ ██████████ ███████);<br><br>• Ex. 91 (email from K. Kremer to M. Powers with draft speakers list);<br><br>• Ex. 233 at KPierson0065 (email from K. Pierson to M. Powers and J. Caporale with "POTUS list" of speakers). | |
| **Mike Hahn** | • Ex. 101 (detailing M. Hahn's "individual role" on the social | • Ex. 103 at SCAVINO_SMITH_0000 042 (███████████ ██████████) | • Ex. 98 (email re "Jan. 6" from M. Hahn |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|------|-------------------------------------|----------------------------------------------|------------------------------------------------|
|  | media team and explaining that he ran the Trump Campaign Facebook, managed content on the social media accounts, posted donations asks, and more); <br><br>• Ex. 102 (M. Hahn's LinkedIn profile stating he is an "alum of the Trump 2016 and 2020 campaigns where he served as the Director of Social Media"); <br><br>• Ex. 66 at row 9044 ("PAYROLL" disbursement to M. Hahn on Feb. 1, 2021); <br><br>• Ex. 28 (DJTFP0093810) (Dec. 26 email from T. Murtaugh to M. Hahn instructing that M. Hahn and other campaign affiliates should "invoice the campaign for the January pay period"); <br><br>• Ex. 69 at SCAVINO_SMITH_0 000030–32 ( ████ ████ ████ ████ | ████ ████ ████ ████ ████ ████ ████ ████ <br><br>• Ex. 69 at SCAVINO_SMITH_0000 030–32 (████ ████ ████ ████ ████ ████ | to J. Karwacki and R. McEnany, copying S. Dollman and stating "[t]hanks again for agreeing to help on the 6th" with instruction to "send the invoice to ap@donaldtru mp.com and copy Dollman"). |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|------|-------------------------------------|---------------------------------------------|------------------------------------------------|
|  | ███████████ |  |  |
| **Ron Holden** | • Ex. 66 at rows 1301, 2706 (disbursements to R. Holden from the Trump Campaign for $15,693 on Nov. 4, 2020 and $3,833 on Nov. 13, 2020);<br><br>• Ex. 63 at rows 42–68 (showing $100,832.18 to R. Holden in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_002965 (Rally permit listing R. Holden as "BACKSTAGE MANAGER"). |  |
| **Ryann McEnany** | • Ex 104 (R. McEnany LinkedIn profile stating she has been the "Social Media Strategist for the Donald J. Trump 2020 Presidential Campaign" since Feb. 2019);<br><br>• Ex. 66 at row 2640 (disbursement to R. McEnany from the Trump Campaign for "PAYROLL" on Nov. 13, 2020). | • Ex. 98 (Dec. 30, 2020 email re "Jan. 6" from M. Hahn to J. Karwacki and R. McEnany, copying S. Dollman and stating "thanks again for agreeing to help on the 6th" with instruction to "send the invoice to ap@donaldtrump.com and copy Dollman"). |  |
| **Sean Dollman** | • Ex. 105 at 10:13–10:24 (S. Dollman discussing role as "CFO"); | • Ex. 94 (S. Dollman approving an invoice for resubmission to the Trump Campaign for | • Ex. 94 (S. Dollman approving an invoice for resubmission to the Trump |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|------|-------------------------------------|-----------------------------------------------|------------------------------------------------|
| | • Ex. 66 at row 9254 (showing payments to S. Dollman for "PAYROLL" up and until Mar. 16, 2021); <br><br> • Ex. 106, No. 306 (██████████ ██████████ ██████████ ██████████ ██████████ ██████) | work completed "thru the 4th"); <br><br> • Ex. 28 DJTFP0093810 (Dec. 26, 2020 email from S. Dollman to M. Hahn regarding M. Hahn remaining on payroll). | Campaign for work completed "thru the 4th"); <br><br> • Ex. 28 (Dec. 26, 2020 email from S. Dollman to M. Hahn regarding M. Hahn remaining on payroll); <br><br> • Ex. 107 (██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████) <br><br> • Ex 99 (Dec. 29, 2020 email from A. Pardo to J. Miller, S. Dollman, and T. Murtaugh, with the Subject "Following up |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|---|---|---|---|
| | | | – Chelsea Parella" and stating "we will also be extending Courtney to help with rally . . . Sean- I have shared the invoice information.");<br><br>• Ex. 98 (Dec. 30, 2020 email re "Jan. 6" from M. Hahn to J. Karwacki and R. McEnany, copying S. Dollman and stating "thanks again for agreeing to help on the 6th. As discussed you'll need to invoice for your pay on this day" with instruction to "send the invoice to ap@donaldtrump.com and copy Dollman"). |
| **Taylor Budowich** | • Ex. 56, No. 53 (████ ████████ ████████) | • Ex. 92 at 27:2–24 (T. Budowich stating that as of Dec. 26, 2020, T. Budowich was in contact | • Ex. 92 at 27:2–23 (T. Budowich stating that as |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|---|---|---|---|
| | ███████████ ███████ ███ • Ex. 92 at 9:17–10:2 (T. Budowich stating that he served as campaign advisor for Trump's 2020 campaign); • Ex. 86 at 31:11–16 (K. Pierson testifying that Budowich "worked on the campaign" not "at the administration"). | with C. Wren regarding Rally fundraising); • Ex. 92 at 39:5–25 (T. Budowich stating that he sought Tea Party Express's help with paid advertising to crowd build for the Rally); • Ex. 92 at 63:5–9 (T. Budowich stating that Turning Point helped to organize buses to bring attendees to the Rally); • Ex. 60 at 63:7–24 (C. Wren stating that as of Dec. 26, 2020 Wren was in contact with T. Budowich regarding Rally fundraising); • Ex. 93 (text from T. Budowich to J. Caporale stating Budowich believed H. Furman "wants to help" with the Rally and was "still on campaign payroll so not looking for money."). | of Dec. 26, 2020, T. Budowich was in contact with C. Wren regarding Rally fundraising); • Ex. 92 at 39:5–25 (T. Budowich stating that he sought Tea Party Express's help with paid advertising to crowd build for the Rally). |
| Tim Unes | • Ex. 77 (T. Unes using an @donaldtrump.com email address regarding planning an Oct. 13, 2020 Rally); • Ex. 70 (Event Strategies, Inc. receiving a total of | • Ex. 108 at KKremer2323–234 (listing T. Unes's role as "President & CEO" of Event Strategies, a "production vendor" for the Rally); • Ex. 21 at DOI_TOUHY_002965 (Rally permit listing T. | |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|---|---|---|---|
| | $2,560,685.55 in disbursements from the Trump Campaign between 2015 and Mar. 1, 2021);<br><br>• Ex. 66 at rows 645, 1321, 7626 (Event Strategies, Inc. receiving disbursements from the Trump Campaign in Nov. and Dec. 2020). | Unes as "STAGE MANAGER"). | |
| **William Wilson** | • Ex. 66 at rows 2036, 2191 (disbursements to W. Wilson from the Trump Campaign for $1,260 on Nov. 9, 2020 and $4,000 on Nov. 10, 2020);<br><br>• Ex. 63 at rows 358–360 (showing $6,040.00 to W. Wilson in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_002965 (Rally permit listing W. Wilson as "BACKSTAGE ASSISTANT"). | |
| **Jason Miller** | • Ex. 103 at SCAVINO_SMITH_0 000042 (█████████ ████████████ ████████████ ████████████ ███████████) | • Ex. 103 at SCAVINO_SMITH_0000 042 (██████████ ████████████ ████████████ ████████████ ██████████████ ████████████) | |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally | Fundraised or Made Disbursements For the Rally |
|---|---|---|---|
| | | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉<br>▉▉▉▉▉▉▉▉▉▉▉▉▉▉<br>▉▉▉▉▉▉▉▉▉▉▉▉▉▉<br>▉▉▉▉▉▉▉<br><br>• Ex. 109 at PLAINTIFFS_000700562–63 (J. Miller tweeting regarding the Rally) (https://web.archive.org/web/20210103214740/https://twitter.com/JasonMillerinDC). | |

39.     Publicly available FEC records corroborate that none of the individuals who participated in the planning or execution of the Save America Rally were actively employed by the Trump campaign and the Trump campaign did not fund the Save America Rally. (Exhibit 26) (Exhibit 27).

**Plaintiffs' Response:  Disputed.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, Defendant Trump's evidence does not support this assertion and should be disregarded.  Fed. R. Civ. P. 56(c)(1)(B); Local Rule 7(h)(1).  Exhibit 26 shows the results of a very narrow search query:  results for disbursements by Make America Great Again PAC (C00580100) made between December 1, 2020, and January 6, 2021, to "Women For America First."  Ex. 26. "Women For America First" is an entity that is *not* registered with the FEC, which explains why no results exist.  *See* Ex. 110 (showing no committees with the name "Women for America First").  Exhibit 27 shows disbursements to Katrina Pierson and

Event Strategies, both of whom actively participated in the planning of the Save America Rally.  Ex. 27; Ex. 86 at 8:3–18, 11:7–21 (K. Pierson testifying to advocacy she carried out on behalf of the Campaign between Nov. 20 and Dec. 31), 29:2–33:23 (K. Pierson explaining her initial involvement and role as a connection point between A. Kremer and T. Budowich regarding J. Fancelli funding); *see* Ex. 87 at KKremer4457, KKremer4464 (Dec. 2020 and Jan. 2021 text chain with K. Kremer, K. Pierson, J. Hulsey, and A. Kremer in which Pierson discusses the "money flow," "allocating funds," and "branding rights" for the Rally);  Ex. 86 at 104:7–118:1 (K. Pierson testifying that "[on] January 4th at 3:30 pm," Ex. 86  at 104:7–13, she discussed the speaker list with Defendant Trump, *id.* at 113:8–118:1); Ex. 83 at PLAINTIFFS_00001388 (text from J. Caporale regarding "schedule proposal" and "a call to action to march to [the] capitol and make noise"); Ex. 108 at KKremer2323, KKremer2327 (permit application submitted to NPS identifying Event Strategies as the "production vendor," *id.* at KKremer2323 and the entity handling trash services at the Rally, *id.* at KKremer2327); Ex. 74 at KKremer5155 (J. Caporale stating that Event Strategies will pay for "the contract with GW medical").  But Exhibit 27 is not a comprehensive list of individuals or entities affiliated with the Trump Campaign that were involved in the Rally.  This list excludes, for example, Megan Powers, who was the Director of Administrative Operations for the Trump Campaign, Ex. 75 (Dec. 31, 2020 Email from M. Powers to Charter, charter@donaldtrump.com, using her @donaldtrump.com email address regarding  a charter flight for Rudy Guiliani); Ex. 76 (M. Powers's LinkedIn account showing that she worked as Director of Operations for Donald J. Trump for President through Jan. 2021), and received a payment from the Campaign for $19,566.67 on February 2, 2021, Ex. 66

at row 9058, as well as Joseph Karwacki and Ryann McEnany, who were told to invoice "the campaign, Donald J. Trump for President, Inc." for their compensation for involvement in the Rally and to "copy Dollman" in an email with the subject "Jan. 6," Ex. 98, and were paid on December 31, 2020 and January 5, 2021 respectively, Ex. 66 at rows 8580, 8681.  Moreover, Exhibit 27 excludes a travel reimbursement issued to Kiran Menon on January 7, 2021, who previously received payroll disbursements.  Ex. 27; Ex. 66 at rows 2631, 6750, 7585, 8749.  ███████████████████████

██████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████. Ex. 80; *see also* Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing the hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she knew because they were in the Trump Campaign's finance department—to assist with the Rally).  ██████████████████

███████████████████████████████████

██████████████████████. Ex. 103 at SCAVINO_SMITH_0000042 ███████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████ Ex. 69 at SCAVINO_SMITH_0000030–32 (█

████████████████████████████████████████

████████████████████████████

████████████); *see, e.g.*, Ex. 28 (S. Dollman emailing M. Hahn on Dec. 26, 2020

stating "[f]or the 15th time.  You, Brandon and Liam are still on payroll").  *Second*, any

significance that Defendant Trump draws from Exhibit 27 is further undermined by the

fact that members of the Trump Campaign were told that they continued to be employed

by the Campaign after the 2020 presidential election regardless of no longer being on

payroll, and that they should "invoice the campaign for the January pay period."  Ex. 28.

In addition, Taylor Budowich suggested to Justin Caporale that a campaign employee,

Harrison Furman, wanted to help with the Rally.  Ex. 93 (Budowich believed that

Harrison Furman wanted to help with the Rally and was "still on campaign payroll so not

looking for money.").  *Third*, this assertion overlooks that the Trump Campaign made

disbursements in connection with the Save America Rally, *see, e.g.*, Answer of Make

America Great Again PAC and Donald J. Trump for President, Inc. at ¶ 84, *Smith v.

Trump,* No. 1:21-cv-02265-APM (D.D.C. Feb. 9, 2023), Dkt. 187 (admitting that "the

Trump Campaign made payments to Event Strategies Inc for equipment rental in

connection with a rally on or near January 6, 2021"); Ex. 28 (email from M. Hahn with

the Subject "Jan. 6" instructing people to invoice "the campaign, Donald J. Trump for

President, Inc." for their help on Jan. 6, 2021).  *Finally*, as noted above, the evidence

reveals that multiple individuals who participated in the planning or execution of the

Save America Rally were associated with the Trump Campaign, *see* Table F.

**Table F: Evidence of Individuals Affiliated with the Trump Campaign Coordinated,**

**Organized, or Planned, for the Save America Rally**

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|---|---|---|
| **Caroline Wren** | • Ex. 56, No. 54 ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , | • Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she knew |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|---|---|---|
| | <br>██████████████<br>████████████████<br>████████████<br><br>• Ex. 60 at 8:10–13 (C. Wren stating that "in March of 2020 to November 2020, I went in-house with the Trump [C]ampaign");<br><br>• Ex. 61 at 34:3–15 (K. Davis stating: "[w]hat I confirmed was that [C. Wren] was part of Trump Victory or Trump something fundraising");<br><br>• Ex. 62 at 51:5–9 (D. Trump Jr. stating that C. Wren was a fundraiser for the Trump Campaign);<br><br>• Ex. 63 at rows 361–377 (showing $170,000 to C. Wren in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021);<br><br>• Ex. 60 at 7:25–10:19 (C. Wren's description of work history does not include any work in government, only private fundraising);<br><br>• Ex. 65, No. 155 (████████<br>████████████<br>██████████████ | because they were in the Trump Campaign's finance department—to assist with the Rally);<br><br>• Ex. 21 at DOI_TOUHY_002965 (Rally permit listing C. Wren as "VIP ADVISOR");<br><br>• Ex. 80 (██████████████████<br>████████████████████<br>████████████████████<br>████████████████<br><br>• Ex. 81 at PLAINTIFFS_00001459–61 (text messages between C. Wren and T. Enlow discussing advertisement package proposals, seeking contracts for speakers, updated fliers or website links to advertise the Rally, and requesting VIP passes and access badges for speakers and the media for the Rally);<br><br>• Ex. 60 at 194:17–195:8 (C. Wren stating that she coordinated speaking fee payments for K. Guilfoyle and D. Trump Jr. for the Rally);<br><br>• Ex. 31 at NARA_PROD_042387 (Rally Guidance Memo stating "if you have any questions please contact" C. Wren, M. Mulvaney, K. Schaefer, or C. Kofoed);<br><br>• Ex. 82 at 74:21–75:14 (K. Guilfoyle stating that C. Wren "brought [speaking fees] to [K. Guilfoyle's] attention");<br><br>• Ex. 83 at PLAINTIFFS_00001388 (J. Caporale texting C. Wren on Dec. 29, 2020 regarding "schedule proposal" and "a call to action to march to [the] capitol and make noise");<br><br>• Ex. 72 at 13:11–18:2 (J. Caporale stating that he was asked to plan the Rally by WFAF, Wren, and Budowich). |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|---|---|---|
| **Hannah Salem** | • Ex. 66 at row 1241 (campaign disbursement of $19,689.96 to "Salem Strategies LLC" on Nov. 4, 2020);<br><br>• Ex. 78 (showing $113,471.51 in total disbursement to Salem Strategies from the Trump Campaign from 2015 through Mar. 1, 2021);<br><br>• Ex. 63 at rows 299–305 (showing $2,346.00 to H. Salem, individually, in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_002964 (Rally permit listing H. Salem's role as "OPERATIONS MANAGER FOR LOGISTICS AND COMMUNICATIONS" and contact information as Hannah@salemstrategiesllc.com);<br><br>• Ex. 88 at KPIERSON0364 ("Hannah Salem handling press credentials");<br><br>• Ex. 69 at SCAVINO_SMITH_0000031█ ███████████████████ ███████████████████ |
| **James Oaks** | • Ex. 66 at row 2606 (disbursement of $3,541.67 to James Oaks from the Trump Campaign for "PAYROLL" on Nov. 13, 2020);<br><br>• Ex. 63 rows 69, 127–190 (showing $144,332.05 to J. Oaks in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_002964 (listing James Oaks as "OPERATIONS ASSOCIATE"). |
| **Justin Caporale** | • Ex. 56, No. 49 (████████████ ███████████████ ███████████████ ██████)<br><br>• Ex. 66 at row 6794 (J. Caporale receiving a "PAYROLL" disbursement from the Trump Campaign on Nov. 30, 2020);<br><br>• Ex. 68 at SCAVINO_SMITH_000026–29 | • Ex. 21 at DOI_TOUHY_002934, 02964 (Rally permit listing J. Caporale as "[o]n-[s]ite [c]ontact" and "PROJECT MANAGER");<br><br>• Ex. 72 at 22:17–24 (J. Caporale stating regarding planning for location of the Rally);<br><br>• Ex. 73 at 95:12–96:17 (K. Kremer explaining that she, A. Kremer, and J. Caporale decided "that the Ellipse was going to be the best place for us to file for the permit"); |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|------|-------------------------------------|----------------------------------------------|
|  | ████████████████ ████ ████████████████ ████████████████ ██████████ *see also* Ex. 69 at SCAVINO_SMITH_00030–32 ████ ); • Ex. 70 (Event Strategies, Inc. receiving a total of $2,560.685.55 in disbursements from the Trump Campaign between 2015 and Mar. 1, 2021); *see also* Ex. 72 at 12:20–13:10 (J. Caporale stating that at the time of the Rally he was "essentially acting on behalf of [ESI] to provide the services that ESI would provide"); • Ex. 56, No. 48 (██████ ██████ ██████ ████ • Ex. 65, No. 158████ ████████ ████████ ██████ | • Ex. 84 (████████████ ████████████████ ██████ ); • Ex. 80 (████████ ████████████ ████████████ ████████████ • Ex. 72 at 19:17–20:5 (J. Caporale stating that he "receive[d] payments from Turning Point to cover the invoices and costs incurred for the January 6th event" in addition to payments from WFAF); • Ex. 69 at SCAVINO_SMITH_0000030–32 (█ ████████████ ████████████ ████████████ ████ • Ex. 69 at SCAVINO_SMITH_0000031 █ ████████████ ████████████ • Ex. 68 at SCAVINO_SMITH_0000026 (█ ████████████ ████████████ ████████████ ████████████ ████ • Ex. 85 at KPierson0042 (J. Caporale discussing "graphics proofs for the stage design and credentials" for the Rally); • Ex. 74 at KKremer5155 (J. Caporale texting K. Kremer stating she can sign the contract with |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|---|---|---|
| | | GW medical for the Rally and he will "pay it");<br><br>• Ex. 233 at KPierson0065 (email from K. Pierson to M. Powers and J. Caporale with "POTUS list" of speakers);<br><br>• Ex. 83 at PLAINTIFFS_00001388 (J. Caporale texting C. Wren on Dec. 29, 2020 regarding "schedule proposal" and "a call to action to march to [the] capitol and make noise"). |
| **Katrina Pierson** | • Ex. 86 at 8:3–18, 11:7–21 (identifying K. Pierson's role on Trump Campaign);<br><br>• Ex. 86 at 11:12–12:8 (K. Pierson stating that she and other members of the Trump Campaign stayed on the Campaign after the 2020 election);<br><br>• Ex. 86 at 8:6–12 (K. Pierson testifying she "did not" work for Trump's presidential administration);<br><br>• Ex. 65, No. 159 (▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮) | • Ex. 86 at 29:2–33:23 (K. Pierson testifying to initial involvement in planning for the Rally);<br><br>• Ex. 86 at 104:7–118:1 (K. Pierson testifying that "[on] January 4th at 3:30 p.m.," *id.* at 104:7–13, she discussed the speaker list with Defendant Trump, *id.* at 113:8–118:1);<br><br>• Ex. 233 at KPierson0065 (email from K. Pierson to M. Powers and J. Caporale with "POTUS list" of speakers);<br><br>• Ex. 87 at KKremer 4457, KKremer_4464 (K. Kremer Dec. 2020 and Jan. 2021 text chain with K. Kremer, Katrina K.Pierson, Jennifer J. Hulsey, and Amy A. Kremer in which K. Pierson discusses the "money flow," "allocating funds," and "branding rights" for the Rally);<br><br>• Ex. 88 at KPierson0201–0202 (Dec. 17, 2020 text from K. Pierson to A. Kremer stating: "January 6th is D day," to which A. Kremer replied, "I know," and said "[w]e are putting together the plan now"). |
| **Kyra Schaefer** | • Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing the hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she knew because they were in the Trump Campaign's | • Ex. 31 at NARA_PROD_042387 (Rally Guidance Memo stating "if you have any questions please contact" C. Wren, M. Mulvaney, K. Schaefer, or C. Kofoed); |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|------|-------------------------------------|----------------------------------------------|
|  | finance department—to assist with the Rally). | • Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney to assist with the Rally). |
| **Kim Guilfoyle** | • Ex. 82 at 11:5–12:9 (K. Guilfoyle stating "my first role was as senior advisor to the President working on the campaign…[a]nd then I became also, in addition to that role, the national finance chair"); <br><br> • Ex. 56, No. 57 (████████ ████████████████ ████████████████ ████████) | • Ex. 56, No. 55 (████ ████████████████████████ ████████) <br><br> • Ex. 60 at 193:21–195:22 (C. Wren stating that Turning Point Action paid invoices for K. Guilfoyle to speak at the Rally); <br><br> • Ex. 60 at 194:11–195:8 (C. Wren stating that Turning Point Action paid speaking fees for D. Trump Jr.). |
| **Kiran Menon** | • Ex. 66 at rows 2631, 6750, 7585 (disbursements to K. Menon from the Trump Campaign for "PAYROLL" as of Nov. 13, 2020, Nov. 30, 2020, and Dec. 15, 2020); <br><br> • Ex. 66 at row 8749 (showing Jan. 7, 2021 "TRAVEL REIMBURSEMENT" from the Trump Campaign to K. Menon); <br><br> • Ex. 63 at rows 70–87 (showing $28,164.46 to K. Menon in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_002965 (listing K. Menon as "OPERATIONS ASSOCIATE 2"); <br><br> • Ex. 89 (████████████████ ████████████████ ████████████) <br><br> • Ex. 84 (████████████████ ████████████████████ ████████) |
| **Maggie Mulvaney** | • Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney— whom she knew because they were in the Trump Campaign's | • Ex. 21 at DOI_TOUHY_002965 (Rally permit listing M. Mulvaney as "VIP LEAD"); <br><br> • Ex. 80 (████████████████ ████████████████ ████████████████) |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|------|-------------------------------------|---------------------------------------------|
| | finance department—to assist with the Rally);<br><br>• Ex. 63 at rows 88–126 (showing $140,394.48 to M. Mulvaney in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | ███████████████████████████<br>███████████████████████████<br><br>• Ex. 31 at NARA_PROD_042387 (Rally Guidance Memo stating "if you have any questions please contact" C. Wren, M. Mulvaney, K. Schaefer, or C. Kofoed);<br><br>• Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren describing hiring of C. Kofoed, K. Schaefer, and M. Mulvaney to assist with the Rally). |
| **Megan Powers** | • Ex. 75 (Email from Megan Powers using her @donaldtrump.com email address);<br><br>• Ex. 76 (M. Powers's LinkedIn account stating she worked as Director of Operations for Donald J. Trump for President through Jan. 2021);<br><br>• Ex. 66 at row 9058 (campaign disbursing $19,566.67 to M. Powers on Feb. 2, 2021);<br><br>• Ex. 63 at rows 191–298 (showing $413,996.71 to M. Powers in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021);<br><br>• Ex. 65, No. 165 (███████<br>███████████████<br>███████████████<br>██████). | • Ex. 90 (M. Powers addressing role in credentialing for Rally);<br><br>• Ex. 21 at DOI_TOUHY_002964 (Rally permit listing M. Powers as "OPERATIONS MANAGER FOR SCHEDULING AND GUIDANCE");<br><br>• Ex. 89 (███████████████<br>███████████████<br>█████████);<br><br>• Ex. 84 (███████████████<br>███████████████<br>████████);<br><br>• Ex. 80 (███████████████<br>███████████████<br>███████████████<br>███████████████);<br><br>• Ex. 91 (email from K. Kremer to M. Powers with draft speaker list);<br><br>• Ex. 233 at KPierson0065 (email from K. Pierson to M. Powers and J. Caporale with "POTUS list" of speakers). |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|---|---|---|
| **Mike Hahn** | • Ex. 101 (detailing Hahn's "individual role" on the social media team and explaining that he ran the Trump Campaign Facebook, managed content on the social media accounts, posted donations asks, and more);<br><br>• Ex. 102 (M. Hahn LinkedIn profile stating he is an "alum of the Trump 2016 and 2020 campaigns where he served as the Director of Social Media");<br><br>• Ex. 66 at row 9044 ("payroll" disbursement to M. Hahn on Feb. 21, 2021);<br><br>• Ex. 28 at DJTFP0093810 (Dec. 26 email from T. Maurtaugh to M. Hahn instructing that M. Hahn and other campaign affiliates should "invoice the campaign for the January pay period");<br><br>• Ex. 69 at SCAVINO_SMITH_0000030–32 (███████████ ███████████████ ███████████████ █████████ ) | • Ex. 103 at SCAVINO_SMITH_0000042 (█ ███████████████████ ███████████████████ ████████████ ███████████████████████ ███████████████████████ █████████████████ ████ <br><br>• Ex. 69 at SCAVINO_SMITH_0000030–32 █ ███████████████████ ███████████████████ ████████████████████ █████████ . |
| **Ron Holden** | • Ex. 66 at rows 1301, 2706 (disbursements to R. Holden from the Trump Campaign for $15,693 on Nov. 4, 2020 and $3,833 on Nov. 13, 2020);<br><br>• Ex. 63 at rows 42–68 (showing $100,832.18 to R. Holden in | • Ex. 21 at DOI_TOUHY_002965 (Rally permit listing R. Holden as "BACKSTAGE MANAGER"). |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|---|---|---|
| | total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | |
| Ryann McEnany | • Ex. 104 at PLAINTIFFS_00072915 (McEnany LinkedIn profile stating she has been the "Social Media Strategist for the Donald J. Trump 2020 Presidential Campaign" since Feb. 2019);<br><br>• Ex. 66 at row 2640 (disbursement to R. McEnany from the Trump Campaign for "payroll" on Nov. 13, 2020). | • Ex. 98 (email re "Jan. 6" from M. Hahn to J. Karwacki and R. McEnany, copying S. Dollman and stating "thanks again for agreeing to help on the 6th" with instruction to "send the invoice to ap@donaldtrump.com and copy Dollman"). |
| Sean Dollman | • Ex. 105 at 10:13–10:24 (S. Dollman discussing role as "CFO");<br><br>• Ex. 66 at row 9254 (showing payments to S. Dollman for "payroll" up and until Mar. 16, 2021);<br><br>• Ex. 106, No. 306 (███████████ ████████████ ███████████ ███████████ ██████) | • Ex. 94 (approving an invoice for resubmission to the Trump Campaign for work completed "thru the 4th");<br><br>• Ex. 28 (DJTFP0093810) (Dec. 26, 2020 Email from S. Dollman to M. Hahn re remaining on payroll). |
| Taylor Budowich | • Ex. 56, No. 53 (███████ ████████████ ███████████ █████)<br><br>• Ex. 92 at 9:17–10:2 (T. Budowich stating that he served as senior advisor on Defendant Trump's re-election campaign); | • Ex. 92 at 27:2–24 (T. Budowich stating that as of December 26, 2020, T. Budowich was in contact with C. Wren);<br><br>• Ex. 92 at 39:5–25 (T. Budowich stating that he sought Tea Party Express's help with paid advertising to crowd build for the Rally); |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|---|---|---|
| | • Ex. 86 at 31:11–16 (K. Pierson testifying that T. Budowich "worked on the campaign" not "the administration"). | • Ex. 92 at 63:5–9 (T. Budowich stating that Turning Point helped to organize buses to bring attendees to the Rally); <br><br> • Ex. 60 at 63:7–24 (C. Wren stating that as of Dec. 26, 2020 Wren was in contact with Taylor Budowich and described Fancelli giving $3 million); <br><br> • Ex. 93 (T. Budowich stating he believed that H. Furman wanted to help with the Rally and was "still on campaign payroll so not looking for money"). |
| Tim Unes | • Ex. 77 (T. Unes using his @donaldtrump.com email address re planning an Oct. 13, 2020 Rally); <br><br> • Ex. 70 (showing Event Strategies, Inc. receiving a total of $2,560.685.55 in disbursements from the Trump Campaign between 2015 and Mar. 1, 2021); <br><br> • Ex. 66 at rows 645, 1321, 7626 (showing Event Strategies Inc. receiving disbursements from the Trump Campaign in Nov. and Dec. 2020). | • Ex. 108 at KKremer2323–24 (listing T. Unes's role as "President & CEO" of Event Strategies and "production vendor" for the Rally); <br><br> • Ex. 21 at DOI_TOUHY_002965 (Rally permit listing T. Unes as "STAGE MANAGER"). |
| William Wilson | • Ex. 66 at rows 2036, 2191 (disbursements to W. Wilson from the Trump Campaign for $1,260 on Nov. 9, 2020 and $4,000 on Nov. 10, 2020); <br><br> • Ex. 63 at rows 358–360 (showing $6,040.00 to W. Wilson in total disbursements from the Trump Campaign from 2015 through Mar. 1, 2021). | • Ex. 21 at DOI_TOUHY_002965 (Rally permit listing W. Wilson as "BACKSTAGE ASSISTANT"). |

| Name | Affiliation with the Trump Campaign | Coordinating, Organizing, Planning the Rally |
|------|-------------------------------------|----------------------------------------------|
| **Jason Miller** | • Ex. 103 at SCAVINO_SMITH_0000042 (███████████ ███████████ ███.) | • Ex. 103 at SCAVINO_SMITH_0000042 (███ ████████████████████████ ████████████████████████ ████████████████████████████ ████████████████████████ ██████; <br><br> • Ex. 109 at PLAINTIFFS_00070059 (J. Miller tweeting regarding the Rally) (https://web.archive.org/web/20210103214740 /https://twitter.com/JasonMillerinDC). |

40.     Internal campaign emails also demonstrate that none of the individuals working on the Save America Rally were employed by the Trump campaign as of December 31, 2020. (Exhibit 28).

