# Exhibit 50

**No.**

# In the Supreme Court of the United States

———

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., PETITIONERS

*v.*

KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA
UNIVERSITY, ET AL.

———

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

———

**PETITION FOR A WRIT OF CERTIORARI**

———

JEFFREY B. WALL
  *Acting Solicitor General
  Counsel of Record*
HASHIM M. MOOPPAN
  *Counselor to the Solicitor
  General*
SOPAN JOSHI
  *Senior Counsel to the
  Assistant Attorney General*
REBECCA TAIBLESON
  *Assistant to the Solicitor
  General*
SCOTT R. MCINTOSH
JENNIFER L. UTRECHT
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

## QUESTION PRESENTED

Twitter, Inc. is a social media company that enables its users to create accounts through which they post "tweets" and interact with each other. Twitter permits users to "block" other individual users' accounts, and a blocked user account cannot directly see or reply to the blocking user's tweets. President Donald J. Trump created a Twitter account as a private citizen in 2009. He has continued to use that personal account since assuming the Presidency, including to announce official actions or policies. In 2017, President Trump blocked individual respondents' Twitter accounts from his personal account after respondents posted messages on their accounts criticizing him or his policies. The court of appeals held that, in doing so, President Trump violated the First Amendment. The question presented is:

Whether the First Amendment deprives a government official of his right to control his personal Twitter account by blocking third-party accounts if he uses that personal account in part to announce official actions and policies.

(I)

## PARTIES TO THE PROCEEDING

Petitioners (defendants-appellants below) are Donald J. Trump, in his official capacity as President of the United States; and Daniel Scavino, in his official capacity as White House Director of Social Media and Assistant to the President.[*]

Respondents (plaintiffs-appellees below) are the Knight First Amendment Institute at Columbia University; Rebecca Buckwalter; Philip Cohen; Holly Figueroa; Eugene Gu; Brandon Neely; Joseph Papp; and Nicholas Pappas.

## RELATED PROCEEDINGS

United States District Court (S.D.N.Y.):

> *Knight First Amendment Inst. at Columbia Univ.* v. *Trump*, No. 17-cv-5205 (May 23, 2018)

United States Court of Appeals (2d Cir.):

> *Knight First Amendment Inst. at Columbia Univ.* v. *Trump*, No. 18-1691 (Apr. 1, 2020)

---

[*] Two other then-members of the White House staff, Hope Hicks and Sarah Huckabee Sanders, were also defendants in the district court. They were both dismissed from this case in the district court and were not parties to the proceeding in the court of appeals. App., *infra*, 88a, 125a.

(II)

**TABLE OF CONTENTS**

Page

Opinions below ............................................................. 1
Jurisdiction ................................................................. 1
Constitutional provision involved..................................... 2
Statement .................................................................. 2
Reasons for granting the petition ................................... 10
    A.  The court of appeals erred in prohibiting the
        President from using Twitter's blocking function
        within his personal account ........................... 11
    B.  The court of appeals' decision warrants this Court's
        review .................................................... 27
Conclusion ............................................................... 30
Appendix A — Court of appeals opinion (July 9, 2019) ........ 1a
Appendix B — District court memorandum and order
             (May 23, 2018)............................. 24a
Appendix C — Court of appeals order (Mar. 23, 2020) ...... 90a
            — Statement with respect to denial of
                rehearing en banc.................................. 92a
            — Dissent from denial of rehearing
                en banc.................................. 108a
Appendix D — Joint stipulation of facts (Sept. 28, 2017)... 120a

**TABLE OF AUTHORITIES**

Cases:

*American Mfrs. Mut. Ins. Co.* v. *Sullivan*,
  526 U.S. 40 (1999) .........................12, 13, 14, 16, 19
*Arkansas Educ. Television Comm'n* v. *Forbes*,
  523 U.S. 666 (1998)............................................. 23
*Attwood* v. *Clemons*, No. 18-12172, 2020 WL 3096325
  (11th Cir. June 11, 2020) ................................... 28
*Bi-Metallic Inv. Co.* v. *State Bd. of Equalization*,
  239 U.S. 441 (1915)............................................. 25
*Blum* v. *Yaretsky*, 457 U.S. 991 (1982) ................................ 16

(III)

IV

Cases—Continued:                                    Page

*Board of Regents* v. *Southworth*, 529 U.S. 217 (2000) ....... 24

*Campbell* v. *Reisch*, No. 18-cv-4129, 2019 WL
    3856591 (W.D. Mo. Aug. 16, 2019), appeal pending,
    No. 19-2994 (8th Cir. filed Sept. 16, 2019) ...................... 28

*Clinton* v. *Jones*, 520 U.S. 681 (1997) .................................. 29

*Columbia Broad. Sys., Inc.* v. *Democratic Nat'l
    Comm.*, 412 U.S. 94 (1973) ........................................... 12, 16

*Cornelius* v. *NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ................................................. 21, 22, 23

*Denver Area Educ. Telecomms. Consortium, Inc.* v.
    *FCC*, 518 U.S. 727 (1996) ................................................ 23

*Faison* v. *Jones*, 440 F. Supp. 3d 1123
    (E.D. Cal. 2020) ............................................................ 28

*Franklin* v. *Massachusetts*, 505 U.S. 788 (1992) ............... 29

*Garnier* v. *Poway Unified Sch. Dist.*,
    No. 17-cv-2215, 2019 WL 4736208 (S.D. Cal. Sept.
    26, 2019) ...................................................................... 28

*Halleck* v. *Manhattan Cmty. Access Corp.*,
    882 F.3d 300 (2d Cir. 2018), rev'd in part,
    139 S. Ct. 1921 (2019) ..................................................... 7

*Lewis* v. *Clarke*, 137 S. Ct. 1285 (2017) ............................... 14

*Lloyd Corp.* v. *Tanner*, 407 U.S. 551 (1972) ................. 16, 17

*Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922
    (1982) ................................................................. 12, 14, 15, 17

*Manhattan Cmty. Access Corp.* v. *Halleck*,
    139 S. Ct. 1921 (2019) .................................. 12, 15, 16, 17, 18

*Minnesota State Bd. for Cmty. Colls.* v. *Knight*,
    465 U.S. 271 (1984) ..................................................... 25, 26

*Minnesota Voters Alliance* v. *Mansky*, 138 S. Ct.
    1876 (2018) .................................................................... 21

*Mississippi* v. *Johnson*, 71 U.S. (4 Wall.) 475 (1867) ......... 29

*National Endowment for the Arts* v. *Finley*,
    524 U.S. 569 (1998) ......................................................... 24

V

Cases—Continued:                                          Page

*Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983) ........................................ 21, 22

*Pleasant Grove City* v. *Summum*, 555 U.S. 460
   (2009) ...................................................... 9, 24

*Screws* v. *United States*, 325 U.S. 91 (1945) ........... 14, 15, 19

*United States* v. *American Library Ass'n*,
   539 U.S. 194 (2003) ...................................... 22, 23

*United States* v. *Classic*, 313 U.S. 299 (1941) .................... 13

*Van Orden* v. *Perry*, 545 U.S. 677 (2005) ........................... 20

*Wagschal* v. *Skoufis*, 442 F. Supp. 3d 612 (S.D.N.Y.
   2020), appeal pending, No. 20-871 (2d Cir. filed
   Mar. 11, 2020) ................................................... 28

*West* v. *Atkins*, 487 U.S. 42 (1988) .................... 13, 14, 15, 19

Constitution:

   U.S. Const.:
      Amend. I (Free Speech Clause)............................ *passim*
      Amend. IV ................................................... 15

Miscellaneous:

   F. Mott, *American Journalism* (3d ed. 1962) .................... 12
   Twitter:
      *How to block accounts on Twitter*,
         https://help.twitter.com/en/using-twitter/
         blocking-and-unblocking-accounts (last visited
         Aug. 19, 2020) ............................................ 5

      *How to mute accounts on Twitter*,
         https://help.twitter.com/en/using-twitter/
         twitter-mute (last visited Aug. 19, 2020) .................. 4

# In the Supreme Court of the United States

——————

No.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., PETITIONERS

*v.*

KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA
UNIVERSITY, ET AL.

——————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

——————

**PETITION FOR A WRIT OF CERTIORARI**

——————

The Acting Solicitor General, on behalf of President Donald J. Trump and Daniel Scavino, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Second Circuit in this case.

**OPINIONS BELOW**

The opinion of the court of appeals (App., *infra*, 1a-23a) is reported at 928 F.3d 226. The order of the district court (App., *infra*, 24a-89a) is reported at 302 F. Supp. 3d 541.

**JURISDICTION**

The judgment of the court of appeals was entered on July 9, 2019. A petition for rehearing was denied on March 23, 2020 (App., *infra*, 90a-119a). The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

(1)

2

**CONSTITUTIONAL PROVISION INVOLVED**

The First Amendment to the Constitution provides in pertinent part that "Congress shall make no law * * * abridging the freedom of speech." U.S. Const. Amend. I.

**STATEMENT**

Petitioner Donald J. Trump established a personal Twitter account in March of 2009. App., *infra*, 5a. In 2017, President Trump blocked the seven individual respondents from interacting with that Twitter account through their own Twitter accounts. *Id.* at 7a. Those respondents, together with respondent the Knight First Amendment Institute at Columbia University, filed suit, seeking a declaration that the blocking violates the First Amendment. *Id.* at 8a-9a. Based on stipulated facts, the district court granted partial summary judgment for respondents, and the court of appeals affirmed. *Id.* at 1a-23a, 24a-89a.

1. a. Twitter is a privately owned and operated social media platform that generally allows its users—individuals and organizations who have created accounts on the platform and agreed to Twitter's terms of service—to post short messages known as "tweets." App., *infra*, 3a-4a & n.2, 126a, 129a. Each Twitter user creates a unique identifier (called a "handle") for his account and is given a webpage (called a "timeline") that is associated with the account and that records the user's tweets in reverse chronological order. *Id.* at 3a-4a, 126a, 128a. By default, Twitter timelines and their associated tweets are visible to everyone with internet access, including those who are not Twitter users. *Id.* at 129a.

Twitter enables users to interact with each other in a variety of ways. Users can "favorite" or "like" another

3

user's tweet by clicking on a heart icon that appears under the tweet. App., *infra*, 3a-4a, 133a. Users can also "mention" another user by including the other user's handle in a tweet. *Ibid.* A Twitter user mentioned by another user will receive a notification that he or she has been mentioned in the other user's tweet. In addition, users can "follow" other users, which enables them to receive notifications every time that other user posts a tweet. *Id.* at 4a. And they can "retweet[]"—*i.e.*, repost—the tweets of other users onto their own timelines. *Id.* at 3a. When a user reposts a tweet, it appears on the user's timeline in the same form as it did on the original poster's timeline, but with a notation indicating that the post was retweeted. *Id.* at 130a. Twitter users also can reply to one another's tweets. *Id.* at 4a. When a user replies to a tweet, that reply appears on the user's own timeline under a tab labeled "Tweets & replies." *Id.* at 28a. The reply is also visible in the original poster's timeline. Anyone who clicks on an original tweet (whether or not they have a Twitter account) can see any replies, as well as any replies-to-replies nested below the replies to which they respond. *Ibid.*; see also *id.* at 131a.

Twitter also gives every user the ability to limit interactions with others. There are three ways of doing so.

First, users may "protect" their accounts. App., *infra*, 133a. When an account is protected, the user's tweets are not visible to the general public, and may be seen (and replied to) only by those users that the account owner has affirmatively approved. *Ibid.*

Second, if account owners do not wish to prevent the public from seeing their tweets, but want to limit their interactions with particular users, they may choose to "block" other individual users' accounts. App., *infra*,

4

4a. While logged into a blocked account, a user cannot see the blocking user's tweets or use the Twitter platform to search for those tweets. *Id.* at 134a. However, because tweets are visible to the public at large by default, the blocked user can continue to view the blocking user's tweets from any internet browser so long as the user has not logged into the blocked Twitter account. *Id.* at 135a. Blocking also prevents the blocked account from retweeting or directly replying to a blocking user's tweets, *id.* at 4a, 134a, but blocked accounts remain able to post responsive tweets on their own timelines, and can reply to other users' replies to the blocking user's tweets, *id.* at 134a. These replies-to-replies will appear in the collection of replies beneath the blocking user's tweet, but the blocking user will not see them. *Ibid.*

Finally, users may "mute" other users. Twitter, *How to mute accounts on Twitter,* https://help.twitter.com/en/using-twitter/twitter-mute. Muted users continue to see all of the muting user's tweets while logged into their own accounts, and they may retweet and reply to the muting user's tweets. *Ibid.* However, unless the muting user follows the muted account, he will not receive notifications when the muted user replies to or mentions the muting user, and replies by the muted user will be invisible to the muting user if he clicks on the tweets that originated those replies. *Ibid.*

b. In March 2009, Donald J. Trump established a personal Twitter account under the handle @realDonaldTrump. App., *infra,* 5a, 135a. The account is not protected, meaning that any member of the public can view his tweets without approval and even without having a Twitter account. *Id.* at 5a, 136a.

Before assuming the presidency in January 2017, Mr. Trump used his personal account to tweet about a

5

variety of topics, including popular culture and politics. Since his inauguration, President Trump has continued to use the account for those personal purposes, but he also has used the account to communicate with the public about official actions and policies of his administration. App., *infra*, 5a, 135a. In certain instances, President Trump receives assistance from Daniel Scavino, an Assistant to the President, in posting tweets to the @real-DonaldTrump account. *Id.* at 6a. The White House and White House staff also separately operate two government Twitter accounts: @POTUS and @WhiteHouse. *Id.* at 142a.

Between May and June 2017, President Trump applied the Twitter blocking feature to Twitter accounts belonging to the seven individual respondents, blocking them from interacting with his personal Twitter account. App., *infra*, 7a, 142a-145a. Each of the individual respondents had posted a reply to an @real-DonaldTrump tweet shortly before being blocked. The replies generally expressed displeasure with the President, in some cases with inflammatory language. *Id.* at 142a-145a. The blocking capability was available to President Trump because he is a registered Twitter user, not by virtue of his public office, and is available to him on the same terms that Twitter makes that capability available to all account holders. See *id.* at 133a-135a; Twitter, *How to block accounts on Twitter*, https://help.twitter.com/ en/using-twitter/blocking-and-unblocking-accounts.

By blocking accounts belonging to the individual respondents, President Trump prevented the respondents from directly interacting with him on Twitter while logged into those accounts. See App., *infra*, 7a. That

6

is, the blocked respondents cannot view @real-DonaldTrump tweets while logged into their accounts, and they also may not directly reply to those tweets or retweet them from their blocked accounts. *Id.* at 7a, 145a. Respondents can, however, view all tweets posted by @realDonaldTrump when not logged into their blocked accounts, either if not logged into any account or if logged into any other unblocked accounts they have. *Id.* at 145a-147a.

Nor does blocking the respondents' accounts prevent them from interacting with others on Twitter or from continuing to criticize President Trump or his administration on that platform. Even while logged into their blocked accounts, respondents may mention @real-DonaldTrump in their own tweets, and may post screenshots of @realDonaldTrump tweets with their own responses to those tweets. App., *infra*, 133a, 134a, 145a-147a. They may also view replies that others have posted in response to @realDonaldTrump tweets, and may reply to those replies. *Id.* at 147a. Those replies-to-replies appear in the collection of replies beneath @real-DonaldTrump tweets for all to see, other than President Trump himself. *Id.* at 148a-149a.

2. In July 2017, respondents filed suit against petitioners and two other White House staff members. App., *infra*, 8a-9a. Respondents challenged the constitutionality of President Trump's decision to block the individual respondents' accounts from his personal Twitter account. See *id.* at 24a. They sought a declaration that blocking the individual respondents' accounts was unconstitutional and an injunction requiring the President to unblock those accounts. See *id.* at 37a.

The parties entered a stipulation of facts and cross-moved for summary judgment. Among other things,

7

the parties stipulated that, for the purpose of this litigation, petitioners do not contest that the individual respondents had been blocked from @realDonaldTrump because they had posted tweets that criticized President Trump or his policies. App., *infra*, 123a.

The district court granted partial summary judgment for respondents, issuing a declaratory judgment that the blocking of the individual respondents' accounts from the @realDonaldTrump account violated the First Amendment. App., *infra*, 89a. As relevant here, the court concluded that the "interactive space" associated with the @realDonaldTrump Twitter account, in which a person can choose to reply to or retweet @realDonaldTrump's tweets, is a "designated public forum." *Id.* at 77a. The court determined that blocking the individual respondents' accounts based on their viewpoints was a constitutionally impermissible restriction on access to that "forum." *Id.* at 88a.

The district court did not separately analyze whether blocking the individual respondents was state action. Instead, relying on the Second Circuit's since-overruled decision in *Halleck* v. *Manhattan Community Access Corp.*, 882 F.3d 300 (2018), rev'd in part, 139 S. Ct. 1921 (2019), the court found that it was unnecessary to analyze whether the blocking was state action so long as the plaintiffs were excluded from a public forum owned or controlled by the government. App., *infra*, 63a-64a. The court found that requirement satisfied here, principally because, during his tenure, President Trump has used the account to make statements about official policies and actions. *Id.* at 63a-65a.

3. The court of appeals affirmed. App., *infra*, 23a.

8

a. The court of appeals first concluded that President Trump's "use of the Account during his presidency" was "governmental," rather than "private." App., *infra*, at 12a-13a. The court emphasized that @realDonaldTrump's tweets often concern official matters and reflect the input of White House staff. *Id.* at 13a-15a. The court rejected the argument that the blocking was not state action, concluding that because the President "acts in an official capacity when he tweets," he must be acting in the "same capacity" when he blocks other users' accounts. *Id.* at 15a.

The court of appeals further agreed with the district court that the @realDonaldTrump account constitutes a "public forum." App., *infra*, 17a-18a. The court of appeals determined that, in light of Twitter's default settings, under which any unblocked Twitter user can see and reply to any published tweet, the government had "intentionally opened [the account] for public discussion when the President, upon assuming office, repeatedly used the Account as an official vehicle for governance." *Ibid.* The court held that the President had burdened plaintiffs' access to this public forum by blocking them, in violation of the First Amendment. *Id.* at 19a-21a.

Finally, the court of appeals also rejected the alternative argument that "to the extent the Account is controlled by the government, it is government speech" exempt from First Amendment challenge. App., *infra*, 21a. Although the court acknowledged that @realDonaldTrump's tweets might be government speech, it determined that "this case does not turn on the President's initial tweets," but rather on the "interactive features of the Account." *Ibid.* Because the "retweets, replies, likes, and mentions" on the @realDonaldTrump account are "controlled by the user who generates

9

them," except to the extent that user is blocked, the court concluded that those features of the account "are not government speech." *Id.* at 22a.

b. The court of appeals denied rehearing. App., *infra*, 91a. Judge Parker issued a statement respecting the denial of rehearing, defending the panel's conclusions and highlighting some of the President's tweets concerning official governmental business. *Id.* at 92a-107a.

Judge Park, joined by Judge Sullivan, dissented. App., *infra*, 108a-119a. Judge Park argued that the panel's application of the state-action doctrine erred by "fixating on the President's recent tweets" rather than focusing on "the specific action at issue—*i.e.*, * * * blocking." *Id.* at 112a. As a result, the dissent explained, the panel opinion "blurred the line between actions by public officials in the performance of their official duties and actions 'in the ambit of their personal pursuits.'" *Ibid.* (citation omitted).

The dissent also argued that "the panel's application of First Amendment public-forum doctrine to @realDonaldTrump is a poor fit." App., *infra*, 113a. Because the @realDonaldTrump account is a platform for President Trump's *own* speech, the dissent explained, forum analysis should not apply. See *id.* at 113a-116a; see also *id.* at 113a ("[I]t is well established that when the government engages in its own speech, it is permitted to 'speak for itself' and to 'select the views that it wants to express.'") (quoting *Pleasant Grove City* v. *Summum*, 555 U.S. 460, 467-468 (2009)). And because President Trump had simply "continu[ed] to use Twitter's features the same way he did before taking office," the dissent determined that the government had not *created* a public forum on the account. *Ibid.*

10

Judge Park also noted that "it is now commonplace for politicians to use personal [social media] accounts to promote their official activities," and expressed concern that the panel opinion would "have the unintended consequence" of ensuring that "the social-media pages of public officials are overrun with harassment, trolling, and hate speech, which officials will be powerless to filter." App., *infra*, 118a-119a. That result could, Judge Park explained, discourage public officials from communicating with their constituents through social media at all. *Ibid.*

### REASONS FOR GRANTING THE PETITION

In this case, seven individuals have asserted a constitutional right to interact directly with President Trump's personal social-media account through their own preferred accounts. The court of appeals found such a right in the First Amendment, holding that the President—unlike every other Twitter user—lacks the authority to block other user accounts from his personal account. The court of appeals reached that conclusion only by disregarding this Court's state-action precedents, engaging in an unwarranted expansion of the public-forum doctrine, and adopting inconsistent reasoning to distinguish the government-speech doctrine.

The decision of the court of appeals warrants this Court's review. By ignoring the critical distinction between the President's (sometimes) official statements on Twitter and his always personal decision to block respondents from his own account, the opinion blurs the line between state action and private conduct—notwithstanding this Court's repeated and recent exhortations to heed that line carefully in applying the First Amendment. The result of the court of appeals' novel ruling will be to jeopardize the ability of public

11

officials—from the President of the United States to a village councilperson—to insulate their social-media accounts from harassment, trolling, or hate speech without invasive judicial oversight. As applied to the President in particular, this Court—not a lower federal court—should decide where to draw the line between the President's personal decisions and official conduct.

**A. The Court Of Appeals Erred In Prohibiting The President From Using Twitter's Blocking Function Within His Personal Account**

In holding that the President acts unconstitutionally in blocking respondents' accounts from his personal Twitter account, the court of appeals misapplied several First Amendment doctrines. Most fundamentally, in determining that the requisite state action exists, the court erroneously considered the President's own speech on his account (his tweets), rather than focusing on the President's challenged restriction on respondents' speech (his blocking of their accounts). That error led the court of appeals to the misguided conclusion that the United States government, rather than Donald J. Trump, had interfered with respondents' preferred use of Twitter. Doubling down on that error, the court of appeals wrongly concluded that the government had created a public forum for speech within the interactive features of the President's personal Twitter account, even though the President uses his account to speak to the public, not to give members of the public a forum to speak to him and among themselves. And finally, after having lumped together all uses of the @realDonaldTrump account for purposes of the state-action and public-forum doctrines, the court of appeals disaggregated the account's features for purposes of the government-speech doctrine: it concluded that the

12

account's tweets, but not its interactive features, were government speech. That analysis was internally incoherent; if the President's tweets somehow transformed his blocking decisions into governmental action, then those tweets likewise transformed his blocking decisions into acts of government speech—namely, an official refusal to consider respondents' speech. For any and all of these reasons, the decision below should be reversed.

1. The distinction between state action and private conduct is vital to the correct application of the First Amendment and to the preservation of individual liberty. "That 'Congress shall make no law . . . abridging the freedom of speech, or of the press' is a restraint on government action, not that of private persons." *Columbia Broad. Sys., Inc.* v. *Democratic Nat'l Comm.*, 412 U.S. 94, 114 (1973) (opinion of Burger, C.J.) (citation omitted). That remains true when private people—even government officials—"open their property for speech." *Manhattan Cmty. Access Corp.* v. *Halleck*, 139 S. Ct. 1921, 1930-1931 (2019). "Benjamin Franklin did not have to operate his newspaper as 'a stagecoach, with seats for everyone.'" *Id.* at 1931 (quoting F. Mott, *American Journalism* 55 (3d ed. 1962)).

"[S]tate action requires *both* an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' *and* that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *American Mfrs. Mut. Ins. Co.* v. *Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). Here, those requirements are not satisfied: The President's use of his

13

own property (his personal Twitter account) in a manner available to all private citizens (applying Twitter's blocking function) does not constitute state action to which the First Amendment applies.

a.  Not every action performed by a government official exercises "some right or privilege created [or imposed] by the State." *Sullivan*, 526 U.S. at 50 (citation omitted).  Were it otherwise, a Congressman who forbids the placement of certain yard-signs on his front lawn could be subject to First Amendment challenge.  Instead, a federal official performs governmental action subject to constitutional scrutiny only when he exercises "power 'possessed by virtue of [federal] law,'" such that his actions are "made possible only because [he] is clothed with the authority of [federal] law." *West* v. *Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States* v. *Classic*, 313 U.S. 299, 326 (1941)).

Under those principles, the President's blocking of the individual respondents' accounts from his personal Twitter account cannot amount to state action.  Although President Trump is currently a public official, the @realDonaldTrump account belongs to him in his personal capacity, not his official one.  He created and began frequent use of that account in 2009, well before taking public office.  In contrast to the @WhiteHouse and @POTUS accounts, over which he may exercise control only by virtue of his office, he will continue to have control over the @realDonaldTrump account after his term of office has completed.[1]

---

[1]  Notwithstanding those undisputed facts, respondents have sued President Trump in his official capacity.  "In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office," meaning that "when officials sued in their official capacities leave office, their successors automatically

14

Accordingly, President Trump's ability to use the features of his personal Twitter account, including the blocking function, are independent of his presidential office. Blocking third-party accounts from interacting with the @realDonaldTrump account is a purely personal action that does not involve any "right or privilege created by the State," *Sullivan*, 526 U.S. at 50 (citation omitted), and is not "made possible only because [the President] is clothed with the authority of [federal] law," *West*, 487 U.S. at 49 (citation omitted). After all, he will still be able to block the individual respondents' accounts from his personal account after he leaves office—which will have precisely the same effect on their ability to interact with all of the tweets on his account. The President's decision to block accounts belonging to the individual respondents from his personal property is thus well within "the ambit of [the official's] personal pursuits" and is therefore "plainly excluded" from being considered state action. *Screws* v. *United States*, 325 U.S. 91, 111 (1945) (plurality opinion).

b. Relatedly, a government official is not "fairly * * * said to be a state actor" whenever he acts, or even whenever he exercises "some right or privilege created by the State." *Lugar*, 457 U.S. at 937. Again, for example, a Congressman who exercises a privilege under

---

assume their role in the litigation." *Lewis* v. *Clarke*, 137 S. Ct. 1285, 1292 (2017). An official-capacity suit makes little sense here, because President Trump's successor neither could control what Donald J. Trump does with the @realDonaldTrump Twitter account after leaving office nor should be subject to a judgment concerning the use of the successor's own personal Twitter account based on President Trump's past conduct. That oddity underscores the fundamental problem with respondents' First Amendment claims: they do not actually challenge any official state action that could be redressed by the Office of the President.

15

D.C. law to use force to repel a trespasser placing yard signs on his front lawn is still not acting as a government official subject to suit under the First or Fourth Amendments. Instead, a person is "fairly * * * said to be a state actor," *ibid.*, only when he commits the challenged action in the course of "performing official duties" and pursuant to "the power which [he is] authorized to exercise" by law. *Screws*, 325 U.S. at 110. That cannot be said of President Trump's challenged action, which relates solely to access to his personal property—namely, his personal Twitter account. The blocking function is a feature that is available to all Twitter account holders, and the right to use that feature on his personal account belongs to him as a private account holder, independent of his public office. Twitter could eliminate the blocking function at any time, and the President, even "clothed with the authority of [federal] law," *West*, 487 U.S. at 49 (citation omitted), would be powerless to block anyone.

To be sure, a Twitter account is a different type of property than a Congressman's front lawn. But the fact that Twitter has designed such accounts to be open for comment by others, unless blocked by the account owner, does not change the state-action analysis. As this Court has recently confirmed, "private property owners and private lessees often open their property for speech," and still retain the right to exclude speech or speakers on the basis of viewpoint. *Manhattan Cmty. Access*, 139 S. Ct. at 1930; see *ibid.* ("[M]erely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints."). For example, antiwar activists do not have a First Amendment right to enter a privately owned

16

shopping center to distribute handbills concerning political affairs. *Lloyd Corp.* v. *Tanner*, 407 U.S. 551, 569 (1972). And the First Amendment does not constrain a broadcast licensee's discretion to accept editorial advertisements, even if the government grants the license subject to regulations designed to ensure public-interest standards. *Columbia Broad. Sys.*, 412 U.S. at 115-116, 120-121 (opinion of Burger, C.J.).

