# Exhibit 60

1

2

3

4

5     SELECT COMMITTEE TO INVESTIGATE THE

6     JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

7     U.S. HOUSE OF REPRESENTATIVES,

8     WASHINGTON, D.C.

9

10

11

12    DEPOSITION OF:    CAROLINE WREN

13

14

15

16                              Friday, December 17, 2021

17

18                              Washington, D.C.

19

20

21         The deposition in the above matter was held in Room 4480, O'Neill House Office

22    Building, commencing at 10:02 a.m.

23         Present:    Representatives Schiff, Lofgren, Murphy, Aguilar, Luria, and Cheney.

1

2    Appearances:

3

4

5

6    For the SELECT COMMITTEE TO INVESTIGATE

7    THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

8    ████████████, SENIOR INVESTIGATIVE COUNSEL

9    ████████████, SENIOR INVESTIGATIVE COUNSEL

10   ██████████, DETAILEE

11   ████████████, CHIEF CLERK

12   ██████████████, DEPUTY STAFF DIRECTOR

13   ██████████████, CHIEF ADMINISTRATIVE OFFICER

14   ████████████, PROFESSIONAL STAFF

15   ████████████████████, INVESTIGATIVE COUNSEL

16   ██████████████, INVESTIGATIVE COUNSEL

17   ████████████, RESEARCHER

18

19   For CAROLINE WREN:

20

21   MICAH KANTERS, ARNALL GOLDEN GREGORY LLP

22   JOHN P. ROWLEY, JP ROWLEY LAW PLLC

23   WILLIAM PARRISH, STRADLING, YOCCA CARLSON & RAUTH

1

2          ███████.    Good morning.

3                This is a deposition of Caroline Wren conducted by the House Select Committee to

4    Investigate the January 6th Attack on the United States Capitol pursuant to House

5    Resolution 503.

6                At this time, I'd ask the witness to please state your full name and spell your last

7    name for the record.

8                Ms. Wren.    Caroline Morgan Wren, W-r-e-n.

9          ████████.    Thank you.

10               This will be a staff-led deposition, and members, of course, may choose to also ask

11   questions.    You may see them come into the Webex and we'll announce when they

12   arrive and leave.

13               In the room today are myself, ███████████, Senior Investigative Counsel; █████

14   ██████, Senior Investigative Counsel; █████████████, Investigative Counsel; ████████

15   ███████, Deputy Staff Director and Chief Counsel.    I wanted to make sure I got all of

16   them right.

17               And on remote, we have my colleague who you've met, █████████

18   ██████████, Investigative Counsel.    And as I said, members may come in.

19               The other people present on the Webex are ███████████████ Chief Clerk ██████

20   ████████; ██████████; and I mentioned █████████████████.

21               Under the House deposition rules neither committee members nor staff may

22   discuss the substance of testimony you provide today unless the committee approves

23   it -- excuse me -- approves the release.    You and your attorney, as we discussed, will

24   have an opportunity to review the transcript.

25               Before we begin, I'd like to describe a few ground rules.    We will follow the

1    House deposition rules that we provided to your counsel previously.    Under those rules,

2    counsel for other persons or government agencies may not attend, but you are permitted

3    to have your two attorneys present.

4        At this time, could counsel please state their names for the record?

5        Mr. Rowley.    John Rowley.    And here with me is Bill Parrish and Micah Kanters.

6        ▬▬▬▬▬.    And I apologize, Micah.    You are included in that.    I did not mean to

7    say two attorneys.

8        Mr. Kanters.    No worries at all.

9        ▬▬▬▬▬.    You are very important.

10        There is an official reporter transcribing the record of this deposition.    Please try

11    to wait until each question is completed before you begin your response and we'll try to

12    wait until your response is complete before we ask our next question.

13        The stenographer can't record nonverbal responses like when you shake your

14    head.    So it's important that you actually answer each question verbally with an audible

15    verbal response.    People frequently nod and don't realize she'll have to ask you.

16        We ask that you provide complete answers based on your best recollection.    If

17    the question is not clear, please don't hesitate to ask for clarification.    If you don't know

18    the answer, please just simply say so.

19        You may only refuse to answer a question to preserve a privilege recognized by

20    the select committee.    If you refuse to answer a question based on a privilege, staff may

21    either proceed with the deposition or seek a ruling from the chairman on the objection.

22    If the chairman overrules such an objection, you are required to answer the question.

23        I also want to remind you -- you know, we've done this before, and we do it for

24    everyone -- that it is unlawful to deliberately provide false information to Congress.

25        Since this deposition is under oath, providing false information could result in

1    criminal penalties for perjury and/or providing false statements.

2          Do you understand all of that or do you have any questions?

3          Ms. Wren.   Yes, I understand.

4          ████████.   Okay.   Would you please stand and raise your right hand to be

5    sworn?

6          The Reporter.   Do you solemnly declare and affirm under the penalty of perjury

7    that the testimony you are about to give will be the truth, the whole truth, and nothing

8    but the truth?

9          Ms. Wren.   Yes, I do.

10          ████████.   Logistically, just let us know if you need any breaks, comfort breaks,

11    discussion breaks, or if you'd like to discuss anything.   You know, it's not meant to be a

12    marathon, so please don't hesitate to interrupt us if you need a break.

13          There may be several people asking questions.   I know I mentioned the members

14    may jump in.   My colleagues may have questions.   We'll try to keep the flow and not

15    overlap on each other.   But if you don't understand a question, please, again, just simply

16    ask me and my colleagues to repeat it.

17                              EXAMINATION

18          BY ████████:

19    Q    Okay.   Can we just start with some biographical information?

20          Can you provide your full name, your maiden name, any other names that you've

21    used?

22    A    Caroline Morgan Wren.

23    Q    And when were you born?

24    A    ████████████.

25    Q    Can you give us your current address, your cell phone, and your email

1    address?

2    A    ██████████████████, Washington, D.C., 20002.    My cell

3    phone --

4    Q    Go ahead.

5    A    My cell phone is ████████████

6    And what was the third one?

7    Q    The email address.

8    A    I have two.    There's ██████████████ and

9    Caroline@bluebonnetfundraising.net.

10    Q    And are those all the same for the period October 2020 through

11    January 2021?

12    A    Those are.

13    Q    Okay.    Do you have --

14    A    No.    I had a Trump email that I think was closed sometime around

15    mid-December -- or mid-November, I'm sorry, if we're talking about October.

16    Q    Did you have an Instagram account during that time?

17    A    I did.

18    Q    Okay.    And what was that handle?

19    A    @CarolineWren.

20    Q    Okay.    And is that the same, is that active?

21    A    Yes.

22    Q    And did you have a Twitter account during that time?

23    A    Yes.    I think it's the same, @CarolineWren.

24    Q    And is that active?

25    A    Yes.

1      Q    Is it private or is it viewable?

2      A    Private.

3      Q    Okay.    Did that change at some point?

4      A    Yes.

5      Q    When did that, I think they say, go dark?

6      A    When the AP story came out with my -- saying my name was on the permit

7  or maybe like right before.

