# Exhibit 82

SELECT COMMITTEE TO INVESTIGATE THE

JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

DEPOSITION OF:   KIMBERLY GUILFOYLE

Monday, April 18, 2022

Washington, D.C.

The deposition in the above matter was held in Room 5480, O'Neill House Office Building, commencing at 10:16 a.m.

Present:   Representatives Schiff and Lofgren.


```
1
2    Appearances:
3
4    For the SELECT COMMITTEE TO INVESTIGATE
5    THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:
6
7    ███████████████████████, INVESTIGATIVE COUNSEL
8    ██████████████ INVESTIGATIVE COUNSEL
9    ████████████████████, STAFF ASSOCIATE
10   ██████████████ PROFESSIONAL STAFF MEMBER
11   █████████,CHIEF INVESTIGATIVE COUNSEL
12   ████████████████, PROFESSIONAL STAFF MEMBER
13   ██████████████████FINANCIAL INVESTIGATOR
14   █████████████, CHIEF CLERK
15   ████████████ FINANCIAL INVESTIGATOR
16   ██████████, PARLIAMENTARIAN
17   ████████████, SENIOR INVESTIGATIVE COUNSEL
18   ██████████, OF COUNSEL TO THE VICE CHAIR
19
20   For KIMBERLY GUILFOYLE:
21
22   CHAD SEIGEL
23   JOE TACOPINA
24   TACOPINA SEIGEL & DEOREO
```

PLAINTIFFS_00050806

1

2          ███████.  Good morning.  This is the deposition of Kimberly Guilfoyle,

3   conducted by the House Select Committee to Investigate the January 6th Attack on the

4   United States Capitol pursuant to House Resolution 503.

5          This will be a staff-led deposition, though members may choose to ask questions.

6   I will note that we are joined by Representatives Schiff and Lofgren.

7          My name is ███████ and I am senior investigative counsel with the select

8   committee.  With me from the select committee staff are ███████████████

9   investigative counsel; ███████, investigative counsel; ███████ financial

10  investigator; ███████, senior investigative counsel; and ███████, financial

11  investigator.

12         Under House deposition rules, neither committee members nor staff may discuss

13  substance of testimony today unless the committee approves release.  You and your

14  attorneys will have an opportunity to review your transcript.

15         Please note under the House rules that you may have your attorney present, but

16  counsel for other individuals may not be.  We don't have that situation here.

17         At this time, I'd like to ask your counsel to identify themselves for the record.

18         Mr. Tacopina.  Thank you, ███████  For Ms. Guilfoyle, Joseph Tacopina.

19         Mr. Seigel.  Good morning.  And Chad Seigel for Ms. Guilfoyle as well.

20         ███████  I just want to go over a couple of ground rules for the deposition.

21         These are our official reporters.  They are going to be transcribing our

22  conversation.  The reporters' transcription is the official record of the proceeding.

23         I will just say I know I can speak fast, so please don't hesitate to tell me to slow

24  down or any of us on this side.

25         Please wait until each question is completed before you begin to respond, and we

1   will do our best to wait until your response is completed before we ask the next question.

2   The reporters can't note nonverbal responses, so if you shake your head or nod,

3   they won't know.   So please try to respond with a yes or a no.

4   Please give complete answers to the best of your recollection.   If a question is

5   unclear, we're not trying to trick you.   So just please ask us for clarification.   We can

6   rephrase it and make sure you understand.

7   If you don't know the answer, please just say you don't know.   We do not want

8   you to guess.

9   You may refuse to answer a question only to preserve a privilege recognized by

10  the select committee.

11  If you refuse to answer a question based on a privilege, we may proceed with the

12  deposition or we can seek a ruling from the chairman on the objection.   If the chairman

13  overrules the objection, you would then be required to answer the question.

14  We will have plenty of opportunities for you to consult with counsel if need be, so

15  please don't hesitate if you need to confer with your counsel to take a moment, pause,

16  and we're happy to give you that chance.

17  Finally, I just want to remind you that -- and we do this for every witness -- it is

18  unlawful to deliberately provide false information to Congress.   Doing so could result in

19  criminal penalties, including under 18 U.S.C. Section 1001.

20  Because this deposition is under oath, would you please raise your right hand to

21  be sworn.

22  The Reporter.   Do you solemnly declare and affirm under the penalty of perjury

23  that the testimony you are about to give will be the truth, the whole truth, and nothing

24  but the truth?

25  The Witness.   Yes, I do.

1    The Reporter.   Thank you.

2    ███████   And just logistically, if you need a comfort break or a break, this is not

3    meant to be a marathon, so please don't hesitate to ask us if you need a break for any

4    reason.

