# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BARBARA J. LEE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | **Case No. 21-cv-00400 (APM)**<br><br>***Consolidated Cases:***<br>*21-cv-00586 (APM)*<br>*21-cv-00858 (APM)*<br>*21-cv-02265 (APM)*<br>*21-cv-00010 (APM)*<br>*21-cv-00011 (APM)*<br>*21-cv-00034 (APM)*<br>*21-cv-00038 (APM)* |

## PRESIDENT DONALD J. TRUMP'S OBJECTION TO ADMISSION OF SELECT COMMITTEE FINAL REPORT

Jonathan M. Shaw
D.C. Bar No. 446249
Gerald A. Urbanek, Jr.
VA Bar No. 95043
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite
608 Alexandria, VA 22314
Telephone: (703) 574-1206
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com
gurbanek@dhillonlaw.com

Scott Gessler
GESSLER BLUE LAW
7350 E. Progress Place, Suite 100
Greenwood Village, CO 80111
Telephone: (720) 839-6637
sgessler@gesslerblue.com

Jesse R. Binnall
D.C. Bar No. VA022
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria VA 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ ii

    A.    The Select Committee's Report is inadmissible hearsay because it is not trustworthy. .................................................................................................... 3

    B.    The Select Committee Report contains inadmissible multi-level hearsay. ............... 21

    C.    Plaintiffs are impermissibly sandbagging President Trump by introducing portions of the Select Committee Report that they did not identify in their discovery responses. ................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. City of New York*,
657 F. Supp. 1571 (S.D.N.Y. 1987) ........................................... 5

*Baker v. Firestone Tire & Rubber Co.*,
793 F.2d 1196 (11th Cir. 1986) ................................................ 7

*Barry v. Trustees of International Ass'n Full-Time Salaried Officers & Employees of Outside Local Unions & District Counsel's (Iron Workers) Pension Plan*,
467 F. Supp. 2d 91 (D.D.C. 2006) ................................. 5, 6, 7, 9

*Beech Aircraft Corp. v. Rainey*,
488 U.S. 153 (1988) ................................................................ 4, 5

*Bright v. Firestone Tire & Rubber Co.*,
756 F.2d 19 (6th Cir.1984) ....................................................... 7

*Knight Pub. Co. v. U.S. Dept. of Justice*,
631 F. Supp. 1175 (W.D.N.C. 1986) ........................................ 5

*Pearce v. E.F. Hutton Grp., Inc.*,
653 F. Supp. 810 (D.D.C. 1987) ............................................ 6, 7

*United States v. Am. Tel. & Tel. Co.*,
498 F. Supp. 353 (D.D.C. 1980) ............................................... 7

**Rules**

FRCP 37(c)(1) .......................................................................... 27

FRE 104(a) ................................................................................. 3

FRE 803(8)(C) ........................................................................ 1, 4

Plaintiffs seek to rely on the Final Report of the Select Committee investigating the events of January 6, 2021, contained at Exhibit 115. But it is inadmissible hearsay not within any exception and must be excluded. Plaintiffs will undoubtedly argue that it comes in under FRE 803(8)(C), which permits the introduction of public records and reports except where "circumstances indicate lack of trustworthiness." FRE 803(8)(C). In the context of Congressional reports—like the Select Committee's Report—this has meant that courts decline to admit them where political motivations *may* have infected the findings.

Here, the Select Committee's Report was a quintessentially political document, one that was palpably intended to make a political case against President Trump. As shown below, its members were hand-picked by the Democratic Speaker, who—in a radical departure from House rules and custom—refused to seat the minority members selected by the Republican Minority Leader but instead chose two Republican opponents of President Trump to give her political show a veneer of bipartisanship. The Select Committee thus operated without a real Minority. It also operated without a minority staff. Witnesses were not subjected to cross-examination. Evidence and witnesses who did not fit the preferred political narrative were not heard or were buried by the Select Committee. And live hearings were orchestrated by a TV producer hired by the majority to create a better show to aid their prospects in the mid-term elections. All in aid of producing a political show trial for public consumption.

How do we know this?

A two-year investigation conducted by the House Administration Subcommittee on Oversight during the 118th Congress—a Subcommittee that in marked contrast to the Select Committee followed Congress's normal rules and procedures—provides a devastating analysis of

the ways in which the Select Committee departed from normal practice and any legitimate fact-finding role:

> Speaker Pelosi and House Democrats spent millions of taxpayer dollars on their politically motivated Select Committee yet failed to accurately, and in a bipartisan manner, investigate the security failures of that day. Instead, the members of the Select Committee were laser-focused on their effort to promote their false, pre-determined narrative that President Trump was personally responsible for the breach of the Capitol on January 6 and should therefore be held accountable, by any means necessary.
>
> Throughout its nearly two years of work, the Select Committee presented uncorroborated, cherry-picked, and, at times, false evidence that fit its narrative. The Select Committee did not attempt to hide its bias, and, in fact, memorialized its own failures and prejudice when it published its Final Report in December 2022. A review of the nearly one-thousand-page report reveals Speaker Pelosi's multimillion-dollar Select Committee was a political weapon with a singular focus to deceive the public into blaming President Trump for the violence on January 6 and to tarnish the legacy of his first Presidency.[1]

The two reports issued by the House Administration Subcommittee, which President Trump incorporates by reference herein, demonstrate overwhelmingly that the Select Committee operated with a political motive and, accordingly, should be deemed untrustworthy for purposes of the public records exception.

