## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BARBARA J. LEE *et al.*, | **Case No. 21-cv-00400 (APM)** |
| *Plaintiffs,* | ***Consolidated Cases:*** |
| v. | *21-cv-00586 (APM)* |
| | *21-cv-00858 (APM)* |
| DONALD J. TRUMP *et al.*, | *21-cv-02265 (APM)* |
| *Defendants.* | *22-cv-00010 (APM)* |
| | *22-cv-00011 (APM)* |
| | *22-cv-00034 (APM)* |
| | *23-cv-00038 (APM)* |

### PRESIDENT DONALD J. TRUMP'S REPLY MEMORANDUM
### IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT ON PRESIDENTIAL IMMUNITY GROUNDS

Jonathan M. Shaw
D.C. Bar No. 446249
Gerald A. Urbanek, Jr.
VA Bar No. 95043
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite
608 Alexandria, VA 22314
Telephone: (703) 574-1206
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com
gurbanek@dhillonlaw.com

Scott Gessler
GESSLER BLUE LAW
7350 E. Progress Place, Suite 100
Greenwood Village, Colorado 80111
Telephone: (720) 839-6637
sgessler@gesslerblue.com

Jesse R. Binnall VA022
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia  22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
jesse@binnall.com

*Attorneys for Defendant President Donald J. Trump*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................ 2

    I.    Plaintiffs have not introduced admissible evidence to establish a dispute over material facts. ..................................................................................................... 2

    II.    President Trump's Ellipse Speech was an exercise of core constitutional powers. 3

    III.    President Trump loses immunity only if his conduct "may reasonably be understood only as re-election campaign activity" or is "manifestly or palpably beyond his authority." .......................................................................................... 5

        A.    Courts have firmly rejected Plaintiffs' approach, whereby a court may weigh evidence and select among competing characterizations. ....................................... 5

        B.    Plaintiffs must show that the President's activity is "manifestly and palpably" beyond a President's authority. ............................................................................. 7

    IV.    "Context" does not include months of activities prior to the Ellipse Speech, nor does Plaintiffs' contemporaneous evidence establish that the Ellipse Speech was re-election activity. ........................................................................................... 10

        A.    "Context" does not include months of activities preceding the Ellipse Speech. .. 11

        B.    Allegations involving "immediate" or "contemporaneous" context do not establish that the Ellipse Speech constituted re-election activity. ....................................... 16

    V.    Plaintiffs cannot establish that President Trump's tweets were manifestly and palpably re-election activity. ................................................................................. 23

CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Blassingame v. Trump*,
   87 F.4th 1 (2024) ............................................................................................................. *passim*

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ..................................................................................................................... 4

*Trump v. United States*,
   603 U.S. 593 (2024) ............................................................................................................. *passim*

## INTRODUCTION

In their *Opposition to Defendant's Motion for Summary Judgment*, Plaintiffs make several fundamental errors. First, as discussed in the various evidentiary submissions referred to below, they rely on evidence that is not admissible in court, such as the January 6th Report, unauthenticated electronic mail, and other documents. As a result, they have failed to produce evidence that would defeat President Trump's *Motion for Summary Judgment*.

Second, they misstate the applicable standard for distinguishing between official and unofficial activity. Employing slightly different formulations, they advance a faulty immunity standard that has a single, central theme: The Court may conclude that the Ellipse Speech (or another action) was unofficial activity if Plaintiffs' evidence of unofficial activity outweighs President Trump's evidence of official activity. This is simply wrong; the Court can deny President Trump immunity only if it concludes that the *only* reasonable interpretation of the evidence is that President Trump engaged in unofficial activity. Put another way, the activity must be "manifestly and palpably" unofficial conduct.

Third, Plaintiffs distort the use of context, citing examples of conduct over the course of six months, from July 2020 until well after January 6, 2021. They argue that the Ellipse Speech was the "culmination" of months of activities, and then also cite conduct *after* the Ellipse Speech. But *Trump v. United States* requires the Court to look at "contemporaneous" context—not "context" spanning half a year.

Fourth, even setting aside the inadmissibility of Plaintiffs' evidence, that evidence itself does not support claims that the Presidential Campaign funded, organized, or directed the Ellipse Speech. The events of January 6, 2020, were organized and funded by a private group, and

1

Plaintiffs' evidence does not remotely show that the Rally on January 6th was a campaign event, nor, even if it did, that President Trump attended as an office-seeker. It was a private event, wholly independent from the campaign. And, more importantly, President Trump's actions at and in connection with that private event can reasonably be understood as official conduct and are therefore immune.

Fifth, Plaintiffs themselves admit that President Trump's Twitter account included both official and non-official speech, and their own evidence shows that President Trump reached out to state election officials in his official capacity to discuss the issue of presidential electors, by including the Chief of Staff on phone calls with state officials and meeting with state officials in the Oval Office. In other words, their own evidence supports a reasonable inference that President Trump's actions can be understood as official and are therefore immune.

In short, even if Plaintiffs' evidence were admissible (which it is not), and even if Plaintiffs' evidence supported their arguments (which it does not), President Trump has still presented this Court with adequate evidence to defeat any argument that the Ellipse Speech, or the Twitter statements, or contact with state officials, could be reasonably interpreted *only* as unofficial, campaign speech. Under the standard enunciated by the D.C. Circuit in *Blassingame* and by the Supreme Court in *Trump,* that requires that summary judgment be entered in his favor on immunity.

