**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DISTRICT OF COLUMBIA**

| | |
|---|---|
| BARBARA J. LEE *et al.*, | |
| *Plaintiffs*, | Case No. 21-cv-00400 (APM) |
| v. | (lead case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants.* | |
| ERIC SWALWELL, | |
| *Plaintiff*, | Case No. 21-cv-00586 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants*. | |
| JAMES BLASSINGAME *et al.*, | |
| *Plaintiffs*, | Case No. 21-cv-00858 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP, | |
| *Defendant.* | |
| CONRAD SMITH *et al.*, | |
| *Plaintiffs*, | Case No. 21-cv-02265 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants.* | |

MARCUS J. MOORE *et al.*,

     *Plaintiffs*,

   v.

DONALD J. TRUMP,

     *Defendant.*

Case No. 22-cv-00010 (APM)

(consolidated case)

BOBBY TABRON *et al.*,

     *Plaintiffs*,

   v.

DONALD J. TRUMP,

     *Defendant.*

Case No. 22-cv-00011 (APM)

(consolidated case)

BRIANA KIRKLAND,

     *Plaintiff*,

   v.

DONALD J. TRUMP,

     *Defendant.*

Case No. 22-cv-00034 (APM)

(consolidated case)

SANDRA GARZA,

     *Plaintiff*,

   v.

DONALD J. TRUMP *et al.*,

     *Defendants*.

Case No. 23-cv-00038 (APM)

(consolidated case)

## PLAINTIFFS' MOTION TO STRIKE THE GOVERNMENT'S WESTFALL ACT CERTIFICATION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

PROCEDURAL BACKGROUND ....................................................................................... 4

FACTUAL BACKGROUND ............................................................................................... 5

STANDARD OF REVIEW ................................................................................................ 11

ARGUMENT ..................................................................................................................... 12

    I.      Trump Acted Outside the Scope of His Employment in Relation to
           Plaintiffs' State and Common Law Claims ......................................................... 12

           A.     Trump's Conduct Was Not of the Kind that He Was Employed to
                  Perform ..................................................................................................... 14

           B.     Trump's Conduct Was Actuated Solely to Serve Himself ...................... 23

           C.     Trump's Use of Force Was Not Expectable by the Employer, the
                  United States ............................................................................................ 28

    II.     Trump Is Not an "Employee of the Government" Under the Westfall Act ......... 28

           A.     The President Is Not an "Employee of the Government" Under the
                  Plain Language of the Westfall Act ........................................................ 29

           B.     The Legislative History of the Westfall Act Supports a Finding that
                  the President Is Not an "Employee of the Government" ......................... 30

CONCLUSION ................................................................................................................... 32

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allaithi v. Rumsfeld,*
    753 F.3d 1327 (D.C. Cir. 2014) ..............................................................................12, 14

*Armstrong v. Bush,*
    924 F.2d 282 (D.C. Cir. 1991) ......................................................................................30

*District of Columbia v. Bamidele,*
    103 A.3d 516 (D.C. Cir. 2014) ................................................................................19, 27

*Bannum, Inc. v. Samuels,*
    No. 16-5353, 2018 WL 11413157 (D.C. Cir. Feb. 15, 2018)..................................11

*Black Lives Matter D.C. v. United States,*
    No. 20-CV-1469, 2025 WL 823903 (D.D.C. Mar. 14, 2025) ...............................31

*\*Blassingame v. Trump,*
    87 F.4th 1 (D.C. Cir. 2023) .................................................................................. *passim*

*Bowles v. United States,*
    685 F. App'x 21 (2d Cir. 2017) ....................................................................................12

*Boykin v. District of Columbia,*
    484 A.2d 560 (D.C. 1984) ..................................................................................21, 22, 27

*Carroll v. Trump (Carroll II),*
    49 F.4th 759 (2d Cir. 2022) .................................................................................. *passim*

*Crawford v. U.S. Dep't of Agric.,*
    50 F.3d 46 (D.C. Cir. 1995)..........................................................................................31

*Ctr. for Food Safety v. Regan,*
    56 F.4th 648 (9th Cir. 2022) .........................................................................................22

*District of Columbia v. Coron,*
    515 A.2d 435 (D.C. 1986) .......................................................................................21, 22

*De Martinez v. Lamagno,*
    515 U.S. 417 (1995)........................................................................................................12

*Eastman v. Thompson,*
    594 F. Supp. 3d 1156 (C.D. Cal. 2022) ................................................................21, 22, 28

*Eastman v. Thompson,*
    636 F. Supp. 3d 1078 (C.D. Cal. 2022), *appeal dismissed*, 2022 WL 18492376
    (9th Cir. Nov. 7, 2022), *cert. denied*, 144 S. Ct. 248 (2023) ...............................6, 7

*Garcia v. United States,*
    88 F.3d 318 (5th Cir. 1996) .........................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

*Haddon v. United States*,
    68 F.3d 1420 (D.C. Cir. 1995) ...............................................................................20

*James v. District of Columbia*,
    302 F. Supp. 3d 213 (D.D.C. 2018) .........................................................................31

*Johnson v. Weinberg*,
    434 A.2d 404 (D.C. 1981) .......................................................................................28

*Marta v. Whitley*,
    No. 20-CV-1020, 2021 WL 1209223 (D.D.C. Mar. 31, 2021) ...............................31

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
    583 U.S. 366 (2018) ................................................................................................29

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012) ................................................................................................30

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
    583 U.S. 109 (2018) ................................................................................................30

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) .............................................................................................3, 31

*Osborn v. Haley*,
    549 U.S. 225 (2007) ...........................................................................................20, 26

*\*Penn Cent. Transp. Co. v. Reddick*,
    398 A.2d 27 (D.C. 1979) ..........................................................................13, 15, 22, 28

*Phillips v. Mabus*,
    894 F. Supp. 2d 71 (D.D.C. 2012) .....................................................................12, 13

*Smith v. Clinton*,
    886 F.3d 122 (D.C. Cir. 2018) ...............................................................................14

*Smith v. Trump*,
    No. 21-CV-02265, 2023 WL 417952 (D.D.C. Jan. 26, 2023) ..................................4

*Stokes v. Cross*,
    327 F.3d 1210 (D.C. Cir. 2003) .............................................................................12

*Taylor v. Clark*,
    821 F. Supp. 2d 370 (D.D.C. 2011) .......................................................................12

*\*Thompson v. Trump*,
    590 F. Supp. 3d 46 (D.D.C. 2022), *aff'd sub nom. Blassingame v. Trump*, 87
    F.4th 1 (D.C. Cir. 2023) ................................................................................. *passim*

*\*Trump v. Carroll* (*Carroll I*),
    292 A.3d 220 (D.C. 2023) ............................................................................. *passim*

# TABLE OF AUTHORITIES

**Page(s)**

*\*Trump v. United States*,
603 U.S. 593 (2024) .................................................................................18, 19, 20, 31

*Trump v. Vance*,
591 U.S. 786 (2020) ................................................................................................18

*United States v. Sabol*,
534 F. Supp. 3d 58 (D.D.C. 2021) ........................................................................21

*Westfall v. Erwin*,
484 U.S. 292 (1988) ................................................................................................30

*Wuterich v. Murtha*,
562 F.3d 375 (D.C. Cir. 2009) ..............................................................................12

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ................................................................................................18

## Statutes

3 U.S.C. § 1 *et seq.*....................................................................................................19, 20

3 U.S.C. § 105(a) .............................................................................................................30

5 U.S.C. § 2105(a)(1)(A) ................................................................................................30

28 U.S.C. § 451 ...............................................................................................................29

28 U.S.C. § 1346(b)(1) ....................................................................................................11

28 U.S.C. § 2671 .............................................................................................................29

28 U.S.C. § 2679 .............................................................................................................11

28 U.S.C. § 2679(b)(1) ....................................................................................................29

28 U.S.C. § 2679(c) .........................................................................................................26

28 U.S.C. § 2679(d) ......................................................................................................1, 11

## Other Authorities

FED. ELECTIONS COMM'N, *Federal Elections 2020, Election Results for the U.S.
President, the U.S. Senate and the U.S. House of Representatives* (Oct. 2022
ed.) .........................................................................................................................1

H.R. Rep. No. 100-700 (1988).........................................................................................30

## Treatises

Restatement (Second) of Agency § 228 ......................................................................3, 13

## TABLE OF AUTHORITIES

**Page(s)**

Restatement (Second) of Agency § 228(a) ........................................................................16

Restatement (Second) of Agency § 229(1) ........................................................................14

### Constitutional Provisions

U.S. Const. art. II, § 1 ......................................................................................18 20, 30

U.S. Const. art. II, § 3 ......................................................................................18

## INTRODUCTION

On March 20, 2025, the Department of Justice (the "Government") filed several Notices of Substitution under the Westfall Act, 28 U.S.C. § 2679(d), seeking to substitute the United States for the individual Defendant Donald J. Trump ("Trump") with respect to the consolidated Plaintiffs' ("Plaintiffs") state and common law claims.  *See, e.g.*, Notice of Substitution, *Smith v. Trump*, No. 21-CV-2265 (D.D.C. Mar. 20, 2025), Dkt. 376.  Nearly four years into litigation, and after opposing Westfall Act certification of another defendant whose alleged conduct was substantially similar to that alleged here, the Government only now asserts that Trump acted within the scope of his employment as President of the United States with respect to the Plaintiffs' state and common law claims.  The Government's certification cannot be justified under the law.  Neither Trump nor the Government can credibly argue that he acted within the scope of his employment as President by directing private citizens to attack the United States Capitol and disrupt the constitutionally mandated proceeding to certify his opponent's victory in the 2020 presidential election.  Plaintiffs therefore move to strike the Notices of Substitution.

