# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BARBARA J. LEE, *et al.,* | Case No. 21-cv-00400 (APM) |
| Plaintiffs, | *Consolidated Cases:* |
| | 21-cv-00586 (APM) |
| v. | 21-cv-00858 (APM) |
| | 21-cv-02265 (APM) |
| DONALD J. TRUMP, *et al.* | 21-cv-00010 (APM) |
| | 21-cv-00011 (APM) |
| Defendants. | 21-cv-00034 (APM) |
| | 21-cv-00038 (APM) |

**REPLY IN SUPPORT OF PRESIDENT DONALD J. TRUMP'S OBJECTION TO ADMISSION OF SELECT COMMITTEE FINAL REPORT [ECF NO. 173]**

Jonathan M. Shaw D.C. Bar No. 446249
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: (703) 574-1206
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com
gurbanek@dhillonlaw.com

Scott Gessler
GESSLER BLUE LAW
7350 E. Progress Place, Suite 100
Greenwood Village, CO 80111
Telephone: (720) 839-6637
sgessler@gesslerblue.com

Jesse R. Binnall VA022
Gerald A. Urbanek, Jr. VA191
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria VA 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930

# Table of Contents

Table of Authorities ...................................................................................................... iii

Argument. ...................................................................................................................... 1

    A.  The admissibility of the Report depends on the procedures used to establish reliability, not the Plaintiffs' claims of truth or accuracy. ........................................... 1

    B.  Sufficient negative factors demonstrate that the Report lacks reliability. ................... 2

        1.  Courts view Congressional Reports with skepticism................................................ 3

        2.  Every committee member announced his or her bias, even before the Committee first met. ........................................................................................ 4

        3.  The unusual and rancorous process used to form the committee and to select members further demonstrates unfairness and unreliability.. ................................. 8

        4.  The Committee "hearings" were biased, unfair, and designed to reach a predetermined conclusion.. ..................................................................................... 10

        5.  The investigators were not normal Congressional investigators, but rather prosecutors, skilled at building a one-sided case for the prosecution................... 13

        6.  The Committee proceedings and the Report produced intense, unprecedented, and long-lasting political rancor. ........................................................................ 14

        7.  The Committee members used the hearings to generate attention for themselves and to dramatize their unanimous political viewpoint. ........................... 16

    C.  The Colorado state trial court's admissibility of the Report has no value: that approach was properly criticized and discounted by reviewing justices. ............ 18

        1.  The committee conclusions themselves are inadmissible on hearsay. ................. 19

        2.  Rather than address President Trump's objection to new evidence, Plaintiffs construct a straw man argument. ........................................................................ 23

Certificate of Service .................................................................................................. 26

**Table of Authorities**

**Page(s)**

**Cases**

*Anderson v. Griswold*
  2023 CO 63 ...............................................................................................................18

*Anderson v. New York*
  657 F. Supp. 1571 (D. S.D.N.Y. 1987)....................................................................4

*Baker v. Firestone Tire & Rubber Co.*
  793 F.2d 1196 (11th Cir. 1986) ...............................................................................15

*Barry v. Trs. of the Int'l Ass'n Full-Time Salaried Officers & Emples. of Outside Local Unions & Dist. Counsel's (Iron Workers) Pension Plan*
  467 F. Supp. 2d 91, 97 (D. D.C. 2006) ...............................................2, 3, 4, 17, 18

*Bright v. Firestone Tire and Rubber*
  756 F.2d 19 (6th Cir. 1984) .....................................................................................15

*Canning v. U.S. Dep't of Justice*
  251 F.Supp. 3d 74 (D.D.C. 2017) ............................................................................23

*Herring v. Richmond Med. Ctr. for Women*
  550 U.S. 901 (2007)...................................................................................................3

*Moss v. Ole South Real Estate, Inc.*
  933 F.2d 1300 (5th Cir. 1991) ...................................................................................2

*Pearce v. E.F. Hutton Group, Inc.*
  653 F. Supp. 810 (D.D.C. 1987)...........................................................4, 15, 16, 20

*Richmond Med. Ctr. for Women v. Hicks*
  301 F. Supp. 2d 499 (E. D. Virg. 2004).................................................................3, 6

*Richmond Med. Ctr. for Women v. Hicks*
  409 F.3d 619 (4th Cir. 2005) .....................................................................................3

*Trump v. Anderson*
  601 U.S. 100 (2024)..................................................................................................19

*United States v. American Tel. & Tel. Co.*
  498 F. Supp. 353 (1980) ...........................................................................................12

**Other Authorities**

Fed. R. Evid. 803(8) ................................................................................................................3

Fed. R. Evid. 803(8)(c) ........................................................................................................3, 5

House Resolution 24 — 117th Congress (2021-2022) ...........................................................5

Interim Report on the Failures and Politicization of the January 6th Select Committee,
House Administration Subcommittee on Oversight ...........................................................10, 13

Merriam-Webster ...............................................................................................................4, 17

Second Interim Report on the Failures and Politicization of the January 6th Select
Committee, House Administration Subcommittee on Oversight ...................................................11

The American Heritage Dictionary of the English Language ....................................................4, 17

Plaintiffs' *Response* frequently misstates applicable law and facts, and it glosses over the January 6th Select Committee's serious biases and procedural failures—an unusual member selection process, biased committee members, faulty internal procedures, and intense political rancor and grandstanding. Every Committee member prejudged President Trump guilty of inciting insurrection, well before the Committee first met. The unfair Committee Proceedings and resulting Report simply reflected those initial biases. This inherent unfairness produced explosive political rancor, which has not abated years later.

Congressional Reports are hearsay that may fall within an exception under Fed. R. Evid. 803(8)(C). When analyzing admissibility of government reports in general, courts consider the four factors set forth in the advisory committee notes, *plus* any other relevant factors. Congressional reports receive additional scrutiny; courts look at political rancor, partisanship, and potential grandstanding. Here, sufficient negative factors compel rejection of the Report, including the portions that the Plaintiffs seek to admit.

To be sure, a narrow Colorado Supreme Court majority endorsed the Final Report's admissibility. But those justices faced harsh condemnation from their colleagues and unanimous reversal from the U.S. Supreme Court. This Court is not bound by and should not repeat Colorado's mistake.

