## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES BLASSINGAME, et al.,

               Plaintiffs,

     vs.

DONALD J. TRUMP,

               Defendant.

Case No. 1:21-cv-00858-APM

SANDRA GARZA,

               Plaintiff,

     vs.

DONALD J. TRUMP, et al.,

               Defendants.

Case No. 1:23-cv-00038-APM

BRIANA KIRKLAND,

               Plaintiff,

     vs.

DONALD J. TRUMP,

               Defendant.

Case No. 1:22-cv-00034-APM

BARBARA J. LEE, et al.,

               Plaintiff,

     vs.

DONALD J. TRUMP, et al.,

               Defendants.

Case No. 1:21-cv-00400-APM

| | |
|---|---|
| MARCUS J. MOORE, | |
|                  Plaintiff, | |
|     vs. | Case No. 1:22-cv-00010-APM |
| DONALD J. TRUMP, | |
|                  Defendant. | |

| | |
|---|---|
| CONRAD SMITH, et al., | |
|                  Plaintiffs, | |
|     vs. | Case No. 1:21-cv-2265-APM |
| DONALD J. TRUMP, et al., | |
|                  Defendants. | |

| | |
|---|---|
| ERIC SWALWELL, | |
|                  Plaintiff, | |
|     vs. | Case No. 1:21-cv-00586-APM |
| DONALD J. TRUMP, et al., | |
|                  Defendants. | |

| | |
|---|---|
| BOBBY TABRON, et al., | |
|                  Plaintiffs, | |
|     vs. | Case No. 1:22-cv-00011-APM |
| DONALD J. TRUMP, | |
|                  Defendant. | |

**THE UNITED STATES OF AMERICA'S OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE *WESTFALL* ACT CERTIFICATIONS (DOC. 183)**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................2

GOVERNING LAW ...........................................................................................................4

I.   Purpose and Function of the Westfall Act.................................................................4

II.  The District of Columbia's Law of *Respondeat Superior* .......................................5

III. The Analyses in *Blassingame* and *Thompson* Do Not Control this Court's Application of D.C.'s Scope-of-Employment Test. ....................................................7

ARGUMENT.......................................................................................................................9

I.   President Trump Acted in the Scope of his Office or Employment. .........................9

    A.  President Trump's Conduct was "of the Kind" He was Employed to Perform.................9

    B.  President Trump Was Actuated, At Least in Part, to Serve the United States.................29

    C.  Plaintiffs' Remaining Arguments Lack Merit.................................................36

II.  The President of the United States is an "Employee of the Government" Under the FTCA, Including the Provisions of the Westfall Act.........................................39

    A.  The President is an "Employee of the Government" Under the FTCA...........................39

    B.  History Confirms that the President is an "Employee of the Government." ...................41

    C.  The Westfall Act's Legislative History Shows the President is an "Employee."............42

CONCLUSION..................................................................................................................43

# TABLE OF AUTHORITIES

**Cases**

*Ali Jaber v. United States,*
    155 F. Supp. 3d 70 (D.D.C. 2016) ...................................................................42

*Allaithi v. Rumsfeld,*
    753 F.3d 1327 (D.C. Cir. 2014) ...............................................................23, 26

*Black Lives Matter D.C. v. United States,*
    – F. Supp.3d –, No. 20-CV-1469(DLF), 2025 WL 823903 (D.D.C. Mar. 14, 2025) ........*passim*

*Blassingame v. Trump,*
    87 F.4th 1 (D.C. Cir. 2023) ...................................................................*passim*

*Boykin v. Dist. of Columbia,*
    484 A.2d 560 (D.C. 1984) .............................................................................6

*Burgess v. United States,*
    553 U.S. 124 (2008) ....................................................................................40

*Carroll v. Trump,*
    49 F.4th 759 (2d Cir. 2022) ........................................................ 8, 39, 40, 41

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) ....................................................................................40

*Conyers v. Westphal,*
    235 F. Supp. 3d 72 (D.D.C. 2017) ...............................................................38

*\*Council on Am. Islamic Rels. v. Ballenger,*
    444 F.3d 659 (D.C. Cir. 2006) ..............................................................*passim*

*CTS Corp. v. E.P.A.,*
    759 F.3d 52 (D.C. Cir. 2014) .......................................................................37

*De Martinez v. Lamagno,*
    515 U.S. 417 (1995) ......................................................................................4

*Does v. Haaland,*
    973 F.3d 591 (6th Cir. 2020) .......................................................................16

*Garza v. Trump,*
    709 F. Supp. 3d 1 (D.D.C. 2024) ..................................................................3

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) .....................................................................28

*Harbury v. Hayden,*
    522 F.3d 413 (D.C. Cir. 2008) ..........................................................1, 6, 7, 18

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ....................................................................................15

*Howard Univ. v. Best,*
    484 A.2d 958 (D.C. 1984) .............................................................................6

*\*Jacobs v. Vrobel,*
    724 F.3d 217 (D.C. Cir. 2013) ..............................................................*passim*

*Johnson v. Weinberg,*
    434 A.2d 404 (D.C. 1981) .............................................................................6

*Kelley v. FBI,*
    67 F. Supp. 3d 240 (D.D.C. 2014) ...................................................13, 28, 38

*Klayman v. Obama*,
   125 F. Supp. 3d 67 (D.D.C. 2015) .......................................................... 25, 34, 35, 42

*Kosak v. United States*,
   465 U.S. 848 (1984) ..........................................................................................41

*Lyon v. Carey*,
   533 F.2d 649 (D.C. Cir. 1976) .......................................................................6, 24

*McNamara v. United States*,
   199 F. Supp. 879 (D.D.C. 1961) ........................................................................40

*Moore v. Trump*,
   No. 22-CV-00010 (APM), 2022 WL 3904320 (D.D.C. Aug. 2, 2022) ....................3

*Murray v. Shaw*,
   No. 24-CV-00640, 2025 WL 915752 (D.D.C. Mar. 26, 2025) .......................*passim*

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ..........................................................................................14

*Osborn v. Haley*,
   549 U.S. 225 (2007) ............................................................................................5

*Page v. Comey*,
   628 F. Supp. 3d 103 (D.D.C. 2022) ....................................................................19

*Penn Central Transportation Co. v. Reddick*,
   398 A.2d 27 (D.C. 1979) ......................................................................................6

*Phillips v. Mabus*,
   894 F. Supp. 2d 71 (D.D.C. 2012) ......................................................................38

*Rasul v. Myers*,
   512 F.3d 644 (D.C. Cir. 2008) .......................................................... 11, 23, 24, 26

*Saleh v. Bush*,
   848 F.3d 880 (9th Cir. 2017) .........................................................................*passim*

*Sandifer v. U.S. Steel Corp.*,
   571 U.S. 220 (2014) ..........................................................................................41

*Schneider v. Kissinger*,
   310 F. Supp. 2d 251 (D.D.C. 2004) ...................................................... 21, 24, 25

*Smith v. Clinton*,
   253 F. Supp. 3d 222 (D.D.C. 2017) ....................................................................12

*Smith v. Trump*,
   No. 21-CV-02265 (APM), 2023 WL 417952 (D.D.C. Jan. 26, 2023) ...................28

*Steele v. Meyer*,
   964 F. Supp. 2d 9 (D.D.C. 2013) .................................................................*passim*

*Stokes v. Cross*,
   327 F.3d 1210 (D.C. Cir. 2003) .........................................................................10

*Talignani v. United States*,
   26 F.4th 379 (7th Cir. 2022) ..............................................................................40

*Thompson v. Trump*,
   590 F. Supp. 3d 46 (D.D.C. 2022) ....................................................................3, 9

*\*Trump v. Carroll*,
   292 A.3d 220 (D.C. 2023) ...........................................................................*passim*

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ..........................................................................................14

*Trump v. Mazars USA, LLP,*
  591 U.S. 848 (2020) .............................................................................14
*\*Trump v. United States,*
  603 U.S. 593 (2024) .........................................................................*passim*
*Trump v. Vance,*
  591 U.S. 786 (2020) ..........................................................................2, 14
*United States v. LePatourel,*
  571 F.2d 405 (8th Cir. 1978) ................................................................40
*United States v. Sabol,*
  534 F. Supp. 3d 58 (D.D.C. 2021) ...........................................................6
*United States v. Smith,*
  499 U.S. 160 (1991) ...............................................................................4
*West v. Trump,*
  No. 19-cv-2522, 2020 WL 4721291 (N.D. Tex. July 23, 2020)..................42
*Wilson v. Libby,*
  498 F. Supp. 2d 74 (D.D.C. 2007) ..........................................................38
*Wilson v. Libby,*
  535 F.3d 697 (D.C. Cir. 2008) .......................................................11, 25, 37
*\*Wuterich v. Murtha,*
  562 F.3d 375 (D.C. Cir. 2009) ..........................................................*passim*
*Youngstown Sheet & Tube Co. v. Sawyer,*
  103 F. Supp. 978 (D.D.C. 1952) .............................................................41

**Constitutional Provisions, Statutes, Rules, and Other Authorities**

2 U.S.C. § 7 .......................................................................................18
5 U.S.C. § 101 ....................................................................................40
18 U.S.C. § 1015(f) .............................................................................17
18 U.S.C. § 241 ..................................................................................17
18 U.S.C. § 611(a) ..............................................................................17
28 U.S.C. § 2671 ................................................................39, 40, 41, 43
28 U.S.C. § 2674 ................................................................................43
28 U.S.C. § 2679(b)(1) ......................................................................4, 21
28 U.S.C. § 2679(d) ..........................................................................4, 39
42 U.S.C. § 1985(1) ..........................................................................2, 3
42 U.S.C. § 5195c ...............................................................................19
50 U.S.C. § 3023 ................................................................................19
52 U.S.C. § 10307(c) ...........................................................................17
52 U.S.C. § 20301(a) ...........................................................................17
52 U.S.C. § 20501 ..............................................................................17
52 U.S.C. § 20505(a)(1) .......................................................................18
52 U.S.C. § 20511(2) ...........................................................................17
52 U.S.C. § 20507 ..............................................................................18
52 U.S.C. § 20921 ..............................................................................17
52 U.S.C. § 20922 ..............................................................................18
52 U.S.C. § 20944 ..............................................................................18
52 U.S.C. § 20961 ..........................................................................17, 18

52 U.S.C. § 20971(a)(1) ................................................................................................17

52 U.S.C. § 21083 ..........................................................................................................18

U.S. CONST. art. I ...........................................................................................................20

U.S. CONST. art. II ....................................................................................................*passim*

Cybersecurity and Infrastructure Security Agency Act of 2018,
Pub. L. 115-278, 132 Stat. 4168 (2018) ..............................................................20

*Establishment of Presidential Advisory Commission on Election Integrity,*
82 Fed. Reg. 22389 (May 11, 2017) ....................................................................33

*Federal Tort Claims Act – Applicability to Agencies in Other Than Executive Branch of*
*Government,*
26 Comp. Gen. 891 (May 22, 1947) ....................................................................42

*Imposing Certain Sanctions in the Event of Foreign Interference in a United States Election,*
Exec. Order No. 13848, 83 Fed. Reg. 46843 (Sep. 12, 2018) .............................19

*Preserving and Protecting the Integrity of American Elections,*
90 Fed. Reg. 14005 (Mar. 25, 2025) ...................................................................33

## INTRODUCTION

It is Plaintiffs' burden to rebut the Attorney General's certifications that President Trump acted within the scope of his office or employment, and they have failed to carry it. Noticeably missing from Plaintiffs' Motion to Strike is a single case in which a court determined that a senior Executive Branch official acted outside the scope of their office or employment for purposes of substitution under the Westfall Act. By contrast, as catalogued below, a bevy of cases applying District of Columbia law have upheld scope certifications for high-ranking Executive Branch officials, including for President Trump, involving a wide range of conduct.

