**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA**

| | |
|---|---|
| BARBARA J. LEE *et al.*, | |
| *Plaintiffs*, | Case No. 21-cv-00400 (APM) |
| v. | (lead case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants.* | |
| ERIC SWALWELL, | |
| *Plaintiff*, | Case No. 21-cv-00586 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants*. | |
| JAMES BLASSINGAME *et al.*, | |
| *Plaintiffs*, | Case No. 21-cv-00858 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP, | |
| *Defendant.* | |
| CONRAD SMITH *et al.*, | |
| *Plaintiffs*, | Case No. 21-cv-02265 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP *et al.*, | |
| *Defendants*. | |

MARCUS J. MOORE *et al.*,

                    *Plaintiffs*,

        v.

DONALD J. TRUMP,

                    *Defendant.*

Case No. 22-cv-00010 (APM)

(consolidated case)

BOBBY TABRON *et al.*,

                    *Plaintiffs*,

        v.

DONALD J. TRUMP,

                    *Defendant.*

Case No. 22-cv-00011 (APM)

(consolidated case)

BRIANA KIRKLAND,

                    *Plaintiff*,

        v.

DONALD J. TRUMP,

                    *Defendant.*

Case No. 22-cv-00034 (APM)

(consolidated case)

SANDRA GARZA,

                    *Plaintiff*,

        v.

DONALD J. TRUMP *et al.*,

                    *Defendants*.

Case No. 23-cv-00038 (APM)

(consolidated case)

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO STRIKE THE GOVERNMENT'S WESTFALL ACT CERTIFICATION

**TABLE OF CONTENTS**

Page

I.    Trump Acted Outside the Scope of His Employment ........................................................ 2

    A.    Trump's Conduct Was Not "of the Kind" He Was Employed to Perform ............ 3

        1.    Trump's Use of a Private Campaign Rally to Direct Private Citizens to Attack the Capitol Was Not Authorized, Nor Was It Similar in Kind or Incidental to Authorized Conduct ................................................ 3

        2.    The Scope of the President's Office Is Not Unlimited and the Authorities the Government Cites in Support of Its Position Are Inapposite ................................................................................................. 9

        3.    Trump's Actions Directing Private Citizens to Attack His Purported Employer Were Not Foreseeable ........................................................... 12

    B.    Trump's Conduct Occurred Outside Authorized Time and Space Limits ........... 13

    C.    Trump's Conduct Was Actuated Solely to Serve Himself ................................. 15

    D.    Trump's Use of Force Was Not Expectable ...................................................... 19

II.   The President Is Not an "Employee of the Government" Under the Westfall Act .......... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ballenger v. Council on Am. Islamic Relations*,
    444 F.3d 659 (D.C. Cir. 2006)............................................................................4, 6, 10, 11

*Black Lives Matter D.C. v. United States*,
    2025 WL 823903 (D.D.C. Mar. 14, 2025)..............................................................10, 11, 21

*Blair v. District of Columbia*,
    190 A.3d 212 (D.C. 2018) ...............................................................................................15, 16

*Blassingame v. Trump*,
    87 F.4th 1 (D.C. Cir. 2023) ............................................................................... *passim*

*Carroll v. Trump*,
    292 A.3d 220 (D.C. 2023) ................................................................................ *passim*

*Carroll v. Trump*,
    49 F.4th 759 (2d Cir. 2022) ....................................................................................23

*Carroll v. Trump*,
    No. 24-644 (2d Cir. June 18, 2024) ....................................................................2

*Carson v. Sim*,
    778 F. Supp. 2d 85 (D.D.C. 2011) ......................................................................21

*CTS Corp. v. E.P.A.*,
    759 F.3d 52 (D.C. Cir. 2014).............................................................................13, 14

*District of Columbia v. Bamidele*,
    103 A.3d 516 (D.C. 2014) ..................................................................................12

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992).............................................................................................22

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ..........................................................................20

*Harbury v. Hayden*,
    522 F.3d 413 (D.C. Cir. 2008) ...........................................................................3, 4

*Howard Univ. v. Best*,
    484 A.2d 958 (D.C. 1984) ................................................................................4

*Jacobs v. Vrobel*,
    724 F.3d 217 (D.C. Cir. 2013) ..........................................................................11

*Johnson v. Weinberg*,
    434 A.2d 404 (D.C. 1981) .................................................................................4

*Kelley v. FBI,*
   67 F. Supp. 3d 240 (D.D.C. 2014) ................................................................... 20

*Kurd v. Republic of Turkey,*
   374 F. Supp. 3d 37 (D.D.C. 2019) .................................................................... 20

*Lyon v. Carey,*
   533 F.2d 649 (D.C. Cir. 1976) ........................................................................... 4

*Lyons v. Brown,*
   158 F.3d 605 (1st Cir. 1998) .............................................................................. 6

*Majano v. United States,*
   469 F.3d 138 (D.C. Cir. 2006) .................................................................... 18, 19

*Murray v. Shaw,*
   2025 WL 915752 (D.D.C. Mar. 26, 2025) ....................................................... 10

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
   583 U.S. 109 (2018) .......................................................................................... 23

*Penn Central Transportation Company v. Reddick,*
   398 A.2d 27 (D.C. 1979) .................................................................................. 13

*Phillips v. Mabus,*
   894 F. Supp. 2d 71 (D.D.C. 2012) ................................................................... 21

*Rasul v. Myers,*
   512 F.3d 644 (D.C. Cir. 2008), *vacated and remanded on other grounds*, 555
   U.S. 1083 (2008), *reinstated in relevant part*, 563 F.3d 527 (D.C. Cir. 2009) ............... 11, 21

*Rasul v. Rumsfeld,*
   414 F. Supp. 2d 26 (D.D.C. 2006), *aff'd sub nom. Rasul v. Myers*, 512 F.3d
   644 (D.C. Cir. 2008) ......................................................................................... 21

*Saleh v. Bush,*
   848 F.3d 880 (9th Cir. 2017) ............................................................................ 11

*Smith v. Clinton,*
   886 F.3d 122 (D.C. Cir. 2018) ......................................................................... 11

*Steele v. Meyer,*
   964 F. Supp. 2d 9 (D.D.C. 2013) ..................................................................... 12

*Thompson v. Trump,*
   590 F. Supp. 3d 46 (D.D.C. 2022) ...................................................... 5, 7, 16, 19

*Trump v. United State*s,
   603 U.S. 593 (2024) ................................................................................... 4, 5, 6

*United States v. Orleans,*
   425 U.S. 807 (1976) .......................................................................................... 22

*Wilson v. Libby*,
    498 F. Supp. 2d 74 (D.D.C. 2007), *aff'd*, 535 F.3d 697 (D.C. Cir. 2008)........................20, 21

*Wilson v. Libby*,
    535 F.3d 697 (D.C. Cir. 2008)..........................................................................................11

*Winglet Tech., LLC v. United States*,
    2022 WL 2116225 (D.D.C. June 13, 2022)...........................................................................20

