**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| **BARBARA J. LEE et al.,** | ) | **Case No. 21-cv-00400 (APM)** |
| | ) | |
| **Plaintiffs,** | ) | **Consolidated Member Cases:** |
| | ) | 21-cv-00586 (APM) |
| **v.** | ) | 21-cv-00858 (APM) |
| | ) | 21-cv-02265 (APM) |
| **DONALD J. TRUMP et al.,** | ) | 22-cv-00010 (APM) |
| | ) | 22-cv-00011 (APM) |
| **Defendants.** | ) | 22-cv-00034 (APM) |
| | ) | 23-cv-00038 (APM) |

**MEMORANDUM OPINION**

## I.   INTRODUCTION

These consolidated civil cases are among the last vestiges of litigation concerning the events at the United States Capitol on January 6, 2021. In February 2022, this court denied President Donald J. Trump's motion to dismiss, ruling that Plaintiffs had plausibly alleged that President Trump's acts leading up to and on January 6, including his rally speech on the Ellipse ("Ellipse Speech" or "Speech"), were not official acts and therefore he did not enjoy presidential immunity from suit. *See Thompson v. Trump*, 590 F. Supp. 3d 46, 73–84 (D.D.C. 2022).[1] The court also held that words spoken during the Ellipse Speech plausibly amounted to incitement and were not protected under the First Amendment. *See id.* at 108–18.

President Trump then sought interlocutory review of the court's immunity ruling. The D.C. Circuit affirmed, and President Trump elected not to appeal that decision. *See Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023). The case then returned to this court.

---

[1] The court ruled, however, that President Trump was immune from suit as to Plaintiff Swalwell's failure-to-act claim under 42 U.S.C. § 1986. *Thompson*, 590 F. Supp. 3d at 84–85 ("Just as he is immune for acts that fall within the outer perimeter of his official responsibilities, so too must he be immune for alleged failures to exercise that official responsibility.").

President Trump opted to take discovery bearing on immunity, and the parties engaged in such discovery for nearly a year.  Now, the question of official-acts immunity is once more teed up for this court, but this time under the more rigorous summary judgment standard.

But that is not all.  President Trump also asks the court to reconsider its ruling rejecting his First Amendment defense.  According to him, a subsequent Supreme Court decision, *Counterman v. Colorado*, 600 U.S. 66 (2023), clarified the law on incitement and confirms that the Ellipse Speech was protected political expression.  President Trump asks the court to walk back its previous decision or, if it declines to do so, to certify the First Amendment question for interlocutory review.

And the Department of Justice has joined the fray.  More than four years after the first of these suits was brought, the Department filed a Westfall Act Certification ("Certification") signed by the Attorney General's designee.  The Certification asserts that the acts by President Trump alleged in the various complaints fell within the scope of his employment as President of the United States.  Under the Westfall Act, the Attorney General's act of certification requires that the United States be substituted as the defendant for tort claims brought against a federal employee. The consequence of substitution in this case would be two-fold.  It would immunize President Trump from tort liability because he could no longer be held personally responsible.  And it would require dismissal of the tort claims altogether, as no Plaintiff filed pre-suit notice as required under the Federal Tort Claims Act.  Plaintiffs have moved to strike the Certification.  If granted, the United States would not be substituted as the defendant and the tort claims against President Trump would remain intact.

Those are the three primary pending motions.  There are also two motions seeking to admit or exclude certain evidence from the court's consideration of the immunity question.  Furthermore,

2

the parties have submitted lengthy statements and counterstatements of undisputed facts to support their positions on immunity. Together, they total over 650 pages and contain what seems an endless stream of evidentiary objections. The court has considered those statements in their entirety, their supporting evidence, and the parties' objections.[2]

For the reasons set forth below, the court rules as follows: (1) President Trump's summary judgment motion with respect to official-acts immunity is denied except as to certain conduct that falls within the outer perimeter of a President's responsibilities; (2) President Trump's motion for reconsideration is denied, but the court certifies its First Amendment rulings for interlocutory review; and (3) Plaintiffs' motion to strike the United States' Westfall Act Certification is granted. Further, to the extent the court has relied on evidence covered by the two evidentiary motions, the court (4) grants Plaintiffs' motion requesting judicial notice and (5) denies Defendant's motion objecting to the court's consideration of the final report of the U.S. House Select Committee to Investigate the January 6 Attack on the U.S. Capitol.

This opinion will proceed as follows. Section II addresses the controlling legal principles, starting with a summary of the two appellate rulings on presidential immunity that followed this court's ruling: (1) the D.C. Circuit's opinion in *Blassingame* and (2) the Supreme Court's decision in *Trump v. United States*, 603 U.S. 593 (2024). Section II closes with a discussion of President Trump's contention that *Trump* altered *Blassingame*'s immunity framework and related legal disputes. Section III addresses the merits of the immunity question. Sections IV and V, respectively, address President Trump's motion to reconsider his First Amendment defense and Plaintiffs' motion to strike the Westfall Act Certification.

---

[2] Instead of identifying the various filings in the body of this opinion or in footnotes, they are listed in an Appendix. The corresponding CM/ECF docket entries and short-cite abbreviations are found there, too.

The court does not lead with a factual or procedural overview, as the court presumes readers' familiarity with the background set forth in *Blassingame*, 87 F.4th at 6–12, and *Thompson*, 590 F. Supp. 3d at 63–69.  It is incorporated here by reference.

## II.    LEGAL PRINCIPLES

### A.    *Blassingame v. Trump*

A unanimous panel in *Blassingame* concluded that, on a motion to dismiss, President Trump had not "demonstrated an entitlement to official-acts immunity for his actions leading up to and on January 6 as alleged in the complaints."  87 F.4th at 5.  In so holding, the court began by distilling three "governing principles" from the Supreme Court's two major cases on presidential immunity from civil suit, *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), and *Clinton v. Jones*, 520 U.S. 681 (1997).  "First, the President is entitled to official immunity from civil damages liability based on actions within the 'outer perimeter' of official presidential responsibility, including discretionary acts within the concept of duty associated with the presidency."  *Blassingame*, 87 F.4th at 14.  "[A]n act lies within the outer perimeter of an official's duties if it is 'the kind of act not manifestly or palpably beyond [the official's] authority, but rather having more or less connection with the general matters committed by law to his control or supervision.'"  *Id.* at 13 (second alteration in original) (quoting *Martin v. D.C. Metro. Police Dep't*, 812 F.2d 1425, 1429 (D.C. Cir. 1987)).  "Second, the President is subject to civil damages suits based on actions taken in an unofficial, private capacity to the same extent as any private citizen."  *Id.* at 14.  "And third, the President's actions do not fall beyond the outer perimeter of official responsibility merely because they are unlawful or taken for a forbidden purpose.  Rather, the President's official immunity insulates all of his official actions from civil damages liability, regardless of their legality or his motives."  *Id.*

With these three principles in mind, the *Blassingame* court rejected President Trump's assertions that his alleged conduct fell within the outer perimeter of his official duties "because they amounted to speech on matters of public concern" and because "they came within his constitutional duty under the Take Care Clause." *Id.* As to his first argument, the court recognized that the President "possesses an extraordinary power to speak to his fellow citizens and on their behalf" and that "many uses of the presidential bully pulpit fall comfortably 'within the "outer perimeter" of [the President's] official responsibility.'" *Id.* at 14–15 (alteration in original) (first quoting *Trump v. Hawaii*, 585 U.S. 667, 701 (2018); then quoting *Nixon*, 457 U.S. at 756). But merely speaking on a matter of public concern is not, by itself, enough to enjoy official-acts immunity. Context matters. As the court explained, "an immunity for all presidential speech on matters of public concern—without regard to the context in which the President speaks—would be grounded purely in 'the identity of the actor who performed it' rather than 'the nature of the function performed,'" "a result that is 'unsupported by precedent.'" *Id.* at 16 (quoting *Clinton*, 520 U.S. at 695). The critical contextual question in this case, the court observed, is whether "the President is speaking (or engaging in conduct) in an official capacity as office-holder or instead in an unofficial capacity as office-seeker." *Id.* at 19. That distinction follows from the fact that the presidency is agnostic as to "who will occupy the office next." *Id.* at 17. "Campaigning to *attain* [the Office of the President] . . . is not an official function *of* the office." *Id.* An incumbent President engaged in "campaign-related activity" therefore is acting beyond the "outer perimeter" of his official responsibilities and is not entitled to absolute immunity from civil damages. *See id.* at 18–19 (offering as examples of non-official acts a nomination acceptance speech at a party convention, the running of a "campaign ad fully funded by a candidate's campaign," and a "speech at a reelection campaign rally").

As to President Trump's second argument—that he was carrying out his duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3—the court quickly disposed of it. *Blassingame*, 87 F.4th at 23. That assertion, "at least without more, assumes the answer to the question whether he acted in an official capacity as office-holder or in a private capacity as office-seeker." *Id.* at 24. Again, context matters. For example, the President "could exhort Congress to do its duty under the Electoral Count Act in a campaign ad, or he could do the same in the State of the Union address"; the latter arguably would be taken in furtherance of the President's Take Care Clause responsibilities, but the former would not. *Id.* The court concluded that President Trump "had made no argument as to why his actions alleged here should be treated more like the State of the Union than the campaign ad," and thus his invocation of the Take Care Clause ultimately did "not add anything to his claim of immunity in the circumstances of the cases before [it]." *Id.*

Importantly, the panel offered guidance on how to distinguish the acts of an incumbent President as "office-holder" from those as "office-seeker." Context, not motive, is the key consideration. *See id.* at 20–21. "An assessment of whether the President is engaged in official functions or unofficial reelection campaign activity . . . does not turn on whether the activity was subjectively undertaken in some measure to enhance the President's re-election prospects or profile. The inquiry instead is an objective one, 'grounded in' a context-specific assessment of 'the nature of the function performed.'" *Id.* (quoting *Clinton*, 520 U.S. at 695). "That context may be substantially informed by the way in which the President and the executive branch themselves treat the activity in question." *Id.* at 21. Put succinctly, if an act is "clothed in the trappings of an official function based on objective indicia, it more likely constitutes an official act for immunity purposes than if it bears the hallmarks of re-election campaign activity." *Id.* Relevant "objective indicia" include whether "an activity is organized and promoted by official White House channels

and government officials and funded with public resources." *Id.* The content of a speech might be relevant, too. "In certain circumstances, for instance, it could serve to confirm what an objective assessment of the context makes evident." *Id.* at 22. "But the crux of the inquiry . . . concerns the context in which the President speaks, not what precisely he says or whether it might advance his re-election prospects." *Id.* And when performed, the inquiry "should be fashioned and carried out with appropriate sensitivity to the important interests at stake." *Id.* at 20.

The court also defined the applicable burden and standard of proof. The President "bears the burden of establishing that he is entitled to official-act immunity." *Id.* at 30. "[T]hat burden will be met if, based on an appropriately objective, context-specific assessment, his alleged actions can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Id.* But "when a President's actions viewed objectively and in context may reasonably be understood only as re-election campaign activity, a court not only may, but must deny immunity." *Id.* at 21–22. And if it is a close call, doubts are resolved in favor of the President. *See id.* at 21 ("When an appropriately objective, context-specific assessment yields no sufficiently clear answer in either direction, the President . . . should be afforded immunity.").

To illustrate these principles, the court considered the remarks President Trump delivered at the "Salute to America" event held at the National Mall on July 4, 2019—a date by which he had "formally announced his candidacy for re-election." *Id.* at 22. Among the objective indicia the court identified were that (1) the rally was "publicly funded" through National Park Service and Department of Defense resources, (2) the government "promoted" the event through National Park Service channels and on the White House official Twitter account, (3) the White House dedicated a page on its website to the event, (4) "its primary organizers were government officials from the White House and the Department of Interior," (5) government officials attended the event,

and (6) the White House posted the President's remarks on its website. *Id.* at 22–23. The court did not definitively opine on whether the President's speech would be an official act for purposes of immunity but said that it would be treated as such "if it could reasonably be understood in that way." *Id.* at 23. The court added that "[w]hether his remarks addressed matters of public concern would not—and we believe should not—decide the issue." *Id.*

Ultimately, as to the conduct alleged in Plaintiffs' complaints, the court held that, because President Trump had not made any effort to show through objective, context-specific indicia that the alleged acts were official, dismissal on grounds of presidential immunity was not warranted. *See id.* at 30. It then remanded the case to this court to make an immunity determination at the summary judgment stage. *Id.* at 29–30. President Trump did not appeal the decision.

### B.     *Trump v. United States*

Seven months after *Blassingame*, the Supreme Court ruled in *Trump v. United States*. That decision addressed whether a former President is absolutely immune from criminal prosecution for conduct alleged to encompass official acts while in office. 603 U.S. at 605–06. That case, like this one, involved President Trump's conduct leading up to and on January 6. *See id.* at 602–03.

The Court held that "the nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office." *Id.* at 606. The Court identified the degree of immunity afforded to three categories of conduct. At one end are activities "within his exclusive sphere of constitutional authority" for which "the President is absolutely immune from criminal prosecution." *Id.* at 609. The Court identified as examples the President's authority to pardon, remove inferior officers, and recognize foreign countries. *Id.* at 608–09. At the other are unofficial acts for which "there is no immunity." *Id.* at 615. And then there is the wide gulf in between. For conduct in that category, the President enjoys "at least a

8

*presumptive* immunity from criminal prosecution for . . . acts within the outer perimeter of his official responsibility." *Id.* at 614. Such presumptive immunity "is required to safeguard the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution." *Id.* That presumption can be overcome if "the Government can show that applying a criminal prohibition to that act would pose no 'dangers of intrusion on the authority and functions of the Executive Branch.'" *Id.* at 615 (quoting *Fitzgerald*, 457 U.S. at 754).

As the D.C. Circuit did in *Blassingame*, the Court offered guidance on how to distinguish official acts from unofficial ones. The inquiry "begins with assessing the President's authority to take [the] action" in dispute. *Id.* at 617. The Court there simply acknowledged the expansive array of conduct that fits within the "outer perimeter" of the President's official responsibilities. *See id.* at 617–18. The court next emphasized that the President's motives and the alleged illegality of the conduct are not relevant to the inquiry. *Id.* at 618–19. And finally, for actions that "cannot be neatly categorized as falling within a particular Presidential function," the "necessary analysis is . . . fact specific." *Id.* at 628. That includes Presidential speech. "[M]ost of a President's public communications," the Court said, "are likely to fall comfortably within the outer perimeter of his official responsibilities." *Id.* at 629. But there may be "contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity—perhaps as a candidate for office or party leader." *Id.* Where there is ambiguity as to speech, an "objective analysis of 'content, form, and context' will necessarily inform the inquiry." *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). That analysis "must be fact specific and may prove to be challenging." *Id.* Relevant considerations may include "what else was said contemporaneous to

9

the excerpted communications" or, as relevant to this case, "who was involved in transmitting the electronic communications and in organizing the rally." *Id.* at 630.

The Supreme Court categorized some of the conduct alleged in the indictment. President Trump's discussions with the Department of Justice about investigative and prosecutorial decisionmaking were within the President's exclusive authority and therefore subject to absolute immunity from prosecution. *Id.* at 619–21. As to his "conversations" with Vice President Mike Pence during which President Trump allegedly pressured the Vice President to reject legitimate electoral votes or return them to state legislatures, the President was presumptively immune. *Id.* at 621–25. "Whenever the President and Vice President discuss their official responsibilities," the Court explained, "they engage in official conduct." *Id.* at 623. To prosecute such acts, the government would have to overcome the presumption of immunity. *Id.* at 623–25. The indictment's remaining allegations would be subject to a "fact specific" inquiry, performed by the district court in the first instance, to determine whether they were official or unofficial. *Id.* at 628–30. That would include President Trump's interactions with persons outside the Executive Branch, such as state election officials and legislators; his communications with the public via tweets; and the January 6 Ellipse Speech. *Id.* at 621, 625–30.

The district court, however, never finally performed that inquiry after President Trump won re-election, resulting in the indictment's dismissal.

### C.    Official-Acts Immunity Legal Framework

The foregoing discussion of *Blassingame* and *Trump* provides the backdrop for the parties' present legal disputes. The court starts with President Trump's contention that the Supreme Court in *Trump* made an important modification to the immunity framework that the D.C. Circuit adopted

in *Blassingame*.  The court then turns to the parties' competing views of how the court should apply the legal principles articulated in both *Trump* and *Blassingame* to the evidence.

> 1.      *Whether* Trump *Alters the* Blassingame *Immunity Framework*

Recall that *Blassingame* requires the court to undertake an "objective, context-specific assessment" to determine whether the President is acting as an office-holder versus office-seeker. *Blassingame*, 87 F.4th at 30.  That inquiry looks primarily to whether the conduct is "clothed in the trappings of an official function based on objective indicia."  *Id.* at 21; *see also id.* at 33 (Katsas, J., concurring) ("Unless speaking at some specific campaign or political event, he will thus likely be 'clothed in the trappings' of his Office . . . .").  The content of speech, while sometimes relevant, plays a secondary role.  "In certain circumstances, for instance, it could serve *to confirm* what an objective assessment of the context makes evident."  *Id.* at 22 (majority opinion) (emphasis added).  "But the crux of the inquiry . . . concerns the context in which the President speaks, not precisely what he says or whether it might advance his re-election prospects."  *Id.*; *see also id.* at 32 (Katsas, J., concurring) ("Because the President may deliver the 'same essential message' at an official or unofficial event, the immunity cannot turn on what he says.").

