**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BARBARA J. LEE et al., | |
| Plaintiffs, | |
| v. | Case No. 21-cv-00400 (APM) |
| DONALD J. TRUMP et al., | (lead case) |
| Defendants. | |
| | |
| ERIC SWALWELL, | |
| Plaintiff, | Case No. 21-cv-00586 (APM) |
| v. | (consolidated case) |
| DONALD J. TRUMP et al., | |
| Defendants. | |
| | |
| JAMES BLASSINGAME et al., | Case No. 21-cv-00858 (APM) |
| Plaintiffs, | (consolidated case) |
| v. | |
| DONALD J. TRUMP, | |
| Defendant. | |
| | |
| CONRAD SMITH et al., | Case No. 21-cv-02265 (APM) |
| Plaintiffs, | (consolidated case) |
| v. | |
| DONALD J. TRUMP et al., | |
| Defendants. | |

MARCUS J. MOORE et al.,

                Plaintiffs,

       v.

DONALD J. TRUMP,

                Defendant.

Case No. 22-cv-00010 (APM)

(consolidated case)

---

BOBBY TABRON et al.,

                Plaintiffs,

       v.

DONALD J. TRUMP,

                Defendant.

Case No. 22-cv-00011 (APM)

(consolidated case)

---

BRIANA KIRKLAND,

                Plaintiff,

       v.

DONALD J. TRUMP,

                Defendant.

Case No. 22-cv-00034 (APM)

(consolidated case)

---

SANDRA GARZA,

                Plaintiff,

       v.

DONALD J. TRUMP et al.,

                Defendants.

Case No. 22-cv-00038 (APM)

(consolidated case)

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE COURT'S HOLDING ON TRUMP'S 2:24 PM TWEET ON JANUARY 6, 2021, OR IN THE ALTERNATIVE, FOR CERTIFICATION FOR INTERLOCUTORY APPEAL**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 2

LEGAL STANDARD .................................................................................................. 7

ARGUMENT ............................................................................................................... 7

    I.   Trump did not carry his burden as to the 2:24 p.m. tweet. ................................. 7

    II.  Ample contextual evidence demonstrates that Trump was acting as a
          presidential candidate when he issued the tweet .................................................. 9

    III. This Court's observations about the President's location and advice from
          White House advisors do not change the outcome. ........................................... 12

        A.  The Court's reliance on the existence of advice from advisors is wrong
            as a matter of fact and as a matter of law .................................................... 12

        B.  The President's physical presence in the White House does not confer
            immunity. ..................................................................................................... 15

    IV. If this Court disagrees, it should certify the issue for interlocutory appeal. ..................... 16

CONCLUSION ........................................................................................................... 17

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Blassingame v. Trump*,
   87 F.4th 1 (D.C. Cir. 2023) .......................................................................... *passim*

*Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.*,
   630 F.3d 217 (D.C. Cir. 2011) .......................................................................7

*Clinton v. Jones*,
   520 U.S. 681 (1997) ......................................................................................15

*In Defense of Animals v. National Institutes of Health*,
   543 F. Supp. 2d 70 (D.D.C. 2008) .................................................................7

*Kennedy v. District of Columbia*,
   145 F. Supp. 3d 46 (D.D.C. 2015) ...............................................................16

*Mohawk Industries, Inc. v. Carpenter*,
   558 U.S. 100 (2009).......................................................................................16

*Philipp v. Federal Republic of Germany*,
   253 F. Supp. 3d 84 (D.D.C. 2017) ...........................................................16, 17

*Trump v. United States*,
   603 U.S. 593 (2024)................................................................................. 10-14

*United States v. Trump*,
   No. 1:23-cr-00257 (D.D.C. Oct. 2, 2024)................................................5, 6, 11

**Statutes**

28 U.S.C. § 1292(b) ............................................................................................7, 16

**Other Authorities**

Interview of Cassidy Hutchinson by House Select Committee,
   117th Cong. 26 (2022) ....................................................................................5

Fed. R. Civ. P. 54..................................................................................................7

**INTRODUCTION**

Plaintiffs request reconsideration of the holding that Trump is entitled to immunity for his 2:24 p.m. tweet accusing Vice President Pence of lacking "the courage" to overturn the electoral vote and proclaiming that "USA demands the truth!" The Court reached that conclusion based on two observations: that the tweet was sent while Trump "was at the White House" and that he "was acting (or not) on the advice of White House advisors." But neither rationale survives scrutiny against the Court's own findings, *Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023), or the record.