> **Plaintiffs' Response:  Disputed.**  This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1). *First*, as Exhibit 28 itself reveals, the list of those employed after December 31, 2020 was not comprehensive.  Ex. 28 (identifying additional individual to be payrolled after December 31, 2020 who were not on the list provided by Tim Murtaugh at 1:10 pm). *Second*, the record shows individuals involved in the Rally and employed or affiliated with the Campaign were, in fact, employed or affiliated with the Campaign as of December 31, 2020. *See, e.g.*, Ex. 75 (Dec. 31, 2020 Email from M. Powers to Charter, charter@donaldtrump.com, using her @donaldtrump.com email address regarding a charter flight for Rudy Guiliani); Ex. 76 (M. Powers LinkedIn profile showing position as "Director Of Operations" for Campaign from January 2019 through January 2021), Ex. 66 at row 9058 (showing payment for

$19,567 to M. Powers on 2/2/2021); Ex. 66 at rows 8749, 2631, 6750 and 7585 (showing

travel reimbursement to K. Menon on 1/7/21 as well as payroll disbursements in Nov.

and Dec. 2020); Ex 98 (Dec. 30, 2020 email with the Subject "Jan. 6" instructing J.

Karwacki and R. McEnany to invoice "the campaign, Donald J. Trump for President,

Inc." for their compensation for involvement in the Rally and to "copy Dollman"); Ex. 66

at row 8681 (showing payment to R. McEnany on 1/5/2021); Ex. 66 at row 8580

(showing payment to J. Karwacki on Dec. 31, 2020); Ex. 80 (███████████████████

█████████████████████████████████████

███████████████; Ex. 69 at SCAVINO_SMITH_000030 (███████████████

████████████████████████████████████████

████████████████████████████████████████

Ex. 68 at SCAVINO_SMITH_000026–29 ███████████████████████

████████████████████████████████████████

███████████████████"); Ex. 103 at SCAVINO_SMITH_0000042 (███████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████

41.    The Save America Rally was a privately funded event that was planned and

executed with input directly from the White House. (Exhibit 29) (Exhibit 30).

**Plaintiffs' Response:  Undisputed** that the Save America Rally was not funded by the government, but **disputed** to the extent that Defendant Trump suggests individuals affiliated with the Trump Campaign did not play a role in the fundraising or payment for the Rally.  *See supra* Table E.  Further **disputed and immaterial** that the Rally was planned and executed with direct input from the White House.  *First*, Exhibits 29 and 30 do not support such an assertion.  *See* Fed. R. Civ. P. 56(c)(1)(B); Local Rule 7(h)(1).

Exhibit 29 merely demonstrates that Hannah Salem and Katrina Pierson—two individuals not established to have ties to the White House but who were instead affiliated with the Trump Campaign; *see* Ex. 66 at row 1241 (showing disbursement from the Campaign to Salem Strategies on Nov. 4, 2020); Ex. 78 (showing $113,471.51 in disbursements to Salem Strategies from May 17, 2016 through Nov. 4, 2020); Ex. 63 at rows 299–305 (showing $2,346.00 in disbursements to H. Salem from Sept. 30, 2017 through Aug. 16, 2019); Ex. 86 at 8:3–18, 11:7–12:8 (K. Pierson testifying that she served as a senior advisor to the 2020 reelection, and continued working with the Campaign through Dec. 31, 2020), Ex. 65, No. 159 ██████████████████████

██████████████████████ provided the White House Communications Agency ("WHCA") with a media-registration link and dictated to the WHCA what to name the Rally in its media-registration link.  Ex. 29 at NARA_PROD_041965 (H. Salem providing a "Media Registration Link for WHCA Board"); NARA_PROD_041963–64 ("Let me ask Katrina . . . Katrina [Pierson] would like [to use the name] 'March to Save America Rally'"), NARA_PROD_041963 (naming the proposed advisory notice "Guidance for President Donald J. Trump's Remarks at the ***March to Save America Rally***" (emphasis added)).  ██████████████████████



Ex. 111, No. 93 (emphasis added).  <u>Exhibit 30</u> similarly does not show that EOP/WHO officials planned or provided direct input on the Rally, but merely demonstrates that Advance officials Christoper Ambrosini or William Russell helped secure entry to the Rally for one or two people using their government email address.  Ex. 30.  Moreover, the record reveals that numerous individuals affiliated with the Trump Campaign planned, coordinated, organized, fundraised for, or made disbursement in connection with the Rally.  *See supra* Table E.  *Second*, the assertion is immaterial.  Not all aspects of the Executive Branch's involvement in the activity in question is relevant, because that involvement may be present whether the activity is official or unofficial.  *See Blassingame*, 87 F.4th at 19, 23.

Ex. 111, No. 93; *see also id.* at No. 91 (

.

42.    Email records indicate that employees within the Executive Office of the President ("EOP") and the White House Office ("WHO") used their official EOP/WHO email addresses when planning the Save America Rally, while those individuals from outside the White House used personal, rather than campaign, email addresses. (Exhibit 23, pg. 2) (Exhibit 24) (Exhibit 30) (Exhibit 30a) (Exhibit 31) (Exhibit 32) (Exhibit 33).

**Plaintiffs' Response:** **Disputed.** This assertion is not supported by evidence that can be presented in a form that would be admissible at trial and therefore should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1). *First*, none of the cited exhibits support this assertion. Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1). Specifically, Exhibit 23 does not involve any EOP or WHO officials. Ex. 23 at DOI_TOUHY_004862. Even if it did, however, that would only be the case because private individuals initiated the conversation. Ex. 23 at DOI_TOUHY_004863 (showing non-WHO/EOP/federal employee, but private individual J. Caporale, initiating the email chain; Ex. 56, No. 49 ███████████████████████

████████████████████████████ The same is true of Exhibit 24, which also does not support that EOP or WHO employees were planning the Rally, but instead demonstrates that they were facilitating requests for meetings and calls for Defendant Trump to occur separate from the Rally. Ex. 24. Exhibit 24 likewise demonstrates that Caroline Wren, a private individual involved in planning the Rally, initiated the email chain. Exhibit 30 also does not show that EOP/WHO officials planned the Rally, but merely demonstrates that two Advance officials, Christoper Ambrosini and William Russell, helped secure entry to the Rally for one or two people using their government email address. Ex. 30. ████████████████████████

████████████████████████████████

████████████████████████████

████████████████████ Ex. 111, No. 93 (emphasis added); *see also id.* at No. 92 (████████████████████████████

████████████████████████████

96

political rallies, and political events that he attended while running for election in 2020"). Neither Exhibit 31 nor Exhibit 32 are email records with employees within the EOP or the White House Office WHO.  Exhibit 33 merely shows that an EOP employee was copied on an email sent by a private person involved in planning the rally, and does not suggest that the EOP employee was involved in planning the rally.  Ex. 33.  Accordingly, the Court should disregard the assertion that these exhibits support that WHO or EOP employees "used their official EOP/WHO email addresses when planning" the Rally. Fed. R. Civ. P. 56(c)(1)(B).  *Second*, this assertion is further **disputed** as it is undermined by the factual record.  Numerous individuals from the Trump Campaign used their Campaign email addresses to plan, coordinate, organize, fundraise, and make disbursements in connection with the Rally.  *See, e.g.*, Ex. 98 (Dec. 30, 2020 email re "Jan. 6" from M. Hahn to J. Karwacki and R. McEnany, copying S. Dollman and stating "[t]hanks again for agreeing to help on the 6th.  As discussed, you'll need to invoice for your pay on this day" with instruction to "[s]end the invoice to ap@donaldtrump.com and copy Dollman"); Ex. 103 (███████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

Ex. 68 at SCAVINO_SMITH_000026 (███████████

████████████████████████████████

████████████████████████████████

████████████████████████; Ex. 69 (████████████████████████████

████████████████████████████████████████████████████████████ Ex.

80 (██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████); Ex.

75 (Dec. 31, 2020 email from M. Powers to charter@donaldtrump.com using her

@donaldtrump.com email address regarding a charter flight for Rudy Guiliani); Ex. 112

at PLAINTIFFS_00073023 (Dec. 2020 and Jan. 2021 email chain in which M. Morgan

used his campaign affiliated @donaldtrump.com email address to email M. Roman at his

campaign affiliated @donaldtrump.com email address regarding "the delivery of Elector

slates"). This fact is further disputed to the extent that Defendant Trump suggests that

private individuals' use of their personal email addresses supports that those individuals

were not affiliated with the Trump Campaign or that people affiliated with the Trump

Campaign did not plan, coordinate, and organize the Save America Rally. The evidence

shows the opposite. *See supra* Table F.

43.    President Trump's attendance at the event was in his official capacity as President

of the United States. Katrina Pierson testified that President Trump stated to her that he

understood his attendance at the Save America Rally to be in an official capacity. (Tr. of Katrina

Pierson before the House Select Committee, pgs. 113:12 – 115:16; 121:2 – 121:25) (Exhibit 20).

**Plaintiffs' Response:  Disputed.**  This assertion is not supported by evidence that can be

presented in a form that would be admissible at trial and therefore should be disregarded.

*See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F. Supp. 3d at 239 ("But

the Court may not consider their testimony if it is both objected to and inadmissible.").

*First*, the Court should disregard the assertion that "President Trump's attendance at the event was in his official capacity as President of the United States" as a legal conclusion, inappropriate for a statement of material facts. *Jackson*, 101 F.3d at 153 ("[R]epeatedly blending factual assertions with legal argument . . . does not satisfy the purposes of [Rule 7(h)]."); *In re Domestic Airline Travel*, 691 F. Supp. 3d at 185 (explaining the court will disregard legal arguments contained within statements of facts). *Second*, this assertion relies on inadmissible hearsay offered to establish the truth of the matter asserted. Fed. R. Evid. 802; *White Coat*, 404 F. Supp. 3d at 105; *Howard Univ.*, 70 F. Supp. 3d at 148. Additionally, the cited evidence does not support that Defendant Trump stated to Katrina Pierson that Trump understood that his attendance at the Save America Rally to be in an official capacity, but rather supports, if anything, the opposite. Ex. 20 at 113:12–115:16, 121:2–25. Katrina Pierson testified that Defendant Trump's reaction to the proposed speaker list, his conclusion that many on the list did not need to speak, and his statement that "[w]e don't really need speakers" triggered Pierson's "mind [to] kick[] in" and Pierson "***th[ought]*** [that] in his mind, he was processing more of an official event and less of an event like a rally. . . . As he was speaking out loud to me, I could see it unfold." *Id.* at 113:23–115:1 (emphasis added). Thus, Pierson testified that she drew that inference—not that Defendant Trump ever made such a statement to her. *Third*, to the extent that the official characterization of the Rally is based on Pierson's subjective belief that Defendant Trump did not want any other speakers (and specifically the decision to cut Kimberly Guilfoyle, his children, and Rudy Guiliani from the speaker list), the evidence shows that Defendant Trump's attendance at the Save America Rally was not in an official capacity, as Kimberly Guilfoyle, Defendant Trump's children, Rudy Guiliani,

and many others did in fact speak at the Rally. *Compare, e.g.*, Ex. 20 at 114:15–19

("[T]he kids want to speak, too? . . . [T]hey don't need to speak."), *with* Ex. 113

(https://www.youtube.com/watch?v=ht20eDYmLXU) (D. Trump Jr., E. Trump, and L.

Trump speaking at the Rally), Ex. 56, Nos. 62, 64, 67; Ex. 20 at 114:2–4 ("[W]hy is

Kimberly on my stage? . . . She doesn't need to be on my stage."), *with* Ex. 113

(https://www.youtube.com/watch?v=ht20eDYmLXU) (K. Guilfoyle speaking at the

Rally), Ex. 56, No. 55 (███); Ex. 20 at 117:18–19 ("No, Rudy doesn't need to speak"),

*with* Ex. 113 (https://www.youtube.com/watch?v=ht20eDYmLXU) (Rudy Guiliani

speaking at the Rally), Ex. 56, No. 71. **<u>Immaterial</u>** to the extent the assertion concerns

what Defendant Trump "understood" to be the nature of his appearance of the Rally.

Defendant Trump's subjective motive or intent is irrelevant to the determination of

whether his appearance at the Rally was official or unofficial in nature. *Blassingame*, 87

F.4th at 20; *Trump v. United States*, 603 U.S. 593, 618 (2024).

## III. The Speech

44.    On January 6, 2021, President Trump attended the Save America Rally and

delivered remarks between approximately 12 p.m. and 1:10 p.m., EST, just hours before the

United States Congress was set to convene—in joint session—to fulfill its own constitutional

duties relative to the certification of the 2020 election (the "Ellipse Speech"). The Ellipse Speech

was delivered from a position centered on the White House and consistent with the plan

approved by the National Park Service. (Exhibit 23) (Exhibit 37).

**Plaintiffs' Response:  <u>Undisputed</u>** that on January 6, 2021, President Trump attended

the Save America Rally and delivered remarks in front of the White House between

approximately 12 p.m. and 1:10 p.m. EST, which happened to be before the certification

was scheduled to occur in Congress.  **Disputed** to the extent Defendant Trump suggests

that the time at which he delivered remarks, as well as the location from which he

delivered them, suggests he gave that speech in his official capacity as President.  *See*

Opp'n Br. at Section II.D.6.

45.    While delivering his remarks, President Trump stood behind a podium which

featured the Seal of the President of the United States. (Exhibit 38).

   **Plaintiffs' Response:  Undisputed and immaterial.**  The president may give a "speech

   at a podium affixed with the presidential seal" even "when speaking in [his] private

   capacit[y]."  *Blassingame*, 87 F.4th at 19.

46.    The exact location of the Ellipse is within close proximity to the United States

Capitol, approximately 2 miles away. (Exhibit 39).

   **Plaintiffs' Response:  Undisputed and immaterial** that the Ellipse and the U.S. Capitol

   are approximately 2 miles apart.

47.    As conceded by Plaintiffs, President Trump used the Ellipse Speech in an attempt

to influence Congress's decision regarding the certification of the 2020 election results.

*Blassingame v. Trump*, 87 F.4th 1, 25 (D.C. Cir. 2023) (Exhibit 40).

   **Plaintiffs' Response:  Disputed and immaterial**.  This assertion is not supported by

   evidence that can be presented in a form that would be admissible at trial and therefore

   should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1); *Dyer*, 264 F.

   Supp. 3d at 239 ("But the Court may not consider their testimony if it is both objected to

   and inadmissible.").  *First*, a judicial opinion is not evidence that Defendant Trump could

   present in an admissible form at trial; "findings of fact by a judge are hearsay and not

   subject to any exception enumerated by the Federal Rules of Evidence."  *Rimkus*, 750 F.

Supp. 2d at 171–72 ("[J]udicial findings are probabilistic determinations based upon a limited set of data points . . . they are not indisputable facts."); *Grimes*, 308 F. Supp. 3d at 106 (declining to consider the D.C. Circuit's characterization in a judicial opinion as evidence); Fed. R. Evid. 802.  *Second*, Plaintiffs did not (and do not) concede that Defendant Trump used the Ellipse Speech in an attempt to influence a congressional decision but rather that Defendant Trump sought to usurp the power of the Congressional branch.  *See Blassingame*, 87 F.4th at 25 (describing that Plaintiffs asserted that the Ellipse Speech was an attempt to "'invad[e] a coordinate branch of government [i.e., Congress] as it carried out its own constitutional duties' to count the votes of the Electoral College." (second alteration in original)); Ex. 40 at 17.  In any event, though the D.C. Circuit acknowledged that "the President *can* act in an official capacity when commenting on . . . Congress's internal procedures" it **held** that when "the President speaks about those subjects at a re-election campaign rally, he does so in an unofficial capacity." *Id.* (emphasis added).  *Third*, the assertion is disputed insofar as it suggests that the D.C. Circuit, in *Blassingame*, stated that Defendant Trump used the Ellipse speech to influence Congress; the court made no such determination.  *Fourth*, further disputed that Defendant Trump was seeking to influence Congress.  As the record demonstrates, Defendant Trump's speech was directed towards members of the audience, and his assertion excludes those instances.  Fed. R. Civ. P. 56(c)(1)(B); *see*, *e.g.*, Ex. 42 at NARA_PROD_097097 ("*All of us here* today do not want to see our election victory stolen by emboldened radical-left Democrats – which is what they're doing. . . . *We* will never give up.  *We* will never concede." (emphasis added)), *id.* ("And to use a favorite term that *all of you people* really came up with: We will stop the steal. Today I will lay

102

out just some of the evidence proving that we won this election, and we won it by a landslide." (emphasis added)), *id.* at NARA_PROD_097099 ("*Many of you have traveled* from all across the nation *to be here*, and I want to thank *you* for the extraordinary love. . . . For the extraordinary love for this amazing country . . . and this amazing movement. Thank you." (emphasis added)), *id.* at NARA_PROD_097100 ("*We're gathered together* in the heart of our nation's capital for one very, very basic and simple reason: to save our democracy." (emphasis added)), *id.* at NARA_PROD_097101 ("But just remember this: *You're* stronger. *You're* smarter. *You've* got more going than anybody. And they try and demean everybody having to do with *us*, and *you're the real people*. *You're the people* that built this nation. *You're not the people* that tore down our nation." (emphasis added)), *id.* at NARA_PROD_097102–103 ("[W]e're going to walk down to the Capitol. And we're going to cheer on our brave senators and congressmen and women. And we're probably not going to be cheering so much for some of them [] because you'll never take back our country with weakness. You have to show strength and you have to be strong." (emphasis added)), *id.* at NARA_PROD_097107 ("*We* will not be intimidated into accepting the hoaxes and the lies that *we've* been forced to believe." (emphasis added)). Furthermore, Defendant Trump made similar comments during his speech on January 6, 2021 and during a rally in Dalton, Georgia days before, which his administration characterized as a political event. Ex. 46 (Jan. 3, 2021 email distributing "draft POTUS remarks for [Jan. 4, 2021] event in GA. . . . This speech will be delivered at a political event"); Def.'s Mot. Summ. J. at 21; Def's Assertion 55; *see supra* Table B (comparing remarks during the two speeches). *Finally*, the assertion is immaterial. Defendant Trump's subjective intent in giving his speech at the Rally is

irrelevant to the immunity analysis.  *See Blassingame*, 87 F.4th at 20; *Trump*, 603 U.S. at

618.  The D.C. Circuit held that "whether the President is engaged in official functions or

unofficial reelection campaign activity, correspondingly, does not turn on whether the

activity was subjectively undertaken in some measure to enhance the President's re-

election prospects or profile." *Blassingame*, 87 F.4th at 20.  Instead, the inquiry "is an

objective one, 'grounded in' a context-specific assessment of 'the nature of the function

performed.'" *Id.*  Thus, whether Defendant Trump "used the Ellipse Speech in an

attempt to influence Congress's decision" is immaterial because the context-specific

analysis indicates that he was acting in his unofficial capacity.  *See* Opp'n Br. at Section

II.D.

48.     Article II, Sec. 3 of the United States Constitution provides, in relevant part, that

the President "shall from time to time give to the Congress Information of the State of the Union,

and recommend to their Consideration such Measures as he shall judge necessary and

expedient…he shall take Care that the Laws be faithfully executed."  (Exhibit 41).

**Plaintiffs' Response:  <u>Undisputed</u>** that the two clauses above accurately quoted Article

II, Sec. 3 of the United States Constitution.  This assertion, however, is disputed to the

extent that legal arguments do not belong in the Statement of Undisputed Facts.  *Jackson*,

101 F.3d at 153 (disregarding legal arguments contained within statements of facts); *In re*

*Domestic Airline Travel*, 691 F. Supp. 3d at 185 (same).

49.     Pursuant to his Article II, Sec. 3 authority, President Trump used the Ellipse

Speech to provide Congress with information regarding the State of the Union in an effort to

ensure that the laws were faithfully executed. Specifically, President Trump used the Ellipse

Speech to inform Congress regarding significant irregularities relating to the 2020 presidential

election, irregularities which, in his view, undermined the outcome of that election and posed a

significant threat to the rule of law. Those irregularities included allegations of outright, systemic

voter fraud and illegal and unconstitutional changes to state election laws; information which

President Trump deemed necessary for Congress's upcoming deliberations as to the certification

of the election. (Exhibit 42, pgs. 15, 16, 20, 21, 22, 23, 24, 25, 26, 27).

     **Plaintiffs' Response:  Disputed and immaterial.**  This assertion is not supported by

evidence that can be presented in a form that would be admissible at trial and therefore

should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, this

assertion relies on legal conclusions and should be disregarded as a result.  *Jackson*, 101

F.3d at 153 ("[R]epeatedly blending factual assertions with legal argument . . . does not

satisfy the purposes of [Rule 7(h)]."); *In re Domestic Airline Travel*, 691 F. Supp. 3d at

185 (explaining the court will disregard legal arguments contained within statements of

facts).  Specifically, the assertion incorrectly assumes that (1) Defendant Trump was

acting "[p]ursuant to his Article II, Sec. 3 authority" and (2) communicated to Congress

what he "deemed necessary" under Article II—core factual questions in this matter.  Not

only is this an improper use of the Statement of Material Fact, but in doing so Defendant

Trump misstates the law.[1]  *See Blassingame*, 87 F.4th at 24 ("President Trump's assertion

that he exercised his authority under the Take Care Clause, at least without more,

assumes the answer to the question whether he acted in an official capacity as office-

holder or in a private capacity as office-seeker.").  *Second*, multiple assertions are not

supported by Exhibit 42 as nothing in Exhibit 42 addresses the underlying purpose for

---

[1] *Blassingame* acknowledged that "the President can act in an official capacity when commenting on . . . Congress's internal procedures," but it held that "if the President speaks about those subjects at a re-election campaign rally, he does so in an unofficial capacity."  *Blassingame*, 87 F.4th at 25.

Defendant Trump's "use[ of] the Ellipse Speech" or what Defendant Trump "deemed necessary" to convey to Congress, and Defendant Trump has not cited any evidence as to his intent or purpose for giving the Ellipse Speech or whether he deemed the speech or any purported recommendations "necessary or expedient."  *See* Ex. 42 at 16, 18, 27, 28; Fed. R. Civ. P. 56(c)(1)(B).  As the record demonstrates, Defendant Trump's speech was directed towards members of the audience, and his assertion excludes those instances. Fed. R. Civ. P. 56(c)(1)(B); *see, e.g.*, Ex. 42 at NARA_PROD_097097 ("*All of us here today* do not want to see our election victory stolen by emboldened radical-left Democrats – which is what they're doing. . . . *We* will never give up.  *We* will never concede."  (emphasis added)), *id.* ("And to use a favorite term that *all of you people really came up with*: We will stop the steal. Today I will lay out just some of the evidence proving that we won this election, and we won it by a landslide."  (emphasis added)), *id.* at NARA_PROD_097099 ("*Many of you have traveled* from all across the nation *to be here*, and I want to thank *you* for the extraordinary love. . . . For the extraordinary love for this amazing country, and this amazing movement, thank you."  (emphasis added)), *id.* at NARA_PROD_097100 ("*We're gathered together* in the heart of our nation's capital for one very, very basic and simple reason:  to save our democracy."  (emphasis added)), *id.* at NARA_PROD_097101 ("But just remember this: *You're* stronger.  *You're* smarter.  *You've* got more going than anybody.  And they try and demean everybody having to do with *us*.  And *you're the real people*.  *You're the people* that built this nation. *You're not the people* that tore down our nation."  (emphasis added)), *id.* at NARA_PROD_097102–103 ("[W]e're going to walk down to the Capitol.  And we're going to cheer on our brave senators and congressmen and women.  And we're probably

not going to be cheering so much for some of them [] because you'll never take back our country with weakness. You have to show strength and you have to be strong." (emphasis added)), *id.* at NARA_PROD_097107 ("*We* will not be intimidated into accepting the hoaxes and the lies that *we've* been forced to believe." (emphasis added)). Furthermore, Defendant Trump made similar comments during his speech on January 6, 2021 and during a rally in Dalton, Georgia days before, which his administration characterized as a political event. Ex. 46 (Jan. 3, 2021 email distributing "draft POTUS remarks for [Jan. 4, 2021] event in GA. . . . This speech will be delivered at a political event"); Def.'s Mot. Summ. J. at 21; Def's Assertion 55; *supra* Table B (comparing remarks during the two speeches). *Third*, this assertion is immaterial to the extent that Defendant Trump asserts his intent was to use the Ellipse Speech to inform Congress about irregularities with the 2020 election or that he intended to communicate to Congress matters he deemed necessary. Defendant Trump's subjective intent in giving his speech at the Rally is irrelevant to the immunity analysis. *See Blassingame*, 87 F.4th at 20; *Trump*, 603 U.S. at 618. The D.C. Circuit held that "whether the President is engaged in official functions or unofficial reelection campaign activity, correspondingly, does not turn on whether the activity was subjectively undertaken in some measure to enhance the President's re-election prospects or profile." *Blassingame*, 87 F.4th at 20. Instead, the inquiry "is an objective one, 'grounded in' a context-specific assessment of 'the nature of the function performed.'" *Id.* Thus, whether Defendant Trump "used the Ellipse Speech in an attempt to influence Congress's decision" is immaterial because the context-specific analysis indicates that he was acting in his unofficial capacity. *See* Opp'n Br. at Section II.D.6. *Finally*, this assertion ignores that state and federal

107

government officials disputed Defendant Trump's allegations regarding election fraud and irregularities.  Ex. 114 (Twitter Post by Arizona Governor K. Hobbes); Ex. 234 (Statement by Arizona Speaker of the House R. Bowers); Ex. 116 (Public Statement Issued By Georgia Secretary of State B. Raffensperger); Ex. 117 (Public Statement Issued by Michigan Department of State); Ex. 118 at 5:22–6:10 (W. Barr testifying "I could find no evidence indicating that the outcome of the election was caused by voting fraud. . . the Department, in fact, when we received specific and credible allegations of fraud, made an effort to look into these to satisfy ourselves that they were without merit. And I repeatedly told the President in no uncertain terms that I did not see evidence of fraud, you know, that would have affected the outcome of the election.").  State and federal courts rejected legal challenges alleging the same.  Ex. 119 Order, *Texas v. Pennsylvania*, No. 22O155 (U.S. 2020); RJN ¶ 41; RJN ¶ 42; *see also Eastman v. Thompson*, 636 F. Supp. 3d 1078, 1092 (C.D. Cal. 2022), *appeal dismissed*, 2022 WL 18492376 (9th Cir. Nov. 7, 2022), *cert. denied*, 144 S. Ct. 248 (2023).  And Defendant Trump's own political appointees at the Justice Department refused his demands to pursue allegations of election fraud because they were baseless.  Ex. 120 at PLAINTIFFS_00071769 (quoting Attorney General W. Barr stating he "looked at [the allegations] and didn't think there was fraud"), *id.* at PLAINTIFFS_00071773–74 (reflecting testimony by former Acting Attorney General J. Rosen that he rejected Defendant Trump's demands to pursue election fraud claims because they were not appropriate "based on the facts and the law" as he understood them), *id.* at PLAINTIFFS_00071775–76 (reflecting testimony by former Acting Deputy Attorney General R. Donoghue stating that he told Defendant Trump that his election allegations

were "false"), *id.* at PLAINTIFFS_00071786 (reflecting testimony by former Assistant

Attorney General for the Office of Legal Counsel S. Engel that Defendant Trump's

lawsuit was "meritless"); Ex. 118 at 7:1–10 (W. Barr testifying that irregularities relating

to the election in the states "were issues for the campaign lawyers to raise" and were "not

the business of the Department of Justice").