The First Amendment does not apply in those circumstances because private property does not "lose its private character merely because the public is generally invited to use it for designated purposes." *Lloyd*, 407 U.S. at 569. Were the rule otherwise, "all private property owners * * * who open their property for speech would be subject to First Amendment constraints and would lose the ability to exercise what they deem to be appropriate editorial discretion within that open forum." *Manhattan Cmty. Access*, 139 S. Ct. at 1930-1931. The same principles that this Court has repeatedly applied to private property apply equally to personal Twitter accounts.

c. In nonetheless concluding that the challenged speech restriction here—the *blocking* of respondents' accounts—was state action, the court of appeals relied on the entirely distinct action reflected in @realDonaldTrump's tweets. The court reasoned that "[b]ecause the President, as we have seen, acts in an official capacity when he tweets, we conclude that he acts in the same capacity when he blocks those who disagree with him." App., *infra*, 15a. That reasoning is incorrect.

Proper application of the state-action doctrine "begins by identifying 'the specific conduct of which the plaintiff complains.'" *Sullivan*, 526 U.S. at 51 (citation omitted); see *Blum* v. *Yaretsky*, 457 U.S. 991, 1003

17

(1982) ("Faithful adherence to the 'state action' require-
ment * * * requires careful attention to the gravamen
of the plaintiff's complaint."). This Court's "cases have
accordingly insisted that the conduct allegedly causing
the deprivation of a federal right be fairly attributable
to the State." *Lugar*, 457 U.S. at 937. That rule makes
sense, because the Free Speech Clause "prohibits only
*governmental abridgement* of speech"—*i.e.*, the abridge-
ment *itself* must be state action. *Manhattan Cmty. Ac-
cess*, 139 S. Ct. at 1928 (emphasis altered).

That the abridgement occurs on private property on
which official governmental business sometimes occurs
is not enough. Were the law otherwise, public officials
who conduct official business on their private property
would effectively lose their rights as property owners to
exclude from the property those with whom they disa-
gree. The First Amendment does not require property
owners to permit members of the public onto their prop-
erty for the purpose of expressing messages with which
the property owner disagrees, *Lloyd*, 407 U.S. at 556,
570, and public officials do not lose their right to exclude
others from their personal property simply by assuming
office or by conducting official business on that prop-
erty. Surely Franklin D. Roosevelt, John F. Kennedy,
or George W. Bush did not forfeit the right to exclude
people, including political critics, from the Hyde Park
estate, the Hyannis Port compound, or the Crawford
ranch by conducting official business or giving official
addresses there. So too, President Trump has not lost
the ability to block third-party Twitter accounts from
accessing his own personal Twitter account—not when
he took office, and not when he exercised his own right
to use that private property as a medium for making of-
ficial pronouncements.

18

By concluding otherwise, the Second Circuit committed an analytical error very similar to its prior error that this Court corrected in *Manhattan Community Access*, *supra*. There, the Second Circuit held that the Manhattan News Network (MNN) was a state actor for the purpose of the First Amendment because the City of New York had designated MNN to operate public access channels on Time Warner's cable system and extensively regulated MNN's operations of those channels. In reversing that decision, this Court explained that the Second Circuit's "analysis mistakenly ignores the threshold state-action question." *Manhattan Cmty. Access,* 139 S. Ct. at 1930. Regardless of whether MNN operated a forum for speech, MNN remained a private entity operating private property. As a result, MNN's exclusion of programming from this private property was an exercise of private, not governmental, authority, notwithstanding the city's "extensive regulation of MNN's operation" of the channels. *Id.* at 1932.

Here too, the alleged abridgment of speech is a private one. The @realDonaldTrump account, like a channel in *Manhattan Community Access*, is hosted by a private company (Twitter), and it has been operated by Donald J. Trump in his personal capacity since long before his inauguration. Even if the court of appeals is correct that President Trump "acts in an official capacity" and thus engages in state action when he tweets about matters related to official governmental business, it erred by assuming that some use of the account for official purposes could entirely transform the account from a personal one into an official one. App., *infra,* 15a.

The court of appeals then exacerbated that error by failing to separately analyze whether the President en-

19

gaged in state action when he blocked respondents' accounts. Instead, the court simply applied its analysis of the President's tweets to the blocking. See App., *infra*, 15a ("Because the President, as we have seen, acts in an official capacity when he tweets, we conclude that he acts in the same capacity when he blocks those who disagree with him."); see also *id.* at 96a (concluding that blocking is state action because "when the President blocks users, he blocks them from access to, and interaction with, *an official account*"). But tweets about official governmental business, such as changes in White House staffing or national policies, are official actions only insofar as they reflect "power 'possessed by virtue of [federal] law,'" "'made possible only because [President Trump] is clothed with the authority of [federal] law.'" *West*, 487 U.S. at 49 (citation omitted). Application of the same state-action test to the *blocking*, however, yields a very different result: President Trump exercised no "right or privilege created by the State" when he blocked respondents' accounts, and instead exercised only a power shared by every single user of Twitter. *Sullivan*, 526 U.S. at 50 (citation omitted). The United States government did not block those accounts on Twitter; instead, Donald J. Trump did so in the "ambit of [his] personal pursuits." *Screws*, 325 U.S. at 111.

Thus, even if the court of appeals were right that the @realDonaldTrump account has taken on some official character, it was wrong to find state action in "the specific conduct of which the plaintiff complains"—*i.e.*, the blocking. *Sullivan*, 526 U.S. at 50-51 (citation omitted). That an abridgement of speech occurs on an official forum, or adjacent to some other governmental action, does not mean the abridgement itself is state action.

20

The First Amendment has no application, for example, if an off-duty police officer obtains a reservation from a public park to host a family picnic in one of its pavilions, and during the picnic asks certain uninvited guests to leave the pavilion because he disagrees with anti-police paraphernalia that they are wearing—even though a public park is the quintessential government-maintained public forum, and even though the police officer's private use of the pavilion is facilitated by the park's reservation system. The court of appeals' method of analysis leaves no room to draw those lines.

Careful application of the state-action doctrine is necessary to distinguish between the actions of the state, and the personal actions of the men and women who are employed by or represent the state. Like police forces, the rest of the government—including the Office of the President—is staffed by people who retain private lives. To avoid expanding constitutional restrictions in a way that trammels their own constitutional freedoms, courts must distinguish between their private actions and state action. When presidents "make public statements about their faith or offer prayers," for example, "we do not understand them to be violating the Establishment Clause." App., *infra*, 111a n.3) (citing *Van Orden* v. *Perry*, 545 U.S. 677, 723 (2005) (Stevens, J. dissenting) ("Our leaders, when delivering public addresses, often express their blessings simultaneously in the service of God and their constituents. * * * [W]e recognize that their words are not exclusively a transmission from *the* government because those oratories have embedded within them the inherently personal views of the speaker as an individual * * * .")). The same principles apply on Twitter. The First Amendment does not give individual members of the

21

public a right of access to a government official's personal property merely because the official chooses to use his property in part to make announcements about official policies and actions to other members of the public. The individual respondents can no more insist on being given access to the President's tweets on @realDonaldTrump than they could insist on being given entry to Trump Tower if the President chose that as the venue where he made important official announcements to preferred members of the public and press.

2. The court of appeals' failure to differentiate between private and state action also infected its public-forum analysis. Under this Court's precedents, the @realDonaldTrump account (including the tweets, replies, and retweets) is not a public forum. Instead, that account was created, and is used, by Donald J. Trump to provide a platform for the expression of his own opinions, not to provide a forum for the public to speak to him or among themselves.

Generally, this Court's cases "recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Minnesota Voters Alliance* v. *Mansky*, 138 S. Ct. 1876, 1885 (2018). Traditional public forums include public parks, streets, and other places which "by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Designated public forums lack that historical pedigree, but can be "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius* v. *NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985).

22

And a nonpublic forum is a space that is "not by tradition or designation a forum for public communication." *Perry*, 460 U.S. at 46.

The court of appeals concluded that the @realDonaldTrump account is a designated public forum because it has been "repeatedly used * * * as an official vehicle for governance" and is "accessible to the public without limitation." App., *infra*, 17a-18a. Once again, that analysis confused Donald J. Trump's actions as a private citizen—creating an account governed by Twitter's standard terms of service—and the actions of the state. In order to create a designated public forum, "the *government* must make an affirmative choice to open up its property for use as a public forum." *United States* v. *American Library Ass'n*, 539 U.S. 194, 206 (2003) (plurality opinion) (emphasis added). That cannot be accomplished "by inaction," but "only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. The mere use of a platform for communication does not suffice to create a designated public forum, because "[n]ot every instrumentality used for communication, * * * is a traditional public forum or a public forum by designation." *Id.* at 803. Instead, the courts must look to "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.* at 802. Absent such an intentional action by the government, the public forum doctrine does not apply. See, *e.g.*, *American Library Ass'n*, 539 U.S. at 206 (plurality opinion).

Under those principles, the @realDonaldTrump account, including its tweets, replies, and retweets, is not a public forum. There is no dispute that at the time of its creation, the account was not—and could not have

23

been—a public forum created by the government. Instead, it was a private platform for Donald J. Trump's own speech, which (like all Twitter accounts) permitted users to interact with each other through various features. The account has the same features today, subject to alteration only by Twitter, a private company. Indeed, because the government has no control over those features, they do not even constitute a nonpublic forum, much less a designated public forum. At no point did (or even could) the government modify those features or "make an affirmative choice to open up [the account] for use as a public forum." *American Library Ass'n*, 539 U.S. at 206 (plurality opinion). That President Trump has used the account to post statements related to official governmental business does not equate to the government "intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. Instead, the account has simply persisted as a private platform for the President's speech, not as a forum created by the government for the public to speak to the President and among themselves.

This Court has repeatedly cautioned that courts must not extend "the public forum doctrine * * * in a mechanical way" to contexts that are "very different" from the streets and parks where the doctrine first arose. *Arkansas Educ. Television Comm'n* v. *Forbes*, 523 U.S. 666, 672-673 (1998); see *Denver Area Educ. Telecomms. Consortium, Inc.* v. *FCC*, 518 U.S. 727, 749 (1996) (opinion of Breyer, J.) ("[W]e are wary of the notion that a partial analogy in one context, for which [courts] have developed doctrines, can compel a full range of decisions in * * * new and changing area[s].").
But that is exactly what the court of appeals did here: it sought to force the square peg of the President's use

24

of the @realDonaldTrump account into the round hole of the public-forum doctrine. That modern digital environment bears little resemblance to traditional government-controlled forums designed to facilitate speech.

3. Finally, the court of appeals concluded that @realDonaldTrump's tweets reflect such pervasive governmental involvement that all of the account's interactive features are subject to the constitutional restraints applicable to state action and government property. See, *e.g.*, App., *infra*, 11a ("[T]he evidence of the official nature of the Account is overwhelming."); *id.* at 15a (concluding that "the Account and its interactive features" have a "public, non-private nature"). As explained above, those conclusions reflect misapplications of the state-action and public-forum doctrines. If the court was correct, however, that "the Account and its interactive features" had all taken on a "public * * * nature," then the court should have concluded that the account as a whole is exempt from First Amendment challenge under the government-speech doctrine. *Id.* at 15a.

a. The "Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City* v. *Summum*, 555 U.S. 460, 467 (2009). In "modern times, at least," it is "the very business of government to favor and disfavor points of view on * * * innumerable subjects." *National Endowment for the Arts* v. *Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in the judgment). Government speech is thus regulated not by the First Amendment, but by the democratic process. See *Board of Regents* v. *Southworth*, 529 U.S. 217, 235 (2000) ("When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in

25

the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position.").

If, as the court of appeals believed, the @realDonaldTrump account is "an official vehicle for governance," App., *infra*, 18a, then the account reflects government speech to which the First Amendment does not apply. As a platform for announcing official policy, the account would properly be subject to governmental control over the messages conveyed in both the tweets themselves *and* in the account's "interactive space." The government has no obligation to open its own platform for speech to all comers, as the "Constitution does not require all public acts to be done in town meeting or an assembly of the whole." *Minnesota State Bd. for Cmty. Colls.* v. *Knight*, 465 U.S. 271, 284 (1984) (quoting *Bi-Metallic Inv. Co.* v. *State Bd. of Equalization*, 239 U.S. 441, 445 (1915)).

If the @realDonaldTrump account is a governmental platform, then the President's blocking of respondents' accounts is constitutionally permissible because its effect is only to limit certain accounts from interacting directly with, and speaking directly on, the government's own platform for speech. When individual user accounts are blocked from the @realDonaldTrump account, the individuals remain free to participate in the broad exchange of information and ideas on Twitter. The blocked respondents can continue to tweet about the current Administration's policies and to criticize President Trump's agenda through their accounts on Twitter. They can read President Trump's tweets when they are not logged into their accounts, and they can respond to the content of his tweets on their own Twitter

26

pages. They may mention @realDonaldTrump in their tweets, reproduce screenshots of the President's tweets in their own tweets, and engage with other Twitter users who are discussing the content of @realDonaldTrump tweets, including those who have replied to or retweeted @realDonaldTrump tweets. And with trivial effort, they can create and use an alternative account that is not blocked at all. See App., *infra*, 147a.

Thus, blocking's only material effect on respondents' speech is that they may not speak directly *to* or *on* the President's own platform for speech by replying to or retweeting his tweets using their preferred accounts in a manner that appears on his account's timeline. Those are not cognizable First Amendment interests. "A person's right to speak is not infringed when government simply ignores that person while listening to others." *Knight*, 465 U.S. at 288. President Trump is exercising the same prerogative not to listen, to the extent he is exercising state action at all, when he chooses to block a particular account from @realDonaldTrump. Similarly, the First Amendment does not entitle anyone to piggyback on the government's speech as a way to amplify their own. See *ibid.* (explaining that it is "doubtless true" that the government's choice to listen to some speakers and not others may "amplif[y]" some voices over others, and nevertheless concluding that such decisions do not infringe speech). Respondents thus have no constitutional right to display their speech on the President's own platform using their preferred accounts, rather than on their own account timelines.

b. The court of appeals avoided that conclusion only by drawing a firm line, in its government-speech analysis, between @realDonaldTrump's tweets and the other features of the account. The court agreed that the official

27

tweets themselves were government speech, but concluded that the other aspects of account-management were not. App., *infra*, 22a. And "this case," it stated, "does not turn on the President's initial tweets; it turns on his supervision of the interactive features of the Account." *Id.* at 21a. Just a few pages earlier, however, the court had employed the opposite reasoning, finding state action in the President's "supervision of the interactive features of the Account" based on the court's analysis of "the President's initial tweets." *Ibid.*; see *id.* at 15a ("Because the President, as we have seen, acts in an official capacity when he tweets, we conclude that he acts in the same capacity when he blocks those who disagree with him."). As a matter of logic, both of those approaches cannot be correct at the same time: if the President's official tweets rendered the blocking state action, then they likewise rendered the blocking a communicative act of government not to receive speech from certain members of the public.

**B. The Court Of Appeals' Decision Warrants This Court's Review**

The court of appeals' decision, which distorts the state-action, public-forum, and government-speech doctrines, has important legal and practical implications that reach beyond the circumstances of this case. As Judge Park recognized in his dissent from denial of rehearing en banc, "[t]he key facts in this case—that the President had a personal Twitter account, that he used it to tweet on matters relating to his office, and that the public was able to comment on his tweets—are not unique." App., *infra*, 118a. The increasing prevalence of social media in American society has not passed public officials by. Like other members of the public, they are increasingly likely to maintain social media accounts

28

to communicate their views, both personal and official. In the last few years, lawsuits against public officials for blocking social media users on non-governmental accounts have proliferated, including suits against a Member of the House of Representatives, state legislators, school officials, and a sheriff.[2]

Were the use of social media to publicize official governmental business enough to convert public officials' personal property into public forums, and their personal acts into state action, it would, as Judge Park observed, substantially limit the ways in which public officials "may act in a personal capacity in all aspects of their life, online or otherwise." App., *infra*, 118a-119a. Indeed, the court of appeals' holding may "have the unintended consequence of creating less speech if the social-media pages of public officials are overrun with harassment, trolling, and hate speech, which officials will be powerless to filter." *Id.* at 119a. The only option for officials who wish to avoid those results will be to forgo these modern means of communication to disseminate

---

[2] See, *e.g.*, *Hikind* v. *Ocasio-Cortez*, No. 19-cv-3956 (E.D.N.Y. filed July 9, 2019) (suit against congresswoman for blocking user on personal Twitter account); *Campbell* v. *Reisch*, No. 18-cv-4129, 2019 WL 3856591 (W.D. Mo. Aug. 16, 2019) (suit against state legislator for blocking user on Twitter campaign page), appeal pending, No. 19-2994 (8th Cir. filed Sept. 16, 2019); *Garnier* v. *Poway Unified Sch. Dist.*, No. 17-cv-2215, 2019 WL 4736208 (S.D. Cal. Sept. 26, 2019) (suit against school officials for blocking residents on Facebook and Twitter campaign pages); *Faison* v. *Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020) (suit against sheriff for blocking individuals from Facebook campaign page); *Wagschal* v. *Skoufis*, 442 F. Supp. 3d 612 (S.D.N.Y. 2020) (suit against state legislator for blocking individual on Facebook page), appeal pending, No. 20-871 (2d Cir. filed Mar. 11, 2020); *Attwood* v. *Clemons*, No. 18-12172, 2020 WL 3096325 (11th Cir. June 11, 2020) (suit against state legislator for blocking constituent from Twitter and Facebook pages).

29

their views on issues of public importance. Ironically, therefore, by curtailing the ability of public officials to choose whom they wish to interact with on their own social media accounts, the decision below has the potential to undermine speech rather than further it.

Those concerns take on heightened significance when the public official in question is the President of the United States. Denying him the power to exclude third parties' accounts from his personal account—a power that every other owner of a Twitter account possesses—would deter holders of his Office from using new technology to efficiently communicate to a broad public audience. And it would leave lower courts in the position of superintending the President's discretionary determinations regarding whom he wishes to hear from or interact with on his private property. Cf. *Franklin* v. *Massachusetts*, 505 U.S. 788, 802-803 (1992) (plurality opinion) ("[I]n general[,] 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.") (quoting *Mississippi* v. *Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867)). This Court should grant review to establish that nothing in the First Amendment demands such a result. Cf. *Clinton* v. *Jones*, 520 U.S. 681, 689-690 (1997) (absent "any conflict among the Courts of Appeals," reviewing "a novel constitutional question" raised by the President that "merit[ed] [the Court's] respectful and deliberate consideration").

30

**CONCLUSION**

The petition for a writ of certiorari should be granted.

Respectfully submitted.

JEFFREY B. WALL
   *Acting Solicitor General*
HASHIM M. MOOPPAN
   *Counselor to the Solicitor*
   *General*
SOPAN JOSHI
   *Senior Counsel to the*
   *Assistant Attorney General*
REBECCA TAIBLESON
   *Assistant to the Solicitor*
   *General*
SCOTT R. MCINTOSH
JENNIFER L. UTRECHT
   *Attorneys*

AUGUST 2020

**APPENDIX A**

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————

August Term 2018
No. 18-1691-cv

KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA
UNIVERSITY, REBECCA BUCKWALTER, PHILIP COHEN,
HOLLY FIGUEROA, EUGENE GU, BRANDON NEELY,
JOSEPH PAPP, AND NICHOLAS PAPPAS,
PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES
AND DANIEL SCAVINO, WHITE HOUSE DIRECTOR OF
SOCIAL MEDIA AND ASSISTANT TO THE PRESIDENT,
DEFENDANTS-APPELLANTS,

SARAH HUCKABEE SANDERS,
WHITE HOUSE PRESS SECRETARY, DEFENDANT[*]

————

Argued:  Mar. 26, 2019
Decided:  July 9, 2019

————

Appeal from the United States District Court
for the Southern District of New York
No. 17 Civ. 5205 (NRB), Naomi R. Buchwald,
District Judge, Presiding

————

————

[*] The Clerk of Court is respectfully directed to amend the official
caption as indicated above.

(1a)

2a

Before:  PARKER, HALL, and DRONEY, *Circuit Judges.*

Plaintiffs Buckwalter, Cohen, Figueroa, Gu, Neely, Papp, and Pappas ("Individual Plaintiffs") are social media users who were blocked from accessing and interacting with the Twitter account of President Donald J. Trump because they expressed views he disliked.  The Knight First Amendment Institute at Columbia University is an organization alleging a right to hear the speech that the Individual Plaintiffs would have expressed had they not been blocked.  The Plaintiffs sued President Trump along with certain White House officials, contending that the blocking violated the First Amendment.  The United States District Court for the Southern District of New York (Buchwald, *J.*) found that the "interactive space" in the account is a public forum and that the exclusion from that space was unconstitutional viewpoint discrimination.  We agree, and, accordingly, we affirm the judgment of the District Court.

**AFFIRMED.**

BARRINGTON D. PARKER, *Circuit Judge*:

President Donald J. Trump appeals from a judgment of the United States District Court for the Southern District of New York (Buchwald, *J.*) concluding that he engaged in unconstitutional viewpoint discrimination by utilizing Twitter's "blocking" function to limit certain users' access to his social media account, which is otherwise open to the public at large, because he disagrees with their speech.  We hold that he engaged in such discrimination and, consequently, affirm the judgment below.

The salient issues in this case arise from the decision of the President to use a relatively new type of social

3a

media platform to conduct official business and to inter-
act with the public.   We do not consider or decide whether
an elected official violates the Constitution by excluding
persons from a wholly private social media account.
Nor do we consider or decide whether private social me-
dia companies are bound by the First Amendment when
policing their platforms.   We do conclude, however,
that the First Amendment does not permit a public offi-
cial who utilizes a social media account for all manner of
official purposes to exclude persons from an otherwise-
open online dialogue because they expressed views with
which the official disagrees.[1]

Twitter is a social media platform that allows its us-
ers to electronically send messages of limited length to
the public.   After creating an account, a user can post
their own messages on the platform (referred to as
tweeting).   Users may also respond to the messages of
others (replying), republish the messages of others (re-
tweeting), or convey approval or acknowledgment of an-
other's message by "liking" the message.   All of a user's
tweets appear on that user's continuously-updated "time-
line," which is a convenient method of viewing and inter-
acting with that user's tweets.

When one user replies to another user's tweet, a "com-
ment thread" is created.   When viewing a tweet, this com-
ment thread appears below the original tweet and in-
cludes both the first-level replies (replies to the original
tweet) and second-level replies (replies to the first-level
replies).   The comment threads "reflect multiple over-

---

[1] The facts in this case are not in dispute as the case was resolved
below on stipulated facts.

4a

lapping 'conversations' among and across groups of users" and are a "large part" of what makes Twitter a "'social' media platform."   App'x at 50.

The platform also allows users to directly interact with each other.   For example, User A can "mention" User B in User A's tweet, prompting a notification to User B that he or she has been mentioned in a tweet. Twitter users can also "follow" one another.   If User A follows User B, then all of User B's tweets appear in User A's "feed," which is a continuously-updated display of content mostly from accounts that User A has chosen to follow.   Conversely, User A can "block" User B. This prevents User B from seeing User A's timeline or any of User A's tweets.   User B, if blocked by User A, is unable to reply to, retweet, or like any of User A's tweets.   Similarly, User A will not see any of User B's tweets and will not be notified if User B mentions User A.[2]   The dispute in this case exclusively concerns the President's use of this blocking function.   The government has conceded that the account in question is not itself "independent of [Trump's] presidency," but contends that the act of blocking was private conduct that does not implicate the First Amendment.   Oral Arg. R. at 1:00-1:15.

_____

[2] All of these features are part of the platform set up by Twitter, a private company.   Use of the platform is governed by terms of service which users agree to when they use the platform.   *See generally Twitter Terms of Service*, Twitter, https://twitter.com/en/tos (last visited June 6, 2019).   A Twitter user cannot choose to have an account that has a subset of these features.   For example, a user cannot obtain from Twitter an account that prohibits certain other users from blocking them.   Nor can a user obtain from Twitter an account with the ability to disable the comment thread.

5a

President Trump established his account, with the handle @realDonaldTrump, (the "Account") in March 2009. No one disputes that before he became President the Account was a purely private one or that once he leaves office the Account will presumably revert to its private status. This litigation concerns what the Account is now. Since his inauguration in January 2017, he has used the Account, according to the parties, "as a channel for communicating and interacting with the public about his administration." App'x at 54. The President's tweets from the Account can be viewed by any member of the public without being signed into a Twitter account. However, if a user has been blocked from the Account, they cannot view the Account's tweets when logged in to their account. At the time of the parties' stipulation, the Account had more than 50 million followers. The President's tweets produce an extraordinarily high level of public engagement, typically generating thousands of replies, some of which, in turn, generate hundreds of thousands of additional replies. The President has not generally sought to limit who can follow the Account, nor has he sought to limit the kind of speech that users can post in reply to his tweets.

The public presentation of the Account and the webpage associated with it bear all the trappings of an official, state-run account. The page is registered to Donald J. Trump "45th President of the United States of America, Washington D.C." *Id.* at 54-55. The header photographs of the Account show the President engaged in the performance of his official duties such as signing executive orders, delivering remarks at the White House, and meeting with the Pope, heads of state, and other foreign dignitaries.

6a

The President and multiple members of his administration have described his use of the Account as official. The President has stipulated that he, with the assistance of Defendant Daniel Scavino, uses the Account frequently "to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; [and] to challenge media organizations whose coverage of his Administration he believes to be unfair." *Id.* at 56. In June 2017, then-White House Press Secretary Sean Spicer stated at a press conference that President Trump's tweets should be considered "official statements by the President of the United States." *Id.* at 55-56. In June 2017, the White House responded to a request for official White House records from the House Permanent Select Committee on Intelligence by referring the Committee to a statement made by the President on Twitter.

Moreover, the Account is one of the White House's main vehicles for conducting official business. The President operates the Account with the assistance of defendant Daniel Scavino, the White House Director of Social Media and Assistant to the President. The President and his aides have characterized tweets from the Account as official statements of the President. For example, the President used the Account to announce the nomination of Christopher Wray as FBI director and to announce the administration's ban on transgender individuals serving in the military. The President used the Account to first announce that he had fired Chief of Staff Reince Priebus and replaced him with General John Kelly. President Trump also used the Account to inform the public about his discussions with the South Ko-

7a

rean president concerning North Korea's nuclear program and about his decision to sell sophisticated military hardware to Japan and South Korea.

Finally, we note that the National Archives, the agency of government responsible for maintaining the government's records, has concluded that the President's tweets are official records. The Presidential Records Act of 1978 established public ownership of the President's official records. 44 U.S.C. § 2202. Under that Act, "Presidential records" include documentary materials created by the President "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory or other official or ceremonial duties of the President." *Id.* § 2201. The statute authorizes the Archivist of the United States to "maintain and preserve Presidential records on behalf of the President, including records in digital or electronic form." *Id.* § 2203. Accordingly, the National Archives and Records Administration has advised the White House that the President's tweets are "official records that must be preserved under the Presidential Records Act." App'x at 57.

In May and June of 2017, the President blocked each of the Individual Plaintiffs (but not the Knight First Amendment Institute) from the Account. The government concedes that each of them was blocked after posting replies in which they criticized the President or his policies and that they were blocked as a result of their criticism. The government also concedes that because they were blocked they are unable to view the President's tweets, to directly reply to these tweets, or to use the @realDonaldTrump webpage to view the comment threads associated with the President's tweets.

8a

The Individual Plaintiffs further contend that their inability to view, retweet, and reply to the President's tweets limits their ability to participate with other members of the public in the comment threads that appear below the President's tweets. The parties agree that, without the context of the President's original tweets (which the Individual Plaintiffs are unable to view when logged in to their accounts), it is more difficult to follow the conversations occurring in the comment threads. In addition, the parties have stipulated that as a consequence of their having been blocked, the Individual Plaintiffs are burdened in their ability to view or directly reply to the President's tweets, and to participate in the comment threads associated with the President's tweets.

While various "workarounds" exist that would allow each of the Individual Plaintiffs to engage with the Account, they contend that each is burdensome. For example, blocked users who wish to participate in the comment thread of a blocking user's tweet could log out of their accounts, identify a first-level reply to which they would like to respond, log back into their accounts, locate the first-level reply on the author's timeline, and then post a message in reply. The blocked users' messages would appear in the comment thread of the blocking user's tweet, although the blocking user would be unable to see it. Blocked users could also create a new Twitter account. Alternatively, blocked users could log out of their accounts, navigate to the blocking user's timeline, take a screenshot of the blocking user's tweet, then log back into their own accounts and post that screenshot along with their own commentary.