8      Q    Would that have been sometime in January 2021?

9      A    Yes, like sometime between January, probably, 10th and 20th or something.

10     Q    Are you married?

11     A    No.

12     Q    Okay.    And what is your -- just tell me your educational background?

13     A    I went to Auburn University.

14     Q    Auburn?

15     A    Auburn.

16     Q    I lived in Alabama, so I almost said War Eagle, but I held it in.

17    Can you tell me your family members' names, your parents' name?

18     A    Carol Wren.

19     Q    Your dad's name?

20     A    William Casey Wren.

21     Q    And do you have any siblings?

22     A    Rebecca Wren and Katherine Wren.

23     Q    Those are two sisters?

24     A    Yes.

25     Q    Can you tell me what your current occupation is?

1       A    I'm the president of Bluebonnet Fundraising.

2       Q    And do you have any other sources of income right now?

3       A    No.

4       Q    Okay.    And I just want to go back a little bit.    And I know some of these

5   may overlap, so if they do just kind of help us understand.

6            How long have you been with Bluebonnet Fundraising?

7       A    I founded it in 2015, January of 2015.

8       Q    And are you still the founder and president?

9       A    Yes.

10      Q    And have you been the entire time?

11      A    Yes, with the exception of in March of 2020 to November of 2020, I went

12  in-house with the Trump campaign.    So I didn't have outside clients outside of the

13  Trump campaign for that duration of time.

14      Q    And would that have been Trump Victory Finance Committee?

15      A    It's a good question.    I don't actually know.    Trump Victory was the joint

16  fundraising committee between Donald J. Trump for President and the Republican

17  National Committee.    I believe that my salary was just Donald J. Trump for President.

18      Q    Okay.    So, to your knowledge, were you employed by Trump Victory

19  Finance Committee?

20      A    Trump Victory Finance Committee was not -- was the name of the finance

21  committee.    So like the person who employed me, I believe, was Donald J. Trump for

22  President, Inc.

23      Q    Got it.

24      A    From March to November.

25      Q    And then are you also an adviser for Women For America First?

1    A    No.

2    Q    And did you found a PAC in 2015 called Security is Strength PAC?

3    A    I was not a founder, but I worked on it.

4    Q    And I just want to note for the record that Representative Aguilar has joined

5    us via Webex.

6    Is there anything else that you've worked on that I missed in terms of Bluebonnet,

7    Donald J. Trump for President, you worked on Security is Strength PAC?    Does that take

8    me back about 2015 or are there any --

9    A    No.    There's a lot more that I've worked on from 2015 to present.

10    Q    Could you cover that for us?

11    A    I can cover to the, like, best of my recollection.    But my -- I -- it is a

12    fundraising firm, and so I contract a lot of different candidates and organizations.

13    So in 2015, I -- Security is Strength PAC was the super-PAC supporting Senator

14    Lindsey Graham, who was running for President at the time, and I just -- I had been his

15    finance director and then worked on the super-PAC.

16    Also during that time, I think I worked on the Republican Jewish Coalition, the

17    College Republican National Committee, and probably some other candidates that I can't

18    recall.

19    When Senator Graham dropped out of the Presidential race, I was the finance

20    director for the Cleveland 2016 Host Committee, which was the 501(c)(3) that puts on the

21    convention, the Republican National Convention.

22    And then after President Trump won, I became the national finance consultant in

23    the beginning of 2017.    And that contract, I believe, at that time started out as the RNC.

24    And then, when the President announced for reelection, or shortly after, became an

25    employee of Trump Victory, which, again, is that JFC.

PLAINTIFFS_00051133

1          And from 2017 to 2020, I had a number of different clients outside of just being

2     like national finance consultant for the President.     It included the Republican National

3     Committee, the National Republican Congressional Committee, Republican Governors

4     Association, the National Republican Senatorial Committee, Governor Henry McMaster,

5     Attorney General Alan Wilson, Congressman Tom Rice.

6          Q     I'll cut you off.

7          A     Oh, okay.     This is going to take a while.     Okay.

8          Q     You're fine.     We appreciate it.     Suffice to say, very extensive fundraising

9     history.

10          I think you said that you started for the Trump campaign in March 2020?

11          A     Yeah.     Before that, I had been the national finance consultant, which

12     means I was paid on a commission base to solicit donations for Trump Victory.     And in

13     March of 2020, I went in-house with the Trump campaign, which means I was a salaried

14     employee and I didn't have outside clients, and so it wasn't a commission based, it was a

15     salary based.

16          Q     And was that when you were finance director?

17          A     I wasn't finance director.     I never really had a set title.     It was a -- I think

18     on some of my email chains it was senior adviser to Kimberly Guilfoyle and national

19     finance adviser.     So it's kind of a --

20          Q     Who did you report to in the role that you were in?

21          A     Kimberly.

22          Q     Okay.     And how would you describe your role in terms of what you did for

23     her?

24          A     She was the finance chair.     And so I helped kind of from a high level on,

25     like, strategy, donor maintenance, you know, travel to put on events.     I didn't really

1    under my purview like manage staff necessarily, but worked closely with a lot of the

2    finance staff, too, so --

3        Q    So you didn't supervise anyone?

4        A    No.

5        Q    And I think you said this earlier, that the compensation structure was now a

6    full-time employee paid by the campaign?

7        A    That's right.    Yes.

8        Q    And no bonuses for fundraising donations?

9        A    No.

10        Q    Okay.    Do you remember how much you made?

11        A    My -- I think my negotiated salary was like $250,000 a year.    But I don't

12    remember the exact start date, but it was like March to November.    So I wouldn't have

13    been paid $250,000 because I didn't work for a full year.

14        Q    Okay.    And can you tell me where you were in terms of the election

15    results?    Just like were you watching?    Who were you watching with?    To be clear,

16    this is the 2020.

17        A    Election night 2020?

18        Q    Yes.

19        A    I was at the Trump Hotel.

20        Q    Okay.    And how many people were there with you?

21        A    A lot.    We had a big election night watch party.

22        Q    Was that in like a room or a public area?

23        A    Several rooms.    There were -- we utilized every single room in the hotel

24    because there was COVID restrictions then, so it had to be limited amount of people in

25    each room.

1    I would have with them.    Like, they've known me for a very long time.

2    ███████.    Yeah.    I guess -- I guess -- and I hate -- I hate -- I don't mean to beat a

3    dead horse, I really don't, but when you say, like, I don't know the legalities and it's not

4    about fundraising and I don't really understand what amicus briefs are, then I'm kind of

5    like then what is the content of the conversation of why they should sign on to the briefs

6    with AG Paxton other than to support President Trump?    Like what's left?

7        Mr. Rowley.    Didn't she already say that she was checking on status when she

8    called these AGs?

9        The Witness.    I talk to AGs often.    So if I talked to the Utah AG, I don't know,

10   like I probably would've covered a number of topics and it could have been, "Are you

11   doing?    Are you signing on?"

12       I also could have asked -- called to ask him for counsel, like, "Is this a good

13   lawsuit?    Is this a good idea?    Have you looked at it?"

14       And that's what I'm saying.    I don't know.    I don't recall from one year ago, like,

15   what he would've said.    The only specific conversation I recall having was Morrisey

16   ████████████████████████████████████████████████████████████

17   ████████

1

2      [10:59 a.m.]