5    The Witness.   Okay.   Thank you.

6    ███████   Okay.   There may be several people asking questions.   And, again,

7    if you don't understand a question, please just ask me or the questioner to repeat it.

8    Do you or your counsel have any questions before we begin?

9    Mr. Tacopina.   No.

10   The Witness.   No.

11   ███████   So first, we just want to start with some biographical information.

12   Mr. Tacopina.   ███████, I do have a question.   I'm sorry.   I'm trying to think of

13   one.   I get paid by the question, that's why.

14   Whoever is speaking up -- I know there are other members who are participating

15   but not visible.   When someone is asking a question, will their face appear on the

16   screen?

17   ███████   So traditionally that is how they appear.   We usually see their video

18   come on, and then we try to pause.   We'll also take breaks just to make sure any of the

19   Representatives have a chance to ask questions as it pertains to certain lines of

20   questioning.   But usually, if their video comes on, that is a signal of them wanting to ask

21   questions.

22   Mr. Tacopina.   Okay.

23   The Witness.   Also, she said you're going to identify if someone is coming in.

24   ███████   Yes, ma'am.

25   Mr. Tacopina.   You'll identify who the speaker is.

1          ▓▓▓▓▓▓▓    So we monitor when the Representatives come in and out, and we
2    put it on the record and we'll notify you as soon as we see.   You can also see the names
3    of individuals.
4              And just so you know, everybody on there is select committee staff or the people
5    operating the webcam, and the only Representatives that we have right now, again, are
6    Schiff and Lofgren.
7              Mr. Tacopina.   Okay.
8          ▓▓▓▓▓▓▓    And when that changes, we'll enunciate it for the record and let you
9    know.   We actually enunciate for the record when they enter and when they leave.
10   Generally when they enter, not when they leave.   Excuse me.
11             Mr. Tacopina.   Okay.   Thank you.
12         ▓▓▓▓▓▓▓    Any other questions?
13             Mr. Tacopina.   No, we're good.
14         ▓▓▓▓▓▓▓    Perfect.   But please don't hesitate to ask questions.
15             The Witness.   Also outside of your presence.
16                              EXAMINATION
17             BY ▓▓▓▓▓▓▓
18        Q    So just if you could start, just provide us your full name and any other names
19   that you've used in the past.
20        A    Sure, certainly.   Kimberly Ann Guilfoyle.   A-n-n.   And Guilfoyle,
21   G-u-i-l-f-o-y-l-e.   I've gone by Kim Guilfoyle, Kimberly Guilfoyle Newsom, Kimberly
22   Guilfoyle Villency, V-i-l-l-e-n-c-y, which is the names of my previous husbands.
23        Q    And so, just to be clear, your original maiden name, Kimberly Guilfoyle?
24        A    That's correct.
25        Q    Thank you.

1        A    That's on my passport.  That's the name that I use.  But I've also been
2    referred to by those names.
3        Q    I really appreciate the clarity.
4             Can you tell me your date of birth?
5        A    Yes. ▮▮▮▮▮▮▮▮.
6        Q    And what is your residence address, cell phone, and email address?
7        A    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  And email is
8    ▮▮▮▮▮▮▮▮, but I have a lot of different emails over the years.
9        Q    And we're just going to focus on the period from December 2020 through
10   January 2021, so that's a rough -- a couple months.  If you could just confirm where you
11   were living then, the cell phones you were using, and the email addresses you were using
12   during that period.
13       A    From when, December --
14       Q    December 2020 through January 2021.
15       A    December 2020, I was living at ▮▮▮▮▮▮, ▮▮▮▮▮▮
16   ▮▮▮▮.  I don't recall the ZIP.
17       Q    That's fine.  And were you using a different cell phone or were you using
18   the same cell phone?
19       A    No, the same.
20       Q    And did you have any other cell phones during that time?
21       A    No.
22       Q    And the same email address, the ▮▮▮▮▮▮?
23       A    Yes.
24       Q    And do you have any Instagram Twitter accounts?  Excuse me, those are
25   separate things.  Instagram or Twitter accounts?

1    A    Yes, I do.

2    Q    And what are the -- I'm not a social media person -- the handles?

3    A    Yes.   I think it's @KimGuilfoyle on Twitter, because Kimberly couldn't fit,

4    but you can check that.   And it's Kimberly Guilfoyle on Instagram.

5    Q    And were those the same accounts during December 2020 and January

6    2021?

7    A    Yes, they were.

8    Q    Okay.   And can you tell us a little about your education background, just

9    college and --

10   A    So yeah, anyway, I attended Our Lady of Mercy Grammar School, Mercy High

11   School in San Francisco, and then UC Davis for college, and University of San Francisco for

12   law school.