In determining the admissibility of the Select Committee's Report, the Court may properly consider the work of the House Administration Subcommittee, as well as the other evidence

---

[1] Exhibit A, Interim Report on the Failures and Politicization of the January 6th Select Committee, House Administration Subcommittee on Oversight (Dec. 17, 2024) at p. 6 (available at https://urldefense.com/v3/__https://house.us20.list-manage.com/track/click?u=67fba463240fdd948eb636b35&id=98b83b09bb&e=78c2da916b__;!!Bg5easoyC-OII2vlEqY8mTBrtW-N4OJKAQ!LOYiu6xRDUv101goRtii0iusaxxwEEu9Sp1x8TRblAGOiV-Hv8Wam4Tv8Dd-w-8PyuL6K8vSfq98Zy827IIjjjxX65EftxkGXZJvvGOV6nM_ePAq7A$). *See also* Exhibit B , Initial Findings Report on the Failures and Politicization of the January 6th Select Committee and the Activities on and Leading up to January 6, 2021, House Administration Subcommittee on Oversight (Mar. 11, 2024). All Exhibits to this Objection are appended to the Declaration of Gerald Urbanek.

offered to support this objection. Under Fed. R. of Evid. 104(a), "The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."

As a preliminary matter, therefore, this Court must first review that evidence to determine whether the Select Committee Report is reliable enough to be admitted into evidence. It is not. Bluntly put, the Report was not a product of a bipartisan, reliable process that produced accurate or reliable conclusions. The Select Committee's history, the members that served on the Committee, the intense controversy and anger produced by the Committee's Report, and subsequent revelations regarding the Committee's biased and one-sided behavior all demonstrate that the Select Committee's Report is untrustworthy and should not be admitted into evidence.

In addition, even if the report were not wholly barred as hearsay, many of the statements within it constitute multiple-level hearsay, which must also be excluded unless each such statement comes within a separate exception.

There is a further problem as well. During immunity discovery in this matter, President Trump asked plaintiffs to identify what supposed facts from the Select Committee Report they intended to use to support their immunity arguments. They identified only a handful. Yet their brief and supporting materials cite to many more than were identified in their discovery responses. This sort of sandbagging should not be permitted. Regardless of any hearsay objection, the Court should refuse to admit any material from the Select Committee Report not timely identified in response to President Trump's discovery requests.

A.    **The Select Committee's Report is inadmissible hearsay because it is not trustworthy.**

Courts have never held that congressional reports deserve special treatment or presumptive reliability in evidentiary matters. To the contrary, they are hearsay and inadmissible unless they come within an exception.  And the Select Committee's report does not.  The Report itself does

not fit within any exception to the hearsay rule, including F.R.E. 803(8)(C), which states that public records and reports "in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law" are exceptions to the hearsay bar "[u]nless the sources of information or other circumstances indicate lack of trustworthiness."

The Supreme Court has endorsed a four-part test to detect a lack of trustworthiness of a government record pursuant to 803(8), *see Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 n.11 (1988), and that test was applied and considered in depth by this Court in *Barry v. Trustees of International Ass'n Full-Time Salaried Officers & Employees of Outside Local Unions & District Counsel's (Iron Workers) Pension Plan*. *See* 467 F. Supp. 2d 91, 96 (D.D.C. 2006). Upon drafting the rule, "[t]he Advisory Committee proposed a nonexclusive list of four factors it thought would be helpful in passing on the trustworthiness question: (1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." *Beech*, 488 U.S. at 168 n.11 (citation omitted).

Significantly, "Congressional reports are not entitled to an additional presumption of trustworthiness or reliability . . . simply by virtue of having been produced by Congress. To the contrary, a number of cases . . . have declined to admit Congressional reports under Rule 803(8)(C)." *Barry*, 467 F. Supp. 2d at 98 (citations omitted). Per *Barry*, a search for problematic motivations behind Congressional reports must consider "(1) whether the findings and conclusions in a Congressional report are the product of serious investigation rather than political grandstanding, and, relatedly, (2) whether members of the minority party refused to join in the

report or otherwise noted their dissent." *Id.* at 100.  As shown below, the evidence of political grandstanding and minority party dissent here are overwhelming.

Courts are noticeably wary of Congressional reports, recognizing that political motivations undercut their reliability. *See, e.g., Anderson v. City of New York*, 657 F. Supp. 1571, 1579 (S.D.N.Y. 1987) (quoting *Knight Pub. Co. v. U.S. Dept. of Justice*, 631 F. Supp. 1175, 1178 (W.D.N.C. 1986) ("[C]ongressional committee hearings are oft time conducted in a circus atmosphere, with a gracious plenty of posturing by the politicians for T.V. publicity in large part for benefit of constituents back home. . . ."); *Pearce v. E.F. Hutton Grp., Inc.*, 653 F. Supp. 810, 814 (D.D.C. 1987) ("Given the obviously political nature of Congress, it is questionable whether any report by a committee or subcommittee of that body could be admitted under rule 803(8)(C) against a private party."); *see also, Barry*, 467 F. Supp. at 98-99 (collecting cases). When courts have considered congressional reports "those courts focused on (1) whether the findings and conclusions in a Congressional report are the product of serious investigation rather than political grandstanding, and, relatedly, (2) whether members of the minority party refused to join in the report or otherwise noted their dissent." *Barry*, 467 F. Supp. at 100.

*Barry* determined a congressional report was rendered untrustworthy for purposes of Rule 803(8) where the report was based on "a strongly partisan foundation." *Id.* at 101. It acknowledged the reality that Congress's political nature means its investigations are likely to veer into partisan "grandstanding," as opposed to honest fact-finding investigations resembling a judicial process. *Id.* at 98-99 ("This consideration of party-line voting reflects both the reality of the political process and the intuitive notion that reports that are truly reliable on a methodological and procedural level are less likely to provoke bitter divisions than those that have politics, rather than policy or truth-seeking, as their ultimate objective."). While not dispositive, a lack of partisan agreement indicates

that a report is a product of partisan considerations rather than true fact-finding, and such reports do not justify admission as judicial evidence. *Id.* at 99. The *Barry* court further indicated that, when evaluating the fourth factor, "courts should be wary of *any* motivation problems." *Id.* (emphasis added).