## **ARGUMENT**

### I. **Plaintiffs have not introduced admissible evidence to establish a dispute over material facts.**

To establish a material fact or to contest a material fact on summary judgment, a party must present admissible evidence, such as testimony, authenticated documents, or business records that

2

fall within an exception to the hearsay rule. President Trump objects to many of Plaintiffs' exhibits, including emails, texts, social media posts (such as Linked In profiles and Instagram Posts), excerpts from federal campaign finance reports, web site printouts, media reports, and the January 6th Report. These objections are set forth in the following concurrently filed documents and incorporated herein:

> *Objection to Admission of Final Select Committee Report;*

> *President Donald J. Trump's Counterstatement to Plaintiffs' Statement of Additional Undisputed Material Facts;*

> *President Donald J. Trump's Reply to Plaintiffs' Counterstatement to his Statement of Undisputed Material Facts; and*

> *Opposition to Plaintiffs' Request for Judicial Notice.*

## II.    President Trump's Ellipse Speech was an exercise of core constitutional powers.

As shown in his opening brief, President Trump's Ellipse Speech constituted the exercise of core presidential power, expressly granted by the Constitution under U.S. Const. art. II § 3. Specifically, the President "shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient." Additionally, under the Electoral Count Act, 3 U.S.C. §15, federal law set forth specific duties and procedures for Vice President Mike Pence (acting in his capacity as President of the Senate) and both chambers of Congress for counting electoral votes. Much of the Ellipse Speech was dedicated to informing Congress and urging it to take action, and it was no coincidence that President Trump delivered the Ellipse Speech on January 6th. As President, he relied on art. II, § 3 to urge both the President of the Senate and Congress to take specific action on under the Electoral Count Act, on the very day Congress met to execute its duties under that law.

Accordingly, the Ellipse Speech constituted an exercise of the Recommendations Clause for which President Trump receives absolute immunity.

In response, Plaintiffs make two arguments. First, they argue that treating the Ellipse Speech as an exercise of core constitutional power opens the door to abuse. Thus, a President need merely "say[] four magic words—'I recommend that Congress....'—anywhere in a speech" in order to receive immunity, and "if a President purports to speak to Congress, he may say *anything*—no matter the context in which he speaks." *Opposition* at 44 (emphasis in original).

This parade of horribles is meritless. America is unlikely to contend with rogue Presidents cunningly peppering their speeches with the phrase "I recommend to Congress" solely to establish Presidential immunity. And if, in fact, the President does recommend Congress take action under U.S. Const. art. II, § 3, then his words *should* receive Presidential immunity as the Framers expressly provided. Moreover, if a future President were to abuse this power, there would remain, as the Supreme Court has recognized*, "*alternative remedies and deterrents" which establish that "absolute immunity will not place the President 'above the law.' For the President … absolute immunity merely precludes a particular private remedy for alleged misconduct in order to advance compelling public ends." *Nixon v. Fitzgerald*, 457 U.S. 731, 758 (1982) (cleaned up).

Second, Plaintiffs argue that President Trump "mischaracterizes" the Ellipse Speech by "excerpt[ing] a few lines ostensibly related to policy proposals." In their view, the Ellipse speech was "threaded throughout with statements about [President Trump's] own bid to win the election," and the speech was "clearly directed to the thousands of supporters gathered before him when it was given, not at Congress." *Opposition* at 43. Not so.

A review of the actual speech easily rebuts this argument. At its core, it was a policy

4

address, with a clear call for congressional action. President Trump forthrightly directed his speech to Members of Congress and Senators by thanking many of them for their support. Ex. 42 at 11. And rather than a "few lines ostensibly related to policy proposals," President Trump devoted the bulk of his speech to election processes, problems with the method of voting and counting ballots in various states, and demands for specific policy changes, such as eliminating absentee voting. *Id.* at 15–19, 20–31. In short, a review of the plain language of the Ellipse Speech reveals that President Trump primarily focused on problems and solutions for voting in American elections based on his views of problems shown by the conduct of the 2020 election.

Importantly, an objective reading of the evidence shows that the purpose of President Trump's speech was to pressure Congress and Vice President Pence. President Trump was compelled to adopt this approach. Following the election he worked to convince the Department of Justice to take decisive action, but in late December 2020, senior Department of Justice officials made it clear to him that the Department did "have an important role, but the bottom line was, if a state ran their election in such a way that it was defective, that is to the State or Congress to correct." Ex. 120 at 12. Thus, President Trump's only alternative was to use the "bully pulpit" of the Presidency, *Trump v. United States*, 603 U.S. 593, 629 (2024), to persuade Congress to take what he considered to be proper, legal action. This is why the Ellipse Speech was directed at Congress and why the bulk of the speech focused on election policies and voting issues.

III. **President Trump loses immunity only if his conduct "may reasonably be understood only as re-election campaign activity" or is "manifestly or palpably beyond his authority."**

A. **Courts have firmly rejected Plaintiffs' approach, whereby a court may weigh evidence and select among competing characterizations.**

Plaintiffs conflate Trump's burden to produce evidence with the standards for determining

immunity. To be sure, under *Blassingame*, President Trump must produce evidence that establishes immunity. But that burden of production should not be confused with the applicable legal standard: President Trump receives immunity for his "actions so long as they are not manifestly or palpably beyond his authority." *Trump*, 603 U.S. at 596 (citing *Blassingame v. Trump*, 87 F.4th 1, 13 (D.C. Cir. 2024)). The D.C. Circuit was crystal clear:  President Trump's "burden will be met if, based on an appropriately objective, context-specific assessment, his alleged actions *can* reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Blassingame*, 87 F.4th at 30 (emphasis added).  Likewise, "when a President's actions viewed objectively and in context may reasonably be understood *only* as re-election campaign activity, a court not only may, but must deny immunity." *Id.* at 21–22 (emphasis added).  "And critically, if it is unclear whether the presidential speech is official, the Court appropriately preserves the immunity.  *Ante*, at 21–22." *Id.* at 33 (Katsas, J., concurring).  Thus, President Trump is entitled to immunity unless it is absolutely clear that his actions *cannot* reasonably be understood as official.  If they *can* be—regardless of whether that is the only or the best understanding—then President Trump is entitled to immunity.