\*\*\*

Trump lost his bid for reelection to the presidency in 2020 by 74 electoral votes.[1]  Refusing to accept his loss, Trump instead continued his campaign to maintain control of the presidency at any cost.  He conspired to interfere with the certification of the election results by, among other things, inciting private citizen rallygoers at a privately funded campaign event to attack the United States Capitol and violently disrupt the peaceful transfer of power.  At the January 6, 2021 Save

---

[1] *See Lee v. Trump*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 153; FED. ELECTIONS COMM'N, *Federal Elections 2020: Election Results for the U.S. President, the U.S. Senate and the U.S. House of Representatives*, at 7 (Oct. 2022), https://www.fec.gov/resources/cms-content/documents/federalelections2020.pdf.

America Rally (the "Rally"), Trump spoke before a crowd of tens of thousands, moments before the election was to be certified by Congress in a constitutionally mandated proceeding presided over by the Vice President. During his speech, Trump encouraged the crowd to "never concede," "fight like hell," and go to the U.S. Capitol to "take back our country." The crowd Trump directed towards the Capitol included members of violent militia groups and others bearing guns, baseball bats, pepper spray, and other weapons. The crowd attacked the Capitol—and law enforcement officers defending it—to prevent Congress from certifying the results of the presidential election. Even after the attack was underway, Trump encouraged the attackers, and he subsequently ratified the crowd's conduct.

Five law enforcement officers died soon after the attack. Hundreds more were injured, many of whom suffer ongoing trauma. The Vice President and members of Congress hid in fear for their lives. Since then, over 1,000 people have been convicted of crimes related to the January 6 attack. A bipartisan congressional committee investigated the riot and the events surrounding it and concluded there was ample evidence to support a criminal referral against Trump, who was subsequently indicted by a grand jury. Plaintiffs in these now-consolidated cases sued, asserting claims for, among other things, assault and battery arising out of Trump's (and others') roles in the events of January 6. Trump's wrongful acts and the resulting harm are the focus of these consolidated lawsuits.

The first of these lawsuits was filed in February 2021. For four years thereafter, neither Trump nor the Government sought to invoke the Westfall Act, a consistent position until two months into Trump's current term as President. In fact, the Government vigorously opposed the request of Congressman Mo Brooks (a co-defendant in one of the lawsuits) for Westfall Act certification. *See* U.S. Resp. to Def. Mo Brooks's Pet. to Certify He Was Acting Within the Scope

of His Office or Employment, *Swalwell v. Trump*, No. 21-CV-586 (D.D.C. July 27, 2021), Dkt. 33 at 2 (arguing that Brooks was engaging in "campaign activity" in connection with the events of January 6, 2021, noting "it is no part of the business of the United States to pick sides among candidates in federal elections," and observing that "courts have routinely rejected claims that campaigning and electioneering activities fall within the scope of official employment").

The Government's newfound position is baseless. The evidentiary record conclusively establishes that Trump's actions giving rise to Plaintiffs' state and common law tort claims fall outside the scope of activities he was authorized to conduct as President, occurred substantially outside the "authorized time and space limits" of his employment, were actuated solely to serve Trump and his goal of unlawfully retaining the presidency, and involved "use[s] of force" that were "unexpectable" by his employer, the United States. *Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023) (quoting Restatement (Second) of Agency § 228). Indeed, this Court has already concluded that Trump's actions, as alleged in the Complaints, constituted campaign conduct that did not "involve official duties." *Thompson v. Trump*, 590 F. Supp 3d 46, 82–83 (D.D.C. 2022). This Court also already analyzed Trump's January 6 speech, line by line, and concluded the speech reflected "an electoral purpose, not speech in furtherance of any official duty." *Id.* at 83. Further, a lengthy presidential immunity discovery process failed to elicit any evidence showing that Trump's actions were within even the outermost perimeter of his presidential duties, such that he would be immune from civil damages claims under the standard set forth in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). *See generally* Pls.' Opp'n to Def.'s Mot. for Summ. J., *Lee v. Trump*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152. That evidence certainly does not establish that his actions were within the scope of his employment as President.

Finally, the President is not an "employee of the Government" under the Westfall Act. The plain text of the Westfall Act, the structure of the Act, and its legislative history all confirm that Westfall Act immunity was intended for rank-and-file federal officials, not the President.

For these reasons and as explained below, the Court should strike the Government's Westfall Act certification, dismiss the Government from the case, and reinstate Trump as a defendant on Plaintiffs' state and common law claims.

## PROCEDURAL BACKGROUND

Plaintiffs in the lead case filed their Complaint on February 16, 2021. *Lee v. Trump*, No. 21-CV-400 (D.D.C. Feb. 16, 2021), Dkt. 1. Trump moved to dismiss the Complaint on May 26, 2021, asserting, *inter alia*, absolute presidential immunity. *Lee*, No. 21-CV-400 (D.D.C. May 26, 2021), Dkt. 22. On February 18, 2022, this Court consolidated three cases in considering the motion to dismiss. The Court denied Trump's motion dismiss "as to Plaintiffs' § 1985(1) claim and certain District of Columbia–law claims," including Plaintiffs' claims for conspiracy to commit and aiding and abetting of assault and battery. *Thompson v. Trump*, 590 F. Supp. 3d 46, 63 (D.D.C. 2022), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023); *see also Smith v. Trump*, No. 21-CV-2265, 2023 WL 417952, at *2 (D.D.C. Jan. 26, 2023) (similarly denying Trump's motion to dismiss). Trump appealed the Court's denial of his presidential immunity defense, and the Court of Appeals affirmed and remanded to give Trump an opportunity to develop evidence that would support it. *Blassingame*, 87 F.4th at 30.[2] After additional cases, including *Smith*, were consolidated, Trump moved for summary judgment on January 24, 2025.

---

[2] Following the D.C. Circuit's instruction in *Blassingame v. Trump*, 87 F.4th 1, 29 (D.C. Cir. 2023), the Court provided Trump an opportunity to produce specific facts supported by evidence contradicting the allegations in the Complaints and to move for summary judgment, which included permitting the parties to conduct "discovery bearing on the immunity question." *See* Order dated Feb. 16, 2024, *Lee*, No. 21-CV-400, Dkt. 78.

*Lee*, No. 21-CV-400 (D.D.C. Jan. 24, 2025), Dkt. 144.[3]  On March 20, 2025, near the conclusion

of this Court's summary judgment briefing schedule, the United States filed a Notice of

Substitution, substituting itself for Trump and certifying that he "was acting in the scope of [his]

office or employment at the time of the incidents out of which the plaintiffs' claims arose" based

on the allegations set forth in the Complaints.  Notice of Substitution ¶ 5, *Smith*, No. 21-CV-2265

(D.D.C. Mar. 20, 2025), Dkt. 376.  On March 21, 2025, Plaintiffs informed the Court that they

intended to oppose the Government's substitution.  Pls.' Notice in Resp. to Notice of Substitution,

*Smith*, No. 21-CV-2265 (D.D.C. Mar. 21, 2025), Dkt. 380.  On April 11, 2025, the Court entered

an Order setting a briefing schedule for Plaintiffs' motion to strike the Notice of Substitution,

which must be based on "the evidentiary record developed in the immunity litigation."  Min. Order

dated Apr. 11, 2025, *Lee*, No. 21-CV-400.

## FACTUAL BACKGROUND

The facts of this case are set forth in detail in Plaintiffs' filings in opposition to Defendant

Trump's motion for summary judgment on the issue of presidential immunity.  *See* Pls.' Opp'n

Opp. to Def.'s Mot. for Summ. J., *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152 ("MSJ

Opp."); Pls.' Counterstmt. to Def.'s Stmt. of Undisputed Facts & Pls.' Stmt. of Additional

Undisputed Facts, *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152-1 ("SUF").  Here,

Plaintiffs focus on the facts most relevant to the state and common law claims against Trump,

which are the subject of the Government's certifications.

---

[3] The consolidated cases are as follows: *Lee v. Trump*, No. 21-CV-400 (D.D.C.); *Swalwell v. Trump*, No. 21-CV-586 (D.D.C.); *Blassingame v. Trump*, No. 21-CV-858 (D.D.C.); *Smith v. Trump*, No. 21-CV-2265 (D.D.C.); *Moore v. Trump*, No. 22-CV-10 (D.D.C.); *Tabron v. Trump*, No. 22-CV-11 (D.D.C.); *Kirkland v. Trump*, No. 22-CV-34 (D.D.C.); and *Garza v. Trump*, No. 23-CV-38 (D.D.C.).