## Argument

**A.    The admissibility of the Report depends on the procedures used to establish reliability, not the Plaintiffs' claims of truth or accuracy.**

Plaintiffs repeatedly argue that portions of the Report should be admitted because the evidence is "true." For example, they argue that President Trump "does not assert that any of the

1

eight facts relied upon by Plaintiffs were not based on true factual findings."[1] And they claim that the choice is whether the committee "made true factual findings or whether the Committee engaged solely in political grandstanding."[2] But Plaintiffs' approach misstates the controlling law. In determining admissibility, courts look to congressional procedures and methods to determine reliability. Citing the Fifth Circuit, the *Barry* court explicitly stated that courts must:

> not . . . focus on questions regarding the accuracy or completeness of the document's conclusions. Instead, the focus is the report's *reliability*, which requires a determination primarily of whether the report was prepared or compiled in a way that indicates that its conclusions can be relied upon. Hence, courts … should examine the manner in which the report was prepared, not whether the court agrees with the conclusions of the report.[3]

This approach, of course, is necessary. Otherwise, a party opposing admissibility would be required to introduce evidence on every disputed factual point as a prelude to determining admissibility. This approach would burden a trial court with holding a mini-evidentiary hearing to determine the accuracy, or truth, or credibility of proffered evidence, thus burdening the judiciary with endless evidentiary hearings to determine what may should be used for future evidentiary hearings. The only workable and fair approach is for the trial court "to determine primarily whether the report was compiled or prepared in a way that indicates that its conclusions can be relied upon."[4]

**B.    Sufficient negative factors demonstrate that the Report lacks reliability.**

The Plaintiffs claim that President Trump "raises no argument regarding the sufficiency or reliability of the Select Committee hearings or the adequacy of the underlying investigation,

---

[1] *Plaintiff's Response to Defendant's Objection to Admission of Select Committee Final Report* [ECF No. 182] at 17, May 14, 2025 ("*Response*").

[2] *Response* at 18.

[3] *Barry v. Trs. of the Int'l Ass'n Full-Time Salaried Officers & Emples. of Outside Local Unions & Dist. Counsel's (Iron Workers) Pension Plan*, 467 F. Supp. 2d 91, 97 (D.D.C. 2006) (internal quotations and citation omitted)(emphasis in original).

[4] *Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991).

much less with respect to the narrow set of facts specifically relied upon by Plaintiffs in their opposition."[5] Not true. Below are seven negative factors, specific to the Report, all of which President Trump raised in his opening papers.

### 1. Courts view Congressional Reports with skepticism.

Fed. R. Evid. 803(8) applies to all governmental reports. The Rule "assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present."[6] Importantly, the rule itself provides a very low bar for overcoming any presumption of admissibility. Opponents have "ample opportunity" to overcome a presumption of admissibility, and the rule only requires "sufficient negative factors." Accordingly, the advisory committee provided examples of four factors that courts could consider, while explicitly recognizing that "no doubt more could be added."[7] Thus, a party opposing admissibility need not meet all four factors, or even a majority. Rather, one or more "negative factors" merely need to be "sufficient" to raise reasonable concerns about admissibility.

Congressional reports face additional scrutiny. Plaintiffs' claim that "courts routinely admit congressional reports"[8] is false. On the contrary, courts view congressional reports on a "case-by-case basis,"[9] with a sharp eye towards political rancor, political considerations, and grandstanding. Indeed, "courts have consistently excluded congressional reports . . .because of the inherently political nature of the reports."[10] And they have expressed great skepticism about the admissibility of Congressional reports due to the "obviously political nature of Congress,"

---

[5] *Response* at 13.
[6] Fed. R. Evid. 803(8).
[7] Fed. R. Evid. 803(8)(c), advisory committee comment.
[8] *Response* at 9,
[9] *Barry*, 467 F. Supp. 2d at 98
[10] *Richmond Med. Ctr. for Women v. Hicks*, 301 F. Supp. 2d 499, 512 (E. D. Virg. 2004) aff'd, *Richmond Med. Ctr. for Women v. Hicks*, 409 F.3d 619 (4th Cir. 2005), *vacated on other grounds*, *Herring v. Richmond Med. Ctr. for Women*, 550 U.S. 901 (2007).

even questioning "whether *any* report by a committee or subcommittee of that body could be admitted under rule 803(8)(C) against a private party [because] there would appear to be too great a danger that political considerations might affect the findings of such a report."[11] Indeed, Congressional "hearings and subsequent reports are frequently marred by political expediency and grandstanding."[12] That danger is fully realized here.

Because of concerns about Congressional reports, *Barry* identified additional negative factors; partisan rancor, political considerations, and the tendency of elected representatives to grandstand. For example, Congressional "reports that are truly *reliable* on a methodological and procedural level are less likely to provoke bitter divisions than those that have politics, rather than policy or truth-seeking, as their ultimate objective."[13] Thus, a congressional report is very likely to be inadmissible if the report produced bitter partisan divisions, if political considerations played a role in the report, or if committee members used the process "to impress onlookers,"[14] or "to behave dramatically or showily to impress an audience or observers."[15]

The January 6 Committee Report was the politicized report poster child; it is hard to imagine anything further from an uncontroversial report on, for instance, railroad rates which produced factual figures regarding rail shipping volume in the ordinary course through a regular, bipartisan, non-political process.

2. **Every committee member announced his or her bias, even before the Committee first met.**

---

[11] *Pearce v. E.F. Hutton Group, Inc.,* 653 F. Supp. 810, 814 (D. D.C. 1987) (emphasis supplied).

[12] *Anderson v. New York*, 657 F. Supp. 1571, 1579 (D. S.D.N.Y. 1987).

[13] *Barry,* F. Supp. 2d at 99 (emphasis in original).

[14] "Grandstand," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/grandstand (last visited May 26, 2025).

[15] The American Heritage Dictionary of the English Language, 5th Edition, available at https://www.wordnik.com/words/grandstand (last visited May 26, 2025).

Governmental reports must be evaluated for "motivational problems" and "possible bias."[16] Here, every Committee member was biased from the start. Plaintiffs do not dispute that every member had voted to impeach President Trump before the Committee was even formed. Which meant that every member had already concluded that he incited an insurrection.[17] And Congressional impeachment votes were not casual statements, lightly disregarded once the Committee began meeting. Rather, voting on House bills is the most important job Congressional Representatives have. A vote on impeachment was particularly important— impeachment was high-profile and incredibly important to each Representative and that Representative's district. And, although nearly half of all Representatives had voted against impeachment, the Speaker allowed none to sit on the Committee.