This is no accident. Under D.C. law, the scope-of-employment test is interpreted "very expansively" and "broadly" construes acts that may fall within the scope of employment. *Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013); *Trump v. Carroll*, 292 A.3d 220, 229 (D.C. 2023). And "[b]ecause of the broad scope-of-employment standard in many states and D.C., . . . tort claims against federal government employees often proceed against the Government itself under the [Federal Tort Claims Act] rather than against the individual employees under state law." *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008).

Perhaps recognizing this, Plaintiffs invite the Court to apply an altogether different legal standard. Citing *Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023), they urge the Court to deny substitution, contending that President Trump's statements leading up to and at the "Save America" rally constituted campaign conduct wholly divorced from any official duty of the President. Mot. at 15. But *Blassingame*'s "office-seeker" vs. "office-holder" test for official-act immunity does not control this Westfall substitution challenge, which is governed instead by D.C.'s liberally construed *respondeat superior* law. Likewise, Plaintiffs conflate the issue of whether conduct is wrongful with the issue of whether it falls within scope, fatally undermining

their Motion to Strike. And, as a last gasp, they argue that the President is not an employee under the Westfall Act or the FTCA. The courts that have addressed the issue have found the opposite.

Application of the governing law confirms that the relevant conduct underlying the D.C. law claims in Plaintiffs' Complaints falls comfortably within the scope of the President's office or employment. Unquestionably, the President is always on duty. His authorized duties are of "unrivaled gravity and breadth." *Trump v. Vance*, 591 U.S. 786, 800 (2020). The conduct at issue in this Westfall challenge—communicating to and on behalf of the American people on a matter of public concern, *i.e.*, the integrity of the 2020 presidential election—is well within the President's authorized duties. Further, Plaintiffs have failed to counter the evidence—including President Trump's evidence and even their own—showing that he was at least partially motivated by concerns about the proper functioning of the democratic process, which is all that is needed for scope purposes in the District of Columbia. For these reasons, and as discussed more fully below, the Court should deny Plaintiffs' Motion to Strike.

## BACKGROUND

Plaintiffs sue President Trump for damages in his personal capacity in connection with the events of January 6, 2021. All of the consolidated cases assert federal statutory claims under 42 U.S.C. § 1985(1). Six cases assert common law claims against the President for "assault and battery" based on a theory that he aided and abetted tortious conduct.[1] The complaints assert, for example, that President Trump encouraged and facilitated assault and battery by creating a violent atmosphere, *see* Am. Compl., *Smith, et al. v. Trump, et al.*, 1:21-cv-2265 (Doc. 89) ¶¶

---

[1] Am. Compl., *Blassingame, et al. v. Trump*, 1:21-cv-858 (D.D.C.) ¶¶ 150-68; Compl., *Swalwell v. Trump*, 1:21-cv-586 (D.D.C.) ¶¶ 237-52; Am. Compl., *Smith, et al. v. Trump, et al.*, 1:21-cv-2265 (D.D.C.) ¶¶ 199-210; Compl., *Moore v. Trump*, 1:22-cv-10 (D.D.C.) ¶¶ 147-65; Compl., *Kirkland v. Trump*, 1:22-cv-34 (D.D.C.) ¶¶ 161-79; Compl., *Tabron v. Trump*, 1:22-cv-11 (D.D.C.) ¶¶ 154-72.

201 & 207; "riled up the crowd and directed and encouraged the mob to attack the Capitol and seek out members of Congress and assault them," Compl., *Swalwell v. Trump, et al.*, 1:21-cv-586 (Doc. 1) ¶ 251; and assisted the attackers with his "suggestive words and encouragement leading up to and on January 6[.]" Am. Compl., *Blassingame v. Trump*, 1:21-cv-858 (Doc. 3) ¶ 165.

Causes of action based on District of Columbia statutes, "civil conspiracy," and "punitive damages" are still active in certain cases,[2] although the Court dismissed such claims on the merits in *Smith, et al. v. Trump, et al.*, 1:21-cv-2265 (Jan. 26, 2013) (Doc. 179) (dismissing claims based on D.C. statutes), and *Thompson v. Trump*, 590 F. Supp. 3d 46, 125 (D.D.C. 2022), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023) (dismissing punitive damages and civil conspiracy causes of action). In *Garza*, a survival action under D.C. Code § 12-101 remains based on 42 U.S.C. § 1985(1). *Garza v. Trump, et al.*, 1:23-cv-38 (D.D.C.); *Garza v. Trump*, 709 F. Supp. 3d 1, 9 (D.D.C. 2024).

On March 20, 2025, the United States filed notices certifying that, in connection with Plaintiffs' claims arising under D.C. law, President Trump was acting within the scope of his office or employment and substituting the United States as the defendant for President Trump on those claims.[3] Plaintiffs moved to strike the certifications. Doc. 183.

---

[2] Am. Compl., *Blassingame, et al., v. Trump*, 1:21-cv-858 (D.D.C.), ¶¶ 180-207 (D.C. statutory claims); Compl., *Swalwell v. Trump*, 1:21-cv-586 (D.D.C.) ¶¶ 192-220 (D.C. statutory claims); *Thompson v. Trump*, 590 F. Supp. 3d 46, 119-21 (D.D.C. 2022) (permitting such claims because President did not raise certain arguments), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023); Compl., *Moore v. Trump*, 1:22-cv-10 (D.D.C.) ¶¶ 166-99 & ¶¶ 212-15 (all three types); Compl., *Kirkland v. Trump*, 1:22-cv-34 (D.D.C.) ¶¶ 180-213 & ¶¶ 226-29 (same); Compl., *Tabron v. Trump*, 1:22-cv-11 (D.D.C.) ¶¶ 173-206 & ¶¶ 219-22 (same); *Moore v. Trump*, No. 22-CV-00010 (APM), 2022 WL 3904320, at *1 (D.D.C. Aug. 2, 2022) (denying motions to dismiss in *Moore*, *Kirkland*, and *Tabron*, noting President Trump asserted only presidential immunity as a defense), *aff'd*, No. 22-7120, 2024 WL 995261 (D.C. Cir. Mar. 8, 2024).
[3] *Blassingame*, 1:21-cv-00858 (Doc. 74); *Swalwell*, 1:21-cv-00586 (Doc. 95); *Smith*, 1:21-cv-02265 (Doc. 376); *Tabron*, 1:22-cv-00011 (Doc. 33); *Moore*, 1:22-cv-00010 (Doc. 41); *Kirkland*, 1:22-cv-00034 (Doc. 34); *Garza*, 1:23-cv-00038 (Doc. 87).

## GOVERNING LAW

### I.    Purpose and Function of the Westfall Act

The Federal Employees Liability Reform and Tort Compensation Act of 1988 (the "Westfall Act"), 28 U.S.C. § 2679(d), amended the Federal Tort Claims Act to "protect Federal employees from personal liability for common law torts committed within the scope of their employment." *De Martinez v. Lamagno*, 515 U.S. 417, 426 (1995). The Act's "core purpose" is "to relieve covered employees from the cost and effort of defending the lawsuit, and to place those burdens on the Government's shoulders." *Wuterich v. Murtha*, 562 F.3d 375, 380 (D.C. Cir. 2009). The Act accomplishes this "by making an FTCA action against the Government the exclusive remedy for torts committed by Government employees in the scope of their employment." *United States v. Smith*, 499 U.S. 160, 163 (1991); *see also* 28 U.S.C. § 2679(b)(1).

Once the Attorney General (or her delegate) certifies that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose," the United States must be substituted in the employee's stead as the named defendant, and the action proceeds against the government under the FTCA. 28 U.S.C. § 2679(d)(1). The certification "constitute[s] *prima facie* evidence that the employee was acting within the scope of his employment." *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006).

The plaintiff "bears the burden of presenting evidence and disproving the Attorney General's decision" to certify that the employee's conduct was within scope. *Saleh v. Bush*, 848 F.3d 880, 889 (9th Cir. 2017). "[M]ere conclusory statements" are not enough to rebut the Attorney General's certification. *Jacobs v. Vrobel*, 724 F.3d 217, 222-23 (D.C. Cir. 2013). "Rather than rely on mere conclusory allegations and speculation, the plaintiff must submit

persuasive evidence—specific evidence or a forecast of specific evidence—that contradicts the certification." *Murray v. Shaw*, No. 24-CV-00640, 2025 WL 915752, at *21 (D.D.C. Mar. 26, 2025) (Mehta, J.) (citing *Steele v. Meyer*, 964 F. Supp. 2d 9, 17 (D.D.C. 2013)) (cleaned up). And further, "[t]he United States … must remain the federal defendant in the action unless and until the District Court determines that the employee, *in fact*, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Osborn v. Haley*, 549 U.S. 225, 231 (2007) (emphasis original).

## II.    The District of Columbia's Law of *Respondeat Superior*

The scope-of-employment analysis is governed by the law of the place where the tort occurred. *Wuterich*, 562 F.3d at 383. The District of Columbia "generally adheres" to the scope-of-employment test set forth in the Second Restatement of Agency. *Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023). Under this test, conduct is within the scope of employment if:

> (a) it is of the kind the person is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master; and
>
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement (Second) of Agency § 228(1). Conduct "is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.* § 228(2).

Federal and local courts in the District of Columbia have emphasized that the scope-of-employment test is interpreted "very expansively" and "broadly" construes acts that may fall within the scope of employment. *Jacobs*, 724 F.3d at 221; *Carroll*, 292 A.3d at 229. Consistent with this broad construction, "several D.C. cases [have held] that seriously criminal and violent

conduct can still fall within the scope of a defendant's employment under D.C. law—including sexual harassment, a shooting, armed assault, and rape." *Harbury*, 522 F.3d at 422 (citing *Howard Univ. v. Best*, 484 A.2d 958, 987 (D.C. 1984) (university dean acted within scope of employment in sexually harassing faculty member during meetings); *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) (laundromat employee acted within scope of employment in shooting customer during dispute over removing clothes from washing machine); *Lyon v. Carey*, 533 F.2d 649, 652 (D.C. Cir. 1976) (mattress deliveryman acted within scope of employment in raping customer after dispute arose during delivery)).[4]

The D.C. Circuit has explained that, while broad construction of scope-of-employment may lead to seemingly "counterintuitive" results, an expansive interpretation reflects a policy choice:

> At first blush, D.C. scope-of-employment law might seem counterintuitive. How could committing physical abuse, for example, be within the scope of an individual's employment? The explanation is straightforward: Many states and D.C. apply the scope-of-employment test very expansively, in part because doing so usually allows an injured tort plaintiff a chance to recover from a deep-pocket employer rather than a judgment-proof employee. *See* RESTATEMENT (THIRD) OF AGENCY § 2.04 cmt. b (2006) ("Respondeat superior . . . reflects the likelihood that an employer will be more likely to satisfy a judgment.").

*Harbury*, 522 F.3d at 422 n.4.