*Wuterich v. Murtha*,
    562 F.3d 375 (D.C. Cir. 2009)..........................................................................................11

## Statutes

3 U.S.C. § 105(a)(1)....................................................................................................................23

28 U.S.C. § 2671........................................................................................................................22

28 U.S.C. § 2679(c)....................................................................................................................23

## Treatises

Restatement (Second) of Agency § 231 cmt. a..........................................................................21

## Constitutional Provisions

U.S. Const. art. II, § 1, cl. 7.......................................................................................................22

U.S. Const. art. II, §§ 2–3...........................................................................................................23

## INTRODUCTION

The Government's Westfall Act certification seeks to turn the scope of employment doctrine on its head by extending it to a presidential candidate who encouraged and directed a crowd of private citizens to carry out a violent attack on the United States during a campaign event. And worse, the Government attempts to assist Defendant Donald J. Trump in evading responsibility for his actions by placing them in the name of the United States, whose sacred tradition of peaceful transfers of power he sought to destroy. The Government's argument distorts the governing legal standard, cherry-picks which evidence to address, and re-imagines Trump's conduct as a speech to Congress and the public about "election integrity," despite all evidence to the contrary.

The Government's mischaracterization fundamentally ignores what the undisputed evidence shows about the context and purpose of Trump's actions: that Trump acted not in service to the United States, but as a private citizen in pursuit of his own reelection ambitions. The contention that Trump acted within the scope of his employment is unsupported by the evidence and fails for several reasons.

First, under District of Columbia law, four circumstances must exist for Trump's conduct to have been within the scope of his employment. *Carroll v. Trump*, 292 A.3d 220, 228 (D.C. 2023). If only one of those circumstances is absent, Trump cannot be regarded as having acted within the scope of his employment, and the Government's substitution must fail. Here, none of those circumstances are met. The evidence establishes that: (a) Trump acted as a private citizen seeking office, not as a President fulfilling an official duty, and his conduct was wholly unforeseeable to the United States; (b) Trump's conduct occurred outside of authorized time and space limits; (c) Trump was solely motivated to serve himself and his goal of securing reelection;

and (d) Trump engaged in entirely "unexpectable" uses of force against the United States.[1]  In its

opposition, the Government makes no serious attempt to rebut any of this evidence.

Second, Trump is not an "employee of the government" under the Westfall Act.  The text,

structure, and legislative history of the Act support this conclusion, and the Government's

arguments do not show otherwise.

For these reasons, Plaintiffs' motion should be granted.

## ARGUMENT

### I.    Trump Acted Outside the Scope of His Employment

The Government argues that Trump acted within the scope of his employment because he

was authorized to make public statements "concerning the integrity of the 2020 election leading

up to and at the January 6 rally."  Gov't Opp'n to Pls.' Mot. to Strike ("Opp.") at 13, *Lee v. Trump*,

No. 21-CV-400 (D.D.C. June 11, 2025), Dkt. 188.  This position requires the Court to focus on a

few lines of text from Trump's January 6 speech while turning a blind eye to the conduct and

context surrounding those isolated words, and it is not sufficient to make his statements official in

nature in any event.  The context surrounding Trump's conduct on January 6 demonstrates that he

acted as a candidate for office—and therefore outside the scope of his employment—at all relevant

times, from organizing and promoting the Rally, to speaking at the Rally, directing private citizens

---

[1]  On June 18, 2025, the Second Circuit denied the Government's motion to substitute itself for
Trump, pursuant to the Westfall Act, in a defamation lawsuit brought and won at trial by E. Jean
Carroll.  *Carroll v. Trump*, No. 24-644, Dkt. 124 (2d Cir. June 18, 2025).  Although the Court has
yet to issue an opinion detailing its reasoning, the Government raised similar arguments to the ones
it raises here, including that substitution was timely and appropriate because the Government may
certify at any time under the Westfall Act, and that Trump is immune from tort liability based on
statements made from the White House because those statements were within the course and scope
of his employment.  *Id.*, Dkt. 112.  The Second Circuit rejected these arguments.  The Court should
do the same here.

to march to the Capitol for his personal benefit, and encouraging the crowd to engage in violence.[2]
Trump's conduct does not meet any element of the governing scope-of-employment standard.

### A.    Trump's Conduct Was Not "of the Kind" He Was Employed to Perform

      *1.    Trump's Use of a Private Campaign Rally to Direct Private Citizens to Attack the Capitol Was Not Authorized, Nor Was It Similar in Kind or Incidental to Authorized Conduct*

The Government offers no explanation for how the President's participation in a campaign rally or his direction of a group of private citizens attending the rally to march to the Capitol to help him retain his office falls within his scope of employment.  On that basis alone, Plaintiffs' motion to strike should be granted.

The Government claims that Trump nonetheless acted within the scope of his employment when engaging in the conduct at issue because the President is authorized to speak on matters of public concern, investigate election fraud, recommend legislation to Congress, or safeguard national security, and Trump uttered words about those things during the Rally.  Opp. at 13–24.  The Government also assumes that because "the President is always on-duty," Opp. at 37 (quoting *Blassingame v. Trump*, 87 F.4th 1, 33 (D.C. Cir. 2023) (Katsas, J., concurring)), anything he says or does while in office—no matter how remotely related to his actual responsibilities, and no matter what capacity he is acting in—*necessarily* falls within the scope of his employment, *see, e.g.*, *id.* at 15–16.  These arguments misinterpret the law and ignore the evidence.[3]

---

[2]  As used herein, the "Rally" refers to the Save America Rally on January 6, 2021.

[3]  The Government also emphasizes the "broad construction of scope-of-employment" by stating that "expansive interpretation reflects a policy choice" even if it may lead to "seemingly 'counterintuitive' results."  Opp. at 6 (citing *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008)).  In support, the Government lists a series of cases to note that "seriously criminal and violent conduct can still fall within the scope of a defendant's employment under D.C. law— including sexual harassment, a shooting, armed assault, and rape."  *Id.* at 5–6 (alterations omitted)

a.    The Government Misconstrues *Trump*, *Blassingame*, and *Thompson*

The crux of the Government's argument is that a President always acts within the scope of employment when making a statement on matters of public concern.  Opp. at 13–22.  But this premise has already been rejected by this Court, the D.C. Circuit, and the Supreme Court in analogous contexts.  In *Trump v. United State*s, 603 U.S. 593 (2024), the Supreme Court—while considering whether presidential immunity applies to criminal prosecutions of a president— explained that the President's statements of public concern are not inherently official because there are "contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity—perhaps as a candidate for office or party leader."  *Id.* at 629.  And as the D.C. Circuit has also made clear, campaigning for office is not a part of a President's official duties: "[A] President acts in a private, unofficial capacity when engaged in re-election campaign activity."  *Blassingame*, 87 F.4th at 17.  Under scope-of-employment law, the D.C. Circuit has similarly emphasized that whether an official's public statements are made within the scope of their employment "necessarily depends on the context in which the statement was made." *Ballenger v. Council on Am. Islamic Relations*, 444 F.3d 659, 666 (D.C. Cir. 2006) (citation omitted); *see also Carroll*, 292 A.3d at 239–240 (declining to categorize conduct as per se within an official's scope of employment).