President Trump argues that the Supreme Court in *Trump* modified, if not inverted, this approach.  According to him, under *Trump*, "content needs to drive the analysis," not context.  Oral Argument Hr'g Tr., ECF No. 211 [hereinafter Hr'g Tr.], at 9:10-13; *see also id.* at 10:8-24; Def.'s SJ Mem. at 9 n.5.  President Trump sees the Supreme Court making this subtle but important paradigm shift when it concluded that "the President's communications to the Attorney General and to the Vice President were exercises of fundamental Article II power."  Hr'g Tr. at 9:15-18.  The Court made that determination, he argues, "solely by reference to the subject matter, the contents of the communication."  *Id.* at 9:18-20; *see also id.* at 11:8-12, 13:20–14:3.  He also points

to what he describes as "the first time that the Supreme Court articulates the broad scope of the bully pulpit power." *Id.* at 15:12-14; *see also id.* at 15:19-20.  While *Blassingame* endorsed the proposition that "when the President is running or speaking in a particular function, like a campaign function or acceptance speech, . . . he's no longer exercising the bully pulpit," the Supreme Court did not adopt that dichotomy.  *Id.* at 15:22–16:4.  The Court's complete embrace of the bully pulpit power, he maintains, cannot be squared with *Blassingame*'s office-holder/office-seeker distinction.  *Id.* at 16:5-8.

This court declines to veer from the *Blassingame* framework.  For one, it cannot do so. This court is bound by D.C. Circuit precedent unless "intervening Supreme Court authority . . . 'effectively overrule[s], *i.e.*, eviscerate[s], the law of our circuit.'"  *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1334 (D.C. Cir. 2024) (citation omitted).  *Trump* does not overrule—effectively or otherwise—*Blassingame*.  And it does not "clearly dictate a departure from circuit law." *Bahlul v. United States*, 77 F.4th 918, 926 (D.C. Cir. 2023).  *Blassingame* therefore must mark the way for this court's analysis.

For another, President Trump's argument is based on a strained reading of *Trump*.  It is true that the Court found him absolutely immune from prosecution for his discussions with the Department of Justice and presumptively immune for his conversations allegedly pressuring the Vice President.  *Trump*, 603 U.S. at 619–24.  Such conduct easily fell within the "outer perimeter" of his official responsibilities.  *See id.*  But that conclusion rested less on the content of the President's speech than on the fact that the acts in question indisputably were of an official character based on the actors involved and the actors' prescribed constitutional duties—in other words, contextual factors.  The Court explained as to President Trump's interactions with Department of Justice officials that "[i]nvestigative and prosecutorial decisionmaking is 'the

special province of the Executive Branch.'"  *Id.* at 620 (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)).  The same was true of the President's alleged threat to remove the Attorney General, which the Court said "implicates 'conclusive and preclusive' Presidential authority."  *Id.* at 620– 21.  And as to his "conversations" and "discussions" with the Vice President, the Court's reasoning rested largely on the singularity of the Vice President as "one of the President's closest advisers" and "[a]s the President's second in command."  *Id.* at 621–23.  That special relationship was enough for the Court to conclude that "[w]henever the President and Vice President discuss their official responsibilities, they engage in official conduct."  *Id.* at 623.  Context, not content, drove the Court's analysis.

Nor did the Court place the President's exercise of the bully pulpit on the same footing as acts "within the scope of his exclusive authority."  *Id.* at 608.  Like the D.C. Circuit in *Blassingame*, the Court acknowledged that "*most* of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities."  *Id.* at 629 (emphasis added); *accord Blassingame*, 87 F.4th at 15 (observing that "many uses of the presidential bully pulpit fall comfortably within the outer perimeter of [the President's] official responsibility" (alteration in original) (internal quotation marks omitted)); *id.* at 33 (Katsas, J., concurring) ("The Court's approach recognizes that presidential speech on matters of public concern will very often be official—and thus immunized.").  But the Court recognized that there may "be contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity—perhaps as a candidate for office or party leader."  *Trump*, 603 U.S. at 629.  When such uncertainty is present, courts must perform an "objective analysis" that is "fact specific" and informed by "'content, form, and context.'"  *Id.* (quoting *Snyder*, 562 U.S. at 453).  In this court's

13

view, there is no daylight between that formulation and the "objective, context-specific assessment" required by *Blassingame*.

The court's analysis of the factual record therefore will proceed using the metes and bounds drawn in *Blassingame*, informed by the Supreme Court's conclusions and reasoning in *Trump*.

### 2.    *The Parties' Disputes Over* Blassingame*'s Application*

But before the court gets there, there is more to say about *Blassingame*.  The parties do not see eye to eye on its legal principles and standards.

According to President Trump, *Blassingame* sets "only a very low bar" to overcome: he is "entitled to summary judgment . . . unless it is absolutely clear that his actions *cannot* be reasonably understood as official acts."  Def.'s SJ Mem. at 4.  In making the assessment, the court cannot "pick among competing understandings of the facts," *id.* at 7, or "weigh competing inferences," Def.'s SJ Reply at 6; rather, if the President's actions can reasonably be understood as official, he is entitled to immunity even if such understanding may not be "the only or the best" one.  *Id.*  Thus, according to President Trump, "Plaintiffs may only defeat immunity if they provide exceedingly unambiguous evidence, uncontradicted by President Trump, to show that the only reasonable way to understand his actions was as 'manifestly and palpably' unofficial."  Def.'s SJ Mem. at 6.

Plaintiffs respond that President Trump's framing of the inquiry "is not the law."  Pls.' SJ Opp'n at 12.  They take issue with characterizations such as "very low threshold," "absolutely clear," and "exceedingly unambiguous."  *Id.* at 11–12.  Plaintiffs instead posit that the "touchstone of the inquiry is reasonableness."  *Id.* at 12.  Mere ambiguity as to the conduct's status does not confer immunity.  *See id.*  The court must "carefully pars[e] the evidence" and then determine what reasonable inferences can be drawn from it.  *Id.*  Immunity must be denied, they emphasize,

"[w]hen a President's actions viewed objectively and in context may *reasonably* be understood only as re-election campaign activity." *Id.* (quoting *Blassingame*, 87 F.4th at 21–22).

This back-and-forth was largely unnecessary. That is because *Blassingame*'s standards and directives are quite clear. To start, it is President Trump's burden to establish that he is entitled to official-acts immunity. *Blassingame*, 87 F.4th at 30. This is not, as he suggests, a mere "burden of production," Def.'s SJ Reply at 6; at this stage, it is a burden of proof, *Blassingame*, 87 F.4th at 30 (observing that the Supreme Court in *Nixon* did not create "any President-specific exception to the 'general rule' that [President Trump] must 'plead and prove . . . a defense'" (quoting *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008))). Further, the Rule 56(a) standard governs. Under that standard, President Trump—as the movant and the party that bears the burden of proof—must establish that the record reveals "no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If he makes a "properly supported motion for summary judgment," Plaintiffs "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If there is conflicting evidence, it is not the court's job to make credibility determinations or weigh the evidence. *Id.* at 255. Rather, the non-movant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Plaintiffs' burden, therefore, is not as President Trump contends to present "exceedingly unambiguous evidence" to defeat summary judgment on the question of immunity. Def.'s SJ Mem. at 6. Rather, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

What factual showing, then, does President Trump have to make to prevail at this stage? Again, he must establish that there are no genuine disputes of material fact and, based on such

15

record, that his "actions can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Blassingame*, 87 F.4th at 30. Put differently, the court must ask, "[I]s it reasonable to think"—based on an undisputed set of material facts—that President Trump "was exercising his official responsibilities as President, or was he instead engaging in reelection campaign activity as a presidential candidate?" *Id.* If the inquiry "yields no sufficiently clear answer in either direction, the President . . . should be afforded immunity." *Id.* at 21. But if the record shows that the conduct "may reasonably be understood only as re-election campaign activity, a court not only may, but must deny immunity." *Id.* at 21–22. So, although Plaintiffs are correct that "[t]he touchstone of the inquiry is reasonableness," Pls.' SJ Opp'n at 12, if the President shows on an undisputed factual record that one reasonable construction of his conduct is official—it need not be the only or best one—he is entitled to immunity for such acts.

It bears emphasizing that the court's present task is not to cast an up or down vote on official-acts immunity with respect to the complaints as a whole or as to any claim. It is to assess whether the record evidence, under the summary judgment standard, proves the discrete acts alleged in the complaint and, if it does, then to assess whether that conduct falls within the outer perimeter of the President's responsibilities. That is the lesson of *Trump.* Plaintiffs here, like the prosecutors in *Trump*, cannot prove their claims based on immunized official acts. *Cf.* 603 U.S. at 630 ("Presidents therefore cannot be indicted based on conduct for which they are immune."). The court therefore must parse the complaints and the factual record and determine which alleged acts are official and which are not. The grouping of similar acts is permitted—the Court did so in *Trump*—but if the evidence is unique as to a particular act or set of acts within a grouping, that difference must figure into the court's calculus.

16

One last observation about the controlling legal principles.  The parties spill much ink over the following line from *Blassingame*: "an act lies within the outer perimeter of an official's duties if it is 'the kind of act not manifestly or palpably beyond [the official's] authority, but rather having more or less connection with the general matters committed by law to his control or supervision.'" 87 F.4th at 13 (alteration in original) (citation omitted).  The Court approvingly cited it in *Trump*. *See* 603 U.S. at 618.  President Trump wields the phrase "manifestly or palpably beyond [the President's] authority" as if it sets a near insurmountable hurdle to demonstrating that a presidential act is unofficial.  *See, e.g.*, Def.'s SJ Mem. at 4–6, Def.'s SJ Reply at 5–10.  Plaintiffs, by contrast, argue that "*Blassingame*'s single use of this phrase was not announcing a new standard of proof but rather explaining that an act may be beyond the 'outer perimeter' of an official's duties if it is 'manifestly or palpably beyond [his] authority.'"  Pls.' SJ Opp'n at 14 (quoting *Blassingame*, 87 F.4th at 13).

Plaintiffs are correct.  The "manifestly or palpably beyond" descriptor in *Blassingame* merely adds texture to the line between acts that lie within the outer perimeter and those that lie without.  That is clear from the contrast drawn by the clause that follows—"but rather having more or less connection with the general matters committed by law to his control or supervision."  An act "manifestly or palpably beyond" an official's authority is one bearing no reasonable nexus to the duties and responsibilities of the office.  That text does not impose an insuperable barrier to finding that a presidential act does not enjoy absolute immunity.

## III.    OFFICIAL-ACTS IMMUNITY

Now, the merits.  The court addresses the arguments in the order in which they appear in President Trump's summary judgment brief.  First, starting with the Ellipse Speech, the President contends based on content alone that the remarks were official because he was exercising authority

under the Constitution's Recommendations Clause, U.S. Const. art. II, § 3, and speaking on a matter of public interest. Def.'s SJ Mem. at 7–18. Only after does he address the contextual evidence, which he asserts also establishes the Speech was official. *Id.* at 18–26. Second, President Trump maintains that his outreach to state and local officials in the election's aftermath was official because he undertook those acts pursuant to his constitutional duty to "take care that the laws be faithfully executed." *Id.* at 27–28. Third, he claims that the tweets Plaintiffs cite from his @realDonaldTrump Twitter account were official acts based on both context and content. *Id.* at 28–36. And fourth, he argues that his response (or lack thereof) to the rioting at the Capitol was conduct within the outer perimeter of his official responsibilities and therefore cannot be relied on to support Plaintiffs' claims. *Id.* at 37. Plaintiffs dispute each of these contentions. *See generally* Pls.' SJ Opp'n.

### A.   January 6 Ellipse Speech

#### 1.   *The Recommendations Clause and Speech on a Matter of Public Interest*

President Trump begins his defense of the Ellipse Speech as official by focusing solely on what he said: "the speech, standing alone, demonstrates that [he] is entitled to absolute civil immunity." Def.'s SJ Mem. at 20. He insists that his remarks on January 6 were an exercise of three Presidential functions: (1) providing information and making recommendations to Congress pursuant to the Recommendations Clause, (2) using the "bully pulpit" to address matters of public concern, and (3) communicating with the Vice President about his official duties as the presiding officer of the Joint Session of Congress. *Id.* at 7–20. The court describes each argument in greater detail before explaining why each fails.

The Recommendations Clause states that the President "shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such

18

Measures as he shall judge necessary and expedient." U.S. Const. art. II, § 3. President Trump maintains that "on its face [the Ellipse] speech falls within President Trump's 'conclusive and preclusive' authority to provide recommendations to Congress and to advise Congress on matters of significant national concern." Def.'s SJ Mem. at 8–9. He says that the audience for the Ellipse Speech "expressly included Senators and Members of Congress, who were the only persons positioned to take measures in response to the concerns raised." *Id.* at 11. He offered them "'Information of the State of Union' by addressing concerns of widespread voter fraud and by providing to Congress evidence of election irregularities," *id.* at 10, and he proposed various election-reform "Measures," such as "an end to ballot harvesting, requirements for voter identification, and a ban on universal mail-in balloting," *id.* at 12. He also suggested "an avenue for Congress to reject the certification of the 2020 election." *Id.* at 13. That these recommendations were made in a public address does not matter: "the Constitution imposes no specific requirement as to how, when, or why the President shall fulfill this function." *Id.* at 11.

As to the bully pulpit, President Trump emphasizes the "'extraordinary power to speak to his fellow citizens and on their behalf'" and states that "in January 2021 there was no matter more pressing to the American public than the outcome of the 2020 president election." *Id.* at 17 (quoting *Trump*, 603 U.S. at 629). The Ellipse Speech therefore fell comfortably within the outer perimeter of his Presidential responsibilities. *Id.* at 17–18.

And with respect to communicating with the Vice President, President Trump highlights that "the Ellipse Speech repeatedly called upon Vice President Mike Pence to perform his constitutional and statutory duties by refusing to certify the election results." *Id.* at 19. He places this aspect of the Speech on the same footing as his conversations with the Vice President that the Supreme Court deemed to be official conduct. *See id.* (citing *Trump*, 603 U.S. at 622–23).

These lead contentions share a common defect: they rely solely on the content of the President's Ellipse Speech.  For that reason alone, the court rejects them.  The D.C. Circuit in *Blassingame* was clear that whether the Ellipse Speech was an official act must be determined from an "objective, context-specific assessment."  *See* 87 F.4th at 30 (discussing allegations relating to the January 6 rally).  The Speech's content is not "off-limits," but "the crux of the inquiry . . . concerns the context in which the President speaks, not what precisely he says or whether it might advance his re-election prospects." *Id.* at 22.  President Trump's singular focus on the content of the Ellipse Speech disregards *Blassingame*'s clear instruction.  And as discussed, nothing in *Trump* altered the context-driven nature of the inquiry.

President Trump's Recommendations Clause and bully pulpit arguments also cannot be squared with *Blassingame* for additional reasons.  The latter is foreclosed: President Trump made that same assertion about the bully pulpit before the D.C. Circuit—i.e., when the President speaks on a matter of public concern, he enjoys official-acts immunity—and the court rejected it.  *Id.* at 14–16.  The decision in *Trump* did not disturb that holding.  *See* 603 U.S. at 629.  As to the former, it fails for the same reason the D.C. Circuit rejected his Take Care Clause argument: "at least without more, [it] assumes the answer to the question whether he acted in an official capacity as office-holder or in a private capacity as office-seeker." *Blassingame*, 87 F.4th at 24.  An incumbent President seeking re-election could offer recommendations to Congress during the State of the Union and then make the very same recommendations the next day at a campaign rally.  *See id.* Only by looking at context can a court determine whether the remarks are official or unofficial. President Trump "has made no argument as to why [the Ellipse Speech] should be treated more like the State of the Union than [a] campaign [speech].  His invocation of the [Recommendations] Clause thus ultimately does not add anything to his claim of immunity . . . ." *Id.*

20

The court is also guided by the Supreme Court's view of the Ellipse Speech. The indictment against President Trump alleged that he falsely asserted during the Speech "that certain States wanted to recertify their electoral votes and that the Vice President had the power to send those States' ballots back for recertification." *Trump*, 603 U.S. at 628 (citing Indictment, *United States v. Trump*, No. 23-cr-257-TSC (D.D.C.), ECF No. 1 [hereinafter Indictment], ¶¶ 103–104).[3] The Court did not declare the Ellipse Speech an official act based on that allegation alone. *Id.* at 628–30. Rather, it said that its status may depend on a "factbound analysis" of its "content, form, and context" and left it to the district court to make that determination in the first instance. *Id.* at 629–30. If the Supreme Court did not view the President's reference to the Vice President's purported "power" as rendering the Ellipse Speech categorically official, this court will not either.

### 2. Objective, Context-Specific Assessment

The court now turns to do what *Blassingame* instructed: perform an "appropriately objective, context-specific assessment" of whether the Ellipse Speech "can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Blassingame*, 87 F.4th at 30. Because the burden of proof rests on President Trump, the court begins with the evidence adduced by him. There is not much of it. The court then evaluates the proof supplied by Plaintiffs, which requires a longer discussion.

### a. President Trump's evidence

President Trump submits five objective facts as context: (1) per "normal practice and procedures, White House staff vetted the speech as an official communication"; (2) "White House officials helped plan the President's involvement in the event"; (3) the "[t]iming and location were

---

[3] Paragraph 104 of the indictment quotes verbatim portions of the Ellipse Speech addressing the Vice President's purported authority to return electoral votes to state legislatures. Indictment ¶ 104(a), (b). President Trump cites to these same portions of the Ellipse Speech in his Statement of Undisputed Material Facts. *See* Def.'s Stmt. at 182–83 ¶ 52 (citing Def.'s SJ Mot., Ex. 42, ECF No. 144-47, at 4–5, 17–18).

designed to affect public policy and Congressional action"; (4) the content of the Ellipse Speech urged the Vice President and Congress to carry out their duties in a manner President Trump believed was consistent with the Constitution; and (5) the speech was nationally televised.[4]  Def.'s SJ Mem. at 20–26.  These factual contentions, individually and collectively, are not enough to carry his burden.