The Court prefaced its holding with: "Neither side has offered specific facts" about the 2:24 p.m. tweet. In fact, Trump placed no evidence before this Court about the tweet because he never sought immunity for it in the first place. And he offered no facts in his summary judgment motion and statement of undisputed facts suggesting he was acting in his official capacity when he issued the tweet. Because Trump bears the burden of proof, immunity should be denied. Indeed, because Trump elsewhere "offer[ed] no contextual evidence"—regarding the false-elector scheme, campaign rallies, and most state-official contacts—this Court deemed them unofficial.

To the extent the Court considers the record, the full record does not demonstrate that Trump was acting on any advisor's advice when he composed the 2:24 p.m. tweet. Trump had expressed frustration that he could not join the march to the Capitol and asked to be left alone in the dining room. Official documentation halted. He watched Fox News, spoke to his personal attorney, and eventually issued the tweet. The record does not demonstrate that Trump spoke with a single government advisor before composing the tweet. The closest-in-time advice he received was from two government officials who pleaded with him to make a public statement to calm rioters. But Trump refused their request. And neither the tweet itself nor any other context suggests

that Trump was acting in response to their advice. Rather, in a continuation of the exhortations in his Ellipse speech, the 2:24 p.m. tweet targeted Pence and egged on rioters.

The unofficial nature of the 2:24 p.m. tweet is confirmed by its similarity to earlier tweets (at 1:00 a.m. and 8:17 a.m.) that the Court already held were unofficial. The 2:24 p.m. tweet presses the same demand against the same target (Pence), for the same purpose (Trump's retention of office), in the same candidate-style language ("USA demands the truth!").

Nor can Trump's presence in the White House make the tweet official. Immunity attaches to functions, not people or happenstance location. *Blassingame*, 87 F.4th at 17-19. That's why office acceptance speeches are paradigmatically unofficial, despite often occurring "at a podium affixed with the presidential seal" or the White House's South Lawn. *Id.*

For these reasons, this Court should reconsider its conclusion on the 2:24 p.m. tweet and hold that Trump did not prove his entitlement to immunity. If the Court declines Plaintiffs' request, Plaintiffs ask that the issue be certified for interlocutory review, so the D.C. Circuit can efficiently review it alongside Trump's appeal. Because the tweet immediately precipitated a surge in violence at the Capitol, the communication is important to Plaintiffs' case and warrants immediate appellate review.[1]

## FACTUAL BACKGROUND[2]

By January 6, Trump had pursued multiple avenues for overturning the election and failed: "[v]irtually all the lawsuits had already been lost," state officials had refused to reverse outcomes, and the Justice Department had concluded the fraud allegations lacked merit. Dkt. No. 173-24 at 76-77 (Select Committee's Final Report, hereinafter "F.R.").

---

[1] Plaintiffs inquired as to Defendants' position on the relief sought in this motion earlier today, but as of the time of filing, have not received a response from opposing counsel.

[2] The facts are recounted here in the light most favorable to Plaintiffs.

Although Pence had repeatedly told Trump—"[m]any times," and "very consistent[ly]"—that he had no legal authority to reject or return electoral votes, F.R. 456, Trump devoted the days and hours preceding 2:24 p.m. on January 6 to a public campaign to coerce Pence into changing the election's outcome. At 1:00 a.m. on January 6, Trump tweeted from @realDonaldTrump: "If Vice President @Mike_Pence comes through for us, we will win the Presidency. . . . Mike can send it back!" *Id.* at 456-57. At 8:17 a.m., he tweeted: "All Mike Pence has to do is send them back to the States, AND WE WIN. Do it Mike, this is a time for extreme courage!" *Id.* at 457.

Trump continued this during his Ellipse speech—a speech that "Trump delivered [] as an office-seeker still attempting to secure re-election and not as an incumbent office-holder." Dkt. No. 219 at 41 (Memorandum Opinion and Order, hereinafter "Op."). Trump went off script five separate times to pressure Pence by name—telling the crowd, "if Mike Pence does the right thing, we win the election," that "Mike Pence is going to have to come through for us," and "I hope Mike has the courage to do what he has to do." F.R. 36-37. Trump also told the crowd at the Ellipse that "Mike Pence has to agree to send it back," prompting the crowd to chant "send it back." Dkt. No. 175 at 442 (Def.'s Counterstmt. to Pls.' Add'l Facts).

Trump concluded his remarks at 1:10 p.m. and made clear "his intention to join the march to the Capitol." F.R. 587. "[A] number of witnesses [] described . . . an 'angry,' 'irate,' or 'furious' interaction in the Presidential vehicle between the President and the Secret Service." *Id.*; *id.* at 590. Trump "continued to push to travel to the Capitol even after returning to the White House." F.R. 592; *see id.* at 588 (recalling, "shortly after he returned to the White House," Trump "saying that he wanted to physically walk and be a part of the march").