50.     Pursuant to his Article II, Sec. 3 authority, President Trump used the Ellipse

Speech to make recommendations to Congress, which he deemed necessary and expedient, in an

effort to ensure that the laws were faithfully executed. Those recommendations included

legislative proposals meant to strengthen future federal elections as well as the specific

recommendation that Congress reject the certification of the 2020 elector slates and send those

slates back to the states for additional deliberation and investigation. (Exhibit 42, pgs. 16, 18, 27,

28).

**Plaintiffs' Response:  <u>Disputed and immaterial.</u>**  This assertion is not supported by

evidence that can be presented in a form that would be admissible at trial and therefore

should be disregarded.  *See* Fed. R. Civ. P. 56(c)(1)–(2); Local Rule 7(h)(1).  *First*, the

assertion improperly relies on a legal conclusion and should be disregarded as a result.

*Jackson*, 101 F.3d at 153 ("[R]epeatedly blending factual assertions with legal

argument . . . does not satisfy the purposes of [Rule 7(h)]."); *In re Domestic Airline*

*Travel*, 691 F. Supp. 3d at 185 (explaining the court will disregard legal arguments

contained within statements of facts).  Specifically, the assertion assumes that Defendant

Trump was acting in his official capacity "[p]ursuant to his Article II, Sec. 3 authority" at

the time of the Ellipse Speech.  Concluding that Defendant Trump was acting with

presidential authority is the core of his motion for summary judgment and is, thus,

necessarily a legal conclusion.  *See Blassingame*, 87 F.4th at 24 ("President Trump's assertion that he exercised his authority under the Take Care Clause, at least without more, assumes the answer to the question whether he acted in an official capacity as office-holder or in a private capacity as office-seeker.").  *Second*, Defendant Trump has not cited any evidence as to his intent or purpose for giving the Ellipse Speech or whether he deemed the speech or any purported recommendations "necessary or expedient."  *See* Ex. 42 at 16, 18, 27, 28.  Accordingly, these unsupported assertions should be disregarded.  *Robertson v. Am. Airlines, Inc.*, 239 F. Supp. 2d 5, 9 (D.D.C. 2002) (striking defendant's motion for summary judgment for where its statement of facts did not have citations to the record to support its assertions).  As the record demonstrates, Defendant Trump's speech was directed towards members of the audience, and his assertion excludes those instances.  Fed. R. Civ. P. 56(c)(1)(B); *see, e.g.*, Ex. 42 at NARA_PROD_097097 ("*All of us here* today do not want to see our election victory stolen by emboldened radical-left Democrats – which is what they're doing. . . . *We* will never give up.  *We* will never concede."  (emphasis added)), *id.* ("And to use a favorite term that *all of you people* really came up with: We will stop the steal. Today I will lay out just some of the evidence proving that we won this election, and we won it by a landslide."  (emphasis added)), *id.* at NARA_PROD_097099 ("*Many of you have traveled* from all across the nation *to be here*, and I want to thank *you* for the extraordinary love. . . . For the extraordinary love for this amazing country, and this amazing movement, thank you."  (emphasis added)), *id.* at NARA_PROD_097100 ("*We're gathered together* in the heart of our nation's capital for one very, very basic and simple reason:  to save our democracy."  (emphasis added)), *id.* at

NARA_PROD_097101 ("But just remember this: *You're* stronger.  *You're* smarter.

*You've* got more going than anybody.  And they try and demean everybody having to do

with *us*.  And *you're the real people*.  *You're the people* that built this nation. *You're not

the people* that tore down our nation."  (emphasis added)), *id.* at NARA_PROD_097102–

103 ("[W]e're going to walk down to the Capitol.  And we're going to cheer on our brave

senators and congressmen and women.  And we're probably not going to be cheering so

much for some of them [] because you'll never take back our country with weakness.

You have to show strength and you have to be strong."  (emphasis added)), *id.* at

NARA_PROD_097107 ("*We* will not be intimidated into accepting the hoaxes and the

lies that *we've* been forced to believe."  (emphasis added)).  Furthermore, Defendant

Trump made similar comments during his speech on January 6, 2021 and during a rally in

Dalton, Georgia days before, which his administration characterized as a political event.

Ex. 46 (Jan. 3, 2021 email distributing "draft POTUS remarks for [Jan. 4, 2021] event in

GA. . . . This speech will be delivered at a political event"); Def.'s Mot. Summ. J. at 21,

Def's Assertion 55; *supra* Table B (comparing remarks during the two speeches).

*Fourth*, the assertion is immaterial to the extent that Defendant Trump alleges the Ellipse

Speech was either "used to make recommendations to Congress" or "in an effort to

ensure that the laws were faithfully executed."  Defendant Trump's subjective intent in

giving his speech at the Rally is irrelevant to the immunity analysis.  *See Blassingame*, 87

F.4th at 20; *Trump*, 603 U.S. at 618.  The D.C. Circuit held that "whether the President is

engaged in official functions or unofficial reelection campaign activity, correspondingly,

does not turn on whether the activity was subjectively undertaken in some measure to

enhance the President's re-election prospects or profile."  *Blassingame*, 87 F.4th at 20.

Instead, the inquiry "is an objective one, 'grounded in' a context-specific assessment of 'the nature of the function performed.'"  *Id.*  Thus, whether Defendant Trump "used the Ellipse Speech in an attempt to influence Congress's decision" is immaterial because the context-specific analysis indicates that he was acting in his unofficial capacity.  *See* Opp'n Br. at Section II.D.

51.      Pursuant to his Article II, Sec. 3 authority, President Trump critiqued Congressional inaction and called upon the Republican members of Congress to fight for the country. (Exhibit 42, pgs. 5, 6, 7).

**Plaintiffs' Response:  <u>Disputed.</u>**  The assertion improperly relies on a legal conclusion and should be disregarded as a result.  *Jackson*, 101 F.3d at 153 ("[R]epeatedly blending factual assertions with legal argument . . . does not satisfy the purposes of [Rule 7(h)].");  *In re Domestic Airline Travel*, 691 F. Supp. 3d at 185 (explaining the court will disregard legal arguments contained within statements of facts).  Specifically, the assertion assumes that Defendant Trump was acting in his official capacity "[p]ursuant to his Article II, Sec. 3 authority" at the time of the Ellipse Speech.  Concluding that Defendant Trump was acting with presidential authority is the core of his motion for summary judgment and is, thus, necessarily a legal conclusion.  *See Blassingame*, 87 F.4th at 24 ("President Trump's assertion that he exercised his authority under the Take Care Clause, at least without more, assumes the answer to the question whether he acted in an official capacity as office-holder or in a private capacity as office-seeker.")  Additionally, this assertion excludes the many instances where Defendant Trump directly addresses the crowd.  *See, e.g.*, Ex. 42 at NARA_PROD_097097 ("*All of us here* today do not want to see our election victory stolen by emboldened radical-left Democrats – which is what they're

doing. . . . *We* will never give up.  *We* will never concede."  (emphasis added)), *id.* ("And

to use a favorite term that *all of you people* really came up with: We will stop the steal.

Today I will lay out just some of the evidence proving that we won this election, and we

won it by a landslide."  (emphasis added)), *id.* at NARA_PROD_097099 ("*Many of you

have traveled* from all across the nation *to be here*, and I want to thank *you* for the

extraordinary love. . . . For the extraordinary love for this amazing country, and this

amazing movement, thank you."  (emphasis added)), *id.* at NARA_PROD_097100

("*We're gathered together* in the heart of our nation's capital for one very, very basic and

simple reason:  to save our democracy."  (emphasis added)), *id.* at

NARA_PROD_097101 ("But just remember this: *You're* stronger.  *You're* smarter.

*You've* got more going than anybody.  And they try and demean everybody having to do

with *us*.  And *you're the real people*.  *You're the people* that built this nation. *You're not

the people* that tore down our nation."  (emphasis added)), *id.* at NARA_PROD_097102–

103 ("[W]e're going to walk down to the Capitol.  And we're going to cheer on our brave

senators and congressmen and women.  And we're probably not going to be cheering so

much for some of them [] because you'll never take back our country with weakness.

You have to show strength and you have to be strong."  (emphasis added)), *id.* at

NARA_PROD_097107 ("*We* will not be intimidated into accepting the hoaxes and the

lies that *we've* been forced to believe."  (emphasis added)).

    52.    President Trump also used the Ellipse Speech to address Vice President Mike

Pence regarding the performance of his constitutional duties. As determined by the Supreme

Court in *Trump v. United States*, such activity necessarily involves official conduct, for which

President Trump is immune. 603 U.S. 593, 623, 144 S. Ct. 2312, 2336, 219 L. Ed. 2d 991 (2024) (Exhibit 42, pgs. 3, 4, 7, 17, and 21).

      **Plaintiffs' Response:  Disputed.**  First, the assertion improperly relies on a legal conclusion and should be stricken as a result.  *Jackson*, 101 F.3d at 153 ("[R]epeatedly blending factual assertions with legal argument . . . does not satisfy the purposes of [Rule 7(h)]."); *In re Domestic Airline Travel*, 691 F. Supp. 3d at 185 (explaining the court will disregard legal arguments contained within statements of facts).  Specifically, the assertion assumes that Defendant Trump was acting in his official capacity when he addressed then-Vice President Mike Pence at the Ellipse Speech.  Concluding that Defendant Trump was acting with presidential authority is the core of his motion for summary judgment and is, thus, necessarily a legal conclusion.  And, in any event, this legal conclusion misstates the law.[2]  Finally, it is further disputed that Defendant Trump "used the Ellipse Speech to address Vice President Mike Pence regarding the performance of his constitutional duties."  During this 187 minute speech, Defendant Trump made 9 comments that he hoped Mike Pence "does the right thing," and only once directly referred to Vice President Pence, Ex. 42 at NARA_PROD_097116, with the bulk of the Ellipse Speech focusing on his grievances about the election results, *see, e.g.*, Ex. 42 at NARA_PROD_097097 ("[W]e won this election, and we won it by a landslide.

---

[2] As discussed in the accompanying opposition to Defendant Trump's motion for summary judgment, Opp'n Br. at p. 44 n.15, *Trump v. United States* acknowledged that when the President and Vice President discuss their official duties, they engage in official conduct, but explicitly stated that "the President plays no direct constitutional or statutory role" in counting electoral votes like the Vice President does, thus, such communications are at most only afforded a rebuttable presumption of immunity.  603 U.S. at 623–24 (remanding for further proceedings).  Accordingly, communications between Defendant Trump and Pence do not "necessarily involve[] official conduct" as asserted.  *Id.* at 624–25.

This was not a close election.  You know, I say sometimes jokingly, but there's no joke

about it:  I've been in two elections; I won them both, and the second one I won much

bigger than the first.").  The speech as a whole demonstrates that Defendant Trump was

addressing the crowd concerning his reelection.  *See, e.g.*, Ex. 42 at

NARA_PROD_097097 ("*All of us here* today do not want to see our election victory

stolen by emboldened radical-left Democrats – which is what they're doing. . . . *We* will

never give up.  *We* will never concede."  (emphasis added)), *id.* ("And to use a favorite

term that *all of you people* really came up with: We will stop the steal. Today I will lay

out just some of the evidence proving that we won this election, and we won it by a

landslide."  (emphasis added)), *id.* at NARA_PROD_097099 ("*Many of you have

traveled* from all across the nation *to be here*, and I want to thank *you* for the

extraordinary love. . . . For the extraordinary love for this amazing country, and this

amazing movement, thank you."  (emphasis added)), *id.* at NARA_PROD_097100

("*We're gathered together* in the heart of our nation's capital for one very, very basic and

simple reason:  to save our democracy."  (emphasis added)), *id.* at

NARA_PROD_097101 ("But just remember this: *You're* stronger.  *You're* smarter.

*You've* got more going than anybody.  And they try and demean everybody having to do

with *us*.  And *you're the real people*.  *You're the people* that built this nation. *You're not

the people* that tore down our nation."  (emphasis added)), *id.* at NARA_PROD_097102–

103 ("[W]e're going to walk down to the Capitol.  And we're going to cheer on our brave

senators and congressmen and women.  And we're probably not going to be cheering so

much for some of them [] because you'll never take back our country with weakness.

You have to show strength and you have to be strong."  (emphasis added)), *id.* at

NARA_PROD_097107 ("*We* will not be intimidated into accepting the hoaxes and the lies that *we've* been forced to believe."  (emphasis added)).

53.    EOP/WHO employees understood that the Ellipse Speech conformed with President Trump's Article II, Sec. 3 authorities and acted in conformity with that understanding. Declaration of Stephen Miller. (Exhibit 43).

**Plaintiffs' Response:  Disputed**.  This assertion is belied by the record.  Miller testified that his position that the Rally speech was "official" was his own "characterization" and was based in part on "things I would have heard secondhand and thirdhand" (in other words, hearsay).  Ex. 44 (Miller Dep. Tr.) at 34:23–35:10, 47:23–48:7.  Not only is this position improper factual support, *Jackson*, 101 F.3d at 153; *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d at 185, and unqualified, Ex. 43 ¶ 5 ("I am not an attorney"), but it is based on his view that "the distinction between official and unofficial activities was ensuring that the President's speeches were preserved on the White House computer system," Ex. 43 ¶ 10—a distinction he himself collapses.  Miller acknowledged that a speech could be preserved on the White House computer system "by e-mailing a copy of the speech to a White House employee at the employee's official White House e-mail address," Ex. 44 at 45:2–45:10, yet testified that *both official and unofficial speeches* were sent to White House employees at those employees' White House email addresses.  Ex. 43 ¶ 8 (further testifying "the White House Counsel's Office and other White House staff reviewed *all* speeches regardless of whether they were 'official' or 'unofficial,'" (emphasis added)), Ex. 44 at 39:16–40:25 (testifying that "overwhelmingly" the White House Counsel's office received draft speeches electronically at their White House e-mail addresses).  Accordingly, the Court should not

give Miller's purported distinction any weight. The same is true of Miller's suggestion that, "[b]ecause of the official character of the January 6, 2021 speech, the electronic trail of the final versions of the speech were routed through the White House system and subjected to the protocols and reviews of other official statements or speeches of President Trump." Ex. 43 ¶ 16. According to Miller, this meant that the January 6 speech went through "the staff secretary process," where the staff secretary emailed drafts of the speech to multiple White House employees at their White House email addresses. Ex. 44 at 49:24–50:15. As the record reveals, however, multiple members of the presidential speechwriting staff, including Ross Worthington (who drafted the January 6 speech) and Robert Gabriel (Mr. Miller's assistant) testified that *both official and unofficial speeches* went through the staff secretary process. Ex. 58 at 16:22–17:8; Ex. 121 at 18:1–11. Even if these distinctions were supported by the record, this assertion is further undermined by Miller's sworn testimony that "it was understood . . . it didn't have to be said. It was blindingly obvious that the purpose of the speech was to build support for the *election* contest"—a goal distinct from informing Congress about the state of the union. Ex. 57 at 131:7–12 (comparing the Ellipse Speech to the rally in Georgia, which Defendant Trump himself acknowledges was a "political event," *see* Def.'s Assertion 55; Ex. 46) (emphasis added).

54.    The White House Staff Secretary, whose office was tasked with differentiating official from unofficial speeches as part of its regular duties for purposes of ensuring Hatch Act compliance, understood the Ellipse Speech to be an official speech and treated it as such as is shown by the fact that the email from the White House Staff Secretary transmitting the Ellipse

117

Speech to White House personnel for review did not bear a Hatch Act notice. Deposition of

Stephen Miller at pgs. 64:1–72:11 (Exhibit 44) (Exhibit 44a) (Exhibit 44b); (Exhibit 45).

> **Plaintiffs' Response:** <u>**Disputed**</u>.  The assertion improperly relies on a legal conclusion
>
> and should be stricken as a result.  *Jackson*, 101 F.3d at 153 ("[R]epeatedly blending
>
> factual assertions with legal argument . . . does not satisfy the purposes of [Rule 7(h)].");
>
> *In re Domestic Airline Travel*, 691 F. Supp. 3d at 185 (explaining the court will disregard
>
> legal arguments contained within statements of facts).  Furthermore, to the extent this
>
> assertion relies on the testimony of Stephen Miller, Miller lacks personal knowledge to
>
> testify regarding the motives of the White House Staff Secretary in transmitting the
>
> Ellipse Speech via email without a Hatch Act notice.  Fed. R. Evid. 602.  Moreover, this
>
> assertion relies on numerous incorrect propositions.  *First*, none of the cited evidence
>
> supports that the White House Staff Secretary "was tasked with differentiating official
>
> from unofficial speeches as part of its regular duties for purposes of ensuring Hatch Act
>
> compliance."  *See* Ex. 44 at 64:12–72:10, Ex. 44a, Ex. 44b, Ex. 45.  *Second*, the evidence
>
> reveals that the Ellipse Speech was written and labeled in a manner consistent with
>
> political speeches.  The White House Counsel instructed Defendant Trump's
>
> speechwriting team to use their personal computers, as opposed to their White House
>
> computer, for drafting and editing political speeches to abide by the Hatch Act.  Ex. 121
>
> at 18:1–6; Ex. 122 at 20:22–21:5; Ex. 58 at 16:22–17:1; 22:18–23:13.  With regards to
>
> the Ellipse Speech, Ross Worthington, Defendant Trump's Head Speechwriter, used his
>
> personal device to work on the Ellipse Speech.  Ex. 58 at 115:15–21.  Moreover,
>
> Worthington drafted the Ellipse Speech using Google Docs—which was typically used
>
> for political speeches whereas official speeches were not drafted on Google Docs.  *Id.* at

13:8–15, 17:6–13, 119:10–23.  *Third*, the evidence shows that both official and political speeches underwent the same review process.  For instance, when asked whether "[t]he staff secretary review process . . . applied for the political speeches," Worthington stated that "[a]s a general matter, the staff secretary process reviewed **all** speeches."  Ex. 58 at 17:6–8 (emphasis added); *see also id.* at 17:2–5 ("There comes a point where we understood from the White House counsel's office that things need to be transferred for them to do the staff secretary circulation . . . It would happen for any speech, whether it's political or official.  And at that point, [all speeches] would generally be moved up to the White House systems."); *id.* at 12:19–13:1 ("[T]here's a staff secretary process in the White House.  So for every speech, every component gets a circulation of the draft of that speech.").  *Fourth*, the White House Staff Secretary's opinions as to the nature of the *draft* speech are immaterial, as the evidence demonstrates that Defendant Trump's speech as given during the Rally bore little resemblance to its prior draft form.  Ex. 123 (redline of Rally Speech).  In fact, the transcript of the actual Ellipse Speech given by Defendant Trump was sent to the White House Staff Secretary ███████████████████████

███████████ which White House staff use as a designation for "political speeches."  Ex. 58 at 16:22–17:1, 22:18–23:13; Ex. 122 at 21:1–22:23; Ex. 124 at VMH-00000182.

*Finally*, the evidence demonstrates that ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████     *Compare* Ex. 125 ("████████████████████

████████████████████████████████████████████

████████████████████     *with* Ex. 126 (███████████████████; Ex.

127; Ex. 128; Ex. 129; Ex. 130; Ex. 131; Ex. 132; Ex. 133; Ex. 134; Ex. 135; Ex. 136;

Ex. 137; Ex. 138; Ex. 139; Ex. 140; Ex. 141; Ex. 142; Ex. 143; Ex. 144; Ex. 145; Ex.

146; Ex. 147; Ex. 148; Ex. 149.

55.    By contrast, just three days earlier, when the White House Staff Secretary

distributed a draft Presidential Speech to be delivered at a political event in Georgia to a largely

identical group of White House Staffers for review, the cover email contained a prominent Hatch

Act notice in the following form:

> **NOTE: HATCH ACT RESTRICTIONS APPLY**. This speech will be delivered at a political event and thus
> Hatch Act restrictions apply.  Accordingly, per instruction from the White House Counsel's Office, review
> for issues beyond accuracy (such as for political consistency or effective messaging) should not be
> performed by noncommissioned officers or using official equipment and office space.  Commissioned
> officers should not use official equipment to review for issues beyond accuracy (such as for political
> consistency or effective messaging)  If you have any questions pertaining to Hatch Act restrictions with
> respect to review of these remarks, please be sure to consult with your designated ethics officer.

(Exhibit 46).

**Plaintiffs' Response:  Undisputed** that the White House Staff Secretary distributed a

draft of a speech on January 3, 2021 for a political event in Georgia that contained a

Hatch Act Notice.  **Disputed** to the extent that Defendant Trump suggests that the

absence of a Hatch Act notice on other communications or documents, including an email

transmitting a draft of the January 6 Rally speech, indicates that such communications or

documents were considered official.  The evidence demonstrates that ███████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

*Compare* Ex. 125 ("████████████████████████████████

████████████████████████████████████ *with* Ex.

126 (████████████████████); Ex. 127; Ex. 128; Ex. 129; Ex. 130; Ex. 131; Ex.

132; Ex. 133; Ex. 134; Ex. 135; Ex. 136; Ex. 137; Ex. 138; Ex. 139; Ex. 140; Ex. 141;

Ex. 142; Ex. 143; Ex. 144; Ex. 145; Ex. 146; Ex. 147; Ex. 148; Ex. 149.

56.    Among the recipients of the Staff Secretary's email transmitting the Ellipse

Speech for review was a member of the White House Counsel's Office, Patrick Philbin. There is

no evidence that Mr. Philbin objected to the lack of such a warning or contended that the Speech

was subject to the Hatch Act. (Exhibit 45) (Urbanek Declaration at ¶ 51).

> **Plaintiffs' Response: <u>Disputed.</u>** *First*, disputed to the extent that the assertions suggest
>
> that Patrick Philbin saw the email in question, thought the speech was official, or
>
> believed that no Hatch Act warning was necessary; the presented evidence shows only
>
> that Philbin never objected to the absence of a Hatch Act warning *in Exhibit 45*, not that
>
> he made a similar objection in other instances where one was warranted, nor that he was
>
> under any obligation to do so such that his silence here carries meaning.  *Second*, Philbin
>
> typically reviewed campaign speeches.  Ex. 150 at 137:19–138:6 (P. Cipollone testifying
>
> P. Philibin typically reviewed campaign speeches); *see also* Ex. 236 (adopting Ex. 150 as
>
> sworn testimony).  Philbin reviewed the Ellipse Speech.  *Id.*; *see also* Ex. 45 at
>
> NARA_PROD_040299 (showing P. Philbin received the speech).  Moreover, the Rally
>
> speech was stamped as an "internal transcript," Ex. 42 at NARA_PROD_097096 (Rally
>
> Speech bearing the stamp "Internal Transcript"), Ex. 124 at VMH-00000182 (███████
>
> ████████████████████████████████████████████████████████
>
> ████████████████████████)—a stamp that the White House used to denote
>
> "political speeches," Ex. 122 at 21:14–23 (V. Haley stating "my recollection is internal
>
> transcripts were political speeches").  Accordingly, this assertion is disputed insofar as it
>
> suggests that Philbin thought the speech was official.  *Third*, the fact that the White

House Counsel's Office received a draft of the speech is immaterial, because the White

House Counsel's Office received drafts of official and unofficial speeches.  Ex. 43 ¶ 8;

Ex. 150 at 137:19–138:1; Ex. 58 at 21:14–22:3 (R. Worthington stating that White House

Counsel's office "w[as] on every circulate of every speech").  The evidence shows that

both official and political speeches underwent the same review process.  For instance,

when asked whether "[t]he staff secretary review process . . . applied for the political

speeches," Worthington stated that "[a]s a general matter, the staff secretary process

reviewed **all** speeches."  Ex. 58 at 17:6–8 (emphasis added); *see also id.* at 17:2–5

("There comes a point where we understood from the White House counsel's office that

things need to be transferred for them to do the staff secretary circulation . . . It would

happen for any speech, whether it's political or official.  And at that point, [all speeches]

would generally be moved up to the White House systems."); *id.* at 12:19–13:1

("[T]here's a staff secretary process in the White House.  So for every speech, every

component gets a circulation of the draft of that speech.").

57.    After the conclusion of his remarks, President Trump posted a link to the speech

to the Account. (Exhibit 47).

**Plaintiffs' Response:  <u>Undisputed</u>** that Defendant Trump posted a link to the speech to

his @realDonaldTrump Twitter account.  **<u>Immaterial.</u>**  This fact is immaterial to the

officiality of Defendant Trump's conduct.  After the conclusion of the speech,

@TeamTrump also shared clips of the speech.  Ex. 151; Ex. 152. ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████. Ex. 111, Nos. 87 (███████████████████████



## PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS

I.      Relevant Background on 2020 Election ........................................................126

II.     Defendant Trump's Use of @realDonaldTrump ...........................................129

III.    Before the 2020 Election, Defendant Trump Publicly Alleged that the 2020
        Election Would be Fraudulent ......................................................................134

IV.     After the 2020 Election, Defendant Trump Publicly Alleged That Election Fraud
        Changed the Outcome of the 2020 Election ..................................................136

V.      Defendant Trump Enlisted Fraudulent Electors to Overturn the 2020 Election.............141

VI.     Defendant Trump Communicated with State Officials to Overturn the 2020
        Election ........................................................................................................153

        A.      Pennsylvania .....................................................................................153

        B.      Michigan ...........................................................................................154

        C.      Georgia..............................................................................................157

        D.      Government Officials Disputed Trump's Allegations of Election Fraud...........160

VII.    Defendant Trump Filed Various Lawsuits Challenging the Outcome of the 2020
        Election ........................................................................................................161

VIII.   The Funding, Organizing, and Promotion of the January 6 Rally ..................167

        A.      Key Individuals and Entities Involved in Funding, Organizing, and
                Promotion of the Rally.....................................................................169

        B.      Permitting for the Rally ....................................................................184

        C.      Donations and Funding for the Rally................................................191

        D.      Promotion of the Rally......................................................................198

        E.      Logistics for the Rally......................................................................205

        F.      Speakers for the Rally.......................................................................210

        G.      White House Processes and Procedures as Related Political Events.................214

        H.      The White House and the U.S. Government's Role in the Rally .........221

IX.     Trump's Involvement in the Rally..................................................................227

X.    Events on January 6, 2021, After the Rally Speech, Including Defendant Trump's
      Actions Following His Speech...........................................................................................237

### I.    Relevant Background on 2020 Election

1. On May 31, 2019, the @realDonaldTrump Twitter account posted a tweet stating: "I will be

   announcing my Second Term Presidential Run with First Lady Melania, Vice President Mike

   Pence, and Second Lady Karen Pence on June 18th in Orlando, Florida, at the 20,000 seat

   Amway Center.  Join us for this Historic Rally! Tickets:

   https://www.donaldjtrump.com/rallies-jun-orla-flor-2019."

   - RJN at ¶ 47; Ex. 153

     (https://x.com/realDonaldTrump/status/1134559092545134593?ref_src=twsrc%5

     Etfw).

2. Defendant Trump's speech accepting the Republican presidential nomination at the 2020

   Republican National Convention took place on the South Lawn of the White House.

   - RJN at ¶ 48.

3. The 2020 presidential election was held on November 3, 2020.

   - RJN at ¶ 1

     (https://web.archive.org/web/20201229030324/https://www.archives.gov/electora

     l-college/2020).

4. On December 14, 2020, the electors of each state cast their votes for President and Vice

   President.

   - RJN at ¶ 2

     (https://web.archive.org/web/20201229030324/https://www.archives.gov/electora

     l-college/2020).

5. President Joseph R. Biden received 306 votes from the electoral college.

- RJN at ¶ 3

  (https://web.archive.org/web/20201229030324/https://www.archives.gov/electora l-college/2020).

6. Defendant Trump received 232 votes from the electoral college.

- RJN at ¶ 4

  (https://web.archive.org/web/20201229030324/https://www.archives.gov/electora l-college/2020).

7. Donald J. Trump for President, Inc., Committee No. C00580100, was Trump's presidential campaign committee for the 2020 presidential election.

- *Smith et al v. Donald J. Trump et al*, No. 1:21-cv-02265-APM, Dkt. 187 (Amended Answer) ¶ 20 *responding to Smith et al v. Donald J. Trump et al*, No. 1:21-cv-02265-APM, Dkt. 89 (Am. Compl.) ¶ 20;

- *See, e.g.*, Ex. 66 at cells 2B, 2C (identifying DONALD J. TRUMP FOR PRESIDENT, INC. as Committee No. C00580100).

8. Committee No. C00580100 officially transitioned from the name "Donald J. Trump for President, Inc.," to the name "Make America Great Again PAC" on February 27, 2021.