In July 2017, the Individual Plaintiffs and the Knight Institute sued Donald Trump, Daniel Scavino, and two

9a

other White House staff members alleging that blocking them from the Account violated the First Amendment. The parties cross-moved below for summary judgment. The District Court granted summary judgment in favor of the plaintiffs and entered a declaratory judgment that "the blocking of the individual plaintiffs from the [Account] because of their expressed political views violates the First Amendment." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018). The District Court held that the "interactive space" associated with each tweet constituted a public forum for First Amendment purposes because it was a forum "in which other users may directly interact with the content of the tweets by . . . replying to, retweeting or liking the tweet." *Id.* at 566. The Court reasoned that: (1) "there can be no serious suggestion that the interactive space is incompatible with expressive activity," and (2) the President and his staff hold the Account open, without restriction, to the public at large on a broadly-accessible social media platform. *Id.* at 574-75. As to the government control requirement of the public forum analysis, the court found that "the President presents the @realDonaldTrump account as being a presidential account as opposed to a personal account and . . . uses the account to take actions that can be taken only by the President as President." *Id.* at 567. The court concluded that "because the President and Scavino use the @realDonaldTrump account for governmental functions" they exercise government control over the relevant aspects of the Account, including the blocking function. *Id.* at 569. The court also rejected the idea that speech within the interactive space on the platform is government speech not subject to First Amendment restrictions, concluding

10a

that "replies to the President's tweets remain the private speech of the replying user." *Id.* at 572.

After concluding that the defendants had created a public forum in the interactive space of the Account, the court concluded that, by blocking the Individual Plaintiffs because of their expressed political views, the government had engaged in viewpoint discrimination. *Id.* at 577. Finally, the court held that the blocking of the Individual Plaintiffs violated the Knight Institute's right to read the replies of the Individual Plaintiffs which they cannot post because they are blocked. *Id.* at 563-64.[3]

This Court reviews a grant of summary judgment *de novo*, applying the same standards that governed the district court's resolution of the motion. *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013). All questions presented on this appeal, including questions of constitutional interpretation, are ones of law which we review *de novo*. *All. for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 911 F.3d 104, 109 (2d Cir. 2018). Because we agree that in blocking the Individual Plaintiffs the President engaged in prohibited viewpoint discrimination, we affirm.

---

[3] The District Court concluded that all plaintiffs had standing to sue, a conclusion the government does not challenge on this appeal and with which we agree. After the District Court granted declaratory relief, the defendants unblocked the Individual Plaintiffs from the Account. This does not render the case moot. *Walling v. Helmerich & Payne*, 323 U.S. 37, 43 (1944) ("Voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power.").

11a

## DISCUSSION

The President's primary argument in his brief is that when he blocked the Individual Plaintiffs, he was exercising control over a private, personal account. At oral argument, however, the government conceded that the Account is not "independent of [Trump's] presidency," choosing instead to argue only that the act of blocking was not state action. Oral Arg. R. at 1:00-1:15. The President contends that the Account is exclusively a vehicle for his own speech to which the Individual Plaintiffs have no right of access and to which the First Amendment does not apply. Secondarily, he argues that, in any event, the Account is not a public forum and that even if the Account were a public forum, blocking the Individual Plaintiffs did not prevent them from accessing the forum. The President further argues that, to the extent the Account is government-controlled, posts on it are government speech to which the First Amendment does not apply. We are not persuaded. We conclude that the evidence of the official nature of the Account is overwhelming. We also conclude that once the President has chosen a platform and opened up its interactive space to millions of users and participants, he may not selectively exclude those whose views he disagrees with.

## I.

The President concedes that he blocked the Individual Plaintiffs because they posted tweets that criticized him or his policies. He also concedes that such criticism is protected speech. The issue then for this Court to resolve is whether, in blocking the Individual Plaintiffs from the interactive features of the Account, the

12a

President acted in a governmental capacity or as a private citizen.

The President maintains that Twitter is a privately owned and operated social media platform that he has used since 2009 to share his opinions on popular culture, world affairs, and politics.   Since he became President, he contends, the private nature of the Account has not changed.   In his view, the Account is not a space owned or controlled by the government.   Rather, it is a platform for his own private speech and not one for the private expression of others.   Because the Account is private, he argues, First Amendment issues and forum analysis are not implicated.   Although Twitter facilitates robust public debate on the Account, the President contends that it is simply the means through which he participates in a forum and not a public forum in and of itself.

No one disputes that the First Amendment restricts government regulation of private speech but does not regulate purely private speech.[4]   If, in blocking, the President were acting in a governmental capacity, then he may not discriminate based on viewpoint among the private speech occurring in the Account's interactive space.   As noted, the government argues first that the Account is the President's private property because he opened it in 2009 as a personal account and he will retain

---

[4] *See, e.g., Harris v. Quinn*, 573 U.S. 616, 629 n.4 (2014); *Loce v. Time Warner Entm't Advance/Newhouse P'ship*, 191 F.3d 256, 266 (2d Cir. 1999); *see also Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (stating that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions  . . .  for speaking out").

13a

personal control over the Account after his presidency. However, the fact that government control over property is temporary, or that the government does not "own" the property in the sense that it holds title to the property, is not determinative of whether the property is, in fact, sufficiently controlled by the government to make it a forum for First Amendment purposes. *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547-52 (1975) (holding privately-owned theater leased to and operated by city was public forum).[5] Temporary control by the government can still be control for First Amendment purposes.

The government's contention that the President's use of the Account during his presidency is private founders in the face of the uncontested evidence in the record of substantial and pervasive government involvement with, and control over, the Account. First, the Account is presented by the President and the White House staff as belonging to, and operated by, the President. The Account is registered to "Donald J. Trump, '45th President of the United States of America, Washington, D.C.'" App'x at 54. The President has described his use of the Account as "MODERN DAY PRESIDENTIAL." *Id.* at 55. The White House social media director has described the Account as a channel through which "President Donald J. Trump . . .

---

[5] *See also Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 749 (1996) (plurality opinion) (stating that "public forums are places that the government has opened for use by the public as a place for expressive activity" (internal quotation marks omitted)); *U.S. Postal Serv. v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 132 (considering "question of whether a particular piece of personal or real property owned *or controlled* by the government" is a public forum (emphasis added)).

14a

[c]ommunicat[es] directly with you, the American people!" *Id.* The @WhiteHouse account, an undoubtedly official Twitter account run by the government, "directs Twitter users to 'Follow for the latest from @POTUS @realDonaldTrump and his Administration." *Id.* Further, the @POTUS account frequently republishes tweets from the Account.[6] As discussed earlier, according to the National Archives and Records Administration, the President's tweets from the Account "are official records that must be preserved under the Presidential Records Act." *Id.* at 57.

Second, since becoming President he has used the Account on almost a daily basis "as a channel for communicating and interacting with the public about his administration." *Id.* at 54. The President utilizes White House staff to post tweets and to maintain the Account. He uses the Account to announce "matters related to official government business," including high-level White House and cabinet-level staff changes as well as changes to major national policies. *Id.* at 56. He uses the Account to engage with foreign leaders and to announce foreign policy decisions and initiatives. Finally, he uses the "like," "retweet," "reply," and other functions of the Account to understand and to evaluate the public's reaction to what he says and does. In sum, since he

---

[6] The President and the White House operate two other Twitter accounts: @POTUS and @WhiteHouse. Both accounts are official government accounts. Those accounts belong strictly to the government, in the sense that the President and members of the White House administration will not retain control over those accounts upon leaving office. The @POTUS account is the official account of the U.S. President. The @WhiteHouse account is the official account for the White House administration.

15a

took office, the President has consistently used the Account as an important tool of governance and executive outreach.   For these reasons, we conclude that the factors pointing to the public, non-private nature of the Account and its interactive features are overwhelming.

The government's response is that the President is not acting in his official capacity when he blocks users because that function is available to all users, not only to government officials.   However, the fact that any Twitter user can block another account does not mean that the President somehow becomes a private person when he does so.   Because the President, as we have seen, acts in an official capacity when he tweets, we conclude that he acts in the same capacity when he blocks those who disagree with him.   Here, a public official and his subordinates hold out and use a social media account open to the public as an official account for conducting official business.   That account has interactive features open to the public, making public interaction a prominent feature of the account.   These factors mean that the account is not private.   *See generally Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995) (applying the same principles to "metaphysical" forums as to those that exist in "a spatial or geographic sense"); *see also Davison v. Randall*, 912 F.3d 666, 680 (4th Cir. 2019) (holding that a public official who used a Facebook Page as a tool of her office exercised state action when banning a constituent); *Robinson v. Hunt Cty., Texas*, 921 F.3d 440, 447 (5th Cir. 2019) (finding that a government official's act of banning a constituent from an official government social media page was unconstitutional viewpoint discrimination).   Accordingly, the President excluded the Individual Plaintiffs from government-controlled property when he used the

16a

blocking function of the Account to exclude disfavored voices.

Of course, not every social media account operated by a public official is a government account.   Whether First Amendment concerns are triggered when a public official uses his account in ways that differ from those presented on this appeal will in most instances be a fact-specific inquiry.   The outcome of that inquiry will be informed by how the official describes and uses the account; to whom features of the account are made available; and how others, including government officials and agencies, regard and treat the account.   But these are concerns for other cases and other days and are ones we are not required to consider or resolve on this appeal.

## II.

Once it is established that the President is a government actor with respect to his use of the Account, viewpoint discrimination violates the First Amendment. *Manhattan Community Access Corp. et al. v. Halleck et al.*, 587 U.S. __ (2019) ("When the government provides a forum for speech (known as a public forum), the government may be constrained by the First Amendment, meaning that the government ordinarily may not exclude speech or speakers from the forum on the basis of viewpoint.  .  .  ."); *see also Pleasant Grove*, 555 U.S. at 469-70 (viewpoint discrimination prohibited in traditional, designated, and limited public forums); *Cornelius*, 473 U.S. at 806 (viewpoint discrimination prohibited in nonpublic forums).

The government makes two responses.   First, it argues that the Account is not a public forum and that, even if it were a public forum, the Individual Plaintiffs

17a

were not excluded from it.   Second, the government ar-
gues that the Account, if controlled by the government,
is government speech not subject to First Amendment
restrictions.

### A.

As a general matter, social media is entitled to the
same First Amendment protections as other forms of
media.   *Packingham v. North Carolina*, 137 S. Ct.
1730, 1735-36 (2017) (holding a state statute preventing
registered sex offenders from accessing social media
sites invalid and describing social media use as "pro-
tected First Amendment activity").   "[W]hatever the
challenges of applying the Constitution to ever-advancing
technology, 'the basic principles of freedom of speech and
the press, like the First Amendment's command, do not
vary' when a new and different medium for communica-
tion appears."   *Brown v. Entm't Merchants Ass'n*, 564
U.S. 786, 790 (2011) (quoting *Joseph Burstyn, Inc. v.
Wilson*, 343 U.S. 495, 503 (1952)).   A public forum, as
the Supreme Court has also made clear, need not be
"spatial or geographic" and "the same principles are ap-
plicable" to a metaphysical forum.   *Rosenberger*, 515
U.S. at 830.

To determine whether a public forum has been cre-
ated, courts look "to the policy and practice of the gov-
ernment" as well as "the nature of the property and its
compatibility with expressive activity to discern the gov-
ernment's intent."   *Cornelius*, 473 U.S. at 802.   Opening
an instrumentality of communication "for indiscriminate
use by the general public" creates a public forum. *Perry
Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S.
37, 47 (1983).   The Account was intentionally opened for

18a

public discussion when the President, upon assuming office, repeatedly used the Account as an official vehicle for governance and made its interactive features accessible to the public without limitation. We hold that this conduct created a public forum.

If the Account is a forum—public or otherwise—viewpoint discrimination is not permitted. *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992); *see also Pleasant Grove*, 555 U.S. at 469-70 (viewpoint discrimination prohibited in traditional, designated, and limited public forums); *Cornelius*, 473 U.S. at 806 (viewpoint discrimination prohibited in nonpublic forums). A blocked account is prevented from viewing any of the President's tweets, replying to those tweets, retweeting them, or liking them. Replying, retweeting, and liking are all expressive conduct that blocking inhibits. Replying and retweeting are messages that a user broadcasts, and, as such, undeniably are speech. Liking a tweet conveys approval or acknowledgment of a tweet and is therefore a symbolic message with expressive content. *See, e.g.*, *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632-33 (1943) (discussing symbols as speech). Significantly, the parties agree that all of this expressive conduct is communicated to the thousands of users who interact with the Account. By blocking the Individual Plaintiffs and preventing them from viewing, retweeting, replying to, and liking his tweets, the President excluded the Individual Plaintiffs from a public forum, something the First Amendment prohibits.

The government does not challenge the District Court's conclusion that the speech in which Individual Plaintiffs seek to engage is protected speech; instead, it

19a

argues that blocking did not ban or burden anyone's speech. *See Knight First Amendment*, 302 F. Supp. 3d at 565. Specifically, the government contends that the Individual Plaintiffs were not prevented from speaking because "the only material impact that blocking has on the individual plaintiffs' ability to express themselves on Twitter is that it prevents them from speaking directly to Donald Trump by replying to his tweets on the @real-DonaldTrump web page." Appellants Br. at 35.

That assertion is not well-grounded in the facts presented to us. The government is correct that the Individual Plaintiffs have no right to require the President to listen to their speech. *See Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 283 (1984) (a plaintiff has "no constitutional right to force the government to listen to their views"). However, the speech restrictions at issue burden the Individual Plaintiffs' ability to converse on Twitter with others who may be speaking to or about the President.[7] President Trump is only one of thousands of recipients of the messages the Individual Plaintiffs seek to communicate. While he is certainly not required to listen, once he opens up the interactive features of his account to the public at large he is not entitled to censor selected users because they express views with which he disagrees.[8]

─────────────────────

[7] If, for example, the President had merely prevented the Individual Plaintiffs from sending him direct messages, his argument would have more force.

[8] The government extends this argument to suggest that the Individual Plaintiffs are claiming a right to "amplify" their speech by being able to reply directly to the President's tweets. The government can choose to "amplify" the speech of certain individuals without violating the rights of others by choosing to listen or not listen.

20a

The government's reply is that the Individual Plaintiffs are not censored because they can engage in various "workarounds" such as creating new accounts, logging out to view the President's tweets, and using Twitter's search functions to find tweets about the President posted by other users with which they can engage.

Tellingly, the government concedes that these "workarounds" burden the Individual Plaintiffs' speech. *See* App'x 35-36, 66. And burdens to speech as well as outright bans run afoul of the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (stating that government "may no more silence unwanted speech by burdening its utterance than by censoring its content"); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000) ("The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans."). When the government has discriminated against a speaker based on the speaker's viewpoint, the ability to engage in other speech does not cure that constitutional shortcoming. *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 690 (2010). Similarly, the fact that the Individual Plaintiffs retain some ability to

---

*See Minnesota State Bd.*, 465 U.S. at 288 (stating that "[a]mplification of the sort claimed is inherent in government's freedom to choose its advisers. A person's right to speak is not infringed when government simply ignores that person while listening to others."). That is not what occurred here; the Individual Plaintiffs were not simply ignored by the President, their ability to speak to the rest of the public users of the Account was burdened. In any event, the government is not permitted to "amplify" favored speech by banning or burdening viewpoints with which it disagrees.

21a

"work around" the blocking does not cure the constitutional violation. Neither does the fact that the Individual Plaintiffs can post messages elsewhere on Twitter. Accordingly, we hold that the President violated the First Amendment when he used the blocking function to exclude the Individual Plaintiffs because of their disfavored speech.

### B.

Finally, the government argues that to the extent the Account is controlled by the government, it is government speech. Under the government speech doctrine, "[t]he Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak" about governmental endeavors. *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017). For example, when the government wishes to promote a war effort, it is not required by the First Amendment to also distribute messages discouraging that effort. *Id.* at 1758; *see also Pleasant Grove*, 555 U.S. at 467 ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").

It is clear that if President Trump were engaging in government speech when he blocked the Individual Plaintiffs, he would not have been violating the First Amendment. Everyone concedes that the President's initial tweets (meaning those that he produces himself) are government speech. But this case does not turn on the President's initial tweets; it turns on his supervision of the interactive features of the Account. The government has conceded that the Account "is generally accessible to the public at large without regard to political af-

22a

filiation or any other limiting criteria," and the President has not attempted to limit the Account's interactive feature to his own speech.   App'x at 55.

Considering the interactive features, the speech in question is that of multiple individuals, not just the President or that of the government.   When a Twitter user posts a reply to one of the President's tweets, the message is identified as coming from that user, not from the President.   There is no record evidence, and the government does not argue, that the President has attempted to exercise any control over the messages of others, except to the extent he has blocked some persons expressing viewpoints he finds distasteful.   The contents of retweets, replies, likes, and mentions are controlled by the user who generates them and not by the President, except to the extent he attempts to do so by blocking.   Accordingly, while the President's tweets can accurately be described as government speech, the retweets, replies, and likes of other users in response to his tweets are not government speech under any formulation.   The Supreme Court has described the government speech doctrine as "susceptible to dangerous misuse."   *Matal*, 137 S. Ct. at 1758.   It has urged "great caution" to prevent the government from "silenc[ing] or muffl[ing] the expression of disfavored viewpoints" under the guise of the government speech doctrine.   *Id.* Extension of the doctrine in the way urged by President Trump would produce precisely this result.

The irony in all of this is that we write at a time in the history of this nation when the conduct of our government and its officials is subject to wide-open, robust debate.   This debate encompasses an extraordinarily broad range of ideas and viewpoints and generates a level of

23a

passion and intensity the likes of which have rarely been seen.   This debate, as uncomfortable and as unpleasant as it frequently may be, is nonetheless a good thing.   In resolving this appeal, we remind the litigants and the public that if the First Amendment means anything, it means that the best response to disfavored speech on matters of public concern is more speech, not less.

## CONCLUSION

The judgment of the District Court is **AFFIRMED**.

24a

## APPENDIX B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

————

17 Civ. 5205 (NRB)

KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA
UNIVERSITY, REBECCA BUCKWALTER, PHILIP COHEN,
HOLLY FIGUEROA, EUGENE GU, BRANDON NEELY,
JOSEPH PAPP, AND NICHOLAS PAPPAS,
PLAINTIFFS

*v.*

DONALD J. TRUMP, HOPE HICKS, SARAH HUCKABEE
SANDERS, AND DANIEL SCAVINO, DEFENDANTS

————

Filed:    May 23, 2018

————

## MEMORANDUM AND ORDER

————

NAOMI REICE BUCHWALD
**United States District Judge**

This case requires us to consider whether a public of-
ficial may, consistent with the First Amendment, "block"
a person from his Twitter account in response to the polit-
ical views that person has expressed, and whether the
analysis differs because that public official is the Presi-
dent of the United States.    The answer to both ques-
tions is no.

Our analysis proceeds as follows.    We first set forth
the background facts regarding Twitter as a platform,
the @realDonaldTrump account that is the center of

25a

this dispute, the plaintiffs, and this case's procedural history.   Because defendants object to our adjudication of this case based on plaintiffs' lack of standing, we then turn—as we must—to the consideration of those jurisdictional arguments.   We conclude that the plaintiffs have established the prerequisites to our jurisdiction: they have experienced a legally cognizable injury, those injuries are traceable to the President and Daniel Scavino's conduct, and a favorable judicial decision on the merits is likely to redress those injuries.

We then proceed to the substance of plaintiffs' First Amendment claims.   We hold that portions of the @realDonaldTrump account—the "interactive space" where Twitter users may directly engage with the content of the President's tweets—are properly analyzed under the "public forum" doctrines set forth by the Supreme Court, that such space is a designated public forum, and that the blocking of the plaintiffs based on their political speech constitutes viewpoint discrimination that violates the First Amendment.   In so holding, we reject the defendants' contentions that the First Amendment does not apply in this case and that the President's personal First Amendment interests supersede those of plaintiffs.

Finally, we consider what form of relief should be awarded, as plaintiffs seek both declaratory relief and injunctive relief.   While we reject defendants' categorical assertion that injunctive relief cannot ever be awarded against the President, we nonetheless conclude that it is unnecessary to enter that legal thicket at this time.   A declaratory judgment should be sufficient, as no government official—including the President—is above the

26a

law, and all government officials are presumed to follow the law as has been declared.

## I.    <u>Background</u>

The facts presented below are drawn almost entirely from the stipulation of facts between the parties, see Stipulation, Sept. 28, 2017, ECF No. 30-1, which "applies exclusively to this litigation and does not constitute an admission for purposes of any other proceeding," Stip. at 1.[1]

### A.    **The Twitter Platform**

"Twitter is a social media platform with more than 300 million active users worldwide, including some 70 million in the United States." Stip. ¶ 13. A "'user' is an individual who has created an account on the platform." Stip. ¶ 14. "A Twitter user must have an account name, which is an @ symbol followed by a unique identifier (e.g., @realDonaldTrump), and a descriptive name (e.g., Donald J. Trump). The account name is called the user's 'handle.'" Stip. ¶ 16.

Twitter "allows users to post short messages," Stip. ¶ 13, which are called "tweets," Stip. ¶ 14. Tweets may be "up to [280] characters in length,"[2] may "include photographs, videos, and links," and are posted "to a

---

[1] We appreciate the parties' professional response to our suggestion that they stipulate to the underlying facts so that the legal issues presented by this dispute could be addressed without the need to undertake a lengthy discovery process.

[2] At the time of the parties' stipulation, most users were limited to 140 characters per tweet. The limit has since been increased to 280 characters. <u>See</u> Aliza Rosen, <u>Tweeting Made Easier</u>, Twitter (Nov. 7, 2017), https://blog.twitter.com/official/en_us/topics/product/2017/tweetingmadeeasier.html.

27a

webpage on Twitter that is attached to the user's account."   Stip. ¶ 14.   "An individual 'tweet' comprises the tweeted content (i.e., the message, including any embedded photograph, video, or link), the user's account name (with a link to the user's Twitter webpage), the user's profile picture, the date and time the tweet was generated, and the number of times the tweet has been replied to   . . .  , retweeted by   . . .  , or liked by . . .  other users."   Stip. ¶ 17.

The Twitter webpage that displays the collection of a user's tweets is known as the user's "timeline."   Stip. ¶ 15.   "When a user generates a tweet, the timeline updates immediately to include that tweet," and "[a]nyone who can view a user's Twitter webpage can see the user's timeline."   Stip. ¶ 15.   "A user's Twitter webpage may also include a short biographical description; a profile picture, such as a headshot; a 'header' image, which appears as a banner at the top of the webpage; the user's location; a button labeled 'Message,' which allows two users to correspond privately; and a small sample of photographs and videos posted to the user's timeline, which link to a full gallery."   Stip. ¶ 16.   "By default, Twitter webpages and their associated timelines are visible to everyone with internet access, including those who are not Twitter users.   However, although non-users can view users' Twitter webpages (if the accounts are public), they cannot interact with users on the Twitter platform."   Stip. ¶ 18.

A defining feature of Twitter is a user's ability "to repost or respond to others' messages, and to interact with other Twitter users in relation to those messages." Stip. ¶ 13.   "Beyond posting tweets  . . .  , Twitter users can engage with one another in a variety of ways."

28a

Stip. ¶ 21.   First, "they can 'retweet'—i.e., repost—the tweets of other users, either by posting them directly to their own followers or by 'quoting' them in their own tweets.   When a user retweets a tweet, it appears on the user's timeline in the same form as it did on the original user's timeline, but with a notation indicating that the post was retweeted."   Stip. ¶ 21.   Second, "[a] Twitter user can also reply to other users' tweets.   Like any other tweet, a reply can be up to [280] characters in length and can include photographs, videos, and links." Stip. ¶ 22.   This reply may be viewed in two places: when a user sends a reply, "the reply appears on the user's timeline under a tab labeled 'Tweets & replies.'" However, the reply may also be accessed from the feed of the user sending the tweet being replied to:   "by clicking on the tweet that prompted the reply[,] the reply will appear below the original tweet, along with other users' replies to the same tweet."   Stip. ¶ 22. Third, "[a] Twitter user can also 'favorite' or 'like' another user's tweet by clicking on the heart icon that appears under the tweet.   By 'liking' a tweet, a user may mean to convey approval or to acknowledge having seen the tweet."   Stip. ¶ 24.   Fourth, "[a] Twitter user can also 'mention' another user by including the other user's Twitter handle in a tweet.   A Twitter user mentioned by another user will receive a 'notification' that he or she has been mentioned in another user's tweet."   Stip. ¶ 25.   Finally, "Twitter users can subscribe to other users' messages by 'following' those users' accounts.   Users generally can see all tweets posted or retweeted by accounts they have followed."   Stip. ¶ 19.   "Tweets, retweets, replies, likes, and mentions are controlled by the user who generates them.   No other Twitter user can alter the content of any retweet or reply, either before

29a

or after it is posted. Twitter users cannot prescreen tweets, replies, likes, or mentions that reference their tweets or accounts." Stip. ¶ 26.

Because a retweet or a reply to a tweet is itself a tweet, each retweet and reply, recursively, may be re-tweeted, replied to, or liked. "A Twitter user can also reply to other replies. A user whose tweet generates replies will see the replies below his or her original tweet, with any replies-to-replies nested below the re-plies to which they respond. The collection of replies and replies-to-replies is sometimes referred to as a 'comment thread.'" Stip. ¶ 23. "Twitter is called a 'so-cial' media platform in large part because of comment threads, which reflect multiple overlapping 'conversa-tions' among and across groups of users." Stip. ¶ 23.

In addition to these means of interaction, Twitter of-fers two means of limiting interaction with other users: blocking and muting. First, "[a] user who wants to pre-vent another user from interacting with her account on the Twitter platform can do so by 'blocking' that user. (Twitter provides users with the capability to block other users, but it is the users themselves who decide whether to make use of this capability.) When a user is signed in to a Twitter account that has been blocked, the blocked user cannot see or reply to the blocking user's tweets, view the blocking user's list of followers or fol-lowed accounts, or use the Twitter platform to search for the blocking user's tweets. The blocking user will not be notified if the blocked user mentions her or posts a tweet; nor, when signed in to her account, will the blocking user see any tweets posted by the blocked user." Stip. ¶ 28. "If, while signed in to the blocked

30a

account, the blocked user attempts to follow the block-ing user, or to access the Twitter webpage from which the user is blocked, the blocked user will see a message indicating that the other user has blocked him or her from following the account and viewing the tweets asso-ciated with the account."  Stip. ¶ 29.

While blocking precludes the blocked user from di-rectly interacting with the blocking user's tweets—including from replying or retweeting those tweets, blocking does not eliminate all interaction between the blocked user and the blocking user.  "After a user has been blocked, the blocked user can still mention the blocking user.  Tweets mentioning the blocking user will be visible to anyone who can view the blocked user's tweets and replies.  A blocked user can also reply to us-ers who have replied to the blocking user's tweets, although the blocked user cannot see the tweet by the blocking user that prompted the original reply.  These replies-to-replies will appear in the comment thread, be-neath the reply to the blocking user's original tweet." Stip. ¶ 30.  Further, "[i]f a blocked user is not signed in to Twitter, he or she can view all of the content on Twit-ter that is accessible to anyone without a Twitter ac-count."  Stip. ¶ 31.

As distinguished from blocking, "[m]ut[ing] is a fea-ture that allows [a user] to remove an account's Tweets from [his or her] timeline without unfollowing or block-ing that account.  Muted accounts will not know that [the muting user has] muted them and [the muting user] can unmute them at any time."  <u>How to Mute Accounts on Twitter</u>, Twitter (last visited May 22, 2018), https://help. twitter.com/en/using-twitter/twitter-mute  [hereinafter

31a

How to Mute].[3]  "Muted accounts can follow [the muting user] and [the muting user] can follow muted accounts.  Muting an account will not cause [the muting user] to unfollow them."  Id.  If a muting user follows a muted user, "[r]eplies and mentions by the muted account will still appear in [the muting user's] Notifications tab," and "[w]hen [the muting user] click[s] or tap[s] into a conversation, replies from muted accounts will be visible."  Id.  By contrast, if a muting user does not follow a muted user, "[r]eplies and mentions will not appear in [the muting user's] Notifications tab," and "[w]hen [the muting user] click[s] or tap[s] into a conversation, replies from muted accounts will be not visible."  Id.

## B.  The @realDonaldTrump Account

"Donald Trump established @realDonaldTrump in March 2009.  Before his inauguration, he used this account to tweet about a variety of topics, including popular culture and politics.  Since his inauguration in January 2017, President Trump has used the @realDonaldTrump account as a channel for communicating and interacting with the public about his administration.  He also has continued to use the account, on occasion, to communicate about other issues not directly related to official government business."  Stip. ¶ 32.  "The Twitter page associated with the account is registered to Donald J. Trump, '45th President of the United States of America, Washington, D.C.'"  Stip. ¶ 35.  "The @realDonaldTrump account

---

[3] The parties agree that we "may take judicial notice of the information published in the 'Using Twitter' and 'Policies and reporting' guides available on Twitter's 'Twitter Support' webpage."  Stip. at 3 n.2.