3      � . Okay.    I totally under understand that.

4      Are there any other questions on that topic?

5      ▮ . No.

6      ▮ . Any from the Representatives?

7      Ms. Cheney.    Ms. Wren, just to understand, how did the amicus brief come to

8      your attention?

9      The Witness.    I do not recall.

10      Ms. Cheney.    And I appreciate that you're not an attorney, and you were not

11      familiar with what an amicus brief is.    So, when you were making calls to States

12      attorneys general, you were asking them to sign on to something, but you weren't

13      familiar with what it was?

14      The Witness.    No, that's not what I said.    I didn't say that I was calling to ask

15      them to sign on to something.    As I mentioned, I don't recall the conversations with each

16      of them.    It could have been asking their opinion of what they thought about it.    It

17      could have been asking the status.

18      Ms. Cheney.    Thank you.

19      BY ▮ :

20      Q    And, just going to your time with the campaign, there were three individuals

21      that I think you hired to work with you, I think on the side on January 6th.    I think they

22      worked with you on the campaign.    I'm going to try to pronounce their name, Cassidy

23      Kofen (ph)?

24      A    Kofoed (ph).

25      Q    Kiera Schaefer (ph) and Maggie Mulvaney?

PLAINTIFFS_00051164

1          A     Yes.

2          Q     Can you tell me what their roles were on the campaign?

3          A     Maggie was the director of finance operations.     Kiera (ph) did finance

4     advance, is what we call it.     And Cassidy (ph) was an intern that we then -- I actually

5     don't know if she ever -- if she was a staffer or an intern -- a staff assistant or something.

6          Q     And I know you said you didn't supervise anyone.     How did you know those

7     women from the campaign?

8          A     They were in my department.

9          Q     The finance department?

10          A     Yep.

11          Q     And did you just call them after the election and say, "Hey, I, have this event,

12     do you want to work it"?

13          A     No.     It would have been.     I don't remember the specifics of the timing

14     with each of the three, but I think it wouldn't have been until probably early January that

15     I would have asked any of them.     And it was to help me with the registration desk that

16     morning.

17          Q     Okay.     And we'll come back to that later.

18          Okay.     So let's talk about, in terms of the events leading up to the rally, there was

19     a tweet that the President made on December 19th, and, unfortunately, his account was

20     shut down.     So I'm just going to read it, but it was sometimes referred to as the

21     WildProtest tweet.     I think you may have a copy in your original PowerPoint.     But it is

22     basically the one that says:     Peter Navarro releases 36-page report alleging election

23     fraud.     More than sufficient to swing victory to Trump.     A great report by Peter.

24     Statistically impossible to have lost the 2020 election.     Big protest in D.C. on January 6th.

25     Be there.     Will be wild.

1       Do you have any idea how this tweet comes about?

2      A    No.

3      Q    Okay.   Were you in touch with anyone at that time in the White House or

4  on the Trump campaign about the event -- an event on January 6th?

5      A    No.

6      Q    Okay.   Had you talked with anybody from Women for America First or

7  anybody in relation to an event on January 6th?

8      A    Not until the email, the info went out on the 26th or 27th.

9      Q    Okay.   So you don't -- you don't hear from anyone at all, but there's an

10  event on January 6th at the time of that tweet?

11      A    My recollection of hearing of an event on January 6th would have been likely

12  on the 22nd, from Julie.   Now, as I mentioned before, I obviously would follow the

13  President's tweets.   And so I'm not saying, like, I didn't see that or something, but I -- I

14  don't remember ever like knowing of some rally or anything that the President was -- I

15  wouldn't even say the President was going to attend because, on the 22nd, when I heard

16  about this, I didn't really have any expectation of the President attending.

17      Q    I'm sorry to interrupt you.   I just need to note that Representatives Lofgren

18  and Murphy joined on the Webex.

19      I think you're referring to exhibit 3.   Can you turn to that one?   And let's just

20  make sure I'm thinking of the right thing.

21      A    Yes.

22      Q    So this is an email on December 22nd to Schuylar Long, and that's somebody

23  who works for Julie Fancelli, right?

24      A    That's right.

25      Q    Now, in the email, you say:   I wanted to follow up with you regarding the

1    that Tea Party Express would do the buses?

2           A      We did not go into like vendor conversations at that time.    I'm sure I would

3    have said:    If she wants to move forward with this plan, would you be able to execute it?

4    Because executing a bus plan is not something I do.    But I don't recall having a

5    conversation about Tea Party Express being the vendor to use because it was unclear like

6    what exactly Julie wanted to do with this.

7           Q      Is it fair to say that your conversation with him would have been focused on

8    what's a reasonable number to propose for buses, like more focused on kind of like the

9    amount needed as opposed to the mechanics of the bussing?

10          A      Um, no, because I think that -- I don't have it in front of me -- I think it starts

11   at maybe around 25,000 and goes up to, like, 250,000?    30,000?    Yeah.    So she

12   never -- she never indicated how much she wanted to spend at all.    So that's why it's

13   such a wide -- 30,000 to 500,000.    I just wanted to be to able show her, like, this is

14   what -- if the objective is to get as many people, then, this, I guess, is like what an outline

15   could look like.    But I hadn't started to think further of how to actually execute this

16   because she hadn't indicated on -- she hadn't signed off or anything like.

17          Q      When she starts having -- actually, let me step back for a second.    At this

18   point, what do you see your role when you're having conversations with her in terms of

19   what she wants you to do for January 6th for her?

20          A      Right.    I don't view my relationship with donors as a, like, role specific to

21   them.    I -- when I mention the term "donor maintenance," donors call me all the time

22   asking for help on a number different things.    And I -- I help them often on things like

23   that.    So, I -- I think, for a project like this, if she had signed off and given a budget on

24   what that was, then I would have identified a group to be able do it.    I probably would

25   have asked Taylor to be in charge of, like, the bussing systems since it's not what I do.

PLAINTIFFS_00051171

1    And then just made sure that it flowed correctly and that the funding that Ms. Fancelli

2    intended for was spent wisely.

3         Q     So, to that point, at some point, there are a number of organizations that are

4    involved where funds go out to Women for America First, Turning Point, et cetera.     How

5    did that come to pass?    Like, who decides that those organizations get the money for

6    those tasks?

7         A     Are we now just going specifically into how the funding ended up being

8    chosen for Ms. Fancelli?

9         Q     Yes.

10        A     Can I get the -- is the budget --

11        Q     I'm sorry.    There was an issue with the way they came in.    You may have it

12   easier than we do.

13        A     Okay.    So you wanted to jump to -- your question is, why were these

14   organizations chosen --

15        Q     Right.

16        A     -- for funding?

17        Q     Yeah.    Why is Tea Party -- why is Turning Point chosen, Tea Party, Turning

18   Point, RAGA, Women for America First?    Why do they get money?

19        Mr. Parrish.    From Ms. Fancelli?

20        ▆▆▆▆▆.    From Ms. Fancelli.

21        The Witness.    It would be easier for me if I could just give the background on

22   each one of those.