13   Q    So we just want to talk with you about your work history.   It's sometimes

14   easier to go back in time.

15        Can you tell us what your current occupation, means of employment, sources of

16   income, however you define that?   Who are you working for now?

17   A    I am currently working for the super-PAC called MAGA Again and MAGA

18   Policies.   I also have self-employment, giving speeches throughout the country, and

19   some other consulting media work.

20   Q    The self-employment, do you do that through an entity, like an LLC or a

21   business?

22   A    Usually, it either goes into my personal account or to Tru Media LLC.

23   Q    I'm going to come back to that in a moment.

24        If we could go back, the last employment you had prior to what you just discussed,

25   was it in 2020 when you were the chair of the Finance Committee for the Trump Victory

1    Committee?

2    A    No.

3    Q    Was there employment in between that?

4    A    No.  Meaning the election was November 3rd.  That was my position then

5    was as national finance chair.

6    Q    Yes.

7    A    Trump Victory Finance Committee, Campaign Donald J. Trump for President.

8    Q    Let me ask this a better way so it's more clear.

9    A    Sure.

10   Q    Let's just go back in time.  Tell us where you're working now, the job before

11   that, the job before that.  That's what I was trying to ask, is before you were working for

12   MAGA Again and MAGA Policies and the self-employment.

13   A    Yes.  I didn't start that till like April of last year.

14   Q    Okay.  And before that, what job did you have?

15   A    Well, I guess I was unemployed.

16   Q    When you say unemployed, were you still doing work through Tru Media?

17   A    Not work like through or to Tru Media.  I don't even know if I had anything,

18   you know, in between that time.  A little bit of consulting, et cetera.  But there was

19   basically a break.

20   Q    Okay.  And before that, the break?

21   A    I worked for Donald J. Trump for President.

22   Q    And what was your title then?

23   A    National Chair for Trump Victory Finance Committee.

24   Q    Okay.  And do you remember what time period that was?

25   A    Well, I was also senior adviser to the President.  So I had two titles.  I

1    started out as senior adviser to the President, and then they added additional job
2    responsibilities for me, which was to oversee and run the finance campaign.
3            ▮▮▮▮▮▮▮▮▮  Sorry to interrupt, Ms. Guilfoyle.   If you don't mind
4    speaking up just a bit louder.
5            The Witness.   Oh, really.   Sorry.
6            ▮▮▮▮▮▮▮▮▮  I think folks on the Webex are having a bit of trouble
7    understanding.
8            Mr. Tacopina.   Should I move that closer?
9            ▮▮▮▮▮▮▮▮▮  Yeah, that would be great, Joe.
10           Mr. Tacopina.   Do you want me to move over?
11           ▮▮▮▮▮  That's totally up to you.   It might be actually a lot easier.
12           Thank you.   We appreciate it.   Thank you.   We do appreciate the
13    accommodation.
14                          BY ▮▮▮▮▮
15       Q    And a moment ago, we were talking about your employment history.
16       A    Yes.
17       Q    You had said you were an adviser to the President, and then you also
18    acquired the title related to the Finance Committee.
19           To the best you can remember, can you give us the estimated dates of when you
20    started as an adviser and then when you picked up the additional role?
21       A    You know, I can't, because had I been told that I was going to need to
22    prepare for that, I would have gone back and researched the exact dates.   It's like
23    people ask me what day did you get married or what day did you get divorced?
24    Sometimes you just don't know those things off the top of your head and then you google
25    yourself.

1      Q     That's fair.   And you're right, we probably can google it.   So if you can't
2  remember, it's not the end of the world.
3      A     But can I tell you this to be helpful and just cut to the chase?
4      Q     Sure.
5      A     Here's the thing.   So I worked, you know, media/television forever, right?
6  MSNBC, CNN, Court TV, FOX News, all of the above.
7          Then I left FOX and went to work for the President at America First Super PAC.
8  From there, I was then asked to join the campaign for Donald J. Trump for President, and I
9  transitioned from the PAC to the campaign.
10         My first role was as senior adviser to the President working on the campaign,
11 attending events, giving speeches, et cetera, whatever was needed.   And then I became
12 also, in addition to that role, the national finance chair.   It's been called national finance
13 chair, national finance chairwoman, Trump Victory Finance Committee.   It's the same
14 job.
15     Q     That was fantastic.   And any time you want to cut to the chase and get to
16 where I'm --
17     A     Yes.
18     Q     -- going like that in an answer, please feel free.   That was a super helpful
19 summary.
20     A     Sure.
21     Q     In your role working for the Trump Victory Committee, can you describe
22 what you were doing?
23     A     Yes.   So I was the principal and chief fundraiser for then President Trump,
24 who was seeking reelection for the 2020 election.   So my job was to do calls, do events,
25 plan them, invite people to attend.   And I would do calls every single day.   And I was on

1    the road, I mean, sometimes six States in a day doing events and campaigning.