Consequently, courts do not look at the four factors as a balancing test, but rather as a threshold inquiry for trustworthiness and reliability. "The rule permits the introduction into evidence of the factual findings of an objective government investigation." *Baker v. Firestone Tire & Rubber Co.*, 793 F.2d 1196, 1199 (11th Cir. 1986). *Baker* held that a congressional subcommittee report "was properly omitted from evidence" because the "report did not contain the factual findings necessary to an objective investigation, but consisted of the rather heated conclusions of a politically motivated hearing." *Id.* at 1199 (citing *Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19, 22–23 (6th Cir.1984)). Where the motivation of a congressional report is suspect, it is not afforded the same credibility as an apolitical government body performing a quasi-judicial or other sober, non-partisan fact-finding exercise. *See Pearce v. E.F. Hutton Grp., Inc.*, 653 F. Supp. 810, 813-14 (D.D.C. 1987) ("[I]t is significant that the public agency which made these findings is an independent regulatory commission . . . operating under stringent procedural guidelines on a public record. . . . *That circumstance provides an element of trustworthiness which might not be present with respect to a public record generated by a person or body lacking these characteristics*." (quoting *United States v. Am. Tel. & Tel. Co.*, 498 F. Supp. 353, 366 (D.D.C. 1980))) (emphasis added).

Here, as the House Administration Subcommittee's Reports and the other evidence marshalled below demonstrate, the Select Committee's Report fails even to come close to clearing

the trustworthiness bar, due to its political bias, committee composition, and its members' partisan motivations.

The Select Committee consisted of nine members (seven Democrats and only two Republicans), who each held deep personal and political animus towards President Trump. And they made no effort to conceal it. President Trump had been impeached by the House for incitement of insurrection and acquitted of that charge by the Senate; every one of the nine members of the Select Committee voted to impeach President Trump, and then as members of the committee used the opportunity to inveigh ceaselessly against President Trump. Impeaching Donald John Trump, President of the United States, for High Crimes and Misdemeanors, H. 24, 117th                                   Cong.                                   (2021); https://www.senate.gov/legislative/LIS/roll_call_votes/vote1171/vote_117_1_00059.htm (last visited on October 16, 2023). One, Representative Raskin, had actually served as the lead impeachment manager for the House. Thus, the Select Committee was heavily biased against President Trump, containing not even one member who could be described as neutral (let alone favorable) toward him.

Out of the more than 200 Republicans in Congress at the time, the two who joined the committee were selected by the Democrat Speaker of the House, not by House Republican leadership, in a shocking break with House tradition. And those two had openly attacked President Trump. And like every one of the seven Democrat members, both had voted to impeach him for the events of January 6th. Thus, far from a neutral panel, the Select Committee consisted of nine members, handpicked by the Democrat Speaker of the House, who were on record before their selection that they each blamed President Trump for the events of January 6th. Given its

composition alone, therefore, this Court should find the Select Committee Report does not meet the required level of trustworthiness.

The Select Committed Report is more akin to the House report, than the Senate report, discussed in *Barry*. *See Barry*, 467 F. Supp. 2d at 100-01. Unlike the Senate Report at issue in *Barry*, the Select Committee Report was not only the product of bias and political grandstanding but was also discredited by the lack of any proper involvement of the minority party, and lack of opportunity for effective dissent. *See Id*. It was also full of "inflammatory rhetoric." *See Id*. at 101. While the Select Committee relied on cherry-picked witnesses and one-sided evidence to furnish the report—a report that set out to prove a predetermined political narrative despite the failed impeachment—as shown below, the bias of its members found full expression in its operations.

As Congressman Troy Nehls explains in his declaration, "Any assertion that the Select Committee was established or run to produce a reliable, bipartisan, factual investigation is simply false. . . . [T]he Select Committee was established and run as a highly partisan kangaroo court, intended to create support for the Democrat Party's favored political narrative."[2] After a failed attempt to establish a bipartisan commission, on June 28, 2021, then-Speaker Nancy Pelosi introduced H. Res. 503, "Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol." Two days later, the House passed H. Res. 503 on a near party-line vote of 222 yeas and 190 nays. Notably, only two Republicans—Reps. Cheney and Kinzinger, who were President Trump's political rivals and had voted to impeach him for the events of January 6—voted in favor of H. Res. 503. Kristin Wilson and Clare Foran, *Only two House Republicans vote for the January 6 select committee*, CNN, June 30, 2021, available at:

---

[2] Declaration of Congressman Troy Nehls, October 17, 2023, ¶¶ 2, 25.

https://edition.cnn.com/2021/06/30/politics/republicans-january-6-select-committee-vote/index.html (last visited Oct. 16, 2023).

H. Res. 503 instructed the Speaker to appoint thirteen members to the Committee, only five of which "shall be appointed after consultation with the minority leader." Thus, from the beginning, the Select Committee was designed to have an 8-5 imbalance that substantially favored the Democrat majority predisposed to criticize President Trump and blame him for all violence that took place on January 6, 2021. Speaker Pelosi appointed Chairman Thompson—one of the original plaintiffs in this litigation—to serve as chair of the Committee and appointed six additional Democrat members: Reps. Lofgren, Schiff, Aguilar, Murphy (FL), Raskin, and Luria. She also appointed Republican Rep. Cheney without any designation of position. Then-House Minority Leader Kevin McCarthy recommended five Republican members to serve on the Committee, consistent with H. Res. 503: Rep. Jim Banks of Indiana to serve as Ranking Member and Reps. Rodney Davis of Illinois, Jim Jordan of Ohio, Kelly Armstrong of North Dakota, and Troy Nehls of Texas to serve as additional minority members. Unwilling to allow an effective minority position on the Select Committee—even with the pre-baked 8-5 Democrat majority—Speaker Pelosi refused to appoint Rep. Banks to serve as Ranking Member. Nor did she appoint any of Minority Leader McCarthy's other recommended minority members. In a public statement, she acknowledged that her refusal to appoint the members recommended by the then-Minority Leader was an "unprecedented decision." Press Release, Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol (July 21, 2021), available at: https://web.archive.org/web/20211222223910/https://www.speaker.gov/newsroom/72121-2 (last visited Oct. 16, 2023).