This test is strict and clear. Its application to these facts is fatal to the Plaintiffs' case, prompting them to obscure its clarity by proposing a "reasonableness" test, where the Court would determine immunity based on a weighing of the evidence. *See, e.g., Opp'n* at 37 (arguing that President Trump "cannot overcome the weight of the evidence showing the Rally and Trump's speech were unofficial."). Their attempts to urge the Court to weigh competing inferences is improper under *Blassingame* and *Trump*.

Plaintiffs' formulations ask this Court to ignore the actual language used in *Blassingame*.

The word "only" in *Blassingame* mandates that the President receives immunity unless the evidence "may reasonably be understood *only* as re-election campaign activity." 87 F.4th at 21–22. (emphasis added). This test severely limits the Court's ability to choose among competing sets of facts and inferences. To be sure, Plaintiffs dispute this straightforward conclusion, *Opp'n* at 13. But the opinion's language is clear. Indeed, Judge Katsas' concurrence emphasizes the limited inquiry; "in certain limited contexts, courts may reliably conclude that a sitting President is speaking *only* in a private capacity as a candidate for re-election or as the leader of a political party." *Blassingame*, 87 F.4th at 31 (Katsas, J. concurring) (emphasis added). To illustrate the point, the concurrence cites examples of exclusively political activities, such as political debates, a convention speech, a party fundraiser, or a political advertisement. *Id.* And it emphasizes that "[t]he President's official duties are so pervasive that he may occasionally render official speech even during a typical campaign event." *Id.* at 34.

**B.    Plaintiffs must show that the President's activity is "manifestly and palpably" beyond a President's authority.**

Like the above test that actions must "reasonably be understood *only* as re-election campaign activity," the "manifestly and palpably" standard also limits a court's ability to weigh competing facts and characterizations. *Trump* explicitly adopted the "manifestly and palpably" test from *Blassingame*, holding that "the immunity we have recognized extends to the "outer perimeter" of the President's official responsibilities, covering actions so long as they are "not manifestly or palpably beyond [his] authority" *Trump*, 603 U.S. at 618 (citing *Blassingame*, 87 F.4th at 13). Plaintiffs try to escape this standard in two ways.

First, they argue that the "single use of this phrase was not announcing a new standard of proof." *Opp'n* at 14. Of course, the Supreme Court can certainly establish a standard by using a

phrase only once; it need not repeat itself. More directly, *Blassingame*, in fact, established a test, and the U.S. Supreme Court explicitly adopted this test in *Trump*. The "single use of this phrase" is now binding nationwide.

Second, Plaintiffs argue that "manifestly and palpably" merely distinguishes official from unofficial conduct—"that conduct in Trump's capacity as office-seeker is, by definition, 'manifestly and palpably' unofficial." *Opp'n* at 13. But that characterization misses the mark. The *Blassingame* court established the "manifestly and palpably" test because oftentimes the nature of Presidential conduct is not immediately clear, and the test allows courts to easily resolve questions involving any ambiguity whatsoever. As *Blassingame* states, official conduct includes activity "not manifestly or palpably beyond [a President's] authority, but rather having more or less connection with the general matters committed by law to his control or supervision." *Blassingame*, 87 F.4th at 13. The phrase "more or less connection with" captures a broad swath of conduct, including instances where it is unclear whether conduct is official or unofficial.

Indeed, both *Trump* and *Blassingame* repeatedly recognized that fuzzy lines frequently surround official conduct; "[d]istinguishing the President's official actions from his unofficial ones can be difficult," *Trump*, 603 U.S. at 617, and where the President operates outside of clearly defined authority, he operates in a "zone of twilight" where "he and Congress may have concurrent authority." *Id.* at 609. Likewise, *Blassingame* understood the "potential difficulty of meting out that distinction [between official and unofficial conduct] in some situations," *Blassingame*, 87 F.4th at 20, and outside of clear examples, "other contexts doubtless present closer calls," *Id.* In short, the distinction between official and unofficial conduct can be unclear, and courts use the "manifestly and palpably" test to resolve any ambiguities in favor of granting immunity to the

President.

Applied here, Plaintiffs must prove that the Ellipse Speech was "manifestly and palpably" beyond President Trump's authority, or alternatively that the Ellipse Speech could *only* be reasonably understood as re-election activity. But President Trump has shown adequate indicia of presidential authority. As discussed below, Plaintiffs have not shown that the Ellipse Speech can *only* be understood *solely* as re-election campaign activity.

Finally, the Supreme Court adopted *Blassingame's* "manifestly and palpably" standard to support the presumption that immunity normally attaches to Presidential action. In *Trump*, the Court considered a criminal indictment and determined that a rebuttable presumption of immunity existed. In considering very similar facts to the instant case, the Court determined it "need not and do[es] not decide whether that immunity must be absolute, or instead whether a presumptive immunity is sufficient." *Trump*, 603 U.S. at 606. Accordingly, it recognized "most of a president's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities," *Id.* at 629. This is consistent with *Blassingame's* standard, whereby "[i]f it is unclear whether the presidential speech is official, the Court appropriately preserves the immunity." *Blassingame*, 87 F.4th at 33 (Katsas, J. concurring).