***Events Leading Up to January 6:***  In the months before the 2020 election—as early as May 2020—Trump repeatedly claimed that he could lose the election only if it were "rigged" and "fraudulent."  SUF ¶¶ 21–25.  Trump then lost the 2020 election.  *See supra* n.1.  Rather than concede his loss, Trump continued his campaign to remain in office.  He claimed that victory was "stolen" from him and that he had actually "won in a LANDSLIDE."  SUF ¶¶ 26–42, 45–50, 243–44.  Trump, his Campaign,[4] and individuals affiliated with his Campaign continued to repeat those claims from Election Day until January 6, 2021, and later.  *Id.*

During the weeks between the election and January 6, federal and state officials repeatedly rejected claims by Trump and his Campaign that there had been widespread fraud in the election that could have altered the result.  Trump's own appointees in the Department of Justice investigated the fraud claims and informed Trump that they lacked merit.  *See, e.g.*, *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152-73, at PLAINTIFFS_00071769 (quoting Attorney General William Barr stating he "looked at [the allegations] and didn't think there was fraud"); *see also* SUF ¶ 102.  State and federal courts rejected dozens of legal challenges to the election results, including in at least ten cases brought by Trump and his Campaign.  *See, e.g.*, Verified Compl. at 1, *Trump v. Kemp*, No. 20-CV-5310 (N.D. Ga. Dec. 31, 2020), Dkt. 1 ("Comes now President Donald J. Trump, in his capacity as a candidate for President of the United States . . ."); *Blassingame*, 87 F.4th at 36 (Rogers, J., concurring in part) ("the district court could properly find that . . . President Trump's filing of lawsuits contesting the election" were among a series "acts directed at securing his reelection"); *Eastman v. Thompson*, 636 F. Supp. 3d 1078, 1092 (C.D. Cal. 2022), *appeal dismissed*, 2022 WL 18492376 (9th Cir. Nov. 7, 2022), *cert. denied*, 144 S. Ct. 248

---

[4] The "Campaign" collectively refers to Donald J. Trump for President, Inc. ("DJTFP") and Make America Great Again PAC ("MAGA PAC"). DJTFP was Trump's campaign organization for the 2020 election that changed its name to MAGA PAC in early 2021. SUF ¶¶ 7–9.

(2023) (noting "an effort by President Trump and his attorneys to press false claims [of voter fraud] in federal court for the purpose of delaying the January 6 vote"); *see also* SUF ¶¶ 103–117 (collecting cases brought by or on behalf of Trump in his personal capacity); Pls.' Request for Judicial Notice in Supp. of Opp'n to Def.'s Mot. for Summ. J., *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 153, at App'x B (same). State officials also refuted Trump's claims of fraud. *See Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152-69, at PLAINTIFFS_00070054 (Nov. 19, 2020 public statement issued by Georgia Secretary of State Brad Raffensperger "reaffirm[ing] the outcome of the presidential race in Georgia as originally reported, with Joe Biden leading President Donald Trump in the state"); SUF ¶¶ 98–99, 101 (listing similar statements made by other states' officials).

After the failure of Trump's and his Campaign's efforts to overturn the election through appeals to the courts and federal and state officials, they turned their attention to the Joint Session of Congress that would meet on January 6 to certify Joe Biden's victory. On December 19, 2020, Trump announced a "Big protest in D.C. on January 6th," inviting his supporters to attend: "Be there, will be wild!" *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152-9, at No. 15. In the buildup to the Rally being planned for that day, Trump continued to restate his false claims of election fraud, claiming that it was "Statistically impossible [for him] to have lost the 2020 election." *Id.* Over that time, election officials warned that they were facing "death threats" from Trump's supporters, which Trump refused to "condemn[]." *See, e.g.*, Caspar Decl. Ex. 1 at PLAINTIFFS_00071723, -71740–41 (statements of Gabriel Sterling).[5] Trump then claimed that he was treated "badly" by the election officials in Georgia and announced that he was holding a

---

[5] Exhibits cited as "Caspar Decl. Ex." herein refer to exhibits annexed to the Declaration of Edward G. Caspar filed in support of Plaintiffs' Motion to Strike the Government's Westfall Act Certification.

rally in Dalton on January 4, 2021, in support of Republican Senate candidates David Perdue and Kelly Loeffler, who were both facing run-off elections the next day.  *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152-6, at NARA_PROD_095765.  During that rally, Trump reiterated many of his past false statements and stated that "they're not taking this White House.  We're going to fight like hell."  SUF ¶ 336.

 ***The Events of January 6:***  The January 6 Rally was planned, funded, promoted, organized, and executed by the Trump Campaign, Campaign affiliates, and other private individuals dedicated to keeping Trump in office.  SUF ¶¶ 203–20, 312–13 & Counterstatement Tables C, D, E.  Ten of the twelve individuals named on the Rally's permit worked for the Trump Campaign in some capacity leading up to the Rally, and none were government employees.  SUF ¶¶ 186–202.  Most of the speakers at the Rally were private individuals unaffiliated with the government.  *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152-9, at Nos. 62–72.  The Rally was not government-sponsored or government-funded.  SUF ¶¶ 311–13.  And the speech Trump delivered at the Rally was substantially similar to remarks he delivered in Georgia two days prior, which speechwriters noted was a "political event" rather than an official event.  *Lee*, No. 21-CV-400 (D.D.C. Jan. 24, 2025), Dkt. 144-54; *see also* SUF ¶¶ 293–301 & Counterstatement Table B.  In the hours prior to the Rally, Trump repeatedly tweeted that he could still win the election, including:  "If Vice President @Mike_Pence comes through for us, we will win the Presidency.  Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be).  Mike can send it back[.]"  SUF ¶ 49.  Trump's speech at the rally continued this theme.  Trump distinguished the rallygoers—whom he identified as "Republicans" and "amazing patriots"—from the "radical-left Democrats" who had "stolen" Trump's "election victory."  *Lee*, No. 21-CV-400 (D.D.C. Jan. 24, 2025), Dkt. 144-47

("Speech Tr."), at NARA_PROD_097097, -097102, -097124.  Trump made clear he was seeking to remain in office when he warned the crowd that "we're going to have somebody in [the Oval Office] that should not be in there . . . and we're not going to stand for that."  *Id.* at NARA_PROD_097100.

Intermixed with these warnings to the crowd were explicit calls to action.  Trump urged the crowd to "never give up," to "never concede," and to "stop the steal."  Speech Tr. at NARA_PROD_097097.  He then said that "Republicans," including those present, were "going to have to fight much harder."  *Id.* at NARA_PROD_097102.  He told the crowd to go to the Capitol and that "[y]ou have to show strength," reminding them that "I'm going to be watching because history is going to be made."  *Id.* at NARA_PROD_097102–04.  He claimed that "[w]hen you catch somebody in a fraud, you're allowed to go by very different rules."  *Id.* at NARA_PROD_097121.  Trump then concluded by urging the crowd to "fight like hell.  And if you don't fight like hell, you're not going to have a country anymore. . . .  So we're going to [] walk down Pennsylvania Avenue . . . and we're going to the Capitol.  And we're going to try and give . . . our Republicans – the weak ones . . . the kind of pride and boldness that they need to take back our country."  *Id.* at NARA_PROD_097125.

Trump was aware that many of his supporters in the crowd were armed during his Rally speech.  Prior to his speech, when Trump learned that many rallygoers were refusing to pass through magnetometers because they were armed, Trump insisted the detectors be removed, stating something to the effect of:  "I don't F'ing care that they have weapons.  They're not here to hurt me.  Take the F'ing mags away.  Let my people in.  They can march to the Capitol from here."  Caspar Decl. Ex. 2 at PLAINTIFFS_00043813–14.  When Trump was told that the magnetometers could not be removed due to "Secret Service protocol," he responded to the effect

of "F the Secret Service.  I'm the President.  Take the F'ing mags away.  *They're not here to hurt me*."  *Id.* at PLAINTIFFS_00043814 (emphasis added).

Trump concluded his speech at 1:10 p.m.  Speech Tr. at NARA_PROD_097125.  Less than an hour later, the Capitol was under attack.  Caspar Decl. Ex. 3 at PLAINTIFFS_00018487–88.  Rioters assaulted the Capitol for roughly three hours, during which time over 2,000 of them forcibly entered the interior of the building, causing Congress and the Vice President to rapidly evacuate.  Caspar Decl. Ex. 4 at PLAINTIFFS_00069264 (testimony of Stephen Ayres that "a lot of damage got done in that, you know, 3, 3 and-a-half hour window"); Caspar Decl. Ex. 5 at PLAINTIFFS_00020846–50 (testimony of Marc Short about the evacuation).  Over one hundred law enforcement officers were injured while trying to contain the attack.  *See* Caspar Decl. Ex. 6 at PLAINTIFFS_00042398.  Five died as a direct consequence.  Caspar Decl. Ex. 7 at PLAINTIFFS_00064265.