In addition to their votes, members of the Committee publicly condemned President Trump and accused him of engaging in insurrection, well before their Committee appointments:

- Representative Bennie Thompson called President Trump's leadership "tyrannical and idiotic," and said President Trump must be "held accountable" for "instigating" an "attack" on the Capitol;[18]

- Representative Zoe Lofgren accused President Trump of "inciting right-wing terrorists to attack the Congress to try to overturn Constitutional government,"[19] and she announced that she was "organizing an investigation" to "hold the perpetrators accountable."[20]

- Representative Adam Schiff condemned President Trump, claiming that he, "in an unconscionable act of sedition and insurrection, incited a violent mob to attack the Capitol."[21]

- Representative Pete Aguilar charged President Trump with "send[ing] a mob to the Capitol, radicalized by his lies about the results of a free and fair election, to stop the

---

[16] Fed. R. Evid. 803(8)(c), advisory committee comment.

[17] House Resolution 24 — 117th Congress (2021-2022), available at https://www.congress.gov/bill/117th-congress/house-resolution/24 (last visited June 2, 2025).

[18] Ex. CC, Bennie G. Thompson Tweets; Ex. DD, Bennie G. Thompson Tweets.

[19] Ex. EE, Press Release, Lofgren Speaks on her Fourth Presidential Impeachment on House Floor, Washington D.C.

[20] Ex. FF, Rep. Zoe Lofgren Tweets.

[21] Ex. GG, Press Release, Rep. Schiff Statement on Impeachment, January 8, 2021.

counting of electoral votes,"[22] and demanded that "he must be held accountable;"[23]

- Representative Stephanie Murphy publicly announced that President Trump "incited a violent insurrection against our country;"[24]

- Representative Jamie Raskin confidently asserted that "overwhelming evidence of the facts of former President Trump's incitement of the violent insurrection that took place in and around the Capitol on January 6, 2021;"[25]

- Representative Elaine Luria insisted that President Trump's "actions [were] seditious and the President has proven that he is not fit to serve;"[26]

- Representative Elizabeth Cheney argued that President Trump "summoned this mob, assembled the mob, and lit the flame of this attack. Everything that followed was his doing;"[27] and

- Representative Adam Kinzinger alleged that President Trump "broke his oath of office and incited this insurrection. He used his position in the Executive to attack the Legislative."[28]

This is the epitome of naked bias. Every Committee member had prejudged President

Trump, voted to impeach him, and publicly condemned him *before* investigating and preparing

the Report.  The Report is inadmissible on this factor alone, because its conclusions

"represent[ed] the political position of the representatives who voted for it."[29]

Plaintiffs, however, try to shift this legal standard, instead arguing that President Trump

must "offer . . . evidence showing that the Select Committee members failed to remain open to

whatever conclusions were supported by the evidence uncovered in the investigation."[30]

Plaintiffs' "failed-to-remain-open" standard is unsupported by precedent and absurd. Courts

---

[22] Ex. HH, Press Release, Following Attack on US Capitol, Aguilar Votes to Impeach Trump, January 13, 2021.

[23] Ex. II, Rep. Pete Aquilar Tweets.

[24] Ex. JJ, U.S. Rep. Stephanie Murphy Tweets.

[25] Ex. KK, Press Release, Taskin Statement on Delivering Impeachment Article to Senate, January 25, 2021.

[26] Ex. LL, Remarks on impeachment of Donald J. Trump, January 13, 2021.

[27] Ex. MM, Press Release, Cheney: I Will Vote To Impeach The President, January 12, 2021.

[28] Ex. NN, Press Release, Congressman Kinzinger Statement on Impeachment, January 12, 2021.

[29] *Richmond Med. Ctr. for Women v. Hicks*, 301 F. Supp. 2d 499, 512.

[30] *Response* at 18.

express concern about bias because a fact-finder's bias infects the entire process. Courts do not demand proof that an unbiased fact finder would have reached a different conclusion.

The Plaintiffs next argue that the members' bias was justified by their conclusions—that their impeachment votes were "hardly remarkable" in light of the subsequent report they produced.[31] This sort of Red Queen "Sentence first, verdict afterwards" attitude is, as Lewis Carrol highlighted, a nonsensical inversion of any fair process. The members announced their conclusions before forming the Committee; the fact that they didn't vary from those conclusions two years later neither purges nor justifies their bias.

Next, Plaintiffs point out that two minority members were Republicans. But political party affiliation does not wipe out demonstrated bias. Rather, Plaintiffs' argument merely peddles shallow partisan stereotypes—that Republicans cannot be biased against other Republicans, or that Democrats cannot be biased against other Democrats. All committee members had voted for impeachment, all proclaimed their hostility to President Trump, all were handpicked by the Speaker of the House, and all were equally biased against President Trump.

Similarly, the Plaintiffs argue that because the Committee interviewed many witnesses who had worked for President Trump, the mere existence of those supposedly sympathetic witnesses somehow negated the Committee members' biases. But witness selection—in light of the selective presentation of evidence, lack of cross examination, and doctoring of evidence (discussed below)—does not negate pervasive bias.

Next, the Plaintiffs point to the number of interviewees and documents. But volume does not eliminate bias, and if anything here it provided greater opportunity for the Committee members to skew evidence in order to reach preordained conclusions. The Plaintiffs further

---

[31] *Response* at 18.

claim—without evidence—that the Committee's staff had impressive professional credentials, were themselves unbiased, and were heavily involved in committee operations.[32] But the Committee members, not the staff, led the Committee. The Committee's Chief Counsel admitted that members—not staff—drove its operations in a departure from ordinary practice:

> The members of the committee themselves were very involved in the day-to-day turning of the wheels of the investigation. They participated in the interviews. They had up-to-the-minute, sometimes daily, reports on what we were learning. And I think that's different from the normal congressional process where the staff does most of the work, the fact-gathering, and the members, you know, are sort of given that information before a public proceeding."[33]

Lastly, the Plaintiffs argue that the official purpose of the Committee indicated a lack of bias. Hardly. Paper disclaimers do not eliminate demonstrated bias. And, contrary to Plaintiffs' assertion, the Committee's very purpose embodied preordained, biased conclusions. The Committee's stated purpose was to investigate the "facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex."[34] Use of the phrase "domestic terrorist attack" itself presumed that the events of January 6, 2021, constituted a "terrorist attack" and that the people involved in those events were "domestic terrorists." An investigation into "the facts, circumstances and causes relating to the president beating his wife" would be no less biased.

### 3. The unusual and rancorous process used to form the committee and to select members further demonstrates unfairness and unreliability.