As a result of the D.C. courts' expansive interpretation of scope-of-employment, the "test often is akin to asking whether the defendant merely was on duty or on the job when committing

---

[4] Plaintiffs' *respondeat superior* authorities are easily distinguishable. *See Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C. 1979) (off-duty railroad employee out of scope when he shattered the leg of a cab driver); *Boykin v. Dist. of Columbia*, 484 A.2d 560, 564 (D.C. 1984) (teacher out of scope when sexually assaulting student while not performing teaching responsibilities). Plaintiffs also cite *United States v. Sabol*, 534 F. Supp. 3d 58, 73 (D.D.C. 2021), a criminal case regarding a defendant's motion for pretrial release. The case has nothing to do with the D.C. law on scope-of-employment. None of these cases involve federal employees or have anything to do with the Westfall Act.

the alleged tort." *Id.* And relevant to the notices of Westfall substitution here, "[b]ecause of the broad scope-of-employment standard in many states and D.C., . . . tort claims against federal government employees often proceed against the Government itself under the FTCA rather than against the individual employees under state law." *Id.*

III.    **The Analyses in *Blassingame* and *Thompson* Do Not Control this Court's Application of D.C.'s Scope-of-Employment Test.**

Plaintiffs' Motion to Strike relies heavily on a test that does not apply here. Citing the D.C. Circuit's decision in *Blassingame*, Plaintiffs repeatedly insist that President Trump acted outside the scope of his office or employment because campaigning for the presidency was not a part of his official duties. *See* Doc. 183 ("Motion to Strike" or the "Motion") at 3 (arguing "campaign conduct" was outside the scope of employment); *id.* at 13 ("Trump was acting unofficially as a candidate for office, in a purely private capacity[.]"); *id.* at 15 ("Trump's efforts . . . entailed unofficial acts that he undertook as a candidate for public office[.]"); *id.* at 16 ("speeches by an office-seeker" are outside the scope of employment).

But none of these quotations or Plaintiffs' related arguments are persuasive because *Blassingame* did not involve a Westfall challenge, and the D.C. Circuit had no occasion to apply D.C.'s law on scope-of-employment there. Rather, the "sole issue" presented was "whether President Trump . . . demonstrated an entitlement to official-act immunity for his actions leading up to and on January 6 as alleged in the complaints." *Blassingame*, 87 F.4th at 4. The D.C. Circuit answered that question in the negative, reasoning that "[w]hen a first-term President opts to seek a second term, his campaign to win re-election is not an official presidential act." *Id.*

Plaintiffs' heavy reliance on *Blassingame* in this Westfall challenge is misplaced for several reasons. First, the Court's analysis of Plaintiffs' scope challenge is governed by D.C.'s law of *respondeat superior*, which—in contrast to federal common law on "official-act

immunity"—serves a different purpose and is applied "very expansively" to achieve the specific policy objectives of D.C. tort law. *Jacobs*, 724 F.3d at 221.

Second, it would be improper to graft *Blassingame*'s bright-line "office seeker" vs. "office holder" test onto D.C.'s scope-of-employment standard because the D.C. Court of Appeals has stressed that *it* has "never adopted a rule that has determined that a certain type of conduct is per se within (or outside of) the scope of employment," and it expressly declined to do so in *Carroll*. 292 A.3d at 240.

Third, *Westfall* Act immunity is particularly broad and especially so when applied to the President, whose duties and responsibilities are unmatched, resulting in a wide range of activity falling within scope. *See Carroll v. Trump* (*Carroll II*), 49 F.4th 759, 765 n.3 (2d Cir. 2022), *certified question answered*, 292 A.3d 220 (D.C. 2023) ("Our holding today is that the *Westfall* Act extended absolute immunity to the President also for non-official acts as long as they are within the scope of employment.").

Lastly, even if *Blassingame*'s analysis of official-act immunity has any application to the Westfall challenge here (it does not), *Blassingame* is not the last word on presidential immunity. The Supreme Court declined to adopt the D.C. Circuit's blanket "office seeker" vs. "office holder" test to a President's actions, saying instead that what had been characterized as "campaign conduct" (for example, the President's interactions with the Vice President and Department of Justice officials) "are readily categorized" as official actions. *Trump v. United States*, 603 U.S. 593, 617, 623 (2024). The Court recognized that other presidential conduct "requires a close analysis" that "must be fact specific and may prove to be challenging." *Id.* at 628-29. In short, *Blassingame's* test for analyzing official-act immunity does not control the Westfall challenge before this Court.

For the same reasons, Plaintiffs' reliance on this Court's analysis of presidential immunity in *Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022), is misplaced. While Plaintiffs repeatedly cite the Court's findings in *Thompson* that President Trump was engaged in "campaign conduct" not "in furtherance of any official duty," Mot. at 3, the Court there was not applying D.C.'s expansive *respondeat superior* law. Moreover, at the time *Thompson* was decided, the Court did not have the benefit of the D.C. Court of Appeals' careful analysis of D.C.'s scope-of-employment law in *Carroll.* Nor did *Thompson* have the benefit of the Supreme Court's decision on official-act immunity in *Trump v. United States*. Accordingly, *Thompson*'s analysis of the President's conduct is not applicable in the context of the Westfall challenge before this Court.

## ARGUMENT

## I.    President Trump Acted in the Scope of his Office or Employment.

Plaintiffs have not carried their burden to establish, with "persuasive evidence," *Steele*, 964 F. Supp. 2d at 17, that President Trump acted outside the scope of his office or employment.

### A.    President Trump's Conduct was "of the Kind" He was Employed to Perform.

The first factor in the scope-of-employment inquiry "plainly encompasses an employee's performance of their stated job duties," but it "extends beyond that narrow category of conduct." *Carroll*, 292 A.3d at 230. The scope of an employee's job functions includes more than "the conduct *expressly* authorized" and embraces "informal responsibilities" that are integral to the employment. *Id.* (emphasis in original). And so, in addition to an employee's expressly authorized duties, an employee's conduct also falls within the scope of the employment if it is "'of the same general nature as' *or* 'incidental to' the conduct authorized." *Id.* (quoting Restatement (Second) of Agency § 299(1)) (emphasis in original). The

District of Columbia "liberally construes" this prong. *Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003).

The first prong requires "focus on the type of act [the defendant] took that gave rise to the tort, not the wrongful character of that act." *Jacobs*, 724 F.3d at 221. It "is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf." *Ballenger*, 444 F.3d at 664. For this reason, alleged tortious and even illegal acts—such as shooting a customer, raping a customer, and torturing detainees—have been deemed to be within scope. *Id.*; *Steele*, 964 F. Supp. 2d at 17. For example, in *Ballenger*, the D.C. Circuit upheld a Westfall certification in a defamation suit against a congressman for statements he made on the telephone to a reporter. 444 F.3d at 661-62, 664. In addressing the first prong of the scope-of-employment test, the D.C. Circuit explained that the relevant question "is whether *that telephone conversation*" in which the congressman made the defamatory statement "was the kind of conduct [the Congressman] was employed to perform," not whether "*the allegedly defamatory sentence*" itself was within the scope of the defendant's employment. *Id.* at 664 (emphasis added). The D.C. Circuit concluded that communicating with the press fell within the scope of the congressman's duties, which require him to have a "relationship with the public." *Id.* at 665; *see also Wuterich*, 562 F.3d at 384-85 (explaining, in defamation action against congressman, that the "underlying conduct—interviews with the media about the pressures on American troops in the ongoing Iraq war—[was] unquestionably of the kind [he] was employed to perform").

Following *Ballenger*, courts interpreting D.C. law have time and again applied this principle to find that the underlying conduct of senior Executive Branch officials is "of the kind" they are authorized to perform, notwithstanding serious allegations of tortious (or even criminal)

activity. This is in part because their responsibilities are broad, their duties vast, and because the test, which requires courts to focus only on the type of act, sweeps in a wide range of conduct. In *Rasul v. Myers*, for example, Guantanamo detainees sued the Secretary of Defense and military officers, claiming the defendants "authorized, implemented, supervised and condoned their torture and detention." 512 F.3d 644, 654 (D.C. Cir. 2008), *vacated and remanded on other grounds*, 555 U.S. 1083 (2008), *reinstated in relevant part*, 563 F.3d 527, 528-29 (D.C. Cir. 2009). Notwithstanding "the allegations of serious criminality," *id.* at 660, the D.C. Circuit focused on "the underlying conduct—[*i.e.*,] the detention and interrogation of suspected enemy combatants" and held that it was "the type of conduct the defendants were employed to engage in." *Id.* at 658.

Likewise, *Wilson v. Libby* involved a tort action against Vice President Cheney, former Chief of Staff Lewis Libby, Senior Advisor to the President Karl Rove, and Deputy Secretary of State Richard Armitage for making comments to the press that intentionally and unlawfully "destroyed [the plaintiff's] cover as a classified CIA employee." 535 F.3d 697, 702 (D.C. Cir. 2008). But the underlying conduct—"[speaking] to the press in order to diffuse . . . criticism of the Executive's handling of pre-war intelligence" was "of the type that the defendants were employed to perform" and "was in the defendants' scope of employment regardless of whether it was unlawful or contrary to the national security of the United States." *Id.* at 712 (explaining that plaintiffs' arguments about the illegality and impropriety of the alleged conduct "are misplaced"); *see also Jacobs*, 724 F.3d at 222 (finding the underlying conduct, "responding to a prospective employer's request for a reference," was "plainly the kind of conduct Vrobel was employed to perform" despite allegations that General Services Administration manager defamed plaintiff).

11

Similarly, *Saleh v. Bush* involved a tort action against President George W. Bush, Vice President Cheney, Defense Secretary Rumsfeld and other high-ranking Executive Branch officials for allegedly instigating an illegal war of aggression in Iraq. 848 F.3d 880 (2017) (applying D.C. law). But rather than focus on the illegality of the war, the court appropriately trained its analysis on the underlying conduct — "guiding the United States' foreign policy" and "us[ing] the Armed Forces of the United States . . . [to] defend the national security of the United States"—which was conduct the defendants were unquestionably authorized to perform. *Id.* at 890-91.

*Smith v. Clinton*, 253 F. Supp. 3d 222 (D.D.C. 2017), *aff'd*, 886 F.3d 122, 127 (D.C. Cir. 2018) is no different. There, plaintiffs sued Secretary of State Hillary Clinton, alleging that her unlawful use of a private email server resulted in the wrongful death of their sons by exposing information that led to the Benghazi terrorist attack. *Id.* at 231. The court explained, it "does not matter whether Secretary Clinton used a private email server lawfully or unlawfully. Instead, the relevant inquiry is whether [her] electronic communications with State Department personnel about official business during her tenure were within the scope of her employment." *Id.* at 237. It held that such conduct "[fell] squarely within the scope of her duty to run the Department and conduct the foreign affairs of the nation as Secretary of State." *Id.*

And finally, in *Black Lives Matter D.C. v. United States*, – F. Supp.3d –, No. 20-CV-1469 (DLF) (LEAD), 2025 WL 823903, at *1 (D.D.C. Mar. 14, 2025), plaintiffs sued President Trump for allegedly directing law enforcement officers to violently disperse peaceful protestors in D.C.'s Lafayette Square. But the underlying conduct, "ordering law enforcement to respond to large-scale protests near to the White House[, was] self-evidently the 'kind' of conduct the President may perform," *id.* at *6 (quoting *Carroll*, 292 A.3d at 230-32), particularly in light of

the President's duty to maintain national security and his "inherent authority . . . to preserve such order in the District of Columbia as may be necessary to protect the function of the federal government." *See id.* (citation omitted).