---

(citing *Harbury*, 522 F.3d at 422; *Howard Univ. v. Best*, 484 A.2d 958, 987 (D.C. 1984); *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981); *Lyon v. Carey*, 533 F.2d 649, 652 (D.C. Cir. 1976). However, none of these cases involves employees directing third parties to attack their employers to retain their jobs.  Moreover, *Best*, *Johnson*, and *Lyon* addressed scope-of-employment challenges in the context of standard tort claims against private employees, and in *Harbury*, the tortious conduct at issue occurred during the performance of an official act, unlike here.  In any event, the "policy rationale" cited by the Government for "allow[ing] an injured tort plaintiff a chance to recover from a deep-pocketed employer rather than a judgment-proof employee," *id.* at 6 (citation omitted), has no relevance here, where the Plaintiffs do not seek substitution and the Defendant seeks to avoid accountability.

Consistent with these principles, the context here, as shown by the evidence, establishes that Trump acted as a candidate for office (and therefore unofficially) leading up to and on January 6. *See* Pls.' Mot. to Strike ("Pls.' Mot.") at 15–20, *Lee*, No. 21-CV-400 (D.D.C. May 14, 2025), Dkt. 183. The Government's reliance on a selection of statements plucked out of Trump's Rally speech cannot overcome the evidence that he was acting as a candidate. *See* Pls.' Mot. at 6–11, 19–20; *see also* Pls.' Opp. to Def.'s Mot. for Summ. J. ("MSJ Opp.) at 26–34, *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152; Pls.' Counterstmt. to Def.'s Stmt. of Undisputed Facts & Pls.' Stmt. of Additional Undisputed Facts ("SUF") ¶¶ 203–20, 311–13, *Lee*, No. 21-CV-400 (D.D.C. Feb. 28, 2025), Dkt. 152-1. Moreover, this Court has already concluded that "the words spoken by" Trump on January 6 "reflect an electoral purpose, not speech in furtherance of any official duty." *Thompson v. Trump*, 590 F. Supp. 3d 46, 83 (D.D.C. 2022). The Government offers no reason for the Court to revisit that determination.

The Government mischaracterizes *Trump* to argue that the President's authority "includes . . . 'encourag[ing] [the public] to act in a manner that promotes the President's view of the public good.'" Opp. at 14 (alterations in original) (citing *Trump*, 603 U.S. at 627). But this argument is based on a misleading representation of the Court's words—the Court was characterizing the *petitioner's* view, and the Government simply replaced the words "state officials" with "the public" to support its desired outcome. In fact, *Trump* does not support the Government's argument, as the Court remanded the case for the district court to conduct a fact-specific analysis of whether Trump's conduct was official.[4] *Trump*, 603 U.S. at 628. The same fact-specific

---

[4] The Government repeatedly overstates and misinterprets cases that it cites as support. For example, the Government claims that *Ballenger* stands for the proposition that "communicating

analysis is required here. *See id.* at 630 ("Whether the Tweets, that speech, and Trump's other communications on January 6 involve official conduct may depend on the content and context of each."); *Blassingame*, 87 F.4th at 30 (noting that certain allegations in the complaint would bear on the issue of whether Trump "was exercising his official responsibilities as President" or was "instead engaging in reelection campaign activity as a presidential candidate").

The Government also incorrectly asserts that *Blassingame* and *Thompson* are irrelevant, and that Plaintiffs have argued the wrong standard. *See* Opp. at 7–9, 24. District of Columbia law, however, requires an inquiry into "whether the tortious conduct was undertaken in service of carrying out an employee's job function" or whether there is "some relationship or nexus between the tortious conduct and the employee's responsibilities." *Carroll*, 292 A.3d at 230–32 (emphasis omitted). Indeed, *Carroll* recognized that "[f]ederal law determines whether a person is a federal employee and defines the nature and scope of [the person's] official responsibilities." *Id.* at 226 (second alteration in original) (citing *Lyons v. Brown*, 158 F.3d 605, 609 (1st Cir. 1998)); *see also Ballenger*, 444 F.3d at 666. Thus, *Blassingame*'s and *Thompson*'s holdings are directly relevant to this Court's analysis here. *See Blassingame*, 87 F. 4th at 4 ("[W]hen a sitting President running for a second term . . . speaks at a campaign rally funded and organized by his re-election campaign committee, he is not carrying out the official duties of the presidency."). Because campaigning

---

with the press" and other such duties are within the "wide range of conduct" that is within government officials' scope of employment. Opp. at 10–11 (citing *Ballenger*, 444 F.3d at 665). But *Ballenger* does not support this overbroad claim. *See supra* at 4. Furthermore, the Government's assertion ignores the D.C. Court of Appeals' express holding in *Carroll*, which emphasized that the scope of employment "is a fact-intensive question for the factfinder" and declined to "adopt a categorical reading of [*Ballenger*] that resolves the scope-of-employment inquiry for elected officials on a per se basis." 292 A.3d at 240.

for office is not a presidential job function (and the Government does not argue otherwise), Trump's actions as a candidate cannot fall within the scope of his employment.

            b.      The Government Fails to Rebut the Evidence Establishing that Trump Acted as a Candidate

      Nowhere in its lengthy Opposition does the Government refute Plaintiffs' evidence showing that Trump acted in his private capacity as a candidate for office when engaged in the conduct underlying Plaintiffs' claims.[5]  Trump's remarks on January 6 focused on his campaign to remain in office; indeed, Trump asserted that he won the election, should have won the election, or won the popular vote in certain swing states no fewer than 12 times during his Rally speech. *See Lee*, No. 21-CV-400 (D.D.C. Jan. 24, 2025), Dkt. 144-47 ("Speech Tr.") at NARA_PROD_097097–98, -097113, -097115–16, -097119, -097122.  And as explained, the Court has already analyzed the entirety of Trump's speech at the Rally and concluded that his remarks reflect an electoral, rather than official, purpose.  *Thompson*, 590 F. Supp. 3d at 83.

      Other evidence also shows Trump participated in and spoke at the Rally in his personal capacity as a candidate seeking office.  Trump's remarks at the Rally were in line with his conduct in the weeks and months preceding the Rally, which included making false claims to his supporters that he won the 2020 presidential election even though countless government officials and courts repeatedly informed Trump that claims of election fraud were unsupported by the evidence.  *See, e.g.*, SUF ¶¶ 98–102 (collecting statements by state and federal officials disputing claims of

---

[5]  The Government claims in a footnote that the Court should only consider a limited subset of evidence, and that evidence such as "how the rally was organized" does not relate to Trump's underlying conduct.  *See* Opp. at 13 n.5.  This is incorrect.  As the D.C. Court of Appeals has made clear, the scope-of-employment analysis depends "on the fact-specific context in which the tortious conduct arose."  *Carroll*, 292 A.3d at 232 (citation omitted).  The evidence that Plaintiffs offer provides necessary and relevant context to this Court's analysis of whether Trump acted within the scope of his employment or in furtherance of his campaign to remain in office.

election fraud); *id.* ¶¶ 116–117 (collecting testimony that "the Justice Department declined [Trump's] requests because we did not think that they were appropriate"); *id.* ¶¶ 103–115 (describing legal challenges to the election results, including cases brought by Trump and his Campaign, that were voluntarily dismissed or rejected by courts).