*Vetting of the Ellipse Speech*.  President Trump's assertion that White House staffers treated the Ellipse Speech as an official act, *id.* at 20–22 (citing Def.'s Stmt. at 186–98 ¶¶ 53–56), rests on the following evidence: (1) a declaration from Senior Advisor to the President, Stephen Miller, Def.'s SJ Mot., Ex. 43, ECF No. 144-48 [hereinafter Miller Decl.], and his deposition testimony in this matter, Def.'s SJ Mot., Ex. 44, ECF No. 144-49, at 64:1–71:24; (2) the absence of a Hatch Act warning on the draft of the Speech circulated internally for review, Def.'s SJ Mot., Exs. 44a & 44b, ECF Nos. 144-50 & 144-51; and (3) that among the distribution recipients was Patrick Philbin, a Deputy White House Counsel who did not suggest that the Ellipse Speech should be treated as subject to the Hatch Act, *id.*; Def.'s Stmt. at 198 ¶ 56.

This record evidence does not establish as an undisputed fact that "White House staff vetted the speech as an official communication."  That fact is very much in dispute.

The court disregards portions of Miller's declaration that contain legal arguments or his legal opinion of the Ellipse Speech's contents.  *See, e.g.*, Miller Decl. ¶¶ 6–8, 11–15 ("In my view, all of these aspects of the speech constituted official conduct.").[5]  These are not appropriate

---

[4] President Trump also adds to this list a legal assertion that the court "may not consider a President's allegedly improper motives or allegations of illegality."  Def.'s SJ Mem. at 26.  The court agrees and has not done so.

[5] At least one of Miller's statements conflicts with the law.  He says that "[w]hether an activity or speech was considered 'official' depended more on the content and objectives of the President's remarks or appearance, rather than the nature of the event or its location."  Miller Decl. ¶ 6.  Miller seems to attribute this understanding to advice from the White House Counsel's Office.  *See id.* ¶¶ 5–6.  Regardless of the source, the law says just the opposite. *See, e.g.*, *Trump*, 603 U.S. at 618 ("[C]ourts may not inquire into the President's motives."); *Blassingame*, 87 F.4th at 22 ("[T]he crux of the inquiry . . . concerns the context in which the President speaks, not what precisely he says or whether it might advance his re-election prospects.").

considerations.  *See Davis v. City of Little Rock*, 122 F.4th 326, 332 (8th Cir. 2024) ("On summary judgment, courts 'consider only admissible evidence and disregard portions of various affidavits and depositions that . . . purport to state legal conclusions as fact.'" (alteration in original) (citation omitted)); *cf. United States v. BCCI Holdings (Lux.), S.A.*, 977 F. Supp. 1, 6 (D.D.C. 1997) ("[L]egal conclusions 'cloaked' as facts are not sufficient to create a genuine issue of material fact.").

Miller does submit one statement that resembles an objective fact: "[B]ecause of the official character of the January 6, 2021 speech, the electronic trail of the final versions of the speech were routed through the White House system and subjected to the protocols and reviews of other official statements or speeches of President Trump."  *Id.* ¶ 16.  But this causal assertion ("because of the official character") conflicts with his own statements and other evidence.  In the same declaration, Miller said that "*all* speeches regardless of whether they were 'official' or 'unofficial'" were reviewed by "the White House Counsel's Office and other White House staff."  *Id.* ¶ 8 (emphasis added).  Other witnesses confirmed that process.  Ross Worthington, who drafted the Ellipse Speech, and Robert Gabriel, Miller's assistant, testified before the U.S. House Select Committee to Investigate the January 6 Attack on the U.S. Capitol ("Select Committee").  Worthington stated that "any speech, whether it's political or official," "would generally be moved up to the White House systems."  Pls.' SJ Opp'n, Ex. 58, ECF No. 152-11 [hereinafter Worthington Dep.], at 16:22–17:5.  Gabriel confirmed that even "a political speech" would "go through an official White House process."  *Id.*, Ex. 121, ECF No. 152-74 [hereinafter Gabriel Dep.], at 18:1-11.[6]  Thus, the fact that a draft of the Ellipse Speech was routed through official White House

---

[6] President Trump has objected on hearsay grounds to the admissibility of testimony before the Select Committee. *See* Notice of Position on Evidentiary Disputes, ECF No. 212, at 5.  But President Trump concedes that, at summary judgment, the court may consider evidence that is "admissible or can be converted into admissible form."  *Id.* at 3.

channels, including to Philbin, is not by itself objective evidence that staff treated it as an official act of the President.  Nor has President Trump presented any evidence that Philbin's silence upon receiving draft remarks customarily would have been understood by others as conveying his legal opinion that the remarks were official.

Further, there is evidence tending to show that President Trump's speechwriters deemed the Ellipse Speech to be *un*official and handled it as such.  The White House speechwriting team "drafted both official speeches and political/campaign speeches."  Def.'s CounterStmt. at 417 ¶ 314.  "[U]nofficial speeches were 'generally' drafted on personal devices."  *Id.* at 410 ¶ 300 (Def.'s Resp.).  And Google Docs "was 'generally' used for the drafting of political speeches." *Id.* at 412 ¶ 301 (Def.'s Resp.).  Consistent with these protocols, Worthington worked on an "early draft" of the Ellipse Speech on his personal device using Google Docs.  *Id.* at 420–21 ¶¶ 320, 322. Gabriel told the Select Committee that he and Worthington had used "their personal [email] accounts" in connection with the Ellipse Speech.  *Id.* ¶ 321.  This evidence creates a genuine dispute of fact as to President Trump's contention that, per "normal practice and procedures, White House staff vetted the speech as an official communication."[7]

The absence of a Hatch Act warning on the internal White House circulation of the Ellipse Speech is not disputed, but what meaning to ascribe to that fact is.  Def.'s Stmt. at 192 ¶ 54. President Trump points out that, two days before the Ellipse Speech, he delivered a rally speech in Dalton, Georgia for a political event.  *Id.* at 197 ¶ 55.  The internal circulation of the Dalton draft

---

Testimony before the Select Committee easily can be "converted into admissible form" by calling the witness to testify at trial.  Contrary to President Trump's contention, there is no requirement that a party attempt first to depose the witness before their testimony from another proceeding may be considered on summary judgment. *See id.* at 5.  The court therefore will consider any testimony submitted of a witness who appeared before the Select Committee.

[7] Worthington's and Gabriel's use of personal devices and email accounts is consistent with their subjective beliefs that the purpose of the Ellipse Speech was "political."  Worthington Dep. at 115:15-18; Gabriel Dep. at 38:8-11.

remarks bore a prominent Hatch Act warning.[8] *Id.*; *see also* Def.'s SJ Mot., Ex. 44b, ECF No. 144-51. President Trump infers from the absence of that same warning on the internally circulated draft Ellipse Speech that staff deemed it to be official. *See* Def.'s SJ Mem. at 21–22. But there is evidence to the contrary. In testimony before the Select Committee, Miller likened the Ellipse Speech to the "one in Georgia." Pls.' SJ Opp'n, Ex. 57, ECF No. 152-10, at 131:7-12 (stating the Ellipse Speech was a "rally" and "we had already done one in Georgia"). All agree that the Dalton speech was unofficial political activity. *See* Def.'s CounterStmt. at 54 ¶ 41 (conceding the Dalton event was "political rally"). If, as Miller testified, the Ellipse Speech and the Dalton remarks were viewed in the same way, then the absence of a Hatch Act warning on the Ellipse Speech's distribution does not establish that staff viewed the Speech as official.

Accordingly, President Trump's evidence does not establish as an undisputed fact that White House staff treated the Ellipse Speech as an official Presidential act.

*Planning of the Ellipse Speech*. President Trump asserts that "White House personnel were involved in the logistics and planning of [the] Ellipse Speech." Def.'s SJ Mem. at 22 (citing Def.'s Stmt. at 105–07, 154–56 ¶¶ 34–36, 41, 42). That is a gross exaggeration. The record firmly establishes that the White House's participation was negligible. *See Trump*, 603 U.S. at 630

---

[8] That warning was as follows:

> **NOTE: HATCH ACT RESTRICTIONS APPLY.** This speech will be delivered at a political event and thus Hatch Act restrictions apply. Accordingly, per instruction from the White House Counsel's Office, review for issues beyond accuracy (such as for political consistency or effective messaging) should not be performed by noncommissioned officers or using official equipment and office space. Commissioned officers should not use official equipment to review for issues beyond accuracy (such as for political consistency or effective messaging). If you have any questions pertaining to Hatch Act restrictions with respect to review of these remarks, please be sure to consult with your designated ethics officer.

Def.'s Stmt. at 197 ¶ 55.

(stating that "who was involved . . . in organizing the rally[] could be relevant to classification" of the Ellipse Speech).

President Trump identifies only *one* meaningful contribution made by any White House employee to organizing or planning the Save America Rally ("Rally") on January 6. *See* Def.'s SJ Mem. at 22 (citing Def.'s Stmt. at 105–07 ¶¶ 34–36). That came from Tony Ornato, the White House Deputy Chief of Staff. Days before the event, Ornato sent an email to the Secretary of the Interior, David Bernhardt, seeking a waiver of a usual National Park Service restriction that prohibits the placement of any event structures within the 150-foot-wide vista sight line from the White House to the Jefferson Memorial. Def.'s Stmt. at 105–07 ¶¶ 34–36 (citing Def.'s SJ Mot., Exs. 22 & 23, ECF Nos. 144-27 & 144-28). Ornato did so at the request of the event "host," who was unable to secure a waiver on their own. Def.'s SJ Mot., Ex. 22, ECF No. 144-27 (noting that the event organizer was "trying to get a center stage position" and forwarding a "brief synopsis from the host," and indicating that the National Park Service had declined to allow the stage to be set at the center of the Ellipse). Without the waiver, the event stage would have been 30 feet off-center of the White House. *Id.* Ornato wrote that centering the stage to position it directly in front of the White House was the "desire of the White House and the President as well." *Id.* The National Park Service granted the requested waiver. Def.'s SJ Mot., Ex. 23, ECF No. 144-28. This is the only evidence of any material White House involvement in planning the event.[9]

---

[9] President Trump cites a handful of other exhibits, but none help him. *See* Def.'s SJ Mem. at 22 (citing Def.'s Stmt. at 154–56 ¶¶ 41–42, in turn citing additional Exhibits 24, 29, 30, 30a, 31–33). Exhibit 24 is an email request directed to two White House staffers from former Campaign official Caroline Wren asking that the President meet with two people on January 6, Texas Attorney General Ken Paxton and the private donor who largely underwrote the Rally's expenses, Julie Fancelli. Def.'s SJ Mot., Ex. 24, ECF No. 144-29. President Trump has not included an exhibit showing whether the White House ever responded to this request. Exhibit 30 is an email from a White House staffer to two private individuals inquiring whether they wished to have VIP seating for the Rally; when those individuals said they would, the staffer said he would "forward [their] names to those keeping the list." Def.'s SJ Mot., Ex. 30, ECF No. 144-35. President Trump does not identify who kept the list. Exhibit 31 is a "Guest Guidance Memo" for "March to Save America Attendees," whose authorship is unidentified but lists Wren, among others, as points of

As discussed in the next subsection, nearly all the planning and preparation for the Rally was done by non-government actors. There was hardly any contribution by White House or other executive branch personnel. President Trump's assertion that "White House officials helped plan the President's involvement in the event" therefore is not supported by the record evidence.

*The Event's Time and Location.* According to President Trump, "the date, location, and timing of the Ellipse Speech confirms" that it was an official event. Def.'s SJ Mem. at 23 (citing Def.'s Stmt. at 163 ¶ 44). He notes that January 6 was the day a Joint Session of Congress convened to count and certify States' electoral votes, and the President spoke before the Joint Session convened. *Id.* And, he adds, "the iconic backdrop of the White House . . . was itself a significant indicator of its official nature." *Id.* at 24.

These might be persuasive points if the Executive Branch had any role in selecting the "date, location, and timing" of the event. But it did not. The event organizer, Women for America First (WAF), conceived the idea of holding a rally on January 6, even before President Trump's "Be there, will be wild" tweet on December 19. Def.'s SJ Mot., Ex. 19, ECF No. 144-23

---

contact. Def.'s SJ Mot., Ex. 31, ECF No. 144-36. Exhibit 32 is a document titled "Participant Instructions," whose authorship also is not identified. Def.'s SJ Mot., Ex. 32, ECF No. 144-37. Exhibit 33 is an email from one event organizer, Megan Powers, to another, Justin Caporale, copying one White House staff member; the White House staffer does not participate in the discussion. Def.'s SJ Mot., Ex. 33, ECF No. 144-38. Finally, President Trump cited to Exhibit 30a, but did not attach it.

President Trump argues that these exhibits demonstrate that organizers outside the White House used non-campaign emails to organize the rally and that White House staffers used their official accounts "when planning the Save America Rally." Def.'s Stmt. at 156 ¶ 42. But the fact that Rally organizers used non-campaign emails to communicate does not establish any greater role by the White House in the event. And the fact that White House staffers used their official email addresses is of no moment, because the more significant point is that the emails' substance underscores the White House's lack of involvement in "planning the [Rally]."

Exhibit 29 illustrates this point. *See* Def.'s Stmt. at 154 ¶ 41. The exhibit is an email string between Rally organizers and White House officials discussing a draft "Guidance" to be issued by the Office of the Press Secretary to credentialed media about the Rally. Def.'s SJ Mot., Ex. 29, ECF No. 144-34. The communications show that Rally organizers were responsible for naming the event and that Hannah Salem, a private consultant, would be the media's point of contact for additional information. *Id.* A White House official eventually decided to hold off on issuing the Guidance after "talk[ing] with Hannah." *Id.* President Trump offers no proof that the Office of the Press Secretary ever sent a final Guidance to credentialed media.

27

[hereinafter A. Kremer Dep.], at 47:11–49:11 (deposition of WAF leader, Amy Kremer, before the Select Committee). WAF also decided to hold the Rally on the Ellipse, after it first considered but rejected Freedom Plaza as a location because that venue decreased the likelihood that the President would attend due to security concerns. *See* Def.'s CounterStmt. at 263–65 ¶ 182 (objecting only on rejected admissibility grounds, *see supra* n.6); Pls.' SJ Opp'n, Ex. 72, ECF No. 152-25, at 21:22–28:12 (deposition of Justin Caporale before the Select Committee); Pls.' SJ Opp'n, Ex. 73, ECF No. 152-26, at 94:25–96:17 (deposition of Kylie Kremer before the Select Committee). And WAF initiated the request for an exception to place the event stage in front of the White House. *See* Def.'s SJ Mot., Ex. 23, ECF No. 144-28. And as for the timing of the Ellipse Speech, that, too, was determined by WAF. Def.'s SJ Mot., Ex. 21, ECF No. 144-26 [hereinafter Rally Permit], at 3 (rally permit indicating speeches would begin at 9:00 a.m.). Thus, the undisputed facts establish that the White House was not involved in setting the "date, location, and timing of the Ellipse Speech." Def.'s SJ Mem. at 23.

*Content of the Ellipse Speech*. The court already has discussed at length what role the Ellipse Speech's content plays under the *Blassingame* framework. That does not need to be repeated. But President Trump also argues that the organizing purpose for the Save America Rally "was not to promote President Trump's re-election or to advance any private agenda, but rather to petition members of Congress to take action regarding the administration of the November 2020 election and to raise concerns regarding election fraud and election integrity." *Id.* at 24–25 (citing Def.'s Stmt. at 75 ¶ 29). But the testimony that President Trump cites from Amy Kremer, a WAF leader, does not establish that contention as an undisputed fact. She testified that the Rally was conceived to "have our voices heard" and urge Senators not to certify the Electoral College results on January 6. A. Kremer Dep. at 49:16–50:2. WAF knew that some members of the House were

28

going to "contest the electoral college," but they "needed Senators to be involved." *Id.* at 49:24–50:2. "So our objective was to put pressure on the Senators, because they couldn't do it without the Senators." *Id.* at 50:1-2. Contrary to President Trump's assertion, then, the Rally did have a "private agenda"—WAF's—and that agenda aligned with the President's private interest as office-seeker to retain the Presidency. The President's own evidence does not establish as an undisputed fact that the Rally's purpose "was not to promote [his] re-election or advance any private agenda." Def.'s SJ Mem. at 24.

*Nationally Televised*. According to President Trump, the fact that the Ellipse Speech was a "nationally televised address" means it is "markedly different than purely private conduct, such as writing a letter to a personal friend, or a private conversation." *Id.* at 25. Fair enough. But President Trump cites no evidence to support the contention that the Ellipse Speech was a "nationally televised address." *See id.* at 25–26. He does not, for instance, identify which networks covered the Speech or recount whether it was telecast in its entirety.

But even if the Speech was broadcast nationally, that adds little to the contextual inquiry. An acceptance speech at a party nominating convention is likewise nationally televised, but the D.C. Circuit placed those remarks squarely in the category of unofficial conduct. *See Blassingame*, 87 F.4th at 18. If President Trump means to suggest that the Ellipse Speech was more akin to the State of the Union than a party acceptance speech, he has provided little evidence in support.

\*        \*        \*

In sum, the context-specific evidence cited by President Trump does not establish based on undisputed facts that the Ellipse Speech can reasonably be understood as falling within the outer perimeter of his official duties. There is a genuine dispute as to whether the Speech was drafted and vetted consistent with the protocols of an official act during the President's first term—in fact,

there is compelling evidence to the contrary.  So, too, as to the Rally's purpose.  There is no dispute, however, as to other contextual facts.  Other than securing an exception for stage placement, White House personnel played no role in the Rally's planning and execution.  The event organizer, WAF, determined the date, location, and timing of the Rally and the Speech.  And the claimed national broadcast of the Speech finds no record support and regardless is a fact of little probative value.

That is the sum and substance of President Trump's "objective, context-specific" proof. *Blassingame*, 87 F.4th at 30.  It does not establish that the Ellipse Speech was "clothed in the trappings of an official function." *Id.* at 21.  Indeed, the only uncontradicted evidence he presents points in the other direction: that the Ellipse Speech was an unofficial "political event[]." *Id.* at 32 (Katsas, J., concurring).  If the court were to assess only President Trump's proof, it would conclude that he has not carried his burden at summary judgment to show that the Speech "can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Id.* at 30 (majority opinion).

But Plaintiffs have offered a raft of their own evidence.  The court must evaluate that evidence, too.  It is to that task the court now turns.