At approximately 1:21 p.m., minutes after arriving at the White House, a staff member informed him "they're rioting down at the Capitol." F.R. 592. The President said, "Oh really?"

3

and "All right, let's go see." *Id.* The White House photographer captured a photograph of the moment, but that was "the last one permitted until later in the day." *Id.*

Official documentation of Trump's activities ended for several hours. "[T]he Presidential Daily Diary—the schedule that tracks every meeting and phone call in which the President partakes—is inexplicably blank between 1:21 p.m. and 4:03 p.m." *Id.* at 593. The White House photographer was "turned away" as Trump proceeded into the White House dining room. *Id.*

Nevertheless, the Select Committee determined that Trump "walked [to] the Presidential Dining Room and sat down at [a] table with the television remote and a Diet Coke close at hand." *Id.* "For the rest of the afternoon," he "hunkered down" in the dining room, watching Fox News and leaving only once to film a video from the Rose Garden. *Id.*

From 1:21 p.m. until the joint session was forced into a recess around 2:20 p.m., Trump called his supporters while watching Fox News. He was "calling [] one by one" the "senators [that] were lodging objections on his behalf" at the joint session. *Id.* at 594. Trump was also on the phone with his personal lawyer Rudolph Giuliani at least twice: "for 3 minutes and 53 seconds at 1:39 p.m. and again for more than 8 minutes at 2:03 p.m." *Id.* White House advisors understood that "[h]e wants to be alone right now." *Id.* at 595.

At 2:24 p.m., Trump made the tweet at issue in this motion: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!" *Id.* at 596.

Around this same time—though the record does not clearly demonstrate whether before or after the 2:24 p.m. tweet—the Chief of Staff and White House Counsel went to the dining room. F.R. 595; *Interview of Cassidy Hutchinson by House Select Committee*, 117th Cong. 26 (2022),

4

https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000928884/pdf/GPO-J6-TRANSCRIPT-CTRL0000928884.pdf (testifying that the two officials went to the dining room around 2:15 to 2:25 p.m.). The rioters had gotten into the Capitol, and they felt "something needs to be done, or people are going to die." F.R. 595. They urged Trump to "issue a statement" to calm rioters. *Id.*

But Trump "refused" and "respond[ed] that the people at the Capitol were angry because the election had been stolen." Motion for Immunity Determinations at 141, *United States v. Trump*, No. 1:23-cr-00257 (D.D.C. Oct. 2, 2024), Dkt. 252 (hereinafter "Smith Mot."). The officials returned from their talk with Trump; "[n]o statement was forthcoming," and they were despairing. F.R. 596. According to Trump, the rioters were not "doing anything wrong" and—with respect to the "Hang Mike Pence" chants—"Mike deserves it." *Id.*

Minutes after the tweet, "the President called [] Senator Tommy Tuberville of Alabama at 2:26 p.m." to convince him to help undermine the election results. *Id.* at 597. "[B]etween 2:26 p.m. and 3:06 p.m., President Trump spoke with House Leader Kevin McCarthy." *Id.* at 598. Again, "Trump wanted to talk objections to the electoral count"—his last hope for victory in the election. *Id.* When McCarthy refused to discuss the electoral count and said, "you've got to call these people off," Trump responded, "Well, Kevin, I guess they're just more upset about the election theft than you are." *Id.* Trump's personal attorney carried on these efforts to pressure legislators later that same day. *Id.* at 608.

Far from organizing or encouraging the 2:24 p.m. tweet—which Trump sent alone from his dining room—"[v]irtually everyone on the White House staff the Select Committee interviewed condemned the 2:24 p.m. tweet in the strongest terms." *Id.* at 86. Adviser Matthew Pottinger testified that the tweet "convinced him to resign as soon as possible." *Id.* at 87. Counselor

Hope Hicks texted a colleague that evening, "Attacking the VP? Wtf is wrong with him." *Id.* at 88. Deputy Press Secretary Sarah Matthews described it as "pouring gasoline on the fire." *Id.*

"[T]he 2:24 p.m. tweet immediately precipitated further violence at the Capitol." *Id.* at 86. A Secret Service agent monitoring threats noted that the tweet had garnered "[o]ver 24K likes in under 2 mins." *Id.* at 597. "[A] rioter used a bullhorn to read the [] Tweet about the Vice President aloud to the crowd trying to gain entry to the building." Smith Mot. at 80-81. Rioters who heard about the tweet described their reactions: "Once we found out Pence turned on us . . . the crowd went crazy. I mean, it became a mob." F.R. 38-39.