- *Smith et al v. Donald J. Trump et al*, No. 1:21-cv-02265-APM, Dkt. 187 ¶ 21 *responding to Smith et al v. Donald J. Trump et al*, No. 1:21-cv-02265-APM, Dkt. 89 (Am. Compl.) ¶ 21.

9. "Make America Great Again PAC" is registered and operates as the same entity as Donald J. Trump for President, Inc. (collectively with Donald J. Trump for President, Inc., "Trump Campaign").[3]

- *Smith et al v. Donald J. Trump et al*, No. 1:21-cv-02265-APM, Dkt. 187 ¶ 21 *responding to Smith et al v. Donald J. Trump et al*, No. 1:21-cv-02265-APM, Dkt. 89 (Am. Compl.) ¶ 21;

- *E.g. Compare* Ex. 66 at cells 2B, 2C (identifying DONALD J. TRUMP FOR PRESIDENT, INC. as Committee No. C00580100), *with id.* at cells 8630B, 8630C (identifying MAKE AMERICA GREAT AGAIN PAC as Committee No. C00580100).

10. The Trump Campaign's email domain was @donaldtrump.com.

- *E.g.*, Ex. 98 (Dec. 30, 2020 email with the Subject "Jan. 6" from M. Hahn to J. Karwacki and R. McEnany, copying S. Dollman and stating "thanks again for agreeing to help on the 6th.  As discussed you'll need to invoice for your pay on this day" with instruction to "send the invoice to ap@donaldtrump.com and copy Dollman");

- *E.g.*, Ex. 103 at SCAVINO_SMITH_0000042 (███████████████

████████████████████████████████████████

███████████████████████████

---

[3]All references to the "Trump Campaign" in Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, Plaintiffs' Counterstatement to Defendant's Statement of Undisputed Fact and Additional Statements of Undisputed Facts, and their Request for Judicial Notice, refer to Committee No. C00580100.

- *E.g.*, Ex. 68 at SCAVINO_SMITH_000026–29 (█████████████

  ██████████████████████████████████

  ████████████████████)

- *E.g,*, Ex. 69 at SCAVINO_SMITH_000030–32 (████████████

  ████████████████████████████████████

  ████████████████████)

- *E.g.*, Ex. 75 (Dec. 31, 2020 Email from M. Powers to Charter,

  charter@donaldtrump.com, using her @donaldtrump.com email address

  regarding a charter flight for R. Guiliani).

**II.     Defendant Trump's Use of @realDonaldTrump**

11. ██████████████████████████████████████████████

    ████████████████████████.

- Ex. 56, No. 1.

12. Defendant Trump asserted in various court filings for litigation occurring from July 2017 to

    through at least April 2021, that the Twitter account @realDonaldTrump was his personal

    account.

- *E.g.*, RJN at ¶ 20 ; *see also* Ex. 155 (Complaint, *Knight First. Amend. Inst. at*

  *Columbia Univ. v. Donald J. Trump*, Case No. 1:17-cv-05205-NRB (July 11,

  2017), Dkt. 1 (initiating lawsuit against Defendant Trump on July 11, 2017)); *see*

  *also* Ex. 156 (*Biden v. Knight First. Amend. Inst. at Columbia Univ.*, 141 S. Ct.

  1220, 1220 (2021)) (granting petition for a writ of certiorari, vacating judgment,

  and remanding to Second Circuit to dismiss as moot on Apr. 5, 2021);

- *E.g.*, RJN at ¶ 22; *see also* Ex. 51 (Reply Br. for Appellants at 15, *Knight First Amend. Inst. at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26, 2018) ("Since its inception in 2009, Donald Trump has used his personal account [@realDonaldTrump] to convey his views to his Twitter followers and the world at large.").

- *E.g.*, RJN at ¶ 23; *see also* Ex. 157 (Reply Br. for the Petitioners at 2, 10, *Trump v. Knight First Amend. Inst. at Columbia Univ.*, No. 20-197 (U.S. Oct. 6, 2020)) (arguing that "the President's blocking of the individual respondents' accounts from his personal Twitter account cannot amount to state action that is attributed to the United States government");

13. In a brief filed in the U.S. Court of Appeals for the Second Circuit, Defendant Trump asserted that "[h]is use of the [@realDonaldTrump] account to make statements about official matters does not alter the fundamentally private, rather than governmental, nature of that authority."

- RJN at ¶ 24; *see also* Ex. 51 (Reply Br. for Appellants at 1, *Knight First Amend. Inst. at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26, 2018).

14. Defendant Trump and his administration stated in a Supreme Court filing that "[a]lthough President Trump is currently a public official, the @realDonaldTrump account belongs to him in his personal capacity, not his official one.  He created and began frequent use of that account in 2009, well before taking public office, [and] … he will continue to have control over the @realDonaldTrump account after his term of office has completed."

- RJN at ¶ 25; *see also* Ex. 50 (*Knight* Cert. Pet.) at 13.

15. In the same Supreme Court filing, Defendant Trump and his administration stated: "Before assuming the presidency in January 2017, Mr. Trump used his personal account to tweet about a variety of topics, including popular culture and politics. Since his inauguration, President Trump has continued to use the account for those personal purposes, but he also has used the account to communicate with the public about official actions and policies of his administration."

- RJN at ¶ 26; *see also* Ex. 50 (*Knight* Cert. Pet.) at 4–5.

16. In the same Supreme Court filing, Defendant Trump and his administration stated that the @White House and @POTUS accounts were "government Twitter accounts" operated by "[t]he White House and White House staff" under Trump's control only "by virtue of his office."

- RJN at ¶ 27; *see also* Ex. 50 (*Knight* Cert. Pet.) at 5, 13 (contrasting the "@realDonaldTrump account" "to the @WhiteHouse and @POTUS accounts, over which he may exercise control only by virtue of his office").

17. While Defendant Trump was President, his administration stated in a public filing that the Twitter account @realDonaldTrump "belongs to and is controlled by Donald Trump in his personal capacity," that he created and began use of the account in 2009 (before he took public office) and that he would "continue to have control over the account after he leaves office."

- RJN at ¶ 28; *see also* Ex. 51 (Reply Br. for Appellants at 5–7, *Knight First Amend. Inst. at Columbia Univ. v. Donald J. Trump*, No. 18-1691 (2d Cir. Oct. 26, 2018) (Trump "created the account before he assumed the Presidency, and he will retain control over it after he leaves public office").

18. The accounts @POTUS and @WhiteHouse are "institutional accounts" that "transfer to the
incoming administration."

- RJN at ¶ 9; *see also* Ex. 158 at PLAINTIFFS_00070029–30

  (https://www.trumplibrary.gov/research/archived-social-media).

19. The transfer of the accounts @POTUS and @WhiteHouse is in line with the "conventional
practice" to transfer "institutional accounts on social media . . . to the incoming
administration," according to the National Archives.

- RJN at ¶ 11; *see also* Ex. 158 at PLAINTIFFS_00070029–30

  (https://www.trumplibrary.gov/research/archived-social-media).

20. . *See, e.g.*, sample of evidence cited in
Table.

| No. | Exhibit | The Tweet |
|---|---|---|
| 1 | • Ex. 52 at NARA_PROD_069147. | • |
| 2 | • Ex. 53 at NARA_PROD_095765. | • |
| 3 | • Ex. 54 at NARA_PROD_095498. | • |

| No. | Exhibit | The Tweet |
|-----|---------|-----------|
|  |  | █████████████████████████ ██████████████████ |
| 4 | • Ex. 54 at NARA_PROD_095499. | • ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ██████████████████████ |
| 5 | • Ex. 54 at NARA_PROD_095500. | • ███████████████████████ ██████████████████████ ███████████████████████ ██████████████████████ ███████████████████████ ██████ |
| 6 | • Ex. 54 at NARA_PROD_095503. | • ████████████████████ ████████████████████████ ████████ |
| 7 | • Ex. 54 at NARA_PROD_095504. | • ████████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ ████████████████████████ ████████████████████ ████████████████ ██████████ |
| 8 | • Ex. 54 at NARA_PROD_095509. | • ████████████████████████ ██████████████████████ ████████████████████████ ████████████████████████ █████████████████████ |
| 9 | • Ex. 54 at NARA_PROD_095510. | • ███████████████████ ████████████████████ ████████████████████████ |

| No. | Exhibit | The Tweet |
|-----|---------|-----------|
|  |  | ████████████████████████<br>████████████████████ |
| 10 | ● Ex. 55 at NARA_PROD_095842. | ● ████████████████████<br>████████████████████<br>████████████████████████<br>██████ |
| 11 | ● Ex. 55 at NARA_PROD_095845. | ● ████████████████████████<br>████████████████ |
| 12 | ● Ex. 55 at NARA_PROD_095845. | ● ██████████████████<br>██████████████ |
| 13 | ● Ex. 55 at NARA_PROD_095848. | ● ████████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████████<br>████████████████████████<br>██████ |
| 14 | ● Ex. 55 at NARA_PROD_095849. | ● ████████████████████<br>████████████ |
| 15 | ● Ex. 55 at NARA_PROD_095849. | ● ██████████████████<br>████████████████████████<br>██████████████. |
| 16 | ● Ex. 55 at NARA_PROD_095851. | ● ████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████████████<br>██████████████ |

### III. Before the 2020 Election, Defendant Trump Publicly Alleged that the 2020 Election Would be Fraudulent

21. 

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

- Ex. 56, No. 4.

22. ██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

- Ex. 56, No. 5.

23. On July 30, 2020, the Twitter account @realDonaldTrump posted: "With Universal Mail-In Voting (not Absentee Voting, which is good), 2020 will be the most INACCURATE & FRAUDULENT Election in history. It will be a great embarrassment to the USA. Delay the Election until people can properly, securely and safely vote???"

- Ex. 159 (https://x.com/realDonaldTrump/status/1288818160389558273).

24. On August 17, 2020, at a Trump Campaign event in Oshkosh, Wisconsin, Defendant Trump said: "the only way we're going to lose this election is if the election is rigged."

- Ex. 160 at PLAINTIFFS_00069918

  (https://thehill.com/homenews/administration/512424-trump-the-only-way-we-are-going-to-lose-this-election-is-if-the/).

25. In a speech at the Republican National Convention on August 24, 2020, Defendant Trump said that "[t]he only way they can take this election away from us is if this is a rigged election."

- Ex. 161 at PLAINTIFFS_00012709

  (https://www.rev.com/blog/transcripts/donald-trump-2020-rnc-speech-transcript-august-24).

## IV.    After the 2020 Election, Defendant Trump Publicly Alleged That Election Fraud Changed the Outcome of the 2020 Election

26. At about 2:30 AM Eastern Time (7:32 AM UTC) on November 4, 2020, the day after the election, Defendant Trump delivered televised remarks in which he said, "[T]his is a fraud on the American public.  [T]his is an embarrassment to our country.  [W]e were getting ready to win this election.  [F]rankly, we did win this election."

- Ex. 162.



- Ex. 56, No. 7.

- Ex. 163, No. 236.

- Ex. 163, No. 236.

████████████████████████████████████████████

███████████████████████

- Ex. 163, No. 238.

31. On November 14, 2020, the Twitter account @realDonaldTrump posted the following:  "I look forward to Mayor Giuliani spearheading the legal effort to defend OUR RIGHT to FREE and FAIR ELECTIONS! Rudy Giuliani, Joseph diGenova, Victoria Toensing, Sidney Powell, and Jenna Ellis, a truly great team, added to our other wonderful lawyers and representatives!"

- Ex. 164 (https://x.com/realDonaldTrump/status/1327811527123103746).

32. On November 29, 2020, the Twitter account @realDonaldTrump posted the following:  "@60Minutes never asked us for a comment about their ridiculous, one sided story on election security, which is an international joke.  Our 2020 Election, from poorly rated Dominion to a Country FLOODED with unaccounted for Mail-In ballots, was probably our least secure EVER!"

- Ex. 165 (https://x.com/realDonaldTrump/status/1333215466022727686).

33. On November 29, 2020, the Twitter account @realDonaldTrump posted the following:  "We have some big things happening in our various litigations on the Election Hoax.  Everybody knows it was Rigged.  They know Biden didn't get more votes from the Black community than Obama & certainly didn't get 80,000,000 votes.  Look what happened in Detroit, Philadelphia, plus!"

- Ex. 166 (https://x.com/realDonaldTrump/status/1333207778643628032).

34. ████████████████████████████████████████

████████████████████████████████████████████,

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████

- Ex. 56, No. 12.

35. ████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ ███

- Ex. 163, No. 246.

36. On December 13, 2020, the Twitter account @realDonaldTrump posted the following: "Swing States that have found massive VOTER FRAUD, which is all of them, CANNOT LEGALLY CERTIFY these votes as complete & correct without committing a severely punishable crime.  Everybody knows that dead people, below age people, illegal immigrants, fake signatures, prisoners, . . . and many others voted illegally.  Also, machine 'glitches' (another word for FRAUD), ballot harvesting, non-resident voters, fake ballots, 'stuffing the ballot box', votes for pay, roughed up Republican Poll Watchers, and sometimes even more votes than people voting, took . . . place in Detroit, Philadelphia, Milwaukee, Atlanta, Pittsburgh, and elsewhere.  In all Swing State cases, there are far more votes than are necessary to win the State, and the Election itself.  Therefore, VOTES CANNOT BE CERTIFIED.  THIS ELECTION IS UNDER PROTEST!"

- Ex. 5 at NARA_PROD_095400–401.

37. ████████████████████████████████████████

████████████████████████████████████████

███████████████████

- Ex. 163, No. 246.

38. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

- Ex. 56, No. 15.

39. On December 21, 2020, the Twitter account @realDonaldTrump posted the following:

"Republicans in Wisconsin should take these 3 strong decisions to their State Legislators and overturn this ridiculous State Election.  We won in a LANDSLIDE!"

- Ex. 167 (https://x.com/realDonaldTrump/status/1341138409092509696).

40. ████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████

- Ex. 56, No. 16.

41. Defendant Trump spoke at a political rally on January 4, 2021 in Dalton, GA.

- Ex. 53 at NARA_PROD_095765 (████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ (emphasis added)).

- Ex. 46 (Jan. 3, 2021 email distributing "draft POTUS remarks for [Jan. 4, 2021] event in GA. . . . This speech will be delivered at a political event").

42. At that political rally in Dalton, Georgia on January 4, 2021, Defendant Trump said, "they're not taking this White House.  We're going to fight like hell."  "If you don't fight to save your country with everything you have, you're not going to have a country left."

- Ex. 59 at 4:19–20, 19:23–24.

43. Giuliani was Defendant Trump's private campaign attorney since at least May 2018.

- Ex. 168 at 7:23–8:10.

44. On January 5, 2021, Giuliani tweeted a YouTube video link with the caption, "WATCH THIS BEFORE JANUARY 6TH."

- Ex. 169.

45. On January 5, 2021, the Twitter account @realDonaldTrump posted the following:  "The Vice President has the power to reject fraudulently chosen electors."

- Ex. 170.

46. On January 5, 2021, Defendant Trump issued a public statement from his campaign, stating: "The Vice President and I are in total agreement that the Vice President has the power to act."

- Ex. 171.

47. ████████████████████████████████████████

████████████████████████████████████████



- Ex. 56, No. 26.

48. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

- Ex. 56, No. 27.

49. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮

- Ex. 56, No. 28.

50. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.

- Ex. 111, No. 106.

## V.    Defendant Trump Enlisted Fraudulent Electors to Overturn the 2020 Election

51. On December 14, 2020, members of the Electoral College met in each state to cast their

votes.

- RJN at ¶ 2 (https://www.archives.gov/electoral-college/2020; 3 U.S.C.A. § 7

("[E]lectors of President and Vice President of each State shall meet and give

their votes on the first Monday after the second Wednesday in December")

(amended 2022)).

52. While each candidate running for President "has their own group of electors (known as a slate)" that are "generally chosen by the candidate's political party" within the state, the electors who actually cast their votes as part of the Electoral College—including those who cast their votes on December 14, 2020—are selected by the voters of their respective states in the general election, and are subsequently identified in a Certificate of Ascertainment prepared by the state's Executive.

- RJN at ¶ 5 (*Electoral College*, National Archives, https://www.archives.gov/electoral-college/about) (explaining the Electoral College process, including the selection of electors).

53. When the individuals appointed as a state's electors meet to cast their votes for President and Vice President, their votes are recorded on a Certificate of Vote, which is prepared at the meeting by the electors.

- RJN at ¶ 6 (*Electoral College*, National Archives, https://www.archives.gov/electoral-college/about) (explaining the Electoral College process, including the Certificate of Vote).

54. The Certificate of Vote is sent to Congress, where the votes are counted in a joint session on the 6th of January in the year following the meeting of the electors.

- RJN at ¶ 7 (*Electoral College*, National Archives, https://www.archives.gov/electoral-college/about) (explaining the Electoral College process, including the Certificate of Vote).

55. The Certificate of Vote is also sent to the National Archives and Records Administration, as part of the official records of the Presidential election.

- RJN at ¶ 8 (*Electoral College*, National Archives,

  https://www.archives.gov/electoral-college/about) (explaining the Electoral

  College process, including the Certificate of Vote).

56. James Troupis and Kenneth Chesebro were attorneys working for the Trump Campaign.

- Ex. 172 at 12:24–13:8 (K. Chesebro testifying that he did legal work "to benefit

  the Trump Campaign" and that J. Troupis "was hired as the lead attorney for

  Trump in Wisconsin").

57. Between November 18, 2020, and January 6, 2021, Defendant Trump and members of the

Trump Campaign, including attorneys James Troupis and Kenneth Chesebro, worked with

individuals in Wisconsin, Pennsylvania, Georgia, Michigan, Arizona, and Nevada to sign

certificates declaring that they were the qualified or elected members of the Electoral College

following the 2020 presidential election.

- Ex. 173 (Dec. 9, 2020 memorandum from K. Chesebro to J. Troupis analyzing the

  "requirements under federal law, and under the law of the [Wisconsin,

  Pennsylvania, Georgia, Michigan, Arizona, and Nevada], concerning what is

  required for presidential electors to validly cast and transmit their votes");

- Ex. 174 (Dec. 6, 2020 memorandum from K. Chesebro to J. Troupis "advocating"

  that "[a]ll the Trump-Pence electors [must] meet and vote, in all six contested

  States, and send in certificates containing their votes, in compliance with federal

  and state statutes, on December 14");

- Ex. 175 (Tr. of Negotiated Plea in *Georgia v. Chesebro*, No. 23SC188947 (Ga.

  Sup. Ct. Oct. 20, 2023),

  https://www.fultonclerk.org/DocumentCenter/View/4138/141-PLEA-

TRANSCRIPT-01-08-2024) at 15–19, 21–22 (transcript of K. Chesebro's plea hearing in Georgia state court in which he plead guilty for conspiracy to commit filing false documents and agreed that, had the case gone to trial, the state would have shown that, "[b]etween November 18th of 2020 and January 6th of 2021," he and others (including Defendant Trump, R. Giuliani, J. Eastman, and M. Roman) conspired with fraudulent electors to "falsely hold themselves out as the duly elected and qualified electors for the President and Vice President from Georgia following the November 3rd, 2020, presidential election");

- Ex. 176 (H.R. Rep. No. 117-216, at 9 (2021)) (discussing "text messages and emails" received by White House Chief of Staff Mark Meadows "regarding apparent efforts to encourage Republican legislators in certain states to send alternate slates of electors to Congress");

- Ex. 177 (Emergency Pet. to Bypass Court of Appeals with Motion to Accept Opening Brief at 8 n.3, *Trump v. Biden*, No. 2020AP2038 (Wis. Dec. 11, 2020), https://www.justsecurity.org/wp-content/uploads/2022/06/january-6-clearinghouse-judge-emergency-petition-wisconsin.pdf) (emergency petition filed in the Supreme Court of Wisconsin by J. Troupis on behalf of D. Trump noting that "the Trump-Pence Campaign has requested its electors to sign and send to Washington on [Dec. 14, 2020] their votes, to ensure their votes will count on January 6 if there is a later determination that they are the duly appointed electors for Wisconsin");

- Ex. 178 (Dec. 14, 2020 Republican Party of Pennsylvania press release stating that "[a]t the request of the Trump campaign, the Republican presidential electors

met today in Harrisburg to cast a conditional vote for Donald Trump and Mike

Pence for President and Vice President respectively").

58. On December 9, 2020, before the December 14 meeting of electors, Chesebro sent a

memorandum (the "Memorandum") detailing the plan to Troupis.

- *See generally* Ex. 173 (Dec. 9, 2020 memorandum from K. Chesebro to J. Troupis

  analyzing the "requirements under federal law, and under the law of the

  [Wisconsin, Pennsylvania, Georgia, Michigan, Arizona, and Nevada], concerning

  what is required for presidential electors to validly cast and transmit their votes").

59. That Memorandum, or a version of the Memorandum, was then widely circulated to

individuals within the Trump Campaign, including Justin Clark, Jason Miller, and Boris

Epshteyn, and the Republican Party.

- Ex. 179 (Nov. 25, 2020 email from J. Troupis to J. Clark, copying K. Chesebro,

  attaching a "memo we discussed about potentially moving the drop dead date

  back by several weeks in naming electors" and directing questions to himself and

  K. Chesebro);

- Ex. 180 (Dec. 6, 2020 email from M. Meadows to J. Miller attaching "Chesebro

  memo on real deadline[]");

- Ex. 181 at PLAINTIFFS_000069898–99 (Dec. 7, 2020 email from J. Troupis to

  B. Epshteyn attaching "Chesebro memo on real deadline[]");

- Ex. 182 at PLAINTIFFS_00072949 (Dec. 6, 2020 text from K. Chesebro to J.

  Troupis stating "Jim, I am about to send you a 6-page memo on having all Trump

  electors in all 6 contested states vote Dec 14.  I think Justin Clark should have it

  ASAP.");

- Ex. 183 (Dec. 10, 2020 email from K. Chesebro to G. Safsten attaching memoranda "[a]s further background on the rationale for all Trump-Pence electors voting on Dec. 14, even in States in which they are not currently certified as the winners");

- Ex. 184 (Dec. 10, 2020 email from K. Chesebro to Georgia official requesting to "coordinate Dec. 14 voting by Georgia electors," noting that "[s]everal people with the Trump campaign, including Justin Clark and Nick Trainer, supplied your contact info and asked me to help coordinate with the other 5 contested States . . .");

- Ex. 185 (Dec. 10, 2020 email from K. Chesebro to Pennsylvania officials containing information on the certificates and logistics for submitting electoral votes).

60. The Memorandum proposed a course of action for Trump-Pence slates of electors to take on December 14, 2020, the day when members of the Electoral College would meet in each state to cast their votes.

- Ex. 173 (Dec. 9, 2020 memorandum from K. Chesebro to J. Troupis stating that "even though none of the Trump-Pence electors are <u>currently</u> certified as having been elected by the voters of their State, most of the electors . . . will be able to take the essential steps needed to validly case and transmit their votes, so that the votes might be eligible to be counted if later recognized . . . as the valid ones that actually count in the presidential election").

61. According to the Memorandum, Chesebro's plan was that, in each of the six states where Defendant Trump alleged election fraud, a slate of electors not named in the state's

146

Certificate of Ascertainment would cast and transmit their votes, without the approval of the governor or any other state official.

- Ex. 173 (Dec. 9, 2020 memorandum from K. Chesebro to J. Troupis explaining that Trump-Pence electors could cast and transmit their votes "without any involvement by the governor or any other state official").

62. The Memorandum described a plan where these uncertified electors would gather at a predetermined location, vote for Defendant Trump for President and Pence for Vice President, prepare "certificates" indicating their votes, and mail the certificates to the President of the Senate, the state's Secretary of State, the National Archives, and the federal district court where the electors met.

- Ex. 173 (Dec. 9, 2020 memorandum from K. Chesebro to J. Troupis explaining plan for Trump-Pence electors to cast and transmit their votes).

63. The plan contemplated then-Vice President Pence "open[ing]" the uncertified electors' votes on January 6, 2021.

- Ex. 181 at PLAINTIFFS_000069898 (Dec. 7, 2020 email from J. Troupis to B. Epshteyn attaching two memoranda "on appointing a second slate of electors in Wisconsin," explaining, "[t]here is no need for the legislators to act," "[t]he second slate just shows up at noon on Monday and votes and then transmits the results," and "[i]t is up to Pence on Jan 6 to open them").

64. The plan detailed in the Memorandum explained the uncertified electors' votes "might be eligible to be counted later if recognized (by a court, the state legislature, or Congress) as the valid ones that actually count in the presidential election."

- Ex. 173 at PLAINTIFFS_00003257 (Dec. 9, 2020 memorandum from K. Chesebro to J. Troupis explaining plan for Trump-Pence electors to cast and transmit their votes).

65. Troupis and Chesebro, alongside others from the Trump Campaign, reached out to Republican party leaders in the contested states regarding the proposed alternate electors plan, "coordinate[d]" the "logistics" of organizing the alternate electors in all six states, drafted and circulated "Certificates" for the alternate electors to use, and provided detailed instructions on how the alternate electors should meet, vote, and deliver their votes.

- Ex. 183 (Dec. 11, 2020 email from K. Chesebro to G. Safsten attaching a "cover memo that would be sent with the Certificates" and noting that the "key" logistics was "for the electors to assemble at the appointed time, and each [to] personally sign . . .");

- Ex. 184 (Dec. 10, 2020 email from K. Chesebro to D. Shafer transmitting K. Chesebro's memoranda "sketching the upside of this strategy" and "the practical logistics" on "coordinat[ing] Dec. 14 voting by Georgia electors");

- Ex. 185 (Dec. 10, 2020 email from K. Chesebro to Pennsylvania officials containing information on the certificates and logistics for submitting electoral votes);

- Ex. 181 (Dec. 9, 2020 Email from Kenneth Chesebro to Joseph Olson) (December 2020 email chain between J. Troupis, K. Chesebro, and others discussing the logistics required to effectuate the Trump-Pence electors' votes, including "draft[ing] the ballot for [the electors] to vote with, the mailing instructions,

words for the meeting, timing of meeting, where the meeting must take place
etc.");

- Ex. 186 (Dec. 10, 2020 email from K. Chesebro to B. Epshteyn, J. Clark, and
  copying J. Troupis, describing "what needs to be done in each of the 6 contested
  States in order to perfect the electoral votes, so Trump and Pence have at least a
  theoretical possibility of flipping the States in Congress beginning January 6").

66. On December 11, 2020, Campaign employee Joshua Findlay emailed Chesebro, copying
other Campaign employees, stating: "It is my understanding from Rudy [Giuliani's] team
that you are now running point on this. I am happy to hand off what has been done so far.
Below is the elector update for the litigation states. I have also attached drafts of voting
instructions, ballots, and Certificates of Vote for each state."

- Ex. 112 at PLAINTIFFS_00073024–25 (Dec. 11, 2020 email from J. Findlay to
  K. Chesebro, and J. Clark, and copying M. Morgan, J. Miller, N. Trainer, and B.
  Epshteyn, concerning the status of the Trump-Pence elector plan).

67. In the days leading up to December 14, 2020, Defendant Trump and John Charles Eastman,
another attorney working for the Trump Campaign, asked Ronna Romney McDaniel,
Chairperson of the Republican National Committee, to assist in recruiting people to serve as
alternate electors, noting the "importance of the RNC helping the campaign
gather . . . contingent electors."

- Ex. 187 at 6:1–5, 7:12–9:13 (R. McDaniel stating that D. Trump and J. Eastman
  discussed with her "the importance of the RNC helping the campaign gather . . .
  contingent electors in case any of the legal challenges that were ongoing changed
  the result of any of the States").

68. McDaniel stated that "the campaign did take the lead" in the efforts to ensure that these uncertified electors met on December 14, 2020, cast votes for Defendant Trump and Vice President Pence, and the RNC was "just . . . helping [the campaign] reach out and assemble them," i.e., the electors.

- Ex. 187 at 12:17–13:1 (Q: "And when you say, 'helped make sure the electors gather,' what exactly was the RNC's role in that, given that it sounds like the campaign sort of had the lead for that?" A: "I think more just helping them reach out and assemble them, but my understanding is the campaign did take the lead and we just were helping them in that role.").

69. For example, on December 10, 2020, Chesebro emailed Jim DeGraffenreid, Nevada RNC Committeeman, stating: "Mayor Giuliani and others with the Trump-Pence campaign (including Justin Clark and Nick Trainer) asked me to reach out to you and the other Nevada electors to run point on the plan to have all Trump-Pence electors in all six contested States meet and transmit their votes to Congress on Monday, Dec. 14," and later sharing his Memorandum.

- Ex. 188 (Dec. 10, 2020 email from K. Chesebro to J. DeGraffenreid discussing plan for Nevada electors, later copying J. Binnall (current attorney for Defendant Trump and the Trump Campaign in this matter) on Dec. 11, 2020).

70. As another example, on January 4, 2021, Matthew Morgan used his campaign affiliated email (@donaldtrump.com) to email Michael Roman at his respective campaign affiliated email (@donaldtrump.com), stating: "Ken says that you [Roman] are in charge of the delivery of Elector slates. The Campaign held a surrogate briefing call earlier today where

there was discussion of the Trump Elector slates.  Have you been able to confirm that all of the slates have been received by Congress for consideration?"