32a

is generally accessible to the public at large without regard to political affiliation or any other limiting criteria." Stip. ¶ 36. "[A]ny member of the public can view his tweets without being signed in to Twitter, and anyone who wants to follow the account can do so. President Trump has not issued any rule or statement purporting to limit (by form or subject matter) the speech of those who reply to his tweets." Stip. ¶ 36.

Since the President's inauguration, the @realDonaldTrump account has been operated with the assistance of defendant Daniel Scavino, "the White House Social Media Director and Assistant to the President [who] is sued in his official capacity only." Stip. ¶ 12. "With the assistance of Mr. Scavino in certain instances, President Trump uses @realDonaldTrump, often multiple times a day, to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; to challenge media organizations whose coverage of his Administration he believes to be unfair; and for other statements, including on occasion statements unrelated to official government business. President Trump sometimes uses the account to announce matters related to official government business before those matters are announced to the public through other official channels." Stip. ¶ 38. "For example, the President used @realDonaldTrump to announce on June 7, 2017, for the first time, that he intended to nominate Christopher Wray for the position of FBI director." Stip. ¶ 38. Since the parties' stipulation, the President has also used the @realDonaldTrump account in removing then-Secretary

33a

of State Rex Tillerson[4] and then-Secretary of Veterans Affairs David Shulkin.[5]  Additionally, "[t]he National Archives and Records Administration has advised the White House that the President's tweets from @realDonaldTrump . . . are official records that must be preserved under the Presidential Records Act." Stip. ¶ 40.

"Mr. Scavino in certain instances assists President Trump in operating the @realDonaldTrump account, including by drafting and posting tweets to the account.  Other White House aides besides Mr. Scavino will, in certain instances, also suggest content for @realDonaldTrump tweets.  President Trump also sometimes dictates tweets to Mr. Scavino, who then posts them on Twitter.  President Trump and/or Mr. Scavino sometimes retweet the tweets of those who participate in comment threads associated with the @realDonaldTrump account."  Stip. ¶ 39.  "Mr. Scavino has access to the @realDonaldTrump account, including the access necessary to block and unblock individuals from the @realDonaldTrump account," Stip. ¶ 12, and has explained that @realDonaldTrump is a channel "through which 'President Donald J. Trump . . .

---

[4] Michael C. Bender & Felicia Schwartz, Rex Tillerson Is out as Secretary of State; Donald Trump Taps Mike Pompeo, Wall St. J. (Mar. 13, 2018, 7:20 P.M.), https://www.wsj.com/articles/rex-tillerson-is-out-as-secretary-of-state-donald-trump-taps-mike-pompeo-15209 78116.

[5] Donovan Slack, Veterans Affairs Secretary David Shulkin Is Out, Trump Announces by Tweet, USA Today (Mar. 28, 2018, 8:46 P.M.), https://www.usatoday.com/story/news/politics/2018/03/28/ david-shulkin-veterans-affairs-secretary-forced-out-john-kelly/3467 41002/.

34a

[c]ommunicat[es] directly with you, the American people!'"   Stip. ¶ 37 (alterations and omissions in original).

Twitter users engage frequently with the President's tweets.   "Typically, tweets from @realDonaldTrump generate thousands of replies from members of the public, and some of those replies generate hundreds or thousands of replies in turn."   Stip. ¶ 41.   "For example, on July 26, 2017, President Trump issued a series of tweets . . . announcing 'that the United States Government will not accept or allow   . . .   Transgender individuals to serve' in the military, and after less than three hours, the three tweets, collectively, had been retweeted nearly 70,000 times, liked nearly 180,000 times, and replied to about 66,000 times."   Stip. ¶ 41 (second omission in original).   "This level of engagement is typical for President Trump's tweets," Stip. ¶ 42, which "frequently receive 15,000-20,000 retweets or more," Stip. ¶ 42, and "are each replied to tens of thousands of times," Stip. ¶ 43.

### C.   The Individual Plaintiffs

Rebecca Buckwalter, Philip Cohen, Holly Figueroa, Eugene Gu, Brandon Neely, Joseph Papp, and Nicholas Pappas (collectively, the "individual plaintiffs"), are all Twitter users.   Stip. ¶¶ 2-8.   They each tweeted a message critical of the President or his policies in reply to a tweet from the @realDonaldTrump account.   Stip. ¶¶ 46-52.   Each individual plaintiff had his or her account blocked shortly thereafter, and each account remains blocked.   Stip. ¶¶ 46-52.   Defendants do "not contest Plaintiffs' allegation that the Individual Plaintiffs were blocked from the President's Twitter account because the Individual Plaintiffs posted tweets that criticized the President or his policies."   Stip. at 1.

35a

"As a result of the President's blocking of the Individual Plaintiffs from @realDonaldTrump, the Individual Plaintiffs cannot view the President's tweets; directly reply to these tweets; or use the @realDonaldTrump webpage to view the comment threads associated with the President's tweets while they are logged in to their verified accounts." Stip. ¶ 54. However, "[t]he Individual Plaintiffs can view tweets from @realDonaldTrump when using an internet browser or other application that is not logged in to Twitter, or that is logged in to a Twitter account that is not blocked by @realDonaldTrump." Stip. ¶ 55. Additionally, "[s]ome of the Individual Plaintiffs have established second accounts so that they can view the President's tweets." Stip. ¶ 56.

Blocking does not completely eliminate the individual plaintiffs' ability to interact with the President's tweets. "The Individual Plaintiffs can view replies to @realDonaldTrump tweets, and can post replies to those replies, while logged in to the blocked accounts. Replies-to-replies appear in the comment threads that originate with @realDonaldTrump tweets and are visible to users who have not blocked (or been blocked by) the Individual Plaintiffs." Stip. ¶ 57. "Although the Individual Plaintiffs who have been blocked have the ability to view and reply to replies to @realDonaldTrump tweets, they cannot see the original @realDonaldTrump tweets themselves when signed in to their blocked accounts, and in many instances it is difficult to understand the reply tweets without the context of the original @realDonaldTrump tweets." Stip. ¶ 58. While "[i]n the past, Plaintiffs Holly Figueroa, Eugene Gu, and Brandon Neely used a third-party service called Favstar that could be used by blocked users to view and reply to a blocking account's tweets if the blocked user

36a

established a Favstar account and followed certain steps[,] [t]he parties' understanding is that it is no longer possible for blocked users to use the Favstar service to view and reply to a blocking account's tweets." Stip. ¶ 59.

These workarounds "require [the individual plaintiffs] to take more steps than non-blocked, signed-in users to view the President's tweets." Stip. ¶ 55. "All of the Individual Plaintiffs have found these various 'workarounds' to be burdensome and to delay their ability to respond to @realDonaldTrump tweets. As a result, four of the Individual Plaintiffs do not use them and the others use them infrequently." Stip. ¶ 60.

### D. The Knight Institute

The "Knight First Amendment Institute at Columbia University is a 501(c)(3) organization that works to defend and strengthen the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. Staff at the Knight First Amendment Institute operate a Twitter account under the handle @knightcolumbia, and this account follows @realDonaldTrump." Stip. ¶ 1. In contrast to the individual plaintiffs, "[t]he Knight Institute has not been blocked from the @realDonaldTrump account." Stip. ¶ 61. However, "[t]he Knight Institute desires to read comments that otherwise would have been posted by the blocked Plaintiffs, and by other accounts blocked by @realDonaldTrump, in direct reply to @realDonaldTrump tweets," Stip. ¶ 61, and "[t]he @knightcolumbia account follows Professor Cohen's account, @familyunequal," Stip. ¶ 62. "As of August 22, 2017," however, "the Knight Institute did not follow the other six Individual Plaintiffs on Twitter." Stip. ¶ 62.

37a

### E. Procedural History

The Knight Institute and the individual plaintiffs filed suit in July 2017, seeking declaratory and injunctive relief and naming the President, Scavino, and then-White House Press Secretary Sean Spicer as defendants.  Compl., July 11, 2017, ECF No. 1.  After Spicer's resignation in late July 2017, his successor as White House Press Secretary, Sarah Huckabee Sanders, and White House Communications Director Hope Hicks were substituted in his place pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.[6]  See Letter from Jameel Jaffer and Michael H. Baer to the Court, Sept. 25, 2017, ECF No. 28.  After entering into the stipulation of facts, defendants moved for summary judgment on October 13, 2017 and plaintiffs cross-moved for summary judgment on November 3, 2017.  We heard oral argument on March 8, 2018.

## II. Standing

Before turning to the merits of this dispute, "we are required to assure ourselves of jurisdiction."  Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J., 760 F.3d 227,

---

[6] Hicks has since resigned her position as White House Communications Director.  See Katie Rogers & Maggie Haberman, Hope Hicks is Gone, and It's Not Clear Who Can Replace Her, N.Y. Times (Mar. 29, 2018), https://www.nytimes.com/2018/03/29/us/politics/hope-hicks-white-house.html.  Because plaintiffs seek only prospective relief and Hicks was sued only in her official capacity, Stip. ¶ 10, the fact of Hicks's resignation alone warrants summary judgment in her favor.  Further, because the President has not yet appointed Hicks's successor, no substitution by operation of Rule 25(d) can occur.  Hicks will therefore be dismissed as a defendant, and no one will be substituted in her stead at this time.  The Clerk of the Court is directed to amend the caption of this case accordingly.

38a

237 n.11 (2d Cir. 2014).   At bottom, the "judicial Power of the United States" is constitutionally limited to "Cases" and "Controversies."   U.S. Const. art. III, § 2.   Because "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy," Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016), "[w]hether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit," Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, 316 F.3d 357, 361 (2d Cir. 2003).   "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim."   Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005).

The Supreme Court has "established that the 'irreducible constitutional minimum' of standing consists of three elements."   Spokeo, 136 S. Ct. at 1547 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."   Id.   "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements."   Id.   "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."   Defs. of Wildlife, 504 U.S. at 561. "In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence

39a

'specific facts'" supporting its standing.  Id.  (quoting Fed. R. Civ. P. 56(e)).  Conversely, in order to grant summary judgment in a plaintiff's favor, there must be no genuine issue of material fact as to that plaintiff's standing.

Because "the standing inquiry requires careful judicial examination of   .  .  .   whether the <u>particular plaintiff</u> is entitled to an adjudication of the <u>particular claims</u> asserted," <u>Allen v. Wright</u>, 468 U.S. 737, 752 (1984) (emphasis added), standing must be assessed as to each plaintiff and each "plaintiff must demonstrate standing separately for each form of relief sought," <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 185 (2000).  Further, because Article III does not "permit[] suits against non-injurious defendants as long as one of the defendants in the suit injured the plaintiff," standing must also be assessed as against each defendant.  <u>Mahon v. Ticor Title Ins. Co.</u>, 683 F.3d 59, 62 (2d Cir. 2012).

We consider the three elements of standing as to the individual plaintiffs before turning to the Knight Institute's standing.

## A.   Injury-in-Fact

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  <u>Spokeo</u>, 136 S. Ct. at 1548 (internal quotation marks omitted). However, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief   .  .  .   if unaccompanied by any continuing, present adverse effects."  <u>City of Los Angeles v.</u>

40a

Lyons, 461 U.S. 95, 102 (1983) (alteration and omission in original) (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)).   Though "[p]ast wrongs" serve as "evidence bearing on whether there is a real and immediate threat of repeated injury," id. (internal quotation marks omitted), "[a] plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement," Deshawn E. ex rel. Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998).   Rather, that plaintiff "must show a likelihood that he or she will be injured in the future."   Id.[7]

"Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes."   Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Defs. of Wildlife, 504 U.S. at 565 n.2).   Therefore, "threatened injury must be 'certainly impending' to constitute injury in fact" that satisfies Article III's requirements.   Whitmore v. Arkansas, 495 U.S. 149, 158 (1990) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).   A "theory of standing [that] relies on a highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending," nor does an "objectively reasonable likelihood" that the injury will occur.   Clapper, 568 U.S.

---

[7] The absence of future injury also precludes a finding of redressability, thereby defeating standing to seek injunctive relief on a second basis.   See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 109 (1998) ("Because [plaintiff] alleges only past infractions of [law], and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury.").

41a

at 410 (citing <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 496 (2009), and <u>Whitmore</u>, 495 U.S. at 157-60).

Further, the injury must be concrete and particularized. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" <u>Spokeo</u>, 136 S. Ct. at 1548 (quoting <u>Defs. of Wildlife</u>, 504 U.S. at 560 n.1). The plaintiff "must have a personal stake in the outcome" and must assert "something more than generalized grievances." <u>United States v. Richardson</u>, 418 U.S. 166, 179-80 (1974) (internal quotation marks omitted). An "impact on him [that] is plainly undifferentiated and common to all members of the public" is insufficient, <u>id.</u> at 176 (internal quotation marks omitted), as is a mere "special interest" in a given problem without more, <u>Sierra Club v. Morton</u>, 405 U.S. 727, 739 (1972). At the same time, "standing is not to be denied simply because many people suffer the same injury." <u>Massachusetts v. EPA</u>, 549 U.S. 497, 526 n.24 (2007) (quoting <u>United States v. Students Challenging Regulatory Agency Procedures (SCRAP)</u>, 412 U.S. 669, 687 (1973)). "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." <u>Spokeo</u>, 136 S. Ct. at 1548 n.7.

Concreteness "is quite different from particularization." <u>Id.</u> at 1548. "A 'concrete' injury must be 'de facto'; that is, it must actually exist." <u>Id.</u> The term "'[c]oncrete' is not, however, necessarily synonymous with 'tangible,'" and "intangible injuries"—including infringements on the exercise of First Amendment rights —"can nevertheless be concrete." <u>Id.</u> at 1549 (citing <u>Pleasant Grove City v. Summum</u>, 555 U.S. 460 (2009),

42a

and Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993)).

In this case, the record establishes a number of limitations on the individual plaintiffs' use of Twitter as a result of having been blocked. As long as they remain blocked, "the Individual Plaintiffs cannot view the President's tweets; directly reply to these tweets; or use the @realDonaldTrump webpage to view the comment threads associated with the President's tweets while they are logged in to their verified accounts." Stip. ¶ 54. While alternative means of viewing the President's tweets exist, Stip. ¶¶ 55-56, and the individual plaintiffs "have the ability to view and reply to replies to @realDonaldTrump tweets, they cannot see the original @realDonaldTrump tweets themselves when signed in to their blocked accounts, and in many instances it is difficult to understand the reply tweets without the context of the original @realDonaldTrump tweets," Stip. ¶ 58.

These limitations are cognizable injuries-in-fact. The individual plaintiffs' ability to communicate using Twitter has been encumbered by these limitations (regardless of whether they are harms cognizable under the First Amendment). Further, as long as the individual plaintiffs remain blocked, their ability to communicate using Twitter will continue to be so limited. Stip. ¶¶ 28-31, 54. The individual plaintiffs have experienced past harm in that their ability to use Twitter to interact with the President's tweets has been limited, and—absent some unforeseen change to the blocking functionality—they will continue to experience that harm as long as they are blocked. These future harms are not only certainly impending as required for standing purposes, but

43a

they are in fact virtually certain because the individual plaintiffs continue to be blocked.[8]

These injuries are also concrete and particularized. While they are not tangible in nature, these limitations are squarely within the "intangible injuries" previously determined to be concrete.  See Spokeo, 136 S. Ct. at 1549.  These limitations are also particularized, in that they have affected and will affect the individual plaintiffs in a "personal and individual way"—each contends that his or her personal First Amendment rights have been and will continue to be encumbered, and the ability to communicate has been and will be limited because of each individual plaintiff's personal ownership of a Twitter account that was blocked.  See id. at 1548.  We accordingly conclude that the individual plaintiffs have established imminent injury-in-fact that is concrete and particularized, which is sufficient for Article III standing purposes.

**B.  Causation**

The causation requirement demands that the complained-of injury "fairly can be traced to the challenged action of the defendant" as opposed to "injury that results from the independent action of some third

---

[8] Further, the Court suggested at oral argument that the parties consider a resolution of this dispute under which the individual plaintiffs would be unblocked and subsequently muted, an approach that would restore the individual plaintiffs' ability to interact directly with (including by replying directly to) tweets from the @realDonaldTrump account while preserving the President's ability to ignore tweets sent by users from whom he does not wish to hear. The fact that no such resolution has been reached further suggests that the individual plaintiffs will continue to be blocked and, consequently, will continue to face the harms of which they complain.

44a

party not before the court." <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 41-42 (1976). While the Supreme Court has often defined the causation prong of standing with reference to a defendant's challenged <u>action</u>, it has also referred to a defendant's "conduct." <u>See, e.g.</u>, <u>Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 472 (1982) (quoting <u>Gladstone, Realtors v. Village of Bellwood</u>, 441 U.S. 91, 99 (1979)). Accordingly, an omission may provide a basis for standing just as an affirmative action may. <u>See</u> <u>Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.</u>, 790 F.3d 411, 417 (2d Cir. 2015) (describing causation as requiring "that the injury was in some sense caused by the opponent's action or omission"); <u>see also, e.g.</u>, <u>Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity</u>, 878 F.3d 371, 378 (D.C. Cir. 2017) (referring to a "defendant's action or omission").

"The traceability requirement for Article III standing means that the plaintiff must 'demonstrate a causal nexus between the defendant's conduct and the injury.'" <u>Rothstein v. UBS AG</u>, 708 F.3d 82, 91 (2d Cir. 2013) (quoting <u>Heldman v. Sobol</u>, 962 F.2d 148, 156 (2d Cir. 1992)). "Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 134 S. Ct. 1377, 1391 n.6 (2014).

### 1. Sarah Huckabee Sanders

Plaintiffs have not established standing against defendant Sanders. "Ms. Sanders does not have access to the @realDonaldTrump account," Stip. ¶ 11, and plaintiffs do not suggest that Sanders blocked the individual

45a

plaintiffs in the first instance or that she could unblock the individual plaintiffs upon a legal finding that such blocking is constitutionally impermissible. Accordingly, plaintiffs do not challenge any action that Sanders has taken (or can take). The individual plaintiffs' injuries-in-fact are not attributable to Sanders, and they accordingly lack Article III standing to sue her. See, e.g., Simon, 426 U.S. at 41-42. Summary judgment will therefore be granted in favor of defendant Sanders.

### 2.  Daniel Scavino

In contrast to Sanders, "Mr. Scavino has access to the @realDonaldTrump account, including the access necessary to block and unblock individuals from the @realDonaldTrump account." Stip. ¶ 12. Indeed, "Mr. Scavino posts messages on behalf of President Trump to @realDonaldTrump and other social media accounts," Stip. ¶ 12, and "assists President Trump in operating the @realDonaldTrump account, including by drafting and posting tweets to the account," Stip. ¶ 39. While Scavino unquestionably has access to the @realDonaldTrump account and participates in its operation, such involvement does not, by itself, establish that the plaintiffs' injuries may be fairly traced to an action taken by Scavino as required for standing purposes. The only evidence in the record as to Scavino pertains to this general involvement, and the record is devoid of any suggestion that he blocked the individual plaintiffs.

Nonetheless, the Second Circuit and several other Courts of Appeals have recognized that in cases seeking prospective relief, an official defendant's lack of personal involvement in past constitutional violations does not render that defendant an improper one for purposes

46a

of prospective declaratory or injunctive relief from con-tinuing violations—provided that the defendant main-tains some connection to, or responsibility for, the continuing violation.   See Koehl v. Dalsheim, 85 F.3d 86, 89 (2d Cir. 1996) (holding that "the complaint also sought in-junctive relief against [a defendant official], and dismis-sal of that claim was not warranted" despite the "lack of an allegation of personal involvement" warranting dis-missal of a damages claim); Pugh v. Goord, 571 F. Supp. 2d 477, 517 (S.D.N.Y. 2008) (Sullivan, J.) (re-quiring "only that a defendant have a 'connection' with the [allegedly unconstitutional] act, and not more" (cit-ing, inter alia, Dairy Mart Convenience Stores, Inc. v. Nickel (In re Dairy Mart Convenience Stores, Inc.), 411 F.3d 367, 372-73 (2d Cir. 2005))); Loren v. Levy, No. 00 Civ. 7687, 2003 WL 1702004, at *11 (S.D.N.Y. Mar. 31, 2003) (Chin, J.) ("[A]ctions involving claims for pro-spective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the al-leged illegal action."   (quoting Davidson v. Scully, 148 F. Supp. 2d 249, 254 (S.D.N.Y. 2001)), aff'd, 120 F. App'x 393 (2d Cir. 2005); see also Parkell v. Danberg, 833 F.3d 313, 332 (3d Cir. 2016) ("Our conclusion that the State Defendants lacked personal involvement in past consti-tutional violations does not preclude [plaintiff] from ob-taining prospective injunctive relief for ongoing viola-tions."); Pouncil v. Tilton, 704 F.3d 568, 576 (9th Cir. 2012) (concluding that a named defendant official was a "proper defendant on a claim for prospective injunctive relief  .  .  .  because he would be responsible for ensur-ing that injunctive relief was carried out, even if he was not personally involved in the decision giving rise to [plaintiff's] claims"); Gonzalez v. Feinerman, 663 F.3d

47a

311, 315 (7th Cir. 2011) (per curiam) ("[S]ince [plaintiff] also seeks injunctive relief it is irrelevant whether [the defendant official] participated in the alleged violations.").

While this line of cases developed in the context of suits against state officials and the Ex parte Young exception to state sovereign immunity under the Eleventh Amendment, see In re Dairy Mart, 411 F.3d at 372-73; see also Finstuen v. Crutcher, 496 F.3d 1139, 1151 (10th Cir. 2007); Pennington Seed, Inc. v. Produce Exch. No. 299, 457 F.3d 1334, 1341-42 (Fed. Cir. 2006), it is no less applicable to the present context of suits against federal officials.[9]  As the Supreme Court has explained, suits seeking prospective relief against federal officials alleging continuing constitutional violations and those against state officials share common characteristics and a common historical basis:  "we have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law.  But that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials."  Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. 1378, 1384 (2015) (citations omitted).  "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  Id. (emphasis added).

---

[9] Both parties' reliance on other precedents developed in the context of suits against state officials under 42 U.S.C. § 1983 further persuades us that this line of precedent is applicable here.

48a

The lack of a prior personal involvement requirement in actions seeking prospective relief does not vitiate standing's traceability requirement, as defendants suggest. The defendant official's connection to the ongoing violation, see, e.g., Parkell, 833 F.3d at 332; Pouncil, 704 F.3d at 576; Gonzalez, 663 F.3d at 315; Pugh, 571 F. Supp. 2d at 517, satisfies the traceability requirement. Assuming the existence of an ongoing violation, an official who has some connection to the violation— i.e., one who may prospectively remedy it—will contribute to the violation and the future injury-in-fact that it may inflict by failing to do so. Here, assuming that the blocking of the individual plaintiffs infringes their First Amendment rights, those rights will continue to be infringed as long as they remain blocked. Cf. Lyons, 461 U.S. at 102 ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (omission in original) (quoting O'Shea, 414 U.S. at 495-96)). Because Scavino has the ability to unblock the plaintiffs, any future injury will be traceable to him because it will have resulted, at least in part, from his failure to unblock them. Ultimately, as defendants' quoted authority explains, "[s]tanding should be recognized as long as the duty claim survives, but becomes irrelevant when litigation reaches the point of rejecting the duty." 13A Charles A. Wright et al., Federal Practice & Procedure, § 3531.5 (3d ed.) (Westlaw 2018). Because we must consider standing before the merits, we have not at this point in the analysis considered plaintiffs' claim that the First Amend-

49a

ment imposes a duty on Scavino to unblock the individual plaintiffs.[10]   We therefore conclude that the traceability requirement of standing is satisfied as to Scavino.

### 3.   The President

The record definitively establishes that the plaintiffs' injuries-in-fact are directly traceable to the President's actions.   "The President blocked [each of the individual plaintiffs] from the @realDonaldTrump account." Stip. ¶¶ 46-52; see also Stip. ¶ 54 (referring to "the President's blocking of the Individual Plaintiffs").   The causation requirement is therefore amply satisfied as to the President.

### C.   Redressability

In order for redressability to be satisfied, "it must be likely that a favorable judicial decision will prevent or redress the injury."   Earth Island Inst., 555 U.S. at 493. That is, redressability must be "likely, as opposed to merely speculative," Laidlaw, 528 U.S. at 181, but it "is not a demand for mathematical certainty," Mhany Mgmt., Inc. v. County of Nassau, 819 F.3d 581, 602 (2d Cir. 2016) (quoting Toll Bros., Inc. v. Township of Readington, 555 F.3d 131, 143 (3d Cir. 2009)).   "All that is

---

[10]  Indeed, this passage of Federal Practice and Procedure suggests that a plaintiff asserting a duty claim has standing as long as the claim remains viable, and that the issue of standing becomes irrelevant when the duty is rejected—as the claim will have failed on the merits at that point.   The government's argument that plaintiffs lack standing as to Scavino because Scavino has no duty therefore inverts the analysis by resolving the merits before standing.   Cf. Steel Co., 523 U.S. at 89 ("[J]urisdiction  . . .  is not defeated  . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover."   (omissions in original) (quoting Bell v. Hood, 327 U.S. 678, 682 (1946)).

50a

required is a showing that such relief be reasonably designed to improve the opportunities of a plaintiff not otherwise disabled to avoid the specific injury alleged." Huntington Branch, NAACP v. Town of Huntington, 689 F.2d 391, 394 (2d Cir. 1982).

Further, any relief provided need not be complete. "The redressability element of the Article III standing requirement and the 'complete relief' referred to by Rule 19 [of the Federal Rules of Civil Procedure] are not identical," Defs. of Wildlife, 504 U.S. at 570 n.4 (emphasis omitted) (plurality opinion),[11] and a plaintiff "need not show that a favorable decision will relieve his every injury," Larson v. Valente, 456 U.S. 228, 244 n.15 (1982). As the Tenth Circuit has subsequently explained, "if the law required that the requested relief afford complete redress, the Supreme Court would not have allowed Massachusetts to proceed against the EPA, as there was no guarantee a favorable decision would mitigate future environmental damage, much less redress it completely." Consumer Data Indus. Ass'n v. King, 678 F.3d 898, 905 (10th Cir. 2012) (citing Massachusetts v. EPA, 549 U.S. at 526); see also WildEarth Guardians v. U.S. Dep't of Agric., 795 F.3d 1148, 1156 n.5 (9th Cir. 2015) ("Partial relief  . . .  would qualify as redress

---

[11] Rule 19(a) mandates the joinder of additional persons as parties if "in that person's absence, the court cannot accord complete relief among existing parties," provided that the joinder of that party does "not deprive the court of subject-matter jurisdiction." Fed. R. Civ. P. 19(a)(1)(A). Justice Blackmun, dissenting in Defenders of Wildlife, had contended that the plurality's analysis of redressability rendered superfluous Rule 19's contemplation that the joinder of additional parties would be needed to afford complete relief, as redressability would be lacking as an initial matter. See 504 U.S. at 598 n.4 (Blackmun, J., dissenting).

51a

for standing purposes." (citing <u>Meese v. Keene</u>, 481 U.S. 465, 476-77 (1987))).  "[E]ven if [plaintiffs] would not be out of the woods, a favorable decision would relieve their problem 'to some extent,' which is all the law requires." <u>Consumer Data</u>, 678 F.3d at 903.

We therefore conclude that the plaintiffs' injuries may be redressed through declaratory relief or through injunctive relief directed at Scavino: the plaintiffs' future injuries will be prevented if they are unblocked—an action within Scavino's power.  Stip. ¶ 12.  Nor is this redressability undercut, as defendants suggest, by the President's ability to block individuals.  The D.C. Circuit has explained that "the partial relief [the plaintiff] can obtain against subordinate executive officials is sufficient for redressability, even recognizing that the President has the power, if he so chose, to undercut this relief," <u>Swan v. Clinton</u>, 100 F.3d 973, 980-81 (D.C. Cir. 1996), reasoning that has since been adopted by the Eleventh Circuit, <u>see</u> <u>Made in the USA Found. v. United States</u>, 242 F.3d 1300, 1309-11 (11th Cir. 2001).  Any declaratory or injunctive relief as to Scavino that results in the unblocking of the individual plaintiffs will redress at least some of their future injury, regardless of whether the President could, theoretically, reblock them subsequently.  And of course, "we may assume it is substantially likely that the President and other executive  .  .  . officials would abide by an authoritative interpretation of [a]  .  .  .  constitutional provision by the District Court, even though they would not be directly bound by such a determination."  <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 803 (1992) (plurality opinion); <u>see also</u> <u>Utah v.</u>

52a

Evans, 536 U.S. 452, 463-64 (2002).[12]   This substantial likelihood, though not a mathematical certainty, is more than sufficient to establish the redressability of plaintiffs' injuries.[13]

### D.   The Knight Institute's Organizational Standing

"Under [the] theory of 'organizational' standing, the organization is just another person—albeit a legal person —seeking to vindicate a right."   N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir.