23              BY ▆▆▆▆▆:

24        Q     Sure.

25        A     So, as we mentioned, I met with her on the 26th, and we talked about a

1    number of different, like, funding priorities that she had.    So the followup document

2    that I sent to her incorporates things from that meeting.    The first would have been

3    Turning Point action.    And so, at the beginning of our conversation, we talked about

4    those text messages with Charlie Kirk, like that was one I had identified that I thought Ms.

5    Fancelli would like to support.    She had heard of Charlie.    And so I was wanting her to

6    go to the conference.    She was unable to go to the conference.    And so, when I went to

7    go meet with her that day, I was expecting to talk about a few different things, but one

8    was to talk to her about Turning Point USA and the work that they do and set up a call

9    between her and Charlie.    So that was one of first conversations that we had.

10            During that conversation, that's where she went in a bit more about how she has

11    grandchildren.    This is a funding priority for her.    I think we talked about a new

12    program Charlie started, called Turning Point Faith, that focuses on registering voters in

13    their churches.    And that's something that Ms. Fancelli would have felt strongly about.

14    And so I reached out to Charlie even during that meeting to see if he could do a call with

15    her, and he was on a plane, and they ended up connecting.    And that is where she

16    ended up committing a million dollars to Turning Point, one of the entities.    And, over

17    the next several days, that's where there's discussions of, is it the (c)(4) or the (c)(3),

18    and -- but that million I, think that if you would -- the January 6th had never happened or

19    solicited, like, I think she would have donated to 1 million to Charlie Kirk anyway.    Like,

20    that was a priority to her.    It was something that she wanted to do.    And it was

21    something that I had gone over there to talk to her about.

22            The second is Save U.S. Senate PAC.    That was one where she had already given I

23    think at this point probably 250,000 early sometime in November or December.    And

24    then that was the other, like, the thing that I went over there and wanted to talk to her

25    about specifically, and said this is incredibly important.    The balance of the Senate is on

1    the line.    And so she had told me, you know, while that wasn't her top priority, you

2    know, she trusted me and if that's where she felt like funding should go, that she would

3    be happy do it.    And so I think from this document I'm looking at, this was a

4    recommendation I gave to her.    So then she gave notes back and reviewed.    So I don't

5    think she did 500,000.    I think it was less.    But then the total she ended up giving it was

6    about 850,000 to Save U.S. Senate PAC.    And Save the U.S. Senate PAC had nothing to

7    do with the rally.    It was just, like, the Georgia race was the day before so we were in

8    that pocket of time.

9           Then Tea Party Express, that was where, when we started to talk about January

10   6th and one of her objectives or goals was to get as many people there as possible, which

11   was reflected in the Million MAGA March memo, that's where Tea Party Express was a

12   vendor that I recommended because they had experience in bussing.    And then -- do

13   you want me to just go one by one?

14          Q     Uh-huh.

15          A     Alex Jones was one I ended up on -- I think this was the day -- I think this was

16   the day -- the 27th, I'm not positive, but she had called, someone in her office had called,

17   I believe like the Infowars hotline or something and someone had called back.    She was

18   calling --

19          Q     We can come back to that because that's going to be a larger conversation --

20          A     -- so then Rule of Law Defense Fund RAGA, was -- I would say kind of similar

21   to Turning Point or Save the U.S. Senate to where election integrity was important, or so

22   it was just the rule of law in general.    And, at this point, a talking point that I was having

23   with donors was, look, we are most likely going to have no chambers of government over

24   the next 2 years, I mean, unless we won Georgia.    So, you know, the last line of defense

25   is the AGs, and I think that there are some fights going on -- between corporate board

1    rooms, government, and the AGs are kind of the last -- and so this should be a priority for

2    anyone.    And so she I don't think had heard of that entity or organization before, but I

3    certainly thought they were a great and worthy of funding and matched up to what her

4    priorities would be.    And so that is why they were recommended like during this period

5    of time and in that meeting that I had with her.    The $50,000 for Bluebonnet Fundraising

6    LLC was a number that Julie had proposed, and that was actually to mainly retain these

7    for the year to do donor advisement for her and then also to help execute things for the

8    rally.

9          Women for America First was, that to me, there to figure out who the permit

10   holder was and though the $300,000 was meant to pay for the audio, staging, lighting,

11   infrastructure of the rally, and since they were the permit holder, that made the most

12   sense as to where that funding would go.

13          Q    And let me just pause for a second.    Tea Party Express, did Taylor Budowich

14   recommend them to you?

15          A    Yes.

16          Q    Okay.    And, at the time that he did that, were you aware that he was a

17   fundraiser for them that would receive a commission on the funds raised?

18          A    Well, Taylor is not a fundraiser, but I don't know if he told me that he would

19   have received a commission, but he probably -- we have a pretty open relationship, and I

20   wouldn't have had any issue with that if he had.    Especially if he was going to, like, help

21   execute the program of which that funding was going.    I mean, like, so I don't know the

22   difference between commission or just hiring to, like, execute during that time.    I would

23   have had no issue with him being the -- but once the money goes to that organization, it

24   is not really my job to dictate where they spend.

25          Q    And I guess that's -- maybe I will ask the question a little differently.    Was it

1  your understanding at the time that Taylor Budowich would make some kind of money

2  when the Tea Party Express was paid from this?

3      A    I don't -- I don't recall the answer to that, because I do remember

4  recommending that Taylor be paid by Women for America First.    I just don't remember

5  any conversation specific to if he would be paid by Tea Party Express.

6      Q    Okay.    So, to the extent that he was paid by Tea Party Express, you don't

7  know, but it wouldn't surprise you if he was?

8      A    Yeah.    Right.

9      Q    Okay.    And, for the Rule of Law Defense Fund, I think if you look at exhibit

10  1, you had produced to us some of these you had, I believe, fundraising relationships

11  with.    And I don't want to mischaracterize so maybe you give me the words --

12      A    Correct.

13      Q    -- for what that is, but you had produced this invoice where Rule of Law

14  Defense Fund was paying you $12,000.    Is it wrong if I call it a commission?

15      A    No.    Commission is correct.

16      Q    Commission is correct.    So a fundraising commission.    So you would have

17  received $12,000 from the Rule of Law Defense Fund receiving the $150,000 donation

18  from Ms. Fancelli?

19      A    Correct.

20      Q    Okay.    And then, for exhibit 2, this is the -- you would have received

21  $50,000 for the commission off of the million dollars that Ms. Fancelli gave to Turning

22  Point?

23      A    Right.

24      Q    And the Turning Point has a 5-percent commission whereas Rule of Law

25  Defense Fund has 8-percent commission?

1    Q    And I'm sorry; I didn't mean to take it into the realm of hypothetical.

2    A    Yes.

3    Q    I'm saying, like, what happened in your discussions around --

4    A    Right.

5    Q    -- January 6th?    Were these donations and those were the commissions?

6    A    Yes.

7    Q    Okay.    And did you make a commission off of the $300,000 that was given

8    to Women for America First?

9    A    No.

10    Q    Okay.

11    A    And nothing for Tea Party Express either.

12    Q    All right.

13    A    Or Alex Jones Free Speech, like those weren't clients.

14    Q    Got it.

15    ███████.    Do you have any questions on that?

16    BY ███████████:

17    Q    Just to be clear, when it comes to the January 6th rally, Ms. Fancelli

18    brought you in in regards to planning that event?