2        Q    And I'm sorry, I didn't mean to cut you off.

3             This was a focus on individual donors or would you say high-level donors?

4        A    I focused on anybody I could that was going to give a contribution to the

5    President.   That included what we call low-dollar, small-dollar contributions.   It also

6    included what we would refer to as major donors.

7             I would also seek out people who had given in the past, because my staff would

8    give me lists of people to call.   So if someone had lapsed as a donor, I might target some

9    of those people that had been engaged in 2016 and we hadn't received a donation from.

10           ▓▓▓▓▓   Are we okay?   She may be beating me in terms of speed.

11            [Reporter responds.]

12            The Witness.   I was waiting for that.   I'm surprised someone didn't complain.

13           ▓▓▓▓▓   No, no, it's okay.   We just try to make sure that the record is clear.

14                    BY ▓▓▓▓▓

15       Q    And did you have a staff when you were working for the Trump Victory

16   Committee?

17       A    Yes, I did.

18       Q    Who worked for you?

19       A    So many people.

20       Q    To the best that you can recollect, just direct reports?

21       A    Everybody reported to me.

22       Q    Directly?

23       A    Well, anything that was going on with Trump Victory, they would come to

24   me or ask me a question.   It wasn't like somebody wasn't allowed to speak to me, you

25   know.

1       So there was just various roles.   There's people that are helping with putting
2   together a call list.   There's people that are helping with my ground operation, which
3   would be checking in people when they attend an event, people that were going to
4   receive a photo with the President, running a click line, which is the photos, that type of
5   thing.   So it was like ground game, logistics, finance, fundraising, all the above.
6       Q    Did Caroline Wren work for you while you were working on the Trump
7   Victory Committee?
8       A    She was one of the people on the team, yes.
9       Q    Do you remember what her title was?
10      A    I don't remember what her specific title was, quite frankly.   She probably
11  used different ones every day.
12      Q    Do you remember what your role -- what her role was?
13      A    Her role was fundraising as well for the President.   And she would do calls
14  with me on many occasions, providing lists, or we'd go over how an event would be, or, in
15  fact, choosing a location, talking about what donor might want to host the President.
16      Q    Do you remember her having her own fundraising list that she brought in, or
17  did she rely on your lists?
18      A    We relied -- well, as far as I know, I relied on the list that we had from the
19  prior campaign and whatever was in the database.
20      Q    Did you ever have awareness of her bringing in her own list or having a list of
21  donors that she provided?
22      A    I don't recall that.
23      Q    Okay.  And did Mr. Budowich work for Trump Victory Committee?
24      A    Taylor?
25      Q    Uh-huh.

1   A   I don't even know if he was there.  I have no recollection.

2   Q   That's fair.  When Mr. Surabian's --

3   A   Do you know?

4   Q   Oh, well, if we did, it wouldn't be pertinent.

5   A   Well, I'm just asking.

6   Mr. Tacopina.  Don't worry about it.  We'll get the other question later.

7   ▮▮▮▮▮  No, you're fine.

8   BY ▮▮▮▮▮

9   Q   What do you think he meant that -- let's assume for a moment that KG there

10  refers to you -- when he says, Her getting blown up bad for Don, was it frequent for him

11  to kind of weigh in, in terms of things that might be good or bad for Don?

12  A   I can't speculate about that.

13  Q   Okay.  You have no knowledge of his role as an adviser with Don Jr.?

14  A   No.  I already told you that he worked during the campaign as an adviser,

15  but I can't speculate about, you know, what he's saying here, with this.

16  Q   Okay.  So just to be clear, because I just want to finish this up --

17  A   Yeah.

18  Q   -- you never spoke with Surabian or Schwartz about their feelings about you

19  and Don speaking at the January 6th rally?

20  A   I don't have a recollection of having a specific conversation with him.  I

21  don't even know if I even spoke to Andy during that time.

22  Q   And you don't remember Don Jr. ever having conversations with you about

23  what they advised him about?