Instead, Speaker Pelosi appointed Rep. Kinzinger—the only Republican other than Rep. Cheney who voted in favor of H. Res. 503—and left four vacancies. Exhibit C, McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee, Jul. 21, 2021, available at: https://www.speaker.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/ (last visited Oct. 16, 2023).

On July 21, 2021, Minority Leader McCarthy issued a statement condemning Speaker Pelosi's partisan actions and sheer abuse of power:

> Speaker Nancy Pelosi has taken the unprecedented step of denying the minority party's picks for the Select Committee on January 6. This represents an egregious abuse of power and will irreparably damage this institution. Denying the voices of members who have served in the military and law enforcement, as well as leaders of standing committees, has made it undeniable that this panel has lost all legitimacy and credibility and shows the Speaker is more interested in playing politics than seeking the truth.
>
> Unless Speaker Pelosi reverses course and seats all five Republican nominees, Republicans will not be party to their sham process and will instead pursue our own investigation of the facts.

*Id*.

The obvious and intended result of Speaker Pelosi's actions was that the Select Committee effectively lacked minority party representation. Witnesses who disagreed with the Select Committee's narrative were therefore not called, cross-examination of witnesses was not done, a minority report was not issued, and findings regarding failures of House security, intelligence, and communications problems that contributed to the events of January 6th were not included in the January 6th Report. Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair (Sept. 2, 2021), available at: https://january6th-benniethompson.house.gov/news/press-releases/chairman-thompson-announces-representative-

cheney-select-committee-vice-chair (last visited Oct. 16, 2023). And, thus, from the very beginning of its life, the Select Committee was an exercise in harsh partisanship.

The Committee was irregularly composed from the beginning. For example, House Rule XI(2)(d) instructs that a committee chair shall designate "[a] member of the majority party . . . as vice chair of the committee." On September 2, 2021, Chairman Thompson announced in a press release that "he has named Representative Liz Cheney (R-WY) to serve as the Vice Chair of the Select Committee."[3] Rep. Cheney was a member of the Republican Conference of the House of Representatives, and thus was not formally a member of the majority party. That she was nonetheless designated for the position of Vice Chair of the Select Committee—and was given one of the 8 seats originally designated for a Democrat member—is ample indication that she was understood to be what she was: a fanatical political opponent of President Trump, wholly aligned with Democratic leadership, who used her Select Committee membership to target President Trump politically.

Similarly, the Select Committee never had a ranking minority member, even though under the House Resolution certain aspects of its operations required the participation of a minority ranking member. For example, H. Res. 503 provides: "The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions." But neither H. Res. 503 nor the House Rules define the term "ranking minority member." That term, by custom and practice of the House, is defined by the parties themselves in their respective Conference and Caucus Rules. Under Rule 14 of the Republican Conference Rules of the 117th Congress, a member's designation as the ranking Republican member of a committee comes only through

_____

[3] *Id.* at ¶ 10; *See* Exhibit D, Chairman Thompson Announces Representative Cheney As Select Committee Vice Chair, Sept. 2, 2021.

nomination by the Steering Committee and election by the Conference. Rule 13 provides that, for a Select Committee, such nominations *shall* be made by the minority leader. No ranking minority member was ever designated in accordance with the Republican Conference Rules for the Committee. Therefore, the Committee had no ranking minority member. As a result, none of the depositions taken by the Committee were taken in conformity with the requirements of H. Res. 503.

The Committee held its first hearing on July 27, 2021. Press Release, Select Committee, Select Committee to Investigate the January 6th Attack on the United States Capitol to Hold First Hearing July 27th (Jul. 20, 2021), available at: https://january6th-benniethompson.house.gov/news/press-releases/select-committee-investigate-january-6th-attack-united-states-capitol-hold-first (last visited Oct. 16, 2023).

 After the hearing, Chairman Thompson reportedly "told reporters the select committee could have another hearing in August while the House is scheduled to be in a seven-week recess." Melissa Macaya et al., *Capitol Riot Committee Holds First Hearing*, CNN (Jul. 27, 2021), available at: https://www.cnn.com/politics/live-news/jan-6-house-select-committee-hearing-07-27-21/h_f000be289ea8ac4e1fb4b992b3d0b80e (last visited Oct. 16, 2023).

But the Committee did not have another hearing in August 2021; nor did it have another hearing for the remainder of 2021. Instead, the Committee waited almost a year to hold a second hearing, holding it on June 9, 2022, right at or before the majority of the 2022 midterm primary and primary runoff elections. The Committee subsequently held seven additional hearings during the summer of 2022: on June 13, 2022, June 16, 2022, June 21, 2022, June 23, 2022, June 28,

2022, July 12, 2022, and July 21, 2022.[4] After holding no hearings for two and a half months, the Committee decided to hold one more hearing on October 13, 2022—less than one month before the 2022 midterm elections.