Plaintiffs recognize that *Trump's* presumption may apply in this civil matter; "to the extent the Court applies the 'rebuttable presumption' standard to civil presidential immunity (thus far, it has only been discussed in the criminal context, *id.*), any presumption is rebutted here." *Opp'n* at 44 n.15. The logic and language of *Trump*, *Blassingame,* and *Fitzgerald* compel the conclusion that at least a presumption of immunity exists in civil cases, too. "[M]ost of a President's public communications are likely to fall *comfortably* within the outer perimeter of his official

responsibilities," *Trump*, 603 U.S. at 629 (emphasis added), because presidents are expected to speak on a "vast array of activities that touch on nearly every aspect of American life," because presidents use the office as a "bully pulpit" to "advance the public interest," and because the president is expected to speak on "matters of public concern that may not directly implicate the activities of the Federal Government." *Id.* Of course, because the *Trump* majority's willingness to indulge the possibility of presumptive—rather than absolute—immunity in the criminal context stems from a recognition that criminal prosecutions vindicate a public interest while civil actions merely a private one, there is no reason in this civil case to permit such a rebuttal. *See Trump,* 603 U.S. at 614 (adopting "at least a *presumptive*" as distinct from absolute immunity in the criminal context because: "We must, however, 'recognize[ ] the countervailing interests at stake.' Federal criminal laws seek to redress 'a wrong to the public' as a whole, not just 'a wrong to the individual.' There is therefore a compelling 'public interest in fair and effective law enforcement.'") (Court's emphasis; internal citations omitted). In his *Motion for Summary Judgment,* President Trump provides substantial indicia showing that the Ellipse Speech can reasonably be considered official conduct. As just one example, the speech took place with the White House dominating the background, ensuring that President Trump was "'clothed in the trappings' of his Office." And accordingly, "his speech on matters of public concern will likely be official." *Blassingame*, 87 F.4th at 33 (Katsas, J. concurring).

IV. **"Context" does not include months of activities prior to the Ellipse Speech, nor does Plaintiffs' contemporaneous evidence establish that the Ellipse Speech was re-election activity.**

Under *Trump*, the Court must look at the "content, form, and context" surrounding the Ellipse Speech. 603 U.S. at 629. In that court's formulation, the three factors bear equal weight.

But Plaintiffs argue that "circumstances . . . are key" and that "context is the crux of the inquiry." *Opp'n* at 11. This is wrong. It distorts *Trump's* and *Blassingame's* tests because the content of a speech—such as the decision to fire the Secretary of State at a campaign rally—can easily override context. *Blassingame*, 87 F.4th at 34 (Katsas J. concurring). Likewise, sexual misconduct—regardless of the setting—is not subject to presidential immunity. *Id.* at 15.

Importantly, Plaintiffs further distort the "context" prong of the test by expanding it to include months of activities preceding the Ellipse Speech rather than contemporaneous activities. In Plaintiff's conception, "context" is divided into two categories. The first consists of months of activities leading up to the Ellipse Speech. In other words, the Ellipse Speech was the "culmination of efforts." *Opp'n* at 26. Second is the "immediate context surrounding the rally." *Id.*

### A.  "Context" does not include months of activities preceding the Ellipse Speech.

Plaintiffs make breathtakingly expansive arguments that "context" includes activities over the course of nearly six months preceding (and following) the Ellipse Speech. For them, "context" includes:

(1).    President Trump's claims of election fraud between the November 2020 election and January 2021. *Opp'n* at 2.

(2).    The President's efforts to lobby state actors, *id.* at 2, and efforts "pushing state officials to block certification of valid election results," *id.* at 20.

(3).    Allegations that the President sought to "employ fraudulent electors" *id.* at 2, or that he "implemented a "scheme" to appoint false electors, *id.* at 20.

(4).    President Trump's private lawsuits. *Id.* at 2.

(5).    President Trump's remarks after January 6, 2020. *Id.* at 2.

(6).    President Trump's public statements "months before any votes were cast." *Id.* at 3.

(7).    President Trump's statement that he won in a landslide. *Id.* at 3.

In Plaintiff's words, "the continuing course of unofficial conduct—all in service of Trump's personal office-seeking—predating January 6, 2021, is itself context." *Id.* at 14. But this argument is so broad and expansive that *anything* President Trump said about electors was "unofficial" and that it *all* can be treated as "context." This includes statements made weeks and months before any organizer even planned the Rally on January 6, 2021, and well before President Trump agreed to speak at the Rally.

This expansive definition of "context" goes far beyond *Trump* and *Blassingame's* standard. Critically, the Supreme Court has limited context to contemporaneous activities. Thus, relevant information is confined to "knowing what else was said *contemporaneous* to the excerpted communications, or who was involved in transmitting the electronic communications and in organizing the rally." *Trump*, 603 U.S. at 629 (emphasis added). And when assessing whether conduct constituted unofficial activity, the *Blassingame* court explicitly looked to "contemporaneous" statements by President Trump, holding that there is "no basis for granting immunity for conduct (or speech) the President himself contemporaneously recognizes he undertakes in his personal, unofficial capacity as a candidate." *Blassingame*, 87 F.4th at 20.

Indeed, examples of contemporaneous context set forth in *Trump* or *Blassingame* are limited to actions logically connected to presidential speech that took place within days of the event. Thus, in its analysis of President Trump's Salute to America speech, *Blassingame* looked to the funding, primary organizer, main promoters, and speakers at the event. *Id.* at 22–23.

To be "contemporaneous," events must "[o]riginat[e], exist[], or happen[] during the same

period of time." *Contemporaneous*, American Heritage Dictionary (5th Ed. 2018). Statements that took place weeks and months before votes were counted, before the January 6th rally was even contemplated, or before President Trump even agreed to speak at the Rally, cannot be considered "contemporaneous." To hold otherwise would drain "contemporaneous" of all meaning and thus expand the "context" standard beyond all reason. For this reason, President Trump is not obligated to argue over the meaning and characterization of his statements weeks and months before January 6th. Those statements are simply not relevant "context."

But even if this Court were to adopt a broader "context" standard, Plaintiffs' arguments fail. Plaintiffs make one central argument: President Trump's previous speeches were similar to his Ellipse Speech. Plaintiffs' logic is as follows: (1) In the weeks and months prior to the Ellipse Speech, President Trump spoke about election fraud and advocated for a specific approach for selecting presidential electors, (2) these actions were "office-seeking;" (3) the Ellipse Speech echoed the same themes, and (4) the Ellipse Speech was therefore "office-seeking." In other words, Plaintiffs argue that solely because the Ellipse Speech raised the same themes as President Trump's earlier speeches, the Ellipse Speech was re-election activity.