***Trump's Response to the Violence of January 6:***  Following the Rally, Trump returned to the White House and monitored the crowd's progress closely on the news.  Caspar Decl. Ex. 8 at PLAINTIFFS_00020301–04.  At 2:24 p.m.—mere minutes after news reports that protestors had made their way inside the Capitol, SUF ¶ 348—Trump tweeted, "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!"  *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152-9, at No. 31.  For nearly three hours after the attack began, Trump did nothing to dissuade the crowd as it attacked the Capitol, even as individuals close to Trump tried to convince him to call off the rioters.    SUF  ¶¶ 348–350;  *see also*  Caspar  Decl.  Ex.  5  at

PLAINTIFFS_00020862–64.  Trump later acknowledged that his supporters "listen to [him] like no one else."  Caspar Decl. Ex. 9 at PLAINTIFFS_00069972.

At 4:17 p.m., approximately two hours after the initial breach of the Capitol, Trump posted a video in which he told the attackers to go home.  Even in that video, Trump communicated support for the attackers, indicating that their violence was justified: "I know your pain, I know you're hurt. We had an election that was stolen from us. It was a landslide election and everyone knows it, especially the other side," whom Trump called "so bad and so evil."  *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152-9, at No. 32.  Trump then told the attackers, "We love you, you're very special."  *Id*.  A few hours later, Trump tweeted that "[t]hese are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots . . . .  Remember this day forever!"  SUF ¶ 351.

## STANDARD OF REVIEW

The Federal Tort Claims Act ("FTCA") grants federal district courts exclusive jurisdiction over civil actions involving claims against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1).  The Westfall Act, 28 U.S.C. § 2679, is a provision of the FTCA that immunizes individual federal employees from tort liability arising out of their official actions "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose."  *Bannum, Inc. v. Samuels*, No. 16-5353, 2018 WL 11413157, at *1 (D.C. Cir. Feb. 15, 2018) (per curiam) (quoting 28 U.S.C. § 2679(d)(1)).  At that point, the United States is substituted as the defendant,

"making the action against the United States under the FTCA the exclusive means of recovery for the injured individual in tort." *Carroll v. Trump*, 49 F.4th 759, 765 (2d Cir. 2022) (*Carroll II*).

A Westfall Act certification is not, however, "necessarily conclusive as to the substitution of the federal government as the defendant." *Taylor v. Clark*, 821 F. Supp. 2d 370, 373 (D.D.C. 2011) (citation omitted); *see also, e.g.*, *Bowles v. United States*, 685 F. App'x 21, 26 (2d Cir. 2017) (affirming denial of substitution after Attorney General's certification); *Garcia v. United States*, 88 F.3d 318, 320 (5th Cir. 1996) (same). Rather, the Attorney General's scope-of-employment certification "only serves as prima facie evidence." *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1329–30 (D.C. Cir. 2014). "A plaintiff may contest the Attorney General's scope-of-employment certification [pursuant to the Westfall Act] before a district court." *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009); *see also De Martinez v. Lamagno*, 515 U.S. 417, 436–37 (1995) ("The statute is fairly construed to allow petitioners to present to the District Court their objections to the Attorney General's scope-of-employment certification."). "[A] plaintiff challenging the government's scope-of-employment certification bears the burden of coming forward with specific facts rebutting the certification." *Stokes v. Cross*, 327 F.3d 1210, 1214 (D.C. Cir. 2003) (internal quotation marks and citation omitted).

## ARGUMENT

## I. Trump Acted Outside the Scope of His Employment in Relation to Plaintiffs' State and Common Law Claims

The Court should strike the Government's certification because Trump acted outside the scope of his employment at all relevant times.

To determine whether a federal employee was acting within the scope of his or her employment, the Court "appl[ies] the law [of] the state in which the alleged tort occurred," here, District of Columbia law. *Phillips v. Mabus*, 894 F. Supp. 2d 71, 86 (D.D.C. 2012). "[T]he District

of Columbia generally adheres to the analytical framework of the scope of employment inquiry

set forth in the Restatement (Second) of Agency," which provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
>> (a) it is of the kind [the person] is employed to perform;
>>
>> (b) it occurs substantially within the authorized time and space limits;
>>
>> (c) it is actuated, at least in part, by a purpose to serve the master, and
>>
>> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023) (*Carroll I*) (alterations in original) (quoting

Restatement (Second) of Agency § 228).[6]  The "determination of scope of employment is

dependent upon the facts and circumstances of each case."  *Id.* at 230 (quoting *Penn Cent. Transp.*

*Co. v. Reddick*, 398 A.2d 27, 29 (D.C. 1979)).  Nevertheless, "each section of the Restatement

(Second) represents a distinct inquiry that the factfinder must undertake" and that the party

invoking vicarious liability "must satisfy."  *Id.* at 238 (noting that § 228 uses "the word 'and'

conjunctively to describe the factors for *respondeat superior*").

Here, the evidence demonstrates that Trump was acting unofficially as a candidate for

office, in a purely private capacity, when he undertook the actions that gave rise to the claims at

issue.  Thus, his conduct: (a) was manifestly different from conduct the president is authorized to

engage in; (b) was actuated to serve only himself and not the Government; and (c) entailed entirely

---

[6] For ease of reference, Plaintiffs refer to the D.C. Court of Appeals' decision in *Trump v. Carroll*, 292 A.3d 220 (D.C. 2023) as *Carroll I*, and the D.C. Circuit's decision in *Carroll v. Trump*, 49 F.4th 759 (D.C. Cir.) as *Carroll II*.

unexpected uses of force against Plaintiffs, all of whom are Government employees, and against the Government itself.

### A.    Trump's Conduct Was Not of the Kind that He Was Employed to Perform

To qualify as conduct "of the kind" an employee is authorized to perform, it must "either [be] 'of the same general nature as' or 'incidental to' the conduct authorized." *Carroll I*, 292 A.3d at 230 (emphasis omitted) (quoting Restatement (Second) of Agency § 229(1)); *see also Allaithi*, 753 F.3d at 1332 (similar).

Whether tortious conduct was "of the same general nature" as "the conduct authorized" calls for an "inquiry into the similarity between the tortious conduct and an individual employee's job functions." *Carroll I*, 292 A.3d at 230. Whether tortious conduct was "incidental to" authorized conduct in turn requires an "inquiry into whether the tortious conduct was undertaken *in service of* carrying out an employee's job function." *Id.* at 230–31 (emphasis in original). Ultimately, "the determination of whether the conduct gives rise to liability [is] tied to the underlying nature of the employment." *Id.* at 231. "The employment must have created more than the mere opportunity to commit the tort; there must still be some relationship or nexus between the tortious conduct and the employee's responsibility[y] . . . ." *Id.*; *see also Smith v. Clinton*, 886 F.3d 122, 127 (D.C. Cir. 2018) ("What matters is whether the underlying activity itself was part of the employee's duties.").

In addition, "[u]tilizing a foreseeability analysis can aid in establishing the nexus between the tortious conduct and the terms of the employment that justifies allocating the costs of the tortious conduct to the employer." *Carroll I*, 292 A.3d at 231. Accordingly, courts may "ask[] whether the conduct in question is so unforeseeable as to make it unfair to charge the employer with responsibility, or whether the tortious conduct was unexpected in view of the employee's

duties." *Id.* at 231 (cleaned up) (citations omitted). The foreseeability analysis "is not boundless and the determination of whether the conduct gives rise to liability remains tied to the underlying nature of the employment." *Id.* (citing *Penn Cent.*, 398 A.2d at 32). Thus, to be foreseeable the conduct must be "the outgrowth of the employees' instructions or job assignments, or the outgrowth of a job-related dispute." *Id.* at 232 (internal quotation marks and citations omitted).

            1.     *Trump's Conduct Was Not Similar to or Incidental to Authorized Conduct.*

The evidence shows that Trump acted in an unofficial, personal capacity as a candidate for office—and not as President of the United States—at all times relevant to this case, including with respect to Plaintiffs' common law claims. As detailed in Plaintiffs' opposition to Trump's motion for summary judgment on presidential immunity grounds, Plaintiffs' claims arise out of a months-long scheme that Trump and others planned and executed to retain control of the presidency unlawfully and against the will of the American people. *See* MSJ Opp. Trump's efforts in this regard entailed unofficial acts that he undertook as a candidate for public office. *See id.* at 14–41; *see also Blassingame*, 87 F.4th at 4 (noting that Trump's "post-election efforts to alter the declared results in his favor" were undertaken "in his personal capacity as presidential candidate, not in his official capacity as sitting President").

Trump's participation in the scheme to prevent certification of the presidential election and remain in office make plain an important truth: Trump acted as a candidate and outside any possible scope of his "employment" as President. Plaintiffs' state and common law claims—and this motion—involve Trump's instigation and encouragement of the violent attack by a private crowd on the Capitol, those within, and those protecting it. None of this conduct was in any way similar or incidental to conduct authorized for the President.