Next, were the unusual and irregular procedures employed to create the Committee and select its members. Robust procedures, developed in advance of specific controversies, exist for a reason—to ensure thoughtful, fair process uncorrupted by emotions or strong views.

---

[32] *Id.* at 19.

[33] Ex. OO, Trial Transcript at 153:4-14, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 3, 2023.

[34] *Response* at 6.

Procedures like the Rules of Civil Procedure or Rules of Evidence help guarantee reliable, credible results. In Congress, venerable procedures ensure that minority views are genuinely represented, and that the minority has an opportunity to present contrary evidence, question witnesses, and identify weaknesses or failures in the majority's approach. None of that happened.

Plaintiffs wave away Presidents Trump's concerns about irregular Committee procedures as "baseless"[35] But even Speaker Pelosi admitted that the process was historically unprecedented,[36] Minority Leader Kevin McCarthy complained bitterly about the unusual process,[37] many Congressional Representatives criticized the approach, and Representative Ken Buck (who previously served as a staff member on the intensely controversial Iran-Contra Congressional investigation during Ronald Reagan's presidency), testified that the process was unusual and unfair.[38]

As a result, Republicans boycotted the process. Plaintiffs argue that because of this boycott, the Court should somehow be more inclined admit the Report. But reliability of evidence is not a game of partisan "gotcha," whereby the House Republicans' refusal participate somehow limits President Trump's ability to object to the Report. Rather, the boycott of nearly half of the House members destroyed the reliability of the Committee's proceedings, just as a successful boycott of an election ruins the ability of the winners to claim an electoral mandate. Even if one were to assume that responsibility for the flawed process should be shared by both the Democrat majority and the Republican House minority, the one thing that is clear is that President Trump had no role in creating or running the flawed committee or its investigation and

---

[35] *Response* at 22.
[36] *Objection* at 9.
[37] *Id.* at *10.*
[38] Ex. PP, Trial Transcript at 215:12-216:20, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 2, 2023.

his rights as an individual defendant are what is paramount here.  What matters is that the House

process was flawed, not which part of the House was responsible for that flaw.

### 4. The Committee "hearings" were biased, unfair, and designed to reach a predetermined conclusion.

To be sure, the Committee called its meetings "hearings." But they were not hearings in

any meaningful sense of the word or hearings that could produce a reliable report. Plaintiffs

claim of "very fair and thorough" procedures[39] cannot withstand factual review.

The first problem was selective use of evidence. The Committee employed a one-sided

approach, to the point that it cherry-picked statements from witnesses and disregarded or buried

other evidence that did not fit a preapproved narrative. For example, the Report concluded, based

on one witness' testimony, that President Trump tried to seize the steering wheel of a moving car

and then attacked his Secret Service detail when they refused to allow him to drive. But the

Committee refused to include the contradictory evidence from other eyewitnesses,[40] which

discredited the Committee's conclusions.  This would not have happened had there been real

minority representation on the Committee.

The Committee interviewed Katrina Pierson, who told members that President Trump

sought to exclude specific speakers that he deemed political, and that President Trump had

requested his staff to have 10,000 National Guard troops available on January 6, 2021, to ensure

no violence. None of this appeared in the Final Report.[41]

Likewise, the Committee suppressed testimony from Kash Patel, currently director of the

Federal Bureau of Investigation. Specifically, Mr. Patel testified from personal knowledge that

---

[39] *Response* at 24.

[40] *Interim Report on the Failures and Politicization of the January 6th Select Committee, House Administration Subcommittee on Oversight* at 28-31.

[41] Ex. QQ, Trial Transcript at 295:11-296:16, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 1, 2023.

President Trump authorized 20,000 National Guard troops to be mobilized into federal service and deployed to the District of Columbia on January 6, 2021, in order to avoid violence and maintain the peace. Yet the Committee refused to allow him to testify in public, insisted on a private interview, and did not include his full, relevant information in the final report.[42] As the Second Interim Report notes, this testimony was corroborated by the testimony of both the Acting Secretary of Defense and Chairman of the Joint Chiefs of Staff, yet the Committee chose to exclude their testimony on this point as well.[43]

And Congressman Ken Buck testified that he personally spoke to Representative Jim Jordan about Rep. Jordan's role in the events of January 6 and the subsequent Committee investigation. Representative Buck then read the Report, to compare it to Representative Jordan's account, and he realized that the Report misrepresented Rep. Jordan's actions and excluded a full account of Rep. Jordan's activities.[44]

The second problem was the Committee's use of doctored evidence. To be sure, Plaintiffs dispute that the Committee presented falsified evidence or that it doctored a silent video by overlaying a soundtrack to dramatize the presentation.[45] But these actions are well-established.[46]

Third, the Committee did not allow an opportunity for minority questioning, or anything resembling an adversarial process that could reveal the truth. To begin, the Committee was

---

[42] Ex. RR, Trial Transcript at 228:12-231:9, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 1, 2023. Ex. TT, Trial Transcript at 228:6-9, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 2, 2023.

[43] *Second Interim Report on the Failures and Politicization of the January 6th Select Committee, House Administration Subcommittee on Oversight* at 65-66.

[44] Ex. SS, Trial Transcript at 216:10-22, 223:2-224:6, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 2, 2023.

[45] *Objection* at 21.

[46] *Id.*

certainly not a politically independent governmental agency, similar to other governmental agencies whose operations and reports are presumed admissible.[47] And the Committee refused to allow any dissent, because its selection process excluded any members who had not pre-committed themselves to the preferred narrative, eliminating any possibility of dissent or tough adversarial, questioning and fact-finding. For example, Representative Buck, himself a former prosecutor and trial attorney, observed many of the Committee's proceeding and testified that the process was not "was set up in a way that would sort of elicit the whole truth in those hearings."[48] No one on the committee represented President Trump's position (or even an uncommitted position)—similar to a prosecutor presenting a case, without the defense counsel present.[49] Courts have found similar reports inadmissible because no one holding a contrary view had an "opportunity to argue its position and to reply to opposing positions."[50]

Fourth, the Committee destroyed evidence. Plaintiffs argue that President Trump must demonstrate how "supposedly buried" evidence and witnesses relate to any of the eight facts relied on by Plaintiffs."[51] Not only is this the incorrect legal standard, but the burden that Plaintiffs seek to place on President Trump is impossible to meet; the Committee's destruction of evidence makes it largely impossible to fully determine the extent to which the Committee's unfair processes corrupted the Report. The Committee refused to save unedited video recordings of witness testimony, and indeed the Chair of the Committee admitted that the Committee did

---

[47] *See United States v. American Tel. & Tel. Co.*, 498 F. Supp. 353, 366.