Applying these principles here, the relevant "underlying conduct" for the Court's scope-of-employment analysis is President Trump's public statements concerning the integrity of the 2020 election leading up to and at the January 6 rally. Notably, Plaintiffs and the United States appear to agree on the core conduct at issue for the Court's Westfall analysis. *See* Mot. at 16 (acknowledging that "[t]he core of the conduct at issue with respect to the state law claims [is] Trump's statements leading up to and at the Rally."); *accord Trump v. United States*, 603 U.S. at 629 (noting the conduct alleged in the January 6 indictment "largely consists of Trump's communications in the form of Tweets and a public address").[5] As demonstrated below, this core conduct was of the kind President Trump was authorized to perform.

> **i.  President Trump was authorized to speak on matters of public concern, such as the integrity of the 2020 election.**

President Trump was and is President of the United States. The President "occupies a unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982), as "the only person who alone composes a branch of government." *Trump v. Mazars USA, LLP*,

---

[5] Contrary to the approach taken in Plaintiffs' brief, *see* Mot. at 16-17 & 19-20, application of this settled principle to identify the relevant "underlying conduct" is how the Court determines the "context" for the scope-of-employment test—not by reference to allegations that are irrelevant to Plaintiffs' D.C. tort claims or a searching review of how the rally was organized. *See Jacobs*, 724 F.3d at 224 (disregarding, for purposes of the Westfall analysis, "several allegations" that had "nothing to do with [the plaintiff's] claims" for which the United States was substituted for the individual employee); *Kelley v. FBI*, 67 F. Supp. 3d 240, 278 (D.D.C. 2014) ("[O]nly those facts that relate to the particular conduct that underlies the alleged tort may support an inference that defendants exceeded the scope of their employment"); *Murray*, 2025 WL 915752, at *22-24 (applying the "type" of act and "underlying dispute or controversy" standards to identify the "context" for analyzing the Westfall certification, and finding the conduct within scope).

591 U.S. 848, 868 (2020); *see also Blassingame*, 87 F.4th at 12 (the President is "the embodiment of the executive branch"). Consequently, the President's authorized duties are of "unrivaled gravity and breadth." *Trump v. Vance*, 591 U.S. 786, 800 (2020); *see also Blassingame*, 87 F.4th at 33 (Katsas, J., concurring) ("The President's duties are so pervasive . . ."). The President is the "chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," and is responsible for both "the enforcement of federal law" and "management of the Executive Branch." *Nixon*, 457 U.S. at 750. President Trump's statements regarding the presidential election fell squarely within his authorized duties.

To begin with, the President holds the important power and responsibility to "speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 585 U.S. 667, 701 (2018). This authority includes "speak[ing] on matters" such as "the fairness and integrity of federal elections" and "encourag[ing] [the public] to act in a manner that promotes the President's view of the public good." *Trump v. United States*, 603 U.S. at 627; *cf. id.* at 629 ("[M]ost of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities.").

Closely related to this duty, the President, as head of the Executive Branch, plays an important role in the Justice Department's investigation and prosecution of election fraud allegations. *Id.* at 619-21 (observing President Trump's official duties authorized him to interact with Justice Department officials concerning investigations into "allegations of election crime"). "Investigative and prosecutorial decisionmaking is 'the special province of the Executive Branch,' and the Constitution vests the entirety of the executive power in the President." *Id.* at 620 (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)) (citing U.S. Const. art. II, § 1). And

relevant here, "the Executive Branch has exclusive authority and absolute discretion to decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Id.* (internal quotation marks omitted). Consequently, then, the President's duties include communicating with the public about the following, via tweet or otherwise:

- On December 19, 2020: "Peter Navarro releases 36-page report alleging election fraud 'more than sufficient' to swing victory to Trump. washex.am/3nwaBCe A great post by Peter. Statistically impossible to have lost the 2020 election. Big protest in D.C. on January 6th. Be there, will be wild!" Doc. 152-9 (MSJ Ex. 56; President Trump's R&Os to Pltfs' 1st RFAs) at 6 (RFA No. 15); Mot. at 17 (quoting portion of foregoing tweet); and

- On December 26, 2020: "The 'Justice' Department and the FBI have done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming evidence. They should be ashamed. History will remember. Never give up. See everyone in D.C. on January 6th." Doc. 152-9 (MSJ Ex. 56; President Trump's R&Os to Pltfs' 1st RFAs) at 6-7 (RFA No. 16); Mot. at 17 (quoting portion of foregoing tweet).

Similarly, at the rally, President Trump set his remarks in the context of "the honesty of our elections and the integrity of our glorious republic," expressed his views and what he considered to be the concerns of his constituents that the election was tainted, and exhorted his supporters to "fight like hell." *See, e.g.*, Doc. 144-47 (MSJ Ex. 42; January 6 Speech) at 3 (NARA_PROD_097097) & 31 (NARA PROD 097125).[6] Speaking to, and on behalf of, the American people about the contested 2020 presidential election, communicating about federal investigations into voter fraud allegations, and exhorting supporters to mobilize and "fight like

---

[6] Plaintiffs cite portions of other tweets that are of the same character. *See* Mot. at 17 (citing (i) the December 21, 2020, @realDonaldTrump Twitter post: "Republicans in Wisconsin should take these 3 strong decisions to their State Legislators and overturn this ridiculous State Election. We won in a LANDSLIDE!" Doc. 152-120 (MSJ Ex. 167; PLAINTIFFS_00069946); and (ii) the January 6, 2021, the @realDonaldTrump Twitter post: "States want to correct their votes, which they now know were based on irregularities and fraud, plus corrupt process never received legislative approval. All Mike Pence has to do is send them back to the States, AND WE WIN. Do it Mike, this is a time for extreme courage!" Doc. 152-9 (MSJ Ex. 56; President Trump's R&Os to 1st RFAs) at 10 (RFA No. 26)).

hell," is conduct "of the kind" President Trump was expressly authorized to perform. As the D.C. Circuit observed in *Wuterich*, it would be difficult to fathom how an elected official's remarks on matters of significant public concern could *ever* fall outside the scope of employment. 562 F.3d at 385 ("Indeed, where comments made in the course of a conversation on as private a matter as marital status [as in *Ballenger*] are within the scope of a congressman's official duties, it is hard to fathom how Congressman Murtha's discussion of grave public policy concerns . . . could ever fall outside the scope of his employment."); *Does v. Haaland*, 973 F.3d 591, 602 (6th Cir. 2020) (holding that Members of Congress were acting within scope when they "broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, [and] . . . through social media postings"). More generally, with respect to federal investigations, this Court has observed that "[c]ourts in this district 'routinely find that a federal employee's statements made during the course of government investigations fall within the scope of that employee's duties, *even when the statements are alleged to be false or defamatory*.'" *See Murray*, 2025 WL 915752, at *23 (emphasis added) (citations omitted).

President Trump's statements concerning the election were also authorized by his express (and constitutionally unique) duty to ensure the enforcement of federal laws. "As the sole person charged by the Constitution with executing the laws of the United States, the President oversees—and thus will frequently speak publicly about—a vast array of activities that touch on nearly every aspect of American life." *Trump v. United States*, 603 U.S. at 629. As the Supreme Court has explained, the "President's duty to 'take Care that the Laws be faithfully executed' plainly encompasses enforcement of federal election laws passed by Congress." *Id.* at 626-27 (quoting U.S. CONST. art. II, § 3). Leading up to and at the rally, President Trump contextualized his statements in terms of election integrity, consistent with the federal government's obligations

to promote every citizen's fundamental right to vote and "protect the integrity of the electoral process." 52 U.S.C. § 20501. He expressed the view that there had been widespread election irregularities and voting fraud. *See, e.g.*, Doc. 144-47 (MSJ Ex. 42; January 6 Speech) at 7-8 (NARA_PROD_097101 - 097102), 12 (NARA_PROD_097106), 14 (NARA_PROD_097108), 16 (NARA_PROD_097110), 22 (NARA_PROD_097116).

Contrary to Plaintiffs' arguments, these are issues of significant federal concern. *See, e.g.*, 52 U.S.C. § 10307(c) (prohibiting false information in registering or voting); *id.* § 20511(2) (prohibiting defrauding residents of a state of a fair and impartial election process); 18 U.S.C. § 241 (prohibiting conspiracy against the right to vote or to have one's vote counted); *id.* § 1015(f) & § 611(a) (prohibiting foreign nationals from registering to vote or voting in federal elections).

They also implicate the President's involvement in government operations furthering election administration. For example, the United States Election Assistance Commission ("EAC") carries out duties "relating to the testing, certification, decertification, and recertification of voting system hardware and software" and develops guidelines regarding "methods to detect and prevent fraud." 52 U.S.C. §§ 20921-20922, § 20961, § 20971(a)(1). The EAC is led by four Commissioners nominated by the President, *id.* § 20923(a)(1), and it is advised and assisted by multiple Presidential subordinates, such as the Department of Justice Public Integrity Chief, the Civil Rights Voting Section Chief, the Department of Defense Federal Voting Assistance Program Director, and the Director of the National Institute of Standards and Technology, a component of the Department of Commerce. 52 U.S.C. § 20944 & § 20961.

At the rally, President Trump publicly discussed reports that local officials made improper changes to election procedures without the approval of state legislatures, that late votes were counted, and that there were problems with voter registration and verification. Doc. 144-47

(MSJ Ex. 42; January 6 Speech) at 15-17 (NARA_PROD_097109-097111), 22

(NARA_PROD_097116), 25 (NARA_PROD_097119). Federal law fixes the date of the

election, 2 U.S.C. § 7, and Congress regulates the registration and identification of lawful voters.

52 U.S.C. § 20507 (providing requirements with respect to administration of voter registration);

*id.* § 21083 (providing computerized statewide voter registration list requirements and

requirements for voters who register by mail); *id.* § 20301(a) (providing that President shall

designate an executive department head to have responsibility for federal functions regarding

registration and voting by overseas voters); *id.* § 20505(a)(1) ("Each State shall accept and use

the mail voter registration application form prescribed by the Federal Election

Commission pursuant to section 20508(a)(2) of this title for the registration of voters

in elections for Federal office.").