Moreover, the Rally speech was drafted by campaign staff and officials who understood that they were working in personal, campaign-oriented capacities. MSJ Opp. at 38–41. Trump delivered the speech at an event that was planned, funded, organized, and executed by private parties, including his campaign, and without government funding. *Id.* at 27–29, 32–34. The Rally was promoted on private channels and not institutional White House accounts or websites. *Id.* at 30–32. This evidence demonstrates that Trump acted privately as a candidate for office, and not as President, when he engaged in the conduct giving rise to Plaintiffs' state and common law claims. *See Blassingame*, 87 F.4th at 23–24 ("Nothing in Article II contemplates the President's exercise of the powers of the presidency when acting in a private—*i.e.*, non-presidential— capacity.").

The Government fails to rebut this evidence. Instead, the Government merely references certain statements in which Trump spoke generally about alleged voter fraud and election irregularities, then broadly asserts that those statements were tied to the President's scope of employment. *See* Opp. at 13–22. For the reasons stated above, including that Trump's statements were made in his capacity as a candidate for office, the Government is wrong. *See supra* section I.A.1.a; *see also Blassingame*, 87 F.4th at 4.

Unable to contend with the evidence, the Government instead attempts to put its own gloss on the conduct at issue in Plaintiffs' state law claims by seeking to re-define the relevant conduct. The Government claims, "the relevant 'underlying conduct' for the Court's scope-of-employment

analysis is President Trump's statements concerning the integrity of 2020 election." Opp. at 13. But this self-serving parsing of the "relevant underlying conduct" has no basis. The specific conduct underlying the claims is that Trump, as a candidate for office, directed and encouraged a crowd of private citizens to march to the Capitol in an effort to overturn the results of the election. Indeed, Plaintiffs allege that Trump's direction and encouragement of the crowd resulted in the assault and battery of Plaintiffs, other Capitol police, members of Congress, and others. And contrary to the Government's assertions, Opp. at 24–25, Plaintiffs do not contend that whether the President's conduct was *wrongful* or *unlawful* is at issue in this motion (though it was both). Instead, what matters is whether Trump's conduct was "of the kind" he was employed to perform.

As set forth in Plaintiffs' opening brief, there is no federal law—codified or otherwise—that authorizes a president to do what Trump did on January 6 as part of his employment (including participate in a campaign event), nor was Trump's conduct similar in kind or incidental to authorized conduct. *See* Pls.' Mot. 18–20; *cf. Blassingame*, 87 F.4th at 36 (Rogers, J., concurring in part) ("Article II and the Take Care Clause do not grant the President boundless authority to supervise, control, or otherwise interfere with procedures entrusted by law to other branches of government."). For this reason alone, the Court should conclude that Trump acted outside the scope of his employment.

2.     *The Scope of the President's Office Is Not Unlimited and the Authorities the Government Cites in Support of Its Position Are Inapposite*

The Government attempts to rescue its argument that Trump was engaged in the kind of work he was employed to perform by citing a litany of prior Westfall Act decisions, effectively suggesting that the scope of a president's duties is limitless. Opp. at 10–13. But these cases are inapposite.

The authorities cited by the Government stand for the unremarkable proposition that a broad range of wrongful conduct may fall within the scope of federal employment. And so it can. But the Government's cited cases all involve the actions of federal officials taken while conducting government business or directing other government employees to do the same. They serve only to underscore that the circumstances and context of the alleged conduct are critical to understanding whether the underlying acts are within the scope of the official's employment. *See Ballenger*, 444 F.3d at 666 (noting that the court's decision "necessarily depend[ed] on the context in which the statement was made").

This Court's decision in *Murray v. Shaw*, 2025 WL 915752 (D.D.C. Mar. 26, 2025) and the district court's decision in *Black Lives Matter D.C. v. United States*, 2025 WL 823903 (D.D.C. Mar. 14, 2025) illustrate exactly why context matters. The claims in *Murray* arose from statements made by attorneys at the Social Security Administration's Office of the Inspector General (the "Agency") to Senator Ron Wyden regarding whistleblower protections, which "prompted [Senator Wyden] to send letters to the Agency and President Biden addressing his concerns with whistleblower retaliation and [the plaintiff's lawsuit]." 2025 WL 915752, at *23. The Court held that the attorneys' statements fell within the scope of their employment because "Congress was preparing to launch a broad, bipartisan inquiry into the Agency around the time that [d]efendants' communications took place," and because "contact with Congress was part of the scope of these defendants' duties at the Agency." *Id.* at *23–24. Similarly, in *Black Lives Matter*, the court "evaluate[d] whether . . . Trump acted within the scope of his employment when he *ordered law enforcement* to clear protestors from Lafayette Square." 2025 WL 823903, at *6 (emphasis added). The court determined that the "core" conduct involved "ordering law enforcement to respond to large-scale protests," which was "self-evidently the 'kind' of conduct the President may perform."

*Id.*  Simply put, the tortious conduct at issue in both cases occurred during the course of official conduct, unlike the private campaign conduct at issue here.

The same is true of the remaining cases the Government cites.  *Smith v. Clinton*, 886 F.3d 122, 127 (D.C. Cir. 2018) (noting that the defendant's use of private email servers "to send and receive confidential and classified government information, often concerning matters of national security" fell "within the heartland of her duties as Secretary of State"); *Saleh v. Bush*, 848 F.3d 880, 891 (9th Cir. 2017) ("The actions that Defendants took in connection with the Iraq War were part of their official duties . . . ."); *Jacobs v. Vrobel*, 724 F.3d 217, 223 (D.C. Cir. 2013) ("Responding to a reference call is an act plainly intended to benefit [the defendant's] employer . . . ."); *Rasul v. Myers*, 512 F.3d 644, 658 (D.C. Cir. 2008) ("[T]he underlying conduct—here, the detention and interrogation of suspected enemy combatants—is the type of conduct defendants were employed to engage in."), *vacated and remanded on other grounds*, 555 U.S. 1083 (2008), *reinstated in relevant part*, 563 F.3d 527, 528–29 (D.C. Cir. 2009); *Wilson v. Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008) (concluding that discussions with the press "in order to diffuse the [plaintiff's] criticism of the Executive's handling of pre-war intelligence" were "of the type that the defendants were employed to perform"); *Wuterich v. Murtha*, 562 F.3d 375, 384 (D.C. Cir. 2009) ("[I]nterviews with the media about the pressures on American troops in the ongoing Iraq war . . . is unquestionably of the kind that Congressman Murtha was employed to perform as a Member of Congress."); *Ballenger*, 444 F.3d at 665–66 ("[T]here was a clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively.").  In contrast, the conduct at issue here is Trump's direction and encouragement of *private citizens*, in attendance at

his privately funded and privately organized campaign rally, to march toward and attack the Capitol to disrupt certification of the election in order for him to remain in office.