### b.    Plaintiffs' evidence

Plaintiffs have proffered over 350 undisputed facts and submitted 185 exhibits to support their contentions.  *See generally* Pls.' SJ Opp'n, Exs.; Def.'s CounterStmt.  The court obviously cannot consider each individually here.  So, it organizes them into categories that generally correspond to the contextual considerations identified in *Blassingame* or *Trump*.[10]  Recall, the

---

[10] President Trump routinely raises boilerplate objections, like hearsay, to evidence Plaintiffs have offered to support their asserted undisputed facts.  *See generally* Def.'s CounterStmt.  The court cannot possibly separately address each objection.  Suffice it to say that if the court cites to a proposed undisputed fact to which President Trump has made evidentiary objections, the court rejects them.

30

court in *Blassingame* said that if an activity "is organized and promoted by official White House channels and government officials and funded with public resources, it is more likely an official presidential undertaking than if it is organized, promoted, and funded by campaign channels, personnel, and resources." 87 F.4th at 21. The Supreme Court also recognized that "who was involved . . . in organizing" could be relevant to how an activity or communication is classified. 603 U.S. at 630. The court considers the following categories of evidence, which *Blassingame* identified when analyzing the Salute to America event: (1) general event organization; (2) rally funding; (3) pre-rally promotion; (4) post-rally promotion; and (5) rally attendees and participants. *See* 87 F.4th at 22–23. The court then separately addresses evidence relating to the campaign entity Donald J. Trump for President, Inc.'s ("Campaign") involvement in organization and planning. The facts that emerge are largely undisputed.

*General Event Organization.* The court starts with high-level facts about the Save America Rally. A private organization, WAF, conceived of and was primarily responsible for organizing and planning the event. Def.'s CounterStmt. at 196–98 ¶¶ 124–125, 127, 129. WAF was founded by Amy and Kylie Kremer to focus on "pushing the America First agenda." *Id.* at 194 ¶ 123; *see also* Pls.' SJ Opp'n, Ex. 203, ECF No. 152-156, 6:11-23.[11] WAF employed at least two private companies—Event Strategies, Inc., and Salem Strategies, LLC—to carry out event organizing and planning. Def.'s CounterStmt. at 246 ¶ 167, 270 ¶ 188, 374–75 ¶ 255.

WAF secured the permit for the Rally. *Id.* at 263 ¶ 181, 266 ¶ 184; *see also* Rally Permit at 1. The Permit identifies 12 people as "event sponsor(s), coordinator(s), staff assistants and emergency response/security team supervisors who will be on site during the event." Rally Permit

---

[11] In response to this fact assertion, President Trump argues that "[t]here is no indication from [Amy Kremer's] statement that an 'America First agenda' is synonymous with 'President Trump.'" Def.'s CounterStmt. at 195 ¶ 123. President Trump does not say what he means by "synonymous." There can be no doubt, however, from Amy Kremer's testimony that WAF was founded to promote a policy-agenda aligned with the President's own.

at 32–33.   Eight were either former employees of the Campaign or consultants who received sizable payments.  Def.'s CounterStmt. at 267–79 ¶¶ 186–195, 283 ¶ 199.[12]  None were executive branch employees during the weeks leading up to the Rally.  WAF also helped to coordinate logistics, including furnishing marshals and volunteers for crowd control and safety.  *Id.* at 370 ¶ 253.  A "Guidance Memo" addressed to Rally attendees identified four people to whom questions could be directed.  *Id.* at 388 ¶ 262.  None were executive branch employees.  *Id.*

*Rally Funding.*  The Rally was funded entirely by private donations.  *Id.* at 286 ¶ 203. Julie Fancelli was the primary contributor.  She "personally funded" Rally expenses totaling over $2.1 million.  *Id.* at 258–60 ¶¶ 177–178, 286 ¶ 203; Def.'s Stmt. at 110 ¶ 37.  She along with her family had donated over $1.5 million to the "Trump Victory campaign."  Def.'s CounterStmt. at 258–59 ¶ 177.

*Pre-Rally Promotion.*  The first Trump White House "regularly posted on the White House website, www.whitehouse.gov, news items about," among other things, "Presidential speeches, statements, [and] remarks."  *Id.* at 414 ¶ 304.  The White House did not, however, announce the Rally on either its website or official Twitter accounts, @whitehouse and @potus.  *Id.* at 368 ¶ 251, 421–23 ¶¶ 323, 327–328.

President Trump himself promoted January 6 events generally and the Rally specifically on his personal @realDonaldTrump Twitter account.  *Id.* at 322–28 ¶¶ 225–229, 354 ¶ 241.  In one such tweet, President Trump referred to the Save America Rally—though not directly by name— as "The BIG Protest Rally," identified its date and time, and signed off with "StopTheSteal!"  *Id.* at 324 ¶ 227.

---

[12] The court does not include Hannah Salem or William Wilson, as both received only modest payments from the Campaign.  *See* Def.'s CounterStmt. ¶ 199.

Rally promotion occurred exclusively through private channels, including the Campaign's. *See id.* at 9 ¶ 7 (identifying name of campaign entity). For instance, the Campaign posted a video on its YouTube account @DonaldJTrumpforPresident on January 2, encouraging people to "JOIN THE MARCH" and identifying the Rally's time and location. *Id.* at 328 ¶ 230. The next day, the Campaign's official Twitter account, @TeamTrump, circulated a video of an interview of Kylie Kremer promoting the Rally, which President Trump (from his personal account) and Jason Miller, a Senior Advisor to the Campaign, retweeted. *Id.* at 352–56 ¶¶ 240–242. WAF also promoted the Rally through at least two news outlets. *Id.* at 316–17 ¶ 221 (Newsmax affiliate); *id.* at 351 ¶ 239 (interview on One America News).

*Post-Rally Promotion.* As noted, the White House website "regularly" posted news items about President Trump's speeches and remarks on its official website. *Id.* at 414 ¶ 304; *see also id.* ¶ 305. The archived Trump White House website does not, however, contain video or a transcript of the President's Ellipse Speech. *Id.* at 422 ¶ 325. Nor does the Trump White House's YouTube video archive. *Id.* ¶ 326. By contrast, the White House did post the President's remarks at the Salute to America event on the White House official website. *Id.* at 416 ¶ 310.

As for the Campaign, it posted on its Twitter and Instagram accounts snippets of the Ellipse Speech from Fox News and images of the Rally. *Id.* at 363–68 ¶¶ 247–250.

*Rally Attendees and Participants.* *Blassingame* suggests that the identities of event attendees or participants is a relevant contextual consideration. *See* 87 F.4th at 22–23. For the Save America Rally, the speaker line-up was determined by President Trump and private individuals. Def.'s CounterStmt. at 388–94 ¶¶ 263–270. No White House official or staff had a role in that decision. *See id.* Of note, on January 4, 2021, President Trump met with a former senior campaign advisor, Katrina Pierson, at the White House to discuss the speaker list. *Id.* at

33

392–93 ¶ 267. At the time, Pierson was only four days removed from her role with the Campaign. *Id.* at 222 ¶ 145.

The final speaker list included one government official: Mo Brooks, a congressman from Alabama. *See Thompson*, 590 F. Supp. 3d at 66. President Trump has not identified any other attendee who was a government official. The other speakers included three family members (Donald Trump, Jr., Eric Trump, and Lara Trump) and three others who either had advised or represented the Campaign (John Eastman, Rudolph Giuliani, and Kimberly Guilfoyle). Def.'s CounterStmt. at 394–96 ¶¶ 271–281; *see also id.* at 209 ¶ 136 (admitting that Guilfoyle "worked for the Trump Campaign and the Trump Victory Fund Committee"). Two were paid for their appearances by a private source: Donald Trump, Jr. and Guilfoyle each received a $30,000 speaker fee from Turning Point Action, an entity founded by Charlie Kirk. *Id.* at 399–400 ¶ 286.

Notable among the speakers was John Eastman. Eastman was President Trump's counsel of record in President Trump's effort to intervene "in his personal capacity as candidate for re-election to the office of President" in a lawsuit brought by Texas before the Supreme Court to challenge election administration by various States. *Id.* at 175–76 ¶¶ 109–110; Pls.' SJ Opp'n, Ex. 200, ECF No. 152-153.

Members of the public could attend and watch the Rally in person but not necessarily from the Ellipse. The event setup included a cordoned-off security perimeter on the Ellipse, which contained designated "VIP Seating" and "Guest Seating" areas in front of the stage. Rally Permit at 23–24 (event diagrams); *id.* at 33 (identifying a "VIP Advisor" and "VIP Lead"). The record does not reveal who would have attended the Rally as a "VIP" or "Guest". Rally attendees who did not have special access likely would have viewed it from the National Mall.

*Campaign Involvement.*    Much of the parties' back-and-forth concerns the extent of the Campaign's involvement in organizing and planning the Rally.    President Trump's answer is none: the Campaign had no role in "permitting, fundraising, promoting, or executing" the event. *See* Def.'s SJ Reply at 17.    Plaintiffs, on the other hand, go to great lengths to tie the Campaign to the Rally.    They say that the "Rally was planned, funded, promoted, organized, and executed by the Campaign, Campaign affiliates, and other private individuals dedicated to keeping Trump in office."    Pls.' SJ Opp'n at 4.    The undisputed facts paint a more nuanced picture.

Some facts are not contested.    The Campaign did not lead the organizing and planning of the Rally.    That was done by WAF and private event vendors.    Campaign funds, except as discussed below, were not used to underwrite the Rally.    Funding for the Rally primarily came from a private individual who (along with her family) was a large-dollar donor to the re-election efforts.    And the Campaign promoted the Rally through its social media channels.    *See supra* Section III.A.2.b.

Beyond these facts, there are others that establish some involvement by the Campaign in Rally funding, planning, and organization.    Still other factual assertions are either not borne out by the evidence or disputed.

Rally Funding (Campaign).    The Campaign provided some funding for the Rally. Def.'s CounterStmt. at 286–88 ¶ 204.    The basis for this fact comes from the Campaign's Answer to the Amended Complaint in *Smith v. Trump*, No. 21-cv-2265-APM (D.D.C.) [hereinafter *Smith* Docket].    Plaintiffs in *Smith* asserted as one of several fact allegations in one paragraph that, "Leading up to the January 6 rally, TRUMP FOR PRESIDENT made payments to Event Strategies Inc., an event staging company that was listed on the permit for the January 6 rally."    Am. Compl., *Smith* Docket, ECF No. 89 [hereinafter *Smith* Am. Compl.], ¶ 84.    The Campaign answered: "Admitted only that the Trump Campaign made payments to Event Strategies Inc for equipment

35

rental in connection with a rally on or near January 6, 2021. The Entity Defendants deny the remaining allegations contained in this paragraph." *See* Make America Great PAC & Donald J. Trump for President, Inc.'s Answer to Am. Compl., *Smith* Docket, ECF No. 187, ¶ 84.

Plaintiffs contend that this admission establishes that the Campaign paid Event Strategies, the Rally's "production vendor," *see* Rally Permit at 31, for equipment rental costs associated with the Rally. Def.'s CounterStmt. at 286–87 ¶ 204. President Trump challenges this fact. He argues that the *Smith* Answer, as drafted, is ambiguous as to whether the Campaign payment was for Rally equipment rental or something else. *Id.* at 288–89 ¶ 204 (Def.'s Resp.).[13]

President Trump's position is untenable. The *Smith* Amended Complaint equates the "January 6 rally" with the Save America Rally. *See, e.g.*, *Smith* Am. Compl. ¶¶ 83, 87, 114–115, 144. The Campaign's counsel would have understood it that way given that the pleading's description of the "January 6 rally" matches the Save America Rally. Thus, the only logical understanding of the allegation and response is that the Campaign paid Event Strategies some amount—how much is not specified—towards staging the Rally. Also, President Trump submits no evidence to rebut or clarify the response. *See id.* Based on the evidence presented, then, the fact is undisputed.

Plaintiffs further maintain that "the Campaign directly compensated some organizers for their work in connection with the Rally." Pls.' SJ Opp'n at 4 (citing Def's. CounterStmt. ¶¶ 134–135, 139–144, 140, 152–157, 195–197, 204–209). That assertion lacks convincing evidentiary support. For instance, Plaintiffs suggest that the Campaign paid Justin Caporale, who led Event Strategies' efforts, for his Rally-related work. Def.'s CounterStmt. at 206–07 ¶ 135 (citing Pls.' SJ Opp'n, Ex. 94, ECF No. 152-47, at 1); *see also* Rally Permit at 32 (identifying Caporale as the

---

[13] President Trump lodges various objections to the *Smith* Answer excerpt's admissibility. But the response is plainly an admission of a party-opponent—the Campaign—that is not hearsay. *See* Fed. R. Evid. 801(d)(2).

"Project Manager"). But the cited exhibit only shows a pre-Rally payment request from Caporale for services from "12/1 – 12/15." Pls.' SJ Opp'n, Ex. 94, ECF No. 152-47, at 1. Similarly, Plaintiffs assert that the Campaign approved payments to "J. Karwacki and R. McEnany" "in connection with the Rally." Def.'s CounterStmt. at 218 ¶ 143. But the invoices submitted by Karwacki and McEnany do not, at least on their face, explicitly reference the Save America Rally. Def.'s SJ Reply, Exs. 242 & 243, ECF Nos. 174-9 & 174-10.[14]

Rally Organization and Planning (Campaign). The Campaign, acting through its then agents and employees, played a modest role in organizing and planning the Rally. Plaintiffs attempt to argue otherwise. Pls.' SJ Opp'n at 4–5, 32–33. Their position, however, relies largely on the roles played by multiple *former* campaign employees—"campaign affiliates," as Plaintiffs call them—not on persons then employed or hired by the Campaign. *Id.* at 32 (identifying Caporale, Megan Powers, Caroline Wren, and Guilfoyle); *see also* Def.'s SJ Mot., Ex. 28, ECF No. 144-33 (listing paid Campaign staff after December 31, 2020).

The one arguable exception is Pierson. She remained affiliated with the Campaign through December 31, 2020. Def.'s CounterStmt. at 222–23 ¶¶ 145, 147. Her involvement in Rally organizing began by acting as a go-between for the Kremers and other persons interested in funding a January 6 event. Pls.' SJ Opp'n, Ex. 86, ECF No. 152-39, at 29:2–33:23. She also kept Mark Meadows, the President's Chief of Staff, and others in the loop about WAF's event planning. *Id.* at 35:20–37:22. Eventually, she joined a text string with the Kremers on December 30, 2020. Pierson told the Kremers, "You guys have full branding rights to the 6th and the only brand w/ POTUS. I made sure no one else will have the stage branding w/POTUS." Pls.' SJ Opp'n, Ex. 87,

---

[14] The Karwacki invoice, if viewed in the light most favorable to Plaintiffs, does pertain to work on the Save America Rally. His invoice seeks payment for "1/6/2021 rally for Team Trump." Def.'s SJ Reply, Ex. 243, ECF No. 174-10. President Trump offers no reason to believe that the "1/6/2021 rally for Team Trump" was anything other than the Save America Rally.

ECF No. 152-40, at 12. She also explained that she had been in touch with Wren about funding for the Kremers' event and that Wren "is going to move funds around." *Id.* at 9. She continued to help plan the Rally during the first week of January 2021, after her formal role with the Campaign had concluded. *See id.* at 1–9 (text messages between Pierson and the Kremers leading up to January 6). Significantly, she met with President Trump in the White House on January 4 to discuss Rally speakers and thereafter worked to finalize the list. Def.'s CounterStmt. at 392–93 ¶¶ 267–269. President Trump denies that he decided who ultimately would speak at the Rally. *Id.* at 393 ¶ 270 (Def.'s Resp.). Evidently, that determination was made by event organizers.

Rally Promotion (Campaign). As previously discussed, the Campaign used its social media channels to tout the Rally and Ellipse Speech, both before and after. *See supra* Section III.A.2.b. There is also some evidence of coordination as to the promotion and broadcasting of the Ellipse Speech between Caporale and Dan Scavino, the White House Director of Social Media. *See* Pls.' SJ Opp'n, Exs. 68 & 69, ECF Nos. 155-10 & 155-11 (email exchange between Caporale, using his @donaldtrump.com email address, and Dan Scavino, using a gmail.com address);[15] Def.'s Stmt. at 25 ¶ 5 (Def.'s response identifying Scavino's White House position). Scavino, however, was likely serving in an unofficial capacity at the time, given that Caporale addressed the inquiry to Scavino's personal email account, not an official White House address, and Scavino used that personal account to respond.

---

[15] President Trump objects to Plaintiffs' use of Exhibits 68 and 69 on various grounds, including late disclosure. *See, e.g.*, Def.'s CounterStmt. at 345–48 ¶ 237 (Def.'s Resp.). President Trump has not, however, identified any prejudice from the late disclosure. He also did not seek leave from the court to take additional discovery once Plaintiffs surfaced the exhibits or move to exclude them in a formal motion.

c.        Objective, context-specific assessment

With the undisputed facts now set forth—both as presented by President Trump and Plaintiffs—the court assesses whether he has carried his burden to show he is cloaked with official-acts immunity for the Ellipse Speech. He has not.

President Trump does not dispute that he remained an office-seeker up to and on January 6. The President's appearance at the Save America Rally, consistent with that status, involved almost no "trappings of an official function." No public funds were used to put on or promote the event.[16] The White House did not tout the Ellipse Speech through its official website or social media channels beforehand, and it did not publish the President's remarks afterwards. Nor did any executive branch agency. Further, the White House played no meaningful role in organizing or planning the Rally. The only material assistance was to send a single email to the Secretary of the Interior to secure a stage-location waiver from the National Park Service. Nothing more. The speaker line-up included only one other public official, Congressman Mo Brooks, and there is no evidence of attendance by any other government official. In *Blassingame*, the D.C. Circuit observed that the White House's involvement in planning, funding, and promoting the Salute to America event and attendance by multiple government officials "strongly suggest" that the President's speech was "part of an official event." 87 F.4th at 22–23. Those considerations are entirely missing here.