Ivanka Trump eventually intervened. F.R. 599. At 2:38 p.m., President Trump tweeted: "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful!" F.R. 89, 600-01. At 3:13 p.m., he tweeted again: "I am asking for everyone at the U.S. Capitol to remain peaceful. No violence! Remember, WE are the Party of Law & Order-respect the Law and our great men and women in Blue. Thank you!" Ivanka Trump helped draft both tweets. F.R. 599-603.

At 4:03 p.m., Trump left the dining room and walked to the Rose Garden to film a video addressing the rioters at the Capitol. F.R. 593, 604-05. The Presidential Daily Diary records that he left the dining room at 4:03 p.m. and returned at 4:07 p.m. *Id.* at 593, 605-06. Multiple White House staffers helped: a personal aide prepared Trump for the camera; advisors drafted a statement; the video was recorded with a White House camera and microphone; staff recorded and reviewed the video before it was released; and a National Archives photographer documented the process. *Id.* at 605-07. Trump told rioters in the video, "[Y]ou have to go home now. We have to have peace. . . . So go home, we love you. . . . [G]o home in peace." *Id.* at 606.

Rioters watched the video on their phones and began to disperse. One rioter shouted to others: "Donald Trump has asked everybody to go home," to which another responded, "That's our order." *Id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) permits this Court to "revise[]" its summary judgment decision "at any time before the entry of a judgment." Fed. R. Civ. P. 54(b); *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (explaining a court may "reconsider an interlocutory order 'as justice requires.'"). Reconsideration is appropriate when, for instance, the court has "made a decision beyond the adversarial issues presented" or "made an error in failing to consider controlling decisions or data." *In Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 70, 75 (D.D.C. 2008).

Certification for interlocutory appeal is appropriate when an order "involves a controlling question of law as to which there is substantial ground for difference of opinion and [] an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

## ARGUMENT

### I.    Trump did not carry his burden as to the 2:24 p.m. tweet.

Because the Rule 56(a) standard governs, Trump "bears the burden of establishing that he is entitled to official-act immunity" and "at this stage, it is a burden of proof," not a burden of production. Op. 14-15. Trump "must establish that the record reveals 'no genuine dispute as to any material fact' and that he 'is entitled to judgment as a matter of law.'" *Id.* at 15 (quoting Fed. R. Civ. P. 56(a)).

Trump failed to do so for the 2:24 p.m. tweet. As this Court recognized: "Neither side has offered specific facts" about the 2:24 p.m. tweet's circumstances. *Id.* at 54. The absence of Trump

7

offering specific evidence dictates the outcome: Trump has not carried his burden, and immunity must be denied.

The Court's grant of immunity on the 2:24 p.m. tweet exceeded the relief Trump himself sought. His motion organizes conduct into four categories: (1) the Ellipse Speech; (2) "[v]arious 'tweets' on . . . Twitter leading up to the events of January 6, 2021"; (3) outreach to state and local officials; and (4) alleged failure to take action to stop the events at the Capitol. Dkt. No. 144-1 at 1-2 (Def.'s Mem. in Supp. of Mot. for Summ. J.). When it turns to tweets specifically, it identifies only tweets "promoting the Rally," the "tweeted video of his Ellipse Rally speech," and "tweets directed at the protesters, urging them to be peaceful." *Id.* at 34. The 2:24 p.m. tweet—which attacked Pence and "immediately precipitated further violence," F.R. 86—fits none of those categories. Nor does it fall within the motion's framing of tweets issued "leading up to" January 6, as it was sent during the Capitol breach. Thus, Trump did not move for summary judgment on immunity grounds as to the 2:24 p.m. tweet.

Further evidencing Trump's failure to carry his burden, Trump's own Statement of Undisputed Material Facts includes *zero facts* indicating he was acting in his official capacity at 2:24 p.m. Dkt. No. 144-2. Rather, the final substantive assertion is that "[a]fter the conclusion of his remarks, President Trump posted a link to the speech to the Account," *id.* ¶ 57—referring to the approximately 1:49 p.m. video post. Not a single one of Trump's asserted facts concerns any other post-speech event: not the 2:24 p.m. tweet, not Trump's location, not his phone calls, not who he spoke with, and not what advice (if any) he received. Plaintiffs' Counterstatement of Facts identifies the text of the tweet itself, Dkt. No. 152-1 ¶ 349, and Trump simply responded "Undisputed," Dkt. No. 175 at 455. Similarly, Defendant's response to Plaintiffs' counterstatement, Dkt. No. 177, offers no facts about the tweet. Thus, Trump failed to meet his

8

burden to demonstrate, through objective, context-specific evidence that the 2:24 p.m. tweet could reasonably be understood as an official action.