- Ex. 112 at PLAINTIFFS_00073023 (Dec. 2020 and Jan. 2021 email chain between M. Morgan, M. Roman, K. Chesebro, and others with the subject line "Electors," discussing the transmission of Trump-Pence elector slates to Congress).

71. Roman confirmed Morgan's understanding that he was responsible for the delivery of the Elector states.

- Ex. 112 at PLAINTIFFS_00073023 (Jan. 4, 2021 email from M. Roman replying to M. Morgan stating that "[a]ll [Elector slates] are confirmed except Michigan").

72. The Trump Campaign pursued having individuals in certain states hold themselves out as qualified and elected electors even though Donald Trump had been told by the White House Counsel's Office that the plan was not legal.

- Ex. 189 at 56:8–64:5 (C. Hutchinson stating: Q:  "Do you know if anybody from the White House Counsel's Office ever provided an opinion about the alternate electors to Mr. Meadows or Mr. Trump?" A:  "Yes, they did."  (*id.* at 57:7–11); Q:  "[W]as that opinion provided to Mr. Meadows?"  A:  "Yes, sir."  Q:  "Was it also provided to Mr. Trump?"  A:  "Yes, either by White House Counsel's Office or Mr. Meadows delivering to Mr. Trump as a surrogate for White House Counsel's Office." (*id.* at 58:21–59:3); Q:  "At any of these meetings with individuals from outside the White House or the executive branch, did the White House Counsel's Office express an opinion as to whether the plan to have electors for President Trump meet and cast electoral college votes in States that President

Trump had lost was legal?"  A:  "Yes . . . So there were some meetings where they had expressed something along the lines of 'Let's continue to look at this, make sure you're still coordinating with us, communicating with us' . . . to meetings where their definitive guidance to external interests was more along the lines of, 'That's not legal, we're not putting ourselves in that line of fire . . .'" (*id.* at 61:17–62:5);  Q:  "And so, to be clear, did you hear the White House Counsel's Office say that this plan to have alternate electors meet and cast votes for Donald Trump in States that he had lost was not legally sound?" A:  "Yes, sir."  (*id.* at 64:2–5)).

73. Former Attorney General William Barr testified that in his "view," "December 14th was the day that the states certified their votes and sent them to Congress," and that was "the end of the matter."

- Ex. 118 at 62:5–7 (W. Barr testifying: ". . . December 14th was the day that the State[s] certified their votes, and sent them to Congress.  And my view, that was the end of the matter.  I didn't see – you know, I thought that this would lead inexorably to a new administration.  I was not aware at that time of any theory, you know, why this could be reversed.").

74. White House Deputy Press Secretary Judd Deere testified he informed Defendant Trump that the "means for him to pursue litigation" had likely ended after the "Electoral College had met."

- Ex. 190 at 10:15–11:17, 25:13–16 (J. Deere stating: "I told him that my personal viewpoint was that the electoral college had met, which is the system that our

country is – is set under to elect a President and Vice President, and I believed at

that point that the means for him to pursue litigation was probably closed.")

**VI.    Defendant Trump Communicated with State Officials to Overturn the 2020 Election**

    A.   <u>Pennsylvania</u>

75. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

- Ex. 56, No. 41;

76. There is no evidence in the record demonstrating that Trump raised such issues to the

Pennsylvania State Senate for other elections in Pennsylvania aside from the 2020

presidential election, in which he was a candidate.

77. Congress determined that in December 2020 Defendant Trump contacted Pennsylvania State

Senate Majority Leader Jake Corman and Pennsylvania Speaker of the House of

Representatives Brian Cutler about purported fraudulent voting in Pennsylvania.

- Ex. 115 at 284–86 (Jan. 6 Select Committee report finding "Corman says he

received a call from an unknown number with a Washington, DC area code . . .

Corman called back and spoke to President Trump, who insisted that he had won

the election in Pennsylvania . . .").

78. Defendant Trump asked Cutler, "if we wanted to do something, what were the options?"

- Ex. 191 at 41:23–44:24 (B. Cutler stating: "[H]e was asking questions about, well

if – you know, if we wanted to do something, what were the options.").

79. In response, Cutler explained that Defendant Trump "could file a legal challenge contesting

the election" and asked Defendant Trump "why his team had never requested a statewide

recount."

- Ex. 115 at 285.

80. There is no evidence in the record demonstrating that Defendant Trump made similar

outreach to elected officials for other elections in Pennsylvania aside from the 2020

presidential election, in which he was a candidate.

B.    Michigan

81. In November 2020, election officials in Wayne County, Michigan unanimously certified the

election results for President Biden.

- RJN at ¶ 3 (*2020 Electoral College Results*, Nat'l Archives,

https://www.archives.gov/electoral-college/2020) (describing Electoral College

results of 2020 election);

- RJN at ¶ 12 (On November 17, 2020, election officials in Wayne County,

Michigan unanimously certified the election results for President Biden.  Minutes

of November 17, 2020 Meeting, Wayne County Board of Canvassers,

https://www.waynecounty.com/documents/clerk/111720_wcbc_minutes.pdf, at 5

("Vice-Chair Kinloch, duly supported by Member Wilson moved for certification

of the November 3, 2020 General Election . . . The motion was adopted

unanimously by a voice vote.")).

82. The January 6 Select Committee found that after Michigan certified the 2020 presidential

election results, Defendant Trump called the two Republican members of Michigan's Wayne

County Board of Canvassers, the body that certifies and reports the county's election results to states.

- Ex. 115 at 274 (Jan. 6 SelectCommittee Report finding that the "two Republican members [of the Wayne County Board of Canvassers], Board Chair Monica Palmer and Board Member William Hartmann, first voted to block the certification of the election. After a brief break, Palmer and Hartmann returned, changed their votes, and certified the election results. Just over twenty minutes later, Palmer and Hartmann received a call from President Trump and RNC Chair Ronna McDaniel[.]").

83. Following that phone call, both Republican board members of Michigan's Wayne County Board of Canvassers issued signed affidavits stating their position that the election results should not be certified and attempting to "rescind" their votes in support of certification.

- Ex. 115 at 274 (Jan. 6 SelectCommittee report finding that "[j]ust over twenty minutes [after the election results were certified], Palmer and Hartmann received a call from President Trump and RNC Chair Ronna McDaniel . . . [b]y the next evening, . . . Palmer and Hartmann had each issued signed affidavits reassuming their earlier position that Wayne County's results should not be certified.").

84. On or around November 18, 2020, Defendant Trump also contacted Michigan Senate Majority Leader Mike Shirkey and Speaker of the Michigan House of Representatives Lee Chatfield, and asked them to attend a November 20, 2020, meeting at the White House to discuss alleged election fraud in Michigan.

- Ex. 192 at 9:15–10:4, 49:4–8 (M. Michael, executive assistant to the President, "remember[ed] the President communicating with – I believe his name was Lee Chatfield and his associate, Mike Shirkey I believe his name was.");

- Ex. 193 at 5:8–21, 8:10–17:12 (M. Shirkey stating that Defendant Trump "invited [Lee Chatfield] and [Mike Shirkey] to Washington, to the Oval Office," and "[Chatfield and Shirkey] anticipated that the conversation [at the White House] would likely get at what we are doing in Michigan to investigate some of the allegations of fraud.").

85. During the meeting at the White House, Defendant Trump likewise told Shirkey and Chatfield to "have some backbone and do the right thing," which they understood to mean "overturn[ing] the election by naming electors for President Trump."

- Ex. 115 at 2 (Jan. 6 SelectCommittee Report finding that D. Trump made the above statements).

86. On January 3, 2021, the Trump Campaign's official Twitter account, @TeamTrump, tweeted: "Contact Speaker Lee Chatfield & Senate Majority Leader Mike Shirkey" to "[c]orrect false statements" and "[d]emand vote on decertification."

- Ex. 194 at PLAINTIFFS_00069949.

- Ex. 195 (T. Murtaugh referring to @TeamTrump as "our main campaign account").

- *See* Ex. 163, No. 221 (█████████████████████████ ████████████████████████

- *See* Ex. 196, No. 2 at 3–4 (rejecting only the @MAGAActionPac account as an official Trump Campaign social media account).

87. There is no evidence in the record demonstrating that Defendant Trump made similar requests of elected officials for other elections in Michigan aside from the 2020 presidential election, in which he was a candidate.

    C.    <u>Georgia</u>

88. 

- Ex. 56, No. 42

89. There is no evidence in the record demonstrating that Defendant Trump made similar requests of the Georgia Governor for other elections in Georgia aside from the 2020 presidential election.

90. 

- Ex. 163, No. 244.

91. On January 2, 2021, Defendant Trump, Mark Meadows, and attorneys for the Trump Campaign, Cleta Mitchell, Kurt Hilbert, and Alex Kaufman, called Georgia Secretary of State Brad Raffensperger.

- Ex. 56, No. 43 (██████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████);

- *See generally* Ex. 197 (transcription of conversation between B. Raffensperger, D. Trump on Jan. 2, 2021 indicating that M. Meadows, C. Mitchell, K. Hilbert, and A. Kaufman were on the call);

- Ex. 198 at 27:5–30:11, 135:13–16 (C. Mitchell, lawyer for D. Trump, explaining that her "job was to look at what was going on – what had gone on in Georgia, what was going on in Georgia, and to make recommendations and assemble a team to identify if there were problems in the election. And we did. And I was more or less the point person for that all together," and that she participated in the "January 22, [sic] 2021 phone call between President Trump, Georgia Secretary of State Brad Raffensperger and others").

92. Defendant Trump told Raffensperger that if Raffensperger "check[ed] the signatures—a real check of the signatures going back in Fulton County you'll find at least a couple of hundred thousand of forged signatures of people who have been forged."



- Ex. 56, No. 43 (██████████████████████████████

- Ex. 197 at PLAINTIFFS_00012804 (transcript containing the above statement).

93. Defendant Trump also told Raffensperger: "And Brad. We just want the truth. It's simple. And everyone's going to look very good if the truth comes out. It's OK. It takes a little

while but let the truth come out.  And the real truth is I won by 400,000 votes.  At least.  That's the real truth.  But we don't need 400,000.  We need less than 2,000 votes."

- Ex. 56, No. 43 (

- Ex. 197 at PLAINTIFFS_00012820 (transcript containing the above statement).

94. Defendant Trump also told Raffensperger:  "So what are we going to do here folks?  I only need 11,000 votes.  Fellas, I need 11,000 votes.  Give me a break.  You know, we have that in spades already."

- Ex. 56, No. 43 (███████████████████████████████████████████████████████████████████████████);

- Ex. 197 at PLAINTIFFS_00012816 (transcript containing the above statement).

95. Defendant Trump told Mitchell:  "[A]ll we have to do Cleta is find 11,000-plus votes."

- Ex. 56, No. 43 (███████████████████████████████████████████████████████████████

- Ex. 197 at PLAINTIFFS_00012818 (transcript containing the above statement).

96. There is no evidence in the record demonstrating that Defendant Trump made similar outreach to the Georgia Secretary regarding other elections in Georgia aside from 2020 presidential election, in which he was a candidate.

97. There is no evidence in the record demonstrating that Defendant Trump made similar requests of elected officials in states that he won in the 2020 presidential election, as he did in Pennsylvania, Michigan, and Georgia.

        D.    <u>Government Officials Disputed Trump's Allegations of Election Fraud</u>

98. Arizona Governor Katie Hobbs issued a public statement disputing allegations of election fraud.

- Ex. 114 (https://x.com/GovernorHobbs/status/1333612044956753921) (Nov. 30, 2020 K. Hobbs tweet stating: "Like I've said from the beginning: We ran this election according to Arizona law, despite what the conspiracy theorists would tell you. Governor Ducey did his job today. Nobody deserves to be attached for fulfilling their oath of office.").

99. Arizona Speaker of the House Rusty Bowers issued a public statement disputing allegations of election fraud and denouncing Defendant Trump's request to overturn the certified election results.

- Ex. 234 (Ariz. H.R. News Release, "Speaker Bowers Addresses Calls for Legislature to Overturn 2020 Certified Election Results" (Dec. 4, 2020)).

100. Georgia Secretary of State Brad Raffensperger issued a public statement reaffirming the original outcome of the election.

- Ex. 116 at PLAINTIFFS_0007054 (Nov. 19, 2020 Public Statement Issued By Georgia Secretary of State Brad Raffensperger) ("The Risk Limiting Audit reaffirmed the outcome of the presidential race in Georgia as originally reported, with Joe Biden leading President Donald Trump in the state.").

101.    The Michigan Department of State issued a public statement disputing "the false claims made by Republican National Chairwoman Ronna McDaniel" and affirming that "Michigan's elections were conducted fairly, effectively and transparently and are an accurate reflection of the will of Michigan voters."

- Ex. 117 at PLAINTIFFS_0070049 (Nov. 6, 2020 Public Statement Issued by Michigan Department of State).

102.    Attorney General William Barr testified that: "I could find no evidence indicating that the outcome of the election was caused by voting fraud. . . the Department, in fact, when we received specific and credible allegations of fraud, made an effort to look into these to satisfy ourselves that they were without merit. And I repeatedly told the President in no uncertain terms that I did not see evidence of fraud, you know, that would have affected the outcome of the election."

- Ex. 118 at 5:23–6:10 ; *see also* Ex. 235 (adopting Ex. 118 as sworn testimony).

**VII.    Defendant Trump Filed Various Lawsuits Challenging the Outcome of the 2020 Election**

103.    ███████████████████████████████████████████

███████████████████████████████████████

- Ex. 111, No. 82 (█████████████████████████

████████████████████████████████████

██████████████████████

104.    Defendant Trump filed five of these lawsuits, each of which was brought in his personal capacity, as a candidate for reelection.

- RJN at ¶ 35; (Verified Compl. at 1, *Trump v. Kemp*, No. 1:20-cv-05310 (N.D. Ga. Dec. 31, 2020), Dkt. 1 ("Comes now President Donald J. Trump, in his capacity as a candidate for President of the United States . . ."));

- RJN at ¶ 34; (Verified Pet. at 2, *Trump v. Raffensperger*, No. 2020CV343255 (Ga. Sup. Ct. Dec. 4, 2020) ("Come now Donald J. Trump, in his capacity as a Candidate for President . . ."));

- RJN at ¶ 44; (Compl. at 1, *Trump v. Wisc. Elections Comm'n*, No. 2:20-cv-01785 (E.D. Wis. Dec. 2, 2020), Dkt 1 ("The plaintiff, Donald J. Trump, Candidate for President of the United States . . ."));

- RJN at ¶ 43; (Pet. for Original Action at 4, *Trump v. Evers*, No. 2020AP001971 (Wis. Dec. 1, 2020) ("Petitioners, President Donald J. Trump and Vice President Michael R. Pence, as candidates for the offices of President and Vice President of the United States . . ."));

- RJN at ¶ 45; (Notice of Appeal at 3–4, *Trump v. Biden*, 2020CV007092 (Wis. Super. Ct. Dec 3, 2020) (appealing "to the Circuit Court of Milwaukee County in accordance with Wis. Stat. § 9.01(6)(a)," which provides "any candidate, or any elector when for a referendum, aggrieved by the recount may appeal to circuit court"));

- Ex. 56, No. 40 (███████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████)

105.    Four of the five cases Defendant Trump brought were rejected or withdrawn by January 6, 2021.

- RJN at ¶ 35; (*Trump v. Kemp*, 511 F. Supp. 3d 1325 (N.D. Ga. 2021) (holding Trump lacked standing and failed to establish likelihood of success on the merits and denying his motion for emergency, declarative, and injunctive relief));

- RJN at ¶ 44; (*Trump v. Wisc. Elections Comm'n*, 506 F. Supp. 3d 620, 639 (E.D. Wis. 2020) (granting the Wisconsin Elections Commission's motion to dismiss because "Plaintiff's Electors Clause claims fail as a matter of law and fact. The record establishes that Wisconsin's election of its 2020 Presidential Electors was conducted in the very manner established by the Wisconsin Legislature" and noting "[t]his is an extraordinary case. A sitting president who did not prevail in his bid for reelection has asked for federal court help in setting aside the popular vote based on disputed issues of election administration, issues he plainly could have raised before the vote occurred. This Court has allowed plaintiff the chance to make his case and he has lost on the merits. In his reply brief, plaintiff 'asks that the Rule of Law be followed.' It has been." (internal citation omitted));

- RJN at ¶ 43; (Opinion at 1–2, *Trump v. Evers*, No. 2020AP001971 (Wis. Dec. 1, 2020) (denying petition for leave to commence original action for improper venue));

- RJN at ¶ 45; (*Trump v. Biden*, 394 Wis. 2d. 629, 633 (Wis. 2020) (holding Trump's challenge to indefinitely confined voter ballots was "meritless on its face," and other challenges to ballots failed under the doctrine of laches)).

106.    The remaining case Defendant Trump filed was voluntarily dismissed on January 7, 2021.

- RJN at ¶ 34; Ex. 199 (Notice of Voluntary Dismissal, *Trump v. Raffensperger*, 2020CV343255 (Ga. Super. Ct. Jan. 7, 2021) (voluntarily dismissing case).

107.    The Campaign brought other election-related lawsuits in key swing states, including five actions brought in federal court.

- RJN at ¶ 36 (Compl., *Donald J. Trump for President, Inc. v. Benson*, No. 1:20-cv-01083 (W.D. Mich. Nov. 11, 2020), Dkt. 1);

- RJN at ¶ 37 (Compl., *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-cv-01445 (D. Nev. Aug. 4, 2020), Dkt. 1);

- RJN at ¶ 38 (Compl., *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-00966 (W.D. Pa. June 29, 2020), Dkt. 4);

- RJN at ¶ 39 (Compl. and Motion for Emergency Injunction, *Donald J. Trump for President, Inc. v. Philadelphia County Board of Elections*, No. 2:20-cv-05533 (E.D. Pa. Nov. 5, 2020), Dkt. 1);

- RJN at ¶ 40 (Compl., *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-cv-02078 (M.D. Pa. Nov. 9, 2020), Dkt. 1).

108.    Each of the five cases brought by the Campaign in federal court was rejected, dismissed, or denied by January 6, 2021.

- RJN at ¶ 36 (Notice of Voluntary Dismissal, *Donald J. Trump for President, Inc. v. Benson*, No. 1:20-cv-01083 (W.D. Mich. Nov. 19, 2020), Dkt. 33);

- RJN at ¶ 37 (Order, *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-cv-01445 (D. Nev. Sept. 18, 2020), Dkt. 47) (dismissing for lack of standing);

- RJN at ¶ 38 (Opinion, *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-00966 (W.D. Pa. Oct. 10, 2020), Dkt. 575) (ruling in favor of defendants on all

federal claims and declining to exercise supplemental jurisdiction over state-law claims);

- RJN at ¶ 39 (Notice of Voluntary Dismissal, *Donald J. Trump for President, Inc. v. Philadelphia County Board of Elections*, No. 2:20-cv-05533 (E.D. Pa. Jan. 8 2021), Dkt. 12);

- RJN at ¶ 40 (Order and Opinion, *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-cv-02078 (M.D. Pa. Nov. 21, 2020), Dkts. 202, 203 (dismissing for failure to state a claim upon which relief may be granted)).

109.    Defendant Trump also moved to intervene "in his personal capacity as candidate for re-election to the office of President" in a lawsuit brought by Texas before the Supreme Court that sought to challenge the administration of the election.

- Ex. 200 (Mot. of Donald J. Trump, President of the United States, to Intervene in His Personal Capacity as Candidate for Re-Election at 3, *Texas v. Pennsylvania*, No. 22O155 (U.S. Dec. 9, 2020)).

110.    In Defendant Trump's motion to intervene, he claimed his right to intervene was based on his "unique and substantial personal interests as a candidate for re-election to the Office of President."

- RJN at ¶ 32; *see also* Ex. 200 (Mot. of Donald J. Trump, President of the United States, to Intervene in His Personal Capacity as Candidate for Re-Election at 24, *Texas v. Pennsylvania*, No. 22O155 (U.S. Dec. 9, 2020)).

111.    On December 11, 2020, the Supreme Court denied the State of Texas's motion to file a bill of complaint in *Texas v. Pennsylvania* on the grounds that the Texas lacked standing and denied as moot Defendant Trump's intervention motion.

- RJN at ¶ 33; *see also* Ex. 119 (Order, *Texas v. Pennsylvania*, 592 U.S. ___ (2020) (No. 22O155))

  (https://www.supremecourt.gov/orders/courtorders/121120zr_p860.pdf).

112.  On November 21, 2020, the U.S. District Court for the Middle District of Pennsylvania dismissed the Trump Campaign's election fraud claims, stating:  "[T]his Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence.  In the United States of America, this cannot justify the disenfranchisement of a single voter, let alone all the voters of its sixth most populated state.  Our people, laws, and institutions demand more."

- RJN at ¶ 41 (*Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 906 (M.D. Pa. 2020), aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania, 830 F. App'x 377 (3d Cir. 2020)).

113.  The U.S. Court for Appeals for the Third Circuit affirmed this decision on November 27, 2020, stating:  "Calling an election unfair does not make it so.  Charges require specific allegations and then proof.  We have neither here."

- RJN at ¶ 42 (*Donald J. Trump for President, Inc.*, 830 F. App'x 377, 381 (3rd Cir. 2020)).

114.  In none of the five lawsuits Defendant Trump filed in his personal capacity to challenge the 2020 presidential election results was any evidence introduced that was held by a court to demonstrate any outcome-determinative fraud in the 2020 presidential election.

- *See* RJN at ¶¶ 34–35, 43–45 (identifying actions brought by Defendant Trump, in his personal capacity).

115.    No federal government agency was a party to any of the lawsuits Defendant Trump filed

to challenge the 2020 presidential election.

- *See* RJN at ¶¶ 34–35, 43–45 (identifying actions brought by Defendant Trump, in

his personal capacity).

116.    Attorney General Barr told Defendant Trump that irregularities in the application of state

law were "issues for the campaign lawyers to raise with the State" and were "not the business

of the Department of Justice."

- Ex. 118 at 7:5–10 (W. Barr testifying to quoted language).

117.    Former Acting Attorney General Jeffery Rosen, former Acting Deputy Attorney General

Richard Donoghue, and former Assistant Attorney General for the Office of Legal Counsel

Steven Engel, testified before Congress that Trump's Justice Department refused his

demands to pursue baseless allegations of election fraud.

- Ex. 120 (June 23, 2022 Hr'g Tr.) at PLAINTIFFS_00071773–76 (J. Rosen

testifying "the Justice Department declined [Trump's] requests because we did

not think that they were appropriate"; R. Donoghue testifying that he tried to

"make it very clear to [Trump] that…these allegations simply had no merit");

PLAINTIFFS_00071825 (S. Engel testifying he "did not doubt" the Department's

conclusion "that there is no evidence of widespread voter fraud").

**VIII.    The Funding, Organizing, and Promotion of the January 6 Rally**

118.    On January 6, 2021, Defendant Trump spoke at an event held at the Ellipse in

Washington D.C., called the "Save America Rally" (hereinafter, the "Rally").

- Ex. 113 (YouTube video of full "Save America Rally");

- Ex. 56, No. 75 ███████████████████████

  ████████████████████████████████

119. Women for America First ("WFAF") obtained the permit for the Rally from the National

Parks Service.

- Ex. 21 at DOI_TOUHY_002934 (permit for the Rally reflecting WFAF as

  organization).

120. Amy Kremer, Kylie Kremer, and Justin Caporale were listed as designated points of

contact on the permit for the Rally.

- Ex. 21 at DOI_TOUHY_002963 (permit for the Rally listing A. Kremer, K.

  Kremer, and J. Caporale as "DESIGNATED POC'S").

121. ████████████████████████████████

- Ex. 56, No. 59 (████████████████████████████

  ████████████████████

122. By the time Defendant Trump spoke at the Save America Rally, tens of thousands of

people were in attendance, including approximately 25,000 people between the Ellipse and

the Washington Monument, with "members of the crowd [] wearing body armor, carrying

radio equipment and possibly OC spray and/or plastic riot shields."

- Ex. 201 (CSD Activity Log #2); *see also* Ex. 115 at 585 n.53 (Jan. 6. Comm.

  Report) (citing CSD Activity Log #2);

- *See also* Ex. 202 (Jan. 4, 2021 email from K. Kremer requesting the Rally permit

  be increased up to 30,000 people).

A.    Key Individuals and Entities Involved in Funding, Organizing, and Promotion of
the Rally

1.    *Women for America First, Amy Kremer, Kylie Kremer, and Cindy Chafian*

123.    WFAF was an organization founded in 2019 and led by Amy Kremer and her daughter

Kylie Kremer, with an express goal of supporting Donald Trump and pushing an America

First agenda.

- Ex. 203 at 6:11–23 (A. Kremer testifying: "And then, after [Donald Trump] won,
  we started Women for America First to focus on pushing the America First
  agenda."); *see also* Ex. 19a (adopting Ex. 203 as sworn testimony).

- Ex. 73 at 5:14–11 (K. Kremer stating that she was the executive director of
  WFAF and that WFAF was "founded in February of 2019, I believe, founded by
  myself and my mother, Amy Kremer.  She's the chairman").

- Ex. 115 at 530 (Jan. 6 Comm. Report) ("WFAF was founded in 2019 by Amy and
  Kylie Kremer, a mother-daughter pair who were longtime supporters of the
  President.").

124.    ███████████████████████████████████████████████████

███████████████████████████████.

- Ex. 65, No. 173 ████████████████████████████████████

████████████████████████

125.    WFAF was one of the groups that sponsored the Rally.

- *See, e.g.*, *infra* ¶¶ 180–85, 210, 212–13, 221–24, 238–39, 253–55, 263–66, 220.

126.    Kylie Kremer is Amy Kremer's daughter and was the executive director for Women for

America First.

- Ex. 73 at 5:1–11 (K. Kremer explaining her role with WFAF and relationship with A. Kremer.).

127.    Kylie Kremer and Amy Kremer, on behalf of WFAF, helped plan and orchestrate the Rally.

- *See, e.g.*, *infra* ¶¶ 180, 182–85, 210, 212–13, 221–24, 238–39, 253–55, 263, 265–66, 220.

128.    

- Ex. 65, No. 156 (

No. 157 (

129.    On December 19, 2020, Cindy Chafian corresponded on behalf of WFAF with the National Parks Service regarding scheduling the rally for January 6, 2020.

- Ex. 204 (email from C. Chafian, whose signature line is "Director of Coalitions" for "Women for America First," asking "to amend the [permit] dates to 6am January 5th to 9am January 7th").

130.    

- Ex. 65, No. 161 (

    2.    *Taylor Budowich*

131.    Taylor Budowich was a senior adviser to the Trump Campaign through at least

November 15, 2020, during which time he acted as "chief of staff to Donald Trump, Jr., and

a senior adviser on campaign and political activity to Kimberly Guilfoyle."

- Ex. 92 at 9:17–10:2 (T. Budowich testifying to his role with the Campaign);

- Ex. 56, No. 53 

132.    Budowich was in contact with Caroline Wren, a former Trump Campaign employee, who

raised approximately between $2.4 and $3 million for the Rally.

- Ex. 92 at 27:2–24 (T. Budowich stating that as of Dec. 26, 2020, he was in

contact with Caroline Wren);

- Ex. 60 at 63:7–24 (C. Wren stating that as of Dec. 26, 2020 she was in contact

with T. Budowich and described J. Fancelli giving $3 million);

- *See, e.g.*, *infra* ¶¶ 161–66, 173, 211, 216–220.

133.    At the time of the Rally, Budowich was not an employee or official of the federal

government.

- Ex. 56, No. 53 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇)

- Ex. 86 at 31:11–16 (K. Pierson testifying that Budowich "worked on the

campaign" not "the administration").

### 3.    *Sean Dollman*

134.    Sean Dollman was the Chief Financial Officer for the Trump Campaign.  He was paid by

the Make America Great Again PAC through at least March 16, 2021.

- *See* Ex. 105 at 10:13–10:24 (S. Dollman discussing role as "CFO" beginning in

    approximately February 2020);

- Ex. 66 at row 9254 (FEC Data Report from Donald J. Trump For President, Inc.)

    (showing payments to S. Dollman for "payroll" through Mar. 16, 2021);

- Ex. 106, No. 306 (███████████████████████████████████

    ███████████████████████████████████████████████

    ███████).

135.    Dollman approved payments from the Trump Campaign to Justin Caporale, a former

Trump Campaign employee and "[o]n-[s]ite [c]ontact" and "PROJECT MANAGER" for the

Rally, as well as other private individuals, in the days leading up to the Rally.

- Ex. 94 (S. Dollman, Email to Justin Caporale (Dec. 30, 2020)) (S. Dollman

    approving an invoice from J. Caporale for resubmission to the Trump Campaign

    for work completed "thru the 4th");

- Ex. 21 at DOI_TOUHY_002934, DOI_TOUHY_002964 (Rally permit listing J.