---

[12] This case involves the interpretation of only one law—the First Amendment.   The Government's reliance on Delta Construction Co. v. EPA, 783 F.3d 1291 (D.C. Cir. 2015) (per curiam), and Doe v. Cuomo, 755 F.3d 105 (2d Cir. 2014), each of which involved a plaintiff or petitioner subject to the requirements of multiple laws, is accordingly misplaced.   In each of those cases, the action that the plaintiff or petitioner sought to undertake would be restricted by the unchallenged law, even if the plaintiff or petitioner were ultimately successful in challenging the first law.

[13] Our conclusion that the individual plaintiffs' injuries are redressable through relief directed at Scavino does not depend on his presence as a defendant.   "The power conferred by the [All Writs Act, 28 U.S.C. § 1651,] extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice."   United States v. N.Y. Tel. Co., 434 U.S. 159, 174 (1977) (citations omitted); see also Made in the USA, 242 F.3d at 1310 n.25; Swan, 100 F.3d at 980; cf. Fed. R. Civ. P. 65(d)(2) (providing that injunctions and restraining orders bind not only the parties but also their "officers, agents, servants, employees, and attorneys" and "other persons who are in active concert or participation" with those persons).   Accordingly, even if Scavino were not a defendant, relief could nonetheless be properly directed at him.

53a

2012).[14]  When organizations "sue on their own behalf, they must independently satisfy the requirements of Article III standing."  Knife Rights, Inc. v. Vance, 802 F.3d 377, 388 (2d Cir. 2015) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982)).  Therefore, the Knight Institute, "as an organization, [bears] the burden of showing:  (i) an imminent 'injury in fact' to itself as an organization (rather than to its members) that is 'distinct and palpable'; (ii) that its injury is 'fairly traceable' to [the complained-of act]; and (iii) that a favorable decision would redress its injuries."  Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017) (quoting Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011)).

Here, the Knight Institute has sufficiently established an injury-in-fact:  the infringement of its desire "to read comments that otherwise would have been posted by the blocked Plaintiffs . . . in direct reply to @realDonaldTrump tweets."  Stip. ¶ 61.  This infringement is a cognizable interest for standing purposes, cf. Defs. of Wildlife, 504 U.S. at 562-63 ("[T]he desire to use or observe . . . is undeniably a cognizable interest for purpose of standing"), and the Knight Institute's following of one of the individual plaintiffs establishes that the Knight Institute "would thereby be 'directly' affected apart from" its special interest in the

_____

[14] An organizational plaintiff may also have associational standing, under which "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Laidlaw, 528 U.S. at 181.  The Knight Institute does not assert that it has standing under an associational standing theory.

54a

First Amendment, id. at 563. Contrary to defendants' assertion that the Knight Institute's standing rests on an impermissibly attenuated chain of possibilities, the injury in question is straightforward: first, the individual plaintiffs cannot reply directly to the President's tweets because they have been blocked, Stip. ¶¶ 28, 54, and second, the Knight Foundation possesses a desire to read the direct replies that would have been tweeted, Stip. ¶ 61.

Defendants further contend that the Knight Institute has suffered a noncognizable generalized grievance, but nothing in the record suggests that the citizenry writ large desires to read the individual plaintiffs' tweets engaging with the President's tweets as the Knight Institute does.[15] Even assuming a large number of other individuals share such a desire, that numerosity would not render the Knight Institute's injury a generalized grievance that cannot support Article III standing. See, e.g., Spokeo, 136 S. Ct. at 1548 n.7; Massachusetts v. EPA, 549 U.S. at 526 n.24.

And even assuming arguendo that the Knight Institute's assertion of its desire to view the individual plaintiffs' tweets standing alone is insufficient to support standing, see, e.g., Defs. of Wildlife, 504 U.S. at 562-64; Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 886-89 (1990), any insufficiency is remedied by the fact that the Knight Institute did and does follow one of the individual plaintiffs, Stip. ¶ 62. Defendants correctly note that the Knight Institute did not follow on Twitter six of the seven individual plaintiffs' accounts (as of one month af-

_____

[15] We would in fact be highly skeptical of any such contention.

55a

ter this lawsuit was filed), Stip. ¶ 62, but the Knight Institute's following of one of the individual plaintiffs is significant and represents "dispositively more than the mere 'general averments' and 'conclusory allegations' found inadequate in National Wildlife Federation," Laidlaw, 528 U.S. at 184 (citing Nat'l Wildlife Fed'n, 497 U.S. at 888), and comparable cases. We therefore conclude that the Knight Institute has established an injury-in-fact necessary to support its organizational standing.

The causation and redressability elements of standing are also satisfied as to the Knight Institute. The causation analysis as to the Knight Institute largely follows that applicable to the individual plaintiffs: the Knight Institute's injury—the inability to read the individual plaintiffs' direct replies to the President's tweets —is a direct consequence of the individual plaintiffs being unable to reply directly to the President's tweets, which is, in turn, a direct consequence of the individual plaintiffs having been blocked. Stip. ¶¶ 28, 54, 59, 61. The Knight Institute's injuries are similarly redressable —if the individual plaintiffs were unblocked, they would be able to tweet direct replies to tweets sent by @realDonaldTrump and the Knight Institute would again be able to fulfill its desire to read those direct replies. While the individual plaintiffs would need to choose to reply in order for the Knight Institute to read a reply, certain individual plaintiffs' attempts to circumvent blocking's limitation on direct replies, Stip. ¶ 59, and the individual plaintiffs' identification of the burdens posed by blocking as prompting their reduced engagement, Stip. ¶ 60, strongly suggests that at least some of the individual plaintiffs are likely to reply if they

56a

were to have the capacity to do so. Accordingly, we conclude that the Knight Institute also has standing.

## III.  First Amendment

Concluding that the individual plaintiffs and the Knight Institute both have standing to sue Scavino and the President, we turn to the First Amendment's application to the distinctly twenty-first century medium of Twitter. The primary point of dispute between the parties is whether a public official's blocking of the individual plaintiffs on Twitter implicates a forum for First Amendment purposes. Our analysis of this question proceeds in several steps.

"[W]e must first decide whether" the speech in which the individual plaintiffs seek to engage "is speech protected by the First Amendment." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985); see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee (ISKCON), 505 U.S. 672, 677 (1992). A conclusion that individual plaintiffs' speech is protected speech, however, "merely begins our inquiry." Cornelius, 473 U.S. at 799. We must then assess whether the putative forum is susceptible to forum analysis at all, see Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998) ("Other government properties are . . . not fora at all."); see also Pleasant Grove City, 555 U.S. at 480 (identifying when "forum analysis is out of place"), identifying with particularity the putative forum at issue, see Cornelius, 473 U.S. at 800. If so, we must then determine its classification. Id. ("Having defined the relevant forum, we must then determine whether it is

57a

public or nonpublic in nature.").[16]   To the extent we conclude that a First Amendment forum is implicated, we consider whether "the extent to which the Government [has] control[led] access" is consistent with the class of forum identified.   Id.

## A.  Protected Speech

Our inquiry into whether the speech at issue is protected by the First Amendment is straightforward. The individual plaintiffs seek to engage in political speech, Stip. ¶¶ 46-52, and such "speech on matters of public concern" "fall within the core of First Amendment protection," Engquist v. Ore. Dep't of Agric., 553 U.S. 591, 600 (2008).   Indeed, there is no suggestion that the speech in which the individual plaintiffs engaged and seek to engage fall within the "well-defined and narrowly limited classes of speech," such as obscenity, defamation, fraud, incitement, and speech integral to criminal conduct, "the prevention and punishment of which have never been thought to raise any Constitutional problem."   Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 791 (2011) (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942)); see also United States v. Stevens, 559 U.S. 460, 468 (2010).   We readily conclude the speech in which individual plaintiffs seek to engage is protected speech.

## B.  Applicability of Forum Doctrine

We turn next to the applicability of forum doctrine. As a threshold matter, for a space to be susceptible to

---

[16] That is, the question of whether a space is susceptible to forum analysis is analytically distinct from the question, assuming that forum analysis applies, of what type of forum (traditional public, designated public, or non-public) the space is.

58a

forum analysis, it must be owned or controlled by the government.  See, e.g., Cornelius, 473 U.S. at 801 ("[A] speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns.").  Further, the application of forum doctrine must be consistent with the purpose, structure, and intended use of the space.  See, e.g., Pleasant Grove City, 555 U.S. at 480 ("[W]here the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place.").

The Supreme Court has instructed that in determining whether these requirements are satisfied (i.e., whether forum analysis can be appropriately applied), we should identify the putative forum by "focus[ing] on the access sought by the speaker."  Cornelius, 473 U.S. at 801; see Lebron v. Nat'l R.R. Passenger Corp. (Amtrak), 69 F.3d 650, 655 (2d Cir. 1995).  "When speakers seek general access to public property, the forum encompasses that property."  Cornelius, 473 U.S. at 801.  By contrast, "[i]n cases in which limited access is sought, [the Supreme Court's] cases have taken a more tailored approach to ascertaining the perimeters of a forum."  Id.  For example, in Cornelius, where plaintiffs sought access to a fundraising drive conducted in the federal workplace, the fundraising drive specifically, rather than the federal workplace generally, constituted the would-be forum.  Id.  Similarly, in Perry Education Ass'n v. Perry Local Educators' Ass'n, where the plaintiff sought access to a public school's internal mail system in order to distribute literature, the mail system rather than the school was the space in question. 460 U.S. 37, 46-47 (1983).  And in Lehman v. City of

59a

Shaker Heights, where the plaintiff sought access to advertising space on the side of city buses, the advertising space and not the buses constituted the putative forum. 418 U.S. 298, 300-01 (1974).   Indeed, this exercise in carefully delineating the putative forum based on the access sought is not an academic one.   For instance, a public park is susceptible to forum analysis when "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," Perry Educ. Ass'n, 460 U.S. at 45 (quoting Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939) (opinion of Roberts, J.)), but the same public park is not when "the installation of permanent monuments" is concerned, Pleasant Grove City, 555 U.S. at 480.

We can therefore reject, at the outset, any contention that the @realDonaldTrump account as a whole is the would-be forum to be analyzed.   Plaintiffs do not seek access to the account as a whole—they do not desire the ability to send tweets as the President, the ability to receive notifications that the President would receive, or the ability to decide who the President follows on Twitter.   Because the access they seek is far narrower, we consider whether forum doctrine can be appropriately applied to several aspects of the @realDonaldTrump account rather than the account as a whole:   the content of the tweets sent, the timeline comprised of those tweets, the comment threads initiated by each of those tweets, and the "interactive space" associated with each tweet in which other users may directly interact with the content of the tweets by, for example, replying to, retweeting, or liking the tweet.

60a

### 1.    Government Ownership or Control

First, to potentially qualify as a forum, the space in question must be owned or controlled by the government. While the Supreme Court has frequently referred to "government-owned property," e.g., Pleasant Grove City, 555 U.S. at 478; see also ISKCON, 505 U.S. at 678 (referring to property that the government "owns and controls"), its precedents have also made clear that a space may be a forum based on government control even absent legal ownership, see, e.g., Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez, 561 U.S. 661, 679 (2010) ("[T]his Court has employed forum analysis to determine when a governmental entity, in regulating property in its charge, may place limitations on speech." (emphasis added)); Cornelius, 473 U.S. at 801 ("[A] speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns." (emphasis added)); Perry Educ. Ass'n, 460 U.S. at 46 ("[T]he 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.'" (emphasis added) (quoting U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 130 (1981))); see also Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 555 (1975) (concluding that a "privately owned . . . theater under long-term lease to the city," id. at 547, was a public forum, id. at 555). This requirement of governmental control, rather than complete governmental ownership, is not only consistent with forum analysis's focus on "the extent to which the Government can control access" to the space and whether that control comports with the First Amendment, Cornelius, 473 U.S. at 800, but also better reflects that a space can be "a forum more in a metaphysical than in a spatial or geographic sense,"

61a

<u>Rosenberger v. Rector & Visitors of the Univ. of Va.</u>, 515
U.S. 819, 830 (1995), and may "lack[] a physical situs,"
<u>Cornelius</u>, 473 U.S. at 801, in which case traditional con-
ceptions of "ownership" may fit less well.

Here, the government-control prong of the analysis
is met. Though Twitter is a private (though publicly
traded) company that is not government-owned, the
President and Scavino nonetheless exercise control over
various aspects of the @realDonaldTrump account:
they control the content of the tweets that are sent from
the account and they hold the ability to prevent, through
blocking, other Twitter users, including the individual
plaintiffs here, from accessing the @realDonaldTrump
timeline (while logged into the blocked account) and
from participating in the interactive space associated
with the tweets sent by the @realDonaldTrump ac-
count, Stip. ¶¶ 12, 28-32, 39, 54. Though Twitter also
maintains control over the @realDonaldTrump account
(and all other Twitter accounts), we nonetheless
conclude that the extent to which the President and
Scavino can, and do, exercise control over aspects of the
@realDonaldTrump account are sufficient to establish
the government-control element as to the content of the
tweets sent by the @realDonaldTrump account, the
timeline compiling those tweets, and the interactive
space associated with each of those tweets. While their
control does not extend to the content of a retweet or
reply when made—"[n]o other Twitter user can alter the
content of any retweet or reply, either before or after it
is posted" and a user "cannot prescreen tweets, replies,
likes, or mentions that reference their tweets or ac-
counts," Stip. ¶ 26—it nonetheless extends to controlling
who has the power to retweet or reply in the first in-
stance.

62a

The President and Scavino's control over the @realDonaldTrump account is also governmental. The record establishes (1) that the @realDonaldTrump account is presented as being "registered to Donald J. Trump, '45th President of the United States of America, Washington, D.C.,'" Stip. ¶ 35; (2) "that the President's tweets from @realDonaldTrump . . . are official records that must be preserved under the Presidential Records Act," Stip. ¶ 40; see 44 U.S.C. § 2202 (directing the retention of "Presidential records"; id. § 2201(2) (defining "Presidential records" as those created "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President"); and (3) that the @realDonaldTrump account has been used in the course of the appointment of officers (including cabinet secretaries), the removal of officers, and the conduct of foreign policy, Stip. ¶ 38—all of which are squarely executive functions, see U.S. Const. art. II, § 2, cl. 2 (appointments); Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 492-93 (2010) (relating the President's removal power to "his responsibility to take care that the laws be faithfully executed" under Article II, section 3, clause 5 of the Constitution (emphasis omitted)); Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S. Ct. 2076, 2090 (2015) ("The President does have a unique role in communicating with foreign governments. . . . "). That is, the President presents the @realDonaldTrump account as being a presidential account as opposed to a personal account and, more importantly, uses the account to take actions that can be taken only by the President as President. Accordingly, we conclude that the control that the President and

63a

Scavino exercise over the account and certain of its features is governmental in nature.

Defendants contend that the governmental control-or-ownership prong is not met because we must also analyze the specific action in question—blocking—under the "under color of state law" precedents developed in the context of actions against state officials under 42 U.S.C. § 1983.  In that context, the standards for whether an action was taken "under color of state law" and for whether an action constitutes "state action" are identical, see Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982), and an official takes action under color of state law when he "exercise[s] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  Invoking this standard, defendants contend that the act of blocking is not state action triggering First Amendment scrutiny because blocking is a functionality made available to every Twitter user, Stip. ¶ 28, and is therefore not a power possessed by virtue of state law.

While the Constitution applies only to the government and not private individuals, the requirement of state action in the forum context is not usually analyzed separately (either in general or under the West standard specifically) from the government control-or-ownership requirement.  As the Second Circuit has recently explained, "[b]ecause facilities or locations deemed to be public forums are usually operated by governments, determining that a particular facility or location is a public forum usually suffices to render the challenged action taken there to be state action subject to First

64a

Amendment limitations."   Halleck v. Manhattan Cmty. Access Corp., 882 F.3d 300, 306-07 (2d Cir. 2018) (citing Widmar v. Vincent, 454 U.S. 263, 265-68 (1981), and City of Madison, Joint Sch. Dist. No. 8 v. Wisc. Emp't Relations Comm'n, 429 U.S. 167, 169-76 (1976)).   While further analysis may be necessary when the party exercising control over the forum is a nongovernmental entity, see, e.g., id. at 307, in which case consideration of the factors set forth by the Supreme Court in Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 295-96 (2001), may be appropriate, the Brentwood factors are a poor fit for the facts of this case: the parties exercising control here are a public official, the President, and his subordinate, Scavino, acting in his official capacity.[17]

---

[17] In Brentwood, the Supreme Court considered whether "a not-for-profit membership corporation organized to regulate interscholastic sport among the public and private high schools" engaged in state action when it enforced its regulations against a member school.   531 U.S. at 291.   The Court held that "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself,'" but acknowledged that "[w]hat is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity."   Id. at 295 (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1976)).   After analyzing a number of factors, including (1) whether the private actor was acting pursuant to the state's coercive power, (2) whether the private actor was undertaking a public function, and (3) whether the private actor received significant encouragement from the state or whether its functions were entwined with governmental policies, the Court concluded that state action was present.   See id. at 295-96; see also Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (per curiam) (analyzing Brentwood).

65a

Further, this argument, which focuses on the act of exclusion divorced from the context of the space from which a person is being excluded, proves too much and is difficult to reconcile with the Supreme Court's public forum precedents. Defendants correctly argue that blocking is a capability held by every Twitter user, Stip. ¶ 28, but the power to exclude is also one afforded generally to every property owner. When a government acts to "legally preserve the property under its control for the use to which it is dedicated," it behaves "like the private owner of property." Rosenberger, 515 U.S. at 829; Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 390 (1993); see also, e.g., Greer v. Spock, 424 U.S. 828, 836 ("The State, no less than a private owner of property, has the power to preserve the property under its control. . . . "). Indeed, when the government exercises its "right to exclude others from entering and using [its] property," Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 539 (2005), it is deploying "one of the most essential sticks in the bundle of rights that are commonly characterized as property," Dolan v. City of Tigard, 512 U.S. 374, 384 (1994). The right to exclude is "perhaps the most fundamental of all property interests," Lingle, 544 U.S. at 539, and it is one shared by the government and private property owners alike. The context of the property from which the government is excluding, therefore, must factor into the analysis. No one can seriously contend that a public official's blocking of a constituent from her purely personal Twitter account—one that she does not impress with the trappings of her office and does not use to exercise the authority of her position—would implicate forum analysis, but those are hardly the facts of this case.

66a

For the same reason, defendants' reliance on the President's establishment of the account in 2009, Stip. ¶ 32—well before his election and inauguration as President—is unpersuasive. To the extent forum analysis applies, "[t]he past history of characterization of a forum may well be relevant; but that does not mean a present characterization about a forum may be disregarded." Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 77 (1st Cir. 2004); see Make the Rd. by Walking, Inc. v. Turner, 378 F.3d 133, 143 (2d Cir. 2004) (recognizing that certain First Amendment restrictions apply "so long as a forum remains public"); cf. Bronx Household of Faith v. Bd. of Educ., 650 F.3d 30, 41 (2d Cir. 2011) (reasoning that "the nature of the site changes" depending on how the site is being used). The Supreme Court has expressly held that "a state is not required to indefinitely retain the open character of the facility," e.g., Perry Educ. Ass'n, 460 U.S. at 46, but changes need not be one-directional. Indeed, the entire concept of a designated public forum rests on the premise that the nature of a (previously closed) space has been changed. See, e.g., Cornelius, 473 U.S. at 802.

To take two examples, if a facility initially developed by the government as a military base—plainly not a public forum under Greer, 424 U.S. at 838—is subsequently decommissioned and repurposed into a public park,[18] the present use of the facility as a park would bear much more heavily on the forum analysis than its historical origins as a military installation. Similarly, if a privately

---

[18] Cf. Colo. Dep't of Pub. Health & Env't v. United States, No. 17-cv-2223, 2018 WL 1152264, at *2 (D. Colo. Mar. 5, 2008) (describing the creation of a national wildlife refuge from portions of the Rocky Mountain Arsenal).

67a

constructed airport were subsequently taken over by a public agency, forum analysis would focus on its current use as a public airport rather than its prior use as a private one.  Cf. ISKCON, 505 U.S. at 681 ("The practices of privately held transportation centers do not bear on the government's regulatory authority over a publicly owned airport.").

Here, the President and Scavino's present use of the @realDonaldTrump account weighs far more heavily in the analysis than the origin of the account as the creation of private citizen Donald Trump.  That latter fact cannot be given the dispositive weight that defendants would ascribe to it.  Rather, because the President and Scavino use the @realDonaldTrump account for governmental functions, the control they exercise over it is accordingly governmental in nature.

That control, however, does not extend to the comment thread initiated by a tweet sent by the @realDonaldTrump account.  The comment thread—consisting of the initial tweet, direct replies to that tweet, and second-order (and higher-order) replies to those replies—therefore cannot be a putative forum. While the President and Scavino can control the interactive space by limiting who may directly reply or retweet a tweet initially sent by the @realDonaldTrump account, they lack comparable control over the subsequent dialogue in the comment thread.  As plaintiffs acknowledge, even the individual plaintiffs who have been blocked "can view replies to @realDonaldTrump tweets, and can post replies to those replies, while logged in to the blocked accounts," and that these "[r]eplies-to-replies appear in the comment threads that originate with @realDonaldTrump tweets."  Stip. ¶ 57.

68a

Because a Twitter user lacks control over the comment thread beyond the control exercised over first-order replies through blocking, the comment threads—as distinguished from the content of tweets sent by @realDonaldTrump, the @realDonaldTrump timeline, and the interactive space associated with each tweet—do not meet the threshold criterion for being a forum.

### 2. Purpose, Structure, and Intended Use

We next assess whether application of forum analysis is consistent with the purpose, structure, and intended use of the three aspects of the @realDonaldTrump account that we have found to satisfy the government control-or-ownership criterion: specifically, the content of tweets, the timeline comprised of the account's tweets, and the interactive space of each tweet.

Generally, "[t]he forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program." Pleasant Grove City, 555 U.S. at 478. By contrast, forum analysis is not appropriately applied when "the government has broad discretion to make content-based judgments in deciding what private speech to make available to the public." United States v. Am. Library Ass'n, 539 U.S. 194, 204 (2003) (plurality opinion). For example, the Supreme Court has held that "[w]hen a public broadcaster exercises editorial discretion in the selection and presentation of its programming," its decisions are not subject to forum analysis. Forbes, 523 U.S. at 674. Forum analysis was inappropriate, the Court reasoned, because "[c]laims of access under [the Court's] public forum precedents could obstruct the legitimate purposes

69a

of television broadcasters." <u>Id.</u> "[B]road rights of access for outside speakers would be antithetical, as a general rule, to the discretion that stations and their editorial staff must exercise to fulfill their journalistic purpose and statutory obligations." <u>Id.</u> at 673. Similarly, the Supreme Court has declined to apply forum analysis to a grant program operated by the National Endowment for the Arts (NEA), reasoning that "[t]he NEA's mandate is to make esthetic judgments" and the application of an "inherently content-based 'excellence' threshold for NEA support." <u>Nat'l Endowment for the Arts v. Finley</u>, 524 U.S. 569, 586 (1998). And applying <u>Forbes</u> and <u>Finley</u>, a four-Justice plurality of the Supreme Court concluded that the internet access provided by public libraries was not susceptible to forum analysis, as forum analysis was "incompatible with the discretion that public libraries must have to fulfill their traditional missions," which involve the "exercise of judgment in selecting the material [the library] provides to its patrons." <u>Am. Library Ass'n</u>, 539 U.S. at 205 (plurality opinion).[19] Ultimately, "where the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place." <u>Pleasant Grove City</u>, 555 U.S. at 480.

Government speech is one category of speech that falls outside the domain of forum analysis: when the government "is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply." <u>Walker</u>

---

[19] Additionally, Justice Breyer agreed that forum analysis was not applicable to the provision of internet access in public libraries. <u>See</u> <u>Am. Library Ass'n</u>, 539 U.S. at 215-16 (Breyer, J., concurring in the judgment).

70a

v. Tex. Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2250 (2015). "The Free Speech Clause restricts [only] government regulation of private speech; it does not regulate government speech." Pleasant Grove City, 555 U.S. at 467.

However, "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." Id. at 470. Private involvement in the formulation of the speech in question does not preclude the conclusion that it is government speech. For example, Pleasant Grove City concluded that monuments that were privately financed but subsequently accepted by a municipal government and displayed on public park land was government speech, see id. at 470-71, and Walker held that specialty license plate designs proposed by private groups but approved and issued by a state department of motor vehicles was also government speech, see 135 S. Ct. at 2248-50. Conversely, "speech that is otherwise private does not become speech of the government merely because the government provides a forum for the speech or in some way allows or facilitates it." Wandering Dago, Inc. v. Destito, 879 F.3d 20, 34 (2d Cir. 2018) (citing Cornelius, 473 U.S. at 811-13).

In assessing whether speech constitutes government speech as opposed to private speech, the Supreme Court has considered at least three factors: whether government has historically used the speech in question "to convey state messages," whether that speech is "often closely identified in the public mind" with the government, and the extent to which government "maintain[s] direct control over the messages conveyed," with Walker's application of these factors "likely mark[ing] the outer

71a

bounds of the government-speech doctrine." Matal v. Tam, 137 S. Ct. 1744, 1760 (2017) (quoting Walker, 135 S. Ct. at 2246-49); see also Wandering Dago, 879 F.3d at 34 (distilling the same three factors from Walker).

Based on the government speech doctrine, we reject out of hand any contention that the content of the President's tweets are susceptible to forum analysis. It is not so susceptible because the content is government speech: the record establishes that the President, sometimes "[w]ith the assistance of Mr. Scavino," uses the content of his tweets "to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; to challenge media organizations whose coverage of his Administration he believes to be unfair; and for other statements, including on occasion statements unrelated to official government business." Stip. ¶ 38. Indeed, the content of the tweets sent by @realDonaldTrump are solely the speech of the President or of other government officials. Stip. ¶ 39.[20] For the same reason, the account's timeline, which "displays all tweets generated

---

[20] Whether the content of retweets initially sent by other users constitutes government speech presents a somewhat closer question. The content of a retweet of a tweet sent by another governmental account, Stip. ¶ 37, is still squarely government speech. The content of the retweet of a tweet sent by a private non-governmental account, Stip. ¶ 39, would still likely be government speech. Despite the private genesis of the content, the act of retweeting by @realDonaldTrump resembles the government's acceptance of the monuments in Pleasant Grove and the government's approval of the license plate designs in Walker, which were sufficient to render the privately originated speech governmental in nature.

72a

by the [account]" is not susceptible to forum analysis:
the timeline merely aggregates the content of all of the
account's tweets, Stip. ¶ 15, all of which is government
speech.

The same cannot be said, however, of the interactive
space for replies and retweets created by each tweet
sent by the @realDonaldTrump account.   At minimum,
as to replies, they are most directly associated with the
replying user rather than the sender of the tweet being
replied to:   a reply tweet appears with the picture,
name, and handle of the replying user, Stip. ¶¶ 23, 57,
and appears most prominently in the timeline of the re-
plying user, Stip. ¶ 22.   Replying tweets are "controlled
by the user who generates them," and "[n]o other Twit-
ter user can alter the content of any   . . .   reply, either
before or after it is posted."   Stip. ¶ 26.   Given the
prominence with which the account information of the
replying user is displayed in the replying tweet, the re-
ply is unlikely to be "closely identified in the public
mind" with the sender, even when the sender of the
tweet being replied to is a governmental one.   Matal,
137 S. Ct. at 1760; Walker, 135 S. Ct. at 2248.   And, far
from "maintain[ing] direct control over the messages
conveyed" in a user's replies to the President's tweets
(assuming the user retains the ability to reply, i.e., the
user has not been blocked), the government maintains
no control over the content of the reply.   Matal, 137 S.
Ct. at 1760; Walker, 135 S. Ct. at 2249.   Taken together,
these factors support the conclusion that replies to the
President's tweets remain the private speech of the re-
plying user.   The association that a reply has with a
governmental sender of the tweet being replied to—the
indication that the replying tweet is a reply and its ap-

73a

pearance in the comment thread accessed from the time-line of the governmental sender—is not sufficient to render the reply government speech.[21]

Nor is the interactive space of each tweet, as distinguished from the content of the tweet, constrained by the notions of inherent selectivity and scarcity that the Supreme Court held to counsel against the application of forum doctrine in <u>Finley</u> and <u>Forbes</u> and in <u>Pleasant Grove City</u>, respectively.  Generally, no selection is involved in determining who has the ability to interact directly with the President's tweets:  the @realDonaldTrump account is "generally accessible to the public at large without regard to political affiliation or any other limiting criteria," such that any Twitter user who has not been blocked may so engage.  Stip. ¶ 36.  Indeed, just as "a park can accommodate many speakers and, over time, many parades and demonstrations"; "[t]he Combined Federal Campaign permits hundreds of groups to solicit donations from federal employees" as in <u>Cornelius</u>; "[a] public university's student activity fund can provide money for many campus activities" as in <u>Rosenberger</u>; "a public university's buildings may offer meeting space for hundreds of student groups" as in <u>Widmar</u>; and "[a] school system's internal mail facilities can support the transmission of many

---

[21] Retweets again present a closer question.  A retweet appears "in the same form as it did on the original [sender]'s timeline," with the name, picture, and handle of the original sender rather than the retweeter, and with an additional "notation indicating that the post was retweeted" above the tweet in smaller font.  Stip. ¶ 21.  Nonetheless, in the same way the President's retweeting of a tweet sent by a private individual likely renders the President's retweet government speech, a private individual's retweet of a tweet sent by the President is likely private speech rather than government speech.