19    A    She did.

20    Q    Okay.    And it was around December 22nd, that's the day that you were

21    brought in, per se, to the January 6th rally planning?

22    A    That was the day that I became aware of it.

23    Q    Okay.    And, before that, you said you had worked with Ms. Guilfoyle.    She

24    hadn't mentioned January 6th to you before Ms. Fancelli reached out?

25    A    Because I don't think Ms. Guilfoyle was aware of a January 6th event until

1    like late December.

2                    BY ▬▬▬▬▬:

3         Q    I just have this:   What did Ms. Fancelli tell you about January 6th?   She

4    calls you; she says what about it?

5         A    The initial conversation on the 22nd I didn't really remember until I was like

6    doing -- I thought the first time I had heard about it was the 26th until I started preparing

7    documents for you and found that memo on the 22nd.   So I -- I think, during that time,

8    like I had no idea what the event was for, I was just making a memo based on bussing to

9    like bring people to some sort of event.   And then on the 26th is where I first heard

10   more about what it was and --

11        Q    So, on the 22nd, the best you can remember, did Ms. Fancelli tell you how

12   she became aware of the event?

13        A    She did not.   But I -- she didn't -- the first time I recall her telling me

14   how -- her knowledge of this event would have been on the 26th.

15        Q    But she specifically asked you to invest the time to come up with a budget

16   proposal for the 6th on that call on December 22nd.

17        A    Yes.

18        Q    Okay.   If you look at exhibit 3, your email exchange with Schuyler Long.

19        A    Yep.

20        Q    At the bottom, you see where Schuyler responds to you on December 23rd

21   at 9:25 a.m.?

22        A    Yep.

23        Q    And the second sentence of her response to you is:   Right now it's up in the

24   air as to whether Julie will load -- load in for the D.C. events.

25        A    Right.

1        Q    What did you understand that to mean?

2        A    She wanted to go.    So part of -- like my involvement would have been, if

3   she came to D.C. to attend this, that memo again -- would have been to make sure that

4   she -- I helped her with like travel logistics and things because she's older.    And so, like,

5   hotels and arranging dinners and meetings -- making it kind of an experience.

6        Q    So "load in" was about her coming to D.C., not --

7        A    Right.

8        Q    -- about whether she would fund the event in D.C.?

9        A    I think -- I -- this is Schuylar's language, not mine.    So I guess "load in" could

10  be interpreted both ways, and I'm it not sure which way he meant it.    It could have

11  meant, if she -- whether or not she'll donate or want to even do this program, or it could

12  mean attendance, and I'm not -- it's kind of unclear here.

13       Q    Fair enough.    But, with your experience with Ms. Fancelli, was there ever a

14  doubt in dealing with her that she wanted to fund the events on January 6th?

15     Mr. <u>Parrish.</u>    Objection, form.    By "the events" you mean the event at the

16  Ellipse?

17     ██████████.    Yes.

18     The <u>Witness.</u>    Yes.    I guess it's -- this here on the 22nd was my understanding

19  was that there was a Million MAGA March on January 6th and that she wanted to help

20  drive up attendance and also attend.    So, in mine, I put in there different options to help

21  with travel logistics and increase logistics.    Travel logistics would have meant specific for

22  her to attend and increase attendance would have meant the bussing program.

23     ██████████.    Okay.    Thanks.

24        BY ██████████:

25       Q    I'm sorry.    Do you mind if I ask you a quick question, Ms. Wren?    Did Ms.

1    conversation with Ms. Fancelli about her desire to do -- to participate somehow in the

2    Million MAGA March.    Do you remember the conversations that you had with

3    Mr. Budowich after you talked with Ms. Fancelli and what Ms. Fancelli wanted to do in

4    relation to the January 6th event?

5        Mr. Parrish.    And, again, by "event" you're talking about?

6            BY ▮▮▮▮▮▮:

7    Q    The rally.    Excuse me, the Ellipse rally.

8    A    I know that I called him after that conversation with Julie, and then he

9    helped advise on, like, bussing and to scale and budgets, and I -- I think I probably would

10   have asked him to review it, or I would have ran numbers by him.    But I don't remember

11   any detailed conversation about what it would have been.    I think, even looking at my

12   documents, like, I kind of just wrote it as a bussing project or something.

13   Q    Do you remember telling him that it was for a rally on January 6th?

14   A    I don't -- I don't remember what I would have referred to it as.

15   Q    Would you have used Million MAGA March on January 6th with him?

16   A    I don't recall, but that's obviously what I thought the name of this was.

17   Q    Okay.    And here's the reason I ask:    Can you turn to exhibit 52?

18   This is a text between Mr. Budowich and Katrina Pierson.

19   A    Right.

20   Q    On December 22nd at 5:38 p.m.?

21   A    Yep.

22   Q    So this may have been soon after you talked with him?

23   A    Right.

24   Q    And he's asking Ms. Pierson, who is doing the January 6th rally?

25   A    Right.

PLAINTIFFS_00051186

1      Q      So is there a chance that he would have gotten the existence of a Jan. 6th

2    rally from you in your conversation about the bus project?

3      A      Yeah.

4      Q      Okay.     And then I think you -- if you turn to exhibit 53, you had talked a

5    minute ago that you were with Ms. Fancelli, I believe, on the 26th.

6      A      Correct.

7      Q      And so this is you, I believe, texting with Mr. Budowich, right?

8      A      Right.

9      Q      And so you're at Ms. Fancelli's house at this point?

10      A      Oh, yeah, I'm at Julie Fancelli's house.

11      Q      Sorry.     That wasn't meant to be a trick.     I was just confirming that that's

12    what you meant.     You say:     Guess what the budget is she just gave me for our bus

13    project.     You won't guess.     $3 million.

14      A      Right.

15      Q      You're talking about the Jan. 6th rally on the Ellipse?     Are you talking about

16    the Jan. 6 rally on the Ellipse?

17      A      Well, I want to be careful.     At this point, like I thought it was just a bussing

18    project.     So I don't know about the Ellipse or anything by this time.     So I was

19    referencing what I thought, like, there was some sort of event Julie told me about on

20    January 6th in Washington, D.C.     She wanted to get people there.     Taylor and I had -- I

21    called him to, like, make up a bus budget.     And then this is where I'm at her house, and I

22    thought, like, I thought the 500,000 was way -- the high end, Right?     It started at 30,000.

23    And then she told me that she wanted to do 3 million.     So that's why I'm kind of saying

24    to him:     You won't guess how much she wants to do on this.

25      Q      Right.     And I guess what I am trying to get at is, in the December 22nd

1    email, you refer to it as the Million MAGA March --

2    A    Right.

3    Q    On January 6th.

4    A    Right.

5    Q    You prepare a Million MAGA March overview that envisions bussing people

6    into a rally.

7    A    Right.

8    Q    Okay.    You talk with Taylor Budowich --

9    A    Right.

10    Q    -- to get a ballpark of the bus cost to bring people into a rally?

11    A    Right.

12    Q    That same day, Budowich texts Pierson and says:    Who is doing the Jan. 6th

13    rally?