24  A   No, I do not.

25  Q   Okay.

1    A    But that doesn't mean they didn't have a conversation with him.   And I also
2    have no personal knowledge of that.
3    Q    That's fair.   Earlier I believe you said something to the effect of, you were
4    hesitant to speak on January 6th.   Others have actually characterized you as being
5    hesitant to speak and not really wanting to go to D.C. that day until Don agreed to it.
6    Would you agree to that characterization?
7    A    Yes, I did not want to go to D.C.
8    Q    Okay.
9    A    But once we were already going to be in D.C., the right thing to do was to be
10   supportive to the family and the President.
11   Q    Okay.   So in his text, Mr. Surabian actually characterizes that you forced
12   yourself on the stage.   Would you agree or disagree with that characterization?
13   A    I would 1,000 percent disagree with that, and how would he know that?
14   Sounds like there's hearsay from Katrina Pierson that Mr. Budowich was referring to
15   there.   I just know what Katrina has relayed, though.
16   Q    That's fair.
17   A    So this is Katrina Pierson, once again, creating problems.
18   Q    And sitting here right now, to the best of your recollection, when do you
19   remember Don Jr. actually agreeing to speak on January 6th?
20   A    On January 1st, when we said, Okay, I guess we'll go.
21   Q    Okay.   Do you remember discussing -- or so, so far, it sounds like you
22   discussed the speaking fees with Caroline Wren, because she mentioned the Turning
23   Point.
24   A    She brought it up to me again.   Don Jr. or myself never solicited a speaking
25   fee.   She brought it to my attention, and said, Charlie Kirk is going to pay you guys.

| | | |
|---|---|---|
| 1 | | But, again, we had done work for him toward the end of the year, in December, at the |
| 2 | | Student Action Summit.   So this was not anything that would seem out of the ordinary. |
| 3 | Q | And regarding the speaking fees, did you have conversations about the fees |
| 4 | | with Don Jr.? |
| 5 | A | At some point, yes, but I don't recall when. |
| 6 | Q | To the extent that you remember any conversation with Don Jr. about the |
| 7 | | speaking fees, can you tell us about those? |
| 8 | A | No.   Because I don't have any recollection of any specificity right now. |
| 9 | Q | Okay. |
| 10 | A | Just that Charlie Kirk, Turning Point USA, was paying us. |
| 11 | Q | Did you ever speak with Mr. Kirk about the fees? |
| 12 | A | Not that I recall, no. |
| 13 | Q | Did you ever speak with anyone at Turning Point about the fees? |
| 14 | A | Not that I recall, no. |
| 15 | Q | Okay.   Did you talk with Mr. Budowich about the speakers' fees? |
| 16 | A | Not that I recall. |
| 17 | Q | And do you remember ever talking with Don's advisers -- Surabian and |
| 18 | | Schwartz -- about the fee specifically? |
| 19 | A | Not that I recall, no. |
| 20 | Q | Okay.   If we could, on January 5th, do you remember having conversations |
| 21 | | with your personal banker, Mr. Suarez, at JPMorgan? |
| 22 | A | Jose Suarez? |
| 23 | Q | I think that's right. |
| 24 | A | What date? |
| 25 | Q | This would've been on January 5th.   Do you remember emailing him? |

| | | |
|---|---|---|
| 1 | A | If you have it in front of you, if you can direct my attention to it. |
| 2 | Q | Yeah.  If we can pull up exhibit 5. |
| 3 | A | Okay, great. |
| 4 | Q | So if you start at the bottom, I believe this is the earlier email on January 5th, |
| 5 | | and then the top email is Mr. Suarez' response on January 6th. |
| 6 | A | Yes.  So, okay, I'm reading the bottom part and then? |
| 7 | Q | So do you remember contacting Mr. Suarez on January 5th regarding -- and |
| 8 | | I'm just going to read the body of the email.  Hi, it's Kimberly.  Did 60K hit Tru Media |
| 9 | | account? |
| 10 | A | I don't, like, recall, but I see this email so, yes. |
| 11 | Q | Do you remember why you would've emailed him on the 5th to check on |
| 12 | | those funds? |
| 13 | A | Oh, because he works at Chase, and that's where the bank account is. |
| 14 | Q | And specific -- |
| 15 | A | He was like my -- you know, like, you have an investor, adviser, a private |
| 16 | | bank, whatever it is. |
| 17 | Q | Like a private banker? |
| 18 | A | He was, like, my point of contact. |
| 19 | Q | Okay.  But do you remember -- were you concerned that the funds -- |
| 20 | A | And I had been on the road and I asked him, hey, did some -- you know, |
| 21 | | that's pretty ordinary for me to ask him. |
| 22 | Q | So it was pretty ordinary for you to check in with him to see if funds had hit |
| 23 | | the account? |
| 24 | A | Yes. |
| 25 | Q | Okay. |