It is no secret that the two nominally Republican Select Committee members—each of whom had declared their positions when they voted to impeach President Trump well before the Select Committee was formed—harshly criticized President Trump throughout the life of the Committee, often on matters having nothing to do with the events of January 6th. For example, at the October 13, 2022, hearing of the Committee, Congressman Kinzinger focused on his policy disagreements with President Trump's orders as commander in chief of the armed forces, stating "President Trump issued an order for large-scale US troop withdrawals. He disregarded concerns about the consequences for fragile governments on the front lines of the fight against ISIS and Al-Qaeda terrorists." Congressman Kinzinger further referenced conversations between the President and his subordinates, including General Keith Kellogg, National Security Advisor to the Vice President, and General Mark Milley, Chairman, Joint Chiefs of Staff.[5] Of course, none of this had anything to do with the events of January 6. Numerous articles highlight both Rep. Kinzinger and Cheney's anti-Trump bias and their continued obsession with President Trump.[6]

---

[4] Nehls Decl., ¶ 19; Exhibit E, Select Committee, Past Hearings, available at: https://january6th-benniethompson.house.gov/news/press-releases/thompson-cheney-opening-statements-select-committee-hearing (last visited Oct. 16, 2023).

[5] *Id.* at ¶¶ 20-21.

[6] Exhibit F, Brian Naylor, *GOP Rep. Adam Kinzinger, who voted to impeach Trump, won't run for reelection*, NPR, October 29, 2021, available at: https://www.npr.org/2021/10/29/1050454729/gop-rep-adam-kinzinger-who-voted-to-impeach-trump-wont-run-for-reelection (last visited Oct. 16, 2023); Exhibit G, Steve Peoples and Paul Weber, *Kinzinger goes to Texas in search of anti-Trump Republicans*, Associated Press, April 30, 2021, available at: https://apnews.com/article/donald-trump-adam-kinzinger-elections-illinois-political-organizations-4a8ca7b3e66818622c146c7b65f04aaf (last visited Oct. 16, 2023); Exhibit H, Rick Pearson, *US Rep. Adam Kinzinger says he'll focus on GOP anti-Trump movement rather than run for statewide office*, Chicago Tribune, Jan. 5, 2022, available at:

The Select Committee issued the January 6th Report on December 22, 2022. But throughout its lifespan, its partisan rancor was the subject of criticism. From its inception, Americans saw through the partisanship. Poll results released in August 2021 confirmed that perception:

> A majority of voters say they believe the House select committee investigating the Jan. 6 attack on the Capitol is biased, according to a new Harvard CAPS-Harris Poll survey. Fifty-eight percent of voters polled said they believed the committee set up by Speaker Nancy Pelosi (D-Calif.) was biased, while 42 percent said they thought it was fair. Americans want an examination of the riots over the summer and the origins of the virus over investigating Jan. 6th," said Mark Penn, the co-director of the Harvard CAPS-Harris Poll survey. "The voters reject the Pelosi move to toss Republicans off of the committee and see it now as just a partisan exercise."[7]

One year after the events of January 6th, Minority Leader McCarthy stated, "Unfortunately, one year later, the majority party seems no closer to answering the central question of how the Capitol was left so unprepared and what must be done to ensure it never happens again . . . . Instead, they are using it as a partisan political weapon to further divide our country."[8] Shortly thereafter, Minority Leader McCarthy stated, "It is not serving any legislative purpose. The committee's only objective is to attempt to damage its political opponents — acting like the Democrat Congressional Campaign Committee one day and the DOJ the next." He continued:

---

https://web.archive.org/web/20220201044329/https://www.chicagotribune.com/politics/ct-adam-kinzinger-trump-20220106-6lm6rmlikvhefnah5p5y3pcgea-story.html (last visited Oct. 16, 2023); Exhibit I, Kristina Peterson, *Liz Cheney Draws More GOP Fire Over Anti-Trump Stance*, Wall Street Journal, May 4, 2021, available at: https://www.wsj.com/articles/liz-cheney-draws-more-gop-fire-over-anti-trump-stance-11620161615 (last visited Oct. 16, 2023); Exhibit J, Julia Manchester, *58 percent say Jan. 6 House committee is biased: poll*, The Hill, Aug. 2, 2021, available at: https://thehill.com/homenews/house/565981-58-percent-say-jan-6-commission-is-biased-poll/ (last visited Oct. 16, 2023).

[7] Exhibit K.

[8] Exhibit L, Monique Beals, *McCarthy says Democrats using Jan. 6 as 'partisan political weapon'*, The Hill, Jan. 2, 2022, available at: https://thehill.com/homenews/house/587954-mccarthy-says-democrats-using-jan-6-as-partisan-political-weapon-ahead-of/ (last visited Oct. 16, 2023).

The committee has demanded testimony from staffers who applied for First Amendment permits. It has subpoenaed the call records of private citizens and their financial records from banks while demanding secrecy not supported by law. It has lied about the contents of documents it has received. It has held individuals in contempt of Congress for exercising their Constitutional right to avail themselves of judicial proceedings. And now it wants to interview me about public statements that have been shared with the world, and private conversations not remotely related to the violence that unfolded at the Capitol. I have nothing else to add.

As a representative and the leader of the minority party, it is with neither regret nor satisfaction that I have concluded to not participate with this select committee's abuse of power that stains this institution today and will harm it going forward.[9]

House Republicans repeatedly protested and condemned the Select Committee's partisanship. On June 8, 2022, for example, Rep. Bice of Oklahoma issued a statement highlighting that the Select Committee was merely a political stunt:

After a year of overreaching subpoenas and dramatized hearings, the next show trial event from the January 6 Select Committee will take place Thursday, during prime time. This further proves that this biased committee does not intend to investigate what occurred on Jan. 6, but instead weaponize the government for their own political gain.