But this argument—and consequent use of months of "context"—misunderstands the very point of representative government and popular elections. It is good, common, and expected that a candidate will talk about how government should work while on the campaign trail. Those who are actually governing also will, when in office, talk about *the same things* and *do the same things* as part of their exercise of their official authority. Ergo, there is an expected overlap between what a candidate talks about during a campaign and what an official does in his or her official capacity. But that unsurprising fact makes the official's actions no less official. If Candidate Trump

13

complained about election fraud and improper results, then voters would reasonably expect (and some would demand) that President Trump do something about it while in office. A functioning, accountable democracy presumes that official action (and speech) will overlap with campaign speech and campaign promises. Whether or not President Trump spoke earlier about election fraud and a rigged election in the weeks and months leading up to the Ellipse Speech has *no* bearing on whether the Ellipse Speech was official conduct.

More saliently, it makes no difference to whether the Ellipse Speech *can* reasonably be understood as official activity. Plaintiffs' argument is simply an assertion about motivation, which *Blassingame* makes clear is forbidden. 87 F.4th at 32 (Katsas, J., concurring) ("[T]his inquiry in no way turns on the President's motive for the speech at issue. In particular, the inquiry does not turn on the extent to which a speech reflects the President's views of good politics as opposed to good policy.").

But even under Plaintiffs' own standard and even using Plaintiffs' own evidence, President Trump's activities leading up to the Ellipse Speech show that his actions regarding election fraud and presidential electors were not "manifestly and palpably" election activity. Rather, they can certainly be reasonably understood as official. For example, President Trump contacted Michigan state officials about that state's election and selection of presidential electors. He then invited them to the White House and spoke to them about that exact topic in the Oval Office. Plaintiffs' Statement of Facts ¶¶ 84, 85. A meeting in the Oval Office, with state officials, involving election processes and election fraud, certainly qualifies as official conduct. Similarly, when President Trump spoke to the Georgia Secretary of State, he included Mark Meadows, his White House Chief of Staff, on the call. Meadows was President Trump's highest-ranking White House aide,

14

and President Trump made the Georgia phone call jointly with a high-ranking government employee at his side. Plaintiffs' Statement of Facts, ¶ 91.

And President Trump's prior conduct included discussions with Vice President Pence about election fraud and presidential electors; the Supreme Court has characterized those conversations as official activity, holding "allegations that Trump attempted to pressure the Vice President to take particular acts in connection with his role at the certification proceeding thus involve official conduct, and Trump is at least presumptively immune from prosecution for such conduct." *Trump*, 603 U.S. at 623.

The same holds true for discussions with Attorney General William Barr and the subsequent acting Attorney General. President Trump demanded that Attorney General Barr investigate election fraud, Plaintiffs' Statement of Facts, ¶ 102, and the Court held "immunity extends to official discussions between the President and his Attorney General." *Trump*, 603 U.S. at 623. Further, the Deputy Attorney General identified a series of conversations between President Trump and Department of Justice officials, in which the President's "entreaties became more urgent." Ex. 120 at 12. And on December 27, 2020, the President urged his Acting Attorney General to take action. This conversation was an "escalation of earlier conversations. Ex. 120 at 10. It isn't often that the U.S. Supreme Court adjudges the exact facts in a district court case, but here, the Supreme Court has determined that President Trump's demands on the Acting Attorney General constituted official action. *Trump*, 603 U.S. at 619–21. Likewise, his ongoing series of conversations with Department of Justice officials also constituted official conduct.

Lastly, Plaintiffs argue that the Ellipse Speech was re-election activity in part because President Trump brought a lawsuit in his personal—not presidential—capacity. But President

Trump's self-identification of his lawsuit as a personal matter defeats Plaintiff's argument. In the lawsuit, President Trump expressly told the Court that he was acting and speaking in his "personal capacity" as a candidate for reelection because he had "substantial personal" reason, rather than an official one. This explicit statement was necessary to resolve the ambiguity that otherwise would have existed and established that lawsuit as personal, unofficial conduct. But President Trump's statement of an overriding personal interest stands in sharp contrast with the Ellipse Speech, in which he made no such statement. The two actions were fundamentally different; one contained a statement, and one did not. In the lawsuit, President Trump explicitly acted in a personal capacity. In the Ellipse Speech, he did not. Clearly, the lawsuit demonstrates that the President knew how to specify that he was acting in a personal rather than an official capacity but did not do so when making the Ellipse Speech. If anything, this undercuts Plaintiffs' argument.

### B. Allegations involving "immediate" or "contemporaneous" context do not establish that the Ellipse Speech constituted re-election activity.

In contrast to "context" that serves as the "culmination" of events, Plaintiffs argue that the "immediate" context shows that the Ellipse Speech was a re-election event. But their claims fall apart upon moderate scrutiny. Tracing the arguments ultimately requires one to review Plaintiffs' exhibits. As noted above, most of these exhibits are inadmissible, but even taking them at face value, the Court can easily determine that Plaintiffs' evidence does not make clear that the only possible conclusion was that President Trump's actions were unofficial.

This is not a close call.

As a general matter, Plaintiffs make great efforts to show that the Rally on January 6, 2021, was not organized by governmental employees or sponsored by a governmental agency. This is true. But it is also irrelevant. To prevail, Plaintiffs' evidence must demonstrate that the Ellipse

Speech was "manifestly and palpably" re-election activity. Establishing that *the Rally* did not constitute a formal governmental activity falls far short of establishing that *the President's Speech* was unequivocally unofficial activity.