The core of the conduct at issue with respect to the state law claims—Trump's statements leading up to and at the Rally—was singularly focused on his own effort to cling to power, and it bears no legitimate connection to the President's official responsibilities.[7]  Trump falsely claimed that the election had been "stolen by emboldened radical-left Democrats," Speech Tr. at -97097, and made several unsupported and factually incorrect statements about voter fraud, *see, e.g.*, *id.* at -97117.  Trump also made clear that he—and his supporters—would not "stand for" a President who, in Trump's view, "should not be in there."  *Id.* at -97100.  He urged the crowd to "never give up," "never concede," and "stop the steal."  *Id.* at -97097.  And he repeatedly encouraged the crowd to "show strength," and "fight like hell" to prevent Congress from certifying the results of the 2020 election.  *Id.* at -97102–04, -97125.  When this Court last examined these words, it held that the speech was not "in furtherance of any official duty."  *Thompson v. Trump*, 590 F. Supp. 3d 46, 83 (D.D.C. 2022).  Indeed, as Trump advisor Stephen Miller testified, it was "blindingly obvious that the purpose of the speech was to build support for the election contest."   SUF ¶ 315.  Simply put, speeches by an office-seeker to secure another term in office are not "of the kind [the person] is employed to perform[.]"  Restatement (Second) of Agency § 228(a); *see Carroll I*, 292 A.3d at 230.

The broader context of January 6 further corroborates that Trump acted well beyond the scope of his employment.   Trump planted the seeds to incite the crowd on January 6 by repeatedly—and falsely—claiming victory in the 2020 election, engaging in litigation in his personal capacity in multiple swing states aimed at overturning the results, and convening meetings with campaign lawyers to implore various state officials to overturn the results.  *See* SUF

---

[7]  As set forth below, the remainder of Trump's conduct remains relevant to the extent it is circumstantial evidence of Trump's subjective intent on January 6.  *See* infra section I.b.

¶¶ 26–117.  When those efforts failed, he encouraged his supporters to attend a "wild" and "[b]ig protest in D.C. on January 6th."  *Id.* ¶ 38; *see also id.* ¶ 39 ("We won in a LANDSLIDE!"); *id.* ¶ 40 ("Never give up.  See everyone in D.C. on January 6th."); *id.* ¶ 47 ("All Mike Pence has to do is send them back to the States, AND WE WIN.").  Two days before the Rally, Trump told his supporters at a political rally in Georgia that he would "fight like hell," and cautioned them that if they did not do the same, they would not "have a country left."  *Id.* ¶ 42.

On January 6, having gathered an outraged crowd mere blocks from the Capitol at the same date and time that Congress was gathering to certify the result of the 2020 election, Trump delivered a campaign speech that incensed them further and outlined a path for him to remain president.  In his speech, Trump told the crowd "that the election was 'rigged' and 'stolen,' and not just from him, but from *them*."  *Thompson*, 590 F. Supp. 3d at 113.  He blamed the election loss on "Democrats," "weak Republicans," and others, and told "the crowd repeatedly that the election had been stolen."  *Id.* at 113–14.  Trump then gave the crowd its marching orders.  He directed his supporters to go to the Capitol, even though the permit for the Rally did not authorize it, and he encouraged these thousands of private actors, many of whom he knew were armed, to "fight like hell."  *See* MSJ Opp. at 4–6; SUF ¶¶ 336–39; *Lee v. Trump*, No. 20-CV-400 (D.D.C. Jan. 24, 2025), Dkt. 144-26.  Following Trump's instructions, that crowd marched to the Capitol building, assaulted it for hours, and more than a hundred law enforcement officers in the process.  SUF ¶ 348; Caspar Decl. Ex. 3 at PLAINTIFFS_00018487–88; Caspar Decl. Ex. 4 at PLAINTIFFS_00069264; Caspar Decl. Ex. 5 at PLAINTIFFS_00020846–50.  As the facts of this case demonstrate, the crowd responded just as Trump intended.  Even during the attack, after news reports that attackers had entered the Capitol, *see SUF* ¶ 348, Trump encouraged the attackers, tweeting, "Mike Pence didn't have the courage to do what should have been done to protect our

Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!" *Lee*, No. 21-CV-400, Dkt. 152-9, at No. 31.

Trump's conduct was not of the same general nature as, or incidental to, any action that he was authorized to undertake as President. "No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (alteration in original) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). There is no provision in the Constitution or any act of Congress that authorizes the President to organize an attack on a co-equal branch of government. To the contrary, the President is charged with, among other things, "tak[ing] Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and "protect[ing] the national security," *Trump v. Vance*, 591 U.S. 786 (2020) (Thomas, J., dissenting) (internal quotation marks omitted). Trump's actions on January 6 were not taken in furtherance of those duties; they were directly contrary to them. Indeed, the President has no authority to direct private citizens to the Capitol to prevent Congress from performing its duties. Trump has not—and cannot—identify any constitutional principle, federal law, or national security interest that would justify this conduct.[8]

---

[8] For the same reasons, the Court should also conclude that Trump's conduct occurred outside authorized time and space limits. *See Carroll I*, 292 A.3d at 228 (setting forth the elements of the scope-of-employment analysis). For employees who are "considered always on duty," such as police officers, courts focus on "whether the officers were obligated by law to take action," "whether the officers 'intend[ed] to take [] action' against the victims," and whether the officers were "on duty," including whether "the officers were considered to be off-duty, dressed in civilian clothing, and otherwise attending to personal business prior to the tortious conduct." *Id.* at 233 (citations omitted).

The President was not "obligated by law to take action," *id.* at 233, in response to his manufactured—and demonstrably false—claims of election fraud. Federal law assigns that responsibility to the States and Congress. U.S. Const. art. II, § 1; 3 U.S.C. § 1 *et seq.*; *see also Trump*, 603 U.S. at 624 ("Despite the Vice President's expansive role of advising and assisting the President within the Executive Branch, the Vice President's Article I responsibility of presiding

Trump's after-the-fact claim that he was ensuring election integrity has nothing to do with his direction to incensed rallygoers to march on the Capitol and his encouragement of the attack—actions that led to Plaintiffs' state and common law tort claims. It is also a post-hoc rationale invented to invoke immunity and as such, lacks credibility and should be disregarded. Moreover, the Constitution contemplates *no role* for a sitting President in the process of certifying and counting electoral votes. Instead, the Constitution provides that, once state electors have cast their votes for President and Vice-President, the counting and certification of those votes shall be conducted by the President of the Senate in the presence of the Senate and House of Representatives.[9] U.S. Const. art. II, § 1. Similarly, the Electoral Count Act, 3 U.S.C. § 1 *et seq.*, the statute that governs the electoral count process, does not allocate any official role or responsibility to the President. Further, as this Court has already found, "the main thrust of [Trump's] Speech was not focused on policy or legislation." *Thompson*, 590 F. Supp. 3d at 83. It cannot be said that Trump's conduct is similar to, or taken in service of, any of his "job function[s]." *Carroll I*, 292 A.3d at 230–31.

Further, while a President has broad authority to speak to and on behalf of the American people, there nevertheless may "be contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity," such as when he speaks as a

---

over the Senate is not an executive branch function." (internal quotation marks and citation omitted)); *id.* at 653 (Barrett, J., concurring) ("The President has no authority over state legislatures or their leadership."). In addition, as set forth above, *supra* section I.a.1, the evidentiary record reflects that Trump did not "'intend to take [official] action,'" was "considered to be off-duty," and was "otherwise attending to personal business" when speaking at the rally on January 6. *Carroll I*, 292 A.3d at 233 (alteration omitted) (quoting *D.C. v. Bamidele*, 103 A.3d 516, 526 (D.C. 2014)). Indeed, Trump, and those who helped him implement his scheme, viewed him to be involved in purely personal, off-duty conduct at all relevant times. *See* MSJ Opp. at 27–39.

[9] To the extent the Vice President participates in this process, the Supreme Court has made clear that "he does so in his capacity as President of the Senate," which is "not an executive branch function." *Trump*, 603 U.S. at 623–24 (internal quotation marks and citation omitted).

"candidate for office" or as a "party leader." *Trump*, 603 U.S. at 629; *see also Blassingame*, 87 F.4th at 17 ("[W]hen a sitting President acts in his capacity as a candidate for re-election, he acts as office-*seeker*, not office-*holder*.").   The content, form, and context of the Rally and Trump's speech at the Rally bear all the hallmarks of unofficial, office-seeking activity.   Indeed, Trump's actions in planning and promoting the Rally, and his speech at it, were in an unofficial capacity. As discussed at length in Plaintiffs' opposition to Trump's motion for summary judgment, the relevant context demonstrates that Trump acted in his capacity as a candidate for public office; the Rally was organized, funded, promoted, and executed by private campaign actors and using private campaign resources.   *See* MSJ Opp. at 26–34.   Executive branch officials were not involved in organizing or executing the Rally other than in their private, unofficial capacities, and understood as much.   *Id.* at 38–41; *see also* SUF ¶¶ 251, 311–34.