[48] Ex. TT, Trial Transcript at 228:6-9, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 2, 2023.

[49] Ex. UU, Trial Transcript at 213:15-214:20, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 2, 2023.

[50] *United States v. American Tel. & Tel. Co.*, 498 F. Supp. 353, 365 (1980).

[51] *Response* at 15.

not "archive any of the unedited video recordings of witness interviews or depositions."[52] This destruction of evidence eliminated the ability to review unedited interviews and depositions, so neither President Trump nor anyone else can now fully measure the effect of the committee's cherry-picked evidence, on *any* issue.

**5.    The investigators were not expert Congressional staffers, but rather prosecutors, skilled at building a one-sided case for the prosecution.**

Plaintiffs make hay of the purported "skill of investigators," but this factor undermines the Report's reliability. First, unlike government agencies that investigate complex, technical matters that require substantial subject matter expertise, there is no such thing as special expertise or knowledge of "insurrections." And contrary to the Plaintiffs' implication of specialization and reliability, few of the investigators had experience conducting Congressional investigations. "Most of the people that [were] hired had never worked in Congress before."[53]

The only skill that Plaintiff can point to is skill as prosecutors—"highly skilled lawyers who were current or former U.S. attorneys from both parties."[54] Their skill and charge was not to carefully and soberly weigh conflicting evidence. Rather, they were charged to build a case for the prosecution—and that is what they did. In fact, by employing prosecutors skilled in building a legal case against an investigative target, the Committee members exacerbated and magnified their inherent biases that President Trump incited an insurrection.

And finally, any suggestion that the staff's supposed lack of bias saves the Report is

---

[52] *Interim Report on the Failures and Politicization of the January 6th Select Committee, House Administration Subcommittee on Oversight* at 15; *see also* Letter from Bennie Thompson, Representative, to Barry Loudermilk, Chairman, Comm. on H. Admin. Oversight Subcomm (July 7, 2023), available at https://cdn.factcheck.org/UploadedFiles/Thompson-letter-to-Loudermilk-7.7.23.pdf (last visited June 2, 2025).

[53] Ex. VV, Trial Transcript at 152:19-22, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 3, 2023.

[54] *Response* at 12.

undermined by the Chief Instigative Counsel, who testified that Committee members were heavily involved in the day-to-day operations of the Committee.[55]

### 6.    The Committee proceedings and the Report produced intense, unprecedented, and long-lasting political rancor.

The Plaintiffs point out that the two Republican Committee Members signed off on the Final Report. This shallow argument, however, carries no weight. Concern about agreement from minority members is not an invitation for the Court to simply count partisan balls and strikes, as the Plaintiffs suggest. Rather, the *Barry* Court considered whether minority members joined in a report because a consensus between majority and minority members "demonstrate[d] less partisan rancor and a higher level of solemnity."[56] Likewise, Plaintiffs claim that any criticism of the Report must be discounted because that criticism was not bipartisan."[57] This, of course, misstates the applicable legal standard. The issues is not whether criticism of the Report was bipartisan. The issue is whether the Report itself generated intense pollical rancor.

And of course, any lack of dissent by the two Republican Committee members is meaningless, because the two members did not genuinely represent the viewpoint of their Republican colleagues, as evidenced by their votes on impeachment, statements prejudging he issues, votes to form the Committee, intense animosity towards President Trump, and selection by the Democratic House Speaker, not the Republican Minority Leader.[58]

Minority agreement or disagreement is a measure of political rancor and controversy. Congressional Reports that generate political rancor demonstrate unreliability, because courts

---

[55] Ex. WW, Trial Transcript at 153:4-14, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 3, 2023.

[56] *Barry*, 467 F. Supp. 2d at 98.

[57] *Response* at 20.

[58] Ex. XX, Trial Transcript at 211:3-11, *Anderson v. Griswold*, Denver District Court, Colorado, Case No. 2023CV032577, November 2, 2023.

properly recognize that controversial reports are primarily political documents, unsuitable for admission in a court of law. By contrast, Congressional reports that receive broad, bipartisan agreement, are more likely to be uncontaminated by political considerations. For this reason, at least two circuits have rejected Congressional reports because they "consisted of the rather heated conclusions of a politically motivated hearing."[59]

The absence of political rancor and partisanship is easy to identify. Portions of Congressional reports have been admitted because "those portions had been joined in by members of both political parties, and where other portions of the report had already been admitted by stipulation."[60] And in *Barry*, the "ranking minority member (Senator Levin) opened by praising the Committee Chairperson for conducting the 'investigation and hearing . . . in a very fair and very thorough way.'"[61] In those cases, the courts found harmonious cooperation between parties. This case presents the diametric opposite.

The level of political rancor here was unprecedented. The Minority Leader criticized the Committee's formation, membership selection, and proceedings. Multiple members criticized the Report as a partisan exercise. And the Report attracted passionate criticism in Congress and beyond. Plaintiffs dismiss this intense anger as "vague criticisms."[62] But in fact the Committee produced a widespread eruption of explosive anger and criticism directed at Speaker Pelosi and members of the Committee.  The idea that its proceedings were uncontroversial is ludicrous.

And this political rancor was not only intense, but also long-lasting. Years after the

---

[59] *Pearce v. E.F. Hutton Group, Inc.*, 653 F. Supp. 810, 815 (1980) (citing *Baker v. Firestone Tire & Rubber Co.* 793 F.2d 1196 (11th Cir. 1986) and *Bright v. Firestone Tire and Rubber*, 756 F.2d 19, 22-23 (6th Cir. 1984)).
[60] *Pearce*, 653 F. Supp. at 815.
[61] *Barry*, 467 F. Supp. 2d at 101.
[62] *Response* at 20.

Report came out, a Congressional subcommittee investigated and condemned the Committee's actions. To be sure, the Plaintiffs try to dismiss both reports of the Oversight Committee because they weren't "final," and because some Democratic members criticized them as "disappointing" and a "solo mission."[63] But this is not an instance of "our report is better than your report." Rather, the report shows ongoing, intense political rancor *years* after the Committee issued its Report. Republican anger at the Committee runs deep. And the Plaintiffs themselves cannot escape concerns about political rancor, because they instinctively seek to undermine the validity of the Interim Report by pointing to Democrat criticism. But President Trump does not seek to introduce the Interim Report into evidence, and that Interim Report adequately demonstrates not only the Committee's procedural unfairness, but its mere existence, two years later, proves ongoing and intense political rancor.