President Trump also observed at the rally that the issues surrounding the contested

presidential election raised "a matter of national security," Doc. 144-47 (MSJ Ex. 42; January 6

Speech) at 28 (NARA_PROD_097122), consistent with prior statements and implicating broad

Executive national security operations. "In tort cases arising in the national security or foreign

policy context, . . . the political question doctrine counsels strongly against judicial second-

guessing of the Attorney General's [scope] certification . . . [because] [d]oing so would require

courts to intrude deeply into the foreign policy and national security decisionmaking process of

the Executive Branch." *Harbury*, 522 F.3d at 421 n.3. On June 22, 2020, President Trump

tweeted, "RIGGED 2020 ELECTION: MILLIONS OF MAIL-IN BALLOTS WILL BE

PRINTED BY FOREIGN COUNTRIES, AND OTHERS. IT WILL BE THE SCANDAL OF

OUR TIMES!" Doc. 152-9 (MSJ Ex. 56; President Trump's R&Os to Pltfs' 1st RFAs) at 3 (RFA

No. 5). On December 19, 2020, President Trump tweeted about whether Russia or China was

responsible for a hack, and he said, "There could also have been a hit on our ridiculous voting machines during the election, which is now obvious that I won big, making it an even more corrupted embarrassment for the USA. @DNI_Ratcliffe @SecPompeo." Doc. 144-9 (MSJ Ex. 5) at 218 (NARA_PROD_095906). The December 19 tweet about potential foreign influence in the election referred to—and was directed to—the Director of National Intelligence and the Secretary of State. *See Page v. Comey*, 628 F. Supp. 3d 103, 130 (D.D.C. 2022), *aff'd on other grounds*, – F.4th –, 2025 WL 1482279 (D.C. Cir. May 23, 2025) (noting that investigation regarding foreign interference in a presidential election presented national security issue). The Director of National Intelligence is a presidential appointee who, "[s]ubject to the authority, direction, and control of the President . . . (1) serve[s] as head of the intelligence community; [and] (2) act[s] as the principal adviser to the President, to the National Security Council, and the Homeland Security Council for intelligence matters related to the national security[.]" 50 U.S.C. § 3023(a)-(b). The State Department and others in the Executive Branch address election interference through, for example, sanctions. *See, e.g.*, *Imposing Certain Sanctions in the Event of Foreign Interference in a United States Election*, Exec. Order No. 13848, 83 Fed. Reg. 46843 (Sep. 12, 2018).

Further, the Department of Homeland Security has designated election infrastructure as "critical" from a national security standpoint. 42 U.S.C. § 5195c (critical infrastructures protection); *Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector*, DEP'T HOMELAND SEC. (Jan. 6, 2017), https://www.dhs.gov/archive/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical. And it "works to secure both the physical security and cybersecurity of the systems and assets that support the nation's elections," including by

19

"working collaboratively with those on the front lines of elections—state and local governments, election officials, federal partners, and private sector partners—to manage risks to the Nation's election infrastructure." *Election Security*, CYBER. & INFRASTRUCTURE SEC. AGENCY, https://www.cisa.gov/topics/election-security (discussing function of CISA, a component of the U.S. Department of Homeland Security); Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. 115-278, 132 Stat. 4168 (2018).

Finally, the President "shall from time to time . . . recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient." U.S. CONST. art. II, §3. And here, consistent with this authority, President Trump's public address on January 6 "call[ed] on Congress and the state legislators to quickly pass sweeping election reforms" including such measures as signature verification, voter ID requirements, mandating in-person voting on Election Day, and eliminating unsolicited mail-in balloting. *See* Doc. 144-47 (MSJ Ex. 42; January 6 Speech) at 28-29 (NARA_PROD_097122 - 097123). In *Wuterich*, the D.C. Circuit observed that Congressman Murtha's allegedly defamatory statements were connected to "his efforts to serve his constituents by advancing legislation," a function that was "part and parcel of [his] job as a legislator." 562 F.3d at 385. Because the President "plays a role in lawmaking by recommending to Congress the measures he thinks wise and signing or vetoing the bills Congress passes," *Trump v. United States*, 603 U.S. at 607 (citing U.S. CONST. art. I, § 7, cl. 2; art. II, § 3), President Trump's statements at the rally, advocating various election reform measures were directly connected to his authorized duties and the Executive Branch functions he oversees.

Importantly, in determining whether Plaintiffs have carried their burden on this (or any) element of the scope-of-employment test, the Court's function is not to evaluate the accuracy,

reasonableness, or wisdom of any of the statements outlined above. Rather, the sole function of the scope-of-employment analysis is to determine *who* should face liability for the underlying conduct at issue—the servant or the master. *See Schneider v. Kissinger*, 310 F. Supp. 2d 251, 265 (D.D.C. 2004) ("Defining an employee's scope of employment is not a judgment about whether alleged conduct is deleterious or actionable; rather, this procedure merely determines who may be held liable for that conduct, an employee or his boss."). Further, the D.C. Court of Appeals has explained that "[i]n considering more than just the employee's reported state of mind, we do *not* suggest that this is a partially subjective test that considers both the employee's subjective state of mind *and whether that subjective state of mind was on some level reasonable* (*i.e.*, objective)." *Carroll*, 292 A.3d at 234 n.14 (emphasis added). This is consistent with the plain text of the Westfall Act, which provides that even "wrongful" conduct (although the government does not concede that here) falls within the statute's ambit. 28 U.S.C. § 2679(b)(1); *see Ballenger*, 444 F.3d at 664.

This fundamental principle explains why this Court concluded in *Murray* that "a federal employee's statements made during the course of government investigations fall within the scope of that employee's duties, *even when the statements are alleged to be false or defamatory*." *Murray*, 2025 WL 915752, at *23 (emphasis added). It further explains why, in upholding the scope certification of President Trump in *Black Lives Matter D.C.*, the court declared that it "*[took] no position* on the ultimate accuracy of" the competing characterizations of the motivation behind President Trump's order to law enforcement to clear Lafayette Square (*i.e.*, enforcing national security vs. bolstering the President's public image). *Black Lives Matter D.C.*, 2025 WL 823903, at *7 (emphasis added). Finally, it explains why the D.C. Circuit in *Jacobs* "found that whatever was said in telephone calls between the plaintiff's supervisors and

plaintiff's prospective employers was 'of the kind of conduct' the plaintiff's supervisor was employed to perform, *i.e.*, responding to a prospective employer's request for a reference, *regardless of the character of those statements*." *Steele*, 964 F. Supp. 2d at 18 (citing *Jacobs*, 724 F.3d at 222-23) (emphasis added). The focus is on the type of act performed by the employee and its connection to the employee's duties—not its lawful or unlawful, accurate or inaccurate character.

ii.    **President Trump's statements were of the "same general nature as" or "incidental to" his expressly authorized duties.**

The foregoing discussion demonstrates that the underlying conduct that is the subject of the Westfall certifications here—President Trump's public comments about the presidential election—were of the kind he was "expressly authorized" to perform. But at a minimum, given the "innumerable" functions and "unrivaled" breadth of a President's duties, *Trump v. United States*, 603 U.S. at 607 & 618, President Trump's statements about the election were of the "same general nature" or "incidental to" his expressly authorized conduct—a considerably lower standard under D.C.'s law of *respondeat superior*. *Carroll*, 292 A.3d at 230.

Conduct is "of the same general nature as" the conduct authorized when there is a "similarity between the tortious conduct and an individual employee's job functions[.]" *Id.* Conduct is "incidental" if undertaken in the service of carrying out an employee's job function. *Id.* at 230-31. This inquiry turns on a "foreseeability" analysis that "reflects a *broadening* of the permissible nexus between an employee's conduct and their job responsibilities beyond a narrow reading of . . . the Restatement." *Id.* at 231 (emphasis added). This foreseeability analysis is focused on "whether the conduct was an 'outgrowth of a job-related controversy,' . . . the 'outgrowth of the employees' instructions or job assignments,' . . . or the 'outgrowth of a job-related dispute.'" *Id*. at 231-32 (citations omitted). As one court succinctly explained: "Conduct

22

is 'incidental' if it is 'foreseeable' and it is 'foreseeable' if it is a 'direct outgrowth of the employee's instructions or job assignment.'" *Steele*, 964 F. Supp. 2d at 18 (citation omitted).

In short, there need only be "some relationship or nexus" between the underlying conduct and the employee's expressly assigned responsibilities for the conduct to be incidental to the employee's duties. *See Carroll*, 292 A.3d at 232. Importantly, the D.C. Circuit has explained that "[f]oreseeable in this context *does not carry the same meaning as it does in negligence cases*; rather, it requires the court to determine whether it is fair to charge employers with responsibility for the intentional torts of their employees. To be foreseeable, the torts must be a direct outgrowth of the employee's instructions or job assignment." *Rasul*, 512 F.3d at 657 (emphasis added) (citations and internal quotation marks omitted). "The foreseeability test is to be liberally applied[.]" *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1332 (D.C. Cir. 2014). As the D.C. Circuit observed, "The test is not a particularly rigorous one." *Id.* (footnote omitted).

At a minimum, President Trump's statements were incidental to his expressly authorized conduct because, as the foregoing discussion regarding his express authority demonstrates, it cannot be said that his public address on January 6 and tweets to the American people regarding the presidential election were "devoid of [any] connection" to the performance of his authorized duties. *Allaithi*, 753 F.3d at 1333 (allegedly harsh detention practices were incidental to authorized duties and "certainly foreseeable because maintaining peace, security, and safety at a place like Guantanamo Bay is a stern and difficult business"); *Murray*, 2025 WL 915752, at *23 (finding that statements to Congress regarding retaliation were incidental to job duties because there was a nexus between that statement and the right to take concerns regarding whistleblower reprisal to Merit Systems Protection Board); *Rasul*, 512 F.3d at 656–659 (alleged torture during interrogations was incidental to "defendants' duties as military officers charged with winning the

war on terror"); *Schneider*, 310 F. Supp. 2d at 265–66 (National Security Advisor's alleged participation in a conspiracy to kidnap Chilean military general was incident to the performance of his authorized foreign policy and national security duties); *Lyon*, 533 F.2d at 652 (holding that jury reasonably found a mattress deliveryman acted within scope of employment when he assaulted and raped a customer following a delivery-related dispute). The conduct at issue in Plaintiffs' D.C. law claims easily falls within this generous standard.

>    iii.    **Plaintiffs fail to carry their burden to prove that President Trump's statements were not of the kind he was authorized to perform.**

Plaintiffs have the burden to disprove the Attorney General's scope-of-employment certification on this and every element of D.C.'s scope of employment test. As to the first prong, Plaintiffs' Motion to Strike falls short in several respects. First, as discussed above, Plaintiffs repeatedly analyze the President's conduct against the wrong legal standard. *Blassingame*'s standard does not control the Westfall challenge here, which is governed instead by D.C.'s "very expansive" law of *respondeat superior.*

Second, Plaintiffs improperly focus on the alleged wrongful or unlawful nature of the conduct in question, as opposed to the type of act giving rise to their D.C. law claims. When Plaintiffs contend that "[t]here is no provision in the Constitution or any act of Congress that authorizes the President to organize an attack on a co-equal branch of government," Mot. at 18, they echo arguments that courts applying D.C. law have repeatedly rejected in the context of scope challenges. *See Saleh*, 848 F.3d at 889-91 (rejecting argument that defendants were outside scope because they "were not employed to instigate an unlawful war"); *Wilson*, 535 F.3d at 711 (plaintiffs "argue that the disclosure of a covert agent's identity cannot fall within an employee's scope of employment . . . because the disclosure is unlawful and threatens the security of the

nation, its covert agents, and its intelligence-gathering functions. [T]his argument rests on a misunderstanding of D.C. scope-of-employment law (not to mention the plain text of the Westfall Act)"); *Klayman v. Obama*, 125 F. Supp. 3d 67, 83 (D.D.C. 2015) ("Plaintiffs' argument appears to be that illegal or unconstitutional conduct (e.g., the funding of terrorist organizations) is never conduct a government official is authorized to perform—an argument possibly implicating the first and third factors. This argument, however, has no legal support."); *Steele*, 964 F. Supp. 2d at 18 ("[T]he plaintiff contends that because the defendants were 'not hired for the purpose of physically restraining Plaintiff,' their alleged contact with him must be outside the scope of their employment. This contention misconstrues District of Columbia law."); *Schneider*, 310 F. Supp. 2d at 265-66 (rejecting argument that Henry Kissinger was acting outside the scope of his employment because he was alleged to have violated "peremptory norms of international law").