3.    *Trump's Actions Directing Private Citizens to Attack His Purported Employer Were Not Foreseeable*

The Government incorrectly argues that Plaintiffs "misconstrue the 'foreseeability' analysis" while itself failing to explain how Trump's use of a private campaign rally to mobilize private citizens to attack his purported employer was foreseeable. Opp. at 26. The Government's failure is no mystery, as Trump's conduct was plainly unforeseeable and thus not what he was employed to do.

In fact, the Government appears to agree that conduct "is 'foreseeable' if it is a 'direct outgrowth of the employee's instructions or job assignment.'" *Steele v. Meyer*, 964 F. Supp. 2d 9, 18 (D.D.C. 2013) (citation omitted); *see* Opp. at 26. Furthermore, to be foreseeable, "it is not enough that an employee's tortious activity occurs while he is on duty, or even that those duties bear some causal relationship to the tort." *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014). Instead, the "employment must have created more than the mere opportunity to commit the tort; there must still be some relationship or nexus between the tortious conduct and the employee's responsibilities." *Carroll*, 292 A.3d at 232.

There is no credible argument that speaking at a campaign event is an outgrowth of Trump's "instructions or job assignment" as President or was in service of carrying out his job function, and the Government does not even attempt to make one. The same can be said for Trump's direction and encouragement to his supporters to march to the Capitol and interfere with the certification of the election, including through violence. Far from being "causation-focused," as the Government wrongly contends, Opp. at 26 (emphasis omitted), this conduct underlies Plaintiffs' claims, has no nexus to the responsibilities that Trump was entrusted with as President,

and was therefore unforeseeable.  This is so even if Trump made passing remarks during his Rally speech about election integrity.  *See infra* section I.A.1; *Blassingame*, 87 F.4th at 20–21 ("[T]he task is to distinguish between official acts and private acts. . . .  We emphasize context because, only by looking to context can the relevant nature of an action be understood.").

The D.C. Court of Appeals' decision in *Penn Central Transportation Company v. Reddick*, 398 A.2d 27 (D.C. 1979), is instructive.  That case involved a railroad worker who became involved in a dispute with a taxi driver while traveling between train stations and ultimately attacked the taxi driver.  *Id.* at 28–29.  The court held that even if the railroad employee was "on duty," the attack was not foreseeable because "[t]he violent and unprovoked nature of [the] attack indeed suggests a personal as distinguished from business-related motive. . . . There is nothing in the business of running a railroad that makes it likely that an assault will occur between a railroad brakeman and a taxicab driver."  *Id.* at 32.  The same principle applies even more directly here, where Trump attacked his own employer rather than a third party.

### B.    Trump's Conduct Occurred Outside Authorized Time and Space Limits

The Government argues that Trump acted within authorized time and space limitations of his employment because he is a "high-ranking federal official[] whose responsibilities often require around-the-clock attention" and because he delivered his speech at the Rally during business hours and "on the Ellipse with the White House as the backdrop."  Opp. at 37–38.[6]  The

---

[6]  The Government also argues that the Court "should decline to consider Plaintiffs' cursory [time and space] argument contained in a footnote because 'hiding an argument there and then articulating it in only a conclusory fashion results in forfeiture.'"  *Id.* at 37 (quoting *CTS Corp. v. E.P.A.*, 759 F.3d 52, 64 (D.C. Cir. 2014)).  The Government's position is confounding as it, too, includes various substantive arguments in footnotes.  *See, e.g.*, Opp. at 13 n.5, 27 n.7.  Regardless, contrary to the Government's assertion, the Court can—and should—consider this factor of the

Government's argument ignores binding case law and would extend Westfall Act immunity to acts that plainly have no relation to a President's employment.

Plaintiffs do not dispute that "[d]efining the authorized space and time of employment is more difficult for employees who are by nature of their job 'always on duty.'" *Carroll*, 292 A.3d at 233. But it is well established that employees with broad authorized time and place limits are not *always* acting within those limits. Instead, for employees who may be considered "always on duty," courts consider "whether the officers were obligated by law to take action," "whether the officers 'intend[ed] to take . . . action' against the victims," and whether "the officers were considered to be off-duty, dressed in civilian clothing, and otherwise attending to personal business prior to the tortious conduct." Pls.' Mot. at 18 n.8 (quoting *Carroll*, 292 A.3d at 233). While this is a "fact-intensive inquiry," District of Columbia courts recognize the basic "principle that the employer is generally only liable under *respondeat superior* for their 'always on duty' employee while the employee is sufficiently engaged with their employment." *Carroll*, 292 A.3d at 233 (citation omitted).

As set forth in Plaintiffs' opening brief and for the reasons discussed above, Trump was not "obligated by law to take action" by speaking about his failed candidacy at the Rally, and the evidentiary record reflects that he did not "intend to take [official] action" as he was "otherwise attending to personal business" as a candidate when speaking at the Rally. Pls.' Mot. at 18–19 n.8 (quoting *Carroll*, 292 A.3d at 233); *supra* section I.A.; MSJ Opp. at 26–44. Because the Government fails to rebut Plaintiffs' evidence that the Rally was a campaign event and Trump's

---

scope of employment analysis, and should find that it weighs against certification. In the case the Government relies upon, the court nevertheless engaged with the merits of the argument at issue, despite its presence in a footnote. *See CTS Corp.*, 759 F.3d at 64–65.

participation in it was as a candidate, the Government cannot credibly argue that Trump was "sufficiently engaged with [his] employment" when he engaged in the conduct at issue. *Carroll*, 292 A.3d at 233; *see also supra* section I.A. This is true regardless of whether the President acted during business hours or on federal land.[7]

### C.    Trump's Conduct Was Actuated Solely to Serve Himself

The Government's claim that Trump was at least partially motivated to serve his purported employer when he directed private citizens to disrupt a government proceeding certifying his opponent's election, Opp. at 29–36, is belied by the evidence and would not be sufficient to satisfy the scope of employment test even if it were correct.