The opposite is true of private interests closely aligned with President Trump's re-election efforts. WAF was an entity dedicated to advancing policies that aligned with the President's agenda. WAF conceived of the Rally, led its organization and planning, secured the permit, and

---

[16] The court excludes any expenditures that were incurred to transport the President to the Ellipse, such as the salaries of Secret Service agents and related costs. Such public funds would be expended any time the President makes an appearance outside the White House.

39

promoted it in various ways.  It selected the location, date, and time for the Rally.  The Rally's expenses—over $2.1 million—were largely underwritten by one private donor.  That donor and her family contributed over $1.5 million to the President's re-election efforts.  A former finance advisor of the Campaign (Wren) secured that funding.  Nearly all the individuals who ran the nuts and bolts of the operation were former Campaign officials, paid staff, or consultants, who had concluded their formal work for the Campaign within the 60 days prior to January 6.  In fact, on January 4, the President met with Pierson, still a senior campaign advisor only four days prior, in the White House to discuss the Rally's production elements and speaker list.  She—not White House officials—communicated the President's wishes back to Rally organizers.  The Rally speaker lineup featured all private individuals but one who were closely associated with the Campaign.  They included the President's two sons (one of whom was paid a speaker fee with private funds) and daughter-in-law, a lawyer who represented the President in his personal capacity before the Supreme Court, and two well-known campaign surrogates (one of whom was the President's son's then-fiancée and was paid a speaker fee with private funds).  Members of the public could attend the Rally, but only official "Guests" and "VIPs" could enter the permitted event site on the Ellipse.  These objective considerations all point towards classifying the President's participation in the Save America Rally as an unofficial act of an office-seeker.

President Trump attempts to carry his burden of proof by focusing primarily on the content of the Ellipse Speech and secondarily on its context.  *See* Def.'s SJ Mem. at 7–20.  As already discussed, that inverts the *Blassingame* inquiry.  *See supra* Section II.C.1.

When addressing context, President Trump emphasizes the lack of Campaign involvement in the Rally.  Def.'s SJ Reply at 17.  To be sure, the allegation of one Plaintiff that the Rally was "organized and funded by Trump's campaign organization" has not panned out.  *Blassingame*, 87

40

F.4th at 30 (quoting Plaintiff Swalwell's complaint). But President Trump's representation to this court that "the January 6th rally is in no way related to the campaign; . . . the campaign doesn't pay [ ] for it; the campaign is not involved with it at all," *id.* (alterations in original) (quoting Hr'g Tr., Jan. 10, 2022, ECF No. 63, at 14:5-8), has not borne out either. The Campaign admits to funding the cost of rental equipment for the Rally (though President Trump now attempts to distance himself from that concession). The Campaign promoted the Rally through its social media channels. And Katrina Pierson, while still associated with the Campaign as a senior advisor, worked with WAF, the Kremers, and other former Campaign staff to organize and plan the Rally. Thus, while it is fair to say that the Rally was not a fully baked campaign event, the Campaign had a hand in it. And when the contributions of donors and the work of former Campaign officials, staff, and consultants are considered, the Rally bears a far stronger resemblance to campaign re-election activity than an official event. These objective, undisputed contextual facts support only one reasonable understanding of the Ellipse Speech: that President Trump delivered it as an office-seeker still attempting to secure re-election and not as an incumbent office-holder. *See Blassingame*, 87 F.4th at 17.

President Trump's other arguments to avoid this conclusion are unpersuasive. He is wrong to suggest that because the Rally was not a fully campaign-sponsored event, his Ellipse Speech therefore must be an official act. *See* Def.'s SJ Reply at 16–23. The court in *Blassingame* never said that. It did not imply that the Ellipse Speech would qualify as unofficial if it could reasonably be understood only as campaign-sponsored. Rather, the question posed was whether it could "reasonably be understood only as re-election campaign activity." *Blassingame*, 87 F.4th at 22–23. The court recognized that re-election campaign activity could take place in venues that were not strictly campaign-sponsored, such as a political party's convention, a fundraiser, or "other

41

political events."  87 F.4th at 20; *id.* at 32 (Katsas, J., concurring) ("Campaign or other political events are unofficial . . . ."); *id.* at 33 ("Unless speaking at some specific campaign or political event, he will thus likely be 'clothed in the trappings' of his Office . . . .").  Accordingly, nothing in *Blassingame* forecloses an event that is "organized, promoted, and funded" by "channels, personnel, and resources" other than those of a campaign from being considered unofficial "if it bears the hallmarks of re-election campaign activity."  *Id.* at 21 (majority opinion).  The Ellipse Speech bore those "hallmarks."

President Trump further argues that the Rally was "in line with the common, well-accepted practice of all presidents . . . [to] use[] private events to further their official duties."  Def.'s SJ Mem. at 25.  He cites as examples the National Prayer Breakfast and a speech before the Economic Club of Chicago.  *Id.*  President Trump is certainly correct that Presidents sometimes act in their official capacities at privately sponsored events.  But what he misses is that merely categorizing the Rally as a "private event" does not resolve the official-acts issue.  The question remains whether at the private event the President is acting as the incumbent office-holder or a candidate for re-election.  Also, President Trump offers no comparator.  He does not say that he appeared at the National Prayer Breakfast, before the Economic Club of Chicago, or at any other private event when he was a declared candidate for President.  And even if there were such events, he offers none that were like the Rally and "clothed in the trappings of an official function."  In fact, the most comparable event on this record—the Dalton, Georgia political rally that occurred only two days prior—points the other way.  Def.'s CounterStmt. at 54 ¶ 41; *see also id*. at 55 ¶ 42, 433–38 ¶ 336.  Merely stating that Presidents have carried out their official duties through "private events" therefore does not satisfy President Trump's burden.

Before moving on, the court returns to where it began its discussion of the Ellipse Speech: its content.  Its content "confirms" what the court's "objective assessment of the context makes evident": President Trump has not shown that the Speech reasonably can be understood as falling within the outer perimeter of his Presidential duties.  *See Blassingame*, 87 F.4th at 22.  The court provided a lengthy summary of the Speech in *Thompson*, *see* 590 F. Supp. 3d at 113–14, and does not repeat it here.  For present purposes, it suffices to quote what the court previously held:

> [W]hile the Speech did touch on matters of public concern (namely President Trump's pledge to work on election laws in a second term), the main thrust of the Speech was not focused on policy or legislation. It was to complain about perceived cases of election fraud that led President-elect Biden to win more votes in closely contested states, to urge members of Congress to object to certain state certifications, and to exhort the Vice President to return those certifications to those states to be recertified.  Much like the tweets leading up to the January 6 Rally, the words spoken by the President—without delving into the motivation behind them— reflect an electoral purpose, not speech in furtherance of any official duty.

*Id.* at 83.  Or, put another way, "President Trump's alleged words and actions were directed toward promoting his victory in the 2020 presidential election rather than carrying out a designated official duty to confirm the integrity of the electoral process, to ensure faithful execution of the laws, or to fulfill other official purposes." *Blassingame*, 87 F.4th at 35 (Rogers, J., concurring) (citing *Thompson*, 590 F. Supp. 3d at 83).  The content of the Ellipse Speech confirms that it is not covered by official-acts immunity.

### B.    President Trump's Outreach to State and Local Officials

The court moves next to those allegations relating to President Trump's direct contacts with state and local officials.  According to Plaintiffs, "President Trump tried to persuade state and local officials in Michigan, Pennsylvania, and Georgia to use their offices to change the declared results in their jurisdictions." *Id.* at 7 (majority opinion); *see* Pls.' SJ Opp'n at 22.  And, in so doing, he

"acted as an office-seeker looking to retain office, not as a President engaged in an official duty." *Id.* at 22. Devoting only one page of his summary judgment brief to these allegations, *see* Def.'s SJ Mem. at 27–28, President Trump makes almost no effort to show that these acts were taken in his official capacity.

He starts by claiming to have made these contacts pursuant to his constitutional authority to "take Care that the Laws be faithfully executed," U.S. Const. art II, § 3. Def.'s SJ Mem. at 27. He also quotes from *Trump*: "[T]he President may speak on and discuss [the fairness and integrity of federal elections] with state officials—even when no specific federal responsibility requires his communication—to encourage them to act in a manner that promotes the President's view of the public good." *Id.* (quoting *Trump*, 603 U.S. at 627). And finally, he once again invokes the President's "broad powers to speak on matters of public concern." *Id.* at 28.

President Trump's near complete failure to offer facts to support these contentions ignores *Trump*. When the Supreme Court considered these very same allegations, it said that determining whether these acts qualify as official "requires a close analysis of the indictment's extensive and interrelated allegations." 603 U.S. at 628. It added that "this alleged conduct cannot be neatly categorized as falling within a particular Presidential function. The necessary analysis is instead fact specific, requiring assessment of numerous alleged interactions with a wide variety of state officials and private persons." *Id.*

The President has not heeded those words. Instead of a "close analysis" that is "fact specific," he mainly offers the broad legal arguments noted above. He does allude to one fact to support his position that these were official communications: "To the extent records exist memorializing or referring to these conversations, they are considered official communications maintained by the National Archives." Def.'s SJ Mem. at 27. He cites only a single item of

44

evidence to support that contention. *See id.* (citing Def.'s Stmt. at 68 ¶ 26). It is an image, maintained by the National Archives, of a single tweet from President Trump's @realDonaldTrump Twitter account dated January 3, 2021, linking a story on breitbart.com titled, "Trump Speaks to State Legislators on Call About Decertifying Election." Def.'s SJ Mot., Ex. 17, ECF No. 144-21. That is the only factual context—if it can be called that—he provides regarding his alleged pressuring of state and local officials to reverse the election outcomes in their jurisdictions. This is plainly insufficient to carry his burden at summary judgment.

Given the complete absence of relevant evidence, Plaintiffs were not required to present any of their own to prevail. *See Anderson*, 477 U.S. at 250. But they have. They have identified the relevant statements President Trump made to state and local officials, to whom he made them, when, and how. They are:

- A telephone call to a Pennsylvania State Republican Senate Policy committee hearing on November 25, 2020, Def.'s CounterStmt. at 112 ¶ 75;

- A telephone call to Pennsylvania State Senate Majority Leader Jake Corman and Pennsylvania Speaker of the House of Representatives Bryan Cutler in December 2020, *id.* at 114–19 ¶¶ 77–79;[17]

- A telephone call to Republican Board Members of the Wayne County Board of Canvassers after they certified election results on November 17, 2021, with Republican National Committee (RNC) Chair Ronna Romney McDaniel present, *id.* at 122–31 ¶¶ 81–83;[18]

---

[17] The evidence cited in ¶¶ 77 and 79 is Plaintiffs' Exhibit 115, which are excerpts from the Select Committee's final report. *See* Pls.' SJ Opp'n, Ex. 115, ECF No. 152-68. President Trump has objected to the Report's admission, *see* Def.'s SJ Obj., but that objection is not well taken here because Plaintiffs also have submitted Cutler's testimony before the Select Committee as proof, *see* Pls.' SJ Opp'n, Ex. 191, ECF No. 152-144. The court already has rejected President Trump's objections to considering transcripts of testimony before the Select Committee.

[18] Like the call to Corman and Cutler, *see supra* n.17, the proof offered for the call to the two Wayne County Board members is the Select Committee's final report. As noted, President Trump has objected to its admissibility. The court does not need to decide whether the Select Committee's final report would be admissible at a trial. For present purposes, it is sufficient to show that proposed evidence can be presented in a form that would be admissible at a trial. The Select Committee interviewed Board member Monica Palmer and Republican National Committee Chair Ronna Romney McDaniel about the phone call. *See* Def.'s SJ Obj., Ex. W, ECF No. 173-24, at 315 n.86. Presumably, either or both could testify at a trial or be deposed with their sworn testimony admissible under Federal Rule of Civil Procedure 32(a)(4).

- A telephone call to Michigan Senate Majority Leader Mike Shirkey and Speaker of the Michigan House of Representatives Lee Chatfield on November 18, 2020, *id.* at 131–32 ¶ 84;

- A meeting in the Oval Office with Michigan Senate Majority Leader Mike Shirkey and Speaker of the Michigan House of Representatives Lee Chatfield on November 20, 2020, *id.* at 131–34 ¶¶ 84–85;[19]

- A telephone call to Georgia Governor Brian Kemp in December 2020, *id.* at 139 ¶ 88; and

- A telephone call to Georgia Secretary of State Brad Raffensperger on January 2, 2021, in the presence of Chief of Staff Mark Meadows and Campaign attorneys Cleta Mitchell, Kurt Hilbert, and Alex Kaufman, *id.* at 142–51 ¶¶ 91–95.

President Trump offers no evidence to contextualize any of these statements. Instead, he claims that Plaintiffs' "own evidence shows that [he] reached out to state election officials in his official capacity to discuss the issue of presidential electors, by including the Chief of Staff on phone calls with state officials and meeting with state officials in the Oval Office." Def.'s SJ Reply at 2; *see also id.* at 14–15. But that contention fails to differentiate among the alleged communications. The evidence establishes that the only call involving the Chief of Staff was with Raffensperger and that the only meeting held in the Oval Office was with Michigan officials. For the others—the calls made to Pennsylvania legislators, the first call to Michigan officials, and the call to Governor Kemp—the record contains no contextual facts. The sole clue about the outreach to the Wayne County Board members is that the RNC Chair was on the call, too. Without objective evidence of context, most of these contacts cannot reasonably be understood as the actions of an office-holder rather than an office-seeker.

That leaves the Oval Office meeting with Michigan state legislators on November 20, 2020, and the call to Raffensperger on January 2, 2021. As to the former, *Blassingame* compels its

---

[19] This fact, too, relies on the Select Committee's final report. Because Shirkey testified before the Select Committee, Def.'s SJ Obj., Ex. W, ECF No. 173-24, at 320 n.159, and Plaintiffs presumably could secure his testimony as discussed in note 18, the court will consider this fact.

recognition as an official act.  The sole contextual fact offered is that the meeting took place in the Oval Office.  Def.'s CounterStmt. at 134 ¶ 85.  That is a trapping of the Office.  *See Blassingame*, 87 F.4th at 32–33 (Katsas, J., concurring).  True, President Trump purportedly told Shirkey and Chatfield to "have some backbone and do the right thing," Def.'s CounterStmt. at 134 ¶ 85, but that content is a secondary consideration, *see Blassingame*, 87 F.4th at 22, and can reasonably be construed as official or unofficial, *see Trump*, 603 U.S. at 626–28.  As here, when a "context-specific assessment yields no sufficiently clear answer in either direction," the President must be afforded immunity.  *Blassingame*, 87 F.4th at 21.  President Trump enjoys presidential immunity as to the November 20, 2020 meeting in the Oval Office with Michigan state legislators.

The call to Raffensperger, on the other hand, can only reasonably be viewed as the act of an office-seeker.  President Trump highlights that his Chief of Staff Mark Meadows was on the call.  But the Eleventh Circuit has ruled that Meadows was not acting in an official capacity when speaking to Raffensperger.  *See State v. Meadows*, 88 F.4th 1331, 1349 (11th Cir. 2023).  "Meadows's participation in the call reflected a clear attempt to further Trump's *private litigation interests*: he urged the participants to 'find[] a path forward that's less litigious.'"  *Id.* (alteration in original) (emphasis added).  This court agrees.  The other three participants with the President were all "attorneys for the Trump Campaign, Cleta Mitchell, Kurt Hilbert, and Alex Kaufman."  Def.'s CounterStmt. at 142 ¶ 91.  That context renders the only reasonable understanding of that communication to be re-election activity.  And content confirms that conclusion.  President Trump told the Georgia Secretary of State, among other things, "And the real truth is I won by 400,000 votes.  At least.  That's the real truth.  But we don't need 400,000.  We need less than 2,000."  *Id.* at 146 ¶ 93.  And he continued, "So what are we going to do here folks?  I only need 11,000 votes. . . .  Give me a break.  You know, we have that in spades already."  *Id.* at 148 ¶ 94.  Also, during

the call, the President said to his Campaign lawyer Cleta Mitchell, "[A]ll we have to do Cleta is find 11,000-plus votes." *Id.* at 149 ¶ 95.  These are the words of an office-seeker imploring a state official to alter the outcome of Georgia's election, not those of an incumbent President acting in his official capacity.

*     *     *

In sum, President Trump has not carried his burden to prove that his various communications with state and local officials, except one, were official acts entitled to immunity. He offered no meaningful evidence of his own on the subject, and Plaintiffs' evidence largely establishes that these acts can only be reasonably construed as those of an office-seeker.  The sole exception is the Oval Office meeting with Michigan state legislators.  As to that act, the sole contextual fact on this record—its location—counsels in favor of construing it as falling within the outer perimeter of the President's official duties.

### C.     The Twitter Account

Next up are various tweets sent from President Trump's @realDonaldTrump Twitter account.  The court counts more than 35 of them.[20]  President Trump has described this Twitter account as "personal" or "private" in various judicial fora, including before the Supreme Court. *See, e.g.*, Def.'s CounterStmt. at 17–22 ¶¶ 12–15, 23 ¶ 17.  Those admissions are relevant, *see Blassingame*, 87 F.3d at 15–16, but not dispositive.  Even Plaintiffs acknowledge that, "[b]ecause some tweets from @realDonaldTrump were official and some were purely private[] campaign activity, the focus must be on the relevant tweets at issue." Pls.' SJ Opp'n at 15 (internal citation omitted).  That is a wise concession.  In *Trump*, the Court said that "[w]hether the Tweets . . . involve official conduct may depend on the content and context *of each*."  603 U.S. at 630

---

[20] *See* Def.'s CounterStmt. ¶¶ 1, 21–23, 27–40, 45, 47–49, 90, 225–29, 238, 241, 243–45, 347, 349, 351.