The Court's own reasoning throughout the rest of the opinion compels the same conclusion. With respect to Trump's outreach to state and local officials, "[g]iven the complete absence of relevant evidence" offered by Trump, "Plaintiffs were not required to present any of their own to prevail." Op. 45. With respect to pre-rally tweets, because "Trump bears the burden to show, through contextual evidence, that a particular tweet can reasonably be construed as official conduct" but "essentially offered no such evidence, he ha[d] not carried his burden as to any tweet." *Id.* at 52. And for five other categories of evidence where "President Trump offer[ed] no contextual evidence": "None are official," this Court explained. *Id.* at 55. The same rule should apply to the 2:24 p.m. tweet. The burden does not shift to Plaintiffs to disprove immunity where Trump offered no evidence.

## II.    Ample contextual evidence demonstrates that Trump was acting as a presidential candidate when he issued the tweet.

For a sitting President seeking reelection, the question is whether the President was acting "in an official capacity as office-holder or instead in an unofficial capacity as office[]-seeker." *Blassingame*, 87 F.4th at 19. Because the presidency is "agnostic about who will occupy [the office] next[,]…[c]ampaigning to *attain* [the presidency] . . . is not an official function *of* the office." *Id.* at 4, 17. An incumbent engaged in "campaign-related activity" therefore acts beyond "the 'outer perimeter' of his official responsibilities and is not entitled to absolute immunity." Op. 5 (citing *Blassingame*, 87 F.4th at 18-19). "[S]traightforward" examples of an incumbent's unofficial acts include: "a speech at a party convention accepting the party's nomination"; "solicit[ing] donations at a fundraiser for his reelection"; or "fir[ing] a campaign pollster." *Blassingame*, 87 F.4th at 20. That remains true even when the activities have the "recognition" of

a sitting president's "current office," such as a speech being at "a podium affixed with the presidential seal." *Id.* at 19.

"The inquiry… is an objective one, 'grounded in' a context-specific assessment of 'the nature of the function performed.'" *Id.* at 20-21 (quoting *Clinton v. Jones*, 520 U.S. 681, 695 (1997)). "That context may be substantially informed by the way in which the President and the executive branch themselves treat the activity in question." *Id.* at 21. Conduct "clothed in the trappings of an official function based on objective indicia" more likely constitutes an official act, while conduct that "bears the hallmarks of re-election campaign activity" does not. *Id.* "[O]bjective indicia" include: whether the activity is "organized and promoted by official White House channels and government officials and funded with public resources," as well as the audience. *Id.* at 21; *id.* at 23 (considering who attended and participated).

With the President's tweets, the "content and context of each" tweet matters, including "what else was said contemporaneous to the excerpted communications, [and] who was involved in transmitting the electronic communications and in organizing [them]." *Trump v. United States*, 603 U.S. 593, 630 (2024).

These principles demonstrate that the 2:24 p.m. tweet was the activity of an office seeker. The nature of the function performed was a message from Trump's personal Twitter account to his campaign supporters at the Capitol, like a campaign speech. There is no evidence that government officials drafted, organized, or promoted it.

To the contrary, Trump issued the tweet as part of a larger set of office-seeking activities. At 1:10 p.m., Trump concluded his Ellipse speech—that is, a speech made as "an office-seeker still attempting to secure re-election and not as an incumbent office-holder." Op. 41. After his speech, Trump repeatedly requested to join the march. Upon learning about the riot, he got a Diet

10

Coke, went to the dining room, and turned on Fox News to watch. The Presidential Daily Diary and White House photographer stopped documenting Trump's activities. And Trump informed White House staffers that he wanted to be left alone. Thus, "the President's (and executive branch's) own treatment of the matter exhibits that [Trump] view[ed] himself to be engaged in *private* activity as a candidate." *Blassingame*, 87 F.4th at 21.

The tweet's unofficial nature is starker after considering the Rose Garden video. For the video, official documentation resumed, White House staff produced it, and Executive Branch advisors drafted remarks and provided feedback. F.R. 605-06.

Trump's activities directly before and after the tweet also indicate that he was acting in his office-seeking capacity. Right before and after 2:24 p.m., with the assistance of his personal attorney, Trump asked members of Congress to hand him a victory. Thus, what the President "said contemporaneous to the excerpted communications" also demonstrates Trump was essentially campaigning when he sent the tweet. *Trump*, 603 U.S. at 630.