    Caporale as "[o]n-[s]ite [c]ontact" and "PROJECT MANAGER");

- Ex. 28 (Dec. 26, 2020 email from S. Dollman to M. Hahn explaining M. Hahn

    remained on the Campaign's payroll);

- *See, e.g.*, *infra* ¶¶ 140, 142–43, 170–74, 176, 205–08.

### 4.    *Kimberly Guilfoyle*

136.    At various times, Kimberly Guilfoyle worked for the Trump Campaign, as well as the

Trump Victory Finance Committee.

- Ex. 82 at 11:5–12:9 (K. Guilfoyle stating she was "asked to join the campaign for

    Donald J. Trump for President" and "[m]y first role was as senior advisor to the

    President working on the campaign, attending events, giving speeches . . .

    whatever was needed.  And then I became also, in addition to that role, the

    national finance chair" including for "Trump Victory Finance Committee").

137.    ██████████████████████████████████████████████

    ██████████.

- Ex. 56, No. 57 (███████████████████████████████████████

    ████████████████████").

138.    Guilfoyle was a speaker at the Save America Rally.

- Ex. 56, No. 55 (███████████████████████████████████████

    ████████████████████

- Ex. 60 at 193:21–195:22 (Jan. 6 Comm. Wren Dep. Tr.) (C. Wren stating that

    Turning Point Action paid invoices for K. Guilfoyle to speak at the Rally).

    *5.    Mike Hahn*

139.    Mike Hahn was the Director of Social Media for the Trump Campaign.

- Ex. 196, No. 2 (stating that "Michael Hahn, Social Media Strategist, was the head

    of campaign social media").

- Ex. 102 (M. Hahn LinkedIn profile stating he is an "alum of the Trump 2016 and

    2020 campaigns where he served as the Director of Social Media").

140.    Hahn was paid by the Make America Great Again PAC through at least February 1,

2021.

- Ex. 101 (Dec. 16, 2020 Email from Mike Hahn to Sean Dollman) (detailing M.

  Hahn's role on the social media team and explaining that he ran managed content

  on "all 7 main social media accounts," posted donations asks, and more);

- Ex. 102 (M. Hahn LinkedIn profile stating he is an "alum of the Trump 2016 and

  2020 campaigns where he served as the Director of Social Media");

- Ex. 66 at row 9044 (FEC Data Report from Donald J. Trump For President, Inc.)

  ("payroll" disbursement to M. Hahn on February 21, 2021).

141.    ████████████████████████████████████████████████

████████████████████████████████

- Ex. 69 at SCAVINO_SMITH_0000030–32 (████████████████████████

  ██████████████████████.

142.    Individuals on the Trump Campaign instructed others affiliated with the Campaign,

including Hahn, that they should "invoice the campaign for the January pay period."

- Ex. 28 (Dec. 26, 2020 email from T. Murtaugh to M. Hahn and other affiliates of

  the Campaign).

143.    Hahn approved payments from the Trump Campaign in connection with the Rally.

- Ex. 98 (Dec. 30, 2020 email with the Subject "Jan. 6" from M. Hahn to J.

  Karwacki and R. McEnany, copying S. Dollman and stating "thanks again for

  agreeing to help on the 6th.  As discussed you'll need to invoice for your pay on

  this day" with instruction to "send the invoice to ap@donaldtrump.com and copy

  Dollman").

144.    Mike Hahn "had access to all campaign social media accounts" through "2021."

- Ex. 196, No. 2 ("Michael Hahn . . . and his team had access to all campaign social media accounts . . . Mike Hahn[:] duration of access: 2016-2021").

    *6.    Katrina Pierson*

145.    Katrina Pierson was a senior advisor for the Trump Campaign through at least December 31, 2020.

- Ex. 86 at 8:3–18, 11:7–21 (K. Pierson testifying that she became the Trump Campaign's "official spokesperson" in September or October 2015, worked with a super PAC after D. Trump was elected in 2016, and later became "senior adviser" for the reelection campaign until December 31, 2020).

146.    While she was the senior advisor for the Trump Campaign, Pierson advocated challenging the election results, often using the Campaign's social media to do so.

- Ex. 86 at 11:12–12:8 (K. Pierson testifying that she and other members of the Trump Campaign stayed on after the 2020 election to challenge the election results, and she herself advocated and commentated "through the [C]ampaign's social media and the Team Trump network").

147.    Pierson was involved in discussions with WFAF members, including Kylie Kremer, around branding rights and raising funds in relation to the Rally, including before December 31, 2020, while she was still employed by the Campaign.

- *See* Ex. 87 at KKremer4457, KKremer4464  (K. Kremer Dec. 2020 and Jan. 2021 text chain with K.Pierson, J. Hulsey, and A. Kremer in which Pierson discusses the "money flow," "allocating funds," and "branding rights" for the Rally);

- *See e.g.*, *infra* ¶¶ 154, 180, 254, 257, 264, 267–69;

- Ex. 86 at 11:7–12:8, 29:2–33:23 (K. Pierson testifying to her continued role with the Trump Campaign after the 2020 election, including working with the Kremers to support the Save America Rally).

148.    Pierson was also involved in organizing the speaker list for the Rally.

- Ex. 86 at 108:12–112:7 (K. Pierson describing her involvement in deciding who would speak at the Rally and in what order).

149.    When asked by the January 6 Select Committee if the Rally was "an official government event that the White House . . . put on or . . . a private event that the President was showing up at," Pierson responded:  "It was a private event that the President was showing up at."

- Ex. 86 at 105:11–106:4 (K. Pierson characterizing the Rally as "[a] Women for America First event").

150.    At no point did Pierson hold a position in Trump's presidential administration.

- Ex. 86 at 8:6–12 (K. Pierson testifying that she worked with a super PAC after D. Trump was elected in 2016 and "did not" work for his presidential administration).

151.    ████████████████████████████████████████████████████
████████ .

- Ex. 65, No. 159 (████████████████████████████████████████
████████████████████████████████

### 7.    *Megan Powers*

152.    Megan Powers served as Director of Administrative Operations for the Trump Campaign through at least January 2021.

- Ex. 75 (Dec. 31, 2020 Email from Megan Powers to Charter, charter@donaldtrump.com, using her @donaldtrump.com email address re:  a charter flight for Rudy Giuliani);

- Ex. 76 (M. Powers's LinkedIn account stating she worked as Director of Operations for Donald J. Trump for President through January 2021).

153. Powers actively performed tasks for the Trump Campaign through, at least January 1, 2021, including efforts to charter a private jet on December 31, 2020 for Giuliani to travel to Washington, D.C.

- Ex. 75 (Dec. 31, 2020 email from M. Powers's @donaldtrump.com address to charter@donaldtrump.com re:  obtaining a charter flight for Rudy Giuliani).

154. On January 5, 2021, Megan Powers, Katrina Pierson, Kylie Kremer, and others discussed credentials for the Rally.

- Ex. 90 (K. Kremer texted "Maggie [Mulvaney] privately emailed Jennifer [Hulsey] and told her Caroline [Wren] only authorized 50 passes for us.  This is after Megan's email said we have 200" and Powers replied "I will have 200 additional credentials for you").

155. Powers was involved in planning and executing the Rally, and was listed as "operations manager for scheduling and guidance" on the permit for the Rally received by WFAF from the NPS.

- Ex. 21 at DOI_TOUHY_002964 (Rally permit listing M. Powers as "OPERATIONS MANAGER FOR SCHEDULING AND GUIDANCE" in section identifying "the event sponsor(s), coordinator(s), staff assistants and

emergency response/security team supervisors who will be on site during the event").

156. ██████████████████████████████████████████████████

- Ex. 65, No. 165 ████████████████████████████████████
  ████████████████████████).

157. On February 2, 2021, Powers received a $19,566.67 disbursement from the Trump Campaign.

- Ex. 66 at row 9058 (FEC Data Report from Donald J. Trump For President, Inc.) (disclosing a $19,566.67 disbursement to M. Powers on Feb 2, 2021).

    8. *Hannah Salem*

158. Hannah Salem, of Salem Strategies LLC, received payments from the Trump Campaign through at least November 4, 2020 for travel reimbursements.

- Ex. 21 at DOI_TOUHY_002964 (Rally permit listing H. Salem's contact information as Hannah@salemstrategiesllc.com);
- Ex. 66 at row 1241 ("Salem Strategies LLC" receiving a $19,689.96 "TRAVEL REIMBURSEMENT" on November 4, 2020).

159. Salem Strategies was collectively paid $113,471.51 by the Trump Campaign between 2015 and March 1, 2021.

- Ex. 78 (reflecting FEC disbursements for "travel reimbursement" and "event consulting").

160. Hannah Salem helped plan, coordinate, or organize the Rally.

- Ex. 88 at KPierson0364 ("Hannah Salem handling press credentials");

- Ex. 21 at DOI_TOUHY_002964 (Rally permit listing H. Salem's role as "Operations Manager for Logistics and Communications").

    9. *Caroline Wren*

161.    Caroline Wren was employed by the Trump Campaign from March through at least November 2020 ███████████████████████████████.

- Ex. 56, No. 54 (███████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████).

- Ex. 60 at 8:10–13 (C. Wren stating "[I]n March of 2020 to November 2020, I went in-house with the Trump [C]ampaign.").

162.    Wren is the president and founder of Bluebonnet Fundraising, which received funds from Julie Fancelli, a campaign fundraiser and donor to the Trump Campaign, to stage and execute the Rally.

- *See* Ex. 60 at 7:25–8:1, 48:17–51:12 (C. Wren stating that she is the "president of Bluebonnet Fundraising" and describing how J. Fancelli's funds were allocated to different organizations to support the Rally);

- Ex. 205 (document titled "Fancelli Budget & Trip Plan" explaining how J. Fancelli's funds would be distributed at events between Jan. 4 and Jan. 6, 2021);

- *See e.g.*, *infra* ¶¶ 177–79, 210–11, 215–220.

163.    Wren was involved in fundraising for the Rally and others believed she was working on behalf of an organization fundraising for the Trump Campaign.

- *See* Ex. 60 at 48:17–51:12, 99:21–100:21 (C. Wren describing Rally fundraising allocation and stating "[i]f I would have explained my background, I would have

said I'm with the Trump [C]ampaign" and did not correct individuals who believed she worked for the Campaign);

- *See* Ex. 61 at 34:3–15 (K. Davis stating "What I confirmed was that [C. Wren] was part of Trump Victory or Trump something fundraising");

- *See* Ex. 62 at 51:5–9 (D. Trump Jr. stating that C. Wren was a fundraiser for the Trump Campaign and stating his belief that Wren fundraised for the Rally).

164.    Wren hired three individuals who previously worked in the Trump Campaign's finance department to help plan and execute the Rally:  (1) Cassidy Kofoed, intern, staffer, or staff assistant; (2) Kiera Schaefer, finance advance; and (3) Maggie Mulvaney, Director of Finance Operations, who was personally hired by Caroline Wren to help execute the Rally.

- Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren discussing the hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she knew because they worked in the Trump Campaign's finance department, which she oversaw—to assist her to "execute" the Rally).

165.    █████████████████████████████████████
████████████.

- Ex. 80 (███████████████████████████
████████████████████████████████████
███████████████████████████████
████████████████)

166.    At no point did Wren hold a position in Trump's presidential administration.  ████████
████████████████████████████████████████



- Ex. 60 at 7:25–10:19 (C. Wren's description of work history does not include any work in government, only private fundraising);

- Ex. 65, No. 155 (██████████████████████████████████
  ██████████████████████████████)

10. *Event Strategies, Inc., Tim Unes, and Justin Caporale*

167.    At the time of the Rally, Tim Unes was President and CEO of Event Strategies, Inc., which served as a production vendor for the Rally.

- Ex. 56, No. 51 (████████████████████████████████████
  ████████████████████████)

- Ex. 108 at KKremer2323–24 (listing T. Unes's role as "President & CEO" of Event Strategies and "production vendor" for the Rally).

168.    Unes worked for the Trump Campaign through at least October 2020, when he helped plan a rally set to take place in Johnstown, PA.

- Ex. 77 (Oct. 10, 2020 email from J. Small to an @donaldtrump.com email address for T. Unes regarding planning an Oct. 13, 2020 Rally at Johnstown, PA).

169.    Event Strategies, Inc., was collectively paid $2,560,685.55 by the Trump Campaign between 2015 and March 1, 2021.

- Ex. 70 (FEC disbursements from Trump Campaign to Event Strategies, Inc.).

170.    At the time of the Rally, Justin Caporale was a contractor with Event Strategies, Inc., and later became its CEO and managing partner.

- Ex. 72 at 12:20–13:10 (J. Caporale stating that at the time of the Rally, he was "essentially acting on behalf of them to provide the services that ESI would provide" and later became its CEO and managing partner).

171.    Justin Caporale worked for the Trump Campaign through at least November 30, 2020.

- Ex. 66 at row 6794 (FEC Data Report from Donald J. Trump For President, Inc. including a $7,500 disbursement for "PAYROLL" to J. Caporale on Nov. 30, 2020);

- Ex. 56, No. 49 (

172.    

- Ex. 68 at SCAVINO_SMITH_000026–29 ( *see also* Ex. 69 at SCAVINO_SMITH_00030–32 (

173.    Caporale was asked to plan the Rally by WFAF, Wren, and Budowich, and was listed as the "PROJECT MANAGER" and "[o]n-[s]ite [c]ontact" on the Rally permit.

- Ex. 72 at 13:11–18:2 (J. Caporale testifying about his communications with WFAF, C. Wren, and T. Budowich around planning the Rally);

- Ex. 56, No. 48 (

- Ex. 21 at DOI_TOUHY_002934, DOI_TOUHY_002964 (Rally permit listing J. Caporale as "[o]n-[s]ite [c]ontact" and "PROJECT MANAGER").

174.    Caporale's "understanding" was that the Rally "was not an official event put on by the White House."

- Ex. 72 at 28:13–29:18 (J. Caporale stating: Q: "But, in your view, was this an official White House event? A: "In my view, I was an event hosted by [WAF] that the President was invited to attend." Q: "So not an official event being put on by the White House?" A: "Yes. That was my understanding; it was not an official event put on by the White House.").

175. Trump Campaign records show more than 40 separate payments from as early as April 2017 to December 2020 totaling over a million dollars from "Donald J. Trump for President, Inc." to "Event Strategies, Inc." This includes payments made in December 2020.

- Ex. 66 at rows 645, 1321, 7626 (FEC Data Report from Donald J. Trump For President, Inc.) (showing Nov. and Dec. 2020 disbursements to Event Strategies, Inc.).

176. ██████████████████████████████████████████████

██████████

- Ex. 65, No. 158 ████████████████████████████████████

████████████████████████

   *11.   Julie Fancelli*

177. Julie Fancelli was a donor to Defendant Trump's re-election campaign.

- Ex. 92 at 24:2–10 (T. Budowich stating: Q: "When was the first time you became aware of [Ms. Fancelli], if you remember?" A: "Around the period in question." Q: "And at a high level, what did you understand her role in this to be?" A: "She was a donor to the President's reelection campaign.");

- Ex. 24 (Jan. 5, 2021 email from C. Wren explaining that J. Fancelli and her family have "donated over $1.5 million to the Trump Victory campaign").

178.    Fancelli was a donor to the Rally.

- Ex. 24 (Jan. 5, 2021 email from C. Wren explaining that J. Fancelli "has personally funded all of the expenses for the Save America rally tomorrow, January 6 which totals over $2.1 million");

- Ex. 205 (document titled "Fancelli Budget & Trip Plan" describing how J. Fancelli's funds would be dispersed in support of the Rally).

179.    ███████████████████████████████████████████

████████.

- Ex. 65, No. 154 ████████████████████████████████

████████████████████████

B.    Permitting for the Rally

180.    On December 17, 2020, Pierson texted Amy Kremer of WFAF that "January 6th is D day," to which Amy Kremer replied, "I know," and said "[w]e are putting together the plan now."

- Ex. 88 at KPierson0201–0202 (text chain between K. Pierson and A. Kremer).

181.    On December 19, 2020, Cindy Chafian, Director of Coalitions for WFAF, contacted the National Park Service ("NPS") to change the date on an event permit already issued to WFAF, asking NPS to "amend the dates [of the permit] to 6am January 5th to 9am January 7th."

- Ex. 204 (email from C. Chafian, whose signature line is "Director Coalitions" for "Women for America First," asking "to amend the [permit] dates to 6am January 5th to 9am January 7th").

182.    On or around December 28, 2020, Justin Caporale and WFAF discussed the likelihood

that if Defendant Trump were to show up to the Rally, the Ellipse would be a better location

for the event because "Secret Service" may have "an issue" with Freedom Plaza, "because of

all the surrounding buildings."

- Ex. 72 at 22:17–24 (J. Caporale stating: Q:  "Now, what was your reaction to

them wanting to have the event at Freedom Plaza?" A:  "I had an understanding

that they wanted to invite the President to come and speak.  And, when that piece

of information became known to me, I looked around Freedom Plaza and knew

that it was a site that wasn't suitable for Secret Service just given the line of sight

issues with the buildings around, and what we would have to do to shut down the

streets in order to get a sitting President to Freedom Plaza would have been very

difficult, disruptive.");

- Ex. 73 at 95:12–96:17 (K. Kremer stating that she, A. Kremer, and J. Caporale

decided "that the Ellipse was going to be the best place for us to file for the

permit").

183.    On December 29, 2020, WFAF submitted a permit application to the NPS for the Rally to

be at the Ellipse on January 6, 2021.

- Ex. 60 at 108:18–20 (C. Wren stating that WFAF "had submitted an application

for the January 6th event on the Ellipse" on or by Dec. 29, 2020).

184.    On January 5, 2021, the NPS issued a permit to WFAF for a rally at the Ellipse to be held

on January 6, 2021.

- *See* Ex. 21 (DOI_TOUHY_002934) (Rally permit as issued on January 5, 2021);

- Ex. 56, No. 44 ████████████████████████████████
  ████████████████████████████████████████████
  ████████████████

185.    The Activity Overview of the permit stated:  "Women for America First will conduct a first amendment rally 'March for Trump' to demand transparency and protect election integrity.  The rally will feature speakers from Women for America First, Congressional Representatives, Roger Stone, Julio Gonzalez, Rudy Giuliani, Diamond and Silk. . . . Some participants may leave to attend rallies at the United States Capitol to hear the results of Congressional certification of the Electoral College Count."

- Ex. 21 at DOI_TOUHY_002935 (Rally permit as issued on January 5, 2021, including above Activity Overview description).

186.    Justin Caporale was named as the "[o]n-[s]ite [c]ontact," "PROJECT MANAGER," and "production vendor" on the permit, and previously worked for the Trump Campaign through at least November 30, 2020.

- Ex. 66 at row 6794 (FEC Data Report from Donald J. Trump For President, Inc. including a $7,500 disbursement for "PAYROLL" to J. Caporale on Nov. 30, 2020);

- Ex. 56, No. 49 (████████████████████████████████
  ██████████████████████████████

- Ex. 21 at DOI_TOUHY_002934, DOI_TOUHY_002964 (Rally permit listing J. Caporale).

187.    Megan Powers was named as the "Operations Manager for Scheduling and Guidance" on the permit, and worked as Director of Administrative Operations for the Trump Campaign.

- Ex. 75 (Dec. 31, 2020 Email from Megan Powers to Charter, charter@donaldtrump.com, using her @donaldtrump.com email address re:  a charter flight for Rudy Guiliani);

- Ex. 76 (M. Powers's LinkedIn account stating she worked as Director of Operations for Donald J. Trump for President through January 2021);

- Ex. 21 at DOI_TOUHY_002964 (Rally permit listing M. Powers).

188.    Hannah Salem was named as the Operations Manager for Logistics and Communications on the permit, and through Salem Strategies LLC, received payments from the Campaign through at least November 4, 2020 for travel reimbursements.

- Ex. 21 at DOI_TOUHY_002964 (Rally permit listing H. Salem at as the "Operations Manager for Logistics and Communications");

- Ex. 66 at row 1241 ("Salem Strategies LLC" receiving a $19,689.96 "TRAVEL REIMBURSEMENT" on Nov. 4, 2020).

189.    Tim Unes was named as the Stage Manager on the permit, and worked for the Campaign through at least October 2020.

- Ex. 77 (Oct. 10, 2020 email from J. Small to an @donaldtrump.com email address for T. Unes regarding planning an Oct. 13, 2020 Rally at Johnstown, PA);

- Ex. 21 at DOI_TOUHY_002965 (Rally permit listing T. Unes as "Stage Manager").

190.    Maggie Mulvaney was named on the permit as a "VIP LEAD," and previously worked for the Trump Campaign's finance department.

- Ex. 60 at 40:20–41:16, 106:20–107:25 (C. Wren discussing the hiring of C. Kofoed, K. Schaefer, and M. Mulvaney—whom she knew because they worked

in the Trump Campaign's finance department, which she oversaw—to assist her

to "execute" the Rally);

- Ex. 21 at DOI_TOUHY_002965 (Rally permit listing M. Mulvaney as "VIP

LEAD").

191.    Caroline Wren was named on the permit as a "VIP ADVISOR," and worked on the

Campaign through at least November 2020.

- Ex. 56, No. 54 (██████████████████████████████

████████████████████████████████████████

█████████████████████

- Ex. 60 at 8:10–13 (C. Wren stating "[I]n March of 2020 to November 2020, I

went in-house with the Trump [C]ampaign.");

- Ex. 21 at DOI_TOUHY_002965 (Rally permit listing C. Wren as "VIP

ADVISOR").

192.    William Wilson was named on the permit as "Backstage Assistant," and worked for the

Campaign from at least October 2020 to November 2020.

- Ex. 66 at rows 2036, 2191 (FEC Data Report from Donald J. Trump For

President, Inc. showing reimbursements to W. Wilson on Nov. 9, 2020 in the

amount of $1,260 and Nov. 10, 2020 in the amount of $4,000);

- Ex. 21 at DOI_TOUHY_002965 (Rally permit listing W. Wilson as "Backstage

Assistant").

193.    Ron Holden was named on the permit as "Backstage Manager," and worked for the

Trump Campaign through at least November 2020.

- Ex. 66 at rows 1301, 2706 (FEC Data Report from Donald J. Trump For President, Inc. showing disbursement to R. Holden on November 4, 2020 in the amount of $15,693 and November 13, 2020 in the amount of $3,833);

- Ex. 21 at DOI_TOUHY_002965 (Rally permit listing R. Holden as "Backstage Manager").

194. James Oaks was named on the permit as "Operations Associate," and worked on the Campaign from until at least November 2020.

- Ex. 66 at row 2606 (FEC Data Report from Donald J. Trump For President, Inc. showing J. Oaks on Donald J. Trump for President payroll as of November 13, 2020);

- Ex. 21 at DOI_TOUHY_002964 (listing J. Oaks as "Operations Associate").

195. Kiran Menon was named on the permit as "Operations Associate 2," and worked on the Campaign until at least December 2020.

- Ex. 66 at rows 2631, 6750, 7585 (FEC Data Report from Donald J. Trump For President, Inc. showing K. Menon on Donald J. Trump for President payroll as of Nov. 13, 2020, Nov. 30, 2020, and Dec. 15, 2020);

- Ex. 21 at DOI_TOUHY_002965 (listing K. Menon as "Operations Associate 2").

196. ███████████████████████████████████████

███████████████████████████████

- Ex. 89 ███████████████████████████████

███████████████████████

- Ex. 84 (█████████████████████████████████

████████████████████████████████████████

█████████

197.    The campaign reimbursed Menon for travel expenses on January 7, 2021.

- Ex. 66 at row 8749 (FEC Data Report from Donald J. Trump For President, Inc.

showing Jan. 7, 2021 "TRAVEL REIMBURSEMENT" to K. Menon).

198.    Ten of the twelve individuals listed on the permit as "event sponsor(s), coordinator(s),

staff assistants and emergency response/security team supervisors who will be on site during

the [Rally]" were associated with the 2020 Trump Campaign.

- *See e.g.*, *Supra* ¶¶ 186–97 (discussing J. Caporale, M. Powers, H. Salem, T.

Unes, M. Mulvaney, C. Wren, W. Wilson, R. Holden, J. Oaks, and K. Menon).

- Ex. 21 at DOI_TOUHY_002964–65.

199.    Those ten individuals were collectively paid at least $1,469,696.81 million by the Trump

Campaign between 2015 and March 1, 2021.  *See* evidence cited in Table.

| No. | Individual | Amount Paid between 2015 to Jan. 6, 2021 | Evidence |
|-----|------------|------------------------------------------|----------|
| 1 | CAPORALE, JUSTIN | $238,391.11 | Ex. 63 at rows 2–41. |
| 2 | HOLDEN, RONALD | $100,832.18 | Ex. 63 at rows 42–68. |
| 3 | OAKS, JAMES | $144,332.05 | Ex. 63 at rows 69, 127–90. |
| 3 | MENON, KIRAN | $28,164.46 | Ex. 63 at rows 70–87. |
| 4 | MULVANEY, MAGGIE | $140,394.48 | Ex. 63 at rows 88–126. |
| 6 | POWERS, MEGAN | $413,996.71 | Ex. 63 at rows 191–298. |

| No. | Individual | Amount Paid between 2015 to Jan. 6, 2021 | Evidence |
|---|---|---|---|
| 7 | SALEM, HANNAH | $2,346.00 | Ex. 63 at rows 299–305. |
| 8 | UNES, TIM | $225,199.82 | Ex. 63 at rows 306–57. |
| 9 | WILLIAM, WILSON | $6,040.00 | Ex. 63 at rows 358–60. |
| 10 | WREN, CAROLINE | $170,000.00 | Ex. 63 at rows 361–77. |
| | Grand Total | $1,469,696.81 | |

200.  Harrison Furman received payroll disbursements from the Trump Campaign.

   • Ex. 66 at 2727, 6777 (FEC Data Report from Donald J. Trump For President, Inc.
     showing H. Furman on Donald J. Trump for President payroll as of Nov. 13, 2020
     and Nov. 30, 2020).

201.  As of January 1, 2021, Taylor Budowich believed that Harrison Furman wanted to help
      with the Rally and was "still on campaign payroll so not looking for money."

   • Ex. 93 (text message chain between T. Budowich and J. Caporale).

202.  There is no evidence in the record that the remaining two individuals listed on the permit
      were affiliated with the Trump Administration at the time of the Rally.

   C.  Donations and Funding for the Rally

203.  

   • Ex. 56, No. 59 (

204.    The Trump Campaign made payments to Event Strategies for equipment rental in

connection with the Rally on or near January 6, 2021.

- Answer of Make America Great Again PAC and Donald J. Trump for President,

    Inc. at ¶ 84, *Smith v. Trump*, No. 1:21-cv-02265-APM (D.D.C. Feb. 9, 2023), Dkt.

    187 (admitting that "the Trump Campaign made payments to Event Strategies Inc

    for equipment rental in connection with a rally on or near January 6, 2021"),

    *responding to* Am. Compl. at ¶ 20, *Smith v. Trump*, No. 1:21-cv-02265-APM

    (D.D.C. Dec. 3, 2021), Dkt. 89.

205.    Harris Sikes Media LLC invoiced the Campaign, ██████████████████████

████████████████████ totaling $4,975,772.54, ████████████████████████████

████████████████████████████████

- Ex. 107 (██████████████████████████████████████████████████

    ████████████████████████████████████████████████████

    ████████████████████████████████

- *See* Ex. 66 at row 7944 (disbursement to "HARRIS SIKES MEDIA LLC" on

    Dec. 22, 2020 for $4,975,772.54).

206.    The Trump Campaign paid Harris Sikes Media LLC $4,975,772.54██████████████

██████████████████████████████ on December 22, 2020.

- Ex. 66 at row 7944 (disbursement to "HARRIS SIKES MEDIA LLC" on Dec. 22,

    2020 for $4,975,772.54).

- *See* Ex. 107 (████████████████████████████████████████████████

    ████████████████████████████████████████████████████████

    ████████████████████████████████████

207.    On December 29 and 30, 2020, Campaign affiliates instructed individuals, including

Joseph Karwacki and Ryann McEnany—who were contractors for or otherwise affiliated

with the Campaign—to invoice "the campaign, Donald J. Trump for President, Inc." for their

compensation for involvement in the Rally and to "copy Dollman" on the email with the

invoice.

- Ex 98 (Dec. 30, 2020 email with the subject "Jan. 6" from M. Hahn to J.

  Karwacki and R. McEnany, copying S. Dollman and stating "thanks again for

  agreeing to help on the 6th.  As discussed you'll need to invoice for your pay on

  this day" with instruction to "send the invoice to ap@donaldtrump.com and copy

  Dollman");

- Ex 99 (Dec. 29, 2020 email from A. Pardo to J. Miller, S. Dollman, and T.

  Murtaugh, with the Subject "Following up – Chelsea Parella" and stating "we will

  also be extending Courtney to help with rally . . . Sean- I have shared the invoice

  information);

- Ex 104 (R. McEnany LinkedIn profile stating she has been the "Social Media

  Strategist for the Donald J. Trump 2020 Presidential Campaign" since Feb. 2019);

- Ex. 66 at row 8580 (FEC data showing the Campaign paid J. Karwacki through

  Dec. 31, 2020);

- Ex. 66 at rows 2640, 8681 (FEC data showing the Campaign paid R. McEnany

  for "payroll" on Nov. 13, 2020 and disbursing $400 to R. McEnany on Jan. 5,

  2021).