74a

messages to and from teachers and school administrators" as in <u>Perry Education Ass'n, Pleasant Grove City</u>, 555 U.S. at 478, the interactive space of a tweet can accommodate an unlimited number of replies and retweets.   Indeed, the record establishes that tweets sent by the @realDonaldTrump account regularly attract tens of thousands, if not hundreds of thousands, of replies and retweets, Stip. ¶¶ 41-43, and nothing suggests that the "application of forum analysis" to the interactive space associated with a tweet "would lead almost inexorably to closing of the forum," <u>id.</u> at 480.   Rather, the interactive space is "capable of accommodating a large number of public speakers without defeating [its] essential function," <u>id.</u> at 478; and indeed, the essential function of a given tweet's interactive space is to allow private speakers to engage with the content of the tweet, Stip. ¶ 13, which supports the application of forum analysis.

Ultimately, the delineation of a tweet's interactive space as the putative forum is consistent with the Supreme Court's directive to "focus[] on the access sought by the speaker."   <u>Cornelius</u>, 473 U.S. at 801.   When a user is blocked, the most significant impediment is the ability to directly interact with a tweet sent by the blocking user.   While a blocked user is also limited in that the user may not view the content of the blocking user's tweets or view the blocking user's timeline, those limitations may be circumvented entirely by "using an internet browser or other application that is not logged in to Twitter, or that is logged in to a Twitter account that is not blocked."   Stip. ¶ 55.   By contrast, the ability to interact directly cannot be completely reestablished, Stip.

75a

¶¶ 54, 58-59, and that ability—i.e., access to the interactive space—is therefore best described as the access that the individual plaintiffs seek.

In sum, we conclude that the interactive space associated with each of the President's tweets is not government speech and is properly analyzed under the Supreme Court's forum precedents.

### C.   Classification

Having concluded that forum analysis is appropriately applied to the interactive space associated with a tweet, we turn to the question of classification. "The Supreme Court has recognized three types of fora across a spectrum of constitutional protection for expressive activity." Make the Rd., 378 F.3d at 142. First, traditional public fora are "places which by long tradition or by government fiat have been devoted to assembly and debate." Perry Educ. Ass'n, 460 U.S. at 45. These spaces, like streets and parks, "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Id. (quoting Hague, 307 U.S. at 515 (opinion of Roberts, J.)). Absent a well-established history of dedication to public use, however, a forum cannot be a traditional public forum. The Supreme Court has "rejected the view that traditional public forum status extends beyond its historic confines." Forbes, 523 U.S. at 678 (citing ISKCON, 505 U.S. at 680-81).

"A second category consists of public property which the state has opened for use by the public as a place for expressive activity." Perry Educ. Ass'n, 460 U.S. at 45.

76a

"To create a forum of this type, the government must intend to make the property 'generally available,' to a class of speakers." Forbes, 523 U.S. at 678 (citations omitted) (quoting Widmar, 454 U.S. at 264). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse," and we "look[] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." Cornelius, 473 U.S. at 802. Finally, a space that is susceptible to forum analysis but is "not by tradition or designation a forum for public communication," Perry Educ. Ass'n, 460 U.S. at 46, is termed a "nonpublic forum," Forbes, 523 U.S. at 677.

Applying this three-part classification framework to the interactive space, we can first conclude that the interactive space of a tweet sent by @realDonaldTrump is not a traditional public forum. There is no historical practice of the interactive space of a tweet being used for public speech and debate since time immemorial, for there is simply no extended historical practice as to the medium of Twitter. While the Supreme Court has referenced the "vast democratic forums of the Internet," Reno v. ACLU, 521 U.S. 844, 868 (1997), has described the internet (including social media platforms such as Twitter) as one of "the most important places (in a spatial sense) for the exchange of views," Packingham v. North Carolina, 137 S. Ct. 1730, 1735 (2017), and has analogized the internet to the "essential venues for public gatherings" of streets and parks, id., the lack of historical practice is dispositive, see Forbes, 523 U.S. at 678.

77a

Accordingly, we consider whether the interactive space is a designated public forum, with "governmental intent" serving as "the touchstone for determining whether a public forum has been created." <u>Gen. Media Commc'ns, Inc. v. Cohen</u>, 131 F.3d 273, 279 (2d Cir. 1997). "Intent is not merely a matter of stated purpose. Indeed, it must be inferred from a number of objective factors, including: [the government's] policy and past practice, as well as the nature of the property and its compatibility with expressive activity." <u>Paulsen v. County of Nassau</u>, 925 F.2d 65, 69 (2d Cir. 1991) (citing <u>Cornelius</u>, 473 U.S. at 802-03).

Here, these factors strongly support the conclusion that the interactive space is a designated public forum. "The @realDonaldTrump account is generally accessible to the public at large without regard to political affiliation or any other limiting criteria," "any member of the public can view his tweets," and "anyone [with a Twitter account] who wants to follow the account [on Twitter] can do so," unless that person has been blocked. Stip. ¶ 36.  Similarly, anyone with a Twitter account who has not been blocked may participate in the interactive space by replying or retweeting the President's tweets.  Stip. ¶¶ 21, 22, 28, 36.  Further, the account—including all of its constituent components—has been held out by Scavino as a means through which the President "communicates directly with you, the American people!"  Stip. ¶ 37 (alterations incorporated).  And finally, there can be no serious suggestion that the interactive space is incompatible with expressive activity: rather, Twitter as a platform is designed to allow users "to interact with other Twitter users in relation to [their tweets]," Stip. ¶ 13, and users can use Twitter to "petition their elected representatives and otherwise engage

78a

with them in a direct manner," Packingham, 137 S. Ct. at 1735. The interactivity of Twitter is one of its defining characteristics, and indeed, the interactive space of the President's tweets accommodates a substantial body of expressive activity. Stip. ¶¶ 41-43. Taking these factors together, we conclude that the interactive space of a tweet from the @realDonaldTrump account constitutes a designated public forum.

### D.   Viewpoint Discrimination

"[T]he extent to which the Government can control access depends on the nature of the relevant forum," Cornelius, 473 U.S. at 800, so we next consider whether the blocking of the individual plaintiffs is permissible in a designated public forum. "Regulation of [a designated public forum] is subject to the same limitations as that governing a traditional public forum"—restriction are permissible "only if they are narrowly drawn to achieve a compelling state interest." ISKCON, 505 U.S. at 678-79; see also Cornelius, 473 U.S. at 800. Regardless of the specific nature of the forum, however, "[v]iewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations." Rosenberger, 515 U.S. at 830; see also Matal, 137 S. Ct. at 1763 ("When government creates such a forum, in either a literal or 'metaphysical' sense, some content- and speaker-based restrictions may be allowed. However, even in such cases, what we have termed 'viewpoint discrimination' is forbidden." (citations omitted) (quoting Rosenberger, 515 U.S. at 830-31)).

Here, the individual plaintiffs were indisputably blocked as a result of viewpoint discrimination. The record establishes that "[s]hortly after the Individual

79a

Plaintiffs posted the tweets  . . .  in which they criticized the President or his policies, the President blocked each of the Individual Plaintiffs," Stip. ¶ 53, and defendants do "not contest Plaintiffs' allegation that the Individual Plaintiffs were blocked from the President's Twitter account because the Individual Plaintiffs posted tweets that criticized the President or his policies." Stip. at 1.   The continued exclusion of the individual plaintiffs based on viewpoint is, therefore, impermissible under the First Amendment.[22]

Defendants contend that the blocking of the individual plaintiffs is permissible because the President retains a personal First Amendment interest in choosing the people with whom he associates and retains the right not to engage with (i.e., the right to ignore) the individual plaintiffs.   Further, they argue, the individual plaintiffs have no right to be heard by a government audience and no right to have their views amplified by the government.   While those propositions are accurate as statements of law, they nonetheless do not render the blocking of the individual plaintiffs constitutionally permissible.

---

[22] Even if the interactive space associated with the content of a tweet constituted a nonpublic forum, the exclusion of the individual plaintiffs would not withstand First Amendment scrutiny.   "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius, 473 U.S. at 806.   The blocking of the individual plaintiffs, which resulted from their "tweets that criticized the President or his policies," Stip. at 1, is not viewpoint-neutral, and is therefore impermissible "regardless of how the property is categorized under forum doctrine," Wandering Dago, 879 F.3d at 39.

80a

To be clear, a public official does not lose his First Amendment rights upon taking office. Cf. Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). "The interest of the public in hearing all sides of a public issue," an interest that the First Amendment seeks to protect, "is hardly advanced by extending more protection to citizen-critics than to [public officials]." Bond v. Floyd, 385 U.S. 116, 136 (1966). That is, no set of plaintiffs could credibly argue that they "have a constitutional right to prevent [government officials] from exercising their own rights" under the First Amendment. X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 70 (2d Cir. 1999). Further, "[n]othing in the First Amendment or in [the Supreme] Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." Minn. State Bd. for Cmty. Colls. v. Knight, 465 U.S. 271, 285 (1984). No First Amendment harm arises when a government's "challenged conduct is simply to ignore the [speaker]," as the Supreme Court has affirmed that "[t]hat it is free to do." Smith v. Ark. State Highway Emps., Local 1315, 441 U.S. 463, 466 (1979) (per curiam). Stated otherwise, "[a] person's right to speak is not infringed when government simply ignores that person while listening to others," or when the government "amplifies" the voice of one speaker over those of others. Minn. State Bd., 465 U.S. at 288. Nonetheless, when the government goes beyond merely amplifying certain speakers' voices and not engaging with others, and actively restricts "the right of an individual to speak freely [and] to advocate ideas," it treads into territory proscribed by the First Amendment. Id. at 286 (quoting Smith, 441 U.S. at 464).

81a

Consideration of Twitter's two features for limiting interaction between users—muting and blocking—is useful in addressing the potentially conflicting constitutional prerogatives of the government as listener on the one hand and of speakers on the other, as muting and blocking differ in relevant ways. As Twitter explains, "[m]ut[ing] is a feature that allows [a user] to remove an account's Tweets from [the user's] timeline without unfollowing or blocking that account." <u>How to Mute</u>. For muted accounts that the muting account does not follow on Twitter, "[r]eplies and mentions will not appear" in the muting account's notifications, nor will mentions by the muted account. <u>Id.</u> That is, muting allows a user to ignore an account with which the user does not wish to engage. The muted account may still attempt to engage with the muting account—it may still reply to tweets sent by the muting account, among other capabilities—but the muting account generally will not see these replies.[23] Critically, however, the muted account may still reply directly to the muting account, even if that reply is ultimately ignored.

Blocking, by contrast, goes further. The blocking user "will not see any tweets posted by the blocked user" just as a muting user would not see tweets posted by a muted user, but whereas muting preserves the muted account's ability to reply to a tweet sent by the muting account, blocking precludes the blocked user from "see[ing] or reply[ing] to the blocking user's tweets" entirely. Stip. ¶ 28. The elimination of the blocked user's

---

[23] These replies <u>will</u> appear in the muting account's notifications if the muting account follows the muted account. Of course, the fact that one account follows a second account strongly indicates some desire by the first user to engage with the second user. Stip. ¶ 19.

82a

ability to reply directly is more than the blocking user merely ignoring the blocked user; it is the blocking user limiting the blocked user's right to speak in a discrete, measurable way. Muting equally vindicates the President's right to ignore certain speakers and to selectively amplify the voices of certain others but—unlike blocking—does so without restricting the right of the ignored to speak.

Given these differing consequences of muting and blocking, we find unpersuasive defendants' contention that a public official's muting and blocking are equivalent, and equally constitutional, means of choosing not to engage with his constituents. Implicit in this argument is the assumption that a reply to a tweet is directed only at the user who sent the tweet being replied to. Were that so, defendants would be correct in that there is no difference between the inability to send a direct reply (as with blocking) and the inability to have that direct reply heard by the sender of the initial tweet being responded to (as with muting). But this assumption is not supported in the record: a reply is visible to others, Stip. ¶ 22, and may itself be replied to by other users, Stip. ¶¶ 57-58. The audience for a reply extends more broadly than the sender of the tweet being replied to, and blocking restricts the ability of a blocked user to speak to that audience. While the right to speak and the right to be heard may be functionally identical if the speech is directed at only one listener, they are not when there is more than one.

In sum, we conclude that the blocking of the individual plaintiffs as a result of the political views they have expressed is impermissible under the First Amendment.

83a

While we must recognize, and are sensitive to, the President's personal First Amendment rights, he cannot exercise those rights in a way that infringes the corresponding First Amendment rights of those who have criticized him.

To be sure, we do not suggest that the impact on the individual plaintiffs (and, by extension, on the Knight Institute) is of the highest magnitude. It is not. But the law is also clear: the First Amendment recognizes, and protects against, even de minimis harms. See Six Star Holdings, LLC v. City of Milwaukee, 821 F.3d 795, 805 (7th Cir. 2016) (rejecting an argument of "de minimis" First Amendment harm and approving an award of nominal damages); Lippoldt v. Cole, 468 F.3d 1204, 1221 (10th Cir. 2006) (similar); KH Outdoor, LLC v. City of Trussville, 465 F.3d 1256, 1261 (11th Cir. 2006) (similar); Risdal v. Halford, 209 F.3d 1071, 1072 (8th Cir. 2000) (similar); cf. Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013) (same). Thus, even though defendants are entirely correct in contending that the individual plaintiffs may continue to access the content of the President's tweets, Stip. ¶¶ 55-56, and that they may tweet replies to earlier replies to the President's tweets, Stip. ¶¶ 57-58, the blocking of the individual plaintiffs has the discrete impact of preventing them from interacting directly with the President's tweets, Stip. ¶ 54, thereby restricting a real, albeit narrow, slice of speech. No more is needed to violate the Constitution.

84a

## IV.  Relief

As plaintiffs seek both injunctive and declaratory re-lief, we turn, then, to the question of the proper remedy to be afforded here.[24]   Defendants suggest that we cat-egorically lack authority to enjoin the President, a prop-osition we do not accept.   Stated simply, "separation-of-powers doctrine does not bar every exercise of juris-diction over the President of the United States."   Nixon v. Fitzgerald, 457 U.S. 731, 753-54 (1982). Rather, "it is . . .  settled that the President is subject to judicial process in appropriate circumstances,"   Clinton v. Jones, 520 U.S. 681, 703 (1997), and the Supreme Court has expressly rejected the notion of "an absolute, un-qualified Presidential privilege of immunity from judi-cial process under all circumstances," id. at 704 (quoting United States v. Nixon, 418 U.S. 683, 706 (1974)).

However, "a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the au-thority and functions of the Executive Branch."   Nixon v. Fitzgerald, 457 U.S. at 754.   A four-Justice plurality of the Supreme Court has explained that while "in gen-eral 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties,'"

---

[24] We do not analyze separately the argument that the blocking of the individual plaintiffs violates their right "to petition the Govern-ment for a redress of grievances" under the First Amendment's Peti-tion Clause.   The First Amendment right to speech and petition "are inseparable," and generally "there is no sound basis for granting greater constitutional protection" to one over the other.   McDonald v. Smith, 472 U.S. 479, 485 (1985).   "There may arise cases where the special concerns of the Petition Clause would provide a sound basis for a distinct analysis," Borough of Duryea v. Guarnieri, 564 U.S. 379, 389 (2011), but this case does not present one of them.

85a

Mississippi v. Johnson, 71 U.S. (4 Wall) 475, 499 (1866), "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." Franklin, 505 U.S. at 802-03 (plurality opinion) (quoting Mississippi v. Johnson, 71 U.S. (4 Wall) at 499). Franklin's acknowledgment of the door left open by Mississippi v. Johnson is consistent with the balancing approach articulated by the Court in Nixon v. Fitzgerald: an injunction directing the performance of a ministerial duty represents a minimal "danger[] of intrusion on the authority and functions of the Executive Branch" as compared to imposition posed by the injunction considered in Mississippi v. Johnson.

In this case, the intrusion on executive prerogative presented by an injunction directing the unblocking of the individual plaintiffs would be minimal. Any such injunction would not direct the President to execute the laws in a certain way, nor would it mandate that he pursue any substantive policy ends. Even accepting that the President's blocking decisions in the first instance are discretionary, the duty to unblock—following a holding that such blocking was unconstitutional—would not be, as the President must act in compliance with the Constitution and other laws. Cf. Swan, 100 F.3d at 977 ("[The asserted statutory] duty, if it exists, is ministerial and not discretionary, for the President is bound to abide by the requirements of duly enacted and otherwise constitutional statutes."). That is, the correction of an unconstitutional act far more closely resembles the performance of "a mere ministerial duty," where "nothing [is] left to discretion," than the performance of a "purely executive and political" duty requiring the exercise of discretion vested in the President. Mississippi

86a

v. Johnson, 71 U.S. (4 Wall) at 499. An injunction directing the unblocking of the individual plaintiffs would therefore impose a duty that far more closely resembles the duties considered in Swan, see 100 F.3d at 977-78, and in National Treasury Employees Union v. Nixon, 492 F.2d 587, 608 (D.C. Cir. 1974) (defining a "ministerial duty" as "a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law"), than the highly discretionary duty considered in Mississippi v. Johnson. The ways to faithfully execute the Reconstruction Acts passed by Congress following the Civil War are uncountable in number, but "[t]he law require[s] the performance of a single specific act" here. Mississippi v. Johnson, 71 U.S. (4 Wall) at 499. No government official, after all, possesses the discretion to act unconstitutionally.

We need not, however, ultimately resolve the question of whether injunctive relief may be awarded against the President, as injunctive relief directed at Scavino and declaratory relief remain available. While we find entirely unpersuasive the Government's parade of horribles regarding the judicial interference in executive affairs presented by an injunction directing the President to comply with constitutional restrictions, we nonetheless recognize that "[a]s a matter of comity, courts should normally direct legal process to a lower Executive official even though the effect of the process is to restrain or compel the President." Nixon v. Sirica, 487 F.2d 700, 709 (D.C. Cir. 1973) (en banc) (per curiam). Subordinate officials may, of course, be enjoined by the courts. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 584, 588 (1952) (affirming an injunction directed at the Secretary of Commerce); see also, e.g., Int'l Refugee Assistance Project v. Trump, 857

87a

F.3d 554, 605 (4th Cir.) (en banc) (vacating an injunction only to the extent it was directed at the President), vacated and remanded, 138 S. Ct. 353 (2017).    Injunctive relief directed against Scavino would certainly implicate fewer separation-of-powers concerns, see Franklin, 505 U.S. at 802-03, but we also recognize that "the strong remedy of injunction," Rivera-Puig v. Garcia-Rosario, 983 F.2d 311, 316 (1st Cir. 1992), should be sparingly employed even when those constitutional concerns are not present; see, e.g., Salazar v. Buono, 559 U.S. 700, 714-15 (2010) (plurality opinion).

Accordingly, though we conclude that injunctive relief may be awarded in this case—at minimum, against Scavino—we decline to do so at this time because declaratory relief is likely to achieve the same purpose.    The Supreme Court has directed that we should "assume it is substantially likely that the President and other executive  .  .  .  officials would abide by an authoritative interpretation of [a]  .  .  .  constitutional provision," Franklin, 505 U.S. at 803 (plurality opinion); see Utah v. Evans, 536 U.S. at 464 (citing Franklin, 505 U.S. at 803 (plurality opinion)); see also Allco Fin. Ltd. v. Klee, 861 F.3d 82, 96 (2d Cir. 2017); Made in the USA, 242 F.3d at 1310; Swan, 100 F.3d at 980; L.A. Cty. Bar Ass'n v. Eu, 979 F.2d 697, 701 (9th Cir. 1992) ("Were this court to issue the requested declaration, we must assume that it is substantially likely that [government officials]  .  .  .  would abide by our authoritative determination."), and there is simply no reason to depart from this assumption at this time.    Declaratory judgment is appropriate under the factors that the Second Circuit directs us to consider, see Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359-60 (2d Cir. 2003), and a declaration will therefore issue:    the blocking of the individual plaintiffs from

88a

the @realDonaldTrump account because of their expressed political views violates the First Amendment.

"It is emphatically the province and duty of the judicial department to say what the law is," <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137, 177 (1803), and we have held that the President's blocking of the individual plaintiffs is unconstitutional under the First Amendment. Because no government official is above the law and because all government officials are presumed to follow the law once the judiciary has said what the law is, we must assume that the President and Scavino will remedy the blocking we have held to be unconstitutional.

## V.  <u>Conclusion</u>

We conclude that we have jurisdiction to entertain this dispute. Plaintiffs have established legal injuries that are traceable to the conduct of the President and Daniel Scavino and, despite defendants' suggestions to the contrary, their injuries are redressable by a favorable judicial declaration. Plaintiffs lack standing, however, to sue Sarah Huckabee Sanders, who is dismissed as a defendant. Hope Hicks is also dismissed as a defendant, in light of her resignation as White House Communications Director.

Turning to the merits of plaintiffs' First Amendment claim, we hold that the speech in which they seek to engage is protected by the First Amendment and that the President and Scavino exert governmental control over certain aspects of the @realDonaldTrump account, including the interactive space of the tweets sent from the account. That interactive space is susceptible to analysis under the Supreme Court's forum doctrines, and is

89a

properly characterized as a designated public forum. The viewpoint-based exclusion of the individual plaintiffs from that designated public forum is proscribed by the First Amendment and cannot be justified by the President's personal First Amendment interests.

In sum, defendants' motion for summary judgment is granted in part and denied in part, and plaintiffs' cross-motion for summary judgment is granted in part and denied in part.   The Clerk of the Court is directed to terminate the motions pending at docket entries 34 and 42.

**SO ORDERED.**

Dated:   New York, New York

May 23, 2018

/s/   <u>NAOMI REICE BUCHWALD</u>
NAOMI REICE BUCHWALD
United States District Judge

90a

**APPENDIX C**

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————

No. 18-1691-cv

KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA
UNIVERSITY, REBECCA BUCKWALTER, PHILIP COHEN,
HOLLY FIGUEROA, EUGENE GU, BRANDON NEELY,
JOSEPH PAPP, AND NICHOLAS PAPPAS,
PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES
AND DANIEL SCAVINO, WHITE HOUSE DIRECTOR OF
SOCIAL MEDIA AND ASSISTANT TO THE PRESIDENT,
DEFENDANTS-APPELLANTS

SARAH HUCKABEE SANDERS, WHITE HOUSE PRESS
SECRETARY, DEFENDANT

————

Filed:   Mar. 23, 2020

————

PRESENT:
    ROBERT A. KATZMANN,
      *Chief Judge,*
    JOSÉ A. CABRANES,
    ROSEMARY S. POOLER,
    PETER W. HALL,
    DENNY CHIN,
    RAYMOND J. LOHIER, JR.,
    RICHARD J. SULLIVAN,
    JOSEPH F. BIANCO,
    MICHAEL H. PARK,
      *Circuit Judges.*

91a

Following disposition of this appeal on July 9, 2019, an active judge of the Court requested a poll on whether to rehear the case *en banc*. A poll having been conducted and there being no majority favoring *en banc* review, rehearing *en banc* is hereby **DENIED**.

Barrington D. Parker, *Circuit Judge*, filed a statement with respect to the denial of rehearing *en banc*.

Michael H. Park, *Circuit Judge*, joined by Richard J. Sullivan, *Circuit Judge*, dissents by opinion from the denial of rehearing *en banc*.

Debra Ann Livingston and Susan L. Carney, *Circuit Judges*, took no part in the consideration or decision of this petition.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK



92a

BARRINGTON D. PARKER, *Circuit Judge*, statement with respect to the denial of rehearing *en banc*.

This case arises from the President's use of the @realDonaldTrump Twitter account (the "Account") as a primary vehicle for his official communications. He uses this account to make official statements on a wide variety of subjects, many of great national importance. The public, in turn, is able to respond to and engage with the President and other users on Twitter. In *Knight First Amendment Inst. at Columbia Univ. v. Trump*, we concluded that this dialogue creates a public forum. 928 F.3d 226 (2d Cir. 2019). We also concluded that when the President creates such a public forum, he violates the First Amendment when he excludes persons from the dialogue because they express views with which he disagrees.

The decision is unusual only in that it involves Twitter, a relatively new form of public, interactive communication, and the President. However, the opinion is consistent with every precedent of this Court, and the dissent does not demonstrate otherwise. It is, I respectfully suggest, a straightforward application of state action and public forum doctrines, congruent with Supreme Court precedent. The dissent misconstrues the applicable law and overstates the scope of the panel's holding.

The dissent's main concern—and its primary argument—is that the Account is the President's personal account and therefore is not a public forum and its use does not constitute state action. This argument is refuted by even a cursory perusal of examples of the tweets in question. Consider these recent ones:

93a





94a

These tweets are published by a public official clothed with the authority of the state using social media as a tool of governance and as an official channel of communication on an interactive public platform. The panel decision discussed the President's use of the Account in an official capacity in detail. *See Knight*, 928 F.3d at 232. Excluding people from an otherwise public forum such as this by blocking those who express views critical of a public official is, we concluded, unconstitutional viewpoint discrimination. *Id.* at 234.

## I.

The dissent contends that the President's use of the Account to conduct official business does not amount to state action. While the dissent does not dispute that the Account is regularly used as an official channel of communication, it argues that no state action is involved because the President does not exercise "some right or privilege created by the State" when he blocks accounts on Twitter. *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) (Park, J., dissenting from the denial of rehearing en banc, at 2) [hereinafter *Dissent*]. Satisfaction of this condition is said to be required by our decision in *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.2d 178, 186 (2d Cir. 2005).

I do not agree. The state action analysis of the panel was correct. When the President tweeted about Iran he was speaking in his capacity as the nation's chief executive and Commander-in-Chief. If that is not a "right or privilege created by the State" it is difficult to imagine what might be. By the same token, when he receives responses from the public to the Account, and when he blocks responders whose views he disfavors, he remains the President. The critical question in this

95a

case is not the nature of the Account when it was set up a decade ago. The critical question for First Amendment purposes is how the President uses the Account in his capacity as President.

The Supreme Court in *Lugar v. Edmondson Oil Co.* identified the test for state action as whether the conduct allegedly causing the deprivation of a federal right is "fairly attributable to the State." 457 U.S. 922, 937 (1982). *Edmondson Oil* instructs us that, where the claim of a constitutional deprivation is directed against a party whose official character is such as "to lend the weight of the State to his decisions," the conduct is state action because it is "fairly attributable to the State." *Id.* The President quintessentially qualifies as a party whose "official character . . . lends the weight of the State to his decisions." *Id.* That, of course, holds true of his current use of Twitter.[1]

The dissent further contends that "the panel decision blurred the line between actions by public officials in the performance of their official duties and actions 'in the ambit of their personal pursuits.'" *Dissent* at 5. This

_____

[1] The dissent misconstrues this statement of views as making the "extraordinary claim that everything the President does is state action or that the test for state action is different for the President." *Dissent* at 3 n.1. That is an inexplicable misreading of the analysis. What the dissent fails to ever seriously address is that when the President blocks users, he blocks them from access to an official account and from engaging in an otherwise open, public dialogue that is created by his use of Twitter to make official statements. Far from saying that everything the President does is state action, the panel narrowly concluded that the President runs afoul of the First Amendment when he prohibits individuals from speaking in an otherwise public, open forum in which he makes official statements.

96a

ignores the detailed discussion the panel provided concerning the "substantial and pervasive government involvement with, and control over," the Account. *Knight*, 928 F.3d at 235. That discussion noted that the President and his staff use the Account as an official channel of communication with the public on matters of public concern. Press Secretary Sean Spicer confirmed that the President's tweets are official statements of the President. White House staff members are involved in the drafting and posting of tweets to the Account, and the National Archives and Records Administration requires the preservation of the President's tweets as official records under the Presidential Records Act. *Id.* None of this is in dispute.