14    A    Right.

15    Q    Okay.    On December 26th, you text him and say:    I'm at Julie Fancelli's.

16    Guess what the budget is she just give us for our bus project, the Million MAGA March.

17    $3 million.

18    A    Right.

19    Q    So all I'm trying to say is, at this point on December 26th, it is $3 million for a

20    rally on January 6th.    You understand that, right?

21    A    The number that she told me in our meeting that she wanted to spend on

22    the rally was $3 million.

23    Q    Okay.

24    A    On January 26th --

25    Q    Okay.    And --

1      it.

2            Q      I'm sorry.    A second ago you said he and the other person.    Who was

3      the -- you said that "they."

4            A      "They" would have been Cindy or like Kylie Kremer.

5            Q      Okay.    And who provided you with Ali's contact information?

6            A      Jack Posobiec.

7            Q      And so how did you -- if you said this already, I apologize -- but who is it that

8      tells you, "Contact this guy"?

9            A      No one asked me to like contact this guy.    By the 27th, I was talking with

10     both of those two.    And Cindy and Kylie both had their own opinions on Ali.    Like, he

11     was always going to be in the mix.

12           Q      Okay.

13           A      And then separate from that, Justin and I were having conversations.    Kind

14     of I would talk to one of these and he would, and then we'd both try to understand what

15     that conversation meant and then talk to one another.

16                  And so we had been talking at some point we need to fold in Ali Alexander into

17     this, mainly because he was -- he had a website, one, that would need to have correct

18     information, and then was promoting things on Twitter.    And so the hope was to have

19     everyone kind of on the same page promoting the same guidance.

20           Q      Okay.    And do you remember -- did he ever ask you who you worked for?

21           A      I don't -- I don't think so.    I think he probably would have known like I was a

22     Trump campaign fundraiser and that.    I have seen -- and so where you may be

23     going -- like that in some videos or things they put out that I just talked to the White

24     House.    I don't know if they have a separate White House contact or they were, like,

25     they were implying that I was the White House.    But I never would have said -- like, I

1    didn't work in the White House.    So I didn't work for the White House, so I don't --

2    Q    So you think there's a possibility that when he said he was talking to the

3    White House, he may have actually been talking about you?

4    A    Yes.

5    Q    Okay.    And I thought you were going somewhere else, but if you can look

6    at -- we've marked it exhibit 80.    I don't know if it's in your binders, but it's the one that

7    you produced late last night?

8    A    Okay.

9    Q    It's, I think -- actually, I'm not sure who it's with.    It's -- can you read that

10    Bates numbers?

11    Mr. Rowley.    Is that the Marianne text?

12    ▓▓▓▓▓▓▓.    No, it's the Ali Alexander and somebody named Tom.    947, I want to

13    say?

14    The Witness.    Yeah, here it is.

15    BY ▓▓▓▓▓▓▓:

16    Q    And I don't know if you can tell this, because you may have a lot of Toms in

17    your phone, but do you know who this is?

18    A    Tom Van Flein.

19    Q    Okay.    And who is that?

20    A    The chief of staff for Paul Gosar.

21    Q    Okay.    And Mr. Alexander says, "Thomas, will you call Caroline with the

22    Trump campaign?"

23    So is it -- I mean, did you tell him that you were with the Trump campaign?

24    A    Yeah.    If I would have explained my background, I would have said I'm with

25    the Trump campaign.    What I would imagine that happens is like that internally is how

1    he would have referenced me, but externally I think that some of these folks like to say

2    that they were in communication with the White House, right?    And so he may have

3    been saying that to others, but like he knew I was not a White House official, clearly from

4    here.

5         Q    Are there problems for you if he represents to people that you're still with

6    the Trump campaign as of January 5th?

7         A    No.    I mean, I wasn't going to like go on the record and correct him and be

8    like, "Oh, the Trump campaign is over.    I'm now Caroline Wren with Bluebonnet."    I

9    mean, it's a text.

10        Q    No, that would have been an awkward text.    But just out of curiosity, did

11   you ever have a talk with him and say, "Hey, I'm not with the Trump campaign anymore"?

12   Like, did you ever say anything to him about that not being true?

13        A    I don't recall like having a conversation one way or the other with him about

14   that.

15        Q    Prior to January 6th, did you ever get the impression from him that he

16   believed that you were either still with the Trump campaign or actively talking to the

17   White House?

18        A    No.    I never would have represented and said that I'm actively talking to

19   the White House, like.    And with the Trump campaign, I feel like I would have talked and

20   he would have known that like the Trump campaign was over, like it ended on November

21   5th, so -- 4th, I guess.

22        Q    Is it your understanding that the Trump fundraising -- because I thought

23   earlier you had said after the election there was like Trump Victory or Team Magic or

24   there's something, right, that's --

25        A    Trump Victory was -- that was the joint fundraising committee between the

1      RNC and the Trump campaign.    But like my last day with the Trump campaign was

2      November 4th.    My last payment by the Trump campaign was November like 15th or

3      something, because we were paid on two-week blocks, and so it went there.

4            And then somewhere in that like middle part like our emails -- people were

5      staggered off of the Trump campaign.    And I was in an early wave, because there was no

6      fundraising efforts.    Like, we weren't soliciting funds.

7            Q      But you were done, but things were still going on that somebody could think

8      there were still people working for the Trump campaign?

9            Mr. Parrish.    Objection, form.

10                      BY ▮▮▮▮▮▮▮▮:

11            Q      Do you understand?

12            A      Like, if they had a press conference, like, and Rudy is talking, I don't know if

13     Rudy was working for the Trump campaign or in the capacity of the personal lawyer or

14     what, but --

15            Q      Right.    But I guess what I'm saying is it was possible -- there were -- there

16     was still something that people could believe the Trump campaign was.    Like, it was still

17     going.    You may not have been working for it --

18            A      Right.

19            Q      -- but somebody might not have been able to know that if they didn't know

20     what your exact end date was, right?

21            Mr. Parrish.    Objection, form.

22            The Witness.    I don't know what Ali knew or when, but I wouldn't at that time

23     have represented myself and said, "I'm like working on the Trump campaign right now

24     and doing this."

25                      BY ▮▮▮▮▮▮▮▮:

PLAINTIFFS_00051225

1

2              BY ▓▓▓▓▓▓:

3       Q    Well, wasn't that -- wasn't that always -- it was a march from the beginning,

4    it was a Million MAGA March, a March to Save America -- I think "march" has been in

5    nearly every title I've seen.

6       A    Yes.

7       Q    And his event was always I believe on Lot 8 at the Capitol.

8       A    Right.

9       Q    So wasn't everything always envisioned that wherever it was, Freedom Plaza

10   or at the Ellipse, they would march to Lot 8 at the Capitol where he was having his rally?

11      A    Well, before I go into that, I want to back up and answer that I think I -- there

12   is -- on that day, it was my understanding he had a permit like all day.    He mentioned to

13   me about that.

14           And so there was a conversation I had with him probably sometime around the

15   4th or the 5th about how he was going to have multiple Members of Congress come

16   outside and do like a press conference type of deal at the Capitol at his permitted spot.

17           So if that's maybe what you're talking about 50, maybe that's like members of the

18   press, but it was meant to be he had these different Members that were going to come

19   out and then they were going to -- then some of the Members were potentially going to

20   come over to our event, or Ali was going to come over to our event.