As you may remember, there were two bills voted on by the House of Representatives last year regarding Jan. 6. I voted in favor to establish a fair, nonpartisan commission, modeled on the September 11 Commission, to fully investigate the security failure and ensure that this incident at our Nation's Capital would not happen again. . . .
However, I vehemently opposed legislation that established the January 6 Select Committee, because I was deeply concerned it would be nothing but political theater for House Democrats. Sadly, this is precisely what we are witnessing today. In creating the membership of this committee, Speaker Pelosi broke 232 years of House precedent, trampling over the rights of the Minority party, by rejecting Republican's chosen Members, including Rep. Banks (R-IN) and Rep. Jordan (R-

---

[9] Nehls Decl., ¶ 24; Exhibit M, Barbara Sprunt, *The top House Republican won't comply with Jan. 6 panel request to voluntarily testify*, NPR, Jan. 12, 2022, available at: https://www.npr.org/2022/01/12/1072544752/jan-6-panel-investigating-insurrection-requests-kevin-mccarthys-voluntary-testim (last visited Oct. 16, 2023); Exhibit N, Leader McCarthy's Statement about Pelosi's Illegitimate Select Committee, Jan. 12, 2022, available at: https://www.speaker.gov/leader-mccarthys-statement-about-pelosis-illegitimate-select-committee/ (last visited Oct. 16, 2023).

OH). This move eliminated the objectivity and legitimacy of this committee from the very start. . . .

. . . A major goal of the committee is becoming increasingly clear: to normalize and ram through a far-left agenda.

I strongly opposed what we are seeing today, which is a dangerous, political stunt. Our country could have benefited from a bipartisan commission that would have worked to protect the People's House and keep Americans who visit and work there safe and secure in the future, while also holding Pelosi and those in charge accountable for their failures. Unfortunately, the reasons why I voted against the Jan. 6 Select Committee have come true. No progress has been made, Republicans have no voice, and Democrats continue their witch hunt against the Republican party to distract from their catastrophic foreign and domestic policy failures.[10]

Minority Leader McCarthy, on June 9, 2022, delivered remarks calling the Select

Committee illegitimate and echoing Rep. Bice's concerns:

Speaker Pelosi's Select Committee on January 6 is unlike any committee in American history. In fact, it's the most political and least legitimate committee in American history. It has used congressional subpoenas to attack Republicans, violate due process, and infringe on the political speech of private citizens. It has been caught altering evidence – including text messages from Ranking Member Jordan. It has permanently damaged the House and divided the country. It's a smokescreen for Democrats to push their radical agenda . . . . To be clear, the violence at the Capitol that day was wrong, and we have repeatedly denounced it. But keeping the Capitol safe is not the point of Pelosi's illegitimate Select Committee. From the beginning, the Select Committee refused to investigate the real circumstances that led to the riot, including the lack of security around the Capitol. They also ignored left-wing mob violence, which led to riots and loss of life across the country. When House Republicans proposed investigating these facts, Speaker Pelosi did not respond for 3 months. Then, she jumped to create the Select Committee. Not only that, she rejected my picks to serve on that Committee – violating 232 years of House tradition. Pelosi rejected Congressman Banks, a distinguished Afghanistan veteran. She rejected Congressman Jordan, the ranking member of the Judiciary Committee. But while she rejected qualified Republicans, she appointed radical Democrats. She appointed Chairman Thompson, who — to be clear — objected to presidential electors in 2005. She appointed Congressman Raskin, who also objected to presidential electors in 2017 AND called for President Trump's impeachment before Trump took office. And she appointed Congressman Schiff, despite his years of lying about the Russia-Collusion Hoax and the Hunter

---

[10] Exhibit O, Stephanie Bice, Democrats' Partisan Jan. 6th Committee, June 8, 2022, available at: https://bice.house.gov/media/weekly-columns/democrats-partisan-jan-6th-committee (last visited Oct. 16, 2023).

Biden Laptop. The future of our nation rests on the ability of Americans to trust our political system, to have safer streets, to have affordable food and gas, and to have confidence that elected officials are listening to real concerns. Democrats are using January 6 to avoid accountability for making the nation less safe and less prosperous. But Americans are not fooled by Democrats' distractions. And Republicans are not deterred from focusing on the issues that matter most to them. Now I want to bring up Congressman Jim Banks. As we said at the time Speaker Pelosi rejected my picks to serve on the committee – Republicans would be conducting our own investigation. And Jim Banks has led that.[11]

Vice President Pence referred to the partisan nature of the Select Committee as a "disappointment" for its harsh partisanship,[12] stating that "It seemed to me in the beginning, there was an opportunity to examine every aspect of what happened on January 6, and to do so more in the spirit of the 9/11 Commission — nonpartisan, nonpolitical, and that was an opportunity lost."[13] Members of the United States Senate felt the same way about the Select Committee.[14]

As Congressman Nehls' Declaration makes clear, besides being partisan, the Select Committee also engaged in dishonest behavior. "In one remarkable display—later admitted by the Select Committee's spokesman when the press reported it—Select Committee staff doctored evidence and a Member of the Committee publicly presented that falsified evidence during a

---

[11] Exhibit N, Leader McCarthy, House GOP: The Select Committee is Illegitimate, June 9, 2022, available at: https://www.speaker.gov/house-gop-the-select-committee-is-illegitimate/ (last visited Oct. 16, 2023).

[12] Exhibit Q, Caroline Linton, *Pence says he thinks there will be "better choices" than Trump for president in 2024*, CBS News, Nov. 16, 2022, available at: https://www.cbsnews.com/news/mike-pence-donald-trump-2024-better-choices-face-the-nation-interview/ (last visited Oct. 16, 2023).