As an initial matter, Plaintiffs' cannot show that the Rally constituted re-election activity as opposed to a privately sponsored event.  Plaintiffs repeatedly state that the January 6th Rally's "organization, funding, promotion, and execution—points in one clear direction: office-seeker." *Opp'n* at 26. For example, they claim that "[t]he Rally was planned, funded, promoted, organized, and executed by the Campaign, Campaign affiliates, and other private individuals." *Id.* at 4. But this is flat-out wrong—again using Plaintiffs' own evidence. No campaign employees worked on the Rally. And upon inspection, Plaintiffs' use of the term "affiliate" or "affiliated" functionally means "someone who used to work for the presidential campaign but doesn't anymore." In short, Plaintiffs have produced no evidence establishing that the campaign had anything to do with the several activities identified by Plaintiffs, such as permitting, fundraising, promoting, or executing.

Each of Plaintiffs' arguments will be considered in turn.

*(1).    Permitting*

Plaintiffs admit that the permit for the Rally was obtained by Women for America First ("WFAF"), a private grassroots organization dedicated to supporting the America First Agenda. *Id.* at 27. This organization was separate and apart from the campaign. Plaintiffs nonetheless argue that "many" of those on the permit were "affiliated" with the campaign." *Id.* at 28. As commonly used in the English language, "affiliated" means "closely associated with another typically in a dependent or subordinate position." *Affiliated*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/affiliated#:~:text=adjective,and%20its%20affiliated%20medical%20sch

17

ool (last accessed April 15, 2025). Fourteen people were on the permit. None was "dependent" or "subordinate" to the campaign. Plaintiffs' evidence shows that all had stopped working for the campaign well before the Rally was even announced:

- Justine Caporale, On-site Contact. Evidence shows no affiliation with the campaign; (1) he was employed by the Trump campaign until November 30, 2020, but *not* after, Ex. 56, No. 49, Ex. 66 & Plaintiffs' Statement of Facts Table E, (2) he sent three emails on January 2,ʼ 2021 and January 3, 2021 from "DonaldTrump.com" all of which involved trivial media items, such as forwarding a link to the WFAF's promotion video, Exs. 68, 69, and (3) over several years his company received over $2.5 million from the Trump campaign, the *last* installment of which was paid on December 15, 2020. Ex. 70. This was day before Amy Kremer announced the Rally on December 16, 2020, eleven days before Mr. Caporale and Ms. Kremer discussed President Trump's possible participation, *see* Exs. 19 at 58:9–16, 20 at 29:2–13, & 20a, and 22 days before the Rally itself. Three trivial emails and the receipt of payments before the Rally even came into existence do not come close to establishing Mr. Caporale as a campaign employee or a person "affiliated" with the campaign.

- Point of Contact: Amy Kremer, Chair I Women for America First (event host). Plaintiffs provide no evidence that Ms. Kremer worked for or was "affiliated" with the campaign. *See* Plaintiffs' Statement of Facts, Table E. In fact, Ms. Kremer formed WFAF to push an America First agenda, *not* to elect President Trump. Ex. 203.

- Kylie Kremer, Executive Director I Women for America First (event host). Plaintiffs provide no evidence that Ms. Kremer worked for or was "affiliated" with the campaign. *See* Plaintiffs' Statement of Facts, Table E.

- Megan Powers, Operations Manager for Scheduling and Guidance. Ms. Powers sent one email using "DonaldTrump.com" on December 31, quoting a price for a charter airplane. Ex. 75; Plaintiffs' Statement of Facts Table E. Plaintiffs provide no evidence that this flight took place or was even connected to the Rally. Ms. Powers' LinkedIn profile is not evidence that she was actually employed by the Trump campaign in January 2021. Ex. 76, especially because their own financial evidence shows a final "payroll" entry of November 30, 2020. Exs. 63, 66. And a payment to Ms. Powers from the campaign on February 2, 2021, does not identify the time period covered by the payment, the work done, or any remote connection to the Rally. *Id.* Even assuming that Plaintiffs' raw spreadsheets were admissible, they do not contain adequate information to establish Ms. Powers was an employee or an "affiliated" person with the campaign at any time between December 16, 2020, until January 6, 2021.

- Hannah Salem, Operations Manager for Logistics and Communications. Plaintiffs again rely entirely on the raw spreadsheets; (1) a final payment to Salem Strategies on

November 4, 2020 (over a month before the Rally was even announced), Ex. 66 & Plaintiffs Statement of Facts Table E, (2) total payments to "Salem Strategies" the last of which was November 4, 2020, Ex. 78, and (3) payments to Ms. Salem personally, the last of which took place in 2019, Ex. 63.

- David Deanovich, On-site Event Security Supervisor. Plaintiffs do not provide any evidence that he was an employee or "affiliated" with the campaign. *See* Plaintiffs' Statement of Facts, Table E.

- James Oaks, Operations Associate. Plaintiffs' spreadsheets show a payment to Mr. Oaks from the campaign on November 13, 2020, Ex. 66, and a series of payments to Mr. Oaks over the course of several years ending on November 30, 2020.

- Kiran Menon, Operations Associate. Again, Plaintiffs' spreadsheet data show (1) a final payroll payment on December 15, 2020, Ex. 66, (2) a series of payments that also ended on December 15, 2020, Ex. 63, and (3) one travel reimbursement for $274, dated January 7, 2021, Ex. 66. This $274 payment does not establish that Mr. Menon received payment for work involving the Rally, and a small travel reimbursement simply does not establish that he was an employee or "affiliated" with the campaign.

- Tim Unes, Stage Manager. Mr. Unes had no connection to the Trump campaign before and during the Rally. Plaintiffs show that Mr. Unes sent an email from a DonaldTrump.com address to plan an *October* 13, 2020, rally, Ex. 77 & Plaintiffs' Statement of Facts Table E, and show Event Strategies payments referenced above for Mr. Caporale. Plaintiffs' Statement of Facts, Table E.

- Mao Clemens, Stage Assistant. Plaintiffs do not provide any evidence that he was an employee or "affiliated" with the campaign." *See* Plaintiffs' Statement of Facts, Table E.