2.    *Trump's Conduct Was Not Foreseeable.*

As discussed above, in determining whether conduct was of a kind a person was employed to perform, courts also undertake "a foreseeability inquiry, asking whether the conduct in question is so unforeseeable as to make it unfair to charge the employer with responsibility, or whether the tortious conduct was unexpected in view of the employee's duties."   *Carroll I*, 292 A.3d at 231 (cleaned up) (citations omitted).    An employee's conduct is not foreseeable when the "employee['s] intentional torts do not arise *directly* from the performance of their *authorized* duties."   *Haddon v. United States*, 68 F.3d 1420, 1425 (D.C. Cir. 1995) (emphasis added), *abrogated on other grounds by Osborn v. Haley*, 549 U.S. 225 (2007).   Employee conduct that is "unrelated to his official responsibilities" is similarly not foreseeable.   *Id.*   To be foreseeable, "[t]he employment must have created more than the mere opportunity to commit the tort; there must still

be some relationship or nexus between the tortious conduct and the employee's responsibilities." *Carroll I*, 292 A.3d at 232.

As discussed above, campaigning to remain in office is not one of the president's authorized duties. *See Blassingame*, 87 F.4th at 17. While one may anticipate that a President will campaign for a second term in office, for the reasons explained above, there was no "relationship or nexus" between Trump's campaign conduct at the rally on January 6th and Trump's employment. More broadly, viewed in the context of the history and tradition of the Presidency, it is entirely unforeseeable that a sitting President would attempt to turn an angry and armed group of his supporters on Congress and on his own Vice President. *Eastman v. Thompson*, 594 F. Supp. 3d 1156, 1198 (C.D. Cal. 2022) (noting that Trump and others "launched a campaign to overturn a democratic election, and action unprecedented in American history"). As the D.C. Circuit aptly explained, the "riot at the Capitol on January 6" was "a decidedly unprecedented event involving the presidency." *Blassingame*, 87 F.4th at 4.

On the contrary, it is fundamental to the American system of government that elections are centered around the peaceful transfer of power. *See Eastman*, 594 F. Supp. 3d at 1192 ("Our nation was founded on the peaceful transition of power, epitomized by George Washington laying down his sword to make way for democratic elections."); *United States v. Sabol,* 534 F. Supp. 3d 58, 73 (D.D.C. 2021) (holding that it is beyond the scope of the president's powers to "ostensibly or actually giv[e] the rioters permission to use violence to interfere with the peaceful transition of power"). Thus, even assuming Trump was in the position to direct his supporters to the Capitol to prevent certification of the election *because* he was President, his employment merely offered him "the *opportunity* to pursue his personal adventure"—it does not render his conduct foreseeable. *See Boykin v. District of Columbia*, 484 A.2d 560, 563 (D.C. 1984); *see also District of Columbia*

*v. Coron*, 515 A.2d 435, 438 (D.C. 1986) ("The sexual assault in *Boykin* occurred during the work day while the employee was on duty. Although the court acknowledged that the employee's assignment responsibilities included some physical contact with students, the court rejected the argument that sexual assaults were, therefore, foreseeable.").

Furthermore, it is unforeseeable that Trump as President—as an "employee" of the American people—would encourage and facilitate violence against a co-equal branch of government comprising elected representatives, especially *after* the American people voted to remove Trump from office. Such an assault is tantamount to the employee turning on its employer. *See, e.g., Ctr. for Food Safety v. Regan*, 56 F.4th 648, 659 (9th Cir. 2022) ("When [the executive] deliberately ignores Congress's legislative command, it undermines the will of the people and ultimately our constitutional structure of government."). Plaintiffs are not aware of any precedent that treats use of force by the servant *against* the master as within the scope of employment. Such a conclusion would be "a complete abandonment of the master-servant relationship." *Penn Cent. Transp. Co.,* 398 A.2d at 30.

Trump's conduct on January 6 ran contrary to basic democratic values that the office of the President had honored for over two centuries and represented an effort to undermine the functioning of the federal government for personal, private gain. Such conduct is outside the scope of conduct a President is authorized to undertake, and accordingly, was unforeseeable. Because the government cannot show that Trump's conduct was similar or incidental to authorized conduct or that it was foreseeable in view of his duties, it cannot show that Trump's conduct was of the kind he was employed to perform. On this basis alone, the Court should conclude that Trump did not act within the scope of his employment.

### B.    Trump's Conduct Was Actuated Solely to Serve Himself

Under District of Columbia law, for conduct to be within the scope of employment, it also must be the case that "the employee's tortious conduct was 'actuated, at least in part, by a purpose to serve the master.'"  *Carroll I*, 292 A.3d at 233–34.  Thus, courts must inquire into "whether, in the moments surrounding the employee's conduct, there is evidence that the employee was, in fact, motivated by the purpose of serving the master."  *Id.* at 238.  This requires a "subjective" assessment of "the employee's state of mind to determine whether the employee was, in fact, motivated by a purpose to serve their employer."  *Id.* at 234.[10]  Where there is "some discernable purpose to serve the employer," the employee's conduct nonetheless falls "outside the scope of employment" if it was "too little actuated" by the purpose to serve the employer.  *Id.* at 235–36 (citation omitted).  Finally, courts also consider whether the employee possessed the purpose to serve the employer at the time the tort was committed or "in the moments preceding the commission of the tort."  *Id.* at 237.  In undertaking this analysis, courts consider both "direct and circumstantial evidence of the employee's state of mind," and may "make credibility determinations about the stated reasons that the tortious conduct was undertaken or otherwise draw reasonable inferences from the facts."  *Id.* at 234.

The evidence demonstrates that, in the moments leading up to, during, and immediately after January 6, Trump was solely concerned with maintaining his grasp on the presidency rather than any official purpose.  *See, e.g.*, SUF ¶ 88 (explaining that Trump "called Georgia Governor

---

[10]  While the Court's analysis of presidential immunity does "not turn on whether the activity was subjectively undertaken in some measure to enhance [Trump's] re-election prospects or profile," *Blassingame*, 87 F.4th at 21, that is not the case for the Court's analysis of whether Trump acted within the scope of his employment on January 6.  Indeed, the D.C. Court of Appeals "disavow[ed] the language . . . that the scope-of-employment inquiry is an objective inquiry."  *Carroll*, 292 A.3d at 234 n.13.  The Court is therefore free to consider evidence of Trump's subjective intent for purposes of deciding whether he acted within the scope of his employment.  *See id.* at 234.

Brian Kemp and asked him to hold a special session of the legislature to appoint electors who could cast electoral votes for him").  Leading up to the Rally, Trump made repeated public statements falsely claiming victory in the 2020 presidential election.  *See, e.g.*, SUF ¶¶ 26–42, 243–44 (tweeting, among other things, that victory in the 2020 election was "stolen" from Trump and that he "won in a LANDSLIDE").  He also filed several lawsuits challenging the results of the 2020 election, all while orchestrating a scheme to block certification of the legitimate results and install false electors who would cast fraudulent electoral votes in his favor.  SUF ¶¶ 56–74, 75–97, 104–05.  All these actions were undertaken with a single goal in mind: securing the Presidency for Trump against the will of American voters.  *See Blassingame*, 87 F.4th at 4 (noting that, based on the allegations in the complaints, Trump's "post-election efforts to alter the declared results in his favor" were actions taken "in his personal capacity as presidential candidate, not in his official capacity as sitting President").

Trump began his Rally speech asserting that "we won this election, and we won it by a landslide."  Speech Tr. at NARA_PROD_097097.  Trump then encouraged government officials to overturn the results in his favor.[11]  Then, Trump concluded his speech with a call to action:

> And we fight.  We fight like hell.  And if you don't fight like hell, you're not going to have a country anymore. . . . [W]e're going to the Capitol.  And we're going to try and give . . . them the kind of pride and boldness that they need to take back our country.

*Id.* at NARA_PROD_097125.  As this Court itself concluded, the content and context of Trump's speech make clear that "the words spoken by the President . . . reflect an electoral purpose, not speech in furtherance of any official duty."  *Thompson*, 590 F. Supp. 3d at 83.

---

[11]  *See, e.g.*, Speech Tr. at NARA_PROD_097097 ("Mike Pence is going to have to come through for us.  And if he doesn't, that will be a sad day for our country because you're sworn to uphold our Constitution.").

Furthermore, Trump's comments during and immediately after the attack show that he was motivated only by his intent to undo the election results and secure a second term.  During the attack, he tweeted that Mike Pence chose not to derail the certification because he "didn't have the courage to do what should have been done . . . ."  SUF ¶ 349.  Later that evening, Trump tweeted that "[t]hese are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long."  *Id.* ¶ 351.  What Trump and his supporters wanted was clear: to prevent certification of the 2020 election.  *Id.* ¶ 352 ("Had Mike Pence sent the votes back to the legislatures, they wouldn't have had a problem with Jan. 6, so in many ways you can blame him for Jan. 6.  Had he sent them back to Pennsylvania, Georgia, Arizona, the states, I believe, number one, you would have had a different outcome.  But I also believe you wouldn't have had 'Jan. 6' as we call it.").  Taken together, Trump's actions before, during and after January 6 show that he was motivated by a single purpose: to maintain his grasp on the Presidency by any means possible.