In a final attempt to salvage the Report from the intense political rancor it generated, the Plaintiffs invite this Court to overlook political fighting as a normal dynamic, claiming "[i]t is difficult to conceive of *any* congressional investigation that does not have some measure of political motivation underlying it."[64] But political infighting is exactly why *all* Congressional reports are suspect, and courts express serious doubts "whether *any* report by a committee or subcommittee of [Congress] could be admitted under rule 803(8)(C) against a private party [because] there would appear to be too great a danger that political considerations might affect the findings of such a report."[65]

7.    **The Committee members used the hearings to generate attention for themselves and to dramatize their unanimous political viewpoint.**

---

[63] *Response* at 19-20.
[64] *Id.* at 21.
[65] *Pearce v. E.F. Hutton Group, Inc.,* 653 F. Supp. 810, 814 (D. D.C. 1987) (emphasis supplied).

Far from producing a "carefully prepared, balanced, and hyperbole-free recitation of all of the available information,"[66] the Committee acted as a political group, designed to attract attention to itself for political purposes. To "grandstand" is "to impress onlookers,"[67] or "to behave dramatically or showily to impress an audience or observers."[68] This is exactly what members of the Committee did.

First, grandstanding was baked into the Committee's very purpose—to investigate "facts, circumstances, and causes relating to the January 6, 2021, *domestic terrorist attack* upon the United States Capitol Complex."[69] Use of phrase "domestic terrorist attack" was itself a dramatic and inflammatory catch phrase designed to create controversy and attract attention.

Second, the Committee blamed President Trump for this putative "domestic terrorist attack" even before it started work. Although the Committee's charge was to investigate "facts circumstances and causes," it instead obsessively focused on President Trump's behavior. A review of the Report shows relatively little attention directed at the overall events involving January 6, 2021, and instead an unrelenting focus on President Trump.

Third, the Committee conducted and timed its hearings to shape public opinion. The Committee hired a TV producer to design and format the hearing presentations and scheduled hearings for prime-time television viewing by the public.[70] And the Committee timed its hearings and release of the Report to take place prior to the Congressional midterm elections, in

---

[66] *Barry,* 467 F. Supp. 2d at 99.
[67] "Grandstand," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/grandstand (last visited May 26, 2025).
[68] The American Heritage Dictionary of the English Language, 5th Edition, available at https://www.wordnik.com/words/grandstand(last visited May 26, 2025).
[69] *Response* at 6. (emphasis supplied).
[70] *See Objection* at 19-20.

order to create a political and public narrative that would affect the national elections.[71]

Finally, Committee members used the attention as a platform to draw attention to themselves by criticizing President Trump, even on matters wholly unrelated to the "domestic terrorist attack." For example, Representative Kinzinger used the Committee hearings as a platform to criticize President Trump on an array of foreign policy issues.[72] This is exactly the "the kind of soliloquy[y] that ha[s] prompted courts' concerns about political "grandstanding."[73]

## C.    The Colorado state trial court's admissibility of the Report has no value: that approach was properly criticized and discounted by reviewing justices.

Plaintiffs cite to *Anderson v. Griswold* as justification for admitting the Report. That case, however, serves as a warning of judicial overreach, not persuasive precedent.

In *Anderson v. Griswold* a narrow 4-3 majority endorsed the trial court approval of the Report's admissibility, but this endorsement drew a scathing dissent from Justice Samour, who wrote "[t]here was no fair trial," partly because (in Justice Samour's a polite formulation) "the court received and considered a partial congressional report, the admissibility of which is not beyond reproach."[74] He went on to write "I have been involved in the justice system for thirty-three years now, and what took place here doesn't resemble anything I've seen in a courtroom,"[75] describing the trial as "a procedural Frankenstein"[76] and lamenting "[t]here was no strict compliance with procedural due process here. How is this result fair? And how can we expect Coloradans to embrace this outcome as fair?"[77]

These well-founded concerns disturbed the U.S. Supreme Court. At oral argument Justice

---

[71] *See Objection* at 20.
[72] *Id.* at 13-14.
[73] *Barry*, 467 F. Supp. 2d at 101.
[74] *Anderson v. Griswold*, 2023 CO 63, P341.
[75] *Id.* at P342.
[76] *Id.* at P339.
[77] *Id.* at P346.

Kavanaugh specifically quoted Justice Samour, sharing his concerns about fairness and due process.[78] Likewise, Justice Alito indicated his skepticism about the Report, noting that Colorado's decision to admit it could differ from another court's determination.[79] And indeed the final decision in *Trump v. Anderson* reflected concern about the dramatic failures in Colorado. To be sure, the U.S. Supreme Court declined to level direct criticism against the Colorado courts, but it expressed doubts by highlighting concern that different states might use different evidentiary procedures in adjudicating Fourteenth Amendment eligibility claims, focusing on the Report's admissibility; "certain evidence (like the congressional Report on which the lower courts relied here) might be admissible in some States but inadmissible hearsay in others."[80]

In short, the Colorado trial court's decision to admit the Report into evidence received condemnation in Colorado and formed the basis for the U.S. Supreme Court's distrust of state court procedures. This Court should heed those warnings.

### 1. The committee conclusions themselves are inadmissible on hearsay and other grounds.

Although it is true that President Trump generally objects to the Final Report, he further specifically objects to the portions of the Report cited by Plaintiffs in their Exhibit 115. "With the exception of pages 323, 324, 325, 614, 615, 616, 628, 678, and 680, each page of Exhibit 115 contains multi-level hearsay." (ECF No. 173 at 21). Thus, Plaintiffs wrongly claim that President Trump lodged only a limited objection that the Final Report contained multi-level hearsay.

President Trump specifically argued that the narrower citations from Exhibit 115 contain

---

[78] Transcript of Oral Argument at 112:16-113:8, *Donald J. Trump v. Norma Anderson*, 601 U.S. 100, 116 (2024), February 8, 2024 ("SCOTUS Transcript"). Available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/23-719_2jf3.pdf (last visited June 2, 2025).
[79] SCOTUS Transcript, 22:5-17.
[80] *Trump v. Anderson*, 601 U.S. 100, 116 (2024).

multi-level hearsay that are inadmissible. Plaintiffs argue that President Trump bears the burden of identifying each instance of hearsay, but this task is unduly burdensome and improper because Exhibit 115 identifies hundreds of instances of prejudicial and irrelevant hearsay. And in response to interrogatories, Plaintiffs themselves earlier assured President Trump that they would *not* seek to introduce this voluminous material. (*See* Section 7, *infra*.)