For this reason, Plaintiffs' various characterizations of the President's public statements as "directing private citizens to attack the United States Capitol" (Mot. at 1) or "encourag[ing] . . . [a] violent attack" (*id.* at 15) are of no legal consequence because they do not take the President's statements outside the scope of his office or employment under D.C. *respondeat superior* law. *See Ballenger*, 444 F.3d at 664 (proper question for scope-of-employment analysis was on whether "the phone call" more broadly, "not the allegedly defamatory sentence" itself, was the kind of conduct the defendant was authorized to perform). Indeed, Plaintiffs' characterizations of the President's conduct mirror the "assertions of malintent" that this Court in *Murray* said focused "too little on the context of the situation." 2025 WL 915752, at *24. Even accepting Plaintiffs' characterizations, however, President Trump's conduct was still "of the kind" he was employed to perform because his expressly assigned duties as President authorized

him to exhort and "encourage [the public] to act in a manner that promotes the President's view of the public good," *Trump v. United States*, 603 U.S. at 627, as well as recommend to Congress "such Measures as he shall judge necessary and expedient," including the specific election reform measures addressed in the President's speech. U.S. CONST. art. II. At a minimum, the President's statements and use of the "bully pulpit" to mobilize supporters and advocate election reform policies were "incidental" to his expressly authorized duty to ensure the enforcement of federal election law.

Third, Plaintiffs misconstrue the "foreseeability" analysis. As discussed above, "foreseeability" in the context of a Westfall challenge "does not carry the same meaning as it does in negligence cases." *Rasul*, 512 F.3d at 657. In the context relevant here, "foreseeability" asks only whether the employee engaged in underlying activity that was a "direct outgrowth of the employee's instructions or job assignment." *Steele*, 964 F. Supp. 2d at 18. And the D.C. Circuit has explained that the standard "is not []particularly rigorous." *Allaithi*, 753 F.3d at 1332. And so, Plaintiffs misapply the concept of foreseeability when they contend that "it is entirely unforeseeable that a sitting President would attempt to turn an angry and armed group of his supporters on Congress and on his own Vice President." Mot. at 21. That particular *causation*-focused understanding of "foreseeability" is irrelevant to the Court's scope-of-employment analysis. *Rasul*, 512 F.3d at 657; *cf. Blassingame*, 87 F.4th at 26 (noting there is "no reliable, administrable criteria for predictably identifying when presidential action" is official or unofficial "when, as here," doing so "depends on how third parties respond to the President").

Fourth, Plaintiffs frequently fail to cite evidence supporting their assertions that President Trump's statements were unrelated to his duties. Repeatedly, Plaintiffs cite no record evidence for their claims that "the crowd responded just as Trump intended," Mot. at 17, that President

Trump's job duties did not encompass his alleged directives to the crowd, *see id.* at 18, and that

"Trump's after-the-fact claim that he was ensuring election integrity has nothing to do with his

direction to incensed rallygoers" and was "a post-hoc rationale invented to invoke immunity," *id.*

at 19; *see also id.* at 25. In other instances, where Plaintiffs argue about the role of the organizers

of the gathering at the Ellipse and the content of the President's speech, they cite the record but

omit key details showing that President Trump's speech raised concerns about the integrity of the

election and the propriety of the congressional proceedings, among other matters of public

concern related to his role as the head of the Executive Branch. *See, e.g., id.* at 16 & 18 n.8. [7]

Fifth, Plaintiffs improperly attempt to expand the relevant conduct for the Court's

Westfall analysis beyond President Trump's January 6 rally statements and tweets leading up to

it to include, for example, private litigation and interactions with state officials. *See* Mot. at 16.

But that conduct is irrelevant because it relates to Plaintiffs' § 1985 claim, not the D.C. law

claims for which the United States has been substituted. *See Smith v. Trump*, No. 21-CV-02265

(APM), 2023 WL 417952, at *8 (D.D.C. Jan. 26, 2023), *aff'd*, No. 23-7010, 2023 WL 9016458

---

[7] For example, Plaintiffs cite Stephen Miller's deposition testimony before the January 6
Committee for the statement that "it was 'blindingly obviously that the purpose of the speech
was to build support for the election contest.'" Mot. at 16 (quoting SUF ¶ 315). But Plaintiffs
omit Miller's testimony, offered shortly before the quoted statement, that one of the purposes of
the speech was to build "[s]upport for election reform," including "the Electoral Count Act," and
"voter ID and citizenship verification, etc.," and that the speech was "an attempt at rhetorical
persuasion in the tradition of the presidential voting call" with an intended audience of "the
general American public" and "Members of Congress and their staffs . . ." Doc. 152-10 (MSJ Ex.
57; Excerpts of Stephen Miller Testimony) at 10 (Tr. 130:5-16). And Plaintiffs neglect to
mention Miller's testimony, almost immediately after the quoted statement about the "election
contest," that "the speech does contain a lot of material about matters of public legislation and
public import and the administration of the law and faithful execution of the law," and that "any
suggestion, insinuation, implication, or conspiracy that the speech served any purpose other than
to promote a better understanding of the subjects in the speech is ludicrous." *Id*. at Tr. 132:8-14.
In context, then, Miller's statement that he believed the speech was "building support for the
election contest" indicates that the speech had at least a dual purpose of persuading Congress to
pass election reform proposals and building support for an "election contest."

(D.C. Cir. Dec. 29, 2023) (dismissing assault and battery claims against campaign based on organizing and promoting the rally, because that did not substantially assist the torts, and there was no indication of "[s]uggestive words" (quoting *Halberstam v. Welch*, 705 F.2d 472, 481–82 (D.C. Cir. 1983)).

As discussed above, conduct other than President Trump's statements leading up to and at the January 6 rally is not even relevant as context under District of Columbia law. *See infra* at n.5.[8] The irrelevant conduct must be disregarded for purposes of the Court's scope-of-employment analysis. *Jacobs*, 724 F.3d at 224 (declining to consider "several allegations" that had "nothing to do with [the plaintiff's] claims" for which the United States was substituted for the individual employee); *Kelley*, 67 F. Supp. 3d at 278 ("[O]nly those facts that relate to the particular conduct that underlies the alleged tort may support an inference that defendants exceeded the scope of their employment.").

Plaintiffs also discuss President Trump's alleged inaction when faced with reports of violence or during the riot, and also comments he made with respect to the Secret Service and security at the January 6 rally. But those assertions do not change the outcome because they indisputably concern the President's official duties. Similarly, Plaintiffs say that President Trump tweeted about the role of Vice President Pence, but those communications too fell within his authority to speak to the public and to interact with the Vice President and Cabinet. *See* Doc. 152-9 (MSJ Ex. 56; President Trump's R&O to Pltfs' 1st RFAs) at 10 (RFA No. 26: "All Mike Pence has to do is send them back to the States, AND WE WIN."); Mot. at 17 (quoting foregoing tweet); *cf. Trump v. United States*, 603 U.S. at 597-98 ("[A]llegations that Trump attempted to

---

[8] Plaintiffs refer to a January 4 rally in Georgia, Mot. at 17, but that is another instance of Plaintiffs drawing from irrelevant conduct to frame the "context."

pressure the Vice President to take particular acts in connection with his role at the certification proceeding . . . involve official conduct.").

Sixth, Plaintiffs err by dwelling on the roles of Congress and the states. *See* Mot. at 18-20. For example, Plaintiffs argue that only Congress and the states, not the President, had an interest in pursuing claims of election fraud. *Id*. at 18 n.8. That ignores the extensive body of federal law addressed to prohibiting and preventing precisely that conduct. Plaintiffs also incorrectly focus on the notion that the President had no constitutional role in the election certification events of January 6. *See id.* at 19-20. The D.C. Circuit rejected as "cramped" a similar argument that a congressman's duties are confined to those mentioned by statute or in the Constitution. *Ballenger*, 444 F.3d at 665. Instead, it recognized that "a primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents." *Id*. For scope purposes, it matters only, as demonstrated above, that President Trump was authorized to speak publicly about the integrity of federal elections, including on such matters as the Electoral Count Act and other federal election law reforms.

### B.    President Trump Was Actuated, At Least in Part, to Serve the United States.

To be within the scope of employment, the underlying conduct must have been "actuated, at least in part, by a purpose to serve" the employer. *Carroll*, 292 A.3d at 233-34. This factor is composed of three elements: (1) a "purpose element," *i.e.*, whether the employee's action was motivated by a purpose to serve their employer; (2) a "quantum element," *i.e.*, whether the employee was motivated "at least in part" to serve the employer; and (3) a "timing element," *i.e.* when the employee possesses the requisite purpose. *Id.* at 233-38. The purpose element focuses on the employee's "subjective state of mind," asking whether the employee "used their employment as a mere opportunity to act on a personal grievance," or "whether the

29

employee was in fact responding to an employment-related circumstance." *Id.* at 234-35.

Importantly, the quantum element "requires only a *partial* desire to serve the employer." *Jacobs*, 724 F.3d at 222 (cleaned up) (emphasis in original). "[A]n employee may be dually motivated by a personal purpose and a desire to serve her employer—a personal purpose may in fact be the employee's predominant purpose, but a desire to serve her employer must be 'more than an insignificant' purpose." *Murray*, 2025 WL 915752, at *22 (quoting *Carroll*, 292 A.3d at 235-37). Construing this element—and finding President Trump's conduct within the scope of employment—the court in *Black Lives Matter D.C.* observed that "[e]lected officials routinely undertake official duties with the intent to enhance their public standing or improve their re-election prospects—self-interest alone does not necessarily transform their conduct into purely private activity." 2025 WL 823903, at *7; *accord Trump v. United States*, 603 U.S. at 627 ("[T]he President's broad power to speak on matters of public concern does not exclude his public communications regarding the fairness and integrity of federal elections *simply because he is running for re-election*.") (emphasis added). Similarly, applying D.C. law, the Ninth Circuit explained that it is a mistake to

> conflat[e] a policy preference or worldview—which is "personal" in the sense that it may be deeply felt or tied to one's sense of morality or identity—that motivates one to advocate for certain positions, with a desire to serve one's individual interests. . . . Even if those alleged objectives or beliefs [are] misguided or in contravention of international norms, the motives [are] not "personal" in the scope-of-employment sense [if the government employee's] conduct was "actuated, at least in part, by a purpose to serve the master," the United States.