In analyzing this factor, courts must evaluate "the employee's state of mind to determine whether the employee was, in fact, motivated by a purpose to serve their employer" at or immediately preceding the time of the tortious conduct. *Carroll*, 292 A.3d at 234. Even if there is "some discernable purpose to serve the employer," however, conduct still falls outside the scope of employment if it is "too little actuated" by that purpose. *Id.* at 236. Courts consider "direct and circumstantial evidence of the employee's state of mind," and may "make credibility determinations about the stated reasons that the tortious conduct was undertaken or otherwise draw reasonable inferences from the facts." *Id.* at 235; *see also Blair v. District of Columbia*, 190 A.3d

---

[7] Indeed, Trump delivered a speech accepting the Republican presidential nomination at the 2020 Republican National Convention on the South Lawn of the White House, SUF ¶ 2, but the D.C. Circuit had no difficulty concluding that a speech at a party convention would be an unofficial act, *see Blassingame*, 87 F.4th at 5 ("When a sitting President running for re-election speaks . . . in accepting his political party's nomination at the party convention, he typically speaks on matters of public concern. Yet he does so in an unofficial, private capacity as office-seeker, not an official capacity as office-holder."); *see also id.* at 19 (noting that a president may give campaign speech "at a podium affixed with the presidential seal" but still "delivers the speech in his private, unofficial capacity as candidate for reelection" (citation omitted)).

212, 226 (D.C. 2018) ("[C]ourts assess, as best they can, the facts relevant to discerning the motivation underlying an officer's conduct.").

Here, Trump acted with no discernible purpose to serve the United States as he waged his campaign conduct to retain the office of the presidency. *See supra* section I.A.1.b; *see also* SUF ¶¶ 203–20, 312–13 & Tbls. C, D, E. As noted above, Trump used his speech as an opportunity to repeatedly assert that he won (or should have won) the election and urge his supporters to join his efforts to overturn the results of the election in his favor. *See supra* section I.A.1.b; *see also Thompson*, 590 F. Supp. 3d at 83. The evidence also demonstrates that Trump's tortious conduct—directing and encouraging private citizens to assault government officials—was nothing more than an attempt to further his personal, office-seeking ambitions and "act on a personal grievance." *Carroll*, 292 A.3d at 235.

The Government contends that Plaintiffs omit "key details" purportedly showing that "Trump's speech raised concerns about the integrity of the election and the propriety of the congressional proceedings, among other matters of public concern related to his role as the head of the Executive Branch." Opp. at 27. In support, the Government cites five pieces of evidence: (1) post-hoc testimony from Stephen Miller that "one of the purposes of the speech was to build '[s]upport for election reform'" and educating the public "about election fraud," among other things, *id.* at 27 n.7, 32; (2) post-hoc testimony from William Barr that Trump "never said anything" to him that indicated Trump did not believe Trump's own false claims of election fraud, *id.* at 32; (3) a speech Trump delivered on December 2, over one month before January 6 (and certainly not "contemporaneous" with Trump's Rally remarks), *id.* at 31; (4) Trump's statements about election integrity in 2016 and executive orders regarding election integrity in 2025, *id.* at 33, 33 n.9; and (5) a snippet of Trump's January 6 speech that the Government asserts is "consistent

with the necessary purpose to serve the United States," *id.* at 35.  Based on this evidence, the Government urges the Court to ignore the wealth of contravening evidence and conclude that Trump acted in the interest of the United States.  *Id.* at 33–34.

The Government's selection of evidence shows that *it* is ignoring the key facts.  For example, the Government fails to address the campaign purposes of the Rally and Trump's actions directing an angry, armed group of private citizens to march on the Capitol.  And the Government's cited evidence cannot overcome those unrebutted facts.  The portions of Miller's and Barr's testimony cited by the Government are post-hoc rationales offered by Trump associates and are not a credible basis on which to find for the Government.  Indeed, Miller's cited testimony is contradicted by his own prior testimony in which stated that "[i]t was blindingly obvious that the purpose of the speech was to build support for the election contest."  SUF ¶ 315.  Meanwhile, the Government misleadingly omits that Barr acknowledged that his understanding of Trump's motives "would be speculation," and conceded that "some of these allegations were . . . ridiculous" and "there was never an indication of interest in what the actual facts were."  William Barr Transcript, Select Committee to Investigate the January 6th Attack on the U.S. Capitol, at 36–37, https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000083860/pdf/GPO-J6-TRANSCRIPT-CTRL0000083860.pdf.

Statements from Trump in the weeks leading up to January 6—whether given in an official or campaign capacity—are entirely consistent with Plaintiffs' allegations, as they were part of Trump's multi-pronged campaign strategy to undermine public confidence in the 2020 presidential election in order to retain the office of the presidency.  *See supra* section I.A; *see also* Pls.' Mot. at 23–27.  For example, Trump delivered strikingly similar remarks at a campaign event in Georgia two days prior to January 6, which speechwriters noted was a "political event" rather than an

official event.  *See* Pls. Mot. at 8; MSJ Opp. at 36.  At the same time, the Government provides no explanation of how Trump making statements regarding election integrity in 2016 and issuing election-related executive orders in 2025 supports a finding that *on January 6, 2021*, Trump was actuated by a purpose to serve the United States when encouraging and directing the crowd at the Rally to prevent certification of the election.  *See Carroll*, 292 A.3d at 234 (courts may "make credibility determinations about the stated reasons that the tortious conduct was undertaken or otherwise draw reasonable inferences from the facts").

The Government's claim that Trump was genuinely concerned about election integrity on January 6 also strains credulity given that Trump's assertions of the election being "stolen" were unsupported by any credible evidence.  *See supra* section I.A.1.b.[8]  Even if the Court were to credit the Government's argument that Trump was in part motivated by an interest in election integrity— which it should not—Trump's conduct was too little actuated by that purpose to satisfy this Westfall factor.  Some generalized references to election integrity or purported voter fraud are not a sufficient basis to find that Trump acted in furtherance of those objectives given his overwhelming focus on serving his own interests as a candidate in directing his supporters to attack the U.S. Capitol, as demonstrated by unrebutted evidence.  *Cf. Majano v. United States*, 469 F.3d 138, 142 (D.C. Cir. 2006) ("We think that a reasonable jury could look at these facts and conclude

---

[8]  The Government's argument that Trump was acting within the scope of his employment by speaking about election integrity is also inconsistent with positions that the Government took with respect to other officials engaged in substantially similar conduct at the Rally.  The Government's only explanation for this inconsistency is that its decision to decline substitution for Congressman Mo Brooks is not relevant because the circumstances surrounding his petition are factually and legally "irrelevant to the notices currently before the Court."  Opp. at 39.  Plaintiffs disagree.  The Government's years-long delay in acting and its shifting positions should certainly inform this Court's credibility determinations.  *See Carroll*, 292 A.3d at 234 ("[T]he factfinder can make credibility determinations about the stated reasons that the tortious conduct was undertaken or otherwise draw reasonable inferences from the facts.").

that when [the employee] assaulted [the plaintiff], she had turned away from her purpose to gain

entry to the building and instead was acting 'solely for the accomplishment of [her] independent

malicious or mischievous purposes.'" (citation omitted)).  Indeed, this Court already indicated as

much in the presidential immunity context, offering "examples" of situations remarkably similar

to the one giving rise to Plaintiffs' claims against Trump here and concluding that the broader

context of a President's statements—not any single remark—bear on whether conduct is official:

> Consider some examples.  At a rally promoting his reelection, an incumbent President touts his policy accomplishments and makes promises about a second term, but during his speech he instructs members of the crowd to "punch" a protester "in the face right now." . . .  Or, consider a President who appears at a campaign event for a candidate of his party who is running for Congress, and during his remarks touts the candidate because his election will help advance his agenda, but also calls on the crowd to destroy property as a sign of support.  In each of these scenarios, the conduct of the President comes in the context of words uttered on matters of public concern, but it is doubtful that anyone would consider the President immune from tort liability for harm resulting from his speech.  To be sure, these scenarios may seem far-fetched, but they illustrate an important point: blanket immunity cannot shield a President from suit merely because his words touch on matters of public concern. The context in which those words are spoken and what is said matter.