(emphasis added).  Among the contextual facts the Court identified as bearing on the issue are "what else was said contemporaneous to the excerpted communications" and "who was involved in transmitting the electronic communications."  *Id.*  Notably, the Court seemed to contemplate that the trial court's task would not be to decide whether tweeting was categorically an official act, but to make that inquiry on a tweet-by-tweet basis.  *See id.*

President Trump largely ignores the "objective," "factbound analysis" that the Supreme Court held might be needed to separate official from unofficial tweets.  *See* Def.'s SJ Mem. at 28–36.  He presents no evidence as to "what else was said contemporaneous" to a particular tweet, who drafted it, or who was involved in its transmission.  *See Trump*, 603 U.S. at 630.  He also offers no other contextual proof that could be relevant, such as his location at the time of the tweet, who else was present (even if not involved in its transmission), or the acts he performed contemporaneously.  *See* Def.'s SJ Mem. at 28–36; Def.'s Stmt. at 1–73 ¶¶ 1–27.  And he makes no effort to delve into any particular tweet's content to support its classification as official.  *See* Def.'s SJ Mem. at 28–36; Def.'s Stmt. at 1–73 ¶¶ 1–27.

Instead, as he did with the Ellipse Speech, President Trump elides the proper legal framework.  He invokes the two-part test that the Supreme Court announced in *Lindke v. Freed* to determine whether a state official's social media message constitutes state action under Section 1983.  *See* Def.'s SJ Mem. at 28–34 (citing *Lindke*, 601 U.S. 187 (2024)).  There, the Court held that "a public official's social-media activity constitutes state action under § 1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media."  601 U.S. at 198.  President Trump claims that all his tweets satisfy the second element because he sent them in furtherance of his responsibilities to "tak[e] care that the laws are faithfully executed," to "urg[e] Congress and the states to take action

on matters of public concern," and to "'engage' with the public on matters of public concern." Def.'s SJ Mem. at 33. This argument fails for the reasons already discussed: it ignores context and "assumes the answer to the question" the court is asked to decide. *Blassingame*, 87 F.4th at 24; *see supra* Section III.A.1. His approach also does not recognize the Court's admonition in *Lindke* that "[h]ard-to-classify cases require awareness that an official does not necessarily purport to exercise his authority simply by posting about a matter within it" and that "many public officials possess a broad portfolio of governmental authority that includes routine interaction with the public, and it may not be easy to discern a boundary between their public and private lives." 601 U.S. at 203. Ultimately, *Lindke* requires the same kind of fact-intensive inquiry as *Trump* and *Blassingame*: "Categorizing posts that appear on an ambiguous [social media] page . . . is a fact-specific undertaking in which the post's content and function are the most important considerations." *Id.* President Trump mostly eschews this "fact-specific undertaking." *See id.* ("And when there is doubt, additional factors might cast light—for example, an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business.").

The court uses the qualifier "mostly" because President Trump does offer eight "facts" that he says show that his "use of his Twitter account was official conduct." Def.'s SJ Mem. at 34. Those facts are: (1) he labeled the account with his official title, "The 45th President of the United States"; (2) members of his administration described the use of the account as "official"; (3) the White House Press Secretary announced that communications on his Twitter account should be considered "official statement[s] by the President of the United States," and he operated the account with the help of the White House's Director of Social Media, Dan Scavino; (4) he routinely used the account for official communications, and federal agencies monitored his account for such

50

messages; (5) the National Archives preserved the tweets, including (6) those relating to the Save America Rally; (7) a "then-in-force" Second Circuit decision *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2019), ruled that "the President . . . acts in an official capacity when he tweets"; and (8) the Trump Presidential Library cites to @realDonaldTrump as the official Twitter account of the Trump presidency. *See id.* at 34–36.

But none of these "facts" help to determine whether any particular tweet was an official act. President Trump does not dispute that he sometimes used @realDonaldTrump for unofficial messages. *See* Def.'s SJ Reply at 23–24. Nor could he. After all, he represented to the Supreme Court that "[s]ince his inauguration, President Trump has continued to use the account for . . . personal purposes," in addition to official ones. Def.'s CounterStmt. at 21 ¶ 15. So, the fact that the account bears his official title and that he sometimes used it for official purposes says little about the status of any individual tweet. The same is true of White House staff pronouncements. None are specific to the tweets cited by Plaintiffs. The National Archives' collection of the tweets carries no weight, as there is no evidence that the Archives sought to separate official from unofficial messages as part of its archival function. Whatever persuasive force the *Knight* decision may have had has evaporated, because the Supreme Court vacated that judgment. *See Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).[21] And the views of the President's Library are of no significance.

The sole fact of some relevance is that President Trump operated the account with the help of Scavino, the White House Social Media Director.[22]  *See Trump*, 603 U.S. at 630; *Lindke*,

---

[21] President Trump concedes that the statements from *Knight* are "not being offered for the truth of the matter asserted therein and [are] only being offered to provide context as to how the @realDonaldTrump account was treated throughout the term of the first Trump Administration and was viewed and understood by those using it during the relevant times, including November of 2020 through January of 2021." Def.'s Stmt. at 23 ¶ 5 (Def.'s Resp.).

[22] President Trump cites only *Knight* for this fact proposition, *see* Def.'s Stmt. at 21 ¶ 5, and Plaintiffs object to the court's consideration of it as inadmissible, *see id.* (Pls.' Resp.). The court nevertheless considers the fact to be true, as it presumes that Scavino would confirm it if called to testify.

601 U.S. at 203. But that general statement has little probative value because it is not specific to any of the dozens of tweets identified by Plaintiffs. Because the court's undertaking here is "fact-specific," *Lindke*, 601 U.S. at 203, it cannot presume that Scavino participated in transmitting any specific tweet, let alone all of them, *see Trump*, 601 U.S. at 630.

President Trump bears the burden to show, through contextual evidence, that a particular tweet can reasonably be construed as official conduct. Because he has essentially offered no such evidence, he has not carried his burden as to any tweet.

Content does not help him either, for the most part. Some tweets are plainly the unofficial acts of an office-seeker. Such communications include: (1) his announcement that he would be running for re-election, Def.'s CounterStmt. at 1 ¶ 1; (2) his commentary on the election results and the belief that he prevailed despite vote counts, *id.* at 39 ¶ 30, 42–43 ¶ 32, 45–46 ¶¶ 34–35; (3) his describing steps that he and others would be taking to challenge the results, *id.* at 40–41 ¶ 31, 43–44 ¶ 33, 47–52 ¶¶ 36–39; and (4) his urging of state officials to take action that would help him win, *id.* at 141 ¶ 90 ("If [two state governors] were with us, we would have already won both Arizona and Georgia.").

President Trump's "contemporaneous" tweets on January 5 and 6, *see Trump*, 603 U.S. at 630, about what the Vice President needed to do during the Joint Session also were unofficial. "The presidency itself has no institutional interest in who will occupy the office next. . . . Rather, an incumbent President's interests in winning re-election have the same purely private character as those of his challenger—i.e., 'substantial personal interests as a candidate' to attain (or retain) the office." *Blassingame*, 87 F.4th at 17. The January 5 and 6 tweets are those of a candidate trying to retain office: "The Vice President has the power to reject fraudulently chosen electors," Def.'s CounterStmt. at 59 ¶ 45; "All Mike Pence has to do is send them back to the States, AND

WE WIN," *id.* at 62 ¶ 47; and "If Vice President @Mike_Pence comes through for us, we will win the Presidency," *id.* at 62 ¶ 49.  Those are the words of a candidate conveying a personal interest in re-election.  That the Campaign issued a similar statement on January 5 confirms their unofficial nature.  *See id.* at 60 ¶ 46 ("The Vice President and I are in total agreement that the Vice President has the power to act.").[23]

The same is true of other tweets sent on January 5.  They, too, are those of a candidate who is seeking to reverse his election fortunes.  *See, e.g., id.* at 358 ¶ 243 ("Washington is being inundated with people who don't want to see an election victory stolen by emboldened Radical Left Democrats."); *id.* at 359 ¶ 244 ("I hope the Democrats, and even more importantly, the weak and ineffective RINO section of the Republican Party, are looking at the thousands of people pouring into D.C.  They won't stand for a landslide election victory to be stolen."); *id.* at 361 ¶ 245 ("Get smart Republicans.  FIGHT!").

Furthermore, given the court's earlier conclusion that the President has failed to show that the Ellipse Speech was official, his tweets promoting that event or touting the Speech likewise were not within the outer perimeter of his duties.  *See, e.g., id.* 322–27 ¶¶ 225–229, 354 ¶ 241, 453 ¶ 347.

Other tweets based on content alone are more difficult to classify.  *See, e.g., id.* at 28–30 ¶¶ 21–23 (pre-election commentary on election integrity); *id.* at 52 ¶ 40 (criticizing the Department of Justice for failing to act "despite overwhelming evidence" of voter fraud and concluding "Never give up.  See everyone in D.C. on January 6th").  But having failed to produce any evidence of context in his favor, President Trump has not carried his burden as to such tweets.

---

[23] Plaintiffs also cite a post-presidency statement made by President Trump on March 13, 2023, regarding the Vice President's authority to return electoral votes to the States and the blame the Vice-President bears for the events of January 6.  Def.'s CounterStmt. at 457 ¶ 352.  Based on timing alone, this does not qualify as an official statement.

### D.        Tweets After the Riot at the U.S. Capitol Began

That leaves the two tweets sent from @realDonaldTrump after the riot at the Capitol began. *See id.* at 455 ¶ 349, 457 ¶ 351.   Neither side has offered specific facts to establish their circumstances.  The Select Committee's final report, which is in the record, helps fill the gaps.[24] *See* Def.'s SJ Obj., Ex. W, ECF No. 173-24.

According to the Select Committee, the President learned of the riot at the Capitol around 1:21 p.m. after he returned to the White House from the Ellipse.  *See id.* at 592.  He then went to the White House dining room and remained there until early evening, leaving only to film a video in the Rose Garden urging his supporters to disperse.  *See id.* at 593.  After rioters broke into the Capitol at 2:13 p.m., the President's advisors urged him to make a public statement.  *See id.* at 595–96.  The first tweet during the riot came at 2:24 p.m.  Def.'s CounterStmt. at 455 ¶ 349.  It said that "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify.  USA demands the truth!" *Id.*  The second tweet came at 6:01 p.m.  *Id.* at 457 ¶ 351.  That tweet expressed solidarity with his supporters and told them, "Go home with love & in peace.  Remember this day forever!" *Id.* Between these two tweets, President Trump made and publicly released the Rose Garden video, in which he expressed sympathy for his supporters and then signed off, saying, "But you have to go home now.  We have to have peace.  We have to have law and order.  . . .  So go home.  We love

---

[24] The court recognizes that the admissibility of the final report in full for its truth is uncertain.  *See, e.g.*, *Barry v. Trs. of Int'l Ass'n Full-Time Salaried Officers & Emps. of Outside Loc. Unions & Dist. Couns.'s (Iron Workers) Pension Plan*, 467 F. Supp. 2d 91, 98 (D.D.C. 2006) (setting forth factors to consider in admitting a congressional report under Rule 803(8)).  Still, for present purposes, it is better to accept the truth of these facts—the court doubts Plaintiffs contest them—instead of allowing the immunity question as to these tweets to linger beyond the summary judgment stage.

you, you're very special. . . . I know how you feel.  But go home, and go home in peace." *Id.* at 456 ¶ 350.

These communications, based on context alone, fall within the outer perimeter of President Trump's official responsibilities.  The President was at the White House at the time; he was acting (or not) on the advice of White House advisors; and at least as to his Rose Garden remarks, he prepared them with the assistance of White House staff who presumably used a government-issued recording device.  Plaintiffs may view President Trump's efforts to quell the violence at the Capitol as inadequate and even as a complete dereliction of duty.  But they reasonably can be construed as the acts of an office-holder and therefore are cloaked in official-acts immunity.  Plaintiffs cannot use these two tweets and the Rose Garden video to make their case.

### E.    Miscellaneous Activities

Beyond the Ellipse Speech, outreach to state and local officials, and tweets, Plaintiffs identify various other acts taken by President Trump that they assert were not official.  Those activities, discussed below, include: (1) statements he made during campaign rallies or other political events, (2) a statement he made in the immediate aftermath of the election, (3) statements, tweets, and other social media postings from his Campaign, (4) court challenges to various States' election results, and (5) his role in the so-called false-elector scheme.  President Trump offers no contextual evidence as to any of these.  None are official.

*Statements Made During Campaign Rallies or Other Political Rallies*.  Plaintiffs identify statements President Trump made during (1) a "Trump Campaign event" on August 17, 2020, *id.* at 31–32 ¶ 24; (2) the Republican National Convention on August 24, 2020, *id.* at 33 ¶ 25; and (3) "a political rally" in Dalton, Georgia, on January 4, 2021, *id.* at 55 ¶ 42.  "Campaign or other political events are unofficial," *see Blassingame*, 87 F.4th at 32 (Katsas, J., concurring), and "a

speech at a political party's convention . . . is inherently given in the nominee's private capacity as officer-seeker," *id.* at 18 (majority opinion). Absent any other context, these statements were unofficial and not immune.

*Statement in the Immediate Aftermath of the Election.* President Trump made televised remarks at 2:30 a.m. on November 4, 2020, the day after the election, declaring the election results were "a fraud on the American public. [T]his is an embarrassment to our country. [W]e were getting ready to win this election. [F]rankly, we did win this election." Def.'s CounterStmt. at 34 ¶ 26. The timing of the statement—after midnight on election night—suggests that it was that of an office-seeker. Content confirms it.

*Campaign Tweets or Other Social Media Postings.* Plaintiffs offer several tweets or social media postings from the Campaign's social media accounts. *Id.* at 136 ¶ 86 (tweet); *id.* at 328 ¶ 230 (YouTube post); *id.* at 362–67 ¶¶ 246–250 (tweets and Instagram posts). Lacking any context to conclude otherwise, these are not official statements. *Cf. Blassingame*, 87 F.4th at 21 (identifying a campaign ad fully funded by the campaign as unofficial).

*Lawsuits.* President Trump or his Campaign mounted a host of lawsuits and other legal challenges contesting various States' election results. *See* Def.'s CounterStmt. at 162 ¶ 103 to 184 ¶ 114. These were filed either in his "personal capacity" or on his behalf as a candidate for office. *See, e.g.*, *id.* at 163 ¶ 104, 170–71 ¶ 107, 175 ¶ 109. These activities therefore enjoy no immunity. *See Blassingame*, 87 F.4th at 15–16.

*Fake-Elector Scheme.* Plaintiffs identify a variety of activities relating to the so-called fake-elector scheme. *See* Def.'s CounterStmt. at 71 ¶ 57 to 104 ¶ 72. Most do not directly involve President Trump, but rather members of his campaign. *But see id.* at 71 ¶ 57 (alleging his general involvement in the scheme); *id.* at 104 ¶ 72 (alleging that the White House Counsel's Office

advised him that the plan was unlawful).  Before the Supreme Court, President Trump suggested that these acts qualified as official conduct.  *See Trump*, 603 U.S. at 626–27.  But here he makes no such argument nor presents any evidence to support that view.  The court therefore treats this alleged conduct as unofficial.

One last category of conduct bears mention: President's Trump interactions with officials from the Department of Justice.  Plaintiffs allege that Attorney General William Barr advised President Trump that purported irregularities in the application of state law were "issues for his [Campaign] to raise with the State" and were "not the business of the Department of Justice." Def.'s CounterStmt. at 186 ¶ 116.  They also assert that the Department of Justice refused the President's demands "to pursue baseless allegations of election fraud."  *Id.* at 188 ¶ 117. The Supreme Court addressed such interactions with the Department of Justice in *Trump*.  *See* 603 U.S. at 621 (holding that President Trump was "absolutely immune from prosecution for the alleged conduct involving his discussions with Justice Department officials").  Here, as there, these "discussions with Justice Department officials" are official acts for which President Trump cannot be held liable.  *Id.*

*        *        *

Before turning to the next motion, the court briefly summarizes its immunity determinations.  Based on the present record of facts not in dispute, with limited exceptions, President Trump has not carried his burden to demonstrate, through "objective, context-specific" evidence, that the acts alleged by Plaintiffs "can reasonably be understood as the official actions of an office-holder rather than the unofficial actions of an office-seeker." *Blassingame*, 87 F.4th at 30.  President Trump is not immune from suit for that conduct.  That includes the Ellipse Speech, most of his contacts with state and local officials, nearly all tweets from his @realDonaldTrump

Twitter account, and various other miscellaneous activities. The exceptions include: his Oval Office meeting with Michigan state legislators, the tweets from his @realDonaldTrump Twitter account at 2:24 p.m. and 6:01 p.m. on January 6, his Rose Garden remarks on January 6, and his interactions with officials from the Department of Justice. These are official acts for which President Trump cannot be held liable. Plaintiffs therefore cannot rely on them to prove their claims.

To be clear, the court's decision today is not a final pronouncement on immunity for any particular act. It is a ruling based on the record evidence and application of the summary judgment standard. President Trump remains free to reassert official-acts immunity as a defense at trial. But the burden will remain his and will be subject to a higher standard of proof. *See Blassingame*, 87 F.4th at 30 (stating that the party asserting immunity bears the burden "throughout"); *id.* at 31 (Katsas, J., concurring) (contemplating that Plaintiffs' allegations as it relates to immunity would need to be "tested on summary judgment or at trial").

## IV.     FIRST AMENDMENT DEFENSE

President Trump previously urged dismissal of these suits because his alleged conduct—consisting almost exclusively of speech—was protected political expression under the First Amendment. *See Thompson*, 590 F. Supp. 3d at 108. The parties focused on the Ellipse Speech, so the court did, too. *See id.* at 113. The issue presented boiled down to whether the President's remarks on January 6 plausibly constituted words of incitement that fell outside the First Amendment's broad protections for political speech. *Id.* Recognizing the "substantial constitutional question" presented, *id.* at 108, the court first discussed in detail the three key Supreme Court decisions on incitement: *Brandenburg v. Ohio*, *Hess v. State of Indiana*, and *NAACP v. Claiborne Hardware Co. See id.* at 110–13. It then reviewed at length the words spoken

by President Trump during the Ellipse Speech. *Id.* at 113–14. Finally, the court applied the key

Supreme Court precedents to those remarks. *Id.* at 115–18. The court concluded:

> Having considered the President's January 6 Rally Speech in its entirety and in context, the court concludes that the President's statements that, "[W]e fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," and "[W]e're going to try to and give [weak Republicans] the kind of pride and boldness that they need to take back our country," immediately before exhorting rally-goers to "walk down Pennsylvania Avenue," are plausibly words of incitement not protected by the First Amendment. It is plausible that those words were implicitly "directed to inciting or producing imminent lawless action and [were] likely to produce such action."