The tweet's content confirms that Trump was acting as an office seeker. Trump spoke to his supporters—after months of riling them up about election fraud—about how Pence ultimately failed to secure Trump's reelection. He encouraged them to demand the truth. That's why the Government, on the same record, characterized the 2:24 p.m. tweet "as a candidate communicating to his angry supporters that Pence had let him—and them—down." Smith Mot. at 144.

That also makes the tweet dissimilar to the Rose Garden video and tweets reflecting Ivanka Trump's involvement. Unlike with those later communications, there is no evidence that the purpose of the 2:24 p.m. tweet was (even ineffectively) to quell the violence.

In fact, the 2:24 p.m. tweet is materially indistinguishable from the contemporaneous January-6 tweets deemed unofficial. The Court held that Trump's tweets at 1:00 a.m. and 8:17

11

a.m. on January 6 were unofficial. Both were directed at Pence, both demanded that he act outside the scope of his ministerial role at the joint session, and both employed the same candidate-to-supporter rhetoric ("we will win the Presidency," "AND WE WIN," "extreme courage"). The 2:24 p.m. tweet tracks the predicate tweets: it accuses Pence of failing to display "the courage" that Trump had demanded that morning ("this is a time for extreme courage!"); it advances the same false claim that States were poised to certify a "corrected set of facts"; and it concludes with the same campaign-style rhetorical flourish ("USA demands the truth!"). Thus, the 2:24 p.m. tweet is the same kind of communication on the same subject directed at the same audience for the same purpose.[3]

### III. This Court's observations about the President's location and advice from White House advisors do not change the outcome.

The Court's holding rests on two contextual observations: that "he was acting (or not) on the advice of White House advisors" and that "[t]he President was at the White House at the time." Op. 54-55. Neither of these observations compels a finding that Trump was acting as an office holder. Even assuming these observations weigh in favor of immunity, they must be considered among the various facts weighing against immunity. Considering those observations along with the facts described above, the only reasonable conclusion is that Trump was acting as a presidential candidate when he sent the 2:24 p.m. tweet.

#### A. The Court's reliance on the existence of advice from advisors is wrong as a matter of fact and as a matter of law.

This Court's observation about the President "acting (or not) on the advice of White House advisors" is not supported by clean record evidence. This Court cites the Select Committee's final

---

[3] Even if a presumption of immunity is present here (and it is not), Plaintiffs have rebutted it. Holding the President liable for the 2:24 p.m. tweet poses no "danger[] of intrusion on the authority and functions of the Executive Branch" because the Constitution excludes the President from the election certification process. Op. 9 (quoting *Trump*, 603 U.S. at 615).

12

report, but the report does not definitively address when Trump drafted the tweet; when Trump's advisors entered the dining room for the first time and requested that he act; and when Trump posted the tweet. The evidence that does exist suggests that Trump drafted the tweet *before* he spoke to a single advisor about the riot at the Capitol. Thus, this Court made an inference in Trump's favor—contrary to the standard required under Rule 56—in concluding that Trump was "acting (or not) on the advice of" his advisors.

But even if Trump's Chief of Staff and White House Counsel had entered the dining room before Trump drafted and posted the tweet, that still would not make it official. Trump refused official documentation (both the White House photographer and the Presidential Diary) of his time in the dining room. And he made clear that he wanted to be alone, not bothered by White House advisors. Those facts alone provide strong evidence he was not acting officially. They are underscored by him watching the results of his Ellipse speech and working with his personal attorney to pressure members of Congress to undermine the election results. Then, two advisors— against his well-known wishes—barged into the dining room because *they* wanted President Trump to issue a public statement quelling the violence at the Capitol.

But there is no evidence that they were "involved in transmitting the electronic communication[]." *Trump*, 603 U.S. at 630. Nothing indicates they composed, edited, or reviewed the tweet. Rather, Trump rebuffed their intrusion; they left the dining room despondent that he would not be making the public statement they requested. Around this time, @realDonaldTrump issued the 2:24 p.m. tweet targeting Pence yet again, and Trump resumed his other efforts to undermine the election results. Thus, the tweet is better understood as part and parcel of the office-seeking activities that precede and follow it rather than the exception (the unwelcome intrusion from advisors).

13

Considering "what else was said contemporaneous to the excerpted communications" lends further support. *Trump*, 603 U.S. at 630. The advisors urged a public statement to quell the violence. Trump instead posted a tweet that his Deputy Press Secretary likened to "pouring gasoline on the fire," and that his Counselor Hope Hicks privately characterized as evidence that something was "wrong with him." F.R. 87-88. The 2:24 p.m. tweet was, on this record, the antithesis of conduct "on the advice of White House advisors."