208.    The invoices from Ryann McEnany and Joseph Karwacki for "help on the 6th" as

described in the December 30, 2020 email were paid shortly thereafter.

- Ex. 98 (Dec. 30, 2020 email with the Subject "Jan. 6" from M. Hahn to J. Karwacki and R. McEnany, copying S. Dollman);

- *See* Ex. 66 at row 8580 (FEC data showing the Campaign paid J. Karwacki on December 31, 2020).

- *See* Ex. 66 at row 8681 (FEC data showing the Campaign paid R. McEnany on January 5, 2021).

209. Ryann McEnany and Joseph Karwacki "had access to all campaign social media accounts" through "2021."

- Ex. 196, No. 2 at 3–4 ("Michael Hahn . . . and his team had access to all campaign social media accounts . . . Ryann McEnany[:] duration of access: 2016–2021 . . . Joe Karwacki[:] duration of access: 2016-2021").

210. On January 3, 2021, WFAF sent a fundraising email that stated "5 MILLION people have watched our video overnight after President Trump tweeted it and that's just on Twitter," referencing Defendant Trump's re-tweeting of the video the Rally stating that he "will be there.  Historic day!"

- Ex. 206 at KKremer2509–10 (Jan. 3, 2021 email thread between K. Kremer and J. Daly).

211. Wren solicited at least $2 million in funding from private donors for the Rally.

- Ex. 60 at 63:4–24 (C. Wren stating that Fancelli provided a budget of $3 million).

- Ex. 88 at KPierson0385 (Jan. 1, 2021 text from K. Pierson to K. Kremer stating: "Caroline was the doorway to finding those multi-million dollar donors for your mom.");

- Ex. 205 (Fancelli Budget & Trip Plan) (listing total donation between $2.4 and $3 million).

212.    WFAF also solicited funding from private donors for the Rally, securing approximately $700,000 in addition to funding raised by Amy Kremer and Kylie Kremer.

- Ex. 95 at 77:8–19 (D. Stockton stating "I believe, in grassroots contributions, I believe [WFAF] brought in between $700,000 and $800,000.").

213.    On December 30, 2020, Kylie Kremer solicited help from Mike Lindell in securing a $125,000 donation for the Rally.

- Ex. 96 at KKremer5452 (Dec. 30, 2020 text message thread between K. Kremer and M. Lindell).

214.    Mike Lindell  "donated $600k" to the Rally.

- Ex. 97 at PLAINTIFFS_00001895–96 (text message from K. Guilfoyle on Jan. 3, 2021 stating M. Lindelll "donated $600k").

215.    Fancelli donated at least $2 million to fund the Rally.

- Ex. 60 at 63:4–24 (C. Wren stating that Fancelli provided a budget of $3 million);
- Ex. 205 (Fancelli Budget & Trip Plan).

216.    Fancelli worked with Wren to prepare a "Budget & Trip Plan" that shows Fancelli allotted a $3 million donation as follows:  (1) $1,000,000 to Turning Point Action; (2) $500,000 to Save the U.S. Senate; (3) $400,000 to Tea Party Express; (4) $200,000 to Alex Jones; (5) $200,000 to Rule of Law Defense Fund (RAGA) (including to pay for a robocall to invite individuals to the Rally); (6) $50,000 to Bluebonnet Fundraising LLC; (7) and $300,000 to WFAF.

- Ex. 205 at PLAINTIFFS_00001858 (Fancelli Budget & Trip Plan);

- Ex. 60 at 56:11–17 (C. Wren stating that she was tasked with creating a budget proposal for the Rally).

217.    Fancelli's donation was ultimately used for, among other things, payment to speakers at the Rally, advertising the Rally, producing the Rally, and organizing the Rally.

- Ex. 205 at PLAINTIFFS_00001858 (Fancelli Budget & Trip Plan);

- Ex. 95 at 101:7 (D. Stockton testifying that Turning Point was one of the organizations with which Wren "parked the $3 million");

- Ex. 60 at 194:11–195:3 (C. Wren stating that Turning Point Action paid speaking fees for K. Guilfoyle and D. Trump Jr.);

- Ex. 92 at 41:3–20 (T. Budowich discussing Tea Party Express's role in "crowd building efforts" including advertising for the Rally);

- Ex. 72 at 19:17–20:5 (J. Caporale stating that he "receive[d] payments from Turning Point to cover the invoices and costs incurred for the January 6th event" in addition to payments from WFAF).

218.    Republican Attorneys General Association, which received funds from Fancelli via its subsidiary Rule of Law Defense Fund, made robocalls to encourage people to attend the Rally.

- Ex. 205 at PLAINTIFFS_00001858 (Fancelli Budget & Trip Plan) (allocating funds to RAGA for "their continued legal efforts to fight the election fraud around the country with so many pending lawsuits");

- Ex. 95 at 101:7 (D. Stockton testifying that Republican Attorneys General Association was one of the organizations with which Wren "parked the $3 million");

- Ex. 92 at 127:2–13 (T. Budowich recalling reporting that RAGA "did a robo-call encouraging people to come to the Ellipse").

219.    Turning Point USA via its subsidiary Turning Point Action received funds from Fancelli, which it used to organize buses, pay for speakers, and otherwise fund the Rally.

- Ex. 205 at PLAINTIFFS_00001862 (Fancelli Budget & Trip Plan) (showing $1,000,000 of Fancelli funds were allocated to Turning Point USA, which would "allow them to deploy social media influencers and students . . . to attend the rally," that they would "be producing all the video content at the event," and that it would also be running nationwide ads education millions about the significance of January 6th for President Trump, in addition to mobilizing students . . .);

- Ex. 95 at 100:19–102:7 (D. Stockton stating that Turning Point USA was one of three organizations that took in money to "spend . . . politically without it exposing the donor" and that it was one of the organizations with which Wren "parked the $3 million");

- Ex. 92 at 63:5–9 (T. Budowich stating that Turning Point helped to organize buses to bring attendees to the Rally).

220.    The Tea Party Express received funds from Fancelli to advertise and "crowd build" for the Rally via radio and digital advertising.

- Ex. 205 at PLAINTIFFS_00001862 (Fancelli Budget & Trip Plan) (showing $400,000 of Fancelli funds allocated to Tea Party Express would be used to "create a centralized website to promote the rally events" and for "targeted ads to promote the website to encourage individuals to attend," including "a television, radio and digital campaign to promote the January 6th rally");

- Ex. 95 at 101:7 (D. Stockton stating that Tea Party Express was one of the organizations with which Wren "parked the $3 million");

- Ex. 92 at 39:5–25 (T. Budowich stating that he sought Tea Party Express's help with paid advertising to crowd build for the Rally).

D.    Promotion of the Rally

221.    On December 19, 2020, Kylie Kremer texted Heather Childers, Newsmax affiliate, with an infographic and link to an invitation for a "March for Trump" in Washington, D.C., on January 6, 2021.

- Ex. 207 at KKremer1350 (text message thread between K. Kremer and H. Childers).

222.    On December 21, 2020, Amy Kremer texted Lara Trump inviting her and Eric Trump to the Rally.

- Ex. 203 at 46:1–14 (A. Kremer testifying that she texted L. Trump, "We will be returning to D.C. on January 6th for another protest . . . We would love to have you and Eric join us that day in D.C.").

223.    On December 21, 2020, Kylie Kremer sent Dustin Stockton, James Lyle, Amy Kremer, and Jennifer Lawrence an email containing a "Twitter Size" infographic about the Rally with the following text:  "ALL HANDS ON DECK – THE PRESIDENT HAS CALLED US TO ACTION… 'BE THERE, WILL BE WILD.'"

- Ex. 208 (Dec. 21, 2020 email from K. Kremer to D. Stockton, J. Lyle, A. Kremer, and J. Lawrence).

224.    On December 21, 2020, Kylie Kremer sent Amy Kremer and Scott Graves a WFAF-
        branded infographic for the "March for Trump bus tour," to take place from December 27
        through January 6, 2021.

        • Ex. 209 (Dec. 21, 2020 email from K. Kremer to A. Kremer and S. Graves).

225.    ███████████████████████████████████████████████████
        ████████████████████████████████████████

        • Ex. 56, No. 17.

226.    ████████████████████████████████████████
        ██████████████████████

        • Ex. 56, No. 19.

227.    ████████████████████████████████████████
        ███████████████████████████████████████████
        ███████████████████

        • Ex. 56, No. 20.

228.    ████████████████████████████████████████
        ███████████████████████████████████████
        ████████████████████████████████

        • Ex. 56, No. 21.

229.    ███████████████████████████████████████████
        ██████████████████████████████████████████
        █████████████

        • Ex. 56, No. 22.

230.    On January 2, 2021, the YouTube account @DonaldJTrumpforPresident, posted a video promoting the Rally, stating "THIS COULD BE THE BIGGEST EVENT IN WASHINGTON DC HISTORY," "BE A PART OF HISTORY," "JOIN THE MARCH," "JANUARY 6TH," "WHITE HOUSE ELLIPSE," and "ARRIVE BEFORE 9AM."

- Ex. 210 (still images of the YouTube account @DonaldJTrumpforPresident promoting the Rally);

- Ex. 211 (full YouTube video).



231.    ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

- Ex. 103 at SCAVINO_SMITH_0000042 (████████████████████████).

232.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

- Ex. 69 at SCAVINO_SMITH_0000030–32 (████████████████████████ ████████).

233. ████████████████████████████████████████

████████████████████████████████████████████

████████████

- Ex. 69 at SCAVINO_SMITH_0000031 ████████████████████████).

234. Hannah Salem also assisted in handling press credentials for the Rally.

- Ex. 88 at KPIERSON0364 (Jan. 5, 2021 text message from S. Graves to K. Kremer and K. Pierson stating "Chris Barron and Hannah Salem handling press credentials").

235. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████

- Ex. 69 at SCAVINO_SMITH_0000031 (████████████████████████████

236. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████

- Ex. 68 at SCAVINO_SMITH_0000026 ████████████████████████

██████████████████████

237. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

- Ex. 68 at SCAVINO_SMITH_0000026 (████████████████████████

  █████████████████.

238.    On January 3, 2021, Kylie Kremer and Amy Kremer sent a fundraising email to Jack

Daly, referencing Defendant Trump's tweet highlighting Kylie Kremer's tweet about the

Rally.  In the tweet, Defendant Trump had written:  "I will be there.  Historic day!"  The

email encouraged readers to "check out the video and make a generous financial

contribution."

- Ex. 206 at KKremer2510 (Jan. 3, 2021 email thread between K. Kremer and J.

  Daly).

239.    On January 3, 2021, Kylie Kremer appeared on One America News Network ("OAN") to

promote the Rally, answer questions about it, and was referred to by the OAN reporter as the

"organizer" of the planned march; the news clip banner stated:  "JAN 6 MAGA MARCH TO

BE HELD ON WHITE HOUSE ELLIPSE."

- Ex. 212 linking to (https://twitter.com/TeamTrump/status/1345838640614805506

  at 0:12).

240.    On January 3, 2021, the Trump Campaign's official Twitter account, @TeamTrump,

tweeted:  "JANUARY 6 – WASHINGTON D.C.," along with a link to the OAN news clip

featuring Kylie Kremer.

- Ex. 212 linking to

  (https://twitter.com/TeamTrump/status/1345838640614805506).

- Ex. 195 (email from T. Murtaugh to R. Lerman at the Washington Post, in which T. Murtaugh referred to @TeamTrump as "our main campaign account").

- *See* Ex. 163, No. 221 (███████████████████████████

███████████████████)

- *See* Ex. 196, No. 2 (denying that @MAGAActionPac, but not the @TeamTrump account, was an official Trump Campaign social media account).

241.    On January 3, 2021, Defendant Trump retweeted the Trump Campaign's January 3, 2021 tweet linking the OAN news clip featuring Kylie Kremer from the Twitter account @realDonaldTrump.

- Ex. 213 linking to (https://twitter.com/realDonaldTrump/status/1345839016848068608).

242.    On January 3, 2021, Jason Miller, who was a Senior Advisor to the Trump Campaign, retweeted Defendant Trump's retweet of the Trump Campaign's January 3 tweet linking the OAN news clip featuring Kylie Kremer using his @JasonMiller in DC account.

- Ex. 214, No. 1 (answering that Jason Miller was a "Senior Advisor" to the Campaign);

- Ex. 109 at PLAINTIFFS_00070058 linking to https://web.archive.org/web/20210103214740/https://twitter.com/JasonMillerinDC.

243.    ████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████

- Ex. 56, No. 24.

244. ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

- Ex. 56, No. 25.

245. ████████████████████████████████████████████

████████████████████████████████████

- Ex. 56, No. 29.

246.    On January 6, 2021, Twitter account @TeamTrump tweeted:  "We must SAVE

AMERICA!  Pass it on."

- Ex. 215.

247.    On January 6, 2021, Twitter account @TeamTrump tweeted:  "This is what Democracy

looks like," along with a photo of the Rally.

- Ex. 216.

248.    The Instagram account @teamtrump posted:  "This is what Democracy looks like," along

with a photo of the Rally, and listing 203,615 likes as of January 6, 2021.

- Ex. 217 at PLAINTIFFS_00072878.

249.    On January 6, 2021, Twitter account @TeamTrump tweeted:  "President

@realDonaldTrump:  'We were leading, then . . . late in the evening and early in the morning

. . . Boom! These explosions of BULLSHIT!," along with a Fox News clip of Trump's speech at the Rally.

- Ex. 151.

250.    The Instagram account @teamtrump posted: "@realDonaldTrump: STOP THE STEAL!," along with a Fox News clip or photo of Trump's speech at the Rally, which received 232,010 views as of January 6, 2021.

- Ex. 152 at PLAINTIFFS_00072876.

251.    There is no evidence in the record demonstrating that the @White House and @POTUS accounts tweeted about the Rally.

E.    Logistics for the Rally

252.    Caroline Wren helped coordinate logistics for the Rally, including coordinating promotion of the Rally, production of the Rally, and access to the Rally.

- Ex. 81 at PLAINTIFFS_00001459–62 (text messages between C. Wren and T. Enlow discussing advertisement package proposals, seeking contracts for speakers, updated fliers or website links to advertise the Rally, and requesting VIP passes and access badges for speakers and the media for the Rally);
- Ex. 60 at 194:17–195:8 (C. Wren stating that she coordinated speaking fee payments for K. Guilfoyle and D. Trump Jr. for the Rally);
- Ex. 82 at 74:21–75:14 (K. Guilfoyle stating that C. Wren "brought [speaking fees] to [Guilfoyle's] attention").

253.    WFAF helped coordinate logistics for the Rally, including coordinating payments associated with the Rally, organizing lodging for certain speakers at the Rally, and furnishing marshals and volunteers.

- Ex. 218 at KKremer2222–23 (K. Kremer coordinating with NPS for the Rally permit);

- Ex. 219 at KKremer4918 (Jan. 1, 2021 text message from J. Hulsey to K. Kremer listing rally attendees WFAF was "paying for");

- Ex. 220 at KKremer5489 (K. Kremer texting A. Kremer that "We do have total control… Do you realize…the fact that most events on the ellipse take 6-8 months to plan and we've done it in just a few days[,] . . . [o]r that we've been raising so much money and web traffic because POTUS wants it all to go to your organization?");

- Ex. 221 at KKremer4067 (Jan. 8, 2021 text from A. Kremer in a group chat about the Rally, "If you have any expenses you need yo [sic] be reimbursed, you need to get them to me today");

- Ex. 56, No. 46 ███████████████████████████████████
███████████████████████

- Ex. 222 at KKremer0560 (WFAF permit application stating WFAF "[w]ill . . . furnish marshals and/or volunteers," who would perform "crowd control, safety");

- Ex. 223 at KKremer2399–402 (K. Kremer emailing the Willard InterContinental Washington D.C. regarding the "WFAF Room List");

- Ex. 224 at KKremer2417 (K.Kremer email to M. Richardson of NPS with a proposed "medical plan" for the Rally).

254.    WFAF repeatedly represented to others that the Rally was its event.

- Ex. 218 at KKremer2223 (email from NPS stating that K. Kremer and J. Hulsey "are now the point of contacts [sic] for applications 21-0212 Women for America First for Freedom Plaza/Lincoln Memorial from January 5-7 with an event date of January 6");

- Ex. 88 at KPierson0378 (K. Kremer texting K. Pierson on Dec. 31, 2020, stating: "[o]ur event is January 6th. That's why we made all of these deals.");

- Ex. 83 at PLAINTIFFS_00001382 (J. Caporale texting C. Wren on Dec. 26, 2020 as to his understanding that "it's women for america first who [] is doing the event on the 6th").

255. Event Strategies worked with WFAF and helped organize logistics for the Rally, including scheduling for and the production of the Rally, with Event Strategies paying for the Rally's medical plan.

- Ex. 83 at PLAINTIFFS_00001388 (J. Caporale texting C. Wren on Dec. 29, 2020 regarding "schedule proposal" and "a call to action to march to [the] capitol and make noise");

- Ex. 85 at KPierson0042 (J. Caporale discussing "graphics proofs for the stage design and credentials" for the Rally);

- Ex. 108 at KKremer2324, KKremer2327 (identifying Event Strategies as the "production vendor" in documentation submitted to NPS regarding the Rally, as well as the entity responsible for the "trash plan" for the Rally);

- Ex. 74 at KKremer5155 (J. Caporale texting K. Kremer stating she can sign the contract with GW medical for the Rally and he will "pay it").

256.   ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████

- Ex. 69 at SCAVINO_SMITH_0000031; *see also id.* at

  SCAVINO_SMITH_0000030 (████████████████████████

  ███████████

257.   Powers helped coordinate logistics for the Rally, including obtaining 200 "credentials"

for Pierson.

- Ex. 90 (K. Kremer stating "Maggie [Mulvaney] privately emailed Jennifer

  [Hulsey] and told her Caroline [Wren] only authorized 50 passes for us.  This is

  after Megan's email said we have 200" and M. Powers replied "I will have 200

  additional credentials for you").

258.   William Wilson, who worked for the Campaign through at least November 2020,

coordinated the rental of golf carts in connection with the Rally.

- Ex. 66 at rows 2036, 2191 (FEC Data Report from Donald J. Trump For

  President, Inc. showing reimbursements to W. Wilson on Nov. 9, 2020 in the

  amount of $1,260 and Nov. 10, 2020 in the amount of $4,000);

- Ex. 21 at DOI_TOUHY_002965 (Rally permit listing W. Wilson as "Backstage

  Assistant");

- Ex. 225 (Jan. 5–6, 2021 emails between W. Wilson and Golf Cart Sales and

  Service regarding golf cart rentals for Jan. 6, 2021);

- Ex. 226 (Jan. 3, 2021 email from M. Powers to W. Wilson, H. Salem, R. Holden, J. Caporale, and K. Menon with the subject line: "2020.01.06_Expenses – Invitation to edit");

- Ex. 227 (excel spreadsheet associated with Jan. 3, 2021 email from M. Powers to W. Wilson, H. Salem, R. Holden, J. Caporale, and K. Menon identifying vendor payments, costs, and "POC[s]," or Points of Contact, for each vendor).

259.    Ron Holden, who worked for the Campaign through at least November 2020, coordinated the procurement of "No Parking Signs" for the Rally.

- Ex. 66 at rows 1301, 2706 (FEC Data Report from Donald J. Trump For President, Inc. showing disbursement to R. Holden on November 4, 2020 in the amount of $15,693 and November 13, 2020 in the amount of $3,833);

- Ex. 21 at DOI_TOUHY_002965 (Rally permit listing R. Holden as "Backstage Manager");

- Ex. 226 (Jan. 3, 2021 email from M. Powers to W. Wilson, H. Salem, R. Holden, J. Caporale, and K. Menon with the subject line: "2020.01.06_Expenses – Invitation to edit");

- Ex. 227 (excel spreadsheet associated with Jan. 3, 2021 email from M. Powers to W. Wilson, H. Salem, R. Holden, J. Caporale, and K. Menon identifying vendor payments, costs, and "POC[s]," or Points of Contact, for each vendor).

260.    Ali Alexander, founder of Stop the Steal, helped organize logistics for the Rally, including attending a "planning call" for the Rally on January 3 that "Members of Congress and/or their staffs" were invited to join.

- Ex. 228 at 32:18–25, 154:6–57:5, 184:18–85:3 (A. Alexander testifying regarding how he "folded" a Stop the Steal Event into the Rally).

261. Budowich referred to the Rally as a "DJTFP rall[y]."

- Ex. 92 at 102:5–8 (T. Budowich discussing her text message to J. Caporale in which she stated "We know how DJTFP rallies can get").

262. A "Guidance Memo" stated that attendees of the Rally should direct questions about the Rally to former Trump campaign employees including Caroline Wren, Maggie Mulvaney and Cassidy Kofoed, and provided their contact information.

- Ex. 31 at NARA_PROD_042387 (stating "[i]f you have any questions please contact" C. Wren, M. Mulvaney, K. Schaefer, or C. Kofoed).

F.   Speakers for the Rally

263. On December 31, 2020, Kylie Kremer and Megan Powers emailed each other about the Rally speaker list.

- Ex. 91 (email from K. Kremer to M. Powers with draft speakers list).

264. On January 2, 2021, Cindy Chafian texted Katrina Pierson: "This is my lineup. Please send me a copy of yours as well so I can submit everything to NPS by Monday. What else I need: Speaker names and all of their guest's names. I'll get the credentials to you Monday evening for distribution. . . ."

- Ex. 232 at KPierson0072 (Jan. 2, 2021 text messages between C. Chafian and K. Pierson).

265. Kylie Kremer asked for Megan Powers's approval before sending the speaker list to the NPS.

- Ex. 91 (K. Kremer asking M. Powers "let me know if you approve of sending" an attached "PDF of the first very loose draft of speakers" for the Rally).

266.    Megan Powers edited the document and told Kylie Kremer she was "good to now send to the Park Service."

- Ex. 91 (email from K. Kremer to M. Powers with draft speakers list).

267.    On January 4, 2021, Katrina Pierson met with Defendant Trump to discuss the list of speakers at the Rally.

- Ex. 86 at 104:7–118:1 (K. Pierson testifying that "[on] January 4th at 3:30 pm" (*id.* at 104:7–13), she discussed the speaker list with Defendant Trump (*id.* at 113:8–118:1)).

268.    On January 4, 2021, Katrina Pierson emailed Megan Powers and Justin Caporale the "POTUS list" of speakers.

- Ex. 233 at KPierson0065–66 (email from K. Pierson to M. Powers and J. Caporale with "POTUS list" of speakers).

269.    Katrina Pierson also provided instructions on the start time for the Rally, the order of speakers, and how to allocate time between speakers.

- Ex. 233 (email from K. Pierson to M. Powers and J. Caporale instructing a "7:00am Doors Open," an order for the speakers, and a "limit[]" of "3 minutes").

270.    At approximately 11 p.m. E.T. on January 5, 2021, WFAF received the final list of speakers for the Rally from Defendant Trump, who "decided who was speaking."

- Ex. 203 at 83:20–84:9 (A. Kremer testifying that "POTUS was the one that decided who was speaking.").

271.    Kimberly Guilfoyle spoke at the Rally.

- Ex. 113 (Video of "Save America Rally");

- Ex. 56, No. 55.

272.  Donald Trump, Jr. spoke at the Rally.

- Ex. 113 (Video of "Save America Rally");

- Ex. 56, No. 62.

273.  ████████████████████████████████████

████████████

- Ex. 56, No. 63.

274.  Lara Trump spoke at the Rally.

- Ex. 113 (Video of "Save America Rally");

- Ex. 56, No. 64.

275.  ████████████████████████████████████

██████████

- Ex. 56, No. 66.

276.  Eric Trump spoke at the Rally.

- Ex. 113 (Video of "Save America Rally");

- Ex. 56, No. 67.

277.  ████████████████████████████████████

██████████

- Ex. 56, No. 68.

278.  John Eastman spoke at the Rally.

- Ex. 113 (Video of "Save America Rally");

- Ex. 56, No. 69.

279. 

- Ex. 56, No. 70.

280.  Rudy Giuliani spoke at the Rally.

- Ex. 113 (Video of "Save America Rally");

- Ex. 56, No. 71.

281.

- Ex. 56, No. 72.

282.

- Ex. 111, No. 83.

283.

- Ex. 111, No. 84.

284.

- Ex. 111, No. 85.

285.

- Ex. 111, No. 86.

286.  Donald Trump, Jr. and Kimberly Guilfoyle were paid for speaking at the Rally using private funds that were solicited for the Rally.

- Ex. 60 at 192:17–95:18 (C. Wren testifying that "Turning Point Action" agreed to pay Donald Trump Jr. and Kimberly Guilfoyle $60,000 to speak (*id.* at 195:4–8)).

G.    White House Processes and Procedures as Related Political Events

287.  ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████

- Ex. 111, No. 92

288.  ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

- Ex. 111, No. 93;

- Ex. 86 at 35:20–36:9 (K. Pierson testifying that in her work on the Trump

  Campaign she communicated with "Jason Miller because he was head of

  comms . . . [and she] always kept senior staff involve of what efforts were going

  on via coalitions").

289.  ███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

- Ex. 111, No. 93.

290.  ███████████████████████████████████████████

███████████████████████████████████████████

- Ex. 111, No. 91.

291.  Judd Deere served as White House Deputy Press Secretary from "November or

December of 2018" to January 20, 2021.

- Ex. 190 at 10:15–11:17 (J. Deere stating he worked at the White House until January 20, 2021 and held three positions during his time there, with the third position being Deputy Press Secretary).

292.    Judd Deere testified that "anything to do with Donald Trump as a candidate, be it encouraging people to vote for him for X, Y, or Z reason, or dealing with lawsuits after the election or allegations of fraud in certain States, all of that would have been handled by the campaign."

- Ex. 190 at 19:10–18.

293. 

- *E.g.*, Ex. 136

- Ex. 146 (

- Ex. 147 (



294. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████

- *Compare* Ex. 125 at NARA_PROD_097767 ████████████████

  ███████████████████████████████████

  ████████████████████████████, *with* Ex. 126 ████████████

  ██████; Ex. 127 (████████████████ Ex. 128 ███████████

  ██████; Ex. 129 ████████████████ Ex. 130 ███████████

  ██████ Ex. 131 ████████████████; Ex. 132 ███████████

  ██████ Ex. 133 ████████████████); Ex. 134 ███████████

  ██████; Ex. 135 (████████████████; Ex. 136 ███████████

  ██████ Ex. 137 (████████████████); Ex. 138 ███████████

  ██████ Ex. 139 (████████████████); Ex. 140 ███████████

  ██████; Ex. 141 ████████████████ Ex. 142 ███████████

  ██████ Ex. 143 ████████████████ Ex. 144 ███████████

  ██████); Ex. 145 (████████████████ Ex. 146 ███████████

  ██████ Ex. 147 ████████████████; Ex. 148 ███████████

  ██████; Ex. 149 ████████████████

295. ███████████████████████████████████████████████

████████████████████████████████████████████████████.

- Ex. 125 at NARA_PROD_097767 ███████████████████████

███████████████████████████████████████████████████████

████████████████████

296. ████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

- Ex. 125 at NARA_PROD_097767 (emphasis added).

297. ███████████████████████████████████████████████

████████████████████████████████████████

- Ex. 125 at NARA_PROD_097768 (emphasis added).

298. ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

- Ex. 126 (████████████████████████

- Ex. 127 ████████████████████████████);

- Ex. 128 ████████████████████████

- Ex. 129 (████████████████████████

- Ex. 130 (████████████████████████

- Ex. 131 ████████████████████████);

- Ex. 132 (████████████████████████

- Ex. 133████████████████████████);

- Ex. 134  );

- Ex. 135

- Ex. 136

- Ex. 137 (

- Ex. 138

- Ex. 139 (

- Ex. 140 (

- Ex. 141 (

- Ex. 142 (

- Ex. 143

- Ex. 144 (

- Ex. 145 (

- Ex. 146

299.

- Ex. 147 (

- Ex. 148

- Ex. 149

300.    The speechwriting team knew to use their personal devices and emails for

political/campaign speeches.

- Ex. 121 at 18:1–6 (R. Gabriel describing knowledge that "you have to abide by the Hatch Act" for political or campaign-related speeches, necessitating use of "your personal computer with your personal email to spend your time drafting the remarks");

- Ex. 122 at 20:22–21:10 (V. Haley testifying to knowledge that "on political speeches," speechwriters were "to minimize, you know, writing them on your work computer," with drafts instead "done on personal laptops");

- Ex. 58 at 16:22–17:1; 22:18–23:13 (R. Worthington testifying that "for political speeches, we would generally try drafting on our personal devices," and would "generally use my personal hotspot").

301.    The White House speechwriting office generally used Google Docs for drafting political speeches and not for official speeches.

- Ex. 58 at 17:9–13 (R. Worthington stating "[w]e generally would use Google Docs for political speeches and not for official speeches").