The dissent states that because "blocking" is a feature available to all users, it cannot be state action. *Dissent* at 3. The panel addressed this argument when the Appellants made it, and the dissent's reiteration breaks no new ground. *See Knight*, 928 F.3d at 235-36. What the dissent never seriously engages with is that when the President blocks users, he blocks them from access to, and interaction with, *an official account.*

The decision was careful to address the areas that generate the dissent's anxiety. We did not consider or decide whether a public official violates the Constitution by excluding persons from a personal, private social media account. Nor did we decide how the First Amendment impacts private social media accounts used by public officials. *Knight*, 928 F.3d at 236. We held only that the First Amendment does not permit a government official who utilizes a social media platform for official purposes to exclude persons from an otherwise

97a

open dialogue merely because they expressed views disfavored by the official.

## II.

In *Packingham v. North Carolina* Justice Kennedy discussed the relationship between Twitter and the First Amendment. He said that "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the Internet in general, and social media in particular. . . . [O]n Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. . . . In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." 137 S. Ct. 1730, 1735-36 (2017). If Justice Kennedy is right, as I believe he is, then the dissent is wrong.

Keeping the Supreme Court's words in mind, the panel concluded that the "interactive space" of the Account was a public forum for the purposes of the First Amendment. *Knight*, 928 F.3d at 237. The dissent articulates two concerns with our public forum analysis. Its first objection is to the "disaggregation" of the President's tweets from the interactive features of the Account. *Dissent* at 8. The second objection is that the President did not change the way he uses Twitter after he took office, and therefore he could not have intended to create a public forum. *Dissent* at 7, 11. Again, I respectfully disagree.

98a

## A.

First, the dissent worries that the panel "strayed from" this Court's precedent (which is never specifically identified) when it distinguished between the President's tweets, which it categorizes as government speech, and the 'interactive space' accessible to the public, which the panel concluded constituted a public forum. *Dissent* at 2. The point of departure of our analysis was that "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Knight*, 928 F.3d at 237 (quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011)).

A simple analogy to physical public fora makes it clear that the distinction between a tweet and its interactive space is appropriate: at a town hall meeting held by public officials, statements made by the officials are protected government speech. If, however, public comment is allowed at the gathering—as it is on any tweet posted to the Account—the officials may not preclude persons from participating in the debate based on their viewpoints. Significantly, that discrimination is impermissible even when the public forum is limited and is "of [the State's] own creation." *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1995); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place"). Of course, a public forum need not be "spatial or geographic"

99a

and even if the forum is metaphysical, "the same principles are applicable." *Knight*, 928 F.3d at 237 (quoting *Rosenberger*, 515 U.S. at 830).

Without citing any authority, the dissent writes that "[i]f an official gives remarks and allows for participation by supporters of the government's policies, that would not require opening the floor to opponents." *Dissent* at 9. That example has nothing to do with the facts before us. Here, the President makes official statements on a platform that allows anyone—not just his supporters—to comment and engage with his statements and with each other. In any event, the line of argument pursued by the dissent is directly contradicted by the Supreme Court: "As soon as municipal officials are permitted to pick and choose . . . the path is cleared for a regime of censorship under which full voice can be given only to those views which meet with the approval of the powers that be." *Se. Promotions, Ltd. v. Conrad.*, 420 U.S. 546, 563 (1975); *see also Rosenberger*, 515 U.S. at 829 (stating that viewpoint discrimination is "an egregious form of content discrimination"). The dissent's contention that a public official could selectively exclude questioners with viewpoints that are disfavored by the official is inconsistent with the First Amendment. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys . . . Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.

## B.

The dissent, citing *Arkansas Educ. Television Comm'n v. Forbes*, contends that we apply public forum

100a

precedent to the President's use of the Account in a 'mechanical way.' 523 U.S. 666, 672-73 (1998). I disagree. In *Forbes* the Supreme Court observed that the public forum doctrine first arose in the context of streets and parks, and warned against a "mechanical" extension of the doctrine to television broadcasting. *Id.* *Forbes* identified two features of parks and streets that television broadcasting does not share: "open access" and "viewpoint neutrality." The Court found that, because television channels create and publish their own content, they "are not only permitted, but indeed required, to exercise substantial editorial discretion in the selection and presentation of their programming." *Id.* at 673.

Twitter possesses both critical attributes identified by the Court in *Forbes* that public broadcasting lacked. First, Twitter is open to the general public. The only limitation Twitter places on creating an account is age-based: those under 13 years of age may not use its services. *See Twitter Terms of Service* at twitter.com/tos (last visited March 6, 2020). Second, Twitter is neutral with respect to viewpoint; it is a platform on which *the users* publish their views.[2]

### C.

Finally, the dissent argues that because the Account was created as a personal one in 2009 it cannot now be a

---

[2] Section 230 of the Communications Decency Act explicitly allows social media websites (among others) to filter and censor content posted on their platforms without thereby becoming a 'publisher.' 47 U.S.C. § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider"). Understood correctly, *Forbes* thus underscores the accuracy of the panel's analysis.

101a

public forum.  *Dissent* at 11.   As I mentioned, the dispositive consideration is not what the Account may have been in the past, but what it is now.   Consider another recent tweet:



As with the tweet concerning Iran, I believe that under no rational view can tweets such as these be considered "personal."

In determining whether the government has "intentionally opened a nontraditional forum for public discourse" the Court looks to the "policy and practice of the government" as well as "the nature of the property and its compatibility with expressive activity."   *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788,

102a

802 (1985); *see also Knight*, 928 F.3d at 237-39.   The Account constitutes a public forum under both considerations the Supreme Court prescribed for forum analysis in *Cornelius*.   As the panel noted, "[o]pening an instrumentality of communication 'for indiscriminate use by the general public' creates a public forum."   *Knight*, 928 F.3d at 237 (quoting *Perry Edu. Ass'n*, 460 U.S. at 47).   The President, upon assuming office, has "repeatedly used the Account as an official vehicle for governance and made its interactive features accessible to the public without limitation."   *Id.*   I continue to believe that this assessment is correct.[3]   Importantly, even if the Account were a non-public forum, excluding individuals who express disfavored views is not permitted. *Cornelius*, 473 U.S. at 806; *see also Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018).

Twitter is undoubtedly a forum compatible with expressive activity.   Navigating to Twitter's "About" page (about.twitter.com) reveals a list of statements concerning its purpose:  "Spark a global conversation."  "See what people are talking about."   In *Hague v. C.I.O.*, the Court noted that public fora are "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."   307 U.S. 496, 515 (1939).   As the Court noted in *Packingham v. North Carolina*, that is precisely what social media platforms do.   137 S. Ct. at 1735-36.   Twitter is no exception.

---

[3] The panel's analysis is congruent with the Supreme Court's conclusion in *Se. Promotions, Ltd. v. Conrad* that a privately-owned theater under a long-term lease to the city was nonetheless "a public forum designed for and dedicated to expressive activities."   420 U.S. at 555.

103a

III.

The dissent asserts that, while the President's tweets are official speech, other uses of the Account, such as blocking, somehow cause the Account to revert to a personal account. The dissent goes on to insist the panel's disaggregation of the Account's tweets and interactive space is "artificial" and that Twitter itself makes no such distinction. *Dissent* at 8. This argument misunderstands how the platform operates. Twitter accounts include a bundle of features. They come with every account and are available to every Twitter user. Neither government officials nor anyone else is able to individually tailor the features of their accounts. If one navigates to the "Twitter Rules" webpage, a hyperlink at the top of the page labeled "Using Twitter"[4] leads to the following:



---

[4] This page can be found at help.twitter.com/en/using-twitter (last visited March 6, 2020).

104a

Each phrase is a hyperlink to a new page with a detailed explanation of the feature listed.  Because every Twitter account comes with every feature listed, the ability to tweet always includes the ability to reply or block.  The interactive functions are what you get when you open a Twitter account.  The dissent never explains how an account used for official government speech turns into a personal account simply because its user limits who is allowed to see and respond to that speech.

In addition, new features recently announced by Twitter highlight the distinction that the panel correctly made but that the dissent characterizes as "artificial." *Dissent* at 8.  One of those features will soon allow Twitter users to limit who can reply to their tweets. These features will allow users to set reply functions to "Global, Group, Panel, and Statement."  Global is the current default (and only) setting for public Twitter accounts.[5]  The Group setting will allow those who follow the account and those @-mentioned[6] in a tweet to reply, while the Panel setting allows only users @-mentioned in a tweet to reply.  The Statement setting does not allow anyone to reply, functionally severing the "interactive space" of the replies from the speech of the tweet itself.  The dissent is thus incorrect to contend that Twitter itself does not distinguish between "initial tweets" and "interactive spaces."  On the contrary, it is continuing to make the bounds of those interactive

---

[5] This allows any Twitter user except those blocked by the original tweeter's account to view and reply to the tweet.  "Locked" or "Private" Twitter Accounts are viewable only by followers of the account, and their tweets cannot be "retweeted" by anyone, even followers.

[6] An @-mention creates a hyperlink in the tweet to the account named.

105a

spaces more sophisticated and an even more integral part of Twitter.

## IV.

The dissent repeatedly misconstrues the scope of the holding in *Knight*. It worries that the opinion "will reach far beyond the Oval Office, creating uncertainty about the use of social media by public officials at every level of government." *Dissent* at 12. These alarms ring hollow. None of these fears have come to fruition since the publication of the opinion. While the dissent worries that "this decision will have the unintended consequence of creating less speech," it points to no marked change to how public officials use social media since the opinion was published.[7]

In fact, just the opposite has occurred. In the past few months, the President has been posting on Twitter at more than three times the rate he was tweeting in 2017. These tweets cover subjects as diverse as military actions, immigration policies, and senior staffing changes, among other major official announcements.

---

[7] The dissent cites four cases purportedly to illustrate and document the concerns that the panel decision is just one in a flood of similar lawsuits. *Leuthy v. LePage* was made moot before the panel even heard oral arguments in *Knight*. No. 1:17-cv-0029-JAW, 2018 WL 4134628 (D. Me. Aug. 29, 2018). *Campbell v. Reisch* was filed and argued before the decision of this panel was released. No. 2:18-cv-4129-BCW, 2019 WL 3856591 (W.D. Mo. Aug. 16, 2019). *Hikind v. Ocasio-Cortez* was recently settled. No. 1:19-cv-03956 (E.D.N.Y. filed July 9, 2019). *Garnier v. Poway Unified Sch. Dist.*, No. 17-cv-2215-W (JLB), 2019 WL 4736208 (S.D. Ca. Sept. 26, 2019) was filed in 2017, and cites to *Knight* repeatedly, agreeing at every step with the panel's analysis. In fact, *Garnier* underscores that the analysis of the panel in *Knight* can be applied in a straightforward manner to cases as they arise, even outside of our Circuit.

106a

Twitter is not just an official channel of communication for the President; it is his most important channel of communication.[8]

## V.

Federal Rule of Appellate Procedure 35 provides that an en banc rehearing "will not be ordered unless (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance." The dissent fails to offer anything beyond conclusory claims that either standard is met in this case.

A distinctive feature of the Second Circuit is its infrequency of rehearing cases en banc. Judge Jon O. Newman has explained that this approach is grounded in the view, "strongly held by all members of the court, that in bancs are normally not a wise use of judicial resources." Jon O. Newman, *In Banc Practice in the Second Circuit, 1984-1988*, 55 BROOK. L. REV. 355, 369 (1989). I, for one, agree with these views. Judge Newman went on to stress that the collegiality of this Court, and its relative lack of the "vitriolic language unfortunately found in the writings of some other appellate courts," is promoted by the infrequency of en bancs. *Id.* He perceptively notes the benefits that flow to each of us from allowing panels to decide their own cases, and being reluctant to oversee the work of one's colleagues through en banc review. Judge Newman concluded his report

---

[8] The President's press secretaries have repeatedly responded to criticisms about the lack of press briefings by pointing out that the press has unprecedented access to him and that he "communicates directly with the American people," which is, of course, a reference to Twitter.

107a

on en banc practice in the Second Circuit with the following reflection:

> As the membership of the court changes, there is always the possibility that the pattern of rare in bancs might change. . . . [T]hose coming onto the court . . . will find a rather firmly established tradition. I hope that they—and all who observe the work of this Court—will appreciate the benefits that our practice of infrequent in bancs has conferred upon our institution.

Newman, *supra*, at 503.

I respectfully submit this statement to accompany the denial of rehearing en banc.

108a

MICHAEL H. PARK, *Circuit Judge*, joined by RICHARD J. SULLIVAN, *Circuit Judge*, dissenting from the denial of rehearing *en banc*:

When public officials use personal social-media accounts to express their views, they do not engage in "state action." And the First Amendment's guarantee of free speech does not include a right to post on other people's personal social-media accounts, even if those other people happen to be public officials.

We have declined to rehear *en banc* a decision that extends the First Amendment to restrict the personal social-media activity of public officials. Because the panel opinion contravenes both our state-action and public-forum precedents, I respectfully dissent from the denial of rehearing *en banc*.

This case concerns the President's personal Twitter account, @realDonaldTrump, which he created in 2009, more than six years before taking office. The President "blocked" Plaintiffs from interacting with his account, and they sued, claiming a violation of the First Amendment. The panel held that (1) the President engaged in "state action" when he blocked Plaintiffs from @realDonaldTrump, and (2) the "interactive spaces" of the account—specifically, the thread of replies to each of the President's tweets, but not the tweets themselves —are a public forum. Therefore, the panel concluded that "the President violated the First Amendment when he used the blocking function [of his personal Twitter account] to exclude" individuals based on their viewpoints. *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 239 (2d Cir. 2019).

109a

This decision strays from our precedents, extends the scope of the First Amendment to encompass the personal social-media activity of government officials, and therefore merits review by the whole court.

I.

Although the panel opinion is correct, as the government concedes, that the President used his personal Twitter account to conduct official business, that does not end the state-action analysis.   The panel opinion ignored an important part of the state-action test by failing to consider whether the President exercised "some right or privilege created by the State" when he blocked Plaintiffs from his personal Twitter account.   *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005) (citation omitted).   "[S]tate action requires *both* . . . the exercise of some right or privilege created by the State   . . . *and*" the involvement of "a person who may fairly be said to be a state actor."   *Id.* (emphases in original) (internal quotation marks omitted) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).   The "right or privilege" requirement is a well-established feature of state-action doctrine.   *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *United States v. Int'l Bhd. of Teamsters, AFL-CIO*, 941 F.2d 1292, 1296 (2d Cir. 1991).[1]

---

[1] Judge Parker's statement of views with respect to the denial of rehearing *en banc* (the "concurrence") misreads *Edmondson Oil* when it asserts that the President's actions were "fairly attributable to the State" because "[t]he President quintessentially qualifies as a party whose 'official character . . . lends the weight of the State to his decisions.'" *Concurrence* at 4 (citation omitted).   *Edmondson Oil* does not support the extraordinary claim that everything the

110a

The President did not exercise a "right or privilege created by the State" when he blocked Plaintiffs, and the panel erred in ignoring this requirement. Because Twitter is privately owned and controlled, a public official's use of its features involves no exercise of state authority. Twitter, Inc.—not President Trump or the United States—controls the platform and regulates its use for everyone. In "blocking" Plaintiffs, the President used a Twitter feature available equally to every other user, so his actions were not "fairly attributable to the State." *Flagg*, 396 F.3d at 186 (citation omitted). Therefore, the President was not a state actor when he blocked users from his personal account. He could block users from that account before assuming office and can continue to do so after he leaves the White House. He "exercised no special powers possessed by virtue of . . . law" when blocking users, "nor were his actions made possible only because he was clothed with the authority" of law. *Colombo v. O'Connell*, 310 F.3d 115, 118 (2d Cir. 2002) (per curiam) (cleaned up).[2]

---

President does is state action or that the test for state action is different for the President. This language simply means that when the actor is a state official, the second prong of the state-action test is satisfied, so the only question is whether that official has "exercised some right or privilege created by the State." 457 U.S. at 937. That is the same question here, which the panel opinion completely overlooks.

[2] The panel's reliance on *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975), is misplaced. There, it was undisputed that the government used facilities that were "under their control." *Id.* at 555. So the Court had no reason to consider whether state action was at issue.

111a

By ignoring this requirement, the panel decision deviated from this Court's state-action precedents. *See* Fed. R. App. P. 35(a)(1).

None of the evidence emphasized by the panel undermines this point. The panel pointed to numerous instances when the President tweeted about his work in office, but that is not enough to make his personal account a "right or privilege created by the State." Such a rule would preclude government officials from discussing public matters on their personal accounts without converting all activity on those accounts into state action.[3]

In addition, the panel's reasoning—that because the President tweets in an official capacity, his use of Twitter's blocking function is state action—operates at the wrong level of analysis. The panel focuses on the status of the entire account—*i.e.*, whether the President's use

---

[3] For example, when incumbent officials run for reelection, we ordinarily understand them to be expressing a mix of personal and official views. But the panel's reasoning would seem to foreclose incumbents from selecting who can participate in campaign rallies, online groups, or personal events. Similarly, when officials make public statements about their faith or offer prayers, we do not understand them to be violating the Establishment Clause. *See Van Orden v. Perry*, 545 U.S. 677, 723 (2005) (Stevens, *J*. dissenting) ("Our leaders, when delivering public addresses, often express their blessings simultaneously in the service of God and their constituents. Thus, when public officials deliver public speeches, we recognize that their words are not exclusively a transmission from *the* government because those oratories have embedded within them the inherently personal views of the speaker as an individual member of the polity." (emphasis in original)). So too here. The mere fact that Donald Trump uses Twitter for both personal and official communication does not transform all of his Twitter activities into state action.

112a

of Twitter transformed his personal account into an official account—rather than examining the specific action at issue—*i.e.*, whether blocking Plaintiffs from accessing the interactive features of his personal Twitter account amounts to state action.   But this Court has explained that we should "look to the nature of the officer's act, not simply his duty status."   *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994).   By departing from the law of state action, the panel decision blurred the line between actions by public officials in the performance of their official duties and actions "in the ambit of their personal pursuits."   *Id.* at 548 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)).   And by fixating on the President's recent tweets, the panel opinion and the concurrence fall into a logical fallacy—*i.e.*, that *some* official use of a Twitter account turns *all* use, or even *all* tweets, into state action.   Our precedent calls for a more nuanced analysis that focuses on the specific feature at issue, which is the President's ability to block users.

Finally, the panel's reliance on evidence from the factual record unmoored from state-action doctrine introduces confusion about when a public official's personal social-media activity becomes state action.   For example, it is not clear from the panel's decision *when* President Trump's Twitter activity crossed into state action.   Did it happen on Inauguration Day?   Upon a particular "official announcement" from @realDonaldTrump?   And how many "official" tweets does it take to convert "personal" tweets into state action?   The panel decision raises difficult questions but provides little guidance for officials today or to litigants, lawyers, and judges tomorrow.

113a

## II.

Even assuming state action, the panel's application of First Amendment public-forum doctrine to @realDonaldTrump is a poor fit, as is the characterization of the account's "interactive spaces" as a public forum. The panel opinion's public-forum analysis strayed from precedent in two ways. First, it is well established that when the government engages in its own speech, it is permitted to "speak for itself" and to "select the views that it wants to express." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009) (citations omitted). Thus, where government speech is at issue, forum analysis does not apply. *Id.* To avoid this result, the panel disaggregated the President's Twitter feed into his initial tweets, which it recognized as government speech, and "his supervision of the interactive features of the Account," which it excluded from that speech. *Knight*, 928 F.3d at 239. With this move, the panel concluded that the "interactive spaces" are a public forum. *Id.* at 234. But the panel cannot have it both ways, and the Supreme Court has warned against extending the public-forum framework in just this sort of "mechanical way." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672-73 (1998).

Second, the panel opinion erred in finding that the President created a public forum by continuing to use Twitter's features the same way he did before taking office, even though "[t]he government 'does not create a public forum by inaction or by permitting limited discourse.'" *Perry v. McDonald*, 280 F.3d 159, 167 (2d Cir. 2001) (emphases removed) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)).

114a

## A.

The Supreme Court has warned that we should be "wary of the notion that a partial analogy in one context," *i.e.* public-forum doctrine, "can compel a full range of decisions in such a new and changing area." *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 749 (1996) (plurality opinion) (Breyer, *J.*). "Having first arisen in the context of streets and parks, the public forum doctrine should not be extended in a mechanical way" to new areas if it is not "compatible with [their] intended purpose." *Forbes*, 523 U.S. at 672-73 (citation omitted). For example, the Supreme Court has noted the limited applicability of the public-forum framework to public television because "public broadcasting as a general matter does not lend itself to scrutiny under the forum doctrine." *Id.* at 675.

The panel here engaged in just the sort of mechanical extension of the public-forum framework that the Supreme Court has warned against. To shoehorn Twitter into public-forum doctrine, the panel carved out "interactive spaces" from the tweets to which they are connected. It acknowledged that the tweets are government speech, but then applied public-forum doctrine to the "interactive spaces." This disaggregation of Twitter's features was wholly artificial—Twitter's own rules make no such distinction between "initial tweets" and "interactive spaces." [4] The panel then stretched the

---

[4] The concurrence points to future updates to Twitter's platform that it believes will "highlight the distinction that the panel correctly made" between tweets and "interactive spaces." *Concurrence* at 13. But the possibility that relevant features may change even before this litigation has concluded should not comfort us, but make us

115a

concept of a public forum, which was originally meant to ensure that "members of the public retain strong free speech rights when they venture into public streets and parks," to hold that the President may not use his personal account on a private company's website in a certain way. *Pleasant Grove City*, 555 U.S. at 469. The panel engaged in this forced analysis because the personal social-media pages of government officials do "not lend [themselves] to scrutiny under the forum doctrine" the way a sidewalk or park might. *Forbes*, 523 U.S. at 675.

A few examples illustrate the illogic of applying public-forum doctrine in connection with government speech. If an official gives remarks and allows for participation by supporters of the government's policies, that would not require opening the floor to opponents. Or if an official distributes pamphlets and solicits letters from the public, that would not deprive the official of editorial discretion to select which responses to publish. Likewise, if tweeting an official message on a personal Twitter account were government speech, then it should not deprive a public official from blocking certain users. *See, e.g.*, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2251 (2015) ("The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider."); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1937 (2019) (Sotomayor, *J.*, dissenting) (noting that in the context of

---

wary of imposing rigid and potentially constricting legal frameworks on fast-evolving technologies.

116a

"government speech," "picking favored viewpoints is appropriately commonplace").

It would be illogical and impractical to apply forum doctrine to such scenarios by bifurcating government speech and "interactive spaces" to require the airing of competing views.   That is because the purpose of such speech, including the "interactive spaces" that may accompany it, is to convey the government's views, not to create a public forum.

### B.

Second, the panel opinion erred in concluding that the President "intentionally" turned his Twitter account into a public forum.   *Knight*, 928 F.3d at 237.   It is well established that the government can create a public forum "only by *intentionally* opening a nontraditional forum for public discourse."   *Cornelius*, 473 U.S. at 802 (emphasis added).   We have explained that "[t]he government 'does not create a public forum by inaction or by permitting limited discourse.'"   *Perry*, 280 F.3d at 167 (emphases omitted) (quoting *Cornelius*, 473 U.S. at 802).

None of the factors considered by the panel indicates that the President intentionally opened his Twitter account to public discourse.   The panel based its conclusion on factors such as the general public's access to the "interactive spaces," the ability of Twitter users to reply and retweet, the holding out of the account as a means the President employs to communicate, and the expressive activity in the interactive spaces.   *Knight*, 928 F.3d at 235-36.   But none of these factors speaks to the President's intention, and the record is clear that Donald Trump set up @realDonaldTrump in 2009 to convey his

117a

own views, not to open a forum for public discourse. Nor are the "interactive spaces" of Twitter intended to provide open access for all. For one thing, only those with a Twitter account can retweet, reply, or like a tweet. Moreover, Twitter provides features like "blocking" precisely to enable users to limit access to and to curate activity on their accounts. Indeed, Twitter describes itself as "a place to share ideas and information, connect with your communities, and see the world around you," and it explains that "[i]n order to protect the very best parts of that experience, we provide tools designed to help you control what you see and what others can see about you, so that you can express yourself on Twitter with confidence."[5]

Under the panel's reasoning, if a public official speaks on a platform that automatically permits others to comment, then the official is responsible for creating a public forum. This is inconsistent with our holding that the government cannot create a public forum by "inaction" alone, and it illustrates how a strict application of public-forum doctrine is ill-suited for social media. *See Perry*, 280 F.3d at 167 (citation omitted).

## III.

Courts should be circumspect in extending legal doctrines to new and evolving technologies outside the realm of judicial expertise. This is particularly true when the result may have significant implications for interactions between government officials and the public.

_____

[5] *How to Control your Twitter Experience*, Twitter, https://help.twitter.com/en/safety-andsecurity/control-your-twitter-experience (last visited Mar. 13, 2020).

118a

The panel opinion will reach far beyond the Oval Office, creating uncertainty about the use of social media by public officials at every level of government. Public officials today routinely maintain social-media accounts for official, personal, and campaign use, and they address issues of public concern on all of them. To be sure, the President's use of Twitter is unprecedented in some respects. But it is now commonplace for politicians to use personal accounts to promote their official activities. The key facts in this case—that the President had a personal Twitter account, that he used it to tweet on matters relating to his office, and that the public was able to comment on his tweets—are not unique. Indeed, this case is just one of several similar lawsuits challenging the right of public officials to use personal social-media accounts in a private capacity. *See, e.g.*, *Hikind v. Ocasio-Cortez*, No. 1:19-cv-03956 (E.D.N.Y. filed July 9, 2019) (suit against congresswoman for blocking user on personal Twitter account, since dismissed with the consent of the parties); *Campbell v. Reisch*, No. 2:18-CV-4129-BCW, 2019 WL 3856591 (W.D. Mo. Aug. 16, 2019) (suit against state legislator for blocking user on Twitter campaign page), *appeal filed* No. 19-2994 (8th Cir. Sept. 16, 2019); *Leuthy v. LePage*, No. 1:17-cv-00296-JAW, 2018 WL 4134628 (D. Me. Aug. 29, 2018) (suit against governor for blocking user on Facebook); *Garnier v. Poway Unified Sch. Dist.*, No. 17-cv-2215-W (JLB), 2019 WL 4736208 (S.D. Cal. Sept. 26, 2019) (suit against school officials for blocking residents on Facebook and Twitter).

Our decision in this case will affect how public officials may use social media, making them less able to defend themselves from hate and harassment. It will limit how public officials may act in a personal capacity

119a

in all aspects of their life, online or otherwise, by writing the "right or privilege" requirement out of state-action doctrine.   And it will bind us to apply public-forum doctrine when analyzing social-media activity, even though the framework is a poor fit for how social media actually functions.   These are issues of "exceptional importance" and merit review by the whole court.   Fed. R. App. P. 35(a)(2).

The panel decision concludes with the statement that "the best response to disfavored speech on matters of public concern is more speech, not less."  *Knight*, 928 F.3d at 240.   Despite the concurrence's premature reassurances to the contrary, it seems likely to me that this decision will have the unintended consequence of creating less speech if the social-media pages of public officials are overrun with harassment, trolling, and hate speech, which officials will be powerless to filter.   The panel's effort to extend public-forum doctrine to social media is a mismatch and highlights why courts "should be cautious in applying our free speech precedents to the internet" and thus "should proceed circumspectly, taking one step at a time."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1744 (2017) (Alito, *J.*, concurring in the judgment).

For these reasons, I respectfully dissent from the denial of rehearing *en banc*.

120a

**APPENDIX D**

 **U.S. Department of Justice**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530

Sept. 28, 2017

<u>**Via ECF and by Fax**</u>

The Hon. Naomi Reice Buchwald
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  ***Knight First Amendment Institute at Columbia University, et al. v. Trump, et al.***, No. 17-cv-5205 (NRB)

Dear Judge Buchwald,

The parties in the above-referenced matter seek leave to file a corrected version of the stipulation that the parties submitted as an attachment to their September 25, 2017 letter motion.  *See* Joint Letter Mot. for Conference, ECF No. 28.  The corrected version is attached to this letter motion, and it removes the word "DRAFT" from the header of the stipulation.  The two versions of the stipulation are otherwise identical (save for an update to the date and the signature block).

121a

To avoid confusion, the parties also request that the Court ask the Clerk's office to remove from the public docket, or disable the electronic link to, the original version of the stipulation, *see* Stipulation, ECF No. 28-1, if such a result is feasible.