21           And I flagged for him -- he was telling me it was something around 10 a.m.    And I

22   said, that's never going to -- you're going to have to be at the Ellipse at 6 a.m.    And also,

23   if Members of Congress are intending to come to the Capitol to our event, there's going

24   to be so much shut down, like there's not really even a way to do that.

25           So there's no way you're -- basically like there's no way that you're going to be

1    able to have a press conference with Members of Congress at 10 a.m. and also participate

2    in the event at the White House Ellipse.

3        Q    Okay.    And in terms of other groups that were planning events, have you

4    ever heard of Moms for America?

5        A    Yes, but only recently.

6        Q    Not at the time, at the election to January 6th?

7        A    I don't think I had ever heard of them.    I wouldn't have known really who

8    Kimberly Fletcher was.    But their name -- I do remember seeing them as a -- like on one

9    of the sponsor groups or things.    But I never interacted with her, to my -- I don't know if

10    I ever texted her or something.    But I met her I thought for the first time like maybe a

11    week or so ago.    So --

12        Q    I think in one of the documents that you provided there was -- it was a setup

13    guide from Event Strategies on December 28th that they sent to you and Women for

14    America First that showed like an audio package and lighting for POTUS.    Did you have

15    any role in helping ESI put that together?

16        A    No.

17        Q    Okay.    Do you know who did put that together?

18        A    Well, they did this for like every event for the President.    So I'm sure it's

19    probably pretty standard.

20        Q    So if they said "for POTUS," is it your understanding that they would have

21    actually coordinated with somebody at the White House or they just had his preferences

22    on file kind of thing?

23        A    No, they would work with White House advance.

24        Q    And what do you mean when you say "White House advance?"    Explain

25    that to me.

1      A      The advance office is the one that executes the events from the White

2   House side.    And there's the advance on the campaign, let's say, which Justin and Megan

3   were the operations team.    And then those two would frequently coordinate with each

4   other on executing events.

5          Q      So walk me through like who are the people that you are talking about?

6   Justin is one.    Caporale is one.

7      A      Yes.

8          Q      Megan Mulvaney?

9      A      No, Megan Powers.

10         Q      Powers, I apologize.    That's another one.    Who else is on what you're

11   calling the White House advance team?

12         A      There's not White House staff.    This was -- those were examples of two

13   people that were on the campaign operations who the whole time I knew them would

14   deal with White House advance.

15         Q      Okay.

16         A      Now, like fast forward to January 6th.    It's my understanding Megan was

17   contracted through Event -- similar to how I hired Maggie and Kira that day to help me

18   execute.    I believe that Event Strategies hired Hannah and Megan to assist with the

19   execution of this event.    But that is the group that would have been communicating with

20   White House advance.

21         Q      And who -- do you know who was on White House advance?

22         A      It's a big department, but Bobby Peede is the head of White House advance

23   and Max Miller kind of floated between advance.    I think towards the end he was like in

24   some sort of different role, but did stuff with advance.

25         And that's probably who they --

1      Q    Did you ever have any conversations with anyone planning the rally on

2  January 6th with anybody that you considered the White House advance team?

3      A    The only -- I think on the 5th we were doing a walk-through late at night, and

4  I think Bobby Peede was out there like with us in a group setting, and I like said hello and

5  gave him a hug or things.    But otherwise, not by phone or text message.    And again,

6  any questions I would have had in that capacity would have just -- I would have asked

7  Justin.

8      Q    Okay.    Because your understanding was going to Justin was effectively

9  going to White House advance?

10      Mr. Parrish.   Objection, form.

11      The Witness.   No.    It would be -- that's just sort of a -- like, if it was something in

12  relation to the President's movements or security or like audio or lighting, which I

13  wouldn't have -- then that is like going through Justin, as the event contractor and

14  organizer, and then they would ask that of White House advance.

15      Like, I would never call Bobby Peede with a question.   I didn't have Bobby

16  Peede's number.   That's not how like a flow of information would go.

17      ██████.   Okay, that makes sense.

18      On December 29th -- or I should say by December 29th -- Women for America

19  First I think had submitted an application for the January 6th event on the Ellipse.    And I

20  should say permit.   I don't think application is exactly accurate.

21      The Witness.   Right.

22      ██████.   Do you know how that came about?

23      The Witness.   Do you have my messages with Kylie Kremer?

1      [2:11 p.m.]

2                      BY ▓▓▓▓▓▓:

3           Q     I think it's all in the group chat.    Are you thinking of an individual one with

4      her?

5           A     Yeah.    Like our individual chain.

6           Q     Unfortunately, I don't know that that one is an exhibit.

7           A     Okay.    Okay.    On December 28th, I texted Kylie and said:    Please submit

8      the permit for the Ellipse on the 4th, 5th, 6th, and 7th for build down strike.    Thank you.

9           And I don't really know -- it would have been Justin and I were talking at that time.

10     And so like right around that text message, probably right prior to it, Justin texted me and

11     said:    Please ask Kylie to submit a permit.

12          It's kind of interesting because Justin had been contracted for one.    So I don't

13     know why he asked me to ask her versus just them talking to each other, but -- but at that

14     time Justin had done the walk-through with Secret Service and probably White House

15     Advance, and they had determined that the Freedom Plaza would not be an option and

16     picked the White House Ellipse.

17          And then Justin and I had conversations about, okay, like what do we do about

18     this permit situation because, at the time, you know, you had Cindy holding the permit

19     for Freedom Plaza; you had the Kremers threatening to sue; you had Ali, who we had not

20     made contact with yet.    And so I don't know who made the final call that it should be in

21     Women for America First name for the permit, but Justin said:    Tell the Kremers to file

22     for a permit, and then, after that, we'll deal with these other people.

23          Q     Were you on any of the calls with the National Park Service regarding the

24     permit?

25          A     Nope.

1      you had heard or seen, in terms of the organization of the event?

2            A      No.    I mean, everything was branded Trump march, and there was two

3      events and a direct line between each other.    So it seemed like something that could or

4      would happen.

5                        BY ▓▓▓▓▓▓▓▓▓ :

6            Q      To be clear, the event at the Capitol was Mr. Alexander's event, that's the

7      one that you're referencing?

8            A      Sort of.    But I knew a bunch of people speaking at it.    Like, Roger was

9      supposed to speak at it, and Ali and Alex, and there was someone else who references

10     that they were a speaker.    So I never viewed anything as like one person's event.    They

11     were like coalitions of events and speakers.    So --

12                  I want to add that when I first got involved or heard about this, so probably on the

13     26th, the route was like Ali's event was supposed to be in the morning, and then the

14     evening was -- and Cindy references this in her Rally to Revival, you know, it's going to be

15     evening.

16                  So a march would have happened from the Capitol to Freedom Plaza in the

17     afternoon, so basically away from the Capitol up to the White House.    And then through

18     this -- like the timing changes is what flipped that.

19           Q      Okay.    Could you turn to exhibit 78.    No, excuse me.    Yes, 78 in your

20     binder.