[13] Exhibit R, Brady Knox, *Mike Pence says he will not testify to Jan. 6 committee*, Washington Examiner, Nov. 16, 2022, available at: https://www.washingtonexaminer.com/news/justice/pence-not-testify-jan-6-committee (last visited Oct. 16, 2023).

[14] Exhibit S, Melissa Quinn, *Rubio says January 6 committee is a "complete partisan scam,"* CBS News, Feb. 7, 2022, available at: https://www.cbsnews.com/news/marco-rubio-january-6-committee-partisan-face-the-nation/ (last visited Oct. 16, 2023).

hearing."[15] "In addition, the Select Committee doctored silent video captured by security cameras in the House, adding a soundtrack to make their presentation more dramatic."[16]

But Republicans were not the only ones condemning the Select Committee for its obvious political nature. Ted Van Dyk penned an op-ed in the Wall Street Journal, stating "Count me as a Democrat disappointed by the way my party has responded to Donald Trump . . . ." He continued:

> The House Jan. 6 hearings offered an opportunity to examine Mr. Trump's activities carefully. But it didn't happen. Thursday's opening statements by Chairman Bennie Thompson and Republican Rep. Liz Cheney were more like prosecutors' closing arguments than introductions to a fact-finding inquiry. Ms. Cheney read aloud a statement by Mr. Trump that was supposed to implicate him in inciting his followers-but she left out that he told his followers: "Go home."
>
> The committee members included harsh Trump critics like Rep. Adam Schiff. Speaker Nancy Pelosi rejected Republican members nominated by Minority Leader Kevin McCarthy and allowed only Mr. Trump's outspoken Republican opponents -- Ms. Cheney and Rep. Adam Kinzinger —to serve on the committee. As a result, chances for a bipartisan outcome were lost and any minority report will be undertaken outside the committee. There will be no consensus on any findings, only further polarization.[17]

Media outlets aired the Democrats' open secret that coverage of the Select Committee's work during prime time would be a tool in the Democratic Party's arsenal to continue to control the House past 2022. The New York Times wrote, "With their control of Congress hanging in the balance, Democrats plan to use made-for-television moments and a carefully choreographed rollout of revelations over the course of six hearings . . . to persuade voters that the coming midterm

---

[15] Nehls Decl., ¶ 22.

[16] *Id*. at ¶ 23.

[17] Exhibit T, Ted Van Dyk, *Jan. 6 Hearing Disappoints This Democrat*, Wall Street Journal, June 12, 2022, available at: https://www.wsj.com/articles/jan-6-hearing-disappoints-this-democrat-partisan-cheney-thompson-investigation-security-trump-11655038308 (last visited Oct. 16, 2023).

elections are a chance to hold Republicans accountable for [January 6th]."[18] The partisan motivation of House Democrats shone in this primetime opportunity to grandstand. To underscore its partisan purpose, the House Democrats hired a television producer to orchestrate their hearings in order to maximize their political impact in the runup to the 2022 election. *See* https://www.nytimes.com/2022/06/09/us/the-committee-hired-a-tv-executive-to-produce-the-hearings-for-maximum-impact.html

If the political bent of the Select Committee were not already clear by its composition and staffing, the Committee's conduct was reprehensible. According to H.R. 503, the Select Committee had three purposes: 1) "To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex;" 2) "To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol;" and 3) "To build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations into the domestic terrorist attack on the Capitol." Instead, the "evidence" and "findings" of the January 6th Report focused almost exclusively on the conduct of President Trump before and after the General Election in 2020. Staffers intimately involved with the information-gathering arm of the Select Committee and the manner in which information was used have lamented "that important findings unrelated to Trump will not become available to

---

[18] Exhibit U, Annie Karni and Luke Broadwater, *Jan. 6 Hearings Give Democrats a Chance to Recast Midterm Message*, The New York Times, June 7, 2022, available at: https://web.archive.org/web/20230105192247/https://www.nytimes.com/2022/06/07/us/politics/jan-6-hearings-tv-democrats.html (last visited Oct. 16, 2023).

the American public."[19] And this Court should be concerned that the Select Committee failed to properly archive information related to President Trump – information potentially useful to him in his ongoing legal matters. Indeed, as the House Administration Subcommittee ultimately discovered, the Select Committee actually made efforts—some successful, some not—to destroy or otherwise render unavailable the evidence and other materials it had gathered to prevent materials inconsistent with its political narrative from coming to light.[20] This further highlights the underlying point that from its inception, the Select Committee formed to engage in political grandstanding, culminating in a political hit job against President Trump.[21]

Similarly, the sworn testimony of former Congressman Ken Buck of Colorado established that the proceedings and procedures of the Select Committee were highly irregular, a marked departure from normal Congressional practice, and were designed to produce a political show rather than a bipartisan or legitimate fact-finding exercise.[22]

The Select Committee Report, rooted in political bias and grandstanding as it was, was aimed at least in part to secure a Democratic majority in Congress during the 2022 midterm elections. It was manifestly not a legitimate, sober, bipartisan, fact-finding exercise. Members of

---

[19] Exhibit V, Jacqueline Alemany, Josh Dawsey and Carol D. Leonnig, *Jan. 6 panel staffers angry at Cheney for focusing so much of report on Trump*, The Washington Post, Nov. 23, 2022, available at: https://www.washingtonpost.com/politics/2022/11/23/liz-cheney-jan-6-committee/ (last visited Oct. 16, 2023).

[20] Exhibit A, at pp. 13-16.