- Ron Holden, Backstage Manager. Again, Plaintiffs rely on Exhibits 63 and 66, which show that Mr. Holden received final payments from the Trump campaign on November 13, 2020. *See* Plaintiffs' Statement of Facts, Table E.

- Williiam Wilson, Backstage Assistant. Again, Plaintiffs rely on Exhibits 63 and 66, which show that Mr. Wilson received final payments from the Trump campaign on November 10, 2020. *See* Plaintiffs' Statement of Facts, Table E.

- Caroline Wren, VIP Advisor. Plaintiffs do not provide any evidence that Ms. Wren was an employee or "affiliated" with the campaign, who "coordinated, organized, or planned the Rally." *See* Plaintiffs' Statement of Facts, Table E.

- Maggie Mulvaney, VIP Lead. Plaintiffs rely on a statement from Ms. Wren that she knew Ms. Mulvaney from the Trump campaign finance department and asked Ms. Mulvaney to help with the registration desk on January 6, 2021. Ex. 60 at 41:3–17.

19

Plaintiffs' Statement of Facts Table E. Like others, Ms. Mulvaney received a final payment from the Trump campaign on November 13, 2020, well before the Rally was even announced.

In short, Plantiffs' statement that "many" of the people listed on the permit were "affiliated" with the campaign has no merit and proves nothing. Rather, it shows that they were *not* affiliated with the campaign at the time of, and leading up to, the Rally. This paucity of evidence (which President Trump does *not* concede is admissible) does not establish "affiliation" with the campaign.

(2)    Funding

Here, Plaintiffs argue that "the Rally was funded by the Campaign and private donations procured." *Opp'n* at 28. But Plaintiffs provide *no* evidence that the campaign funded the Rally.

First, Plaintiffs admit that the Rally was "underwritten and paid for by private donors." Plaintiffs' Statement of Facts, ¶ 121.

Second, over the course of *hundreds* of requests for admissions, President Trump has steadfastly denied that he, his campaign committee, or any organization associated with his campaign committee paid for or financed the Rally. Exs. 65, 106.

Third, Plaintiffs rely on statements from Katrina Pierson and Sean Dollman that they stayed with the campaign after the election. But Pierson testified that she only stayed on until December 31, 2020, Ex. 86 at 11:7–11, and Dollman's activities were limited to discussions about invoices, none of which showed any funding for the Rally. In total, Dollman's actions were:

- Approving an invoice for work completed months before the Rally. Ex. 94;

- A statement (not supported by any financial numbers) that Mike Hahn continued to work for the Trump campaign on social media, Ex. 28, but no evidence that he did any work for the Rally;

- An invoice for media buys from the Trump campaign until January 6, 2021. Ex. 107. Again, this invoice shows no connections to, or coordination with, the Rally;

- An agreement to provide media assistance to someone *not* working for the Rally, Ex. 99; and

- An agreement to pay someone $400 for future help on the "6th." Ex. 99. As with the above evidence, this email shows no connection to the Rally.

None of these activities shows campaign funding for the Rally.

Fourth, this lack of evidence stands in stark contrast to sworn evidence that neither the campaign—nor any political organizations connected or associated or affiliated with the campaign—provided any funding whatsoever to the Rally. Exs. 65 and 106.

Fifth, Plaintiffs opine, without any foundation or expertise, that "the Rally was financed like a campaign event—not a governmental one." *Opp'n* at 29. And this opinion about campaign event funding contradicts campaign finance laws that limit contributions.

Sixth, Plaintiffs provide evidence that private contributors, outside of the campaign, helped fund the Rally. *Id.* at 29. This shows, of course, that the campaign did *not* fund the Rally.

*(3)    Promotion*

Plaintiffs do not provide any evidence that campaign employees worked for the Rally organizers to help promote the Rally, and indeed, the independent efforts from the campaign to promote the Rally were minimal at best. Plaintiffs show one campaign Twitter post, one video posted on YouTube, an Instagram post, and three "retweets" from a campaign staffer. *Id.* at 31. This is minimal effort at best, *none* of which was connected to or coordinated with Rally organizers.

By contrast, Plaintiffs show extensive promotion of the event by Women for America First and President Trump himself. *Id.* at 31–32. By Plaintiffs' admission, this was *not* campaign

activity, and Plaintiffs show that the campaign was *not* involved in promoting the Rally. To be sure, Plaintiffs describe President Trump's tweets as "personal," using the same faulty logic employed elsewhere. But even this description shows that the campaign did not promote the Rally.

And lastly, Plaintiffs argue that government officials did not promote the Rally. Yet again, the absence of government officials cannot constitute evidence of campaign involvement.

(4)    *Organization and Execution*

Plaintiffs argue that many of those who organized and operated the Rally "were employed by or otherwise affiliated with the Campaign." *Id.* at 32. This is simply wrong. Plaintiffs claim that "Caporale, Powers, Wren, and Guilfoyle" were employed or affiliated with the campaign, but their own evidence does not back up the claim. Caporale, Powers, and Wren are described above. Kim Guilfoyle formerly worked for the Trump campaign but had no connection with the campaign at the time of January 6th. Ex. 82. *None* were employees or affiliates of the campaign.

Plaintiffs describe WFAF's role in organizing and executing the Rally. This demonstrates the campaign's lack of involvement.

(5)    *Speakers*

The selection of speakers in no way bore "the hallmarks of campaign activity"—as if that phrase actually has an objective meaning. *Opp'n* at 34. Despite Plaintiffs' mischaracterization that Megan Powers was an "employee," no campaign employee helped choose speakers. President Trump himself chose three Congressmen and three Senators as speakers. Ex. 20, 115:2-3, 115:9-11. And Plaintiffs cannot point to any campaign employee or "affiliate" who spoke at the event.