In his motion for summary judgment, Trump has asserted that the purpose of his speech on January 6 was to promote "the fairness and integrity of federal elections."  *See, e.g.*, Def's Mem. in Supp. of Mot. for Summ. J., *Lee*, No. 21-CV-400, (D.D.C. Jan. 24, 2025), Dkt. 144-1 at 14.  This is a self-serving, *post-hoc* rationale invented for the purpose of invoking immunity.  *Carroll I*, 292 A.3d at 234 n.15 (noting that, in the context of Westfall immunity, it is "appropriate to consider evidence suggesting the employee has an incentive to describe their conduct as motivated by a purpose to serve their employer to immunize themselves from personal liability").

The assertion also lacks credibility in this context because the Government's certification comes after years of delay and is wholly inconsistent with its prior positions in this very litigation.  *Id.* at 234 (noting that, in evaluating subjective state of mind, "the factfinder can make credibility

determinations about the stated reasons that the tortious conduct was undertaken or otherwise draw reasonable inferences from the facts"). Trump and the Government have had notice of Plaintiffs' common law claims and the factual basis of those claims for over four years.[12] Nevertheless, Trump failed to seek certification from Government or assert Westfall Act immunity despite ample opportunities to do so.[13] *See* 28 U.S.C. § 2679(c) (requiring employees subject to the Westfall Act to "promptly furnish copies of the pleadings and process therein to the United States attorney for the district embracing the place where the proceeding is brought, to the Attorney General, and to the head of his employing Federal agency"). Similarly, the Government waited years to make its certification and has taken a position that is directly contrary to its stance earlier in this case. In

---

[12] *See, e.g.*, Compl., *Swalwell v. Trump*, No. 21-CV-586 (D.D.C. Mar. 5, 2021), Dkt. 1 at ¶¶ 237–252; Compl., *Blassingame v. Trump*, No. 21-CV-858 (D.D.C. Mar. 30, 2021), Dkt. 1 at ¶¶ 132–61; Compl., *Smith v. Trump*, No. 21-CV-2265 (D.D.C. Aug. 26, 2021), Dkt. 1 at ¶¶ 142–166, 184–195; Compl., *Moore v. Trump*, No. 22-CV-10 (D.D.C. Jan. 4, 2022), Dkt. 1 at ¶¶ 147–165; Compl., *Tabron v. Trump*, No. 22-CV-11 (D.D.C. Jan. 4, 2022), Dkt. 1 at ¶¶ 154–172; Compl., *Kirkland v. Trump*, No. 22-CV-34 (D.D.C. Jan. 6, 2022), Dkt. 1 at ¶¶ 161–179.

[13] Trump made a few passing references to the Westfall Act in footnotes of certain of his motions to dismiss, but otherwise neither asserted it nor sought Government substitution, prior to the Government's March 2024 Notices of Substitution. *See* Mem. Supp. Donald J. Trump and Donald Trump Jr.'s Mot. Dismiss, *Swalwell v. Trump*, No. 21-CV-586 (D.D.C. May 24, 2021), Dkt. 14-1 at 11 n.6; Mem. Supp. Donald J. Trump's Mot. Dismiss, *Lee v. Trump*, No. 21-CV-400 (D.D.C. May 26, 2021), Dkt. 22-1 at 11 n.6; *Blassingame v. Trump*, No. 21-CV-858 (D.D.C. June 24, 2021), Dkt. 10-1 at 13 n.5. In each of these briefs, Trump suggested but did not expressly contend that he may be entitled to the immunity, while stating that immunity under the Westfall Act is "narrower than . . . absolute immunity arising directly from the Constitution." *See, e.g.*, *Swalwell*, No-21-CV-586 (D.D.C. May 24, 2021), Dkt. 14-1 at 11 n.6; *see also* Donald J. Trump Mem. Supp. Mot. Dismiss, *Garza v. Trump*, No. 23-CV-38 (D.D.C. Apr. 3, 2023), Dkt. 24-1 at 12 (conceding that "Presidential immunity is broader than even Congressional immunity under the Westfall Act"). Plaintiffs agree that Westfall Act immunity, which is available to "a federal employee . . . acting within the scope of his office or employment at the time of the incident out of which the claim arose," *Osborn v. Haley*, 549 U.S. 225, 247 (2007) (internal quotation marks and citation omitted), is not broader than presidential immunity, which is "a functionally mandated incident of the President's unique office" and extends to the "outer perimeter of his official responsibility," *Blassingame*, 87 F.4th at 12 (internal quotation marks and citation omitted). Thus, if this Court determines that Trump is not entitled to presidential immunity, it should also conclude that he is not entitled to immunity under the Westfall Act.

fact, when former Congressman Mo Brooks sought a certification from the Government for substantially similar conduct, the Government opposed certification.  U.S. Resp. to Def. Mo Brooks's Pet. to Certify, *Swalwell*, No. 21-CV-586 (D.D.C. July 27, 2021), Dkt. 33.  In opposing certification, the Government recognized that there can be no colorable argument that any government official acts within the scope of their office when they direct and encourage a crowd to attack the Capitol and prevent members of Congress from certifying the results of an election. *See id.* at 1–3.

Trump's assertion that he acted in the interest of election integrity is also refuted by the evidentiary record.  As set forth above, Trump was repeatedly informed by executive branch officials, state officials, and courts that his claims of widespread voter fraud lacked merit, and that he lost the election fair and square.  *See, e.g.*, SUF ¶¶ 72, 98–102, 103–117; Ex. 116, *Lee*, No. 21-CV-400, Dkt. 152-69 at PLAINTIFFS_0007054; Ex. 120, *Lee*, No. 21-CV-400, Dkt. 152-73 at PLAINTIFFS_00071769.  Trump nevertheless addressed an incensed crowd of his supporters on the day the election results were scheduled to be certified, continuing to peddle the myth that voter fraud cost him the election and encouraging his supporters to "fight" to overturn the election results.  Thus, any claim that Trump's conduct was directed at promoting free and fair elections defies credulity.

Trump's actions were "in no degree committed to serve [his employer's] interest, but rather appear[] to have been done solely for the accomplishment of [Trump's] independent, malicious, mischievous and selfish purposes."  *District of Columbia v. Bamidele*, 103 A.3d 516, 526 (D.C. Cir. 2014) (quoting *Boykin*, 484 A.2d at 562).  This Court therefore should reject the Government's claim that Trump was acting within his "scope of employment" as President.

### C.     Trump's Use of Force Was Not Expectable by the Employer, the United States

Because the allegations against Trump implicate a use of force, a Court may find that his conduct was within the scope of his employment "*only* if" the use of force was "[]expectable by the master," *Carroll I*, 292 A.3d at 228, meaning that it was "within the range of responsibilities entrusted to the employee." *Johnson v. Weinberg*, 434 A.2d 404, 408 (D.C. 1981).  Uses of force are "unexpectable" when "the conduct in question is so unforeseeable as to make it unfair to charge the [employer] with responsibility."  *Carroll I* at 231 (quoting *Penn Cent.*, 398 A.2d at 30). "[W]hen considering whether the use of force was 'unexpectable,' the factfinder should undertake the same foreseeability analysis for intentional torts considered under § 228(1)(a) of the Restatement (Second)."  *Id.* at 239.

For the reasons discussed above, *see supra* Section I.A.2 ("Trump's Conduct Was Not Foreseeable"), Trump's conduct was plainly unforeseeable in view of his duties as President.  *See Blassingame*, 87 F.4th at 17 (distinguishing between a President's conduct in his official and personal capacities).  Trump directed an attack on his own employer, the United States government, by means of a private crowd and in furtherance of his own office-seeking ambitions.  These acts fall well outside of the scope of the traditional foreseeability analysis by "complete[ly] abandon[ing] the master-servant relationship."  *Penn Cent. Transp. Co.*, 398 A.2d at 30.  And his conduct was unheard-of in over two centuries of democratic government.  *Eastman*, 594 F. Supp. at 1198 (noting that the conduct of Trump and others was "unprecedented in American history"). This factor warrants a denial of Westfall certification.

## II.     Trump Is Not an "Employee of the Government" Under the Westfall Act

The Government's certification is deficient for the independent reason that the President is not an "employee of the Government" within the meaning of the Westfall Act.

### A. The President Is Not an "Employee of the Government" Under the Plain Language of the Westfall Act

To determine whether the President is covered by the Westfall Act, a court must "begin[] with the text" of the statute. *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 378 (2018). The Westfall Act adopts the FTCA's definition of "any employee of the [g]overnment," 28 U.S.C. § 2679(b)(1), which "includes":

> (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18.

28 U.S.C. § 2671. Among these categories, the President could potentially qualify only as an "officer[] or employee[] of any federal agency." *See Carroll II*, 49 F.4th at 767–68.