The hearsay items contained within the cited portions of Exhibit 115 are not subject to any exceptions. For example, Pages 37-40 contain numerous out-of-court statements by non-parties, including statements by rioters, statements by White House staff quoting non-testifying third parties, and statements by other individuals offering opinions. In many instances, it is unclear which statements may have been delivered under oath, if any, and certainly none of those statements was subject to cross-examination.[81] Pages 273-322 fare no better, with numerous statements being offered from non-testifying third parties and self-serving recitations of alleged third-party statements offered by members of the Committee. Similar examples occur on pages 529-602 and pages 626, 627, 652, 653, 654, and 679.

Plaintiffs submit a table of specific report conclusions, along with the evidence they rely upon. That table is reproduced below, along with specific objections.

| No | Report conclusion | Plaintiffs' cited evidence | Additional reason for inadmissibility |
|---|---|---|---|
| 77 | Congress determined that in December 2020 Defendant Trump contacted Pennsylvania State Senate Majority Leader Jake Corman and Pennsylvania Speaker of the House of Representatives Brian Cutler about purported | Select Committee's informal interview with Jake Corman. *See* ECF No. 173-24, Ex. W at 284–86 & n.176. | The "informal interview" of Jake Corman was not sworn testimony and was not subject to cross-examination. This interview, and the evidence obtained from it, cannot be converted to admissible evidence |

---

[81] "Testimony before a congressional committee is manifestly hearsay" and "[u]nder no stretch of the imagination could such evidence fit within one of the exceptions to the hearsay rule—least of all rule 803(8)(C)." *Pearce v. E.F. Hutton Grp., Inc.*, 653 F. Supp. 810, 815 (D.D.C. 1987).

| | | |
|---|---|---|
| | fraudulent voting in Pennsylvania. | | at trial. Furthermore, n. 176 corresponding to pgs. 284-286 does not exist in Plaintiffs' Ex. 115 and thus exists outside the record for summary judgment. |
| 79 | In response, Cutler explained that Defendant Trump "could file a legal challenge contesting the election" and asked Trump "why his team had never requested a statewide recount." | Select Committee's transcribed interview of Bryan Cutler. *See* ECF No. 173-24, Ex. W at 285 & n.186. | The "staff-led interview" of Brian Cutler was not sworn testimony and was not subject to cross-examination. This interview, and the evidence obtained from it, cannot be converted to admissible evidence at trial. |
| 82 | The January 6 Select Committee found that after Michigan certified the 2020 presidential election results, Defendant Trump called the two Republican members of Michigan's Wayne County Board of Canvassers, the body that certifies and reports the county's election results to states. | Select Committee's informal interview of Monica Palmer, Select Committee's transcribed interview of Ronna Romney McDaniel, Palmer's phone records, and Minutes of the Meeting Wayne County Board of Canvassers. *See* ECF No. 173-24, Ex. W at 274 & n.82–86. | President Trump is unable to locate any "informal interview" of Monica Palmer from the official "Supporting Materials" in the online database. Regarding the "transcribed interview" of Ronna McDaniel, that "interview" was not conducted under oath and was not subject to cross-examination. These interviews cannot be converted to admissible evidence at trial. ¶ 82 cannot be substantiated solely on the phone records of Monica Palmer and the Minutes of the Meeting of the Wayne County Board of Canvassers. Furthermore, n. 82-86 corresponding to pg. 274 do not exist in Plaintiffs' Ex. 115 and thus exist outside the record for summary judgment. |
| 83 | Following that phone call, both Republican board members of Michigan's Wayne County Board of Canvassers issued signed affidavits stating their position that the election results should not be certified and attempting to "rescind" their votes in support of certification. | News articles from ABC News, WILX10, and the Detroit Free Press. *See* ECF No. 173-24, Ex. W at 274 & n.89–90. | News articles are hearsay, without an exception, and cannot be converted to admissible evidence at trial. Furthermore, n. 89-90 corresponding to pg. 274 do not exist in Plaintiffs' Ex. 115,and thus exist outside the record for summary judgment. |
| 85 | During the meeting at the White House, Defendant Trump likewise told [Mike] Shirkey and [Lee] Chatfield to "have some backbone and do the right thing," which they understood to mean "overturn[ing] | Select Committee's informal interview of Lee Chatfield. *See* ECF No. 173-24, Ex. W at 282 & n.158. | President Trump has been unable to locate the "informal interview" of Lee Chatfield from the official "Supporting Materials" in the online database. Based on similar J6 |

| | | | |
|---|---|---|---|
| | the election by naming electors for President Trump." | | documents, an "informal interview" is not sworn testimony, was not subject to cross-examination, and thus cannot be converted to admissible evidence at trial. Furthermore, n. 158 corresponding to pg. 282 does not exist in Plaintiffs' Ex. 115 and thus exists outside the record for summary judgment. |
| 122 | By the time Defendant Trump spoke at the Save America Rally, tens of thousands of people were in attendance, including approximately 25,000 people between the Ellipse and the Washington Monument, with "members of the crowd [] wearing body armor, carrying radio equipment and possibly OC spray and/or plastic riot shields." | CSD Activity Log #2. *See* ECF No. 173-24, Ex. W at 585 n.53. | No additional objections. |
| 123 | WFAF was an organization founded in 2019 and led by Amy Kremer and her daughter Kylie Kremer, with an express goal of supporting Donald Trump and pushing an America First agenda. | Select Committee's transcribed interview of Kylie Kremer. *See* ECF No. 173-24, Ex. W at 530 & n.375. | The "transcribed interview" of Kylie Kremer was not sworn testimony, was not subject to cross-examination, and cannot be converted to admissible evidence at trial. Furthermore, n. 375 corresponding to pg. 530 does not exist in Plaintiffs' Ex. 115 and thus exists outside the record for summary judgment. |
| 348 | According to the Final Report Select Committee to Investigate the January 6th Attack on the United States Capitol, at 2:13 pm ET on January 6, 2021, the U.S. Capitol was breached, and those who entered the Capitol began chanting "Hang Mike Pence!" | Footage from U.S. Capitol Police Camera 102, publicly available reports from Fox News dated January 6, 2021, and video evidence played at the Select Committee's public hearing dated June 16, 2022. *See* ECF No. 173-24, Ex. W at 653 & 679 n.159; 601 & 627 nn.220–221; 38 n.198. | The footage from the "U.S. Capitol Police Camera 102" is unauthenticated, Fox News reports are hearsay media reports not subject to an exception, and the "video evidence" played at the Select Committee's public hearing dated June 16, 2022, was not authenticated by any witness and had been altered to add a soundtrack not present on the originals. *See Objection* at 21. Furthermore, n. 198 corresponding to pg. 38 does not exist in Plaintiffs' Ex. 115 and thus exists outside the record for summary judgment. |