*Saleh*, 848 F.3d at 890. Lastly, the timing element is construed "quite broadly" and requires only that the "requisite purpose" exist "in the moments preceding the commission of the tort[.]" *Carroll*, 292 A.3d at 237.

i.    **Purpose**

Applying those principles here, President Trump had the necessary "subjective state of mind" because he was "motivated by a purpose to serve" the United States. *Id.* at 234. The best evidence of President Trump's subjective state of mind are his own statements, reflected in numerous tweets and other communications concerning "the honesty of our elections and the integrity of our glorious republic." Doc. 144-47 (MSJ Ex. 42; January 6 Speech) at 3 (NARA_PROD_097097). For example, on December 2, President Trump delivered a speech that he described as perhaps the most important of his life and where he said, "This is not just about honoring the votes of 74 million Americans who voted for me. It's about ensuring that Americans can have faith in this election, and in all future elections." *Remarks on the Presidential Election*, THE AM. PRESIDENCY PROJECT (Dec. 2, 2020),

https://www.presidency.ucsb.edu/documents/remarks-the-presidential-election-0;

https://www.facebook.com/100044274887410/posts/10165908467175725/ (posting full video); *see also* Doc. 144-47 (MSJ Ex. 42; January 6 Speech). These contemporaneous statements are "evidence of the President's subjective belief." *Black Lives Matter D.C.*, 2025 WL 823903, at *7. *Black Lives Matter DC* is particularly instructive here. In that case, the plaintiffs argued that the President's actions were "improperly motivated" and "purely personal and political." *Id.* They claimed the President cleared Lafayette Park of protesters to take videos and photographs of himself "to bolster his own image for his re-election campaign." *Id*. They pointed to a "29-second campaign-style video" of the President's walk through Lafayette Park and his contemporaneous tweets "denigrating" George Floyd to "secure political points." *Id.* Relevant here, the court looked to the content of the President's contemporary tweets about the protests. *Id*. Although the court took no position on the accuracy of President Trump's characterizations

31

of the protests in his tweets, it nonetheless concluded that the tweets were "evidence of the President's subjective belief of an imminent threat." *Id*. (citing *Carroll*, 292 A.3d at 234). The court therefore found that the plaintiffs failed to rebut that President Trump's conduct was actuated in part by a purpose to serve the security interests of the United States. *Id*.

Testimony provided during the January 6 investigations reinforces the conclusion that President Trump was motivated at least in part to serve the United States. For example, Stephen Miller (then-Senior Advisor to the President) testified before Congress that the January 6 speech was "for the purpose [of] educating the public about election fraud and about generating public support for election reform," *see* Stephen Miller Transcript, Select Committee to Investigate the January 6th Attack on the U.S. Capitol, at 129, https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000062444/pdf/GPO-J6-TRANSCRIPT-CTRL0000062444.pdf, and that "the audience for the speech was both the general American public for them to hear the facts concerning the election, and then also for Members of Congress and their staffs to, likewise, hear a discussion or presentation on the facts and concerns regarding the election." *Id*. at 130. Former Attorney General Barr, when asked why President Trump acted as he did in connection with the events of January 6, testified that President Trump "never said anything to me to -- that indicated that he really didn't believe this[.]" *See* William Barr Transcript, Select Committee to Investigate the January 6th Attack on the U.S. Capitol, at 36-37, https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000083860/pdf/GPO-J6-TRANSCRIPT-CTRL0000083860.pdf (the "Barr Transcript").

The context further confirms President Trump's subjective motivation to serve the United States. The District of Columbia has explained that whether the tort was an "outgrowth of a job-related controversy" is relevant not just to the "of kind" inquiry, but to the motivation inquiry,

too. *See Carroll*, 292 A.3d at 234–35. Such inquiries "allow the factfinder to make inferences about whether the employee was in fact responding to an employment-related circumstance[.]" *Id.* at 235. President Trump's statements were an outgrowth of a job-related controversy, *i.e.*, connected to his responsibilities. Illustrating the job-related—not solely self-serving—nature of the underlying conduct, President Trump raised concerns about election integrity after his 2016 election win and again recently as President, even though in neither case did he personally stand to directly gain as a candidate.[9] Further, the District of Columbia has identified "it as relevant, at least in part, whether there was a prior history between the tortfeasor and the victim." *Id*. at 234. Plaintiffs identify no such personal relationship or prior history between President Trump and any of them.

### ii.    Quantum

As to the quantum element, the record provides even more evidence of President Trump's at least "partial" motivation to serve the United States than was present in *Black Lives Matter D.C.*, where the plaintiffs argued (as Plaintiffs do here) that President Trump was motivated only to enhance his re-election prospects. *See* 2025 WL 823903, at *7. There, the court observed that a sitting president may act both to enhance re-election prospects and to serve the United States, emphasized that President Trump's contemporaneous tweets framed the protest as a national security event, and reasoned that the court need not take a position on the accuracy of those characterizations for the tweets to provide the necessary "discernible purpose" for the President's actions underlying the asserted torts. *Id*. That reasoning applies with greater force here, where

---

[9] *See Establishment of Presidential Advisory Commission on Election Integrity*, 82 Fed. Reg. 22389 (May 11, 2017); *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025). Indeed, many of the very same concerns, criticisms, and proposals raised in his January 6 speech are reflected in these Executive Orders.

the evidentiary record is replete with tweets and the text of the January 6 speech containing the President's own statements expressing concerns regarding election fraud. Plaintiffs' focus on prior conduct such as discussions with state officials, private litigation, and state electors, Mot. at 24, is misplaced. That conduct is in the main tangential to the claims under D.C. law for which the United States substituted, and is less illuminating than the President's own repeated statements about his beliefs. *See, e.g.*, *Trump v. United States*, 603 U.S. at 627 (the President's power to speak on matter of public concern did "not exclude his public communications regarding the fairness and integrity of federal elections simply because he [was] running for re-election."); *Ballenger*, 444 F.3d at 665 ("even a partial desire to serve the master is sufficient"); *Klayman*, 125 F. Supp. 3d at 84 (even evidence of an ulterior motive insufficient to take conduct outside scope, and "the fact that an agent may be motivated by self-interest, or interests other than those of its principal, is not dispositive"). Plaintiffs also cite this Court's finding in *Thompson* that "the main thrust of [the President's] Speech was not focused on policy or legislation." Mot. at 19. But so long as the speech evidences at least a *partial* desire to serve the United States, it falls within the scope of the President's office or employment. *Jacobs*, 724 F.3d at 222; *Carroll*, 292 A.3d at 235-37.

### iii.    Timing

The timing element is also satisfied here, as the evidence reflects at least a partial motivation at all relevant times to address concerns of voting irregularities in the 2020 presidential election and to advocate for federal election reforms. Plaintiffs emphasize that President Trump said, "And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore." Mot. at 24. That statement, viewed in context, concerned President Trump's claims regarding election integrity:

> I think one of our great achievements will be election security. Because nobody until I came along had any idea how corrupt our elections were. And again, most people would stand there at nine o'clock in the evening and say, "I want to thank you very much." And they go off to some other life. But I said, "Something is wrong here. Something is really wrong. Can't have happened." And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore.

Doc. 144-47 (MSJ Ex. 42; January 6 Speech) at 30-31 (NARA_PROD_097124 – 097125).

Further, President Trump's comments during and after the rally are consistent with the necessary purpose to serve the United States, since on their face they indicate a belief that the events were related to election integrity. Mot. at 10-11 & 25. President Trump's underlying conduct and own statements therefore satisfy the motivation elements of District of Columbia law.

Plaintiffs fail to carry their heavy burden to identify evidence that President Trump acted without any desire to serve the United States. *Steele*, 964 F. Supp. 2d at 19; *Klayman*, 125 F. Supp. 3d at 84 ("The issue . . . is whether there is a complete absence of a desire to serve the principal's interests[.]"). Plaintiffs nakedly declare that President Trump was "singularly" motivated to retain power, emphasizing statements by Executive Department officials, state officials, and courts disagreeing about the merits of claims of widespread fraud. Mot. at 27. But Plaintiffs' cited evidence does not support their conclusion. Like the plaintiffs in *Murray*, Plaintiffs' "assertions of malintent" and craven motive focus "too little on the context of the situation." 2025 WL 915752, at *24. Plaintiffs' blanket assertions of malintent fail in light of evidence that President Trump was at least partially motivated by, and responding to, concerns about the integrity and proper functioning of the democratic process. As a matter of law, President Trump's interest in his own re-election is irrelevant because the test allows for dual motives. While Plaintiffs emphasize this Court's *Thompson* decision finding the specific language at issue reflected an electoral purpose, *see* Mot. at 24, for the reasons discussed above,

neither *Thompson*'s nor *Blassingame*'s analysis of presidential immunity govern this Court's analysis of D.C.'s *respondeat superior* law.

Further, Plaintiffs' arguments ignore that President Trump was being provided additional information beyond what Plaintiffs identify in their Motion, *see* Mot. at 17; *e.g.*, Doc. 152-9 (MSJ Ex. 56; President Trump's R&Os to Pltfs' RFAs) at 6 (RFA No. 15; tweeting about and citing report from Peter Navarro) & 6-7 (RFA No. 16; asserting investigations were contrary to "overwhelming evidence"); Barr Transcript at 21 (Former Attorney General Barr relaying conversation where Eric Herschman noted that President Trump was receiving information suggesting fraud from people "being very authoritative"). And they ignore President Trump's unrebutted discovery responses. *See* Doc. 152-116 (Supp. R&Os to Pltfs' 4th RFAs) at 22 (Resp. to RFA 249).[10]

### C.   Plaintiffs' Remaining Arguments Lack Merit.

Plaintiffs' Motion to Strike primarily contests the first and third prongs of the scope-of-employment standard. As demonstrated above, those arguments fail to carry Plaintiffs' burden to disprove the Attorney General's certification that President Trump acted within the scope of his office or employment. Plaintiffs present other arguments—sometimes in passing and other times merely in a footnote—that also lack merit.

---

[10] The Court may take judicial notice of the government records and public materials cited herein. FED. R. EVID. 201(b); *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) (taking notice of legislative materials, including hearing transcripts); *United States v. Flynn*, 507 F. Supp. 3d 116, 126 n.6 (D.D.C. 2020) (taking notice of social media post); *Detroit Int'l Bridge Co. v. Canada*, 133 F. Supp. 3d 70, 84-85 (D.D.C. 2015) (noting court can take notice of government documents and materials in Federal Register); *Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 69 & nn.5-7 (D.D.C. 2019) (noting court can take notice of, among other things, facts in executive orders); *see Indep. Inst. v. Fed. Election Comm'n*, 216 F. Supp. 3d 176, 190 n.10 (D.D.C. 2016) (citing American Presidency Project).

First, Plaintiffs bury in a footnote an argument that President Trump's underlying conduct was not within "authorized time and space limits" under D.C. *respondeat superior* law. Mot. at 18 n.8. The Court should decline to consider Plaintiffs' cursory argument contained in a footnote because "hiding an argument there and then articulating it in only a conclusory fashion results in forfeiture." *CTS Corp. v. E.P.A.*, 759 F.3d 52, 64 (D.C. Cir. 2014). In any event, Plaintiffs fail to carry their burden of proof on this element, which involves "three distinct considerations": (1) "a temporal element," (2) a "spatial element," and (3) a quantitative element—recognizing that an "employee's conduct does not need to be absolutely within the authorized space and time of the employment, [but] only 'substantially,' which counsels against a strict understanding of where and when an employee was on duty." *Carroll*, 292 A.3d at 232-33.

The D.C. Circuit has twice questioned whether traditional "time and space" limitations apply to the employment of high-ranking federal officials, whose responsibilities often require around-the-clock attention. *See Ballenger*, 444 F.3d at 663 (as to the "time and space" element, questioning whether "there are such limitations on a Representative's work"); *Wilson*, 535 F.3d at 712 n.2 (holding that conversations that allegedly took place on Sunday and off White House property "would still have occurred within the 'time and space' of employment . . . [because] [n]either the Vice President, his chief of staff, nor a close advisor to the President punches out of work at the end of the day or when he leaves White House property"). The same analysis should apply with more force to the President, for "the President is always on-duty: He alone composes a branch of government." *Blassingame*, 87 F.4th at 33 (Katsas, J., concurring) (cleaned up). The President can and does, by the very nature of the office, perform the duties of the presidency anywhere — "whether in the West Wing, in the Executive Residence, on Air Force One, at

Camp David, at his own private residence, visiting foreign dignitaries, or even on a working vacation." *Id*. The President's public statements on the 2020 election leading up to and at the Ellipse—also commonly referred to as "President's Park South," *see President's Park*, NAT'L PARK SERV., https://www.nps.gov/places/president-s-park.htm—are no exception to this rule. But even a literal application of the test does not aid Plaintiffs here: the January 6 rally occurred on a weekday, during business hours, on the Ellipse with the White House as the backdrop.