*Thompson*, 590 F. Supp. 3d at 80.  As the foregoing analysis of the evidence in this case

demonstrates, the relevant context of the entire speech establishes that Trump was motivated solely

by his self-centered intent to remain in office rather than any desire to serve the United States.

### D.    Trump's Use of Force Was Not Expectable

The Government attempts to sidestep the use-of-force element of the scope of employment

test, by claiming that "Trump himself" did not directly "use[] force" against the Plaintiffs.  Opp.

at 38.  That argument ignores the nature of Plaintiffs' claims.

First, the state law claims against Trump include battery, which involves an actual use of

force.  Whether the defendant used force with his own hands or by causing others to use theirs is

immaterial.  The Plaintiffs in these cases claim that Trump's tortious conduct *caused* force to be

used against them.  *See* Am. Compl. ¶ 161, *Smith v. Trump*, No. 21-CV-2265 (D.D.C. Dec. 3, 2021), Dkt. 89 ("Defendants directed, incited, aided, and abetted attackers to break through police lines, to overwhelm and assault Plaintiffs and their fellow police officers"); *see also* Speech Tr. at NARA_PROD_097125 ("[W]e're going to try and give our Republicans, the weak ones . . . , the kind of pride and boldness that they need to take back our country."); *id.* ("[I]f you don't fight like hell, you're not going to have a country anymore."); Pls.' Mot. at 9–10 (noting that Trump urged the crowd to "fight" even though he knew many rallygoers were armed).

Regardless of whether Trump's liability stems from aiding and abetting battery, a conspiracy to commit battery, or any vicarious liability theories, Trump's conduct provides a straightforward basis for tort liability based on the use of force under District of Columbia law. *See, e.g.*, *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983) ("District law recognizes that a person's actions in support of a wrong may make him liable for the tortious injury."); *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 49 (D.D.C. 2019) (concluding "that [the Court] is bound by the law of this Circuit to recognize aiding and abetting liability for common law torts under District of Columbia law.").

The underlying conduct at issue in Plaintiffs' claims against Trump indisputably "concerns the intentional use of force," which is all that is required to trigger this prong.  *Carroll*, 292 A.3d at 239.[9]  The Government's authorities do not support its position that this fourth prong is not at issue.  Instead, its proffered authority involves tort claims that did not concern the use of force in any respect.  *See* Opp. at 38; *Wilson v. Libby*, 498 F. Supp. 2d 74, 96–97 (D.D.C. 2007) (finding

---

[9]  By contrast, an intentional tort that does not involve the use of *any* force (such as defamation or fraud) would not require an analysis of the fourth element.  *See, e.g.*, *Winglet Tech., LLC v. United States*, 2022 WL 2116225, at *3 n.3 (D.D.C. June 13, 2022) ("use of force" analysis does not apply for defamation claim).

the fourth element to be "irrelevant" when the tort at issue is "public disclosure of private facts"), *aff'd*, 535 F.3d 697 (D.C. Cir. 2008); *see also Kelley v. FBI*, 67 F. Supp. 3d 240, 247, 285 n.34 (D.D.C. 2014) (same conclusion where "[p]laintiffs do not allege a tort involving force," but instead allege "intrusions upon their privacy."); *Phillips v. Mabus*, 894 F. Supp. 2d 71, 85 (D.D.C. 2012) (same conclusion for tortious interference with "contractual relations, . . . prospective contractual relations, and . . . prospective advantageous relationships").

Moreover, contrary to the Government's unsupported assertions, courts analyze whether use of force was "unexpectable" even when defendants are not alleged to have directly used force against plaintiffs—including in cases the Government relies on. *See, e.g.*, Opp. at 26; *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 36 (D.D.C. 2006) (analyzing whether "the use of force was . . . expectable" where conduct at issue was defendant Donald Rumsfeld's "memorandum approving more aggressive interrogation techniques" that led to Plaintiffs' torture), *aff'd sub nom. Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008); *Myers*, 512 F.3d at 660 (acknowledging that "serious crimes are not only unexpectable but in general are in nature different from what servants in a lawful occupation are expected to do") (quoting Restatement (Second) of Agency § 231 cmt. a.).[10]

The Government could not have reasonably argued Trump's use of force on January 6 was expected by the United States and chose not to. *See supra* section I.A.3. And by failing to address the substance of the use of force element, the Government concedes the issue. *See Carson v. Sim*, 778 F. Supp. 2d 85, 91 n.1 (D.D.C. 2011) (finding that a party "waived or conceded [the] issue by completely failing to address or rebut the [opposing party's] arguments").

---

[10]  The Government further asserts that the "use of force" element "was not even contested by the plaintiffs" in another case that it argues is analogous to this one, *see* Opp. at 38 (citing *Black Lives Matter*, 2025 WL 823903, at *6–8), but arguments not raised in that case have no bearing on this case.

## II.    The President Is Not an "Employee of the Government" Under the Westfall Act

The Government also fails to rebut Plaintiffs' argument that the President is not an "employee" under the Westfall Act. There is no dispute that the President is not mentioned in the text of the Westfall Act, and the Government does not meaningfully contend with Plaintiffs' explanation of the statutory language, *see* Pls.' Mot. at 29–30. Instead, the Government argues that because the FTCA defines "employee" using the word "includes," the President *could* fall within the definition.[11] *See* Opp. at 40–41. At most, this argument only suggests that the President is not *expressly excluded* from Westfall protections, not that Congress intended for the President to be subject to them. The Government's argument that because the President "shall . . . receive for his Services, a Compensation," he must be an employee, is equally unconvincing. *See* Opp. at 41 (quoting U.S. Const. art. II, § 1, cl. 7). Federal contractors, for example, generally receive compensation, but the FTCA "does not include" contractors in most situations. 28 U.S.C. § 2671; *see also United States v. Orleans*, 425 U.S. 807, 813 (1976).