*Id.* at 115 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)). President Trump now asks

the court to reconsider that ruling.

The ostensible reason given for reconsideration is that, after this court's decision, the

Supreme Court decided *Counterman v. Colorado*, 600 U.S. 66 (2023). *See* Def.'s Recons. Mem.

at 5–7. According to President Trump, *Counterman* stands for the principle that a speaker's "intent

can save facially unprotected speech from incitement liability, but it cannot be used the other way

around, to hold a speaker liable for facially protected speech." *Id.* at 5–6. He claims that, contrary

to *Counterman*, this court erroneously "view[ed] the words of the Speech through the prism of

President Trump's supposed understanding and intent" and, as a result, "fail[ed] to properly

analyze the language actually used by the President on January 6 in determining that he implicitly

incited the crowd on that day." *Id.* at 22.

But the true reason President Trump asks for reconsideration is that he simply disagrees

with the court's holding. As discussed below, *Counterman* is not about incitement, and it did not

clarify the law about that category of unprotected speech. *Counterman* is merely the vehicle by

which President Trump dissects the court's reasoning and makes arguments that he did not the first

59

time around. *See Thompson*, 590 F. Supp. 3d at 116–17 ("In his motions, President Trump largely avoids any real scrutiny of the actual words he spoke or the context in which they were spoken."); *see also* Def.'s Mot. to Dismiss, ECF No. 10, Def.'s Mem. in Supp. of His Mot. to Dismiss, ECF No. 10-1, *Blassingame v. Trump*, No. 21-cv-858-APM (D.D.C.), at 25–26.

Be that as it may, the court proceeds to address the President's arguments. It will view them through the "as justice requires" standard of Rule 54(b). *See Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011). That standard affords the court more flexibility in revisiting a prior decision than if the same argument were made post-judgment. *See Cobell v. Jewell*, 802 F.3d 12, 25–26 (D.C. Cir. 2015).

### A.    *Counterman* and the Court's Alleged Legal Error

*Counterman* is not a case about incitement. It addressed the requisite mental state, or mens rea, for a different category of unprotected speech, "true threats." 600 U.S. at 69. The Court held that the government must prove recklessness—"that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence"—to secure a conviction in a "true threats case." *Id.* "The State need not prove any more demanding form of subjective intent to threaten another." *Id.*

In reaching that conclusion, the Court discussed its incitement doctrine. Inciting words are those "'directed [at] producing imminent lawless action,' and likely to do so." *Id.* at 73 (alteration in original) (quoting *Brandenburg*, 395 U.S. at 447). "Like threats, incitement inheres in particular words used in particular contexts: Its harm can arise even when a clueless speaker fails to grasp his expression's nature and consequence. But still, the First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder." *Id.* at 76. (quoting *Hess*, 414 U.S. at 109). "That rule helps prevent a law

60

from deterring 'mere advocacy' of illegal acts—a kind of speech falling within the First Amendment's core." *Id.* (quoting *Brandenburg*, 395 U.S. at 449).  The Court would go on to acknowledge that a recklessness mens rea for a true-threats prosecution was less than its "incitement decisions demand." *Id.* at 81.  But that was appropriate because "the reason for that demand is not present here.  When incitement is at issue, we have spoken in terms of specific intent, presumably equivalent to purpose or knowledge." *Id.*  Such "potency" is required to "ensure that efforts to prosecute incitement would not bleed over, either directly or through a chilling effect, to dissenting political speech at the First Amendment's core." *Id.*[25]  That is the totality of what *Counterman* says about incitement.

President Trump's reads *Counterman* as making clear that, for purposes of incitement, "intent is a one-way ratchet." Def.'s Recons. Mem. at 5.  That is, "intent can save facially unprotected speech from incitement liability, but it cannot be used the other way around, to hold a speaker liable for facially protected speech." *Id.* at 5–6.  It is in this respect, President Trump argues, this court erred.  He contends that the court's analysis gave outsized importance to the "element[s]" of "intent" and "imminence" over the actual words spoken by President Trump. *Id.* at 6–7.  The court ignored "the reality" that his words were far less incendiary than those deemed protected in the Supreme Court's incitement decisions, and it improperly viewed his words as plausibly inciting by "making impermissible use—*contra Counterman*—of intent to infuse words with meaning that they do not objectively hold." *Id.* at 23; *see also id.* at 28 (arguing that the court "leaned too heavily on . . . the intent the Court inferred President Trump may have had, given past

---

[25] That same "potency" was not needed as a buffer to prosecutions for "true threats" because "the speech on the other side of the true-threats boundary line—as compared with advocacy addressed in our incitement decisions—is neither so central to the theory of the First Amendment nor so vulnerable to government prosecutions." *Counterman*, 600 U.S. at 81.  Proof of recklessness therefore struck the appropriate balance between protected expression and the benefits of enforcing laws against true threats. *See id.* at 81–82.

events . . . and . . . the fact of subsequent violence by some of his listeners[], to imbue the words he actually used on January 6 with implicit incitement").

### B.    The Ellipse Speech Plausibly Crossed the Line to Incitement

These criticisms both misstate the law of incitement and mischaracterize this court's reasoning.

Start with the law.  President Trump says that protected expression crosses over to unprotected incitement only if three elements are present: the words "specifically advocate imminent violence," the speaker intends to produce imminent disorder, and the words spoken are likely to have that result.  Def.'s Recons. Mem. at 6–7, 14, 20–21.  Those elements derive from Sixth Circuit caselaw, which this court acknowledged but did not expressly adopt.  *See Thompson*, 590 F. Supp. 3d at 112 (citing *Bible Believers v. Wayne County*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc)).  President Trump takes the elements one step further.  He argues that there is a hierarchy among the elements and that they proceed in a kind of order of operations that *Counterman* "demands."  Def.'s Recons. Mem. at 25.  "[T]he inquiry must begin with the words used by the speaker (*Brandenburg's* element one).  Only if those words are facially unprotected under the first element of the *Brandenburg* test could a speaker *potentially* be penalized if there is *also* a showing of the requisite intent (element two) and imminence (element three)."  *Id.* at 6; *see also id.* at 20.

Neither *Counterman* nor any other Supreme Court case erects the rigid incitement framework that President Trump suggests.  No decision instructs courts to consider as a first step only the words spoken, unmoored from their context, to derive their "objective meaning."  *Id.* at 23.  To the contrary, *Counterman* clearly states that "incitement inheres in particular words used in *particular contexts*."  600 U.S. at 76 (emphasis added).  The importance of context has long been central to the Supreme Court's incitement jurisprudence.  *See Thompson*, 590 F. Supp. 3d at

62

112 (observing that "both the words spoken and the context in which they are spoken matter" (citing cases)); *see also id.* at 110–11 (describing in detail the contextual facts of *Brandenburg*, *Hess*, and *Claiborne Hardware*). And it was central to this court's holding. *See id.* at 115–17.

Now the court's reasoning. This court did not engage in an "intent-based interpretation" of the Ellipse Speech to create a veneer of incitement that it objectively does not have, *see* Def.'s Recons. Mem. at 25, or, as President Trump colorfully puts it, perform "analysis by psychoanalysis," *id.* The court first identified the words used, then described the relevant context, and finally evaluated those words within the context in which they were spoken. That is precisely what *Counterman* and the Supreme Court's incitement jurisprudence require. *See* 600 U.S. at 76.

More specifically, here is how the court proceeded. After setting forth the controlling legal principles, the court considered the entirety of the Ellipse Speech and summarized it in greater detail than contained in Plaintiffs' complaints. *See Thompson*, 590 F. Supp. 3d at 113–14. The court acknowledged that "[t]he President's words on January 6th did not explicitly encourage the imminent use of violence or lawless action," but it went on to consider whether they did so implicitly. *Id.* at 115. That required the court to recount the context for the Ellipse Speech, *id.* at 115–16, which had to be construed in the light most favorable to Plaintiffs. *See Steele v. United States*, 144 F.4th 316, 320 (D.C. Cir. 2025). The context considered was comprehensive. It encompassed the events leading up to January 6, during which the President "had created an air of distrust and anger among his supporters by creating the false narrative that the election literally was stolen from underneath their preferred candidate by fraud and corruption." *Thompson*, 590 F. Supp. 3d at 115. It also included that the President and his advisors "actively monitored" media coverage about him and would have known that some of his supporters had participated in violence at earlier election-related protests; others (including militia groups) had called for the use

violence on January 6, including against police officers (e.g., "Cops don't have 'standing' if they are laying on the ground in a pool of their own blood."); and a former aide to the President predicted in a widely publicized statement, "there will be violence on January 6th because the President himself encourages it." *Id.* at 65, 115–16. These facts led the court to find plausible that, "when the President stepped to the podium on January 6th . . . he would have known that some in the audience were prepared for violence." *Id.*

Then, as cases from *Brandenburg* to *Counterman* require, the court considered the President's words within this context. *Id.* at 116. The court highlighted some of the more provocative words he used during the Ellipse Speech and then focused on his final exhortation: "We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore." *Id.* He uttered these words immediately before telling his supporters to "march to the Capitol," the very location where he had moments earlier said that those responsible for stealing the election (e.g., "radical Left Democrats" and "weak Republicans") and those who could reverse those results to secure a victory (such as the Vice President) could be found. *Id.* at 113, 116. "Importantly, it was the President and his campaign's idea to send thousands to the Capitol while the Certification was underway. It was not a planned part of the rally. In fact, the permit expressly stated that it did 'not authorize a march from the Ellipse.'" *Id.* at 102; *see* Rally Permit at 3 ("[WAF] will not conduct an organized march from the Ellipse at the conclusion of the rally."). In the end, the court held that the President's words plausibly were "an implicit call for imminent violence or lawlessness. He called for thousands 'to fight like hell' immediately before directing an unpermitted march to the Capitol, where the targets of their ire were at work, knowing that militia groups and others among the crowd were prone to violence." *Thompson*, 590 F. Supp. 3d at 117. These facts also gave rise to the plausible inference that the President specifically intended

64

for his words to produce imminent violence, and they likely would do so.  *See id.* at 116 (quoting *Hess*, 414 U.S. at 108–09); *see also Counterman*, 600 U.S. at 73, 76.

Nowhere in this analysis did the court start with a presumption about President Trump's intent and then apply it to the words he spoke.  Just the opposite is true.  Based on the "particular words used in [the] particular context[]," the court considered whether it was plausible that the President intended for his words to produce imminent lawlessness and the likelihood of it.  *Counterman*, 600 U.S. at 73, 76.  His knowledge of what had come before and who would be in the crowd was critical to that analysis and plainly relevant to the inquiry.  *See id.* at 81 (equating the "specific intent" in its incitement decisions with "purpose or knowledge").  President Trump is wrong to suggest otherwise.  *See* Def.'s Recons. Mem. at 21–22 (asserting that the court "improperly filter[ed] the words used through what it took to be President Trump's understanding of the crowd and its reaction[26] in order to vest them with implicit meaning that the Court acknowledged they did not explicitly contain"); *id.* at 27–28 ("[T]his Court erred when it relied on the 'broader context' to read into President Trump's words a meaning that simply was not there.").

The court quickly disposes of one additional critique of its reasoning.  President Trump argues that, even accepting the factual allegations outlined by the court, the most that they establish is that he "was aware of a risk that some listeners might react violently and spoke anyway."  Def.'s Recons. Mem. at 22.  The court agrees that merely ignoring a known substantial risk—acting recklessly—is not enough to make out incitement, which requires a heightened mental state—the specific intent to produce imminent disorder.  *See id.* (citing *Counterman*, 600 U.S. at 78–79, 81).

---

[26] If by "reaction" President Trump means how the crowd perceived the Speech, the court did not take that into account. In fact, the court recognized that the subjective understandings and reactions of listeners was not a relevant consideration. *See Thompson*, 590 F. Supp. 3d at 116–17. For that reason, the court made clear that it had "assiduously avoided relying on any allegations that Plaintiffs made about any person's reaction to the President's January 6 Rally Speech. (And, Plaintiffs did make such allegations. . . .)." *Id.* at 117 (citations omitted).

But the argument about pleading sufficiency fails for the simple reason that, on a motion to dismiss, the well-pleaded facts must be "taken in the light most favorable to the plaintiff[s] and with all reasonable inferences drawn in [their] favor." *Steele*, 144 F.4th at 320 (alterations in original) (internal quotation marks omitted). For the reasons discussed, it is plausible that President Trump had the requisite intent to produce imminent disorder.

Since the court's decision, new allegations have surfaced that only confirm this conclusion. Cassidy Hutchinson, then-assistant to Chief of Staff Mark Meadows, testified before the Select Committee. *See* Pls.' Mot. to Strike, Ex. 2, ECF No. 183-3.[27] Hutchinson was with President Trump immediately before the Ellipse Speech. *See id.* at 11. She described him as angry that the rally space was not full of spectators, and she heard him complain about the Secret Service setting up magnetometers, or "mags," that were preventing people who possessed weapons from entering the rally. *See id.* Hutchinson "overheard the President say something to the effect of, 'You know, I don't F'ing care that they have weapons. They're not here to hurt me. Take the F'ing mags away. Let my people in. They can march to the Capitol from here. Let the people in. Take the F'ing mags away.'" *Id.* at 11–12. After he was told the magnetometers could not be removed, Hutchinson heard the President say "something to the effect of, you know, 'F the Secret Service. I'm the President. Take the F'ing mags away. They're not here to hurt me.'" *Id.* at 12.

Hutchinson's recollections of January 6 heighten the plausibility that President Trump's Ellipse Speech contained words of incitement. If assumed true—and the President disputes their veracity, Hr'g Tr. at 110:23-25—at a minimum, they establish that the President knew that some

---

[27] Hutchinson's testimony is outside the four corners of the complaints, but the court believes it is appropriate to consider it in the present posture where the question is whether "justice requires" reconsideration. *See Capitol Sprinkler*, 630 F.3d at 227. If the court were to grant reconsideration, it would allow Plaintiffs to amend their complaints to reflect Hutchinson's testimony and any additional relevant evidence that has come to light after the court's ruling. It therefore is more efficient to consider those allegations now.

supporters in the crowd had weapons and that those weapons might be used to cause harm, though not to him.  No longer is the President's knowledge about his supporters' willingness to engage in imminent violence based merely on complaint allegations about historical facts preceding January 6.  It is now corroborated by a first-hand account of his state of mind on the day itself, moments before addressing the crowd.  His statements to "Take the F'ing mags away" and that "They're not here to hurt me" may not amount to a confession.  But those words support the reasonable inference that he meant for his Ellipse Speech to be heard as "an implicit call for imminent violence or lawlessness."  *See Thompson*, 590 F. Supp. 3d at 117.  His remarks on January 6 therefore plausibly were inciting words that are not protected by the First Amendment.

### C.    The Rap Concert Analogy

As a final salvo, President Trump resuscitates an argument the court previously rejected but with a twist.  He again insists that an adverse ruling "will open floodgates for incitement decisions" and thereby constrain First Amendment protections.  *Compare* Def.'s Recons. Mem. at 29, *with Thompson*, 590 F. Supp. 3d at 117.  Before, his focus was on the impact such ruling would have on political speech.  *See Thompson*, 590 F. Supp. 3d at 117.  Now his concern is over the "ramifications for public citizen speech."  Def.'s Recons. Mem. at 30.  To illustrate the point, he poses the hypothetical of a popular rapper (bearing some resemblance to Eminem) whose concert performance leads to fan violence.  *See id.* at 30–31.

It goes something like this.  The rapper is known for his provocative and controversial lyrics, which "describe explicit violent acts, including gun violence, rape, and a description of the rapper drowning his wife."  *Id.* at 30.  It is widely reported in the news that his song lyrics are inspiring young people to "act emotionally and sometimes violently."  *Id.* at 30–31.  The rapper is aware of this phenomenon.  Yet, when he takes the stage in front of thousands of fans, he performs

67

his "most aggressive" songs and stokes his audience's passions saying, "Fight the Man!  Fight the Establishment!  Don't let them tell you what to do!  Fight like hell!"  *Id.*  Chaos ensues.  Inspired by these words, concert goers "storm[] the nearest establishments," stealing food from concession stands, attacking vendors, and "beating down security guards to access the backstage areas of the venue."  *Id.*  Presumably, this goes on for hours and the rapper does not unequivocally call for his fans to cease committing acts of violence.

President Trump fears that, under the court's ruling, "there is a compelling argument to be made that the rapper's speech—'in context' (which could include lyrics he published weeks, months, or years prior to the concert)—constitutes incitement to violence."  *Id.*  That result, he says, would represent a major break from First Amendment precedent, which otherwise protects the rapper's expression.  *Id.*

But here is what is missing from the President's hypothetical.  There is no contention that, for weeks before the concert, the rapper told his fans that the Establishment had taken something valuable from *them* through fraud and deceit.  No assertion that the rapper knew his fans had prepared to act violently on that very day (including by bringing weapons to the show) to reclaim what was taken from them.  No averment that during the performance the rapper specifically identified the members of the Establishment who took this thing of value.  And no allegation that, at the show's crescendo, he implored his fans to "Fight the Establishment" and "Fight like hell" *and* then directed them, without warning local law enforcement, to descend thousands strong on the very place the Establishment was working to finally take away that thing of value.  Only if those facts are included does the rap concert begin to resemble January 6, and only then do the artist's song lyrics and exhortation to "Fight like hell" mirror the Ellipse Speech.  The court would

68

agree that, in this revised hypothetical, the rapper's expression plausibly are words of incitement. But not in the incomplete one posed by the President.