The Court's holding rests on the alternative formulation that Trump "was acting (or not) on the advice of White House advisors." Op. 54-55. The "(or not)" suggests that the President's act is official either way: whether he heeded his advisors or rejected them. But *Blassingame* makes clear that it is *supporting* acts from the Executive Branch that matters—that is, whether an activity is affirmatively "organized and promoted by official White House channels and government officials." 87 F.4th at 21.

The Court's rule would also lead to incongruous results: It would mean that any act taken by the president—no matter how outlandish (like organizing a poker game) or plainly office-seeking (like firing a campaign pollster)—would become official simply because they occurred after the President received some advice about not engaging in such acts from government officials. And because those officials surround an incumbent on a near-constant basis, immunity would attach to virtually every presidential utterance, collapsing the inquiry into the type of identity-based immunity that *Clinton* and *Blassingame* reject. *See Clinton*, 520 U.S. at 695; *Blassingame*, 87 F.4th at 14-15.

Indeed, many of the actions that Trump took before and on January 6 were contrary to the advice of White House advisors, who repeatedly told him that: (a) there was no evidence of fraud sufficient to change the outcome of the election; and (b) Vice President Pence did not have the

14

power to hand him an electoral victory. But that advice did not convert every action Trump took to stay in office into an official act. Op. 57-58, 47-48.

> **B. The President's physical presence in the White House does not confer immunity.**

The other ground for the Court's holding—that "[t]he President was at the White House at the time"—cannot bear much weight without contravening the foundational principle that immunity attaches to functions, not to actors or to physical settings. *Clinton*, 520 U.S. at 695.

Because the President's job requires near-constant presence at the White House, his presence there shed little light on whether an action should be regarded as official. Imagine that the President is in the White House when he takes a call from his child's teacher. Or imagine that the President accepts his party's nomination to be a presidential candidate in a speech on the White House Lawn. Neither activity is that of an office holder. Accepting a contrary conclusion would come "perilously close" to categorical, identity-based immunity. *See Clinton*, 520 U.S. at 695 (immunity must be "grounded in 'the nature of the function performed, not the identity of the actor'"); *Blassingame*, 87 F.4th at 14-15 (ruling out speech on "public concern" as conferring immunity because it "does not rule out much when the speaker is the President").

That's particularly true here, where Trump sat in the White House dining room—not the Oval Office. And he went there for convenience—not to use any trappings of government. Functionally, the location sufficed because it had a television set and provided privacy for calling his personal attorney and engaging in other efforts to undermine the election results. On that narrative, the White House dining room is much like "a podium affixed with the presidential seal" at a campaign speech: It is an optic that cannot transform the President's activity from that of an office seeker. *Blassingame*, 87 F.4th at 19.

15

### IV.   If this Court disagrees, it should certify the issue for interlocutory appeal.

This issue involves "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). This aspect of the Court's "ruling involves a new legal question [and] is of special consequence"—that is, the application of *Blassingame* and *Trump* (new caselaw) to an established record concerning a tweet that caused rioters to become even more violent at the Capitol (a crucial communication for Plaintiffs' case). *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009). As arguments above demonstrate, there is substantial ground for difference of opinion on whether (1) Trump being "at the White House" and "acting (or not) on the advice of White House advisors" suffices to confer immunity as a matter of law despite other evidence that Trump was acting in his unofficial capacity; and (2) the record suffices for concluding, as a matter of law, that Trump "was acting (or not) on the advice of White House advisors." *Cf. Kennedy v. District of Columbia*, 145 F. Supp. 3d 46, 52 (D.D.C. 2015) (prong satisfied with legal issue of "first impression").

Certification will materially advance the ultimate termination of the litigation. Interlocutory appeals are disfavored because they produce piecemeal litigation. *Philipp v. Fed. Republic of Germany*, 253 F. Supp. 3d 84, 88 (D.D.C. 2017). But the D.C. Circuit will soon consider this Court's holdings denying immunity using the same record and principles of law that pertain to this issue. The same panel should consider the 2:24 p.m. tweet to prevent piecemeal litigation. Otherwise, Plaintiffs will be forced to appeal after final judgment based on a record excluding an important piece of contemporaneous evidence that Trump explicitly ratified and caused more violence at the Capitol. *Cf. id.* (prong satisfied where defendants had already appealed the same decision).

16

**CONCLUSION**

For the reasons above, Plaintiffs request that the Court reconsider its immunity holding on

the 2:24 p.m. tweet and, if it declines to, certify the issue for interlocutory appeal.