302.    Both Ross Worthington and Vincent Haley, members of the White House speechwriting office, explained that drafts of political speeches were prepared on Google Docs, but soon before political speeches were delivered, they were sent through official White House channels, including the "staff secretary circulation."

- Ex. 58 at 16:22–17:13, 23:12–13 (R. Worthington testifying that "[t]here comes a point where we understood from the White House counsel's office that things need to be transferred for them to do the staff secretary circulation" (*id.* at 17:2–3);

- Ex. 122 at 20:22–21:5 (V. Haley testifying that "[o]n political speeches, initial drafts would be done on personal laptops, and then, as we got to the speech day, those would then go onto the official system.").

303.    Transcriptions stylized as "internal transcripts" were considered by the White House as "political speeches."

- Ex. 122 at 21:15–23 (V. Haley stating that "my recollection is internal transcripts were political speeches").

304.    

- Ex. 111, No. 97.

305.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████

- Ex. 111, No. 98.
- Ex. 46 (Jan. 3, 2021 email distributing "draft POTUS remarks for [Jan. 4, 2021] event in GA. . . . This speech will be delivered at a political event").

306.    ████████████████████████████████████

████████████████████████████████████

- Ex. 111, No. 99.

307.    ██████████████████████████████████

████████████████████████████████████



- Ex. 111, No. 100.

308.

- Ex. 111, No. 103.

309.

- Ex. 111, No. 95.

310.

- Ex. 111, No. 96.

H.    The White House and the U.S. Government's Role in the Rally

311.    The permit issued by NPS for the Rally was not issued to the White House or any other

federal government entity.

- Ex. 21 at DOJ_TOUHY_002934 (NPS permit for the "First Amendment Rally"
  issued to "Women for America First).

312.

- Ex. 111, No. 94.

313.

- Ex. 163, No. 246.

- Ex. 122 at 21:15–23 (V. Haley stating that "my recollection is internal transcripts were political speeches").

314.    The White House speechwriting team, including Ross Worthington, Vincent Haley, and

Stephen Miller, drafted both official speeches and political/campaign speeches, and they

helped draft Defendant Trump's Rally Speech.

- Ex. 121 at 11:8–12:11 (R. Gabriel identifying the speechwriting team), 17:20–18:11 (R. Gabriel testifying regarding the speechwriting team's processes for drafting both official speeches and political/campaign speeches), 37:15–23 (R. Gabriel testifying that the speechwriting team worked on the Rally speech and he was involved to "make sure, like, it's sent to staff secretary" and Defendant Trump had "a speech in hand and it's sent to the teleprompter");

- Ex. 122 at 20:22–21:13 (V. Haley testifying to the processes required for official and political speeches; 74:6–10 (V. Haley testifying "Ross has the lead pen on [the Rally speech], and I was involved");

- Ex. 58 at 15:20–16:11 (R. Worthington testifying that Worthington, Haley, and Miller worked on the official and political speeches), 105:18–106:8 (R. Worthington testifying he and Haley contributed to drafting the Rally speech).

315.    Miller testified that "[i]t was blindingly obvious that the purpose of the speech was to

build support for the *election* contest."

- Ex. 57 at 131:7–12 (emphasis added).

316.    After receiving a copy of Defendant Trump's Rally speech the morning of the Rally, White House Counsel Pat Cipollone instructed Deputy White House Counsel Pat Philbin that it was not their role to review or sign off on the factual accuracy of the speech.

- Ex. 150 at 137:19–138:19.

317.    Miller stated in a Declaration that "the White House Counsel's Office and other White House staff reviewed all speeches regardless of whether they were 'official' or 'unofficial.'"

- Ex. 43 (Miller Decl.) ¶ 8.

318.    Worthington testified that, "as a general matter, for political speeches, there was less interest of various White House components . . . to provide input.  So generally political speeches were rallies."

- Ex. 58 at 16:4–8 (R. Worthington stating that "political speeches were rallies").

319.    Worthington testified that "staff secretary circulation" of a speech "would happen for any speech, whether it's political or official."

- Ex. 58 at 16:22–17:8 (R. Worthington stating that "we understood from the White House counsel's office that things needed to be transferred over to them to do the staff secretary circulation," which "would happen for any type of speech, whether it's political or official" and "as a general matter, the staff secretary process reviewed all speeches").

320.    Worthington used his personal device to work on Defendant Trump's Rally Speech.

- Ex. 58 at 115:15–21 (R. Worthington stating that he used his personal devices to work on the Rally Speech).

321.    The White House speechwriting team used their personal email accounts when drafting the Rally Speech.

- Ex. 121 at 38:8–11 (R. Gabriel testifying they used their personal accounts in connection with the Rally Speech).

322. Worthington "work[ed] on" the first draft of the Rally Speech in Google Docs.

- Ex. 58 at 119:10–23 (R. Worthington stating that he worked on the first draft of the Rally Speech in Google Docs on his personal computer).

323. ████████████████████████████████████████████████.

- Ex. 111, No. 87 (████████████████████████████████████
████████████████████████████████.

324. ████████████████████████████████████████
████████████████████████████.

- Ex. 111, No. 101 (████████████████████████████
████████████████████████████████████
████.

325. ████████████████████████████████████████
████████████.

- Ex. 111, No. 102 ██████████████████████████
████████████████████████.

326. ████████████████████████████████████
██████████████████████████████████████████.

- Ex. 111, No. 105.

327. ████████████████████████████████████████
████████████.

- Ex. 111, No. 88.

- RJN at ¶ 27; *see also* Ex. 50 (*Knight* Cert. Pet.) at 5, 13 (contrasting the "@realDonaldTrump account" "to the @WhiteHouse and @POTUS accounts, over which he may exercise control only by virtue of his office");

- RJN at ¶ 9; *see also* Ex. 158 at PLAINTIFFS_00070029–30 (https://www.trumplibrary.gov/research/archived-social-media);

- RJN at ¶ 11; *see also* Ex. 158 at PLAINTIFFS_00070029–30 (https://www.trumplibrary.gov/research/archived-social-media).

328. ███████████████████████████████████████████████

- Ex. 111, No. 89.

- RJN at ¶ 27; *see also* Ex. 50 (*Knight* Cert. Pet.) at 5, 13 (contrasting the "@realDonaldTrump account" "to the @WhiteHouse and @POTUS accounts, over which he may exercise control only by virtue of his office");

- RJN at ¶ 9; *see also* Ex. 158 at PLAINTIFFS_00070029–30 (https://www.trumplibrary.gov/research/archived-social-media);

- RJN at ¶ 11; *see also* Ex. 158 at PLAINTIFFS_00070029–30 (https://www.trumplibrary.gov/research/archived-social-media).

329. Hope Hicks was a White House employee and counselor to Defendant Trump at the time of the Rally.

- Ex. 229 at 6:10–7:14 (H. Hicks testifying "in January of 2017 . . . [I] worked in the White House for about 15 months," that she left the White House for a period of time and "in March of 2020, I returned to the White House where I served as counselor to the President"); 100:22–23 (H. Hicks testifying she worked at the White House until "January 12th [2021]").

330.    Hicks stated that the Save America Rally was not "submitted through the traditional

scheduling process," and she was not sent documents "that outlined what the purpose was,

who the attendees were, like something you [White House officials] would normally get at an

event the President is attending or speaking at before a decision is made that he will

participate."

- Ex. 229 at 122:11–22.

331.    When Hicks was asked why she "didn't get the kind of material you would normally get

before a Presidential event," Hicks stated "I don't know.  Maybe because people thought [the

Rally] was more of a campaign event."

- Ex. 229 at 121:4–122:22 (H. Hicks stating: Q:  "And do you know why that is that
  you didn't get the kind of material you would normally get before a Presidential
  event?" A:  "I don't know.  Maybe because people thought it was more of a
  campaign event is the only thing I can think of.").

332.    When Hicks was asked what she meant by writing "[a]s predicted" and "[S]o dumb," in

response to a message from Justin Wells on the afternoon of January 6 at 2:27 p.m saying

"this won't end well," Hicks stated:  "I just didn't see this whole thing going well.  There was

no good that was going to come from an event like this . . . I just predicted that this whole

thing, in terms of talking about the election in the way that we had for several weeks, months

now, and events like this are – predictably no good comes from them."

- Ex. 229 at 121:4–20.

333.    Referring to the events of January 6, Hicks stated:  "It was stupid to gather people before

the certification of the vote and imply that there was still a path to victory."

- Ex. 229 at 121:16–20.

334.    Hicks also testified that "this could have all been avoided . . . by conceding the election."

- Ex. 229 at 122:3–10.

## IX.    Trump's Involvement in the Rally

335.    Defendant Trump took the Ellipse stage at noon on January 6, 2021, and spoke to the

assembled crowd for approximately one hour and fifteen minutes.

- Ex. 56, No. 75.

- Ex. 42 at NARA_PROD_097096 ██████████████████████); *id.* at

NARA_PROD_097125 ████████████████████

- Ex. 113 (YouTube video of full "Save America Rally," with Defendant Trump

appearing on stage at the approximate video timestamp of 2:33:58, and Defendant

Trump leaving the stage at the approximate video timestamp of 3:49:04); *see also*

Ex 56, No. 76 ███████████████████████████████

████████████████████████

336.    Defendant Trump made similar comments during his January 6, 2021 speech at the Rally

and during a January 4, 2021 speech in Dalton, Georgia, as illustrated by **Ex. 59** (transcript of

Jan. 4, 2021 Speech in Dalton) and **Ex. 42** (transcript of Jan. 6, 2021 Rally Speech bearing

the stamp "Internal Transcript" (*id.* at NARA_PROD_097096, *see* PLAINTIFFS_00063794

at 21:15–23)).

| Jan. 4, 2021, Dalton, GA. rally speech.  Ex. 59 | Jan. 6, 2021, Rally Speech.  Ex. 42 |
|---|---|
| • "[A]nd they're not taking this White House. We're going **to fight like hell**." Ex. 59 at 4:19–20.<br><br>• "If you don't fight to save your country with everything that you have, **you're not** | • "We **fight like hell**.  And if you don't fight like hell, **you're not going to have a country anymore**." Ex. 42 at NARA_PROD_097125. |

| Jan. 4, 2021, Dalton, GA. rally speech.  Ex. 59 | Jan. 6, 2021, Rally Speech.  Ex. 42 |
|---|---|
| **going to have a country left**.”  Ex. 59 at 19:23–24. | |
| • “[B]ut when you win in a landslide and they steal it and it's **rigged**, it's not acceptable.”  Ex. 59 at 4:25–5:1 | • “And this year they **rigged** an election.”  Ex. 42 at NARA_PROD_097097. |
| • “How about the press?  Look at them back there. . . . But, you know, they've gone silent now.  They have a new thing.  **They used to fight me left, right -- I'd go, they'd go.  You know, you'd fight, I'd win, they'd win -- who knows who wins?** . . . Now they don't want to talk about it . . . they went stone cold silent. . . . Big tech, the fake news media, they go silent anymore.  They don't talk about it, and that is the beginning of **communism**.”  Ex. 59 at 5:10–25.. | • “The American people do not believe the corrupt, fake news anymore.  They have ruined their reputation . . . But you know, it used to be that they'd argue with me.  **I'd fight so -- I'd fight, they'd fight, I'd fight, they'd fight . . . they had their point of view**; I had my point of view, but you'd have an argument.  Now what they do is they go silent.  It's called “suppression.”  And that's what happens in a **communist country**.”  Ex. 42 at NARA_PROD_097106-7107. |
| • “I **hope Mike Pence comes through for us**, I have to tell you.  I hope that our great vice president . . . comes through for us.”  Ex. 59 at 6:9–12. | • “I **hope Mike is going to do the right thing**.  I hope so.”  Ex. 42 at NARA_PROD_097098. |
| • “If [Democrats] Ossoff and Warnock are elected . . . they'll **throw open American borders** . . . .”  Ex. 59 at 13:3–5. | • “Democrats enacted policies that . . . **threw open our borders** and put America last.”  Ex. 42 at NARA_PROD_097101. |
| • “[W]e built almost 500 miles of wall and **they want to rip down the wall**.  They want to rip down. . . . So, they're coming up now, the caravans.  **Remember the caravans?  The caravans are starting to form.**  Here they come. . . . If they win this race, Democrats will implement nationwide catch and release.”  Ex. 59 at 13:16–14:7. | • “You know, the wall is built.  We're doing record numbers at the wall.  Now, **they want to take down the wall**.  Let's let everyone flow in.  Let's let everybody flow in.  We did a great job in the wall.  Remember, the wall, they said it could never be done – one of the largest infrastructure projects we've ever had in this country, and it's had a tremendous impact.  And we got rid of catch and release. . . . But now, **the caravans**, I think Biden's getting in. |

| Jan. 4, 2021, Dalton, GA. rally speech. Ex. 59 | Jan. 6, 2021, Rally Speech. Ex. 42 |
|---|---|
| | **The caravans are forming again**.” Ex. 42 at PLAINTIFFS_00070125. |
| • “**The most unhappy person right now, anywhere** in the United States **is Hillary Clinton** because she’s asking the Democrat party, why the hell didn’t you do this for me? . . . True. **Why didn’t you do it for me?** . . . Why the hell didn’t you? You **notice how quiet she’s been**?” Ex. 59 at 37:15–24. | • “And the only unhappy person in the United States, **single most unhappy, is Hillary Clinton**, because she said: ‘**Why didn’t you do this for me four years ago**? Why didn’t you do this for me four years ago? Change the votes – 10,000 in Michigan. You could have changed the whole thing.’ But she’s not too happy. You notice she, **you don’t see her anymore**. What happened? Where’s Hillary? Where is she?” Ex. 42 at NARA_PROD_097124. |
| • “I’ve had **two elections. I won both of them.** It’s amazing. And I actually did **much better on the second one**.” Ex. 59 at 2:10–12. | • “I’ve been in **two elections; I won them both,** and the second one, I won **much bigger than the first**.” Ex. 42 at NARA_PROD_097097. |
| • “**Almost 75 million people voted for me -- the most of any incumbent president in the history of our country**. We won over 11 million -- close to **12 million, more votes than 2016**; one of the largest -- actually, the single **largest increase** in the history of our country.” Ex. 59 at 6:20–25. | • “**Almost 75 million people voted for our campaign, the most of any incumbent president by far in the history of our country**. Twelve **million more people than four years ago**.” Ex. 42 at NARA_PROD_097097. |
| • “The U.S. military, which we rebuilt -- we’ve totally **rebuilt the U.S. military**, much of it coming right out of Georgia.” Ex. 59 at 11:16–18. | • “We got rid of plenty of different things that everybody knows and the **rebuilding of our military** in three years. People said it couldn’t be done. And it was all made in the USA, all made in the USA, best equipment in the world.” Ex. 42 at NARA_PROD_097114. |
| • “**We want voter ID**. Is that so much to ask?” Ex. 59 at 15:22_23. | • “**We want voter ID,** by the way. . . .” Ex. 42 at NARA_PROD_097110. |
| • “They never got the approval. You have to, by law, under the Constitution, you can’t just do these deals and not get the approval, | • “So, just in a nutshell, you can’t make a change on voting for a federal election **unless the state legislature approves** |

| Jan. 4, 2021, Dalton, GA. rally speech.  Ex. 59 | Jan. 6, 2021, Rally Speech.  Ex. 42 |
|---|---|
| and your secretary of state -- or whoever it was -- made this horrible consent decree -- horrible -- which got rid of so much safety. . . . **And it was only approved by your local politicians -- him -- and local judges.  You can't do that.  You have to have your state legislatures do it.**  That's true with all states."  Ex. 59 at 37:2–11. | it.  No judge can undo it.  Nobody can do it.  Only a legislature."  Ex. 42 at NARA_PROD_097110. |
| • "**In Pennsylvania, there were 205,000 more ballots cast than there were voters.**"  Ex. 59 at 39:10–11 | • "So, in Pennsylvania, you had 205,000 more votes than you had voters."  Ex. 42 at NARA_PROD_097110. |
| • "**In Wisconsin, over 90,000 ballots were illegally harvested.** . . . through so-called human drop boxes, and **over 500 illegal unmanned drop boxes** were put out statewide."  Ex. 59 at 38:22–25. | • "**In Wisconsin**, corrupt Democrat-run cities deployed **more than 500 illegal, unmanned, unsecured drop boxes, which collected a minimum of 91,000 unlawful votes**."  Ex. 42 at NARA_PROD_097114. |
| • "**In addition, over 170,000 absentee votes were counted that are blatantly illegal under Wisconsin law** and should never have been included in the tally."  Ex. 59 at 39:1–3. | • "**In addition, over 170,000 absentee votes were counted in Wisconsin** without a valid absentee ballot application."  Ex. 42 at NARA_PROD_097115. |
| • "I said, I want you to go to **Fulton County to check the signatures**, because **hundreds of thousands** of ballots came in. I want you to check the signature to see if it compares to somebody who lived there two years, four years or six years ago.  **They don't want to do it . . . .**"  Ex. 59 at 36:4–8. | • "But we've been trying to get **verifications of signatures in Fulton County.  They won't let us do it.**  The only reason they won't is because we'll find things in the **hundreds of thousands**.  Why wouldn't they let us verify signatures in Fulton County, which is known for being very corrupt?  **They won't do it.**"  Ex. 42 at NARA_PROD_097116. |
| • "We were up **10,315 ballots were cast by individuals whose name and date of birth matches a Georgia resident who died in 2020, prior to the election. . . . 2,506 ballots were cast by individuals whose name and date of birth matches an incarcerated felon in a Georgia prison.** | • "**Over 10,300 ballots in Georgia were cast by individuals whose names and dates of birth match Georgia residents who died in 2020 and prior to the election.  More than 2,500 ballots were cast by individuals whose names and dates of birth match** |

| Jan. 4, 2021, Dalton, GA. rally speech.  Ex. 59 | Jan. 6, 2021, Rally Speech.  Ex. 42 |
|---|---|
| Maybe they aren't all there, but they did a lot of work.  They paid a lot of money to a lot of people, I can tell you that.  **4,502 illegal ballots were cast by individuals who do not appear on the state's voter rolls.  Well, that's sort of strange.  18,325 illegal ballots were cast by individuals who registered to vote using an address listed as vacant according to the postal service.  At least 86,880 ballots were cast by people whose registrations were illegally backdated.**" Ex. 59 at 34:4–22. | **incarcerated felons in Georgia prison** -- people who are not allowed to vote. **More than 4,500 illegal ballots were cast by individuals who do not appear on the state's own voter rolls.  Over 18,000 illegal ballots were cast by individuals who registered to vote using an address listed as 'vacant,' according to the Postal Service.**  At least 88,000 ballots in Georgia were cast by people whose registrations were illegally backdated." Ex. 42 at NARA_PROD_097117–18. |
| • **"In Arizona, more than 36,000 votes were cast by noncitizens . . . .**" Ex. 59 at 40:25–41:1. | • **"In the state of Arizona, over 36,000 ballots were** illegally **cast by non-citizens.**" Ex. 42 at NARA_PROD_097118. |
| • **"In Clark County, Nevada, over 130,000 ballots** -- this is far -- just so you know, all these numbers, these are far more than we need -- **were processed on machines where the signature matching threshold was intentionally lowered to a level that you could sign your name, 'Santa Clause,' and it wouldn't pick it up.** Didn't pick up anything.  **More than 42,000 people in Nevada double voted.**" Ex. 59 at 40:16–23. | • **"In Clark County, Nevada, the accuracy settings on signature verification machines were purposely lowered before they were used to count over 130,000 ballots. If you signed your name as 'Santa Claus,' it would go through.**  There were also **more than 42,000 double votes in Nevada.**" Ex. 42 at NARA_PROD_097118. |

337.    During his Rally speech on January 6, Defendant Trump repeatedly referred to the

election as "stolen," including singling out specific states:

- Defendant Trump claimed more than 36,000 ballots were cast by non-citizens in

    Arizona.  Ex. 113 at 3:29:29–3:29:39 (YouTube video of full "Save America

    Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the

    accuracy of the recording of the statements made at the Rally).

- Defendant Trump claimed more than 10,300 ballots in Georgia were cast by individuals whose names and dates of birth matched Georgia residents who died prior to the 2020 election.  Ex. 113 at 3:27:36–3:27:49 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- Defendant Trump claimed ballots were cast in Nevada and Michigan by individuals whose names and dates of birth matched those of residents of those states who died prior to the 2020 election.  Ex. 113 at 3:30:48–3:31:01; 3:31:32– 3:31:41 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- Defendant Trump claimed votes were illegally counted in Wisconsin.  Ex. 113 at 3:20:19–3:22:12 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- Defendant Trump claimed there were hundreds of thousands more ballots than there had been voters in Pennsylvania.  Ex. 113 at 3:10:02–3:11:18 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- Defendant Trump said, "[w]hen you catch somebody in a fraud, you're allowed to go by very different rules."  Ex. 113 at 3:38:56–3:39:02 (YouTube video of full

"Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- Defendant Trump said, "I've been in two elections; I won them both, and the second one I won much bigger than the first." Ex. 113 at 2:39:28–2:39:35 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- Defendant Trump said, "[a]ll of us here today do not want to see our election victory stolen by emboldened radical-left Democrats, which is what they're doing. And stolen by the fake news media. That's what they've done and what they're doing. We will never give up, we will never concede. It doesn't happen. You don't concede when there's theft involved." Ex. 113 at 2:38:30–2:38:52 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- Defendant Trump said, "Democrats attempted the most brazen and outrageous election theft—and there's never been anything like this, it's a pure theft—in American history." Ex. 113 at 2:48:57–2:49:06 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- Defendant Trump said, "You will have an illegitimate President. That's what you'll have. And we can't let that happen." Ex. 113 at 3:15:18–3:15:24 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting

that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- Defendant Trump said, "[m]ake no mistake, this election was stolen from you, from me, and from the country." Ex. 113 at 3:29:14–3:29:20 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

338.    During his speech on January 6, 2021, Defendant Trump mentioned Mike Pence to the crowd several times, insisting that he should "do[] the right thing."  Trump said:

- "Because if Mike Pence does the right thing, we win the election.  All he has to do, all this is, this is from the number one, or certainly one of the top Constitutional lawyers in our country.  He has the absolute right to do it."  Ex. 113 at 2:42:23–2:42:41 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- "And Mike Pence is going to have to come through for us, and if he doesn't, that will be a, a sad day for our country because you're sworn to uphold our Constitution." Ex. 113 at 2:51:26–2:51:41 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- "They [Pennsylvania] want to recertify.  But the only way that can happen is if Mike Pence agrees to send it back.  Mike Pence has to agree to send it back." (The crowd thereafter chanted "send it back.") Ex. 113 at 3:13:45–3:14:08 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting

that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

- "And Mike Pence, I hope you're going to stand up for the good of our Constitution and for the good of our country.  And if you're not, I'm going to be very disappointed in you.  I will tell you right now.  I'm not hearing good stories."  Ex. 113 at 3:25:49–3:26:05 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

339.   Defendant Trump also encouraged the crowd to "walk" to the U.S. Capitol, stating: "Now, it is up to Congress to confront this egregious assault on our democracy.  And after this, we're going to walk down, and I'll be there with you, we're going to walk down, we're going to walk down.  Anyone you want, but I think right here, we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them.  Because you'll never take back our country with weakness.  You have to show strength, and you have to be strong.  We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated.  I know that everyone here will soon be marching over to the Capitol Building to peacefully and patriotically make your voices heard."

- Ex. 113 at 2:51:43–2:52:49 (YouTube video of full "Save America Rally"); *see also* Ex 56, No. 76 (admitting that he has no basis to dispute the accuracy of the recording of the statements made at the Rally).

340.   Worthington described Defendant Trump as "ad-libbing" his Rally speech.

- Ex. 58 at 169:4–21 (R. Worthington stating that Defendant Trump ad-libbed his Rally speech).

341. The speech that Defendant Trump gave at the Rally differed from the last draft of the speech that the White House speechwriting team circulated.

- Ex. 123 (redline of Rally Speech).

342. For example, Defendant Trump's remarks about joining the crowd to "walk" to the U.S. Capitol were not in the earlier draft of the Rally Speech.

- Ex. 123 at PLAINTIFFS_00003570; *id.* at PLAINTIFFS_00003590.

343. Defendant Trump's remarks about the number of votes he and President Biden received were not in the earlier draft of the Rally Speech.

- Ex. 123 at PLAINTIFFS_00003566; *id.* at PLAINTIFFS_00003567.

344. Defendant Trump's remarks about then Vice President Pence were also not in the earlier draft of the Rally Speech.

- Ex. 123 at PLAINTIFFS_00003567; *id.* at PLAINTIFFS_00003570; *id.* at PLAINTIFFS_00003577; *id.* at PLAINTIFFS_00003581.

345. Defendant Trump's remarks about his feelings towards the Supreme Court were also not in the earlier draft of the Rally Speech.

- Ex. 123 at PLAINTIFFS_00003575.

346. ."

- Ex. 124 at VMH-00000182

236

X.  **Events on January 6, 2021, After the Rally Speech, Including Defendant Trump's Actions Following His Speech**

347.  ███████████████████████████████████████████████

███████████████████████████████████████████

- Ex. 56, No. 30.

348.  According to the Final Report Select Committee to Investigate the January 6th Attack on the United States Capitol, at 2:13 pm ET on January 6, 2021, the U.S. Capitol was breached, and those who entered the Capitol began chanting "Hang Mike Pence!"

- Ex. 115 at 653 & 679 n.159 (finding the Senate Wing of the Capitol was breached at 2:13 p.m. ET, that rioters pushed through a second door—the Senate fire door—at approximately 2:16 p.m. ET, and that Vice President Pence was ushered off the Senate floor "[j]ust as the building was being breached");

- Ex. 115 at 601 & 627 nn.220–221 (finding that shortly before 3:38 p.m. ET, Fox News reported "that the Capitol was on lockdown; that Capitol police officers were injured; that rioters were in the building and 'just feet from the House chamber'") (citations omitted)).

- Ex. 115 at 38.

349.  ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

- Ex. 56, No. 31.

350. 

- Ex. 56, No. 32.

351.    On January 6, 2021, at approximately 6:01 p.m. ET, Defendant Trump tweeted from his @realDonaldTrump handle:  "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long.  Go home with love & in peace. Remember this day forever!"

- Ex. 230 at PLAINTIFFS_00070025 (BBC News article "Capitol riots timeline: What happened on 6 January 2021" with screenshot of tweet).

352.    On March 13, 2023, Defendant Trump said, "Had [Mike Pence] sent the votes back to the legislatures, they wouldn't have had a problem with Jan. 6, so in many ways you can blame him for Jan. 6. . . . Had he sent them back to Pennsylvania, Georgia, Arizona, the states, I

believe, number one, you would have had a different outcome.  But I also believe you wouldn't have had 'Jan. 6' as we call it."

- Ex. 231 at PLAINTIFFS_00070139.


Respectfully submitted,


Dated: February 28, 2025

*/s/ Edward G. Caspar*
Edward G. Caspar, D.C. Bar No. 1644168
Marc P. Epstein D.C. Bar No. 90003967
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, DC 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org
mepstein@lawyerscommittee.org

Faith E. Gay, *pro hac vice*
Joshua S. Margolin, *pro hac vice*
Elizabeth H. Snow, *pro hac vice*
Esther D. Ness, *pro hac vice*
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
jmargolin@selendygay.com
esnow@selendygay.com
eness@selendygay.com

William J. Blechman, *pro hac vice*
Elizabeth B. Honkonen, *pro hac vice*
SPERLING KENNY NACHWALTER
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: 305-373-1000
wblechman@sperlingkenny.com
ebh@sperlingkenny.com

*Attorneys for Plaintiffs Conrad Smith, et al.*

*/s/  Joseph  M.  Sellers*
Joseph M. Sellers, Bar No. 318410
Brian Corman, Bar No. 1008635
Alison S. Deich, Bar No. 1572878
Nina Jaffe-Geffner, Bar No. 90011459 (application
for admission forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue N.W.
Eighth Floor Washington, D.C. 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699
jsellers@cohenmilstein.com
bcorman@cohenmilstein.com
adeich@cohenmilstein.com
njaffegeffner@cohenmilstein.com

Janette McCarthy-Wallace, Bar No. OH066257
Anthony P. Ashton, Bar No. MD25220
NAACP
Office of General Counsel
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: 410-580-5777
jlouard@naacpnet.org
aashton@naacpnet.org

*Attorneys for Plaintiffs Barbara J. Lee, et al.*

*/s/ Matthew Kaiser*
Matthew Kaiser, D.C. Bar No. 486272
Noah Brozinsky, D.C. Bar No. 1655789
KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor
Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
bozinsky@kaiserlaw.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC
1100 H Street N.W. Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com

joe@calebandonian.com

*Attorneys for Plaintiff Eric Swalwell*

## CERTIFICATE OF SERVICE

I certify that on February 28, 2025, a copy of the foregoing was filed with the Clerk of Court using the Court's CM/ECF system, which will send a copy to all counsel of record. Plaintiffs are serving pro se defendants with redacted copies of the Motion and Proposed Order via first class mail or other permitted means.

*/s/ Edward G. Caspar*
Edward G. Caspar