Respectfully submitted,

/s/  JAMEEL JAFFER
JAMEEL JAFFER (JJ-4653)
Katherine Fallow (KF-2535)
Alex Abdo (AA-0527)
Knight First Amendment Institute
    at Columbia University
314 Low Library
535 West 116th Street
New York, NY 10027
(212) 854-9600
Jameel.Jaffer@knightcolumbia.org

*Counsel for Plaintiffs*

CHAD A. READLER
Acting Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director

/s/  MICHAEL H. BAER
MICHAEL H. BAER
DANIEL HALAINEN
Trial Attorneys
U.S. Department of Justice,
Civil Division, Federal Programs
    Branch

122a

20 Massachusetts Avenue, NW
Washington, DC 20530
Telephone:   (202) 305-8573
Facsimile:   (202) 616-8460
E-mail:   Michael.H.Baer@usdoj.gov

*Counsel for Defendants*

Jessica Ring Amunson (*pro hac vice*)
Tassity S. Johnson (*pro hac vice*)
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001

123a

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

────────

No. 17-cv-5205 (NRB)

KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA
UNIVERSITY, ET AL., PLAINTIFFS

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., DEFENDANTS

────────

Filed:   Sept. 28, 2017

────────

## **STIPULATION**

────────

The parties in the above-captioned matter hereby stipulate to the following facts for purposes of this litigation.   The parties have agreed that this Stipulation applies exclusively to this litigation and does not constitute an admission for purposes of any other proceeding, and Defendants have agreed that they will not contest Plaintiffs' allegation that the Individual Plaintiffs were blocked from the President's Twitter account because the Individual Plaintiffs posted tweets that criticized the President or his policies.

1.   Plaintiff Knight First Amendment Institute at Columbia University is a 501(c)(3) organization that works to defend and strengthen the freedoms of speech and the press in the digital age through strategic litigation, research, and public education.   Staff at the

124a

Knight First Amendment Institute operate a Twitter account under the handle @knightcolumbia, and this account follows @realDonaldTrump.

2. Plaintiff Rebecca Buckwalter, who resides in Washington, DC, is a writer and political consultant. She operates a verified Twitter account under the handle @rpbp.

3. Plaintiff Philip Cohen, who resides in Takoma Park, MD, is a professor of sociology at the University of Maryland, College Park. He operates a verified Twitter account under the handle @familyunequal.

4. Plaintiff Holly Figueroa, who resides in Mercer Island, WA, is a political organizer and songwriter. She operates a verified Twitter account under the handle @AynRandPaulRyan.

5. Plaintiff Eugene Gu, who resides in Nashville, TN, is a resident in general surgery at Vanderbilt University Medical Center and the CEO of Ganogen Research Institute. He operates a verified Twitter account under the handle @eugenegu.

6. Plaintiff Brandon Neely, who resides in Tomball, TX, is a police officer. He operates a verified Twitter account under the handle @BrandonTXNeely.

7. Plaintiff Joseph Papp, who resides in Bethel Park, PA, is a former professional road cyclist and current anti-doping advocate and author. He operates a verified Twitter account under the handle @joepabike.

125a

8.    Plaintiff Nicholas Pappas, who resides in New York City, is a comic and writer.    He operates a verified Twitter account under the handle @Pappiness.[1]

9. Defendant Donald Trump is President of the United States and is sued in his official capacity only. President Trump operates and oversees the operation of a verified Twitter account under the handle @real-DonaldTrump.    The President has blocked all of the Plaintiffs except the Knight First Amendment Institute from this account.

10.    Defendant Hope Hicks is the White House Acting Communications Director and is sued in her official capacity only.    Ms. Hicks does not have access to the @realDonaldTrump account.

11.    Defendant Sarah Huckabee Sanders is the White House Press Secretary and is sued in her official capacity only.    Ms. Sanders does not have access to the @realDonaldTrump account.

12.    Defendant Daniel Scavino is the White House Social Media Director and Assistant to the President and is sued in his official capacity only.    Mr. Scavino posts messages on behalf of President Trump to @realDonaldTrump and other social media accounts, including @POTUS and @WhiteHouse.    Mr. Scavino has access to the @realDonaldTrump account, including the access necessary to block and unblock individuals from the @realDonaldTrump account.

13.  Twitter is a social media platform with more than 300 million active users worldwide, including some

---

[1]  For ease of reference, Plaintiffs other than the Knight Institute are referred to herein as the "Individual Plaintiffs," collectively.

126a

70 million in the United States.   The platform allows users to post short messages, to repost or respond to others' messages, and to interact with other Twitter users in relation to those messages.

## **How Twitter Works[2]**

14. <u>Users</u>.   A Twitter "user" is an individual who has created an account on the platform.   A user can post "tweets," up to 140 characters in length, to a webpage on Twitter that is attached to the user's account.   Tweets can include photographs, videos, and links.   Some Twitter users do not tweet—i.e., post messages—at all.   Others post hundreds of messages a day.

15. <u>Timelines</u>.   A Twitter user's webpage displays all tweets generated by the user, with the most recent tweets appearing at the top of the page.   This display is known as a user's "timeline."   When a user generates a tweet, the timeline updates immediately to include that tweet.   Anyone who can view a user's Twitter webpage can see the user's timeline.   Below is a screenshot of part of the timeline associated with the @realDonaldTrump account:

---

[2] The parties agree that the Court may take judicial notice of the information published in the "Using Twitter" and "Policies and reporting" guides available on Twitter's "Twitter Support" webpage, https://support.twitter.com/.

127a

**Tweets**     **Tweets & replies**     **Media**

 **Donald J. Trump** @realDonaldTrump · 2h

Great trilateral meeting & dinner w/ President Shinzō Abe of Japan & President Moon Jae-in of South Korea @ the @usconshamburg this evening.



💬 3.4K     ↻ 5.4K     ♡ 24K

 **Donald J. Trump** @realDonaldTrump · 3h

A strong Poland is a blessing to the nations of Europe, and a strong Europe is a blessing to the West, and to the world.



2:05 MI

💬 5.2K     ↻ 12K     ♡ 43K

128a

16.  A Twitter user must have an account name,
which is an @ symbol followed by a unique identifier
(e.g., @realDonaldTrump), and a descriptive name (e.g.,
Donald J. Trump).   The account name is called the
user's "handle."   Alongside the handle, a user's web-
page will display the date the user joined Twitter and a
button that invites others to "Tweet to" the user.   (This
button is visible only to other Twitter users.)   A user's
Twitter webpage may also include a short biographical
description; a profile picture, such as a headshot; a
"header" image, which appears as a banner at the top of
the webpage; the user's location; a button labeled "Mes-
sage," which allows two users to correspond privately;
and a small sample of photographs and videos posted to
the user's timeline, which link to a full gallery.   Thus,
part of the webpage for @realDonaldTrump recently
looked like this:



129a

17. <u>Tweets</u>.  An individual "tweet" comprises the tweeted content (i.e., the message, including any embedded photograph, video, or link), the user's account name (with a link to the user's Twitter webpage), the user's profile picture, the date and time the tweet was generated, and the number of times the tweet has been replied to  (♡) ,  retweeted (⟲) by , or liked by (♡) other users.  Thus, a  recent  tweet  from




@realDonaldTrump looks like this:

18.  By default, Twitter webpages and their associated timelines are visible to everyone with internet access, including those who are not Twitter users.  However, although non-users can view users' Twitter webpages (if the accounts are public), they cannot interact with users on the Twitter platform.

19. <u>Following</u>.   Twitter users can subscribe to other users' messages by "following" those users' accounts. Users generally can see all tweets posted or retweeted by accounts they have followed.  The display of tweets from the accounts a user follows is labeled

130a

"Home" on Twitter's site, but it is often referred to as a user's "feed."

20.  Verification.    Twitter permits users to establish accounts under their real names or pseudonyms.  Users who want to establish that they are who they claim to be can ask Twitter to "verify" their accounts.  When an account is verified, a blue badge with a checkmark appears next to the user's name on his or her Twitter page and on each tweet the user posts.

21.  Retweeting.    Beyond posting tweets to their followers, Twitter users can engage with one another in a variety of ways.  For example, they can "retweet"—i.e., repost—the tweets of other users, either by posting them directly to their own followers or by "quoting" them in their own tweets.  When a user retweets a tweet, it appears on the user's timeline in the same form as it did on the original user's timeline, but with a notation indicating that the post was retweeted.  This is a recent retweet by @realDonaldTrump:



131a

22. <u>Replying</u>.   A Twitter user can also reply to other users' tweets.   Like any other tweet, a reply can be up to 140 characters in length and can include photographs, videos, and links.   When a user replies to a tweet, the reply appears on the user's timeline under a tab labeled "Tweets & replies."   The reply may also be viewed from the original user's feed by clicking on the tweet that prompted the reply—the reply will appear below the original tweet, along with other users' replies to the same tweet.   When a user replies to a tweet, it starts what Twitter describes as a "conversation."

23. <u>Comment threads</u>.   A Twitter user can also reply to other replies.   A user whose tweet generates replies will see the replies below his or her original tweet, with any replies-to-replies nested below the replies to which they respond.   The collection of replies and replies-to-replies is sometimes referred to as a "comment thread."   Reply tweets by verified users, reply tweets by users with a large number of followers, and reply tweets that are "favorited" and retweeted by large numbers of users generally appear higher in the comment threads.   Conversely, reply tweets from non-verified accounts, reply tweets from users with a small number of followers, and reply tweets with few "favorites" or retweets, generally appear lower in the comment threads. Reply tweets that appear higher in the comment threads are likely to be viewed by more people than those that appear lower in the threads.   Twitter is called a "social" media platform in large part because of comment threads, which reflect multiple overlapping "conversations" among and across groups of users.   Below is a recent @realDonaldTrump tweet that prompted tens of thousands of comments:

132a



133a

24. <u>Favoriting</u>.  A Twitter user can also "favorite" or "like" another user's tweet by clicking on the heart icon that appears under the tweet. By "liking" a tweet, a user may mean to convey approval or to acknowledge having seen the tweet.

25. <u>Mentioning</u>.  A Twitter user can also "mention" another user by including the other user's Twitter handle in a tweet.  A Twitter user mentioned by another user will receive a "notification" that he or she has been mentioned in another user's tweet.

26. Tweets, retweets, replies, likes, and mentions are controlled by the user who generates them.  No other Twitter user can alter the content of any retweet or reply, either before or after it is posted.  Twitter users cannot prescreen tweets, replies, likes, or mentions that reference their tweets or accounts.

27. <u>Protected tweets</u>.  Because all Twitter webpages are by default visible to all Twitter users and to anyone with access to the internet, users who wish to limit who can see and interact with their tweets must affirmatively "protect" their tweets.  Other users who wish to view "protected" tweets must request access from (*i.e.*, request to "follow") the user who has protected her tweets.  "Protected" tweets do not appear in third-party search engines, and they are searchable only on Twitter, and only by the user and her approved followers.  Users must protect all the tweets in their accounts or none; tweets may not be protected on a tweet-by-tweet basis.

28. <u>Blocking</u>.  A user who wants to prevent another user from interacting with her account on the Twitter platform can do so by "blocking" that user.  (Twitter

134a

provides users with the capability to block other users,
but it is the users themselves who decide whether to
make use of this capability.)   When a user is signed in
to a Twitter account that has been blocked, the blocked
user cannot see or reply to the blocking user's tweets,
view the blocking user's list of followers or followed ac-
counts, or use the Twitter platform to search for the
blocking user's tweets.   The blocking user will not be
notified if the blocked user mentions her or posts a
tweet; nor, when signed in to her account, will the block-
ing user see any tweets posted by the blocked user.

29.  If, while signed in to the blocked account, the
blocked user attempts to follow the blocking user, or to
access the Twitter webpage from which the user is
blocked, the blocked user will see a message indicating
that the other user has blocked him or her from follow-
ing the account and viewing the tweets associated with
the account.   This is an example of a notification from
Twitter that a user has been blocked:



135a

30.   After a user has been blocked, the blocked user can still mention the blocking user.   Tweets mentioning the blocking user will be visible to anyone who can view the blocked user's tweets and replies.   A blocked user can also reply to users who have replied to the blocking user's tweets, although the blocked user cannot see the tweet by the blocking user that prompted the original reply.   These replies-to-replies will appear in the comment thread, beneath the reply to the blocking user's original tweet.

31.   If a blocked user is not signed in to Twitter, he or she can view all of the content on Twitter that is accessible to anyone without a Twitter account.   That includes the tweets of a blocking user and the replies to a blocking user's tweet, assuming that the tweets and replies are not "protected."

### President Trump's @realDonaldTrump Account

32.   Donald Trump established @realDonaldTrump in March 2009.   Before his inauguration, he used this account to tweet about a variety of topics, including popular culture and politics.   Since his inauguration in January 2017, President Trump has used the @realDonaldTrump account as a channel for communicating and interacting with the public about his administration.   He also has continued to use the account, on occasion, to communicate about other issues not directly related to official government business.

33.   This Stipulation incorporates by reference all of the tweets posted as of the date of this Stipulation to the @realDonaldTrump account since January 20, 2017. The parties will jointly agree on an exhibit containing a true and correct copy of these tweets and replies to be

136a

filed with Defendants' opening brief.   The exhibit may
not include tweets that were subsequently deleted from
the @realDonaldTrump account.

34.  This Stipulation incorporates by reference all
available header images and profile photos used on the
@realDonaldTrump Twitter web page since January 20,
2017 to the date of this Stipulation.   The parties will
jointly agree on an exhibit containing a true and correct
copy of these header images to be filed with Defendants'
opening brief.

35.  The Twitter page associated with the account is
registered to Donald J. Trump, "45th President of the
United States of America, Washington, D.C."   The ac-
count bears a blue badge indicating that it has been ver-
ified by Twitter.   On July 7, 2017, the header photo-
graph showed an American flag.   In the few weeks be-
fore that date, the header photograph showed images of
President Trump performing his official duties, such as
making a speech to the Department of Energy, flanked
by Vice President Mike Pence and Secretary of Energy
Rick Perry.

36.  The @realDonaldTrump account is generally ac-
cessible to the public at large without regard to political
affiliation or any other limiting criteria.   President
Trump has not "protected" his tweets, so any member
of the public can view his tweets without being signed in
to Twitter, and anyone who wants to follow the account
can do so.   President Trump has not issued any rule or
statement purporting to limit (by form or subject mat-
ter) the speech of those who reply to his tweets.   The
account has 35 million followers—16 million more than
@POTUS and 21 million more than @WhiteHouse—as
of the filing of this Stipulation.   The only accounts that

137a

cannot follow @realDonaldTrump are those that the President has blocked.

37.   On July 2, 2017, President Trump tweeted from @realDonaldTrump, "My use of social media is not Presidential—it's MODERN DAY PRESIDENTIAL." A month earlier, White House Press Secretary Sean Spicer stated at a press conference that tweets from President Trump should be understood as "official statements by the President of the United States."   On June 23, 2017, the White House responded to a request from the House Permanent Select Committee on Intelligence for official White House records by referring the Committee to the President's "statement" made on Twitter on June 22, 2017.   The White House social media director, Dan Scavino, has, on at least one occasion, promoted @realDonaldTrump, @POTUS, and @WhiteHouse equally as channels through which "President Donald J. Trump . . . [c]ommunicat[es] directly with you, the American people!" The @WhiteHouse account's description directs Twitter users to "Follow for the latest from @POTUS @realDonaldTrump and his Administration." Further, tweets from @POTUS are sometimes retweeted by @realDonaldTrump, and tweets from @realDonaldTrump are frequently retweeted by @POTUS.

38.   With the assistance of Mr. Scavino in certain instances, President Trump uses @realDonaldTrump, often multiple times a day, to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; to challenge media organizations whose coverage of his Administration he believes to be unfair; and for other

138a

statements, including on occasion statements unrelated
to official government business.    President Trump
sometimes uses the account to announce matters related
to official government business before those matters are
announced to the public through other official channels.
For example, the President used @realDonaldTrump to
announce on June 7, 2017, for the first time, that he in-
tended to nominate Christopher Wray for the position
of FBI director.    Likewise, on June 22, 2017, he used
@realDonaldTrump to acknowledge for the first time
that he did not possess tapes of conversations with for-
mer FBI Director James Comey.

39.  Mr. Scavino in certain instances assists Presi-
dent Trump in operating the @realDonaldTrump ac-
count, including by drafting and posting tweets to
the account.    Other White House aides besides Mr.
Scavino will, in certain instances, also suggest content
for @realDonaldTrump tweets.    President Trump also
sometimes dictates tweets to Mr. Scavino, who then
posts them on Twitter.    President Trump and/or Mr.
Scavino sometimes retweet the tweets of those who
participate in comment threads associated with the
@realDonaldTrump account.

40.  The National Archives and Records Administra-
tion has advised the White House that the President's
tweets from @realDonaldTrump, like those from
@POTUS, are official records that must be preserved
under the Presidential Records Act.    The Ninth Circuit
cited one of the President's tweets in striking down Ex-
ecutive Order 13,780, the order that temporarily sus-
pends nationals of certain countries from entering the
United States.    *Hawaii v. Trump*, 859 F.3d 741, 773
n.14 (9th Cir. 2017), *cert. granted sub nom.    Trump v.*

139a

*Int'l Refugee Assistance Project*, No. 16-1436, 2017 WL 2722580 (U.S. June 26, 2017).

41.   Typically, tweets from @realDonaldTrump generate thousands of replies from members of the public, and some of those replies generate hundreds or thousands of replies in turn.   For example, on July 26, 2017, President Trump issued a series of tweets (reproduced below) announcing "that the United States Government will not accept or allow  . . .   Transgender individuals to serve" in the military, and after less than three hours, the three tweets, collectively, had been retweeted nearly 70,000 times, liked nearly 180,000 times, and replied to about 66,000 times:



140a



42.   This level of engagement is typical for President Trump's tweets.   His tweets frequently receive 15,000-20,000 retweets or more.   His tweets frequently receive even more likes.   It's common for President Trump's tweets to approach 100,000 likes.   For example, this recent tweet was liked more than 126,000 times and retweeted more than 33,000 times in approximately 3 days.

141a





Made additional remarks on Charlottesville and realize once again that the #Fake News Media will never be satisfied...truly bad people!

6:29 PM - 14 Aug 2017

33,620 Retweets  126,206 Likes

81K  34K  126K

43.  The President's tweets are each replied to tens of thousands of times, as in the example above, which received 81,000 replies, and the example below, which received 73,000 replies, as of the time the screenshots of the tweets were taken.





The so-called angry crowds in home districts of some Republicans are actually, in numerous cases, planned out by liberal activists. Sad!

6:23 PM - 21 Feb 2017

25,986 Retweets  117,566 Likes

73K  26K  118K

142a

44.  Given the number of followers that President Trump has on Twitter and the level of engagement with his tweets, the comment threads that appear beneath each of his tweets are seen by a very large number of people.  As a general matter, comments that appear near the top of the comment threads are more prominent and visible, and therefore seen by more people, than comments that appear lower in the threads.  For this reason, Twitter users often compete to have their replies appear near the top of the comment threads, especially for threads on tweets by extremely popular accounts, such as President Trump's.  A reply near the top of the reply thread of an account as popular as President Trump's is likely to be seen many thousands of times.  A high reply placement is likely to garner further engagement for that user—the reply is more likely to spread and be seen by more people, and the user may gain more followers as a result.

45.  The President and the White House also operate two other Twitter accounts:  @POTUS and @WhiteHouse.  The @POTUS account currently has approximately 19.9 million followers, it follows approximately 42 other Twitter users, and it has tweeted approximately 1,015 times since January 20, 2017.  The @WhiteHouse account currently has approximately 15.2 million followers, it follows approximately 13 other Twitter users, and it has tweeted approximately 1,268 times since January 20, 2017.

**The Blocking of the Individual Plaintiffs**

46.  The President blocked Ms. Buckwalter from the @realDonaldTrump account on June 6, 2017.  At 8:15 that morning, President Trump tweeted, "Sorry folks, but if I would have relied on the Fake News of CNN,

143a

NBC, ABC, CBS washpost or nytimes, I would have had ZERO chance winning WH." Ms. Buckwalter replied, "To be fair you didn't win the WH: Russia won it for you." Ms. Buckwalter's reply tweet received 9,033 likes and 3,371 retweets. Ms. Buckwalter's @rpbp account remains blocked by @realDonaldTrump.

47. The President blocked Plaintiff Professor Cohen from the @realDonaldTrump account on June 6, 2017. At 8:44 that evening, President Trump tweeted, "#ICYMI [In Case You Missed It] Announcement of Air Traffic Control Initiative . . . Watch" with a link to an announcement of his Air Traffic Control Initiative. Professor Cohen replied with a tweet showing a photograph of the President with these words superimposed on the photograph: "Corrupt Incompetent Authoritarian. And then there are the policies. Resist." Professor Cohen's tweet received 307 likes and 35 retweets. Professor Cohen's @familyunequal account remains blocked by @realDonaldTrump.

48. The President blocked Ms. Figueroa from the @realDonaldTrump account on May 28, 2017. That morning, addressing the previous week's terrorist attack in Manchester, England, President Trump tweeted: "British Prime Minister May was very angry that the info the U.K. gave to the U.S. about Manchester was leaked. Gave me full details!" Ms. Figueroa replied to the President in a series of tweets, including one that contained an image of the Pope looking incredulously at President Trump, along with the statement "This is pretty much how the whole world sees you. #AMJoy #SundayMorning." Her reply received 15,000 likes and 5,300 retweets. Ms. Figueroa's

144a

@AynRandPaulRyan account remains blocked by @realDonaldTrump.

49. The President blocked Dr. Gu from the @realDonaldTrump account on June 18, 2017. At 4:02 AM that morning, President Trump tweeted: "The new Rasmussen Poll, one of the most accurate in the 2016 Election, just out with a Trump 50% Approval Rating. That's higher than O's #'s!" At 4:12 AM, Dr. Gu replied: "Covfefe: The same guy who doesn't proofread his Twitter handles the nuclear button." Dr. Gu's tweet received 2,900 likes and 239 retweets. Dr. Gu's @eugenegu account remains blocked by @realDonaldTrump.

50. The President blocked Mr. Neely from the @realDonaldTrump account on June 12, 2017. That morning, President Trump tweeted: "Congratulations! First new Coal Mine of Trump Era Opens in Pennsylvania." He included a link to a *Fox News* article about the opening of the mine. Mr. Neely replied: "Congrats and now black lung won't be covered under #Trump-Care." The tweet received 3,334 likes and 341 retweets. Mr. Neely's @BrandonTXNeely account remains blocked by @realDonaldTrump.

51. The President blocked Mr. Papp from the @realDonaldTrump account on or about June 3, 2017. At 12:35 on June 3, President Trump tweeted a video of his weekly presidential address with the hashtag "#WeeklyAddress." At 12:36 and 12:39, Mr. Papp replied to the President with a pair of linked tweets stating, "Greetings from Pittsburgh, Sir.," and "Why didn't you attend your #PittsburghNotParis rally in DC, Sir? #fakeleader." The second tweet received 335 likes and

145a

34 retweets.  Mr. Papp's @joepabike account remains blocked by @realDonaldTrump.

52. The President blocked Mr. Pappas from the @realDonaldTrump account on June 5, 2017.  That morning, President Trump tweeted:  "The Justice Dept. should ask for an expedited hearing of the watered down Travel Ban before the Supreme Court—& seek much tougher version!" and "In any event we are EXTREME VETTING people coming into the U.S. in order to keep our country safe.  The courts are slow and political!"  Mr. Pappas replied:  "Trump is right.  The government should protect the people.  That's why the courts are protecting us from him."  Mr. Pappas' tweet received 395 retweets and 1,181 likes. Mr. Pappas' @Pappiness account remains blocked by @realDonaldTrump.

53.  Shortly after the Individual Plaintiffs posted the tweets described in paragraphs 46 to 52 of this Stipulation, in which they criticized the President or his policies, the President blocked each of the Individual Plaintiffs.

54.  As a result of the President's blocking of the Individual Plaintiffs from @realDonaldTrump, the Individual Plaintiffs cannot view the President's tweets; directly reply to these tweets; or use the @realDonaldTrump webpage to view the comment threads associated with the President's tweets while they are logged in to their verified accounts.

55.  The Individual Plaintiffs can view tweets from @realDonaldTrump when using an internet browser or other application that is not logged in to Twitter, or that is logged in to a Twitter account that is not blocked by @realDonaldTrump.  Using these methods, some

146a

of the Individual Plaintiffs have viewed @realDonaldTrump tweets since they were blocked. For example, Professor Cohen tweeted a screenshot of an @realDonaldTrump tweet on August 1, 2017, and explained how he was able to view the tweet:



147a

However, all of the methods the Individual Plaintiffs may use to view @realDonaldTrump tweets require them to take more steps than non-blocked, signed-in users to view the President's tweets. In addition, while non-blocked users can set their accounts to deliver real-time "push" notifications of the President's tweets, blocked users cannot.

56. Some of the Individual Plaintiffs have established second accounts so that they can view the President's tweets. For example, Ms. Buckwalter created a second Twitter account, @realRPBP, in June 2017, and has used the @realRPBP account on some occasions to view @realDonaldTrump tweets and receive push notifications for @realDonaldTrump tweets. The @realRPBP account follows @realDonaldTrump and is not blocked. The @realRPBP account is not verified and has two followers.

57. The Individual Plaintiffs can view replies to @realDonaldTrump tweets, and can post replies to those replies, while logged in to the blocked accounts. Replies-to-replies appear in the comment threads that originate with @realDonaldTrump tweets and are visible to users who have not blocked (or been blocked by) the Individual Plaintiffs. The below screenshot illustrates how an Individual Plaintiff's participation in such a comment thread would appear to a user who has not been blocked by @realDonaldTrump. In this example, the @realDonaldTrump account posted a tweet on August 20, 2017, at 4:22 PM, and a user with the handle @danibostick posted a reply at 4:25 PM, followed by two additional replies at 4:27 PM and 4:29 PM. Dr. Gu tweeted a reply to @danibostick from the @eugenegu account at 4:30 PM:

148a



58.  Although the Individual Plaintiffs who have
been blocked have the ability to view and reply to replies
to @realDonaldTrump tweets, they cannot see the orig-
inal @realDonaldTrump tweets themselves when signed
in to their blocked accounts, and in many instances it is
difficult to understand the reply tweets without the
context of the original @realDonaldTrump tweets.
All but one of the Individual Plaintiffs have posted
replies in comment threads that originated with

149a

@realDonaldTrump tweets after their accounts were blocked. Because of the additional steps and time involved in using this method, some of the Plaintiffs have stopped replying to replies to @realDonaldTrump tweets altogether, while others reply less frequently than if they had not been blocked.

59. In the past, Plaintiffs Holly Figueroa, Eugene Gu, and Brandon Neely used a third-party service called Favstar that could be used by blocked users to view and reply to a blocking account's tweets if the blocked user established a Favstar account and followed certain steps. The parties' understanding is that it is no longer possible for blocked users to use the Favstar service to view and reply to a blocking account's tweets.

60. All of the Individual Plaintiffs have found these various "workarounds" to be burdensome and to delay their ability to respond to @realDonaldTrump tweets. As a result, four of the Individual Plaintiffs do not use them and the others use them infrequently.

61. The Knight Institute has not been blocked from the @realDonaldTrump account. The Knight Institute desires to read comments that otherwise would have been posted by the blocked Plaintiffs, and by other accounts blocked by @realDonaldTrump, in direct reply to @realDonaldTrump tweets. The Knight Institute is able to read such comments only to the extent the blocked users have chosen to post them through the methods specified in paragraphs 57 to 59.

62. The @knightcolumbia account follows Professor Cohen's account, @familyunequal. As of August 22, 2017, the Knight Institute did not follow the other six Individual Plaintiffs on Twitter.

150a

63. This Stipulation incorporates by reference selected tweets and replies posted to the Individual Plaintiffs' Twitter accounts, as described in paragraphs 2 through 8. The parties will jointly agree on an exhibit containing a true and correct copy of these tweets and replies to be filed with Defendants' opening brief.

Date:   Sept. 28, 2017

Respectfully submitted,

/s/   JAMEEL JAFFER
JAMEEL JAFFER (JJ-4653)
Katherine Fallow (KF-2535)
Alex Abdo (AA-0527)
Knight First Amendment Institute
   at Columbia University
314 Low Library
535 West 116th Street
New York, NY 10027
(212) 854-9600
Jameel.Jaffer@knightcolumbia.org

*Counsel for Plaintiffs*

CHAD A. READLER
Acting Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director

/s/   MICHAEL H. BAER
MICHAEL H. BAER
DANIEL HALAINEN
Trial Attorneys
U.S. Department of Justice,

151a

Civil Division, Federal Programs
   Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
Telephone:   (202) 305-8573
Facsimile:   (202) 616-8460
E-mail:   Michael.H.Baer@usdoj.gov

*Counsel for Defendants*

Jessica Ring Amunson (*pro hac vice*)
Tassity S. Johnson (*pro hac vice*)
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001