21                  I just wanted to talk about some of the speaker fees issues.    I think you had

22     conversations with Ms. Fancelli early on about possible speaker fees.    If I'm

23     remembering right, I think you proposed $200,000, but it ended up being like minimal I

24     think on your edited one.

25           A      Right.

1    Q    But there are some individuals that do end up getting speaker fees.    And I

2    want to talk about the two individuals that we know, Mr. Don Jr. and Ms. Guilfoyle, but,

3    first, I want to ask you, do you know of anybody else who spoke on the 6th who was paid

4    speaker fees for speaking?

5    A    You have to define speaker's fee.    If Katrina was paid 25,000 for Women for

6    America First and then made herself one of the only speakers, would you define that as a

7    speaker's fee?

8    Q    I would find that relevant, yes.    So, I mean, that's broader probably, but I

9    can't say it's not.    So I appreciate kind of like the attempt to answer the answer within

10    the question.    So not unreasonable that it was unclear, if she was paid the $25,000,

11    would it qualify as speaker fees.

12    Is there anyone else who, black, white, or gray, may have been remunerated for

13    speaking on January 6th?

14    A    Not to my knowledge.

15    Q    Okay.    And this is really to clear it out of the way to make sure that I'm not

16    missing anything.

17    In exhibit 76, there's an email from you to somebody named Rebecca Karabus at

18    Capitol HQ regarding putting together two invoices to Turning Point Action.    Who is

19    Ms. Karabus?

20    A    Sorry, it's exhibit which one?

21    Q    Oh, 78.

22    A    She is a friend of Kimberly and I's, a younger girl who sometimes assists with

23    operational things.

24    Q    And Capitol HQ, had you used them before?

25    A    I've never used them or hired them or like worked with them in any capacity.

PLAINTIFFS_00051316

1    Q    So your relationship was with Ms. Karabus, not with Capitol HQ?

2    A    I don't know what Capitol HQ is.

3    Q    Are you familiar with their association with Steve Bannon?

4    A    No.

5    Q    Okay.    And --

6    A    But that makes -- Rebecca works for Alexandra Preate.

7    Q    And that is who?

8    A    She's a friend of mine and Kimberly.

9    Q    When you said "that makes sense" because I said Bannon, does Ms. -- and

10   I'm going to -- Preate?

11   A    Yes.

12   Q    Does she have a relationship with Mr. Bannon?

13   A    Yes.

14   Q    A professional one?

15   A    Yes.

16   Q    Do you know what role, like if you could describe her professional

17   relationship with him?

18   A    I don't know.

19   Q    PR, is that fair?

20   A    She does comms, communications.

21   Q    Okay.    And did somebody -- you asked Ms. Karabus to put together the

22   invoices to Turning Point for Ms. Guilfoyle and Mr. Trump to speak that day.    Did Ms.

23   Guilfoyle ask you to do that?

24   A    Rebecca had helped before to make -- she had the format of a True Media

25   invoice before.    So I don't remember who asked who what, but it was not uncommon

PLAINTIFFS_00051317

1    for Rebecca to assist with something like that.

2        Q      Okay.    So it would not be uncommon for you, knowing that the

3    speaker -- how the speaker fees worked, to ask Ms. Karabus to put it in an invoice for

4    you?

5            Mr. Parrish.    Objection, form.

6                  BY ▨▨▨▨▨▨:

7        Q      I guess it sounded like you were saying Ms. Karabus made these invoices in

8    the past?

9        A      Yes.    She made invoices for True Media, for Kim.    Like she had the invoice

10   template.

11       Q      Right.    So can you create an invoice like you've done before?

12       A      Right.    Correct.

13       Q      And so you had not -- apparently, I'm reading into this you had not run that

14   by Ms. Guilfoyle, because she corrects you and asks you -- asks Ms. Karabus instead to

15   make one invoice instead.    Is that right?

16       A      Can you rephrase the question?

17       Q      Well, I'm just reading the two emails.    You say:    Please put together two

18   invoices, one for Ms. Guilfoyle for 30,000, one for Donald Trump, Jr. for 30,000.

19            Ms. Guilfoyle responds 20 minutes later and says:    So, actually, we're going to go

20   ahead and invoice for 60,000 to True Media.    I talked to Don for Kimberly Guilfoyle,

21   Donald Trump, Jr., for Wednesday, January 6th, and I will just 1099 him, and I'll wire the

22   money so it's my True Media LLC and Chase Bank account number and routing.    And,

23   Rebecca, you have it.    Thank you so much.

24       A      Right.

25       Q      There's a lot of missing punctuation so I did the best I could, but the gist is it

1    sounds like you asked for these invoices, but she corrects it and asks for a different form

2    where it's one for 60,000 to True Media?

3        A    Correct.

4        Q    And let me step back for a second.    How did these speaking fees come to

5    be?    Who agreed to pay them $60,000 to speak?

6        A    Turning Point USA.

7        Q    Okay.    And who --

8        A    Or Turning Point Action, I guess.

9        Q    And who at Turning Point authorized that?    Was that Charlie Kirk, or who

10   said, we're paying Don and Kimberly 60,000 to speak?

11       A    Can you rephrase the question as to --

12       Q    Who authorized -- who at Turning Point authorized Ms. Guilfoyle and

13   Mr. -- can I call him Mr. Trump?

14       A    Yes.

15       Q    Like Trump Jr.?

16       A    Right.

17       Q    Don seems -- Mr. Trump, Jr.

18       A    Yeah.

19       Q    Who authorized them to receive the $30,000 payments from Turning Point?

20       Mr. Parrish.    Objection, form.

21       The Witness.    I don't know their authorization process.    But I do know, like, that

22   Don and Kim are often paid to speak at Turning Point events.

23       ███████.    Okay.    So who would have authorized them to be paid to speak at

24   this as if it were a Turning Point event?

25       Mr. Parrish.    Objection, form.

PLAINTIFFS_00051319

1          ████.   Like, who is saying, we will pay you $60,000 to speak on January 6th?

2    Who at Turning Point is saying that?

3          Mr. Parrish.    If you know.

4          The Witness.    I don't.    I guess I still don't understand the question.

5          ████.   A minute ago, I said:    Who authorized the $60,000?

6    You said, Turning Point authorized it.

7    My question is, who at Turning Point said, yes, we will pay you $60,000 to speak?

8          The Witness.    I don't know.

9          ████.    Did they need to say, or did you tell them, Turning Point, to pay Ms.

10   Guilfoyle and Mr. Trump?

11         The Witness.    Yeah, that's why it's un -- it is not abnormal for them to get

12   speakers' fees from events that Turning Point are involved in.    Like, that's something

13   that -- discussions I've had with Charlie before of other events.

14              BY ████:

15         Q     Did you discuss with Charlie paying Ms. Guilfoyle and Mr. Trump, Jr., $60,000

16   to speak on January 6th?

17         A     Yes.

18         Q     Okay.    And did he say, yes, he was willing to pay that $60,000 to them?

19         A     Yes.

20         Q     Did he do that by email, by phone, or by text?

21         Mr. Rowley.    Did he do what?    Sorry.

22              BY ████:

23         Q     Did he agree to the 60 --

24         A     Yes.

25         Q     How did he agree to the $60,000 in fees?

PLAINTIFFS_00051320