[21] Exhibit X, Catherine Yang, *Trump Trying to Subpoena Records Missing From January 6 Select Committee Archives*, The Epoch Times, Oct. 11, 2023, available at: https://www.theepochtimes.com/us/trump-trying-to-subpoena-records-missing-from-january-6-select-committee-archives-5508235?utm_source=Morningbrief&src_src=Morningbrief&utm_campaign=mb-2023-10-12&src_cmp=mb-2023-10-12&utm_medium=email&cta_utm_source=Morningbrief&est=5%2BJlyMJcrOKGUi2B32%2FyfcDMISXGc31irTxezMWPoFLWGt%2FYwpOGHC9rOxL8 (last visited Oct. 16, 2023).

[22] Exhibit Y.

the minority party expressed their vehement disagreement with the Committee's flawed process and the Report that it produced.   In short, this Court should conclude that the Report is untrustworthy and thus to be excluded as hearsay not within any exception.

**B.    The Select Committee Report contains inadmissible multi-level hearsay.**

The Select Committee Report is also inadmissible because it contains multi-level hearsay under Fed. R. Evid. 805. As the Court in *Barry* noted, when a congressional report includes out-of-court statements that are also hearsay, hearsay within hearsay is present.[23] "These other hearsay statements are admissible only 'if each part of the combined statements conforms with an exception to the hearsay rule provided in' the [] Rules of Evidence."[24] The Select Committee Report quotes and relies upon hundreds of other reports, documents, videos, and third-party statements. Each is hearsay. Even if this Court were to admit the Select Committee Report into evidence, it is still plaintiffs' burden to overcome the multi-level hearsay objections to each and every subsidiary component of the report. With the exception of pages 323, 324, 325, 614, 615, 616, 628, 678, and 680, each page of Exhibit 115 contains multi-level hearsay.

**C.    Plaintiffs are impermissibly sandbagging President Trump by introducing portions of the Select Committee Report that they did not identify in their discovery responses.**

President Trump timely propounded the following interrogatory to all Plaintiffs:

**Interrogatory No. 8:**

To the extent You intend to refer to, reference, or otherwise cite as evidence any portion of the Final Report to support any fact alleged by You in Your Complaint, provide all facts You intend to rely upon and provide citations from the Final Report wherein those alleged facts can be found.

---

[23] *Barry*, 467 F. Supp. 2d at 102.

[24] *Id.*

(The defined term Final Report in the interrogatory referred to what in this motion has been referred to as the Select Committee Report.)  On August 16, 2024, Plaintiffs provided their first Supplemental Responses and Objections to President Trump's First Set of Interrogatories. At that time, Plaintiffs stated that they did not intend to rely upon any portions of the Final Report. (Urbanek Dec., Exhibit AA at ¶ 8). On October 25, 2024, Plaintiffs supplemented their response to this interrogatory, this time identifying just two pages—pages 285 and 286—from the Final Report. (Urbanek Dec., Exhibit BB at ¶ 8).  They explained that these pages would be offered for the sole purpose of arguing that "[i]n December 2020, Trump contacted Pennsylvania State Majority Leader Kim Ward and Pennsylvania Speaker of the House of Representatives Brian Cutler regarding fraudulent voting in Pennsylvania. *Id.* On December 13, 2024, Plaintiffs again supplemented their interrogatory response by identifying six more pages—pages 53, 274, 282, 324, 530, 585—they intended to rely upon, bringing the total count to eight. ((Urbanek Dec., Exhibit CC at ¶ 8).). Per Plaintiffs, the cited portions would be predominantly offered to demonstrate the various meetings President Trump had with state and local officials after the 2020 Election and to show that Amy Kremer and Kylie Kremer were the founders of Women for America First. *Id.* Thus, Plaintiffs promised a narrow, limited use of the Select Committee Report.

But in support of their opposition to summary judgment, Plaintiffs have sandbagged President Trump by introducing 31 additional pages, covering a wide variety of topics, including portions of its "Executive Summary," which essentially outlines much of the content of the Final Report. Thus, in addition to significantly expanding the number of pages Plaintiffs entered into evidence, Plaintiffs also radically exceeded the substantive scope that their interrogatory responses disclosed. Pursuant to FRCP 37(c)(1), a party that "fails to provide information required by Rule 26(a) or (e), the party is not allowed to use that information…to supply evidence on a motion…."

Plaintiffs' failure to timely disclose prejudiced President Trump as it affected both his conduct of immunity discovery and his drafting of his opening brief.  This Court should not countenance their sandbagging.  To the extent that the undisclosed material is not otherwise excluded as hearsay, it should be excluded pursuant to Rule 37(c)(1).

April 16, 2025                                    Respectfully submitted,


                                                 */s/ Jonathan M. Shaw*
                                                 Jonathan M. Shaw
                                                 D.C. Bar No. 446249
                                                 Gerald A. Urbanek, Jr.
                                                 VA Bar No. 95043
                                                 DHILLON LAW GROUP, INC.
                                                 2121 Eisenhower Avenue, Suite
                                                 608 Alexandria, VA 22314
                                                 Telephone: (703) 574-1206
                                                 Facsimile: (415) 520-6593
                                                 jshaw@dhillonlaw.com
                                                 gurbanek@dhillonlaw.com

                                                 Jesse R. Binnall VA022 BINNALL LAW
                                                 GROUP, PLLC
                                                 717 King Street, Suite 200
                                                 Alexandria, VA  22314
                                                 Telephone: (703) 888-1943
                                                 Facsimile: (703) 888-1930
                                                 jesse@binnall.com

                                                 Scott Gessler
                                                 GESSLER BLUE LAW
                                                 7350 E. Progress Place, Suite 100
                                                 Greenwood Village, CO 80111
                                                 Telephone: (720) 839-6637
                                                 sgessler@gesslerblue.com

                                                 *Attorneys for Defendant*
                                                 *President Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that on April 16, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


/s/    *Jonathan M. Shaw*    
Jonathan M. Shaw  
D.C. Bar No. 446249  
*Attorney for Defendant*  
*President Donald J. Trump*