(6)    *The Ellipse Speech*

President Trump's speech used the same type of language that he used in official

communications, formal addresses to the American public, and campaign events. He authentically told the American people his views and priorities, whether on the campaign trail or in office. *See supra* at 14–15. And the bulk of his speech was devoted to policies and prescriptions involving voting. *See supra*. Whether he departed from his written draft is wholly irrelevant, and use of the Hatch Act statements shows that the White House viewed the Ellipse Speech as official speech.

It bears repeating that the President's speech itself—as shown in President Trump's opening brief—had substantial indicia of official status, including notably its treatment as official by White House staff tasked with distinguishing between official and unofficial speeches for purposes of application of the Hatch Act. That they understood it to be official is itself compelling evidence that it *can* reasonably be so understood.

### (7) Lack of Government Officials

The lack of executive branch speakers is not evidence of campaign involvement or re-election activity.

In short, Plaintiffs repeatedly claim that the organizers behind the Rally were campaign employees or "affiliates." But this sweeping declaration has no basis in reality—even relying upon Plaintiffs own evidence. Rather, the evidence shows that a private organization—Women for America First—organized and ran the Rally. To be sure, that group relied upon a handful of out-of-work, former campaign workers. But it had no connection with, and received no support from, President Trump's campaign.

## V. Plaintiffs cannot establish that President Trump's tweets were manifestly and palpably re-election activity.

As an initial matter, even Plaintiffs admit that the overall nature of President Trump's tweets was ambiguous. Specifically, "some tweets from @realDonaldTrump were official and

some were purely private, campaign activity." *Opp'n* at 15. This should end the Court's inquiry because Plaintiffs cannot show that President Trump's Twitter usage could be reasonably interpreted only as campaign activity.

Yet Plaintiffs insist that the tweets referring to January 6, 2021, were unofficial for two reasons. First is context, stretching back weeks and months. But, as noted above, activities weeks and months prior to a speech are not "contemporaneous" context, as required by *Trump*. Second is the claim that the tweets were not republished on official White House channels. This is merely a conclusory argument that contradicts Plaintiffs' unavoidable admission—that some tweets on @realDonaldTrump were official. Plaintiffs arbitrarily choose which tweets were official and which ones were unofficial. But this does not meet the requirement that the tweets be "manifestly and palpably" re-election activity.

Next, Plaintiffs misapply the *Lindke* standard to effectively negate the controlling standards in *Trump* and *Blassingame*. Plaintiffs claim that in order for President Trump's tweets to be considered official speech, they "must connected to speech on a matter within [his] bailiwick," and therefore President Trump "must show he had authority to speak on behalf of the government on the particular matter covered by the relevant tweets." *Id.* at 17.

It is unclear just what type of "showing" Plaintiffs demand as proof. Discussions about federal elections would seem to fall within a President's bailiwick. But regardless of that contemplated proof, Plaintiffs' standard is directly refuted by *Trump*. Requiring a President to make a separate showing, subject to a court's scrutiny, that each subject falls within his or her "bailiwick," would ensure that a "President would be chilled from taking the 'bold and unhesitating action' required of an independent Executive." *Trump*, 603 U.S. at 614. And requiring an

24

affirmative showing to justify presidential action runs afoul of the Supreme Court's admonition that a President may use the office's "bully pulpit" in ways that he or she believes will advance the public interest. Indeed, a President is expected to comment on matters of "public concern that may not directly implicate the activities of the Federal Government." *Id.* at 630. Importantly, the selection of presidential electors is partly a federal activity and properly the subject of official presidential action. Indeed, the Supreme Court has determined that official action includes President Trump's conversations with his Vice President about the subject and conversations with his Attorney General and Acting Attorney General on that topic. Likewise, President Trump met with state officials in the Oval Office and, of course, lobbied Congress through a series of tweets and a televised, in-person speech on January 6, 2021. In short, President Trump's tweets meet the *Lindke* standard because his speech involving the election and the need for electoral reform falls firmly within the proper scope of Presidential action.

## <u>CONCLUSION</u>

Plaintiffs make sweeping claims that the Rally and Ellipse Speech constituted campaign activity and, therefore, can justify stripping President Trump of immunity. But they cannot establish any dispute over the underlying facts that would show that President Trump's actions could be reasonably interpreted only as campaign activity. They also mischaracterize their own evidence in their effort to treat the Rally as a campaign event. President Trump directed his Ellipse Speech to Congress at a private event, which had nothing to do with his presidential campaign.

April 16, 2025                              Respectfully submitted,


                                            _/s/Jonathan M. Shaw_____
                                            Jonathan M. Shaw
                                            D.C. Bar No. 446249
                                            Gerald A. Urbanek, Jr.
                                            VA Bar No. 95043
                                            DHILLON LAW GROUP, INC.
                                            2121 Eisenhower Avenue, Suite
                                            608 Alexandria, VA 22314
                                            Telephone: (703) 574-1206
                                            Facsimile: (415) 520-6593
                                            jshaw@dhillonlaw.com
                                            gurbanek@dhillonlaw.com

                                            Scott Gessler
                                            GESSLER BLUE LAW
                                            7350 East Progress Place, Suite 100
                                            Greenwood Village, Colorado 80111
                                            Telephone: (720) 839-6637
                                            sgessler@gesslerblue.com

                                            Jesse R. Binnall VA022
                                            BINNALL LAW GROUP, PLLC
                                            717 King Street, Suite 200
                                            Alexandria, VA  22314
                                            Telephone: (703) 888-1943
                                            Facsimile: (703) 888-1930
                                            jesse@binnall.com

                                            *Attorneys for Defendant*
                                            *President Donald J. Trump*

26

## CERTIFICATE OF SERVICE

I certify that on April 16, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/    *Jonathan M. Shaw*
Jonathan M. Shaw
D.C. Bar No. 446249
*Attorney for Defendant*
*President Donald J. Trump*