The term "'[f]ederal agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." 28 U.S.C. § 2671. The term "department" refers to "one of the executive departments enumerated in section 1 of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government." 28 U.S.C. § 451. The "executive departments" enumerated in 5 U.S.C. § 101 are fifteen cabinet-level agencies. The President is not an "officer or employee" of any of them. Congress defined "Federal agency" as "includ[ing] the executive departments," and "the judicial and legislative branches," but did ***not*** list the "executive branch." *See* 28 U.S.C. § 2671.

In sum, both the plain text and the structure of the Westfall Act show that the President is not covered within the meaning of "employee." If "employee" were meant to sweep so broadly

as to reach the President, Congress could have used the term "the President" explicitly or broadened the term "executive departments" to "executive branch" in one of its many amendments to the FTCA. *See Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (holding the President is not an "agency" under the Administrative Procedure Act ("APA") because the "textual silence" of the APA indicates Congress's intent not to include the President in the definition). It has not. This court must "respect Congress'[s] decision to use different terms to describe different categories of people or things." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012).[14]

### B.      The Legislative History of the Westfall Act Supports a Finding that the President Is Not an "Employee of the Government"

The legislative history confirms the conclusion drawn from the text and structure of the Westfall Act: the President is not an "employee" for its purposes. In *Westfall v. Erwin*, 484 U.S. 292, 293–94 (1988), *superseded by statute*, Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563, civilian workers at an Army warehouse brought state law tort claims against their supervisors after allegedly coming into contact with toxic materials in a warehouse. The Supreme Court held that "federal employees" do not enjoy "absolute immunity from state-law tort actions." *Id*. at 296. Thereafter, Congress enacted the Westfall Act "to address the potential liability of Federal employees" resulting from

---

[14] Congress also has made clear through other statutes that it understands the difference between the President and an "employee of the [g]overnment." For example, in Title 3 of the U.S. Code, which relates to the "President," Congress provided that "*the President* is authorized to appoint and fix the pay of employees in the White House Office," 3 U.S.C. § 105(a)(1) (emphasis added), clearly distinguishing between the "President" and "employees." This delineation is also clear in Title 5, which relates to government organization, and defines "employee" for purposes of that section to mean "an officer and an individual who is . . . appointed in the civil service" by, among others, "the President." 5 U.S.C. § 2105(a)(1)(A). Similarly, if Congress intended for "executive departments" to mean the "executive branch," it would not have included "military departments" as a "federal agency," given that the military is encompassed within the executive branch. See U.S. Const. art. II. The Court is "obliged to give effect, if possible, to every word Congress used." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128–29 (2018).

the Supreme Court's decision.  H.R. Rep. No. 100-700, at 2 (1988).  The legislative history shows

Congress was particularly concerned with *Westfall*'s impact on "lower-level" and "'rank and file'

workers" who might face liability for tasks undertaken at work.  *Id.* at 3.  The legislation returned

liability protection to federal workers who, unlike the President, did not already enjoy "absolute

Presidential immunity from damages liability" for official acts.  *See Nixon v. Fitzgerald*, 457 U.S.

731, 756 (1982).  Unlike federal employees generally, the President "occupies a unique position

in the constitutional scheme."  *Trump v. United States*, 603 U.S. 593, 610 (2024) (quoting

*Fitzgerald*).  Applying Westfall immunity to the President is therefore unnecessary.  Thus, both

the text and legislative history of the Westfall Act indicate that the President should fall outside

the scope of the meaning of employee.

While the plain language of the Westfall Act and its legislative history show the President

is not an "employee" under the statute, Plaintiffs acknowledge that the Second Circuit has ruled

differently.  *See Carroll II*, 49 F.4th at 769, *certified question answered*, 292 A.3d 220 (D.C. 2023).

The District of Columbia Court of Appeals, however, has not accepted that conclusion.  *See* 292

A.3d at 227 (noting that the Second Circuit's decision was based on "[a] split panel" that

"disagreed with the district court's determination").  District of Columbia courts are entitled to

"respectfully disagree with [their] sister circuits," including on issues of federal statutory

interpretation.  *Crawford v. U.S. Dep't of Agric.*, 50 F.3d 46, 50 (D.C. Cir. 1995).  And while one

judge in this district has adopted the approach of the *Carroll II* court, *see Black Lives Matter D.C.*

*v. United States*, No. 20-CV-1469, 2025 WL 823903, at *3 (D.D.C. Mar. 14, 2025), that decision

"is not binding on this court." *James v. District of Columbia*, 302 F. Supp. 3d 213, 228 n.7 (D.D.C.

2018); *see also Marta v. Whitley*, No. 20-CV-1020, 2021 WL 1209223 at *7 (D.D.C. Mar. 31,

2021).  Rather, as Judge Chin correctly explains in his dissenting opinion in *Carroll II*, the

President is not covered by the Westfall Act because he is not expressly mentioned in statute, and

Congress has not "made an 'express' or 'unequivocal' statement" expressing its intent to immunize

him. *Carroll II*, 49 F.4th at 785–789.

## CONCLUSION

For the reasons discussed above, the Court should strike the Government's Notices of

Substitution and reinstate Trump as the defendant on the common law claims.

Dated: May 14, 2025                              Respectfully submitted,

    */s/ Edward G. Caspar*
Edward G. Caspar, D.C. Bar No. 1644168
Marc P. Epstein D.C. Bar No. 90003967
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, DC 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org
mepstein@lawyerscommittee.org

Faith E. Gay, *pro hac vice*
Joshua S. Margolin, *pro hac vice*
Babak Ghafarzade, *pro hac vice*
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
jmargolin@selendygay.com
bghafarzade@selendygay.com

William J. Blechman, *pro hac vice*
Elizabeth B. Honkonen, *pro hac vice*
Jeffrey Todd Foreman, *pro hac vice*
SPERLING KENNY NACHWALTER
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: 305-373-1000
wblechman@sperlingkenny.com
ebh@sperlingkenny.com

jtf@sperlingkenny.com


*Attorneys for Plaintiffs Conrad Smith, et al.*


 /s/Joseph Sellers
Joseph M. Sellers, Bar No. 318410
Brian Corman, Bar No. 1008635
Alison S. Deich, Bar No. 1572878
Nina Jaffe-Geffner, Bar No. 90011459
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue N.W.
Eighth Floor Washington, D.C. 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699
jsellers@cohenmilstein.com
bcorman@cohenmilstein.com
adeich@cohenmilstein.com
njaffegeffner@cohenmilstein.com

Janette McCarthy-Wallace, Bar No. OH066257
Anthony P. Ashton, Bar No. MD25220
NAACP
Office of General Counsel
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: 410-580-5777
jlouard@naacpnet.org
aashton@naacpnet.org


*Attorneys for Plaintiffs Barbara J. Lee, et al.*


 /s/ Matthew Kaiser
Matthew Kaiser, D.C. Bar No. 486272
Noah Brozinsky, D.C. Bar No. 1655789
KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor
Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
bozinsky@kaiserlaw.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC

1100 H Street N.W. Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com
joe@calebandonian.com

*Attorneys for Plaintiff Eric Swalwell*

*/s/ Patrick Malone*
Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556
(application for admission forthcoming)
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

Cameron Kistler, Bar No. 1008922
Kristy Parker, Bar No. 1542111
Erica Newland (Bar No. MD0141)
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Avenue N.W. #163
Washington, D.C. 20006
Telephone: 202-579-4582
cameron.kistler@protectdemocracy.org
kristy.parker@protectdemocracy.org
erica.newland@protectdemocracy.org

Genevieve C. Nadeau, Bar No. 979410
UNITED TO PROTECT DEMOCRACY
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: 202-579-4582
genevieve.nadeau@protectdemocracy.org

*Attorneys for Plaintiffs James Blassingame and
Sidney Hemby*

*/s/ Mark Zaid*
Mark S. Zaid, Esq., D.C. Bar No. 440532
Bradley P. Moss, Esq., D.C. Bar No. 975905
MARK S. ZAID, P.C.
1250 Connecticut Avenue N.W. Suite 700
Washington, D.C. 20036
Telephone: 202-498-0011
Facsimile: 202-330-5610
Mark@MarkZaid.com
Brad@MarkZaid.com

Matthew Kaiser, D.C. Bar No. 486272
Noah Brozinsky, D.C. Bar No. 1655789
Daniel Csigirinszkij, D.C. Bar No. 90017805
KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor
Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
nbrozinsky@kaiserlaw.com
dcsigirinszkij@kaiserlaw.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC
1100 H Street N.W. Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com
joe@calebandonian.com

*Attorneys for Plaintiff Sandra Garza*

*/s/ Patrick Malone*
Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

*Attorneys for Plaintiffs Marcus J. Moore et al.;*
*Bobby Tabron et al.; and Briana Kirkland*

**CERTIFICATE OF SERVICE**

I certify that on May 14, 2025, a copy of the foregoing was filed with the Clerk of Court using the Court's CM/ECF system, which will send a copy to all counsel of record. Plaintiffs are serving pro se defendants with redacted copies of the Motion and Proposed Order via first class mail or other permitted means.

*/s/ Edward G. Caspar*
Edward G. Caspar