**2.      Rather than address President Trump's objection to new evidence not properly disclosed in discovery, Plaintiffs construct a straw man argument.**

In response to President Trump's objection that Plaintiffs introduced previously undisclosed evidence from the Final Report, Plaintiffs ignore and misconstrue President Trump's objection as plainly stated. Throughout the entirety of immunity discovery, Plaintiffs affirmatively identified a mere eight pages from the Report, which they intended to rely upon at summary judgment. These eight pages were offered to substantiate a very limited set of factual assertions relating to alleged meetings between President Trump and state and local officials, and to establish that Amy Kremer and Kylie Kremer were the founders of Women for America First.[82] Yet, without seeking agreement from President Trump, or supplementing their interrogatory responses in a timely manner, Plaintiffs reneged on their prior commitments and introduced an additional 31 pages from the Final Report, including portions contained within the "Executive Summary."

Contrary to Plaintiffs' contention, President Trump does *not* object on the basis that Plaintiffs are introducing new *arguments* at summary judgment, but rather that Plaintiffs are seeking to introduce new *evidence*—evidence that Plaintiffs previously affirmed they would not be seeking to introduce.[83] As such, Plaintiffs' reliance upon *Canning v. U.S. Dep't of Justice*[84] is misplaced. Moreover, this new evidence does not specifically bear on the limited purposes for which Plaintiffs claimed they were offering the Final Report when responding to President Trump's Interrogatory No. 8. To this point, Plaintiffs have not even attempted to justify the inclusion of these additional documents, and Plaintiffs have offered no reason as to why they should not be limited to the material timely identified in discovery.

---

[82] *See* Exhibits Z, AA, and BB.
[83] *Id.*
[84] *Canning v. U.S. Dep't of Justice*, 251 F. Supp. 3d 74, 77 (D.D.C. 2017).

Rather, Plaintiffs tacitly concede that these additional documents are not being offered for the purpose of substantiating their claimed factual allegations, as evidenced by the chart provided by Plaintiffs in their Response to President Trump's Objection to Admission of Select Committee Final Report (ECF No. 182 at 6-7). To wit, that chart fails to include all the additional documents introduced by Plaintiffs in Exhibit 115 (ECF No. 152-68), and only account for a small minority. Among those excluded are pgs. 37, 38, 39, 40, 273, 275, 281, 283, 287, 322, 323, 324, 325, 529, 531, 584, 586, 600, 602, 614, 615, 616, 626, 628, 652, 654, 678, and 680.

Even more puzzling is Plaintiffs' contention that President Trump's objection is solely concerned with the allegation that rioters at the U.S. Capitol chanted, "Hang Mike Pence!" Although it is true that Plaintiffs never raised this subject in response to Interrogatory No. 8—and it should therefore be disregarded by the Court—President Trump never mentions this alleged fact anywhere in his objection (ECF No. 173). Concerning this alleged fact, Plaintiffs claim no prejudice occurred because this fact was "widely known based on publicly available information." Yet, this argument presupposes that what is "widely known" can be used as a substitute for what has been properly placed in the record; it cannot. Plaintiffs' argument also fails to take into account that this Court clearly established specific deadlines for immunity discovery, which Plaintiffs have ignored.

Setting all this aside, it is also incorrect that the additional portions of the Executive Summary merely introduce evidence pertaining to the words of certain rioters. Rather, the additional pages introduced by Plaintiffs cover a wide variety of alleged facts which are partisan, unsubstantiated, and impermissibly prejudicial under the Federal Rules of Evidence. This is especially evidenced by pages 37-40 (ECF No. 152-68), which almost exclusively features the

opinions of the members of the January 6 Select Committee.

Similarly, Plaintiffs have offered no answer to President Trump's objection under FRCP 37(c)(1), which clearly and unequivocally prohibits the sort of conduct Plaintiffs pray this Court ratify. (A party that "fails to provide information required by Rule 26 (a) or (e) . . . is not allowed to use that information. . . to supply evidence on a motion." FRCP 37(c)(1)). Under Rule 26 (e), a party who has responded to an interrogatory *must* supplement its response if the party learns that its response is incomplete or incorrect. Although Plaintiffs supplemented their response to President Trump's Interrogatory No. 8 as late as December 13, 2024, that supplementation was deficient in that Plaintiffs made no mention of the documents which they now seek to introduce.

Finally, President Trump does not solely object that Plaintiffs' additional evidence prejudiced the drafting of his *Opening Brief*, but also that it prejudiced his decisions during immunity discovery. ("Plaintiffs' failure to timely disclose prejudiced President Trump as it affected *both* his conduct of immunity discovery *and* his drafting of his opening brief." (ECF No. 173 at 23, emphasis added). Yet again, Plaintiffs ignore this argument and focus solely on their contrived narrative. Certainly, had President Trump known that Plaintiffs intended to offer additional portions of the Final Report into evidence, he would have conducted additional discovery on this topic to prepare to respond to Plaintiffs' evidence at summary judgment. President Trump was deprived of the opportunity to conduct additional, relevant discovery, occasioned solely and entirely by false, sworn interrogatory responses from Plaintiffs. This is prejudicial on its face.

Respectfully submitted this 4th day of June 2025,

/s/ Jonathan M. Shaw
Jonathan M. Shaw D.C. Bar No. 446249
DHILLON LAW GROUP, INC. 2121
Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: (703) 574-1206
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com
gurbanek@dhillonlaw.com

Jesse R. Binnall VA022
Gerald A. Urbanek, Jr. VA191
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Telephone: (703) 888-1943
Facsimile: (703) 888-1930
jesse@binnall.com

Scott Gessler
GESSLER BLUE LAW
7350 E. Progress Place, Suite 100
Greenwood Village, CO 80111 Telephone:
Telephone: (720) 839-6637
sgessler@gesslerblue.com

*ATTORNEYS FOR DEFENDANT PRESIDENT
DONALD J. TRUMP*

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, which notified all parties and their counsel of record.

/s/ Jonathan M. Shaw
Jonathan M. Shaw D.C. Bar No. 446249
Attorney for Defendant
President Donald J. Trump