Second, Plaintiffs vaguely claim that their allegations against President Trump "implicate" a use of force. *See* Mot. at 28. On its face, the last element of D.C.'s scope-of-employment test applies only "if force is intentionally used *by the servant* against another[.]" *Carroll*, 292 A.3d at 228 (emphasis added) (quoting Restatement (Second) of Agency § 228(1)(d)). As D.C. courts have noted, this "final criterion is not 'at issue,'" where a plaintiff "does not allege that [the defendant] used force against her." *Conyers v. Westphal*, 235 F. Supp. 3d 72, 78 (D.D.C. 2017).

Here, Plaintiffs do not argue (nor could they) that President Trump himself used force "against [them]." *Carroll*, 292 A.3d at 228. This "fourth Restatement element," therefore, is "irrelevant." *Wilson v. Libby*, 498 F. Supp. 2d 74, 97 (D.D.C. 2007); *Phillips v. Mabus*, 894 F. Supp. 2d 71, 86 (D.D.C. 2012) (same); *Kelley*, 67 F. Supp. 3d at 285 & n.34 (same). In a similar case—where assault and battery claims were brought against President Trump for "order[ing]" federal law enforcement to forcibly "clear protestors from Lafayette Square"—this element was not even contested by the plaintiffs or evaluated before the court held that President Trump had acted in the scope of his employment. *Black Lives Matter D.C.*, 2025 WL 823903, at **6-8. In the same way, neither President Trump's tweets nor his speech at the Ellipse can fairly be regarded as a use of force "by the servant against another[.]" *Carroll*, 292 A.3d at 228.

Lastly, Plaintiffs imply that the Government's notices of substitution are somehow improper because they were filed approximately four years into this litigation and after a prior Attorney General declined Westfall substitution for Congressman Mo Brooks. Mot. at 2-3. These contentions are without merit. The Westfall Act contains no temporal limitation or other restrictions on when a notice of substitution may be filed; the Attorney General may certify whenever she determines the law and facts warrant it. 28 U.S.C. § 2679(d)(1). And simply put: Congressman Brooks is not the President of the United States. The circumstances surrounding the congressman's petition for certification are both factually and legally irrelevant to the notices currently before the Court.

## II.    The President of the United States is an "Employee of the Government" Under the FTCA, Including the Provisions of the Westfall Act.

Plaintiffs say multiple times that President Trump's "employer" is "the United States." Mot. at 3 & 28. Nonetheless, they tuck away at the end of their brief an argument that the President is not an "employee of the government" under the Westfall Act. *Id.* at 28-32. Their argument is incorrect and, as they acknowledge, contrary to holdings of the Second Circuit and the only court to address the issue in this district. *Carroll II*, 49 F.4th at 767-72; *Black Lives Matter D.C.*, 2025 WL 823903, at *3-6. Both courts correctly held that nothing in the text, purpose, or history of either the FTCA or the Westfall Act suggests the President is excluded from their coverage. *See Black Lives Matter*, 2025 WL 823903, at *3-6; *Carroll II*, 49 F.4th at 767-72. This Court should not depart from these thorough, well-reasoned decisions.

### A.    The President is an "Employee of the Government" Under the FTCA.

While Plaintiffs address the text of the Westfall Act, they actually challenge the statutory definition of "[e]mployee of the Government" under the FTCA. 28 U.S.C. § 2671. Congress enacted the FTCA in 1946 to create a cause of action against the United States when an action is

brought against "any employee of the Government." *Id.* § 1346(b)(1), §§ 2671–80. Congress amended the FTCA on many occasions, one of which was when in 1988 it passed the Westfall Act, which "adopt[ed] the FTCA's definition of 'any employee of the Government.'" *Black Lives Matter D.C*, 2025 WL 823903, at *3.

"Employee of the government" is defined to "include[]," among many categories, "officers or employees of any federal agency" or "persons acting on behalf of a federal agency in an official capacity[.]" 28 U.S.C. § 2671. "Federal agency," in turn, is defined to "*include*[]" among other things "the executive departments" and "the judicial and legislative branches." *Id.* (emphasis added). The use of the word "includes" in each definition "is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012); *Burgess v. United States*, 553 U.S. 124, 131 (2008).

Plaintiffs argue that because "[f]ederal agency" is defined not to include the "executive branch" but only "executive departments," and since the President (and other agencies) are not "executive departments" under 5 U.S.C. § 101, employees of such agencies should not be covered under the statutes. Mot. at 29. But, as many courts have noted, the relevant definitions use "the word 'includes,' which ordinarily introduces exemplary, not exhaustive language," and so the statutes do not identify "every instance in which a person is an 'employee of the Government.'" *Talignani v. United States*, 26 F.4th 379, 382 (7th Cir. 2022); *Carroll II*, 49 F.4th at 768 ("the better reading of [§ 2671] is that it simply sets forth an *illustrative* set of examples"); *United States v. LePatourel*, 571 F.2d 405, 408 (8th Cir. 1978) ("Congress chose to define 'employees of the government' and 'federal agency' inclusively rather than exclusively."); *McNamara v. United States*, 199 F. Supp. 879, 880 (D.D.C. 1961) (noting same).

Where a term is not defined to identify all instances in which a person is an employee, canons of "statutory construction" require looking to "ordinary, contemporary . . . meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014). Doing that "lends itself to only one interpretation:" The President "fits comfortably" as an "employee of the Government" under the FTCA's text. *Carroll II*, 49 F. 4th at 770. When the FTCA was enacted, "[t]he term 'employee' had roughly the same meaning . . . as it does today." *Id.* at 769-70. "[A]n 'employee' was defined as 'one who works for wages or salary in the service of an employer.'" *Id.* at 770 (citation omitted)). Under that definition, "the President is a government employee in the most basic sense of the term: He renders service to his employer, the United States government, in exchange for a salary and other job-related benefits." *Id.*; *see* U.S. CONST. art. II, § 1, cl. 7 (providing the President "shall . . . receive for his Services, a Compensation"). If anything, the current definition of "[e]mployee of the government" sweeps more broadly than the term's ordinary usage at the time the FTCA was passed because it does not require compensation or full-time work. 28 U.S.C. § 2671 (noting employees can act "with or without compensation" or be "temporarily or permanently in the service of the United States").

B.    **History Confirms that the President is an "Employee of the Government."**

History confirms this understanding. For almost eighty years since its enactment, "litigants and the federal courts" understood the FTCA to waive the United States' sovereign immunity for a President's actions. *Black Lives Matter*, 2025 WL 823903, at *3 (noting that "until recently" the "President's 'employee' status" had never been questioned). In fact, Judge Holtzoff, "one of the major figures in [the FTCA's] development," *Kosak v. United States*, 465 U.S. 848, 856–57 & 857 n.13 (1984), held this understanding just after the FTCA was passed. *See Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 978, 981 (D.D.C. 1952) (Holtzoff, J.)

(noting the court's agreement that "an action for damages lies against the United States" under the FTCA if President Truman's ordering of steel mill seizures during the Korean War was "illegal"). The Government also held this view. *See Federal Tort Claims Act – Applicability to Agencies in Other Than Executive Branch of Government*, 26 Comp. Gen. 891, 892 (May 22, 1947) ("[A]n examination of the entire act and its legislative history requires a conclusion that no agencies or employees are excluded from the operation of the act . . . ."). This understanding has remained undisturbed, even after the Westfall Act passed in 1988. *See, e.g.*, *Saleh*, 848 F.3d at 890–91 (substituting the United States for a former President); *Klayman*, 125 F. Supp. 3d at 82–85 (same for sitting President); *Ali Jaber v. United States*, 155 F. Supp. 3d 70, 73 & 73 n.1 (D.D.C. 2016) (same), *aff'd*, 861 F.3d 241 (D.C. Cir. 2017); *West v. Trump*, No. 19-cv-2522, 2020 WL 4721291, at *3 n.6 (N.D. Tex. July 23, 2020) (same).

Further, immediately after its passage, Congress appropriated "funds to components of EOP for payment of FTCA claims." *Black Lives Matter D.C.*, 2025 WL 823903, at *5 (citing 61 Stat. 585, 586 (1947)). Those appropriations would be inexplicable if the Executive Office of the President was not a "[f]ederal agency" under the FTCA. As would the decisions by the many courts which routinely allowed substitution of the United States in tort cases brought against EOP officials under the Westfall Act after it was passed. *See id.* (collecting cases).

**C.      The Westfall Act's Legislative History Shows the President is an "Employee."**

Lastly, Plaintiffs fault Congress for not using "'the President' explicitly" in defining an "[e]mployee of the government," and argue that it is "unnecessary" to apply Westfall immunity to the President since he or she already enjoys "absolute Presidential immunity from damages liability" for official acts. Mot. at 30-31. These arguments "presum[e] Congress understood the FTCA to only cover a sliver of the executive branch when it" passed the Westfall Act. *Black*

*Lives Matter D.C.*, 2025 WL 823903, at *5. The Act's legislative history shows just the opposite. Congress enacted a corresponding provision that allowed the United States to "assert any defense based upon judicial or legislative immunity." 28 U.S.C. § 2674. In doing so, Congress sought to "preserv[e]" not just these immunities, but for the Government "*to continue* to assert other . . . immunities, *such as Presidential* . . . immunity" in FTCA cases. H.R. Rep. 100-700 at 5 (emphasis added). "The reference to Presidential immunity suggests the drafters presumed the President to be covered." *Black Lives Matter D.C.*, 2025 WL 823903, at *5. Plaintiffs cannot adequately rebut the text and history of the FTCA showing that the President is an "[e]mployee of the Government" under the FTCA. 28 U.S.C. § 2671.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Strike (Doc. 183).

Dated: June 11, 2025                    Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Director, Torts Branch, Civil Division

ANDREA W. MCCARTHY
Deputy Director

REGINALD M. SKINNER
Senior Trial Attorney

/s/ Jonathan R. Myers
JONATHAN R. MYERS
DC Bar No. 1601183
JOHN B. F. MARTIN
NY Bar No. 4682928
CONNOR HACKERT
PA Bar No. 320753
Trial Attorneys
U.S. Department of Justice
Civil Division, Torts Branch
175 N Street NE
Washington, DC 20002

Tel: 202-305-8049
Fax: 202-616-4314
jonathan.r.myers@usdoj.gov

*Attorneys for United States of America*

**CERTIFICATION OF SERVICE**

I certify that on June 11, 2025, the foregoing was filed electronically through ECF/CM,

served on ECF participating parties via ECF, and served on non-ECF participants by mail or

other appropriate means.

/s/ Jonathan R. Myers
JONATHAN R. MYERS
DC Bar No. 1601183
Trial Attorney
U.S. Department of Justice
Civil Division, Torts Branch
175 N Street NE
Washington, DC 20002
Tel: 202-305-8049
Fax: 202-616-4314
jonathan.r.myers@usdoj.gov