Had Congress intended to immunize the President under the Westfall Act, it would have done so expressly. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) ("[T]extual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress . . . ."). But the FTCA "was *never intended*, and has not been construed . . . to reach employees or agents of all federally funded programs." *Orleans*, 425 U.S. at 813 (emphasis added). Instead, the FTCA's definition of "employee" includes "officers or employees," with each of these terms having a meaning distinct from the President. An employee, as used elsewhere in the U.S. Code, signifies a non-officer, rank-and-file employee of a given

---

[11] *See* 28 U.S.C. § 2671 ("'Employee of the government' *includes* (1) officers or employees of any federal agency . . . ." (emphasis added)).

federal entity. *See, e.g.*, 3 U.S.C. § 105(a)(1) ("*[T]he President* is authorized to appoint and fix the pay of *employees* in the White House Office." (emphasis added)). That the term "officer" carries a meaning distinct from the President is embedded in the Constitution. *See, e.g.*, U.S. Const. art. II, §§ 2–3 ("The *President* . . . shall Commission all the *Officers* of the United States." (emphasis added)). Further, the Act requires that "[t]he employee against whom such civil action or proceeding is brought" "deliver . . . all process served upon him or an attested true copy thereof to his *immediate superior or to whomever was designated by the head of his department to receive such papers* . . . and to the head of his employing Federal agency." 28 U.S.C. § 2679(c) (emphasis added). The President has no "immediate superior" or "head of his department." This Court should not second-guess Congress' choice of language in the statute it passed. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128–29 (2018) ("[T]he Court is obliged to give effect, if possible, to every word Congress used." (internal quotation marks and citation omitted)).

The Government relies on non-binding, out-of-circuit cases that do not warrant a different outcome. *See* Opp. at 40–41 (citing *Carroll v. Trump*, 49 F.4th 759, 770 (2d Cir. 2022)). As explained in Plaintiffs' Motion, this Court is entitled to disagree with sister circuits and other courts in this district. Pls' Mot. at 31–32. Accordingly, this Court should find that the President is not an "employee of the Government" within the meaning of the FTCA or Westfall Act.

## CONCLUSION

For the reasons discussed above, the Court should strike the Government's Notices of Substitution and reinstate Trump as the defendant on the common law claims.

Dated:  June 27, 2025                              Respectfully submitted,


                                                  */s/ Marc P. Epstein*
                                                  Edward G. Caspar, D.C. Bar No. 1644168
                                                  Marc P. Epstein D.C. Bar No. 90003967
                                                  LAWYERS' COMMITTEE FOR
                                                  CIVIL RIGHTS UNDER LAW
                                                  1500 K Street N.W., Suite 900
                                                  Washington, DC 20005
                                                  Tel: 202-662-8600
                                                  ecaspar@lawyerscommittee.org
                                                  mepstein@lawyerscommittee.org

                                                  Faith E. Gay, *pro hac vice*
                                                  Joshua S. Margolin, *pro hac vice*
                                                  Babak Ghafarzade, *pro hac vice*
                                                  SELENDY GAY PLLC
                                                  1290 Avenue of the Americas
                                                  New York, NY 10104
                                                  Tel: 212-390-9000
                                                  fgay@selendygay.com
                                                  jmargolin@selendygay.com
                                                  bghafarzade@selendygay.com

                                                  William J. Blechman, *pro hac vice*
                                                  Elizabeth B. Honkonen, *pro hac vice*
                                                  Jeffrey Todd Foreman, *pro hac vice*
                                                  SPERLING KENNY NACHWALTER
                                                  Four Seasons Tower – Suite 1100
                                                  1441 Brickell Avenue
                                                  Miami, FL 33131
                                                  Tel: 305-373-1000
                                                  wblechman@sperlingkenny.com
                                                  ebh@sperlingkenny.com
                                                  jtf@sperlingkenny.com


                                                  *Attorneys for Plaintiffs Conrad Smith, et al.*


                                                  */s/Joseph Sellers*
                                                  Joseph M. Sellers, Bar No. 318410
                                                  Brian Corman, Bar No. 1008635
                                                  Alison S. Deich, Bar No. 1572878
                                                  Nina Jaffe-Geffner, Bar No. 90011459

COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Avenue N.W.
Eighth Floor Washington, D.C. 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699
jsellers@cohenmilstein.com
bcorman@cohenmilstein.com
adeich@cohenmilstein.com
njaffegeffner@cohenmilstein.com

Janette McCarthy-Wallace,
Bar No. OH066257
Anthony P. Ashton, Bar No. MD25220
NAACP
Office of General Counsel
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: 410-580-5777
jlouard@naacpnet.org
aashton@naacpnet.org

*Attorneys for Plaintiffs Barbara J. Lee, et al.*


*/s/ Matthew Kaiser*
Matthew Kaiser, D.C. Bar No. 486272
Noah Brozinsky, D.C. Bar No. 1655789
KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor
Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
nbrozinsky@kaiserlaw.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC
1100 H Street N.W. Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com
joe@calebandonian.com

*Attorneys for Plaintiff Eric Swalwell*

*/s/ Patrick Malone*

Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556
(application for admission forthcoming)
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

Cameron Kistler, Bar No. 1008922
Kristy Parker, Bar No. 1542111
Erica Newland (Bar No. MD0141)
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Avenue N.W. #163
Washington, D.C. 20006
Telephone: 202-579-4582
cameron.kistler@protectdemocracy.org
kristy.parker@protectdemocracy.org
erica.newland@protectdemocracy.org

Genevieve C. Nadeau, Bar No. 979410
UNITED TO PROTECT DEMOCRACY
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: 202-579-4582
genevieve.nadeau@protectdemocracy.org

*Attorneys for Plaintiffs James Blassingame
and Sidney Hemby*

*/s/ Mark Zaid*

Mark S. Zaid, Esq., D.C. Bar No. 440532
Bradley P. Moss, Esq., D.C. Bar No. 975905
MARK S. ZAID, P.C.
1250 Connecticut Avenue N.W. Suite 700
Washington, D.C. 20036
Telephone: 202-498-0011
Facsimile: 202-330-5610
Mark@MarkZaid.com
Brad@MarkZaid.com

Matthew Kaiser, D.C. Bar No. 486272
Noah Brozinsky, D.C. Bar No. 1655789
Daniel Csigirinszkij, D.C. Bar No. 90017805
KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor
Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
nbrozinsky@kaiserlaw.com
dcsigirinszkij@kaiserlaw.com

Philip Andonian, D.C. Bar No. 490792
Joseph Caleb, D.C. Bar No. 495383
CALEBANDONIAN PLLC
1100 H Street N.W. Suite 315
Washington, D.C. 20005
Telephone: 202-953-9850
phil@calebandonian.com
joe@calebandonian.com

*Attorneys for Plaintiff Sandra Garza*

 */s/ Patrick Malone*
Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com
*Attorneys for Plaintiffs Marcus J. Moore et al.; Bobby Tabron et al.; and Briana Kirkland*

**CERTIFICATE OF SERVICE**

I certify that on June 27, 2025, a copy of the foregoing was filed with the Clerk of Court using the Court's CM/ECF system, which will send a copy to all counsel of record.  Plaintiffs are serving pro se defendants with redacted copies of the Motion and Proposed Order via first class mail or other permitted means.

*/s/ Marc P. Epstein*
Marc P. Epstein