Accordingly, the court declines to reconsider its decision not to dismiss based on the First Amendment.

### D.    Certification for Interlocutory Review

Although the court declines to reconsider, it will certify its First Amendment rulings—the denials of the motion to dismiss and the motion for reconsideration—for interlocutory review. *See* 28 U.S.C. § 1292(b).   The certifiable question is: Have Plaintiffs plausibly alleged that President Trump's exhortations at the end of the Ellipse Speech—"We fight.  We fight like hell and if you don't fight like hell, you're not going to have a country anymore," and "[W]e're going to try to and give [weak Republicans] the kind of pride and boldness they need to take back our country"—moments before directing thousands of followers on an unpermitted march to the Capitol are inciting words that fall outside the protections of the First Amendment?

The court's rulings (1) "involve[] a controlling question of law; (2) a substantial ground for difference of opinion concerning the ruling[s] exists; and (3) an immediate appeal would materially advance the litigation." *APCC Servs., Inc. v. Sprint Commc'ns Co.*, 297 F. Supp. 2d 90, 95 (D.D.C. 2003).   The court further believes that "exceptional circumstances" exist to depart from the ordinary policy of not permitting immediate review of interlocutory orders. *Virtual Def. & Dev. Int'l Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 22 (D.D.C. 2001).  These lawsuits involve the sitting President of the United States, raise an important question about the line between protected political expression and unprotected incitement, and involve matters of considerable public interest.  Further, resolving the First Amendment issue in favor of President Trump may accelerate

these proceedings against him and result in the dismissal of the cases.[28]   The court therefore certifies its First Amendment rulings for interlocutory review.

## V.   MOTION TO STRIKE WESTFALL ACT CERTIFICATION

The court finally arrives at the last of the three primary motions before it: Plaintiffs' motion to strike the Department of Justice's Westfall Act Certification.  Recall, the Department of Justice filed a Certification that the Attorney General had determined that President Trump's alleged conduct fell within the scope of his employment as President of the United States.  Under the Westfall Act, such certification mandates the United States' substitution as the defendant for the tort claims brought against him.  Plaintiffs have moved to strike the Certification, arguing that the record evidence does not support the Attorney General's scope-of-employment determination. *See generally* Pls.' Mot. to Strike.

The Westfall Act provides in relevant part:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).  A scope-of-employment certification by the Attorney General is not "conclusive[]," but it does "constitute *prima facie* evidence that the employee was acting within the scope of his employment." *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006) (internal quotation marks omitted).

A plaintiff can challenge a certification.  To do so, the plaintiff "must submit persuasive evidence—specific evidence or a forecast of specific evidence—that contradicts the certification."

---

[28] The court expresses no opinion as to whether Plaintiffs' claims would be subject to dismissal for failure to state a claim if allegations relating to the Ellipse Speech were to drop out of these suits.

70

*Steele v. Meyer*, 964 F. Supp. 2d 9, 17 (D.D.C. 2013) (internal quotation marks omitted); *see also Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013) (noting that "[m]ere conclusory statements" are not enough to rebut a Westfall certification (internal quotation marks omitted)). Plaintiffs believe that the discovery taken and developed on official-acts immunity is sufficient to overcome the Certification. *See* Joint Status Report, ECF No. 170, at 3 (declining to seek additional Westfall Act discovery).[29]

"To determine whether an employee was acting within the scope of his employment under the Westfall Act, courts apply the *respondeat superior* law of the state in which the alleged tort occurred." *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009). Both Plaintiffs and the United States evaluate the Certification's merits under District of Columbia law, so the court does the same. *See* Pls.' Mot. to Strike at 12–13; U.S. Opp'n to Pls.' Mot. to Strike at 5–6. The District of Columbia "generally adheres to" the Second Restatement of Agency in delineating the scope of employment. *Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023). This means, in relevant part, that conduct falls within the scope of employment if "(a) it is of the kind [the person] is employed to perform; (b) it occurs substantially within the authorized time and space limits;" and "(c) it is actuated, at least in part, by a purpose to serve the master." *Id.* (quoting Restatement (Second) of Agency § 228(1) (A.L.I. 1958)).

The parties scrupulously address each of these factors. Pls.' Mot. to Strike at 14–28; U.S. Opp'n to Pls.' Mot. to Strike at 9–38. The court need not do the same. It grants Plaintiffs'

---

[29] It remains unclear to the court which party bears the ultimate burden of proof when a Westfall Act Certification is challenged. The plaintiff bears an initial *pleading* burden to show that the defendant's actions exceeded the scope of his employment. *See Wuterich v. Murtha*, 562 F.3d 375, 382–83 (D.C. Cir. 2009). Success entitles the plaintiff to discovery. *See id.* Thereafter, the plaintiff bears a burden of *production* to come forward "with evidence supporting his allegations both as to scope and as to the merits." *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994). If there is a dispute of material fact as to scope at that point, the trial court must hold a hearing. *See id.* In *Kimbro*, the court did not say which party bears the ultimate burden of proof—the plaintiff to disprove scope or the United States to prove it. And the D.C. Circuit has not done so since. In any event, the court need not belabor the issue any further, as it decides in Plaintiffs' favor regardless of which side bears the ultimate burden of proof.

motion largely for the reasons already discussed: the same activities found to be beyond the outer perimeter of President Trump's official responsibilities also fall outside the scope of his employment as President of the United States. The similarities between the two inquiries explain why.

Start with official-acts immunity. Protected conduct must be of the kind tied to the "function" of the office. *See Clinton v. Jones*, 520 U.S. 681, 694 (1997) (describing the "functional approach" applied to official-acts immunity). Conduct within the "outer perimeter" thus encompasses not only those Presidential duties enumerated by the Constitution or statute, but also "'discretionary acts' within the 'concept of duty.'" *Blassingame*, 87 F.4th at 13 (citation omitted). This functional approach is reflected in the now-familiar outer-perimeter formulation from *Blassingame*: "an act lies within the outer perimeter of an official's duties if it is 'the kind of act not manifestly or palpably beyond [the official's] authority, but rather having more or less connection with the general matters committed by law to his control or supervision.'" *Id.* (alteration in original) (citation omitted). Conversely, conduct that has no connection to the official's functions does not enjoy immunity.

The D.C. Court of Appeals has taken a similar "functional approach" in describing the first element of the scope-of-employment test—whether the conduct "is of the kind the person is employed to perform." *Carroll*, 292 A.3d at 230. "This language plainly encompasses an employee's performance of their stated job duties." *Id.* That includes not only expressly authorized "job functions" but also "informal responsibilities that are as integral to their employment as their formal responsibilities." *Id.* Or, to quote the Restatement formulation used by the D.C. Court of Appeals, conduct is of the kind a person is employed to perform if it is "either 'of the same general nature as' *or* 'incidental to' the conduct authorized so as to be within the scope

of employment." *Id.* (quoting Restatement (Second) of Agency § 229(1)). The former "reflect[s] an inquiry into the similarity between the tortious conduct and an individual employee's job functions akin to a plain language reading of § 228(1)(a)." The latter "reflects a broadening of the permissible nexus between an employee's conduct and their job responsibilities" and asks whether the tortious conduct was the "outgrowth of a job-related controversy." *Id.* at 231–32 (internal quotation marks omitted). It is not enough that the employment created the mere opportunity to commit the tort; there must be "some relationship or nexus between the tortious conduct and the employee's responsibilities for it to be an outgrowth of a job-related controversy." *Id.* at 232.

These scope-of-employment principles map neatly onto the framework for assessing official-acts immunity for Presidential conduct. Both cover conduct that is "*expressly* authorized." *Id.* at 230. For the President, those are the core functions delineated by Article II and by statute. But they also go further, reaching conduct having "some relationship or nexus between the tortious conduct and the employee's responsibilities." *Id.* at 232. For the President, that would extend to "'discretionary acts' within the 'concept of duty' associated with the office." *Blassingame*, 87 F.4th at 13. On the other hand, activities that have no such nexus fall outside the President's scope of employment, just as conduct with no connection to "the general matters committed [to him] by law" falls beyond the outer perimeter and is not immune from civil liability. *Id.*

The court need not decide whether the scope and outer-perimeter inquiries are always co-extensive when it comes to the acts of the President. It is enough to say that, in this case, it is hard to discern any daylight between the two. This follows from the fact that "[t]he presidency itself has no institutional interest in who will occupy the office next." *Id.* at 17. "Campaigning to *attain* that office thus is not an official function *of* the office." *Id.* And importantly, "an incumbent President's interests in winning re-election have the same purely private character as those of his

challengers." *Id.* If conduct in pursuit of retaining office is not an "official function" and is of a "purely private character," then such conduct likewise is neither the kind of act an incumbent President is employed to perform nor one that bears any relationship or nexus with his responsibilities. Put more simply, winning re-election is not a function or outgrowth of the job of an incumbent officeholder; therefore, acts in furtherance of that end fall outside the scope of employment under District of Columbia law.

The United States resists applying *Blassingame*'s logic to resolve the scope issue for purposes of the Westfall Act Certification. U.S. Opp'n to Pls.' Mot. to Strike at 7–8. The court is not persuaded by these arguments.

First, the United States contends that *Blassingame* is inapt because the District of Columbia's "law of *respondeat superior*, which—in contrast to federal common law on 'official-act immunity'—serves a different purpose and is applied 'very expansively' to achieve the specific policy objectives of D.C. tort law." *Id.* at 7–8. But the United States does not explain how the District's *respondeat superior* law is broader than the law on official-acts immunity or why its underlying policy demands a more expansive reading. One would think the opposite would be true. "The principal rationale for official immunity—providing an official the maximum ability to deal fearlessly and impartially with the duties of his office— . . . applies to the President with pronounced force." *Blassingame*, 87 F.4th at 12 (internal quotation marks omitted). That purpose would seem to warrant a more capacious application of official-acts immunity than when assessing an employer's liability for the tortious acts of its employee in a private action.

Second, the United States argues that "graft[ing]" *Blassingame*'s officer-seeker/office-holder distinction onto the scope issue would be improper because the D.C. Court of Appeals in *Carroll* stated that it has "never adopted a rule that has determined that a certain type of conduct

74

is per se within (or outside of) the scope of employment." U.S. Opp'n to Pls.' Mot. to Strike at 8 (quoting *Carroll*, 292 A.3d at 240). That is true. But the *Carroll* court also said that "the District of Columbia's precedents have consistently adhered to a fact-bound inquiry to determine whether the conduct of an employee is within the scope of employment." *Carroll*, 292 A.3d at 240. The official-acts immunity inquiry described in *Blassingame* requires precisely the same fact-specific assessment. *See Blassingame*, 87 F.4th at 21–22.

Third, the United States asserts that "*Westfall* Act immunity is particularly broad and especially so when applied to the President, whose duties and responsibilities are unmatched, resulting in a wide range of activity falling within scope." U.S. Opp'n to Pls.' Mot. to Strike at 8. But again, it does not explain why that statutory immunity should be construed more broadly than official-acts immunity when it comes to the President. The government quotes a footnote from the Second Circuit's decision in *Carroll v. Trump*, 49 F.4th 759, 765 n.3 (2d Cir. 2022), which states, "Our holding today is that the Westfall Act extended absolute immunity to the President for non-official acts as long as they are within the scope of employment." It is hard to know what to make of this statement. The Second Circuit in that case was not asked to opine on the intersection between official-acts immunity and the Westfall Act—official-acts immunity was not even raised as an issue.[30] And ordinarily appellate courts do not put a "holding" in a footnote. The statement's meaning becomes even murkier given that the Second Circuit did not ultimately "hold" anything but instead certified the scope-of-employment question to the D.C. Court of Appeals. *See id.* at 781. The ambiguous footnote from *Carroll v. Trump* thus does not alter the court's thinking.

---

[30] In the *Carroll* litigation, President Trump failed to move to dismiss on the ground of official-acts immunity or assert the defense in his answer, and the Second Circuit ruled that he had waived it as a result. *See Carroll v. Trump*, 88 F.4th 418, 429 (2d Cir. 2023), *adhered to*, 151 F.4th 50, 65–67 (2d Cir. 2025).

Finally, the United States argues that, even if *Blassingame*'s analysis of official-acts immunity were relevant to the scope question, "*Blassingame* is not the last word on presidential immunity." U.S. Opp'n to Pls.' Mot. to Strike at 8. It asserts that the Supreme Court "declined to adopt the D.C. Circuit's blanket 'office seeker' vs. 'office holder' test to a President's actions," noting that the Court viewed as "official" some acts characterized as "campaign conduct," such as President Trump's interactions with the Vice President and with the Department of Justice. *See id.* But as already described, the Supreme Court did not reject the distinction made by *Blassingame*. *See supra* Section II.C.1. Rather, like the D.C. Circuit, it refused to accept a party's characterization of President Trump's various activities and instead called for judicial review to "differentiate between a President's official and unofficial actions." *Trump*, 603 U.S. at 617. That is precisely what the court has done here. It has distinguished official from unofficial acts. President Trump cannot be held liable for the former. Because those acts have fallen away on immunity grounds, they are no longer a basis for substitution under the Westfall Act. All that remains is conduct that lies beyond the outer perimeter of his official responsibilities and, concomitantly, outside the scope of his employment.

The court therefore strikes the United States' Westfall Act Certification.

## VI.    CONCLUSION AND ORDER

For the foregoing reasons, the court rules as follows:

1.    President Donald J. Trump's Motion for Summary Judgment, ECF No. 144, is denied except as to the conduct that the court has determined were official acts;

2.    President Donald J. Trump's Motion to Reconsider Denial of His Motion to Dismiss on First Amendment Grounds, ECF No. 145, is denied, but the court grants the President's request to certify both the present ruling and the original denial for interlocutory review;

3.    Plaintiffs' Motion to Strike the Government's Westfall Act Certification, ECF No. 183, is granted;

4.    Plaintiffs' Request for Judicial Notice in Support of Opposition to Defendant's Motion for Summary Judgment, ECF No. 153, is granted insofar as the court has relied on any facts Plaintiffs have requested be judicially noticed; and

5.    President Donald J. Trump's Objection to Admission of Select Committee Final Report, ECF No. 173, is denied to the extent the court has cited to the Report to establish facts that the court believes can be converted into admissible evidence.

Dated:  March 31, 2026

_____
Amit P. Mehta
United States District Judge

**APPENDIX**

The filings relevant to Defendant's Motion for Summary Judgment on Absolute Presidential Immunity Grounds are: (1) Def.'s Mot. for Summ. J., ECF No. 144 [Def.'s SJ Mot.], Def.'s Mem. of P. & A. in Supp. of Def.'s SJ Mot. on Absolute Presidential Immunity Grounds, ECF No. 144-1 [Def.'s SJ Mem.]; (2) Under Seal - Pls.' Opp'n to Def.'s SJ Mot., ECF No. 155-1 [Pls.' SJ Opp'n];[31] and (3) Def.'s Reply Mem. in Supp. of Def.'s SJ Mot. on Presidential Immunity Grounds, ECF No. 174 [Def.'s SJ Reply].

When referencing the parties' fact statements, the court refers to two filings: (1) Def.'s Resp. to Pls.' Counterstatement to Def.'s Stmt. of Undisputed Facts, ECF No. 175-1 [Def.'s Stmt.], and (2) Def.'s Counterstatement to Pls.' Stmt. of Add'l Undisputed Facts, ECF No. 175-2 [Def.'s CounterStmt.].  Together, these filings set forth each parties' respective statements and responses.

The filings relevant to Def.'s Motion for Reconsideration are: (1) Def.'s Mot. to Recons. Denial of his Mot. to Dismiss on First Am. Grounds, ECF No. 145 [Def.'s Recons. Mot.], Def.'s Mem. of P. & A. in Supp. of Def.'s Recons. Mot., ECF No. 145-1 [Def.'s Recons. Mem.]; (2) Pls.' Opp'n to Def.'s Recons. Mot., ECF No. 154 [Pls.' Recons. Opp'n]; and (3) Def.'s Reply Mem. of P. & A. in Supp. of Def.'s Recons. Mot., ECF No. 171 [Def.'s Recons. Reply].

The relevant filings relating to Plaintiffs' Motion to Strike the Government's Westfall Act Certification are: (1) Pls.' Mot. to Strike the Gov't's Westfall Act Cert., ECF No. 183 [Pls.' Mot. to Strike]; (2) U.S.'s Opp'n to Pls.' Mot. to Strike, ECF No. 188 [U.S. Opp'n to Pls.' Mot. to Strike]; and (3) Pls.' Reply in Supp. of Pls.' Mot. to Strike, ECF No. 190 [Pls.' Mot. to Strike Reply].

---

[31] When the court cites to exhibits filed with Plaintiffs' Summary Judgment Opposition, ECF No. 155-1, the court sometimes cites to exhibits filed with ECF No. 152, Redacted - Plaintiffs' Opposition to Defendant's Motion for Summary Judgment.

The relevant evidentiary filings are: (1) Pls.' Request for Jud. Notice in Supp. of Pls.' SJ Opp'n, ECF No. 153 [Pls.' Mot. for Jud. Notice]; (2) Def.'s Mem. of P. & A. in Partial Opp'n to Pls.' Mot. for Jud. Notice, ECF No. 172 [Def.'s Opp'n to Pls.' Mot for Jud. Notice]; and (3) Pls.' Reply in Supp. of Pls.' Mot. for Jud. Notice, ECF No. 181 [Pls.' Jud. Notice Reply]; (4) Def.'s Obj. to Admis. of Select Comm. Final Rep., ECF No. 173 [Def.'s SJ Obj.]; (5) Pls.' Resp. to Def.'s SJ Obj., ECF No. 182 [Pls.' SJ Obj. Opp'n]; and (6) Def.'s Reply in Supp. of Def.'s SJ Obj., ECF No. 187 [Def.'s SJ Obj. Reply].