Dated: April 30, 2026                             Respectfully submitted,


                                                  /s/ Joseph Sellers
                                                  Joseph M. Sellers, Bar No. 318410
                                                  Brian Corman, Bar No. 1008635
                                                  Alison S. Deich, Bar No. 1572878
                                                  Alisa Tiwari (appl. for admission pending)
                                                  Nina Jaffe-Geffner, Bar No. 90011459
                                                  COHEN MILSTEIN SELLERS & TOLL
                                                  PLLC
                                                  1100 New York Avenue N.W.
                                                  Eighth Floor Washington, D.C. 20005
                                                  Telephone: 202-408-4600
                                                  Facsimile: 202-408-4699
                                                  jsellers@cohenmilstein.com
                                                  bcorman@cohenmilstein.com
                                                  adeich@cohenmilstein.com
                                                  atiwari@cohenmilstein.com
                                                  njaffegeffner@cohenmilstein.com

                                                  Janette McCarthy-Wallace, Bar No.
                                                  OH066257
                                                  Anthony P. Ashton, Bar No. MD25220
                                                  NAACP
                                                  Office of General Counsel
                                                  4805 Mount Hope Drive
                                                  Baltimore, MD 21215
                                                  Telephone: 410-580-5777
                                                  jlouard@naacpnet.org
                                                  aashton@naacpnet.org

                                                  *Attorneys for Plaintiffs Barbara J. Lee, et al.*


                                                  /s/ Edward G. Caspar
                                                  Edward G. Caspar, D.C. Bar No. 1644168
                                                  Marc P. Epstein, D.C. Bar No. 90003967

17

Jeffrey Blumberg, D.C. Bar No. 432928
 LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, DC 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org
mepstein@lawyerscommittee.org
jblumberg@lawyerscommittee.org

Faith E. Gay, *pro hac vice*
Joshua S. Margolin, *pro hac vice*
Babak Ghafarzade, *pro hac vice*
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
jmargolin@selendygay.com
bghafarzade@selendygay.com

William J. Blechman, *pro hac vice*
Elizabeth B. Honkonen, *pro hac vice*
SPERLING KENNY NACHWALTER
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: 305-373-1000
wblechman@sperlingkenny.com

*Attorneys for Plaintiffs Conrad Smith, et al.*


/s/ Matthew Kaiser
Matthew Kaiser, D.C. Bar No. 486272
Sarah R. Fink, D.C. Bar No. 166663
KAISER PLLC
1099 Fourteenth Street N.W.
8th Floor Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com

*Attorneys for Plaintiff Eric Swalwell*


/s/ Patrick Malone

18

Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556 (application
for admission forthcoming)
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

Cameron Kistler, Bar No. 1008922
Kristy Parker, Bar No. 1542111
Erica Newland (Bar No. MD0141)
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Avenue N.W. #163
Washington, D.C. 20006
Telephone: 202-579-4582
cameron.kistler@protectdemocracy.org
kristy.parker@protectdemocracy.org
erica.newland@protectdemocracy.org

Genevieve C. Nadeau, Bar No. 979410
UNITED TO PROTECT DEMOCRACY
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: 202-579-4582
genevieve.nadeau@protectdemocracy.org

*Attorneys for Plaintiffs James Blassingame
and Sidney Hemby*


*/s/ Mark Zaid*
Mark S. Zaid, Esq., D.C. Bar No. 440532
Bradley P. Moss, Esq., D.C. Bar No. 975905
MARK S. ZAID, P.C.
1250 Connecticut Avenue N.W. Suite 700
Washington, D.C. 20036
Telephone: 202-498-0011
Facsimile: 202-330-5610
Mark@MarkZaid.com
Brad@MarkZaid.com

Matthew Kaiser, D.C. Bar No. 486272
Sarah R. Fink, D.C. Bar No. 166663

19

KAISER PLLC
1099 Fourteenth Street N.W. 8th Floor
Washington, D.C. 20005
Telephone: 202-640-2850
mkaiser@kaiserlaw.com
dcsigirinszkij@kaiserlaw.com

*Attorneys for Plaintiff Sandra Garza*


/s/ Patrick Malone
Patrick A. Malone, Bar No. 397142
Daniel Scialpi, Bar No. 997556
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street N.W. Suite 800
Washington, D.C. 20005
Telephone: 202-742-1500
Facsimile: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com

*Attorneys for Plaintiffs Marcus J. Moore et al.; Bobby Tabron et al.; and Briana Kirkland*

20

**CERTIFICATE OF SERVICE**

I certify that on April 30, 2026, a copy of the foregoing was filed with the Clerk of

Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


*/s/ Joseph Sellers*
Joseph M. Sellers

21